FILED
2021 Nov-16  AM 10:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

|  |  |
|---|---|
| JAMES THOMAS, LAQUISHA CHANDLER, KHADIDAH STONE, EVAN MILLIGAN, GREATER BIRMINGHAM MINISTRIES, and the ALABAMA STATE CONFERENCE OF THE NAACP, <br><br> *Plaintiffs*, <br><br> vs. <br><br> JOHN H. MERRILL, in his official capacity as Secretary of State of Alabama, and JIM MCCLENDON and CHRIS PRINGLE, in their official capacities as Co-Chairs of the Alabama Permanent Legislative Committee on Reapportionment, <br><br> *Defendants*. | **COMPLAINT** <br><br> **THREE-JUDGE PANEL REQUESTED** |

1.      The State of Alabama carries a sordid record of using racial discrimination to maintain the political power of its white citizens. While Alabama's elected officials have made important changes over the past fifty years—mostly as a result of court orders or U.S. Department of Justice intervention—Defendants continue to run afoul of the law when it comes to redistricting, even after a three-judge court struck down 12 state legislative districts as unconstitutional racial gerrymanders in the last, 2010, redistricting cycle.

2.      Despite deploying new tricks and tools to justify their actions during redistricting, Defendants cannot conceal their use of race as a predominant factor in drawing many state legislative districts. Those districts are not drawn in a way that is narrowly tailored to comply with

Section 2 of the Voting Rights Act ("VRA") or justified by any other compelling governmental interest.

3.    Considering race in drawing district lines, including as a predominant factor, may be permissible and indeed necessary in many areas of Alabama to ensure compliance with Section 2 of the VRA, but that was not what Defendants carried out in this cycle. Rather, the challenged districts use race as a means to maintain power through the packing and cracking of Black voters in certain districts while paying lip service to non-discriminatory districting obligations by purporting to have ignored race in the initial draft maps and nominally and inconsequentially unpacking Black voters in some districts.

4.    Behind this subterfuge, the challenged districts employ race as a primary tool in determining district lines. They do so without proper regard for what Section 2 actually requires—analyzing whether there is racially polarized voting in different localities and, if so, drawing effective districts for Black voters and other voters of color without unnecessarily diminishing their political influence in neighboring districts. Instead, Alabamians were prevented from participating in a secretive map drawing process, and at the eleventh hour, presented with racially gerrymandered maps.

5.    The Legislature enacted Alabama Senate Districts 7, 11, 12, 18, 19, 20, 21, 23, 24, 25, 26, and 33 (enacted in SB1) (the "Challenged Senate Districts"), and State House Districts 52, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 70, 71, 72, 75, 76, 78, 98, 99, 101, and 103, (enacted in HB2) (the "Challenged House Districts" and together with the Challenged Senate Districts, "the Challenged Districts"), using race as a predominant factor in a manner not narrowly tailored to comply with Section 2 of the VRA or any other compelling governmental interest. As a result,

these districts violate the Fourteenth Amendment of the United States Constitution and must be enjoined.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction to hear this case under 28 U.S.C. §§ 1331, 1343, and 1357 because the matters in controversy arise under the Constitution and laws of the United States, as well as under 42 U.S.C. §§ 1983 and 1988.

7.      The Court has jurisdiction to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

8.      The Court has personal jurisdiction over the Defendants, who are all citizens of Alabama.

9.      A three-judge panel is requested pursuant to 28 U.S.C. § 2284(a), as this action challenges "the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body."

10.      Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this district and because at least one Defendant resides in this district and all Defendants are Alabama residents.

## PARTIES

11.      Plaintiff James Thomas is a registered voter who lives in Mobile, Alabama, in State Senate District 33 and State House District 97. He is and will continue to be irreparably harmed by living and voting in unconstitutionally racially gerrymandered districts.

12.      Plaintiff Laquisha (Que) Chandler is a registered voter who lives in Tuscaloosa, Alabama, in State Senate District 24 and State House District 71. She is and will continue to be irreparably harmed by living and voting in unconstitutionally racially gerrymandered districts.

13.    Plaintiff Khadidah Stone is a registered voter who lives in Montgomery, Alabama, in State Senate District 26. She is and will continue to be irreparably harmed by living and voting in an unconstitutionally racially gerrymandered district.

14.    Plaintiff Evan Milligan is a registered voter who lives in Montgomery, Alabama, in State Senate District 26. He is and will continue to be irreparably harmed by living and voting in an unconstitutionally racially gerrymandered district.

15.    Plaintiff Greater Birmingham Ministries ("GBM") was founded in 1969 in response to the challenges posed by the mid-twentieth century Civil Rights movement and its transformative impact in Birmingham, Alabama, and across the United States. GBM seeks to address urgent human rights and social justice needs in the greater Birmingham area. GBM is a multi-faith, multi-racial, non-profit membership organization that provides emergency services to people in need and engages people to build a strong, supportive, engaged community and a more just society for all people.

16.    GBM is dedicated to advancing social justice through political participation across Alabama. GBM actively opposes state laws, policies, and practices that result in the exclusion of vulnerable groups or individuals from the democratic process. Toward that end, GBM regularly communicates with its members and works to register, educate, and increase voter turnout and efficacy, particularly among Black, Latinx, and low-income people and people with disabilities.

17.    GBM has around 5,000 individual members located primarily throughout the greater Birmingham, Alabama area. GBM also has members in other areas of Alabama including Mobile, Tuscaloosa, Montgomery, and Madison Counties. Many GBM members are Black, Latinx, and/or low-income registered voters and/or voters with disabilities. GBM has members who are registered voters and live in State Senate Districts 12, 18, 19, 20, 23, 24, and 26, and State

House Districts 52, 54, 55, 56, 57, 58, 59, 60, 70, 71, 72, 98, and 99. If not enjoined, these members will be harmed by living and voting in unconstitutionally racially gerrymandered districts.

18.    Plaintiff Alabama State Conference of the N.A.A.C.P. ("Alabama NAACP") is a state subsidiary of the National Association for the Advancement of Colored People, Inc. The Alabama NAACP is the oldest and one of the most significant civil rights organizations in Alabama, and it works to ensure the political, educational, social, and economic equality of African Americans and all other Americans. Two central goals of the Alabama NAACP are to eliminate racial discrimination in the democratic process, and to enforce federal laws and constitutional provisions securing voting rights. Toward those ends, the Alabama NAACP has participated in lawsuits to protect the right to vote, regularly engages in efforts to register and educate African American voters, and encourages African Americans to engage in the political process by turning out to vote on Election Day.

19.    The Alabama NAACP is a membership organization with approximately 5,000 members across the State, approximately 95% of whom identify as Black. It has members who are registered voters and live in each and every one of the challenged districts.

20.    Plaintiffs Thomas, Chandler, Stone, and Milligan will be collectively referred to as the "Individual Plaintiffs." Plaintiffs GBM and Alabama NAACP will be collectively referred to as the "Organizational Plaintiffs."

