FILED

2022 May-19  PM 04:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **James Thomas,** *et al.*,<br>    Plaintiffs, | |
| **v.** | **2:21-cv-1531-AMM** |
| **John H. Merrill, in his official<br>capacity as Secretary<br>of State of Alabama,** *et al.*,<br>    Defendants. | **Three-Judge Court** |

### ORDER

Corey L. Maze, *District Judge*:

I **deny** Plaintiffs' motion to recuse (doc. 40). I explain why below.

### BACKGROUND

Plaintiffs challenge Alabama's plan to redraw its House and Senate districts after the 2020 Census. Alabama's Attorney General represents Defendants. Each judge on the panel worked or interned at the Attorney General's Office before taking the bench. But Plaintiffs only ask me to recuse. As Plaintiffs acknowledge, that means my recusal cannot be warranted simply "because [I] formerly worked as an attorney at the Alabama Attorney General's Office." (Doc. 50 at 1). Plaintiffs say this is what sets me apart:

> [R]ecusal is required because Judge Maze, as opposed to the other judges, recently represented Secretary Merrill against two *Thomas* Plaintiffs in litigation addressing the role of race in voting-related policies, which allowed Judge Maze to gain knowledge of material evidentiary facts likely to be at issue in this case.

(Doc. 50 at 1–2).

Plaintiffs are referring to *Greater Birmingham Ministries v. Merrill*, 284 F. Supp. 3d 1253 (N.D. Ala. 2018), *aff'd sub nom. Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299 (11th Cir. 2021) ("*GBM*"). Because Plaintiffs' motion hinges on my role in *GBM*, I explain that case—and my involvement in it—below.

## A.   *GBM v. Merrill*: Photo Voter ID

*GBM* involved photo voter ID cards, not redistricting.

1. *The Photo Voter ID law*: In 2011, the Alabama Legislature passed an Act that required Alabama voters to show photo identification when voting in person or by absentee ballot. *See* Ala. Act No. 2011-673. The law took effect in 2014. I played no part in the drafting or passage of the Photo Voter ID law in 2011 or its implementation in 2014. At the time, I was traveling to New Orleans, prosecuting the State's case against the parties that caused the 2010 Gulf Oil Spill. This assignment started in December 2010 and ended in July 2015.

2. *The* GBM *Litigation*: Two of the Plaintiffs here, GBM and the Alabama NAACP, sued a Defendant here, Secretary of State John Merrill, in December 2015. Plaintiffs say that my "extensive involvement" in that case threatens to undermine the public's trust that I can be fair in this case. (Doc. 50 at 16). But "extensive" is an exaggeration. I had *no* involvement in *GBM* for the first 14 months and minimal involvement after that because I was lead counsel in other State cases.

When GBM sued the Secretary in December 2015, I was the State's lead counsel in *CSX Transp. v. Alabama Dep't of Revenue*, No. 2:08-cv-655-AKK (N.D. Ala.), a decade-long lawsuit about fuel taxes that the Supreme Court remanded for trial about the same time the State resolved its case against BP in July 2015. I worked almost exclusively on the *CSX* re-trial, starting with the remand in 2015 through trial and post-trial briefing, which ended in February 2017. *See id.* (docs. 138–41, 153, 155, 156).

I say "almost exclusively" because I started working on the State's deceptive trade practice case against Volkswagen in 2016. Once *CSX* wound down, I litigated *Volkswagen*—which required travel to Michigan and New York for meetings and depositions—until the parties settled in March 2018.

My involvement in *GBM* was sandwiched in between. I appeared on January 13, 2017—*i.e.*, the week after I filed the State's post-trial brief in *CSX* and 14 months after *GBM* filed its complaint. *See GBM v. Merrill*, No. 2:15-cv-2193-LSC (N.D. Ala.) (doc. 138). That was long after the parties answered the district court's question about Plaintiffs' standing, *see id.* (docs. 25, 29, 31), and well after the parties exchanged initial disclosures, written discovery, and deposition notices. *See, e.g., id.* (attachments to docs. 78, 95, 102, 121).

My role was limited to four depositions.[1] I deposed Alabama NAACP President Bernard Simelton (both individually and as corporate representative) about the effect of Alabama's Photo Voter ID law. (Docs. 40-3, 40-4). I deposed Dr. J. Morgan Kousser about his expert opinion that the 2011 Photo Voter ID law was passed with a racially discriminatory intent. (Doc. 40-7). And I defended the deposition of Secretary Merrill, which focused on the Secretary's implementation of the Photo Voter ID law. (Doc. 40-2).

That's it. While I likely read a draft of the Secretary's motion for summary judgment and supporting brief, I did not write the motion or brief. There was no trial. And I was transitioning from my deceptive trade practice cases to the State's case against opioid manufacturers and distributors when *GBM* appealed the district court's decision. That I

---

[1] Plaintiffs attach the deposition transcript of GBM President Scott Douglas III. (Doc. 40-5). I did not attend that deposition or help the State's attorney prepare for that deposition. Nor, to my knowledge, had I read the transcript prior to resolving this motion. Plaintiffs also attach the deposition transcript of their expert Dr. Zoltan Hajnal. (Doc. 40-6). I did not take or prepare for that deposition either. I attended it only because Dr. Hajnal was deposed in the same Washington D.C. office where I deposed Dr. Kousser the next day. I spoke only once, to correct the record about the party who the State's attorney represented. (Doc. 40-6 at 11).

remained on the Secretary's list of attorneys on appeal after my confirmation in June 2019 was an oversight.

