FILED

2023 Jul-24 PM 04:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| LAQUISHA CHANDLER, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Case No. 2:21-cv-1531-AMM |
| | ) | |
| WES ALLEN, *et al.*, | ) | **THREE-JUDGE COURT** |
| | ) | |
| *Defendants*. | ) | |

## <u>DEFENDANTS' MOTION TO DISMISS</u>

In this action, Plaintiffs challenge the district maps of the Alabama Senate and House of Representatives enacted by the Alabama Legislature following the 2020 Census. They claim the Senate Map violates Section 2 of the Voting Rights Act and that both Maps violate the Equal Protection Clause of the Fourteenth Amendment. All Plaintiffs' claims are due to be dismissed.

First, Plaintiffs' § 2 claim should be dismissed because private parties lack statutory authority to sue under § 2 of the Voting Rights Act. Though the Supreme Court has "assumed—without deciding—that the Voting Rights Act of 1965 furnishes an implied cause of action under § 2," the existence of such a cause remains an "open question." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2350 (2021) (Gorsuch, J., concurring). The answer is that there is no such right of action.

It does not exist on the face of the statute, and courts cannot create a right of action where Congress did not. Plaintiffs' § 2 claim therefore must be dismissed.

Second, Plaintiffs' constitutional claims should be dismissed for failure to state a claim. In an intent-based challenge to any state law, plaintiffs face a "near-impossible challenge" of overcoming the presumption of good faith. *Greater Birmingham Ministries v. Sec'y of State for State of Alabama*, 992 F.3d 1299, 1324 (11th Cir. 2021) (*GBM*). "This rule takes on special significance in districting cases." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018). And the facts alleged in the Amended Complaint fall far short of rebutting that presumption. The presumption can be overcome in certain circumstances, such as when the State's conceded "aim" is to "disenfranchis[e] practically all of" one racial group, *Hunter v. Underwood,* 471 U.S. 222, 230 (1985), or when the State asserts an explicit desire to target a racial percentage in a district, *Cooper v. Harris*, 581 U.S. 285, 311 (2017). And there have been a few "rare cases in which a statistical pattern of discriminatory impact demonstrated a constitutional violation," but those cases involved "statistical disparities" so stark that they were "'tantamount for all practical purposes to a mathematical demonstration' that the State acted with a discriminatory purpose." *McCleskey v. Kemp,* 481 U.S. 279, 294 n.12 (1987) (quoting *Gomillion v. Lightfoot,* 364 U.S. 339, 341 (1960)). But the allegations in the Amended Complaint bear no

resemblance to such cases of blatant discrimination. Plaintiffs' constitutional claims should therefore be dismissed as well.

## BACKGROUND

According to the allegations in the Amended Complaint, on November 4, 2021, Governor Kay Ivey signed into law HB 2 and SB 1 of the 2021 Second Special Session of the Alabama Legislature. Doc. 83 ¶ 25; *see* Ala. Act No. 2021-558; Ala. Act No. 2021-556. Those laws provide for the electoral districts of the Alabama House of Representative and Senate. *See* Ala. Code §§ 29-1-1.2 & 29-1-2.3.

On November 16, 2021, Plaintiffs filed the Complaint alleging that Alabama's 2021 maps for State House and Senate districts violated the Fourteenth Amendment to the United States Constitution. Doc. 1. A three-judge court was convened later that day. Doc. 5. Though Plaintiffs initially requested preliminary injunctive relief, Doc. 1 at 41, they later informed the Court that they did not intend to pursue a preliminary injunction, Doc. 34. Plaintiffs filed the (operative) Third Amended Complaint on July 10, 2023. Doc. 83.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). The Court must "take the factual allegations in the complaint as true and construe them in the light most favorable to

the plaintiff." *Pielage v. McConnell,* 516 F.3d 1282, 1284 (11th Cir. 2008). This rule

"is inapplicable to legal conclusions." *Iqbal,* 556 U.S. at 678.

## ARGUMENT

**I.    Plaintiffs' Section 2 claims are due to be dismissed because Section 2 of the Voting Rights Act does not contain a private right of action.**

"[T]he fact that a federal statute has been violated and some person harmed

does not automatically give rise to a private cause of action in favor of that person."

*Cannon v. Univ. of Chicago*, 441 U.S. 677, 688 (1979). "A statute may, but does not

necessarily, create a cause of action either expressly or by implication." *Alabama v.*

*PCI Gaming Auth.*, 801 F.3d 1278, 1294 (11th Cir. 2015). And though a statute *can*

create a cause of action by implication, that is the exception to the rule. Courts

"interpret statutes with a presumption against, not in favor of, the existence of an

implied right of action." *In re Wild*, 994 F.3d 1244, 1274 (11th Cir. 2021) (en banc)

(W. Pryor, J., concurring). Plaintiffs cannot satisfy their burden here.

First, Section 2 contains no express private right of action. The plaintiffs in

*Milligan* did not argue that it did, Supreme Court opinions advocating for the

existence of a private right of action indicate that it doesn't, and the Department of

Justice conceded as much in separate litigation. Section 2's lack of an express private

action is self-evident.

Second, Section 2 contains no implied private right of action, either. It is

Congress that must create a right of action, even when the private right of action is

implied. To do so, Congress must create a private right by specifically conferring it on a particular class of individuals with an unmistakable focus on those individuals, characteristics Section 2 lacks.

Further, to show an implied private right of action, Plaintiffs must show—from the text of the statute—a clear expression of congressional intent to authorize a private plaintiff to sue. The text and structure of the VRA show no such intent. Instead, the VRA provides a specific mechanism for the Attorney General to enforce Section 2 and sets out procedures for him to do so, strongly cutting against any argument that Section 2 must be enforceable by private plaintiffs, too. Outside of Section 2, the VRA's references to "aggrieved persons" do not create a new cause of action, but reference existing causes of action—such as the § 1983 claims that Plaintiffs bring in this very case.

Because Congress did not expressly or impliedly create for Section 2 a private cause of action, it does not contain one, and Plaintiffs' Section 2 claim is due to be dismissed.

**A.    Section 2 does not expressly create a private right of action.**

"To determine whether a statute provides an express right of action, [courts] look for an express provision granting a federal cause of action to enforce the provisions of that act." *PCI Gaming Auth.*, 801 F.3d at 1294 (cleaned up). Congress has expressly authorized rights of action in many contexts. *See, e.g.*, 15 U.S.C.

§ 15(a) ("[A]ny person who shall be injured . . . by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States. . . .").[1] But as the statutory text reveals and the Department of Justice—which argues that Section 2 contains an *implied* private right of action—recently conceded, Section 2 contains no *express* private right of action. Statement of Interest of the United States at *9, *Arkansas NAACP*, No. 4:21-CV-01239-LPR (Jan. 28, 2022) (ECF No. 71).

Section 2 of the Voting Rights Act prohibits "any State or political subdivision" from imposing any "voting qualification or prerequisite to voting or standard, practice, or procedure" if it "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). Though this language imposes a duty on States, it says nothing about whether private parties may bring suit to enforce that duty. Because Section 2 contains no express provision granting private plaintiffs a federal cause of action, it does not create an express right of action. *PCI Gaming Auth.*, 801 F.3d at 1294; *see also Morse*, 517 U.S. at 232 (opinion of Stevens, J.) ("§ 2, like § 5, provides no right to sue on its face.").

---

[1] *See also* 18 U.S.C. § 2520(a) ("[A]ny person whose wire, oral, or electronic communication is intercepted . . . may in a civil action recover . . . such relief as may be appropriate."); 29 U.S.C. § 1132(a)(1)(B) ("A civil action may be brought . . . by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan. . . ."); 42 U.S.C. § 1983 ("Every person who, under color of any statute . . . subjects . . . any citizen of the United States . . . to the deprivation of any rights . . . shall be liable to the party injured in an action at law. . . .").

**B.     The Voting Rights Act's text and structure show that Section 2 does not contain an implied private right of action.**

"[P]rivate rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). "A reviewing court must "interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right *but also a private remedy*." *In re Wild*, 994 F.3d at 1255 (quoting *Sandoval*, 532 U.S. at 286). The creation of each—both a right and a remedy—is necessary for Congress to imply a cause of action to enforce a federal statute. *Id.* Because Section 2 contains neither a private right nor a private remedy, it contains no implied private right of action.

To be sure, "federal courts across the country, including both the Supreme Court and the Eleventh Circuit, have considered numerous Section Two cases brought by private plaintiffs." *Singleton v. Merrill*, 582 F. Supp. 3d 924, 1031 (N.D. Ala. 2022). But the Supreme Court has "repeatedly held that the existence of unaddressed jurisdictional defects has no precedential effect." *Lewis v. Casey*, 518 U.S. 343, 353 n.2 (1996). Likewise, a court passing on a Section 2 claim brought by a private plaintiff does not, without more, show that Congress created a private right of action for violations of Section 2. *See Webster v. Fall*, 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."). And neither the Supreme Court nor the Eleventh Circuit has

answered whether Section 2 contains a private right of action.[2] The answer to the question lies in the statute's text.

### i.    Section 2 does not create a new individual right.

To determine whether a statute creates a right, courts "look to the statutory text for 'rights-creating' language." *Love v. Delta Air Lines*, 310 F.3d 1347, 1352 (11th Cir. 2002) (quoting *Sandoval,* 532 U.S. at 288). "'Rights-creating language' is language explicitly conferring a right directly on a class of persons that includes the plaintiff in a case." *Love*, 310 F.3d at 1352 (cleaned up). A statute may create an individual right where it has "an *unmistakable focus* on the benefitted class." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002) (quoting *Cannon,* 441 U.S. at 692 n.13). But "laws enacted for the protection of the general public" or a statute written "simply as a ban on discriminatory conduct by recipients of federal funds" provides "far less reason to infer a private remedy in favor of individual persons." *Cannon*, 441 U.S. at 691; *Sandoval,* 532 U.S. at 289 ("Statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to

---

[2] In a judgment that the Supreme Court later vacated, the Eleventh Circuit held that the VRA validly abrogated state sovereign immunity because it "clearly expresses an intent to allow private parties to sue the States. The language of § 2 and § 3, read together, imposes direct liability on States for discrimination in voting and explicitly provides remedies to private parties to address violations under the statute." *Ala. State Conf. of NAACP v. Alabama*, 949 F.3d 647, 652 (11th Cir. 2020), *cert. granted, judgment vacated*, 141 S. Ct. 2618, (2021); *but see id.* at 656-57 (Branch, J., dissenting) ("[T]he text of Section 2 contains no language whatsoever—either explicitly or by implication—that allows private plaintiffs to sue a State in federal court.").

confer rights on a particular class of persons.'") (quoting *California v. Sierra Club,* 451 U.S. 287, 294 (1981)).

Section 2's text focuses on regulating and prohibiting certain actions by State governments, not providing new benefits to individual voters. By its terms, "No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision[.]" 52 U.S.C. § 10301(a). This restriction on State governments does not expressly create any new individual rights. To be sure, that restriction is limited to that which "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." *Id.* But the reference to "any citizen of the United States" hardly shows an unmistakable focus on a particular class; instead, the provision was "enacted for the protection of the general public," indicating that it does not create any individual right. *Cannon*, 441 U.S. at 691.

Even if Section 2 did identify a particular class of people it benefits, it is not enough that a statute refer to individuals the statute benefits; those individuals must be the *unmistakable focus* of the statute. For example, in finding no creation of a private right in the Family Educational Rights and Privacy Act, the Supreme Court distinguished FERPA from other statutory provisions in which Congress *did* create a private right:

> Unlike the individually focused terminology of Titles VI and IX ("No person ... shall ... be subjected to discrimination"), FERPA's provisions

speak only to the Secretary of Education, directing that "[n]o funds shall be made available" to any "educational agency or institution" which has a prohibited "policy or practice [of permitting the release of education records ... of students without the written consent of their parents to any individual, agency, or organization.]" 20 U.S.C. § 1232g(b)(1).

*Gonzaga*, 536 U.S. at 287 (last alteration added).[3] Like FERPA, Section 2 does not focus on the individuals it would benefit, but on the entity being regulated: "No voting qualification . . . shall be imposed or applied *by any State or political subdivision*[.]" 52 U.S.C. 10301(a) (emphasis added). Section 2 therefore does not contain an "unambiguously conferred right" that could support a private right of action. *See also Univs. Rsch. Ass'n, Inc. v. Coutu*, 450 U.S. 754, 772 (1981) ("Section 1 of the Davis-Bacon Act requires that certain stipulations be placed in federal construction contracts for the benefit of mechanics and laborers, but it does not confer rights directly on those individuals.").

### ii.    Section 2 does not contain a private right of action.

To discern whether a statute creates a private right of action, statutory intent—as adduced from the statute's text—is determinative. *In re Wild*, 994 F.3d at 1255. Without a "clear expression of congressional intent to authorize a would-be plaintiff to sue, 'a cause of action does not exist and courts may not create one, no matter

---

[3] In *Gonzaga*, the Supreme Court considered whether a plaintiff could enforce a purported statutory right under 42 U.S.C. § 1983. 536 U.S. at 276. Whether considering the enforcement of a statutory right under § 1983 or via an implied private right of action, the analysis regarding *the creation* of a right is the same. *Id.* at 285-86, 290.

10

how desirable that might be as a policy matter, or how compatible with the statute.'" *Id.* (quoting *Sandoval*, 532 U.S. at 286-87). Courts may not "plumb a statute's supposed purposes and policies in search of the requisite intent to create a cause of action." *Id.* at 1255. Instead, "the inquiry both begins and ends with a careful examination of the statute's language." *Id.* Provisions in the statute that "prescribe— and circumscribe—judicial involvement and enforcement" are likely to show whether the provision at issue contains a private remedy. *Id.* at 1256. A close look the VRA's text and structure shows "no clear evidence that Congress intended to authorize" a private remedy. *Id.* Each VRA provision that could even arguably weigh in favor of an implied private right of action will be considered in turn.

**1.** Section 2 itself says nothing about a private right of action. Its first subsection prohibits a State or political subdivision from imposing or applying any voting qualification, prerequisite, standard, practice, or procedure "which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]" 52 U.S.C. 10301(a). The second subsection elaborates on how to prove a violation of the "results test" set forth in the first subsection. *Id.*(b). But nothing in Section 2 speaks to the consequences of a violation.

**2.** That issue is addressed by Section 12—entitled "Civil and criminal sanctions"—which, true to name, sets forth civil and criminal consequences for those who violate Section 2 or certain other VRA provisions. 52 U.S.C. § 10308.

11

Notably, this provision focuses on enforcement proceedings instituted by the Attorney General of the United States. And because "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others," *Sandoval*, 532 U.S. at 290, this provision indicates that in passing the Voting Rights Act, Congress *did not* make a remedy available to private plaintiffs.

Consider subsections (a) and (c) of Section 12, which concern criminal enforcement. Those subsections provide that anyone who violates, attempts to violate, or conspires to violate Sections 2, 3, 4, 5, 10, or 11 of the Act shall be fined up to $5,000 and/or be imprisoned for up to five years. 52 U.S.C. § 10308. And, given the potential punishment of fines and imprisonment, it can't be that Congress would intend for private parties to pursue these remedies under Section 12. *See Chapa v. Adams*, 168 F.3d 1036, 1038 (7th Cir. 1999) (Easterbrook, J.) ("Criminal statutes, which express prohibitions rather than personal entitlements and specify a particular remedy other than civil litigation, are accordingly poor candidates for the imputation of private rights of action.").

Section 12(d) likewise cuts strongly against attempts to read a private right of action into Section 2:

> Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice prohibited by [§§ 2, 3, 4, 5, 10, or 11], section 1973e of Title 42, or subsection (b) of this section, the Attorney General may institute for the United States, or in the name of the United States, an action for preventive relief, including an application for a temporary or permanent

> injunction, restraining order, or other order, and including an order
> directed to the State and State or local election officials to require them
> (1) to permit persons listed under chapters 103 to 107 of this title to
> vote and (2) to count such votes.

52 U.S.C. § 10308(d). So, when "there are reasonable grounds to believe" that a

violation of Section 2 is forthcoming, Section 12(d) affirmatively authorizes the

Attorney General of the United States to seek a preliminary or permanent injunction

to prevent the violation. But Section 12(d) makes no mention of private parties,

which strongly implies their exclusion. *See Sandoval*, 532 U.S. at 290; *see also*

*Karahalios v. Nat'l Fed'n of Fed. Emps.*, 489 U.S. 527, 533 (1989) ("[I]t is . . . an

'elemental canon' of statutory construction that where a statute expressly provides a

remedy, courts must be especially reluctant to provide additional remedies."

(quoting *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 (1979)));

*Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453, 458

(1974) ("[W]hen legislation expressly provides a particular remedy or remedies,

courts should not expand the coverage of the statute to subsume other remedies.");

*McDonald v. S. Farm Bureau Life Ins. Co.*, 291 F.3d 718, 725 (11th Cir. 2002)

("When Congress creates certain remedial procedures, we are, 'in the absence of

strong indicia of contrary congressional intent, . . . compelled to conclude that

Congress provided precisely the remedies it considered appropriate.'") (quoting

*Karahalios*, 489 U.S. at 533); *Love*, 310 F.3d at 1353 (Courts "ought not imply a

private right of action" where the "statutory structure provides a discernible enforcement mechanism.").

Section 12(f) also warrants discussion. It provides:

> The district courts of the United States shall have jurisdiction of proceedings instituted pursuant to this section and shall exercise the same without regard to whether a person asserting rights under the provisions of chapters 103 to 107 of this title shall have exhausted any administrative or other remedies that may be provided by law.

52 U.S.C. § 10308(f). Read in isolation, this subsection might indicate that Congress thought any person could bring suit to enforce Section 2, which is part of Chapter 103. After all, it is private litigants who generally must exhaust administrative remedies.

But a closer look at the Section 12's structure shows that subsection (f) indicates no such thing. Read in light of Section 12(e), it is apparent that Section 12(f) does not create, recognize, or assume a private right of action. Section 12(e) provides:

> Whenever . . . there are observers appointed . . . [and] any persons allege to such an observer within forty-eight hours after the closing of the polls that notwithstanding (1) their listing under chapters 103 to 107 of this title or registration by an appropriate election official and (2) their eligibility to vote, they have not been permitted to vote in such election, the observer shall forthwith notify the Attorney General if such allegations in his opinion appear to be well founded. Upon receipt of such notification, the Attorney General may forthwith file with the district court an application for an order providing for the marking, casting, and counting of the ballots of such persons and requiring the inclusion of their votes in the total vote before the results of such election shall be deemed final and any force or effect given thereto. The

> district court shall hear and determine such matters immediately after
> the filing of such application. The remedy provided in this subsection
> shall not preclude any remedy available under State or Federal law.

52 U.S.C. 10308(e). The "person asserting rights" language in Section 12(f) does

not describe a hypothetical private plaintiff in a Section 2 enforcement proceeding.

Instead, "the person asserting rights" language is referencing a person on whose

behalf the Attorney General of the United States brings suit under § 12(e).

In the context of Section 12(e), Section 12(f)'s discussion of exhaustion of

remedies makes perfect sense. The Attorney General of the United States should not

have to wait to pursue a Section 12(e) action until the individual voter exhausts

administrative remedies or other legal remedies (such as state law remedies

or Section 1983 litigation). Correspondingly, Section 12(e) reserves for the voter

"remed[ies] available under State or Federal law," but it does not create any new

remedies. Sections 12(e) and (f) work in combination such that the Attorney General

can quickly bring a Section 12(e) suit on behalf of a voter, while the voter can

individually bring his or her own suit under state law or other federal law (*i.e.*, not

the Voting Rights Act) if such other law provides a private right of action. Nothing

about this set-up suggests—much less requires—the conclusion that Section 12(f)

recognizes or assumes the private enforceability of Section 2.

**3.** Next consider Section 3 of the Voting Rights Act, which appears to

authorize specific relief in certain lawsuits brought by either the Attorney General

of the United States or an "aggrieved person." 52 U.S.C. § 10302. Under this provision, a district court is permitted to "retain jurisdiction for such period as it may deem appropriate" over "proceedings instituted by the Attorney General or an aggrieved person under any statute to enforce the guarantees of the fourteenth or fifteenth amendment in any State or political subdivision" if the court "finds that violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred within the territory of such State or political subdivision." 52 U.S.C. § 10302(c). During the period in which a court exercises jurisdiction pursuant to this provision, "no qualification or prerequisite or voting or standard, practice, or procedure with respect to voting different from that in force or effect at the time the proceeding was commenced shall be enforced" unless the court finds that it "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color" or the voting requirement in question "has been submitted by the chief legal officer or other appropriate official of such State or subdivision" to the Attorney General and obtained preclearance. *Id.*

This provision contemplates suits brought by "aggrieved persons" to enforce the guarantees of the Fourteenth and Fifteenth Amendments under "any statute" that gives private litigants a cause of action to enforce those Amendments. But it does not create—even implicitly—a wholly *new* cause of action under the VRA. The purpose of Section 3(c) is to allow a district court to "assume for that jurisdiction a

function identical to that of the District Court for the District of Columbia in § 5

preclearance proceedings" once it "has struck down an unconstitutional practice."

*Reno v. Bossier Parish School Bd.*, 528 U.S. 320, 333, n. 2 (2000). This preclearance

function presupposes, rather than creates, jurisdiction over *constitutional*[4] claims

brought by "aggrieved persons." For example, Plaintiffs in this action have requested

relief under Section 3(c), Doc. 83 at 53 ¶ G, a remedy distinct from the declaratory

and injunctive relief purportedly sought under Section 2, *id.* at 53 ¶¶ B-C. The

availability of such a remedy under Section 3 presupposes the existence of another

cause of action brought by an aggrieved person—such as Plaintiffs' Section 1983

claims, *see* Doc. 83 ¶¶ 195-204—but says nothing about the existence of a claim

brought under Section 2.

To the extent Section 3 is read to refer to claims brought by private plaintiffs

under the VRA, "[t]he most logical deduction from the inclusion of 'aggrieved

person' in [§ 3] is that Congress meant to address those cases brought pursuant to

---

[4] Indeed, it appears that counsel for Plaintiffs has indicated that Section 3(c) is available only for constitutional violations, not Section 2 violations. LDF, *Standing in the Breach: Using the Remaining Tools in the Voting Rights Act to Combat Voting Discrimination* at *4 (Jan. 5, 2021) ("Following the Supreme Court's devastating ruling in *Shelby County, Alabama v. Holder*, Section 3(c), which had rarely been the subject of litigation, remains an avenue to 'bail in' jurisdictions and require them to preclear voting changes as a *remedy* to a finding of *intentional* discrimination in violation of the U.S. Constitution.") (available at https://www.naacpldf.org/wp-content/uploads/LDF-Sections-2-and-3c-VRA-primer-1.5.21.pdf); *see also* Brian F. Jordan, *Finding Life in Hurricane Shelby: Reviving the Voting Rights Act by Reforming Section 3 Preclearance*, 75 OHIO ST. L.J. 969, 979 (2014) ("Section 3 authorizes federal judges to submit states or other jurisdictions to preclearance if the court finds violations of the Fourteenth or Fifteenth Amendments. In other words, the court must first find that the jurisdiction engaged in intentional discrimination[.]").

17

the private right of action that this Court had recognized as of 1975, *i.e.,* suits under

§ 5, as well as any rights of action that [the Supreme Court] might recognize in the

future." *Morse*, 517 U.S. at 289 (Thomas, J., dissenting, joined by Rehnquist, C.J.,

Scalia, and Kennedy, JJ.). There is no reason to think that Section 3 itself implies

the creation of a *new* cause of action in Section 2.

**4.** Finally, an examination of Section 14 yields the same result. That provision

allows for attorneys' fees, expert fees, and other litigation costs to be awarded to the

"prevailing party, other than the United States," in "action[s] or proceeding[s] to

enforce the voting guarantees of the fourteenth or fifteenth amendment." 52 U.S.C.

§ 10310(e). By its text, Section 14—like Section 3—is concerned only with actions

or proceedings brought to enforce the Fourteenth or Fifteenth Amendments. *See*

*supra* n.6.

Further, Section 14's text permits attorney fees for *any* "prevailing party"

other than the United States, not just a private plaintiff. So long as the "*lawsuit* could

be described as 'an action or proceeding to enforce the voting guarantees of the

fourteenth or fifteenth amendment,'—without regard to who filed the case or who

was seeking fees," the text of Section 14 seemingly permits attorney fees to any

prevailing party. *See Shelby County v. Holder*, 43 F. Supp. 3d 47, 62 (D.D.C. 2014)

(noting that such interpretation is "faithful to the statutory text"). To be sure, the

court in *Shelby County* did not award fees to Shelby County, but only because Shelby

County was not "entitled" to fees—the court "le[ft] for another day" the question of whether Shelby County was "eligible" for fees. *Id.* at 61; *see also Shelby County v. Lynch*, 799 F.3d 1173 (D.C. Cir. 2015) (affirming district court and assuming without deciding that Shelby County was "eligible" for fees because it was not "entitled" to fees).

Moreover, 42 U.S.C. "§ 1988 … authorizes a fee award to a prevailing defendant," *Fox v. Vice*, 563 U.S. 826, 833 (2011), not just a prevailing plaintiff. That provision too includes familiar "prevailing party" language, which "Congress has included … in various fee-shifting statutes, and it has been the [Supreme] Court's approach to interpret the term in a consistent manner." *CRST Van Expedited, Inc. v. E.E.O.C.*, 578 U.S. 419, 422 (2016). This precedent thus strongly suggests that under VRA Section 14, a State that prevails in an action brought by the United States Attorney General could be a prevailing party potentially eligible for a fee award. And because parties other than the United States *or* a would-be private plaintiff—that is, either a defendant or a Section 5 plaintiff like Shelby County—can be prevailing parties under Section 14, that provision does not presuppose that Section 2 includes a right of action for private plaintiffs.

\*    \*    \*

In short, no part of the VRA shows that Congress implied a private right to sue for violations of Section 2. Instead, the VRA's text and structure show that

Congress intended the Attorney General to enforce Section 2, strongly implying the exclusion of any private remedy. Though certain provisions of the VRA could be read to refer to the existence of a private remedy, the statute lacks the "clear expression of congressional intent to authorize a would-be plaintiff to sue" under Section 2 that is required to find an implied private right of action. *In re Wild*, 994 F.3d at 1255. Because Congress did not create a right for private plaintiffs to enforce Section 2, Plaintiffs' Section 2 claims must be dismissed.

### C. Supreme Court precedent does not establish the existence of a private right of action.

The *Milligan* court stated that the Supreme Court in *Morse* decided a "close cousin" of the question whether Section 2 contains a private right of action and opined that precedent "strongly suggests" that Section 2 provides such a right. 2022 WL 265001 at *79. But *Morse*'s dictum suggesting an implied cause of action to enforce the guarantees of Section 2 was a self-conscious extension of *Allen v. State Bd. of Elections*, 393 U.S. 544 (1969), in which the Supreme Court held that there is an implied private cause of action to enforce Section 5 of the VRA, 52 U.S.C. § 10304. *Morse*, 517 U.S. at 231-32 & 240. So, then, analyzing *Morse* (and understanding the force of its reasoning) begins with analyzing *Allen*.

In *Allen*, the Supreme Court implied a private right of action to enforce Section 5 of the Voting Rights Act. 393 U.S. at 555. The *Allen* Court readily acknowledged that Congress did not include a private right of action in the VRA's

text. *Id.* at 554. Nevertheless, the Court created just such a private right of action based on policy considerations:

> The achievement of the Act's laudable goal could be severely hampered, however, if each citizen were required to depend solely on litigation instituted at the discretion of the Attorney General. For example, the provisions of the Act extend to States and the subdivisions thereof. The Attorney General has a limited staff and often might be unable to uncover quickly new regulations and enactments passed at the varying levels of state government.
>
> . . . .
>
> The guarantee of [§] 5 that no person shall be denied the right to vote for failure to comply with an unapproved new enactment subject to [§] 5, might well prove an empty promise unless the private citizen were allowed to seek judicial enforcement of the prohibition.

*Id*. at 556-57.

Since then, the Supreme Court has repeatedly discredited and disavowed this reasoning. The Court has made clear that private rights of action are not to be implied merely because they are "desirable . . . as a policy matter, or [] compatible with the statute." *Sandoval*, 532 U.S. at 286-87. *Allen* is the epitome of this sort of freewheeling approach. In fact, the Supreme Court has specifically identified *Allen* as the defective product of an outdated jurisprudence that too loosely implied private rights of action where Congress had created none:

> During this "*ancien regime*," the Court assumed it to be a proper judicial function to "provide such remedies as are necessary to make effective" a statute's purpose. Thus, as a routine matter with respect to statutes, the Court would imply causes of action not explicit in the statutory text itself.

*Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017). In short, *Allen* was decided long before *Sandoval* and its progeny, which established an undeniably stricter standard to show the creation of an implied private right of action. *Allen*'s discredited reasoning, then, is not helpful in figuring out whether Section 2 contains a private right of action.

All this leads to *Morse*. That decision had no majority opinion. Five of the Justices, however, agreed to imply a private right of action to enforce Section 10 of the VRA. 517 U.S. 186. The Supreme Court reversed a district court that had held that Section 10 of the VRA contains no implied private right of action. *Id.* at 230. Justice Stevens, writing for himself and Justice Ginsburg, acknowledged that the district court's ruling "might have been correct if the Voting Rights Act had been enacted recently" but concluded that the ruling "fail[ed] to give effect to our cases holding that our evaluation of congressional action 'must take into account its contemporary legal context.'" *Id.* at 230-31 (quoting *Cannon*, 441 U.S. at 698-99).

Despite this recognition, Justice Stevens believed that the implied-right-of-action analysis should still account for the "highly liberal standard for finding private remedies" that was commonplace in the 1960s. *Id.* at 231. According to Justice Stevens, considering this "contemporary legal context" was the proper way to determine what Congress wanted when it passed the Voting Rights Act. *Id.* So, for example, it was important to Justice Stevens that Congress "acted against a

'backdrop' of decisions in which implied causes of action were regularly found." *Id.* The three Justices concurring in the judgment—Justices Breyer, O'Connor, and Souter—were far more succinct. Essentially, they found "that the rationale of [*Allen*] applies with similar force" to Section 10. *Id.* at 240 (Breyer, J., concurring in the judgment) (citing S. Rep. No. 97-417, pt. 1, p. 30 (1982)).

Much like that of *Allen* itself, the *Morse* approach to the private-right-of-action analysis does not survive *Sandoval* and its progeny. In *Sandoval*, the Supreme Court expressly refused to "revert . . . to the understanding of private causes of action that held sway . . . when [the statute] was enacted." 532 U.S. at 287. The Court was explicit that use of "contemporary legal context" to smuggle the old ways of judicial invention into modern times was a non-starter. *Id.* at 288. "[C]ontemporary legal context" is only relevant "to the extent it clarifies text." *Id.* It cannot be used to read into a statute a private remedy that is not there.

To be sure, *Allen* and *Morse* are binding precedent insofar as they held that Sections 5 and 10 are privately enforceable. But these cases cannot be stretched any further. *See Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 165 (2008); *see also* Bryan Garner et al., The Law of Judicial Precedent 79 (2016) ("Modes of analysis aren't binding on future courts in the same way legal rules are."). Any discussion about private enforcement of Section 2 in those cases is not only dicta, but dicta based on methods of interpretation that the Supreme Court has long since

abandoned. Absent binding precedent that extends *Allen* or *Morse* to Section 2, those cases are inapplicable here.

*    *    *

Courts "interpret statutes with a presumption against, not in favor of, the existence of an implied right of action." *In re Wild*, 994 F.3d at 1274 (W. Pryor, J., concurring). A close look at the Voting Rights Act's text and structure cannot support an argument that overcomes this weighty presumption. Without clear statutory indication of a private right of action, "courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Sandoval*, 532 U.S. at 286-87. Because the VRA contains no such clarity, Plaintiffs here have no cause of action under Section 2, and their claim must be dismissed.

## II.  Plaintiffs' equal protection claims are due to be dismissed for failure to state a claim.

To prevail on a redistricting claim under the Equal Protection Clause, a plaintiff must prove that public officials acted with discriminatory *intent*, not just that the conduct had discriminatory *effects*. *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977); *Washington v. Davis*; 426 U.S. 229, 238-45 (1976). That is, a plaintiff must show that "the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects on an identifiable group." *Personnel Admin'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). To establish the required "because of"

24

intent in a gerrymandering case, a plaintiff must prove that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Cooper v. Harris*, 581 U.S. 285, 291 (2017). In other words, "[e]vidence of *race-based* discrimination is necessary to establish a constitutional violation." *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 924 (11th Cir. 2023).

Plaintiffs have not alleged facts that could make that showing here. As set out in more detail below, Plaintiffs face a series of demanding hurdles to state a claim under the Equal Protection Clause in the redistricting context. Because the allegations in the Amended Complaint do not come close to satisfying Plaintiffs' demanding burden, Plaintiffs' constitutional claims should be dismissed.

### A.    Plaintiffs bringing equal protection challenges to districting legislation must bear a "demanding" burden of proof.

*First*, any "successful equal protection claim under the Fourteenth Amendment requires proof of *both* an intent to discriminate and actual discriminatory effect." *GBM*, 992 F.3d at 1321.[5] Thus, plaintiffs must show that "the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects on an identifiable group." *Feeney*, 442 U.S. at 279. Even when dealing with a small number of decisionmakers,

---

[5] *Ala. Legis. Black Caucus v. Alabama*, 988 F. Supp. 2d 1285, 1305 (M.D. Ala. 2013) ("It is well settled that we are bound by Eleventh Circuit precedent when we sit as a three-judge district court.") (collecting cases).

"[p]roving the motivation behind official action is often a problematic undertaking." *Hunter v. Underwood*, 471 U.S. 222, 228 (1985).

*Second*, in trying to prove the intent of a body the size of the Alabama Legislature, "the difficulties in determining the actual motivations of the various legislators that produced a given decision increase." *Id.* It is not enough to prove the motives of only a handful of the bill's backers, for "the legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2350 (2021). Instead, a plaintiff must show "that the legislature as a whole was imbued with racial motives." *Id.* Making that showing is not merely difficult, it "is a problematic and near-impossible challenge." *GBM*, 992 F.3d at 1324. Accordingly, when there are "legitimate reasons" for a legislature to enact a particular law, courts should "not infer a discriminatory purpose on the part of the State." *McCleskey*, 481 U.S. at 298-99 (rejecting Equal Protection challenge to Georgia "capital punishment statute" despite its alleged "racially disproportionate impact"); *see also GBM*, 992 F.3d at 1326 (affirming grant of summary judgment to defendants where "legislative body passed a nondiscriminatory voter ID law, supported by valid neutral justifications"); *cf. Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009) (dismissing claim at pleadings stage based on "obvious alternative explanation" for defendants' conduct).

*Third*, attacks on redistricting legislation face additional hurdles. "Federal-court review of districting legislation represents a serious intrusion on the most vital of local functions." *Miller v. Johnson*, 515 U.S. 900, 915 (1995). Redistricting "is a most difficult subject for legislatures, requiring a delicate balancing of competing considerations." *Bethune-Hill v. Va. St. Bd. of Elections*, 580 U.S. 178, 187 (2017) (internal quotation marks omitted). Moreover, "redistricting differs from other kinds of state decisionmaking in that the legislature always is *aware* of race when it draws district lines…." *Id.* So while in most other contexts, "any mention of race by the decisionmakers may be cause for suspicion[,] … that is not so in the redistricting context." *Cooper v. Harris*, 581 U.S. 285, 347 (2017) (Alito, J., concurring in the judgment in part and dissenting in part).

Plaintiffs thus face a "demanding … burden of proof." *Easley v. Cromartie*, 532 U.S. 234, 257 (2001) (*Cromartie II*) (internal quotation marks omitted). They "must show that 'race was the *predominant* factor motivating the legislature's decision to place a significant number of voters within or without a particular district.'" *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 272 (2015) (emphasis added) (quoting *Miller*, 515 U.S. at 916). That requires proving "that the legislature subordinated traditional race-neutral districting principles ... to racial considerations." *Id*. (emphasis deleted). If plaintiffs cannot show "that racial considerations [we]re 'dominant and controlling,'" they have failed to carry their

heavy burden. *Cromartie II*, 532 U.S. at 257 (quoting *Miller*, 515 U.S. at 913). Throughout this inquiry, "the good faith of a state legislature must be presumed." *Miller*, 515 U.S. at 915.

### B. Plaintiffs' allegations cannot carry their "demanding" burden of proof.

With those standards in mind, it is plain that Plaintiffs fail to allege facts that could prove that the Legislature acted with a racially discriminatory purpose in adopting the 2021 House and Senate Maps. As the Amended Complaint recognizes, Senator McClendon explained on the senate floor that the Maps were drawn "race blind[]"—i.e., "racial data 'was removed from the screen." *See* Doc. 83 ¶ 78. The Amended Complaint's factual allegations—even taken as true—do not show instead that the Alabama Legislature acted with racially discriminatory intent.

Plaintiffs' allegations that could even possibly establish an improper motive fall into a few buckets: (1) some legislators' concerns about the Maps' potential racial effects, *e.g.*, *id.* ¶ 54; (2) allegations about the challenged districts' shapes or the districts' asserted adherence to traditional districting criteria, *e.g.*, *id.* ¶ 110; (3) legal assertions such as that race was the predominant factor in the drawing of the challenged districts or that black voters in certain districts were cracked or packed, *e.g.*, *id.* ¶ 5; and (4) allegations that the Legislature didn't consider race *enough* by failing to conduct certain racial-polarization analyses or otherwise

comply with Section 2 of the Voting Rights Act, *e.g.*, *id.* ¶¶ 107, 115. None of these allegations can show a constitutional violation in any of the challenged districts.

First, the statements by individual legislators are not "facts plausibly showing" that race motivated the Legislature's decision to adopt the Maps, much less that race was the predominant factor behind it. *Iqbal*, 556 U.S. at 682. For example, Plaintiffs allege that one legislator "explained that it appeared that in areas with significant percentages of people of color, 'you dove into cities just to capture[] the Black population and to pack them into districts.'" Doc. 83 ¶ 55. This allegation about the *appearance* of racial discrimination is nothing more than an allegation about discriminatory *effect*. No such allegation plausibly connects the map's alleged discriminatory *effects* to the *intent* of those who adopted it. *See Washington v. Davis*, 426 U.S. 229, 239 (1976) (explaining that "a law" is not "unconstitutional solely because it has a racially disproportionate impact").

What's more, even if alleged statements from individual legislators could show discriminatory intent, such allegations would still fail to create a plausible inference "that the legislature *as a whole* was imbued with racial motives." *Brnovich*, 141 S. Ct. at 2350 (emphasis added); *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 932 (11th Cir. 2023) ("[T]he explanatory value of an isolated statement [of a legislator] would be limited."). Ultimately, legislators' conclusory statements do not support an inference of racial discrimination. *See*

*Iqbal*, 556 U.S. at 681; *see also Butts v. City of New York*, 779 F.2d 141, 147 (2d Cir. 1985) (explaining "that the speculations and accusations" of a law's opponents "do not support an inference of . . . racial animus"). Thus, these allegations in the Amended Complaint could not show a violation of the Equal Protection Clause.

Second, the allegations about the shape and other characteristics of the challenged districts fall well short of shouldering Plaintiffs' heavy burden to show an equal protection violation. Although there have been a few "rare cases in which a statistical pattern of discriminatory impact demonstrated a constitutional violation," those cases involved "statistical disparities" so stark that they were "'tantamount for all practical purposes to a mathematical demonstration' that the State acted with a discriminatory purpose." *McCleskey*, 481 U.S. at 294 n.12 (1987) (quoting *Gomillion*, 364 U.S. at 341). Factual allegations such as characterizing the shape of a portion of a district as a "pronounced divot," *e.g.*, doc. 83 ¶ 89, don't come close to factual allegations that could make such a "demonstration."

Third (and relatedly), Plaintiffs' conclusory allegations of *law* cannot shoulder their burden and avoid dismissal. Throughout the Amended Complaint, Plaintiffs assert that "[r]ace was the predominant factor in" drawing certain districts. *E.g.*, Doc. 83 ¶ 84. But the Court need not "accept" such allegations "as true." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Instead, Plaintiffs must make "[f]actual allegations" that "raise [the] right to relief above the speculative level."

*Twombly*, 550 U.S. at 555. Because they have not done so, their challenge under the Equal Protection Clause is due to be dismissed.

Finally, Plaintiffs include several allegations that seem to assert that the Legislature used race but used it incorrectly. *E.g.*, Doc. 83 ¶ 107 ("This haphazard lumping of Black Alabamians into the challenged districts is[]not narrowly tailored to comply with the VRA."). To be clear, there are no factual allegations in the Amended Complaint that could show that the Legislature used race in drawing any of the challenged districts. Instead, Plaintiffs seem to allege that the Legislature didn't use race enough. *Id.* ¶ 75 ("Multiple voters raised that the Reapportionment Committee had not conducted sufficient racial-polarization analyses[.]"). Ultimately, Plaintiffs do not explain how an alleged *lack* of racial polarization studies could show discriminatory intent on the part of the Alabama Legislature. Because the Legislature *not* using race in the map-drawing process is not evidence of racially discriminatory intent, these allegations do not prevent dismissal of Plaintiffs' constitutional claims.

The decision of a three-judge court rejecting a similar equal protection challenge to another congressional redistricting plan at the motion-to-dismiss stage is instructive. *See Simpson v. Hutchinson*, —F. Supp. 3d—, No. 4:22-cv-213, 2022

WL 14068633 (Oct. 24, 2022 E.D. Ark. 2022) (three-judge court).[6] There, the plaintiffs brought a vote-dilution claim under Equal Protection Clause. *Id.* at *1-2. The three-judge court recognized that the plaintiffs' complaint needed to "contain facts that plausibly show, either directly or indirectly, that Arkansas's General Assembly acted with that [discriminatory] purpose in mind" and that race was the predominant factor. *Id.* at *2 (citing *Ashcroft*, 556 U.S. at 682; *Easley*, 532 U.S. at 241). The court walked through the plaintiffs' allegations—including statements from legislators, statements from the Governor, and the rejection of available alternative plans—before concluding that "there [wa]s no 'smoking gun'" and that "there [we]re no allegations that 'nudge[d]' an inference of discriminatory intent 'across the line from conceivable to plausible.'" *Id.* (quoting *Iqbal*, 556 U.S. at 680). Thus, the complaint could not survive a motion to dismiss for failure to state a claim.

The same analysis applies here. Plaintiffs assert that the 2021 Maps are racially discriminatory, but they have not alleged *facts* that could allow a plausible inference of discriminatory intent. Because Plaintiffs have not alleged facts that could show that the Legislature enacted the 2021 Maps "'because of,' not merely 'in spite of,' its adverse effects on an identifiable group," *Feeney*, 442 U.S. at 279,

---

[6] *See also Simpson v. Thurston*, No. 4:22-CV-213, 2023 WL 3993040, at *2 (E.D. Ark. May 25, 2023) (holding subsequently amended complaint likewise due to be dismissed).

Plaintiffs' claims under the Equal Protection Clause are due to be dismissed for failure to state a claim.

## CONCLUSION

The Third Amended Complaint is due to be dismissed in full.

Steve Marshall
  *Attorney General*

Edmund G. LaCour Jr. (ASB-9182-U81L)
  *Solicitor General*

/s/ James W. Davis

James W. Davis (ASB-4063-I58J)
  *Deputy Attorney General*

A. Barrett Bowdre (ASB-2087-K29V)
Thomas A. Wilson (ASB-1494-D25C)
  *Deputy Solicitors General*

Misty S. Fairbanks Messick (ASB-1813-T71F)
A. Reid Harris (ASB-1624-D29X)
Brenton M. Smith (ASB-1656-X27Q)
Benjamin M. Seiss (ASB-2110-O00W)
  *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama  36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Barrett.Bowdre@AlabamaAG.gov
Thomas.Wilson@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Misty.Messick@AlabamaAG.gov
Reid.Harris@AlabamaAG.gov
Brenton.Smith@AlabamaAG.gov

Ben.Seiss@AlabamaAG.gov

***Counsel for Secretary of State Allen***

## CERTIFICATE OF SERVICE

I certify that on July 24, 2023, I electronically filed the foregoing notice with the Clerk of the Court using the CM/ECF system, which will send notice to all counsel of record.

/s/    James W. Davis
Counsel for Secretary Allen