FILED

2023 Sep-22  PM 04:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| LAQUISHA CHANDLER, *et al.*, | |
| *Plaintiffs,* | Case No. 2:21-cv-1531-AMM |
| v. | **THREE-JUDGE COURT** |
| WES ALLEN, *et al.*, | |
| *Defendants.* | |

## STATEMENT OF INTEREST OF THE UNITED STATES

The United States respectfully submits this Statement of Interest pursuant to 28 U.S.C. § 517, which authorizes the Attorney General "to attend to the interests of the United States in a suit pending in a court of the United States."  This case presents important questions regarding enforcement of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.  Congress has vested the Attorney General with authority to enforce Section 2 on behalf of the United States.  *See* 52 U.S.C. § 10308(d).  Accordingly, the United States has a substantial interest in ensuring Section 2's proper interpretation.  The United States submits this Statement of Interest to address the availability of a private right of action to enforce Section 2.  The United States expresses no views on any other issue in this case.

# I.    BACKGROUND

Following the 2020 decennial census, a Special Session of the Alabama Legislature passed a redistricting plan for the State's legislative districts, signed into law by Alabama Governor Kay Ivey on November 4, 2021.  Several private plaintiffs challenged the plan in this Court, alleging among other things that the plan has a discriminatory result in violation of Section 2 of the Voting Rights Act because it dilutes the voting power of Black voters in the State.  Third Am. Compl. ¶¶ 205-11, ECF 83.  Defendants filed motions to dismiss arguing in part that Section 2 of the Voting Rights Act does not contain a private right of action.  ECF 92, 93.

Section 2 of the Voting Rights Act (VRA), 52 U.S.C. § 10301, imposes a "permanent, nationwide ban on racial discrimination in voting." *Shelby Cnty. v. Holder*, 570 U.S. 529, 557 (2013).  Section 2(a) prohibits any state or political subdivision from imposing or applying a "voting qualification," a "prerequisite to voting," or a voting "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color" or membership in a language minority group.  52 U.S.C. § 10301(a); *see also* 52 U.S.C. § 10303(f)(2).  A violation of Section 2 "is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a [protected class] in that its members have less

opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b). A violation of Section 2 can "be established by proof of discriminatory results alone." *Chisom v. Roemer*, 501 U.S. 380, 404 (1991).

## II.    ARGUMENT

**A. Private Plaintiffs May Sue to Enforce Section 2.**

Courts have heard hundreds of Section 2 cases brought by private parties through decades of litigation under the VRA. *See, e.g.,* Ellen D. Katz et al., *To Participate and Elect: Section 2 of the Voting Rights Act* at 40, Univ. Mich. L. Sch. Voting Rights Initiative (2022), https://voting.law.umich.edu (estimating that private plaintiffs have brought over 350 Section 2 cases since 1982). Where the question has arisen, courts have held with near-unanimity that Section 2 can be enforced by private plaintiffs. See *infra* note 2.

Defendants' motions to dismiss here rely on the rationale of a single outlier ruling that is currently on appeal. *See* Defs.' Mot. to Dismiss 5-6, ECF 92 ("MTD"); *citing Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment*, 586 F. Supp. 3d 893 (E.D. Ark. 2022), *on appeal* No. 22-1395 (8th Cir.).[1] The

---

[1] The United States has discussed at length why Section 2 of the Voting Rights Act provides a private right of action. *See, e.g.*, U.S. Brief as Amicus filed April 22, 2022 in *Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment*, No. 22-1395 (8th Cir.) (discussing at length why the the district court decision in *Arkansas State Conf.* is incorrect), available at https://www.justice.gov/crt/case-document/arkansas-state-conference-naacp-v-arkansas-board-apportionment-brief-amicus.

reasoning of that outlier ruling has already been explicitly rejected by several other courts. *See, e.g., Robinson v. Ardoin*, 605 F. Supp. 3d 759, 819 (M.D. La. 2022) (rejecting *Arkansas State Conf. NAACP*), *cert. granted before judgment,* 142 S. Ct. 2892 (2022), *and cert. dismissed as improvidently granted*, 143 S. Ct. 2654 (2023); *Alpha Phi Alpha Fraternity, Inc v. Raffensperger*, 587 F. Supp 3d. 1222, 1243, n.10 (N.D. Ga. 2022) (same); *Coca v. City of Dodge City*, No. 22-1274-EFM, 2023 WL 2987708, at *3-5 (D. Kan. Apr. 18, 2023) (same), *motion to certify appeal denied*, No. 22-1274-EFM, 2023 WL 3948472 (D. Kan. June 12, 2023); *Georgia State Conf. of NAACP v. Georgia*, 2022 WL 18780945, at *7 (N.D. Ga. Sept. 26, 2022) (three-judge court) (same); *Turtle Mountain Band of Chippewa Indians v. Jaeger*, 2022 WL 2528256, at *5 (D.N.D. July 7, 2022) (same).  Moreover, in the Alabama congressional redistricting case, a three-judge panel has recently rejected a similar argument made by the State that Section 2 does not provide a private right of action.  *Singleton* v. *Merrill*, 582 F.Supp.3d 924, 1031-1032 (N.D. Ala. 2022) (three-judge court) ("although the Supreme Court has not directly decided this question, it has decided a close cousin of a question, and that precedent strongly suggests that Section Two provides a private right of action"), *aff'd sub nom. Allen v. Milligan*, 143 S. Ct. 1487 (2023) (not discussing the private right of action question).

Supreme Court precedent, congressional ratification, and the structure of the VRA make clear that Section 2 can be enforced by private plaintiffs.  The rights-

creating language in Section 2 is fully consistent with congressional intent to create a private right of action. And even if one were to conclude—against the near-unanimous weight of authority—that Section 2 contains no private right of action, the statute would nevertheless be enforceable through 42 U.S.C. § 1983. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002).

1. *Supreme Court precedent and the VRA's text establish a private right of action to enforce Section 2.*

The Supreme Court recognized more than 25 years ago that although Section 2 "provides no right to sue on its face, 'the existence of the private right of action under Section 2 . . . has been clearly intended by Congress since 1965.'" *Morse v. Republican Party of Va.*, 517 U.S. 186, 232 (1996) (opinion of Stevens, J., joined by Ginsburg, J.) (alteration in original) (quoting S. Rep. No. 417, 97th Cong., 2d Sess. (1982) ("1982 Senate Report")); *accord id.* at 240 (opinion of Breyer, J., concurring in the judgment, joined by O'Connor & Souter, JJ.). Twice the Court has confronted the question whether certain sections of the VRA contain implied rights of action, and both times the Court answered yes. In *Allen v. State Board of Elections*, the Court found a private right of action to enforce Section 5 of the VRA, 52 U.S.C. § 10304(a), which required covered jurisdictions to obtain preclearance from the Attorney General or the United States District Court for the District of Columbia before subjecting any "person" to a new voting qualification or procedure. 393 U.S. 544, 556-57 (1969). Decades later, in *Morse*, the Court

5

found an implied private right of action to enforce Section 10 of the VRA, 517 U.S. at 232-234, which prohibits jurisdictions from conditioning the right to vote on payment of a poll tax.  *See* 52 U.S.C. § 10306(a).  The Court recognized the presence of a private right of action in these cases because "[t]he achievement of the [VRA's] laudable goal" to "make the guarantees of the Fifteenth Amendment finally a reality for all citizens  *  *  *  could be severely hampered  *  *  *  if each citizen were required to depend solely on litigation instituted at the discretion of the Attorney General."  *Allen*, 393 U.S. at 556; *see also Morse*, 517 U.S. at 231.

*Morse*'s conclusion that private plaintiffs can enforce Section 10 flows directly from the Supreme Court's recognition that Congress intended the same for Section 2.  The *Morse* Court held that private plaintiffs must be able to enforce Section 10 because "[i]t would be anomalous, to say the least, to hold that both § 2 and § 5 are enforceable by private action but § 10 is not, when all lack the same express authorizing language."  517 U.S. at 232; *accord id.* at 240 (Breyer, J., concurring) (stating that *Allen's* rationale "applies with similar force not only to § 2 but also to § 10").  Because private plaintiffs' ability to enforce Section 2 was foundational to *Morse*'s holding, it would be illogical to conclude that Section 2— unlike Sections 5 and 10—lacks a private right of action.  Accordingly, over the

last 25 years, a vast body of lower court decisions have held that Section 2 can be enforced by private plaintiffs.[2]

Congress has ratified the consensus view that Section 2 is privately enforceable. "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard* v. *Pons*, 434 U.S. 575, 580 (1978); *cf. Tex. Dep't of Hous. & Cmty. Affs.* v. *Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 536 (2015) (concluding that Congress had "ratified the unanimous holdings of the Courts of Appeals" that plaintiffs can bring disparate impact claims under the Fair Housing Act because it was "aware of [the] unanimous precedent" and "made a considered judgment to retain the relevant statutory text"). In repeatedly amending the VRA, Congress never questioned that Section 2 is privately enforceable. Pub. L. No. 91-285, 84 Stat. 14 (1970); Pub. L. No. 94-73, 89 Stat. 400 (1975); Pub. L. No. 97-

---

[2] *See, e.g.*, *Mixon v. Ohio*, 193 F.3d 389, 406 & n.12 (6th Cir. 1999) ("An individual may bring a private cause of action under Section 2 of the [VRA]."); *Roberts v. Wamser*, 883 F.2d 617, 621 (8th Cir. 1989) (recognizing that individual voters have standing to bring a Section 2 claim); *League of United Latin Am. Citizens v. Abbott*, 2021 WL 5762035, at *1 (W.D. Tex. Dec. 3, 2021) (three-judge court) (denying a motion to dismiss arguing that Section 2 lacks a private right of action); *Georgia State Conf. of NAACP v. Georgia*, 269 F. Supp. 3d 1266, 1275 (N.D. Ga. 2017) (three-judge court) ("Section 2 contains an implied private right of action." (citing *Morse*, 517 U.S. at 232)); *Veasey v. Perry*, 29 F. Supp. 3d 896, 906 (S.D. Tex. 2014) (holding that "individual voter[s]" and organizations have the "power to enforce" Section 2); *Perry-Bey v. City of Norfolk*, 678 F. Supp. 2d 348, 362 (E.D. Va. 2009) ("The [VRA] creates a private cause of action."). Although Justice Gorsuch recently suggested that "[l]ower courts have treated this as an open question," his concurring opinion relied solely on a case that predated *Morse* and "[a]ssum[ed] without deciding" that Section 2 is privately enforceable. *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2350 (2021) (Gorsuch, J., concurring) (citing *Washington v. Finlay*, 664 F.2d 913, 926 (4th Cir. 1981)).

205, 96 Stat. 131 (1982); Pub. L. No. 109-246, 120 Stat. 577 (2006).  And

Congress cited *Allen* approvingly.  *See, e.g.*, S. Rep. No. 295, 94th Cong., 1st Sess.

16 (1975) (1975 Senate Report); H.R. Rep. No. 196, 94th Cong., 1st Sess. 9

(1975); H.R. Rep. No. 397, 91st Cong., 1st Sess. 4, 8 (1969).  Moreover, in the

1982 Senate Report that the Supreme Court called the "authoritative source for

legislative intent" behind amended Section 2, *Thornburg* v. *Gingles*, 478 U.S. 30,

43 n.7 (1986), Congress "reiterate[d] the existence of the private right of action

under section 2."  1982 Senate Report 30.

2. *Congress's intent to create a private right of action flows directly from the Sandoval framework.*

The Supreme Court in *Alexander v. Sandoval* established the relevant

framework for analyzing implied causes of action.  532 U.S. 275 (2001).  As noted

by the Court in *Sandoval*, at times during its "*ancien regime*" the Court had taken a

permissive approach to recognizing implied causes of action under federal statutes.

*Id.* at 287.  But also noting that this permissive approach did not comport with the

limited role of the judiciary, the Court emphasized that "[l]ike substantive federal

law itself, private rights of action to enforce federal law must be created by

Congress * * *  The judicial task is to interpret the statute Congress has passed to

determine whether it displays an intent to create not just a private right but also a

private remedy."  *Id.* at 286-87.  Thus, under the Court's *Sandoval* framework,

before finding an implied cause of action under a federal statute, a court must

ensure that the statute at issue—namely its text and structure (*see id.* at 288 & n.7)—contains both "'rights-creating' language" and language demonstrating Congress's intent to provide a private remedy to enforce the right created. *Id.* at 286-88.

The *Sandoval* framework reinforces the conclusion that Congress intended to create a private right of action to enforce Section 2, *see* 532 U.S. at 288-89. In *Sandoval*, the Court found no implied private cause of action to enforce disparate-impact regulations promulgated pursuant to Section 602 of Title VI of the Civil Rights Act of 1964 (citation omitted), as no rights-creating language existed in that statute. 532 U.S. at 288–93. However, in so holding, the Court distinguished Section 602 (no rights-creating language) from Section 601, which contains language highlighted by the Court as a specific example of a "rights-creating" provision:

> *No person* in the United States *shall, on the ground of race, color, or national origin*, be excluded from participation in, be denied the benefits of, or *be subjected to discrimination under any program or activity receiving Federal financial assistance*.

42 U.S.C. § 2000d (emphases added); *see Sandoval*, 532 U.S. at 288. That language is substantially similar to Section 2, which indisputably contains the "rights-creating language" that, under *Sandoval*, is so "critical" to finding a private right of action. *Sandoval*, 532 U.S. at 288. Section 2 provides:

> *No voting* qualification or prerequisite to voting or *standard, practice, or*

*procedure shall be imposed or applied* by any State or political subdivision *in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote* on account of race or color, or [membership in a language minority group].

52 U.S.C. § 10301(a) (emphases added); *see Georgia State Conf. of NAACP v. Georgia*, 2022 WL 18780945, at *4 (N.D. Ga. Sept. 26, 2022) (three-judge court) (finding a private right of action under Section 2, noting that Section 2's "language closely resembles" that of Section 601). Both provisions confer private rights.

Section 2 "grants" individual citizens "a right to be free from" discriminatory voting practices. *Chisom v. Roemer*, 501 U.S. 380, 392 (1991) (quoting H.R. Rep. No. 439, 89th Cong., 1st Sess. 23 (1965)). "If that is not rights-creating language, we are not sure what is." *Georgia State Conf. of NAACP*, 2022 WL at *4; "It is difficult to imagine more explicit or clear rights creating language. It cannot be seriously questioned that Section 2 confers a right on a particular class of people." *Turtle Mountain Band of Chippewa Indians*, 2022 WL 2528256, at *5.[3]

> *3. Congress's intent to create a private right of action is evinced by the text and structure of the Voting Rights Act as a whole.*

The text and structure of the entire VRA also reveal Congress's "intent to create a private remedy" to enforce Section 2, *Sandoval*, 532 U.S. at 289, and

---

[3] *Allen* relied on similar language to infer Congress's intent to create a private right of action to enforce Section 5. 393 U.S. at 555; *see* 52 U.S.C. § 10304 (providing that "no person shall be denied the right to vote for failure to comply with [a] qualification, prerequisite, standard, practice, or procedure" covered by, but not approved under, Section 5).

Congress's intent to provide a private remedy to enforce Section 2 also can be inferred from the text of Sections 12(f), 3, and 14(e) of the VRA.

**Section 12(f)** provides:

> The district courts of the United States shall have jurisdiction of proceedings instituted pursuant to [Section 12 of the VRA] and shall exercise the same without regard to whether *a person asserting rights* under the provisions of [the VRA] shall have exhausted any administrative or other remedies that may be provided by law.

52 U.S.C. § 10308(f) (emphasis added).  The statutory term "person" is broad and "include[s] corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals."  Dictionary Act, 1 U.S.C. § 1. Section 12(f) therefore reflects Congress's intent that federal courts have subject matter jurisdiction over suits to enforce the VRA's substantive provisions— including Section 2—brought by private plaintiffs, as well as by the United States, when it has been given litigating authority.  *Allen*, 393 U.S. at 555 n.18 (finding "force" to the argument that Section 12(f) "necessarily implies that private parties may bring suit under the [VRA]").  Indeed, because Congress repeatedly stated its intent for a private right of action to exist under Section 2—*see* 1982 Senate Report 30; 1981 House Report 32—it would have understood Section 12(f) as allowing district courts to hear such suits.

Defendants incorrectly assert that Section 12(f)'s language merely "referenc[es] a person on whose behalf the Attorney General of the United States brings suit under § 12(e)."  MTD 15-16.  Section 12(e) permits the Attorney

General to seek a court order requiring an individual's vote to be counted if, within 48 hours of the polls closing, such individual alleges to an election observer appointed under the VRA that she was improperly prohibited from voting.  52 U.S.C. § 10308(e).  Defendants argue that subsections 12(e) and (f) "work in combination such that the Attorney General of the United States can quickly bring a § 12(e) suit on behalf of a voter, while the voter can individually bring his or her own suit under state law or other federal law (*i.e.*, not the Voting Rights Act) if such law provides a private right of action."  MTD 15; *see Arkansas State Conf. NAACP*, 586 F. Supp. 3d. at 910.  This Court should reject that strained reading because Section 12(f) references "chapters 103 to 107" of the VRA—*i.e.*, the full panoply of the statute's substantive provisions—and not Section 12(e) alone.  And whereas subsection (e) provides a narrow authority to the Attorney General tailored to exigent circumstances surrounding casting of ballots, subsection (f) is an omnibus provision granting federal courts subject-matter jurisdiction over *all* VRA claims.  Compare 52 U.S.C. § 10308(e), with 52 U.S.C. § 10308(f).  Finally, Section 12(e) *itself* provides federal courts with subject-matter jurisdiction over claims brought by the Attorney General under that provision.  52 U.S.C. § 10308(e) (providing that "the Attorney General may * * * file with *the district court* an application" under Section 12(e) and that "*[t]he district court* shall hear and determine such matters immediately after the filing of such application" (emphases added)).  The *Arkansas* district court's interpretation of subsections (e)

and (f), adopted by Defendants here, would render superfluous the latter's broad reference to "a person asserting rights under" the VRA.

**Section 3** provides for certain remedies in actions brought by "the Attorney General *or an aggrieved person* . . . under *any* statute to enforce the voting guarantees of the fourteenth or fifteenth amendment." 52 U.S.C. § 10302(a), (b), (c) (emphases added); *see also Roberts v. Wamser*, 883 F.2d 617, 621, 624 (8th Cir. 1989) (recognizing that Section 3 provides "aggrieved" voters standing to bring a Section 2 claim).

Knowing full well that *Allen* had construed the VRA as permitting private suits, 393 U.S. at 556-557, Congress in 1975 amended Section 3 to add the term "aggrieved person" "'to make what was once implied now explicit:  private parties can sue to enforce the VRA.'" *Fla. State Conf. of NAACP v. Lee*, 576 F. Supp. 3d 974, 989 (N.D. Fla. 2021) (citations omitted); Pub. L. No. 94-73, § 401, 89 Stat. 404; 1975 Senate Report 40 (stating that an "aggrieved person" includes "an individual or an organization representing the interests of injured persons").

Under Section 3, which provides for "the general enforcement mechanisms of the Act," *Fla. State Conf. of NAACP*, 576 F. Supp. 3d at 989 (citations omitted)*,* "an aggrieved person" may "institute[ ] a proceeding under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment."  52 U.S.C. § 10302(a); *Fla. State Conf. of NAACP*, 576 F. Supp. 3d at 989 (citations omitted).

Importantly, Section 3 speaks not of actions to enforce *this section*; but rather actions under "*any statute* to enforce the voting guarantees of the fourteenth or fifteenth amendment."  52 U.S.C. § 10302(a) (emphasis added); *Fla. State Conf. of NAACP*, 576 F. Supp. 3d at 989.  And as "the Supreme Court has explained, when a statute 'by its terms' is 'designed for enforcement of the guarantees of the Fourteenth and Fifteenth Amendments, . . . Congress must have intended it to provide private remedies.'"  *Fla. State Conf. of NAACP*, 576 F. Supp. 3d at 989 (quoting *Morse*, 517 U.S. at 233–34).

Congress clearly designed Section 2 to enforce the constitutional voting rights guarantees.  Pub. L. No. 89-110, 79 Stat. 437 (1965) (describing the original VRA as an act "[t]o enforce to enforce the fifteenth amendment to the Constitution of the United States"); 1982 Senate Report 40 ("[T]o enforce fully the Fourteenth and Fifteenth Amendments, it is necessary that Section 2 ban election procedures and practices that result in a denial or abridgment of the right to vote."); 1981 House Report 31 ("Section 2, as amended, is an exercise of the broad remedial power of Congress to enforce the rights conferred by the Fourteenth and Fifteenth Amendments.").  Thus, Section 2 remains a "statute to enforce the voting

guarantees of the fourteenth or fifteenth amendment" to which Section 3's private

remedies apply.  52 U.S.C. § 10302.[4]

**Section 14(e)** bears on the question presented in ways similar to Section 3.

It provides:

> In any action or proceeding to enforce the voting guarantees of the
> fourteenth or fifteenth amendment, the court, in its discretion, may allow the
> prevailing party, *other than the United States*, a reasonable attorney's fee.

52 U.S.C. § 10310(e) (emphasis added).  Like Section 3, Section 14(e) reflects

Congress's understanding that private plaintiffs can bring claims under the VRA's

substantive provisions—including Section 2.  Congress added Section 14(e) to the

statute in 1975, well aware of *Allen*'s holding.  Pub. L. No. 94-73, § 402, 89 Stat.

404; see also 1981 House Report 32 (stating that if private plaintiffs prevail under

Section 2, "they are entitled to attorneys' fees under [Section 14(e)] and [42 U.S.C.

§] 1988"); 1975 Senate Report 40 (finding "appropriate" the award of "attorneys'

fees to a prevailing party in suits to enforce the voting guarantees of the Fourteenth

and Fifteenth amendments, *and statutes enacted under those amendments*" because

---

[4] Defendants note that Section 3(c) relief is "available only for constitutional violations, not
Section 2 violations," MTD 17 n.4.  However, such bail-in relief is not the only remedy provided
under Section 3—there are others:  appointment of federal observers (Section 3(a)), and
suspension of tests/devices that deny or abridge the right to vote (Section 3(b)) that do not
require proof of a violation of the fourteenth or fifteenth amendments.  52 U.S.C. §§ 10302(a)
and (b).  And all three Section 3 remedies remain available to an "aggrieved person [suing] under
*any statute* to enforce the voting guarantees of the fourteenth or fifteenth amendment."  52
U.S.C. 10302 (emphasis supplied).

"Congress depends heavily on private citizens to enforce the fundamental rights involved" (emphasis added)).

"[P]revailing party" is a "legal term of art" with which Congress was intimately familiar in 1975. *Buckhannon Bd. & Care Home, Inc.* v. *West Va. Dep't of Health & Hum. Res.*, 532 U.S. 598, 602-603 (2001) (specifically listing Section 14(e) of the VRA as an example of the term's technical use). The Supreme Court construed a nearly identical provision in Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a-3(b), as allowing private plaintiffs to recover attorney's fees whenever they secure a legal victory. *Newman* v. *Piggie Park Enters., Inc.*, 390 U.S. 400, 401-402 (1968) (per curiam). As the Court explained, suits under Title II of the Civil Rights Act are "private in form only," and when a private plaintiff sues under that statute, "he does so not for himself alone but also as a 'private attorney general.'" *Id.* (citations omitted). For that reason, the Court construed the term "prevailing party" broadly "to encourage individuals injured by racial discrimination to seek judicial relief" because "[i]f successful plaintiffs were routinely forced to bear their own attorneys' fees, few aggrieved parties would be in a position to advance the public interest by invoking the injunctive powers of the federal courts." *Id.*

When Congress inserted the term "prevailing party" into Section 14, it therefore did so with the plain understanding that that term is tailored to statutes—like Section 2—that allow private plaintiffs to sue as private attorneys general.

*Shelby Cnty.* v. *Lynch*, 799 F.3d 1173, 1185 (D.C. Cir. 2015) ("Congress intended for courts to award fees under the VRA, pursuant to the *Piggie Park* standard, when prevailing parties help[] secure compliance with the statute."), *cert. denied*, 577 U.S. 1119 (2016); *accord Donnell* v. *United States*, 682 F.2d 240, 245 (D.C. Cir. 1982), *cert. denied*, 459 U.S. 1204 (1983).

Defendants suggest that Congress intended Section 14(e) to allow prevailing *defendants* to obtain attorney's fees—*e.g.*, "a State that prevails in an action brought by the United States Attorney General [and thus] eligible for a fee award"—and that Section 14 thus "does not presuppose that Section 2 includes a right of action for private plaintiffs." MTD 18-19. But the Supreme Court has construed the term "prevailing party" to allow defendants to recover attorney's fees only under very narrow circumstances. *Christianburg Garment Co.* v. *EEOC*, 434 U.S. 412, 421-422 (1978) (construing Title VII's fee-shifting provision, 42 U.S.C. § 2000e-5(k), to allow a defendant to recover as a "prevailing party" only when "the plaintiff's action was frivolous, unreasonable, or without foundation" because to do otherwise "would substantially add to the risks inhering in most litigation and would undercut" Congress's efforts to promote Title VII's "vigorous enforcement"); *accord Hughes* v. *Rowe*, 449 U.S. 5, 14 (1980) (per curiam) (same in the context of 42 U.S.C. § 1988(b)). No credible argument can be made that Congress intended by inserting the word "prevailing party" into Section 14(e) to provide for defendants to recover under the narrow circumstances described in

17

*Christianburg Garment* and *Hughes* but not for private plaintiffs to recover under the far broader circumstances under which plaintiffs typically can recover under similar fee-shifting statutes.

Collectively, Sections 12(f), 3, and 14(e) of the VRA evince Congress's intent to provide a private remedy to enforce Section 2's rights-creating language.

Further, Congress's "intent to create not just a private right but also a private remedy," *Sandoval*, 532 U.S. at 286, is clear in Section 2 when it "'recognized that private rights of action' were available under the VRA when it 'reenacted and extended the life of the Voting Rights Act in 1975.'" *Fla. State Conf. of NAACP*, 576 F. Supp. 3d at 989  (citations omitted); *see also supra*, Part I.A.1.

## B. Private Plaintiffs Can Enforce Rights Conferred by Section 2 through Section 1983.

Even if Section 2 did not confer a private right of action—and it does—the statute is presumptively enforceable against Defendants through 42 U.S.C. § 1983, which provides a general remedy for private plaintiffs to redress violations of federal rights committed by state actors.  *See Maine v. Thiboutot*, 448 U.S. 1, 4 (1980) (holding that "the plain language" of Section 1983 "undoubtedly embraces" suits by private plaintiffs to enforce federal statutory rights); *Turtle Mountain Band*

*of Chippewa Indians*, 2022 WL 2528256, at *6 ("Section 2 may be enforced through § 1983").[5]

To determine whether private plaintiffs can enforce a federal statute through Section 1983, under the test set forth by the Supreme Court, a court must first "determine whether Congress intended to create a federal right" in the statute that a plaintiff seeks to enforce. *Gonzaga Univ.*, 536 U.S. at 283 (emphasis omitted). That analysis "is no different from the initial inquiry in an implied right of action case." *Id.* at 285. Once a court determines a federal right exists, that "right is presumptively enforceable by § 1983," and a plaintiff "do[es] not have the burden of showing an intent to create a private remedy because § 1983 generally supplies a remedy for the vindication of rights secured by federal statutes." *Id.* at 284.

Although defendants can rebut the presumption that a federal right is enforceable through Section 1983, they can do so only by "demonstrat[ing] that Congress shut the door to private enforcement either [1] expressly, through specific evidence from the statute itself" or "[2] impliedly, by creating a *comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983*." *Id.* at 284 n.4 (emphasis added; citations and internal quotation marks omitted). Specifically, a defendant could rebut the presumption

---

[5] *Cf., Migliori* v. *Cohen*, 36 F.4th 153, 159 (3d Cir. 2022) ("Voters may enforce the Materiality Provision of the Civil Rights Act (52 U.S.C. § 10101(a)(2)(B)) by an action brought under 42 U.S.C. § 1983"), *cert. granted, judgment vacated sub nom. Ritter v. Migliori*, 143 S. Ct. 297 (2022) (mem.).

by showing that Congress provided "a more restrictive *private remedy*" for violation of the relevant statute. *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 121 (2005) (emphasis added). That showing is rare indeed. Even an express private remedy does not "conclusively" foreclose the possibility that Congress meant such a remedy "to complement, rather than supplant § 1983." *Id.* at 122.

Section 2 is unquestionably a rights-creating statute. *See supra*, Part I.A. Defendants therefore bear the burden of rebutting the presumption that Section 2 is enforceable through Section 1983. *Gonzaga Univ.*, 536 U.S. at 284. They cannot. Congress clearly did not "shut the door to private enforcement" of Section 2, *id.* at 284 n.4, because "there is certainly no specific exclusion of private actions" in the VRA. *Allen*, 393 U.S. at 555 n.18; *cf. Schwier v. Cox*, 340 F.3d 1284, 1297 (11th Cir. 2003) (holding that a voting provision of the Civil Rights Act of 1964, 52 U.S.C. § 10101, is enforceable by private plaintiffs through Section 1983). Nor does the VRA provide for "a more restrictive private remedy," *Abrams*, 544 U.S. at 121, than Section 1983. While the VRA permits the United States to enforce Section 2, these public remedies do not constitute "a comprehensive enforcement scheme" and are "[]compatible with individual enforcement under § 1983," *Gonzaga Univ.*, 536 U.S. at 284 n.4; *see also Turtle Mountain Band of Chippewa Indians*, 2022 WL 2528256, at *6 ( "[P]rivate enforcement actions have co-existed with collective enforcement brought by the United States for decades."). Accordingly, Section 2 is also enforceable under Section 1983.

## III.    CONCLUSION

For the foregoing reasons, private plaintiffs have a private right of action under Section 2.  The Court should therefore deny Defendants' motions to dismiss on that basis.


Dated:  September 22, 2023                  Respectfully submitted,

PRIM F. ESCALONA                            KRISTEN CLARKE
United States Attorney                      Assistant Attorney General
                                            Civil Rights Division


By: */s/  Carla C. Ward*            By:    */s/  Victor J. Williamson*
CARLA C. WARD                              T. CHRISTIAN HERREN, JR. (AL
Deputy Chief, Civil Division               6671R63T)
United States Attorney's Office            TIMOTHY F. MELLETT (DC 430968)
Northern District of Alabama               VICTOR J. WILLIAMSON (DC
1801 Fourth Avenue North                   495783)
Birmingham, Alabama 35203                  Attorneys
(205) 244-2185                             Civil Rights Division
carla.ward@usdoj.gov                       U.S. Department of Justice
                                           950 Pennsylvania Ave NW – 4CON
                                           Washington, D.C. 20530
                                           Phone: (800) 253-3931
                                           victor.williamson@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 22, 2023, I electronically filed the

foregoing Statement of Interest of the United States, using the CM/ECF system,

which will send notification of such filing to all counsel of record.


        */s/ Carla C. Ward*
CARLA C. WARD
Deputy Chief, Civil Division
United States Attorney's Office
Northern District of Alabama
1801 Fourth Avenue North
Birmingham, Alabama 35203
(205) 244-2185
carla.ward@usdoj.gov