FILED
2023 Sep-22  PM 09:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| LAQUISHA CHANDLER, *et al.*, | |
| *Plaintiffs*, | |
| v. | No. 2:21-cv-1531-AMM |
| WES ALLEN, *et al.*, | |
| *Defendants*. | |

## <u>PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS</u>

Plaintiffs Laquisha Chandler, Evan Milligan, Khadidah Stone, Greater Birmingham Ministries, and the Alabama State Conference of the NAACP allege that six Alabama Senate Districts in Madison, Montgomery, and Jefferson Counties, and thirteen State House Districts in the Jefferson County and Tuscaloosa County areas, are racially gerrymandered in violation of Section 2 of the Voting Rights Act ("VRA") and the Fourteenth Amendment of the Constitution. *See* Pls.' Third Amended Compl., ECF No. 83 ("Complaint"). Plaintiffs allege that the enacted plan (the "2021 Plan") results in discrimination in violation of Section 2 and that race was the Legislature's predominate motive in the design of certain districts in a manner not narrowly tailored to comply with Section 2 in violation of the Fourteenth Amendment. In their Motions to Dismiss, Defendants assert that Plaintiffs as private

parties cannot sue under Section 2 of the VRA, and Defendants challenge the sufficiency of Plaintiffs' racial gerrymandering allegations, but do not challenge the sufficiency of Plaintiffs' Section 2 allegations. *See* Defs.' Mot. to Dismiss ("Defs.' Br."), ECF No. 92 at 1–2.

Since 1965 the existence of the private right of action under Section 2 has been the undisputed law of the land. *See Morse v. Republican Party of Va.*, 517 U.S. 186, 232 (1996) (plurality opinion). To assuage any doubt, in 1975, Congress amended the VRA to "provide the same remedies to private parties as had formerly been available to the Attorney General alone," *id*. at 233, making explicit that either the "Attorney General *or aggrieved person*" can seek relief to enforce the VRA. 52 U.S.C. § 10302(a), (b), and (c) (emphasis added). Over the decades, federal courts— including the Supreme Court—have heard hundreds of private plaintiffs' Section 2 cases. *See, e.g.*, *Allen v. Milligan ("Milligan II")*, 599 U.S. 1 (2023). Only one of those cases has been dismissed on the grounds that Section 2 lacks a private right of action. For good reason, "the existence of the private right of action under Section 2 has been clearly intended by Congress since 1965." *Morse*, 517 U.S. at 232 (cleaned up). Even if there were any ambiguity in the statutory text and design of the VRA (and there is not), Plaintiffs could bring Section 2 claims against Defendants, all of whom are proper parties to this action, under both the VRA and 42 U.S.C. § 1983.

Defendants nonetheless seek relief that runs counter to decades of binding precedent and judicial action.

There is no basis to dismiss this case. Plaintiffs have sufficiently pled their constitutional claims alleging Alabama's state legislative maps constitute unlawful racial gerrymanders. And Legislative Defendants' are proper parties to this case, and explicitly waived legislative privilege. For these reasons and those explained below, the court should deny the Defendants' motions to dismiss in full.

## FACTUAL BACKGROUND

### I.    Factual Allegations

Alabama has "historically had difficulty with reapportionment." Compl. ¶ 26 (quoting *Kelley v. Bennett*, 96 F. Supp. 2d 1301, 1308 (M.D. Ala. 2000), *rev'd on other grounds, Sinkfield v. Kelley*, 531 U.S. 28, 29 (2000)). This difficulty was manifest in the current redistricting cycle, with the Legislature twice failing to enact a congressional district plan that complied with Section 2, *Milligan*, 599 U.S. at 17–24; *Milligan v. Allen*, No. 2:21-CV-1291-AMM, 2023 WL 5691156, at *1 (N.D. Ala. Sept. 5, 2023).

In the 2010 redistricting cycle, a three-judge court similarly held that the Legislature had unconstitutionally racially gerrymandered twelve House and Senate districts. *Ala. Legis. Black Caucus v. Ala. ("ALBC II")*, 231 F. Supp. 3d 1026, 1348–49 (M.D. Ala. 2017). Federal courts have found similar constitutional and statutory

violations in previous redistricting cycles. *See, e.g.*, *Reynolds v. Sims*, 377 U.S. 533 (1964); *Wesch v. Hunt*, 785 F. Supp. 1491 (S.D. Ala. 1992), *aff'd sub nom. Camp v. Wesch*, 504 U.S. 902 (1992) (mem.); *Burton v. Hobbie*, 561 F. Supp. 1029 (M.D. Ala. 1983); *Burton v. Hobbie*, 543 F. Supp. 235 (M.D. Ala. 1982); *Sims v. Amos*, 336 F. Supp. 924 (M.D. Ala. 1972), *aff'd mem.*, 409 U.S. 942 (1972); *Sims v. Baggett*, 247 F. Supp. 96 (M.D. Ala. 1965); *Brooks v. Hobbie*, 631 So.2d 883, 884 (Ala. 1993).

## II.    2021 Legislative Redistricting Process

Following the results of the U.S. 2020 Census, the Alabama Permanent Legislative Committee on Reapportionment (the "Committee') began developing redistricting plans for the State Senate and State House of Representatives. Compl. ¶ 43. The Census results showed that Alabama's population grew by 5.1% between 2010 and 2020. *Id.* ¶ 42.  Alabama's population identified as 63.1% non-Hispanic white, 26.9% as any part Black, and 5.3% as Hispanic. *Id*. These percentages reflected a Black population increase of 3.5%, Hispanic population increase of 42.3%, and a decline in the white population by 1%. *Id*.

The Alabama Legislature passed the challenged House and Senate redistricting plans on November 4, 2021, in a Special Legislative Session. Plaintiffs Alabama NAACP, Greater Birmingham Ministries, and Evan Milligan, as well as Committee Members and members of the public, implored the Committee to conduct

a racially polarized voting analysis in each House and Senate district before passing the maps, to ensure compliance with Section 2. Compl. ¶¶ 48, 51-53, 55, 66-67, 75. Some members of the Committee expressed concern that it was selectively disregarding the State's redistricting guidelines on keeping counties whole, following traditional redistricting principles, and splitting communities of interest, which resulted in racial disparities that disadvantaged Black Alabamians. Compl. ¶¶ 48, 51-55, 66, 67, 72, 75. The Committee disregarded those concerns and passed the challenged maps. *Id.* ¶ 56.

Race predominated over traditional redistricting principles in the design of the challenged House and Senate districts, violating the Committee's own redistricting guidelines. *See* Compl. ¶¶ 33–41. The violations, which occur in many of the challenged districts, include: statistically noncompact districts, bizarrely-shaped districts in which irregular features create racial disparities, county splits that create racial disparities, and community of interest splits that create racial disparities. *Id.* ¶¶ 83–115. The racial predominance in these district boundaries is not narrowly tailored to serve Section 2 compliance or any other governmental interest. *Id.*

By way of example, Senate District Seven surgically carves out some of the Black population of central and north Huntsville to split apart those communities into two other Senate Districts, thereby diluting the voting power of Huntsville's Black voters. *See id.* ¶ 86. The six House Districts around Tuscaloosa County also

evidence that racial demographics determined district lines. *Id.* ¶ 114. There, Black and white voters had their districts drawn so as to lump Black voters into several districts, while carving out white voters into others. *Id.* ¶ 115. These are just a few of the many examples of racial gerrymandering Plaintiffs highlight in their Complaint. *Id.* ¶¶. 83–115.

After Plaintiffs filed suit, the Secretary and Legislative Defendants both answered Plaintiffs' original Complaint. *See* ECF Nos. 52, 53. Once Plaintiffs submitted a Second Amended Complaint, ECF No. 57, the Secretary—but not the Legislative Defendants—filed a motion to dismiss. ECF No. 58. This court held this matter in abeyance, pending the resolution of *Allen v. Milligan*, 599 U.S. 1 (2023) (decided on June 8, 2023), in the Supreme Court. ECF No. 59. Plaintiffs moved to modify the stay twice: first at a status conference on May 20, 2022, where both the Secretary and Legislative Defendants participated, and again by motion on February 16, 2023, to which all Defendants responded. ECF No. 73, at 6. The stay was lifted on June 9, 2023, ECF No. 75, and all Defendants filed their motions to dismiss thereafter. ECF Nos. 92, 93.

## LEGAL STANDARD

On a motion to dismiss for failure to state a claim for which relief may be granted, courts must "accept[] the complaint's allegations as true and constru[e]

them in the light most favorable to the plaintiff." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1335 (11th Cir. 2012).

Where the factual allegations provide "enough fact to raise a reasonable expectation that discovery will reveal evidence of the defendant's liability," the court must deny the motion to dismiss. *Id*. at 1337 (cleaned up). Racial gerrymandering cases involve an "inherently complex endeavor" of evaluating intentional discrimination claims, requiring the "trial court to perform a 'sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999) (citation omitted). The pretrial dismissal of such cases is "inappropriate" where, as here, the alleged "evidence is susceptible of different interpretations or inferences by the trier of fact." *See id*. at 553 (reversing the grant of summary judgment for the defendants in a racial gerrymandering case).

## ARGUMENT

I.  **The Statutory Text and Binding Precedent Require this Court to Find that the Voting Rights Act Contains a Private Right of Action.**

### A. The Supreme Court Has Interpreted the Voting Rights Act to Permit Private Litigants to Sue Under Section 2 and Other Sections of the Act.

The Supreme Court has consistently read the VRA to contain a private right of action, and the Court has recognized Congress's codification of this right. This court is bound by that precedent and Alabama provides no valid reason to depart from it.

7

In *Allen v. State Bd. of Elections*, the Supreme Court recognized that Section 5 of the VRA was enforceable by private litigants because of its implied private right of action. 393 U.S. 544, 557 (1969). The Court properly held that "achievement of the Act's laudable goal could be severely hampered . . . if each citizen were required to depend solely on litigation instituted at the discretion of the Attorney General." *Id*. at 556. Recognizing the importance of this ruling, Congress codified this private right of action in two ways in the 1975 amendments to the VRA. First, Congress amended Section 3 of the VRA to provide that the "Attorney General *or an aggrieved person*" could pursue certain remedies, including injunctions against devices "used for the purpose or *with the effect*" of racial discrimination. 52 U.S.C. § 10302(a), (b), and (c) (emphasis added). Additionally, Congress added Section 14(e), which allows a "prevailing party, *other than the United States*," to obtain attorneys' fees in VRA enforcement actions. 52 U.S.C. § 13010(e) (emphasis added).

Based on this history, in *Morse v. Republican Party of Virginia*, the Court recognized that the text, purpose, and history of the VRA explicitly and implicitly permit private litigants to sue under the VRA. 517 U.S. 186, 231–32 (1996). In *Morse*, the Supreme Court considered whether private actors could enforce Section 10 of the VRA, which authorizes the Attorney General to challenge poll taxes with a discriminatory "purpose or effect," but does not mention private plaintiffs. 517

8

U.S. at 231-33 & n.42 (quoting 52 U.S.C. § 10306). In holding that Section 10 does provide such a private right of action, Justice Stevens' plurality opinion, joined by Justice Ginsburg, expressly recognized that the "existence of the private right of action under Section 2 . . . has been clearly intended by Congress since 1965." *Id.* at 232 (quoting S. Rep. No. 97-417, at 30 (1982)).[1] Notably, that opinion also "attached significance to the fact that the Attorney General had urged" the Court "to find that private litigants may enforce the Act," *id.*, 517 U.S. at 231, just as the United States has here. ECF No. 110, at 3. Justice Breyer, joined by Justices O'Connor and Souter, also held that "Congress intended to establish a private right of action to enforce § 10, no less than it did to enforce §§ 2 and 5." *Id.* at 240 (Breyer, J., concurring). And, based on the 1975 Amendments, six Justices agreed that Section 3 "*explicitly* recognizes that private individuals can sue under the Act." *Id*. at 289 (Thomas, J., dissenting) (emphasis added) (cleaned up); *id*. at 234 (op. of Stevens, J., with Ginsburg, J.); *id*. at 240 (Breyer, J., concurring, with O'Connor, Souter, JJ.).

Relying on *Morse* and the 1975 Amendments, every court in this circuit to consider the issue has concluded that Section 2 has a private right of action.[2] *See,*

---

[1] The Senate Report is the "authoritative source" for interpreting Section 2. *Thornburg v. Gingles*, 478 U.S. 30, 44 n. 7 (1986); *accord Milligan II*, 599 U.S. at 10, 30 (consulting the Senate Report); *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2333 (2021) (same).

[2] Other courts agree. *See, e.g.*, *Roberts v. Wamser*, 883 F.2d 617, 621 (1989); *Coca v. City of Dodge City*, No. 22-1274-EFM, 2023 WL 2987708, at *5 (D. Kan. Apr.

*e.g.*, *Ala. State Conf. of NAACP v. Ala.*, 949 F.3d 647, 653 (11th Cir. 2020) (holding that Section 2 contains a private right of action, and rejecting Alabama's arguments about Section 3 as "contrary to both the text of the statute and Supreme Court precedent"), *vacated as moot* 141 S. Ct. 2618 (2021) (mem.); *Ford v. Strange*, 580 F. App'x 701, 705 n.6 (11th Cir. 2014) ("A majority of the Supreme Court has indicated that Section 2 of the [VRA] contains an implied private right of action."); *Milligan v. Merrill*, 582 F. Supp. 3d 924, 1031 (N.D. Ala. 2022) ("*Milligan I*") (three-judge court); *Fla. State Conf. of NAACP v. Lee*, 576 F. Supp. 3d 974, 988–91 (N.D. Fla. 2021); *Ga. State Conf. of NAACP v. Georgia*, 269 F. Supp. 3d 1266, 1275 (N.D. Ga. 2017) (three-judge court); *Greater Birmingham Ministries v. Ala.*, No. 2:15-CV-02193-LSC, 2017 WL 782776, at *12 (N.D. Ala. Mar. 1, 2017).

Secretary Allen argues that *Morse* and its predecessor cases do not bind this court as to Section 2 because that portion of the opinion is dicta, and because "the *Morse* approach to the private-right-of action analysis does not survive *Sandoval* and

---

18, 2023); *Robinson v. Ardoin*, 605 F. Supp. 3d 759, 819 (M.D. La. 2023) (explaining that "*Morse* has not been overruled" and courts must "apply Supreme Court precedent"); *Ark. United v. Thurston*, 626 F. Supp. 3d 1064, 1079 n.12 (W.D. Ark. 2022) (holding that the "Supreme Court has long found—consistent with § 3 and the VRA's remedial purpose—that a right of action exists for private parties to enforce the VRA's various sections."); *Mich. Welfare Rights Org. v. Trump*, No. 20-3388 (EGS), 2022 WL 990704, at *11 (D.D.C. Apr. 1, 2022) (noting the Supreme Court "recognized a private right of action under § 2" in *Morse*).

its progeny." Defs.' Br. 23. These arguments lack any legal basis for several, independent reasons.

*First*, the *Morse* Court's "understanding that Section 2 provides a private right of action was necessary to reach the judgment that Section 10 provides a private right of action." *Milligan I*, 582 F. Supp. 3d at 1031. The Supreme Court's reasoning in *Morse* as to Section 2 is thus binding here even if it was not the case's central holding: "When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound." *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 66–67 (1996).

*Second*, even if the *Morse* reasoning about Section 2 were only dicta, this court remains bound by its ruling. This is because "dicta from the Supreme Court is not something to be lightly cast aside.'" *Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006) (citation omitted). The "carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative." *Id.* at 1326 (quoting *Wynne v. Town of Great Falls*, 376 F.3d 292, 298 n.3 (4th Cir. 2004)).

*Third*, Secretary Allen incorrectly claims that *Alexander v. Sandoval*, 532 U.S. 275 (2001) undermined the reasoning of *Morse* by discouraging the use of the "contemporary legal context" when the statute passed. Defs.' Br. 23. The Secretary's position misunderstands how lower courts must apply Supreme Court precedent.

11

Although *Sandoval* might inform the analysis to identify new private rights of action, *Sandoval* does not authorize lower courts to simply ignore or overrule *existing* Supreme Court precedent where, as in *Morse* or *Allen*, the Court has already identified the right of private actors to enforce the VRA. Even the Secretary recognizes that "*Allen* and *Morse* are binding precedent insofar as they held that Sections 5 and 10 are privately enforceable." Stay Br. 23. This concession logically requires the same conclusion for Section 2. *See Morse*, 517 U.S. at 232 (plurality opinion) ("It would be anomalous, to say the least, to hold that both § 2 and § 5 are enforceable by private action but § 10 is not, when all lack the same express authorizing language."); *id.* at 240 (Breyer, J., concurring) ("Congress intended to establish a private right of action to enforce § 10, no less than it did to enforce §§ 2 and 5."). Defendants point to nothing to suggest otherwise, and lower courts cannot unilaterally hold that the Supreme Court's "more recent cases have, by implication, overruled an earlier precedent." *Agostini v. Felton*, 521 U.S. 203, 237 (1997). Rather, where precedent "has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions," courts "should follow the case which directly controls, leaving to th[e] Court the prerogative of overruling its own

decisions."[3] *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989).

### B. Statutory Stare Decisis Compels the Conclusion that Section 2 of the VRA Contains a Private Right of Action.

Even if *Morse* and the 1975 Amendments left any ambiguity on the issue (and they do not), statutory stare decisis similarly counsels strongly in favor of recognizing Section 2's private right of action.

Statutory stare decisis carries "special force." *Halliburton Co. v. Erica P. John Fund*, 573 U.S. 258, 274 (2014). "[U]nlike in a constitutional case, . . . Congress can correct any mistake it sees." *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 456 (2015). An opinion interpreting a statute is a "ball[] tossed into Congress's court, for acceptance or not as that branch elects." *Id.* Where, as here, Congress "acquiesce[s]" to this Court's interpretation by leaving a holding undisturbed, *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 139 (2008), its action "enhance[s] even the usual precedential force" of statutory stare decisis. *Shepard v. United States*, 544 U.S. 13, 23 (2005).

Federal courts have entertained hundreds of Section 2 cases brought by private litigants. *See, e.g.*, *Milligan II*, 599 U.S. at 17–18, *Brnovich*, 141 S. Ct. 2321, 2333

---

[3] Indeed, even when a Supreme Court decision calls into question a prior decision of the Eleventh Circuit, "the Supreme Court decision must be clearly on point" to overrule that decision. *Garrett v. Univ. of Ala. at Birmingham Bd. of Trustees*, 344 F.3d 1288, 1292 (11th Cir. 2003).

(2021) ("In the years since *Gingles*, we have heard a steady stream of vote dilution cases."); *Perry v. Perez*, 565 U.S. 388 (2012); *LULAC v. Perry*, 548 U.S. 399 (2006); *Chisom v. Roemer*, 501 U.S. 380 (1991); *Houston Lawyers Assoc. v. Attorney General of Texas*, 501 U.S. 419 (1991); *Thornberg v. Gingles*, 478 U.S. 30 (1986); *City of Mobile, Ala. v. Bolden*, 446 U.S. 55 (1980). "Congress is undoubtedly aware" of the Supreme Court construing Section 2 to contain a private right of action and "can change that if it likes. But until and unless it does, statutory stare decisis counsels our staying the course." *Milligan II*, 599 U.S. at 39. While Congress may sometimes struggle to "find[] room in a crowded legislative docket" to correct judicial misinterpretations, *Ramos*, 140 S. Ct. at 1413 (Kavanaugh, J., concurring), Congress has closely monitored the VRA and congressional amendments have only ever made it *easier* for private litigants to enforce the VRA. *See, e.g.*, *Milligan II*, 599 U.S. at 12–14 (discussing the 1982 Amendments); *Morse*, 517 U.S. at 233–234 (plurality) (the 1975 Amendments).

This "long congressional acquiescence" to permitting courts to enforce Section 2's private right of action generally "enhance[s] even the usual precedential force [the Court] accords to [] interpretations of statutes." *See Watson v. United States*, 552 U.S. 74, 82–83 (2007) (internal quotation marks omitted). Where, as here, "Congress has spurned multiple opportunities to reverse" a statutory decision,

this court demands a "super-special justification" to change course. *Kimble*, 576 U.S. at 456, 458. Defendants cannot clear that high hurdle here.

### C. The VRA's Text and Structure also Plainly Establish a Private Right of Action to Enforce Section 2.

The VRA's text and structure further support private plaintiffs' rights to enforce Section 2. Even if *Morse* had not resolved the private right of action question—which it does—and the *Sandoval* test was applicable—which it is not— Section 2 still satisfies that test. The *Sandoval* test has two requirements to determine if private plaintiffs can enforce a statute: (1) the statutory provision contains a "private right," as evinced by "rights-creating" language; and (2) the statute provides for "a private remedy." *See Sandoval*, 532 U.S. at 286–88. Section 2 meets both.

### i.  The Voting Right Act Contains Rights-Creating Language.

The main criterion for whether a statute contains rights-creating language, as referenced in *Sandoval*, 532 U.S. at 288, is whether it explicitly refers to a citizen's "right[]" and is "phrased in terms of the persons benefited." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002). Section 2 contains such language. It expressly protects the "right of *any citizen* . . . to vote" free from discrimination. 52 U.S.C. § 10301(a) (emphasis added). Defendants are simply wrong to assert that Section 2 protects the "general public." Defs.' Br. at 8–9. Rather, the "right to an undiluted vote does not belong to the 'minority as a group,' but rather to 'its individual members.'" *LULAC*, 548 U.S. at 437 (quoting *Shaw v. Hunt*, 517 U.S. 899, 917 (1996)). "[T]he fact that

the statute confers rights on a 'group' of people does not suggest that the group, rather than the persons, enjoy the right the statute confers." *Ga. State Conf. of NAACP*, No. 1:21-CV-5338-ELB-SCJ-SDG, 2022 WL 18780945, at *5 (N.D. Ga. Sept. 26, 2022). Defendants point to no decisions interpreting Section 2 differently.

Moreover, despite Defendants' assertions otherwise, Section 2's language "closely resembles" the language of 42 U.S.C. § 2000(d), which *Sandoval* "highlighted . . . as a specific example of a 'rights-creating' provision." *Ga. State Conf. of NAACP*, 2022 WL 18780945, at *4; *see also League of United Latin Am. Citizens v. Abbott*, No. EP-21-CV-00259-DCG-JES-JVB, 2021 WL 5762035, at *1 (W.D. Tex. Dec. 3, 2021) (three-judge court) (same).

### ii. **The Voting Rights Act clearly provides for a private remedy under Section 2.**

The VRA also satisfies the second part of the *Sandoval* test: the statute provides for "a private remedy." *Sandoval*, 532 U.S. at 286–88. In analyzing this issue, courts "must read the words" in a statute "in their context and with a view to their place in the overall statutory scheme" because the court's "duty, after all, is to construe statutes, not isolated provisions." *King v. Burwell*, 576 U.S. 473, 475, 486 (2015) (internal quotation marks omitted). As the Court instructed in *Sandoval*, courts ascertaining congressional intent must review not only the statutory text, but also its structure. 532 U.S. at 288. While the text of Section 2 itself does not expressly reference a private right of action, the VRA's structure unequivocally

supports congressional intent to create a private remedy. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1856 (2017) (quoting *Sandoval*, 532 U.S. at 286–87) (private right of action to challenge statutes that "'displa[y] an intent' to create 'a private remedy.'").

### a. Defendants Misread Section 3's Language Regarding "Aggrieved Persons."

Section 3 of the VRA, provides for relief in "proceeding[s]" brought by "the Attorney General or an aggrieved person . . . under any statute to enforce the voting guarantees of the Fourteenth or Fifteenth Amendment." 52 U.S.C. § 10302(a) (emphasis added); *see also id.* § 10302(b) (same), *id.* § 10302(c) (same). Under Section 2, private plaintiffs are "aggrieved person[s]" when their voting rights are violated. *See Morse*, 517 U.S. at 233 (Congress' reference to "or an aggrieved person" in Section 3 was intended "to provide the same remedies to private parties as had formerly been available to the Attorney General alone."); *Roberts*, 883 F.2d at 621 (1989) (("In recognition of the Supreme Court's holding in *Allen*, Congress amended the Voting Rights Act in 1975 to reflect the standing of 'aggrieved persons' to enforce their right to vote."; *see also Ga. State Conf. of NAACP*, 2022 WL 18780945, at *6 ("The plain textual answer is that Section[] 3 . . . impl[ies] a private right to sue under whatever statute or statutes 'enforce the voting guarantees of the Fourteenth or Fifteenth Amendment'"). Section 3's text clearly creates a private right of action under Section 2, as Congress intended. *See supra*, at 9.

A Section 2 case is "a proceeding" brought under a statute "to enforce the voting guarantees of the Fourteenth or Fifteenth Amendment." 52 U.S.C. § 10302(a). As the Supreme Court has explained, Section 3 provides private remedies for actions under "a statute" that, "by its terms," is "designed for enforcement of the guarantees of the Fourteenth and Fifteenth Amendments." *Morse*, 517 U.S. at 233–34 (emphasis added). Section 2 was adopted to enforce the Fifteenth Amendment. *Milligan II*, 599 U.S. at 41.

Save for one exception,[4] all other courts that have examined this issue have agreed that Section 3 provides remedies to private parties under Section 2. *See, e.g.*, *Ala. State Conf.*, 949 F. 3d at 652 ("The language of § 2 and § 3, read together, . . . explicitly provides remedies to private parties to address violations under the statute."); *Roberts*, 883 F. 2d at 621 n.6 (same); *Veasey v. Perry*, 29 F. Supp. 3d 896,

---

[4] The exception is *Ark. State Conf. of NAACP v. Ark. Board of Apportionment*, 586 F. Supp. 3d 893 (E.D. Ark., Feb 17, 2022), currently pending a decision from the Eighth Circuit Court of Appeals. There, plaintiffs challenged Arkansas's state legislative house districts under Section 2 because Black voters are packed into 11 state house seats. *Id.* The Court—*sua sponte*—ordered the parties to "be prepared to discuss" the Section 2 private right-of-action question when no motion to dismiss was pending, and after the defendants filed a response to plaintiffs' preliminary injunction request. The district court offered defendants the opportunity to submit a sur-reply to argue Section 2 contains no private right of action, before dismissing the case in a ruling on the plaintiffs' request for preliminary relief. The case is an extreme outlier. In any event, Plaintiffs here litigate their Section 2 rights under § 1983 in the alternative, unlike those in *Arkansas*.

906 (S.D. Tex. 2014) (same); *Perry-Bey v. City of Norfolk, Va.*, 678 F. Supp. 2d 348, 362 (E.D.Va. 2009) (same).

Defendants' arguments—that Section 3 only applies to constitutional claims, or, alternatively, if it applies to the VRA, only to Section 5—is at odds with the statutory text, structure, and case law. *See* Defs.' Br. at 16–18. Section 3 clearly applies beyond constitutional claims. "[A]n action to enforce the protections of Section 2 is inevitably—at least in part—an action that 'enforce[s] the voting guarantees of the Fourteenth or Fifteenth Amendment' as contemplated in Section[] 3." *Ga. State Conf. of NAACP,* 2022 WL 18780945 at *6 (quoting 52 U.S.C. §10302(a), (b), (c)). Sections 3(a) and 3(b) explicitly permit courts to provide a remedy where a direct constitutional violation is *not* shown. Section 3(b) permits a court to suspend the use of a test or device if it is used "for the purpose or with the effect of denying or abridging the right of any citizen . . . to vote on account of race or color." 52 U.S.C. § 10302(b). And Section 3(a) authorizes courts to appoint observers to enforce Section 203 of the VRA. *See United States v. Sandoval Cnty., N.M.*, 797 F. Supp. 2d 1249, 1256 (D.N.M. July 6, 2011). With respect to Section 3(c), the constitutional violation need not be the basis for granting Section 3(c) relief. *See Jeffers v. Clinton*, 740 F. Supp. 585, 587, 601 (E.D. Ark. 1990) (three-judge court) (ordering preclearance under Section 3(c) to remedy intentionally racially

discriminatory majority-vote requirements in a Section 2 case first premised on a challenge to a discriminatory redistricting plan), *aff'd mem*. 111 U.S. 662 (1991).

And, again, even the dissenting justices in *Morse* acknowledged that "§ 3 explicitly recognizes that private individuals can sue under the [VRA]," including "suits under § 5, as well as any rights of action that we might recognize in the future." *Morse*, 517 U.S. at 289 (Thomas, J., dissenting).

### b. Section 14(e) Provides Private Plaintiffs a Remedy for Violations of Section 2.

Section 14(e) provides a fee-shifting mechanism for prevailing Section 2 private plaintiffs, further supporting a private right of action under Section 2. Section 14 broadly authorizes "the prevailing party, other than the United States" to seek attorney's fees "[i]n any action or proceeding to enforce the voting guarantees of the Fourteenth or Fifteenth Amendment." 52 U.S.C. § 10310(e). "Obviously, a private litigant is not the United States, and the Attorney General does not collect attorney's fees." *Morse*, 517 U.S. at 234. Section 14(e) offers attorney's fees "to enforce civil rights statutes, including the voting rights statutes." *Brooks v. Ga. State Bd. of Elections*, 997 F.2d 857, 860–61 (11th Cir. 1993); *see also Ga. State Conf. of NAACP*, 2022 WL 18780945, at *5. Section 2 is one of those statutes. *See, e.g.*, *Veasy v. Abbott*, 13 F.4th 362, 368 (5th Cir. 2021) (awarding attorney's fees to private plaintiffs in a § 2 case); *Dillard v. City of Greensboro*, 213 F.3d 1347, 1353 (11th Cir. 2000) (same).

Defendants argue that successful defendants against a VRA action might also be "prevailing parties," and that Section 14(e) need not necessarily confirm the availability of a private right of action under Section 2. But courts have held that Congress intended for fee-shifting to incentivize VRA enforcement by victims of discrimination. Section 12 seeks to "encourage private attorneys general to bring lawsuits vindicating individual voting rights." *Shelby Cnty., Ala. v. Holder*, 43 F. Supp. 3d 47, 67 (D.D.C. 2014) (collecting cases); *see also Shelby Cnty., Ala. v. Lynch*, 799 F.3d 1173, 1185 (D.C. Cir. 2015) (denying attorney's fees to prevailing defendants since "Congress intended for courts to award fees under the VRA . . . when prevailing parties helped secure compliance with the statute"); *Howard v. Augusta-Richmond Cnty.*, 615 F. App'x 651 (11th Cir. 2015) (denying attorney's fees to a prevailing VRA defendant).

### c. The Attorney General's Section 12 Authority Does not foreclose Private Plaintiffs Standing Under Section 2 of the VRA.

Defendants' Section 12 arguments also do not support dismissal. Section 12 describes remedies that only the Attorney General can seek, such as monetary fines and imprisonment. 52 U.S.C. § 10308. Defendants argue that Section 12 indicates that in passing the VRA, Congress did not make a remedy available to private plaintiffs. In support of their argument, Defendants cite *Sandoval* for the proposition that, "sometimes," an express "method of enforcing a substantive rule suggests that

Congress intended to preclude others." *Sandoval*, 532 U.S. at 290. Section 12(a) and (c), concern criminal enforcement, which obviously cannot be enforced by private persons. However, the VRA plainly provides for civil enforcement as well. The availability of some remedies that private persons cannot obtain does not imply that private persons are precluded from securing the remedies that are available to them and to which they are legally entitled.

Defendants ignore that Congress and the Supreme Court have consistently accepted that the Attorney General's enforcement power under Section 12(d) is consistent with an implied private right of action under other VRA sections. When the Supreme Court in *Morse* held that Section 10 of the VRA contained an implied private right of action, Section 12(d) explicitly gave the Attorney General the exact same enforcement power with respect to Section 10 violations as it does over Section 2. *See* 52 U.S.C. § 10308(d) (giving the Attorney General the same enforcement power over Section 2 (§ 10301) as it does Section 10 (§ 10306)). The same is true of *Allen*, which held that Section 5 contained an implied private right of action, despite Section 12(d)'s grant of enforcement power to the Attorney General. *See Allen v. State Bd. of Elections*, 393 U.S. 544, 555 (1969); *see also* S. Rep. 97–417, at 30. Congress never amended the VRA to grant the Attorney General exclusive enforcement power over Sections 2, 5, or 10 following these decisions.

The Eleventh Circuit has also determined—in a case decided after *Sandoval*—that statutory provisions granting the Attorney General an express right to sue do not preclude finding an implied private right of action. *See Schwier v. Cox*, 340 F.3d 1284, 1296 (11th Cir. 2003) ("We conclude that neither § 1971's provision for enforcement by the Attorney General nor Congress's failure to provide for a private right of action expressly in § 1971 require the conclusion that Congress did not intend such a right to exist."); *see also Colon-Marrero v. Valez*, 813 F.3d 1, 21–22 (1st Cir. 2016) (private plaintiffs could bring suit even though the statute in question expressly permits that "[t]he Attorney General may bring a civil action in federal court."). This is consistent with the Court's private right of action jurisprudence.[5]

Nor does Section 12(f) of the VRA suggest no private right of action exists under Section 2, when read in light of Section 12(e)'s references to the Attorney

---

[5] This is consistent with the Supreme Court's broader private right of action jurisprudence. The Supreme Court has acknowledged that Title IX itself contains an "express enforcement mechanism," *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 255 (2009), which constitutes an "express provision of one method of enforcing a substantive rule," *Sandoval*, 532 U.S. at 290. Nevertheless, the Supreme Court—in *Sandoval* and afterward—has continued to hold that Title IX contains an implied private right of action despite this express enforcement mechanism. The Supreme Court has often stated that a provision for alternative relief does "not, by itself, preclude the availability of equitable relief." *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 328 (2015); *see also Blessing v. Freestone*, 520 U.S. 329, 347 (1997) (noting that private enforcement of a statute cannot be defeated simply by "[t]he availability of administrative mechanisms to protect the plaintiff's interests.") (internal quotation marks omitted).

General's express right of action. ECF No. 92 at 14–15. Congress's grant of authority to the Attorney General does not foreclose private litigants' ability to litigate rights under Section 2. *See Schwier*, 340 F.3d at 1296 (citing *Morse*, 517 U.S. at 193) ("a private right of action had not been foreclosed even though the enforcement scheme of the Voting Rights provision at issue gave the Attorney General the right to sue for violations" as well.)

According to Defendants' view that courts lack jurisdiction to adjudicate Section 2 claims brought by private plaintiffs, all of the above-cited courts got it wrong. But "there is no reason to ignore or refute the decades of Section 2 litigation in which courts (including the Supreme Court) have never denied a private plaintiff the ability to bring a Section 2 claim." *Alpha Phi Alpha Fraternity v. Raffensperger*, No. 1:21-cv-5337-SCJ (N.D. Ga. Jan. 28, 2022), ECF No. 65, Order Denying Defs.' Mot. to Dismiss at 34. Common sense demands otherwise.

### D. Alternatively, Plaintiffs' Section 2 Claim Remains Viable Under Section 1983.

Plaintiffs also pled a cause of action to enforce their Section 2 rights under the VRA through § 1983 as a basis for jurisdiction. Compl., ¶ 9. "The attendant presumption is that § 1983 can play its textually prescribed role as a vehicle for enforcing [] rights, even alongside a detailed enforcement regime that also protects those interests, so long as § 1983 enforcement is not incompatible with Congress's handiwork." *See Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166,

188-89 (2023). Section 2 contains paradigmatic rights-creating language. *See supra* 15–16 (citing *LULAC*, 548 U.S. at 437). Accordingly, this "right is presumptively enforceable by § 1983." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002).[6] This presumption can be rebutted only in "exceptional cases," *Livadas v. Bradshaw*, 512 U.S. 107, 133 (1994)—not a textbook Section 2 action like this one.

Enforcing Section 2 rights under § 1983 is not a novel concept. "Section 2 contain[s] clear rights-creating language—a legal position thus far unquestioned by any members of the Supreme Court[,]" and thus is enforceable under § 1983. *See Coca v. City of Dodge City*, No. 6:22-cv-01274-EFM-RES, 2023 WL 2987708, at *6 (D. Kan. Apr. 18, 2023); *Turtle Mountain Band of Chippewa Indians v. Jaeger*, No. 3:22-CV-22, 2022 WL 2528256, at *5 (D.N.D. July 7, 2022).

In *Schwier*, for example, the Eleventh Circuit reiterated that "Section 1983 provides a private right of action whenever an individual has been deprived of any

---

[6] Under the reasoning of every justice that heard *Talevski*, private parties can litigate Section 2 rights under § 1983. *See* 599 U.S. at 200 (Thomas, J., dissenting) ("[F]or the violation of a federal statutory provision to give rise to a cognizable § 1983 claim, the provision must confer 'rights, privileges, or immunities' that are 'secured by . . . la[w].' This Court's cases make clear that a right is secured by law in the relevant sense if [] federal law imposes a binding obligation on the defendant to respect a corresponding substantive right that belongs to the plaintiff."). *Id.* at 230 (Alito, J., dissenting) (same). Plaintiffs here are "citizen[s] of the United States," who Section 2 affords protection from States' "denial or abridgment" of their right to "vote on account of race or color." 52 U.S.C. § 10301(a). It is federal law that Section 2 creates individual rights for citizens, and those rights can be protected through legal actions brought under § 1983 in addition to the VRA.

constitutional or statutory federal right under color of state law." 340 F.3d at 1290. That mandate applies with force when the federal statutory right arose under the VRA: "we hold that the provisions of section 1971 of the Voting Rights Act may be enforced by a private right of action under § 1983." *Id.* at 1297. Section 2 and section 1971 share analogous "right-or-duty-creating language," evidencing *Schwier*'s application of equal force here. *Id.* at 1291; *compare* 52 U.S.C. § 10101(a)(2) ("No person acting under color of law shall … deny the right of any individual to vote . . . ") *with* 52 U.S.C. § 10301(a) ("No voting qualification . . . shall be imposed or applied . . . in a manner which results in a denial or abridgment of the right of any citizen . . . to vote"). Section 1983 accordingly serves as an alternative pathway for private litigants to bring their Section 2 claims.

## II.   Plaintiffs Plead Sufficient Facts to Support Their Racial Gerrymandering Claims.

The factual allegations supporting Plaintiffs' racial gerrymandering claims are more than sufficient to set forth a claim, and withstand a motion to dismiss. Plaintiffs need not and do not allege intentional discrimination, nor are they required to prove discriminatory intent to prevail on their racial gerrymandering claims. Defendants attempt to hold Plaintiffs to a standard higher than what is needed to overcome a 12(b)(6) motion to dismiss. These arguments should be promptly rejected.

### A. Defendants raise challenges that are inappropriate at the motion to dismiss stage.

Defendants improperly elevate the motion to dismiss standard. Defendants argue that Plaintiffs cannot "carry" their "burden of proof," pointing to the "demanding" standard that racial gerrymandering claims face. Defs.' Br. at 28. Yet, to survive a motion to dismiss, the facts alleged by the plaintiffs need simply "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). That standard "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Plaintiffs have no "burden of proof" at the pleading stage.

Defendants' arguments relating to the weight of particular evidence, such as the proper weight afforded to statements of individual legislators, are questions for the fact finder at trial, not issues to be resolved at the pleading stage. *See Cromartie*, 526 U.S. at 553 ("Outright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely upon other evidence"). Plaintiffs have stated a plausible claim for relief, and that is all that is required at this stage of the litigation.

**B. Racial gerrymandering claims do not require a showing of intentional vote dilution or racial animus.**

To prove racial gerrymandering, Plaintiffs must show that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Bethune-Hill v. Va. State*

*Bd. of Elections*, 580 U.S. 178, 187 (2017) (citation omitted). Such predomination is shown when "the legislature subordinate[s] traditional race-neutral districting principles to racial considerations." *Id.* Those principles include: compactness; respect for political boundaries, *e.g.*, not splitting counties; and respect for communities of interest. And "race may predominate even when a reapportionment plan respects traditional principles." *Id.* at 189. To meet their burden, plaintiffs may rely on "'direct evidence' of legislative intent, 'circumstantial evidence of a district's shape and demographics,' or a mix of both." *Cooper v. Harris*, 581 U.S. 285, 291 (2017) (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (2017)). "Second, if racial considerations predominated over others, the design of the district must withstand strict scrutiny. The burden thus shifts to the State to prove that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." *Id.* at 292.

Unlike in intentional vote dilution claims, Plaintiffs are not required to prove "the State has enacted a particular voting scheme as a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities." *Miller*, 515 U.S. at 911 (citation and internal quotation marks omitted); *see, e.g.*, *Cooper*, 581 U.S. at 291; *Bethune-Hill*, 580 U.S. at 187; *Ala. Legis. Black Caucus v. Alabama ("ALBC I")*, 575 U.S. 254 (2015). Rather, racial gerrymandering claims are "analytically distinct" from intentional vote dilution claims. *Miller*, 515 U.S. at 911.

28

Intentional vote dilution and racial gerrymandering claims are distinct violations of the Fourteenth Amendment's Equal Protection Clause that pose two different harms and have two different remedies. Intentional vote dilution occurs where a "purposeful device to minimize[s] or cancel[s] out the voting potential of racial or ethnic minorities," resulting in the "disadvantaging" of racial minority voters. *Miller*, 515 U.S. at 911. The remedy in such cases is the creation of new majority-minority or opportunity districts that increase minority voters' ability to elect candidates of their choice. *Rogers v. Lodge*, 458 U. S. 613, 616–17 (1982); *White v. Regester*, 412 U.S. 755, 769 (1973).  On the other hand, the harms of racial gerrymandering "include being 'personally . . . subjected to [a] racial classification.'" *ALBC I*, 575 U.S. at 263 (quoting *Bush v. Vera*, 517 U.S. 952, 957 (1996)). And the remedy is redistricting without the elicit use of race, even if such non-racial redistricting does not result in the creation of new majority-minority or opportunity districts for minority voters. *See Abrams v. Johnson*, 521 U.S. 74, 93–94 (1997) (reducing the Black population in certain districts to remedy racial gerrymandering concerns while ensuring that the remedy does not violate the VRA).

Defendants ignore *ALBC II*, 231 F. Supp. 3d 1026, in which the Court found race predominated in the design of fourteen Alabama state legislative districts.[7] The

---

[7] The *ALBC II* Court found that two of these fourteen districts survived strict scrutiny, as the Legislature "had a strong basis in evidence" to believe that those

Court cited no evidence of intentional vote dilution in finding that plaintiffs made a showing of race predominance. *See id.*; *see also Cooper*, 581 U.S. 285; *North Carolina v. Covington*, 581 U.S. 1015 (2017). And the Supreme Court has vacated and remanded district court opinions dismissing racial gerrymandering claims, without instructions that plaintiffs must proffer evidence that a legislature intentionally sought to minimize minority voting strength. *See*, *e.g.*, *Bethune-Hill*, 580 U.S. 178 (2017); *ALBC I*, 575 U.S. 254 (2015).

Defendants' apparent preference to contest an intentional vote dilution claim, rather than the racial gerrymandering claim that Plaintiffs assert, is also evident in the inapposite cases Defendants cite. Defendants improperly confuse racial gerrymandering jurisprudence by quoting *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905 (11th Cir. 2023), a case in which plaintiffs challenged voting restrictions and did not bring a racial gerrymandering claim. In *League of Women Voters*, the court's analysis of plaintiffs' claims has no applicability to the Plaintiffs' racial gerrymandering claims in this case. The reasoning in *Simpson v. Hutchinson* is similarly inapplicable.  636 F. Supp. 3d 951 (E.D. Ark. 2022) (three-judge court). The other cases Defendants cite also do not involve claims of racial gerrymandering. *See* Defs.' Br. at 24–25 (citing cases

---

districts' Black population percentages were required to comply with the VRA. *See* 231 F. Supp. 3d at 1106, 1241-44.

involving intentional attempts to exclude women or minority groups from housing, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977), jobs, *Washington v. Davis*, 426 U.S. 229 (1976) and *Personnel Admin'r of Mass. v. Feeney*, 442 U.S. 256 (1979), and access to the ballot, *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299 (11th Cir. 2021)).

### C. Plaintiffs plead facts which, if taken as true, are sufficient to assert their racial gerrymandering claims.

Plaintiffs' Third Amended Complaint contains ample factual allegations of statistically non-compact and irregularly shaped districts, split counties and communities of interest causing racial disparities, analyses of boundary line decisions at the precinct level and their racial impacts, as well as RPV analysis and legislative process defects. Compl. ¶¶ 25–115. Defendants misunderstand Plaintiffs' criticism of the Legislature's failure to conduct a racially polarized voting study. If Plaintiffs demonstrate that race predominated in the design of the challenged districts, Defendants will carry the burden of proving that the Legislature's race-based sorting of voters is "narrowly tailored" to serve a "compelling interest." *See supra*, at 28 (citing *Cooper*, 581 U.S. at 291). Compliance with the VRA is a compelling interest. *Clark v. Putnam Cty.*, 293 F. 3d 1261, 1273 (11th Cir. 2002); *see also Milligan II*, 599 U.S. at 41. "[T]o meet the 'narrow tailoring' requirement," Defendants must prove the Legislature "had 'a strong basis in evidence' for concluding that the [VRA] required its action." *Id.* at 292 (quoting *ALBC I*, 575 U.S.

at 278). This requires a "functional analysis of the electoral behavior within the particular election district." *Bethune-Hill*, 580 U.S. at 194 (citation omitted) (cleaned up). Where courts "have accepted a State's 'good reasons' for using race in drawing district lines, the State made a strong showing of a pre-enactment analysis with justifiable conclusions"—an "actual 'legislative inquiry' that would establish the need for its manipulation of the racial makeup of the district." *Abbott v. Perez*, 138 S. Ct. 2305, 2335 (2018). By the Legislature's own admission, it did not do this.

Plaintiffs allege that these tactics "packed" and "cracked" voters along clear racial lines and were not justified by a narrowly tailored, compelling governmental interest.[8] These allegations are more than sufficient to state a plausible claim for relief. *See, e.g.*, *ALBC II*, 231 F. Supp. 3d 1026. Plaintiffs have sufficiently pleaded that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district" in each of the challenged districts. *Bethune-Hill*, 580 U.S. at 187.

Defendants assert in a conclusory manner that "the allegations about the shape and other characteristics of the challenged districts fall well short of shouldering

---

[8] For example, Plaintiffs have adequately pled that "the lines [of Senate District 7] themselves indicate that race is the reason for the unusual shape of District 7 above and beyond any other factors," cracking the Black community in Huntsville, in an unnaturally surgical manner, into three districts, which deviates from the Legislature's stated redistricting principles governing SB1. Compl. ¶¶ 84-87. Defendants do not single out any of the allegations about Senate District 7 in their instant Motion.

Plaintiffs' heavy burden to show an equal protection violation." Defs.' Br. at 30. But plaintiffs may rely on "'direct evidence' of legislative intent, 'circumstantial evidence of a district's shape and demographics,' or a mix of both." *Cooper*, 581 U.S. at 291 (quoting *Miller*, 515 U.S. at 916). Certainly, Plaintiffs' robust factual allegations containing "circumstantial evidence of [the challenged districts'] shape[s] and demographics" are more than sufficient at the motion to dismiss stage. *Cooper*, 581 U.S. at 291.

Defendants do not specifically contest the vast majority of the particularized factual allegations in Plaintiffs' Third Amended Complaint. Where they do challenge one of Plaintiffs' specific factual allegations—relating to Plaintiffs' challenged districts in the Montgomery area, Senate Districts 25 and 26— Defendants single out Plaintiffs' characterization of District 25's irregular shape including a "pronounced divot," arguing that a "pronounced divot," on its own, cannot substantiate the intentional racial discrimination claim that Defendants mistakenly believe Plaintiffs allege.[9] In doing so, Defendants conveniently ignore Plaintiffs' allegations that the non-compact "pronounced divot" has a racial impact

---

[9] Defendants quote, partially, a footnote from *McCleskey v. Kemp*, 481 U.S. 279 (1987), an inapposite intentional racial discrimination case. Defs.' Br. at 30 (quoting *id.* at 294 n.12). The Court's assessment of the evidence of racial disparities in Georgia death penalty sentencing required to prove intentional death penalty discrimination has no applicability here. Defendants misapply intentional racial discrimination case law to a racial gerrymandering claim.

as it "reach[es] in to capture white communities," that Senate District 25 is "one of the least compact in the State," that Districts 25 and 26 split Montgomery with "all but a few" majority white precincts included in District 25 and "all but two" of Montgomery's majority-Black precincts included in District 26, and that "the districts work together to pack Black voters into District 26 and draw white voters into neighboring District 25." Compl. ¶¶ 89-91. These factual allegations are more than sufficient to allege Plaintiffs' racial gerrymandering claims.

## III.   Legislative Defendants are Proper Parties.

### A. Legislative Defendants Waived Their Legislative Immunity.

Legislative Defendants separately seek absolute immunity from suit, nearly two years into litigation, and move to dismiss on those grounds. Legislative immunity aims to prevent the harassment of legislators from the worries and distraction associated with litigation. *Scott v. Taylor*, 405 F.3d 1251, 1256 (11th Cir. 2005). But where the legislators actively participate in the litigation, as Legislative Defendants have here, that immunity is waived. *Singleton v. Merrill*, 576 F. Supp. 3d 931, 941–42 (N.D. Ala. Dec. 16, 2021) ("the Legislators' extensive litigation conduct . . . worked the waiver").

Legislative Defendants explicitly waived any privilege in these proceedings. During the Parties' May 20, 2022, hearing before the Court, the Chairs' counsel— while noting that some legislators may assert legislative immunity—explicitly

acknowledged that "the [Reapportionment Committee] chairs have ***obviously*** waived their immunity." Exhibit A, May 20, 2022 Hearing, Tr. 18:1-1 (emphasis added). The Chairs have affirmatively and actively sought to defend the legislation throughout this litigation.[10] They cannot *both* seek to defend the legislation *and* claim immunity.

"[F]ederal jurisprudence reflects no doubt" that "legislative immunity can be waived in a civil action." *Singleton*, 576 F. Supp. 3d at 939 (collecting cases). As in *Singleton*, the Chairs "identif[y] no authorities establishing or suggesting that legislative immunity cannot be waived in a civil action." *Id*. at 940. Further, "the party holding a privilege can, in general, waive its privilege implicitly through litigation conduct in a civil case." *Id*. at 939–40. Applied here, the Chairs cannot substantively participate in the case for years and later raise legislative immunity as a shield; to do so would be "to turn what [is] the shield of legislative immunity into a sword." *Id.* at 940 (citing *Powell v. Ridge*, 247 F.3d 520, 525 (3d Cir. 2001)).

In *Singleton*, the Committee Chairs[11] likewise attempted to assert legislative immunity. 576 F. Supp. 3d at 934. The court rejected their argument, finding that

---

[10] *See, e.g.*, ECF No. 45, Defendants' Opposition to Plaintiffs' Motion for Recusal; ECF No. 53, Senator Jim McClendon and Representative Chris Pringle's Answer to Plaintiffs' Complaint; ECF No. 73, Defendants' Response to Plaintiffs' Motion to Modify Stay.

[11] Senator Steve Livingston succeeded Senator Jim McClendon as the Senate Chair of the Alabama Permanent Legislative Committee on Reapportionment.

the Chairs' "extensive litigation conduct" effectively waived their privilege.[12] *See id*. at 941. In support of this finding, the court cited, in part, the legislators' answering of the complaint and their active participation in pre-hearing motion practice, "without giving the slightest indication that they were participating in the litigation for the limited purpose of asserting legislative immunity." *Id*.

The present situation is similar. The Chairs have willingly and actively engaged in the litigation. For instance, the Chairs filed their own Answer to Plaintiffs' original Complaint, ECF No. 53, joined Defendants' Opposition to Plaintiffs' Motion for Recusal, ECF No. 45, and Defendants' Response to Plaintiffs' Motion to Modify Stay, ECF No. 73.  And, as in *Singleton*, at no point did the Chairs give the "slightest indication that they were participating in the litigation for the limited purpose of asserting legislative immunity." *Singleton*, 576 F. Supp. 3d at 941. To the contrary, during the May 20, 2022 hearing concerning Plaintiffs' Motion to Modify the Stay, after the Chairs engaged substantively on the merits of the motion the Court raised the question of legislative immunity, resulting in the following exchange:

---

[12] In *Singleton*, legislative defendants affirmatively intervened in the action. 576 F. Supp. 3d at 934. But whether legislators intervene or not does not determine whether the privilege is waived. Instead, legislators can waive their privilege "implicitly through litigation conduct in a civil case" as Defendant Legislators have done here. *Id.* at 939–40.

JUDGE MANASCO: I have one question and that is, do you foresee that there will be legislative immunity issues that we have to deal with? It sounds like maybe some discussion between the parties to that effect.

MR. WALKER: I can tell you that some of the legislators have told me that they will assert immunity. So, yes, ma'am, there will be. ***Now, the chairs have obviously waived their immunity.*** But the testimony of some individual -- yeah, there will be privileges.

Exhibit A, May 20, 2022 Hearing, Tr. 17:1-25 (emphasis added).

The Legislators now seek to enforce the immunity they previously stated was "obviously waived." However, like any other privilege, once an individual's immunity is waived, the Chairs "may not unring the bell." *See In re Sims*, 534 F.3d 117, 126 (2d Cir. 2008) (discussing waiver of psychotherapist-patient privilege). Accordingly, the Chairs' motion to dismiss on legislative immunity grounds should be denied.

### B. Legislative Defendants Play a Role in Redressing Plaintiffs' Injuries, Making them Proper Defendants.

Far from being "powerless to remedy the plaintiffs' alleged injury," the Chairs head the very Committee assigned responsibility for overseeing the redistricting process, which, in 2021, resulted in the enactment of SB1 and HB2—the source of Plaintiffs' injuries. In this capacity, the Chairs are uniquely positioned to provide critical relief sought by Plaintiffs, the "adopt[ion] and enact[ment] [of] constitutional and VRA-compliant districting plans for State House and State Senate that remedy the unconstitutional gerrymanders and Voting Rights Act violations." Compl.,

Prayer for Relief (D)), ECF No. 83, at 53. Because Plaintiffs' have properly alleged (1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision, the Chairs' motion to dismiss for lack of Article III standing should be denied. *See Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up).

*First*, unlike the cases Defendants rely upon, here, Plaintiffs' injuries are directly traceable to the Chairs' conduct in constructing and adopting the State House and Senate districts that violate Plaintiffs' rights under the Constitution and the VRA. *Contra Doe v. Pryor*, 344 F.3d 1282, 1285 (11th Cir. 2003) (finding injury not traceable where Attorney General conceded that the challenged statute was unconstitutional and refused to enforce statute against plaintiffs); *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1299 (11th Cir. 2019) (finding injury not traceable where challenged statute "doesn't require (or even contemplate) 'enforcement' by anyone, let alone the Attorney General.").

The Alabama Legislature created the Committee to "prepare for and develop a reapportionment plan for the [State of Alabama]." Ala. Code §§ 29-2-50 to 29-2-52. The Committee engages in activities necessary for the "preparation and formulation of a reapportionment plan" and the "readjustment or alteration of the Senate and House districts and of congressional districts of the [S]tate [of

Alabama]." *Id*. § 29-2-52(c). The Committee is authorized "to do and perform any acts that may be necessary, desirable, or proper to carry out the purposes and objectives" for which it was created, including "request[ing] and receiv[ing] from any court . . . of the state . . . such assistance . . . as will enable it to properly carry out its powers and duties …." *Id*. § 29-2-52(e) and (h). The Chairs possess the unique authority to "prepare for and develop a reapportionment plan for the [State of Alabama]," which they exercised in developing SB1 and HB2. *Id*. § 29-2-52(c). Their failures to comply with their obligations under the VRA and Constitution while exercising this authority directly caused Plaintiffs' asserted injuries.

*Second*, the Chairs' assertion that they are "powerless to remedy" Plaintiffs' injury stands in stark contrast to their asserted position less than two years ago in their motion to intervene in *Caster v. Allen*, 2:21-CV-1536-AMM (N.D. Ala. Dec. 20, 2021), ECF No. 60. In *Caster*, the Chairs argued strenuously that they *should* be allowed to intervene in a congressional redistricting challenge due to their distinctive role in the redistricting process. *Id*. at 4. They argued that "Alabama has exclusive responsibility for redistricting its Congressional districts" and "[w]ithin Alabama government, this responsibility is the exclusive responsibility of the Legislature." *Id.* The Legislature, in turn, "delegated to the Reapportionment Committee responsibility for preparing new Congressional Districts," and "[a]s Chairs of the Reapportionment Committee, the Committee Chairs oversee operation of the

Legislature's Reapportionment Office." *Id.* at 2–4. Thus, the plaintiffs' attempt to challenge the constitutionality of the congressional districts without naming the Chairs as defendants, amounted to an attempt "to wrest from the Legislature exclusive authorship of the State's congressional districts." *Id.* at 5. Further, the Chairs argued that the Secretary of State could not adequately represent the Chairmen's interest because, as a member of the Executive branch, "[h]e has no authority to conduct redistricting, and consequently has no experience in redistricting." *Id.*

The Chairs concluded, "'[t]he manner in which a state legislature is districted and apportioned is primarily the duty and responsibility of the State,' and within the state, it 'is primarily a matter for legislative consideration and determination.'" *Caster v. Allen*, 2:21-CV-1536-AMM, ECF No. 60 at 6 (citing *Chapman v. Meier*, 420 U.S. 1, 27 (1975); *Connor v. Finch*, 431 U.S. 407, 414 (1977)). When intervening in *ALBC*, the Chairs position was unequivocal; "the Alabama Legislature, and its individual members, have 'a judicially cognizable interest in matters affecting its composition' and have a justiciable, institutional interest in ensuring that the congressional districts in Alabama are composed in a constitutionally lawful manner." *Id.* at 6–7 (citing *United States House of Representatives v. United States Department of Commerce*, 11 F. Supp. 2d 76, 86–87 (D.C. 1998) (three-judge court)). That court not only granted the Chairs' motion,

but more recently, in an order denying defendants' emergency motion for stay pending appeal in a related case, the court reiterated that "[i]t is the Legislature's task to draw districts; the Secretary simply administers elections," citing to the Chairs' motion to intervene. *Milligan v. Allen*, 2:21-cv-1530-AMM (N.D. Ala. Sept. 11, 2023), ECF No. 289 at 23.

The Supreme Court has also acknowledged the Legislature's unique interest within the election context. In *Berger v. N.C. State Conf. of the NAACP*, the Supreme Court reversed the lower court's denial of the North Carolina legislature's motion to intervene in a lawsuit involving a challenge to the constitutionality of a North Carolina election law. 142 S. Ct. 2191 (2022). The Court concluded that "[t]he legislative leaders seek to give voice to a different perspective," than the state's executive branch. *Id.* at 2205. And, unlike the executive branch, "[t]heir 'primary objective' is not clarifying which law applies," but instead, they can "focus on defending the law vigorously on the merits without an eye to crosscutting administrative concerns." *Id.* Thus, because "branches of government may seek to vindicate different and valuable state interests," the Court found the legislature was entitled to intervene. *Id.*

This decision also strongly suggests that the Chairs' reliance on *Chestnut v. Merrill* is misplaced. In *Chestnut*, then Chairman McClendon affirmatively argued "that his assistance would be necessary should the court order the state to redraw its

congressional districts." *Chestnut*, No. 2:18-cv-907-KOB, 2018 WL 9439672, at *1 (N.D. Ala. Oct. 16, 2018). The court's decision to deny intervention rested on findings that while the Chair may impact a potential remedy, that the necessity of future remedial processes were highly speculative, and that legislators' other interests were already adequately represented by Defendants. ECF No. 93 at 8 (citing *Chestnut*, 2018 WL 9439672, at *1).

Here, in contrast, the question before the court is whether a "judgment on the [Chairs]" granting Plaintiffs' requested relief by requiring the enactment of constitutional and VRA-compliant districting plans for State House and State Senate, "redresses the plaintiff's injury, whether directly or indirectly." *Lewis*, 944 F.3d at 1301. Under the Chairs' prior consistently held position, the answer is undoubtedly yes. *See Caster*, 2:21-CV-1536-AMM, ECF No. 60 at 4; *Chestnut*, 2018 WL 9439672, at *1. Thus, the Chairs' motion to dismiss for lack of standing should be denied.

## CONCLUSION

For the reasons discussed above, Defendants' Motions to Dismiss should be denied.

DATED this 22nd day of September 2023.

*/s/ Alison Mollman*
Alison Mollman (ASB-8397-A33C)
AMERICAN CIVIL LIBERTIES UNION OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
510-909-8908
amollman@aclualabama.org

*/s/ Deuel Ross*
Deuel Ross*
NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.
700 14th Street N.W. Ste. 600
Washington, DC 20005
(202) 682-1300
dross@naacpldf.org

Leah Aden*
Stuart Naifeh*
Kathryn Sadasivan (ASB-517-E48T)
Brittany Carter*
NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
 (212) 965-2200
laden@naacpldf.org
snaifeh@naacpldf.org
ksadasivan@naacpldf.org

David Dunn*
HOGAN LOVELLS LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000

Respectfully submitted,

*/s/ Davin M. Rosborough*
Davin M. Rosborough*
Julie A. Ebenstein*
Dayton Campbell-Harris*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad St.
New York, NY 10004
 (212) 549-2500
drosborough@aclu.org
jebenstein@aclu.org
dcampbell-harris@aclu.org

*/s/ Sidney Jackson*
Sidney Jackson (ASB-1462-K40W)
Nicki Lawsen (ASB-2602-C00K)
WIGGINS, CHILDS, PANTAZIS, FISHER, & GOLDFARB
301 19th Street
North Birmingham, AL 35203
(205) 314-0500
sjackson@wigginschilds.com
nlawsen@wigginschilds.com

*/s/ Jack Genberg*
Jack Genberg*
Jess Unger*
SOUTHERN POVERTY LAW CENTER
PO Box 1287
Decatur, GA 30031
(404) 521-6700
jack.genberg@splcenter.org
junger@splc.org

Jessica L. Ellsworth*
Shelita M. Stewart*
HOGAN LOVELLS LLP

david.dunn@hoganlovells.com

Blayne R. Thompson*
HOGAN LOVELLS US LLP
609 Main St., Suite 4200
Houston, TX 77002
(713) 632-1400
blayne.thompson@hoganlovells.com

555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600
jessica.ellsworth@hoganlovells.com
shelita.stewart@hoganlovells.com

Michael Turrill*
Harmony R. Gbe*
HOGAN LOVELLS US LLP
1999 Avenue of the Stars
 Suite 1400
Los Angeles, CA 90067
(310) 785-4600
michael.turrill@hoganlovells.com
harmony.gbe@hoganlovells.com

*Attorneys for Plaintiffs*

Anthony Ashton*
Anna-Kathryn Barnes*
NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE
(NAACP)
4805 Mount Hope Drive
Baltimore, MD 21215
(410) 580-5777
aashton@naacpnet.org
abarnes@naacpnet.org

*Attorneys for Plaintiff Alabama State
Conference of the NAACP*

*Admitted *pro hac vice*