FILED
2023 Dec-06 PM 04:47
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| KHADIDAH STONE, EVAN MILLIGAN, GREATER BIRMINGHAM MINISTRIES, and the ALABAMA STATE CONFERENCE OF THE NAACP, <br><br> *Plaintiffs*, <br><br> vs. <br><br> WES ALLEN, in his official capacity as Secretary of State of Alabama, and STEVE LIVINGSTON and CHRIS PRINGLE, in their official capacities as Co-Chairs of the Alabama Permanent Legislative Committee on Reapportionment, <br><br> *Defendants*. | No. 2:21-cv-01531-AMM |

## FOURTH AMENDED COMPLAINT

1.      The State of Alabama carries a sordid record of using racial discrimination to maintain the political power of its white citizens. While Alabama's elected officials have made important changes over the past fifty years—mostly as a result of court orders or U.S. Department of Justice intervention—Defendants continue to run afoul of the law when it comes to redistricting. Even as recently as this year, the Supreme Court affirmed a ruling that Alabama's 2023 congressional plan likely violated the Voting Rights Act ("VRA") and a three-judge court preliminarily enjoined Alabama's 2023 congressional plan.

2.      Senate Bill 1, the 2021 Alabama State Senate Redistricting law ("SB 1" or the "Enacted Plan"), denies Black Alabamians an equal opportunity to participate in the political

1

process and elect candidates of their choice in violation of Section 2 of the VRA in both the Montgomery and Huntsville regions.

3.      In Montgomery, it unnecessarily packs Black voters into State Senate District 26 in Montgomery while carving white residents out of the district and into District 25. The plan does so even though (1) Black voting-age citizens are sufficiently numerous and geographically compact to form a reasonably configured majority in an additional State Senate District in the Montgomery area; (2) the voting patterns of Black voters in the Montgomery area are politically cohesive; and (3) white voters in this region of Alabama vote sufficiently as a bloc typically to defeat the candidates preferred by Black voters.

4.      In the Huntsville region, SB 1 unnecessarily cracks Black voters in State Senate Districts 2, 7, and 8 in Huntsville, thereby preserving three districts where candidates preferred by white voters reliably win. The plan does so even though (1) Black voting-age citizens in the Huntsville area are sufficiently numerous and geographically compact to form a reasonably configured majority in a State Senate District; (2) the voting patterns of Black voters in the Huntsville area are politically cohesive; and (3) white voters in this region of Alabama vote sufficiently as a bloc typically to defeat the candidates preferred by Black voters.

5.      Under the totality of the circumstances, including Alabama's current practices and ongoing history of racial discrimination in voting, the continuing effect of racial discrimination on Black people in areas like education, employment, and health, continuing racial appeals by political candidates, and the Legislature's lack of responsiveness to Alabama's Black communities, SB 1 prevents Black voters from participating equally in the political process and electing candidates of choice.

6.      Accordingly, SB 1 violates Section 2 of the VRA and must be enjoined in favor of

a remedial plan that completely cures the illegal vote dilution by including additional State Senate districts in Montgomery and Huntsville in which Black voters have a fair opportunity to elect candidates of their choosing.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction to hear this case under 28 U.S.C. §§ 1331, 1343, and 1357 because the matters in controversy arise under federal law, including 52 U.S.C. § 10301 and 42 U.S.C. § 1983, under which the Section 2 "right is presumptively enforceable," *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002).

8.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. §§ 1343(a)(4) and 1357, because this is a civil action to secure equitable relief under Section 2 of the Voting Rights Act, which is an Act of Congress that protects the right to vote.

9.     The Court has jurisdiction to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure.

10.     This challenge is based solely on the federal Voting Rights Act, and is brought both under that Act's provisions, including 52 U.S.C. §§ 10301 and 10302, as well as 42 U.S.C. § 1983. Accordingly, this should properly proceed before a single-judge district court.

11.     The Court has personal jurisdiction over the Defendants, who are all citizens of Alabama.

12.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this district and because at least one Defendant resides in this district and all Defendants are Alabama residents.

## PARTIES

13.     Plaintiff Khadidah Stone is a Black registered voter who lives in Montgomery,

3

Alabama, in State Senate District 26. District 26 is a district in which Black voters are packed, preventing the creation of an additional district in which Black voters have a fair opportunity to elect a candidate of choice in that region as required by Section 2 of the VRA.

14.    Plaintiff Evan Milligan is a Black registered voter who lives in Montgomery, Alabama, in State Senate District 26. District 26 is a district in which Black voters are packed, preventing the creation of an additional district in which Black voters have a fair opportunity to elect a candidate of choice in that region as required by Section 2 of the VRA.

15.    Plaintiff Greater Birmingham Ministries ("GBM") was founded in 1969 in response to the challenges posed by the mid-twentieth century civil rights movement and its transformative impact in Birmingham, Alabama, and across the United States. GBM is a multi-faith, multi-racial, non-profit membership organization that provides emergency services to people in need and engages people to build a strong, supportive, engaged community and a more just society for all people.

16.    GBM is dedicated to advancing social justice through political participation across Alabama. GBM actively opposes state laws, policies, and practices that result in the exclusion of vulnerable groups or individuals from the democratic process. Toward that end, GBM regularly communicates with its members and works to register, educate, and increase voter turnout and efficacy, particularly among Black and low-income people and people with disabilities.

17.    GBM has around 5,000 individual members in Alabama, including Black Alabamians who are registered voters and reside in the relevant areas in and around Huntsville and Montgomery where SB 1 illegally dilutes Black voting strength. These members suffer harm because they are denied the opportunity to elect candidates of their choice and live in packed and/or cracked districts. GBM's Black members who are lawfully registered voters are located not only

4

throughout the greater Birmingham area, but also in Montgomery and Madison Counties. Many GBM members are Black and/or low-income registered voters and/or voters with disabilities.

18.     Plaintiff Alabama State Conference of the N.A.A.C.P. ("Alabama NAACP") is a state subsidiary of the National Association for the Advancement of Colored People, Inc. The Alabama NAACP is the oldest and one of the most significant civil rights organizations in Alabama, and it works to ensure the political, educational, social, and economic equality of African Americans and all other Americans. Two central goals of the Alabama NAACP are to eliminate racial discrimination in the democratic process, and to enforce federal laws and constitutional provisions securing voting rights. Toward those ends, the Alabama NAACP has participated in lawsuits to protect the right to vote, regularly engages in efforts to register and educate African American voters, and encourages African Americans to engage in the political process by turning out to vote on Election Day.

19.     The Alabama NAACP is a membership organization with approximately 5,000 members across the State, approximately 95% of whom identify as Black. It has Black members who are registered voters and live in the Montgomery and Huntsville areas, where the VRA violation compels the drawing of new State Senate districts where Black voters can elect candidates of choice. These members suffer harm under SB 1 because they are denied the opportunity to elect candidates of their choice.

20.     Plaintiffs Stone and Milligan will be collectively referred to as the "Individual Plaintiffs." Plaintiffs GBM and Alabama NAACP will be collectively referred to as the "Organizational Plaintiffs."

21.     Defendant Wes Allen is sued in his official capacity as Alabama Secretary of State. As Secretary of State, Defendant Allen is the chief elections official in the State of Alabama. He

must provide uniform guidance for election activities in the State and certify the elections of members of the Alabama Legislature and Congress. Ala. Code §§ 17-1-3, 17-12-21. Defendant Allen also has responsibility for certifying the names of primary and general election candidates for the State Legislature, as well as issuing Certificates of Election following tabulation of vote results. Ala. Code §§ 17-13-5(b), 17-9-3(b), 17-12-21.

22.    Defendants Steve Livingston and Chris Pringle are sued in their official capacities as Co-Chairs of the Alabama Permanent Legislative Committee on Reapportionment ("the Committee") that was responsible for the 2021 maps challenged here. In that capacity, Defendant Pringle prepared and developed redistricting plans for the State following the decennial census and presided over the meetings of the Committee. The Committee was tasked with making a "continuous study of the reapportionment problems in Alabama seeking solutions thereto" and reporting its investigations, findings, and recommendations to the Legislature as necessary for the "preparation and formulation" of redistricting plans for the Senate and House districts in the State of Alabama. Ala. Code §§ 29-2-51, 29-2-52. Defendant Pringle led the drawing of the challenged districts. Defendants Livingston and Pringle will likely lead efforts to re-draw the districts to remedy their illegality if the Court orders the State to do so. In earlier proceedings before this Court, Defendants Livingston and Pringle willingly waived any claim to legislative immunity.

## STATEMENT OF FACTS

23.    On November 4, 2021, Governor Kay Ivey signed into law SB 1 of the 2021 Special Session of the Alabama Legislature which redistricted the Alabama State Senate map for the next decade. Before turning to this enactment directly, some background is warranted.

### Recent History of Statewide Redistricting in Alabama

24.    Alabama has "historically had difficulty with reapportionment." *Kelley v. Bennett*,

96 F. Supp. 2d 1301, 1308 (M.D. Ala. 2000), *rev'd on other grounds*, *Sinkfield v. Kelley*, 531 U.S. 28, 29 (2000). Prior to 1960, the Legislature failed to reapportion for 50 years—diluting the votes of residents of rapidly growing counties. As a result, Alabama's entire legislative apportionment scheme was struck down for violating the principle of one-person, one-vote. *Reynolds v. Sims*, 377 U.S. 533, 568 (1964). On remand, a three-judge court found that, in devising remedial maps to correct the malapportionment, the "Legislature intentionally aggregated predominantly Negro counties with predominantly white counties for the sole purpose of preventing the election of Negroes to [State] House membership." *Sims v. Baggett*, 247 F. Supp. 96, 108–09 (M.D. Ala. 1965).

25.    Following *Reynolds* and the 1970 Census, the Legislature again failed to redistrict and a three-judge federal court was forced to draw new district lines to protect voters' rights under the Fourteenth Amendment. *Sims v. Amos*, 336 F. Supp. 924, 940 (M.D. Ala. 1972).

26.    In the 1980s, the United States Attorney General denied preclearance under Section 5 of the VRA to maps drawn by the Legislature to redistrict State House and Senate seats, finding the maps improperly retrogressive for Black voters, with specific examples cited in Jefferson County and the cities of Tuscaloosa and Mobile. *See* U.S. Dep't of Justice Ltr. to Ala. Att'y General Graddick, May 6, 1982.[1] A three-judge panel allowed the 1982 elections to proceed under an interim plan. *Id*. at 238. The Legislature adopted a new plan in early 1983, which the court accepted. *Burton v. Hobbie*, 561 F. Supp. 1029, 1035 (M.D. Ala. 1983).

27.    In the 1990s, the Legislature again failed to redistrict itself in an expeditious manner. By 1993, several plans were in circulation, but the Legislature had not yet agreed to one. *Kelley v. Bennett*, 96 F. Supp. 2d 1301, 1309 (M.D. Ala. 2000). The State eventually entered a

---

[1] https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/AL-1520.pdf (last visited Nov. 29, 2023).

consent decree to resolve a VRA lawsuit filed in state court on behalf of Black voters. *Id*. at 1308. That consent decree imposed a map that created several new majority-Black State House and Senate districts. *Id*. At about the same time, Black voters entered into a settlement with the State to resolve a Section 2 lawsuit challenging Alabama's congressional districts. *Wesch v. Hunt*, 785 F. Supp. 1491, 1497-1500 (S.D. Ala. 1992), *aff'd sub nom. Camp v. Wesch*, 504 U.S. 902 (1992), and *aff'd sub nom. Figures v. Hunt*, 507 U.S. 901 (1993). As a result of this settlement, Black voters were able to elect a Black and Black-preferred candidate for Congress for the first time since Reconstruction.

28.     In the 2010 cycle, the Alabama Legislative Black Caucus and the Alabama Democratic Conference challenged state legislative districts as unconstitutional racial gerrymanders. After the district court initially rejected their claims, the U.S. Supreme Court reversed and remanded the case to a three-judge panel to allow plaintiffs to challenge individual districts as racial gerrymanders, rather than the statewide plan. *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 262 (2015). On remand, the district court found that race was a predominant factor in the drawing of 14 of the 36 challenged districts. The court analyzed those districts under strict scrutiny and held that 12 were unconstitutional racial gerrymanders and enjoined their use in all future elections. *Ala. Legis. Black Caucus v. Alabama*, 231 F. Supp. 3d 1026, 1348–49 (M.D. Ala. 2017). Generally, districts did not survive strict scrutiny where the State offered insufficient evidence that they were narrowly tailored to comply with the Voting Rights Act. Many of the unconstitutional districts had packed Black voters, creating Black population shares far than necessary to enable Black voters to elect their candidates of choice. *Id*.

29.     The Legislature adopted remedial plans that were signed into law by the Governor in May 2017.

30.     Most recently, a three-judge panel preliminarily enjoined two different congressional districting plans that had been adopted by the Alabama legislature following the 2020 census. The three-judge court found that both the Legislature's 2021 plan and 2023 plan likely violate the Voting Rights Act, with the former decision upheld in full by the U.S. Supreme Court and the latter in place as the Supreme Court declined to stay the injunction.

## Redistricting Criteria

31.     The Alabama Constitution requires the redrawing of State House of Representatives and Senate districts every decade based on the results of the decennial census. Ala. Const. art. IX, §§ 198–200.

32.     The Alabama Constitution sets the number of districts and requires that districts are contiguous and do not cross county lines, except where otherwise necessary to comply with federal legal requirements. Ala. Const. art. IX, §§ 198-200; *see also Reynolds v. Sims*, 377 U.S. 533 (1964). Where the whole-county proviso "can be applied without bringing about a conflict with federal constitutional requirements, the proviso remains operative." *Sims v. Baggett*, 247 F. Supp. 96, 101 (1965).

33.     On May 5, 2021, the Committee enacted guidelines for the current redistricting cycle. The guidelines represent that they are based on requirements under the U.S. Constitution, Alabama Constitution, and policies that "are embedded in the political values, traditions, customs, and usages of the State of Alabama."

34.     The criteria for redistricting set by the Committee begin with requirements under the U.S. Constitution and federal law, including compliance with the one-person, one-vote requirement. The Committee instructed that legislative districts must be drawn to achieve "substantial equality of population," not exceeding an overall deviation range of plus or minus 5%,

and must comply with Section 2 of the VRA, meaning that districts have "neither the purpose nor the effect of diluting minority voting strength." The Committee further stated that districts cannot be drawn "in a manner that subordinates race-neutral districting criteria to considerations of race, color, or membership in a language minority group, except that race, color, or membership in a language-minority group may predominate over race-neutral districting criteria to comply with Section 2 of the Voting Rights Act, provided there is a strong basis in evidence in support of such a race-based choice."

35.   Each district must also be "contiguous and reasonably compact," under the criteria. The criteria next require compliance with the Alabama Constitution, including that:

36.   Districts are "drawn to reflect the democratic will of all the people concerning how their governments should be restructured;"

    a.   Districts are drawn based on total population except that the voting-age population may be considered to comply with Section 2 of the VRA and other laws;

    b.   The number of Senate districts is set at 35 and House districts at 105;

    c.   All districts must be single-member districts; and

    d.   All districts must be contiguous with each other.

37.   The criteria next require compliance with redistricting policies that are "embedded in the political values, traditions, customs, and usages of the State of Alabama . . . to the extent that they do not violate or subordinate the foregoing policies prescribed by the Constitution and laws of the United States and of the State of Alabama," including:

    a.   Avoiding contests between incumbents where possible;

    b.   Permitting contiguity by water but not point-to-point or long-lasso contiguity;

10

    c.   Respect for "communities of interest, neighborhoods, and political subdivisions to the extent practicable," with a community of interest "defined as an area with recognized similarities of interests, including but not limited to ethnic, racial, economic, tribal, social, geographic, or historical identities;"

    d.   Minimization of the number of counties in each district; and

    e.   Preservation of the cores of existing districts, although the Supreme Court recently forbade using "adherence to a previously used districting plan [to] defeat a § 2 claim." *Allen v. Milligan*, 599 U.S. 1, 22 (2023).

38.     The Committee did not provide an order of importance for each of the criteria, except that "equality of population among districts and compliance with the Voting Rights Act of 1965" take priority when they conflict with other criteria.

### The 2021 Legislative Process for Redistricting

39.     On August 12, 2021, the U.S. Census Bureau released the results of the 2020 Census. Alabama's population grew by 5.1% between 2010 and 2020. Alabama's current population identifies as 63.1% non-Hispanic white, 26.9% as any part Black, 5.3% as Hispanic or Latino, 2.3% as any part American Indian/Alaska Native, and 2% as any part Asian. Communities of color drove this population growth. The Black population grew by 3.5%, the Hispanic/Latino population grew by 42.3%, and the Asian-American population grew by 43.4%, while the white population shrank by 1%. The population identifying as solely Native American shrank as well, while the proportion of Alabamians identifying as multi-racial tripled.

40.     Once census data was released, the Committee, under the leadership of Defendant Pringle and then-Co-Chair Senator Jim McClendon, began to develop redistricting plans for State Senate and State House of Representatives districts. *See* Ala. Code § 29-2-50(2).

11

41.    The Committee consists of members of both the State House and Senate, with the Speaker of the House appointing one House member from each of the seven congressional districts and four additional House members and the Lieutenant Governor appointing one Senator from each of the seven congressional districts and four additional Senators. *See* Ala. Code § 29-2-51(c). The 2021 Committee included 21 members—15 of whom are white and 6 of whom are Black.[2]

42.    All Committee meetings must be open to the public, and the Committee must provide a "[r]easonable opportunity" for members of the public to give comments and input regarding redistricting.

43.    Between September 1 and September 16, 2021, well before the Committee released any draft maps or proposals, the Legislative Reapportionment Office held 28 public hearings across the State. All but one hearing—held at 6:00 p.m. at the Statehouse in Montgomery—was held between the normal workday hours of 9:00 a.m. to 5:00 p.m.

44.    Although Committee Co-Chair McClendon said that the public hearings served "to try to give the opportunity for any citizen to have input into the process," before the public hearings even began, he told the press that the new maps would not cause "any surprises for the candidates or for the voters,"[3] suggesting that the contours of the maps had already been decided and that the

---

[2] Ala. Legis., *Permanent Legislative Committee on Reapportionment*, http://www.legislature.state.al.us/aliswww/ISD/JointIntCommResults.aspx?OID_COMM=1300&COMMITTEE=PERMANENT%20LEGISLATIVE%20COMMITTEE%20ON%20REAPPORTIONMENT (last visited Nov. 13, 2021). An additional Republican committee member left the Legislature in July 2021. *See* Eddie Burkhalter, *Governor appoints Rep. Bill Poole as state finance director*, Ala. Pol. Rep. (July 16, 2021), https://www.alreporter.com/2021/07/16/governor-appoints-rep-bill-poole-as-state-finance-director/.

[3] Mike Cason, *Alabama lawmakers begin task of drawing new political districts*, AL.com (Aug. 31, 2021), https://www.al.com/news/2021/08/alabama-lawmakers-begin-task-of-drawing-new-political-districts.html.

public input process was, at best, a formality rather than a meaningful opportunity for public input.

45.    On October 19, 2021, Plaintiffs Alabama NAACP and Greater Birmingham Ministries, along with other advocacy organizations, sent a letter to the Committee reminding them of their obligations under Section 2 and the Constitution, highlighting the Committee's obligation to conduct a racial-polarization analysis, and sharing that based on the organizations' own racial-polarization analyses, voting continues to be highly polarized but that districts packed with high Black voting age populations are not necessary for Black voters to have an influence in elections.[4]

46.    Governor Ivey called a Special Legislative Session on redistricting in Alabama to begin on October 28, 2021.

47.    On October 26, 2021, the Committee held its first public meeting of this redistricting cycle. The maps proposed by the Committee were not available to the public until the day before—October 25, 2021—long after the last of the Legislative Reapportionment Office's public redistricting hearing. A member of the Committee, Rep. Chris England, published the proposed maps on Twitter.[5] Upon information and belief, the Committee itself did not release the maps to the public until the day of the Committee meeting and many Committee members did not see the full proposed maps beyond their own districts and those surrounding until the day before the meeting. Beyond the Committee, the Committee Co-Chairs and their staff met with each incumbent legislator or their staff in person or online and individual legislators only viewed and provided feedback on draft maps of their own districts, not maps of the entire state.

48.    The Co-Chairs asserted that the Committee's lawyer, Dorman Walker, reviewed the maps and determined that they all complied with Section 2 and the Fourteenth Amendment to

---

[4] October 19, 2021 Letter to Committee, https://www.naacpldf.org/wp-content/uploads/Letter-to-AL-Reapportionment-Committee-20211019-1-1.pdf (last visited Nov. 29, 2023).
[5] Chris England (@RepEngland70), Twitter (Oct. 25, 2021, 12:30 p.m.), https://twitter.com/RepEngland70/status/1452674045804167169.

the U.S. Constitution, but did not explain what analysis had been undertaken to reach that conclusion. Sen. McClendon explained that Mr. Walker told him that racial-polarization analysis was only done—by an unnamed consultant in Georgia—for certain state legislative districts where "it looked like there might possibly be a racial issue," rather than analyzing every district. Sen. McClendon did not elaborate on any criteria used to determine which of the districts were sufficiently "questionable" to require racial-polarization analysis. No such analysis was provided to Committee members before or during the meeting. Committee members only received demographic and population data for each district, and neither Mr. Walker nor the Georgia consultant attended the Committee meeting.

49.     Rep. Laura Hall moved to postpone any vote on the proposed maps until the Committee members and the public had time to review the maps and accompanying racial-polarization analysis. That motion failed along racial lines.

50.     It is illustrative that no racial-polarization analysis was conducted for Congressional District 7—the single majority-minority congressional district in the State. Defendant Pringle told the Committee that Mr. Walker said that such analysis was unnecessary because the district has a Black voting age population ("BVAP") of around 54%, but did not explain the significance of that number, and when Rep. England asked Sen. McClendon to explain the relationship between a BVAP of 54% and the actual or potential results of a racial-polarization study, Senator McClendon replied, "I got no clue."

51.     Some Committee members expressed concern that the maps applied the whole-county proviso selectively, along racial lines, creating an extreme number of county splits in majority-minority Jefferson County and in Tuscaloosa County, which is now approximately 40% people of color. Rep. England suggested that larger metropolitan areas—where the largest number

of Black Alabamians and Alabamians of color reside—were being divided to dilute the voices of the residents of those counties.

52.     In the end, the House and Senate maps were passed out of the Committee along racial lines, with all 15 white members voting in favor and all 6 Black members opposed.

53.     On October 28, 2021, the Alabama House of Representatives and the Senate convened in a special session dedicated to redistricting.

54.     The Senate first took up the State Senate and Board of Education maps while the House considered the State House and congressional maps.

55.     On October 29, 2021, the Senate General Fund and Appropriations Committee reviewed the State Senate map.

56.     Senator McClendon specified that the Senate map had a maximum deviation of plus or minus 5%. Although the map drawers "tr[ied] to respect counties," the map contained 19 county splits.

57.     After less than five minutes of consideration, that Committee gave the State Senate map a favorable report.

58.     The House State Government Committee reviewed the State House and congressional maps at the same time. Multiple times throughout the committee meeting, Rep. Pringle noted that he had not seen full plans from outside groups, including the Alabama NAACP and Greater Birmingham Ministries. Defendant Pringle stated that he was "running analysis" on maps from outside groups but did not specify when that analysis would be complete.

59.     Rep. Grimsley inquired whether the map split up precincts. Although Rep. Pringle stated that he did not draw Rep. Grimsley's district "along racial lines," Rep. Grimsley equated the precincts included with racial lines. When Rep. Grimsley asked Rep. Pringle to fix the issue of

splitting precincts across racial lines, Rep. Pringle moved on to another questioner.

60.    Defendant Pringle also asserted that when the maps were drawn, "they were race neutral." "There was no race up on the screen." "Race was not in the equation."

61.    Rep. Hollis asked Rep. Pringle to explain how the State Government Committee took up the bill after the Reapportionment Committee voted it out the previous day. Specifically, Rep. Hollis explained that "a lot of people in the public" would not know how to access the maps, which were only put online a day before.

62.    Plaintiff Evan Milligan asked Defendant Pringle whether the Reapportionment Committee conducted racial polarization studies on any of the maps. Rep. Pringle replied that such studies were conducted on "some of the districts that we were concerned about," but that they "were still working on it." Mr. Milligan asked Rep. Pringle for a timeline of these analyses. Again, Rep. Pringle offered no detail. "We're working on it," he said. Mr. Milligan suggested that the Committee lacked the necessary data to determine whether either State Legislative map violated federal law. Defendant Pringle did not reply.

63.    Without having any public racial polarization analyses, the State Government Committee gave the State House map a favorable report.

64.    On November 1, 2021, the full Senate considered the State Senate map. Throughout the floor debate, Senator McClendon emphasized that a primary concern in drawing the maps was whether the Senate would pass them. He maintained the importance of drawing a passable map even when another senator suggested that the Supreme Court might hold that the maps were unconstitutional.

65.    Sen. Smitherman told Sen. McClendon that he had not received a copy of the proposed Senate map, or even a map of his district. He asked that everyone be given copies of the

map so they "can understand just what [they're] voting for." He specifically requested a map with street- or precinct-level data as opposed to a map of counties with only the senators' names on them.

66.     Meanwhile, the full House of Representatives debated the State House map.

67.     Rep. Mary Moore discussed how Jefferson County was districted in a manner that split communities of interest. As a result, voters in some districts have "little, if anything, in common." Rep. England asked Rep. Pringle what the primary objective was that he had in drawing the maps. "To comply with the Committee Guidelines," Rep. Pringle replied. Rep. England asked Rep. Pringle, "When it matters the most, constitutional principles override political ones. Would you say that's correct?" Rep. Pringle responded that he is "not an attorney" so he could not answer the question.

68.     The House adopted a substitute State House map sponsored by Defendant Pringle, which made very minor changes to the original map. The House passed the State House map, as substituted, 68-35.

69.     The next day, the House State Government Committee considered the State Senate map already passed by the Senate.

70.     Multiple voters raised concerns that the Reapportionment Committee had not conducted sufficient racial-polarization analyses, did not draw enough majority-minority districts, and split up communities of interest.

71.     One voter criticized the public hearing process. She noted that 27 out of 28 public hearings were held during work hours. "Many hearings were closed within minutes of starting." The last hearing, for example, lasted only 4 minutes and 40 seconds. It closed while people were still typing out their questions.

72.     Regardless, the State Government Committee gave the Senate bill a favorable report.

73.     The full Senate considered the State House map the next day. Senator McClendon presented the map to the Senate. He claimed that racial data "was removed from the screen" when the districts were initially drawn with "race blindness" in mind, but did not address how race was ultimately considered for VRA compliance or otherwise before being finalized. Sen. Singleton highlighted that Rep. Pringle made changes to the map after the Reapportionment Committee approved it. He found it "pretty disturbing" that Rep. Pringle made the changes without consulting the Committee and that Sen. McClendon could not explain what the changes were.

74.     Sen. McClendon requested that the Senate not "get involved" in the House's business. He added that the Senate previously has voted on maps and proposals "with not a lot of detail" and that "nobody has seen before, except maybe one person or two people."

75.     The Senate carried over debate on the State House map until November 3, 2021. After approving the congressional map, the Senate approved the House map by a vote of 25-7.

76.     Meanwhile, the full House of Representatives approved the State Senate map 76-26-1 with essentially no debate.

77.     Governor Ivey signed the State House and Senate maps into law on November 4, 2021.

**The State's Failure to Create Additional Districts in Which Black Voters Can Elect Candidates of their Choice in Montgomery and Huntsville Violates Section 2 of the Voting Rights Act**

78.     In order to establish liability under Section 2 of the Voting Rights Act, Plaintiffs must satisfy the three *Gingles* preconditions and demonstrate that "the totality of the circumstances results in an unequal opportunity for minority voters to participate in the political process and to

elect representatives of their choosing as compared to other members of the electorate." *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1342 (11th Cir. 2015) (citing *Thornburg v. Gingles*, 478 U.S. 30 (1986)).

> *Gingles I*: The Committee Could Have Drawn Additional Reasonably Configured State Senate Districts Where Black Voters Form a Majority and Have an Opportunity to Elect Candidates of Choice.

79.     Alabama's Black population is sufficiently large and geographically compact to constitute majorities of the voting-age population in at least one additional Alabama State Senate district in each of the Montgomery and Huntsville areas.

80.     District 25 stretches from the northern edge of Elmore County down to the southern edge of Crenshaw County. Instead of following the county line, District 25 splits away from the southwest border of Elmore County, leaving the remaining portion of the County in another district. Along its path, it picks up the eastern and southern parts of Montgomery County. Its shape becomes irregular in Montgomery, where a pronounced divot reaches in to capture white communities on the east side of the City of Montgomery; it becomes increasingly narrow as the district moves south through the city, then juts under District 26 before continuing south into Crenshaw. All but a few of its precincts are majority white and it has a BVAP of 29%. District 25 is one of the least compact in the State.

81.     District 26 includes much of the City of Montgomery except the portion that District 25 has carved out on the east side. District 26 has a BVAP of 66.1% and contains all but two of the City's precincts made up of a majority of Black residents.

82.     The figures below reveal how these districts work together to pack Black voters

into District 26 and draw white voters into neighboring District 25.[6] The first figure shows a broader view of the region; the second figure shows a closer view of the central juncture between Districts 25 and 26.





---

[6] In this and other figures, district lines appear in yellow, county lines in red, and municipalities in dotted lines. Green shading indicates the concentration of the Black voting age population, with darker areas indicating a higher BVAP percentage. District numbers appear in black boxes, with the number below the district number showing BVAP for that district.

83.    The enacted plan unnecessarily packs Black voters in Montgomery into District 26, and surgically extracts communities with higher percentages of white VAPs from the core of Montgomery into District 25.

84.    District 7 begins in the Northwest portion of Madison County along the Tennessee border to the north and Limestone County to the west, and then becomes much narrower, snaking south to capture some of the center of the City of Huntsville, splitting the City of Huntsville and the Black community there into three parts, and then running east all the way to the border of Jackson County.

85.    The district is among the least compact in the Senate, consistent with its highly irregular shape. It cuts through Huntsville's Black community and splits communities of interest, taking a sharp eastern turn to capture heavily white communities rather than additional Black communities in Huntsville, which instead lie in the adjacent Senate Districts 2 and 8, to the west and east, respectively.

86.    The figure below reveals how District 7 surgically carves out some but not all of the Black population of central and north Huntsville, splitting the other parts of those communities into Districts 2 and 8. District 7 violates the principles the Committee bound itself to by, among other things, splitting a community of interest in the center of Huntsville.



87.    The Enacted Plan unnecessarily dilutes the voting strength of Huntsville's Black community. District 7, along with neighboring Districts 2 and 8, slices central Huntsville's Black community into three pieces, effectively cracking its voting strength.

88.    Alternative district lines could configure the State Senate map to provide two additional, reasonably configured State Senate districts comprised of a majority of Black voting-age citizens. This illustrative map maintains contiguity of all districts, has permissible population deviations of no more than ±5% for each district, splits no more counties than the Enacted Plan, has comparable compactness scores to the Enacted Plan, and satisfies other traditional redistricting criteria, including respect for communities of interest, better than the current map.

89.    The illustrative plan unites reasonably compact areas of Black citizens into districts where Black voting-age citizens form majorities and does so in a manner that respects traditional principles by maintaining contiguity, maintaining similar compactness scores and political subdivision splits to the current districts in the Montgomery and Huntsville regions, and better respecting communities of interest, among other principles. Voters in these districts are members of communities of interest with a shared history, political beliefs, cultural values, and economic

interests. For the majority of those voters, their history includes a shared legacy of achievement and discrimination, and shared goals for livable wages, quality healthcare, better sanitation and water quality, and greater economic opportunity.

90.     In Montgomery, illustrative State Senate districts can be drawn that are more compact than the enacted ones on at least one metric and result in the one split of Montgomery County just as the enacted plan did. An illustrative District 25 can be drawn that contains the Southern and Eastern portions of Montgomery City and County and all of Crenshaw County, as opposed to the Enacted Plan, which ran from the southern border of Crenshaw County to the top of Elmore County while carving out a divot from the center of the City of Montgomery. The illustrative plan results in Black citizen-voting age populations above 50% in both Districts 25 and 26.

91.     In the Huntsville area, the illustrative map creates new districts more compact than others drawn by the Legislature in the Enacted Plan and approximately the same levels of compactness as the old Districts 2 and 7, and splits Madison and Limestone Counties into fewer districts (four and two, respectively) than the Enacted Plan (five and four, respectively). Further, the illustrative plan better respects communities of interest, uniting the core of the largest city in the State—Huntsville—and remedying the split of Alabama A&M University and its surrounding communities in the current plan.

92.     The map also recognizes the commonalities and connections between the City of Huntsville and the City of Decatur, which form the collective core of the Huntsville-Decatur-Albertville Combined Statistical Area, which the U.S. Census Bureau has recognized based on the high rate of employment interchange between cities. The two cities share a hub of aerospace and engineering industry, with numerous companies located just off Interstate 565 on the way into

Huntsville—including Lockheed Martin, Boeing, and many more at Huntsville's Cummings Research Park—and others based in Decatur, like United Launch Alliance. A recent comprehensive plan for Decatur's future released by the Decatur City Council further highlights the intense connections between the cities: Decatur's "efficient connections to Huntsville and areas beyond promote access to employment, education, and entertainment while also supporting a more connected regional economy." Decatur announced its intent to establish an express bus service to Huntsville given the "substantial amount of traffic [that] travels each day between Decatur and Huntsville." In fact, the cities' economies are so closely tied that Decatur's self-professed primary economic objective is to "'captur[e]' more new businesses that serve or contract with clients in Huntsville and Madison." They also share educational opportunities; for example, Calhoun Community College—which has campuses in both Decatur and Huntsville—is the largest two-year institution in the Alabama Community College System. Recently, a cooperative of local leaders even banded together to develop a greenway system connecting Decatur and Huntsville by outdoor trails.

93.    The illustrative plan results in a District 2 Black citizen-voting age population above 50%.

_Gingles II and III_: Voting Remains Racially Polarized in Alabama Across the State, including in Montgomery, Such That Despite Cohesion Among Black Voters, the White Majority Consistently Votes as a Bloc to Defeat Black Voters' Candidates of Choice.

94.    Voting is racially polarized across the State. "The surest indication of race-conscious politics is a pattern of racially polarized voting." _United States v. Marengo Cnty. Comm'n_, 731 F.2d 1546, 1567 (11th Cir. 1984).

95.    Numerous federal courts in Alabama have found that the State's elections are racially polarized, including just this year and as agreed by the State's expert in that area. _See_

*Milligan v. Allen*, No. 2:21-CV-1291-AMM, 2023 WL 5691156, at *52 (N.D. Ala. Sept. 5, 2023);
*Milligan v. Merrill*, 582 F. Supp. 3d 924, 1016-18 (N.D. Ala. 2022), *aff'd sub nom. Allen v.
Milligan*, 599 U.S. 1, 22 (2023); *see also ALBC I*, 575 U.S. at 277 (noting the existence of racially
polarized voting in Alabama elections); *Ala. State Conf. of NAACP v. Alabama*, No. 2:16-CV-731-
WKW, 2020 WL 583803, at *17 (M.D. Ala. Feb. 5, 2020) (accepting the undisputed statistical
evidence proving the existence of racially polarized voting statewide); *United States v. McGregor*,
824 F. Supp. 2d 1339, 1345-46 & n.3 (M.D. Ala. 2011) (finding that voting is racially polarized
across Alabama). "In an environment characterized by racially polarized voting, politicians can
predictably manipulate elections—either by drawing districts or setting an issue for a referendum—
to minimize or cancel out minority voters' ability to elect their preferred candidates." *McGregor*,
824 F. Supp. 2d at 1346 (internal citation, quotation marks, and alterations omitted).

96.     There is a causal relationship between racial bloc voting and the State's history of
racial discrimination. "Racial bloc voting by whites is attributable in part to past discrimination,
and the past history of segregation and discrimination affects the choices of voters at the polls."
*Brown v. Bd. of School Comm'rs of Mobile Cnty.*, 542 F. Supp. 1078, 1094 (S.D. Ala. 1982), *aff'd*
702 F.2d 1103 (11th Cir. 1983), *aff'd* 464 U.S. 1005 (1983).

97.     Analysis of voting patterns in Montgomery County in state legislative elections,
congressional elections, and elections for statewide office all show consistent patterns of Black
voters voting cohesively, and white voters consistently voting as a bloc for candidates that defeat
the candidates preferred by Black voters in districts without BCVAP majorities. For example, in
Montgomery County, in statewide elections over the last decade, including for President, U.S.
Senate, Governor, and other offices, at least 85% and usually over 90% of Black voters in
Montgomery have consistently supported the same candidates, while white voters' support for

those candidates consistently fell below 20%. In the 2018 state legislative elections, over 80% of Black voters supported Black candidate David Sadler for Senate District 25, while less than 20% of white voters supported him. Sadler was defeated by white and white-preferred candidate Will Barfoot in that election.

98.    In races in the current majority-white SD 25, Black candidates and Black-favored candidates have never won election to the state Senate over the past decade-plus.

99.    Similarly, analysis of voting patterns in Madison County in state legislative elections, congressional elections, and elections for statewide office show consistent patterns of Black voters voting cohesively, and white voters consistently voting as a bloc for candidates that defeat the candidates preferred by Black voters in districts without BCVAP majorities. As an example, in the 2022 Alabama Supreme Court election, 88% of Black voters in Madison County supported a Black candidate, Anita Kelly, while only 22.5% of white voters supported Kelly. Kelly was defeated, both within Madison County and statewide, by white and white-preferred candidate Gregory Cook. In the 2018 Senate District 7 election, Black voters cast about 90% of their ballots in favor of a Black candidate (Deborah Barros), whereas about 70% of white voters cast ballots for her white opponent (Sam Givhan). Givhan defeated Barros in the Senate District 7 election. The 2018 Madison County Probate Judge election involving Black and white candidates had similar levels of racially polarized voting as the 2018 Senate District 7 election. In the 2018 statewide biracial races for Lt. Governor and State Auditor, Black voters in Madison again supported the Black candidates who were defeated in Madison by white candidates due to high levels of racially polarized voting.

100.    Voting in primary elections in Alabama is racially polarized. That is, even when voters are choosing among candidates from the same party, race influences their vote. For example,

in the 2008 Democratic presidential primary, Black people overwhelmingly voted for Barack Obama, whereas most white voters supported Hillary Clinton or other white candidates.

> The Totality of the Circumstances Demonstrate that SB 1 Prevents Black Voters in Alabama from Participating in the Political Process on Equal Terms and Electing Representatives of Choice.

101.    To undertake the totality-of-the-circumstances determination, courts use the nine factors drawn from a report of the Senate Judiciary Committee accompanying the 1982 amendments to the VRA, i.e., the "Senate Factors."[7] *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1342 (11th Cir. 2015). But courts are not limited to solely considering these factors, nor is there a requirement that "any particular number of factors be proved, or that a majority of them point one way or the other." *Id.* (internal citations and quotation marks omitted).

102.    Although district courts must perform this totality-of-the-circumstances analysis, "it will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of circumstances." *Id*. (citation omitted).

103.    Under the totality of the circumstances, the failure to draw additional State Senate districts in the Montgomery and Huntsville areas where Black voters have an equal opportunity to participate in the political process and elect candidates of choice violates Section 2 of the VRA.

> *Senate Factors 1 and 3: Alabama Has an Extensive and Ongoing History of Voting Discrimination and Has Used Voting Practices and Procedures that Enhance the Opportunity for Discrimination Against Black Voters.*

104.    In five of the six decennial redistricting cycles between 1960 and 2010, courts or

---

[7] Plaintiffs do not address Senate Factor 2 concerning racially polarized voting separately in this section, but rather rely on the evidence from the previous section supporting such a finding and the fact that racially polarized voting occurs even in partisan primary elections.

the U.S. Department of Justice found that Alabama's congressional map or state legislative maps discriminated against Black voters in violation of the Constitution or the VRA.

105.    Prior to 1960, the Legislature failed to reapportion for 50 years—diluting the votes of residents in rapidly expanding counties. As a result, Alabama's entire legislative apportionment scheme was struck down for violating the principle of one person, one vote. *Reynolds v. Sims*, 377 U.S. 533, 568 (1964). On remand, a three-judge court found that, in devising remedial maps to correct the malapportionment, the "Legislature intentionally aggregated predominantly Negro counties with predominantly white counties for the sole purpose of preventing the election of Negroes to [State] House membership." *Sims v. Baggett*, 247 F. Supp. 96, 108–09 (M.D. Ala. 1965).

106.    Following *Reynolds* and the 1970 Census, the Legislature again failed to redistrict and a three-judge federal court was forced to draw new district lines. *Sims v. Amos*, 336 F. Supp. 924, 940 (M.D. Ala. 1972). The court rejected the Alabama Secretary of State's proposed map because of its racially "discriminatory effect" on Black voters. *Id*. at 936.

107.    In the 1980s, the United States Attorney General denied preclearance under Section 5 of the VRA to State House and Senate maps drawn by the Legislature because of their discriminatory effect on Black voters in Jefferson County and the Black Belt. U.S. Dep't of Justice Ltr. to Ala. Att'y General Graddick, May 6, 1982, https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/AL-1520.pdf. Shortly thereafter, a three-judge court rejected Alabama's proposed interim remedial state maps in part because Alabama's maps "had the effect of reducing the number of 'safe' black districts" in and near Jefferson County. *Burton v. Hobbie*, 543 F. Supp. 235, 238 (M.D. Ala. 1982).

108.    After the 1990 census, the State entered a consent decree to resolve a VRA lawsuit

filed on behalf of Black voters. *See Brooks v. Hobbie*, 631 So.2d 883, 884 (Ala. 1993).

109.   Most recently, after the 2010 census, Black voters and legislators successfully challenged a dozen state legislative districts as unconstitutional racial gerrymanders. *See Ala. Legis. Black Caucus v. Alabama* ("*ALBC II*"), 231 F. Supp. 3d 1026, 1348-49 (M.D. Ala. 2017).

110.   Alabama's history of discrimination dates to the State's admission to the union. Before the Civil War, Black people were barred from voting in the state. After the passage of the Reconstruction Acts and Amendments, Alabama was forced to allow Black men access to the franchise, and the 1867 Alabama Constitution granted every male person over the age of 21— who satisfied the citizenship and residency requirements—the right to vote. This meant that for the first time in Alabama's history, Black people voted and held public office.

111.   In response, white leaders reformed the Democratic Party with the intent of "redeeming" the State and re-establishing white supremacy. This was accomplished by using violence to deter Black people from political participation and, once the Redeemers returned to political office, passing racially discriminatory laws to cement their control.

112.   Between 1868 and 1872, the Ku Klux Klan maintained an active membership in Alabama's rural areas and suppressed the Black vote by beating and killing Republican leaders, burning their homes, lynching Black Americans, and sending bands of armed white men on horseback to break up Republican political rallies and intimidate voters.

113.   In 1874, Democratic candidates were elected to public office in large numbers, mainly due to the party's use of violence against and intimidation of Black voters. On election day, in Eufaula, Alabama, members of a white paramilitary group known as the White League killed several unarmed Black Republican voters and drove away thousands of voters from the polls.

114.   The following year, in 1875, the Alabama legislature adopted a new state

constitution and passed a series of local laws and ordinances designed to strip Black Americans of the civil rights they enjoyed briefly during Reconstruction.

115.    Violent intimidation of Black voters continued throughout the 1880s and 1890s, and by the twentieth century, white leaders in Alabama had declared Black disenfranchisement a policy goal. At the 1901 Constitutional Convention, 155 white male delegates gathered in Montgomery with the express intention "to establish white supremacy in the State."

116.    The Convention ratified changes to the constitution that required literacy tests as a prerequisite to registering to vote and mandated payment of an annual $1.50 poll tax, which was intended to and had the effect of disenfranchising Black voters. *United States v. Alabama*, 252 F. Supp. 95, 99 (M.D. Ala. 1966).

117.    After the passage of the 1901 Constitution, the number of Black registered voters in Alabama dropped from 180,000 to 3,000.

118.    Alabama's discriminatory voter registration system, combined with continued violent intimidation, successfully suppressed Black voting in the State for several more generations, with no significant federal intervention until the passage of the VRA in 1965.

119.    In 1964 and 1965, Alabama's discrimination and brutality against Black voters was on full display in Selma, where Dallas County Sheriff Jim Clark, Alabama state troopers, and vigilantes violently assaulted peaceful Black protesters attempting to gain access to the franchise.

120.    On March 7, 1965, in what became known as Bloody Sunday, state troopers viciously attacked and brutally beat unarmed peaceful civil rights activists crossing the Edmund Pettus Bridge in Selma, where less than 5 percent of Black voters were registered to vote. Bloody Sunday helped pave the way for the passage of the VRA in 1965 and Alabama was declared a "covered" state under Section 4(b) of the Act.

121.    Between 1965 and 2013, at least 100 voting changes proposed by Alabama state, county, and city officials were either blocked or altered pursuant to Section 5 of the VRA. U.S. Dep't of Justice, Civil Rights Division, Voting Section, *Voting Determination Letters for Alabama*, https://www.justice.gov/crt/voting-determination-letters-alabama (last updated May 18, 2020). This includes at least 16 objections between 1969 and 2008 in cases where a proposed state or local redistricting plan had the purpose or would have the effect of diminishing the ability of Black voters to elect their candidates of choice. *Id.*; *see* 52 U.S.C. § 10304(b).

122.    Beyond redistricting, Alabama has employed voting practices that impair Black electoral success. In 1986, for instance, a court found that the state laws requiring numbered posts for nearly every at-large voting system in Alabama had been intentionally enacted to dilute Black voting strength, and that numbered posts had the effect of diluting Black voting strength in at-large elections. *Dillard v. Crenshaw Cnty.*, 640 F. Supp. 1347, 1357 (1986). The court also found that from the late 1800s to the 1980s, Alabama had purposefully manipulated the method of electing local governments to prevent Black citizens from electing their preferred candidates. *Id.*

123.    Ultimately, a defendant class of 17 county commissions, 28 county school boards, and 144 municipalities were found to be employing at-large election systems designed and motivated by racial discrimination. These cases resulted in settlement agreements requiring about 180 Alabama jurisdictions to adopt new election systems, including single-member districts, limited voting, and cumulative voting systems, in an attempt to purge the State's election systems of intentional discrimination. *See* James Blacksher, et. al., *Voting Rights in Alabama: 1982-2006*, 17 S. Cal. Rev. L. & Soc. Just. 249, 264 (2008).

124.    Federal courts have continued to reject municipal at-large voting systems created by the State Legislature under Section 2. *See, e.g.*, *Jones v. Jefferson Cnty. Bd. of Educ.*, No. 2:19-

cv-01821, 2019 WL 7500528, at *4 (N.D. Ala. Dec. 16, 2019) (finding that the at-large multi-member district used to elect board members violated Section 2 of the VRA); *Ala. State Conf. of the NAACP v. City of Pleasant Grove*, No. 2:18-cv-02056, 2019 WL 5172371, at *1 (N.D. Ala. Oct. 11, 2019) (ordering changes to the city's at-large voting system to remedy an alleged violation of the VRA).

125.    Black voters have successfully challenged other discriminatory Alabama voting laws under Section 2 of the VRA and the Constitution in federal court. *See, e.g.*, *People First of Alabama v. Merrill* ("*People First*"), 491 F. Supp. 3d 1076, 1106-1107 (N.D. Ala. 2020); *Harris v. Siegelman*, 695 F. Supp. 517, 530 (M.D. Ala. 1988). For example, the Supreme Court struck down Alabama's discriminatory misdemeanant disfranchisement law, *Hunter v. Underwood*, 471 U.S. 222 (1985), and a state law permitting certain discriminatory annexations, *Pleasant Grove v. United States*, 479 U.S. 462, 466-67 (1987).

126.    In the wake of *Shelby County v. Holder*, Alabama is the only state in the nation where federal courts have ordered more than one political subdivision to be re-subjected to preclearance review under Section 3(c) of the VRA. *See Jones*, 2019 WL 7500528, at *4-5; *Allen v. City of Evergreen*, No. 13-0107, 2014 WL 12607819, at *2 (S.D. Ala. Jan. 13, 2014).

127.    Since the VRA's passage, "the Justice Department has sent election observers to Alabama nearly 200 different times," and "between 1965 and 2013, more than 100 voting changes proposed by the State or its local jurisdictions were blocked or altered under Section 5 of the Voting Rights Act." *Milligan I*, 582 F. Supp. 3d at 972-73.

128.    Alabama also continues to use majority vote requirements, which hinder the opportunity for Black voters to elect candidates of choice on equal terms. Until 2021, some Alabama municipalities used at-large elections with numbered posts, several of which courts have

struck down or altered in recent years.

> *Senate Factor 5: Black Alabamians Continue to Bear the Effects of Past Socioeconomic Discrimination Which Hinders Their Ability to Participate Effectively in the Political Process.*

129.    Alabama has a long history of official and private discrimination which predates the State's admission to the union and has been well documented by the federal courts since at least the 1960s. As one federal court explained, Alabama has had an "unrelenting historical agenda, spanning from the late 1800s to [today], to keep its black citizens economically, socially, and politically downtrodden, from the cradle to the grave." *Dillard*, 640 F. Supp. at 1357.

130.    As a result of the history of official and private discrimination in Alabama, Black Alabamians lag behind white residents in many crucial aspects of public life, including employment, income, educational attainment, and access to healthcare. Black Alabamians also disproportionately bear the brunt of the consequences of the State's criminal legal system. All of this discrimination and its vestiges hinder Black Alabamians' ability to participate effectively in the political process.

131.    Alabama's history of denying Black people equal access to education persisted long after the Supreme Court's decision in *Brown v. Board of Education*. In 1956, after a federal court ordered the segregated University of Alabama to admit a Black woman named Autherine Lucy, white people gathered on campus, burned a cross, and marched through town chanting, "Hey, hey, ho, ho, Autherine has got to go!" Frye Gaillard, *Cradle of Freedom: Alabama and the Movement that Changed America,* 40 (Tuscaloosa: University of Alabama Press, 2004).

132.    Desegregation litigation continues in Alabama today. A December 2014 report found that 54 Alabama school districts remain under desegregation orders as they still have not satisfied their constitutional obligations to integrate public schools and eliminate the vestiges of

racial discrimination. *People First*, 491 F. Supp. 3d at 1108. For example, in 2018, in a case challenging the attempt by the City of Gardendale, which is 85% white, to form a school district separate from Jefferson County's more racially diverse district, the Eleventh Circuit affirmed a finding that "race was a motivating factor" in the City's effort. *Stout v. Jefferson Cnty. Bd. of Ed.*, 882 F.3d 988, 1007–09 (11th Cir. 2018).

133.    Alabama's constitution contained, until at least 2022, language that mandates separate schools for Black and white students after a majority of voters rejected repeal attempts in 2004 and 2012. Although the provision has not been enforceable for decades, its underlying prejudice continues to shape ongoing educational inequality.

134.    Alabama was the first state ever to be subjected to a statewide injunction prohibiting the State from discriminating on the basis of race in the operation of its public schools. *Lee v. Macon Cnty. Bd. of Ed.*, 267 F. Supp. 458 (M.D. Ala.), *aff'd sub nom. Wallace v. United States*, 389 U.S. 215 (1967). The order resulted from the court's finding that the State Board of Education, through Governor George Wallace, had previously wielded its powers to maintain segregation across the State. *Id.* For decades, state officials ignored their duties under the statewide desegregation order. *See Lee v. Lee Cnty. Bd. of Educ.*, 963 F. Supp. 1122, 1128–30 (M.D. Ala. 1997). The State did not satisfy its obligations to remedy the vestiges of segregation under this order until as late as 2007. *Lee v. Lee Cnty. Bd. of Educ.*, 476 F. Supp. 2d 1356 (M.D. Ala. 2007).

135.    The Huntsville City schools and Madison County schools remain subject to federal desegregation orders. In 2022, this Court entered a consent order to address the outstanding vestiges of racial discrimination against Black students and teachers in Madison County in the areas of student discipline and faculty recruitment, retention, and assignment. This Court continues to monitor a similar court order entered against Huntsville City schools to address the vestiges of

discrimination as well as more recent instances of discrimination. For example, in 2015, this Court found that Huntsville City schools engaged in the unconstitutional disparate treatment of Black students insofar as "black students tended to receive, on average, more serious consequences for similar behaviors to white students." *Hereford v. Huntsville Bd. of Educ.*, No. 5:63-CV-00109-MHH, 2015 WL 13398941, at *3 (N.D. Ala. Apr. 21, 2015). Although Montgomery County is no longer subject to a desegregation order, it operated segregated homecoming queen elections as late as 1998. *Godby v. Montgomery Cty. Bd. of Educ.*, 996 F. Supp. 1390, 1411 (M.D. Ala. 1998).

136.    Alabama's institutions of higher education similarly remain plagued by the "vestiges of segregation," decades after Alabama colleges and universities were court-ordered to desegregate. *Knight v. Alabama*, 787 F. Supp. 1030 (N.D. Ala. 1991). In 1991, a trial court in *Knight v. Alabama* found that Alabama remained obligated to eliminate the lingering and continued effects of segregation and discrimination in the University of Alabama and Auburn University, as well as their proposed satellites, to try to recruit Black students to those schools, and to recruit white students to the State's Historically Black Colleges and Universities (HBCUs). In 1995, the trial court issued a remedial decree analogous to the statewide injunction issued in *Lee v. Macon*, the implementation of which the court would oversee for over a decade. *Knight v. State of Ala.*, 900 F. Supp. 272 (N.D. Ala. 1995). And Alabama did not satisfy its obligations under the *Knight* order until as late as 2006. *Knight v. Alabama*, 469 F. Supp. 2d 1016 (N.D. Ala. 2006).

137.    Today, after increasing for many years, Black student enrollment in the State's higher education institutions has drastically declined. For example, Black enrollment at Auburn University peaked 14 years ago with Black students making up 8.7 percent of the student body. In 2021, the number of Black students in the freshman class at Auburn was a mere 3.2%. Drake Pooley, *Why Has Black Enrollment Fallen at an Elite Southern University?*, N.Y. Times (Sept. 17,

2021).

138.    In 2016, all 76 of the schools labeled "failing" by Alabama were majority-Black schools, and Black students constituted 91% of those Alabama students who were enrolled in "failing" public schools.

139.    More than 13% of Black adults in Alabama over the age of 25 have not completed high school, compared to 9.5% of white adults. For the same age group, only 21% of Black Alabamians hold a bachelor's degree or a higher qualification, compared to 31.6% of white adults. U.S. Census Bureau, Table S0201, 1-year 2022 American Community Survey.

140.    Alabama also has a persistent history of denying its Black residents equal access to employment opportunities. Nearly one quarter (23.3%) of Black Alabamians live in poverty compared to only 7.8% of white Alabamians. *Id*.

141.    The unemployment rate among Black people over the age of 16 in Alabama's labor force (7.4%) is more than double the rate among white residents of the same age. And of those adults who are employed, Black Alabamians are more likely to work in lower-paying jobs than white workers: 21.2% of Black employees work in service occupations compared to 13.5% of whites. *Id*.

142.    In Alabama, Black households also have fewer economic resources. The median household income for Black families is $40,774, compared to $68,168 for white households. *Id*.

143.    Black Alabamians are significantly more likely to lack a vehicle than white Alabamians. About one-tenth of Black households (9.2%) lack access to a vehicle, while only 3.5% of white households lack a vehicle. *Id*.

144.    Further, Black Alabamians are significantly more likely to rent their home than white Alabamians. While 52.7% of white Alabamians are homeowners, only 7.8% of Black Alabamians

own their homes. *Id*.

145.    Rampant and overt discrimination in education works in tandem with discrimination against Black people in employment in Alabama. In 2019, there were 2,108 claims of employment discrimination submitted to the U.S. Equal Employment Opportunity Commission ("EEOC") from Alabama, of which 45.1% were based on race – the highest percentage of any state in the United States. U.S. Equal Employment Opportunity Commission, 2019 EEOC Charge Receipts for AL, https://www.eeoc.gov/statistics/enforcement/charges-by-state/AL; U.S. Census Bureau, Quick Facts, http://www.census.gov/quickfacts/table/PST045215/00,01. Alabama's race-based claims accounted for 2.9% of the race-based claims received by the EEOC in the entire country and Alabama's color-based claims represented 2.2% of the EEOC's color-based claims in the country, even though in 2020 Alabama accounted for only 1.5% of the national population.

146.    Income and education are independently important, but both also have a significant impact on political participation rates, which remain persistently lower among Black than among white Alabamians.

147.    Racial discrimination also exists in the healthcare system. Alabama has one of the highest maternal mortality rates in the country. In 2019, the infant mortality rate for Black infants was 12.0 deaths per 1,000 live births, which is more than twice the white infant mortality rate of 5.6 deaths. Ala. Public Health, *Alabama Infant Mortality Rate Shows Slight Uptick in 2019* (Dec. 16, 2020), https://www.alabamapublichealth.gov/news/2020/12/16.html. As a gynecologic oncologist in Mobile recently stated, "It is more lethal to be Black and pregnant in Alabama than in some poor countries." Eyal Press, *A Preventable Cancer Is on the Rise in Alabama*, The New Yorker (Mar. 30, 2020), https://www.newyorker.com/magazine/2020/04/06/a-preventable-cancer-is-on-the-rise-in-alabama.

148.    The life expectancy of Black Alabamians (72.9 years) is significantly shorter than that of white Alabamians (76 years). In Alabama's Black Belt, researchers have found that Black women, compared to white women, are more than twice as likely to die from cervical cancer. *Id.*

149.    In Lowndes County—part of the Montgomery statistical metropolitan area— scientists at the National School of Tropical Medicine at Baylor College of Medicine documented high rates of hookworm infections among residents from exposure to raw sewage and inadequate wastewater management. A disease long thought to have been eradicated in the United States, hookworm infections cause anemia, iron deficiencies, cognitive delay, and stunted growth in children. The peer-reviewed study published in the *American Journal of Tropical Medicine and Hygiene* found that more than one in three Lowndes County residents tested positive for traces of hookworm. Equal Justice Initiative, *Researchers Find Hookworm Infection Linked to Extreme Poverty in Rural Alabama*, https://eji.org/news/researchers-find-hookworm-infection-linked-extreme-poverty-rural-alabama/.

150.    On November 9, 2021, the U.S. Department of Justice announced an investigation into the wastewater disposal and infectious disease and outbreaks programs of the Alabama Department of Public Health and the Lowndes County Health Department. The investigation is examining whether the Alabama and Lowndes County Health Departments operate their onsite wastewater  disposal program and infectious diseases and outbreaks program in a manner that discriminates against Black residents in violation of Title VI of the Civil Rights Act of 1964. *See* U.S. Dep't of Justice Office of Public Affairs, *Justice Department Announces Environmental Justice Investigation into Alabama Department of Public Health and Lowndes County Health Department* (last updated Nov. 9, 2021), https://www.justice.gov/opa/pr/justice-department-announces-environmental-justice-investigation-alabama-department-public.

151.    The COVID-19 public health crisis that began in 2019 and the deaths associated with the novel and deadly respiratory virus have fallen most heavily on Black Alabamians as a result of centuries of discrimination against Black people in all areas of life in Alabama, including in health, income, and employment. Kesha Moore, *COVID-19 Vaccinations In Alabama: Protecting and Perpetuating a Racial Divide*, NAACP Legal Defense Fund (Apr. 2, 2021), https://www.naacpldf.org/naacp-publications/ldf-blog/covid-19-vaccinations-in-alabama-protecting- and-perpetuating-a-racial-divide/. The continued effects of discrimination in Alabama are further evidenced by the fact that Black Alabamians have the highest rates of COVID-19 cases and disproportionately account for COVID-19 deaths. The COVID Tracking Project, *Alabama: All Race & Ethnicity Data*, The Atlantic, https://covidtracking.com/data/state/alabama/race-ethnicity (last updated Mar. 7, 2021).

152.    These "disparities hinder Black Alabamians' opportunity to participate in the political process today." *Milligan*, 2022 WL 265001, at *71. Because "white Alabamians tend to have more education and therefore higher income" than Black Alabamians, "they tend to be better able than Black Alabamians to afford a car, internet service, a personal computer, or a smart phone; take time off from work; afford to contribute to political campaigns; afford to run for office; [and] have access to better healthcare," and "[e]ducation has repeatedly been found to correlate with income [and] independently affects citizens' ability to engage politically." *Id.* (cleaned up).

153.    Not surprisingly, significant racial disparities in voter turnout and voter registration rates remain, with the 2020 election in Alabama revealing that 70.6% of non-Hispanic white people and 61% of Black people were registered to vote, and a similar disparity in voter turnout.

*Senate Factor 6: Overt and Subtle Racial Appeals Continue in Political Campaigns.*

154.    In the last decade, both overt and subtle racial appeals have defined political

campaigns in Alabama. Former Alabama Congressman Mo Brooks—who represented Madison County in Congress until just recently—stated that "[he] will do anything short of shooting [undocumented immigrants]" to remove them from the United States. He has also repeatedly claimed that "Democrats are waging a 'war on whites,'" which is an "obvious and overt appeal[] to race." *Milligan*, 2022 WL 265001, at *72.

155.    In the 2017 special election for the U.S. Senate seat vacated by Jeff Sessions, then-candidate Roy Moore told a group of people in Jackson, Alabama that the VRA created new rights and "today we've got a problem." When asked to speak about a time when America was great, Moore replied, "I think it was great at the time when families were united—even though we had slavery— they cared for one another . . . Our families were strong, our country had direction."

156.    In the 2018 election for Chief Justice of the Alabama Supreme Court, at least two campaign ads run by Chief Justice Tom Parker were characterized by racial appeals. In one of his campaign ads, Chief Justice Parker, a white candidate, declared that he opposes "the leftist mob tr[ying] to destroy our society" and featured a clip of Congresswoman Maxine Waters. *Ala. State Conf. of NAACP*, 2020 WL 583803, at *56. A court recently found that this statement alongside images of Congresswoman Waters, a Black congresswoman from California who had no reason to appear in an ad for an Alabama judicial election, shows that "one of the motives of the ad was to draw attention to race." *Id*. In another of Justice Parker's ads, he targeted immigrant communities: "It's an invasion. What happens if they make it to Alabama?" *Id*. The ad then showed what appeared to be people of color trying to cross the southern border and concluded with a declaration that Justice Parker "stand[s] up for what we believe" and "stand[s] *with us*." *Id*.

157.    In 2020, former Congressman and then-Senate candidate Bradley Byrne released a video "of a white man narrating as images of prominent persons of color (and only persons of

color) are juxtaposed with images of the 9/11 terrorist attacks, in or on or hovering above a crackling fire," which "could be understood as a racial appeal." *Milligan*, 2022 WL 265001, at *72.

*Senate Factor 7: Black Alabamians Remain Woefully Underrepresented in Public Office.*

158.    Black people in Alabama remain underrepresented, as a proportion of the population, in public office.

159.    Even though Black people comprise approximately 27% of Alabama's population, only 7 of 35 or 20% of Alabama's state senators are Black. While white voters are only about 63% of the population, white voters control electoral results in 80% of Senate districts. Likewise, only one in seven, or approximately 14% of Alabama's congressional representatives is Black. The number of majority-Black congressional districts has remained constant since 1992, before which there had never been a Black congressional representative from Alabama in the twentieth century.

160.    None of the current statewide elected officials are Black. Only two Black people have ever been elected to statewide office. In both instances, the office was an associate justice of the Alabama Supreme Court. In 1982 and 1988, the late Justice Oscar W. Adams, Jr. was elected to two consecutive terms; and, in 1994, Justice Ralph D. Cook won an unopposed statewide election. In 2000, both Justice Cook and the then-recently appointed Justice John England, a Black person, lost elections to white candidates.

161.    As of 2015, there were 757 local Black elected officials in Alabama, making up only 16.7% of elected offices.

162.    Alabama has never had a Black governor or a Black senator representing the state in the U.S. Senate.

163.    There are currently no Black Republicans in either the State Senate or in any

statewide elective positions.

164.    "[N]early all of [the] success [of Black candidates] is attributable to the creation of majority-Black districts to comply with federal law." *Milligan*, 2022 WL 265001, at *69.

*Senate Factor 8: Elected Officials are Unresponsive to the Needs of Black Alabamians.*

165.    Black Alabamians' lack of representation in public office has contributed to the failure of elected officials to respond to the particularized needs of the Black communities. The Alabama Legislature rejected requests to expand Medicaid under the Affordable Care Act despite the racial gap in insurance coverage. Expanding Medicaid would have insured an additional 220,000 Alabamians, particularly benefiting Black residents. This disparity in healthcare and insurance coverage contributed to the vulnerability of Black Alabamians when the novel coronavirus surfaced in early 2020. *People First*, 491 F. Supp. 3d at 1109.

166.    Alabama's elected officials have also been unresponsive to the needs of Black Alabamians in other areas of government services. In 2014, following the Supreme Court's decision in *Shelby County v. Holder*, Alabama's photo identification law went into effect; and in 2015, the State announced that it was closing 31 of 75 driver license offices throughout Alabama. The planned closures overwhelmingly affected Black Alabamians, as the State specifically concentrated closures in the Black Belt. Civil rights organizations challenged the State's actions as having a disproportionate effect on the rights of Black voters to participate in the electoral process. The decision to close these offices was ultimately reversed as part of a settlement after the U.S. Department of Transportation determined that the closures had discriminated against Black people in violation of Title VI of the Civil Rights Act. *See* Mem. Agreement Between the U.S. Department of Transportation and the     Alabama     Law     Enforcement     Agency (Dec. 22,     2016), https://www.transportation.gov/sites/dot.gov/files/docs/ALEA%20US%20DOT%20Signed%20

MOA_0.PDF.

*Senate Factor 9: The justifications for drawing the current Senate Districts in Montgomery and Huntsville are tenuous.*

167.    As explained above, under the current configuration of Senate districts in Montgomery, traditional districting principles can justify neither the State's packing of Black voters into District 26 in much higher numbers than necessary to elect candidates of choice, nor the surgical extraction of white populations from the city core into District 25. Likewise, traditional districting principles do not explain the three-way division of Huntsville's Black voters that enables white-preferred candidates to consistently prevail in all three districts representing the core of the Huntsville metropolitan area.

<u>Black Alabamians Do Not Hold a Roughly Proportional Number of State Senate Seats Compared to their Population.</u>

168.    Evidence of "proportionality—defined as the relationship between the number of majority-minority voting districts and the minority group's share of the relevant population— is *always* relevant evidence in determining vote dilution, but is *never* itself dispositive." *Johnson v. De Grandy*, 512 U.S. 997, 1025 (1994) (O'Connor, J., concurring).

169.    In Alabama, Black Senators represent only 7 of 35 State Senate Districts, or 20% of districts. By contrast, Black Alabamians make up 27.16% of the State's population.

**CLAIM FOR RELIEF**

**Count One: SB 1's violations of Section 2 of the Voting Rights Act of 1965**
**52 U.S.C § 10301, 42 U.S.C. § 1983**
**(Racial Vote Dilution)**

170.    The relevant allegations contained in the preceding paragraphs are alleged as if fully set forth herein. Although dilutive "electoral devices, such as at-large elections, may not be considered per se violative of § 2," Plaintiffs can "demonstrate that, under the totality of the

circumstances, the devices result in unequal access to the electoral process." *Gingles*, 478 U.S. at 46; 52 U.S.C. § 10301; 52 U.S.C. § 10302(b).

171.    Voting in Alabama is racially polarized. Black voters in Alabama, including in Montgomery and Huntsville, are politically cohesive and overwhelmingly support the same candidates in legislative and statewide elections. By contrast, the white majority typically votes as a bloc in legislative and statewide elections with the usual result of defeating Black voters' candidates of choice.

172.    In addition, Black voters in Alabama are sufficiently numerous and geographically compact enough to form ten Alabama Senate districts in which Black voters constitute the majority rather than current eight.

173.    Moreover, considering the totality of the circumstances in Alabama, Individual Plaintiffs, Organizational Plaintiffs' Black members, and Black Alabamians at large have less opportunity than other members of the Alabama electorate to participate in the political process and to elect representatives of their choice to the Alabama Senate.

174.    Among other factors, there is a long history and ongoing pattern of discrimination in voting, education, employment, health, and other areas in Alabama that affect Black voters' ability to participate equally in the political process, Black voters are underrepresented in the State's legislative delegation, recent political campaigns have been characterized by overt and subtle racial appeals, and the Legislature has been unresponsive to the particular concerns of Black voters. The prevailing justifications for drawing the State Senate districts in Montgomery to pack Black voters, and in Huntsville to crack Black voters, are tenuous at best.

175.    These facts, as well as the particular circumstances surrounding the adoption of SB 1 by the Alabama Legislature, demonstrate that the Legislature adopted the 2021 Alabama Senate

redistricting plan with the result of diluting Black voter strength in violation of Section 2 of the VRA, 52 U.S.C. § 10301.

176.    Plaintiffs have no adequate remedy at law other than the judicial relief sought in this case. The failure to enjoin the conduct of elections under SB 1 and order the creation of additional State Senate districts in the Montgomery and Huntsville regions where Black voters will have the opportunity to elect candidates of their choice has and will continue to irreparably harm Plaintiffs by subjecting them to racial vote dilution. Plaintiffs seek to enforce their Section 2 rights and remedies through 42 U.S.C. § 1983 and 52 U.S.C. §§ 10302(a), (b), (c).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.    Declare the State Senate districting plan adopted in SB 1 a violation of Section 2 of the Voting Rights Act of 1965;

B.    Enjoin the Defendants and their agents from holding elections in the challenged districts adopted in SB 1 and any adjoining districts necessary to remedy the Voting Rights Act violations, 42 U.S.C. § 1983; 52 U.S.C. § 10302(b);

C.    Set a reasonable deadline for the State of Alabama to adopt and enact a districting plan for the State Senate that remedies the Voting Rights Act violations;

D.    Award Plaintiffs their costs, expenses, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to and in accordance with 52 U.S.C. § 10310(e) and 42 U.S.C. § 1988(b);

E.    Retain jurisdiction over this matter until all Defendants have complied with all orders and mandates of this Court;

F.    Retain jurisdiction over this matter and require all Defendants to subject future State Senate

redistricting plans for preclearance review from this court or the U.S. Attorney General under Section 3(c) of the VRA, 52 U.S.C. § 10302(c);

G.      Grant such other and further relief as the Court may deem just and proper.

DATED this 6th day of December, 2023.       Respectfully submitted,

/s/ Alison Mollman
Alison Mollman
AMERICAN CIVIL LIBERTIES UNION
OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 265-2754
amollman@aclualabama.org

/s/ Deuel Ross
Deuel Ross*
NAACP Legal Defense & Educational
Fund, Inc.
700 14th Street NW Ste. 600
Washington, DC 20005
(202) 682-1300
dross@naacpldf.org

Leah Aden*
Stuart Naifeh*
Kathryn Sadasivan (ASB-517-E48T)
Brittany Carter*
NAACP LEGAL DEFENSE &
EDUCATIONALFUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
laden@naacpldf.org
snaifeh@naacpldf.org
ksadasivan@naacpldf.org
bcarter@naacpldf.org

David Dunn*
Hogan Lovells US LLP
390 Madison Avenue New York, NY
10017
(212) 918-3000
david.dunn@hoganlovells.com

Blayne R. Thompson*
HOGAN LOVELLS US LLP
609 Main St., Suite 4200
Houston, TX 77002
(713) 632-1400
blayne.thompson@hoganlovells.com

/s/ Davin M. Rosborough
Davin M. Rosborough*
Julie A. Ebenstein*
Dayton Campbell-Harris*
Jacob van Leer**
Sophia Lin Lakin*
American Civil Liberties Union Foundation
125 Broad St.
New York, NY 10004
(212) 549-2500
drosborough@aclu.org
jebenstein@aclu.org
dcampbell-harris@aclu.org
jvanleer@aclu.org
slakin@aclu.org

/s/ Sidney Jackson
Sidney Jackson (ASB-1462-K40W)
Nicki Lawsen (ASB-2602-C00K)
WIGGINS, CHILDS, PANTAZIS, FISHER &
GOLDFARB
301 19th Street
North Birmingham, AL 35203
(205) 314-0500
sjackson@wigginschilds.com
nlawsen@wigginschilds.com

/s/ Jack Genberg
Bradley E. Heard*
Jack Genberg*
Jess Unger*
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Avenue, Suite 340
Decatur, GA 30030
(404) 521-6700
bradley.heard@splcenter.org
jack.genberg@splcenter.org
jess.unger@splcenter.org

Jessica L. Ellsworth*
Shelita M. Stewart*
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW Washington, DC 20004
(202) 637-5600

47

Michael Turrill*
Harmony R. Gbe*
HOGAN LOVELLS US LLP
1999 Avenue of the Stars Suite 1400
Los Angeles, CA 90067
(310) 785-4600
michael.turrill@hoganlovells.com
harmony.gbe@hoganlovells.com

jessica.ellsworth@hoganlovells.com
shelita.stewart@hoganlovells.com

*Admitted *pro hac vice*
** *Pro hac vice* application pending

***Attorneys for Plaintiffs***

Anthony Ashton*
Anna-Kathryn Barnes*
National Association for the Advancement
of Colored People (NAACP)
4805 Mount Hope Drive Baltimore, MD
21215
(410) 580-5777
aashton@naacpnet.org
abarnes@naacpnet.org

***Attorneys for Plaintiff Alabama State
Conference of the NAACP***

**CERTIFICATE OF SERVICE**

I hereby certify that I have electronically filed a copy of the foregoing with the Clerk of Court using the CM/ECF system which provides electronic notice of filing to all counsel of record.

This the 6th day of December, 2023.

*/s/ Davin Rosborough*