FILED

2024 Jan-11  PM 09:08
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| KHADIDAH STONE, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | No. 2:21-cv-1531-AMM |
| v. | ) | |
| | ) | |
| WES ALLEN, *et al.,* | ) | |
| | ) | |
| *Defendants*. | ) | |

# PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE FOURTH AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................1

ARGUMENT ...............................................................................................................3

I.     UNDER BINDING SUPREME COURT PRECEDENT AND PROPER
       TEXTUAL ANALYSIS, PRIVATE PLAINTIFFS MAY BRING AN
       ACTION UNDER SECTION 2 OF THE VOTING RIGHTS ACT .............3

       A.     The Supreme Court Has Interpreted the Voting Rights
              Act to Permit Private Parties to Sue Under Section 2 ..........................4

       B.     The VRA's Text and Structure Also Plainly Establish a
              Private Right of Action to Enforce Section 2 .....................................10

           i.     Section 2 of the VRA Contains Rights-Creating Language ..........11

           ii.    The Voting Rights Act Provides for a Private Remedy
                  Under Section 2 ...............................................................................12

                  a.     Defendants Misread Section 3's Language
                         Regarding "Aggrieved Persons" ...............................13

                  b.     Sections 12 and 14(e) and Provide Private Plaintiffs a
                         Remedy for Violations of Section 2 ...........................16

                  c.     The Attorney General's Section 12 Authority Does
                         Not Foreclose Private Plaintiffs' Actions Under Section 2 ......18

       C.     Statutory Stare Decisis Compels the Conclusion That Section 2
              of the VRA Contains a Private Right of Action ..................................20

       D.     Plaintiffs' Section 2 Claim is Also Viable Under Section 1983 .........23

II.    PLAINTIFFS' FOURTH AMENDED COMPLAINT STATES A
       CLAIM UNDER SECTION 2 OF THE VOTING RIGHTS ACT .........27

A.    Plaintiffs Have Sufficiently Pled Facts Showing an
      Unequal Opportunity to Elect Representatives of Choice in
      the Montgomery and Huntsville Regions...............................................29

B.    Plaintiffs Have Sufficiently Pled Facts Showing an
      Unequal Opportunity to Participate in the Political Process...............31

III.   LEGISLATIVE DEFENDANTS ARE PROPER PARTIES TO
       THIS ACTION ............................................................................................36

A.    Legislative Defendants Waived Their Legislative Immunity............36

    i.    Defendant Pringle.................................................................39

    ii.   Defendant Livingston...................................................................40

B.    Legislative Defendants Play a Role in Redressing Plaintiffs'
      Injuries, Making Them Proper Defendants.........................................41

CONCLUSION ........................................................................................47

# TABLE OF AUTHORITIES

<u>Page(s)</u>

**Cases:**

*Adinolfe v. United Techs. Corp.*,
    768 F.3d 1161 (11th Cir. 2014) .............................................................42

*Agostini v. Felton*,
    521 U.S. 203 (1997)............................................................................10

*Ala. State Conf. of NAACP v. Alabama*,
    949 F.3d 647 (11th Cir. 2020) .......................................................6, 14

*Ala. State Conf. of NAACP v. City of Pleasant Grove*,
    372 F. Supp. 3d 1333 (N.D. Ala. 2019)..................30, 31, 35, 36, 42

*Allen v. Milligan*,
    599 U.S. 1 (2023).........................................................................*passim*

*Allen v. State Board of Elections*,
    393 U.S. 544 (1969).....................................................................*passim*

*Alexander v Sandoval*,
    532 U.S. 275 (2001)......................................................9, 11, 12, 20

*Alpha Phi Alpha Fraternity Inc. v. Raffensperger*,
    No. 1:21-CV-05337, 2023 WL 7037537 (N.D. Ga. Oct. 26, 2023)....................6

*Ark. United v. Thurston*,
    626 F. Supp. 3d 1064 (W.D. Ark. 2022) ............................................7

*Ark. State Conference of NAACP v. Ark. Board of Apportionment*,
    86 F.4th 1204 (8th Cir. Nov. 20, 2023) .............................................14

*Armstrong v. Exceptional Child Ctr., Inc.*,
    575 U.S. 320 (2015)............................................................................20

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)............................................................................28

*Berger v. N.C. State Conf. of the NAACP*,
   142 S. Ct. (2022)...............................................................................45

*Blessing v. Freestone*,
   520 U.S. 329 (1997)..........................................................................20

*Brnovich v. Democratic Nat'l Comm.*,
   141 S. Ct. 2321 (2021)...................................................................5, 21

*Brooks v. Ga. State Bd. of Elections*,
   997 F.2d 857 (11th Cir. 1993) .........................................................17

*Carrizosa v. Chiquita Brands Int'l, Inc.*,
   47 F.4th 1278 (11th Cir. 2022) ........................................................43

*Caster v. Allen*,
   2:21-CV-1536-AMM (N.D. Ala. Dec. 20, 2021), ECF No. 60...................44, 46

*Chaparro v. Carnival Corp.*,
   693 F.3d 1333 (11th Cir. 2012) .....................................................2, 28

*Chapman v. Meier*,
   420 U.S. 1 (1975).............................................................................44

*Chestnut v. Merrill*,
   No. 2:18-cv-907-KOB, 2018 WL 9439672 (N.D. Ala. Oct. 16,
   2018) .................................................................................................46

*Chisom v. Roemer*,
   501 U.S. 380 (1991)....................................................................21, 26

*City of Mobile v. Bolden*,
   446 U.S. 55 (1980)............................................................................21

*Coca v. City of Dodge City*,
   No. 22-1274-EFM, 2023 WL 2987708 (D. Kan. Apr. 18, 2023).......7, 23, 25, 31

*Colon-Marrero v. Valez*,
   813 F.3d 1 (1st Cir. 2016).................................................................20

*Connor v. Finch*,
   431 U.S. 407 (1977)..........................................................................44

*Dillard v. City of Greensboro*,
  213 F.3d 1347 (11th Cir. 2000) ..........................................................16

*Dillard v. Crenshaw Cnty.*,
  831 F.2d 246 (11th Cir. 1987) ...........................................................28

*Doe v. Pryor*,
  344 F.3d 1282 (11th Cir. 2003) .........................................................43

*Fitzgerald v. Barnstable Sch. Comm.*,
  555 U.S. 246 (2009) ...........................................................................20

*Fla. State Conf. of NAACP v. Lee*,
  576 F. Supp. 3d 974 (N.D. Fla. 2021) .............................................6–7

*Ford v. Strange*,
  580 F. App'x 701 (11th Cir. 2014) .......................................................6

*In re Fundamental Long Term Care, Inc.*,
  512 B.R. 690 (Bankr. M.D. Fla. 2014) ..............................................40

*Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*,
  775 F.3d 1336 (11th Cir. 2015) .........................................................32

*Ga. State Conf. of NAACP v. Georgia*,
  269 F. Supp. 3d 1266 (N.D. Ga. 2017) ................................................7

*Ga. State Conf. of the NAACP v. Georgia*,
  No. 121CV0533, 2023 WL 7093025 (N.D. Ga. Oct. 26, 2023) ..........................6

*Ga. State Conf. of NAACP v. Georgia*,
  No. 121CV5338, 2022 WL 18780945 (N.D. Ga. Sept. 26, 2022) .............*passim*

*Garrett v. Univ. of Ala. at Birmingham Bd. of Trustees*,
  344 F.3d 1288 (11th Cir. 2003) .........................................................10

*Gonzaga University v. Doe*,
  536 U.S. 273 (2002) ...............................................2, 11, 24, 25, 27

*Grant v. Raffensperger*,
  No. 1:22-CV-00122-SCJ, 2022 WL 1516321 (N.D. Ga. Jan. 28, 2022) ...............................................................................6

v

*Halliburton Co. v. Erica P. John Fund*,
   573 U.S. 258 (2014)..................................................................................21

*Health & Hosp. Corp. of Marion Cnty. v. Talevski*,
   599 U.S. 166 (2023)............................................................................*passim*

*Houston Lawyers Assoc. v. Attorney General of Tex.*,
   501 U.S. 419 (1991)..................................................................................21

*Howard v. Augusta-Richmond Cnty.*,
   615 F. App'x 651 (11th Cir. 2015)............................................................17

*Jackson v. Birmingham Bd. of Educ.*,
   544 U.S. 167 (2005)..................................................................................20

*Jacobson v. Fla. Sec'y of State*,
   974 F.3d 1236 (11th Cir. 2020) ..................................................................2

*Jeffers v. Clinton*,
   740 F. Supp. 585 (E.D. Ark. 1990)...........................................................15

*John R. Sand & Gravel Co. v. United States*,
   552 U.S. 130 (2008)....................................................................................1

*Johnson v. De Grandy*,
   512 U.S. 997 (1994)..................................................................................34

*Johnson v. Hamrick*,
   196 F.3d 1216 (11th Cir. 1999) ................................................................29

*Kentucky v. Graham*,
   473 U.S. 159 (1985)..................................................................................41

*Kimble v. Marvel Ent., LLC*,
   576 U.S. 446 (2015)............................................................................21, 22

*King v. Burwell*,
   576 U.S. 473 (2015)..................................................................................12

*League of United Latin Am. Citizens v. Abbott*,
   No. EP-21-CV-00259, 2021 WL 5762035 (W.D. Tex. Dec. 3,
   2021) ........................................................................................................12

*Lewis v. Governor of Ala.*,
944 F.3d 1287 (11th Cir. 2019) ....................................................43, 46

*Livadas v. Bradshaw*,
512 U.S. 107 (1994)............................................................................25

*LULAC v. Perry*,
548 U.S. 399 (2006)....................................................11, 21, 24, 35

*Luna v. Cnty. of Kern*,
No. 116CV00568DADJLT, 2016 WL 4679723 (E.D. Cal. Sept. 6,
2016) ..................................................................................................31

*Maine v. Thiboutot*,
448 U.S. 1 (1980)........................................................................1, 23

*Marks v. United States*,
430 U.S. 188 (1977)............................................................................8

*Metts v. Murphy*,
363 F.3d 8 (1st Cir. 2004)..................................................................28

*Mich. Welfare Rights Org. v. Trump*,
No. 20-3388, 2022 WL 990704 (D.D.C. Apr. 1, 2022) .......................7

*Milligan v. Merrill*,
576 F. Supp. 3d 931 (N.D. Ala. 2021)........................................37, 38

*Milligan v. Allen*,
No. 2:21-CV-1291-AMM, 2023 WL 5920139 (N.D. Ala. Sept. 11,
2023) ..................................................................................................45

*Mixon v. Ohio*,
193 F.3d 389 (6th Cir. 1999) ..............................................................7

*Morse v. Republican Party of Va.*,
517 U.S. 186 (1996).................................................................*passim*

*Nipper v. Smith*,
39 F.3d 1494 (11th Cir. 1994) (en banc) ..........................................35

*Page v. Postmaster Gen.*,
493 F. App'x 994 (11th Cir. 2012)....................................................36

*Pendergrass v. Raffensperger*,
    No. 1:21-CV-05339, 2022 WL 1518234 (N.D. Ga. Jan. 28, 2022) ................... 6

*Perez-Santiago v. Volusia Cnty.*,
    No. 608CV-1868, 2009 WL 2602461 (M.D. Fla. Aug. 25, 2009) ...................... 7

*Perry v. Perez*,
    565 U.S. 388 (2012) ........................................................................................ 21

*Perry-Bey v. City of Norfolk*,
    678 F. Supp. 2d 348 (E.D. Va. 2009) ............................................................... 7

*Powell v. Ridge*,
    247 F.3d 520 (3d Cir. 2001) ........................................................................... 37

*Roberts v. Wamser*,
    883 F.2d 617, 621 n.6 (8th Cir. 1989) ........................................................... 14

*Robinson v. Ardoin*,
    86 F.4th 574 (5th Cir. 2023) ............................................................................. 7

*Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*,
    490 U.S. 477 (1989) ........................................................................................ 10

*Rogers v. Lodge*,
    458 U.S. 613 (1982) .......................................................................................... 4

*Rose v. Raffensperger*,
    511 F. Supp. 3d 1340 (N.D. Ga. 2021) ........................................................... 28

*Schwab v. Crosby*,
    451 F.3d 1308 (11th Cir. 2006) .................................................................... 8, 9

*Schwier v. Cox*,
    340 F.3d 1284 (11th Cir. 2003) ............................................................. *passim*

*Scott v. Taylor*,
    405 F.3d 1251 (11th Cir. 2005) .............................................................. 3,7 41

*Seminole Tribe of Fla. v. Florida*,
    517 U.S. 44 (1996) ............................................................................................ 7

*Shaw v. Hunt,*
    517 U.S. 899 (1996)...................................................................11, 24, 25

*Shelby Cnty. v. Lynch,*
    799 F.3d 1173 (D.C. Cir. 2015).................................................................17

*Shelby Cnty. v. Holder,*
    43 F. Supp. 3d 47 (D.D.C. 2014)...............................................................17

*Shelby Cnty. v. Holder,*
    570 U.S. 529 (2013)..................................................................................19

*Shepard v. United States,*
    544 U.S. 13 (2005)....................................................................................21

*In re Sims,*
    534 F.3d 117 (2d Cir. 2008) ...............................................................37, 39

*Singleton v. Merrill,*
    582 F. Supp. 3d 924 (N.D. Ala. 2022)...............................................*passim*

*Stout by Stout v. Jefferson Cty. Bd. of Educ.,*
    882 F.3d 988 (11th Cir. 2018) (Pryor, C.J.) ..............................................10

*Thornburg v. Gingles,*
    478 U.S. 30 (1986)...........................................................................*passim*

*Turtle Mountain Band of Chippewa Indians v. Howe,*
    No. 23-3655 (8th Cir. Dec. 15, 2023)........................................................14

*Turtle Mountain Band of Chippewa Indians v. Jaeger,*
    No. 3:22-CV-22, 2022 WL 2528256 (D.N.D. July 7, 2022)............23, 24, 25, 27

*U.S. House of Representatives v. U.S. Dep't of Com.,*
    11 F. Supp. 2d 76 (D.C. 1998)...................................................................45

*United States v. Mississippi,*
    380 U.S. 128 (1965)..................................................................................19

*United States v. Raines,*
    362 U.S. 17 (1960)....................................................................................19

*United States v. Salem Cnty.*,
No. 108-CV-03726, 2008 WL 11513214 (D.N.J. July 29, 2008) ......................15

*United States v. Sandoval Cnty.*,
797 F. Supp. 2d 1249 (D.N.M. 2011) ..................................................15

*Veasey v. Abbott*,
13 F.4th 362 (5th Cir. 2021) ..............................................................16

*Veasey v. Perry*,
29 F. Supp. 3d 896 (S.D. Tex. 2014) ....................................................7

*Vote.Org v. Callanen*,
No. 22-50536, _ F.4th _, 2023 WL 8664636
(5th Cir. Dec. 15, 2023) ...................................................2, 18, 19, 20, 23

*Watson v. United States*,
552 U.S. 74 (2007) ..........................................................................22

*Whitcomb v. Chavis*,
403 U.S. 124 (1971) ......................................................................4, 32

*White v. Regester*,
412 U.S. 755 (1973) ........................................................................32

*Wynne v. Town of Great Falls*,
376 F.3d 292 (4th Cir. 2004) ...............................................................8

*Ziglar v. Abbasi*,
137 S. Ct. 1843 (2017) ......................................................................12

**Statutes:**

42 U.S.C. § 1983 ..................................................................*passim*

42 U.S.C. § 2000(d) ...................................................................11

52 U.S.C. § 10101(a)(2) .............................................................25

52 U.S.C. § 10301 ......................................................11, 24, 25, 31, 32

52 U.S.C. § 10302 ..................................................................*passim*

52 U.S.C. § 10306 ......................................................................5

52 U.S.C. § 10308 ....................................................................................17, 18

52 U.S.C. § 10310(e) ...........................................................................5, 16, 22

Ala. Code § 29-2-50 .....................................................................................43

Ala. Code § 29-2-51 .....................................................................................43

Ala. Code § 29-2-52 .................................................................................43, 44

Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights
    Act Reauthorization and Amendments Act of 2006, Pub. L. 109–
    246, §§3(e)(3), 6, 120 Stat. 580, 581 (July 27, 2006) ........................................22

**Legislative Materials:**

S. Rep. 94-295 (1975) ...................................................................................17

S. Rep. No. 97-417 (1982) .......................................................................*passim*

**Rules:**

Fed. R. Civ. P. 12(d) ....................................................................................42

Fed. R. Civ. P. 25(d)…………….... ..............................................................41

Fed. R. Civ. P. 45(d)(3)(A)(iii) .....................................................................37

## INTRODUCTION

To justify their motion for dismissal, Defendants urge the Court to defy decades of Supreme Court and Eleventh Circuit precedent on the Voting Rights Act (VRA), contort accepted principles of statutory interpretation, ignore the proper standard for evaluating pleadings, consider extrinsic evidence, and disregard past admissions and waivers made by the Legislative Defendants.

Section 2's private right of action has "been clearly intended by Congress since 1965." *Morse v. Republican Party of Va.*, 517 U.S. 186, 232 (1996) (plurality opinion) (quoting S. Rep. No. 97-417, at 30 (1982))); *see id.* at 240 (Breyer, J., concurring) (same). The text and structure of the VRA lead to the same conclusion as precedent, with several sections of the statute identifying Congress's intent to provide parties parties an ability to sue under Section 2. Statutory stare decisis compels the same result, with Congress declining to correct the longstanding, uncontested view that private parties may bring suit despite many opportunities.

Section 1983 also provides a vehicle to challenge violations of Section 2. This is not only because Section 1983'a "major purpose" was to "benefit those claiming deprivations of . . . civil rights," *Maine v. Thiboutot*, 448 U.S. 1, 9 (1980). But also, because Section 2 contains paradigmatic rights-creating language that produces a strong presumption of enforceability that is not overcome by any "incompatibility between the enforcement scheme that Congress crafted in [the VRA] and

enforcement under § 1983," *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 187 (2023); *accord Vote.Org v. Callanen*, No. 22-50536, _ F.4th _, 2023 WL 8664636, at *6-10 (5th Cir. Dec. 15, 2023) (applying *Gonzaga University v. Doe*, 536 U.S. 273 (2002) and concluding that a different section of the Voting Rights Act is privately enforceable under § 1983); *Schwier v. Cox*, 340 F.3d 1284, 1294-97 (11th Cir. 2003) (same).

As to their arguments that Plaintiffs fail to state a claim, Defendants ignore the complaint's copious factual allegations that, especially when "construing them in the light most favorable to the plaintiff," *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1335 (11th Cir. 2012), amply show that the challenged plan denies affected Black Alabamians equal opportunities to elect candidates of choice and participate in the political process. Instead, Defendants ignore binding VRA precedent from the enactment of the 1982 Amendments through *Allen v. Milligan*, 599 U.S. 1 (2023), and try to construct an alternate meaning by misreading two pre-Amendment cases.

As for the Legislative Defendants—Chairs of Alabama's Permanent Legislative Committee on Reapportionment (the "Chairs")—their argument depends on trying to un-ring the bell of their explicit and implicit waiver of legislative immunity and ignoring past admissions in this Court that establish how Plaintiffs' concrete injuries are traceable to and redressable by them, at least in part.

Defendants' motions to dismiss should be denied in full.

## ARGUMENT

I. **UNDER BINDING SUPREME COURT PRECEDENT AND PROPER TEXTUAL ANALYSIS, PRIVATE PLAINTIFFS MAY BRING AN ACTION UNDER SECTION 2 OF THE VOTING RIGHTS ACT.**

Since 1965, the existence of private rights of action under Section 2 has been the undisputed law of the land. *See Morse*, 517 U.S. at 232 (plurality opinion) ("Section 2's private right of action has "been clearly intended by Congress since 1965" (quoting S. Rep. No. 97-417, at 30 (1982))); *see id.* at 240 (Breyer, J., concurring) (same). To assuage any doubt, in 1975, Congress amended the VRA to "provide the same remedies to private parties as had formerly been available to the Attorney General alone," *id.* at 233 (plurality), making explicit that either the "Attorney General *or aggrieved person*" can seek relief to enforce the VRA. 52 U.S.C. § 10302(a), (b), and (c) (emphasis added).

Over the decades, federal courts—including the Supreme Court—have heard hundreds of private plaintiffs' Section 2 cases. *See, e.g.*, *Singleton v. Merrill*, 582 F. Supp. 3d 924, 1031 (N.D. Ala. 2022) (per curiam) (three-judge court) (collecting cases), *aff'd sub nom. Allen v. Milligan*, 599 U.S. 1 (2023). Even if there was any ambiguity in the precedent or text, Plaintiffs could bring Section 2 claims against Defendants under 42 U.S.C. § 1983 because Section 2 contains classic rights-creating language and nothing in its statutory scheme overcomes the strong presumption of enforceability via Section 1983.

3

### A.    The Supreme Court Has Interpreted the Voting Rights Act to Permit Private Parties to Sue Under Section 2.

The Supreme Court has consistently read the VRA to contain a private right of action, and the Court has recognized Congress's codification of this right. This precedent is binding and Alabama proffers no valid reason or basis to depart from it.

In *Allen v. State Board of Elections*, the Supreme Court held that Section 5 of the VRA was enforceable by private litigants because of its implied private right of action. 393 U.S. 544, 557 (1969). The Court explained that "achievement of the Act's laudable goal could be severely hampered . . . if each citizen were required to depend solely on litigation instituted at the discretion of the Attorney General." *Id.* at 556. Recognizing the importance of the *Allen* ruling, Congress codified this private right of action in two ways in the 1975 amendments to the VRA. First, Congress amended Section 3 of the VRA to provide that the "Attorney General *or an aggrieved person*" could pursue certain remedies, including injunctions against "devices used for the purpose or *with the effect*" of racial discrimination. 52 U.S.C. § 10302(a), (b), and (c) (emphasis added).[1] Second, Congress added Section 14(e),

---

[1] Section 3 does not define the term "devices," but the Supreme Court has repeatedly identified dilutive districts as "devices" that may "result in unequal access to the electoral process" in violation of Section 2. *Gingles*, 478 U.S. at 46; *see also id.* at 57 & 49 n.15 (listing several other "dilutive electoral devices"); *Rogers v. Lodge*, 458 U.S. 613, 617 (1982) ("multimember districts violate the Fourteenth Amendment if 'conceived or operated as purposeful *devices* to further racial discrimination' by minimizing, cancelling out or diluting the voting strength of racial elements in the voting population") (emphasis added) (quoting *Whitcomb v. Chavis*, 403 U.S. 124, 142 (1971)).

4

which allows a "prevailing party, *other than the United States*," to obtain attorneys'

fees in VRA enforcement actions. 52 U.S.C. § 10310(e) (emphasis added).

Building on that VRA-specific history, in *Morse*, the Supreme Court

recognized that the text, purpose, and history of Section 3 explicitly and implicitly

permit private litigants to sue under sections of the VRA that enforce the voting

guarantees of the Fourteenth and Fifteenth Amendments. 517 U.S. at 231–32. In

*Morse*, the Court considered whether private actors could enforce Section 10 of the

VRA, which authorizes the Attorney General to challenge poll taxes with a

discriminatory "purpose or effect," but does not mention private plaintiffs. 517 U.S.

at 231–33 & n.42 (quoting 52 U.S.C. § 10306). To reach the holding that Section 10

provides a private right of action, Justice Stevens' plurality opinion recognized that

the "existence of the private right of action under Section 2 . . . has been clearly

intended by Congress since 1965." *Id.* at 232 (quoting S. Rep. No. 97-417, at 30

(1982)).[2] That opinion found significant "that the Attorney General had urged" the

Court "to find that private litigants may enforce the Act," *id.*, 517 U.S. at 231, as the

United States has here, ECF No. 110 at 3. Justice Breyer, joined by Justices

O'Connor and Souter, concurred and agreed that "Congress intended to establish a

private right of action to enforce § 10, no less than it did to enforce §§ 2 and 5." *Id.*

---

[2] The Senate Report is the "authoritative source" for interpreting Section 2. *Thornburg v. Gingles*, 478 U.S. 30, 44 n. 7 (1986); *accord Milligan*, 599 U.S. at 10, 30 (consulting the Senate Report); *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2333 (2021) (same).

at 240 (Breyer, J., concurring). Based on the 1975 Amendments, all nine Justices agreed that Section 3 "*explicitly* recognizes that private individuals can sue under the Act." *Id.* at 289 (Thomas, J., dissenting, with Rehnquist, Scalia, Kennedy, JJJ.) (emphasis added) (cleaned up); *id.* at 234 (op. of Stevens, J., with Ginsburg, J.); *id.* at 240 (Breyer, J., concurring, with O'Connor, Souter, JJ.).

Relying on *Morse* and the 1975 Amendments, the Eleventh Circuit and every court therein that has considered the issue has concluded that Section 2 contains a private right of action. *See, e.g.*, *Ala. State Conf. of NAACP v. Alabama* ("*Ala. NAACP*"), 949 F.3d 647, 653 (11th Cir. 2020) (holding Section 2 contains a private right of action, and rejecting Alabama's arguments about Section 3 as "contrary to both the text of the statute and Supreme Court precedent"), *vacated as moot* 141 S. Ct. 2618 (2021) (mem.); *Ford v. Strange*, 580 F. App'x 701, 705 n.6 (11th Cir. 2014) ("A majority of the Supreme Court has indicated that Section 2 of the [VRA] contains an implied private right of action."); *Ga. State Conf. of the NAACP v. Georgia*, No. 1:21-CV-05338, 2023 WL 7093025, at *6-8 (N.D. Ga. Oct. 26, 2023) (three-judge court); *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, No. 1:21-CV-05337, 2023 WL 7037537, at *47 (N.D. Ga. Oct. 26, 2023); *Grant v. Raffensperger*, No. 1:22-CV-00122-SCJ, 2022 WL 1516321, at *10 (N.D. Ga. Jan. 28, 2022); *Pendergrass v. Raffensperger*, No. 1:21-CV-05339, 2022 WL 1518234, at *6 (N.D. Ga. Jan. 28, 2022); *Singleton*, 582 F. Supp. 3d at 1031; *Fla. State Conf. of NAACP*

6

*v. Lee*, 576 F. Supp. 3d 974, 988–91 (N.D. Fla. 2021); *Ga. State Conf. of NAACP v. Georgia*, 269 F. Supp. 3d 1266, 1275 (N.D. Ga. 2017) (three-judge court); *Perez-Santiago v. Volusia Cnty.*, No. 6:08-CV-1868, 2009 WL 2602461, at *2 (M.D. Fla. Aug. 25, 2009). Other circuits and courts agree.[3] *See, e.g., Robinson v. Ardoin*, 86 F.4th 574, 587 (5th Cir. 2023); *Mixon v. Ohio*, 193 F.3d 389, 406 (6th Cir. 1999).

To avoid *Morse*, Secretary Allen asserts that any of the relevant language constitutes dicta. State Defs.' Br. 21–23. To the contrary, "the understanding that Section Two provides a private right of action was *necessary to reach the judgment* that Section Ten provides a private right of action" and "[a] ruling that Section Two does not provide a private right of action would badly undermine the rationale offered by the Court in *Morse*." *Singleton*, 582 F. Supp. 3d at 1031 (emphasis added). "When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 66–67 (1996). Because in *Morse*, five justices not only arrived at the result that private citizens may sue under Section 10 of the VRA but

---

[3] *See, e.g.*, *Coca v. City of Dodge City*, No. 22-1274-EFM, 2023 WL 2987708, at *5 (D. Kan. Apr. 18, 2023); *Ark. United v. Thurston*, 626 F. Supp. 3d 1064, 1079 n.12 (W.D. Ark. 2022) (holding that the "Supreme Court has long found—consistent with § 3 and the VRA's remedial purpose— that a right of action exists for private parties to enforce the VRA's various sections."); *Mich. Welfare Rights Org. v. Trump*, No. 20-3388, 2022 WL 990704, at *11 (D.D.C. Apr. 1, 2022) (noting the Supreme Court "recognized a private right of action under § 2" in *Morse*); *Veasey v. Perry*, 29 F. Supp. 3d 896, 906 (S.D. Tex. 2014) (same); *Perry-Bey v. City of Norfolk*, 678 F. Supp. 2d 348, 362 (E.D. Va. 2009) (same).

found Section 2's private right of action necessary to their reasoning in doing so, that portion of the opinion is also binding precedent.

Secretary Allen is wrong in arguing that "the narrowest position of agreement among the five justices" in *Morse* only addressed Section 10. State Defs.' Br. 22 (citing *Marks v. United States*, 430 U.S. 188, 193 (1977)). Rather, in *Morse*, the "narrowest position" was the three-justice concurrence's agreement with the two-justice plurality that the "rationale of *Allen v. State Bd. of Elections* . . . applies with similar force not only to § 2 but also to § 10" and that "Congress intended to establish a private right of action to enforce § 10, no less than it did to enforce §§ 2 and 5." *Morse*, 517 U.S. at 240 (Breyer, J., concurring). The concurrence explicitly cited the plurality's interpretation of Sections 2 and 3 and stated that it "agree[d] with Justice Stevens" on these points. *Id*. Thus, five justices in *Morse* grounded their reasoning that a private right of action is available under Section 10 in light of the existence of a private right of action under Sections 2 and 5, and the explicit text of Section 3.

Even if *Morse*'s reasoning about Section 2 could be characterized as dicta (and it is not), this Court remains bound by its ruling: "dicta from the Supreme Court is not something to be lightly cast aside." *Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006) (citation omitted). The "carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative." *Id.* at 1326 (quoting *Wynne v. Town of Great Falls*, 376 F.3d 292,

298 n.3 (4th Cir. 2004)). The Supreme Court's statements in *Morse* are "not a subordinate clause, negative pregnant, devoid-of-analysis, throw-away kind of dicta. It is well thought out, thoroughly reasoned, and carefully articulated analysis by the Supreme Court describing the scope of one of its own decisions." *Singleton*, 582 F. Supp. 3d at 1032 (quoting *Schwab*, 431 F.3d at 1325). Those statements "deserve greater respect than Defendants would have [the Court] give." *Id.*

Next, Secretary Allen wrongly claims that *Morse* "diverges from the [statutory] text and is based upon repudiated methods of interpretation," and, "[a]s such, does not bind this Court." State Defs.' Br. 23. The Secretary's position misunderstands how to apply Supreme Court precedent. Although *Alexander v. Sandoval*, 532 U.S. 275 (2001), and *Gonzaga* might inform the analysis to identify new private rights of action, they do not authorize lower courts to overrule the *existing* Supreme Court precedent of *Morse* or *Allen*. *See Schwier*, 340 F.3d 1284, 1294–97 (holding that *Sandoval*, *Gonzaga*, and *Morse* permit private enforcement of the VRA). Even the Secretary recognizes that "*Allen* and *Morse* are binding precedent insofar as they held that Sections 5 and 10 are privately enforceable." State Defs.' Mot. to Dismiss Third Am. Compl. at 23, ECF No. 92. This concession logically requires the same result for Section 2. *See Morse*, 517 U.S. at 232 (plurality opinion) ("It would be anomalous, to say the least, to hold that *both § 2 and § 5 are* enforceable by private action but § 10 is not, when all lack the same express

9

authorizing language.") (emphasis added); *id.* at 240 (Breyer, J., concurring) (agreeing with this point).

Lower courts cannot unilaterally hold that the Supreme Court's "more recent cases have, by implication, overruled an earlier precedent." *Agostini v. Felton*, 521 U.S. 203, 237 (1997). Where precedent "has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions," courts "should follow the case which directly controls, leaving to th[e] Court the prerogative of overruling its own decisions."[4] *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989). The age of the *Allen* and *Morse* decisions "does not diminish their precedential effect. If anything, their age enhances that effect." *Stout by Stout v. Jefferson Cnty. Bd. of Educ.*, 882 F.3d 988, 1014 (11th Cir. 2018) (Pryor, C.J.).

## B. The VRA's Text and Structure Also Plainly Establish a Private Right of Action to Enforce Section 2.

Even if *Morse* and *Allen* had not resolved the private right of action question, Section 2 still would satisfy *Sandoval*. *See generally Ga. State Conf. of NAACP v. Georgia* ("*Ga. NAACP*"), No. 1:21-CV-05338, 2022 WL 18780945, at *2–7 (N.D. Ga. Sept. 26, 2022) (three-judge court)[5] (concluding, after rigorously applying the

---

[4] Indeed, even when a Supreme Court decision calls into question a prior decision of the Eleventh Circuit, "the Supreme Court decision must be clearly on point" to overrule that decision. *Garrett v. Univ. of Ala. at Birmingham Bd. of Trustees*, 344 F.3d 1288, 1292 (11th Cir. 2003).

[5] Judge Branch dissented from the *Alabama NAACP* ruling that the VRA abrogates state sovereign immunity, 949 F.3d at 655–62 (Branch, J., dissenting), but joined the three-judge court's holding in *Georgia NAACP* that Section 2 contains a private right of action, 2022 WL 18780945, at *7.

*Sandoval* test, that Section 2 contains an implied private right of action). *Sandoval* contains two criteria to determine if private parties can enforce a statute—the statute: (1) contains a "private right," as evinced by "rights-creating" language; and (2) provides for "a private remedy." 532 U.S. at 286–88. Section 2 meets both.

###### i.     Section 2 of the VRA Contains Rights-Creating Language.

Under *Sandoval*, the main criterion for whether a statute contains rights-creating language is whether it explicitly refers to a citizen's "right[]" and is "phrased in terms of the persons benefited." *Gonzaga*, 536 U.S. at 284. Section 2 contains such language. It protects the "right of *any citizen* . . . to vote" free from discrimination. 52 U.S.C. § 10301(a) (emphasis added). In *Shaw v. Hunt*, 517 U.S. 899, 917 (1996), the Supreme Court explicitly interpreted this portion of Section 2's text to mean that the "right to an undiluted vote does not belong to the 'minority as a group,' but rather to 'its individual members.'" *LULAC v. Perry*, 548 U.S. 399, 437 (2006) (quoting *Shaw*, 517 U.S. at 917). "[T]he fact that the statute confers rights on a 'group' of people does not suggest that the group, rather than the persons, enjoy the right the statute confers." *Ga. NAACP*, 2022 WL 18780945, at *5; *accord Talevski*, 599 U.S. at 184 (holding that a statute about the "rights" of an identified group of nursing home "residents" contained necessary rights-creating language).

Section 2's language also "closely resembles" the language of 42 U.S.C. § 2000(d) that *Sandoval* "highlighted . . . as a specific example of a 'rights-creating'

provision." *Ga. NAACP*, 2022 WL 18780945, at *4; *see also League of United Latin Am. Citizens v. Abbott*, No. EP-21-CV-00259, 2021 WL 5762035, at *1 (W.D. Tex. Dec. 3, 2021) (three-judge court) (same). Thus, while Section 2(b) "speaks in terms of a plaintiff's obligation to provide proof that operates at the 'group' level," it "makes clear that this 'group'-oriented proof establishes '[a] violation of subsection (a).'" *Ga. NAACP*, 2022 WL 18780945, at *5.

ii.    **The Voting Rights Act Provides for a Private Remedy Under Section 2.**

The VRA also satisfies the second part of *Sandoval*: it provides for "a private remedy." *Sandoval*, 532 U.S. at 286–88. In analyzing this issue, courts "must read the words" in a statute "in their context and with a view to their place in the overall statutory scheme" because the court's "duty, after all, is to construe statutes, not isolated provisions." *King v. Burwell*, 576 U.S. 473, 475, 486 (2015) (internal quotation marks omitted). Courts ascertaining congressional intent must review not only the statutory text, but also its structure. *Sandoval*, 532 U.S. at 288. The VRA's structure unequivocally supports congressional intent to create a private remedy. *See Ziglar v. Abbasi*, 582 U.S. 120, 133 (2017) (quoting *Sandoval*, 532 U.S. at 286–87) (recognizing private right of action to challenge statutes that "'displa[y] an intent' to create 'a private remedy'").

> ### a.    Defendants Misread Section 3's Language Regarding "Aggrieved Persons."

Section 3 of the VRA provides for relief in "proceeding[s]" brought by "*an aggrieved person . . . under any statute* to enforce the voting guarantees of the Fourteenth or Fifteenth Amendment." 52 U.S.C. § 10302(a) (emphasis added); *see also id.* § 10302(b) (same), *id.* § 10302(c) (same). Under Section 2, private plaintiffs are "aggrieved person[s]" when their voting rights are violated. Congress' reference to "an aggrieved person" in Section 3 was intended "to provide the same remedies to private parties as had formerly been available to the Attorney General alone." *Morse*, 517 U.S. at 233 (plurality); *see also id*. at 240 (Breyer, J., concurring). "The plain textual answer is that Section[] 3 . . . impl[ies] a private right to sue under whatever statute or statutes 'enforce the voting guarantees of the Fourteenth or Fifteenth Amendment.'" *Ga. NAACP*, 2022 WL 18780945, at *6.

Section 3's text permits private litigants to seek remedies under Section 2, as Congress intended, because a Section 2 case is "a proceeding" brought under a statute "to enforce the voting guarantees of the Fourteenth or Fifteenth Amendment." 52 U.S.C. § 10302(a); *see Milligan*, 599 U.S. at 41. Section 3 provides private remedies for actions under "a statute" that, "by its terms," is "designed for enforcement of the guarantees of the Fourteenth and Fifteenth Amendments." *Morse*, 517 U.S. at 233–34 (emphasis added).

Save for one Eighth Circuit Court of Appeals panel and district court,[6] the Supreme Court, *Morse*, 517 U.S. at 233 (plurality); *id.* at 240 (Breyer, concurring), and all other courts that have examined this issue have agreed that Section 3 provides remedies to private parties under Section 2. *See, e.g.*, *Ala. NAACP*, 949 F.3d at 652; *Roberts v. Wamser*, 883 F.2d 617, 621 n.6 (8th Cir. 1989) (same); *see also supra* 6–7 & n.3 (collecting cases).

Defendants' convoluted arguments—that Section 3 only applies to constitutional claims; or, if it applies to statutes, only statutes other than the one in which it resides (the VRA); or, if it applies to the VRA, only to Section 5—is at odds with the statutory text, structure, precedent, and logic. *See* State Defs.' Br. 20–21.

Consistent with *Morse*, 517 U.S. at 233–34, Section 3 applies beyond constitutional claims most obviously because the statutory text references proceedings brought "under any *statute*." 52 U.S.C. § 10302(a) (emphasis added). And Section 3(b) explicitly permits courts to provide a remedy where a direct constitutional violation is *not* shown. *See* 52 U.S.C. § 10302(b) (permitting a court to suspend a "test or device" used "*with the effect* of denying or abridging the right

---

[6] The exception is *Arkansas State Conference of NAACP v. Arkansas Board of Apportionment*, 86 F.4th 1204 (8th Cir. Nov. 20, 2023), *aff'g*, 586 F. Supp. 3d 893 (E.D. Ark., Feb 17, 2022), which is currently pending a decision on the plaintiffs-appellants' petition for rehearing en banc. The case is an extreme outlier. In any event, Plaintiffs here litigate their Section 2 rights under § 1983 in the alternative, unlike those in *Arkansas*. Indeed, after *Arkansas*, a unanimous Eighth Circuit panel summarily denied a stay where private Plaintiffs won a judgment enforcing Section 2 via § 1983 and where the State's sole argument in the stay motion concerned this issue. *See* Order Denying Stay, *Turtle Mountain Band of Chippewa Indians v. Howe*, No. 23-3655 (8th Cir. Dec. 15, 2023).

of any citizen . . . to vote on account of race or color") (emphasis added). Section 3(a) also authorizes courts to appoint observers without demonstrating discriminatory intent. *See United States v. Sandoval Cnty.*, 797 F. Supp. 2d 1249, 1256 (D.N.M. 2011); *United States v. Salem Cnty.*, No. 1:08-CV-03726, 2008 WL 11513214, at \*4 (D.N.J. July 29, 2008). With respect to Section 3(c), the constitutional violation need not be the basis for granting Section 3(c) relief. *See Jeffers v. Clinton*, 740 F. Supp. 585, 587, 601 (E.D. Ark. 1990) (three-judge court) (ordering preclearance under Section 3(c) to remedy intentionally racially discriminatory majority-vote requirements in a Section 2 case first premised on a challenge to the discriminatory effect of a redistricting plan), *aff'd mem*. 111 U.S. 662 (1991). For that reason, the Court in *Morse* found that Section 3 provides remedies under Sections 2, 5, and 10—each of these sections prohibit laws that have discriminatory effects, regardless of intent. *See Morse*, 517 U.S. at 233–34 (plurality opinion); *id*. at 240 (Breyer, J., concurring). "[A]n action to enforce the protections of Section 2 is inevitably—at least in part—an action that 'enforce[s] the voting guarantees of the Fourteenth or Fifteenth Amendment' as contemplated in Section[] 3." *Ga. NAACP*, 2022 WL 18780945 at \*6 (quoting 52 U.S.C. §10302(a), (b), (c)).

Finally, Defendants' argument, quoting Justice Thomas's *Morse* dissent, that "Congress meant [with Section 3] to address those cases brought pursuant to the private right of action that this Court had recognized as of 1975, *i.e.*, suits under § 5,

as well as any rights of action that [the Court] might recognize in the future," belies Supreme Court precedent and the historical record. State Defs.' Br. 21 (quoting *Morse*, 517 U.S. at 289 (Thomas, J., dissenting)). In *Morse,* five justices concluded that Section 2's private right of action had "been clearly intended by Congress since 1965." *Id.* at 232 (plurality opinion) (quoting S. Rep. No. 97-417, at 30 (1982))); *see id.* at 240 (Breyer, J., concurring) (same). Defendants' arguments based on a lone dissent cannot overcome binding precedent and the statutory text and structure.

> **b.** **Sections 12 and 14(e) and Provide Private Plaintiffs a Remedy for Violations of Section 2.**

Section 14(e) provides a fee-shifting mechanism for prevailing Section 2 private plaintiffs, further supporting a private right of action under Section 2. Section 14 authorizes "the prevailing party, other than the United States" to seek attorney's fees "[i]n any action or proceeding to enforce the voting guarantees of the Fourteenth or Fifteenth Amendment." 52 U.S.C. § 10310(e). "Obviously, a private litigant is not the United States, and the Attorney General does not collect attorney's fees." *Morse*, 517 U.S. at 234 (plurality). Section 14(e) provides for attorney's fees "to enforce civil rights statutes, including the voting rights statutes." *Brooks v. Ga. State Bd. of Elections*, 997 F.2d 857, 860–61 (11th Cir. 1993); *see also Ga. NAACP*, 2022 WL 18780945, at *5. Section 2 is such a statute. *See, e.g.*, *Veasey v. Abbott*, 13 F.4th 362, 368 (5th Cir. 2021) (awarding attorney's fees to private plaintiffs in a § 2 case); *Dillard v. City of Greensboro*, 213 F.3d 1347, 1353 (11th Cir. 2000) (same).

Congress intended for Section 14's fee-shifting to incentivize VRA enforcement by private parties. *See* S. Rep. 94-295, 40, 1975 U.S.C.C.A.N. 774, 807 (1975) ("Congress depends heavily upon private citizens to enforce the fundamental rights involved. Fee awards are a necessary means of enabling private citizens to vindicate these Federal rights"). Section 14 seeks to "encourage private attorneys general to bring lawsuits vindicating individual voting rights." *Shelby Cnty. v. Holder*, 43 F. Supp. 3d 47, 67 (D.D.C. 2014) (collecting cases); *see also Shelby Cnty. v. Lynch*, 799 F.3d 1173, 1185 (D.C. Cir. 2015) ("Congress intended for courts to award fees under the VRA . . . when prevailing parties helped secure compliance with the statute"); *Howard v. Augusta-Richmond Cnty.*, 615 F. App'x 651 (11th Cir. 2015) (denying attorney's fees to a prevailing VRA defendant).

Section 12(f) also evinces Congress's intent to provide a private right of action to enforce Section 2. That section provides that "district courts of the United States shall have jurisdiction of proceedings instituted pursuant to this section and shall exercise the same without regard to whether *a person asserting rights* under the provisions of chapters 103 to 107 of [the VRA] shall have exhausted any administrative or other remedies that may be provided by law." 52 U.S.C. § 10308(f) (emphasis added). Section 12(f) envisions private enforcement of Section 2 of the VRA because a "person asserting rights" certainly encompasses more than just the Attorney General, particularly given separate references to the Attorney General and

17

an "aggrieved person" in other VRA sections. See 52 U.S.C. § 10302. Moreover, the administrative exhaustion defenses eliminated by Section 12(f) had been barriers to private plaintiffs, not the Attorney General. *Cf. Vote.org*, 2023 WL 8664636, at *8 (discussing a similar VRA provision); *Schwier*, 340 F.3d at 1296. The *Allen* Court found "force" to the argument that Section 12(f)'s "a person" language "necessarily implies that private parties may bring suit under the [VRA]." 393 U.S. at 555 n.18.

### c.    The Attorney General's Section 12 Authority Does Not Foreclose Private Plaintiffs' Actions Under Section 2.

Section 12(a), (b) and (c) describe criminal sanctions that only the Attorney General can seek, such as monetary fines and imprisonment.[7] 52 U.S.C. §§ 10308(a), (b), (c). Yet the VRA plainly provides for civil enforcement as well. The availability of some criminal remedies that private persons cannot obtain does not imply that private persons are precluded from securing the remedies that are available to them and to which they are legally entitled.

Section 12(d) permits the United States to seek a permanent or preliminary injunction when enforcing the VRA. 52 U.S.C. § 10308(d). Rather than restricting private rights, this provision was "included to give the Attorney General power to bring suit to enforce what might otherwise be viewed as 'private' rights." *Allen*, 393 U.S. at 555. This is because, in the years before Section 12(f)'s enactment, states had

---

[7] For example, Section 12(a) and (c), concern criminal enforcement, which obviously cannot be enforced by private persons.

(wrongly) argued that, absent explicit authorization, the United States lacked the authority to institute actions under federal civil and voting rights laws, which had historically been enforced by private litigants. *See, e.g.*, *United States v. Mississippi,* 380 U.S. 128, 137 (1965); *United States v. Raines*, 362 U.S. 17, 27 (1960); *see also Vote.Org*, 2023 WL 8664636, at *8 (discussing the similar history of Section 1971); *Schwier*, 340 F.3d at 1295-96 (same).

Congress and the Supreme Court have consistently accepted that the Attorney General's enforcement power under Section 12(d) is consistent with an implied private right of action under other VRA sections. *See Shelby Cnty. v. Holder*, 570 U.S. 529, 537 (2013) ("Both the Federal Government and individuals have sued to enforce § 2, and injunctive relief is available in appropriate cases to block voting laws from going into effect."). Section 12(d)'s existence did not preclude the Court in *Morse* and *Allen* from holding that the VRA is enforceable by private actors. *See Morse*, 517 U.S. at 233-34; *Allen*, 393 U.S. at 555; *see also* S. Rep. 97-417, at 30. There, "a private right of action had not been foreclosed even though the enforcement scheme of the [VRA] provision at issue gave the Attorney General the right to sue for violations." *Schwier*, 340 F.3d at 1296.

The Eleventh Circuit has also determined—in a case decided after *Sandoval*— that statutory provisions granting the Attorney General an express right to sue do not preclude finding an implied private right of action. *See Schwier*, 340 F.3d at 1296;

19

*see also Vote.org*, 2023 WL 8664636, at *8. In concluding that the VRA's inclusion of the "provision for enforcement by the Attorney General" did not lead to the conclusion that private parties lacked such a right, the court cited to *Allen*'s reasoning that "the possibility of enforcement by the Attorney General did not preclude enforcement by private citizens" of Section 5. *Id.* at 1295; *see also Talevski*, 599 U.S. at 189-92 (finding government enforcement of a law did not preclude private enforcement); *Colon-Marrero v. Valez*, 813 F.3d 1, 21–22 (1st Cir. 2016) (private plaintiffs could bring suit even though the statute in question expressly permits that "[t]he Attorney General may bring a civil action in federal court"). This is consistent with the Court's private-right-of-action jurisprudence.[8]

### C.    Statutory Stare Decisis Compels the Conclusion That Section 2 of the VRA Contains a Private Right of Action.

Binding precedent and the plain text are enough. But statutory stare decisis similarly compels affirming Section 2's private right of action.

---

[8] This is also consistent with the Supreme Court's broader private right of action jurisprudence. The Supreme Court has acknowledged that Title IX itself contains an "express enforcement mechanism," *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 255 (2009), which constitutes an "express provision of one method of enforcing a substantive rule," *Sandoval*, 532 U.S. at 290. Nevertheless, the Supreme Court—in *Sandoval* and afterward—has continued to hold that Title IX contains an implied private right of action despite this express enforcement mechanism. *See id.* at 280; *see also Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 171 (2005). The Supreme Court has often stated that a provision for alternative relief does "not, by itself, preclude the availability of equitable relief." *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 328 (2015); *see also Blessing v. Freestone*, 520 U.S. 329, 347 (1997) (noting that private enforcement of a statute cannot be defeated simply by "[t]he availability of administrative mechanisms to protect the plaintiff's interests.") (internal quotation marks omitted).

Statutory stare decisis carries "special force." *Halliburton Co. v. Erica P. John Fund*, 573 U.S. 258, 274 (2014). "[U]nlike in a constitutional case, . . . Congress can correct any mistake it sees." *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 456 (2015). An opinion interpreting a statute is a "ball[] tossed into Congress's court, for acceptance or not as that branch elects." *Id.* Where, as here, Congress "acquiesce[s]" to the Court's interpretation by leaving a holding undisturbed, *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 139 (2008), its action "enhance[s] even the usual precedential force" of statutory stare decisis, *Shepard v. United States*, 544 U.S. 13, 23 (2005).

Federal courts have entertained hundreds of Section 2 cases brought by private litigants. *See, e.g.*, *Milligan*, 599 U.S. at 17–18, *Brnovich*, 141 S. Ct. 2321, 2333 (2021) ("In the years since *Gingles*, we have heard a steady stream of vote dilution cases."); *Perry v. Perez*, 565 U.S. 388 (2012); *LULAC*, 548 U.S. 399; *Chisom v. Roemer*, 501 U.S. 380 (1991); *Houston Lawyers Assoc. v. Attorney General of Tex.*, 501 U.S. 419 (1991); *Thornburg v. Gingles*, 478 U.S. 30 (1986); *City of Mobile v. Bolden*, 446 U.S. 55 (1980). "Congress is undoubtedly aware" of the Supreme Court construing Section 2 to contain a private right of action and "can change that if it likes. But until and unless it does, statutory stare decisis counsels our staying the course." *Milligan*, 599 U.S. at 39. While Congress may sometimes struggle to "find[] room in a crowded legislative docket" to correct judicial misinterpretations, *Ramos*,

140 S. Ct. at 1413 (Kavanaugh, J., concurring), Congress has closely monitored the VRA. Across the full span of congressional amendments to the VRA, from 1970 through 1975, 1982, 1992, and 2006, Congress has only ever made it *easier* for private litigants to enforce the VRA, and, in each instance, implicitly endorsed the prevailing interpretation of the statute as including a private cause of action. *See, e.g.*, *Milligan*, 599 U.S. at 12–14 (discussing the 1982 Amendments); *Morse*, 517 U.S. at 233–234 (plurality) (the 1975 Amendments).

Indeed, in the most recent VRA Amendments in 2006, Congress again made it easier for private litigants to bring suit by amending Section 14(e) to permit the recovery of "reasonable expert fees and other reasonable litigation expenses." 52 U.S.C. § 10310(e); *see* Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006, Pub. L. 109–246, §§3(e)(3), 6, 120 Stat. 580, 581 (July 27, 2006).

This "long congressional acquiescence" and implicit encouragement of private enforcement of Section 2 generally "enhance[s] even the usual precedential force [the Court] accords to [] interpretations of statutes." *Watson v. United States*, 552 U.S. 74, 82–83 (2007) (internal quotation marks omitted). Where, as here, "Congress has spurned multiple opportunities to reverse" a statutory decision, the Supreme Court itself would demand a "super-special justification" to change course. *Kimble*, 576 U.S. at 456, 458. Defendants cannot clear that very high hurdle here.

22

**D.    Plaintiffs' Section 2 Claim is Also Viable Under Section 1983.**

Plaintiffs also pled a cause of action to enforce their Section 2 rights under the VRA through § 1983. *See* Fourth Am. Compl. ("FAC") ¶¶ 7, 10, 176. "The attendant presumption is that § 1983 can play its textually prescribed role as a vehicle for enforcing [] rights, even alongside a detailed enforcement regime that also protects those interests, so long as § 1983 enforcement is not incompatible with Congress's handiwork." *Talevski*, 599 U.S. at 188-89. Consistent with this presumption, each court to consider the issue has agreed that Section 2 is enforceable under § 1983. *See, e.g.*, *Coca v. City of Dodge City*, No. 22-1274-EFM, 2023 WL 2987708, at *6 (D. Kan. Apr. 18, 2023); *Turtle Mountain Band of Chippewa Indians v. Jaeger* ("*Turtle Mountain Band*"), No. 3:22-CV-22, 2022 WL 2528256, at *6 (D.N.D. July 7, 2022). The Eleventh and Fifth Circuits have also held that a related VRA section is enforceable under § 1983. *See Vote.Org*, 2023 WL 8664636, at *6-10; *Schwier*, 340 F.3d at 1294–97.

A "major purpose" of Congress's enactment of § 1983 was to "benefit those claiming deprivations of constitutional and civil rights." *Maine v. Thiboutot*, 448 U.S. 1, 9 (1980); *accord Talevski*, 599 U.S. at 175-76 (describing Congress's enactment of § 1983 to permit the private enforcement of federal laws passed pursuant to the Reconstruction Amendments). "Section 1983 provides a private right of action whenever an individual has been deprived of any constitutional or statutory

federal right under color of state law." *Schwier*, 340 F.3d at 1290. That mandate applies with special force when the right arises under the VRA. *See id*. at 1297 (holding that "the provisions of section 1971 of the Voting Rights Act may be enforced by a private right of action under § 1983"). It is unclear then that *Gonzaga*, which involved § 1983 enforcement of laws enacted under the Spending Clause, is applicable to the VRA, which was enacted under the Reconstruction Amendments. *Cf. Gonzaga*, 536 U.S. at 281 (noting the Court's reluctance to "infer enforceable rights from Spending Clause statutes"); *Schwier*, 340 F.3d at 1291 n.5 (same).

Assuming that the *Gonzaga* test does apply, Plaintiffs must first show that the "provision in question is 'phrased in terms of the persons benefited' and contains 'rights-creating,' individual-centric language with an 'unmistakable focus on the benefited class.'" *Talevski*, 599 U.S. at 183 (citations omitted). "Once a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983." *Gonzaga*, 536 U.S. 273, at 284. "This presumption of enforceability is only overcome in cases where Congress intended to foreclose any § 1983 remedy." *Turtle Mountain Band*, 2022 WL 2528256, at *4.

First, Section 2 contains paradigmatic rights-creating language. *See supra* 12; (citing *LULAC*, 548 U.S. at 437; *Shaw*, 517 U.S. at 917). Again, as referenced above, the Court has explicitly held that Section 2's reference to "the right of any citizen," 52 U.S.C. § 10301(a), confirms that the "right to an undiluted vote" does not belong

to the "minority as a group," but rather to the group's "individual members." *Shaw*, 517 U.S. at 917. Accordingly, this "right is presumptively enforceable by § 1983." *Gonzaga*, 536 U.S. at 284.[9] This presumption can be rebutted only in "exceptional cases," *Livadas v. Bradshaw*, 512 U.S. 107, 133 (1994)—not a textbook Civil rights statute like Section 2. That "Section 2 contain[s] clear rights-creating language [is] a legal position thus far unquestioned by any members of the Supreme Court." *Coca*, 2023 WL 2987708, at *6; *see also Turtle Mountain*, 2022 WL 2528256, at *5.

In *Schwier*, the Eleventh Circuit found that Section 1971 of the VRA is enforceable under § 1983. 340 F.3d at 1290. Sections 2 and 1971 share analogous "right-or-duty-creating language," confirming that *Schwier* applies with equal force here. *Id.* at 1291; *compare* 52 U.S.C. § 10101(a)(2) ("No person acting under color of law shall … deny the right of any individual to vote . . . ") *with* 52 U.S.C. § 10301(a) ("No voting qualification . . . shall be imposed or applied . . . in a manner which results in a denial or abridgment of the right of any citizen . . . to vote").

---

[9] Even under the reasoning of the dissenting justices in *Talevski*, private parties can litigate Section 2 rights under § 1983. *See* 599 U.S. at 200 (Thomas, J., dissenting) ("[F]or the violation of a federal statutory provision to give rise to a cognizable § 1983 claim, the provision must confer 'rights, privileges, or immunities' that are 'secured by . . . la[w].' This Court's cases make clear that a right is secured by law in the relevant sense if [] federal law imposes a binding obligation on the defendant to respect a corresponding substantive right that belongs to the plaintiff."). *Id.* at 230 (Alito, J., dissenting) (same). Plaintiffs here are "citizen[s] of the United States," who Section 2 affords protection from States' "denial or abridgment" of their right to "vote on account of race or color." 52 U.S.C. § 10301(a).

Section 2's plain rights-creating language presumptively permits § 1983 enforcement. Nonetheless, Defendants seem to argue that Section 2 is not enforceable under § 1983 because Congress failed to establish "new rights" different from the rights to be free from intentional discrimination under the Fifteenth Amendment. State Defs.' Br. at 6-7. Defendants argue that instead Congress created "new remedies." *Id.* at 7. This is incorrect.

The Court in *Morse* and *Allen*, 393 U.S. at 556 n.20, held that it was irrelevant whether the VRA "created new rights or only gave plaintiffs new remedies to enforce existing rights." *Morse*, 517 U.S. at 232–33. Like Section 2, "[e]ven if it mattered whether [Section 2] created rights or remedies," *id.*, "Congress amended § 2 of the Voting Rights Act to make clear that certain practices and procedures that result in the denial or abridgment of the right to vote are forbidden even though the absence of proof of discriminatory intent  protects them from constitutional challenge," *Chisom v. Roemer*, 501 U.S. 380, 383–84 (1991). As the Supreme Court recently reiterated in a case brought by the same private plaintiffs as in this case to enforce Section 2 against these same Defendants, Congress acted within its constitutional powers to enact Section 2's ban on electoral laws with a discriminatory effect. *Milligan*, 599 U.S. at 41–42.

Defendants mistake the creation of a prophylactic right of individuals to be free from racial vote dilution in service of the Fifteenth Amendment with a remedy.

The "VRA's 'ban on electoral changes that are discriminatory in effect,'. . . 'is an appropriate method of promoting the purposes of the Fifteenth Amendment.'" *Milligan*, 599 U.S. at 41. It contrasted the *right* under Section 2's effects test with "race-based redistricting as a *remedy* for state districting maps that violate § 2." *Id*. (emphasis added). To the extent Defendants argue that prophylactic rights are not enforceable under § 1983, the Eleventh Circuit, *Schwier*, 340 F.3d at 1290, and Supreme Court disagree, *supra* 4–6, and held otherwise.

Because Plaintiffs have demonstrated that the VRA confers an individual right, it is "presumptively enforceable by § 1983." *Gonzaga*, 536 U.S. 273, at 284. As explained above, Sections 3, 12, and 14 of the VRA contemplate private remedies, *supra* 13–18, so Defendants cannot overcome the strong presumption favoring § 1983 enforcement. *See Turtle Mountain Band*, 2022 WL 2528256, at \*4. The same is true because there is "no incompatibility between the enforcement scheme that Congress crafted in the rights-conferring statute and enforcement under § 1983," *Talevski*, 599 U.S. at 187.

Accordingly, even if Section 2 did not contain an explicit or implied private right of action, the VRA is enforceable under § 1983.

## II. PLAINTIFFS' FOURTH AMENDED COMPLAINT STATES A CLAIM UNDER SECTION 2 OF THE VOTING RIGHTS ACT.

Defendants' arguments that Plaintiffs have failed to plead facts sufficient to establish a Section 2 vote dilution claim depend on two faulty premises.

First, Defendants' arguments as to both equal opportunity to participate in the political process and to elect candidates of choice ignore the correct standard for evaluating pleadings on motions to dismiss for failure to state a claim: courts must "accept[] the complaint's allegations as true and constru[e] them in the light most favorable to the plaintiff." *Chaparro*, 693 F.3d at 1335. Rather, Defendants attempt to impose a summary judgment or trial standard on Plaintiffs and ignore the copious factual allegations that allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Yet Section 2 cases are typically inappropriate for resolution at the motion-to-dismiss stage because such claims must "undergo fact-intensive review." *Dillard v. Crenshaw Cnty.*, 831 F.2d 246, 248 (11th Cir. 1987) (citing *Gingles*, 478 U.S. at 46); *see also Metts v. Murphy*, 363 F.3d 8, 11 (1st Cir. 2004) (en banc) ("It is no accident that most cases under section 2 have been decided on summary judgment or after a verdict, and not on a motion to dismiss."); *Rose v. Raffensperger*, 511 F. Supp. 3d 1340, 1358, 1360 (N.D. Ga. 2021) (denying motion to dismiss because the factual nature of the Section 2 results inquiry "makes it particularly inappropriate to foreclose at the pleading stage Plaintiffs' opportunity to prove their claims").

Second, Alabama's substantive arguments are again "not about the law as it exists" but rather "about Alabama's attempt to remake . . . § 2 jurisprudence anew."

*Milligan*, 599 U.S. at 23. The facts alleged in the complaint are ample to support the Section 2 claims under well-settled precedent and the correct pleading standard.

### A.   Plaintiffs Have Sufficiently Pled Facts Showing an Unequal Opportunity to Elect Representatives of Choice in the Montgomery and Huntsville Regions.

Defendants first argue that Plaintiffs failed to plead that Black voters lack an equal opportunity "to elect representatives of their choice" because the allegations are not sufficient to prove "that legally significant racial bloc voting '*consistently*' occurs and '*regularly causes* the candidate preferred by [B]lack voters to lose' in the Montgomery or Huntsville regions." State Defs.' Br. 24 (quoting *Johnson v. Hamrick*, 196 F.3d 1216, 1221 (11th Cir. 1999)); *see also* Leg. Defs.' Br. 20. This argument depends on selective reading, inferences improperly drawn against Plaintiffs, and an attempt to try the case at the pleading stage.

A Section 2 claim requires that plaintiffs allege racial bloc voting, *i.e.*, that "the minority group . . . is politically cohesive" and "that the white majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate." *Milligan*, 599 U.S. at 18 (quoting *Gingles*, 478 U.S. at 51). Plaintiffs have done both. The complaint alleges consistent racially polarized voting, *both* in the relevant local areas and statewide. *See* FAC ¶¶ 94–100. Defendants ignore significant portions of Plaintiffs' allegations, including those showing that "[n]umerous federal courts in Alabama [that] have found that the State's elections are racially polarized, including

29

just this year and as agreed by the State's expert in that area." *Id.* ¶ 95 (collecting cases); *see, e.g.*, *Milligan*, 599 U.S. at 22 (upholding district court's determination "that there was no serious dispute that Black voters are politically cohesive, nor that the challenged districts' white majority votes sufficiently as a bloc to usually defeat Black voters' preferred candidate" (internal quotation marks omitted)).

Defendants are wrong in claiming that Plaintiffs "do *not* allege that 'white bloc voting *regularly causes* the candidate preferred by [B]lack voters [in the relevant regions] to lose.'" State Defs.' Br. 33–34 (quoting *Johnson*, 196 F.3d at 1221); *see* Leg. Defs.' Br. 28–29 (same). Plaintiffs allege that "analysis of voting patterns" in both Montgomery and Madison counties "in state legislative elections, congressional elections, and elections for statewide office all show *consistent patterns* of Black voters voting cohesively, and white voters *consistently* voting as a bloc for candidates that defeat the candidates preferred by Black voters in districts without BCVAP majorities," FAC ¶¶ 97, 99 (emphasis added), including in primaries, *id.* ¶ 100; *see Ala. State Conf. of NAACP v. City of Pleasant Grove* ("*Pleasant Grove*"), 372 F. Supp. 3d 1333, 1340 (N.D. Ala. 2019) (finding similar allegations of polarization to be sufficient).

Defendants' attempt to sweep past these factual allegations and nitpick the specific examples offered by Plaintiffs by arguing that they are too few in number or too narrow in geography is detached from the operative pleading standards.

30

"Plaintiffs need not prove their entire case within their complaint," *Coca*, 2023 WL 2987708, at *8. Nor are they obligated to incorporate an expert report on racially polarized voting into their complaint or catalog every potential example they may later prove up. To the contrary, plaintiffs have alleged more than enough to state a claim. *See, e.g.*, *id.* (concluding that pleading examples of a few recent elections that featured racially polarized voting "suffice[d] at this stage to show" that the second and third *Gingles* preconditions were met); *Pleasant Grove*, 372 F. Supp. 3d at 1340 (same); *Luna v. Cnty. of Kern*, No. 1:16-CV-00568, 2016 WL 4679723, at *5 (E.D. Cal. Sept. 6, 2016) (concluding that "plaintiffs ha[d] alleged facts in their complaint to support a plausible inference of political cohesiveness and submergence by a majority voting bloc" when they alleged that Latino voters "express a preference for Latino candidates" and consistently vote for such candidates, and that "no Latino . . . candidate ha[d] been elected outside of" the majority-Latino district").

### B. Plaintiffs Have Sufficiently Pled Facts Showing an Unequal Opportunity to Participate in the Political Process.

Plaintiffs have plausibly alleged that Black voters have "less opportunity than other members of the electorate to participate in the political process." 52 U.S.C. § 10301(b). Defendants' argument to the contrary is based on a misrepresentation of the relevant law and, again, a distortion of the liberal pleading standard.

Under binding precedent, Plaintiffs can "show, under the 'totality of circumstances,' that the political process is not 'equally open' to minority voters,"

*Milligan*, 599 U.S. at 18 (quoting *Gingles*, 478 U.S. at 45–46), based on "factors drawn from a report of the Senate Judiciary Committee accompanying the 1982 amendments to the VRA." *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1342 (11th Cir. 2015). The Supreme Court in *Milligan* recently affirmed a finding of unequal opportunity to participate under the totality of the circumstances, based primarily on a constellation of evidence under the Senate Factors. *See Milligan*, 599 U.S. at 22 (citing Senate factors evidence in affirming the ruling under the totality of the circumstances).

Here, Plaintiffs have pled substantial facts using the rubric of the Senate factors that Black Alabamians, particularly in the Montgomery and Huntsville regions, lack an equal opportunity to participate in the political process. *See* FAC ¶¶ 101–167; *see also Gingles*, 478 U.S. at 44–45 (describing Senate factors). In doing so, Plaintiffs have plausibly alleged that "the political process is not 'equally open' to minority voters," *Milligan*, 599 U.S. at 18 (quoting *Gingles*, 478 U.S. at 51), and that Black voters therefore have "less opportunity than other members of the electorate to participate in the political process," 52 U.S.C. § 10301(b).

Defendants argue that Plaintiffs have failed to plead facts showing an unequal opportunity to participate in the political process. Based on a narrow interpretation of two 1970s cases, *Whitcomb v. Chavis*, 403 U.S. 124 (1971), and *White v. Regester*, 412 U.S. 755 (1973), they insist that the statutory phrase "equal opportunity to

participate in the political process" refers solely to "the ability to register and vote, choose the party one desires to support, participate in its affairs, and have an equal vote when the party's candidates are chosen." State Defs.' Br. 27; Leg. Defs.' Br. 22. But this is simply not the standard applied by the Supreme Court and circuit courts. Defendants' attempt to disregard the *Milligan* decision and forty years of law "runs headlong into [Supreme Court] precedent." *Milligan*, 599 U.S. at 25.

As a threshold matter, Defendants' exclusive reliance on these two cases is misplaced. Defendants insist that "it is to *Whitcomb* and *White* that [courts] should look in the first instance in determining how great an impairment of minority voting strength is required to establish vote dilution in violation of § 2." State Defs.' Br. 24–25 (quoting *Gingles*, 478 U.S. at 97 (O'Connor, J., concurring in the judgment)). But that language comes from a concurrence, which "explain[ed] [its] disagreement with the [*Gingles*] Court's interpretation of § 2," *id.* at 85, in particular, how the majority appeared to only require satisfaction of the three *Gingles* preconditions without reference to the Senate Factors. *Id.* at 92–93 (O'Connor, J., concurring) (expressing concern that the majority focused solely on low electoral success, and "require[d] no reference to most of the '*Zimmer* factors' that were developed by the Fifth Circuit to implement *White*'s results test and which were highlighted in the Senate Report"). The Court has subsequently made clear that "[l]ack of electoral success is evidence of vote dilution, but courts must also examine other evidence in

the totality of circumstances" by reference to the Senate Factors. *See Johnson v. De Grandy*, 512 U.S. 997, 1011–12 (1994) (citing *Gingles*, 478 U.S. at 46, 79–80; *id.* at 98–99 (O'Connor, J., concurring in judgment)). The Court recently explained that "[i]ndividuals . . . lack an equal opportunity to participate in the political process when a State's electoral structure operates in a manner that . . . disable[s] [them] from 'enter[ing] into the political process in a reliable and meaningful manner' 'in the light of past and present reality, *political and otherwise*.'" *Milligan*, 599 U.S. at 25 (quoting *White*, 412 U.S. at 767, 770) (emphasis added).

Plaintiffs have properly pled that the challenged districts are "not equally open" because "minority voters face . . . bloc voting along racial lines, arising against the backdrop of substantial racial discrimination within the State, that renders a minority vote unequal to a vote by a nonminority voter." *Id.* This is because, in addition to the *Gingles* preconditions, the Complaint pleads a lack of electoral access based on the *Zimmer/*Senate Factors that the Court has found relevant from *White* through *Milligan*. FAC ¶¶ 94–100, 101 n.7 (racially polarized voting), ¶¶ 104–128 (history of voting discrimination and use of voting practices that enhance the opportunity for discrimination), ¶¶ 129–153 (extent to which the minority group members bear the effects of past discrimination in areas such as education, employment, and health), ¶¶ 154–157 (the use of overt or subtle racial appeals in political campaigns), ¶¶ 158–166 (the extent to which minorities have been elected

to public office in the jurisdiction), ¶ 167 (tenuous justifications for current districts); *see also LULAC*, 548 U.S. at 440 (holding that the "'political, social, and economic legacy of past discrimination' for Latinos in Texas may well 'hinder their ability to participate effectively in the political process'") (citations omitted); *Pleasant Grove*, 372 F. Supp. 3d at 1340-41 (relying on the Senate Factors to find that plaintiffs "plausibly alleged" that Black voters "have less opportunity than other members of the electorate to participate in the political process").

To the extent *White* and *Whitcomb* are relevant to the Section 2 analysis, Defendants' own authority belies their interpretations of those cases. Significantly, Defendants' proposed heightened standard is wholly absent from Eleventh Circuit precedent that looks to *Whitcomb* and *White* "in determining how great an impairment of minority voting strength is required." *Nipper v. Smith*, 39 F.3d 1494, 1517 (11th Cir. 1994) (en banc); *see* State Defs.' Br. 25 n.6 (citing *Nipper*). *Nipper* explained instead that these cases establish that plaintiffs need not prove "subjective discriminatory motive" to establish a Section 2 violation, so long as they point to "objective factors demonstrating that the electoral scheme interacts with racial bias in the community and allows that bias to dilute the voting strength of the minority group." *Nipper*, 39 F.3d at 1520 (op. of Tjolflat, J.); *see id.* at 1517–1520.

Defendants' frustration that plaintiffs "plead facts about socioeconomic disparities," Leg. Defs.' Br. 26, is misguided; the Supreme Court considers evidence

of "the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health" to be "probative of a § 2 violation." *Gingles*, 478 U.S. at 37 (quoting S. Rep. No. 97–417, 97th Cong. 2nd Sess. 28 (1982)).

Finally, Defendants' assertion that plaintiffs do not plead facts "about disparities when it comes to voting rights" is false. *See, e.g.*, FAC ¶¶ 104–128, 154–166. In fact, Defendants recount—and attempt to rebut—some of Plaintiffs' voting-related allegations in their motions to dismiss. *See* State Defs.' Br. 29–30; Leg. Defs.' Br. 24–25. Defendants' efforts to refute Plaintiffs' allegations are improper at this stage. *See Page v. Postmaster Gen.*, 493 F. App'x 994, 995–96 (11th Cir. 2012) ("In adjudicating a motion to dismiss, the district court may not resolve factual disputes."); *Pleasant Grove*, 372 F. Supp. 3d at 1341 (explaining that "it would be inappropriate at the pleadings stage for the Court to consider contradictory evidence presented by" the defendants about voters' political access).

Defendants may disagree with the Section 2 approach mandated by the Supreme Court but that construction of the law is binding precedent.

## III. LEGISLATIVE DEFENDANTS ARE PROPER PARTIES TO THIS ACTION.

### A. Legislative Defendants Waived Their Legislative Immunity.

The Chairs seek absolute immunity from suit after over two years of participating in this litigation. Legislative immunity aims to prevent the harassment

of legislators from the distraction associated with litigation. *See Scott v. Taylor*, 405 F.3d 1251, 1256 (11th Cir. 2005). Yet "federal jurisprudence reflects no doubt" that "legislative immunity can be waived in a civil action," and Defendants cite nothing to the contrary. *Milligan*, 576 F. Supp. 3d at 939 (collecting cases). Legislators may waive their immunity by actively participating in the litigation as the Legislative Defendants have here. *Id.* at 941–42 ("the Legislators' extensive litigation conduct . . . worked the waiver"); *see also* Fed. R. Civ. P. 45(d)(3)(A)(iii). Like other privileges, once immunity is waived, the Chairs "may not unring the bell," *see In re Sims*, 534 F.3d 117, 126 (2d Cir. 2008) (discussing waiver of psychotherapist-patient privilege), regardless of any "change of intent," Leg. Defs.' Br. 11.

The Chairs explicitly and implicitly waived immunity in these proceedings. They cannot simultaneously defend legislation and also claim immunity from suit attacking it. Allowing them to do so would turn "the shield of legislative immunity into a sword." *Milligan*, 576 F. Supp. 3d at 940 (quoting *Powell v. Ridge*, 247 F.3d 520, 525 (3d Cir. 2001)).

The *Milligan* court addressed a comparable waiver of legislative immunity, where the Committee Chairs[10] similarly attempted to assert immunity after engaging substantively in the action. 576 F. Supp. 3d at 934. The court rejected their belated

[10] Senator Steve Livingston succeeded Senator Jim McClendon as the Senate Chair of the Alabama Permanent Legislative Committee on Reapportionment.

assertion and found that the Chairs' "extensive litigation conduct" waived their privilege. *See id*. at 941. In support, the court cited, in part, to the legislators' answering of the complaint and their active participation in pre-hearing motion practice, "without giving the slightest indication that they were participating in the litigation for the limited purpose of asserting legislative immunity." *Id*.

Here too, the Chairs have willingly and actively engaged in the litigation. For instance, the Chairs filed their own Answer to Plaintiffs' original Complaint (ECF No. 53), and joined Defendants' Opposition to Plaintiffs' Motion for Recusal (ECF No. 45) and Defendants' Response to Plaintiffs' Motion to Modify Stay (ECF No. 73). And, as in *Milligan*, at no point did the Chairs give the "slightest indication that they were participating in the litigation for the limited purpose of asserting legislative immunity." 576 F. Supp. 3d at 941.

Moreover, during the May 20, 2022, hearing concerning Plaintiffs' attempt to modify the stay, and after the Chairs engaged substantively on the merits, the Chairs *explicitly* waived their immunity in response to a question from the Court:

> JUDGE MANASCO: I have one question and that is, do you foresee that there will be legislative immunity issues that we have to deal with? It sounds like maybe some discussion between the parties to that effect.

> MR. WALKER: I can tell you that some of the legislators have told me that they will assert immunity. So, yes, ma'am, there will be. ***Now, the chairs have obviously waived their immunity.*** But the testimony of some individual -- yeah, there will be privileges.

Hearing Tr. 17:1-25, ECF No. 115-1 (emphasis added).

The Chairs now seek to assert the immunity they previously stated was "obviously waived" by contending that this prior waiver is no longer in effect because Defendant Pringle has had a "change of intent," and Defendant Livingston was not a party to this action when then-acting Senate Chair of the Committee, Senator Jim McClendon, authorized the waiver. Both arguments are without merit.

### i.    <u>Defendant Pringle</u>

Defendants' Motion concedes that "Rep. Pringle and counsel acknowledge that at the May 20, 2022 status conference . . . counsel for the Chairs indicated that Rep. Pringle and Sen. McClendon[] 'have obviously waived their [legislative] immunity.'" Leg. Defs.' Br. 10. Despite Defendant Pringle's counsel's unambiguous use of the past-tense "***waived***" to describe the Chairs' prior waiver of legislative immunity, Defendant now contends that this statement merely "reflected Rep. Pringle's intent at the time not to asse[r]t privilege if the case proceeded," a condition that—although the case has proceeded—is no longer in effect because the case was stayed "for over a year." *Id*. Defendants cite no relevant authority that a party can conditionally waive legislative immunity (without asserting any conditions), then later revoke this waiver upon a "change of intent," if the case is stayed for long enough. *See* Leg. Defs.' Br. 10–11. Once immunity is purposefully waived, it cannot be revived. *See In re Sims*, 534 F.3d at 126.

Defendant Pringle also argues that legislative immunity is a "personal defense" that can "be waived only by the legislator himself or herself," Leg. Defs.' Br. 11, appearing to suggest that counsel could not waive legislative immunity on Defendant Pringle's behalf. But "it is hornbook law that a principal is bound by the acts of an agent taken within the scope of the agent's actual (and, in some cases, apparent) authority." *In re Fundamental Long Term Care, Inc.*, 512 B.R. 690, 695 (Bankr. M.D. Fla. 2014), *aff'd sub nom. Est. of Jackson v. Schron*, 2016 WL 4718145 (M.D. Fla. Sept. 8, 2016), *aff'd sub nom. In re Fundamental Long Term Care, Inc.*, 873 F.3d 1325 (11th Cir. 2017). Defendant Pringle has not claimed that his counsel was acting outside the scope of his actual authority when willingly and actively engaging in this litigation on the Chairs' behalf, including when explicitly waiving any claim to legislative immunity. Of course, in litigation represented parties speak and act principally through counsel—by whose acts and statements they are bound. *See id.*

### ii.    **Defendant Livingston**

Defendant Livingston argues that he can invoke legislative immunity because he was not party to this action when then-acting Senate Chair of the Committee, Senator Jim McClendon, authorized the waiver. *See* Leg. Defs.' Br. 11. However, Senator McClendon was not sued in his individual legislative capacity but rather, in his official capacity as a Co-Chair of the Alabama Permanent Legislative Committee

on Reapportionment. *See* Compl. ¶ 22, ECF No. 1. "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity," of which "an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985). It was in their capacity as Co-Chairs of the Committee that Sen. McClendon and Rep. Pringle chose to actively participate in this litigation, as well as explicitly to waive legislative immunity. *See infra* 37–38. Defendant Livingston substituted himself into this action upon his selection as a Co-Chair of the Committee, *see* Fed. R. Civ. P. 25(d), and a "substituted party steps into the same position as the original party," *Carrizosa v. Chiquita Brands Int'l, Inc.*, 47 F.4th 1278, 1337 (11th Cir. 2022). Therefore, the Chairs acting for and binding the Committee cannot revive previously waived legislative immunity simply by appointing a new member as chair. Allowing otherwise would permit a committee chair to engage in substantial litigation on behalf of their committee, then on the eve of trial, appoint a new chair to claim legislative immunity as a shield.

The Chairs' motion to dismiss on immunity grounds should be denied.

**B.    Legislative Defendants Play a Role in Redressing Plaintiffs' Injuries, Making Them Proper Defendants.**

Far from being "powerless to remedy the alleged injury," Leg. Defs.' Br. 5 (quoting *Scott v. Taylor*, 405 F.3d 1251, 1259 (11th Cir. 2005) (Jordan, J. concurring)), the Chairs direct the very Committee responsible for overseeing the redistricting process, which, in 2021, resulted in the enactment of SB1—the original

source of Plaintiffs' injuries. At the outset, on a motion to dismiss, "[o]nly the complaint itself and any attachments thereto may be considered, even when the parties attempt to present additional evidence." *Pleasant Grove*, 372 F. Supp. 3d at 1338 (citing *Adinolfe v. United Techs. Corp.*, 768 F.3d 1161, 1168 (11th Cir. 2014)); *see also* Fed. R. Civ. P. 12(d). Accordingly, the Court should disregard the self-serving affidavits filed by the Chairs, which contradict past positions in this case and others. *Pleasant Grove*, 372 F. Supp. 3d at 1338 (declining to consider extrinsic affidavits and evidence submitted by the defendant at the motion-to-dismiss stage).

In their extrinsic affidavits, Defendants Pringle and Livingston each admit that the Committee they chair "is responsible for proposing new statewide redistricting plans," including for the Alabama Senate. *See* Pringle Decl., ECF No. 103-1, ¶ 4; Livingston Decl., ECF No. 130-2, ¶ 4.[11] In this capacity, the Chairs play a critical role in "adopt[ing] and enact[ing] a districting plan for the State Senate that remedies the Voting Rights Act violations" of which Plaintiffs complain. FAC at 45, ECF No. 126. Because Plaintiffs have properly alleged (1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision, the Chairs' motion to dismiss for lack of standing should be denied. *See Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020).

---

[11] Sen. Livingston also avers that he "will have a leadership role in the development and design of any proposed new Senate districts." Livingston Decl. ¶ 6.

*First*, unlike the cases Defendants rely upon, here, Plaintiffs' injuries are directly traceable to the Chairs' conduct in constructing and adopting the State Senate districts that violate Plaintiffs' rights under the VRA. In *Doe v. Pryor*, 344 F.3d 1282, 1285 (11th Cir. 2003), the Eleventh Circuit held that the injury could not be traceable to the Attorney General where he had conceded that the challenged statute was unconstitutional and refused to enforce the statute. In *Lewis v. Governor of Alabama*, 944 F.3d 1287 (11th Cir. 2019), the traceability issues stemmed from a finding that the challenged statute "[didn't] require (or even contemplate) 'enforcement' by anyone, let alone the Attorney General." *Id.* at 1299.

In contrast, the Alabama Legislature created the Permanent Legislative Committee on Reapportionment ("the Committee") to "prepare for and develop a reapportionment plan for the [State of Alabama]." Ala. Code §§ 29-2-50 to 52. The Committee engages in activities necessary for the "preparation and formulation of a reapportionment plan" and the "readjustment or alteration of the Senate and House districts and of congressional districts of the [S]tate [of Alabama]." *Id*. § 29-2-52(c). The Reapportionment Committee is authorized "to do and perform any acts that may be necessary, desirable, or proper to carry out the purposes and objectives" for which it was created, including "request[ing] and receiv[ing] from any court . . . of the state . . . such assistance . . . as will enable it to properly carry out its powers and duties." *Id*. § 29-2-52(e) and (h). The Chairs possess the unique authority to "prepare for and

develop a reapportionment plan for the [State of Alabama]," *id*. § 29-2-52(c), which they exercised in developing SB1. Their failure to comply with the VRA while exercising this authority is properly alleged to be a cause of Plaintiffs' injuries.

*Second*, the Chairs' assertion that they "cannot provide any relief sought by Plaintiffs" directly contradicts the position they asserted less than two years ago in their motion to intervene in *Caster v. Allen*, 2:21-CV-1536-AMM (N.D. Ala. Dec. 20, 2021), ECF No. 60 (attached as Ex. A). In *Caster*, the Chairs argued that they *should* be allowed to intervene in a congressional redistricting challenge due to their distinctive role in the redistricting process. *Id*. at 4. They then contended that within Alabama, the Legislature has "exclusive responsibility for redistricting." *Id.* The Legislature, in turn, "delegated to the Reapportionment Committee responsibility for preparing new Congressional Districts," and "[a]s Chairs of the Reapportionment Committee, the Committee Chairs oversee operation of the Legislature's Reapportionment Office." *Id.* at 2–4. Thus, the plaintiffs' attempt to challenge the constitutionality of the congressional districts without naming the Chairs as defendants, amounted to an attempt "to wrest from the Legislature exclusive authorship of the State's congressional districts." *Id.* at 5. Further, the Chairs argued that the "authority to conduct redistricting . . . 'is primarily a matter for legislative consideration and determination.'" *Id.* at 6 (citing *Chapman v. Meier*, 420 U.S. 1, 27 (1975); *Connor v. Finch*, 431 U.S. 407, 414 (1977)).

Moreover, they argued that as members of the Alabama Legislature, they have a "justiciable, institutional interest in ensuring that the congressional districts in Alabama are composed in a constitutionally lawful manner." *Id.* at 6–7 (citing *U.S. House of Representatives v. U.S. Dep't of Com.*, 11 F. Supp. 2d 76, 86–87 (D.C. 1998) (three-judge court)). The *Caster* court not only granted the Chairs' motion, but more recently, in an order denying Defendants' emergency motion for stay pending appeal in a related case, reiterated that "[i]t is the Legislature's task to draw districts; the Secretary simply administers elections," citing, among other authority, to the Chairs' motion to intervene. *Milligan v. Allen*, No. 2:21-CV-1291-AMM, 2023 WL 5920139, at *9 (N.D. Ala. Sept. 11, 2023).

The Supreme Court has also acknowledged the Legislature's unique interest within the election context. In *Berger v. North Carolina State Conference of the NAACP*, the Supreme Court reversed the lower court's denial of the North Carolina legislature's motion to intervene as of right in a lawsuit involving a challenge to the constitutionality of a North Carolina election law. 142 S. Ct. 2191 (2022). The Court concluded that "[t]he legislative leaders seek to give voice to a different perspective," than the state's executive branch. *Id.* at 2205. And, unlike the executive branch, "[t]heir 'primary objective' is not clarifying which law applies," but instead, they can "focus on defending the law vigorously on the merits without an eye to crosscutting administrative concerns." *Id.* Thus, because "branches of government

45

may seek to vindicate different and valuable state interests," the Court found the legislature was entitled to intervene. *Id.*

The Chairs also misplace reliance on *Chestnut v. Merrill*. Leg. Defs.' Br. 8. In *Chestnut*, Senator McClendon—the former Senate Chair—argued that he should be permitted to intervene because "his assistance would be necessary should the court order the state to redraw its congressional districts." *Chestnut*, No. 2:18-cv-907-KOB, 2018 WL 9439672, at *1 (N.D. Ala. Oct. 16, 2018). The court's denial of intervention rested on findings that while the Chair may impact a potential remedy, the necessity of future remedial processes was highly speculative, and that legislators' other interests were already adequately represented. *Id.*

Here, by contrast, the question before the Court is whether a "judgment on the [Chairs]" granting Plaintiffs' requested relief by requiring the enactment of VRA-compliant districting plans for the State Senate, "redresses the plaintiff's injury, whether directly or indirectly." *Lewis*, 944 F.3d at 1301. As the Chairs have already answered, the answer is yes. *See Caster*, 2:21-CV-1536-AMM, ECF No. 60 at 4; *Chestnut*, 2018 WL 9439672, at *1.

## CONCLUSION

Because Defendants' legal arguments lack merit, misapply pleading standards, and ignore both the copious supporting facts pled in the FAC and the Chairs' prior statements and actions making their role as parties proper, the Court should deny Defendants' motions to dismiss in full.

DATED this 11th day of January, 2024.    Respectfully submitted,

/s/ Alison Mollman
Alison Mollman
AMERICAN CIVIL LIBERTIES
UNION OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 265-2754
amollman@aclualabama.org

/s/ Deuel Ross
Deuel Ross*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street NW Ste. 600
Washington, DC 20005
(202) 682-1300
dross@naacpldf.org

Leah Aden*
Stuart Naifeh*
Kathryn Sadasivan (ASB-517-E48T)
Brittany Carter*
NAACP LEGAL DEFENSE &
EDUCATIONALFUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006

/s/ Davin M. Rosborough
Davin M. Rosborough*
Julie A. Ebenstein*
Dayton Campbell-Harris***
Sophia Lin Lakin*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
(212) 549-2500
drosborough@aclu.org
jebenstein@aclu.org
dcampbell-harris@aclu.org
slakin@aclu.org

Jacob van Leer*
jvanleer@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th St. NW
Washington, D.C. 20005
(212) 549-2500

/s/ Sidney Jackson
Sidney Jackson (ASB-1462-K40W)
Nicki Lawsen (ASB-2602-C00K)

47

(212) 965-2200
laden@naacpldf.org
snaifeh@naacpldf.org
ksadasivan@naacpldf.org
bcarter@naacpldf.org

David Dunn*
HOGAN LOVELLS US LLP
390 Madison Avenue New York, NY
10017
(212) 918-3000
david.dunn@hoganlovells.com

Blayne R. Thompson*
HOGAN LOVELLS US LLP
609 Main St., Suite 4200
Houston, TX 77002
(713) 632-1400
blayne.thompson@hoganlovells.com

Michael Turrill*
Harmony R. Gbe*
HOGAN LOVELLS US LLP
1999 Avenue of the Stars Suite 1400
Los Angeles, CA 90067
(310) 785-4600
michael.turrill@hoganlovells.com
harmony.gbe@hoganlovells.com

*Attorneys for Plaintiffs*

Anthony Ashton*
Anna-Kathryn Barnes*
NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED
PEOPLE (NAACP)
4805 Mount Hope Drive
Baltimore, MD 21215
(410) 580-5777

WIGGINS, CHILDS, PANTAZIS,
FISHER & GOLDFARB
301 19th Street
North Birmingham, AL 35203
(205) 314-0500
sjackson@wigginschilds.com
nlawsen@wigginschilds.com

/s/ Jack Genberg
Bradley E. Heard*
Jack Genberg*
Jess Unger*
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Avenue, Suite 340
Decatur, GA 30030
(404) 521-6700
bradley.heard@splcenter.org
jack.genberg@splcenter.org
jess.unger@splcenter.org

Jessica L. Ellsworth*
Shelita M. Stewart*
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600
jessica.ellsworth@hoganlovells.com
shelita.stewart@hoganlovells.com

aashton@naacpnet.org
abarnes@naacpnet.org

*Attorneys for Plaintiff Alabama State
Conference of the NAACP*

*Admitted *pro hac vice*
**Practice is limited to federal court,

## CERTIFICATE OF SERVICE

I hereby certify that I have electronically filed a copy of the foregoing with the Clerk of Court using the CM/ECF system which provides electronic notice of filing to all counsel of record.

This the 11th day of January, 2024.

/s/ Davin Rosborough