FILED

2024 Feb-13  AM 11:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **KHADIDAH STONE, *et al.*,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| | ) **Case No.: 2:21-cv-1531-AMM** |
| **WES ALLEN, *in his official*** | ) |
| ***capacity as Alabama Secretary of*** | ) |
| ***State*, *et al.*,** | ) |
| | ) |
| **Defendants.** | ) |

## <u>ORDER</u>

This case is before the court on two motions to dismiss. One was filed by Secretary of State Wes Allen ("the Secretary"). Doc. 131. The other was filed by Representative Chris Pringle and Senator Steve Livingston ("the Legislators") in their official capacities as House and Senate Chairs of the Alabama Legislature's Permanent Legislative Committee on Reapportionment. Doc. 130. The plaintiffs in this case—Khadidah Stone, Evan Milligan, Greater Birmingham Ministries, and the Alabama State Conference of the NAACP—oppose the motions. Doc. 138. The motions are fully briefed. *See* Docs. 139, 140. For the reasons explained below, the motions to dismiss are **DENIED**, except that the motion to dismiss Senator Livingston is **GRANTED** on the basis of legislative immunity.

## I.    BACKGROUND

### A.    The Operative Complaint

This redistricting case challenges Alabama's districting maps for State Senate elections. The plaintiffs allege that "Senate Bill 1, the 2021 Alabama State Senate Redistricting law ('SB 1' . . .), denies Black Alabamians an equal opportunity to participate in the political process and elect candidates of their choice . . . in both the Montgomery and Huntsville regions." Doc. 126 ¶ 2. The plaintiffs contend that this denial of equal opportunity violates Section Two of the Voting Rights Act of 1965 ("Section Two"). *Id.*

Ms. Stone and Mr. Milligan are Black voters who live in Montgomery in State Senate District 26. *Id.* ¶¶ 13, 14. Greater Birmingham Ministries "has around 5,000 individual members in Alabama, including Black Alabamians who are registered voters and reside in the relevant areas in and around Huntsville and Montgomery." *Id.* ¶ 17. The Alabama State Conference of the NAACP has "approximately 5,000 members across the State, approximately 95% of whom identify as Black," and "[i]t has Black members who are registered voters and live in the Montgomery and Huntsville areas." *Id.* ¶ 19.

According to the plaintiffs, SB 1 "unnecessarily packs Black voters into State Senate District 26 in Montgomery while carving white residents out of the district and into [Senate] District 25." *Id.* ¶ 3. The plaintiffs allege that "Black voting-age

citizens are sufficiently numerous and geographically compact to form a reasonably configured majority in an additional State Senate District in the Montgomery area." *Id.* They further assert that "the voting patterns of Black voters in the Montgomery area are politically cohesive." *Id.* And they plead that "white voters in this region of Alabama vote sufficiently as a bloc typically to defeat the candidates preferred by Black voters." *Id.*

Similarly, the plaintiffs allege that "SB 1 unnecessarily cracks Black voters in State Senate Districts 2, 7, and 8 in Huntsville, thereby preserving three districts where candidates preferred by white voters reliably win." *Id.* ¶ 4. Like the allegations related to the Montgomery-area Senate Districts, the plaintiffs allege that the Black voting-age population in the Huntsville area is "sufficiently numerous and geographically compact to form a reasonably configured majority in a State Senate District," that its voting patterns "are politically cohesive," and that "white voters in this region of Alabama vote sufficiently as a bloc typically to defeat the candidates preferred by Black voters." *Id.*

The plaintiffs allege that "SB 1 prevents Black voters from participating equally in the political process and electing candidates of choice." *Id.* ¶ 5. They point to "the totality of the circumstances, including Alabama's current practices and ongoing history of racial discrimination in voting, the continuing effect of racial discrimination on Black people in areas like education, employment, and health,

continuing racial appeals by political candidates, and the Legislature's lack of responsiveness to Alabama's Black communities." *Id.* Therefore, the plaintiffs contend that "SB 1 violates Section 2 of the [Voting Rights Act] and must be enjoined in favor of a remedial plan that completely cures the illegal vote dilution by including additional State Senate districts in Montgomery and Huntsville in which Black voters have a fair opportunity to elect candidates of their choosing." *Id.* ¶ 6.

The plaintiffs contend that "Alabama's Black population is sufficiently large and geographically compact to constitute majorities of the voting-age population in at least one additional Alabama State Senate district in each of the Montgomery and Huntsville areas." *Id.* ¶ 79. "[Senate] District 25 stretches from the northern edge of Elmore County down to the southern edge of Crenshaw County." *Id.* ¶ 80. But the plaintiffs allege that Senate District 25 does not "follow[] the county line [and instead it] splits away from the southwest border of Elmore County, leaving the remaining portion of the County in another district." *Id.* Senate District 25 also "picks up the eastern and southern parts of Montgomery County." *Id.* The plaintiffs allege that Senate District 25's "shape becomes irregular in Montgomery, where a pronounced divot reaches in to capture white communities on the east side of the City of Montgomery; it becomes increasingly narrow as the district moves south through the city, then juts under [Senate] District 26 before continuing south into

Crenshaw [County]." *Id.* The plaintiffs further allege that "[a]ll but a few of [Senate District 25's] precincts are majority white and it has a BVAP [Black voting-age population] of 29%." *Id.* Therefore, the plaintiffs allege that "[Senate] District 25 is one of the least compact in the State." *Id.*

The plaintiffs allege that "[Senate] District 26 includes much of the City of Montgomery except the portion that [Senate] District 25 has carved out on the east side." *Id.* ¶ 81. Further, "[Senate] District 26 has a BVAP of 66.1% and contains all but two of the City's precincts made up of a majority of Black residents." *Id.* The plaintiffs argue that SB 1 "unnecessarily packs Black voters in Montgomery into [Senate] District 26, and surgically extracts communities with higher percentages of white VAPs from the core of Montgomery into [Senate] District 25." *Id.* ¶ 83. The following figures illustrate the lines of Senate Districts 25 and 26.[1]

---

[1] In these figures, the district lines appear in yellow, county lines in red, and municipalities in dotted lines. The green shading shows the concentration of the Black voting-age population—darker shading means that area has a higher concentration of Black voters. The black boxes contain the district number and the percentage of Black voting-age population for that district. *Id.* at 20 n.6.





*Id.* at 20.

The plaintiffs allege that "[Senate] District 7 begins in the Northwest portion of Madison County along the Tennessee border to the north and Limestone County to the west, and then becomes much narrower, snaking south to capture some of the center of the City of Huntsville" and eventually "run[s] east all the way to the border of Jackson County." *Id.* ¶ 84. This configuration "split[s] the City of Huntsville and the Black community there into three parts." *Id.* The plaintiffs allege that Senate District 7 "is among the least compact in the Senate, consistent with its highly irregular shape." *Id.* ¶ 85. According to the plaintiffs, Senate District 7 "cuts through Huntsville's Black community and splits communities of interest, taking a sharp eastern turn to capture heavily white communities rather than additional Black communities in Huntsville, which instead lie in the adjacent Senate Districts 2 and 8, to the west and east, respectively." *Id.* The following figure illustrates the lines of Senate District 7.



*Id.* at 22.

According to the plaintiffs, "[a]lternative district lines could configure the State Senate map to provide two additional, reasonably configured State Senate districts comprised of a majority of Black voting-age citizens." *Id.* ¶ 88. The plaintiffs allege that the proposed remedial map preserves "contiguity of all districts, has permissible population deviations of no more than ±5% for each district, splits no more counties than the Enacted Plan, has comparable compactness scores to the Enacted Plan, and satisfies other traditional redistricting criteria, including respect for communities of interest, better than the current map." *Id.* The plaintiffs further allege that "[v]oters in these districts are members of communities of interest with a shared history, political beliefs, cultural values, and economic interests." *Id.* ¶ 89.

Those voters' "history includes a shared legacy of achievement and discrimination, and shared goals for livable wages, quality healthcare, better sanitation and water quality, and greater economic opportunity." *Id.*

The plaintiffs allege that "[v]oting is racially polarized across the State." *Id.* ¶ 94. They allege that "[n]umerous federal courts in Alabama have found that the State's elections are racially polarized, including [in 2023] and as agreed by the State's expert in that area." *Id.* ¶ 95 (citing, *e.g.*, *Milligan v. Allen*, No. 2:21-CV-1291-AMM, 2023 WL 5691156, at *52 (N.D. Ala. Sept. 5, 2023)). The plaintiffs contend that "[t]here is a causal relationship between racial bloc voting and the State's history of racial discrimination." *Id.* ¶ 96.

According to the plaintiffs, Montgomery County voting patterns "show consistent patterns of Black voters voting cohesively, and white voters consistently voting as a bloc for candidates that defeat the candidates preferred by Black voters in districts without [Black voting-age population] majorities." *Id.* ¶ 97. "For example, in Montgomery County, in statewide elections over the last decade . . . at least 85% and usually over 90% of Black voters in Montgomery have consistently supported the same candidates, while white voters' support for those candidates consistently fell below 20%." *Id.* "In races in the current majority-white [Senate District] 25, Black candidates and Black-favored candidates have never won election to the state Senate over the past decade-plus." *Id.* ¶ 98. The plaintiffs contend that in

Madison County, voting data "show[s] consistent patterns of Black voters voting cohesively, and white voters consistently voting as a bloc for candidates that defeat the candidates preferred by Black voters in districts without [Black voting-age population] majorities." *Id.* ¶ 99.

The plaintiffs allege that Alabama has a pattern and practice of voting discrimination against Black voters. *Id.* ¶¶ 104–28. The plaintiffs allege this practice began "[b]efore the Civil War, [as] Black people were barred from voting in the state." *Id.* ¶ 110. And even though the "Reconstruction Acts and Amendments . . . forced [Alabama] to allow Black men access to the franchise," white leaders "us[ed] violence to deter Black people from political participation and . . . pass[ed] racially discriminatory laws to cement their control." *Id.* ¶¶ 110, 111. The 1901 Constitutional Convention "required literacy tests as a prerequisite to registering to vote and mandated payment of an annual $1.50 poll tax, which was intended to and had the effect of disenfranchising Black voters." *Id.* ¶ 116 (citing *United States v. Alabama*, 252 F. Supp. 95, 99 (M.D. Ala. 1966)). The Voting Rights Act was passed in 1965, but "[i]n five of the six decennial redistricting cycles between 1960 and 2010, courts or the U.S. Department of Justice found that Alabama's congressional map or state legislative maps discriminated against Black voters in violation of the Constitution or the [Voting Rights Act]." *Id.* ¶¶ 104, 120.

The plaintiffs also allege that Black Alabamians continue to suffer from the effects of past discrimination, and those effects hinder their ability to participate in the political process. *Id.* ¶¶ 129–53. "As one federal court explained, Alabama has had an 'unrelenting historical agenda, spanning from the late 1800s to [today], to keep its black citizens economically, socially, and politically downtrodden, from the cradle to the grave.'" *Id.* ¶ 129 (quoting *Dillard* v. *Crenshaw Cnty.*, 640 F. Supp. 1347, 1357 (M.D. Ala. 1986)). The plaintiffs allege that "Black Alabamians lag behind white residents in many crucial aspects of public life, including employment, income, educational attainment, and access to healthcare." *Id.* ¶ 130. The plaintiffs further allege that Black Alabamians are more likely to lack a vehicle and more likely to rent their home than white Alabamians. *Id.* ¶¶ 143–44. The plaintiffs allege that "[i]n 2019, the infant mortality rate for Black infants was 12.0 deaths per 1,000 live births, which is more than twice the white infant mortality rate of 5.6 deaths." *Id.* ¶ 147. The plaintiffs allege that Black Alabamians have a "significantly shorter" lifespan than white Alabamians. *Id.* ¶ 148. These disparities, as well as others listed in the complaint, "hinder Black Alabamians' opportunity to participate in the political process today." *Id.* ¶ 152 (quoting *Singleton v. Merrill*, 582 F. Supp. 3d 924, 1022 (N.D. Ala. 2022)).

The plaintiffs allege that candidates seeking elected office in Alabama have used "overt and subtle racial appeals" in their campaigns. *Id.* ¶ 154. For example,

11

the plaintiffs cite the statements of former Alabama Congressman Mo Brooks, who said that "Democrats are waging a 'war on whites.'" *Id.* (quoting *Singleton*, 582 F. Supp. 3d at 984). In the 2017 special election for U.S. Senate, then–candidate Roy Moore was "asked to speak about a time when America was great" and stated that "I think it was great at the time when families were united—even though we had slavery—they cared for one another . . . Our families were strong, our country had direction." *Id.* ¶ 155.

In the 2018 race for Chief Justice of the Supreme Court of Alabama, Chief Justice Tom Parker appeared in an advertisement, which "declared that he opposes 'the leftist mob tr[ying] to destroy our society' and featured a clip of Congresswoman Maxine Waters"—who is a Black congresswoman from California. *Id.* ¶ 156 (quoting *Ala. State Conf. of NAACP v. Alabama*, 612 F. Supp. 3d 1232, 1309 (M.D. Ala. 2020)). In another advertisement, Chief Justice Parker "targeted immigrant communities: 'It's an invasion. What happens if they make it to Alabama?'" *Id.* (quoting *Ala. State Conf. of NAACP*, 612 F. Supp. 3d at 1309). This advertisement "showed what appeared to be people of color trying to cross the southern border and concluded with a declaration that Justice Parker 'stand[s] up for what we believe' and 'stand[s] *with us*.'" *Id.* (quoting *Ala. State Conf. of NAACP*, 612 F. Supp. 3d at 1309).

In 2020, former congressman and then–Senate candidate Bradley Byrne appeared in a video "'of a white man narrating as images of prominent persons of color (and only persons of color) are juxtaposed with images of the 9/11 terrorist attacks, in or on or hovering above a crackling fire,' which 'could be understood as a racial appeal.'" *Id.* ¶ 157 (quoting *Singleton*, 582 F. Supp. 3d at 1024).

The plaintiffs allege that Black Alabamians are underrepresented in public office. *Id.* ¶¶ 158–66. The plaintiffs allege that "[e]ven though Black people comprise approximately 27% of Alabama's population, only 7 of 35 or 20% of Alabama's state senators are Black." *Id.* ¶ 159. Additionally, "[n]one of the current statewide elected officials are Black [and o]nly two Black people have ever been elected to statewide office." *Id.* ¶ 160. "Alabama has never had a Black governor or a Black senator representing the state in the U.S. Senate." *Id.* ¶ 162.

The plaintiffs allege that elected officials in Alabama fail "to respond to the particularized needs of the Black communities." *Id.* ¶ 165. For example, "[t]he Alabama Legislature rejected requests to expand Medicaid under the Affordable Care Act despite the racial gap in insurance coverage [when that] would have insured an additional 220,000 Alabamians, particularly benefiting Black residents." *Id.* The plaintiffs also allege that Alabama instituted a voter identification law and then

closed "driver license offices throughout Alabama . . . [and] specifically concentrated closures in the Black Belt."[2] *Id.* ¶ 166.

The plaintiffs further allege that "traditional districting principles can justify neither the State's packing of Black voters into [Senate] District 26 in much higher numbers than necessary to elect candidates of choice, nor the surgical extraction of white populations from the city core into [Senate] District 25." *Id.* ¶ 167. Also, "traditional districting principles do not explain the three-way division of Huntsville's Black voters that enables white-preferred candidates to consistently prevail in all three districts representing the core of the Huntsville metropolitan area." *Id.*

On the basis of these allegations, the plaintiffs assert only one claim, a violation of Section Two. *Id.* ¶ 175. The "[p]laintiffs seek to enforce their Section 2 rights and remedies through 42 U.S.C. § 1983 and 52 U.S.C. §§ 10302(a), (b), (c)." *Id.* ¶ 176.

B.    Procedural History

The plaintiffs' initial complaint alleged that various State Senate and House Districts are "unconstitutional as violating the Fourteenth Amendment to the United

---

[2]The Black Belt is an area of the state that is "named for the region's fertile black soil. The region has a substantial Black population because of the many enslaved people brought there to work in the antebellum period. All the counties in the Black Belt are majority- or near majority-BVAP." *Singleton*, 582 F. Supp. 3d at 953 (cleaned up).

States Constitution as racial gerrymanders." Doc. 1 at 41. Therefore, the plaintiffs requested that a three-judge court hear this case as required by 28 U.S.C. § 2284(a), *id.* ¶ 9, and the Chief Judge of the Eleventh Circuit convened the three-judge court, Doc. 5. The plaintiffs' first three amended complaints contained constitutional allegations. *See* Docs. 54, 57, 83.

On May 20, 2022, the court held a status conference. During that status conference, a member of the three-judge court asked whether this case will present "legislative immunity issues that we have to deal with" because of "discussion between the parties to that effect." Doc. 115-1 at 19, Tr. 18:2–4. In response to that question, the attorney representing Senator Jim McClendon and Representative Pringle—the chairs of the Permanent Legislative Committee on Reapportionment at the time of the hearing—said that "the chairs have obviously waived their immunity." *Id.*, Tr. 18:8–9.

On December 6, 2023, the plaintiffs filed their Fourth Amended Complaint. Doc. 126. This complaint asserts one claim under Section Two and does not assert any constitutional claims. Accordingly, the three-judge court was dissolved, and this action returned to the undersigned district judge to whom the case was originally assigned. Doc. 127 at 1.

The motion is fully briefed. Docs. 130, 131, 138, 139, 140.

## II.   LEGAL STANDARDS

### A.   Rule 12(b)(6)

A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint need not make "detailed factual allegations;" its purpose is only to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). To survive a motion to dismiss under Rule 12(b)(6), a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* To test the complaint, the court discards any "conclusory allegations," takes the facts alleged as true, *McCullough v. Finley*, 907 F.3d 1324, 1333 (11th Cir. 2018), and "draw[s] all reasonable inferences in the plaintiff's favor," *Randall v. Scott*, 610 F.3d 701, 705 (11th Cir. 2010). These facts and inferences must amount to a "plausible" claim for relief, a standard that "requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

### B.   Rule 12(b)(1)

"Because a motion to dismiss for lack of standing is one attacking the district court's subject matter jurisdiction, it is brought pursuant to Rule 12(b)(1)." *Region 8 Forest Serv. Timber Purchasers Council v. Alcock*, 993 F.2d 800, 807 n.8 (11th

Cir. 1993). "Attacks on subject matter jurisdiction under" Rule 12(b)(1) of the Federal Rules of Civil Procedure "come in two forms." *Lawrence v. Dunbar*, 919 F.2d 1525, 1528–29 (11th Cir. 1990). "Facial attacks on the complaint require the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion." *Id*. at 1529 (cleaned up). "Factual attacks, on the other hand, challenge the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered." *Id*. (cleaned up).

## III.   ANALYSIS

The Secretary asserts that this case should be dismissed because (1) Section Two contains no private right of action, and (2) the plaintiffs fail to state a claim under Section Two. The Legislators make those arguments and two more: (3) the claims against them should be dismissed because they have legislative immunity, and (4) the plaintiffs lack standing.

### A. Private Right of Action

The Secretary and Legislators first argue that the court must dismiss the plaintiffs' Section Two claim because Section Two lacks a private right of action. The Secretary contends that because Section Two does not unambiguously confer new individual rights, "there is no basis for a private suit, whether under § 1983 or

under an implied right of action." Doc. 131 at 12 (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 286, 290 (2002)). The Secretary further argues that the Voting Rights Act lacks any clear evidence that Congress intended to provide a private right of action under Section Two. *Id.* at 27. The Legislators echo these arguments. *See* Doc. 130 at 11–20.

The plaintiffs respond that "[t]he Supreme Court has consistently read the [Voting Rights Act] to contain a private right of action . . . the Court has recognized Congress's codification of this right . . . [and] Alabama proffers no valid reason or basis to depart from it." Doc. 138 at 16. The plaintiffs further contend that Section Two contains the necessary rights-creating language and provides for a private remedy. *Id.* at 22–23. Additionally, the plaintiffs argue that "statutory stare decisis similarly compels affirming Section 2's private right of action." *Id.* at 32.

On reply, the Secretary contends that "[t]he text, structure, and history are clear: Section 2 confers no private rights and no private remedies." Doc. 139 at 3. Further, "[t]he Supreme Court has never said otherwise, and non-binding cases suggesting a different conclusion are wrong." *Id.* The Legislators adopt these arguments. Doc. 140 at 15.

The Secretary and Legislators identify no controlling precedent holding that Section Two does not contain a private right of action. On the other hand, accepting the defendants' argument would require the court to ignore decades of controlling

Section Two jurisprudence. "Since the passage of the Voting Rights Act, federal courts across the country, including both the Supreme Court and the Eleventh Circuit, have considered numerous Section Two cases brought by private plaintiffs." *Singleton*, 582 F. Supp. 3d at 1031 (collecting cases). The Secretary and Legislators can identify only a single instance in which a circuit court and district court held that Section Two did not provide for a private right of action. *See Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, 86 F.4th 1204, 1207 (8th Cir. 2023), *aff'g* 586 F. Supp. 3d 893, 905 (E.D. Ark. 2022), *reh'g en banc denied*, No. 22-1395, 2024 WL 340686 (8th Cir. Jan. 30, 2024).

Further, "[a] ruling that Section Two does not provide a private right of action would badly undermine the rationale offered by the Court in *Morse* [*v. Republican Party of Va.*, 517 U.S. 186 (1996)]." *Singleton*, 582 F. Supp. 3d at 1031. In *Morse*, the Supreme Court held that Section Ten of the Voting Rights Act has a private right of action, and reasoned that:

> Although § 2, like § 5, provides no right to sue on its face, "the existence of the private right of action under Section 2 . . . has been clearly intended by Congress since 1965." S. Rep. No. 97–417, at 30. We, in turn, have entertained cases brought by private litigants to enforce § 2. It would be anomalous, to say the least, to hold that both § 2 and § 5 are enforceable by private action but § 10 is not, when all lack the same express authorizing language.

517 U.S. at 232 (opinion of Stevens, J., with one justice joining) (some internal citations omitted); *accord id.* at 240 (opinion of Breyer, J., with two justices joining).

Even if these statements are or might be dicta, this court is "obligated to respect it." *Henderson v. McMurray*, 987 F.3d 997, 1006 (11th Cir. 2021) (Pryor, C.J.); *see also Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006) ("[T]here is dicta and then there is dicta, and then there is Supreme Court dicta.").

Moreover, as the Supreme Court reasoned in *Allen v. Milligan*, 599 U.S. 1, 39 (2023), "statutory *stare decisis* counsels our staying the course." "Congress is undoubtedly aware of [the Court] construing § 2 to apply to districting challenges." *Id.* Some of those challenges—including the challenge in *Allen*—were brought by private parties. *See id.* at 16. "[S]*tare decisis* carries enhanced force when a decision . . . interprets a statute . . . [because] unlike in a constitutional case, critics of our ruling can take their objections across the street, and Congress can correct any mistake it sees." *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 456 (2015). Because "Congress has spurned multiple opportunities to reverse" the Supreme Court's and lower courts' treatment of private-party-plaintiff Section Two actions, the Supreme Court itself would require "a superspecial justification to warrant revers[al]." *Id.* at 456, 58. No superspecial justification exists here.

The defendants' motion to dismiss the plaintiffs' complaint on the ground that Section Two does not provide a private right of action is **DENIED**.

### B. The Plaintiffs' Section Two Claim

Next, the Secretary and Legislators argue that the plaintiffs fail to state a Section Two claim. According to the Secretary, the "[p]laintiffs must allege facts plausibly showing that members of a minority group 'have less opportunity than other members of the electorate [1] to participate in the political process *and* [2] to elect representatives of their choice.'" Doc. 131 at 31 (quoting 52 U.S.C. § 10301(b)) (cleaned up). The Secretary argues that the "[p]laintiffs have proven neither." *Id.* at 32. The Legislators share this view. *See* Doc. 130 at 20–29.

The plaintiffs respond that these arguments "depend on two faulty premises." Doc. 138 at 39. First, the "[d]efendants' arguments as to both equal opportunity to participate in the political process and to elect candidates of choice ignore the correct standard for evaluating pleadings on motions to dismiss for failure to state a claim." *Id.* at 40. Second, "Alabama's substantive arguments are again 'not about the law as it exists' but rather 'about Alabama's attempt to remake . . . § 2 jurisprudence anew.'" *Id.* (quoting *Allen*, 599 U.S. at 23).

"To succeed in proving a § 2 violation under *Gingles*, plaintiffs must satisfy three 'preconditions.'" *Allen*, 599 U.S. at 18 (quoting *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986)). "First, the 'minority group must be sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district.'" *Id.* (quoting *Wis. Legislature v. Wis. Elections Comm'n*, 595 U.S. 398, 402

(2022)). "Second, the minority group must be able to show that it is politically cohesive." *Id.* (quoting *Gingles*, 478 U.S. at 51). "And third, 'the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate.'" *Id.* (quoting *Gingles*, 478 U.S. at 51).

Plaintiffs who satisfy the three *Gingles* preconditions "must also show, under the 'totality of circumstances,' that the political process is not 'equally open' to minority voters." *Id.* (quoting *Gingles*, 478 U.S. at 45–46). Courts rely on the following factors (the "Senate Factors") to evaluate the totality of circumstances:

> 1. "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process";
>
> 2. "the extent to which voting in the elections of the state or political subdivision is racially polarized";
>
> 3. "the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group";
>
> 4. "if there is a candidate slating process, whether the members of the minority group have been denied access to that process";
>
> 5. "the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process";

6. "whether political campaigns have been characterized by overt or subtle racial appeals";

7. "the extent to which members of the minority group have been elected to public office in the jurisdiction";

8. "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group"; and

9. "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous."

*Singleton*, 582 F. Supp. 3d at 969–70 (quoting *Gingles*, 478 U.S. at 36–37 (quoting in turn S. Rep. No. 97-417 at 28–29)).

The plaintiffs plead sufficient facts to clear the plausibility bar. The plaintiffs allege that Black voters are sufficiently large and geographically compact to form a reasonably configured majority in a district in the Montgomery and Huntsville areas. *See* Doc. 126 ¶¶ 3, 4, 79, 172. The plaintiffs allege that Black voters are politically cohesive. *See id.* ¶¶ 3, 4, 97, 99. And the plaintiffs allege that the white majority votes sufficiently as a bloc to typically defeat the candidates preferred by Black voters. *See id.* ¶¶ 3, 4, 96, 97, 99, 171. The plaintiffs also plead factual allegations about the Senate Factors to assert that the political process in Alabama is not equally open to Black voters. *See id.* ¶¶ 104–67.

Accordingly, the defendants' motion to dismiss the plaintiffs' operative complaint for failure to state a claim is **DENIED**.

23

### C. Legislative Immunity

The Legislators argue that the claims against them must be dismissed because they are absolutely immune from suit. Doc. 130 at 8. The Legislators contend that Representative Pringle has legislative immunity because the plaintiffs' operative complaint "challenges no House Districts" and he "played only a ministerial role as House Chair . . . in passage of the challenged Senate districts." *Id.* at 9. The Legislators further argue that Representative Pringle's actions "were inherently legislative, [and] he has absolute legislative immunity." *Id.* at 10.

Representative Pringle "acknowledge[s] that at the May 20, 2022 status conference, in response to a question from the Court, counsel for the Chairs indicated that Rep. Pringle and Sen. McClendon 'have obviously waived their [legislative] immunity.'" *Id.* (footnote omitted) (quoting Doc. 115-1 at 19, Tr. 18:8–9). That statement "accurately reflected Rep[resentative] Pringle's intent at the time," but his intention changed after the case was "stayed for over a year." *Id.* Representative Pringle also asserts that because legislative immunity is a personal defense, it "can be waived only by the legislator himself or herself." *Id.* at 11.

Senator Livingston points out that "[a]t the time of the May 20, 2022 status conference, [he] was not Senate Chair of the Committee, was not a party to this case, and was not represented by the Committee's counsel." *Id.* Since he became Senate

Chair, "he has not engaged in litigation other than to seek dismissal of this case and assert immunity." *Id.*

The plaintiffs respond that the Legislators have implicitly waived immunity by "willingly and actively engag[ing] in the litigation." Doc. 138 at 48, 50. The plaintiffs argue that the Legislators "filed their own Answer to Plaintiffs' original Complaint [Doc. 53], and joined Defendants' Opposition to Plaintiffs' Motion for Recusal [Doc. 45] and Defendants' Response to Plaintiffs' Motion to Modify Stay [Doc. 73]." *Id.* at 50. According to the plaintiffs, the Legislators took these actions without giving the "slightest indication that they were participating in the litigation for the limited purpose of asserting legislative immunity." *Id.* (quoting *Singleton v. Merrill*, 576 F. Supp. 3d 931, 941 (N.D. Ala. 2021)).

The plaintiffs further contend that the Legislators explicitly waived immunity during the May 20, 2022 status conference. *Id.* They argue that the Legislators "cite no relevant authority that a party can conditionally waive legislative immunity (without asserting any conditions), then later revoke this waiver upon a 'change of intent.'" *Id.* at 51. They also contend that the Legislators "cannot revive previously waived legislative immunity simply by appointing a new member as chair" because such an allowance "would permit a committee chair to engage in substantial litigation on behalf of their committee, then on the eve of trial, appoint a new chair to claim legislative immunity as a shield." *Id.* at 53.

The Legislators reply that courts cannot impute waiver due to the mere passage of time during litigation, that they have not engaged in "extensive litigation conduct," and that counsel's statements during the May 20, 2022 status conference did not constitute a waiver. Doc. 140 at 3–4 (quoting *Singleton*, 576 F. Supp. 3d at 931).

Legislative immunity is a "personal defense." *Scott v. Taylor*, 405 F.3d 1251, 1255 (11th Cir. 2005). "Although the Supreme Court has not directly decided the question whether legislative immunity can be waived in a civil action, federal jurisprudence reflects no doubt that it can." *Singleton*, 576 F. Supp. 3d at 940 (footnote omitted) (collecting cases). And in a criminal case, the Supreme Court held a legislator's waiver of legislative immunity would require an "explicit and unequivocal renunciation of the protection." *United States v. Helstoski*, 442 U.S. 477, 491 (1979).

Through his counsel, Representative Pringle "explicit[ly] and unequivocal[ly]" renounced the protection of immunity. *See id.* His counsel's unqualified statement that "the chairs have obviously waived their immunity" neither hinted nor equivocated on the point. Doc. 115-1 at 19, Tr. 18:8–9.

And a separate and independent waiver occurred when Representative Pringle participated in the litigation. Representative Pringle answered the plaintiffs' complaint, joined an opposition to the plaintiffs' motion to recuse another judge, and

joined a response to the plaintiffs' motion to modify the stay in this case. In each of those filings, Representative Pringle did not give the "slightest indication that [he was] participating in the litigation for the limited purpose of asserting legislative immunity." *Singleton*, 576 F. Supp. 3d at 941. If the court were now to allow Representative Pringle to claim immunity, it would "turn what has heretofore been the shield of legislative immunity into a sword." *Powell v. Ridge*, 247 F.3d 520, 525 (3d Cir. 2001).

The immunity analysis is different for Senator Livingston. Senator Livingston was not involved in this litigation during the litigation conduct that waived Representative Pringle's immunity, nor when Representative Pringle's counsel explicitly waived his immunity. Because legislative immunity is a personal defense, the court will not impute either of those waivers to Senator Livingston. *See Scott*, 405 F.3d at 1255. Senator Livingston's only participation in this case has been to file a motion to dismiss, which is based in part on his assertion of legislative immunity, and a reply brief on the same grounds. *See* Docs. 130, 140.

Under controlling precedent, when absolute legislative immunity applies, the court must dismiss a defendant who seeks dismissal on that ground. *See Scott*, 405 F.3d at 1252. Therefore, Senator Livingston's motion to dismiss the claims brought against him on the basis of legislative immunity is **GRANTED**. Representative Pringle's motion to dismiss on the basis of legislative immunity is **DENIED**.

27

### D. Standing

Finally, the Legislators argue that the plaintiffs lack standing. Doc. 130 at 5. The Legislators cite a concurring opinion for the proposition that, "in a suit against state officials for injunctive relief, a plaintiff does not have Article III standing with respect to those officials who are powerless to remedy the alleged injury." *Id.* (quoting *Scott*, 405 F. 3d at 1259) (Jordan, J. concurring) (emphasis omitted). The Legislators contend that they cannot provide the relief that the plaintiffs seek: "[t]hey cannot declare SB1 in violation of the Voting Rights Act; they have no authority to administer elections; they cannot cause the Legislature to enact new Senate districts, and they cannot make preclearance submissions." *Id.* at 5–6 (footnote omitted).

The plaintiffs respond that the Legislators "direct the very Committee responsible for overseeing the redistricting process, which, in 2021, resulted in the enactment of SB1—the original source of Plaintiffs' injuries." Doc. 138 at 53–54. They contend that their "injuries are directly traceable to the [Legislators]' conduct in constructing and adopting the State Senate districts that violate Plaintiffs' rights under the [Voting Rights Act]." *Id.* at 55. And the plaintiffs argue that the Legislators' position "that they 'cannot provide any relief sought by Plaintiffs' directly contradicts the position they asserted less than two years ago in their motion to intervene in *Caster v. Allen*, 2:21-CV-1536-AMM (N.D. Ala. Dec. 20, 2021), [Doc. 60]." *Id.* at 56.

On reply, the Legislators concede that they "have a relationship to the subject-matter of this lawsuit," but assert that "they are simply the wrong defendants to grant [p]laintiffs the relief that they seek." Doc. 140 at 15. Because they cannot provide redress to the plaintiffs' alleged injuries, the Legislators contend that the plaintiffs lack standing to sue them. *Id.*

The plaintiffs have standing to sue the Legislators. The Legislators' standing argument is based on a concurring opinion, not controlling precedent. And under controlling precedent—namely, the Supreme Court's test for standing laid out in *Lujan v. Defenders of Wildlife*. 504 U.S. 555 (1992)—the plaintiffs have standing. *Lujan* provides a three-part standing test. *See id.* at 560–61. To establish standing, a plaintiff first "must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560 (cleaned up). The Legislators do not contend that the plaintiffs do not satisfy this requirement.

The second part of the standing analysis asks whether there exists "a causal connection between the injury and the conduct complained of." *Id.* The plaintiff's injury must be traceable to the defendant's actions "and not . . . th[e] result [of] the independent action of some third party not before the court." *Id.* (quoting *Simon v. E. Ky. Welfare Rights Org.,* 426 U.S. 26, 41–42 (1976)). The plaintiffs' injury in this case—allegedly unlawful voting maps—were the result of the Legislators' alleged

actions—"constructing and adopting the State Senate districts that violate plaintiffs' rights under the [Voting Rights Act]." Doc. 138 at 55. The plaintiffs' alleged injury is therefore traceable to the Legislators' conduct.

The third and final part of the standing analysis is redressability. "[I]t must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 561 (quoting *Simon*, 426 U.S. at 38, 43). In this litigation, there is a clear path to redress involving the Legislators if the court were to rule for the plaintiffs. Their requested relief would "requir[e] the enactment of [Voting Rights Act]-compliant districting plans for the State Senate." Doc. 138 at 58. Under Supreme Court precedent, if the plaintiffs were to prevail, "the Alabama Legislature . . . should have the first opportunity to draw that plan." *Singleton*, 582 F. Supp. 3d at 936 (citing *North Carolina v. Covington*, 138 S. Ct. 2548, 2554 (2018)). The Legislators are Chairs of the Alabama Legislature's Permanent Legislative Committee on Reapportionment, which has statutory authority to "engage in such activities as it deems necessary for the preparation and formulation of a reapportionment plan . . . and readjustment or alteration of Senate and House districts and of congressional districts of the state." Ala. Code § 29-2-52(c). Additionally, that committee has statutory authority to "receive from any court . . . such assistance and data as will enable it to properly carry out its powers and duties hereunder." Ala. Code § 29-2-52(h).

Therefore, the Legislators' motion to dismiss on the grounds that the plaintiffs lack standing is **DENIED**.

## IV.    CONCLUSION

The Secretary's motion to dismiss is **DENIED**. The Legislators' motion to dismiss is **DENIED** in all respects except that the motion to dismiss all claims against Senator Livingston is **GRANTED**.

The previously filed motions to dismiss, Docs. 58, 92, 93, are **DENIED as MOOT**.

This case is **SET** for a bench trial to commence at 9:00 a.m. Central time on November 12, 2024 in Courtroom 8B of the Hugo Black U.S. Courthouse in Birmingham, Alabama. The parties are **ORDERED** to meet and confer and submit a joint proposed scheduling order for pretrial deadlines within fourteen days of the date of this order.

**DONE** and **ORDERED** this 13th day of February, 2024.



**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE