FILED
2024 Jun-20  PM 05:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 13

Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION


CASE NO. 2:21-Cv-1531-AMM


KHADIDAH STONE, et al.,

              Plaintiff,

vs.

WES ALLEN, et al.,

              Defendants.




     REMOTE DEPOSITION OF ANTHONY FAIRFAX


                 May 6, 2024



REPORTED BY:  Laura H. Nichols
                 Certified Realtime Reporter,
                 Registered Professional
                 Reporter and Notary Public

Page 2

1     A P P E A R A N C E S

2

3   FOR THE PLAINTIFFS:

4       Mr. Jack Genberg

5       Mr Jess Unger

6       Attorneys at Law

7       Southern Poverty Law Center

8       P.O. Box 1287

9       Decatur, Georgia 30031

10       (404) 521-6700

11       jack.genberg@splcenter.org

12       jess.unger@splcenter.org

13   -and-

14       Ms. Brittany Carter

15       Attorney at Law

16       Legal Defense Fund

17       40 Rector Street, 5th Floor

18       New York, New York 10006

19       (646) 761-0596

20       bcarter@naacpldf.org

21

22

23

Page 3

1       A P P E A R A N C E S (Continuing)

2

3   FOR THE DEFENDANT, SECRETARY OF STATE

4   WESLEY HARRISON ALLEN

5       Mr. Edmund G. LaCour Jr.

6       Ms. Misty S. Fairbanks Messick

7       Mr. Benjamin M. Seiss

8       Mr. Brenton M. Smith

9       Ms. Soren Geiger

10       Mr. Richard Mink

11       Attorneys at Law

12       Office of the Attorney General

13       State of Alabama

14       501 Washington Avenue

15       P.O. Box 300152

16       Montgomery, Alabama 36130-0152

17       (334) 242-7300

18       edmund.lacour@alabamaag.gov

19       misty.messick@alabamaag.gov

20       ben.seiss@alabamaag.gov

21       brenton.smith@alabamaag.gov

22       soren.geiger@alabamaag.gov

23       richard.mink@alabamaag.gov

Page 4

1       A P P E A R A N C E S (Continuing)

2

3   FOR THE DEFENDANTS, STEVE LIVINGSTON AND

4   CHRIS PRINGLE, IN THEIR OFFICIAL CAPACITIES AS

5   CO-CHAIRS OF THE ALABAMA PERMANENT LEGISLATIVE

6   COMMITTEE ON REAPPORTIONMENT:

7       Mr. Dorman Walker

8       Attorney at Law

9       Balch & Bingham

10       455 Dexter Avenue, Suite 8000

11       P.O. Box 78

12       Montgomery, Alabama 36104 (36101-0078)

13       (334) 834-6500

14       dwalker@balch.com

15   -and-

16       Mr. Michael Taunton

17       Attorney at Law

18       Balch & Bingham

19       1901 Sixth Avenue North

20       Suite 1500

21       Birmingham, Alabama 35203-4642

22       (205) 251-8100

23       mtaunton@balch.com

Page 5

1       A P P E A R A N C E S (Continuing)

2

3   FOR THE DEPONENT:

4       Mr. Jacob Van Leer

5       Attorney at Law

6       American Civil Liberties Union

7       915 15th Street Northwest

8       Washington, DC 20005

9       (202) 675-2330

10       jvanleer@aclu.org

11   -and-

12       Mr. Davin Rosborough

13       Attorney at Law

14       American Civil Liberties Union

15       125 Broad Street

16       New York, New York 10004

17       (703) 380-0804

18       drosborough@aclu.org

19

20

21

22

23

2 (Pages 2 - 5)

Page 6

INDEX OF EXAMINATION

Page:

EXAMINATION BY MR. LACOUR                10
EXAMINATION BY MR. VAN LEER             215
REEXAMINATION BY MR. LACOUR             219

INDEX OF EXHIBITS

Page:

Exhibit 1                11
    Defendants' Notice of Deposition
of Anthony E. Fairfax
Exhibit 2                13
    Expert Report of Anthony E.
Fairfax on the Development of an
Illustrative Plan for State Senate
Districts for the State of Alabama in
Stone v. Allen, No. 2:21-cv-01531
(N.D. Ala.), February 2, 2024
Exhibit 3                22
    Volume III, Preliminary
Injunction Hearing Transcript, 2/5/22

Page 7

Exhibit 4                27
    Expert Report of Anthony E.
Fairfax on Racial Gerrymandering
Analysis of the Jefferson County,
Alabama Commissioner Districts, March
15, 2024
Exhibit 5                45
    Appendix A, Resume of Anthony E.
Fairfax
Exhibit 6                53
    Report of Anthony Fairfax on
Population Deviation, Compactness,
and Partisan Analysis of Wake County,
North Carolina Board of County
Commissioners and School Board
District Plans, November 2, 2015
Exhibit 7                57
    Alabama SD Illustrative Plan,
Alabama State Senate Population
Summary, Friday, January 19, 2024
Exhibit 8                103
    Colored Map, McClendon Senate
Plan 1

Page 8

INDEX OF EXHIBITS (Continuing)

Page:

Exhibit 9                134
    City of Decatur with Pop & VAP
by Race
Exhibit 10               165
    The Dwelling Place Precinct,
Split SD7 in Orange; SD9 in Yellow
Exhibit 11               182
    Amended Rebuttal Expert Report
of Anthony E. Fairfax, Stone v.
Allen, No. 2:21-cv-01531 (N.D. Ala.),
April 30, 2024
Exhibit 12               202
    United States Census Bureau,
Explanation of Symbols
Exhibit 13               208
    Third Amended Complaint

Page 9

S T I P U L A T I O N

IT IS STIPULATED AND AGREED, by
and between the parties, through their
respective counsel, that the deposition of
ANTHONY FAIRFAX may be taken before Laura H.
Nichols, Commissioner, Certified Realtime
Reporter, Registered Professional Reporter and
Notary Public;

That it shall not be necessary for
any objections to be made by counsel to any
questions, except as to form or leading
questions, and that counsel for the parties may
make objections and assign grounds at the time
of trial, or at the time said deposition is
offered in evidence, or prior thereto.

1      I, Laura H. Nichols, a Certified
2  Realtime Reporter and Registered Professional
3  Reporter of Birmingham, Alabama, and a Notary
4  Public for the State of Alabama at Large,
5  acting as Commissioner, certify that on this
6  date, as provided by the Federal Rules of Civil
7  Procedure of the United States District Court,
8  and the foregoing stipulation of counsel, there
9  came before me remotely via Zoom, on May 6,
10  2024, commencing at 10:11 a.m. EDT, ANTHONY
11  FAIRFAX, witness in the above cause, for oral
12  examination, whereupon the following
13  proceedings were had:
14
15         ANTHONY FAIRFAX,
16  being first duly sworn, was examined and
17  testified as follows:
18
19  EXAMINATION BY MR. LACOUR:
20      Q.   Sir, would you please state your
21  name for the record?
22      A.   Anthony Edward Fairfax.
23      Q.   Thank you for being with us here

1  this morning.  My name is Edmond LaCour.  I
2  represent the Alabama Secretary of State, a
3  defendant in a case styled Stone v. Wes Allen.
4      Have you ever been deposed before,
5  Mr. Fairfax?
6      A.   Yes, I have.
7      Q.   About how many times?
8      A.   Approximately ten times, maybe a
9  little more.
10      Q.   Okay.  So you will appreciate,
11  then, I will have some questions for you today.
12  If at any time you don't understand my
13  questions, will you please let me know?
14      A.   Yes, I will.
15      Q.   Great.  And if you need a break,
16  will you please let me know?
17      A.   Yes.
18      Q.   Great.  You are here on a notice
19  of deposition.  I am going to go ahead and mark
20  the document as Exhibit 1 and share that.
21      (Exhibit 1 was marked for
22       identification.)
23      Q.   (BY MR. LACOUR:)  All right.  Is

1  the deposition notice showing up for you,
2  Mr. Fairfax?
3      A.   Not yet.
4      Q.   Okay.  Let me --
5      (Off-the-record discussion.)
6      Q.   (BY MR. LACOUR:)  How about now?
7      A.   Not yet.
8      Q.   All right.
9      A.   Something just popped up.  It is
10  very tiny.
11      Q.   Is this better?
12      A.   Yes.
13      Q.   Okay.  This is good practice.  So
14  does this look like the notice of deposition
15  that you received?
16      A.   Yes, it does.
17      Q.   All right.  Thank you.  All right.
18  And you have been hired as an expert by the
19  plaintiffs in this case, correct?
20      A.   That is correct.
21      Q.   And you have submitted, I believe
22  it is four reports in this case now; is that
23  correct?

1      A.   I believe so.
2      (Exhibit 2 was marked for
3       identification.)
4      Q.   (BY MR. LACOUR:)  Okay.  So for
5  Exhibit 2 I am going to pull up your -- does
6  this look like --
7      MR. VAN LEER:  Counsel, they are
8  showing up really small on the screen.  Is
9  there a way to get them to zoom in a little?
10  That might be a bit better.
11      MR. LACOUR:  Is this better?
12      MR. VAN LEER:  Maybe this is our
13  setting.  We just need to change our setting.
14  You are fine.
15      Q.   (BY MR. LACOUR:)  Mr. Fairfax,
16  does this look like a copy of the report that
17  you submitted to the Court on February 2nd,
18  2024, in this case?
19      A.   Yes, it does.  It looks like the
20  cover page, yes.
21      Q.   All right.  Let's start on Page 4.
22  You state that you were retained by counsel
23  representing the plaintiffs in this lawsuit to

Page 14

1 analyze and determine whether it is possible to
2 draw a reasonably configured illustrative plan
3 that adheres to traditional redistricting
4 criteria and satisfies the first precondition
5 of Thornburg v. Gingles 1 for Alabama State
6 Senate districts and, if so, to produce such a
7 plan, correct?
8     A.   Yes, that is correct.
9     Q.   And have you been hired by other
10 plaintiffs to conduct any similar analyses in
11 other Section 2 cases?
12     A.   Yes, I have.
13     Q.   All right.  About how many in such
14 cases?
15     A.   I can count probably off the top
16 of my head maybe four, maybe five.
17     Q.   Okay.  In any of those cases, did
18 you ever conclude that a reasonably configured
19 illustrative plan that adheres to traditional
20 redistricting criteria and satisfies the first
21 Gingles precondition could not be drawn?
22     A.   Not in litigation.  I have been
23 contracted to determine prior to litigation,

Page 15

1 and I have told the client that it couldn't be
2 done.
3     Q.   Okay.  Do you know about how many
4 times that has happened without revealing
5 client confidences?
6     A.   I know at least of one case that I
7 recall.  There might have been a second one,
8 but I know of at least one case or potential
9 case, let's say.
10     Q.   And was that because there just
11 was not enough minority population to make up a
12 majority in a district at all?
13     A.   I believe it was because, in my
14 estimation, the district that could be created
15 was too irregularly shaped, let me say,
16 noncompact, if you will.
17     Q.   So you emphasize in the paragraph
18 we read a second ago adherence to traditional
19 redistricting criteria.  Which criteria are
20 important to adhere to when you are drawing an
21 illustrative plan?
22     A.   Which particular criteria?
23     Q.   Yes.  For Gingles 1 purposes.

Page 16

1     A.   For Gingles, the two components or
2 the one criteria is geographically compact.
3 There's another component that looks at
4 sufficiently large.  But then the assumption is
5 that you use the traditional redistricting
6 criteria for -- that the jurisdiction uses.
7         I mean the assumption is that you
8 can -- that you utilize whatever criteria that
9 that jurisdiction has passed unless it violates
10 the Voting Rights Act.
11     Q.   When would criteria violate the
12 Voting Rights Act?
13     A.   There could be scenarios, for
14 example, if a jurisdiction passes, let's say,
15 for a Congressional plan that you have to
16 utilize whole counties to create congressional
17 districts.  And in that estimation, I think
18 that the Courts potentially would find that
19 that violates.  There's no way that potentially
20 you could create a majority-minority district
21 using whole counties, so that is just an
22 example.
23     Q.   So if the racial goal of creating

Page 17

1 an additional majority-minority district
2 conflicts with the traditional districting
3 principle of keeping counties together, then
4 the Voting Rights Act requires the traditional
5 districting criteria of keeping counties
6 together to yield?  Is that your view?
7         MR. VAN LEER:  Object to form.
8     Q.   (BY MR. LACOUR:)  You may answer
9 the question.
10     A.   What I am -- again, I am not an
11 attorney.  Let me say that up front.  But in my
12 estimation, if the criteria works against the
13 Voting Rights Act, then you would not be
14 compelled or forced to utilize that criteria.
15 Again, this comes from a map drawer's
16 perspective, not from a legal perspective.
17     Q.   Okay.  And when you say "works
18 against the Voting Rights Act," do you mean
19 stands in the way of drawing an additional
20 majority-minority district?
21     A.   Not necessarily stands in the way.
22 Maybe doesn't allow it to occur.  The example
23 that I gave, which was using whole counties to

5 (Pages 14 - 17)

1 create congressional districts, it may be
2 impossible.  That is what I believe would void
3 it.  Whether you have one example that could
4 occur, that may be allowable if there was one
5 example that could be created, but it may not.
6 So again, I am speaking from a map drawer's
7 perspective.
8       Q.   So what if one person/one vote is
9 the traditional districting criteria that makes
10 it difficult or impossible to draw an
11 additional majority-minority district, should
12 the Voting Rights Act -- or does the Voting
13 Rights Act, rather, require that particular
14 principle to give way so that a
15 minority-majority district can be drawn?
16       MR. VAN LEER:  Object to form
17 again.  You can answer.
18       A.   I think it depends.  I think in a
19 normal situation, that equal population of the
20 one person/one vote requirement is exceeded.
21 For example, in Hawaii, you have hundreds of
22 people in congressional districts as far as the
23 population deviation.  So if that coincided

1 with creating a minority-minority district,
2 then, of course, that would be allowable as
3 well.
4       Q.   (BY MR. LACOUR:)  Okay.  And what
5 if a district is not -- scratch that.
6       What if in order to draw an
7 additional majority-minority district you have
8 to sacrifice compactness, would that still be a
9 reasonably configured district?
10       A.   There are, I would say, limits
11 placed upon compactness.  It is one of the
12 components of that first precondition of
13 Gingles.  And so there is a limit placed on
14 that.
15       Q.   When you say "a limit placed on
16 compactness," do you mean compactness places a
17 limit on how far a map drawer can go before his
18 district is no longer reasonably configured?
19       A.   Yes.  I mean that since
20 compactness is one of the components of the
21 test, of the Gingles test, and it is looking at
22 trying to have a reasonably compact district,
23 if you go below that reasonably compact

1 district, then, of course, that would be some
2 type of violation or that would not satisfy the
3 Gingles test, let me say.
4       Q.   Is there a certain compactness
5 metric you think a plan must be above to be
6 reasonably configured?
7       A.   A particular measure are you
8 speaking of or what?
9       Q.   Sure.
10       A.   So you are talking about a
11 particular -- no, there are different measures
12 that have been created.  And the industry seems
13 to be moving and sort of centering around two
14 measures, and that is Reock and Polsby-Popper.
15 And so usually I utilize those.
16       Q.   Okay.  But there's no
17 Polsby-Popper score below which you cannot go
18 and still have a reasonably configured
19 district?
20       A.   It depends on -- compactness
21 changes from jurisdiction to jurisdiction
22 because of different, you know, voting
23 districts or precinct shapes and the shape of

1 the state and the shape of the counties and
2 whether there's water there, a variety of
3 factors.  So you can't come up with a single
4 number, a numerical number to shoot for.
5       Q.   Have you ever advised legislatures
6 or other local governments regarding how to
7 comply with Section 2?
8       A.   I -- when I was districting master
9 for Everett, Washington, the city of Everett,
10 Washington, of course, I gave them some
11 guidance on that.  Throughout the course of my,
12 you know, redistricting career, I, of course,
13 have provided advice of, you know, how to avoid
14 a violation, speaking to legislators and, you
15 know, members of Congress, if you will.
16       Q.   In Everett, what sort of measures
17 did you provide them so they could know whether
18 it was possible to draw a reasonably configured
19 plan with a certain amount of majority-minority
20 districts?
21       A.   Could you repeat that?
22       Q.   Yes.  When you were working with
23 Everett, were there any majority-minority

Page 22

1  districts that you thought were required to be
2  drawn to comply with the Voting Rights Act?
3       A.   No.
4       Q.   Okay.  Switching gears a little,
5  did you testify in the Eastern District of
6  Arkansas in 2022 in a case captioned "Arkansas
7  State Conference of the NAACP versus The
8  Arkansas Board of Apportionment"?
9       A.   Yes.
10           (Exhibit 3 was marked for
11           identification.)
12           MR. LACOUR:  I am going to
13  introduce Exhibit 3, which is Volume 3 of the
14  preliminary injunction hearing transcript in
15  that case.  I believe that occurred on
16  February 5th, 2022.  Let me try to --
17       Q.   (BY MR. LACOUR:)  Does this appear
18  to be the transcript from that proceeding?
19       A.   I believe so.
20           MR. VAN LEER:  Counsel, I am sorry
21  to interject here.  We are still having trouble
22  on our screen getting the visual of it.  Would
23  you mind just emailing a copy to us when you

Page 23

1  introduce the exhibits so we can pull them up
2  separately?  Thank you.  I'm sorry about that.
3           MR. LACOUR:  Not a problem at all.
4           (Off-the-record discussion.)
5       Q.   (BY MR. LACOUR:)  I am going to
6  scroll to Page 497.  Can you read that,
7  Mr. Fairfax, or can you make that out on your
8  screen?
9       A.   Yes, I believe so.  It is tiny,
10  but I think I can make it out.
11      Q.   Okay.  I will read down from
12  Lines 2 to 17:
13           Question:  It is okay, but when
14  you are doing work in those three decades of
15  work and when you look at your resume, you have
16  got pages and pages of work for organizations
17  such as the NAACP or the ACLU; is that fair?
18           Answer:  That's correct.
19           Question:  And when you are doing
20  work for organizations such as that, are you
21  looking for ways to find ways to draw more
22  majority-minority districts, for the most part?
23           Answer:  Again, I don't know if I

Page 24

1  can characterize it like I'm looking for
2  majority-minority districts.  I look at it as
3  I'm looking at the jurisdiction and trying to
4  develop a plan that's fair for that
5  jurisdiction.  So I don't necessarily seek out.
6  You know, occasionally there is some analysis
7  that you do where you're intentionally looking
8  at majority-minority.  But when you are, you
9  know, doing a plan, you may submit to something
10  that is more in line with developing a fair
11  plan.
12           Did I read that accurately, sir?
13      A.   Yes.
14      Q.   And do you stand by the testimony
15  that you see a role in developing an
16  illustrative plan as developing a fair plan?
17           MR. VAN LEER:  Object to form.
18      Q.   (BY MR. LACOUR:)  You can answer
19  the question.
20      A.   Yes.  Yes, I do.
21      Q.   What in your view makes an
22  illustrative plan fair?
23      A.   A fair plan covers a variety of

Page 25

1  aspects.  In the case of majority-minority
2  districts, it is a fair plan that doesn't
3  dilute minority voting strength in particular
4  if I am looking at additional majority-minority
5  districts.
6       Q.   And how can you tell if the map is
7  diluting majority-minority voting strength?
8       A.   Well, you know, one of the ways is
9  that you look at whether the district cracks or
10  packs the minority population and they are
11  either not creating districts where minorities
12  can elect candidates of choice, meaning that
13  there are additional districts where minorities
14  can elect candidates of choice.  And I think
15  that is probably the primary way in the context
16  of what I am talking here.
17      Q.   So anytime an additional district
18  could be created in which minorities can elect
19  their candidate of choice and it is not
20  created, that would constitute vote dilution?
21           MR. VAN LEER:  Object to form.
22      A.   You know, there are other tests.
23  I am looking at only that Gingles 1, but then

7 (Pages 22 - 25)

1 there's second and third tests and the totality
2 of circumstances. I don't handle that. That
3 is not what I do. But collectively you look at
4 all those things.
5    Q.   (BY MR. LACOUR:  Okay.  If a plan
6 is super proportional for a minority group,
7 would that constitute a fair plan?
8        MR. VAN LEER:  Object to form.
9    A.   It may or may not.  It depends.
10    Q.   (BY MR. LACOUR:  So when you drew
11 your illustrative plans in this case, did you
12 start with the enacted plan and then make
13 changes going from there?
14    A.   Yes.  In most cases I would start
15 with the previously enacted plan.  But in this
16 particular case, the focal point was the -- one
17 of the objectives was not to disturb as many
18 other districts as possible.  So in order to do
19 that, I started with the enacted plan.
20    Q.   Thank you.  Have you submitted an
21 expert report in the ongoing cases in the
22 Northern District of Alabama captioned
23 "McClure v. Jefferson County Commission" and

1 "Addoh-Kondi v. Jefferson County Commission"?
2    A.   Yes.
3        (Exhibit 4 was marked for
4        identification.)
5        MR. LACOUR:  Exhibit 4 I am about
6 to email around and then share a copy of that
7 report.
8    Q.   (BY MR. LACOUR:)  Mr. Fairfax, can
9 you see on your screen a document titled
10 "Expert Report of Anthony E. Fairfax on Racial
11 Gerrymandering Analysis of the Jefferson
12 County, Alabama Commissioner Districts," dated
13 March 15th, 2024?
14    A.   Yes, I can.
15    Q.   Generally speaking, what expert
16 opinions did you offer the Court in those
17 cases?
18    A.   In this particular case, I offered
19 the opinion that the development or the planned
20 development for the commission districts was or
21 used race as a guiding factor for developing
22 the plan.
23    Q.   Do you see a difference between

1 being conscious of race and using race
2 predominantly as a map drawer?
3    A.   Yes.
4    Q.   And was it your opinion that in
5 Jefferson County, whoever drew the 2021 map had
6 used race predominantly?
7    A.   Yes.  They used race
8 predominantly, yes.
9    Q.   So in other words, they racially
10 gerrymandered?
11        MR. VAN LEER:  Objection to form.
12    A.   I don't want to make this a
13 semantic aspect, but by lack of a better words,
14 I would say yes.
15    Q.   (BY MR. LACOUR:)  Okay.  I am
16 going to turn to Pages 7 and then on to 8.  Can
17 you see Paragraph 15, Subparagraph A?
18    A.   Yes.  It is small, but I believe I
19 can read that.  Yes, much better.
20    Q.   Thank you.
21        (Off-the-record discussion.)
22    Q.   (BY MR. LACOUR:)  Mr. Fairfax,
23 could you read Paragraph 15?  Well, actually I

1 will read that because I will have to switch to
2 the next page when I get to the end of it.
3        Summary of Opinions, Paragraph 15:
4 A summary of my conclusions and opinions
5 includes the following:  Subsection a), the
6 shifting of population from the pre2020 to the
7 adopted 2021 plans is primarily due to race
8 predominating during plan development.
9        The shifting and segmenting of
10 population by race concentrates Black
11 population in order to maintain two districts
12 with significant Black population (Districts 1
13 and 2) and three districts with significant
14 White population (Districts 3, 4 and 5.)
15        Did I read that correctly?
16    A.   Yes.
17    Q.   Then the next paragraph:
18 District 1 with greater than seventy-eight
19 percent Black under the adopted 2021 plan kept
20 approximately the same or higher than the
21 pre2020 plan by adding significantly more Black
22 population than White population.
23        Meanwhile, Districts 3 and 4 with

Page 30

1  populations greater than thirty percent Black
2  in the pre2020 plan saw a decrease in Black
3  percentage and an increase in White percentage
4  under the adopted 2021 plan.
5       Did I read that correctly?
6     A.   Yes.
7     Q.   And do you stand by those views
8  today?
9     A.   Yes.
10    Q.   And it's your position that if a
11  map drawer adds significantly more Black
12  population to a district than White population,
13  that is evidence of racial gerrymandering?
14       MR. VAN LEER:  Object.  Calls for
15  a legal opinion.
16    A.   No.
17    Q.   (BY MR. LACOUR:)  Okay.  Why not?
18    A.    In this particular case that we
19  are looking at here -- it is a racial
20  gerrymandering case -- it wouldn't be analogous
21  to a case, for example, that we are doing,
22  which is Section 2 where you are creating two
23  new majority-minority districts.

Page 31

1       You know you have to add Black
2  population in those cases or you would not be
3  able to create new majority-minority districts
4  if you don't add Black population to the
5  districts.  So two different cases, two
6  different scenarios.
7     Q.   Okay.  So in a Section 2 case, if
8  you are drawing this new district that has to
9  have a certain amount of additional Black
10  population, do you get to draw by different
11  rules, essentially?  Do you get to use race
12  more than the map drawer who drew the Jefferson
13  County map?
14       MR. VAN LEER:  Objection to the
15  form.  You can answer.
16    A.   It is usually not viewed in that
17  particular manner.  It is viewed more from the
18  Black population is, let's say, previously
19  cracked and now you are uncracking that Black
20  population by including it within a particular
21  district, one or more districts.  So it is not
22  viewed in that manner that you are talking
23  about.

Page 32

1     Q.   (BY MR. LACOUR:)  So in a
2  gerrymandering case, what makes the use of race
3  predominant rather than merely race conscious?
4     A.   It is the forethought of race over
5  the other criteria.
6     Q.   So the forethought of race over
7  the other criteria?
8     A.   Yes, and the utilization of race
9  over the other criterias, the focus on race
10  dominating other criteria.
11    Q.   So you are raising --
12    A.   Where --
13    Q.   Sorry.  Go ahead.
14    A.   Where you raise race above the
15  other criteria that you are using.
16    Q.   So if you sacrifice compactness
17  for the purpose of moving certain people into a
18  district because of their race, that would be
19  race-predominant districting, a gerrymandering
20  case?
21    A.   I don't know if I would frame it
22  that way.  It is a balancing act that you are
23  trying to perform when you are drawing

Page 33

1  districts.  And so you are balancing the
2  criteria, but you are also considering the
3  race.
4       And in the context of Gingles,
5  that first precondition of Gingles, you are
6  looking to see if something is possible and so
7  is it possible to create this particular
8  district or new district using the traditional
9  redistricting criteria and balancing all of
10  those.  So it is not necessarily that you view
11  it as increasing or decreasing compactness in
12  order to increase race.  It is a balancing act,
13  if you will.
14    Q.   So in a gerrymandering case, a
15  county commission or a legislature can use race
16  as long as they are balancing things correctly?
17  Is that your view?
18    A.   No.  No.  Remember that we are
19  talking two different cases.  We are talking a
20  racial gerrymandering case and a Section 2
21  case.  We have already stated that in the
22  Section 2, you are going to have to add Black
23  population to a district.  That is just a

9 (Pages 30 - 33)

Page 34

1  given.
2      Q.   Uh-huh.
3      A.   I mean you are going to have to do
4  that.  In the racial gerrymandering case, the
5  question is whether you actually focused on
6  race and added population or kept population in
7  a packed manner, let's say, or a cracked manner
8  in -- that divided that population, two
9  different sort of scenarios.
10     Q.   Okay.  And so you might find
11  gerrymandering if there are additional county
12  splits, for example, along racial lines; is
13  that correct?
14         MR. VAN LEER:  Objection to the
15  form of the question.
16     A.   One of the things that you look
17  for when you are, I guess, performing a racial
18  gerrymandering analysis is a pattern.  And the
19  pattern won't be one, even maybe two of some
20  aspect.  It is a pattern that you show that
21  permeates through the plan development.
22         So one county split is not a
23  racially gerrymandered, in my opinion, plan --

Page 35

1  or may not be.  Let me say that.
2      Q.   (BY MR. LACOUR:)  Okay.  Now, if
3  you saw a pattern in a racial gerrymandering
4  case and concluded that there was a gerrymander
5  in that enacted plan and then you saw the same
6  pattern in an illustrative plan in a Section 2
7  case, would you also conclude that that
8  illustrative plan was racially gerrymandered?
9          MR. VAN LEER:  Objection to the
10  form of the question.
11     A.   No.  Not necessarily.  And the
12  reason why I say is that you have two different
13  scenarios.  Again, in one scenario, you may
14  have a district that has a low percentage of
15  Black population and that is because the
16  population is cracked.  And so you are adding
17  Black population in order to achieve that
18  Gingles 1 first precondition.
19         On the racial gerrymandering, you
20  may add population to a Black precinct or Black
21  district.  That is a different scenario than
22  the Section 2 where nothing may exist.  So you
23  have different scenarios, and you have to take

Page 36

1  each of these scenarios on its own
2  configuration or own situation.
3          So I don't think you can draw any
4  general rule of thumb, as you are trying to do.
5      Q.   (BY MR. LACOUR:)  It sounds like,
6  then, that the key difference between these two
7  different scenarios of the gerrymandering case
8  and the Section 2 case is whether or not
9  minority voters do better under the final map;
10  is that right?
11         MR. VAN LEER:  Objection -- sorry.
12  Objection to the form of the question.
13     A.   I think the umbrella of the Voting
14  Rights Act for you, know, Section 2 and racial
15  gerrymandering is that you don't -- that you
16  are fair and diluting or not racial
17  gerrymandering districts as a rule of thumb
18  overall.  So that scenario differs depending
19  upon what the situation is at hand.
20     Q.   (BY MR. LACOUR:)  Okay.  Thank
21  you.  Well, let's move on a few pages down in
22  the report.  Turn to Page 19, bottom of 19 and
23  onto 20.  This is the Jefferson County report.

Page 37

1  Sorry.  Actually, onto Page 19.  There we are.
2  All right.
3          Mr. Fairfax, can you see
4  Paragraph 44?
5      A.   Yes.
6      Q.   I will read it again or I will
7  read it for the first time.  Paragraph 44
8  begins:  Reviewing the pre2020 plan using the
9  2020 census data, the overall population
10  deviation is 18.44 percent (See Appendix C).
11         Thus, population shifts to the
12  pre2020 were necessary to bring the plan within
13  the plus or minus one percent maximum overall
14  deviation employed by the drafters and
15  constitutional compliance of ten percent,
16  albeit without race predominating.
17         Although the changes from the
18  pre2020 to the adopted 2021 plan were not
19  numerous, they were impactful (See Figure 1.)
20  In addition, lowering the pre2020 plan's
21  population deviation to an acceptable deviation
22  could have been achieved without race
23  predominating during the process.

10 (Pages 34 - 37)

1        Did I read that correctly?
2        A.   Yes.
3        Q.   And looking at Figure 1, that
4    reflects the changes to the Jefferson County
5    districts between 2020 and the 2021 plan,
6    correct?
7        A.   That is correct.
8        Q.   This reflects what you described
9    as impactful changes to the 2021 plan, correct?
10       A.   Geographically speaking, yes.
11       Q.   And you stand by that description,
12   correct?
13       A.   Yes.
14       Q.   We are going to turn to Page 23
15   now.
16       A.   Can I go back?
17       Q.   Absolutely.
18       A.   Yeah, I didn't mean geographically
19   speaking.  This reflects geographically
20   speaking, not the impact wasn't, geographically
21   speaking, large.  I want to make sure I -- the
22   map shows geographically speaking the impact,
23   but it doesn't show the demographic impact of

1    these.
2        Q.   Got it.  Thank you for clarifying
3    that.  If you look down to Page 49 or
4    Paragraph 49, rather, which discusses those
5    demographic impacts I believe that you were
6    just mentioning, I will read that into the
7    record:  The demographic shifts of
8    Districts 1, 3, 4 and the increase in White
9    percentage of District 5 are evidence of race
10   predominating during the redistricting process.
11       Do you stand by that statement
12   that you made earlier?
13       A.   Yes.
14       Q.   And then I believe it is Page 17
15   has those statistics.  Looking at Table 4, what
16   does that show?
17       A.   That is the commission population
18   for what I call the pre2020 plan -- that is the
19   prior plan -- for the commission districts in
20   Jefferson County.
21       Q.   Okay.  And then Table 5, what does
22   that show?  Can you see that?
23       A.   Yes.  That shows what was adopted

1    in 2021, same demographic categories.
2        Q.   Okay.  So then looking between
3    Table 4 and Table 5, District 1 goes from 78.30
4    percent, be that before 2020, to 78.27 percent
5    in the 2021 plan.
6        Did I read that correctly?
7        A.   Yes.
8        Q.   Is that a significant shift that
9    indicates race-predominant map drawing?
10       A.   The numbers don't change, but how
11   they got to those numbers is what is the
12   problem or the issue.
13       Q.   Okay.  Do you recall what it was
14   about how they got to those numbers that
15   created the problem?
16       A.   Yes.  In the majority of the plans
17   that altered, practically all of the precincts
18   or part of the precincts that they added to,
19   for example, 1, excuse me, were eighty percent
20   Black population.  I think there might have
21   been one that wasn't, if I am recalling from
22   memory.
23       And so they specifically added

1    those eighty percent VTDs in order to maintain
2    that seventy-eight percent Black population.
3    Or let me say that I am not going to describe
4    intent.  I am just going to say that is what
5    occurred.
6        Q.   Okay.  And that occurring is
7    evidence of race predominant districting?
8        A.   Yes.  When you have multiple VTDs
9    and you have significantly high majority Black
10   precincts that were added and you had
11   alternatives that could have been added, yes,
12   this is one part of the pattern that I was
13   talking about.
14       Q.   All right.  District 2, it goes
15   from 69.01 percent BVAP to 66.18 percent BVAP;
16   is that correct?
17       A.   Sixty-nine to sixty-six, yes.
18       Q.   And you view that shift as
19   significant evidence of race-predominant
20   districting as well; is that correct?
21       MR. VAN LEER:  Objection to the
22   form of the question.
23       A.   Again, it is part of it.  It

Page 42

1  wasn't as dominant as what occurred in
2  District 1, but there were aspects of picking
3  majority Black VTDs where other options could
4  have existed in order to maintain at least that
5  sixty-six percent.
6      Q.   (BY MR. LACOUR:)  Just generally
7  speaking, how much of an increase in Black
8  voting age population percentage is significant
9  when you are looking at a prior map versus an
10  enacted map for purposes of a racial
11  gerrymandering claim?
12      A.   There is not a specific number.
13  In this particular case, when you are looking
14  at, for example, eighty percent Black VTDs or
15  precincts where there were significantly many
16  that were not eighty percent, that is one of
17  the conditions.
18      In another scenario, that may not
19  exist.  And so you have to once again keep
20  everything in the context of the scenario that
21  you are dealing with, so you can't have a
22  certain percentage that you are looking at.
23      Q.   Okay.  This is hypothetical, but

Page 43

1  if one of the districts in the Jefferson County
2  map had shifted not just a few percentage
3  points in terms of Black voting age population
4  but had its Black voting age population double,
5  would that change represent a significant shift
6  as race predominating in the districting
7  process?
8      MR. VAN LEER:  Objection to the
9  form.
10      A.   It depends.  Again, once again it
11  depends.  A district could double from, say,
12  twenty-five to, you know, fifty percent, let's
13  say.  But that district now reflects, as I
14  mentioned before, a fairer plan, a plan that
15  doesn't dilute the voting strength of the
16  jurisdictions, minority population, Black
17  population in this case.  So that could be
18  something that is fair.
19      If, however, on the other hand,
20  you have a sixty some percent district and it
21  goes to eighty some percent or from sixty to
22  ninety percent, that may not be fair because
23  you are now packing individuals inside that

Page 44

1  particular district.  And so that wouldn't be
2  fair.  So again, you have to take it on a
3  case-by-case situation.
4      Q.   (BY MR. LACOUR:)  Okay.  Using
5  those two hypotheticals, one where the district
6  shifts from twenty-five to fifty percent and
7  the second where it shifts from sixty percent
8  to eighty percent, assume that the districts
9  are otherwise equal in terms of compactness,
10  counties, etcetera.  The only difference is
11  that one has moved to fifty percent and the
12  other has moved to eighty percent.
13      It is your view that one of those
14  is race-predominant districting and one of them
15  is not?
16      MR. VAN LEER:  Objection to the
17  form.
18      A.   It -- once again it depends.  Even
19  that district that is eighty percent may be in
20  certain scenarios justified to be eighty
21  percent.  And so some deeper analysis would
22  have to occur with that.  And then you would
23  look at whether -- if you are doing an

Page 45

1  analysis, you would look at whether options
2  were available.  So there are a variety of
3  factors you would consider.  So it is very
4  difficult to take a raw example like that and
5  come up with a general rule.
6      Q.   (BY MR. LACOUR:)  Almost ready for
7  a break.  I just have one or two more
8  questions.  Thank you for bearing with me.
9      (Exhibit 5 was marked for
10      identification.)
11      Q.   (BY MR. LACOUR:)  I am going to
12  send over Exhibit 5 now, which is the appendix
13  to your initial report.  It is fairly large, so
14  I hope it gets through.  Can you see the
15  appendix there, Mr. Fairfax?
16      A.   Yes, I can.
17      Q.   I want to look at some statistics
18  you had in here about Senate District 7.
19      A.   It is back to the normal --
20      Q.   Yes.
21      A.   -- small.
22      Q.   Sorry.  I am going to try to find
23  my way there.

12 (Pages 42 - 45)

1    A.    That is okay.
2    Q.    It is a large document.  So can
3  you read the page I have pulled up right now on
4  the shared screen?
5    A.    Yes, I can.
6    Q.    These are demographic reports for
7  the enacted 2021 Alabama State Senate plan,
8  correct?
9    A.    Correct.
10    Q.    All right.  And for District 7, we
11  see a White voting age population of 66.75
12  percent and a Black voting age population of
13  almost twenty-three percent; is that correct?
14    A.    That's correct.
15    Q.    And here we have your same
16  statistics for your first illustrative plan; is
17  that correct?
18    A.    That is correct.
19    Q.    It shows that the White voting age
20  population for District 7 is now just shy of
21  thirty-nine percent and the Black voting age
22  population is 46.82 percent; is that correct?
23    A.    That is correct.

1    Q.    Would you categorize those changes
2  as adding significantly more Black population
3  than nonBlack population to District 7?
4    A.    Yes.  But this gets into what I
5  mentioned before.  That was two different
6  scenarios under the racially gerrymandered
7  scenario versus the Section 2 scenario.  Yes.
8    Q.    Do you think you used race more
9  than the map drawer who drew the 2021 Jefferson
10  County plan?
11        MR. VAN LEER:  Objection to the
12  form of the question.
13    A.    I don't know.  I don't know if I
14  used it more than the other map drawer.  I just
15  know I used it to balance that with other
16  criteria.  That is all I know.
17    Q.    (BY MR. LACOUR)  Do you have an
18  opinion on whether you used race as much as the
19  other map drawer from Jefferson County?
20        MR. VAN LEER:  Objection to the
21  form of the question.
22    A.    Once again, I don't know.
23    Q.    (BY MR. LACOUR)  Is this shift in

1  Black population in District 7 evidence of race
2  predominating during your map-drawing process?
3    A.    No.  And let me come back to say I
4  do believe that I did not use it as much as the
5  map drawer in Jefferson County using race
6  specifically, is what you are referring to.
7  And, no, race is not predominant, no, in this
8  one.
9    Q.    You made far more significant
10  changes to District 7 than the Jefferson County
11  map drawer made to any of the five districts in
12  Jefferson County, though, just in terms of
13  number of people moved in and out, correct?
14    A.    As I mentioned before, there are
15  two different scenarios.  One was a scenario
16  where they -- it had existing majority Black
17  districts and moved in VTDs that were
18  excessively Black in order to maintain that.
19        In this particular case, there
20  wasn't a majority Black district in the area.
21  And what I am trying to do is use -- or answer
22  that test of Gingles to see if it is possible
23  to actually create an additional one or more

1  majority-minority districts.
2    Q.    Okay.  Would you agree that the
3  Jefferson County map drawer had fewer
4  opportunities to consider race because he was
5  just making minimal changes to that plan?
6        MR. VAN LEER:  Objection to the
7  form.
8    A.    No.  I can't agree with that,
9  again, because it is two different scenarios.
10    Q.    (BY MR. LACOUR)  Because he is
11  trying to increase the Black voting age
12  population by just a little in District 1 and
13  you are trying to increase it by quite a lot in
14  District 7?
15        MR. VAN LEER:  Objection to the
16  form.
17    A.    No.  If the scenarios need to be
18  equal, then if SD7 was a sixty or seventy
19  percent majority Black district and I tried to
20  add Black precincts to that, I think then the
21  scenarios would be equal.  Then I think you
22  would be appropriate in drawing some
23  comparison.

13 (Pages 46 - 49)

1    Q.   (BY MR. LACOUR:)  Okay.  What
2  makes it different, then, is not how race is
3  used but what race is being used to do; is that
4  fair?
5         MR. VAN LEER:  Objection to the
6  form.  You can answer.
7    A.   No.  What makes a difference is
8  that one is a Section 2 situation and the other
9  is a racial gerrymandering situation.  And so
10 the two really can't be compared.
11   Q.   (BY MR. LACOUR:)  Couldn't the map
12 drawer for Jefferson County engage in balancing
13 like a Section 2 map drawer and make sure that
14 other traditional districting principles are
15 kept in his or her mind as he draws the map?
16        MR. VAN LEER:  Objection to form.
17   A.   Yes.  In my estimation, I think he
18 or she, the map drawer, could have done that.
19 But that is not what occurred.  So I think you
20 are right that that could have been done.
21   Q.   (BY MR. LACOUR:)  And that is not
22 what occurred because of the -- what evidence
23 suggested that that is not what happened in

1  Jefferson County, in your view?
2    A.   Because, for example, just 1,
3  District 1, the population for District 1 was
4  below ideal population size, so you had to add.
5    Q.   Uh-huh.
6    A.   And every precinct or VTD precinct
7  except for one, I believe, was eighty percent.
8  And so there are other alternatives that could
9  have been made other than the vast majority
10 being eighty percent.  That is just District 1.
11        MR. LACOUR:  Okay.  Thank you.
12 This is like a good place to take a short
13 break, if that works for you all.
14   A.   Yeah, I think so.
15        MR. VAN LEER:  Yeah.  Definitely.
16        THE REPORTER:  Ten minutes, five
17 minutes?
18        (Whereupon, a break was had from
19        11:09 a.m. until 11:21 a.m. EDT)
20   Q.   (BY MR. LACOUR:)  Welcome back,
21 Mr. Fairfax.  While we were on the break, did
22 you talk about the substance of any of the
23 deposition with counsel?

1    A.   No, I did not.
2    Q.   Thank you for confirming.  Did you
3  work on the case of Raleigh Wake Citizens
4  Association v. Wake County Board of Elections
5  sometime in the twenty-teens?
6    A.   I believe so.  That sounds
7  familiar.  Yes, I believe so.
8    Q.   Do you recall the general
9  substance of your work on that matter?
10   A.   If it is what I am thinking of, it
11 is where the courts -- the Court struck down, I
12 believe it was the Senate districts, might have
13 been the House districts inside of Wake County
14 and found one or two districts that had been
15 racially gerrymandered.
16        And I believe there was a suit --
17 they reconfigured the districts, but I believe
18 they reconfigured the districts violating the
19 interdecennial, I believe, criteria.  We can't
20 do any interdecennial redistricting by altering
21 many, many more districts inside of Wake County
22 than they could.
23        And so my job was to show that

1  they did not have to touch all of the
2  districts.  They could actually, I believe,
3  reconfigure the district without touching all
4  of the adjacent districts -- I mean nonadjacent
5  districts.
6    Q.   Thank you.  I am going to share
7  now what we are marking as Exhibit 6.
8         (Exhibit 6 was marked for
9         identification.)
10   Q.   (BY MR. LACOUR:)  I will get that
11 one on the screen.  Can you see that, sir?
12   A.   Yes.
13   Q.   And is this --
14   A.   Can I -- I might have gotten the
15 case wrong.  So it may be another case I was
16 thinking of, but go ahead and show this.
17   Q.   I believe it is a different case
18 with regard to, according to the report,
19 Population Deviation, Compactness and Partisan
20 Analysis of Wake County, North Carolina Board
21 of County Commissioners and School Board
22 District Plans.  Did I read that correctly?
23   A.   Yes.  Yes.  I believe this is a

Page 54

1 different case than the one I was referring to,
2 I believe.
3     Q.   And does this look like the report
4 that you submitted in this other case?
5     A.   Yes.
6     Q.   Okay.  I am going to turn to
7 Page 797, at the bottom of the page, which
8 internally is Page 11 of that report.
9         Can you look this over for just a
10 moment and see if that refreshes your
11 recollection on what you opined on in this
12 case?
13     A.   Yes.  I believe so.  Yes.
14     Q.   And do you recall what Table 6 was
15 showing to the Court?
16     A.   It was looking at the partisan
17 results of the 2004-2008 elections insofar as
18 the districts.
19     Q.   Okay.  And what was significant
20 about the population deviations for those nine
21 districts?
22     A.   I believe this case also looked at
23 the, I think, the Democratic-performing

Page 55

1 districts being overpopulated, I believe.  I'm
2 not a hundred percent sure, but I believe that
3 is one of the things, that it was packing, I
4 guess, those districts.
5     Q.   Well, let's look at what the table
6 shows.  There are five districts that are
7 underpopulated and four that are overpopulated,
8 correct?
9     A.   Correct.
10     Q.   And four of the five districts
11 that lean Republican were underpopulated while
12 three of the four districts that leaned
13 Democrat were overpopulated; is that correct?
14     A.   Correct.
15     Q.   We will turn now to Page 19, the
16 internal page numbers for the report, towards
17 the bottom of the page.
18         Was it your conclusion that there
19 was a marked pattern of overpopulation in
20 Democratic performing districts and
21 underpopulation in Republican performing
22 districts?
23     A.   Yes.

Page 56

1     Q.   What made this pattern marked?
2     A.   That it appeared on all of the
3 districts.
4     Q.   And was this pattern evidence that
5 the map drawer had favored Republican voters
6 over Democratic voters?
7     A.   I don't know if it was intended to
8 do that, but that is the outcome; that is the
9 results; that is the effect.
10     Q.   And why is that when it comes to
11 underpopulation versus overpopulation?
12     A.   Because it's akin to packing the
13 districts.  The same principal of packing is
14 you put a concentration of one particular group
15 in one or more districts and it dilutes the
16 voting strengths of that group in other
17 districts.
18     Q.   And that could be evidence that
19 partisan interests predominated in the drawing
20 of the plan, correct?
21         MR. VAN LEER:  Objection to the
22 form.
23     A.   It is possible.

Page 57

1     Q.   (BY MR. LACOUR:)  We are going to
2 turn back now to the appendix from your initial
3 report, Page 149.  And again these show a
4 deviation, population deviation for your
5 Illustrative Plan 1, correct?
6     A.   Correct.
7     Q.   Now, to make this a little easier,
8 I have reproduced these pages with highlighting
9 on them.  And I will email that around right
10 now as Exhibit 7.
11         (Exhibit 7 was marked for
12         identification.)
13     Q.   (BY MR. LACOUR:)  Does this look
14 to be the same numbers, just with highlighting
15 on there now?
16     A.   Yes.
17     Q.   Okay.  So the highlighting is the
18 ten districts that have either a majority Black
19 voting age population or, for District 7, an
20 estimated Black citizen voting age population
21 above fifty percent.  Does that look correct to
22 you?
23     A.   Yes.

15 (Pages 54 - 57)

Page 58

1    Q.   How many of those ten districts
2  are underpopulated based on the deviation in
3  that, in the deviation column?
4    A.   How many out of the twenty-five or
5  how many --
6    Q.   Out of the ten --
7    A.   Black districts?
8    Q.   Yes.
9    A.   It appears that all of them, at
10  least in the page that you are looking at.
11  Well, on the second page, I see one that isn't.
12    Q.   Okay.  So then nine out of the ten
13  are underpopulated; is that correct?
14    A.   That's correct.
15    Q.   And then the remaining districts
16  are all majority White population, correct?
17    A.   I believe so.  There may be some
18  other population group in there that would
19  prevent that district from being majority
20  White.  But I believe so.
21    Q.   If I told you that only eight of
22  those twenty-five are underpopulated, would
23  that sound accurate to you?

Page 59

1    A.   If you told me that only eight of
2  the --
3    Q.   Of the twenty-five remaining
4  districts are underpopulated.
5    A.   That I would -- I didn't count,
6  but I would not doubt that.
7    Q.   Then that would mean that
8  seventeen of the twenty-five majority White
9  districts are overpopulated, correct?
10    A.   Seventeen?  Trying to do the math
11  in my head.  That sounds correct.
12    Q.   If ninety percent of the majority
13  Black districts in your Plan 1 were
14  underpopulated and about sixty-eight percent of
15  the majority White districts in your Plan 1
16  were overpopulated, would that constitute a
17  marked pattern of overpopulation in majority
18  White districts and underpopulation in majority
19  Black districts?
20    MR. VAN LEER:  Objection to form.
21    A.   Now, remember I am starting with
22  the enacted plan.  So we are really talking
23  about two districts that I really am in control

Page 60

1  of.  And so the legislature found fit to
2  actually underpopulate eight of those
3  districts, which I didn't have any control
4  over.  So we are only talking about the two
5  districts.
6    Q.   If those districts, those eight
7  districts who you just referenced were
8  underpopulated, would that be evidence in
9  support of a finding of dilution or against a
10  finding of dilution?
11    MR. VAN LEER:  Objection to form.
12    A.   If those were -- those eight that
13  were enacted were underpopulated, is that what
14  you are asking?
15    Q.   (BY MR. LACOUR:)  Correct, yes,
16  sir.
17    A.   It may or may not.  Again, it
18  depends upon the situation at hand.  Sometimes
19  you have to underpopulate a particular district
20  in order to balance out another criteria.  So
21  it is a balancing act, if you will.
22    Q.   So the two districts that you did
23  or made significant changes to are Districts 7

Page 61

1  and 25, at least among the majority Black
2  districts listed on these two pages of your
3  appendix, correct?
4    A.   Correct.
5    Q.   And District 7 is underpopulated
6  by 4.41 percent; is that correct?
7    A.   Correct.  Correct.
8    Q.   Okay.  And then District 25 is
9  underpopulated by 4.28 percent?
10    A.   Correct.
11    Q.   Now, you said before that you try
12  to draw fair maps.  Do you think a map treats
13  White and Black voters fairly if ninety percent
14  of majority Black districts are underpopulated
15  while sixty-eight percent of majority White
16  districts are overpopulated?
17    MR. VAN LEER:  Objection to form.
18    A.   Once again, the population
19  deviation is one of many criteria that you have
20  to actually balance out.  And the courts, of
21  course, have accepted that overall ten percent
22  population deviation.  And so the enacted plan
23  falls within that, as well as these

16 (Pages 58 - 61)

Page 62

1 illustrative plans, they fall within that
2 range, if you will.
3     Q.   (BY MR. LACOUR:)  Would that
4 balancing lead to a map that was fairer if half
5 the majority White districts were
6 underpopulated and half the majority Black
7 districts were underpopulated as well?
8         MR. VAN LEER:  Objection to form.
9     A.   I don't know if you could directly
10 relate that to being fair or just because the
11 population deviation may state a certain
12 configuration, if you will.  You have to
13 consider all of the factors, not just that
14 particular one.
15     Q.   (BY MR. LACOUR:)  If your new
16 version of District 7 around Huntsville and the
17 majority Black districts of 25 and 26 around
18 Montgomery were not among the most
19 underpopulated districts in your illustrative
20 plans, would they still be majority Black
21 voting age population?
22         MR. VAN LEER:  Objection to form.
23     A.   I would imagine that you could

Page 63

1 create a district in both of those where it is
2 closer to the ideal population.  How close I'm
3 not a hundred percent sure, but closer.
4     Q.   (BY MR. LACOUR:)  Doing that,
5 though, would likely require you to sacrifice
6 other traditional principles like compactness
7 or splitting communities of interest, correct?
8     A.   Most likely it would be a
9 balancing out; that is right, a trade-off of
10 different criteria.
11         And also this is an illustrative
12 plan.  And so this is not necessarily an
13 optimal plan.  It could be the best plan.  And
14 so spending more time and effort can -- could
15 potentially not trade off those other factors.
16 But under this scenario, time is limited.
17     Q.   Okay.  Do you recall the Black
18 voting age population for Alabama total
19 following the 2020 census?
20     A.   I believe the total was
21 twenty-seven percent.  Something like that
22 comes to mind.
23     Q.   I will pull up your report.  This

Page 64

1 is Exhibit 2, your initial report, which we
2 looked at earlier, Page 7, Paragraph 12d.  So
3 this says:  Alabama's Black voting age
4 population and Black citizen voting age
5 population, which are now both near
6 twenty-six percent of the State's total
7 population.
8         So twenty-seven is very close to
9 twenty-six, right?
10     A.   But twenty-six is --
11     Q.   I'm sorry.  I may have misspoken.
12 Please go ahead.
13     A.   I was going to say I thought you
14 said total population.
15     Q.   I probably did.  Black voting age
16 population would be just shy of twenty-six
17 percent, correct?
18     A.   I believe so.
19     Q.   And your illustrative plans
20 purport to draw ten majority Black Senate
21 districts out of thirty-five; is that right?
22     A.   Yes.
23     Q.   So if I told you that that means

Page 65

1 that 28.57 percent of the districts are
2 majority Black, would that sound correct to
3 you?
4     A.   I would have to do the math, but
5 that probably sounds about right.
6     Q.   And nine out of thirty-five would
7 equal about 25.7 percent of districts as
8 majority Black, correct?
9     A.   Once again, I would have to do the
10 math.  I think I would have to look at a
11 calculator to get that.
12     Q.   Okay.  If nine out of thirty-five
13 districts equal 25.7 percent of districts as
14 majority Black, that would be nearly twenty-six
15 percent, correct?
16     A.   Correct.
17     Q.   And you have looked at a lot of
18 maps over your career, correct?
19     A.   I believe so.
20     Q.   Would you normally expect to see
21 any population of twenty-six percent obtain
22 super proportionality in a statewide
23 redistricting plan without race factoring

17 (Pages 62 - 65)

Page 66

1  heavily into a line drawing process?
2          MR. VAN LEER:  Objection to form.
3      A.   Could you repeat that?
4      Q.   (BY MR. LACOUR:)  Yes.  First, are
5  you aware of the term "super proportionality"
6  in the context of redistricting?
7      A.   I have heard of proportionality.
8  I'm not sure if I have heard of super
9  proportionality.  I am trying to recall if I
10  have heard that qualifier.
11     Q.   What is proportionality?
12     A.   That is when you would actually
13  have a percentage of a particular group,
14  whether it is minority or a partisan group,
15  that exists in each of the districts.
16         So, you know, twenty-five percent
17  Democratic or Republican state by election
18  would have twenty-five percent of the
19  districts.
20     Q.   Okay.  And if that twenty-five
21  percent of the Democrats made up a majority in
22  twenty-eight percent of the districts, that
23  would go beyond proportionality, correct?

Page 67

1      A.   Sometimes you can't exactly
2  apportion the districts exactly to that
3  percentage.  So sometimes you may have to go
4  high above, and sometimes maybe you may have to
5  go low.
6          In the context of minority voting,
7  essentially you are now trying to look at
8  whether -- you are not looking at that
9  percentage.  You are just looking at whether
10  that Gingles 1 is met insofar as the map is
11  concerned.  Proportionality doesn't have
12  anything to do with that first precondition of
13  Gingles.
14     Q.   Right.  I am just talking about
15  outside of the Voting Rights Act context.  If
16  you have a state that was twenty-five percent
17  Democrat and they had thirty-five districts in
18  the legislative house at issue, would you be
19  surprised to see twenty-eight percent of those
20  districts as majority Democrat?
21         MR. VAN LEER:  Objection to form.
22     A.   No.  As I mentioned, sometimes it
23  is not possible to get exactly what the

Page 68

1  percentage is.
2      Q.   (BY MR. LACOUR:)  What sort of
3  factors lead to that kind of scenario where a
4  political minority ends up with a greater than
5  proportional share of legislative districts?
6          MR. VAN LEER:  Objection, form.
7      A.   What kind of factors lead up to
8  that scenario that you are talking about, super
9  proportionality?
10     Q.   (BY MR. LACOUR:)  Yes, sir.
11     A.   It could be a variety of factors.
12  As I mentioned before, it could be the only
13  scenario or the best scenario that could fit.
14  So it may have nothing to do with any intent.
15  It is you are weighing these other criteria
16  factors, and that may end up being what is
17  created.  So it is very difficult to say
18  anything particular.
19     Q.   Okay.  Let's look back at your
20  report, same page, Paragraph 12c.  And can you
21  read that?
22     A.   Yes.
23     Q.   And it says:  The illustrative

Page 69

1  plan is reasonably configured by all relevant
2  measures.  It adheres to the U.S. Constitution,
3  Alabama Constitution and the Federal Voting
4  Rights Act and complies with the equal
5  population (one-person-one-vote) requirements.
6          The illustrative plan is
7  reasonably configured based on well established
8  traditional redistricting criteria:  1)
9  contiguity and 2) compactness and 3) respect
10  for communities of interest and political
11  subdivisions and 4) minimizing the number of
12  county splits and counties within each
13  district.
14         Did I read that correctly?
15     A.   Yes.
16     Q.   And that is an accurate
17  description of your first illustrative plan?
18     A.   Yes.
19     Q.   So if that plan then was not
20  contiguous, would it be reasonably configured?
21     A.   If you are referring to that point
22  contiguity that was copied, I copied that in
23  order to maintain the configuration that the

18 (Pages 66 - 69)

Page 70

1  legislature included.  And that was -- that
2  could be changed by the legislature.  Again,
3  this is an illustrative plan.  But that was to
4  maintain contiguity because they approved it.
5  And so I assume that they have allowed that to
6  occur.
7      Q.   And I was referring more
8  generally.  If you had a map that otherwise was
9  not contiguous, leaving aside that particular
10  point that you were referring to --
11         MR. VAN LEER:  Counsel, sorry, we
12  had an audio glitch, I think, in the internet
13  here.  Do you mind just reasking that question?
14  There were a few words that cut out.
15         MR. LACOUR:  Sure.
16      Q.   (BY MR. LACOUR:)  So leaving aside
17  that one part of the map, the enacted map that
18  you were just referring to, we will go to
19  assume that that satisfies contiguity.
20         If your illustrative plan
21  otherwise did not satisfy contiguity, would it
22  be reasonably configured?
23      A.   It all depended upon -- it all

Page 71

1  depended upon the situation at hand.
2      Q.   Okay.  So what sort of situation
3  would justify sacrificing contiguity to some
4  extent in a way that would still leave your map
5  reasonably configured?
6      A.   It all depends on the definition
7  of "contiguity" for the particular scenario.
8  For example, water bodies can be contiguous,
9  but some states state that water bodies aren't
10  contiguous.  And so it all depends on
11  situations such as that.
12      Q.   Is there a situation in which a
13  map can be reasonably configured, even if it
14  departs from the legislature's traditional
15  definition of "contiguity"?
16      A.   Once again, if the legislature
17  included it in an enacted plan under what I was
18  doing, I adhere to -- I assumed that those were
19  acceptable by the legislature.  Once again,
20  this is an illustrative plan.  That is not a
21  remedial plan.  It is not the plan that would
22  be passed.
23      Q.   Right.  I am just trying to more

Page 72

1  generally understand how the traditional
2  districting principles interact with your
3  conception of reasonably configured at a higher
4  level than anything in this particular map, if
5  that is helpful.
6         So if, for example, you had to
7  jump over some VTDs and sacrifice contiguity in
8  that way, in a way that everyone would agree
9  that is not contiguous anymore to form a
10  majority Black district, could that district or
11  that plan still be reasonably configured?
12      A.   I would say that it doesn't adhere
13  to that specific criteria of contiguity which
14  would be part of the consideration of whether
15  that district is reasonably configured.  I
16  would have to think about what the scenario was
17  at that particular time in the example that is
18  given, the specific example that is given.
19      Q.   So there could be a situation
20  where contiguity would have to yield to comply
21  with the Voting Rights Act.  Is that your
22  position?
23      A.   I believe that would probably be a

Page 73

1  court decision.  That would be a legal decision
2  and not necessarily a map drawer's decision.  I
3  believe again, coming from a nonattorney, the
4  Courts may rule under that scenario.  So I
5  would --
6      Q.   You do have views -- I'm sorry to
7  cut you off.  You do have views on what makes a
8  reasonably considered plan though, correct?
9      A.   Correct.
10      Q.   And there could be a plan that is
11  reasonably configured, even if to draw an
12  additional majority-minority district, you have
13  to sacrifice contiguity to some respect?
14      A.   Are you saying that I would have
15  to sacrifice contiguity in order to meet the --
16      Q.   Yes, in order to draw the
17  additional majority-minority district.
18      A.   Again, I think that would be a
19  decision for the courts to make.  I would
20  normally adhere to whatever the criteria is
21  directed by the jurisdiction.
22      Q.   But there are some situations
23  where you don't adhere to the traditional

19 (Pages 70 - 73)

Page 74

1 districting criteria of the jurisdiction, at
2 least to the same extent as the jurisdiction,
3 correct?
4        MR. VAN LEER:  Objection to form.
5    A.   Under the guise of what I
6 mentioned previously, the scenario of the
7 congressional district being created using
8 county levels, that is a scenario that I think
9 I would proceed in drawing one that did break
10 county boundaries, recognizing that it would
11 not be possible to do it with county
12 boundaries.
13    Q.   (BY MR. LACOUR:)  Okay.  Instead
14 county boundaries, the traditional districting
15 principle were contiguity and you had to break
16 contiguity to some small degree in order to
17 draw your additional majority-minority
18 district, would that plan still be reasonably
19 configured?
20    A.   Again, that is very difficult to
21 say.  I think that is a decision by the courts.
22 And I would draw, attempt to draw one that
23 adhered to the contiguity principle for that

Page 75

1 jurisdiction.
2    Q.   And if you could not, would you
3 conclude that the plan, that it is not possible
4 to draw a reasonably configured plan that
5 contains an additional majority-minority
6 district?
7    A.   That depends as well.  For
8 example, if a jurisdiction was noncontiguous,
9 in some states that is allowable, to have those
10 noncontiguous areas because it is part of the
11 same jurisdiction.  In other states it is not.
12 So once again, it really is a question that has
13 to be looked at on the specific aspect or the
14 specific scenario.
15    Q.   Right.  And in my hypothetical
16 scenario, we are dealing with a state that does
17 not allow -- that takes a very strict view of
18 contiguity, does not allow noncontiguous
19 districts to be drawn in any way.  Is it
20 possible to draw a reasonably configured
21 district that does sacrifice -- for that
22 jurisdiction that does sacrifice contiguity?
23    A.   Again, that would be left up, I

Page 76

1 think, to the courts.  The courts may allow it
2 in that particular -- a particular case.
3    Q.   But, sir, you have offered an
4 opinion in your report on what makes an
5 illustrative plan reasonably configured,
6 correct?
7    A.   Yes.
8    Q.   So why can you not give me an
9 opinion on whether that hypothetical plan is
10 reasonably configured?
11    A.   Because I know that these are
12 reasonably configured.  But I don't know that
13 if there's an example out there, for example,
14 in something not contiguous, whether that may
15 also be a reasonably configured district
16 because it is an exception to the rule.  There
17 always is.
18    Q.   Okay.  So it is possible, then,
19 that there could be a reasonably configured
20 illustrative plan drawn that does not adhere
21 fully to a state's traditional districting
22 principle of contiguity?
23    A.   There is a possibility of that

Page 77

1 occurring.  That would be decided by the Court.
2    Q.   Thank you.  Moving to the next
3 traditional districting principle you mentioned
4 in Paragraph 12c, compactness, if your Plan 1
5 was not compact, would you still opine that it
6 is reasonably configured?
7        MR. VAN LEER:  Objection to form.
8    A.   The question or the key, I guess,
9 to that is what is noncompact.  And there's not
10 a specific numerical value associated with
11 that.
12    Q.   (BY MR. LACOUR:)  How would a
13 legislature know if an alternative plan was
14 compact or not compact?
15    A.   Most of the time you look at -- or
16 many times you look at plans that have been
17 previously enacted, specifically the last plan
18 that had been previously enacted.  And that
19 gives you measurements to at least compare the
20 new plan to.  And so in this scenario that is
21 what I did.  I looked at the enacted plan and
22 compared the compactness to that enacted plan.
23    Q.   And can a map be reasonably

20 (Pages 74 - 77)

1 configured when it comes to compactness if it
2 is not as compact as the enacted plan?
3         MR. VAN LEER:  Objection, form.
4     A.   Yes.  Yes.  You may have a
5 district or a plan that may be very similar but
6 numerically slightly different.  And so that
7 would be I think in many cases acceptable.
8     Q.   (BY MR. LACOUR:)  So would it be
9 fair to say that close enough is good enough
10 for purposes of compactness in the Gingles 1
11 analysis?
12         MR. VAN LEER:  Objection to form.
13     A.   I don't know if I would put it
14 that way.  But when you have a small amount or
15 relatively small amount of difference, then
16 they are similar enough to definitely pass as
17 compact enough or sufficiently compact.
18     Q.   (BY MR. LACOUR:)  How would you
19 measure that difference in the sense that --
20 how is one to know when it is too big versus
21 close enough?
22     A.   Well, once again, there isn't a
23 numerical value associated with it.  But by

1 experience -- and most map drawers know that a
2 matter of just changing a line to a different
3 street can actually change that, one of the
4 values by .01, let's say, percent.
5         And so if it is something close
6 to .01, two, maybe even three percent, there's
7 not that much difference because even moving
8 over a street or two may change the
9 compactness.  And so that should in most map
10 drawer's eyes be considered similar, let's say.
11     Q.   And when does it start to become
12 dissimilar?
13     A.   Once again, there's no value.
14 There's no standard out there for what to
15 consider a difference or not.  It is up to the
16 map drawer and, of course, ultimately the
17 Court.
18     Q.   All right.  We are going to look
19 to Page 46 of your report, which I think we are
20 still sharing.  This is comparing a few
21 different compactness scores for the
22 illustrative plan and enacted plan; is that
23 correct?

1     A.   That is correct.
2     Q.   With regard to Number 15,
3 District 15, it says that:  Illustrative plan
4 and enacted plan both score a .53 for the
5 Reock.  For the Polsby-Popper, the illustrative
6 plan is at a .17; whereas, the enacted is
7 at .16.  And for the Area/Convex Hull, you have
8 a .17 and a .17.
9         At the end you rate the
10 illustrative plan's District 15 as more
11 compact; is that correct?
12     A.   Yes.  This is a pure numerical
13 identification.  You have two that are equal
14 and one that the Polsby-Popper for the
15 illustrative was better.  So numerically it
16 moves to the illustrative plan.
17         I do the same thing for the
18 enacted plan of those scenarios.
19     Q.   I have to check something on the
20 earlier page.  So if you look down at
21 Footnote 39 on Page 45, it reads:  When using
22 three compactness measures, a district is
23 considered to be more compact when two or more

1 of the three measures are more compact.
2         Is that correct?
3     A.   That is a typo mistake.  What it
4 should read is:  When you have more compactness
5 measures, then it is considered more compact
6 because of the scenario you just showed me.
7     Q.   Okay.
8     A.   So it should not be -- it should
9 not be two or more.  It should just be more.
10     Q.   Okay.  Why do you use this
11 definition of "more compact" for these
12 head-to-head match-ups on Table 22?
13     A.   Why did I use the more compact?
14     Q.   Yes.  So your definition of "more
15 compact" in Table 22 I now understand to mean
16 if there are two of the scores that tie and one
17 of them is -- the third one is the tie breaker,
18 then the districting plan that wins the tie
19 breaker is the more compact plan.  Is that
20 accurate?
21     A.   That is correct.
22     Q.   Okay.  And why do you use that
23 definition of "more compact"?

Page 82

1    A.   It is very similar to, you know,
2  why would you have an odd number of, say, board
3  members.  And many times the reason why I use
4  three is for someone to break the tie.  And so
5  if you have two equals and you have a third
6  one, that third one actually is the one that
7  breaks the tie.
8         That is the intent of using that
9  extra Convex Hull, although the -- like I said
10  before, the industry is somewhat moving to
11  Reock and Polsby-Popper, so I may be looking at
12  not using Convex Hull.  But that is the purpose
13  in essence of that three.  You have that third
14  one to break the tie.
15    Q.   Okay.  And then a district wins
16  the compactness competition, regardless of
17  whether it is .01 more compact rather than .1
18  more compact, correct?
19         MR. VAN LEER:  Objection to form.
20    A.   That is correct.  In this table,
21  that is correct.
22    Q.   (BY MR. LACOUR:)  Do you consider
23  the absolute difference in scores elsewhere

Page 83

1  when measuring the compactness of your plans
2  versus the enacted plan?
3    A.   Only -- excuse me.  Only in --
4  when I am summarizing and categorizing the
5  compactness for the plans for a particular
6  district, that is when I would dig deeper and
7  summarize, in essence, this being similarly
8  compact.
9    Q.   So then looking, for example, at
10  District 2, the Reock score for the
11  illustrative plan is .54.  The enacted plan
12  is .63.  And we have a tie for Polsby-Popper
13  and then a .03 win for Convex Hull.  And we
14  treat these as equal.  Do you think that is a
15  fair way to compare the two districts?
16    A.   Yes, in a table scenario like
17  this.  You have one where the illustrative plan
18  is better and one where the enacted plan is
19  better and then one that is equal.
20    Q.   Now, isn't the enacted plan is .09
21  better on Reock; whereas, the illustrative plan
22  is only .03 better on Convex Hull?  But your
23  measurements don't account for that absolute

Page 84

1  difference, does it?
2    A.   No.  Not in the scenario, no.
3    Q.   Okay.  And you said earlier that
4  Polsby-Popper and Reock are becoming more of
5  the, is it fair to say, the industry standard
6  for map drawers?
7    A.   That is correct.
8    Q.   So would it make sense to give the
9  Reock score more weight than the Convex Hull
10  score when we are comparing your District 2 to
11  the enacted District 2?
12    A.   No.  Not under this scenario, no.
13    Q.   Is there a most relevant metric
14  for measuring compactness as part of the
15  Gingles 1 inquiry?
16    A.   No.  No.  I think that you
17  shouldn't use just one metric, if you will, one
18  measurement, compactness measurement.
19    Q.   Did you anywhere consider --
20  actually scratch that.  I am going to turn to a
21  different page of the report.  This might be
22  helpful.  All right.  We are looking at
23  Table 23.

Page 85

1         Can you describe for me first
2  what that first row is measuring?  Is that just
3  more majority Black districts versus less and
4  that is why the illustrative plan does better
5  on the U.S. Constitution, Alabama Constitution
6  and VRA criteria?
7    A.   Not just that.  It adheres to
8  Section 2 specifically of the Voting Rights
9  Act.  Under that scenario, you have ten
10  majority Black and eight majority Black for the
11  enacted, ten majority Black for the
12  illustrative and eight majority Black for the
13  enacted.  So under that scenario, the
14  illustrative plan would be a better -- meet the
15  better criteria.
16    Q.   Okay.  And you are not saying that
17  the illustrative plan is reasonably configured
18  because it better satisfies Section 2, are you?
19    A.   That is not that one row is
20  talking about, although the assumption is that
21  when you do meet that Gingles first prong, that
22  you are crafting a reasonably configured
23  district.

1        So indirectly, it is saying that
2    it is a reasonably configured district.  But
3    the other ones, the other rows are the ones
4    that sort of break out that reasonably
5    configured metric, if you will, or metrics.
6        Q.   Got it.  All right.  Let's look at
7    compactness.  You have got four different
8    measures of compactness there.  Could you just
9    explain what each of those four is and what it
10   is getting at?
11       A.   Sure.  The first one is the plan
12   mean.  And so if you look at all the
13   compactness and get the average for each of the
14   compactness measurements, you come up with the
15   mean.  And so that is what that .39, .25, .73
16   for the illustrative plan, that is the mean of
17   all the districts for a particular compactness
18   measurements.
19       It's Reock the first,
20   Polsby-Popper second and Convex Hull the third.
21   And I do that for each of the enacted plans.
22       The district by district looks at
23   the district in the illustrative plan and the

1    same number in the enacted plan and determines
2    whether it is more compact or less compact.
3        And so under this scenario, there
4    were nine districts that were more compact than
5    the enacted plan.  And the enacted plan had
6    five more districts that were more compact
7    overall.
8        The third is comparing just in the
9    majority Black districts, there were two Black
10   districts that were more compact and one
11   district that was more compact for the enacted
12   plan.  So the illustrative plan had two more
13   compact majority Black districts, and the
14   enacted plan had one more compact.
15       The fourth one is probably one of
16   the critical ones.  This looks at the majority
17   Black districts and compares it to the minimal
18   compactness measured district for the enacted
19   plan.  And so the ten out of ten, that means
20   that all the majority Black districts were more
21   compact than the least compact district in the
22   enacted plan.
23       Q.   Okay.  Are you weighing these

1    equally, or how do they fit together to lead to
2    the conclusion that the illustrative plan does
3    better?
4        A.   It is a simple numerical majority.
5    So there are four.  So if you get three out of
6    the four, then it is that particular plan.  Two
7    out of the four would be equal.
8        Q.   So why is minimum enacted plan
9    values compared to ten majority Black districts
10   a relevant metric?
11       A.   Because that is the crux of
12   Gingles, that first Gingles because it states
13   that you attempt to look at the ability to
14   create one or more majority-minority districts
15   that are sufficiently large and geographically
16   compact.
17       So this one is the one that really
18   gets to the crux.  You are looking at whether
19   the additional districts are reasonably
20   compact.  And so that is the one that really
21   could replace all of them, although I look at
22   all -- the other three.
23       Q.   So as long as the majority Black

1    district is more compact than the least compact
2    district in the plan, then you have a
3    reasonably configured district?
4        MR. VAN LEER:  Objection to form.
5        A.   Insofar as the Gingles itself, it
6    is looking at the majority Black districts.
7    The assumption is that you are adhering to
8    traditional redistricting criteria for the
9    entire plan.  So Gingles is met just by itself,
10   but the assumption of adhering to redistricting
11   criteria compels you to actually create a plan
12   that adheres to the entire plan.
13       But as far as Gingles is, you are
14   looking at the compactness for that particular
15   district.
16       Q.   (BY MR. LACOUR:)  And why would
17   you set as the benchmark for that particular
18   district the least compact district in the
19   enacted plan?
20       MR. VAN LEER:  Objection to form.
21       A.   Because the assumption is that the
22   legislature, I guess, in this particular case,
23   the jurisdiction governing body has accepted

Page 90

1  the compactness measures for all of the
2  districts as being acceptable or reasonably
3  compact. That is the assumption.
4      Q.   (BY MR. LACOUR:)  Are there other
5  traditional districting principles that might
6  explain why a particularly noncompact district
7  is drawn the way that it is drawn, for example,
8  protecting incumbents?
9      A.   Yes. I mean are you saying are
10 there other tradeoffs that the legislature may
11 make with compactness?
12     Q.   Yes.
13     A.   And I say legislature in this
14 particular case. For compactness? Yes. But
15 they determine that this compactness measure is
16 acceptable.
17     Q.   And it says for minimum enacted
18 plan values compared to ten majority Black
19 Senate districts, that the enacted plan scored
20 zero out of ten. How is that?
21     A.   There wasn't a district that
22 of the minimal compactness scores were worse
23 than the -- the minimum was worse than the

Page 91

1  illustrative plan. There wasn't a case or a
2  scenario where the minimum district scored
3  better than the minimal districts for the Black
4  districts.
5      Q.   Okay. So it looks to me that the
6  district by district and the comparing majority
7  Black districts metric and even the minimum
8  enacted plan versus ten majority Black
9  districts have the potential to double count,
10 correct? Like just looking at -- let me
11 explain what I mean by that.
12         So you compare the majority of
13 Black districts in your plan to the enacted
14 plan, which I guess would be, for example,
15 District 26 around Montgomery. And you also
16 compare it in the district-by-district metric
17 as well, right?
18     A.   They are two different
19 methodologies, if you are saying it -- yes,
20 there are two different methodologies.
21     Q.   But aren't they the same
22 methodology, measuring the same thing but just
23 given two different labels and counted twice?

Page 92

1      A.   No. No. The district by district
2  looks at all the districts. And so it is
3  possible that the enacted plan could have
4  performed much better with the district by
5  district. Whereas when you looked at the
6  specific majority Black districts, the
7  illustrative plan could have done better. So
8  it captures -- they capture two different
9  things.
10     Q.   When you are talking about
11 majority Black districts, obviously your plan
12 has two more majority Black districts than the
13 enacted plan, so are you measuring District 7
14 in your plan against District 7 in the enacted
15 plan --
16     A.   Yes.
17     Q.   -- even though District 7 is not
18 majority Black in the enacted plan?
19     A.   Yes. This refers to majority
20 Black districts in the illustrative plan.
21     Q.   Okay.
22         MR. LACOUR:  This is probably a
23 good spot to take maybe a five-minute break,

Page 93

1  and then we can do one more round before lunch.
2  Does that sound good?
3      A.   That sounds good.
4         (Whereupon, a break was had from
5          12:23 a.m. until 12:37 a.m. EDT)
6      Q.   (BY MR. LACOUR:)  Okay. So
7  earlier we were talking about comparing one
8  district to another for purposes of
9  compactness. It is correct that your version
10 of District 7 only keeps about thirty percent
11 of the enacted plan's District 7 within the
12 core of your new District 7 for Plan 1; is that
13 correct?
14     A.   I can't recall. I would have to
15 look at it, but I will accept what you are
16 saying.
17     Q.   Okay. When so little of the old
18 District 7 is kept within your new District 7,
19 is it still fair to compare the compactness
20 scores of two significantly different
21 districts?
22         MR. VAN LEER:  Objection to the
23 form.

Page 94

1     A.   Yes.  Because there isn't really
2  any other way to compare district to district.
3  If you are going to compare all the districts,
4  which district do you compare to -- probably
5  the best way is to compare it numerically,
6  although sometimes you could switch to district
7  numbers and compare different district numbers.
8          So it is fair because it is the
9  only way or probably one of the standard ways
10  of comparing district to district.
11     Q.   (BY MR. LACOUR:)  What about
12  comparing districts in a particular region of a
13  map, would that be a good way to compare
14  compactness between two plans?
15     A.   I wouldn't think so unless it was
16  internally a particular county.  I have seen,
17  for example, a particular county that had
18  districts internally and comparing that.  But a
19  region, I would think not.
20     Q.   The initial or the enacted
21  District 7 is only within Madison County,
22  correct?
23     A.   Correct.  I believe so.

Page 95

1     Q.   And your Plan 1 is in Madison and
2  in Limestone and in Morgan Counties, correct?
3     A.   That is correct.
4     Q.   So it is actually displacing parts
5  of other districts that had previously been in
6  those counties, correct?
7     A.   Correct.
8     Q.   So why wouldn't it make sense to
9  aggregate all those districts in that general
10  area and then measure compactness for that
11  region where the changes are being made?
12     A.   Well, because you are looking at
13  compactness, let's say, for the mean as a whole
14  for the entire state.  And then the focal point
15  is compactness using Gingles, and that is
16  associated with the majority Black district.
17  So you actually compare those regional
18  districts in the compactness for the entire
19  state.
20          It could be that you have the
21  regional districts in -- for that area not
22  compact but then you have all of the other
23  districts in another region more compact.  So

Page 96

1  if you are going to do that, you have to look
2  at a scenario that sort of makes it fair.  And
3  I think the best scenarios look at the entire
4  district -- excuse me, the entire state and
5  then the districts that are the additional
6  majority Black districts.
7     Q.   But you said earlier that, when we
8  were talking about the underpopulated majority
9  Black districts in the enacted plan, that you
10  had no need to change those because they
11  weren't in the area -- scratch that.
12          You said earlier you did not make
13  changes to many of the majority Black districts
14  that were already in the enacted plan, correct?
15     A.   Correct.
16     Q.   Why didn't you make any changes to
17  those districts?
18     A.   I was trying to leave those
19  districts intact, if you will.  There wasn't --
20  I mean in creating a plan, I think it is always
21  best to do minimal changes to the existing
22  configuration that you are starting from for
23  continuity's sake.  But it is not mandatory.

Page 97

1  You don't have to do that.  But I think it is
2  beneficial to do that.
3     Q.   And if you are including all those
4  untouched districts in your overall compactness
5  score, then that could mask some of the
6  noncompactness present in an illustrative plan,
7  correct?
8          MR. VAN LEER:  Objection to form.
9     A.   I don't know if it -- you can say
10  masks.  You are comparing district to district
11  if you use that method.  So that would flesh
12  out the issues that I think you are talking
13  about, which you are comparing District 1 to
14  District 1 and determining whether that
15  changed, District 2 to District 2, determining
16  whether that changed.
17          And so ultimately you actually end
18  up comparing that region that you are talking
19  about and the other districts in the state as
20  well, not just one region.
21     Q.   (BY MR. LACOUR:)  Right.  I think
22  there are twenty of the thirty-five districts
23  that you left untouched in your plan; is that

25 (Pages 94 - 97)

Page 98

1  right?
2      A.   It was either twenty or
3  twenty-one.  I can't recall the specifics, yes.
4      Q.   It was somewhere in that ballpark,
5  correct?
6      A.   Correct.
7      Q.   So if we are comparing the new
8  plan to the old plan, why do we include in that
9  calculus all the districts that are identical
10  between the two?
11      A.   Because you are looking at the
12  entire plan.  I mean you are considering the
13  entire plan, which includes both the districts
14  that are -- remain the same and the districts
15  that have changed.  Conceivably I could have
16  drawn an illustrative plan that changed many
17  more of those districts that were equal.  And
18  so that plays a factor in looking and tending
19  to judge the plan, if you will.
20      Q.   What would it prove if you redrew
21  parts of the map that had nothing to do with
22  the additional majority-minority districts that
23  you are drawing?

Page 99

1          MR. VAN LEER:  Objection, form.
2      A.   Could you repeat that?
3      Q.   (BY MR. LACOUR:)  Yeah.  There's
4  not a reason for you to redraw districts that
5  are far away from the minority population that
6  you are trying to place together within a new
7  majority-minority district, correct?
8          MR. VAN LEER:  Objection to form.
9      A.   I don't know if you can say that
10  is a hard and fast rule because when you change
11  a district, there's a domino effect that
12  occurs.  And it could affect many, many, many
13  other districts, especially in that northern
14  region where you have VTDs that are ten
15  thousand common and twenty thousand common.
16          And so it is going to affect or
17  impact ten thousand persons that are common up
18  there.  And so it is going to impact multiple
19  districts.  So you may think that you are only
20  going to affect a small group, but it actually
21  affects, you know, many other districts.
22      Q.   (BY MR. LACOUR:)  Okay.  Then
23  would it be relevant comparing compactness of

Page 100

1  an enacted plan and an illustrative plan by
2  just taking the mean, compacting the scores for
3  those districts that are affected by the
4  changes needed to draw the additional
5  majority-minority district?
6      A.   No.  Once again, I think you are
7  looking at a subset of the entire plan.  The
8  plan is a complete thirty-five state Senate
9  districts.  Some have been changed.  Some have
10  not been changed.
11          Remember, potentially I could have
12  changed, you know, thirty or forty districts,
13  let's say.  Not forty.  Excuse me.  Twenty or
14  thirty districts and twenty-five or thirty
15  districts instead of twenty districts, let's
16  say.  And so, you know, minimizing that
17  actually is something I think that could be
18  credited or viewed or measured, if you will, in
19  the context that you are actually looking at
20  and comparing.
21      Q.   Don't three of your other
22  compactness metrics, the district by district
23  and the majority-minority, the

Page 101

1  majority-minority and majority-minority to the
2  least compact district metrics look at subsets
3  of the map too?
4      A.   Yes.  But they are subsets that
5  are directed toward -- or directed by Gingles.
6  Remember, Gingles, that second component talks
7  about geographically compact.  And so it wants
8  to determine or it wants you to determine
9  whether that those additional majority or
10  minority districts are geographically compact.
11  So it does focus on those.  So that is a reason
12  why you have those additional ones.
13      Q.   Have you reviewed Dr. Trende's
14  supplemental report in which he assesses the
15  two plans that you introduced in your rebuttal
16  report, Plaintiffs' 2 and 3?
17      A.   Yes.
18      Q.   And did you see that he computed
19  compactness numbers on a regional basis for the
20  Huntsville area?
21      A.   Yes.
22      Q.   Do you dispute those numbers?
23      A.   I don't dispute the numbers.  I

26 (Pages 98 - 101)

1  dispute the value that it has in the context of
2  the Gingles 1 and even the context of the
3  overall plan configuration.
4      Q.   Now, you said earlier that one
5  needs to take into account local geography like
6  the shape of counties and water, etcetera, when
7  considering compactness scores, correct?
8      A.   Correct.
9      Q.   Wouldn't that need to take into
10  account local geography support the use of a
11  regional approach when trying to compare
12  whether a new plan is reasonably compact or
13  not?
14      A.   Excuse me.  Again I would say no
15  in the context of looking at the overall plan
16  and looking at the specific majority Black
17  districts.
18          If there was a criteria -- excuse
19  me, for example, North Carolina, that has
20  clusters, then that would be a region -- then,
21  yes, if they had passed the criteria that looks
22  at a region, then I think you should look at
23  the region because that is part of the

1  criteria.
2          If it is not a part of the
3  criteria, then I think you use the standard.
4  It is a plan looked at district by district and
5  the majority Black districts are looked at as
6  well.
7      Q.   Okay.  I am going to introduce
8  another exhibit that is a compilation of
9  enacted plan and then some of the statistics
10  that you have prepared for that plan, as well
11  as the three illustrative plans, just to make
12  it simpler for us to toggle between the various
13  plans.
14          This will be Exhibit 8.  I will
15  send it out now.
16          (Exhibit 8 was marked for
17          identification.)
18      Q.   (BY MR. LACOUR:)  I will share it
19  in just a moment.  All right.  Mr. Fairfax,
20  does this appear to be the enacted Alabama
21  Senate plan for 2021?
22      A.   Yes, it appears to be that.
23      Q.   I will represent to you that it

1  is.  Focusing on District 7, which is shown
2  here in green in Madison County, do you see
3  that?
4      A.   Yes.
5      Q.   Would you say that it is compact
6  or not very compact district?
7      A.   I would say that is similarly
8  compact to the plan that I came up with,
9  District 7.
10      Q.   Okay.  If I told you that it was
11  one of the less compact districts in the
12  enacted plan, would that sound right to you?
13      A.   I assume you mean using the mean
14  or comparing the ranking of the compactness
15  measures for all three, is what I really wanted
16  to say.  That may be the case, yes.
17      Q.   Do you think that there could have
18  been other traditional districting principles
19  that led to District 7's relatively noncompact
20  shape?
21          MR. VAN LEER:  Objection, form.
22      A.   Yes.  There's always possibility
23  that different criteria and political decisions

1  are made in enacting a plan.
2      Q.   (BY MR. LACOUR:)  And is one of
3  those sometimes incumbency, where the incumbent
4  lives?
5      A.   That is correct.  Many times it
6  is.
7      Q.   Do you know where Senator Givhan
8  who represents District 7 lives in the current
9  district?
10      A.   Not offhand.  No, not offhand.
11      Q.   So I will represent to you that he
12  lives in the bottom right corner of the enacted
13  plan's District 7.  If that is the case, could
14  District 7 in the enacted plan have been drawn
15  in a more compact manner if it did not need to
16  pick up Senator Givhan and draw him into the
17  district?
18          MR. VAN LEER:  Objection to form.
19      A.   That is a possibility.  It also
20  could be possible that there were other factors
21  as well involved in the configuration.
22      Q.   (BY MR. LACOUR:)  Keeping Senator
23  Givhan in District 7 was not something that you

27 (Pages 102 - 105)

Page 106

1 considered when you were drawing your version
2 of District 7, correct?
3     A.   It was something that I
4 considered.  I try to continue to keep all of
5 the incumbents inside the districts and only
6 paired -- I had one pairing, so I think it was
7 successful in doing so.
8     Q.   Not as successful as the enacted
9 plan, though, correct?
10     A.   Correct.  Insofar as pairing
11 incumbencies, that is true.
12     Q.   And there could have been other
13 considerations that you didn't take into
14 account when you were drawing District 7,
15 correct?
16         MR. VAN LEER:  Objection to form.
17     A.   Correct.  This is an enacted plan.
18 And what I drew was an illustrative plan which
19 many times don't go into the different nuances
20 of an enacted plan.
21     Q.   (BY MR. LACOUR:)  Thank you.  Do
22 you think it is fair to compare your
23 District 7's compactness with the enacted

Page 107

1 District 7's compactness when you did not have
2 to consider incumbency protection to the same
3 extent as the legislature?
4         MR. VAN LEER:  Objection to form.
5     A.   Yes, it is fair.  What you are
6 doing is you are including all of -- and I
7 don't mean you, but what I am doing is
8 including all of the factors that are involved.
9 Incumbency is just one in this particular case,
10 but it may not be in another district.
11         So all of the criterias are
12 integrated together, if you will, when you
13 compare district by district, even the mean,
14 plan by plan.
15     Q.   (BY MR. LACOUR:)  But you have a
16 little more freedom when it comes to incumbency
17 because you compare -- you were willing to pair
18 incumbents in a way that the enacted plan did
19 not pair incumbents, correct?
20         MR. VAN LEER:  Objection to form.
21     A.   I attempted to include the
22 incumbents separately in each of the districts.
23 So there was an attempt, and clearly it wasn't

Page 108

1 by accident because there was only one pairing.
2 It was -- it is difficult.
3         And when you draw a new
4 illustrative plan to include all of the
5 incumbents, sometimes it ends up being the case
6 and sometimes it doesn't end up being the case.
7     Q.   (BY MR. LACOUR:)  And it is your
8 position that despite not complying with the
9 traditional districting -- scratch that.
10         Which map performs better on the
11 traditional districting principle of avoiding
12 pairing of incumbents, your enacted plan or
13 your illustrative plans?
14         MR. VAN LEER:  Objection to form.
15     A.   Of course, I would have to give an
16 edge to the enacted plan.  You have
17 thirty-three -- doing my calculation here --
18 that weren't paired, and you have two
19 incumbents that were.
20         (Off-the-record discussion.)
21     Q.   (BY MR. LACOUR:)  I want to go
22 back for a minute to your initial report,
23 Exhibit 2, Page 14, in particular subparagraphs

Page 109

1 h and i, Preserve District Cores and Incumbent
2 Pairing.  And for both of those traditional
3 districting principles, you stated that you
4 served them "to the extent possible but
5 accorded it lower priority when it conflicted
6 with the criteria above."  Is that correct?
7     A.   Yes.
8     Q.   When would preserving district
9 cores conflict with the criteria above?  If you
10 need me to scroll up to look at those criteria,
11 I am happy to.
12     A.   The one that definitely jumps out
13 is, of course, the Section 2 with the Voting
14 Rights Act in creating a majority Black
15 district.  But there could be other criteria
16 that once you began to change and alter one
17 district, you are compelled to change and
18 configure the other in a domino effect.
19         So you may not be able to be able
20 to meet the district cores because of this
21 domino effect of districts changing.  And you
22 try to adhere to, let's say, one person one
23 vote.

28 (Pages 106 - 109)

Page 110

1     And so once you move or shift
2  populations away from one district, you have to
3  add on population using another district.
4  Therefore, it is impossible to have district
5  cores maintained completely under that
6  scenario.
7     Q.   So is the first criteria you
8  mentioned was compliance with Section 2?  Is
9  that correct?
10    A.   Yes.
11    Q.   And in your view, that is why you
12 could not observe the guideline principle of
13 incumbent pairing to the same extent as the
14 enacted plan; is that fair?
15    A.   I wouldn't frame it like that.  I
16 would frame it from the point of view that --
17 again, I am not an attorney, so let me frame it
18 from a map drawer's perspective.  The courts
19 have said that district cores, at least in the
20 Milligan case, had no weight.
21        And so they did not weigh that
22 district core in order to actually create the
23 majority Black district, so it -- meaning that

Page 111

1  if you stuck yourself with adhering to district
2  cores, you would not be able to create a new
3  majority Black district.
4     Q.   Correct.  But I am asking about
5  incumbent pairing.  You said to the extent
6  possible -- sorry.  Scratch that.
7        You observed this incumbent
8  pairing to the extent possible but accorded it
9  lower priority when it conflicted with the
10 criteria above.  And you identified Section 2
11 as one of the criteria above that conflicted
12 with incumbent pairing; is that correct?
13    A.   They are related.  Because you are
14 given low priority to district cores, you are
15 going to change the districts.  And in essence,
16 there may be an incumbent that will not be
17 included or there may be incumbents that may be
18 paired under that scenario.  So the district
19 cores also relate to the incumbent locations
20 really.
21    Q.   I think you said earlier that part
22 of the analysis that needs to be done to
23 determine whether a reasonably configured plan

Page 112

1  can be constructed that contains an additional
2  majority-minority district is taking into
3  account the traditional districting principles
4  of the state or local government whose plan you
5  are assessing, correct?
6     A.   Yes.  I did have that caveat, so,
7  yes.
8     Q.   So if you cannot construct a plan
9  with an additional majority-minority district
10 that is reasonably configured, then there is no
11 Section 2 violation, correct?
12    A.   I agree that it has to be
13 reasonably configured, if that is what you are
14 saying.
15    Q.   And that analysis requires looking
16 at the traditional districting principles, in
17 this case of the state, that it used to draw
18 the enacted plan, correct?
19        MR. VAN LEER:  Objection to form.
20    A.   Yes.  But if it hinders, say, the
21 Voting Rights Act -- again I am not talking
22 about -- I'm not talking from an attorney point
23 of view -- then those would be held under a

Page 113

1  much, much lower weight than the other
2  traditional redistricting criteria.
3     Q.   (BY MR. LACOUR:)  But isn't that a
4  bit circular?  Because how do you know that
5  there is a Section 2 violation until you have
6  actually tried to draw the illustrative plan in
7  accordance with the traditional districting
8  principles of the state?
9        MR. VAN LEER:  Objection to form.
10    A.   Well, I did.  I did try to adhere.
11 The reason why it is here is that I did try to
12 adhere to preserving district cores.  And I did
13 try to adhere to incumbent pairing.  So both of
14 those were attempted to be adhered to as best
15 as possible.  And I underscore "best" as not
16 something that -- in the context of the time
17 frame that I had.
18        I think you always can spend more
19 time and improve that.  There is a possibility
20 that maybe I could come up with a configuration
21 that didn't pair incumbents.  But under the
22 context of the illustrative plan, what I am
23 trying to bring forth is a plan that approves

29 (Pages 110 - 113)

Page 114

1 those first three conditions of Gingles and
2 adhere to the criteria.
3     Q.   (BY MR. LACOUR:)  Right.  But the
4 criteria that conflicted with the state's
5 traditional redistricting criterion of
6 incumbent pairing was, in your testimony,
7 Section 2.
8          And so what I heard you just say
9 is that it was all right to pair incumbents and
10 to sacrifice that principle in order to comply
11 with Section 2.  Is that correct?
12    A.   What I said was that I think the
13 question was what criteria -- and I can't
14 remember specifically, but you were talking
15 about what criteria would compel you to not
16 pair incumbents.  And one of the things that I
17 said was if you are looking at creating a fair
18 plan under Section 2, majority-minority
19 district, the new one, then pairing incumbents
20 would be held at a lower weight, just like
21 district cores.
22    Q.   Lower compared to what?
23    A.   Compared to the other criteria.

Page 115

1     Q.   And which criteria?
2     A.   All of the other criteria, the
3 county splits, the communities of interest.
4 And let me -- let me say this.  I am not
5 agreeing that that incumbent pairing wasn't
6 held to.  I mean it wasn't held to with a
7 hundred percent, but it was held to that only
8 one pairing occurred.
9          And sometimes that occurs in the
10 normal districting process.  It doesn't have
11 anything to do with Section 2.  Sometimes that
12 occurs.  You end up with pairing incumbents and
13 they enact the plan.  And so I am not stating
14 that that wasn't adhered to.  But I am stating
15 that if there is something associated, then I
16 think lowering the way for that is appropriate
17 under Section 2, just like district cores.
18    Q.   Okay.  But is it your testimony,
19 then, that you paired incumbents to improve on
20 the prior map's compactness?
21    A.   No.  I am not saying that.  I
22 didn't compare plans with or without pairing
23 incumbents and looking at the compactness.  I

Page 116

1 don't know about that.
2     Q.   So it wasn't one of those -- it
3 wasn't one of those nonracial traditional
4 districting principles that led you to pair
5 incumbents, correct?
6          MR. VAN LEER:  Object to the form.
7     A.   No, not necessarily.  Remember
8 when I said that when you add population or
9 move or shift population, there's a domino
10 effect that you have to grab population from
11 another district and thereby doing so, you may
12 end up with a district, one, that doesn't
13 preserve district cores; and two, that may not
14 include that incumbent.
15    Q.   (BY MR. LACOUR:)  So was the goal
16 of drawing an additional majority-minority
17 district why your illustrative plans pair
18 incumbents when the enacted plan does not?
19          MR. VAN LEER:  Objection to form.
20    A.   Could you repeat that question,
21 please?
22    Q.   (BY MR. LACOUR:)  We will scratch
23 that question.  First, you mentioned core

Page 117

1 attention earlier, correct?
2     A.   Yes.
3     Q.   And you were willing to sacrifice
4 core attention for the purpose of drawing
5 additional majority-minority districts in the
6 illustrative plan, correct?
7          MR. VAN LEER:  Objection to form.
8     A.   I don't know if I would put it
9 into the context of willing to sacrifice, I
10 guess, what you used.  The question is how much
11 weight do you give it.  Clearly I used it to
12 retain or preserve the districts.  But the
13 weight was given lower for district cores.
14    Q.   (BY MR. LACOUR:)  And what was
15 given more weight in its place?
16    A.   All of the other factors, all of
17 the other criteria, county splits, compactness,
18 equal population, contiguity, all of those
19 other criteria.
20    Q.   But your map doesn't split any
21 fewer counties than the enacted plan, does it?
22    A.   No, not fewer counties.
23    Q.   So what was given more weight was

30 (Pages 114 - 117)

Page 118

1 the goal of drawing additional
2 majority-minority districts, correct?
3          MR. VAN LEER: Objection to form.
4      A.   No.  No.  You are trying to
5 achieve all of them.  You are trying to achieve
6 all of the other criterion, plus you are trying
7 to look to see whether you can create one or
8 more majority-minority districts that are
9 sufficiently large and geographically compact.
10     Q.   (BY MR. LACOUR:)  Right.  But your
11 plan does not do better on counties.  It is not
12 overall more compact than the enacted plan, and
13 it does worse on incumbent pairing, correct?
14     A.   What were the three you said,
15 incumbent pairing, county splits and --
16     Q.   And overall compactness across the
17 entire map.
18     A.   That is correct.  It doesn't
19 perform numerically better on those specific
20 ones, but it performs sufficiently and
21 reasonably on those.
22     Q.   All right.  Return briefly to the
23 Arkansas transcript we looked at earlier today.

Page 119

1 Let's see.  Now, Mr. Fairfax, does this look
2 like your testimony from the preliminary
3 injunction hearing in the Arkansas
4 redistricting case?
5      A.   I don't see anything yet.
6      Q.   Oh, I'm sorry.  I have forgotten
7 to hit the share button.  How is this?
8      A.   Yes.
9      Q.   Okay.  All right.  I am going to
10 move from Page 551 to 552.  And I will read,
11 and this is your testimony starting at Line 1:
12 I mean there is some benefit to the voters by
13 not impairing, regardless of the legislators.
14 There's a benefit so the voters don't end up
15 getting incumbents swapped back and forth.  So
16 it is not just when you pair incumbents.  You
17 also hurt the voters too.  And so that's a
18 critical point to think about.
19          Did I read that correctly?
20     A.   Yes.
21     Q.   And is that still your view, that
22 pairing incumbents hurts voters?
23          MR. VAN LEER: Objection to form.

Page 120

1      A.   Yes.  And, of course, there is a
2 quantity associated with that.
3      Q.   (BY MR. LACOUR:)  Okay.  I am
4 going to pull up your exhibit again or your
5 initial report again.  Bear with me.  All
6 right.  This is your initial report,
7 Mr. Fairfax, Page 39.
8          Looking down at the footnote, you
9 said that: The enacted plan largely preserved
10 district cores.  As a result of using that plan
11 as a starting point, so does the illustrative
12 plan.  Accordingly, both the illustrative and
13 enacted plans are largely comparable in the
14 preservation of the district cores of the
15 previous plan configuration used in 2020 (the
16 original 2010 plan had been altered due to
17 litigation).
18          How do you know that the scores
19 are largely comparable?
20     A.   Excuse me.  I measured the scores.
21 I measured the scores of the enacted plan to
22 the original plan.  And then I measured the
23 scores of the illustrative plan to the enacted

Page 121

1 plan.
2      Q.   Is that analysis in your report?
3      A.   Other -- you mean the specific
4 reports of the first one?  No, it is not.  The
5 most important one, I think, was the enacted
6 plan, which was used as a basis.
7      Q.   Okay.  And let's see.  What does
8 "largely comparable" mean?  Do you recall that
9 that had a particular level of comparability?
10     A.   I don't.  I don't at this
11 particular moment recall percentages.
12     Q.   Okay.  I believe -- let me find my
13 spot in the report.  Let's see.
14          MR. LACOUR: I am told we are
15 coming up on an hour, so I think we could break
16 for what would be a late lunch for you guys and
17 only a little bit of a late lunch for me.  So
18 if this is a good time to stop, we can break.
19          MR. VAN LEER: Sounds good.
20     A.   Yes.
21          (Off-the-record discussion.)
22          (Whereupon, a lunch break was had
23          from 1:21 p.m. until 2:07 p.m.

31 (Pages 118 - 121)

1      EDT)
2      Q.   (BY MR. LACOUR:)  Welcome back,
3  Mr. Fairfax.
4      A.   (Nodding.)
5      Q.   So I want to focus in a little bit
6  on how many splits in your illustrative plans.
7  Let me share my screen, Exhibit 8, which is
8  that compilation of the enacted and the
9  illustrative plans and some of the relevant
10  information.
11      So going to your Plan 1, do you
12  see that on your screen?
13      A.   Yes, I do.
14      Q.   And it splits Marshall and Morgan
15  Counties -- or actually Morgan and Limestone
16  Counties, correct?
17      A.   Correct.
18      Q.   Then if we move on to Plan 3,
19  District 7 also has the part of Madison, part
20  of Morgan, part of Limestone and part of
21  Lawrence Counties; is that correct?
22      A.   That is correct.
23      Q.   Okay.  Now, in the enacted

1  plan Lawrence County is whole, Morgan County is
2  whole; is that correct?
3      A.   You are speaking of for --
4      Q.   For the enacted plan.  They are
5  not split between different Senate districts,
6  correct?
7      A.   Correct.  Correct.
8      Q.   But your Plans 1 and 2 have the
9  same number of the counties split or splits in
10  counties as the enacted plan does, correct?  I
11  believe it is nineteen?
12      A.   Yes.
13      Q.   So that means you have closed up
14  county splits in other areas of the map; is
15  that correct?
16      A.   It must be, yes.  Right now I
17  can't tell you the particular ones, but that
18  must have occurred.
19      Q.   So I think one of them might be --
20  they may be Blount and Chilton Counties.  So if
21  you see here on the enacted map, Blount County
22  is split, and then if you go down towards the
23  center of the state, you will see Chilton

1  County is split in the enacted District 1; is
2  that correct?
3      A.   That is correct.
4      Q.   All right.  We will scroll to your
5  illustrative plan.  You see Blount appears to
6  be whole, and Chilton appears to be whole
7  within your illustrative plan District 14; is
8  that correct?
9      A.   Yes, that's correct.
10      Q.   Do you recall why you chose to
11  close up those specific splits?
12      A.   They all were affected by the
13  configuration of -- the new configuration of
14  those districts.  For example, in 25 and 26,
15  they impacted the adjacent counties associated
16  with that.  And so as I was looking at it,
17  those adjacent counties, I was trying or
18  attempting to minimize the county splits in
19  those particular areas.  The same thing up in
20  the northern area.
21      As that domino effect that I
22  mentioned about, I am trying to minimize the
23  county splits of the impacted districts.

1      Q.   Okay.  And you would agree by
2  closing up split counties that had been split
3  in the enacted plan, your core attention score
4  would be worse in your illustrative plan, at
5  least for those particular counties, correct?
6      A.   I would agree that, yes, they
7  would be different, yes.
8      Q.   Okay.  You would be prioritizing
9  reducing county splits over core attention?
10      MR. VAN LEER:  Objection to the
11  form.
12      A.   I don't know if I would put it as
13  plainly as that, meaning that, as I am trying
14  to configure the district in the new
15  configuration, I am attempting to balance
16  everything out.
17      And so I am looking at county
18  splits as one of those factors that I am trying
19  to balance out.  So I don't know if I would
20  look at it as prioritizing.
21      Q.   (BY MR. LACOUR:)  Okay.  But
22  because you have split more counties in the
23  north, you have got to close somewhere to

Page 126

1  strike that balance, right?
2      A.   Well, Blount was impacted by 3,
3  which was impacted by 7, which was impacted by
4  9.
5          So the Blount was in that same
6  region, let's say.  And the domino effect was
7  the same down below as well.
8      Q.   All right.  If I go to -- this is
9  still in Exhibit 8, which, as I said, has some
10 of the population summaries from your
11 appendices in it.  Looking here, this is
12 Appendix Page 149.
13         District 7, we spoke about this
14 earlier, is underpopulated by about 4.41
15 percent, correct?
16     A.   Correct.
17     Q.   So District 7 can pick up at least
18 thirteen thousand people and still be within
19 the population parameters that you are using
20 for your illustrative plan, correct?
21     A.   It could, yes.  If it picked up
22 population, it would be closer to the ideal,
23 yes, that is correct.

Page 127

1      Q.   And is that about the same, do you
2  recall, for your districts -- versions of
3  District 7 in Plan 2 and Plan 3?
4      A.   Yes, approximately, from what I
5  can recall.
6      Q.   All right.  I want to look
7  specifically at Plan 7.  Do you have that in
8  front of you now?
9      A.   Yes, I see it on the screen.
10     Q.   Great.  You see the Tennessee
11 River dividing at least part of District 7 from
12 the district directly south of District 7,
13 correct?
14     A.   Correct.
15     Q.   So why did your plans choose to
16 cross over the Tennessee River at Decatur in
17 Limestone County?
18     A.   Well, as I began drawing this,
19 Illustrative 2 was very similar to Illustrative
20 1, and so the configuration spans from
21 Huntsville to that Redstone Arsenal and grabs
22 areas going west and use that boundary of
23 Morgan and the river.  It picks up the Decatur

Page 128

1  noncontiguous area, and then it does add the
2  Decatur on the other side.
3          And so one of the things that I
4  looked at were socioeconomic aspects that bound
5  the two, that portion of Decatur and certain
6  portions of Huntsville.  And that was one of
7  the configuration choices.
8          I went through, you know, several
9  configuration choices.  This is the one I felt
10 was preferred, let's say.
11     Q.   Okay.  But if you had just crossed
12 the river at Morgan County without crossing
13 into Limestone, that would be one -- you could
14 have had one fewer county split, correct?
15     A.   Correct.
16     Q.   Why didn't you opt to minimize
17 county splits by making that move and crossing
18 Madison County rather than over in Limestone?
19     A.   Well, you are looking at all of
20 those criteria that exist, and you are looking
21 at also trying to satisfy that first
22 precondition of Gingles.  So you are trying to
23 see whether it is possible to draw, you know,

Page 129

1  one or more majority-minority districts.  And
2  the configuration that I chose and ended up
3  with added Decatur, which is a reasonable city
4  to add, it is in the same combined statistical
5  area; and as a matter of fact, it is named
6  after it, the Huntsville/Decatur combined
7  statistical area.  So I don't think it is
8  anything unusual to combine those two cities
9  together.
10     Q.   So it is your position that you
11 crossed the river over in Limestone County
12 rather than in Madison County to put people
13 from Decatur who live in Limestone and people
14 who live in Decatur and Morgan Counties
15 together?
16     A.   It is acceptable to do that, I
17 guess is what I am saying.  It is acceptable to
18 put a city like Decatur and combine with a city
19 like Huntsville.
20     Q.   Most of Decatur -- most of Decatur
21 is in Morgan County, though, correct?
22     A.   That's correct.
23     Q.   So why did you need to pick up

33 (Pages 126 - 129)

1  Limestone County if you were just trying to put
2  Decatur and Huntsville together?
3      A.   You are saying why didn't I cross
4  over the Tennessee River?
5      Q.   Is it possible -- well, I am
6  saying is it possible to put portions of
7  Decatur and portions of Huntsville together
8  without adding Limestone County to the
9  district?
10     A.   It would be very difficult because
11 I think it would almost have a narrow
12 connector, if you will, that would connect the
13 two, because Decatur, I believe, is extended
14 down southward, if you can imagine, sort of
15 where that area is that says Decatur, it is
16 extended down somewhat southeastward.
17          And so it -- the only way would be
18 to cross over the Tennessee River at an earlier
19 point, if that is what you are trying to look
20 at.  If you didn't do that, it would -- if you
21 removed all that in Limestone, then you would
22 have to cross over sooner and then have a thin
23 connecting below the Tennessee River going to

1  Decatur.  To me that doesn't make sense as a
2  configuration.
3      Q.   Okay.  So was part of your goal in
4  drawing the district as you did to keep more of
5  Decatur together?
6      A.   I think you -- on my end, you --
7      Q.   I'm sorry.
8      A.   -- you faded out.
9      Q.   Was part of the reason you
10 constructed the district like you did to keep
11 more of Decatur together within District 7?
12     A.   I don't know if that is correct,
13 to keep more of Decatur inside District 7.
14 What I am saying is that I think it is
15 appropriate to connect Decatur with the areas
16 of Huntsville.  That is what I am saying.
17     Q.   Okay.  More appropriate than
18 connecting parts of Decatur with other parts of
19 Decatur?
20     A.   Well, you know, ideally, of
21 course, it would be great to include all of
22 Decatur.  That would be probably impossible to
23 include that with the areas of Huntsville.

1  Just the population would exceed.
2          So that is -- that is one.  But,
3  you know, this is a test I am trying to
4  configure the districts, satisfying that first
5  precondition of Gingles and adhering to
6  traditional redistricting criteria.
7      Q.   Uh-huh.  But keeping a city
8  together, that is a pretty important tradition
9  in districting criteria, correct?
10         MR. VAN LEER:  Objection to the
11 form.
12     A.   That is one of the criterias,
13 although there were -- if you look at census
14 places, there were over a hundred that were not
15 kept together in the enacted and in the
16 illustrative plans.
17     Q.   There's not a traditional
18 principle you have measured or in your report
19 that would measure how many times a map has
20 combined part of a city with another part of a
21 city in a way that makes sense -- sorry.  That
22 is not a good question.  I will scratch that.
23         What I am trying to understand,

1  essentially, you could put all of Decatur in
2  its own district, right?
3      A.   Right at this moment, I don't know
4  if the population of Decatur matches a state
5  Senate district.  So I'm not sure if I can say
6  yes.
7      Q.   If the population of Decatur was
8  around sixty thousand people, could you put all
9  of it within one Senate district?
10     A.   Yes.
11     Q.   And that would advance a
12 traditional districting principle of keeping a
13 city together within one district, correct?
14     A.   Yes.  Isolated, yes, that would.
15     Q.   Okay.  Then what traditional
16 districting principle are you advancing when
17 you split part of that city off and combine it
18 with part of Huntsville?
19     A.   It is not a principle that you use
20 to attempt to split.  It is a principle to
21 minimizing the split.  And so what I am just
22 saying is that it is appropriate to have
23 Huntsville that is partial Huntsville and

34 (Pages 130 - 133)

Page 134

1  Decatur that is partial Decatur. That is done
2  throughout the state with other districts.
3        So I'm just saying that it is
4  appropriate and -- acceptable, let's say, would
5  be probably a better word. I am not trying
6  intentionally to split. It is acceptable to
7  split.
8     Q.   Okay. One moment. I am looking
9  for another document. Just one second.
10       Okay. I have got Exhibit 9 I am
11  about to send to you all, and then I will also
12  share my screen.
13       (Exhibit 9 was marked for
14       identification.)
15    Q.   (BY MR. LACOUR:) It shows splits
16  of Decatur and various maps. Mr. Fairfax, have
17  you ever used Dave's Redistricting?
18    A.   Yes, I have.
19    Q.   Do you generally find it to be
20  fairly accurate in the numbers that are in
21  reports demographically and otherwise?
22    A.   I am hesitating because I do know
23  that racially they use the any part black for

Page 135

1  all the minorities. So that tends to increase
2  the numbers of all of the different racial
3  groups, let's say, minority populations.
4        So that is why I am hesitating.
5  But I think it is a good software to use to
6  utilize to look at districts. I am hesitant in
7  utilizing it in litigation.
8     Q.   Understood. So looking now at
9  Exhibit 9, I will represent to you that the
10  statistics at the bottom of this page are the
11  demographics of the entire city of Decatur.
12  And can you tell me what it says for the White
13  voting age population and for the Black voting
14  age population?
15    A.   The White voting age population is
16  twenty-seven thousand one hundred and
17  fifty-seven. The Black population is ten
18  thousand four hundred and forty.
19    Q.   All right. And percentages, does
20  that say for the White voting age population
21  percentage that is 60.6 percent and for the
22  Black voting age population percentage 23.3
23  percent?

Page 136

1     A.   Correct.
2     Q.   So turning to the second page. I
3  will represent to you this page has the
4  portions of Decatur that you include in SD7 in
5  your first illustrative plan represented in
6  green and the others outside of that District 7
7  represented in blue.
8        And the SD7 Black voting age
9  population is 32.5, while the nonDistrict 7
10  Black voting age population is 18.5. Is that
11  an accurate representation of what the document
12  shows?
13    A.   Yes. Of what the document shows,
14  yes.
15    Q.   Okay. Then we have Plan 2, and I
16  will represent that this is -- this shows the
17  split of Decatur between SD7 in your
18  Illustrative Plan 2 and other districts in that
19  Plan 2 with the SD7 portion of Decatur 35.7
20  percent Black voting age population and the
21  nonSD7 portion being 17.8 percent Black voting
22  age population.
23        Did I recount that correctly?

Page 137

1     A.   Yes. That is what is shown on the
2  document; that is correct.
3     Q.   Okay. And then finally, Plan 3,
4  similarly, does the document reflect or does
5  the document state that the Black voting age
6  population of Decatur within District 7 or the
7  portions of Decatur within District 7 are --
8  sorry.
9        I want to be precise here. So I
10  will represent to you this is Plan 3, your
11  Illustrative Plan 3, part of Decatur in
12  District 7, part of it without District 7, and
13  that the population within District 7, the
14  Black voting age population 58.9 percent and
15  for the portion without District 7, a Black
16  voting age population of 17.6 percent. Did I
17  recount that accurately?
18    A.   Yes, yes, you did.
19    Q.   Now, if these relative differences
20  in the Black voting age population between the
21  portions of Decatur that are within your
22  District 7 and the portions of Decatur that are
23  outside of District 7 are accurate, do those

35 (Pages 134 - 137)

1 differences suggest that you split Decatur on
2 the basis of race in any or all of three of
3 your plans?
4          MR. VAN LEER:  Object to form.
5     A.    No.  That could be the end result.
6 But there were other factors involved, for
7 example, I mentioned.  There were socioeconomic
8 commonalities in that particular area that was
9 added.  So that's another factor.
10          Of course, the other using whole
11 VTDs, adding additional population, of course,
12 factored in.  Additional population -- I'm
13 sorry.  Additional population to move it to the
14 ideal population.
15     Q.   (BY MR. LACOUR:)  Okay.  So your
16 testimony is that socioeconomic issues
17 explain -- socioeconomic issues could explain a
18 difference of more than thirty percentage
19 points when it comes to Black voting age
20 population within District 7 and Decatur and
21 Black voting age population outside of District
22 7 within Decatur?
23          MR. VAN LEER:  Objection to the

1 form.
2     A.    No.  What I am saying is that
3 there are commonalities in that area of Decatur
4 with areas of Huntsville that provides for a
5 connection between the areas, that they could
6 be included in a district or the same district.
7     Q.   (BY MR. LACOUR:)  I am happy to
8 sort of scroll back through this again.
9          But looking first at Plan 1 and
10 then Plan 2 and to Plan 3, do you agree that
11 the percentage of Decatur contained within your
12 SD7 decreases from Plan 1 to Plan 2 to Plan 3?
13     A.    Yes.
14     Q.    How did you decide which precincts
15 to omit as you were sending more of Decatur
16 outside of District 7?
17     A.    I am looking at the totality of
18 the district.  I am trying to meet that first
19 precondition of Gingles.  And so I am looking
20 at different VTD options that would match, you
21 know, that first component of Gingles and the
22 second, which is reasonably compact, and then I
23 am also looking at, of course, those other

1 criteria.  So I am trying a variety of
2 configurations.  And these are the
3 configurations that I ended up with.
4     Q.    Okay.  So if a configuration that
5 may have been more compact would reduce your
6 Black voting age population or Black citizen
7 voting age population below fifty percent for
8 the illustrative plan, would you have not
9 chosen that particular iteration of the map?
10     A.    That is correct because it doesn't
11 satisfy that first precondition of Gingles.  It
12 wouldn't be logical to choose that as something
13 that satisfied that.
14     Q.    All right.  So did you say earlier
15 you considered Decatur and Huntsville to be a
16 community of interest?
17     A.    They are contained within the same
18 combined statistical area, and they share, at
19 least that portion, commonalities.
20 socioeconomic commonalities to median housing
21 values, median household income, they share
22 those two commonalities.
23     Q.    Is there any other evidence you

1 considered -- first, would you consider them to
2 be a community of interest, yes or no?
3     A.    You are talking about Decatur and
4 Huntsville?
5     Q.    Yes.
6     A.    By itself?  Outside of those
7 socioeconomic aspects, I didn't do an analysis
8 that looked at Decatur and Huntsville to
9 determine whether they were a community of
10 interest.  I do know that they shared
11 commonalities socioeconomically together.
12     Q.    And are those socioeconomic
13 similarities enough to establish them as a
14 community of interest?
15     A.    Socioeconomic data has been used
16 as communities of interest.  And so
17 potentially.  But in this particular case I am
18 looking at, there is a reason to add on that
19 portion of Decatur to the other parts of
20 Huntsville.
21     Q.    You said there is a reason.  What
22 is that reason?
23     A.    The commonality amongst the areas.

Page 142

1    Q.   Socioeconomic commonalities.
2    A.   Socioeconomic, correct.  Correct.
3    Q.   Were there people in Huntsville
4  who had socioeconomic commonalities with other
5  people in Huntsville yet who were not included
6  within your District 7?
7    A.   Let me make sure I am getting this
8  question correct.  Are you asking, were there
9  other socioeconomic aspects?
10    Q.   Rather, were there some parts of
11  Huntsville that had the same socioeconomic
12  indicators as the parts of Huntsville that were
13  in District 7 and the parts of Decatur that
14  were included in District 7 but that were not
15  themselves included within District 7?
16        MR. VAN LEER:  Objection to form.
17    A.   I want to make sure I understand
18  your --
19    Q.   (BY MR. LACOUR:)  It is poorly
20  worded.  This might be easier if I pull up the
21  appendix.  I'm sorry.
22        So this is Exhibit 5 again.  I
23  will be sharing it in just a moment.  This is

Page 143

1  the appendix that you provided with your
2  initial report.
3        Okay.  This is your -- you
4  prepared this to show -- to demonstrate what to
5  the court?
6    A.   To demonstrate those commonalities
7  that I mentioned about you can see that when it
8  comes to median household income.  This is sort
9  of the bottom quintile, breaking it up, census
10  tracts into five different equally part ranges.
11        You can see that the Huntsville
12  area in that area and Decatur have
13  similarities, let's say, with each other,
14  commonalities.
15    Q.   Okay.  And I am going to zoom in
16  on Huntsville towards the eastern part of your
17  District 7 in Plan 1, Illustrative Plan 1.
18        You see some red portions of the
19  map just to the other side, just to the east of
20  your District 7 that are also apparently part
21  of Huntsville?
22    A.   Yes.
23    Q.   So if you were districting to put

Page 144

1  together areas with similar interests,
2  including similar socioeconomic interests, why
3  were these portions not also included within
4  your Illustrative Plan 1's District 7?
5    A.   Well, one of the things is I am
6  not sure at this particular moment.  But it
7  could be that those census tracts were
8  overlapping.  So part of it could be inside the
9  district and part could be outside because the
10  census tracts overlap the VTDs.
11        The second part is that I used
12  that Red Arsenal [sic] area as a demarcation
13  coming down, starting from the northern tip.
14  And so I followed that on down.  And once
15  again, census tracts are being used that
16  overlap VTDs, and part of that could be inside
17  the district and part outside.
18    Q.   So if they are part of the same
19  VTD, wouldn't that be even more reason to
20  include them as part of District 7?
21    A.   No.  If only part of it you would
22  most likely have to split an additional VTD in
23  order to get that census tract in.

Page 145

1    Q.   Help me understand, what are the
2  geographies that are colored in in the red and
3  the orange, what level of geography?
4    A.   Census tracts.
5    Q.   Census tracts?  Okay.  Understood.
6        And then if you look at the
7  southwest quarter of your District 7, just
8  south of there, you have got another patch of
9  red and a little further south another large
10  area of orange.  Is there a reason that you
11  didn't combine them with the red and the orange
12  that were in Decatur and also within that same
13  county of Morgan County?
14    A.   If I were to connect those two
15  areas, I would have to drop off significant
16  population elsewhere in the district.  And I
17  don't think that would be a logical or a good
18  thing to do, let me say.
19    Q.   And why not?
20    A.   It would reconfigure the district
21  I think significantly.
22    Q.   It would improve the district in
23  terms of connecting people who have common

37 (Pages 142 - 145)

Page 146

1  interests and common socioeconomic status
2  within Morgan County, though, would it not?
3      A.  Yes, it may do that, but it also
4  may reconfigure the district populationwise,
5  and I would have to substantially alter the
6  configuration elsewhere.
7      Q.  And that is always true when you
8  bring some people in or send some people out of
9  a district, right?
10      A.  That is correct.
11      Q.  So is there some other traditional
12  districting principle that would explain why
13  you didn't include those people and decided to
14  include some other people within District 7?
15          MR. VAN LEER:  Objection to form.
16      A.  As I mentioned, it would be a
17  completely different district in that all of
18  those components, including the first
19  precondition of Gingles and the redistricting
20  criteria, I'm not even sure if you could make
21  it compact by doing that, by adding what you
22  are adding.
23      Q.  (BY MR. LACOUR:)  When you say the

Page 147

1  first precondition of Gingles, you mean it
2  would drop the district below fifty percent
3  Black voting age population or Black citizen
4  voting age population?
5      A.  There's a possibility it could do
6  that.
7      Q.  So you mentioned four or five
8  quintiles.  Is the red the bottom quintile; the
9  orange the second from the bottom quintile?  Is
10  that how you settled on those figures?
11      A.  Yes, that is the bottom, second
12  and then the three collapsed.
13      Q.  Okay.  Why did you collapse the
14  top three quintiles?
15      A.  So you can easily see the bottom
16  two quintiles.  When you are looking for
17  commonalities, I found it much easier just to
18  show the ones that have the commonalities.  So
19  in this particular case the commonalities were
20  those bottom two quintiles.  If you show
21  everything, there's a tendency to not be able
22  to visualize the commonalities that exist.
23      Q.  Do you know if that part of Morgan

Page 148

1  County, sort of the eastern half of Morgan
2  County would be colored in if you had also
3  included some of that center quintile from
4  forty-five thousand two hundred fifty-one
5  dollars to whatever the upper limit is of that
6  quintile?
7      A.  I don't know.  I didn't -- I
8  didn't look at that.
9      Q.  Okay.  And is that the same reason
10  why, on the next page we are looking at median
11  housing values, you have got the red and the
12  orange colored in as you do?
13      A.  Yes, those are the bottom
14  quintiles, and then the other ones are
15  collapsed, that is right.
16      Q.  Okay.  And then looking to the
17  eastern border of your District 7, a similar
18  question to what I had before:  It looks like
19  there are at least three parts of -- I believe
20  that is Huntsville just to the east of your
21  District 7 borderline that are not included
22  within your District 7, despite being in that
23  bottom quintile when it comes to median

Page 149

1  household values.  Do you recall why you did
2  not include them within your District 7?
3          MR. VAN LEER:  Objection to form.
4      A.  Yes.  The same reason.  One, those
5  could be overlapping census tracts that overlap
6  VTDs.  So just as I mentioned before, that they
7  could be included.  It is just that you have an
8  overlapping of a census tract.  And when it
9  comes down to the Redstone Arsenal, you see a
10  demarcation of that used as a boundary as well.
11  And that additional could be an overlapping as
12  well.
13      Q.  (BY MR. LACOUR:)  But you could
14  include the additional VTD though, correct?
15      A.  Yes, but not if I were using the
16  Red Arsenal [sic] as a boundary demarcation,
17  right.
18      Q.  Right.  But why would you -- what
19  is the reason why you would need to use the
20  Redstone Arsenal as a boundary line
21  demarcation?
22      A.  Many times you use -- in this
23  case, it is a landmark area and it's also a

1  CDP, at least part of it.  And many times you
2  use city boundaries or boundaries such as that
3  as a demarcation for the district boundary.
4      Q.   Right.  But you left Huntsville to
5  pick up lower income areas of Decatur, despite
6  those areas of Decatur being outside of
7  Huntsville and beyond Redstone Arsenal,
8  correct?
9      A.   Correct.  And I'm not -- at this
10  moment, as I mentioned before, I'm not sure if
11  that is not an overlapping.  There is part of
12  that census tract that lies inside the
13  district.  It is just an overlapping.  But that
14  is correct.  It is a balancing situation that
15  you are using, just like the others, excuse me,
16  so you are not going to get all of the areas
17  that you want.  Remember you are trying to
18  configure using all of the factors, not just
19  one.  So none of the criteria are going to come
20  out to be perfect.
21      Q.   And one of those factors is
22  satisfying the requirements of Gingles 1,
23  correct?

1      A.   That is correct.
2      Q.   Your report does reference
3  landmark areas.  Can you explain what those
4  are?
5      A.   The landmark areas is a dataset
6  that the Census Bureau has.  It -- I include it
7  because it includes areas such as universities,
8  colleges and universities, military bases,
9  Native American reservations and areas such as
10  like the Red Arsenal [sic], Redstone Arsenal.
11      And so these are areas, insofar as
12  at least the colleges, universities, military
13  bases and Native American reservations, that
14  are commonly accepted as communities of
15  interest.
16      So including those and counting
17  the splits, what you are doing is you are
18  adding a database that you can at least draw
19  some analysis of the communities of interest
20  insofar as what I just mentioned, those --
21      Q.   Are things like commercial
22  buildings included as a landmark area?
23      A.   They have hospitals, they have

1  certain areas, parks, they have certain areas
2  like that that are included.  But the concept
3  and the idea is that it is an unbiased database
4  that has all these areas, so you are not really
5  biassing any particular plan.
6      So looking at it gives you some
7  idea, some indication of -- some additional
8  indication, let's say, of communities of
9  interest and the splits associated with it.
10      Q.   Okay.  And are landmark areas
11  mentioned in Alabama's 2021 redistricting
12  guidelines?
13      A.   Are they -- are they mentioned is
14  what you asked?
15      Q.   Yes, sir.
16      A.   Insofar as communities of
17  interest.  What I use it for is the pulling out
18  of a database that has potential communities of
19  interest in it.
20      Q.   So to the extent your map does
21  better on landmarks, we don't know if it is
22  because you split fewer parks and hospitals or
23  split fewer universities or like reservations;

1  is that fair to say?
2      A.   That is fair to say.  It is an
3  unbiased database that is used to -- that
4  captures both those that I mentioned as well as
5  parks and hospitals and things of that nature.
6      Q.   Would you say that -- are you
7  familiar with what a census place is?
8      A.   A census place is a term used by
9  the census to denote a city, a town, a village
10  or something called a census designated place,
11  a CDP, which are statistical areas defined by
12  the Census Bureau.  However, they originate, at
13  least in most parts, by the locality.
14      So usually the locality defines a
15  particular area that people have titled locally
16  and understand it locally, but it doesn't have
17  a governing body.  And so the census uses it as
18  a statistical area.
19      Q.   Typically when designing a plan,
20  is it more important to avoid splitting a
21  census place or to avoid splitting a landmark?
22      MR. VAN LEER:  Object to form.
23      A.   It is -- they are both considered

39 (Pages 150 - 153)

Page 154

1  or they both can be considered communities of
2  interest. So trying to place a priority is
3  something that I don't know if I can do.
4      Q.   (BY MR. LACOUR:) Do you know if
5  the Alabama 2021 redistricting guidelines place
6  a priority on keeping together a municipality
7  versus keeping together a landmark?
8      A.   I think the appropriate way to
9  phrase that, I don't want to put words in your
10  mouth, but it would be keeping together
11  municipalities versus preserving communities of
12  interest. And they don't -- they don't have,
13  as far as I see, a priority associated.
14      Q.   So you say in your report, your
15  initial report, that your illustrative plan did
16  not prioritize race over other factors. That
17  remains your opinion, correct?
18      A.   That's correct.
19      Q.   Plan 1 splits the same number of
20  counties as the enacted plan, correct?
21      A.   That's correct.
22      Q.   So Plan 1 does not prioritize race
23  over keeping counties whole, correct?

Page 155

1      A.   That's correct.
2      Q.   But if Plan 1 had split additional
3  counties to alter the racial demographics of a
4  district, they would have prioritized race over
5  the factor of keeping counties whole, correct?
6          MR. VAN LEER: Objection to form.
7      A.   No, not necessarily. There are
8  some configurations that you would create that
9  may split additional counties, but it's
10  acceptable, meaning that the splits are within
11  an acceptable realm.
12      Q.   (BY MR. LACOUR:) And what would
13  be the line between the acceptable and the
14  unacceptable when it comes to splitting
15  additional counties?
16      A.   Once again, as we mentioned
17  before, there isn't a specific numerical value
18  associated with it. So it is difficult for me
19  to say five or ten splits would be excessive.
20  It all depends on the configuration and the
21  circumstances around splitting those. But
22  certainly, you know, one or two or even three
23  are probably very similar and reasonable to do

Page 156

1  so.
2      Q.   Okay. Just take into account the
3  2021 Alabama Senate enacted map, three
4  additional splits would be reasonable, in your
5  view?
6      A.   I would say so.
7      Q.   Would four additional splits of
8  counties be reasonable?
9      A.   We are moving into that potential.
10  I would say potentially it would be.
11      Q.   And five, would that be a
12  reasonably configured map or would race have
13  predominated over keeping counties together at
14  that point?
15          MR. VAN LEER: Objection to form.
16      A.   Again, there's a potential there.
17  And again, it has to do with the
18  configurations. It has to do with the
19  jurisdiction. Certainly if it was another
20  state, that wouldn't -- all bets are off
21  because then you are dealing with a completely
22  different scenario.
23          So it all depends on really the

Page 157

1  specific scenario, what you have at hand. So
2  again, I can't say a particular number because
3  you have to look at what that circumstance
4  is -- what that circumstance is of that
5  particular splitting.
6      Q.   (BY MR. LACOUR:) If there are
7  twice as many county splits in the illustrative
8  plan than in the enacted plan that was being
9  challenged, could that map still be reasonably
10  configured?
11      A.   Twice as many is relative. If it
12  goes from one to two, is that twice as many?
13      Q.   Let's stick with the Senate map.
14  If your illustrative plan -- if the enacted
15  plan had nineteen county splits and your
16  illustrative plan had thirty-eight county
17  splits, would you consider that to be
18  reasonably configured?
19      A.   You know, once again, it depends
20  on the circumstances. So for example, let's
21  say that you had a plan that used the whole
22  counties, again, and it was possible to create
23  a districting plan using whole counties, but

Page 158

1 now you are compelled to -- or now you are
2 allowed to draw without using whole counties.
3 It may very well be that now all of a sudden
4 you split an additional nineteen or even twenty
5 now because of that adoption of the new
6 criteria. So it all depends on the
7 circumstances that exist.
8      Q.   Okay. So it is possible there
9 could be an illustrative version of an Alabama
10 Senate plan with twice as many county splits
11 that is still reasonably configured?
12          MR. VAN LEER: Objection, form.
13      A.   Once again, the circumstances
14 matter. Something might have changed in the
15 criteria. The legislature may have decided on
16 something new and different where all of a
17 sudden the county splits occur. And so just
18 saying it blindly, I really don't know at this
19 particular time. I would have to know the
20 exact same -- I would have to know the
21 scenario.
22          Once again, you are talking about
23 balancing the criteria. And so the idea is to

Page 159

1 balance the criteria. If all of a sudden
2 there's a change, then there very well could be
3 a change in county splits.
4      Q.   (BY MR. LACOUR:) Okay. But
5 there's no clear line that you could articulate
6 right now?
7      A.   I can't give you a specific
8 number, no, because the scenario has to put --
9 it -- I could say it is not a good thing, but
10 that doesn't mean that it is not acceptable.
11      Q.   Got it. Thank you.
12          I will share my screen again. I
13 am looking back at Exhibit 2, your initial
14 report. We will come up on a break in just a
15 moment. But I wanted to get through this last
16 few questions on this.
17          I believe Page 12 of your initial
18 report, looking specifically at Paragraph 19B,
19 Adherence to Section 2 of the Voting Rights Act
20 and the United States Constitution, and that
21 last full sentence of the paragraph reads: I
22 ensured that the illustrative plan did not run
23 afoul of these requirements by avoiding

Page 160

1 elevating the consideration of race over other
2 factors while ensuring that the map did not
3 create new majority Black districts at the
4 expense of existing majority Black districts.
5      Q.   Did I read that correctly?
6      A.   Yes.
7      Q.   And that is an accurate
8 description of your illustrative plans?
9      A.   Yes.
10      Q.   Does this mean that you treated
11 majority Black districts differently from how
12 you treated other districts in the enacted
13 plan?
14          MR. VAN LEER: Objection to form.
15      A.   Maybe you -- can you repeat that?
16      Q.   (BY MR. LACOUR:) Yes. When you
17 said that you were ensuring that the map did
18 not create new majority Black districts at the
19 expense of existing majority Black districts,
20 does that mean that you treated the existing
21 majority Black districts differently from how
22 you treated other existing districts?
23          MR. VAN LEER: Same objection.

Page 161

1      A.   What I am saying here is that
2 there was an attempt not to dismantle, if you
3 will, any of the districts, but specifically
4 the Black districts, because I wouldn't want to
5 violate the Voting Rights Act dismantling some
6 other district in order to create another
7 district.
8      Q.   (BY MR. LACOUR:) And I share
9 again this Exhibit 8 that has this compilation
10 of various maps and some of their statistics.
11          Focusing down on District 26 in
12 the enacted plan, that district is solely
13 within Montgomery County, correct?
14      A.   Correct.
15      Q.   But in all three of your plans, it
16 stretches into an additional county, correct?
17      A.   Correct.
18      Q.   And that didn't need to happen for
19 population equality purposes, right?
20      A.   If you remove, as I did, Elmore,
21 it did need to do it for population equality,
22 Elmore from 25.
23      Q.   Well, if you removed Elmore from

41 (Pages 158 - 161)

Page 162

1  25, you could get -- potentially get more
2  people from Pike, Bullock, Macon or Tallapoosa
3  Counties or Coosa, for that matter, or Autauga,
4  correct, if all you were focused on was equal
5  population?
6      A.   Yes.  If all I was focused on was
7  equal population.  But, of course, that would
8  expand it into three different counties.  One
9  of the things I wanted to do was reduce it down
10  to two.  But yes.
11     Q.   By increasing District 26 into
12  two, though, correct?
13     A.   Say that again, please.
14     Q.   By moving District 25 into two
15  districts, you had to move District 26 from one
16  into two districts, correct?
17     A.   That is correct.  That is correct.
18     Q.   Were there any majority White
19  districts that you redrew so that they went
20  from being wholly within a county, like
21  District 26 was in the enacted plan, to being
22  constructed of two or more split counties?
23     A.   One of the things I think you

Page 163

1  pointed out was Blount County was made whole
2  inside, I believe, 17, and Chilton was also
3  made whole.  So those reduced down the splits.
4  I think if I am following what you are asking.
5      Q.   My question was whether you --
6  never mind, we will scratch that question.
7          MR. LACOUR:  Now is I think a good
8  time to take a break.  We will try to keep it
9  five minutes, or do y'all need ten minutes?  I
10  am fine either way.
11     A.   Five is fine with me.
12         MR. VAN LEER:  Five is fine with
13  us if that is okay with Ms. Nichols.  Let us
14  know if you need more time.
15         THE REPORTER:  Five is good.
16         MR. LACOUR:  Well, actually, maybe
17  if we do ten -- if we do ten, I can talk to my
18  colleague a little more and maybe find a way to
19  streamline the rest of the deposition.
20         MR. VAN LEER:  We would appreciate
21  it.  If it works for you, that works for us.
22         MR. LACOUR:  Split the difference,
23  say 3:15, be back in eight minutes?

Page 164

1          MR. VAN LEER:  We will check back
2  at 3:15.  If you need a few more minutes, not a
3  problem.
4          MR. LACOUR:  Thank y'all.
5          MR. VAN LEER:  Thank you.
6          (Whereupon, a break was had from
7          3:07 p.m. until 3:17 p.m. EDT)
8      Q.   (BY MR. LACOUR:)  Welcome back.
9  So I want to talk about precinct splits for a
10  moment.  Is it generally important to keep
11  precincts whole?
12     A.   Yes.
13     Q.   Why is that?
14     A.   Well, many different reasons.  It
15  increases administrative costs for the local
16  jurisdiction.  It sort of -- split adds on
17  confusion for the voters inside the precinct.
18  So those are probably the biggest two.
19     Q.   And when you draw maps, what are
20  the typical reasons you might have for
21  splitting a precinct?
22     A.   Population.  Usually that is done
23  for population equality.  Occasionally I may

Page 165

1  look at it for compactness, trying to make a
2  district more compact.
3      Q.   Okay.  Are there split precincts
4  in your version of District 7, in any of your
5  versions of District 7?  I should be clear.
6      A.   Yes, there are in -- yes, there
7  are in different versions, yes.
8      Q.   And let's see.  I want to look at
9  one of them in particular.  You don't happen to
10  recall a precinct known as The Dwelling Place,
11  do you?
12     A.   It does come to mind, yes.
13     Q.   Do you recall why you split The
14  Dwelling Place?
15         MR. VAN LEER:  Objection to form.
16     A.   I would have to see the map to
17  refresh my recollection.
18         MR. LACOUR:  Okay.  I will share a
19  new exhibit.  Let me email this around.  And I
20  will share it now.
21         (Exhibit 10 was marked for
22          identification.)
23     Q.   (BY MR. LACOUR:)  So I will

42 (Pages 162 - 165)

Page 166

1 represent to you this is The Dwelling Place
2 precinct with District 7 in orange and District
3 9 in yellow.
4         Does that look familiar?
5     A.   Yes.
6     Q.   Okay.  And do you recall why you
7 may have split this particular precinct the way
8 you did?
9     A.   That was, as I mentioned before,
10 the boundaries of Redstone Arsenal follows that
11 boundary all the way down.
12        MR. VAN LEER:  Eddie, can we just
13 ask for clarity, do you know whether this is a
14 representation of Illustrative Plan 1, 2 or 3?
15        MR. LACOUR:  I believe this is
16 Plan 1, but let me confirm.
17        MR. VAN LEER:  Sorry.
18        MR. LACOUR:  I believe this is
19 Plan 1 which may be similar to the other two
20 plans, but I know it is Plan 1, so --
21        MR. VAN LEER:  Thank you.
22     Q.   (BY MR. LACOUR:)  Scrolling to the
23 next page, I'll represent to you that this

Page 167

1 shows the blue dots represent -- each blue dot
2 represents one White person and each green dot
3 one Black person in the map.  And then to focus
4 here on the statistics we have -- now, do you
5 see this reflects that the total population of
6 the precinct is eight thousand four hundred and
7 seventeen?
8     A.   Yes.
9     Q.   Okay.  And that part of the map
10 that is in District 7 includes about eight
11 hundred and sixty-five of those people,
12 correct?
13     A.   Correct.
14     Q.   And the part that is placed in
15 District 9, it is seven thousand five hundred
16 and fifty-two total population, correct?
17     A.   Correct.
18     Q.   And looking down at the
19 demographics of the parts of the precinct that
20 are in District 7 versus District 9, if these
21 numbers are accurate, you would agree that the
22 part placed into District 9 has a much higher
23 White voting age population percentage than the

Page 168

1 part placed into District 7, correct?
2     A.   Correct.
3         (Off-the-record discussion.)
4     Q.   (BY MR. LACOUR:)  Do you know if
5 you kept this particular precinct whole within
6 District 7, whether Plan 1 would still have an
7 estimate of greater than fifty percent Black
8 citizen voting age population?
9     A.   Offhand I do not know.
10     Q.   Based on the numbers in front of
11 you right now, do you think that the Black
12 citizen voting age population would have likely
13 dropped below fifty percent had you kept this
14 precinct whole within District 7?
15        MR. VAN LEER:  Objection to form.
16     A.   Most likely it would have dropped
17 and also increased over the ideal population
18 size acceptable range as well.  So I would have
19 to drop off something somewhere else.
20     Q.   (BY MR. LACOUR:)  But I think we
21 established earlier that District 7 in your
22 Plan 1 was underpopulated by around six
23 thousand people, right?

Page 169

1     A.   I can't recall whether that was
2 the specific number.  If that was the number,
3 then you are correct, it is approximately close
4 to that number.
5     Q.   So you could add an additional
6 seventy-five hundred fifty-two people to an
7 underpopulated District 7 and still be well
8 within equal population range used by the 2021
9 Alabama Legislature, correct?
10     A.   Yes, numerically, I think you are
11 right.
12     Q.   Do you know roughly how many White
13 voters you would have to add to District 7 in
14 your Plan 1 for it to lose its majority Black
15 citizen voting age population status?
16     A.   No.  No, I do not.
17     Q.   Okay.  All right.  So I want to
18 turn back to your -- well, last question on
19 this.  Given the significant difference in the
20 population, in the White voting age population
21 percentage found in the portion of the precinct
22 within District 7 versus the portion of the
23 precinct found within District 9, could that be

43 (Pages 166 - 169)

1 considered some evidence of race-based precinct
2 splitting?
3          MR. VAN LEER: Object to the form.
4     A.  No. No. As I mentioned, I
5 followed that Redstone Arsenal boundary, and it
6 includes that Redstone CDP. I think that is
7 the population that is included, so that is a
8 wholly-contained CDP as well.
9     Q.  (BY MR. LACOUR:) But the decision
10 to split this precinct where you split it did
11 have a significant racial effect, did it not?
12          MR. VAN LEER: Objection to form.
13     A.  Potentially. Yes, potentially it
14 did. You have to take it in the totality,
15 meaning that if I left it and it did adjust the
16 percentage, then I would go back and look at
17 reconfiguring the district in a different
18 manner. And so I would look at a different
19 configuration for the district.
20     Q.  (BY MR. LACOUR:) All right. Look
21 back at your initial report again. And so this
22 is Exhibit 2. I am going to turn to Page 8,
23 Paragraph 15. I will read it: I used the

1 category of any part Black throughout parts of
2 this report for Black total and voting age
3 populations with the exception of CVAP. To
4 determine majority Black district status, I
5 used Not Hispanic Black VAP (BVAP) and CVAP
6 (BCVAP) plus their respective NonHispanic Black
7 and White combined race for all districts
8 except for SD7. Because of the significant
9 noncitizen population for SD7, I used only
10 BCVAP.
11          Did I read that correctly?
12     A.  Yes, you read that correctly.
13     Q.  So is it your testimony today that
14 the only reason you used BCVAP for SD7 is
15 because of the significant noncitizen
16 population?
17          MR. VAN LEER: Object to the form.
18     A.  Yes, I looked at the noncitizen
19 population and analyzed to see whether it was
20 appropriate to use that measure and found out
21 it was appropriate to use BCVAP.
22     Q.  (BY MR. LACOUR:) Okay. What in
23 your view made it appropriate to use BCVAP?

1     A.  The significant number of
2 noncitizens in that particular area.
3     Q.  And anything else? Or is that it?
4     A.  I mean BCVAP has been used in
5 litigation, so it is not something that is
6 uncommon to use, so --
7     Q.  Correct. But the reason -- the
8 only reason you have given for why you used
9 BCVAP was because of the significant noncitizen
10 population in the Huntsville area. Is that
11 your testimony today?
12     A.  And I am hesitating because I am
13 trying to frame this correctly, meaning that
14 BCVAP was the appropriate measure, after I made
15 some determinations that the noncitizens in
16 that area was significant. They all centered
17 around -- or it centered around meeting that
18 first component of the first precondition of
19 Gingles.
20          But the use of BCVAP centered
21 around the noncitizenship, if you can follow
22 what I am saying, if I am understandable.
23     Q.  I am going to try to ask a couple

1 more questions to make sure I am understanding
2 you.
3          So one reason you used BCVAP was
4 because of the significant noncitizen
5 population, that's correct?
6     A.  That's correct.
7     Q.  And then another reason you used
8 BCVAP was to satisfy Gingles 1?
9          MR. VAN LEER: Objection to form.
10     Q.  (BY MR. LACOUR:) Correct?
11     A.  Yes. That that would be the
12 appropriate measure to meet the sufficiently
13 large component of Gingles.
14     Q.  Okay. And was it the appropriate
15 measure only because there was a significant
16 noncitizen population, or was it the
17 appropriate measure because Black voting age
18 population, as a measure, did not reveal an
19 additional majority-minority district in the
20 Huntsville area?
21          MR. VAN LEER: Objection to form.
22     A.  I could create a majority Black
23 district that was majority in both BVAP -- both

Page 174

1  VAP, rather, and CVAP.  And so I could create
2  a, excuse me, more compact district that is
3  utilizing only CVAP, and is it the correct
4  measure to use because of the noncitizenship.
5  The answer in my estimation was yes, it is the
6  correct measure to use.
7         So then utilized that to do the
8  best configuration that you can -- or I won't
9  say best but the configuration that uses BCVAP.
10      Q.   So the only reason it was the
11  correct metric to use was because of the
12  significant size of the noncitizen population
13  in the Huntsville area, or was there another
14  reason?
15      A.   Again I am hesitating because the
16  determination was made that using CVAP in that
17  area is adequate.  And so if it is adequate,
18  then you draw a plan according to BCVAP.
19      Q.   If you were advising the
20  legislature, when would you tell them they
21  should start using BCVAP rather than BVAP to
22  determine what Section 2 demands of them?
23         MR. VAN LEER:  Objection to form.

Page 175

1      A.   I don't know if I would give them
2  any hard or fast rule.  But I would say that in
3  certain cases using BCVAP is appropriate.  In
4  this particular case, I would say it is
5  appropriate.  In another situation, I may not
6  say that.
7      Q.   (BY MR. LACOUR:)  I understand.
8  Now what I want to understand, too, is why is
9  it appropriate in the situation.  Do you have
10  an answer for that?
11      A.   It is appropriate because the
12  noncitizenship is significant enough that you
13  can use -- it would be more representative of
14  the Black population, in this particular case,
15  in that area versus the VAP, which includes
16  noncitizens.
17      Q.   And is that based on raw numbers
18  or on percentage?
19         MR. VAN LEER:  Objection to form.
20      Q.   (BY MR. LACOUR:)  Is it
21  significant based on raw numbers or based on
22  the percentage of noncitizens in an area?
23      A.   Yeah, it is related to both,

Page 176

1  meaning that the percentage of noncitizen in an
2  area relates to the number of noncitizens in an
3  area.  And the reduction that occurs is a
4  reduction in the amount of noncitizens and an
5  amount, a percentage that exists insofar as the
6  Black population exists.
7      Q.   You didn't use CVAP for
8  Montgomery, correct, which would mean that the
9  noncitizen population in Montgomery County is
10  insignificant, right?
11         MR. VAN LEER:  Objection to form.
12      A.   All of the other districts
13  satisfied that majority component -- majority
14  that -- first component of Gingles, which is
15  sufficiently large.  All of them, including the
16  one for SD7, also satisfied that, and so all of
17  the other ones satisfied both VAP and CVAP.
18      Q.   (BY MR. LACOUR:)  So you didn't
19  worry about CVAP for Montgomery because VAP was
20  high enough to draw two majority Black
21  districts in the Montgomery area; is that your
22  testimony?
23         MR. VAN LEER:  Object to form.

Page 177

1      A.   The focal point of SD7 was in the
2  analysis of whether it is better to use, in
3  that particular area, the CVAP because of the
4  noncitizens.
5         In the Montgomery area, no, I did
6  not look at that, the noncitizens in that
7  particular area because there was no need to
8  determine what that -- what the best component
9  for the Gingles' first precondition was.
10      Q.   (BY MR. LACOUR:)  How did you know
11  that there was no need to determine the CVAP in
12  the Montgomery area if you never looked at the
13  BCVAP in the Montgomery area?
14      A.   I did look at BCVAP.
15      Q.   Okay.  Looking at -- this is
16  Exhibit 5, which is your initial appendix.  And
17  this lists both nonCVAP totals and nonCVAP
18  percentages and, as you can see, the nonCVAP
19  total for Montgomery is five thousand six
20  hundred and eleven, correct?
21      A.   Correct.
22      Q.   Which is much higher than the
23  nonCVAP total for Decatur, just a few rows

45 (Pages 174 - 177)

Page 178

1  down, at two thousand eight hundred and
2  seventy-four, correct?
3      A.   Correct.
4      Q.   And Huntsville nonCVAP percentage
5  is 3.76, correct?
6      A.   Correct.
7      Q.   That is fairly close to 3.68
8  percent for Montgomery, correct?
9      A.   Correct.
10     Q.   So the nonCVAP percentage is
11 significant for Huntsville, correct?
12     A.   Correct.
13     Q.   Do you think it is significant for
14 Montgomery as well?
15     A.   It is extremely close, so, yes,
16 probably.
17     Q.   When you drafted your initial
18 report, you included one plan in that report,
19 correct?
20     A.   Correct.
21     Q.   It did not include a version,
22 Senate District 7, that was above fifty percent
23 BVAP, correct?

Page 179

1      A.   That was correct.
2      Q.   Is it fair to say that one reason
3  you used BCVAP when you drafted your initial
4  report was because at the time you did not see
5  a way to draw a reasonably configured plan with
6  a district in the Huntsville area that was
7  majority BVAP?
8          MR. VAN LEER:  Objection to form.
9      A.   No.  I had previously created that
10 plan or at least a similar plan that was
11 included in my second report that actually
12 reached the BVAP and CVAP.  But I made that
13 determination, once again, what was the
14 appropriate measure for that sufficiently large
15 and made a determination that CVAP was it.
16         So once again, I put in what I
17 considered the preferred plan, you could say
18 the best plan, that I had, but it was a
19 preferred plan.  Not saying that the other plan
20 was inadequate.  But I put together what I
21 considered a preferred plan.
22     Q.   And so why do you prefer Plan 1 to
23 Plan 3?

Page 180

1          MR. VAN LEER:  Objection to form.
2      A.   It does make SD7 more compact.  So
3  I prefer that.  It doesn't mean that the other
4  plan, Illustrative 3, isn't reasonably or
5  acceptably compact, but it just makes it more
6  compact.  And when you are putting forth a
7  plan, you want to put forth what you would
8  consider, I think, the preferred plan, if you
9  will.
10     Q.   (BY MR. LACOUR:)  Would you say
11 Plan 1 better comports with traditional
12 districting principles than Plan 3?
13         MR. VAN LEER:  Objection to form.
14     A.   I would say it is better with
15 metrics, yes.  Again, I have to say that it
16 doesn't mean that Illustrative Plan 3 doesn't
17 perform reasonably well.
18     Q.   (BY MR. LACOUR:)  And you said you
19 had already drafted Plan 3 at the time you
20 submitted your initial report?
21     A.   I drafted something very similar
22 to Illustrative Plan 3, another plan that had
23 3, Illustrative Plan 3, which was both BVAP and

Page 181

1  CVAP majority Black.
2      Q.   But you didn't opine anywhere in
3  your initial report that it was possible to
4  draw a majority BVAP district around the
5  Huntsville area, correct?
6      A.   I didn't include the BVAP; is that
7  what you are saying, I didn't measure that?
8      Q.   You did not include a majority
9  BVAP plan in your initial -- you did not
10 include a majority BVAP plan for the Huntsville
11 area in your initial report, correct?
12     A.   Correct.
13     Q.   And you did not otherwise opine in
14 your initial report that one such plan with
15 that majority BVAP district could be drawn,
16 correct?
17     A.   Correct.
18     Q.   All right.  I want to move to your
19 rebuttal report, which I don't think we have
20 put into the record yet.
21         THE REPORTER:  I never got Exhibit
22 10 either, Edmund.
23         MR. LACOUR:  Did I not send that?

1  It shows that it sent to you, 2:20 p.m.
2  Central.
3        (Off-the-record discussion.)
4        (Exhibit 11 was marked for
5  identification.)
6        MR. LACOUR:  This I will mark as
7  Exhibit 11.  This is the rebuttal report
8  amended that was sent on April 30th, 2024, in
9  red line.  I will share that now.
10     Q.   (BY MR. LACOUR:)  Mr. Fairfax, you
11 initially sent your rebuttal report on April
12 19th, 2024; is that correct?
13     A.   Yes, that is correct.
14     Q.   And then on April 30th, you
15 submitted an amended version of that rebuttal
16 report, correct?
17     A.   That is correct.
18     Q.   Does this appear to be a red line
19 version of that amended rebuttal report?
20     A.   Yes, it does.
21     Q.   If you would turn to -- okay.  So
22 looking at Part 3, Paragraph 4A:  The use of
23 the U.S. Census Bureau's five-year CVAP data is

1  standard and reliable in litigation under
2  Section 2 of the Voting Rights Act when
3  evaluating citizens above the --
4        THE REPORTER:  I'm sorry.  You are
5  going to have to slow down.
6        MR. LACOUR:  I apologize --
7  sometimes -- okay.
8        Q.   (BY MR. LACOUR:)  Starting over,
9  Subparagraph A, on Page 5 of the amended
10 rebuttal report, red-lined:  The use of the
11 U.S. Census Bureau's five-year CVAP data is
12 standard and reliable in litigation under
13 Section 2 of the Voting Rights Act when
14 evaluating citizens above the age of eighteen
15 years, particularly for areas of sufficient
16 population like Alabama's State Senate
17 districts.  Further, the U.S. Department of
18 Justice states that the ACS CVAP data continues
19 to meets its statistical needs in enforcing
20 Section 2 of the Voting Rights Act -- or of the
21 VRA.
22        Did I read that correctly?
23     A.   Yes.

1     Q.   Do you know why DOJ has made this
2  statement?
3        MR. VAN LEER:  Objection to form.
4     A.   I would imagine that they wanted
5  to provide confidence in using the CVAP,
6  five-year CVAP data.
7     Q.   (BY MR. LACOUR:)  Okay.  But the
8  report doesn't actually explain why DOJ has
9  that confidence in the data, does it?
10     A.   I can't recall the specific
11 report.  But it does state that they still rely
12 on that CVAP data.
13     Q.   Okay.  Are you aware of any
14 instances where the Department of Justice has
15 used ACS data for analyzing Gingles 1 for
16 additional majority Black district?
17     A.   CVAP data?
18     Q.   Yes, sir.
19     A.   I would imagine if they had cases
20 in, say, Texas, which they -- I am sure they
21 opted in, then they would have used CVAP data.
22     Q.   For analyzing -- you are not aware
23 of any specific case in which DOJ has used CVAP

1  data when the additional majority-minority
2  district that is being analyzed is a majority
3  Black citizen voting age population district,
4  are you?
5     A.   I am not aware right at this
6  moment.
7     Q.   When is CVAP typically used in
8  Voting Rights Act litigation?
9        MR. VAN LEER:  Objection to form.
10     A.   It is usually used in districts
11 where the Latino population is included in the
12 majority -- included as the majority-minority
13 districts.  However, when they do that in their
14 majority Black districts, they use CVAP as well
15 because it impacts them as well.
16     Q.   (BY MR. LACOUR:)  Okay.  Would it
17 be fair to say that CVAP is typically used when
18 the Gingles 1 map drawer is trying to draw
19 majority Latino districts?
20        MR. VAN LEER:  Objection to the
21 form.
22     A.   Yes, that is the majority of
23 cases.  But they also look at -- many times

Page 186

1  there's an adjacent Black district, let's say,
2  or a district with Black population.  And they
3  look at that as well.
4      Q.  (BY MR. LACOUR:)  Now, do you know
5  why it is important to look at CVAP when
6  someone is trying to construct a new majority
7  Latino district in a Section 2 case?
8      A.  Yes.  Because many or sometimes
9  there are considerable amount of noncitizens
10  that exist in the district.
11      Q.  So is the concern that a majority
12  Latino VAP district might not be a district
13  that could perform for Latino voters if the
14  district was simply Latino VAP rather than
15  Latino CVAP?
16          MR. VAN LEER:  Objection to form.
17      A.  I think it is more of the
18  opposite, meaning that if they stuck with VAP,
19  they would end up -- let me see.  They would
20  end up with districts -- strike that.
21          Yes.  You are correct.  Yes.
22      Q.  (BY MR. LACOUR:)  Have you ever
23  seen a plan in any jurisdiction within the

Page 187

1  United States in which a district was majority
2  Latino CVAP but not majority Latino VAP?
3      A.  I cannot recall seeing any
4  district like that.
5      Q.  It is fair to say, then, that if
6  you are in the United States and you have a
7  majority Latino CVAP district, that it is
8  almost certainly going to be majority Latino
9  VAP as well, true?
10          MR. VAN LEER:  Objection to form.
11      A.  I can't say that definitely
12  because I haven't done the analysis.
13  Logically, it may be -- that is the
14  conclusion, but I cannot say.
15      Q.  (BY MR. LACOUR:)  If the Latino
16  population in an area has a large number of
17  noncitizens and you draw a Latino CVAP district
18  that is majority Latino CVAP, then that
19  district is also going to be majority Latino
20  VAP as well, correct?
21      A.  This gets into what you just
22  asked.  It -- I haven't done an analysis on
23  that.  It is logical that that would be the

Page 188

1  case, but I haven't done any analysis looking
2  at that.
3      Q.  Looking at your Plans 1 and 2 in
4  District 7 in particular in those plans, those
5  show that there are majority BCVAP districts
6  that are not majority BVAP, correct?
7      A.  On, yes, a couple of plans but not
8  all.
9      Q.  All right.  I will turn back to
10  your initial report, all right?  So if you see,
11  Paragraph 11, Subparagraph B on Page 6 of
12  Exhibit 2, the last sentence you said:  To
13  determine noncitizen populations, I downloaded
14  2022 five-year ACS data at the county and
15  census places levels.
16          Did I read that correctly?
17      A.  Yes.
18      Q.  So the 2022 data had come out
19  before you submitted your initial report,
20  correct?
21      A.  This is county level and census
22  place level.  I believe the block group of
23  dataset came out about around the same time.

Page 189

1  I'm not sure exactly when that particular
2  dataset came out.
3      Q.  Okay.
4      A.  But that was --
5      Q.  I'm sorry.  Go ahead.
6      A.  There was -- there was an
7  overlapping of when I was writing the report
8  and when it came out.
9      Q.  So in your initial report, you did
10  not estimate SD7 in Plan 1 -- you did not
11  estimate -- let me state that again.
12          In your initial report when you
13  were calculating SD7's BCVAP, you did not use
14  the 2022 five-year ACS data, correct?
15      A.  When I am -- are you saying at the
16  county level or census place?  Let me explain.
17          The five-year ACS county level and
18  census place data was available, I believe,
19  before the block group level dataset which they
20  use.  And so I think that is what you are
21  referring to.
22      Q.  Yes.  Maybe just tell me, which
23  ICS data did you use to measure BCVAP for

Page 190

1  District 7 in your initial report?
2      A.   It would be 2021.
3      Q.   Okay.  Have you looked to see
4  whether it remains majority BCVAP using the
5  2022 data?
6      A.   In the second report, I used the
7  2022 data that was certainly available at that
8  particular time.  As far as I can recall, the
9  2022 data five-year ACS data at the block group
10 level I believe wasn't available at the time,
11 so that is why I didn't do it.  But it was
12 available at the county and census place level,
13 or noncitizenship data was available at the
14 county and census place.
15     Q.   Okay.  And have you -- have you
16 gone back and plugged in the 2022 data into
17 Plan 1 to see if SD7 is majority BCVAP using
18 that newer data?
19     A.   Yes, it did dip down to 49 point
20 some percent.  It was a little bit under fifty
21 percent.
22     Q.   Okay.  And then so you submitted
23 two additional plans in your rebuttal report

Page 191

1  after Dr. Trende critiqued Plan 1 in your
2  initial report, correct?
3      A.   Yes, after he submitted his
4  response report.
5      Q.   Could you have drawn those two
6  additional plans and included them in your
7  initial report?
8          MR. VAN LEER:  Objection to form.
9      A.   I -- I probably could have drawn
10 both 2 and 3.  But saw no need to do that.
11     Q.   (BY MR. LACOUR:)  In cases where
12 you have been hired to draw an illustrative
13 plan, have you ever submitted an initial report
14 that contained no illustrative plan and then
15 submitted the illustrative plan in your
16 rebuttal?
17         MR. VAN LEER:  Objection to form.
18     A.   I think the question is, have I
19 created a report to develop an illustrative
20 plan but not submit an illustrative plan?
21     Q.   (BY MR. LACOUR:)  Yes.
22     A.   No, I have never done that, and I
23 didn't do that in this particular case.  I

Page 192

1  submitted an illustrative plan in this case as
2  well.
3      Q.   Okay.  All right.  Two more.  Do
4  you recall what racial groups you used to make
5  up your definition of BCVAP in your reports?
6      A.   Yes.  I used the nonHispanic Black
7  alone plus nonHispanic Black and White,
8  recognizing --
9      Q.   Do you -- sorry.
10     A.   Recognizing that there is a
11 nonHispanic Black and American Indian that also
12 could be added that would increase the BCVAP.
13     Q.   Okay.  But your definition did not
14 include that group of Black plus Native
15 American, correct?
16     A.   I did not use it, but I would be
17 allowed to use it, yes.
18     Q.   So if someone were trying to
19 replicate your BCVAP estimates, would they need
20 to use your same definition?
21     A.   Yes.
22     Q.   So it wouldn't make sense for
23 someone who is trying to replicate your data to

Page 193

1  include the Black plus Native American
2  population within your definition of BCVAP,
3  correct?
4      A.   It would be allowable to include
5  in the context of that first component of the
6  first precondition of Gingles, it would be
7  allowable.  But if you are trying to match
8  apples and apples, then they would not match
9  up.
10     Q.   Thank you.
11         MR. LACOUR:  We are making good
12 progress.  If you need a break, we can take a
13 break now or we can keep going.  But I do think
14 we will be able to finish before 6:00 Eastern.
15 What would y'all prefer?
16         MR. VAN LEER:  Do you have a rough
17 estimate, Eddie, for how much longer?  Are you
18 looking at more like an hour, or are you
19 looking at more like two hours right now, do
20 you think?
21         MR. LACOUR:  I think more on
22 the -- closer to one hour than to two, I would
23 say.

1      MR. VAN LEER:  Do we want to take
2  a short break now and then see if we can get
3  through the rest of it?
4      A.   Yeah, that is probably good.
5      MR. LACOUR:  Great.  Five minutes?
6      MR. VAN LEER:  Sounds fine.  Yeah,
7  fine.
8      MR. LACOUR:  Okay.  Great.  We
9  will see you back at around 4:07.
10     (Whereupon, a break was had from
11         4:02 p.m. until 4:10 p.m. EDT)
12     Q.   (BY MR. LACOUR:)  Welcome back,
13  Mr. Fairfax.
14     So the 2020 census VAP numbers are
15  an enumeration, not a sample, correct?
16     A.   Yes.  It is a -- what they call a
17  hundred percent count.
18     Q.   And with a hundred percent count
19  like that, there's no margin of error for those
20  numbers, correct?
21     A.   Correct.  We know there's an
22  error, but it's no margin of error, that's
23  correct.

1      Q.   That is not the same for ACS data,
2  right?
3      A.   Correct.
4      Q.   Because ACS data is a sample of
5  the population, not a one hundred percent
6  count, correct?
7      A.   That is correct.
8      Q.   And because there is -- and
9  because the ACS data is a sample, the numbers
10  you get from the ACS data are estimates, not --
11  they do not purport to be the true number,
12  correct?
13     A.   They could be the true number, but
14  they also could be between the margin of
15  errors -- margin of error.
16     Q.   And there's no way to know whether
17  it is the true number or not, correct?
18     MR. VAN LEER:  Objection to form.
19     Q.   (BY MR. LACOUR:)  Let me state
20  that again.
21     Based simply on the sample data,
22  it is not possible to know whether the estimate
23  is the true number or not, correct?

1      A.   That is correct.
2      Q.   So you are familiar with the
3  phrase "margin of error," correct?
4      A.   Correct, yes.
5      Q.   What do you understand the margin
6  of error to be in the context of using ACS
7  data?
8      A.   In the context of ACS data, it
9  refers to a ninety percent confidence level
10  that the actual value is somewhere in between
11  the margin of error with a ninety percent
12  confidence.
13     Q.   Did you calculate the BCVAP margin
14  of error for the new versions of SD7 that you
15  created in your reports?
16     A.   I did not recreate them for all of
17  the supplemental reports.  I created for that
18  Illustrative Plan 2 which gave me some insight
19  to the margin -- gave me some insight to the
20  margin of error for pretty much all of them,
21  really.
22     Q.   What did you calculate the margin
23  of error to be?

1      A.   It was something, two point some
2  percent, maybe 2.7, under three percent.
3      Q.   Okay.  And do you recall the BCVAP
4  for your Plans 1 and 2?
5      A.   Plans 1 and 2 had a -- I believe a
6  50.05.  I believe the other Plan 2 was a little
7  higher than that.  I believe the 2A was 50.15,
8  I believe, something like that.  And that is
9  using the disaggregated estimate values.
10     Q.   And with a 2.7 percent margin of
11  error -- sorry.  Let me start over.
12     Is that 2.7 margin of error a plus
13  or minus margin of error?
14     A.   Yes.  Yes, it is.
15     Q.   So the margin of error could
16  include a value below fifty percent BCVAP for
17  your new District 7's in Plans 1, 2 and 2A,
18  correct?
19     A.   There is a possibility that it can
20  be -- populations below -- excuse me -- fifty
21  percent, but it is more likely that it is going
22  to be above fifty percent.
23     Q.   On what basis do you opine that it

1  is more likely to be -- that the true value is
2  more likely to be above fifty percent BCVAP
3  rather than below fifty percent BCVAP?
4      A.   Because the point value or the
5  stated value, actually, is above.  And so there
6  are more values theoretically above that fifty
7  percent than there are below fifty percent.
8      Q.   So is it your understanding of a
9  confidence interval that the true value is more
10  likely to be centered around the particular
11  estimate rather than closer to the tail of a
12  confidence interval, either above or below?
13         MR. VAN LEER:  Objection to form.
14      A.   I'm not saying that.  What I am
15  saying is if the starting point is above fifty
16  percent and you have an equal amount of margin
17  of error above and below, there are more
18  options above fifty percent than there are
19  below fifty percent because you are starting
20  off above fifty percent.
21      Q.   (BY MR. LACOUR:)  And if you are
22  mistaken on that premise of statistics, then
23  have you shown that it is more -- or sorry,

1  have you taken any classes in probability?
2      A.   A long time ago.
3      Q.   And if your understanding of
4  confidence intervals is mistaken, then there's
5  no other reason to think that it is more likely
6  than not that the true value is going to fall
7  towards the top half of that confidence
8  interval rather than somewhere below fifty
9  percent BCVAP?
10         MR. VAN LEER:  Objection to form.
11      A.   No, that is not what I am saying.
12  I'm not saying it is more likely to fall above
13  the confidence interval, in the positive.
14         I am saying that if your starting
15  point is higher than fifty percent, then you
16  already have a portion of that equally margin
17  of error being above, but you also have the
18  difference between the starting point and the
19  fifty percent.  So you have more options above
20  fifty percent than you do below fifty percent.
21      Q.   So your understanding of the
22  confidence interval is that if the estimate was
23  at forty-nine percent, then it would be more

1  likely that the true value of the district is
2  below fifty percent BCVAP.  And if the estimate
3  was at fifty-one percent, it would be more
4  likely that the true value is above fifty
5  percent BCVAP?
6      A.   Correct.
7      Q.   That is helpful.  Are you aware
8  that many of the blocks in your District 7 are
9  reported to have higher numbers of citizens of
10  voting age than citizens and noncitizens of
11  voting age, correct?
12         MR. VAN LEER:  Objection to form.
13      A.   Yes, block groups is what you are
14  referring to or blocks?
15      Q.   (BY MR. LACOUR:)  We'll say block
16  groups.
17      A.   Yes.
18      Q.   And that would suggest that the
19  ACS sample is subject to some large potential
20  errors, correct?
21      A.   For the individual block group,
22  that is correct.
23      Q.   And is it your position in the

1  rebuttal report that some of these errors are
2  cancelled out by other errors within other
3  block groups?
4      A.   Absolutely.  They have to cancel
5  out because you have some block groups that
6  have a high value, like you said, above the
7  voting age population, citizen voting age
8  population, that is higher than the voting age
9  population.  But the margin of error comes out
10  to be two point some percent when you aggregate
11  it to the district level.  So they have to
12  cancel out.
13      Q.   Is there any way of knowing
14  which -- is there any way of knowing when they
15  have cancelled out?
16         MR. VAN LEER:  Objection to form.
17      A.   There's no way in identifying
18  exactly when they cancel out, that is correct.
19  You do know that there will be some that are
20  higher, and you can see some that appear to be
21  lower, and so assumptions can be made.  But
22  there's no way to know the specific value that
23  should be there because that is -- you are

51 (Pages 198 - 201)

Page 202

1  estimating it.
2       Q.   (BY MR. LACOUR:)  So I want to
3  show you something from the Census Bureau.  One
4  moment.
5       MR. LACOUR:  And I hope that this
6  exhibit will show up with you, Ms. Nichols.
7       THE REPORTER:  Thank you.
8       (Exhibit 12 was marked for
9  identification.)
10      Q.   (BY MR. LACOUR:)  Okay.  Exhibit
11  12, the document from the Census Bureau.  I am
12  really particularly interested in this
13  paragraph in the middle starting with the
14  sentence:  The margin of error can be
15  interpreted roughly as providing a ninety
16  percent probability that the interval defined
17  by the estimate minus the margin of error and
18  the estimate plus the margin of error (the
19  lower and upper confidence bounds) contains the
20  true value.
21       And then:  In addition to sampling
22  variability, the ACS estimates are subject to
23  nonsampling error.

Page 203

1       Did I read that correctly?
2       A.   That is correct.
3       Q.   And is that how you understand the
4  margin of error as well?
5       A.   Yes.
6       Q.   Does anything in that paragraph
7  suggest that wherever the estimate falls, the
8  true value is more likely to congregate around
9  that estimate?
10      A.   I don't see anything that says
11  that, if that is what you are asking.
12      Q.   Yes, thank you.  If your District
13  7 and one of your illustrative plans had been
14  majority BVAP but not majority BCVAP, would
15  that have satisfied the requirements of Gingles
16  1?
17       MR. VAN LEER:  Objection to form.
18      A.   I -- I am hesitating because I am
19  trying to view the different scenarios.  If I
20  did not do any analysis and find out that the
21  noncitizenship was sufficient, then I can see
22  doing -- see using BVAP, because the analysis
23  wasn't there to show noncitizens were

Page 204

1  significant.
2       So there could be a possibility
3  under different scenarios.  But under this
4  scenario, I would say probably not.  I would at
5  least want to see BCVAP as well.
6       Q.   And give me a moment.
7       (Pause.)
8       Q.   (BY MR. LACOUR:)  So did you say
9  in your initial report that you used BCVAP
10  because it was more appropriate -- I will put
11  up the report so you are not having to guess.
12       (Pause.)
13      Q.   (BY MR. LACOUR:)  So I am looking
14  at the top of the Page 41.  Do you have that in
15  front of you?
16      A.   Yes.
17      Q.   It is a -- I will read:  When a
18  meaningful number of noncitizens are present,
19  CVAP, which only includes citizens, becomes a
20  more appropriate racial population to determine
21  the majority of eligible voters because
22  noncitizens are not eligible to vote and when
23  there's a significant amount, they should be

Page 205

1  removed from the analyzed population group.
2  Thus, CVAP represents a more accurate
3  population group that only includes citizens
4  above the age of eighteen years.
5       So is it your view that only
6  eligible voters should be counted for purposes
7  of constructing additional majority-minority
8  district for purposes of Gingles 1?
9       MR. VAN LEER:  Objection to form.
10      A.   What I am trying to say here is
11  that CVAP is more appropriate than VAP because
12  of the noncitizen population.  If you are
13  looking at that.
14       The amount of eligible voters goes
15  to a different level, a different extent.  So
16  it is a different question to get all of only
17  the eligible voters.
18       But you are moving toward trying
19  to determine what is eligible -- what is the
20  population that is eligible and what is the
21  population that is adequate to be included in
22  that particular majority-minority status.
23      Q.   (BY MR. LACOUR:)  Did you use

52 (Pages 202 - 205)

Page 206

1  BCVAP because it is a more accurate depiction
2  of eligible voters?
3      A.   Yes.  It moves closer to a greater
4  depiction of eligible voters because the VAP
5  includes the noncitizens.
6      Q.   Okay.  If there were other ways to
7  even more accurately determine and to separate
8  eligible from noneligible voters, would that be
9  appropriate as well?
10     A.   I think ultimately.  I also --
11 ultimately I used registered voters as well.
12 So I think that would also signify, and that
13 came out to be above fifty percent on all of
14 the different plans.
15         So that would also be a better
16 representation to use.
17     Q.   Why would registered voters be a
18 better representation to use when there are,
19 you would agree, at least some nonregistered
20 voters who are also eligible?
21     A.   Well, it pulls from the population
22 of those who can vote.  And ideally you are
23 trying to determine the individuals that can

Page 207

1  vote.
2          And so that is why the registered
3  voters, if it is an accurate depiction, would
4  be even better than CVAP, in most cases, many
5  cases, let's say.  Because it is an accurate
6  depiction or theoretically a more accurate
7  depiction of those that can actually vote.
8      Q.   But you would agree with me, there
9  are some people who are not registered who can
10 actually vote, correct?
11     A.   That is correct.  Absolutely.
12     Q.   And then in addition to
13 noncitizens, there are some citizens who are
14 not eligible to vote, correct?
15     A.   That is correct.
16     Q.   Should they be removed from the
17 analyzed population group as well?
18     A.   Potentially it could occur.  For
19 example, the prison population, potentially.
20 If, for example, the State of Alabama passed a
21 legislation like Maryland where the prison
22 population is reallocated and sometimes
23 removed, then I would follow that guidance.

Page 208

1  But that doesn't exist here in Alabama.
2      Q.   And what about disenfranchised
3  felons who are not eligible to vote, would it
4  be more appropriate to remove them from the
5  analyzed population group?
6      A.   Potentially.  But getting at that
7  data is, let's say, difficult.
8      Q.   Okay.  Mr. Fairfax, are you aware
9  that the plaintiffs in this case had previously
10 alleged that the enacted District 7 was
11 racially gerrymandered?
12     A.   I am aware of -- there are several
13 complaints, let's say, that occurred.  I am not
14 necessarily aware about the specifics on each
15 of the complaints.
16     Q.   I am going to share with you
17 another exhibit.  Label this Exhibit 13.
18         (Exhibit 13 was marked for
19          identification.)
20     Q.   (BY MR. LACOUR:)  Is that showing
21 up on your screen as well?
22     A.   Yes, it is.
23     Q.   I will represent to you that this

Page 209

1  is the third amended complaint filed by the
2  plaintiffs in this case.
3          If you could look with me at
4  Paragraph 84.  And that alleges, quote, race
5  was the predominant factor in drawing state
6  Senate District 7 in the Huntsville-Madison
7  County area, but it was not employed in a
8  narrowly-tailored manner to advance compliance
9  with Section 2 of the VRA or any other
10 compelling governmental interest.
11         District 7 begins in the northwest
12 portion of Madison County along the Tennessee
13 border to the north and Limestone County to the
14 west, and then it becomes much narrower snaking
15 south to capture some of the center of the city
16 of Huntsville, splitting the city of Huntsville
17 and the Black community there into three parts
18 and then running east all the way to the border
19 of Jackson County.
20         Did I read that correctly?
21     A.   Yes, you did.
22     Q.   So they are alleging that
23 splitting a Black community in a city can be

53 (Pages 206 - 209)

Page 210

1  evidence of racial gerrymandering, correct?
2       MR. VAN LEER:  Objection to the
3  form.
4       Q.   (BY MR. LACOUR:)  Did plaintiffs
5  allege that splitting a Black community in
6  Huntsville was evidence of a racial
7  gerrymander?
8       MR. VAN LEER:  Same objection.
9       A.  Yes, that is what is read here.
10      Q.   (BY MR. LACOUR:)  Would you
11 consider splitting a Black community in a city
12 between different districts to potentially be
13 evidence of race predominant districting?
14      A.   It could be.  I mean it could be
15 one of the aspects.
16      Q.   And I believe we touched on this
17 earlier.  In the enacted plan, Senate District
18 26 is made up entirely of Montgomery County,
19 correct?
20      A.   Correct.
21      Q.   Would you categorize that as
22 predominantly an urban district as opposed to a
23 suburban or rural district?

Page 211

1       MR. VAN LEER:  Objection to form.
2       A.   I would agree that it is a
3  predominant urban district.
4       Q.   (BY MR. LACOUR:)  Now, in your
5  versions of District 26, you did split off
6  parts of the city of Montgomery and move them
7  into SD25, correct?
8       A.   Correct.
9       Q.   And then to compensate, you add
10 parts of Elmore County to SD26, correct?
11      A.   Correct.  To compensate for
12 population, that is correct.
13      Q.   Do you recall if those parts are
14 predominantly urban, suburban or rural?
15      A.   No.  I don't recall.
16      Q.   Okay.  All right.  I want to look
17 at your rebuttal report one more time.
18      All right.  Go to Page 38, right
19 near the end.  This is the red-line version of
20 the amended rebuttal report from April 30th.
21      So for Plan 3, on April 19th, you
22 concluded that the plan was reasonably
23 configured when you reported that the plan had

Page 212

1  the same number of county splits as the enacted
2  plan, correct?
3       A.   Yes, correct.
4       Q.   And then you later realized that
5  Plan 3 actually had two additional county
6  splits, correct?
7       A.   That is correct.
8       Q.   So Plan 3 did not respect county
9  lines, at least as well as Alabama's
10 redistricting plan, correct?
11      MR. VAN LEER:  Objection to form.
12      A.   They split more, but it was
13 similar and acceptable, in my opinion.
14      Q.   (BY MR. LACOUR:)  Okay.  And so
15 those two additional splits in the counties did
16 not change your conclusion that your plan was
17 reasonably configured; is that fair?
18      A.   That is correct.  As I mentioned
19 earlier on, that is correct.
20      Q.   So it wasn't important whether
21 your plan respected county lines to the same
22 extent as Alabama's plan when it comes to
23 determining whether it was reasonably

Page 213

1  configured, correct?
2       MR. VAN LEER:  Apologies.
3  Objection to form.
4       A.   It is -- can you repeat that
5  because I think he said something.
6       Q.   (BY MR. LACOUR:)  Sure.  Was it
7  important whether your plan respected county
8  lines, at least as well as Alabama's enacted
9  Senate plan?
10      A.   That is what I thought I heard.
11 The word "important."  It was important, but it
12 did split two additional counties.
13      Q.   Okay.  Plan 3 splits Lawrence
14 County, correct?
15      A.   Correct.
16      Q.   Is Lawrence County fairly rural?
17      A.   It appears to be.
18      Q.   Did you consider its rural
19 character before connecting it with Huntsville
20 and Decatur?
21      A.   There are districts throughout the
22 states, the state Senate districts that
23 integrate rural and urban, in many cases, in

54 (Pages 210 - 213)

Page 214

1 the plan, in the enacted plan. So I didn't
2 find it any different.
3     Q.   Okay. It is probably something I
4 should have asked at the beginning. But what
5 did you do to prepare for your deposition
6 today?
7     A.   Met with counsel, reviewed the
8 reports. That is probably -- probably it. Met
9 with counsel and reviewed the reports.
10     Q.   And how many times did you meet
11 with them?
12     A.   Maybe three times.
13     Q.   And just roughly for how long all
14 together?
15     A.   Probably maybe an hour, hour and a
16 half. During the times the session were
17 probably an hour, hour and a half, give or take
18 some minutes.
19          MR. LACOUR: Can I just take five
20 more minutes to talk to my colleague, and then
21 we may be done?
22          MR. VAN LEER: Of course. Thank
23 you.

Page 215

1          MR. LACOUR: Thank you. I will
2 see y'all back here in five minutes.
3          (Whereupon, a break was had from
4 4:42 p.m. until 4:46 p.m. EDT)
5          MR. LACOUR: And we are done.
6 So -- do you need -- Laura, do you need us on
7 the record to say we are done?
8          MR. VAN LEER: Actually if it is
9 okay, I might just have one or two follow-up
10 questions, if you don't mind.
11          MR. LACOUR: Of course.
12          MR. VAN LEER: And the other thing
13 I should ask now -- I realize I may have
14 forgotten to say this at the beginning as well.
15 But if we could have the witness read and sign
16 as well, we will exercise that.
17
18 EXAMINATION BY MR. VAN LEER:
19     Q.   Okay. Just a few things. Tony, I
20 know that we have had you here for a good
21 while. I promise not to keep you too much
22 longer.
23          You were asked earlier about

Page 216

1 overall impactness, meaning compactness, for
2 various plans.
3          Do you have any view of whether
4 you might have been able to improve overall
5 compactness had you changed more districts in
6 other areas from the enacted plan?
7     A.   Yes, I probably could have made --
8 sorry. I was muted.
9          Yes, I probably could have
10 improved the compactness if I changed more of
11 the enacted plan's districts that stayed the
12 same.
13     Q.   Okay. And is there -- what was
14 the reason you didn't do that?
15     A.   Why I didn't change the enacted
16 plan? I am trying to retain as much as I could
17 of the enacted plan as possible.
18     Q.   Okay. You were also asked
19 about -- you had a back and forth with counsel
20 about the balance between impactness and
21 considering the BCVAP percentage when
22 configuring various districts. How did you
23 consider that balance in drawing districts?

Page 217

1     A.   It is a balance that the map
2 drawer has to make. There are tradeoffs, as
3 you know, as everyone probably involved in this
4 knows, that when you adjust one of the
5 criteria, another criteria may be reduced. And
6 so you are balancing out by trying a variety of
7 different configurations to reach ideally an
8 optimal. And the question is what is that
9 optimum configuration. So you are just
10 balancing trying a variety of different
11 configurations.
12     Q.   Okay. When configuring Senate
13 District 7 across the various plans you
14 included in your reports, did those tradeoffs
15 you mention always come out in favor of one
16 factor or another?
17     A.   No, they are -- they go back and
18 forth. You trade off population equality,
19 excuse me, if you make something potentially
20 more compact. If you keep VDT whole, you also
21 may change population equality; you also may
22 change compactness. So depending upon the
23 configuration, it goes back and forth with all

55 (Pages 214 - 217)

Page 218

1  of the different criteria.
2      Q.   And then just one, maybe two last
3  questions here.
4          As you were preparing your initial
5  report, your first report related to
6  Illustrative Plan 1, what was the best most
7  recent five-year ACS CVAP data available at
8  that time?
9      A.   At that time it was 2021, insofar
10  as I can recall.  Like I said before, there may
11  have been an overlapping potentially when I
12  finally submitted, but there -- definitely when
13  I started the illustrative plan and created
14  that, that was the data that is available at
15  the block group level, I am speaking of.
16      Q.   Okay.  And in your first
17  illustrative plan, did the illustrative Senate
18  District 7 have over fifty percent BCVAP using
19  that 2021 ACS data?
20      A.   Yes, it did.
21          MR. VAN LEER:  Okay.  No other
22  questions for me.  Thank you so much, Tony.
23  Anything else?

Page 219

1          MR. LACOUR:  Just one, maybe two.
2
3  REEXAMINATION BY MR. LACOUR:
4      Q.   The 2021 ACS data that you were
5  just asked about, Mr. Fairfax, that you used to
6  draft your Plan 1, do you know when that first
7  became available?
8      A.   I don't know.  But when I started
9  on the illustrative report, it wasn't
10  available, I don't believe.  But somewhere
11  during that time frame of when I might have
12  submitted it, it might have become available.
13  So like I said, there may have been an
14  overlapping period of time that exists between
15  when it was available and when I started the
16  illustrative --
17      Q.   Yes, sir.  I was actually asking
18  about the 2021 data that you did use.
19      A.   Oh.
20      Q.   Did that become available -- did
21  that become available sometime in 2022 or 2023?
22      A.   That became available -- the
23  data -- the data was delayed.  So I am not

Page 220

1  exactly sure.  For some reason I am thinking it
2  was available in '23.
3      Q.   Okay.
4      A.   Because there was a delay in --
5  that occurred because of the -- the pandemic
6  somewhat delayed everything out.
7      Q.   Okay.  But it was certainly not
8  available in 2021, correct?
9      A.   That is correct, yes.
10          MR. LACOUR:  That is all I have
11  got.
12          MR. VAN LEER:  Perfect.  We are
13  all set here.
14      (Off-the-record discussion.)
15          MR. LACOUR:  Excellent.  Thank
16  you.  Enjoy the rest of your day.
17          MR. VAN LEER:  Thank you so much.
18          THE REPORTER:  Does anyone need a
19  rough draft?
20          MR. ROSBOROUGH:  Yeah, we will
21  take a rough, actually.
22          THE REPORTER:  Okay.
23          MR. VAN LEER:  That is fine.

Page 221

1          THE REPORTER:  So just a rough
2  draft for Mr. Van Leer, and no one needs an
3  expedited final, correct?
4          MR. VAN LEER:  Correct.
5          MR. TAUNTON:  I haven't said
6  anything yet today, but I represent the
7  committee, and we will take a rough as well.
8          THE REPORTER:  Okay.  Thank you so
9  very much.  I really appreciate it, and y'all
10  have a nice rest of your week.
11      (Off-the-record discussion.)
12
13
14  (Deposition concluded at 4:56 p.m. EDT)
15
16      FURTHER THE DEPONENT SAITH NOT
17
18
19
20
21
22
23

56 (Pages 218 - 221)

Page 222

DEPONENT'S CERTIFICATE

1
2
3     I, ANTHONY FAIRFAX, the witness herein,
4 have read the transcript of my testimony and
5 the same is true and correct, to the best of my
6 knowledge. Any corrections and/or additions,
7 if any, are listed separately.
8
9
10     ANTHONY FAIRFAX
11     c/o Mr. Jacob Van Leer
       Attorney at Law
12     American Civil Liberties Union
       915 15th Street Northwest
13     Washington, DC 20005
       (202) 675-2330
14     Jvanleer@aclu.org
15
16         Sworn to and subscribed before me,
17 this the  day of        , 2024, to certify
18 which witness my hand and seal of office.
19
20
21
22
23     NOTARY PUBLIC

Page 223

C E R T I F I C A T E

1
2
3
4 STATE OF ALABAMA
5 JEFFERSON COUNTY
6
7         I hereby certify that the above
8 and foregoing deposition was taken down by me
9 in stenotypy, and the questions and answers
10 thereto were reduced to typewriting under my
11 supervision, and that the foregoing represents
12 a true and correct transcript of the deposition
13 given by said witness upon said hearing, to the
14 best of my ability.
15         I further certify that I am
16 neither of counsel nor of kin to the parties to
17 the action, nor am I in anywise interested in
18 the result of said cause.
19
20
21     *Laura H. Nichols*
       Commissioner-Notary Public, State of AL
22     ACCR License No. 3, Exp. 9/30/2024
       GA CCR No. 2714, Exp. 4/1/2025
23     TN LCR No. 679, Exp. 6/30/2025
       Transcript Certified on 5/8/2024

Page 224

1 To: Jacob Van Leer, Esq.
2 Re: Signature of Deponent Anthony Fairfax
3 Date Errata due back at our offices: 30 days
4
5 Greetings:
6 This deposition has been requested for read and sign by
   the deponent. It is the deponent's responsibility to
7 review the transcript, noting any changes or corrections
   on the attached PDF Errata. The deponent may fill
8 out the Errata electronically or print and fill out
   manually.
9
10 Once the Errata is signed by the deponent and notarized,
    please mail it to the offices of Veritext (below).
11
12 When the signed Errata is returned to us, we will seal
    and forward to the taking attorney to file with the
13 original transcript. We will also send copies of the
    Errata to all ordering parties.
14
15 If the signed Errata is not returned within the time
    above, the original transcript may be filed with the
16 court without the signature of the deponent.
17
18 Please Email the completed errata/witness cert page
    to CS-SOUTHEAST@VERITEXT.COM
19 or mail to
20 Veritext Production Facility
21 2000A Southbridge Parkway, Suite 400
22 Birmingham, AL 35209
23 800-808-4958

Page 225

1 ERRATA for ASSIGNMENT #6658459
2 I, the undersigned, do hereby certify that I have read the
   transcript of my testimony, and that
3
4 ___ There are no changes noted.
5 ___ The following changes are noted:
6
   Pursuant to Civil Procedure, Rule 30. ALA. CODE § 5-30(e)
7 (2017). Rule 30(e) states any changes in form or
   substance which you desire to make to your testimony shall
8 be entered upon the deposition with a statement of the
   reasons given for making them. To assist you in making any
9 such corrections, please use the form below. If additional
   pages are necessary, please furnish same and attach.
10
11 Page _____ Line _____ Change _____
12 _____
13 Reason for change _____
14 Page _____ Line _____ Change _____
15 _____
16 Reason for change _____
17 Page _____ Line _____ Change _____
18 _____
19 Reason for change _____
20 Page _____ Line _____ Change _____
21 _____
22 Reason for change _____
23 Page _____ Line _____ Change _____

57 (Pages 222 - 225)

Page 226

1  Page _____ Line _____ Change _____

2  _____

3  Reason for change _____

4  Page _____ Line _____ Change _____

5  _____

6  Reason for change _____

7  Page _____ Line _____ Change _____

8  _____

9  Reason for change _____

10 Page _____ Line _____ Change _____

11 _____

12 Reason for change _____

13 Page _____ Line _____ Change _____

14 _____

15 Reason for change _____

16

17

18         _____

           DEPONENT'S SIGNATURE

19

     Sworn to and subscribed before me this ____ day of

20      _____, _____.

21

22 _____

23 NOTARY PUBLIC / My Commission Expires:_____

Veritext Legal Solutions

877-373-3660                                                    800.808.4958

**&**

**&**   4:9,18 8:6

**0**

**01**   79:4,6 82:17
**01531**   6:19 8:14
**03**   83:13,22
**09**   83:20

**1**

**1**   6:11 7:23
   11:20,21 14:5
   15:23 25:23
   29:12,18 35:18
   37:19 38:3 39:8
   40:3,19 42:2
   49:12 51:2,3,3
   51:10 57:5
   59:13,15 67:10
   69:8 77:4 78:10
   82:17 84:15
   93:12 95:1
   97:13,14 102:2
   119:11 122:11
   123:8 124:1
   127:20 139:9,12
   143:17,17
   150:22 154:19
   154:22 155:2
   166:14,16,19,20
   168:6,22 169:14
   173:8 179:22
   180:11 184:15
   185:18 188:3
   189:10 190:17
   191:1 197:4,5

   197:17 203:16
   205:8 218:6
   219:6
**1's**   144:4
**10**   6:4 8:8
   165:21 181:22
**10004**   5:16
**10006**   2:18
**103**   7:21
**10:11**   10:10
**11**   6:11 8:11
   54:8 182:4,7
   188:11
**11:09**   51:19
**11:21**   51:19
**12**   8:16 159:17
   202:8,11
**125**   5:15
**1287**   2:8
**12:23**   93:5
**12:37**   93:5
**12c**   68:20 77:4
**12d**   64:2
**13**   6:14 8:19
   208:17,18
**134**   8:5
**14**   108:23 124:7
**149**   57:3 126:12
**15**   7:6 28:17,23
   29:3 80:2,3,10
   170:23
**1500**   4:20
**1531**   1:5
**15th**   5:7 27:13
   222:12

**16**   80:7
**165**   8:8
**17**   23:12 39:14
   80:6,8,8 163:2
**17.6**   137:16
**17.8**   136:21
**18.44**   37:10
**18.5.**   136:10
**182**   8:11
**18409**   223:21
**19**   7:20 36:22,22
   37:1 55:15
**1901**   4:19
**19b**   159:18
**19th**   182:12
   211:21
**1:21**   121:23

**2**

**2**   6:14,20 7:16
   13:2,5 14:11
   21:7 23:12
   29:13 30:22
   31:7 33:20,22
   35:6,22 36:8,14
   41:14 47:7 50:8
   50:13 64:1 69:9
   83:10 84:10,11
   85:8,18 97:15
   97:15 101:16
   108:23 109:13
   110:8 111:10
   112:11 113:5
   114:7,11,18
   115:11,17 123:8
   127:3,19 136:15

   136:18,19
   139:10,12
   159:13,19
   166:14 170:22
   174:22 183:2,13
   183:20 186:7
   188:3,12 191:10
   196:18 197:4,5
   197:6,17 209:9
**2.7**   197:2,10,12
**2/5/22**   6:23
**20**   36:23
**20005**   5:8
   222:13
**2000a**   224:21
**2004-2008**
   54:17
**2010**   120:16
**2015**   7:16
**2017**   225:7
**202**   5:9 8:16
   222:13
**2020**   37:9 38:5
   40:4 63:19
   120:15 194:14
**2021**   28:5 29:7
   29:19 30:4
   37:18 38:5,9
   40:1,5 46:7 47:9
   103:21 152:11
   154:5 156:3
   169:8 190:2
   218:9,19 219:4
   219:18 220:8

**[2022 - 69.01]**

**2022**   22:6,16
  188:14,18
  189:14 190:5,7
  190:9,16 219:21
**2023**   219:21
**2024**   1:17 6:20
  7:6,20 8:15
  10:10 13:18
  27:13 182:8,12
  222:17
**205**   4:22
**208**   8:19
**215**   6:5
**219**   6:6
**22**   6:21 81:12,15
**23**   38:14 84:23
  220:2
**23.3**   135:22
**242-7300**   3:17
**25**   61:1,8 62:17
  86:15 124:14
  161:22 162:1,14
**25.7**   65:7,13
**251-8100**   4:22
**26**   62:17 91:15
  124:14 161:11
  162:11,15,21
  210:18 211:5
**27**   7:1
**2714**   223:22
**28.57**   65:1
**2:07**   121:23
**2:20**   182:1
**2:21**   1:5 6:19
  8:14

**2a**   197:7,17
**2nd**   13:17

**3**

**3**   6:21 22:10,13
  22:13 29:14,23
  39:8 69:9
  101:16 122:18
  126:2 127:3
  137:3,10,11
  139:10,12
  166:14 179:23
  180:4,12,16,19
  180:22,23,23
  182:22 191:10
  211:21 212:5,8
  213:13 223:22
**3.68**   178:7
**3.76**   178:5
**30**   8:15 224:3
  225:6,7
**300152**   3:15
**30031**   2:9
**30th**   182:8,14
  211:20
**32.5**   136:9
**334**   3:17 4:13
**35.7**   136:19
**35203-4642**
  4:21
**35209**   224:22
**36101-0078**
  4:12
**36104**   4:12
**36130-0152**
  3:16

**38**   211:18
**380-0804**   5:17
**39**   80:21 86:15
  120:7
**3:07**   164:7
**3:15**   163:23
  164:2
**3:17**   164:7

**4**

**4**   7:1 13:21 27:3
  27:5 29:14,23
  39:8,15 40:3
  69:11
**4.28**   61:9
**4.41**   61:6 126:14
**4/1/2025**   223:22
**40**   2:17
**400**   224:21
**404**   2:10
**41**   204:14
**44**   37:4,7
**45**   7:7 80:21
**455**   4:10
**46**   79:19
**46.82**   46:22
**49**   39:3,4 190:19
**497**   23:6
**4:02**   194:11
**4:07**   194:9
**4:10**   194:11
**4:42**   215:4
**4:46**   215:4
**4:56**   221:14
**4a**   182:22

**5**

**5**   7:7 29:14 39:9
  39:21 40:3 45:9
  45:12 142:22
  177:16 183:9
**5-30**   225:6
**5/8/2024**   223:23
**50.05.**   197:6
**50.15**   197:7
**501**   3:14
**521-6700**   2:10
**53**   7:10 80:4
**54**   83:11
**551**   119:10
**552**   119:10
**57**   7:17
**58.9**   137:14
**5th**   2:17 22:16

**6**

**6**   1:17 7:10 10:9
  53:7,8 54:14
  188:11
**6/30/2025**
  223:23
**60.6**   135:21
**63**   83:12
**646**   2:19
**66.18**   41:15
**66.75**   46:11
**6658459**   225:1
**675-2330**   5:9
  222:13
**679**   223:23
**69.01**   41:15

| | | | |
|---|---|---|---|
| **6:00**  193:14 | 218:18 | **able**  31:3 109:19 | **accordance** |
| **7** | **7's**  104:19 | 109:19 111:2 | 113:7 |
| **7**  7:17 28:16 | 106:23 107:1 | 147:21 193:14 | **accorded**  109:5 |
| 45:18 46:10,20 | 197:17 | 216:4 | 111:8 |
| 47:3 48:1,10 | **703**  5:17 | **above**  10:11 | **account**  83:23 |
| 49:14 57:10,11 | **73**  86:15 | 20:5 32:14 | 102:5,10 106:14 |
| 57:19 60:23 | **761-0596**  2:19 | 57:21 67:4 | 112:3 156:2 |
| 61:5 62:16 64:2 | **78**  4:11 | 109:6,9 111:10 | **accr**  223:22 |
| 92:13,14,17 | **78.27**  40:4 | 111:11 178:22 | **accurate**  58:23 |
| 93:10,11,12,18 | **78.30**  40:3 | 183:3,14 197:22 | 69:16 81:20 |
| 93:18 94:21 | **797**  54:7 | 198:2,5,6,12,15 | 134:20 136:11 |
| 104:1,9 105:8 | **8** | 198:17,18,20 | 137:23 160:7 |
| 105:13,14,23 | **8**  7:21 28:16 | 199:12,17,19 | 167:21 205:2 |
| 106:2,14 122:19 | 103:14,16 122:7 | 200:4 201:6 | 206:1 207:3,5,6 |
| 126:3,13,17 | 126:9 161:9 | 205:4 206:13 | **accurately** |
| 127:3,7,11,12 | 170:22 | 223:7 224:15 | 24:12 137:17 |
| 131:11,13 136:6 | **800-808-4958** | **absolute**  82:23 | 206:7 |
| 136:9 137:6,7 | 224:23 | 83:23 | **achieve**  35:17 |
| 137:12,12,13,15 | **8000**  4:10 | **absolutely** | 118:5,5 |
| 137:22,23 | **834-6500**  4:13 | 38:17 201:4 | **achieved**  37:22 |
| 138:20,22 | **84**  209:4 | 207:11 | **aclu**  23:17 |
| 139:16 142:6,13 | **9** | **accept**  93:15 | **aclu.org**  5:10,18 |
| 142:14,15 | **9**  8:5 126:4 | **acceptable** | 222:14 |
| 143:17,20 144:4 | 134:10,13 135:9 | 37:21 71:19 | **acs**  183:18 |
| 144:20 145:7 | 166:3 167:15,20 | 78:7 90:2,16 | 184:15 188:14 |
| 146:14 148:17 | 167:22 169:23 | 129:16,17 134:4 | 189:14,17 190:9 |
| 148:21,22 149:2 | **9/30/2024** | 134:6 155:10,11 | 195:1,4,9,10 |
| 165:4,5 166:2 | 223:22 | 155:13 159:10 | 196:6,8 200:19 |
| 167:10,20 168:1 | **915**  5:7 222:12 | 168:18 212:13 | 202:22 218:7,19 |
| 168:6,14,21 | **a** | **acceptably** | 219:4 |
| 169:7,13,22 | **a.m.**  10:10 | 180:5 | **act**  16:10,12 |
| 178:22 188:4 | 51:19,19 93:5,5 | **accepted**  61:21 | 17:4,13,18 |
| 190:1 200:8 | **ability**  88:13 | 89:23 151:14 | 18:12,13 22:2 |
| 203:13 208:10 | 223:14 | **accident**  108:1 | 32:22 33:12 |
| 209:6,11 217:13 | | | 36:14 60:21 |

67:15 69:4
72:21 85:9
109:14 112:21
159:19 161:5
183:2,13,20
185:8
**acting**  10:5
**action**  223:17
**actual**  196:10
**actually**  28:23
34:5 37:1 48:23
53:2 60:2 61:20
66:12 79:3 82:6
84:20 89:11
95:4,17 97:17
99:20 100:17,19
110:22 113:6
122:15 163:16
179:11 184:8
198:5 207:7,10
212:5 215:8
219:17 220:21
**add**  31:1,4
33:22 35:20
49:20 51:4
110:3 116:8
128:1 129:4
141:18 169:5,13
211:9
**added**  34:6
40:18,23 41:10
41:11 129:3
138:9 192:12
**adding**  29:21
35:16 47:2

130:8 138:11
146:21,22
151:18
**addition**  37:20
202:21 207:12
**additional**  17:1
17:19 18:11
19:7 25:4,13,17
31:9 34:11
48:23 73:12,17
74:17 75:5
88:19 96:5
98:22 100:4
101:9,12 112:1
112:9 116:16
117:5 118:1
138:11,12,13
144:22 149:11
149:14 152:7
155:2,9,15
156:4,7 158:4
161:16 169:5
173:19 184:16
185:1 190:23
191:6 205:7
212:5,15 213:12
225:9
**additions**  222:6
**addoh**  27:1
**adds**  30:11
164:16
**adequate**
174:17,17
205:21

**adhere**  15:20
71:18 72:12
73:20,23 76:20
109:22 113:10
113:12,13 114:2
**adhered**  74:23
113:14 115:14
**adherence**
15:18 159:19
**adheres**  14:3,19
69:2 85:7 89:12
**adhering**  89:7
89:10 111:1
132:5
**adjacent**  53:4
124:15,17 186:1
**adjust**  170:15
217:4
**administrative**
164:15
**adopted**  29:7,19
30:4 37:18
39:23
**adoption**  158:5
**advance**  133:11
209:8
**advancing**
133:16
**advice**  21:13
**advised**  21:5
**advising**  174:19
**affect**  99:12,16
99:20
**affected**  100:3
124:12

**affects**  99:21
**afoul**  159:23
**age**  42:8 43:3,4
46:11,12,19,21
49:11 57:19,20
62:21 63:18
64:3,4,15
135:13,14,15,20
135:22 136:8,10
136:20,22 137:5
137:14,16,20
138:19,21 140:6
140:7 147:3,4
167:23 168:8,12
169:15,20 171:2
173:17 183:14
185:3 200:10,11
201:7,7,8 205:4
**aggregate**  95:9
201:10
**ago**  15:18 199:2
**agree**  49:2,8
72:8 112:12
125:1,6 139:10
167:21 206:19
207:8 211:2
**agreed**  9:2
**agreeing**  115:5
**ahead**  11:19
32:13 53:16
64:12 189:5
**akin**  56:12
**al**  1:7,10 223:21
224:22

ala   6:20 8:14 225:6
alabama   1:2 3:13,16 4:5,12 4:21 6:18 7:5,18 7:19 10:3,4 11:2 14:5 26:22 27:12 46:7 63:18 69:3 85:5 103:20 154:5 156:3 158:9 169:9 207:20 208:1 223:4
alabama's   64:3 152:11 183:16 212:9,22 213:8
alabamaag.gov   3:18,19,20,21 3:22,23
albeit   37:16
allege   210:5
alleged   208:10
alleges   209:4
alleging   209:22
allen   1:10 3:4 6:19 8:14 11:3
allow   17:22 75:17,18 76:1
allowable   18:4 19:2 75:9 193:4 193:7
allowed   70:5 158:2 192:17
alter   109:16 146:5 155:3

altered   40:17 120:16
altering   52:20
alternative   77:13
alternatives   41:11 51:8
amended   8:12 8:20 182:8,15 182:19 183:9 209:1 211:20
american   5:6,14 151:9,13 192:11 192:15 193:1 222:12
amm   1:5
amount   21:19 31:9 78:14,15 176:4,5 186:9 198:16 204:23 205:14
analogous   30:20
analyses   14:10
analysis   7:4,13 24:6 27:11 34:18 44:21 45:1 53:20 78:11 111:22 112:15 121:2 141:7 151:19 177:2 187:12,22 188:1 203:20,22
analyze   14:1
analyzed   171:19 185:2 205:1

207:17 208:5
analyzing   184:15,22
answer   17:8 18:17 23:18,23 24:18 31:15 48:21 50:6 174:5 175:10
answers   223:9
anthony   1:15 6:13,15 7:2,8,11 8:13 9:5 10:10 10:15,22 27:10 222:3,10 224:2
anymore   72:9
anytime   25:17
anywise   223:17
apologies   213:2
apologize   183:6
apparently   143:20
appear   22:17 103:20 182:18 201:20
appeared   56:2
appears   58:9 103:22 124:5,6 213:17
appendices   126:11
appendix   7:8 37:10 45:12,15 57:2 61:3 126:12 142:21 143:1 177:16

apples   193:8,8
apportion   67:2
apportionment   22:8
appreciate   11:10 163:20 221:9
approach   102:11
appropriate   49:22 115:16 131:15,17 133:22 134:4 154:8 171:20,21 171:23 172:14 173:12,14,17 175:3,5,9,11 179:14 204:10 204:20 205:11 206:9 208:4
approved   70:4
approves   113:23
approximately   11:8 29:20 127:4 169:3
april   8:15 182:8 182:11,14 211:20,21
area   48:20 80:7 95:10,21 96:11 101:20 124:20 128:1 129:5,7 130:15 138:8 139:3 140:18

143:12,12
144:12 145:10
149:23 151:22
153:15,18 172:2
172:10,16
173:20 174:13
174:17 175:15
175:22 176:2,3
176:21 177:3,5
177:7,12,13
179:6 181:5,11
187:16 209:7
**areas** 75:10
123:14 124:19
127:22 131:15
131:23 139:4,5
141:23 144:1
145:15 150:5,6
150:16 151:3,5
151:7,9,11
152:1,1,4,10
153:11 183:15
216:6
**arkansas** 22:6,6
22:8 118:23
119:3
**arsenal** 127:21
144:12 149:9,16
149:20 150:7
151:10,10
166:10 170:5
**articulate** 159:5
**aside** 70:9,16
**asked** 152:14
187:22 214:4

215:23 216:18
219:5
**asking** 60:14
111:4 142:8
163:4 203:11
219:17
**aspect** 28:13
34:20 75:13
**aspects** 25:1
42:2 128:4
141:7 142:9
210:15
**assesses** 101:14
**assessing** 112:5
**assign** 9:13
**assignment**
225:1
**assist** 225:8
**associated**
77:10 78:23
95:16 115:15
120:2 124:15
152:9 154:13
155:18
**association** 52:4
**assume** 44:8
70:5,19 104:13
**assumed** 71:18
**assumption**
16:4,7 85:20
89:7,10,21 90:3
**assumptions**
201:21
**attach** 225:9

**attached** 224:7
**attempt** 74:22
88:13 107:23
133:20 161:2
**attempted**
107:21 113:14
**attempting**
124:18 125:15
**attention** 117:1
117:4 125:3,9
**attorney** 2:15
3:12 4:8,17 5:5
5:13 17:11
110:17 112:22
222:11 224:12
**attorneys** 2:6
3:11
**audio** 70:12
**autauga** 162:3
**available** 45:2
189:18 190:7,10
190:12,13 218:7
218:14 219:7,10
219:12,15,20,21
219:22 220:2,8
**avenue** 3:14
4:10,19
**average** 86:13
**avoid** 21:13
153:20,21
**avoiding** 108:11
159:23
**aware** 66:5
184:13,22 185:5
200:7 208:8,12

208:14

**b**

**b** 188:11
**back** 38:16
45:19 48:3
51:20 57:2
68:19 108:22
119:15 122:2
139:8 159:13
163:23 164:1,8
169:18 170:16
170:21 188:9
190:16 194:9,12
215:2 216:19
217:17,23 224:3
**balance** 47:15
60:20 61:20
125:15,19 126:1
159:1 216:20,23
217:1
**balancing** 32:22
33:1,9,12,16
50:12 60:21
62:4 63:9
150:14 158:23
217:6,10
**balch** 4:9,18
**balch.com** 4:14
4:23
**ballpark** 98:4
**based** 58:2 69:7
168:10 170:1
175:17,21,21
195:21

**bases**   151:8,13
**basis**   101:19
  121:6 138:2
  197:23
**bcarter**   2:20
**bcvap**   171:6,10
  171:14,21,23
  172:4,9,14,20
  173:3,8 174:9
  174:18,21 175:3
  177:13,14 179:3
  188:5 189:13,23
  190:4,17 192:5
  192:12,19 193:2
  196:13 197:3,16
  198:2,3 199:9
  200:2,5 203:14
  204:5,9 206:1
  216:21 218:18
**bear**   120:5
**bearing**   45:8
**becoming**   84:4
**began**   109:16
  127:18
**beginning**   214:4
  215:14
**begins**   37:8
  209:11
**believe**   12:21
  13:1 15:13 18:2
  22:15,19 23:9
  28:18 39:5,14
  48:4 51:7 52:6,7
  52:12,16,17,19
  53:2,17,23 54:2

54:13,22 55:1,2
58:17,20 63:20
64:18 65:19
72:23 73:3
94:23 121:12
123:11 130:13
148:19 159:17
163:2 166:15,18
188:22 189:18
190:10 197:5,6
197:7,8 210:16
219:10
**ben.seiss**   3:20
**benchmark**
  89:17
**beneficial**   97:2
**benefit**   119:12
  119:14
**benjamin**   3:7
**best**   63:13 68:13
  94:5 96:3,21
  113:14,15 174:8
  174:9 177:8
  179:18 218:6
  222:5 223:14
**bets**   156:20
**better**   12:11
  13:10,11 28:13
  28:19 36:9
  80:15 83:18,19
  83:21,22 85:4
  85:14,15,18
  88:3 91:3 92:4,7
  108:10 118:11
  118:19 134:5

152:21 177:2
180:11,14
206:15,18 207:4
**beyond**   66:23
  150:7
**biassing**   152:5
**big**   78:20
**biggest**   164:18
**bingham**   4:9,18
**birmingham**
  4:21 10:3
  224:22
**bit**   13:10 113:4
  121:17 122:5
  190:20
**black**   29:10,12
  29:19,21 30:1,2
  30:11 31:1,4,9
  31:18,19 33:22
  35:15,17,20,20
  40:20 41:2,9
  42:3,7,14 43:3,4
  43:16 46:12,21
  47:2 48:1,16,18
  48:20 49:11,19
  49:20 57:18,20
  58:7 59:13,19
  61:1,13,14 62:6
  62:17,20 63:17
  64:3,4,15,20
  65:2,8,14 72:10
  85:3,10,10,11
  85:12 87:9,9,13
  87:17,20 88:9
  88:23 89:6

90:18 91:3,7,8
91:13 92:6,11
92:12,18,20
95:16 96:6,9,13
102:16 103:5
109:14 110:23
111:3 134:23
135:13,17,22
136:8,10,20,21
137:5,14,15,20
138:19,21 140:6
140:6 147:3,3
160:3,4,11,18
160:19,21 161:4
167:3 168:7,11
169:14 171:1,2
171:4,5,6
173:17,22
175:14 176:6,20
181:1 184:16
185:3,14 186:1
186:2 192:6,7
192:11,14 193:1
209:17,23 210:5
210:11
**blindly**   158:18
**block**   188:22
  189:19 190:9
  200:13,15,21
  201:3,5 218:15
**blocks**   200:8,14
**blount**   123:20
  123:21 124:5
  126:2,5 163:1

**blue** 136:7
167:1,1
**board** 7:14,15
22:8 52:4 53:20
53:21 82:2
**bodies** 71:8,9
**body** 89:23
153:17
**border** 148:17
209:13,18
**borderline**
148:21
**bottom** 36:22
54:7 55:17
105:12 135:10
143:9 147:8,9
147:11,15,20
148:13,23
**bound** 128:4
**boundaries**
74:10,12,14
150:2,2 166:10
**boundary**
127:22 149:10
149:16,20 150:3
166:11 170:5
**bounds** 202:19
**box** 2:8 3:15
4:11
**break** 11:15
45:7 51:13,18
51:21 74:9,15
82:4,14 86:4
92:23 93:4
121:15,18,22

159:14 163:8
164:6 193:12,13
194:2,10 215:3
**breaker** 81:17
81:19
**breaking** 143:9
**breaks** 82:7
**brenton** 3:8
**brenton.smith**
3:21
**briefly** 118:22
**bring** 37:12
113:23 146:8
**brittany** 2:14
**broad** 5:15
**buildings**
151:22
**bullock** 162:2
**bureau** 8:17
151:6 153:12
202:3,11
**bureau's** 182:23
183:11
**button** 119:7
**bvap** 41:15,15
171:5 173:23
174:21 178:23
179:7,12 180:23
181:4,6,9,10,15
188:6 203:14,22

**c**

**c** 2:1 3:1 4:1 5:1
37:10 222:11
223:1,1

**calculate** 196:13
196:22
**calculating**
189:13
**calculation**
108:17
**calculator** 65:11
**calculus** 98:9
**call** 39:18
194:16
**called** 153:10
**calls** 30:14
**cancel** 201:4,12
201:18
**cancelled** 201:2
201:15
**candidate** 25:19
**candidates**
25:12,14
**capacities** 4:4
**captioned** 22:6
26:22
**capture** 92:8
209:15
**captures** 92:8
153:4
**career** 21:12
65:18
**carolina** 7:14
53:20 102:19
**carter** 2:14
**case** 1:5 11:3
12:19,22 13:18
15:6,8,9 22:6,15
25:1 26:11,16

27:18 30:18,20
30:21 31:7 32:2
32:20 33:14,20
33:21 34:4 35:4
35:7 36:7,8
42:13 43:17
44:3,3 48:19
52:3 53:15,15
53:17 54:1,4,12
54:22 76:2
89:22 90:14
91:1 104:16
105:13 107:9
108:5,6 110:20
112:17 119:4
141:17 147:19
149:23 175:4,14
184:23 186:7
188:1 191:23
192:1 208:9
209:2
**cases** 14:11,14
14:17 26:14,21
27:17 31:2,5
33:19 78:7
175:3 184:19
185:23 191:11
207:4,5 213:23
**categories** 40:1
**categorize** 47:1
210:21
**categorizing**
83:4
**category** 171:1

cause 10:11
223:18
caveat 112:6
ccr 223:22
cdp 150:1
153:11 170:6,8
census 8:17 37:9
63:19 132:13
143:9 144:7,10
144:15,23 145:4
145:5 149:5,8
150:12 151:6
153:7,8,9,10,12
153:17,21
182:23 183:11
188:15,21
189:16,18
190:12,14
194:14 202:3,11
center 2:7
123:23 148:3
209:15
centered 172:16
172:17,20
198:10
centering 20:13
central 182:2
cert 224:18
certain 20:4
21:19 31:9
32:17 42:22
44:20 62:11
128:5 152:1,1
175:3

certainly 155:22
156:19 187:8
190:7 220:7
certificate 222:1
certified 1:21
9:6 10:1 223:23
certify 10:5
222:17 223:7,15
225:2
chairs 4:5
challenged
157:9
change 13:13
40:10 43:5 79:3
79:8 96:10
99:10 109:16,17
111:15 159:2,3
212:16 216:15
217:21,22
225:11,13,14,16
225:17,19,20,22
225:23 226:1,3
226:4,6,7,9,10
226:12,13,15
changed 70:2
97:15,16 98:15
98:16 100:9,10
100:12 158:14
216:5,10
changes 20:21
26:13 37:17
38:4,9 47:1
48:10 49:5
60:23 95:11
96:13,16,21

100:4 224:7
225:4,5,7
changing 79:2
109:21
character
213:19
characterize
24:1
check 80:19
164:1
chilton 123:20
123:23 124:6
163:2
choice 25:12,14
25:19
choices 128:7,9
choose 127:15
140:12
chose 124:10
129:2
chosen 140:9
chris 4:4
circular 113:4
circumstance
157:3,4
circumstances
26:2 155:21
157:20 158:7,13
cities 129:8
citizen 57:20
64:4 140:6
147:3 168:8,12
169:15 185:3
201:7

citizens 52:3
183:3,14 200:9
200:10 204:19
205:3 207:13
city 8:6 21:9
129:3,18,18
132:7,20,21
133:13,17
135:11 150:2
153:9 209:15,16
209:23 210:11
211:6
civil 5:6,14 10:6
222:12 225:6
claim 42:11
clarifying 39:2
clarity 166:13
classes 199:1
clear 159:5
165:5
clearly 107:23
117:11
client 15:1,5
close 63:2 64:8
78:9,21 79:5
124:11 125:23
169:3 178:7,15
closed 123:13
closer 63:2,3
126:22 193:22
198:11 206:3
closing 125:2
clusters 102:20
code 225:6

coincided  18:23
collapse  147:13
collapsed
    147:12 148:15
colleague
    163:18 214:20
collectively  26:3
colleges  151:8
    151:12
colored  7:22
    145:2 148:2,12
column  58:3
combine  129:8
    129:18 133:17
    145:11
combined  129:4
    129:6 132:20
    140:18 171:7
come  21:3 45:5
    48:3 86:14
    113:20 150:19
    159:14 165:12
    188:18 217:15
comes  17:15
    56:10 63:22
    78:1 107:16
    138:19 143:8
    148:23 149:9
    155:14 201:9
    212:22
coming  73:3
    121:15 144:13
commencing
    10:10

commercial
    151:21
commission
    26:23 27:1,20
    33:15 39:17,19
    226:23
commissioner
    7:5 9:6 10:5
    27:12 223:21
commissioners
    7:15 53:21
committee  4:6
    221:7
common  99:15
    99:15,17 145:23
    146:1
commonalities
    138:8 139:3
    140:19,20,22
    141:11 142:1,4
    143:6,14 147:17
    147:18,19,22
commonality
    141:23
commonly
    151:14
communities
    63:7 69:10
    115:3 141:16
    151:14,19 152:8
    152:16,18 154:1
    154:11
community
    140:16 141:2,9
    141:14 209:17

    209:23 210:5,11
compact  16:2
    19:22,23 77:5
    77:14,14 78:2
    78:17,17 80:11
    80:23 81:1,5,11
    81:13,15,19,23
    82:17,18 83:8
    87:2,2,4,6,10,11
    87:13,14,21,21
    88:16,20 89:1,1
    89:18 90:3
    95:22,23 101:2
    101:7,10 102:12
    104:5,6,8,11
    105:15 118:9,12
    139:22 140:5
    146:21 165:2
    174:2 180:2,5,6
    217:20
compacting
    100:2
compactness
    7:12 19:8,11,16
    19:16,20 20:4
    20:20 32:16
    33:11 44:9
    53:19 63:6 69:9
    77:4,22 78:1,10
    79:9,21 80:22
    81:4 82:16 83:1
    83:5 84:14,18
    86:7,8,13,14,17
    87:18 89:14
    90:1,11,14,15

    90:22 93:9,19
    94:14 95:10,13
    95:15,18 97:4
    99:23 100:22
    101:19 102:7
    104:14 106:23
    107:1 115:20,23
    117:17 118:16
    165:1 216:1,5
    216:10 217:22
comparability
    121:9
comparable
    120:13,19 121:8
compare  77:19
    83:15 91:12,16
    93:19 94:2,3,4,5
    94:7,13 95:17
    102:11 106:22
    107:13,17
    115:22
compared  50:10
    77:22 88:9
    90:18 114:22,23
compares  87:17
comparing
    79:20 84:10
    87:8 91:6 93:7
    94:10,12,18
    97:10,13,18
    98:7 99:23
    100:20 104:14
comparison
    49:23

compel  114:15
compelled  17:14
    109:17 158:1
compelling
    209:10
compels  89:11
compensate
    211:9,11
competition
    82:16
compilation
    103:8 122:8
    161:9
complaint  8:20
    209:1
complaints
    208:13,15
complete  100:8
completed
    224:18
completely
    110:5 146:17
    156:21
compliance
    37:15 110:8
    209:8
complies  69:4
comply  21:7
    22:2 72:20
    114:10
complying
    108:8
component  16:3
    101:6 139:21
    172:18 173:13

176:13,14 177:8
    193:5
components
    16:1 19:12,20
    146:18
comports
    180:11
computed
    101:18
conceivably
    98:15
concentrates
    29:10
concentration
    56:14
concept  152:2
conception  72:3
concern  186:11
concerned
    67:11
conclude  14:18
    35:7 75:3
concluded  35:4
    211:22 221:14
conclusion
    55:18 88:2
    187:14 212:16
conclusions
    29:4
conditions
    42:17 114:1
conduct  14:10
conference  22:7
confidence
    184:5,9 196:9

196:12 198:9,12
    199:4,7,13,22
    202:19
confidences
    15:5
configuration
    36:2 62:12
    69:23 96:22
    102:3 105:21
    113:20 120:15
    124:13,13
    125:15 127:20
    128:7,9 129:2
    131:2 140:4
    146:6 155:20
    170:19 174:8,9
    217:9,23
configurations
    140:2,3 155:8
    156:18 217:7,11
configure
    109:18 125:14
    132:4 150:18
configured  14:2
    14:18 19:9,18
    20:6,18 21:18
    69:1,7,20 70:22
    71:5,13 72:3,11
    72:15 73:11
    74:19 75:4,20
    76:5,10,12,15
    76:19 77:6 78:1
    85:17,22 86:2,5
    89:3 111:23
    112:10,13

156:12 157:10
    157:18 158:11
    179:5 211:23
    212:17 213:1
configuring
    216:22 217:12
confirm  166:16
confirming  52:2
conflict  109:9
conflicted  109:5
    111:9,11 114:4
conflicts  17:2
confusion
    164:17
congregate
    203:8
congress  21:15
congressional
    16:15,16 18:1
    18:22 74:7
connect  130:12
    131:15 145:14
connecting
    130:23 131:18
    145:23 213:19
connection
    139:5
connector
    130:12
conscious  28:1
    32:3
consider  45:3
    49:4 62:13
    79:15 82:22
    84:19 107:2

**[consider - correct]**

141:1 157:17
180:8 210:11
213:18 216:23
**considerable**
186:9
**consideration**
72:14 160:1
**considerations**
106:13
**considered** 73:8
79:10 80:23
81:5 106:1,4
140:15 141:1
153:23 154:1
170:1 179:17,21
**considering**
33:2 98:12
102:7 216:21
**constitute** 25:20
26:7 59:16
**constitution**
69:2,3 85:5,5
159:20
**constitutional**
37:15
**construct** 112:8
186:6
**constructed**
112:1 131:10
162:22
**constructing**
205:7
**contained**
139:11 140:17
170:8 191:14

**contains** 75:5
112:1 202:19
**context** 25:15
33:4 42:20 66:6
67:6,15 100:19
102:1,2,15
113:16,22 117:9
193:5 196:6,8
**contiguity** 69:9
69:22 70:4,19
70:21 71:3,7,15
72:7,13,20
73:13,15 74:15
74:16,23 75:18
75:22 76:22
117:18
**contiguous**
69:20 70:9 71:8
71:10 72:9
76:14
**continue** 106:4
**continues**
183:18
**continuing** 3:1
4:1 5:1 8:1
**continuity's**
96:23
**contracted**
14:23
**control** 59:23
60:3
**convex** 80:7
82:9,12 83:13
83:22 84:9
86:20

**coosa** 162:3
**copied** 69:22,22
**copies** 224:13
**copy** 13:16
22:23 27:6
**core** 93:12
110:22 116:23
117:4 125:3,9
**cores** 109:1,9,20
110:5,19 111:2
111:14,19
113:12 114:21
115:17 116:13
117:13 120:10
120:14
**corner** 105:12
**correct** 12:19,20
12:23 14:7,8
23:18 34:13
38:6,7,9,12
41:16,20 46:8,9
46:13,14,17,18
46:22,23 48:13
55:8,9,13,14
56:20 57:5,6,21
58:13,14,16
59:9,11 60:15
61:3,4,6,7,7,10
63:7 64:17 65:2
65:8,15,16,18
66:23 73:8,9
74:3 76:6 79:23
80:1,11 81:2,21
82:18,20,21
84:7 91:10 93:9

93:13 94:22,23
95:2,3,6,7 96:14
96:15 97:7 98:5
98:6 99:7 102:7
102:8 105:5
106:2,9,10,15
106:17 107:19
109:6 110:9
111:4,12 112:5
112:11,18
114:11 116:5
117:1,6 118:2
118:13,18
122:16,17,21,22
123:2,6,7,7,10
123:15 124:2,3
124:8,9 125:5
126:15,16,20,23
127:13,14
128:14,15
129:21,22
131:12 132:9
133:13 136:1
137:2 140:10
142:2,2,8
146:10 149:14
150:8,9,14,23
151:1 154:17,18
154:20,21,23
155:1,5 161:13
161:14,16,17
162:4,12,16,17
162:17 167:12
167:13,16,17
168:1,2 169:3,9

**[correct - create]**

172:7 173:5,6
173:10 174:3,6
174:11 176:8
177:20,21 178:2
178:3,5,6,8,9,11
178:12,19,20,23
179:1 181:5,11
181:12,16,17
182:12,13,16,17
186:21 187:20
188:6,20 189:14
191:2 192:15
193:3 194:15,20
194:21,23 195:3
195:6,7,12,17
195:23 196:1,3
196:4 197:18
200:6,11,20,22
201:18 203:2
207:10,11,14,15
210:1,19,20
211:7,8,10,11
211:12 212:2,3
212:6,7,10,18
212:19 213:1,14
213:15 220:8,9
221:3,4 222:5
223:12
**corrections**
222:6 224:7
225:9
**correctly**  29:15
30:5 33:16 38:1
40:6 53:22
69:14 119:19

136:23 160:5
171:11,12
172:13 183:22
188:16 203:1
209:20
**costs**  164:15
**counsel**  9:4,10
9:12 10:8 13:7
13:22 22:20
51:23 70:11
214:7,9 216:19
223:16
**count**  14:15
59:5 91:9
194:17,18 195:6
**counted**  91:23
205:6
**counties**  16:16
16:21 17:3,5,23
21:1 44:10
69:12 95:2,6
102:6 117:21,22
118:11 122:15
122:16,21 123:9
123:10,20
124:15,17 125:2
125:5,22 129:14
154:20,23 155:3
155:5,9,15
156:8,13 157:22
157:23 158:2
162:3,8,22
212:15 213:12
**counting**  151:16

**county**  7:4,13
7:14 26:23 27:1
27:12 28:5
31:13 33:15
34:11,22 36:23
38:4 39:20 43:1
47:10,19 48:5
48:10,12 49:3
50:12 51:1 52:4
52:13,21 53:20
53:21 69:12
74:8,10,11,14
94:16,17,21
104:2 115:3
117:17 118:15
123:1,1,14,21
124:1,18,23
125:9,17 127:17
128:12,14,17,18
129:11,12,21
130:1,8 145:13
145:13 146:2
148:1,2 157:7
157:15,16
158:10,17 159:3
161:13,16
162:20 163:1
176:9 188:14,21
189:16,17
190:12,14 209:7
209:12,13,19
210:18 211:10
212:1,5,8,21
213:7,14,16
223:5

**couple**  172:23
188:7
**course**  19:2 20:1
21:10,11,12
61:21 79:16
108:15 109:13
120:1 131:21
138:10,11
139:23 162:7
214:22 215:11
**court**  1:1 10:7
13:17 27:16
52:11 54:15
73:1 77:1 79:17
143:5 224:16
**courts**  16:18
52:11 61:20
73:4,19 74:21
76:1,1 110:18
**cover**  13:20
**covers**  24:23
**cracked**  31:19
34:7 35:16
**cracks**  25:9
**crafting**  85:22
**create**  16:16,20
18:1 31:3 33:7
48:23 63:1
88:14 89:11
110:22 111:2
118:7 155:8
157:22 160:3,18
161:6 173:22
174:1

| | | d | |
|---|---|---|---|

**created** 15:14
  18:5 20:12
  25:18,20 40:15
  68:17 74:7
  179:9 191:19
  196:15,17
  218:13
**creating** 16:23
  19:1 25:11
  30:22 96:20
  109:14 114:17
**credited** 100:18
**criteria** 14:4,20
  15:19,19,22
  16:2,6,8,11 17:5
  17:12,14 18:9
  32:5,7,10,15
  33:2,9 47:16
  52:19 60:20
  61:19 63:10
  68:15 69:8
  72:13 73:20
  74:1 85:6,15
  89:8,11 102:18
  102:21 103:1,3
  104:23 109:6,9
  109:10,15 110:7
  111:10,11 113:2
  114:2,4,13,15
  114:23 115:1,2
  117:17,19
  128:20 132:6,9
  140:1 146:20
  150:19 158:6,15
  158:23 159:1

217:5,5 218:1
**criterias** 32:9
  107:11 132:12
**criterion** 114:5
  118:6
**critical** 87:16
  119:18
**critiqued** 191:1
**cross** 127:16
  130:3,18,22
**crossed** 128:11
  129:11
**crossing** 128:12
  128:17
**crux** 88:11,18
**cs** 224:18
**current** 105:8
**cut** 70:14 73:7
**cv** 1:5 6:19 8:14
**cvap** 171:3,5
  174:1,3,16
  176:7,17,19
  177:3,11 179:12
  179:15 181:1
  182:23 183:11
  183:18 184:5,6
  184:12,17,21,23
  185:7,14,17
  186:5,15 187:2
  187:7,17,18
  204:19 205:2,11
  207:4 218:7

**d**

**data** 37:9
  141:15 182:23
  183:11,18 184:6
  184:9,12,15,17
  184:21 185:1
  188:14,18
  189:14,18,23
  190:5,7,9,9,13
  190:16,18
  192:23 195:1,4
  195:9,10,21
  196:7,8 208:7
  218:7,14,19
  219:4,18,23,23
**database** 151:18
  152:3,18 153:3
**dataset** 151:5
  188:23 189:2,19
**date** 10:6 224:3
**dated** 27:12
**dave's** 134:17
**davin** 5:12
**day** 220:16
  222:17 226:19
**days** 224:3
**dc** 5:8 222:13
**dealing** 42:21
  75:16 156:21
**decades** 23:14
**decatur** 2:9 8:6
  127:16,23 128:2
  128:5 129:3,6
  129:13,14,18,20
  129:20 130:2,7

130:13,15 131:1
  131:5,11,13,15
  131:18,19,22
  133:1,4,7 134:1
  134:1,16 135:11
  136:4,17,19
  137:6,7,11,21
  137:22 138:1,20
  138:22 139:3,11
  139:15 140:15
  141:3,8,19
  142:13 143:12
  145:12 150:5,6
  177:23 213:20
**decide** 139:14
**decided** 77:1
  146:13 158:15
**decision** 73:1,1
  73:2,19 74:21
  170:9
**decisions**
  104:23
**decrease** 30:2
**decreases**
  139:12
**decreasing**
  33:11
**deeper** 44:21
  83:6
**defendant** 3:3
  11:3
**defendants** 1:11
  4:3
**defendants'**
  6:12

**defense** 2:16
**defined** 153:11
    202:16
**defines** 153:14
**definitely** 51:15
    78:16 109:12
    187:11 218:12
**definition** 71:6
    71:15 81:11,14
    81:23 192:5,13
    192:20 193:2
**degree** 74:16
**delay** 220:4
**delayed** 219:23
    220:6
**demands** 174:22
**demarcation**
    144:12 149:10
    149:16,21 150:3
**democrat** 55:13
    67:17,20
**democratic**
    54:23 55:20
    56:6 66:17
**democrats**
    66:21
**demographic**
    38:23 39:5,7
    40:1 46:6
**demographica...**
    134:21
**demographics**
    135:11 155:3
    167:19

**demonstrate**
    143:4,6
**denote** 153:9
**department**
    183:17 184:14
**departs** 71:14
**depended** 70:23
    71:1
**depending**
    36:18 217:22
**depends** 18:18
    20:20 26:9
    43:10,11 44:18
    60:18 71:6,10
    75:7 155:20
    156:23 157:19
    158:6
**depiction** 206:1
    206:4 207:3,6,7
**deponent** 5:3
    221:16 224:2,6
    224:7,10,16
**deponent's**
    222:1 224:6
    226:18
**deposed** 11:4
**deposition** 1:15
    6:12 9:4,14
    11:19 12:1,14
    51:23 163:19
    214:5 221:14
    223:8,12 224:6
    225:8
**describe** 41:3
    85:1

**described** 38:8
**description**
    38:11 69:17
    160:8
**designated**
    153:10
**designing**
    153:19
**desire** 225:7
**despite** 108:8
    148:22 150:5
**determination**
    174:16 179:13
    179:15
**determinations**
    172:15
**determine** 14:1
    14:23 90:15
    101:8,8 111:23
    141:9 171:4
    174:22 177:8,11
    188:13 204:20
    205:19 206:7,23
**determines** 87:1
**determining**
    97:14,15 212:23
**develop** 24:4
    191:19
**developing**
    24:10,15,16
    27:21
**development**
    6:16 27:19,20
    29:8 34:21

**deviation** 7:12
    18:23 37:10,14
    37:21,21 53:19
    57:4,4 58:2,3
    61:19,22 62:11
**deviations**
    54:20
**dexter** 4:10
**difference** 27:23
    36:6 44:10 50:7
    78:15,19 79:7
    79:15 82:23
    84:1 138:18
    163:22 169:19
    199:18
**differences**
    137:19 138:1
**different** 20:11
    20:22 31:5,6,10
    33:19 34:9
    35:12,21,23
    36:7 47:5 48:15
    49:9 50:2 53:17
    54:1 63:10 78:6
    79:2,21 84:21
    86:7 91:18,20
    91:23 92:8
    93:20 94:7
    104:23 106:19
    123:5 125:7
    135:2 139:20
    143:10 146:17
    156:22 158:16
    162:8 164:14
    165:7 170:17,18

203:19 204:3
205:15,15,16
206:14 210:12
214:2 217:7,10
218:1

**differently**
160:11,21

**differs**   36:18

**difficult**   18:10
45:4 68:17
74:20 108:2
130:10 155:18
208:7

**dig**   83:6

**dilute**   25:3
43:15

**dilutes**   56:15

**diluting**   25:7
36:16

**dilution**   25:20
60:9,10

**dip**   190:19

**directed**   73:21
101:5,5

**directly**   62:9
127:12

**disaggregated**
197:9

**discusses**   39:4

**discussion**   12:5
23:4 28:21
108:20 121:21
168:3 182:3
220:14 221:11

**disenfranchised**
208:2

**dismantle**   161:2

**dismantling**
161:5

**displacing**   95:4

**dispute**   101:22
101:23 102:1

**dissimilar**   79:12

**district**   1:1,2
7:16 10:7 15:12
15:14 16:20
17:1,20 18:11
18:15 19:1,5,7,9
19:18,22 20:1
20:19 22:5 25:9
25:17 26:22
29:18 30:12
31:8,21 32:18
33:8,8,23 35:14
35:21 39:9 40:3
41:14 42:2
43:11,13,20
44:1,5,19 45:18
46:10,20 47:3
48:1,10,20
49:12,14,19
51:3,3,10 53:3
53:22 57:19
58:19 60:19
61:5,8 62:16
63:1 69:13
72:10,10,15
73:12,17 74:7
74:18 75:6,21

76:15 78:5 80:3
80:10,22 82:15
83:6,10 84:10
84:11 85:23
86:2,22,22,23
87:11,18,21
89:1,2,3,15,18
89:18 90:6,21
91:2,6,6,15,16
91:16 92:1,1,4,5
92:13,14,17
93:8,10,11,12
93:18,18 94:2,2
94:4,6,7,10,10
94:21 95:16
96:4 97:10,10
97:13,14,15,15
99:7,11 100:5
100:22,22 101:2
103:4,4 104:1,6
104:9,19 105:8
105:9,13,14,17
105:23 106:2,14
106:23 107:1,10
107:13,13 109:1
109:8,15,17,20
110:2,3,4,19,22
110:23 111:1,3
111:14,18 112:2
112:9 113:12
114:19,21
115:17 116:11
116:12,13,17
117:13 120:10
120:14 122:19

124:1,7 125:14
126:13,17 127:3
127:11,12,12
130:9 131:4,10
131:11,13 133:2
133:5,9,13
136:6 137:6,7
137:12,12,13,15
137:22,23
138:20,21 139:6
139:6,16,18
142:6,13,14,15
143:17,20 144:4
144:9,17,20
145:7,16,20,22
146:4,9,14,17
147:2 148:17,21
148:22 149:2
150:3,13 155:4
161:6,7,11,12
162:11,14,15,21
165:2,4,5 166:2
166:2 167:10,15
167:20,20,22
168:1,6,14,21
169:7,13,22,23
170:17,19 171:4
173:19,23 174:2
178:22 179:6
181:4,15 184:16
185:2,3 186:1,2
186:7,10,12,12
186:14 187:1,4
187:7,17,19
188:4 190:1

[district - draw]

197:17 200:1,8
201:11 203:12
205:8 208:10
209:6,11 210:17
210:22,23 211:3
211:5 217:13
218:18
**districting** 17:2
17:5 18:9 21:8
32:19 41:7,20
43:6 44:14
50:14 72:2 74:1
74:14 76:21
77:3 81:18 90:5
104:18 108:9,11
109:3 112:3,16
113:7 115:10
116:4 132:9
133:12,16
143:23 146:12
157:23 180:12
210:13
**districts** 6:18
7:5 14:6 16:17
18:1,22 20:23
21:20 22:1
23:22 24:2 25:2
25:5,11,13
26:18 27:12,20
29:11,12,13,14
29:23 30:23
31:3,5,21 33:1
36:17 38:5 39:8
39:19 43:1 44:8
48:11,17 49:1

52:12,13,14,17
52:18,21 53:2,4
53:5 54:18,21
55:1,4,6,10,12
55:20,22 56:3
56:13,15,17
57:18 58:1,7,15
59:4,9,13,15,18
59:19,23 60:3,5
60:6,7,22,23
61:2,14,16 62:5
62:7,17,19
64:21 65:1,7,13
65:13 66:15,19
66:22 67:2,17
67:20 68:5
75:19 83:15
85:3 86:17 87:4
87:6,9,10,13,17
87:20 88:9,14
88:19 89:6 90:2
90:19 91:3,4,7,9
91:13 92:2,6,11
92:12,20 93:21
94:3,12,18 95:5
95:9,18,21,23
96:5,6,9,13,17
96:19 97:4,19
97:22 98:9,13
98:14,17,22
99:4,13,19,21
100:3,9,12,14
100:15,15
101:10 102:17
103:5 104:11

106:5 107:22
109:21 111:15
117:5,12 118:2
118:8 123:5
124:14,23 127:2
129:1 132:4
134:2 135:6
136:18 160:3,4
160:11,12,18,19
160:21,22 161:3
161:4 162:15,16
162:19 171:7
176:12,21
183:17 185:10
185:13,14,19
186:20 188:5
210:12 213:21
213:22 216:5,11
216:22,23
**disturb** 26:17
**divided** 34:8
**dividing** 127:11
**division** 1:3
**document** 11:20
27:9 46:2 134:9
136:11,13 137:2
137:4,5 202:11
**doing** 23:14,19
24:9 30:21
44:23 63:4
71:18 106:7
107:6,7 108:17
116:11 146:21
151:17 203:22

**doj** 184:1,8,23
**dollars** 148:5
**dominant** 42:1
**dominating**
32:10
**domino** 99:11
109:18,21 116:9
124:21 126:6
**dorman** 4:7
**dot** 167:1,2
**dots** 167:1
**double** 43:4,11
91:9
**doubt** 59:6
**downloaded**
188:13
**dr** 101:13 191:1
**draft** 219:6
220:19 221:2
**drafted** 178:17
179:3 180:19,21
**drafters** 37:14
**draw** 14:2 18:10
19:6 21:18
23:21 31:10
36:3 61:12
64:20 73:11,16
74:17,22,22
75:4,20 100:4
105:16 108:3
112:17 113:6
128:23 151:18
158:2 164:19
174:18 176:20
179:5 181:4

185:18 187:17
191:12
**drawer** 19:17
28:2 30:11
31:12 47:9,14
47:19 48:5,11
49:3 50:12,13
50:18 56:5
79:16 185:18
217:2
**drawer's** 17:15
18:6 73:2 79:10
110:18
**drawers** 79:1
84:6
**drawing** 15:20
17:19 31:8
32:23 40:9 48:2
49:22 56:19
66:1 74:9 98:23
106:1,14 116:16
117:4 118:1
127:18 131:4
209:5 216:23
**drawn** 14:21
18:15 22:2
75:19 76:20
90:7,7 98:16
105:14 181:15
191:5,9
**draws** 50:15
**drew** 26:10 28:5
31:12 47:9
106:18

**drop** 145:15
147:2 168:19
**dropped** 168:13
168:16
**drosborough**
5:18
**due** 29:7 120:16
224:3
**duly** 10:16
**dwalker** 4:14
**dwelling** 8:9
165:10,14 166:1

**e**

**e** 2:1,1 3:1,1 4:1
4:1 5:1,1 6:13
6:15 7:2,8 8:13
27:10 223:1,1
225:6,7
**earlier** 39:12
64:2 80:20 84:3
93:7 96:7,12
102:4 111:21
117:1 118:23
126:14 130:18
140:14 168:21
210:17 212:19
215:23
**easier** 57:7
142:20 147:17
**easily** 147:15
**east** 143:19
148:20 209:18
**eastern** 22:5
143:16 148:1,17
193:14

**eddie** 166:12
193:17
**edge** 108:16
**edmond** 11:1
**edmund** 3:5
181:22
**edmund.lacour**
3:18
**edt** 10:10 51:19
93:5 122:1
164:7 194:11
215:4 221:14
**edward** 10:22
**effect** 56:9
99:11 109:18,21
116:10 124:21
126:6 170:11
**effort** 63:14
**eight** 29:18 41:2
58:21 59:1,14
60:2,6,12 61:15
66:22 67:19
85:10,12 157:16
163:23 167:6,10
178:1
**eighteen** 183:14
205:4
**eighty** 40:19
41:1 42:14,16
43:21 44:8,12
44:19,20 51:7
51:10
**either** 25:11
57:18 98:2
163:10 181:22

198:12
**elect** 25:12,14
25:18
**election** 66:17
**elections** 52:4
54:17
**electronically**
224:8
**elevating** 160:1
**eleven** 177:20
**eligible** 204:21
204:22 205:6,14
205:17,19,20
206:2,4,8,20
207:14 208:3
**elmore** 161:20
161:22,23
211:10
**email** 27:6 57:9
165:19 224:18
**emailing** 22:23
**emphasize**
15:17
**employed** 37:14
209:7
**enact** 115:13
**enacted** 26:12
26:15,19 35:5
42:10 46:7
59:22 60:13
61:22 70:17
71:17 77:17,18
77:21,22 78:2
79:22 80:4,6,18
83:2,11,18,20

84:11 85:11,13
86:21 87:1,5,5
87:11,14,18,22
88:8 89:19
90:17,19 91:8
91:13 92:3,13
92:14,18 93:11
94:20 96:9,14
100:1 103:9,20
104:12 105:12
105:14 106:8,17
106:20,23
107:18 108:12
108:16 110:14
112:18 116:18
117:21 118:12
120:9,13,21,23
121:5 122:8,23
123:4,10,21
124:1 125:3
132:15 154:20
156:3 157:8,14
160:12 161:12
162:21 208:10
210:17 212:1
213:8 214:1
216:6,11,15,17
**enacting**  105:1
**ended**  129:2
140:3
**ends**  68:4 108:5
**enforcing**
183:19
**engage**  50:12

**enjoy**  220:16
**ensured**  159:22
**ensuring**  160:2
160:17
**entered**  225:8
**entire**  89:9,12
95:14,18 96:3,4
98:12,13 100:7
118:17 135:11
**entirely**  210:18
**enumeration**
194:15
**equal**  18:19
44:9 49:18,21
65:7,13 69:4
80:13 83:14,19
88:7 98:17
117:18 162:4,7
169:8 198:16
**equality**  161:19
161:21 164:23
217:18,21
**equally**  88:1
143:10 199:16
**equals**  82:5
**errata**  224:3,7,8
224:10,12,13,15
224:18 225:1
**error**  194:19,22
194:22 195:15
196:3,6,11,14
196:20,23
197:11,12,13,15
198:17 199:17
201:9 202:14,17

202:18,23 203:4
**errors**  195:15
200:20 201:1,2
**especially**  99:13
**esq**  224:1
**essence**  82:13
83:7 111:15
**essentially**
31:11 67:7
133:1
**establish**  141:13
**established**  69:7
168:21
**estimate**  168:7
189:10,11
193:17 195:22
197:9 198:11
199:22 200:2
202:17,18 203:7
203:9
**estimated**  57:20
**estimates**
192:19 195:10
202:22
**estimating**
202:1
**estimation**
15:14 16:17
17:12 50:17
174:5
**et**  1:7,10
**etcetera**  44:10
102:6
**evaluating**
183:3,14

**everett**  21:9,9
21:16,23
**evidence**  9:15
30:13 39:9 41:7
41:19 48:1
50:22 56:4,18
60:8 140:23
170:1 210:1,6
210:13
**exact**  158:20
**exactly**  67:1,2
67:23 189:1
201:18 220:1
**examination**  6:1
6:4,5 10:12,19
215:18
**examined**  10:16
**example**  16:14
16:22 17:22
18:3,5,21 30:21
34:12 40:19
42:14 45:4 51:2
71:8 72:6,17,18
75:8 76:13,13
83:9 90:7 91:14
94:17 102:19
124:14 138:7
157:20 207:19
207:20
**exceed**  132:1
**exceeded**  18:20
**excellent**  220:15
**except**  9:11 51:7
171:8

**exception**  76:16
171:3
**excessive**  155:19
**excessively**
48:18
**excuse**  40:19
83:3 96:4
100:13 102:14
102:18 120:20
150:15 174:2
197:20 217:19
**exercise**  215:16
**exhibit**  6:11,14
6:21 7:1,7,10,17
7:21 8:5,8,11,16
8:19 11:20,21
13:2,5 22:10,13
27:3,5 45:9,12
53:7,8 57:10,11
64:1 103:8,14
103:16 108:23
120:4 122:7
126:9 134:10,13
135:9 142:22
159:13 161:9
165:19,21
170:22 177:16
181:21 182:4,7
188:12 202:6,8
202:10 208:17
208:17,18
**exhibits**  6:8 8:1
23:1
**exist**  35:22
42:19 128:20

147:22 158:7
186:10 208:1
**existed**  42:4
**existing**  48:16
96:21 160:4,19
160:20,22
**exists**  66:15
176:5,6 219:14
**exp**  223:22,22
223:23
**expand**  162:8
**expect**  65:20
**expedited**  221:3
**expense**  160:4
160:19
**experience**  79:1
**expert**  6:15 7:2
8:12 12:18
26:21 27:10,15
**expires**  226:23
**explain**  86:9
90:6 91:11
138:17,17
146:12 151:3
184:8 189:16
**explanation**
8:18
**extended**
130:13,16
**extent**  71:4 74:2
107:3 109:4
110:13 111:5,8
152:20 205:15
212:22

**extra**  82:9
**extremely**
178:15
**eyes**  79:10

**f**

**f**  223:1
**facility**  224:20
**fact**  129:5
**factor**  27:21
98:18 138:9
155:5 209:5
217:16
**factored**  138:12
**factoring**  65:23
**factors**  21:3
45:3 62:13
63:15 68:3,7,11
68:16 105:20
107:8 117:16
125:18 138:6
150:18,21
154:16 160:2
**faded**  131:8
**fair**  23:17 24:4
24:10,16,22,23
25:2 26:7 36:16
43:18,22 44:2
50:4 61:12
62:10 78:9
83:15 84:5
93:19 94:8 96:2
106:22 107:5
110:14 114:17
153:1,2 179:2
185:17 187:5

212:17
**fairbanks**  3:6
**fairer**  43:14
62:4
**fairfax**  1:15
6:13,16 7:3,9,11
8:13 9:5 10:11
10:15,22 11:5
12:2 13:15 23:7
27:8,10 28:22
37:3 45:15
51:21 103:19
119:1 120:7
122:3 134:16
182:10 194:13
208:8 219:5
222:3,10 224:2
**fairly**  45:13
61:13 134:20
178:7 213:16
**fall**  62:1 199:6
199:12
**falls**  61:23 203:7
**familiar**  52:7
153:7 166:4
196:2
**far**  18:22 19:17
48:9 89:13 99:5
154:13 190:8
**fast**  99:10 175:2
**favor**  217:15
**favored**  56:5
**february**  6:20
13:17 22:16

**federal** 10:6
  69:3
**felons** 208:3
**felt** 128:9
**fewer** 49:3
  117:21,22
  128:14 152:22
  152:23
**fifty** 43:12 44:6
  44:11 57:21
  135:17 140:7
  147:2 148:4
  167:16 168:7,13
  169:6 178:22
  190:20 197:16
  197:20,22 198:2
  198:3,6,7,15,18
  198:19,20 199:8
  199:15,19,20,20
  200:2,3,4
  206:13 218:18
**figure** 37:19
  38:3
**figures** 147:10
**file** 224:12
**filed** 209:1
  224:15
**fill** 224:7,8
**final** 36:9 221:3
**finally** 137:3
  218:12
**find** 16:18 23:21
  34:10 45:22
  121:12 134:19
  163:18 203:20

214:2
**finding** 60:9,10
**fine** 13:14
  163:10,11,12
  194:6,7 220:23
**finish** 193:14
**first** 10:16 14:4
  14:20 19:12
  33:5 35:18 37:7
  46:16 66:4
  67:12 69:17
  85:1,2,21 86:11
  86:19 88:12
  110:7 114:1
  116:23 121:4
  128:21 132:4
  136:5 139:9,18
  139:21 140:11
  141:1 146:18
  147:1 172:18,18
  176:14 177:9
  193:5,6 218:5
  218:16 219:6
**fit** 60:1 68:13
  88:1
**five** 14:16 43:12
  44:6 48:11
  51:16 55:6,10
  58:4,22 59:3,8
  64:21 65:6,12
  66:16,18,20
  67:16,17 87:6
  92:23 97:22
  100:8,14 143:10
  147:7 148:4

155:19 156:11
  163:9,11,12,15
  167:11,15 169:6
  177:19 182:23
  183:11 184:6
  188:14 189:14
  189:17 190:9
  194:5 214:19
  215:2 218:7
**flesh** 97:11
**floor** 2:17
**focal** 26:16
  95:14 177:1
**focus** 32:9
  101:11 122:5
  167:3
**focused** 34:5
  162:4,6
**focusing** 104:1
  161:11
**follow** 172:21
  207:23 215:9
**followed** 144:14
  170:5
**following** 10:12
  29:5 63:19
  163:4 225:5
**follows** 10:17
  166:10
**footnote** 80:21
  120:8
**forced** 17:14
**foregoing** 10:8
  223:8,11

**forethought**
  32:4,6
**forgotten** 119:6
  215:14
**form** 9:11 17:7
  18:16 24:17
  25:21 26:8
  28:11 31:15
  34:15 35:10
  36:12 41:22
  43:9 44:17
  47:12,21 49:7
  49:16 50:6,16
  56:22 59:20
  60:11 61:17
  62:8,22 66:2
  67:21 68:6 72:9
  74:4 77:7 78:3
  78:12 82:19
  89:4,20 93:23
  97:8 99:1,8
  104:21 105:18
  106:16 107:4,20
  108:14 112:19
  113:9 116:6,19
  117:7 118:3
  119:23 125:11
  132:11 138:4
  139:1 142:16
  146:15 149:3
  153:22 155:6
  156:15 158:12
  160:14 165:15
  168:15 170:3,12
  171:17 173:9,21

174:23 175:19
176:11,23 179:8
180:1,13 184:3
185:9,21 186:16
187:10 191:8,17
195:18 198:13
199:10 200:12
201:16 203:17
205:9 210:3
211:1 212:11
213:3 225:7,9
**forth** 113:23
119:15 180:6,7
216:19 217:18
217:23
**forty** 100:12,13
135:18 148:4
199:23
**forward** 224:12
**found** 52:14
60:1 147:17
169:21,23
171:20
**four** 12:22
14:16 55:7,10
55:12 86:7,9
88:5,6,7 135:18
147:7 156:7
167:6 178:2
**fourth** 87:15
**frame** 32:21
110:15,16,17
113:17 172:13
219:11

**freedom** 107:16
**friday** 7:20
**front** 17:11
127:8 168:10
204:15
**full** 159:21
**fully** 76:21
**fund** 2:16
**furnish** 225:9
**further** 145:9
183:17 221:16
223:15

## g

**g** 3:5
**ga** 223:22
**gears** 22:4
**geiger** 3:9
**genberg** 2:4
**general** 3:12
36:4 45:5 52:8
95:9
**generally** 27:15
42:6 70:8 72:1
134:19 164:10
**geographically**
16:2 38:10,18
38:19,20,22
88:15 101:7,10
118:9
**geographies**
145:2
**geography**
102:5,10 145:3
**georgia** 2:9

**gerrymander**
35:4 210:7
**gerrymandered**
28:10 34:23
35:8 47:6 52:15
208:11
**gerrymandering**
7:3 27:11 30:13
30:20 32:2,19
33:14,20 34:4
34:11,18 35:3
35:19 36:7,15
36:17 42:11
50:9 210:1
**getting** 22:22
86:10 119:15
142:7 208:6
**gingles** 14:5,21
15:23 16:1
19:13,21 20:3
25:23 33:4,5
35:18 48:22
67:10,13 78:10
84:15 85:21
88:12,12 89:5,9
89:13 95:15
101:5,6 102:2
114:1 128:22
132:5 139:19,21
140:11 146:19
147:1 150:22
172:19 173:8,13
176:14 177:9
184:15 185:18
193:6 203:15

205:8
**give** 18:14 76:8
84:8 108:15
117:11 159:7
175:1 204:6
214:17
**given** 34:1 72:18
72:18 91:23
111:14 117:13
117:15,23
169:19 172:8
223:13 225:8
**gives** 77:19
152:6
**givhan** 105:7,16
105:23
**glitch** 70:12
**go** 11:19 19:17
19:23 20:17
32:13 38:16
53:16 64:12
66:23 67:3,5
70:18 106:19
108:21 123:22
126:8 170:16
189:5 211:18
217:17
**goal** 16:23
116:15 118:1
131:3
**goes** 40:3 41:14
43:21 157:12
205:14 217:23
**going** 11:19
13:5 22:12 23:5

26:13 28:16
33:22 34:3
38:14 41:3,4
45:11,22 53:6
54:6 57:1 64:13
79:18 84:20
94:3 96:1 99:16
99:18,20 103:7
111:15 119:9
120:4 122:11
127:22 130:23
143:15 150:16
150:19 170:22
172:23 183:5
187:8,19 193:13
197:21 199:6
208:16
**good** 12:13
51:12 78:9
92:23 93:2,3
94:13 121:18,19
132:22 135:5
145:17 159:9
163:7,15 193:11
194:4 215:20
**gotten** 53:14
**governing** 89:23
153:17
**government**
112:4
**governmental**
209:10
**governments**
21:6

**grab** 116:10
**grabs** 127:21
**great** 11:15,18
127:10 131:21
194:5,8
**greater** 29:18
30:1 68:4 168:7
206:3
**green** 104:2
136:6 167:2
**greetings** 224:5
**grounds** 9:13
**group** 26:6
56:14,16 58:18
66:13,14 99:20
188:22 189:19
190:9 192:14
200:21 205:1,3
207:17 208:5
218:15
**groups** 135:3
192:4 200:13,16
201:3,5
**guess** 34:17 55:4
77:8 89:22
91:14 117:10
129:17 204:11
**guidance** 21:11
207:23
**guideline**
110:12
**guidelines**
152:12 154:5
**guiding** 27:21

**guise** 74:5
**guys** 121:16

**h**

**h** 1:20 9:5 10:1
109:1
**half** 62:4,6
148:1 199:7
214:16,17
**hand** 36:19
43:19 60:18
71:1 157:1
222:18
**handle** 26:2
**happen** 161:18
165:9
**happened** 15:4
50:23
**happy** 109:11
139:7
**hard** 99:10
175:2
**harrison** 3:4
**hawaii** 18:21
**head** 14:16
59:11 81:12,12
**heard** 66:7,8,10
114:8 213:10
**hearing** 6:23
22:14 119:3
223:13
**heavily** 66:1
**held** 112:23
114:20 115:6,6
115:7

**help** 145:1
**helpful** 72:5
84:22 200:7
**hesitant** 135:6
**hesitating**
134:22 135:4
172:12 174:15
203:18
**high** 41:9 67:4
176:20 201:6
**higher** 29:20
72:3 167:22
177:22 197:7
199:15 200:9
201:8,20
**highlighting**
57:8,14,17
**hinders** 112:20
**hired** 12:18 14:9
191:12
**hispanic** 171:5
**hit** 119:7
**hope** 45:14
202:5
**hospitals** 151:23
152:22 153:5
**hour** 121:15
193:18,22
214:15,15,17,17
**hours** 193:19
**house** 52:13
67:18
**household**
140:21 143:8
149:1

**housing** 140:20
148:11
**huh** 34:2 51:5
132:7
**hull** 80:7 82:9
82:12 83:13,22
84:9 86:20
**hundred** 55:2
63:3 115:7
132:14 135:16
135:18 148:4
167:6,11,15
169:6 177:20
178:1 194:17,18
195:5
**hundreds** 18:21
**huntsville** 62:16
101:20 127:21
128:6 129:6,19
130:2,7 131:16
131:23 133:18
133:23,23 139:4
140:15 141:4,8
141:20 142:3,5
142:11,12
143:11,16,21
148:20 150:4,7
172:10 173:20
174:13 178:4,11
179:6 181:5,10
209:6,16,16
210:6 213:19
**hurt** 119:17
**hurts** 119:22

**hypothetical** 42:23 75:15
76:9
**hypotheticals** 44:5

**i**

**ics** 189:23
**idea** 152:3,7
158:23
**ideal** 51:4 63:2
126:22 138:14
168:17
**ideally** 131:20
206:22 217:7
**identical** 98:9
**identification** 11:22 13:3
22:11 27:4
45:10 53:9
57:12 80:13
103:17 134:14
165:22 182:5
202:9 208:19
**identified** 111:10
**identifying** 201:17
**iii** 6:22
**illustrative** 6:17
7:18 14:2,19
15:21 24:16,22
26:11 35:6,8
46:16 57:5 62:1
62:19 63:11
64:19 68:23

69:6,17 70:3,20
71:20 76:5,20
79:22 80:3,5,10
80:15,16 83:11
83:17,21 85:4
85:12,14,17
86:16,23 87:12
88:2 91:1 92:7
92:20 97:6
98:16 100:1
103:11 106:18
108:4,13 113:6
113:22 116:17
117:6 120:11,12
120:23 122:6,9
124:5,7 125:4
126:20 127:19
127:19 132:16
136:5,18 137:11
140:8 143:17
144:4 154:15
157:7,14,16
158:9 159:22
160:8 166:14
180:4,16,22,23
191:12,14,15,19
191:20 192:1
196:18 203:13
218:6,13,17,17
219:9,16
**imagine** 62:23
130:14 184:4,19
**impact** 38:20,22
38:23 99:17,18

**impacted** 124:15,23 126:2
126:3,3
**impactful** 37:19
38:9
**impactness** 216:1,20
**impacts** 39:5
185:15
**impairing** 119:13
**important** 15:20
121:5 132:8
153:20 164:10
186:5 212:20
213:7,11,11
**impossible** 18:2
18:10 110:4
131:22
**improve** 113:19
115:19 145:22
216:4
**improved** 216:10
**inadequate** 179:20
**include** 98:8
107:21 108:4
116:14 131:21
131:23 136:4
144:20 146:13
146:14 149:2,14
151:6 178:21
181:6,8,10
192:14 193:1,4

197:16
**included** 70:1
71:17 111:17
139:6 142:5,14
142:15 144:3
148:3,21 149:7
151:22 152:2
170:7 178:18
179:11 185:11
185:12 191:6
205:21 217:14
**includes** 29:5
98:13 151:7
167:10 170:6
175:15 204:19
205:3 206:5
**including** 31:20
97:3 107:6,8
144:2 146:18
151:16 176:15
**income** 140:21
143:8 150:5
**increase** 30:3
33:12 39:8 42:7
49:11,13 135:1
192:12
**increased**
168:17
**increases**
164:15
**increasing**
33:11 162:11
**incumbencies**
106:11

**incumbency**
105:3 107:2,9
107:16
**incumbent**
105:3 109:1
110:13 111:5,7
111:12,16,19
113:13 114:6
115:5 116:14
118:13,15
**incumbents**
90:8 106:5
107:18,19,22
108:5,12,19
111:17 113:21
114:9,16,19
115:12,19,23
116:5,18 119:15
119:16,22
**index** 6:1,8 8:1
**indian** 192:11
**indicates** 40:9
**indication** 152:7
152:8
**indicators**
142:12
**indirectly** 86:1
**individual**
200:21
**individuals**
43:23 206:23
**industry** 20:12
82:10 84:5
**information**
122:10

**initial** 45:13
57:2 64:1 94:20
108:22 120:5,6
143:2 154:15
159:13,17
170:21 177:16
178:17 179:3
180:20 181:3,9
181:11,14
188:10,19 189:9
189:12 190:1
191:2,7,13
204:9 218:4
**initially** 182:11
**injunction** 6:23
22:14 119:3
**inquiry** 84:15
**inside** 43:23
52:13,21 106:5
131:13 144:8,16
150:12 163:2
164:17
**insight** 196:18
196:19
**insignificant**
176:10
**insofar** 54:17
67:10 89:5
106:10 151:11
151:20 152:16
176:5 218:9
**instances**
184:14
**intact** 96:19

**integrate**
213:23
**integrated**
107:12
**intended** 56:7
**intent** 41:4
68:14 82:8
**intentionally**
24:7 134:6
**interact** 72:2
**interdecennial**
52:19,20
**interest** 63:7
69:10 115:3
140:16 141:2,10
141:14,16
151:15,19 152:9
152:17,19 154:2
154:12 209:10
**interested**
202:12 223:17
**interests** 56:19
144:1,2 146:1
**interject** 22:21
**internal** 55:16
**internally** 54:8
94:16,18
**internet** 70:12
**interpreted**
202:15
**interval** 198:9
198:12 199:8,13
199:22 202:16
**intervals** 199:4

**introduce** 22:13
23:1 103:7
**introduced**
101:15
**involved** 105:21
107:8 138:6
217:3
**irregularly**
15:15
**isolated** 133:14
**issue** 40:12
67:18
**issues** 97:12
138:16,17
**iteration** 140:9

**j**

**jack** 2:4
**jack.genberg**
2:11
**jackson** 209:19
**jacob** 5:4
222:11 224:1
**january** 7:20
**jefferson** 7:4
26:23 27:1,11
28:5 31:12
36:23 38:4
39:20 43:1 47:9
47:19 48:5,10
48:12 49:3
50:12 51:1
223:5
**jess** 2:5
**jess.unger** 2:12

**job** 52:23
**jr** 3:5
**judge** 98:19
**jump** 72:7
**jumps** 109:12
**jurisdiction**
16:6,9,14 20:21
20:21 24:3,5
73:21 74:1,2
75:1,8,11,22
89:23 156:19
164:16 186:23
**jurisdictions**
43:16
**justice** 183:18
184:14
**justified** 44:20
**justify** 71:3
**jvanleer** 5:10
222:14

**k**

**keep** 42:19
106:4 131:4,10
131:13 163:8
164:10 193:13
215:21 217:20
**keeping** 17:3,5
105:22 132:7
133:12 154:6,7
154:10,23 155:5
156:13
**keeps** 93:10
**kept** 29:19 34:6
50:15 93:18
132:15 168:5,13

**key** 36:6 77:8
**khadidah** 1:7
**kin** 223:16
**kind** 68:3,7
**know** 11:13,16
15:3,6,8 20:22
21:12,13,15,17
23:23 24:6,9
25:8,22 31:1
32:21 36:14
43:12 47:13,13
47:15,16,22
56:7 62:9 66:16
76:11,12 77:13
78:13,20 79:1
82:1 97:9 99:9
99:21 100:12,16
105:7 113:4
116:1 117:8
120:18 125:12
125:19 128:8,23
131:12,20 132:3
133:3 134:22
139:21 141:10
147:23 148:7
152:21 154:3,4
155:22 157:19
158:18,19,20
163:14 166:13
166:20 168:4,9
169:12 175:1
177:10 184:1
186:4 194:21
195:16,22
201:19,22

215:20 217:3
219:6,8
**knowing** 201:13
201:14
**knowledge**
222:6
**known** 165:10
**knows** 217:4
**kondi** 27:1

**l**

**l** 9:1
**label** 208:17
**labels** 91:23
**lack** 28:13
**lacour** 3:5 6:4,6
10:19 11:1,23
12:6 13:4,11,15
17:8 19:4 22:12
22:17 23:3,5
24:18 26:5,10
27:5,8 28:15,22
30:17 32:1 35:2
36:5,20 42:6
44:4 45:6,11
47:17,23 49:10
50:1,11,21
51:11,20 53:10
57:1,13 60:15
62:3,15 63:4
66:4 68:2,10
70:15,16 74:13
77:12 78:8,18
82:22 89:16
90:4 92:22 93:6
94:11 97:21

99:3,22 103:18
105:2,22 106:21
107:15 108:7,21
113:3 114:3
116:15,22
117:14 118:10
120:3 121:14
122:2 125:21
134:15 138:15
139:7 142:19
146:23 149:13
154:4 155:12
157:6 159:4
160:16 161:8
163:7,16,22
164:4,8 165:18
165:23 166:15
166:18,22 168:4
168:20 170:9,20
171:22 173:10
175:7,20 176:18
177:10 180:10
180:18 181:23
182:6,10 183:6
183:8 184:7
185:16 186:4,22
187:15 191:11
191:21 193:11
193:21 194:5,8
194:12 195:19
198:21 200:15
202:2,5,10
204:8,13 205:23
208:20 210:4,10
211:4 212:14

213:6 214:19
215:1,5,11
219:1,3 220:10
220:15
**landmark**
  149:23 151:3,5
  151:22 152:10
  153:21 154:7
**landmarks**
  152:21
**large**  10:4 16:4
  38:21 45:13
  46:2 88:15
  118:9 145:9
  173:13 176:15
  179:14 187:16
  200:19
**largely**  120:9,13
  120:19 121:8
**late**  121:16,17
**latino**  185:11,19
  186:7,12,13,14
  186:15 187:2,2
  187:7,8,15,17
  187:18,19
**laura**  1:20 9:5
  10:1 215:6
**law**  2:6,7,15
  3:11 4:8,17 5:5
  5:13 222:11
**lawrence**
  122:21 123:1
  213:13,16
**lawsuit**  13:23

**lcr**  223:23
**lead**  62:4 68:3,7
  88:1
**leading**  9:11
**lean**  55:11
**leaned**  55:12
**leave**  71:4 96:18
**leaving**  70:9,16
**led**  104:19 116:4
**leer**  5:4 6:5 13:7
  13:12 17:7
  18:16 22:20
  24:17 25:21
  26:8 28:11
  30:14 31:14
  34:14 35:9
  36:11 41:21
  43:8 44:16
  47:11,20 49:6
  49:15 50:5,16
  51:15 56:21
  59:20 60:11
  61:17 62:8,22
  66:2 67:21 68:6
  70:11 74:4 77:7
  78:3,12 82:19
  89:4,20 93:22
  97:8 99:1,8
  104:21 105:18
  106:16 107:4,20
  108:14 112:19
  113:9 116:6,19
  117:7 118:3
  119:23 121:19
  125:10 132:10

138:4,23 142:16
146:15 149:3
153:22 155:6
156:15 158:12
160:14,23
163:12,20 164:1
164:5 165:15
166:12,17,21
168:15 170:3,12
171:17 173:9,21
174:23 175:19
176:11,23 179:8
180:1,13 184:3
185:9,20 186:16
187:10 191:8,17
193:16 194:1,6
195:18 198:13
199:10 200:12
201:16 203:17
205:9 210:2,8
211:1 212:11
213:2 214:22
215:8,12,18
218:21 220:12
220:17,23 221:2
221:4 222:11
224:1
**left**  75:23 97:23
  150:4 170:15
**legal**  2:16 17:16
  30:15 73:1
**legislation**
  207:21
**legislative**  4:5
  67:18 68:5

legislators
  21:14 119:13
legislature
  33:15 60:1 70:1
  70:2 71:16,19
  77:13 89:22
  90:10,13 107:3
  158:15 169:9
  174:20
legislature's
  71:14
legislatures
  21:5
level 72:4 121:9
  145:3 188:21,22
  189:16,17,19
  190:10,12 196:9
  201:11 205:15
  218:15
levels 74:8
  188:15
liberties 5:6,14
  222:12
license 223:22
lies 150:12
likely 63:5,8
  144:22 168:12
  168:16 197:21
  198:1,2,10
  199:5,12 200:1
  200:4 203:8
limestone 95:2
  122:15,20
  127:17 128:13
  128:18 129:11

129:13 130:1,8
  130:21 209:13
limit 19:13,15
  19:17 148:5
limited 63:16
limits 19:10
line 24:10 66:1
  79:2 119:11
  149:20 155:13
  159:5 182:9,18
  211:19 225:11
  225:14,17,20,23
  226:1,4,7,10,13
lined 183:10
lines 23:12
  34:12 212:9,21
  213:8
listed 61:2 222:7
lists 177:17
litigation 14:22
  14:23 120:17
  135:7 172:5
  183:1,12 185:8
little 11:9 13:9
  22:4 49:12 57:7
  93:17 107:16
  121:17 122:5
  145:9 163:18
  190:20 197:6
live 129:13,14
lives 105:4,8,12
livingston 4:3
local 21:6 102:5
  102:10 112:4
  164:15

locality 153:13
  153:14
locally 153:15
  153:16
locations 111:19
logical 140:12
  145:17 187:23
logically 187:13
long 33:16
  88:23 199:2
  214:13
longer 19:18
  193:17 215:22
look 12:14 13:6
  13:16 23:15
  24:2 25:9 26:3
  34:16 39:3
  44:23 45:1,17
  54:3,9 55:5
  57:13,21 65:10
  67:7 68:19
  77:15,16 79:18
  80:20 86:6,12
  88:13,21 93:15
  96:1,3 101:2
  102:22 109:10
  118:7 119:1
  125:20 127:6
  130:19 132:13
  135:6 145:6
  148:8 157:3
  165:1,8 166:4
  170:16,18,20
  177:6,14 185:23
  186:3,5 209:3

211:16
looked 54:22
  64:2 65:17
  75:13 77:21
  92:5 103:4,5
  118:23 128:4
  141:8 171:18
  177:12 190:3
looking 19:21
  23:21 24:1,3,7
  25:4,23 30:19
  33:6 38:3 39:15
  40:2 42:9,13,22
  54:16 58:10
  67:8,9 82:11
  83:9 84:22
  88:18 89:6,14
  91:10 95:12
  98:11,18 100:7
  100:19 102:15
  102:16 112:15
  114:17 115:23
  120:8 124:16
  125:17 126:11
  128:19,20 134:8
  135:8 139:9,17
  139:19,23
  141:18 147:16
  148:10,16 152:6
  159:13,18
  167:18 177:15
  182:22 188:1,3
  193:18,19
  204:13 205:13

**looks**   13:19 16:3
   86:22 87:16
   91:5 92:2
   102:21 148:18
**lose**   169:14
**lot**   49:13 65:17
**low**   35:14 67:5
   111:14
**lower**   109:5
   111:9 113:1
   114:20,22
   117:13 150:5
   201:21 202:19
**lowering**   37:20
   115:16
**lunch**   93:1
   121:16,17,22

**m**

**m**   3:7,8
**macon**   162:2
**made**   9:10
   39:12 48:9,11
   51:9 56:1 60:23
   66:21 95:11
   105:1 163:1,3
   171:23 172:14
   174:16 179:12
   179:15 184:1
   201:21 210:18
   216:7
**madison**   94:21
   95:1 104:2
   122:19 128:18
   129:12 209:6,12

**mail**   224:10,19
**maintain**   29:11
   41:1 42:4 48:18
   69:23 70:4
**maintained**
   110:5
**majority**   15:12
   16:20 17:1,20
   18:11,15 19:1,7
   21:19,23 23:22
   24:2,8 25:1,4,7
   30:23 31:3
   40:16 41:9 42:3
   48:16,20 49:1
   49:19 51:9
   57:18 58:16,19
   59:8,12,15,17
   59:18 61:1,14
   61:15 62:5,6,17
   62:20 64:20
   65:2,8,14 66:21
   67:20 72:10
   73:12,17 74:17
   75:5 85:3,10,10
   85:11,12 87:9
   87:13,16,20
   88:4,9,14,23
   89:6 90:18 91:6
   91:8,12 92:6,11
   92:12,18,19
   95:16 96:6,8,13
   98:22 99:7
   100:5,23 101:1
   101:1,9 102:16
   103:5 109:14

   110:23 111:3
   112:2,9 114:18
   116:16 117:5
   118:2,8 129:1
   160:3,4,11,18
   160:19,21
   162:18 169:14
   171:4 173:19,22
   173:23 176:13
   176:13,20 179:7
   181:1,4,8,10,15
   184:16 185:1,2
   185:12,12,14,19
   185:22 186:6,11
   187:1,2,7,8,18
   187:19 188:5,6
   190:4,17 203:14
   203:14 204:21
   205:7,22
**make**   9:13
   15:11 23:7,10
   26:12 28:12
   38:21 50:13
   57:7 73:19 84:8
   90:11 95:8
   96:12,16 103:11
   131:1 142:7,17
   146:20 165:1
   173:1 180:2
   192:4,22 217:2
   217:19 225:7
**makes**   18:9
   24:21 32:2 50:2
   50:7 73:7 76:4
   96:2 132:21

   180:5
**making**   49:5
   128:17 193:11
   225:8,8
**mandatory**
   96:23
**manner**   31:17
   31:22 34:7,7
   105:15 170:18
   209:8
**manually**   224:8
**map**   7:22 17:15
   18:6 19:17 25:6
   28:2,5 30:11
   31:12,13 36:9
   38:22 40:9 42:9
   42:10 43:2 47:9
   47:14,19 48:2,5
   48:11 49:3
   50:11,13,15,18
   56:5 61:12 62:4
   67:10 70:8,17
   70:17 71:4,13
   72:4 73:2 77:23
   79:1,9,16 84:6
   94:13 98:21
   101:3 108:10
   110:18 117:20
   118:17 123:14
   123:21 132:19
   140:9 143:19
   152:20 156:3,12
   157:9,13 160:2
   160:17 165:16
   167:3,9 185:18

217:1
map's  115:20
maps  61:12
  65:18 134:16
  161:10 164:19
march  7:5 27:13
margin  194:19
  194:22 195:14
  195:15 196:3,5
  196:11,13,19,20
  196:22 197:10
  197:12,13,15
  198:16 199:16
  201:9 202:14,17
  202:18 203:4
mark  11:19
  182:6
marked  11:21
  13:2 22:10 27:3
  45:9 53:8 55:19
  56:1 57:11
  59:17 103:16
  134:13 165:21
  182:4 202:8
  208:18
marking  53:7
marshall  122:14
maryland
  207:21
mask  97:5
masks  97:10
master  21:8
match  81:12
  139:20 193:7,8

matches  133:4
math  59:10 65:4
  65:10
matter  52:9
  79:2 129:5
  158:14 162:3
maximum  37:13
mcclendon  7:22
mcclure  26:23
mean  16:7
  17:18 19:16,19
  34:3 38:18 53:4
  59:7 81:15
  86:12,15,16
  90:9 91:11
  95:13 96:20
  98:12 100:2
  104:13,13 107:7
  107:13 115:6
  119:12 121:3,8
  147:1 159:10
  160:10,20 172:4
  176:8 180:3,16
  210:14
meaning  25:12
  110:23 125:13
  155:10 170:15
  172:13 176:1
  186:18 216:1
meaningful
  204:18
means  64:23
  87:19 123:13
measure  20:7
  78:19 90:15

95:10 132:19
  171:20 172:14
  173:12,15,17,18
  174:4,6 179:14
  181:7 189:23
measured  87:18
  100:18 120:20
  120:21,22
  132:18
measurement
  84:18,18
measurements
  77:19 83:23
  86:14,18
measures  20:11
  20:14 21:16
  69:2 80:22 81:1
  81:5 86:8 90:1
  104:15
measuring  83:1
  84:14 85:2
  91:22 92:13
median  140:20
  140:21 143:8
  148:10,23
meet  73:15
  85:14,21 109:20
  139:18 173:12
  214:10
meeting  172:17
meets  183:19
members  21:15
  82:3
memory  40:22

mention  217:15
mentioned
  43:14 47:5
  48:14 67:22
  68:12 74:6 77:3
  110:8 116:23
  124:22 138:7
  143:7 146:16
  147:7 149:6
  150:10 151:20
  152:11,13 153:4
  155:16 166:9
  170:4 212:18
mentioning  39:6
merely  32:3
messick  3:6
met  67:10 89:9
  214:7,8
method  97:11
methodologies
  91:19,20
methodology
  91:22
metric  20:5
  84:13,17 86:5
  88:10 91:7,16
  174:11
metrics  86:5
  100:22 101:2
  180:15
michael  4:16
middle  202:13
military  151:8
  151:12

**milligan**  110:20
**mind**  22:23
  50:15 63:22
  70:13 163:6
  165:12 215:10
**minimal**  49:5
  87:17 90:22
  91:3 96:21
**minimize**
  124:18,22
  128:16
**minimizing**
  69:11 100:16
  133:21
**minimum**  88:8
  90:17,23 91:2,7
**mink**  3:10
**minorities**  25:11
  25:13,18 135:1
**minority**  15:11
  16:20 17:1,20
  18:11,15 19:1,7
  21:19,23 23:22
  24:2,8 25:1,3,4
  25:7,10 26:6
  30:23 31:3 36:9
  43:16 49:1
  66:14 67:6 68:4
  73:12,17 74:17
  75:5 88:14
  98:22 99:5,7
  100:5,23 101:1
  101:1,10 112:2
  112:9 114:18
  116:16 117:5

118:2,8 129:1
135:3 173:19
185:1,12 205:7
205:22
**minus**  37:13
  197:13 202:17
**minute**  92:23
  108:22
**minutes**  51:16
  51:17 163:9,9
  163:23 164:2
  194:5 214:18,20
  215:2
**misspoken**
  64:11
**mistake**  81:3
**mistaken**
  198:22 199:4
**misty**  3:6
**misty.messick**
  3:19
**moment**  54:10
  103:19 121:11
  133:3 134:8
  142:23 144:6
  150:10 159:15
  164:10 185:6
  202:4 204:6
**montgomery**
  3:16 4:12 62:18
  91:15 161:13
  176:8,9,19,21
  177:5,12,13,19
  178:8,14 210:18
  211:6

**morgan**  95:2
  122:14,15,20
  123:1 127:23
  128:12 129:14
  129:21 145:13
  146:2 147:23
  148:1
**morning**  11:1
**mouth**  154:10
**move**  36:21
  110:1 116:9
  119:10 122:18
  128:17 138:13
  162:15 181:18
  211:6
**moved**  44:11,12
  48:13,17
**moves**  80:16
  206:3
**moving**  20:13
  32:17 77:2 79:7
  82:10 156:9
  162:14 205:18
**mtaunton**  4:23
**multiple**  41:8
  99:18
**municipalities**
  154:11
**municipality**
  154:6
**muted**  216:8

| **n** |
|---|

**n**  2:1 3:1 4:1 5:1
  9:1

**n.d.**  6:20 8:14
**naacp**  22:7
  23:17
**naacpldf.org**
  2:20
**name**  10:21
  11:1
**named**  129:5
**narrow**  130:11
**narrower**
  209:14
**narrowly**  209:8
**native**  151:9,13
  192:14 193:1
**nature**  153:5
**near**  211:19
**nearly**  64:5
  65:14
**necessarily**
  17:21 24:5
  33:10 35:11
  63:12 73:2
  116:7 155:7
  208:14
**necessary**  9:9
  37:12 225:9
**need**  11:15
  13:13 49:17
  96:10 102:9
  105:15 109:10
  129:23 149:19
  161:18,21 163:9
  163:14 164:2
  177:7,11 191:10
  192:19 193:12

215:6,6 220:18
**needed** 100:4
**needs** 102:5
  111:22 183:19
  221:2
**neither** 223:16
**never** 163:6
  177:12 181:21
  191:22
**new** 2:18,18
  5:16,16 30:23
  31:3,8 33:8
  62:15 77:20
  93:12,18 98:7
  99:6 102:12
  108:3 111:2
  114:19 124:13
  125:14 158:5,16
  160:3,18 165:19
  186:6 196:14
  197:17
**newer** 190:18
**nice** 221:10
**nichols** 1:20 9:6
  10:1 163:13
  202:6
**nine** 41:17
  46:21 54:20
  58:12 65:6,12
  87:4 199:23
**nineteen** 123:11
  157:15 158:4
**ninety** 43:22
  59:12 61:13
  196:9,11 202:15

**nodding** 122:4
**nonadjacent**
  53:4
**nonattorney**
  73:3
**nonblack** 47:3
**noncitizen**
  171:9,15,18
  172:9 173:4,16
  174:12 176:1,9
  188:13 205:12
**noncitizens**
  172:2,15 175:16
  175:22 176:2,4
  177:4,6 186:9
  187:17 200:10
  203:23 204:18
  204:22 206:5
  207:13
**noncitizenship**
  172:21 174:4
  175:12 190:13
  203:21
**noncompact**
  15:16 77:9 90:6
  104:19
**noncompactn...**
  97:6
**noncontiguous**
  75:8,10,18
  128:1
**noncvap** 177:17
  177:17,18,23
  178:4,10

**nondistrict**
  136:9
**noneligible**
  206:8
**nonhispanic**
  171:6 192:6,7
  192:11
**nonracial** 116:3
**nonregistered**
  206:19
**nonsampling**
  202:23
**nonsd7** 136:21
**normal** 18:19
  45:19 115:10
**normally** 65:20
  73:20
**north** 4:19 7:14
  53:20 102:19
  125:23 209:13
**northern** 1:2
  26:22 99:13
  124:20 144:13
**northwest** 5:7
  209:11 222:12
**notarized**
  224:10
**notary** 1:23 9:8
  10:3 222:23
  223:21 226:23
**noted** 225:4,5
**notice** 6:12
  11:18 12:1,14
**noting** 224:7

**november** 7:16
**nuances** 106:19
**number** 21:4,4
  42:12 48:13
  69:11 80:2 82:2
  87:1 123:9
  154:19 157:2
  159:8 169:2,2,4
  172:1 176:2
  187:16 195:11
  195:13,17,23
  204:18 212:1
**numbers** 40:10
  40:11,14 55:16
  57:14 94:7,7
  101:19,22,23
  134:20 135:2
  167:21 168:10
  175:17,21
  194:14,20 195:9
  200:9
**numerical** 21:4
  77:10 78:23
  80:12 88:4
  155:17
**numerically**
  78:6 80:15 94:5
  118:19 169:10
**numerous** 37:19

**o**

**o** 9:1 222:11
**object** 17:7
  18:16 24:17
  25:21 26:8
  30:14 116:6

138:4 153:22
170:3 171:17
176:23
**objection**  28:11
31:14 34:14
35:9 36:11,12
41:21 43:8
44:16 47:11,20
49:6,15 50:5,16
56:21 59:20
60:11 61:17
62:8,22 66:2
67:21 68:6 74:4
77:7 78:3,12
82:19 89:4,20
93:22 97:8 99:1
99:8 104:21
105:18 106:16
107:4,20 108:14
112:19 113:9
116:19 117:7
118:3 119:23
125:10 132:10
138:23 142:16
146:15 149:3
155:6 156:15
158:12 160:14
160:23 165:15
168:15 170:12
173:9,21 174:23
175:19 176:11
179:8 180:1,13
184:3 185:9,20
186:16 187:10
191:8,17 195:18

198:13 199:10
200:12 201:16
203:17 205:9
210:2,8 211:1
212:11 213:3
**objections**  9:10
9:13
**objectives**  26:17
**observe**  110:12
**observed**  111:7
**obtain**  65:21
**obviously**  92:11
**occasionally**
24:6 164:23
**occur**  17:22
18:4 44:22 70:6
158:17 207:18
**occurred**  22:15
41:5 42:1 50:19
50:22 115:8
123:18 208:13
220:5
**occurring**  41:6
77:1
**occurs**  99:12
115:9,12 176:3
**odd**  82:2
**offer**  27:16
**offered**  9:15
27:18 76:3
**offhand**  105:10
105:10 168:9
**office**  3:12
222:18

**offices**  224:3,10
**official**  4:4
**oh**  119:6 219:19
**okay**  11:10 12:4
12:13 13:4
14:17 15:3
17:17 19:4
20:16 22:4
23:11,13 26:5
28:15 30:17
31:7 34:10 35:2
36:20 39:21
40:2,13 41:6
42:23 44:4 46:1
49:2 50:1 51:11
54:6,19 57:17
58:12 61:8
63:17 65:12
66:20 68:19
71:2 74:13
76:18 81:7,10
81:22 82:15
84:3 85:16
87:23 91:5
92:21 93:6,17
99:22 103:7
104:10 115:18
119:9 120:3
121:7,12 122:23
125:1,8,21
128:11 131:3,17
133:15 134:8,10
136:15 137:3
138:15 140:4
143:3,15 145:5

147:13 148:9,16
152:10 156:2
158:8 159:4
163:13 165:3,18
166:6 167:9
169:17 171:22
173:14 177:15
182:21 183:7
184:7,13 185:16
189:3 190:3,15
190:22 192:3,13
194:8 197:3
202:10 206:6
208:8 211:16
212:14 213:13
214:3 215:9,19
216:13,18
217:12 218:16
218:21 220:3,7
220:22 221:8
**old**  93:17 98:8
**omit**  139:15
**once**  42:19
43:10 44:18
47:22 61:18
65:9 71:16,19
75:12 78:22
79:13 100:6
109:16 110:1
144:14 155:16
157:19 158:13
158:22 179:13
179:16 224:10
**ones**  86:3,3
87:16 101:12

118:20 123:17
147:18 148:14
176:17
**ongoing** 26:21
**opine** 77:5
181:2,13 197:23
**opined** 54:11
**opinion** 27:19
28:4 30:15
34:23 47:18
76:4,9 154:17
212:13
**opinions** 27:16
29:3,4
**opportunities**
49:4
**opposed** 210:22
**opposite** 186:18
**opt** 128:16
**opted** 184:21
**optimal** 63:13
217:8
**optimum** 217:9
**options** 42:3
45:1 139:20
198:18 199:19
**oral** 10:11
**orange** 8:10
145:3,10,11
147:9 148:12
166:2
**order** 19:6
26:18 29:11
33:12 35:17
41:1 42:4 48:18

60:20 69:23
73:15,16 74:16
110:22 114:10
144:23 161:6
**ordering** 224:13
**organizations**
23:16,20
**original** 120:16
120:22 224:13
224:15
**originate**
153:12
**outcome** 56:8
**outside** 67:15
136:6 137:23
138:21 139:16
141:6 144:9,17
150:6
**overall** 36:18
37:9,13 61:21
87:7 97:4 102:3
102:15 118:12
118:16 216:1,4
**overlap** 144:10
144:16 149:5
**overlapping**
144:8 149:5,8
149:11 150:11
150:13 189:7
218:11 219:14
**overpopulated**
55:1,7,13 59:9
59:16 61:16
**overpopulation**
55:19 56:11

59:17
**own** 36:1,2
133:2

## p

**p** 2:1,1 3:1,1 4:1
4:1 5:1,1 9:1
**p.m.** 121:23,23
164:7,7 182:1
194:11,11 215:4
215:4 221:14
**p.o.** 2:8 3:15
4:11
**packed** 34:7
**packing** 43:23
55:3 56:12,13
**packs** 25:10
**page** 6:3,10 8:3
13:20,21 23:6
29:2 36:22 37:1
38:14 39:3,14
46:3 54:7,7,8
55:15,16,17
57:3 58:10,11
64:2 68:20
79:19 80:20,21
84:21 108:23
119:10 120:7
126:12 135:10
136:2,3 148:10
159:17 166:23
170:22 183:9
188:11 204:14
211:18 224:18
225:11,14,17,20
225:23 226:1,4

226:7,10,13
**pages** 23:16,16
28:16 36:21
57:8 61:2 225:9
**pair** 107:17,19
113:21 114:9,16
116:4,17 119:16
**paired** 106:6
108:18 111:18
115:19
**pairing** 106:6
106:10 108:1,12
109:2 110:13
111:5,8,12
113:13 114:6,19
115:5,8,12,22
118:13,15
119:22
**pandemic** 220:5
**paragraph**
15:17 28:17,23
29:3,17 37:4,7
39:4 64:2 68:20
77:4 159:18,21
170:23 182:22
188:11 202:13
203:6 209:4
**parameters**
126:19
**parks** 152:1,22
153:5
**parkway** 224:21
**part** 23:22
40:18 41:12,23
70:17 72:14

75:10 84:14
102:23 103:2
111:21 122:19
122:19,20,20
127:11 131:3,9
132:20,20
133:17,18
134:23 137:11
137:12 143:10
143:16,20 144:8
144:9,11,16,17
144:18,20,21
147:23 150:1,11
167:9,14,22
168:1 171:1
182:22

**partial**  133:23
134:1

**particular**
15:22 18:13
20:7,11 25:3
26:16 27:18
30:18 31:17,20
33:7 42:13 44:1
48:19 56:14
60:19 62:14
66:13 68:18
70:9 71:7 72:4
72:17 76:2,2
83:5 86:17 88:6
89:14,17,22
90:14 94:12,16
94:17 107:9
108:23 121:9,11
123:17 124:19

125:5 138:8
140:9 141:17
144:6 147:19
152:5 153:15
157:2,5 158:19
165:9 166:7
168:5 172:2
175:4,14 177:3
177:7 188:4
189:1 190:8
191:23 198:10
205:22

**particularly**
90:6 183:15
202:12

**parties**  9:3,12
223:16 224:13

**partisan**  7:13
53:19 54:16
56:19 66:14

**parts**  95:4 98:21
131:18,18
141:19 142:10
142:12,13
148:19 153:13
167:19 171:1
209:17 211:6,10
211:13

**pass**  78:16

**passed**  16:9
71:22 102:21
207:20

**passes**  16:14

**patch**  145:8

**pattern**  34:18
34:19,20 35:3,6
41:12 55:19
56:1,4 59:17

**pause**  204:7,12

**pdf**  224:7

**people**  18:22
32:17 48:13
126:18 129:12
129:13 133:8
142:3,5 145:23
146:8,8,13,14
153:15 162:2
167:11 168:23
169:6 207:9

**percent**  29:19
30:1 37:10,13
37:15 40:4,4,19
41:1,2,15,15
42:5,14,16
43:12,20,21,22
44:6,7,8,11,12
44:19,21 46:12
46:13,21,22
49:19 51:7,10
55:2 57:21
59:12,14 61:6,9
61:13,15,21
63:3,21 64:6,17
65:1,7,13,15,21
66:16,18,21,22
67:16,19 79:4,6
93:10 115:7
126:15 135:21
135:23 136:20

136:21 137:14
137:16 140:7
147:2 168:7,13
178:8,22 190:20
190:21 194:17
194:18 195:5
196:9,11 197:2
197:2,10,16,21
197:22 198:2,3
198:7,7,16,18
198:19,20 199:9
199:15,19,20,20
199:23 200:2,3
200:5 201:10
202:16 206:13
218:18

**percentage**  30:3
30:3 35:14 39:9
42:8,22 43:2
66:13 67:3,9
68:1 135:21,22
138:18 139:11
167:23 169:21
170:16 175:18
175:22 176:1,5
178:4,10 216:21

**percentages**
121:11 135:19
177:18

**perfect**  150:20
220:12

**perform**  32:23
118:19 180:17
186:13

| | | | |
|---|---|---|---|
| **performed** 92:4 | **placed** 19:11,13 | 76:5,9,20 77:4 | 120:10,12,15,16 |
| **performing** | 19:15 167:14,22 | 77:13,17,20,21 | 120:21,22,23 |
| 34:17 54:23 | 168:1 | 77:22 78:2,5 | 121:1,6 122:11 |
| 55:20,21 | **places** 19:16 | 79:22,22 80:3,4 | 122:18 123:1,4 |
| **performs** | 132:14 188:15 | 80:6,16,18 | 123:10 124:5,7 |
| 108:10 118:20 | **plainly** 125:13 | 81:18,19 83:2 | 125:3,4 126:20 |
| **period** 219:14 | **plaintiff** 1:8 | 83:11,11,17,18 | 127:3,3,7 136:5 |
| **permanent** 4:5 | **plaintiffs** 2:3 | 83:20,21 85:4 | 136:15,18,19 |
| **permeates** | 12:19 13:23 | 85:14,17 86:11 | 137:3,10,11 |
| 34:21 | 14:10 101:16 | 86:16,23 87:1,5 | 139:9,10,10,12 |
| **person** 18:8,20 | 208:9 209:2 | 87:5,12,12,14 | 139:12,12 140:8 |
| 69:5 109:22 | 210:4 | 87:19,22 88:2,6 | 143:17,17 144:4 |
| 167:2,3 | **plan** 6:17 7:18 | 88:8 89:2,9,11 | 152:5 153:19 |
| **persons** 99:17 | 7:23 14:2,7,19 | 89:12,19 90:18 | 154:15,19,20,22 |
| **perspective** | 15:21 16:15 | 90:19 91:1,8,13 | 155:2 157:8,8 |
| 17:16,16 18:7 | 20:5 21:19 24:4 | 91:14 92:3,7,11 | 157:14,15,16,21 |
| 110:18 | 24:9,11,16,16 | 92:13,14,15,18 | 157:23 158:10 |
| **phrase** 154:9 | 24:22,23 25:2 | 92:20 93:12 | 159:22 160:13 |
| 196:3 | 26:5,7,12,15,19 | 95:1 96:9,14,20 | 161:12 162:21 |
| **pick** 105:16 | 27:22 29:8,19 | 97:6,23 98:8,8 | 166:14,16,19,20 |
| 126:17 129:23 | 29:21 30:2,4 | 98:12,13,16,19 | 168:6,22 169:14 |
| 150:5 | 34:21,23 35:5,6 | 100:1,1,7,8 | 174:18 178:18 |
| **picked** 126:21 | 35:8 37:8,12,18 | 102:3,12,15 | 179:5,10,10,17 |
| **picking** 42:2 | 38:5,9 39:18,19 | 103:4,9,10,21 | 179:18,19,19,21 |
| **picks** 127:23 | 40:5 43:14,14 | 104:8,12 105:1 | 179:22,23 180:4 |
| **pike** 162:2 | 46:7,16 47:10 | 105:14 106:9,17 | 180:7,8,11,12 |
| **place** 8:9 51:12 | 49:5 56:20 57:5 | 106:18,20 | 180:16,19,22,22 |
| 99:6 117:15 | 59:13,15,22 | 107:14,14,18 | 180:23 181:9,10 |
| 153:7,8,10,21 | 61:22 63:12,13 | 108:4,12,16 | 181:14 186:23 |
| 154:2,5 165:10 | 63:13 65:23 | 110:14 111:23 | 189:10 190:17 |
| 165:14 166:1 | 69:1,6,17,19 | 112:4,8,18 | 191:1,13,14,15 |
| 188:22 189:16 | 70:3,20 71:17 | 113:6,22,23 | 191:20,20 192:1 |
| 189:18 190:12 | 71:20,21,21 | 114:18 115:13 | 196:18 197:6 |
| 190:14 | 72:11 73:8,10 | 116:18 117:6,21 | 210:17 211:21 |
| | 74:18 75:3,4 | 118:11,12 120:9 | 211:22,23 212:2 |

212:5,8,10,16
212:21,22 213:7
213:9,13 214:1
214:1 216:6,16
216:17 218:6,13
218:17 219:6
**plan's**   37:20
80:10 93:11
105:13 216:11
**planned**   27:19
**plans**   7:16 26:11
29:7 40:16
53:22 62:1,20
64:19 77:16
83:1,5 86:21
94:14 101:15
103:11,13
108:13 115:22
116:17 120:13
122:6,9 123:8
127:15 132:16
138:3 160:8
161:15 166:20
188:3,4,7
190:23 191:6
197:4,5,17
203:13 206:14
216:2 217:13
**plays**   98:18
**please**   10:20
11:13,16 64:12
116:21 162:13
224:10,18 225:9
225:9

**plugged**   190:16
**plus**   37:13 118:6
171:6 192:7,14
193:1 197:12
202:18
**point**   26:16
69:21 70:10
95:14 110:16
112:22 119:18
120:11 130:19
156:14 177:1
190:19 197:1
198:4,15 199:15
199:18 201:10
**pointed**   163:1
**points**   43:3
138:19
**political**   68:4
69:10 104:23
**polsby**   20:14,17
80:5,14 82:11
83:12 84:4
86:20
**poorly**   142:19
**pop**   8:6
**popped**   12:9
**popper**   20:14,17
80:5,14 82:11
83:12 84:4
86:20
**population**   7:12
7:19 15:11
18:19,23 25:10
29:6,10,11,12
29:14,22,22

30:12,12 31:2,4
31:10,18,20
33:23 34:6,6,8
35:15,16,17,20
37:9,11,21
39:17 40:20
41:2 42:8 43:3,4
43:16,17 46:11
46:12,20,22
47:2,3 48:1
49:12 51:3,4
53:19 54:20
57:4,19,20
58:16,18 61:18
61:22 62:11,21
63:2,18 64:4,5,7
64:14,16 65:21
69:5 99:5 110:3
116:8,9,10
117:18 126:10
126:19,22 132:1
133:4,7 135:13
135:14,15,17,20
135:22 136:9,10
136:20,22 137:6
137:13,14,16,20
138:11,12,13,14
138:20,21 140:6
140:7 145:16
147:3,4 161:19
161:21 162:5,7
164:22,23 167:5
167:16,23 168:8
168:12,17 169:8
169:15,20,20

170:7 171:9,16
171:19 172:10
173:5,16,18
174:12 175:14
176:6,9 183:16
185:3,11 186:2
187:16 193:2
195:5 201:7,8,9
204:20 205:1,3
205:12,20,21
206:21 207:17
207:19,22 208:5
211:12 217:18
217:21
**populations**
30:1 110:2
135:3 171:3
188:13 197:20
**populationwise**
146:4
**portion**   128:5
136:19,21
137:15 140:19
141:19 169:21
169:22 199:16
209:12
**portions**   128:6
130:6,7 136:4
137:7,21,22
143:18 144:3
**position**   30:10
72:22 108:8
129:10 200:23
**positive**   199:13

possibility
76:23 104:22
105:19 113:19
147:5 197:19
204:2
possible 14:1
21:18 26:18
33:6,7 48:22
56:23 67:23
74:11 75:3,20
76:18 92:3
105:20 109:4
111:6,8 113:15
128:23 130:5,6
157:22 158:8
181:3 195:22
216:17
potential 15:8
91:9 152:18
156:9,16 200:19
potentially
16:18,19 63:15
100:11 141:17
156:10 162:1
170:13,13
207:18,19 208:6
210:12 217:19
218:11
poverty 2:7
practically
40:17
practice 12:13
pre2020 29:6,21
30:2 37:8,12,18
37:20 39:18

precinct 8:9
20:23 35:20
51:6,6 164:9,17
164:21 165:10
166:2,7 167:6
167:19 168:5,14
169:21,23 170:1
170:10
precincts 40:17
40:18 41:10
42:15 49:20
139:14 164:11
165:3
precise 137:9
precondition
14:4,21 19:12
33:5 35:18
67:12 128:22
132:5 139:19
140:11 146:19
147:1 172:18
177:9 193:6
predominant
32:3,19 40:9
41:7,19 44:14
48:7 209:5
210:13 211:3
predominantly
28:2,6,8 210:22
211:14
predominated
56:19 156:13
predominating
29:8 37:16,23
39:10 43:6 48:2

prefer 179:22
180:3 193:15
preferred
128:10 179:17
179:19,21 180:8
preliminary
6:22 22:14
119:2
premise 198:22
prepare 214:5
prepared
103:10 143:4
preparing 218:4
present 97:6
204:18
preservation
120:14
preserve 109:1
116:13 117:12
preserved 120:9
preserving
109:8 113:12
154:11
pretty 132:8
196:20
prevent 58:19
previous 120:15
previously
26:15 31:18
74:6 77:17,18
95:5 179:9
208:9
primarily 29:7
primary 25:15

principal 56:13
principle 17:3
18:14 74:15,23
76:22 77:3
108:11 110:12
114:10 132:18
133:12,16,19,20
146:12
principles 50:14
63:6 72:2 90:5
104:18 109:3
112:3,16 113:8
116:4 180:12
pringle 4:4
print 224:8
prior 9:15 14:23
39:19 42:9
115:20
prioritize
154:16,22
prioritized
155:4
prioritizing
125:8,20
priority 109:5
111:9,14 154:2
154:6,13
prison 207:19
207:21
probability
199:1 202:16
probably 14:15
25:15 64:15
65:5 72:23
87:15 92:22

94:4,9 131:22
134:5 155:23
164:18 178:16
191:9 194:4
204:4 214:3,8,8
214:15,17 216:7
216:9 217:3
**problem**  23:3
40:12,15 164:3
**procedure**  10:7
225:6
**proceed**  74:9
**proceeding**
22:18
**proceedings**
10:13
**process**  37:23
39:10 43:7 48:2
66:1 115:10
**produce**  14:6
**production**
224:20
**professional**
1:22 9:7 10:2
**progress**  193:12
**promise**  215:21
**prong**  85:21
**proportional**
26:6 68:5
**proportionality**
65:22 66:5,7,9
66:11,23 67:11
68:9
**protecting**  90:8

**protection**
107:2
**prove**  98:20
**provide**  21:17
184:5
**provided**  10:6
21:13 143:1
**provides**  139:4
**providing**
202:15
**public**  1:23 9:8
10:4 222:23
223:21 226:23
**pull**  13:5 23:1
63:23 120:4
142:20
**pulled**  46:3
**pulling**  152:17
**pulls**  206:21
**pure**  80:12
**purport**  64:20
195:11
**purpose**  32:17
82:12 117:4
**purposes**  15:23
42:10 78:10
93:8 161:19
205:6,8
**pursuant**  225:6
**put**  56:14 78:13
117:8 125:12
129:12,18 130:1
130:6 133:1,8
143:23 154:9
159:8 179:16,20

180:7 181:20
204:10
**putting**  180:6

**q**

**qualifier**  66:10
**quantity**  120:2
**quarter**  145:7
**question**  17:9
23:13,19 24:19
34:5,15 35:10
36:12 41:22
47:12,21 70:13
75:12 77:8
114:13 116:20
116:23 117:10
132:22 142:8
148:18 163:5,6
169:18 191:18
205:16 217:8
**questions**  9:11
9:12 11:11,13
45:8 159:16
173:1 215:10
218:3,22 223:9
**quintile**  143:9
147:8,9 148:3,6
148:23
**quintiles**  147:8
147:14,16,20
148:14
**quite**  49:13
**quote**  209:4

**r**

**r**  2:1 3:1 4:1 5:1
223:1
**race**  8:7 27:21
28:1,1,6,7 29:7
29:10 31:11
32:2,3,4,6,8,9
32:14,18,19
33:3,12,15 34:6
37:16,22 39:9
40:9 41:7,19
43:6 44:14 47:8
47:18 48:1,5,7
49:4 50:2,3
65:23 138:2
154:16,22 155:4
156:12 160:1
170:1 171:7
209:4 210:13
**racial**  7:3 16:23
27:10 30:13,19
33:20 34:4,12
34:17 35:3,19
36:14,16 42:10
50:9 135:2
155:3 170:11
192:4 204:20
210:1,6
**racially**  28:9
34:23 35:8 47:6
52:15 134:23
208:11
**raise**  32:14
**raising**  32:11

**raleigh** 52:3
**range** 62:2
  168:18 169:8
**ranges** 143:10
**ranking** 104:14
**rate** 80:9
**rather** 18:13
  32:3 39:4 82:17
  128:18 129:12
  142:10 174:1,21
  186:14 198:3,11
  199:8
**raw** 45:4 175:17
  175:21
**reach** 187:13
  217:7
**reached** 179:12
**read** 15:18 23:6
  23:11 24:12
  28:19,23 29:1
  29:15 30:5 37:6
  37:7 38:1 39:6
  40:6 46:3 53:22
  68:21 69:14
  81:4 119:10,19
  160:5 170:23
  171:11,12
  183:22 188:16
  203:1 204:17
  209:20 210:9
  215:15 222:4
  224:6 225:2
**reads** 80:21
  159:21

**ready** 45:6
**realize** 215:13
**realized** 212:4
**reallocated**
  207:22
**really** 13:8
  50:10 59:22,23
  75:12 88:17,20
  94:1 104:15
  111:20 152:4
  156:23 158:18
  196:21 202:12
  221:9
**realm** 155:11
**realtime** 1:21
  9:6 10:2
**reapportionm...**
  4:6
**reasking** 70:13
**reason** 35:12
  82:3 99:4
  101:11 113:11
  131:9 141:18,21
  141:22 144:19
  145:10 148:9
  149:4,19 171:14
  172:7,8 173:3,7
  174:10,14 179:2
  199:5 216:14
  220:1 225:13,16
  225:19,22 226:3
  226:6,9,12,15
**reasonable**
  129:3 155:23
  156:4,8

**reasonably** 14:2
  14:18 19:9,18
  19:22,23 20:6
  20:18 21:18
  69:1,7,20 70:22
  71:5,13 72:3,11
  72:15 73:8,11
  74:18 75:4,20
  76:5,10,12,15
  76:19 77:6,23
  85:17,22 86:2,4
  88:19 89:3 90:2
  102:12 111:23
  112:10,13
  118:21 139:22
  156:12 157:9,18
  158:11 179:5
  180:4,17 211:22
  212:17,23
**reasons** 164:14
  164:20 225:8
**rebuttal** 8:12
  101:15 181:19
  182:7,11,15,19
  183:10 190:23
  191:16 201:1
  211:17,20
**recall** 15:7
  40:13 52:8
  54:14 63:17
  66:9 93:14 98:3
  121:8,11 124:10
  127:2,5 149:1
  165:10,13 166:6
  169:1 184:10

  187:3 190:8
  192:4 197:3
  211:13,15
  218:10
**recalling** 40:21
**received** 12:15
**recent** 218:7
**recognizing**
  74:10 192:8,10
**recollection**
  54:11 165:17
**reconfigure**
  53:3 145:20
  146:4
**reconfigured**
  52:17,18
**reconfiguring**
  170:17
**record** 10:21
  12:5 23:4 28:21
  39:7 108:20
  121:21 168:3
  181:20 182:3
  215:7 220:14
  221:11
**recount** 136:23
  137:17
**recreate** 196:16
**rector** 2:17
**red** 143:18
  144:12 145:2,9
  145:11 147:8
  148:11 149:16
  151:10 182:9,18
  183:10 211:19

**redistricting**
14:3,20 15:19
16:5 21:12 33:9
39:10 52:20
65:23 66:6 69:8
89:8,10 113:2
114:5 119:4
132:6 134:17
146:19 152:11
154:5 212:10
**redraw** 99:4
**redrew** 98:20
162:19
**redstone** 127:21
149:9,20 150:7
151:10 166:10
170:5,6
**reduce** 140:5
162:9
**reduced** 163:3
217:5 223:10
**reducing** 125:9
**reduction** 176:3
176:4
**reexamination**
6:6 219:3
**reference** 151:2
**referenced** 60:7
**referring** 48:6
54:1 69:21 70:7
70:10,18 189:21
200:14
**refers** 92:19
196:9

**reflect** 137:4
**reflects** 38:4,8
38:19 43:13
167:5
**refresh** 165:17
**refreshes** 54:10
**regard** 53:18
80:2
**regarding** 21:6
**regardless**
82:16 119:13
**region** 94:12,19
95:11,23 97:18
97:20 99:14
102:20,22,23
126:6
**regional** 95:17
95:21 101:19
102:11
**registered** 1:22
9:7 10:2 206:11
206:17 207:2,9
**relate** 62:10
111:19
**related** 111:13
175:23 218:5
**relates** 176:2
**relative** 137:19
157:11
**relatively** 78:15
104:19
**relevant** 69:1
84:13 88:10
99:23 122:9

**reliable** 183:1
183:12
**rely** 184:11
**remain** 98:14
**remaining**
58:15 59:3
**remains** 154:17
190:4
**remedial** 71:21
**remember**
33:18 59:21
100:11 101:6
114:14 116:7
150:17
**remote** 1:15
**remotely** 10:9
**remove** 161:20
208:4
**removed** 130:21
161:23 205:1
207:16,23
**reock** 20:14
80:5 82:11
83:10,21 84:4,9
86:19
**repeat** 21:21
66:3 99:2
116:20 160:15
213:4
**replace** 88:21
**replicate** 192:19
192:23
**report** 6:15 7:2
7:11 8:12 13:16
26:21 27:7,10

36:22,23 45:13
53:18 54:3,8
55:16 57:3
63:23 64:1
68:20 76:4
79:19 84:21
101:14,16
108:22 120:5,6
121:2,13 132:18
143:2 151:2
154:14,15
159:14,18
170:21 171:2
178:18,18 179:4
179:11 180:20
181:3,11,14,19
182:7,11,16,19
183:10 184:8,11
188:10,19 189:7
189:9,12 190:1
190:6,23 191:2
191:4,7,13,19
201:1 204:9,11
211:17,20 218:5
218:5 219:9
**reported** 1:20
200:9 211:23
**reporter** 1:21
1:23 9:7,7 10:2
10:3 51:16
163:15 181:21
183:4 202:7
220:18,22 221:1
221:8

**reports** 12:22 46:6 121:4 134:21 192:5 196:15,17 214:8 214:9 217:14

**represent** 11:2 43:5 103:23 105:11 135:9 136:3,16 137:10 166:1,23 167:1 208:23 221:6

**representation** 136:11 166:14 206:16,18

**representative** 175:13

**represented** 136:5,7

**representing** 13:23

**represents** 105:8 167:2 205:2 223:11

**reproduced** 57:8

**republican** 55:11,21 56:5 66:17

**requested** 224:6

**require** 18:13 63:5

**required** 22:1

**requirement** 18:20

**requirements** 69:5 150:22 159:23 203:15

**requires** 17:4 112:15

**reservations** 151:9,13 152:23

**respect** 69:9 73:13 212:8

**respected** 212:21 213:7

**respective** 9:4 171:6

**response** 191:4

**responsibility** 224:6

**rest** 163:19 194:3 220:16 221:10

**result** 120:10 138:5 223:18

**results** 54:17 56:9

**resume** 7:8 23:15

**retain** 117:12 216:16

**retained** 13:22

**return** 118:22

**returned** 224:12 224:15

**reveal** 173:18

**revealing** 15:4

**review** 224:7

**reviewed** 101:13 214:7,9

**reviewing** 37:8

**richard** 3:10

**richard.mink** 3:23

**right** 11:23 12:8 12:17,17 13:21 14:13 36:10 37:2 41:14 46:3 46:10 50:20 57:9 63:9 64:9 64:21 65:5 67:14 71:23 75:15 79:18 84:22 86:6 91:17 97:21 98:1 103:19 104:12 105:12 114:3,9 118:10 118:22 119:9 120:6 123:16 124:4 126:1,8 127:6 133:2,3 135:19 140:14 146:9 148:15 149:17,18 150:4 159:6 161:19 168:11,23 169:11,17 170:20 176:10 181:18 185:5 188:9,10 192:3 193:19 195:2 211:16,18,18

**rights** 16:10,12 17:4,13,18 18:12,13 22:2 36:14 67:15 69:4 72:21 85:8 109:14 112:21 159:19 161:5 183:2,13,20 185:8

**river** 127:11,16 127:23 128:12 129:11 130:4,18 130:23

**role** 24:15

**rosborough** 5:12 220:20

**rough** 193:16 220:19,21 221:1 221:7

**roughly** 169:12 202:15 214:13

**round** 93:1

**row** 85:2,19

**rows** 86:3 177:23

**rule** 36:4,17 45:5 73:4 76:16 99:10 175:2 225:6,7

**rules** 10:6 31:11

**run** 159:22

**running** 209:18

**rural** 210:23 211:14 213:16 213:18,23

**s**

**s** 2:1 3:1,6 4:1 5:1 9:1

**sacrifice** 19:8 32:16 63:5 72:7 73:13,15 75:21 75:22 114:10 117:3,9

**sacrificing** 71:3

**saith** 221:16

**sake** 96:23

**sample** 194:15 195:4,9,21 200:19

**sampling** 202:21

**satisfied** 140:13 176:13,16,17 203:15

**satisfies** 14:4,20 70:19 85:18

**satisfy** 20:2 70:21 128:21 140:11 173:8

**satisfying** 132:4 150:22

**saw** 30:2 35:3,5 191:10

**saying** 73:14 85:16 86:1 90:9 91:19 93:16 112:14 115:21 129:17 130:3,6 131:14,16 133:22 134:3

139:2 158:18 161:1 172:22 179:19 181:7 189:15 198:14 198:15 199:11 199:12,14

**says** 64:3 68:23 80:3 90:17 130:15 135:12 203:10

**scenario** 35:13 35:21 36:18 42:18,20 47:7,7 48:15 63:16 68:3,8,13,13 71:7 72:16 73:4 74:6,8 75:14,16 77:20 81:6 83:16 84:2,12 85:9,13 87:3 91:2 96:2 110:6 111:18 156:22 157:1 158:21 159:8 204:4

**scenarios** 16:13 31:6 34:9 35:13 35:23 36:1,7 44:20 47:6 48:15 49:9,17 49:21 80:18 96:3 203:19 204:3

**school** 7:15 53:21

**score** 20:17 80:4 83:10 84:9,10 97:5 125:3

**scored** 90:19 91:2

**scores** 79:21 81:16 82:23 90:22 93:20 100:2 102:7 120:18,20,21,23

**scratch** 19:5 84:20 96:11 108:9 111:6 116:22 132:22 163:6

**screen** 13:8 22:22 23:8 27:9 46:4 53:11 122:7,12 127:9 134:12 159:12 208:21

**scroll** 23:6 109:10 124:4 139:8

**scrolling** 166:22

**sd** 7:18

**sd25** 211:7

**sd26** 211:10

**sd7** 8:10 49:18 136:4,8,17,19 139:12 171:8,9 171:14 176:16 177:1 180:2 189:10 190:17 196:14

**sd7's** 189:13

**sd9** 8:10

**seal** 222:18 224:12

**second** 15:7,18 26:1 44:7 58:11 86:20 101:6 134:9 136:2 139:22 144:11 147:9,11 179:11 190:6

**secretary** 3:3 11:2

**section** 14:11 21:7 30:22 31:7 33:20,22 35:6 35:22 36:8,14 47:7 50:8,13 85:8,18 109:13 110:8 111:10 112:11 113:5 114:7,11,18 115:11,17 159:19 174:22 183:2,13,20 186:7 209:9

**see** 24:15 27:9 27:23 28:17 33:6 37:3,10,19 39:22 45:14 46:11 48:22 53:11 54:10 58:11 65:20 67:19 101:18 104:2 118:7

**[see - signify]**

119:1,5 121:7
121:13 122:12
123:21,23 124:5
127:9,10 128:23
143:7,11,18
147:15 149:9
154:13 165:8,16
167:5 171:19
177:18 179:4
186:19 188:10
190:3,17 194:2
194:9 201:20
203:10,21,22
204:5 215:2
**seeing** 187:3
**seek** 24:5
**seems** 20:12
**seen** 94:16
186:23
**segmenting** 29:9
**seiss** 3:7
**semantic** 28:13
**senate** 6:17 7:19
7:22 14:6 45:18
46:7 52:12
64:20 90:19
100:8 103:21
123:5 133:5,9
156:3 157:13
158:10 178:22
183:16 209:6
210:17 213:9,22
217:12 218:17
**senator** 105:7
105:16,22

**send** 45:12
103:15 134:11
146:8 181:23
224:13
**sending** 139:15
**sense** 78:19 84:8
95:8 131:1
132:21 192:22
**sent** 182:1,8,11
**sentence** 159:21
188:12 202:14
**separate** 206:7
**separately** 23:2
107:22 222:7
**served** 109:4
**session** 214:16
**set** 89:17 220:13
**setting** 13:13,13
**settled** 147:10
**seven** 63:21
64:8 135:16,17
167:15
**seventeen** 59:8
59:10 167:7
**seventy** 29:18
41:2 49:18
169:6 178:2
**several** 128:8
208:12
**shape** 20:23
21:1 102:6
104:20
**shaped** 15:15
**shapes** 20:23

**share** 11:20
27:6 53:6 68:5
103:18 119:7
122:7 134:12
140:18,21
159:12 161:8
165:18,20 182:9
208:16
**shared** 46:4
141:10
**sharing** 79:20
142:23
**shift** 40:8 41:18
43:5 47:23
110:1 116:9
**shifted** 43:2
**shifting** 29:6,9
**shifts** 37:11 39:7
44:6,7
**shoot** 21:4
**short** 51:12
194:2
**show** 34:20
38:23 39:16,22
52:23 53:16
57:3 143:4
147:18,20 188:5
202:3,6 203:23
**showed** 81:6
**showing** 12:1
13:8 54:15
208:20
**shown** 104:1
137:1 198:23

**shows** 38:22
39:23 46:19
55:6 134:15
136:12,13,16
167:1 182:1
**shy** 46:20 64:16
**sic** 144:12
149:16 151:10
**side** 128:2
143:19
**sign** 215:15
224:6
**signature**
223:21 224:2,16
226:18
**signed** 224:10
224:12,15
**significant**
29:12,13 40:8
41:19 42:8 43:5
48:9 54:19
60:23 145:15
169:19 170:11
171:8,15 172:1
172:9,16 173:4
173:15 174:12
175:12,21
178:11,13 204:1
204:23
**significantly**
29:21 30:11
41:9 42:15 47:2
93:20 145:21
**signify** 206:12

similar  14:10
78:5,16 79:10
82:1 127:19
144:1,2 148:17
155:23 166:19
179:10 180:21
212:13

similarities
141:13 143:13

similarly  83:7
104:7 137:4

simple  88:4

simpler  103:12

simply  186:14
195:21

single  21:3

sir  10:20 24:12
53:11 60:16
68:10 76:3
152:15 184:18
219:17

situation  18:19
36:2,19 44:3
50:8,9 60:18
71:1,2,12 72:19
150:14 175:5,9

situations  71:11
73:22

six  41:17 42:5
64:6,9,10,16
65:14,21 168:22
177:19

sixth  4:19

sixty  41:17,17
42:5 43:20,21

44:7 49:18
59:14 61:15
133:8 167:11

size  51:4 168:18
174:12

slightly  78:6

slow  183:5

small  13:8 28:18
45:21 74:16
78:14,15 99:20

smith  3:8

snaking  209:14

socioeconomic
128:4 138:7,16
138:17 140:20
141:7,12,15
142:1,2,4,9,11
144:2 146:1

socioeconomi...
141:11

software  135:5

solely  161:12

somewhat  82:10
130:16 220:6

sooner  130:22

soren  3:9

soren.geiger
3:22

sorry  22:20 23:2
32:13 36:11
37:1 45:22
64:11 70:11
73:6 111:6
119:6 131:7
132:21 137:8

138:13 142:21
166:17 183:4
189:5 192:9
197:11 198:23
216:8

sort  20:13 21:16
34:9 68:2 71:2
86:4 96:2
130:14 139:8
143:8 148:1
164:16

sound  58:23
65:2 93:2
104:12

sounds  36:5
52:6 59:11 65:5
93:3 121:19
194:6

south  127:12
145:8,9 209:15

southbridge
224:21

southeast
224:18

southeastward
130:16

southern  1:3 2:7

southward
130:14

southwest  145:7

spans  127:20

speaking  18:6
20:8 21:14
27:15 38:10,19
38:20,21,22

42:7 123:3
218:15

specific  42:12
72:13,18 75:13
75:14 77:10
92:6 102:16
118:19 121:3
124:11 155:17
157:1 159:7
169:2 184:10,23
201:22

specifically
40:23 48:6
77:17 85:8
114:14 127:7
159:18 161:3

specifics  98:3
208:14

spend  113:18

spending  63:14

splcenter.org
2:11,12

split  8:10 34:22
117:20 123:5,9
123:22 124:1
125:2,2,22
128:14 133:17
133:20,21 134:6
134:7 136:17
138:1 144:22
152:22,23 155:2
155:9 158:4
162:22 163:22
164:16 165:3,13
166:7 170:10,10

211:5 212:12
213:12
**splits** 34:12
69:12 115:3
117:17 118:15
122:6,14 123:9
123:14 124:11
124:18,23 125:9
125:18 128:17
134:15 151:17
152:9 154:19
155:10,19 156:4
156:7 157:7,15
157:17 158:10
158:17 159:3
163:3 164:9
212:1,6,15
213:13
**splitting** 63:7
153:20,21
155:14,21 157:5
164:21 170:2
209:16,23 210:5
210:11
**spoke** 126:13
**spot** 92:23
121:13
**stand** 24:14
30:7 38:11
39:11
**standard** 79:14
84:5 94:9 103:3
183:1,12
**stands** 17:19,21

**start** 13:21
26:12,14 79:11
174:21 197:11
**started** 26:19
218:13 219:8,15
**starting** 59:21
96:22 119:11
120:11 144:13
183:8 198:15,19
199:14,18
202:13
**state** 3:3,13 6:17
6:18 7:19 10:4
10:20 11:2
13:22 14:5 21:1
22:7 46:7 62:11
66:17 67:16
71:9 75:16
95:14,19 96:4
97:19 100:8
112:4,17 113:8
123:23 133:4
134:2 137:5
156:20 183:16
184:11 189:11
195:19 207:20
209:5 213:22
223:4,21
**state's** 64:6
76:21 114:4
**stated** 33:21
109:3 198:5
**statement** 39:11
184:2 225:8

**states** 1:1 8:17
10:7 71:9 75:9
75:11 88:12
159:20 183:18
187:1,6 213:22
225:7
**statewide** 65:22
**stating** 115:13
115:14
**statistical** 129:4
129:7 140:18
153:11,18
183:19
**statistics** 39:15
45:17 46:16
103:9 135:10
161:10 167:4
198:22
**status** 146:1
169:15 171:4
205:22
**stayed** 216:11
**stenotypy** 223:9
**steve** 4:3
**stick** 157:13
**stipulated** 9:2
**stipulation** 10:8
**stone** 1:7 6:19
8:13 11:3
**stop** 121:18
**streamline**
163:19
**street** 2:17 5:7
5:15 79:3,8
222:12

**strength** 25:3,7
43:15
**strengths** 56:16
**stretches** 161:16
**strict** 75:17
**strike** 126:1
186:20
**struck** 52:11
**stuck** 111:1
186:18
**styled** 11:3
**subdivisions**
69:11
**subject** 200:19
202:22
**submit** 24:9
191:20
**submitted** 12:21
13:17 26:20
54:4 180:20
182:15 188:19
190:22 191:3,13
191:15 192:1
218:12 219:12
**subparagraph**
28:17 183:9
188:11
**subparagraphs**
108:23
**subscribed**
222:16 226:19
**subsection** 29:5
**subset** 100:7
**subsets** 101:2,4

substance  51:22
  52:9 225:7
substantially
  146:5
suburban
  210:23 211:14
successful  106:7
  106:8
sudden  158:3,17
  159:1
sufficient
  183:15 203:21
sufficiently  16:4
  78:17 88:15
  118:9,20 173:12
  176:15 179:14
suggest  138:1
  200:18 203:7
suggested  50:23
suit  52:16
suite  4:10,20
  224:21
summaries
  126:10
summarize  83:7
summarizing
  83:4
summary  7:20
  29:3,4
super  26:6
  65:22 66:5,8
  68:8
supervision
  223:11

supplemental
  101:14 196:17
support  60:9
  102:10
sure  20:9 38:21
  50:13 55:2 63:3
  66:8 70:15
  86:11 133:5
  142:7,17 144:6
  146:20 150:10
  173:1 184:20
  189:1 213:6
  220:1
surprised  67:19
swapped  119:15
switch  29:1 94:6
switching  22:4
sworn  10:16
  222:16 226:19
symbols  8:18

**t**

t  9:1,1 223:1,1
table  39:15,21
  40:3,3 54:14
  55:5 81:12,15
  82:20 83:16
  84:23
tail  198:11
tailored  209:8
take  35:23 44:2
  45:4 51:12
  92:23 102:5,9
  106:13 156:2
  163:8 170:14
  193:12 194:1

  214:17,19
  220:21 221:7
taken  9:5 199:1
  223:8
takes  75:17
talk  51:22
  163:17 164:9
  214:20
talking  20:10
  25:16 31:22
  33:19,19 41:13
  59:22 60:4
  67:14 68:8
  85:20 92:10
  93:7 96:8 97:12
  97:18 112:21,22
  114:14 141:3
  158:22
talks  101:6
tallapoosa
  162:2
taunton  4:16
  221:5
teens  52:5
tell  25:6 123:17
  135:12 174:20
  189:22
ten  11:8 37:15
  51:16 57:18
  58:1,6,12 61:21
  64:20 85:9,11
  87:19,19 88:9
  90:18,20 91:8
  99:14,17 135:17
  155:19 163:9,17

  163:17
tendency
  147:21
tending  98:18
tends  135:1
tennessee
  127:10,16 130:4
  130:18,23
  209:12
term  66:5 153:8
terms  43:3 44:9
  48:12 145:23
test  19:21,21
  20:3 48:22
  132:3
testified  10:17
testify  22:5
testimony  24:14
  114:6 115:18
  119:2,11 138:16
  171:13 172:11
  176:22 222:4
  225:2,7
tests  25:22 26:1
texas  184:20
thank  10:23
  12:17 23:2
  26:20 28:20
  36:20 39:2 45:8
  51:11 52:2 53:6
  77:2 106:21
  159:11 164:4,5
  166:21 193:10
  202:7 203:12
  214:22 215:1

218:22 220:15
220:17 221:8
**theoretically**
198:6 207:6
**thereto** 9:15
223:10
**thin** 130:22
**thing** 80:17
91:22 124:19
145:18 159:9
215:12
**things** 26:4
33:16 34:16
55:3 92:9
114:16 128:3
144:5 151:21
153:5 162:9,23
215:19
**think** 16:17
18:18,18 20:5
23:10 25:14
36:3,13 40:20
47:8 49:20,21
50:17,19 51:14
54:23 61:12
65:10 70:12
72:16 73:18
74:8,21 76:1
78:7 79:19
83:14 84:16
94:15,19 96:3
96:20 97:1,12
97:21 99:19
100:6,17 102:22
103:3 104:17

106:6,22 111:21
113:18 114:12
115:16 119:18
121:5,15 123:19
129:7 130:11
131:6,14 135:5
145:17,21 154:8
162:23 163:4,7
168:11,20
169:10 170:6
178:13 180:8
181:19 186:17
189:20 191:18
193:13,20,21
199:5 206:10,12
213:5
**thinking** 52:10
53:16 220:1
**third** 8:20 26:1
81:17 82:5,6,13
86:20 87:8
209:1
**thirteen** 126:18
**thirty** 30:1
46:21 64:21
65:6,12 67:17
93:10 97:22
100:8,12,14,14
108:17 138:18
157:16
**thornburg** 14:5
**thought** 22:1
64:13 213:10
**thousand** 99:15
99:15,17 126:18

133:8 135:16,18
148:4 167:6,15
168:23 177:19
178:1
**three** 23:14
29:13 46:13
55:12 79:6
80:22 81:1 82:4
82:13 88:5,22
100:21 103:11
104:15 108:17
114:1 118:14
138:2 147:12,14
148:19 155:22
156:3 161:15
162:8 197:2
209:17 214:12
**thumb** 36:4,17
**tie** 81:16,17,18
82:4,7,14 83:12
**time** 9:13,14
11:12 37:7
63:14,16 72:17
77:15 113:16,19
121:18 158:19
163:8,14 179:4
180:19 188:23
190:8,10 199:2
211:17 218:8,9
219:11,14
224:15
**times** 11:7,8
15:4 77:16 82:3
105:5 106:19
132:19 149:22

150:1 185:23
214:10,12,16
**tiny** 12:10 23:9
**tip** 144:13
**titled** 27:9
153:15
**tn** 223:23
**today** 11:11
30:8 118:23
171:13 172:11
214:6 221:6
**together** 17:3,6
88:1 99:6
107:12 129:9,15
130:2,7 131:5
131:11 132:8,15
133:13 141:11
144:1 154:6,7
154:10 156:13
179:20 214:14
**toggle** 103:12
**told** 15:1 58:21
59:1 64:23
104:10 121:14
**tony** 215:19
218:22
**top** 14:15
147:14 199:7
204:14
**total** 63:18,20
64:6,14 167:5
167:16 171:2
177:19,23
**totality** 26:1
139:17 170:14

**totals** 177:17
**touch** 53:1
**touched** 210:16
**touching** 53:3
**toward** 101:5
205:18
**towards** 55:16
123:22 143:16
199:7
**town** 153:9
**tract** 144:23
149:8 150:12
**tracts** 143:10
144:7,10,15
145:4,5 149:5
**trade** 63:9,15
217:18
**tradeoffs** 90:10
217:2,14
**tradition** 132:8
**traditional** 14:3
14:19 15:18
16:5 17:2,4 18:9
33:8 50:14 63:6
69:8 71:14 72:1
73:23 74:14
76:21 77:3 89:8
90:5 104:18
108:9,11 109:2
112:3,16 113:2
113:7 114:5
116:3 132:6,17
133:12,15
146:11 180:11

**transcript** 6:23
22:14,18 118:23
222:4 223:12,23
224:7,13,15
225:2
**treat** 83:14
**treated** 160:10
160:12,20,22
**treats** 61:12
**trende** 191:1
**trende's** 101:13
**trial** 9:14
**tried** 49:19
113:6
**trouble** 22:21
**true** 106:11
146:7 187:9
195:11,13,17,23
198:1,9 199:6
200:1,4 202:20
203:8 222:5
223:12
**try** 22:16 45:22
61:11 106:4
109:22 113:10
113:11,13 163:8
172:23
**trying** 19:22
24:3 32:23 36:4
48:21 49:11,13
59:10 66:9 67:7
71:23 96:18
99:6 102:11
113:23 118:4,5
118:6 124:17,22

125:13,18
128:21,22 130:1
130:19 132:3,23
134:5 139:18
140:1 150:17
154:2 165:1
172:13 185:18
186:6 192:18,23
193:7 203:19
205:10,18
206:23 216:16
217:6,10
**turn** 28:16
36:22 38:14
54:6 55:15 57:2
84:20 169:18
170:22 182:21
188:9
**turning** 136:2
**twenty** 43:12
44:6 46:13 52:5
58:4,22 59:3,8
63:21 64:6,8,9
64:10,16 65:14
65:21 66:16,18
66:20,22 67:16
67:19 97:22
98:2,3 99:15
100:13,14,15
135:16 158:4
**twice** 91:23
157:7,11,12
158:10
**two** 16:1 20:13
29:11 30:22

31:5,5 33:19
34:8,19 35:12
36:6 44:5 45:7
47:5 48:15 49:9
50:10 52:14
59:23 60:4,22
61:2 79:6,8
80:13,23 81:9
81:16 82:5
83:15 87:9,12
88:6 91:18,20
91:23 92:8,12
93:20 94:14
98:10 101:15
108:18 116:13
128:5 129:8
130:13 140:22
145:14 147:16
147:20 148:4
155:22 157:12
162:10,12,14,16
162:22 164:18
166:19 167:16
169:6 176:20
178:1 190:23
191:5 192:3
193:19,22 197:1
201:10 212:5,15
213:12 215:9
218:2 219:1
**type** 20:2
**typewriting**
223:10
**typical** 164:20

**[typically - utilize]**

**typically**  153:19
185:7,17
**typo**  81:3

**u**

**u**  9:1
**u.s.**  69:2 85:5
182:23 183:11
183:17
**uh**  34:2 51:5
132:7
**ultimately**  79:16
97:17 206:10,11
**umbrella**  36:13
**unacceptable**
155:14
**unbiased**  152:3
153:3
**uncommon**
172:6
**uncracking**
31:19
**under**  29:19
30:4 36:9 47:6
63:16 71:17
73:4 74:5 84:12
85:9,13 87:3
110:5 111:18
112:23 113:21
114:18 115:17
183:1,12 190:20
197:2 204:3,3
223:10
**underpopulate**
60:2,19

**underpopulated**
55:7,11 58:2,13
58:22 59:4,14
60:8,13 61:5,9
61:14 62:6,7,19
96:8 126:14
168:22 169:7
**underpopulati...**
55:21 56:11
59:18
**underscore**
113:15
**undersigned**
225:2
**understand**
11:12 72:1
81:15 132:23
142:17 145:1
153:16 175:7,8
196:5 203:3
**understandable**
172:22
**understanding**
173:1 198:8
199:3,21
**understood**
135:8 145:5
**unger**  2:5
**union**  5:6,14
222:12
**united**  1:1 8:17
10:7 159:20
187:1,6
**universities**
151:7,8,12

152:23
**untouched**  97:4
97:23
**unusual**  129:8
**upper**  148:5
202:19
**ups**  81:12
**urban**  210:22
211:3,14 213:23
**use**  16:5 31:11
32:2 33:15 48:4
48:21 81:10,13
81:22 82:3
84:17 97:11
102:10 103:3
127:22 133:19
134:23 135:5
149:19,22 150:2
152:17 171:20
171:21,23 172:6
172:20 174:4,6
174:11 175:13
176:7 177:2
182:22 183:10
185:14 189:13
189:20,23
192:16,17,20
205:23 206:16
206:18 219:18
225:9
**used**  27:21 28:6
28:7 47:8,14,15
47:18 50:3,3
112:17 117:10
117:11 120:15

121:6 134:17
141:15 144:11
144:15 149:10
153:3,8 157:21
169:8 170:23
171:5,9,14
172:4,8 173:3,7
179:3 184:15,21
184:23 185:7,10
185:17 190:6
192:4,6 204:9
206:11 219:5
**uses**  16:6 153:17
174:9
**using**  16:21
17:23 28:1
32:15 33:8 37:8
44:4 48:5 74:7
80:21 82:8,12
95:15 104:13
110:3 120:10
126:19 138:10
149:15 150:15
150:18 157:23
158:2 174:16,21
175:3 184:5
190:4,17 196:6
197:9 203:22
218:18
**usually**  20:15
31:16 153:14
164:22 185:10
**utilization**  32:8
**utilize**  16:8,16
17:14 20:15

135:6

**utilized**   174:7

**utilizing**   135:7
174:3

**v**

**v**   6:19 8:13 11:3
14:5 26:23 27:1
52:4

**value**   77:10
78:23 79:13
102:1 155:17
196:10 197:16
198:1,4,5,9
199:6 200:1,4
201:6,22 202:20
203:8

**values**   79:4 88:9
90:18 140:21
148:11 149:1
197:9 198:6

**van**   5:4 6:5 13:7
13:12 17:7
18:16 22:20
24:17 25:21
26:8 28:11
30:14 31:14
34:14 35:9
36:11 41:21
43:8 44:16
47:11,20 49:6
49:15 50:5,16
51:15 56:21
59:20 60:11
61:17 62:8,22
66:2 67:21 68:6

70:11 74:4 77:7
78:3,12 82:19
89:4,20 93:22
97:8 99:1,8
104:21 105:18
106:16 107:4,20
108:14 112:19
113:9 116:6,19
117:7 118:3
119:23 121:19
125:10 132:10
138:4,23 142:16
146:15 149:3
153:22 155:6
156:15 158:12
160:14,23
163:12,20 164:1
164:5 165:15
166:12,17,21
168:15 170:3,12
171:17 173:9,21
174:23 175:19
176:11,23 179:8
180:1,13 184:3
185:9,20 186:16
187:10 191:8,17
193:16 194:1,6
195:18 198:13
199:10 200:12
201:16 203:17
205:9 210:2,8
211:1 212:11
213:2 214:22
215:8,12,18
218:21 220:12

220:17,23 221:2
221:4 222:11
224:1

**vap**   8:6 171:5
174:1 175:15
176:17,19
186:12,14,18
187:2,9,20
194:14 205:11
206:4

**variability**
202:22

**variety**   21:2
24:23 45:2
68:11 140:1
217:6,10

**various**   103:12
134:16 161:10
216:2,22 217:13

**vast**   51:9

**vdt**   217:20

**veritext**   224:10
224:20

**veritext.com**
224:18

**version**   62:16
93:9 106:1
158:9 165:4
178:21 182:15
182:19 211:19

**versions**   127:2
165:5,7 196:14
211:5

**versus**   22:7 42:9
47:7 56:11

78:20 83:2 85:3
91:8 154:7,11
167:20 169:22
175:15

**view**   17:6 24:21
33:10,17 41:18
44:13 51:1
75:17 110:11,16
112:23 119:21
156:5 171:23
203:19 205:5
216:3

**viewed**   31:16,17
31:22 100:18

**views**   30:7 73:6
73:7

**village**   153:9

**violate**   16:11
161:5

**violates**   16:9,19

**violating**   52:18

**violation**   20:2
21:14 112:11
113:5

**visual**   22:22

**visualize**   147:22

**void**   18:2

**volume**   6:22
22:13

**vote**   18:8,20
25:20 69:5
109:23 204:22
206:22 207:1,7
207:10,14 208:3

**voters** 36:9 56:5
56:6 61:13
119:12,14,17,22
164:17 169:13
186:13 204:21
205:6,14,17
206:2,4,8,11,17
206:20 207:3
**voting** 16:10,12
17:4,13,18
18:12,12 20:22
22:2 25:3,7
36:13 42:8 43:3
43:4,15 46:11
46:12,19,21
49:11 56:16
57:19,20 62:21
63:18 64:3,4,15
67:6,15 69:3
72:21 85:8
109:13 112:21
135:13,13,15,20
135:22 136:8,10
136:20,21 137:5
137:14,16,20
138:19,21 140:6
140:7 147:3,4
159:19 161:5
167:23 168:8,12
169:15,20 171:2
173:17 183:2,13
183:20 185:3,8
200:10,11 201:7
201:7,8

**vra** 85:6 183:21
209:9
**vs** 1:9
**vtd** 51:6 139:20
144:19,22
149:14
**vtds** 41:1,8 42:3
42:14 48:17
72:7 99:14
138:11 144:10
144:16 149:6

**w**

**wake** 7:13 52:3
52:4,13,21
53:20
**walker** 4:7
**want** 28:12
38:21 45:17
108:21 122:5
127:6 137:9
142:17 150:17
154:9 161:4
164:9 165:8
169:17 175:8
180:7 181:18
194:1 202:2
204:5 211:16
**wanted** 104:15
159:15 162:9
184:4
**wants** 101:7,8
**washington**
3:14 5:8 21:9,10
222:13

**water** 21:2 71:8
71:9 102:6
**way** 13:9 16:19
17:19,21 18:14
25:15 32:22
45:23 71:4 72:8
72:8 75:19
78:14 83:15
90:7 94:2,5,9,13
107:18 115:16
130:17 132:21
154:8 163:10,18
166:7,11 179:5
195:16 201:13
201:14,17,22
209:18
**ways** 23:21,21
25:8 94:9 206:6
**week** 221:10
**weigh** 110:21
**weighing** 68:15
87:23
**weight** 84:9
110:20 113:1
114:20 117:11
117:13,15,23
**welcome** 51:20
122:2 164:8
194:12
**went** 128:8
162:19
**wes** 1:10 11:3
**wesley** 3:4
**west** 127:22
209:14

**white** 29:14,22
30:3,12 39:8
46:11,19 58:16
58:20 59:8,15
59:18 61:13,15
62:5 135:12,15
135:20 162:18
167:2,23 169:12
169:20 171:7
192:7
**wholly** 162:20
170:8
**willing** 107:17
117:3,9
**win** 83:13
**wins** 81:18
82:15
**witness** 10:11
215:15 222:3,18
223:13 224:18
**word** 134:5
213:11
**worded** 142:20
**words** 28:9,13
70:14 154:9
**work** 23:14,15
23:16,20 52:3,9
**working** 21:22
**works** 17:12,17
51:13 163:21,21
**worry** 176:19
**worse** 90:22,23
118:13 125:4
**writing** 189:7

| |
|---|
| **wrong**   53:15 |
| **y** |
| **y'all**   163:9 |
|   164:4 193:15 |
|   215:2 221:9 |
| **yeah**   38:18 |
|   51:14,15 99:3 |
|   175:23 194:4,6 |
|   220:20 |
| **year**   182:23 |
|   183:11 184:6 |
|   188:14 189:14 |
|   189:17 190:9 |
|   218:7 |
| **years**   183:15 |
|   205:4 |
| **yellow**   8:10 |
|   166:3 |
| **yield**   17:6 72:20 |
| **york**   2:18,18 |
|   5:16,16 |
| **z** |
| **zero**   90:20 |
| **zoom**   10:9 13:9 |
|   143:15 |

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.