21.    Defendant John H. Merrill is sued in his official capacity as Alabama Secretary of State. As Secretary of State, Defendant Merrill is the chief elections official in the State of Alabama. He must provide uniform guidance for election activities in the State and certify the elections of members to the Alabama Legislature and Congress. Ala. Code §§ 17-1-3, 17-12-21. Defendant Merrill also has responsibility for certifying the names of primary and general election

candidates for the State Legislature as well as issuing Certificates of Election following tabulation of vote results. Ala. Code §§ 17-13-5(b), 17-9-3(b), 17-12-21.

22.     Defendants Jim McClendon and Chris Pringle are sued in their official capacities as Co-Chairs of the Alabama Permanent Legislative Committee on Reapportionment ("the Committee"). In that capacity, Defendants McClendon and Pringle prepared and developed redistricting plans for the State following the decennial census and presided over the meetings of the Committee. The Committee was tasked with making a "continuous study of the reapportionment problems in Alabama seeking solutions thereto" and reporting its investigations, findings, and recommendations to the Legislature as necessary for the "preparation and formulation" of redistricting plans for the Senate and House districts in the State of Alabama. Ala. Code §§ 29-2-51, 29-2-52. Defendants McClendon and Pringle led the drawing of the challenged districts. They will likely lead efforts to re-draw the districts to remedy their unconstitutionality if the Court orders the State to do so.

## STATEMENT OF FACTS

23.     On November 4, 2021, Governor Kay Ivey signed into law HB 2 and SB 1 of the 2021 Special Session of the Alabama Legislature which, respectively, redistricted the Alabama State House of Representatives districts and State Senate Districts for the next decade. Before turning to these enactments directly, some background is warranted.

### Recent History of State Legislative Redistricting in Alabama

24.     Alabama has "historically had difficulty with reapportionment." *Kelley v. Bennett*, 96 F. Supp. 2d 1301, 1308 (M.D. Ala. 2000), *rev'd on other grounds*, *Sinkfield v. Kelley*, 531 U.S. 28, 29 (2000). Prior to 1960, the Legislature failed to reapportion for 50 years—diluting the votes of residents of rapidly growing counties. As a result, Alabama's entire legislative apportionment

scheme was struck down for violating the principle of One-Person-One-Vote. *Reynolds v. Sims*, 377 U.S. 533, 568 (1964).

25.    Following *Reynolds* and the 1970 Census, the Legislature failed to redistrict and a three-judge federal court was forced to draw new district lines to protect voters' rights under the Fourteenth Amendment. *Sims v. Amos*, 336 F. Supp. 924, 940 (M.D. Ala. 1972).

26.    In the 1980s, the United States Attorney General denied preclearance under Section 5 of the VRA to maps drawn by the Legislature to redistrict State House and Senate seats, finding the maps improperly retrogressive for Black voters, with specific examples cited in Jefferson County and the cities of Tuscaloosa and Mobile. *See* U.S. Dep't of Justice Ltr. to Ala. Attorney General Graddick, May 6, 1982.[1] A three-judge panel allowed the 1982 elections to proceed under an interim plan. *Id*. at 238. The Legislature adopted a new plan in early 1983, which the court accepted. *Burton v. Hobbie*, 561 F. Supp. 1029, 1035 (M.D. Ala. 1983).

27.    In the 1990s, the Legislature again failed to redistrict itself in an expeditious manner. By 1993, several plans were in circulation, but the Legislature had not yet agreed to one. *Kelley v. Bennett*, 96 F. Supp. 2d 1301, 1309 (M.D. Ala. 2000). The State eventually entered a consent decree to resolve a VRA lawsuit filed in state court on behalf of Black voters. *Id*. at 1308. That consent decree imposed a map that created several new majority-Black State House and Senate districts. *Id*.

28.    In the 2000 cycle, for the first time in many decades, the Legislature adopted a state legislative plan, without court assistance, that survived legal challenges.

29.    In the 2010 cycle, the Alabama Legislative Black Caucus and the Alabama Democratic Conference challenged state legislative districts as unconstitutional racial

---

[1] https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/AL-1520.pdf.

gerrymanders. After the district court initially rejected their claims, the Supreme Court of the United States reversed and remanded the case to a three-judge panel to allow plaintiffs to challenge individual districts as racial gerrymanders, rather than the statewide plan. *Ala. Legislative Black Caucus v. Alabama*, 575 U.S. 254, 262 (2015). On remand, the district court found that race was a predominant factor in the drawing of 14 of the 36 challenged districts. The court analyzed those districts under strict scrutiny and held that 12 were unconstitutional racial gerrymanders and enjoined their use in all future elections. *Ala. Legislative Black Caucus v. Alabama*, 231 F. Supp. 3d 1026, 1348–49 (M.D. Ala. 2017). Generally, districts did not survive strict scrutiny where the State offered insufficient evidence that they were narrowly tailored to comply with the Voting Rights Act. Many of the unconstitutional districts instead had Black population shares far higher than necessary to enable Black voters to elect their candidates of choice. *Id*.

30.    The Legislature adopted remedial plans that were signed into law by the Governor in May 2017 and were approved by the court for use in the 2018 and 2020 elections.

## Redistricting Criteria

31.    The Alabama Constitution requires the redrawing of State House of Representatives and Senate districts every decade based on the results of the decennial census. Ala. Const. Art. IX, §§ 198–200.

32.    The Alabama Constitution sets the number of districts and requires that districts are contiguous and do not cross county lines except where otherwise necessary to comply with federal legal requirements. Ala. Const. Art. IX, §§ 198-200; *see also Reynolds v. Sims*, 377 U.S. 533 (1964). Where the whole-county proviso "can be applied without bringing about a conflict with federal constitutional requirements, the proviso remains operative." *Sims v. Baggett*, 247 F. Supp. 96, 101 (1965).

33.    The specific requirement regarding county splits is important given the significant role counties play in the Alabama State Legislature. Alabama counties lack any direct grant of home rule power, meaning that they must work through the Legislature to enact many local laws and set many local policies. In practice, the legislative delegations from each county plays the primary role in the enactment of legislation for their respective counties, with other legislators generally deferring to the delegation's position on local laws and local issues.

34.    On May 5, 2021, the Committee enacted guidelines for the current redistricting cycle. The guidelines represent that they are based on requirements under the U.S. Constitution, Alabama Constitution, and policies that "are embedded in the political values, traditions, customs, and usages of the State of Alabama."

35.    The criteria for redistricting set by the Committee begin with requirements under the U.S. Constitution and federal law, including compliance with the one-person, one-vote requirement. The Committee instructed that legislative districts must be drawn to achieve "substantial equality of population," not exceeding an overall deviation range of plus or minus 5%, and must comply with Section 2 of the VRA, meaning that districts have "neither the purpose nor the effect of diluting minority voting strength." The Committee further stated that districts cannot be drawn "in a manner that subordinates race-neutral districting criteria to considerations of race, color, or membership in a language minority group, except that race, color, or membership in a language-minority group may predominate over race-neutral districting criteria to comply with Section 2 of the Voting Rights Act, provided there is a strong basis in evidence in support of such a race-based choice." Notably, this last criterion does not call for the Legislature to use race for Section 2 compliance in a narrowly tailored manner.

36.    Each district must also be "contiguous and reasonably compact," under the criteria.

37.     The criteria next require compliance with the Alabama Constitution, including that:

   a.   Districts are "drawn to reflect the democratic will of all the people concerning how their governments should be restructured;"

   b.   Districts are drawn based on total population except that voting-age population may be considered to comply with Section 2 of the VRA and other laws;

   c.   The number of Senate districts is set at 35 and House districts at 105;

   d.   All districts must be single-member districts; and

   e.   All districts must be contiguous with each other.

38.     The criteria next require compliance with redistricting policies that are "embedded in the political values, traditions, customs, and usages of the State of Alabama . . . to the extent that they do not violate or subordinate the foregoing policies prescribed by the Constitution and laws of the United States and of the State of Alabama," including:

   a.   Avoiding contests between incumbents where possible;

   b.   Permitting contiguity by water but not point-to-point or long-lasso contiguity;

   c.   Respect for "communities of interest, neighborhoods, and political subdivisions to the extent practicable," with a community of interest "defined as an area with recognized similarities of interests, including but not limited to ethnic, racial, economic, tribal, social, geographic, or historical identities;"

   d.   Minimization of the number of counties in each district; and

   e.   Preservation of the cores of existing districts.

39.     The Committee did not provide an order of importance for each of the criteria, except that "equality of population among districts and compliance with the Voting Rights Act of 1965" take priority when they conflict with other criteria.

### The 2021 Legislative Process for Redistricting

40.      On August 12, 2021, the U.S. Census Bureau released the results of the 2020 Census. Alabama's population grew by 5.1% between 2010 and 2020. Alabama's current

10

population identifies as 63.1% non-Hispanic white, 26.9% as any part Black, 5.3% as Hispanic or Latino, 2.3% as any part American Indian/Alaska Native, and 2% as any part Asian. Communities of color drove this population growth. The Black population grew by 3.5%, the Hispanic/Latino population grew by 42.3%, and the Asian-American population grew by 43.4%, while the white population shrunk by 1%. The population identifying as solely Native American shrank as well, while the proportion of Alabamians identifying as multi-racial tripled.

41.    Once census data was released, the Committee, under the leadership of Defendants McClendon and Pringle, began to develop redistricting plans for State Senate and State House of Representatives districts. *See* Ala. Code § 29-2-50(2).

42.    The Committee consists of members of both the State House and Senate, with the Speaker of the House appointing one House member from each of the seven congressional districts and four additional House members and the Lieutenant Governor appointing one Senator from each of the seven congressional districts and four additional Senators. *See* Ala. Code § 29-2-51(c). The 2021 Committee includes 21 members—15 of whom are white and six of whom are Black.[2]

43.    All Committee meetings must be open to the public, and the Committee must provide a "[r]easonable opportunity" for members of the public to give comments and input regarding redistricting.

---

[2] Ala. Legis., *Permanent Legislative Committee on Reapportionment*, http://www.legislature.state.al.us/aliswww/ISD/JointIntCommResults.aspx?OID_COMM=1300 &COMMITTEE=PERMANENT%20LEGISLATIVE%20COMMITTEE%20ON%20REAPPO RTIONMENT (last visited Nov. 13, 2021). An additional Republican committee member left the Legislature in July 2021. *See* Eddie Burkhalter, *Governor appoints Rep. Bill Poole as state finance director*, Ala. Pol. Rep. (July 16, 2021), https://www.alreporter.com/2021/07/16/governor-appoints-rep-bill-poole-as-state-finance-director/.

44.     Between September 1 and 16, 2021, well before the Committee released any draft maps or proposals, the Legislative Reapportionment Office held 28 public hearings across the State. All but one hearing—held at 6:00 pm at the Statehouse in Montgomery—were held between the normal workday hours of 9:00 a.m. to 5:00 p.m.

45.     Although Committee Co-Chair Sen. Jim McClendon said that the public hearings served "to try to give the opportunity for any citizen to have input into the process," before the public hearings even began, he told the press that the new maps would not cause "any surprises for the candidates or for the voters,"[3] suggesting that the contours of the maps had already been decided and that the public input process was, at best, a formality rather than a meaningful opportunity for public input.

46.     On October 19, 2021, Plaintiffs Alabama NAACP and Greater Birmingham Ministries, along with other advocacy organizations, sent a letter to the Committee reminding them of their obligations under Section 2 and the Constitution, highlighting the Committee's obligation to conduct a racial-polarization analysis, and sharing that based on the organizations' own racial-polarization analyses, voting continues to be highly polarized but that districts packed with high Black voting age populations are not necessary for Black voters to have an influence in elections.[4]

47.     Governor Ivey called a Special Legislative Session on redistricting in Alabama to begin on October 28, 2021.

48.     On October 26, 2021, the Committee held its first public meeting of this redistricting cycle. The maps proposed by the Committee were not available to the public until the

---

[3] Mike Cason, *Alabama lawmakers begin task of drawing new political districts*, AL.com (Aug. 31, 2021), https://www.al.com/news/2021/08/alabama-lawmakers-begin-task-of-drawing-new-political-districts.html.

[4] October 19, 2021 Letter to Committee, https://www.naacpldf.org/wp-content/uploads/Letter-to-AL-Reapportionment-Committee-20211019-1-1.pdf (last visited Nov. 13, 2021).

day before—October 25, 2021— long after the last of the public redistricting hearings. A member of the Committee, Rep. Chris England, published the proposed maps on Twitter.[5] Upon information and belief, the Committee itself did not release the maps to the public until the day of the Committee meeting and many Committee members did not see the full proposed maps beyond their own districts and those surrounding until the day before the meeting. Beyond the Committee, the Committee Co-Chairs and their staff met with each incumbent legislator or their staff in person or online and individual legislators only viewed and provided feedback on draft maps of their districts, not maps of the entire state.

49.     The Co-Chairs asserted that the Committee's lawyer, Dorman Walker, reviewed the maps and determined that they all complied with Section 2 and the Fourteenth Amendment to the U.S. Constitution, but did not explain what analysis had been undertaken to reach that conclusion. Mr. Walker has been the Committee's lawyer for 25 years, including when a federal court held that 12 districts were unconstitutional racial gerrymanders. Sen. McClendon explained that Mr. Walker told him that racial-polarization analysis was only done—by an unnamed consultant in Georgia—for certain state legislative districts where "it looked like there might possibly be a racial issue," rather than analyzing every district. Sen. McClendon did not elaborate on any criteria used to determine which of the districts were sufficiently "questionable" to require racial-polarization analysis. No such analysis was provided to Committee members before or during the meeting. Committee members only received demographic and population data for each district, and neither Mr. Walker nor the Georgia consultant attended the Committee meeting.

---

[5] Chris England (@RepEngland70), Twitter (Oct. 25, 2021, 12:30 p.m.), https://twitter.com/RepEngland70/status/1452674045804167169.

50.     Rep. Laura Hall moved to postpone any vote on the proposed maps until the Committee members and the public had time to review the maps and accompanying racial-polarization analysis. That motion failed along racial lines.

51.     It is illustrative that no racial-polarization analysis was conducted for Congressional District 7—the single majority-minority congressional district in the state. Defendant Pringle told the Committee that Mr. Walker said that such analysis was unnecessary because the district has a Black voting age population ("BVAP") of around 54%, but did not explain the significance of that number, and when Rep. England asked Sen. McClendon to explain the relationship between a BVAP of 54% and the actual or potential results of a racial-polarization study, Defendant McClendon replied, "I got no clue."

52.     Some Committee members expressed concern that the maps applied the whole-county proviso selectively, along racial lines, creating an extreme number of county splits in majority-minority Jefferson County and in Tuscaloosa County, which is now approximately 40% people of color. Rep. England suggested that larger metropolitan areas—where the largest number of Black Alabamians and Alabamians of color reside—were being divided to dilute the voices of the residents of those counties. He made the point that House District 72, for example, reaches from Bibb County through Hale and Greene Counties, and then not just into Tuscaloosa County, but well into the predominantly Black west side of the city of Tuscaloosa. Those Black residents would be represented by a member who lives an hour and a half away, unlike the predominantly white districts around Tuscaloosa.

53.     "I don't think that's by accident," Rep. England said. The map "carved up the city of Tuscaloosa to the point where it's very difficult to say" that people who live inside the city limits have as much influence as people that live outside them. Rep. England explained that it

appeared that in areas with significant percentages of people of color, "you dove into cities just to capture [ ] the Black population and to pack them into districts . . . to make sure that their influence[ ] does not spread outside to potentially impact an election . . . ." He then requested racial-polarization studies for the House districts around Tuscaloosa and to see the results of the studies done on any other districts in the State. Upon information and belief, these studies still have not been released.

54.     In the end, the House and Senate maps were passed out of Committee along racial lines, with all 15 white members voting in favor and all 6 Black members opposed.

55.     On October 28, 2021, the Alabama House of Representatives and the Senate convened in a special session dedicated to redistricting.

56.     The Senate first took up the State Senate and Board of Education maps while the House considered the State House and congressional maps.

57.     On October 29, the Senate General Fund and Appropriations Committee reviewed the State Senate map.

58.     Defendant McClendon specified that the Senate map had a maximum deviation of plus or minus 5%. Although the map drawers "tr[ied] to respect counties," the map contained 19 county splits.

59.     Senator Singleton asked Sen. McClendon why seven senators represented a single county—Jefferson County. Defendant McClendon replied that "that's more of the rule than the exception," particularly in high population areas. Senator McClendon explained that the map drawers made these splits to obtain "the necessary votes to get this bill passed." Sen. McClendon did not disagree when Sen. Singleton clarified that the county splits were not "about whether or not we legally need to do this or not," but more about getting enough votes.

60.     After less than five minutes consideration, the Committee gave the State Senate map a favorable report.

61.     The House State Government Committee reviewed the State House and congressional maps at the same time. Multiple times throughout the Committee meeting, Rep. Pringle noted that he had not seen full plans from outside groups, including the Alabama NAACP and Greater Birmingham Ministries. Defendant Pringle stated that he was "running analysis" on maps from outside groups but did not specify when that analysis would be complete.

62.     Rep. Grimsley inquired whether the map split up precincts. Although Rep. Pringle stated that he did not draw Rep. Grimsley's district "along racial lines," Rep. Grimsley equated the precincts included with racial lines. When Rep. Grimsley asked Rep. Pringle to fix the issue of splitting precincts across racial lines, Rep. Pringle moved on to another questioner.

63.     Defendant Pringle also asserted that when the maps were drawn, "they were race neutral." "There was no race up on the screen." "Race was not in the equation." Yet he also responded to a question from a voter about packing and cracking the Black community by explaining the Committee's obligation under the VRA to ensure that they neither "intentionally or unintentionally diminish the ability of a protected class of minority citizens from electing or defeating the candidate of their choosing." Rep. Pringle also noted a difference between political and racial gerrymandering, which he considered "a totally different subject," and when the voter replied that he did not see the difference between parties and race in this context, Rep. Pringle told the voter that "[t]his is like peeling an onion" and that his time for questioning had expired.

64.     Rep. Hollis asked Rep. Pringle to explain how the State Government Committee took up the bill after the Reapportionment Committee voted it out the previous day. Specifically,

Rep. Hollis explained that "a lot of people in the public" would not know how to access the maps, which were only put online a day before.

65.    Evan Milligan asked Defendant Pringle whether the Reapportionment Committee conducted racial polarization studies on any of the maps. Rep. Pringle replied that such studies were conducted on "some of the districts that we were concerned about," but that they "were still working on it." Mr. Milligan asked Rep. Pringle for a timeline of these analyses. Again, Rep. Pringle offered no detail. "We're working on it," he said. Mr. Milligan suggested that the Committee lacked the necessary data to determine whether either State Legislative map violated federal law. Defendant Pringle did not reply.

66.    Without having any public racial polarization analyses, the Committee gave the State House map a favorable report.

67.    On November 1, the full Senate considered the State Senate map. Throughout the floor debate, Defendant McClendon emphasized that a primary concern in drawing the maps was whether the Senate would pass them. He maintained the importance of drawing a passable map even when another senator suggested that the Supreme Court might hold that the maps are unconstitutional.

68.    Sen. Smitherman told Sen. McClendon that he had not received a copy of the proposed Senate map, or even a map of his district. He asked that everyone be given copies of the map so they "can understand just what [they're] voting for." He specifically requested a map with street- or precinct-level data as opposed to a map of counties with only the senators' names on them.

69.    Sen. Smitherman again questioned why Jefferson County has seven senators when, population-wise, it should only have 4.7. He noted that the Senate map did not reduce the number

of splits in Jefferson County even though the map reduced the number of splits in multiple other counties. Sen. Singleton echoed the concern over "unnecessary splits" in Jefferson County. The Senate nonetheless passed the State Senate map.

70.    Meanwhile, the full House of Representatives debated the State House map.

71.    Rep. Mary Moore discussed how Jefferson County in a manner that split communities of interest. As a result, voters in some districts have "little, if anything, in common." Rep. England asked Rep. Pringle what the primary objective he had in drawing the maps. "To comply with the Committee Guidelines," Rep. Pringle replied. Rep. England asked Rep. Pringle, "when it matters the most, constitutional principles override political ones. Would you say that's correct?" Rep. Pringle responded that he is "not an attorney" so he could not answer the question.

72.    The House adopted a substitute State House map sponsored by Defendant Pringle, which made very minor changes to the original map. The House passed the State House map, as substituted, 68-35.

73.    The next day, the House State Government Committee considered the State Senate map already passed by the Senate.

74.    Multiple voters raised that the Reapportionment Committee had not conducted sufficient racial-polarization analyses, did not draw enough majority-minority districts, and split up communities of interest.

75.    One voter criticized the public-hearing process. She noted that 27 out of 28 public hearings were held during work hours. "Many hearings were closed within minutes of starting." The last hearing, for example, lasted only four minutes and 40 seconds. It closed while people were still typing out their questions.

76.     Regardless, the State Government Committee gave the Senate bill a favorable report.

77.     The full Senate considered the State House map the next day. Defendant McClendon presented the map to the Senate. He claimed that racial data "was removed from the screen" when the districts were initially drawn with "race blindness" in mind, but did not address how race was ultimately considered for VRA-compliance or otherwise before being finalized. Sen. Singleton highlighted that Rep. Pringle made changes to the map after the Reapportionment Committee approved it. He found it "pretty disturbing" that Rep. Pringle made the changes without consulting the Committee and that Sen. McClendon could not explain what the changes were.

78.     Sen. McClendon requested that the Senate not "get involved" in the House's business. He added that the Senate previously has voted on maps and proposals "with not a lot of detail" and that "nobody has seen before, except maybe one person or two people."

79.     The Senate carried over debate on the State House map until November 3. After approving the congressional map, the Senate approved the House map by a vote of 25-7.

80.     Meanwhile, the full House of Representatives approved the State Senate map 76-26-1 with essentially no debate.

81.     Governor Ivey signed the State House and Senate maps into law on November 4, 2021.

### State Senate Districts 7, 11, 12, 18–21, 24–26, and 33 are Racially Gerrymandered

82.     The Challenged Senate Districts, which are clustered in and around the State's largest cities and largest concentrations of Black voters, reflect the use of race as a predominant redistricting factor, packing voters in a manner not justified by the VRA or cracking communities to prevent voters of color from electing candidates of choice.

19

State Senate District 7

83.    Race was the predominant factor in drawing State Senate District 7 in the Huntsville/Madison County area, but it was not employed in a narrowly tailored manner to advance compliance with Section 2 of the VRA or any other compelling governmental interest. District 7 begins in the Northwest portion of Madison County along the Tennessee border to the north and Limestone County to the west, and then becomes much narrower, snaking south to capture some of the center of the city of Huntsville, splitting the City of Huntsville and the Black community there into three parts, and then running east all the way to the border of Jackson County.

84.    Other indicators further establish race as the predominant factor in drawing Senate District 7. For one, the district is among the least compact in the Senate, consistent with its highly irregular shape. Moreover, by cutting through the Black community and splitting communities of interest and then taking a sharp eastern turn to capture heavily white communities rather than more racially diverse communities in Huntsville, the lines themselves indicate that race is the reason for the unusual shape of District 7 above and beyond any other factors.

85.    The figure below reveals how District 7 surgically carves out some but not all of the Black population of central and north Huntsville, splitting the other parts of those communities into Districts 2 and 8.[6]

---

[6] In this and other figures, district lines appear in yellow, county lines in red, and municipalities in dotted lines. Green shading indicates the concentration of the Black voting age population, with darker areas indicating a higher BVAP percentage. District numbers appear in black boxes, with the number below the district number showing BVAP for that district.



86.     No compelling governmental interest, including compliance with Section 2 of the VRA, justifies the use of race to crack Black voters among three districts and impair such voters from having a meaningful chance at electing candidates of choice. Indeed, District 7 appears to violate the principles the Committee bound itself to by splitting a community of interest in the center of Huntsville. Had the Committee followed its own districting principles and prioritized race only in a narrowly tailored manner to consider VRA compliance, Black voters could form an effective plurality, if not majority, in Huntsville. Yet the irregular lines drawn for District 7 appear designed to prevent that very possibility.

State Senate Districts 25 and 26:

87.     Race was the predominant factor in drawing both State Senate Districts 25 and 26, and it was not employed in a narrowly tailored manner to advance compliance with Section 2 of the VRA or any other compelling governmental interest.

88.     District 25 stretches from the northern edge of Elmore County down to the southern edge of Crenshaw County. Instead of following the county line, District 25 splits away from the southwest border of Elmore County, leaving the remaining portion of the County in another district. Along its path, it picks up the eastern and southern parts of Montgomery County. Its shape becomes irregular in Montgomery, where a pronounced divot reaches in to capture white communities on the east side of the City of Montgomery; it becomes increasingly narrow as the district moves south through the city, then juts under District 26 before continuing south into Crenshaw. All but a few of its precincts are majority white and it has a BVAP of 29%. District 25 is one of the least compact in the State.

89.     District 26 includes much of the City of Montgomery except the portion that District 25 has carved out on the east side. District 26 has a BVAP of 66.1% and contains all but two of the City's precincts made up of majority of Black residents.

90.     The figures below reveal how these districts work together to pack Black voters into District 26 and draw white voters into neighboring District 25. The first figure shows a broader view of the region; the second figure shows a closer view of the central juncture between Districts 25 and 26.





91.     No compelling governmental interest, including compliance with Section 2 of the

VRA, justifies the use of race to pack Black voters into one district and white voters into another,

thereby diluting the voting power of Black voters in the Montgomery area. An effectiveness

analysis—an examination that identifies whether and to what degree voting is racially polarized and analyzes based on votes for Black-preferred candidates and turnout percentages across elections what percentage BVAP is required for Black voters to usually elect candidates of choice in that region—shows that District 26 is drawn with a BVAP that is more than 15% higher than necessary for Black voters to elect their candidates of choice.

<u>State Senate District 33</u>

92.     Race was the predominant factor in drawing State Senate District 33, and it was not employed in a narrowly tailored manner to advance compliance with Section 2 of the VRA or any other compelling governmental interest.

93.     Butterfly-shaped District 33 straddles the boundary line between Mobile and Baldwin Counties. The district lines are drawn to pull in nearly every majority-Black precinct in Mobile as well as the majority-Black City of Prichard. The figure below reveals how district lines in Mobile County pack Black voters into District 33.



94.     No compelling governmental interest, including compliance with Section 2 of the VRA, justifies the use of race to pack Black voters into one district thereby diluting the voting power of Black voters in the Mobile area. An effectiveness analysis based on racially polarized voting and turnout statistics in the Mobile area shows that District 33 is drawn with a BVAP which is well over 10% higher than necessary for Black voters to elect their candidates of choice.

State Senate Districts 11 and 12

95.     Race was the predominant factor in drawing both State Senate Districts 11 and 12, and it was not employed in a narrowly tailored manner to advance compliance with Section 2 of the VRA or any other compelling governmental interest. Instead, these districts were drawn to crack Black voters across districts and prevent them from exercising greater political power in a more compact district that respects communities of interest.

96.     District 11 splits three counties. It begins by bisecting St. Clair County, encompassing the southwest portion from Springville to Pell City, before jumping the line into Talladega County. After pulling in the City of Talladega, the district narrows and swings to the southwest, picking up predominantly Black communities on the western half of Talladega County. It eventually breaks into Shelby County and continues until it can reach the Black communities in and around the City of Calera.

97.     District 12 splits Talladega County in half, spanning its entire length. As it snakes north along the eastern edge, it splits communities throughout the county with the effect, and for the apparent purpose of, including areas within which white voters predominate. Once it reaches the northern line, the district opens up to encompass all of Calhoun County, including Black communities in the Anniston-Oxford metropolitan area.

98.     Districts 11 and 12 are among the least compact Senate Districts in the State.

99.    The figure below reveals how these districts combine to split Talladega County down the middle, using bizarre shapes and jumping across county lines to crack Black communities.



100.    No compelling governmental interest, including compliance with Section 2 of the VRA, justifies the use of race to draw district lines that divide Black communities throughout an entire county to prevent a greater showing of political power. Had the Committee followed its own districting principles, it could have, for example, kept Talladega County intact and included the city of Anniston in Calhoun County, which would have provided more influence to Black voters in that district. Yet the irregular lines drawn for Districts 11 and 12 appear designed to prevent that very possibility.

State Senate Districts 21 and 24

101.    Race was the predominant factor in drawing State Senate Districts 21 and 24, and it was not employed in a narrowly tailored manner to advance compliance with Section 2 of the VRA or any other compelling governmental interest. District 21 begins on the western state border in Pickens County, narrows to bisect the center of the city of Tuscaloosa, and then widens again in the more rural, eastern portions of Tuscaloosa County. Along the way, Senate District 21 is expressly crafted to include precincts with predominantly white residents, while excluding the precincts with a majority of Black residents in the city, which are then placed in District 24. District 24 begins further south in Choctaw County, and despite working its way up to Tuscaloosa through several majority-Black counties, reaches into Tuscaloosa to include many of the precincts with the highest percentage of Black residents in the County and city.

102.    The figure below reveals how District 24 is drawn so as to surgically include nearly all of the Black population of Tuscaloosa while leaving behind the majority-white precincts for District 21. Meanwhile, District 21 dips south and east out of Tuscaloosa to embrace majority-white communities.



103.    Other indicators show establish race was the predominant factor in drawing Senate Districts 21 and 24. District 21 is among the least compact in the Senate as well. District 21 would be more compact if it included precincts in the city of Tuscaloosa with higher concentrations of Black residents in exchange for the precincts in the southeast corner of Tuscaloosa County with higher concentrations of white residents. These precincts are also of nearly identical populations, demonstrating that equal population constraints combined with attempts to minimize precinct splits do not explain these choices. Moreover, despite the area around the University of Alabama is more Democratic, but it is also majority-white and it was included in majority-white District 21.

104.    Based on its population, Tuscaloosa County is entitled to 1.58 Senate districts— ideally, one district entirely within the county and another that spills into another county. But instead, Tuscaloosa County has three Senate districts, all of which split into other counties, further emphasizing the lack of regular districting principles at play in creating these districts.

105.    No compelling governmental interest, including compliance with Section 2 of the VRA, justifies the use of race to pack Black voters into District 24 and prevent Black voters from increasing their influence in District 21. District 24 instead has a BVAP of 57%, approximately 10 percentage points higher than necessary for Black voters to elect candidates of choice. This targeted grouping of Black voters from a large swath of the state into one district is not narrowly tailored to comply with the VRA.

State Senate Districts 18, 19, 20

106.    Race was the predominant factor in drawing State Senate Districts 18, 19, and 20 in the Birmingham area, but it was not employed in a narrowly tailored manner to advance compliance with Section 2 of the VRA or any other compelling governmental interest.

107.    District 20 has a BVAP of 63.8%, District 19 a BVAP of 65.7%, and District 18 a BVAP of 53.8%. These districts all capture the center, majority-Black core of Jefferson County and include all the majority-Black precincts in Jefferson County. All of the precincts in the four other districts in Jefferson County are majority-white and all four of those districts take in portions of other counties.

108.    District 20 has only 2 majority-white precincts. District 19 is carefully drawn to avoid overwhelmingly white Vestavia Hills and Cahaba Heights. District 18 takes in all of the rest of the majority-BVAP precincts in Jefferson County.

109.    While some differences in racial composition between districts are expected due to segregated housing patterns, residential demographic differences cannot account for the stark racial disparities between the challenged Senate districts in Jefferson County and the other Senate districts in the county. Districts 18, 19, and 20 were designed to pack almost all of Jefferson County's Black precincts into three districts and so as to allow the creation of districts comprised of overwhelmingly white voters on the perimeters of the county which then necessarily need to cross county lines to include sufficient population. In turn, these majority-white districts pull in heavily white parts of neighboring counties. Given Alabama's lack of home rule, the effect of these district lines is that Jefferson County's State Senate delegation will likely be majority white, diluting the voice of Black voters and other voters of color in Jefferson County's local affairs, even though the county as a whole is majority minority.

110.    Jefferson County's ideal number of Senate districts based on its population is 4.7, a number that could be achieved with four districts lying entirely within the county and another that takes in part of another county. Drawn that way, it would be almost impossible to avoid having three out of five of the county's delegation elected from majority-minority districts. But instead, Jefferson has seven Senate districts, four of which are split across county lines, further emphasizing the departure from the Committee's declared districting principles in Jefferson County.

111.    The figure below reveals how the three challenged districts draw in all of the Black population centers of the county, leaving the edges for majority-white precincts and allowing those other districts to cross county lines.



112.    No compelling governmental interest, including compliance with Section 2 of the VRA, justifies the use of race to pack Black voters into District 18, 19, and 20. These districts are drawn at levels approximately 10-20% higher than necessary for Black voters to elect candidates

of choice. This deliberate grouping of Black voters into the challenged districts in this proportion is not narrowly tailored to comply with the VRA.

### State House Districts 52, 54–63, 70–72, 75, 76, 78, 98, 99, 101, and 103 are Racially Gerrymandered

State House Districts 75, 76, and 78:

113.    Race was the predominant factor in drawing State House Districts 75, 76, and 78, and it was not employed in a narrowly tailored manner to advance compliance with Section 2 of the VRA or any other compelling governmental interest. District 75 has a BVAP of 24.1% and begins in Elmore County, splitting the county line and running south to pick up white precincts in eastern Montgomery County.  Every precinct in District 75 has a white VAP majority, although thirty precincts in Montgomery and Elmore Counties have a majority BVAP.

114.    District 76, reminiscent of a person flexing their biceps, runs from the southern border of Montgomery County into the city itself. It has a BVAP of 67.9%, and only one precinct within its borders has a white majority. Yet all of the precincts bordering it on the south and east having white majorities.

115.    District 78 looks like a dinosaur. It begins its lengthy trek along the Alabama River on the border with Lowndes County, following the river until it gets east of the city of Montgomery, where it drops down to pick up Black precincts. It has a BVAP of 61.1%, and white voters form a majority in only a few of its precincts even though it is surrounded on three sides by majority-white VAP precincts with only one exception. It is one of the least compact districts in the State.

116.    The figure below reveals how District 75 surgically carves out nearly all of the white population of Montgomery County while leaving behind Black voters to be places in Districts 76 and 78 to the east and west, both of which therefore have unnecessarily high BVAPs.

31



117.    District 75 could become more compact by including more precincts with higher BVAP in the northern portion of the city of Montgomery instead of going south to include more precincts with higher white VAP. The districts around Montgomery could be easily shifted to avoid the need for one district to snake around the city. The use of race patently explains the shape of these three districts.

118.    No compelling governmental interest, including compliance with Section 2 of the VRA, justifies the use of race to pack Black voters into Districts 76 and 78 while creating an overwhelmingly white District 75. Districts 76 and 78 pack Black voters with BVAPs approximately 12-18% higher than necessary to elect candidates of choice. And because District 75 has a significant white majority, the VRA cannot justify its predominant use of race. Instead, these districts appear drawn to prevent Black voters from exercising political power in an additional Montgomery-area district.

State House Districts 98, 99, 101, and 103

119.    Race was the predominant factor in drawing State House Districts 98, 99, 101, and 103, and it was not employed in a narrowly tailored manner to advance compliance with Section 2 of the VRA or any other compelling governmental interest.

120.    Districts 99—which looks like a chef petting a cat and has a BVAP of 58.4%—and District 101—which becomes so narrow in its middle that it almost becomes non-contiguous and has a 21.3% BVAP—both start on the western county line and meander towards the city, but with one key difference: District 101 systematically includes neighborhoods with predominantly white populations, while District 99 is drawn to include precincts with predominantly Black residents. On the other side of District 101, District 103 similarly includes precincts with predominantly Black residents and has a BVAP of 57.7%. District 98, with a BVAP of 54.21%, begins in the heart of the City of Mobile, grabbing majority-Black VAP precincts, before stretching to the northern border of Mobile County and including three majority-white precincts to meet its population requirements.

121.    The image below reveals how District 101 pulls in all of the whitest precincts of western Mobile leaving behind the majority-Black precincts which are then assigned to Districts 99 and 103, while District 98 eats up the rest of the core of predominantly Black northern Mobile.



122.    Districts 98, 99, 101, and 103 are quite non-compact. District 101 could be made significantly more compact by swapping Black precincts for white precincts in western Mobile. The district lines also repeatedly cross over the Mobile city border, demonstrating no respect for municipal boundaries or the Committee other avowed redistricting principles.

123.    No compelling governmental interest, including compliance with Section 2 of the VRA, justifies the use of race to pack Black voters into Districts 98, 99, and 103 and prevent those voters from any chance at electing candidates of choice in District 101. Districts 98, 99, and 103 have BVAPs of 8-10% higher than necessary to allow Black voters to elect candidates of choice. By packing Black voters into Districts 98, 99, and 103, this map attempts to diminish the political power of Black voters in neighboring District 101.

Districts 52, 54, 55, 56, 57, 58, 59, 60

124.    Race was the predominant factor in drawing State House Districts 52 and 54–60, and it was not employed in a narrowly tailored manner to advance compliance with Section 2 of the VRA or any other compelling governmental interest.

125.    All eight of these districts are located within Jefferson County and all have BVAP percentages above 55%, ranging from 55.5% up to 70.3%. Specifically, District 52 has a 65.9% BVAP, District 54 has a 55.5% BVAP, District 55 has a 60.7% BVAP, District 56 has a 58.5% BVAP, District 57 has a 57.6% BVAP, District 58 has a 65.2% BVAP, District 59 has a 70.3% BVAP, and District 60 has a 65.5% BVAP. A number of these districts have low compactness scores, especially Districts 52, 54, 55, 57, and 59.

126.    These districts all stretch along the center, majority-Black core of Jefferson County by aligning on the same diagonal as the county's Black population and avoiding any population beyond the center core of the County. These eight districts capture all of the majority-Black precincts in Jefferson County except one, despite the existence of nine other House districts in whole or in part within Jefferson County. Five of those nine other districts in Jefferson County besides the challenged districts include portions of other counties.

127.    While some differences in racial composition between the districts are to be expected due to segregated housing patterns, residential demographic differences alone cannot account for the stark racial disparities between the challenged House districts in Jefferson County and the other districts in the county. Rather, Districts 52 and 54–60 were designed to pack almost all of Jefferson County's districts into these eight districts and thereby result in the creation of overwhelmingly white districts on the perimeters of the county which then necessarily cross county lines. In turn, these white districts are drawn to include heavily white parts of neighboring counties and dilute the voice of Black voters and other voters of color in majority-minority Jefferson County's local affairs.

128.    Moreover, Jefferson County's ideal number of House districts is 14.1 based on its population—potentially achieved by drawing fourteen districts entirely within the county and

another that spills into another county. But instead, Jefferson has seventeen House districts in the County, five of which cross county lines, further emphasizing the departure from the Committee's own districting principles at play for these districts. Given Alabama's lack of home rule, the effect of these district lines is that Jefferson County's State House delegation will likely be majority white, diluting the voice of Black voters and other voters of color in Jefferson County's local affairs, even though the county as a whole is majority minority. This practice disproportionately empowers the state's white, rural population at the expense of people of color living in urban areas.

129.    The figure below reveals how these eight districts draw in all of the Black population centers of the county, leaving the edges of the county, which are majority-white, for majority-white districts and allowing those other districts to cross county lines.



130.    No compelling governmental interest, including compliance with Section 2 of the VRA, justifies the use of race to pack Black voters into House Districts 52 and 54–60. These

districts are drawn at levels approximately 10-25% higher than necessary for Black voters to elect candidates of choice. This haphazard lumping of Black Alabamians into the challenged districts is not narrowly tailored to comply with the VRA.

House Districts 61, 62, 63, 70, 71, 72

131.     Race was the predominant factor in drawing State House Districts 61–63 and 70–72, and it was not employed in a narrowly tailored manner to advance compliance with Section 2 of the VRA or any other compelling governmental interest.

132.     These six districts all exist in whole or in part in Tuscaloosa County. Districts 63 and 70 exist mostly within the City of Tuscaloosa, with the former including the mostly white parts of the city and the latter including almost all majority-Black or majority-minority precincts.

133.     District 71 has a highly irregular, dragon-like shape. It pulls in part of Marengo County. It runs along the Mississippi border to include all of 74%-Black Sumter County, then moves into Calhoun County and includes precincts with predominantly Black populations there. Finally, it turns east to include a few precincts with majority-white populations to get to Tuscaloosa County, where it also includes precincts with majority-Black populations on the west side of Tuscaloosa. District 61 runs parallel to District 71 on its northern edge, starting at the Mississippi border in Calhoun County, taking in a few majority-BVAP precincts near the state border, and then grabbing heavily white VAP areas of Calhoun County and northern Tuscaloosa County.

134.     Districts 62 and 72 share the southern portion of Tuscaloosa County, but are divided in ways that were plainly based on racial considerations. District 62 includes the southeastern portion of Tuscaloosa County and consists entirely of majority-white precincts except for one as it enters Holt and the City of Tuscaloosa on its eastern edge. District 72 consists of all of Greene and Hale Counties in the western Black Belt—at 80.5% and 56.6% BVAP, respectively—jutting

out on its east side to encompass the parts of Bibb County that have the highest BVAP, and on its northwest side, turning northeast into Tuscaloosa County to reach toward the City of Tuscaloosa and include more majority BVAP precincts.

135.    Districts 70, 71, and 72 unnecessarily pack Black Alabamians including by pulling in areas with predominantly Black populations in Tuscaloosa in unnecessary ways. District 70 has a BVAP of 54.3%, District 71 has a BVAP of 55.1%, and District 72 has a BVAP of 56.4%. Meanwhile, Districts 61, 62, and 63 are drawn to agglomerate the whiter parts of Tuscaloosa. District 61 has a BVAP of 18.5%, District 62 has a BVAP of 21.7%, and District 63 has a BVAP of 16.7%. Districts 61, 71, and 72 all create county splits, and Districts 62 and 71 are extremely non-compact.

136.    Tuscaloosa County's ideal number of House districts based on its population in 4.74—which could be achieved by drawing four districts entirely within the county and another that spills into another county. Instead, Tuscaloosa has seven House districts in the County, four of which cross into other counties, further emphasizing the departure from the Committee's own districting principles at play for these districts.

137.    The figure below reveals the significant extent to which these six districts' borders are determined primarily by racial demographics, particularly within Tuscaloosa County.



138.    No compelling governmental interest, including compliance with Section 2 of the VRA, justifies the use of race to pack Black voters into House Districts 70–72 and white voters into Districts 61–63. Districts 70–72 are drawn at BVAP levels approximately 6-12% higher than necessary for Black voters to elect candidates of choice. This haphazard lumping of Black voters into several districts while carving out white voters to this extent is not narrowly tailored to comply with the VRA.

**CLAIMS FOR RELIEF**

**Count One**
**SB1's violations the Fourteenth Amendment to the U.S. Constitution**
**U.S. Const. amend. XIV; 42 U.S.C §1983**
**(Racial Gerrymandering)**

139.    The allegations contained in the preceding paragraphs are alleged as if fully set forth herein.

140.    The Fourteenth Amendment to the U.S. Constitution provides in relevant part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 2.

141.    State Senate Districts 7, 11, 12, 18–21, 23–26, and 33 were drawn using race as a predominant factor in determining their boundaries, as detailed above.

142.    The use of race in the challenged districts was not narrowly tailored to advance compliance with Section 2 of the Voting Rights Act because Black voters and other voters of color were either packed into districts in numbers substantially higher than necessary to elect candidates of choice or cracked across multiple districts to prevent the formation of a majority-minority district or minority-opportunity district.

143.    Because these districts separate individuals because of their race in a manner not narrowly tailored to advance a compelling governmental interest, they harm Individual Plaintiffs and Organizational Plaintiffs' members who live in the challenged districts and violate the rights guaranteed to them by the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States.

**Count Two**
**HB2's violations of the Fourteenth Amendment to the U.S. Constitution**
**U.S. Const. amend. XIV; 42 U.S.C §1983**
**(Racial Gerrymandering)**

144.    The allegations contained in the preceding paragraphs are alleged as if fully set forth herein.

145.    The Fourteenth Amendment to the U.S. Constitution provides in relevant part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of

the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

146.    State House of Representatives Districts 52, 54–63, 70–72, 75, 76, 78, 98, 99, 101, and 103 were drawn using race as a predominant factor in determining their boundaries, as detailed above.

147.    The use of race in the challenged districts was not narrowly tailored to advance compliance with Section 2 of the Voting Rights Act because Black voters and other voters of color were either packed into districts in numbers substantially higher than necessary to elect candidates of choice or cracked across multiple districts to prevent the formation of a majority-minority district or minority opportunity district.

148.    Because these districts separate individuals because of their race in a manner not narrowly tailored to advance a compelling governmental interest, they harm Individual Plaintiffs and Organizational Plaintiffs' members who live in the challenged districts and violate the rights guaranteed to them by the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.    Declare the challenged districts adopted in SB1 and HB2 to be unconstitutional as violating the Fourteenth Amendment to the United States Constitution as racial gerrymanders;

B.    Preliminarily and permanently enjoin the Defendants and their agents from holding elections in the challenged districts adopted in HB2 and SB1 and any adjoining districts necessary to remedy the constitutional violations, including, if necessary, delaying the

primary filing date until the Court adopts a remedial plan for 2022 elections and/or holding special elections;

C.    Set an immediate and reasonable deadline for the State of Alabama to adopt and enact constitutional districting plans for State House and State Senate that remedy the unconstitutional gerrymanders in the challenged districts while still complying with Section 2 of the Voting Rights Act;

D.    Award Plaintiffs their costs, expenses, disbursements, and reasonable attorneys' fees incurred in bring this pursuant to in accordance with 52 U.S.C. § 10310(e) and 42 U.S.C. § 1988(b);

E.    Retain jurisdiction over this matter until all Defendants have complied with all orders and mandates of this Court;

F.    Grant such other and further relief as the Court may deem just and proper.

DATED this 15th day of November 2021.

Respectfully submitted,

 /s/ Sidney Jackson
Sidney Jackson (ASB-1462-K40W)
Nicki Lawsen (ASB-2602-C00K)
WIGGINS, CHILDS, PANTAZIS, FISHER & GOLDFARB
301 19th Street North
Birmingham, AL 35203
(205) 314-0500
sjackson@wigginschilds.com
nlawsen@wigginschilds.com

Deuel Ross*
NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.
700 14th Street N.W. Ste. 600
Washington, DC 20005
(202) 682-1300
dross@naacpldf.org

Leah Aden*
Stuart Naifeh*
Kathryn Sadasivan^ (ASB-517-E48T)
NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor

 /s/ LaTisha Gotell Faulks
LaTisha Gotell Faulks (ASB-1279-I63J)
Kaitlin Welborn*
AMERICAN CIVIL LIBERTIES UNION OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 265-2754
tgfaulks@aclualabama.org
kwelborn@aclualabama.org

Davin M. Rosborough*
Julie A. Ebenstein*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad St.
New York, NY 10004
(212) 549-2500
drosborough@aclu.org
jebenstein@aclu.org

Caren E. Short (ASB-0646-P48N)
Jack Genberg*
Liza Weisberg*
SOUTHERN POVERTY LAW CENTER
PO Box 1287
Decatur, GA 30031

New York, NY 10006
(212) 965-2200
laden@naacpldf.org
snaifeh@naacpldf.org
ksadasivan@naacpldf.org

Jessica L. Ellsworth*
Shelita M. Stewart*
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600
jessica.ellsworth@hoganlovells.com
shelita.stewart@hoganlovells.com

David Dunn*
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000
david.dunn@hoganlovells.com

(404) 521-6700
caren.short@splcenter.org
jack.genberg@splcenter.org
liza.weisberg@splcenter.org

Michael Turrill*
Harmony R. Gbe*
HOGAN LOVELLS US LLP
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
(310) 785-4600
michael.turrill@hoganlovells.com
harmony.gbe@hoganlovells.com

Blayne R. Thompson*
HOGAN LOVELLS US LLP
609 Main St., Suite 4200
Houston, TX 77002
(713) 632-1400
blayne.thompson@hoganlovells.com

*Attorneys for Plaintiffs*

Janette McCarthy Wallace*
Anthony Ashton*
Anna-Kathryn Barnes*
NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE
(NAACP)
4805 Mount Hope Drive
Baltimore, MD 21215
(410) 580-5777
jlouard@naacpnet.org
aashton@naacpnet.org
abarnes@naacpnet.org

*Attorneys for Plaintiff Alabama State
Conference of the NAACP*

*Motion for admission *pro hac vice* to be filed
^Request for admission to the Northern District of
Alabama forthcoming