3. *Dr. Hood*: In their recusal motion, Plaintiffs focus on the fact that Secretary Merrill retained Dr. M.V. "Trey" Hood III as an expert in *GBM*. (Doc. 40 at 3). Plaintiffs "reasonably suspect that Dr. Hood may also serve as an expert in this case." (*Id.*). Without citation, Plaintiffs claim that "Dr. Hood worked directly with Judge Maze as one of Secretary Merrill's experts in *GBM*" and that "Judge Maze will be called upon to make judgements about the credibility, expertise, and analysis of an expert whom he and his colleagues recently worked closely with on similar issues." (*Id.*).

But Dr. Hood was not my witness. I didn't choose Dr. Hood to be the Secretary's expert; I didn't prepare for or defend his deposition; and I didn't read his transcript and exhibits.[2] His name was not mentioned during my depositions. (*See* docs. 40-2, 40-3, 40-4, 40-7). I'm not sure I met Dr. Hood. If I did, I had no reason to talk to him about redistricting—*i.e.*, the issue here. So I have not formed an opinion that Dr. Hood is more credible than anyone else. I would have no basis for that opinion.

## B.   Redistricting

While this case may involve some of the same parties and attorneys as *GBM*, the issue is different: *GBM* was a challenge to the 2011 Voter Photo ID law; this is a challenge to the 2021 redistricting plan.

I have not worked on redistricting plans or litigation. I received my bar license after different plaintiffs challenged Alabama's drawing of State House and Senate Districts in 2001. *See Montiel v. Davis*, 215 F. Supp. 2d 1279 (S.D. Ala. July 8, 2002). As explained, I was litigating the

---

[2] Plaintiffs don't attach Dr. Hood's deposition transcript to their recusal motion. It is in the *GBM* record, however, and my name does not appear in it. *See GBM v. Merrill*, No. 2:15-cv-2193 (N.D. Ala.) (docs. 228-14, 228-15, 228-16, 228-17, 228-18, 228-19, 228-20, 228-21, 228-22, 228-23, 228-24). My name is also absent from the Secretary's objection to Plaintiffs' request to depose Dr. Hood for 21 hours, which I note because every other State attorney who represented the Secretary in *GBM* is listed below the signature line. *Id.* (Doc. 191 at 8-9).

Gulf Oil Spill MDL when different plaintiffs challenged Alabama's reapportionment of State House and Senate Districts in 2011, *see Ala. Legis. Black Caucus v. Alabama*, 989 F. Supp. 2d 1227 (M.D. Ala. Dec. 20, 2013), and I was litigating *CSX* and *Volkswagen* when the case was tried on remand. *See Ala. Legis. Black Caucus v. Alabama*, 231 F. Supp. 3d 1026 (M.D. Ala Jan. 20, 2017). And I was confirmed to the bench in June 2019, so I could not have discussed or helped craft the 2021 redistricting plan that Plaintiffs challenge here.

APPLICABLE LAW

Section 455 of Title 28 governs the recusal of judges. Plaintiffs argue that I must recuse under two of its provisions:

> **28 U.S.C. § 455(a)**: Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

> **28 U.S.C. § 455(b)(1)**: He shall also disqualify himself . . . [w]here he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding.

Section 455(a) is broad; it looks for any objective appearance of bias. The standard of review is "whether an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt about the judge's impartiality." *United States v. Patti*, 337 F.3d 1317, 1321 (11th Cir. 2003). The court must apply this test "in light of the facts as they existed, and not as they were surmised or reported." *Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 541 U.S. 913, 914 (2004). The parties can waive the broader question of impartiality, 28 U.S.C. § 455(e), but Plaintiffs have asserted the question here.

Section 455(b)(1) is specific and cannot be waived. *See* 28 U.S.C. § 455(e). If Plaintiffs show that I have "personal knowledge of disputed evidentiary facts" in this case, then "partiality is conclusively presumed, making recusal mandatory." *United States v. Scrushy*, 721 F.3d 1288, 1303 (11th Cir. 2013).

On the flip side, "there is as much obligation for a judge not to recuse when there is no occasion for him to do so as there is for him to do so when there is." *In re Moody*, 755 F.3d 891, 895 (11th Cir. 2014). "[A] judge, having been assigned to a case, should not recuse himself on unsupported, irrational, or highly tenuous speculation." *Id.*

So the question is whether Plaintiffs satisfy either provision. If they do, I must recuse. If they don't, I cannot recuse.

## DISCUSSION

I start with the specific allegations, then address the general one.

## A.   Knowledge of Disputed Evidentiary Facts (§ 455(b)(1))

Section 455(b)(1) mandates recusal if I have "personal knowledge of disputed evidentiary facts concerning the proceeding." Plaintiffs offer three facts that they say are "likely to be disputed" in this case:

> (a) facts concerning the membership of the Alabama NAACP and GBM material to whether the organizations have associational standing;

> (b) the role of race in enacting voting-related policies in the last decade in Alabama; and

> (c) information about turnout and registration rates by race and county that affect analyses of whether a district drawn using race as the predominant factor was narrowly tailored to comply with the VRA.

(Doc. 40 at 9–10). I address each below.

1. **Facts about GBM and Alabama NAACP's membership that impact their associational standing.**

Defendants have not answered the operative complaint. (Doc. 57). Nor have they otherwise challenged the allegation that both GBM and the Alabama NAACP have members in each challenged district. So even if I knew where Plaintiffs' members live (and I don't), that knowledge would not require my recusal because the members' residences are not "disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(b)(1).

Nor would I have to recuse if associational standing becomes an issue. To prove associational standing, GBM and the Alabama NAACP must prove that they had members in each challenged district, *see Alabama Legis. Black Caucus v. Alabama*, 575 U.S. 254, 269–70 (2015), on the day they filed the case, *see Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000).

That means if associational standing becomes an issue, the disputed fact question will be whether GBM and the Alabama NAACP had members in each of the challenged districts on November 16, 2021—*i.e.*, the day they filed suit. (Doc. 1). I did not learn where Plaintiffs' members would live in November 2021 when I deposed their witnesses in 2017. Nor could I. The only knowledge I have about where the parties' members lived in November 2021 comes from reading their complaint in this case. (*See* doc. 1 ¶¶ 17, 19). Because my knowledge about the location of the parties' membership in 2021 is judicial, not personal, § 455(b)(1) does not apply.

2. **Facts about the State's previous use of race when passing legislation.**

Plaintiffs made this argument about my personal knowledge of "the role of race" in their opening brief:

> As to the role of race and information about turnout and registration rates by race and county, Judge Maze solicited testimony from one of the plaintiffs' experts in GBM on this

issue and attended a deposition where the latter facts were
discussed.

(Doc. 40 at 11). After Defendants pointed out the cursory nature of this
argument in their response, (*see* doc. 45 at 13), Plaintiffs fleshed out their
"role of race" argument in their reply brief by identifying the following as
potential evidentiary disputes that I have personal knowledge about:

- "[W]hether all or some of the districts use race in a
  predominant manner to separate voters across districts.
  *See Shaw v. Reno*, 509 U.S. 630, 658 (1993)."

- Whether the 2021 districts "preserve the cores of districts
  enacted in 2011" and thus "continue to bear the
  hallmarks of racial predominance, *North Carolina v.
  Covington*, 138 S. Ct. 2548, 2551–53 (2018)[.]"

(Doc. 50 at 6–7). Plaintiffs also noted that, in *GBM*, "Defendants elicited
extensive testimony, for example, from Scott Douglas of Greater
Birmingham Ministries as to the State's redistricting process, ECF No.
40-5 at 70–77, including about specific state legislative districts such as
Senate District 33 that is challenged here." (*Id.* at 7).

The first potentially disputed fact is whether Defendants used race
when drawing the challenged districts. Let's assume Defendants dispute
that they did. Defendants drew the districts in 2021, about four years after
my participation in *GBM* and two years after my appointment. So I cannot
have extrajudicial knowledge of this fact from my work in *GBM*.

The second potentially disputed fact is whether Defendants based
the 2021 districts on 2011 drawings to perpetuate an illegal gerrymander.
Even if the Redistricting Committee re-used the 2011 drawings to
perpetuate a gerrymander in 2021, the Committee wasn't convened until
2021—nearly two years after I was appointed to the bench. So I cannot
have gained personal knowledge of the Committee's discriminatory
scheme(s) during my work on *GBM*.

That the *GBM* defendants asked Scott Douglas about redistricting during his 2016 deposition does not change this result for two reasons. First, I was not at Mr. Douglas's deposition, and to my knowledge, I never read the transcript. (Plaintiffs don't allege that I did. *See* doc. 50 at 7.) So I don't possess extrajudicial knowledge of his testimony. Second, Scott Douglas was GBM's President, not a legislator who drew the 2011 district maps. The portion of the deposition cited by Plaintiffs as containing a potentially disputed fact (*i.e.,* doc. 40-5 at 70-77) is Mr. Douglas testifying why *he believed* the 2011 maps were illegal—or, as he put it, designed to "maximize the power of not just white but white right-wing power." (Doc. 40-5 at 77). Mr. Douglas's opinion about the 2011 maps' legality is not a disputed evidentiary fact for the panel to decide in this case about the 2021 maps. So even if I had read Mr. Douglas's deposition in 2017, I would not have gained "personal knowledge of disputed evidentiary facts" in this case. 28 U.S.C. § 455(b)(1).[3]

### 3.  Facts about voter turnout and registration rates.

On the final disputed fact, Plaintiffs' opening brief mentioned only that I "attended a deposition" during which "information about turnout and registration rates by race and county" was discussed. (Doc. 40 at 11). After Defendants noted the cursory nature of this argument, Plaintiffs fleshed out the argument in their reply brief. (Doc. 50 at 8).

In short, Plaintiffs argue that turnout and registration rates could become an evidentiary issue if two things happen: (1) Plaintiffs prove that Defendants used race as the predominant factor in drawing the 2021 maps and (2) Defendants try to defend their use of race by proving that the State conducted a pre-enactment, functional analysis of electoral behavior to narrowly tailor maps that comply with the Voting Rights Act. *See, e.g.*, *Abbott v. Perez*, 138 S. Ct. 2305, 2334–35 (2018); *Cooper v. Harris*,

---

[3] I deposed Alabama NAACP President Bernard Simelton, who similarly opined that he believed the Alabama legislature acted with discriminatory intent when passing the 2011 Photo Voter ID law based in part on the Eleventh Circuit's 2017 decision about the 2011 redistricting maps. *See* (Doc. 40-4 at 148–49, 166–70). But again, Plaintiffs' opinions about the 2011 maps and 2011 photo ID law are not disputed evidentiary facts in a case about the 2021 maps.

137 S. Ct. 1455, 1469–72 (2017); *Bethune-Hill v. Va. State Bd. Of Elections*, 137 S. Ct. 788, 800–02 (2017). Plaintiffs identify two potential sources of facts that could be relevant if Defendants make a "narrowly tailored" defense. (Doc. 50 at 8).

First, Plaintiffs say that Dr. Trey Hood conducted the State's "analysis for the 2021 cycle" and that Dr. Hood's analysis "relates to what levels of Black Voting Age Population are necessary for Black voters to elect candidates of choice." (*Id.*). But Plaintiffs do not allege that I have personal knowledge about Dr. Hood's 2021 analysis. Nor do I. I *assume* that if Dr. Hood performed an analysis for redistricting after the 2020 Census, he started that work after I was appointed in June 2019. But even if he began his analysis before the 2020 Census, as I explained in the Background section, I didn't talk to Dr. Hood about redistricting during my time at the Attorney General's Office. So I don't know what facts Dr. Hood used in his analysis—if he in-fact conducted that analysis.

Second, Plaintiffs point out that during the *GBM* case, I deposed expert witness Dr. J. Morgan Kousser (doc. 40-7) and was present for the deposition of expert witness Dr. Zoltan Hajnal (doc. 40-6). Plaintiffs say that "[t]he facts testified to by Dr. Kousser and Dr. Hajnal have direct relevance to this inquiry, as differing levels of racial polarization and Black turnout by county affect what percentage of Black voters are necessary to effectively select chosen candidates." (Doc. 50 at 8).

But Plaintiffs do not identify a particular fact that Dr. Kousser testified about during his 2017 deposition that may be disputed in this case. (*See id.*). Plaintiffs only point to pages 21–25 and 37–39 of Dr. Hajnal's deposition as containing the facts that may become relevant in this case. (*Id.*). There, Dr. Hajnal testified that he collected "county voter turnout" records, plus "census data that indicated the race, the racial demographics of a county, and then looked for relationships between the racial demographics and changes in turnout in Alabama and compared those to changes in turnout in other states." (Doc. 40-5 at 21).

That I heard this testimony in 2017 does not require recusal under § 455(b)(1) for at least two reasons. First, the statistics that Dr. Hajnal collected in 2017 are not *disputed* evidentiary facts in this case. Even if Plaintiffs cite the same statistics that I heard Dr. Hajnal recount in 2017 to combat a "narrowly tailored" defense of actions taken in 2021, there is no likelihood that Defendants will dispute them. Stats are stats. While the parties and their experts may quarrel over what the correlation of voter turnout to racial demographic stats mean, such disputes are matters of opinion and law—not "evidentiary facts," which is all that § 455(b)(1) prevents judges from knowing beforehand.[4] Second, voter turnout and racial makeup percentages are public record. My personal knowledge of these facts is no greater than any person who read the newspaper, the Secretary of State's website, or the Census Bureau's website.[5] If extrajudicial access to voting and racial demographic statistics required judges to recuse from redistricting cases, no one could hear them.

———

To sum up, Plaintiffs have not pointed to any "disputed evidentiary facts" in this redistricting case that I learned about while working on the Photo Voter ID case in 2017. So 28 U.S.C. § 455(b)(1) does not require me to recuse. But it leads us to the broader question: "whether an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt about [my] impartiality" under 28 U.S.C. § 445(a). *Patti*, 337 F.3d at 1321.

---

[4] Indeed, the defendants did not dispute the voter turnout stats in *GBM*. They instead argued that comparison of turnout rates "have very little value because turnout can be affected by many local variables." *GBM*, No. 2:15-cv-2193 (N.D. Ala.) (Doc. 265 at 160). They also argued that "if minority turnout fell in Alabama in recent years, a lack of enthusiasm among Democratic voters is a far better explanation for the alleged drop than the photo ID law." (*Id*. at 161.).

[5] Congress requires the Census Bureau to provide States with the statistics necessary for redistricting, *see* 13 U.S.C. § 141, and the Bureau publishes these stats online. *See* UNITED STATES CENSUS BUREAU, DECENNIAL CENSUS P.L. 94-171 REDISTRICTING DATA PROGRAM, https://www.census.gov/programs-surveys/decennial-census/about/rdo/summary-files.html. The Alabama Secretary of State publishes voter registration and turnout statistics on his website. *See* ALABAMA SECRETARY OF STATE, ELECTIONS DATA DOWNLOADS, https://www.sos.alabama.gov/alabama-votes/voter/election-data.

## B.      Reasonable Question of Impartiality (§ 455(a))

Plaintiffs say that my work on *GBM* plus an amicus brief that I wrote for Governor Bob Riley in *Nw. Austin Mun. Util. Dist. No. 1 v. Holder*, 553 U.S. 193 (2009) would lead a reasonable person to question my partiality in this case. (Doc. 40 at 11-15). Defendants make two arguments in reply: (1) § 455(b)(3)'s specific rule for former government attorneys precludes application of § 455(a), and (2) a reasonable person would not question my impartiality. I'll start with the former.

### 1.      Preclusive effect of § 455(b)(3)

Here's the text of the two relevant provisions:

**(a)** Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

**(b)** He shall also disqualify himself in the following circumstances:

. . .

> **(3)** Where he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy;

28 U.S.C. § 455(a), (b)(3). Applying subsection (b)(3) to this case would require me to recuse if either: (1) I participated in this case while I was still a government attorney or (2) I offered an opinion about this case while I was still a government attorney. Neither of these circumstances applies because this case rose after I left state service. So subsection (b)(3) doesn't require my recusal, and no one argues that it does.

Rather, Defendants argue that the two limited circumstances listed in subsection (b)(3) should be imposed as limits to subsection (a) because all of my previous work came as a government attorney. (Doc. 45 at 16). In other words, Defendants argue that if a former government attorney

needn't recuse under § 455(b)(3), then § 455(a) cannot require his recusal either—at least not for actions he took, or statements he made, while in government service. Defendants quote this statement to support their argument: "it is unreasonable to interpret § 455(a) (unless the language *requires* it) as implicitly eliminating a limitation explicitly set forth in § 455(b)." *Liteky v. United States*, 510 U.S. 540, 553 (1994).

I disagree with Defendants. Plaintiffs aren't trying to "eliminat[e] a limitation explicitly set for in § 455(b)." *Id.* Rather, Plaintiffs say that § 455(a) *expands* the list of reasons a former government attorney might need to recuse. I agree. Subsection (b) starts with the phrase, "He shall also disqualify himself in the following circumstances[.]" Using the word "also" right after subsection (a) naturally means that the list that follows is an addition to what Congress just said in subsection (a). That's how the Supreme Court reads it: "As we have described, § 455(a) expands the protection of § 455(b) but duplicates some of its protection as well—not only with regard to bias and prejudice but also with regard to interest and relationship." *Liteky*, 510 U.S. at 553.

Here's an example. Imagine if I had talked about the Photo Voter ID case during a government CLE and, during my presentation, I told the audience that "I wouldn't believe anything that GBM's President said in any case. He's completely incredible." Subsection (b)(3) wouldn't require me to recuse from this case because, at the time, I was neither litigating this redistricting case nor commenting on the merits of this redistricting case. But an audience member could reasonably question whether I would be impartial in a case in which I had to judge Mr. Douglas's credibility. After all, I just said that "I wouldn't believe him . . . in any case." That's the point of subsection (a). It's not eliminating the limitations that subsection (b) creates; it's expanding its scope where necessary.

Of course, I never made that statement or anything like it. My point is that scenarios exist that would cause "an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which recusal was sought [to] entertain a significant doubt about the judge's impartiality," thus requiring recusal under § 445(a), *Patti*, 337 F.3d at

1321, even if those facts don't satisfy § 445(b)(3), *see Liteky*, 510 U.S. at 553 n.2 ("subsection (a) requires recusal in some circumstances where subsection (b) does not").

So I now turn to the set of facts that Plaintiffs argue fit the gap between subsection (a) and subsection (b)(3).

### 2.    Impartiality under § 455(a)

Plaintiffs say that the combination of these five facts would cause an objective lay observer to question my impartiality:

1.  I represented Secretary Merrill against GBM and the Alabama NAACP in the Photo Voter ID case;

2.  I deposed Alabama NAACP President Bernard Simelton about his belief that Secretary Merrill applied the Photo Voter ID law in a racially discriminatory manner;

3.  I retained Dr. Hood as the Secretary's expert in *GBM*;

4.  I deposed Dr. J. Morgan Kousser about his opinion that one must consider the Alabama Legislature's history of passing racist laws in the 20th Century when judging the discriminatory intent of laws the Alabama Legislature passes in the 21st Century; and,

5.  I wrote an amicus brief for Governor Bob Riley in *Nw. Austin Mun. Util. Dist. No. 1 v. Holder*, 553 U.S. 193 (2009).

(Doc. 40 at 11–15). Before I address each fact individually, I note that all five refer to actions I took in my role as an advocate for the State.

Judges were lawyers first. We all "come to the bench with a background of experiences, associations, and viewpoints." *United States v. State of Alabama*, 828 F.2d 1532, 1543 (11th Cir. 1987). So our backgrounds alone cannot require recusal. "It is well settled that the facts pleaded . . . will not suffice to show the personal bias required by the statute if they go to the background and associations of the judge rather than to his appraisal of a party personally." *Id.* That rule holds true in all

types of cases, including civil rights cases. *Id.* (rejecting the State's argument that "Judge Clemon is prejudiced and no longer impartial by virtue of his background as a civil rights lawyer").

Section 455(a) prohibits partiality. "'[P]artiality' does not refer to all favoritism, but only to such as is, for some reason, wrongful or inappropriate." *Liteky*, 510 U.S. at 552. So the question is not whether I advocated for legal positions taken by the Secretary and opposed by GBM and the Alabama NAACP. I did; it was my job. The question is whether I said or did something while representing the Secretary that makes my assignment to a case involving GBM and the NAACP look "wrongful or inappropriate." *Id.*; *see also Alabama*, 828 F.2d at 1543 ("It is well settled that the facts pleaded . . . will not suffice to show the personal bias required by the statute if they go to the background and associations of the judge rather than to his appraisal of a party personally.").

### a. My representation of Secretary Merrill in the *GBM* Photo Voter ID Case

Plaintiffs first point to the fact that I defended Secretary Merrill against their lawsuit in *GBM*. As stated above, a judge's work as an attorney in civil rights cases does not require recusal in civil rights cases. *State of Alabama*, 828 F.2d at 1543. Nor is a judge's acquaintance with the parties and their attorneys a ground for recusal. *Parrish v. Board of Comm. of Alabama State Bar*, 524 F.2d 98, 102 (5th Cir. 1975); *see also Sphere Drake Ins. Ltd. v. All Am. Life Ins. Co.*, 307 F.3d 617, 621 (7th Cir. 2002) ("Still, a judge's former representation of a litigant does not imply any need to disqualify under § 455(a) because his impartiality might reasonably be questioned. [citations omitted]. Nothing in the Code of Conduct for federal judges makes prior representation of a litigant a disqualifying event.").

Plaintiffs must instead point to some action that I took, or some statement that I made, during *GBM* that would make my assignment here "wrongful or inappropriate." *Liteky*, 510 U.S. at 552. Plaintiffs say the next three facts fit that bill. (Doc. 40 at 14–15).

### b.   The deposition of Bernard Simelton

Plaintiffs say that "as an advocate, Judge Maze pressed NAACP President Simelton about whether he or the Alabama NAACP believed Secretary Merrill harbored racist and white supremacist views, and expressed criticism that he [Mr. Simelton] had a basis for that conclusion." (Doc. 40 at 14, citing Doc. 40-4 at 33–35).

A little background: the *GBM* plaintiffs alleged that Secretary Merrill's implementation of the Photo Voter ID law and his mobile ID unit program "demonstrate[d] that a purpose or effect of the Photo ID law [was] to deny or abridge the right to vote on account of race." No. 2:15-cv-2193 (N.D. Ala.) (Doc. 112 ¶ 180). So in the deposition passage that Plaintiffs cite, my job was to determine the basis for their allegation that Secretary Merrill acted with discriminatory intent or purpose.

Because I must apply § 455(a) "in light of the facts as they existed, and not as they were surmised or reported," *Cheney*, 541 U.S. at 914, I quote the entire passage below:

> Q. Let me ask you this. I represent the Secretary of State John Merrill. Have you ever heard Secretary of State John Merrill make any statements that leads you to believe that he personally enforces the photo voter ID bill in a manner that discriminates against minority; that that's his purpose in doing so, is to hurt minority voters?
>
> MR. ROSS: Objection.
>
> A. I have not heard him make that statement, make that statement. Now, there are actions that he has taken that leads one to believe, at least leads me to believe that.
>
> Q. Well, what actions would those be? What has Secretary of State Merrill done that changes your opinion of him, or makes you form an opinion of him? First of all, let me strike

that. What is your opinion of Secretary of State Merrill when it comes to the enforcement of the photo voter ID bill?

MR. ROSS: Objection.

A. He tries to enforce it.

Q. He tries to enforce it, okay. Does he try to enforce it in a manner that either hurts or advantages any particular race?

A. Yes.

Q. Which race is he trying to advantage or disadvantage?

A. Well, he's trying to disadvantage African-American and other minorities.

Q. Other than just enforcing the bill as it is written, what actions has the Secretary of State taken that leads you to believe that he is doing his actions to suppress minority vote?

MR. ROSS: Objection.

A. Well, when he says that he wants to make it -- I want to make sure I get it correctly -- he wants to make it easy to -- let me see -- easy to vote, difficult to cheat -- no. Something to that effect. I forgot exactly how he said it, but something to that effect. Additionally, when he says that he wants to do his mobile ID units to ensure that everyone has the opportunity to register -- I mean, to get the photo ID, he does not go into the African-American community where we live and where we congregate in order to ensure that those individuals have an opportunity to register for the photo ID. Additionally, when the State of Alabama closed the DMVs, I did not see him jumping up and saying, "Don't close them, we need to keep these open because this is

where people can get their photo ID, which is required to vote."

Q. You do understand that the Secretary of State does not control ALEA, correct, that those are two different state agencies?

A. Well, I fully understand that, but that still did not prevent him as a candidate-level position for the governor -- well, for the State of Alabama cabinet level. It's a misnomer, because he runs as Secretary of State himself. But I still did not see him speaking out saying, "I have a responsibility to ensure that all voters have a photo ID. How dare you, Governor, close these places."

Q. You understand that Secretary of State Merrill offers free photo ID cards not only in his office, but in the offices of every county Board of Registrars, correct?

A. Yes, sir.

Q. And that none of those were closed at the same time the ALEA offices were closed, correct?

A. Yes, sir.

Q. So even during the period of time in which ALEA offices had been closed at the governor's direction, Secretary of State Merrill and the Board of Registrars were still offering photo ID cards in the same places and times that they always had, correct?

A. Yes, sir.

Q. You don't believe that that is enough for the Secretary of State to show that he is trying to get photo IDs into the hands of everyone, that he also had to take the additional step of re-opening ALEA offices?

> MR. ROSS: Objection. You are mischaracterizing his testimony.
>
> Q. I'll strike it, and I'll ask it an easier way. You understand that the Secretary of State can only control the photo ID cards for voting that he and the registrars give out? He doesn't control driver's license that ALEA gives out, correct?
>
> A. Yes, I understand, but I didn't say what he controls. I'm talking about him speaking out.
>
> Q. So you would have preferred to see the Secretary of State issue a public statement saying that the ALEA offices need to be re-opened for the purposes of allowing someone to purchase a driver's license?
>
> A. Yes, which is one of the documents that they can use to vote.
>
> Q. Not the only one, but one?
>
> A. Right.

(Doc. 40-4 at 33–38).

An objective, disinterested, lay observer who reads this transcript would not find that I "expressed criticism" of Mr. Simelton or that I asked him whether "Secretary Merrill harbored racist and white supremacist views," as Plaintiffs describe it. (Doc. 40 at 14). Rather, a disinterested lay observer would see an advocate trying to determine the basis of the allegation that his client was acting with a discriminatory intent or effect. And I did: Mr. Simelton said that he based his belief on Secretary Merrill's failure to speak out against the closing of ALEA offices. Nothing in this passage is "wrongful or inappropriate," so it does not make my assignment here "wrongful or inappropriate." *Liteky*, 510 U.S. at 552. So the Simelton deposition cannot support recusal under § 455(a).

### c.   Dr. Trey Hood

Plaintiffs next say that:

> One of Secretary Merrill's experts in *GBM*, Dr. Trey Hood,
> appears to be a significant witness for Defendants in this
> case given his analysis of racial polarization in voting in
> different state legislative districts. Assessing Dr. Hood's
> expertise, the validity of his analysis, and his credibility will
> be relevant in assessing whether race-predominant efforts to
> comply with the VRA in drawing districts were narrowly
> tailored. Having retained Dr. Hood as an expert on related
> issues involving some of the same parties raises the question
> of whether observers will believe that Judge Maze can judge
> his testimony impartially.

(Doc. 40 at 14–15). But as I explained in the Background section, I did not
retain Dr. Hood. I did not attend his deposition. I did not talk to him about
redistricting or racial polarization in voting. He was not my witness. So I
don't have any basis to prejudge his testimony.

Once an "objective, disinterested, lay observer" is "fully informed of
the facts" of my association with Dr. Hood, that objective observer would
not doubt my impartiality when judging Dr. Hood's testimony in this case.
*Patti*, 337 F.3d at 1321. So the possibility that Dr. Hood may testify here
does not require recusal.

### d.   The deposition of J. Morgan Kousser, Ph.D.

Plaintiffs say that I "also pressed one of Plaintiffs' experts, Dr.
Kousser, on whether Alabama's racial discrimination in the political
process still bears any relevance to the present intent of state officials.
Kousser. Dep. at 45-47." (Doc. 40 at 15).

Again, some background: Dr. Kousser opined that the Alabama
Legislature passed the Photo Voter ID law with a discriminatory intent.
My job in deposing him, in part, was to determine the basis of that opinion.

Earlier in the deposition, Dr. Kousser testified that he had opined in other cases that Alabama governments had passed laws with a discriminatory intent in "1919, 1874, 1876, 1919, 1901, 1901, 1901, 1879 and 1901." (Doc. 40-7 at 42–43). So in the passage Plaintiffs cite, I asked Dr. Kousser if he based his opinion about the 2011 Legislature on his feelings about past Alabama Legislatures, and if so, whether he could set those feelings aside.

Because I must apply § 455(a) "in light of the facts as they existed, and not as they were surmised or reported," *Cheney*, 541 U.S. at 914, I again quote the entire passage cited by Plaintiffs:

> Q. My question was specifically about Alabama, but we'll drop that for a second. With as much history as you have working on Alabama cases looking at language from 1901 to 1960 – strike that. We can both agree that in 1901 Alabama had white supremacist racist legislators; correct?
>
> MR. ROSS: Objection.
>
> BY MR. MAZE:
>
> Q. At least some of them.
>
> A. I would certainly agree with that. I hope you would as well.
>
> Q. And we can both agree that the same is true in the 1960s; correct?
>
> MR. ROSS: Objection.
>
> THE WITNESS: I certainly would agree with that.
>
> BY MR. MAZE:
>
> Q. How can you, with that knowledge and basis of all that you've done and all that you've seen and all that you've testified -- first of all, do you even think that it's

appropriate or possible to set your view of Alabama in 1901 and 1965 aside when you are judging Alabama in 2011 and 2017?

MR. ROSS: Objection.

THE WITNESS: It would not be appropriate to do that.

BY MR. MAZE:

Q. Why?

A. Because there is a historical context that affects the political leanings and the political understandings of people for a long period of time. A good example of this, I think, is the recent law that was passed in Alabama, I think, sponsored by Mr. Allen, had something to do with the voter ID law, which prohibits localities from removing, in effect, Confederate monuments in Alabama.

There have been, as you know, major efforts to remove the Confederate flags from state capitals across the South. Some have succeeded. Most interestingly, recently there were four major Confederate monuments in New Orleans that were removed.

Many of the people in the South have been responsive to the desire to escape the racist history that's symbolized by those movements, those monuments. Alabama seems much less willing to escape its history.

Q. What must Alabama do to escape that history to the point where you can set aside 1901, 1965 when you're judging the intent of present day Alabama?

A. Nothing can entirely erase it. There could be measures that move towards it. Alabama could elect an African

> American to a statewide office who was supported by African-American voters. That would start -- that would be a movement. Alabama could abolish its voter ID law. That would be a good start.

(Doc. 40-7 at 44–47).

An objective, disinterested, lay observer who reads this transcript would see an attorney trying to determine the basis of the opposing party's expert opinion. And I did: Dr. Kousser testified that he based his opinion, in part, on Alabama's past. I was not disrespectful of that opinion, nor did I offer my own opinion. Nothing in this passage approaches the level of "wrongful or inappropriate," so it does not make my assignment here "wrongful or inappropriate." *Liteky*, 510 U.S. at 552. So Dr. Kousser's deposition cannot support recusal under § 455(a).

### e.    The Governor's Amicus Brief in *NAMUDNO*

Finally, Plaintiffs note that I wrote Governor Bob Riley's amicus brief in *NAMUDNO v. Holder*, 557 U.S. 193 (2009). (Doc. 40 at 15). They focus on the portion of the brief where the Governor detailed the difference between "Alabama's modern government" and its "Jim Crow ancestors." (*Id.* quoting 40-8 at 1.)

Because I must apply § 455(a) "in light of the facts as they existed, and not as they were surmised or reported," *Cheney*, 541 U.S. at 914, I quote the entire paragraph cited by Plaintiffs, not just the first sentence:

> Alabama's modern governments have shown a great commitment to minority voting rights. The Department of Justice ("USDOJ") has not objected to a state-wide preclearance submission from Alabama in more than 14 years. App. 15a-16a. In fact, in the 10 years preceding the 2006 reauthorization, USDOJ lodged objections to a scant 0.06% (2 out of 3279) of Alabama's preclearance submissions from all levels of government: state, county, and municipal. *See id.*; App. 1a-14a (tracking the total number of §5 submissions from all jurisdictions from 1990 to 2008).

23

> Furthermore, despite an exponential increase in Alabama's submissions, USDOJ objected to fewer Alabama submissions between 1982 and 2005 (45) than it did between 1965 and 1982 (59). 11 H.R. Rep. No. 109-478, at 73 (2006); *cf id.* at 21, 37 (justifying §5's renewal on a greater number of §5 objections between August 1982 and 2005 than between 1965 and August 1982); J.S. App. at 103-106 (district court opinion; same).

(Doc. 40-8 at 23–24 (footnotes omitted)). Plaintiffs do not argue that these facts are false. And the Governor's claim that Alabama governments progressed between 1965 and 2006 was unremarkable. The Supreme Court agreed with it:

> Some of the conditions that we relied upon in upholding this statutory scheme in *Katzenbach* and *City of Rome* have unquestionably improved. Things have changed in the South. Voter turnout and registration rates now approach parity. Blatantly discriminatory evasions of federal decrees are rare. And minority candidates hold office at unprecedented levels.

*NAMUDNO*, 557 U.S. at 202.

Plaintiffs agree with it too, although to a lesser extent, as explained in the opening paragraph of their complaint:

> The State of Alabama carries a sordid record of using racial discrimination to maintain the political power of its white citizens. While Alabama's elected officials have made important changes over the past fifty years—mostly as a result of court orders or U.S. Department of Justice intervention—Defendants continue to run afoul of the law when it comes to redistricting, even after a three-judge court struck down 12 state legislative districts as unconstitutional racial gerrymanders in the last, 2010, redistricting cycle.

(Doc. 57 ¶ 1).

An objective, disinterested, lay observer who reads the *NAMUDNO* amicus brief would see an advocate presenting the position of his client, the Governor. While Plaintiffs may disagree with the Governor's position, nothing in the brief approaches the level of "wrongful or inappropriate," so it does not make my assignment here "wrongful or inappropriate." *Liteky*, 510 U.S. at 552. So the *NAMUDNO* brief cannot support recusal under § 455(a).

—

I have never litigated or judged a case about redistricting. None of the five facts that Plaintiffs note about my career—either individually or collectively—would cause an objective, disinterested, lay observer to reasonably question my impartiality to judge this case about redistricting. So Plaintiffs have not shown that § 455(a) requires me to recuse.

Nor have Plaintiffs shown that I have personal knowledge of disputed facts that would require recusal under § 455(b)(1). So I have a duty to deny their motion and hear this case. *See Moody*, 755 F.3d at 895. As in all cases, I will do so impartially.

## CONCLUSION

For these reasons, I **deny** Plaintiffs' motion to recuse. (Doc. 40).

**Done** and **Ordered** on May 19, 2022.

**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE