FILED
2024 Jun-20  PM 05:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 18

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CASE NUMBER: 2:21-cv-1531-AMM

KHADIDAH STONE, et al.,

Plaintiffs,

vs.

WES ALLEN, et al.,

Defendants.

S T I P U L A T I O N

IT IS STIPULATED AND AGREED by and between the parties through their respective counsel, that the deposition of Kassra A.R. Oskooii, Ph.D., may be taken before Angela Smith McGalliard, RPR, CRR, CCR, via remote video-conference, on the 10th of May, 2024.

DEPOSITION OF KASSRA A.R. OSKOOII, PH.D.

IT IS FURTHER STIPULATED AND AGREED that the signature to and the reading of the deposition by the witness is not waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions except as to form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of the trial, or at the time said deposition is offered in evidence, or prior thereto.

IT IS FURTHER STIPULATED AND AGREED that the notice of filing of the deposition by the Commissioner is waived.

* * * * * * * * * * * * *

* * * * * * * * * * * * *

INDEX

EXAMINATION

| | PG | LN |
|---|---|---|
| By Mr. Seiss | 7 | 22 |
| By Mr. Genberg | 268 | 14 |

DEFENDANT'S EXHIBITS

| | | PG | LN |
|---|---|---|---|
| Exhibit 1 | Dr. Oskooii's report | 22 | 5 |
| Exhibit 2 | Excerpt All of Statistics, Wasserman | 51 | 16 |
| Exhibit 3 | Rebuttal Report of Fairfax | 74 | 17 |
| Exhibit 4 | Dr. Trende Expert Report | 159 | 15 |
| Exhibit 5 | Arizona Independent Redistricting Commission, Overview of Decennial Redistricting Process and Maps, January 2022 | 178 | 19 |

| | | | |
|---|---|---|---|
| Exhibit 6 | Palmer v. Hobbs Expert Report of Trende | 187 | 16 |
| Exhibit 7 | Supplemental Report of Dr. Trende | 228 | 21 |

* * * * * * * * * * * * *

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CASE NUMBER: 2:21-cv-1531-AMM

KHADIDAH STONE, et al.,
Plaintiffs,
vs.
WES ALLEN, et al.,
Defendants.

BEFORE:
Angela Smith McGalliard,
Commissioner.

APPEARANCES:

JACK GENBERG, ESQUIRE, of SOUTHERN POVERTY LAW CENTER, 150 East Ponce de Leon Avenue, Suite 340, Decatur, Georgia 30030, appearing remotely on behalf of the Plaintiffs.

JESSE CUNGER, ESQUIRE, of SOUTHERN POVERTY LAW CENTER, 150 East Ponce de Leon Avenue, Suite 340, Decatur, Georgia 30030, appearing remotely on behalf of the Plaintiffs.

APPEARANCES (continued):

BENJAMIN M. SEISS, ESQUIRE, of OFFICE OF THE ATTORNEY GENERAL, STATE OF ALABAMA, 501 Washington Avenue, Montgomery, Alabama 36130, appearing remotely on behalf of the Defendants.

JAMES W. DAVIS, ESQUIRE, of OFFICE OF THE ATTORNEY GENERAL, STATE OF ALABAMA, 501 Washington Avenue, Montgomery, Alabama 36130, appearing remotely on behalf of the Defendants.

ALSO PRESENT: Davin Rosborough, Esq. - ACLU Foundation

* * * * * *

I, Angela Smith McGalliard, Registered Professional Reporter, Certified Realtime Reporter and Certified Court Reporter, State of Alabama at large, acting as Commissioner, certify that on this date, as provided by the Federal Rules of Civil Procedure and the foregoing stipulation of counsel, there came before me via remote video-conference, beginning at 9:05 a.m., Kassra A.R. Oskooii, Ph.D., witness in the above cause, for oral examination, whereupon the following proceedings were had:

KASSRA A.R. OSKOOII, PH.D., being first duly sworn, was examined and testified as follows:

COURT REPORTER: Usual stipulations?

MR. SEISS: Yes.

MR. GENBERG: Yes.

EXAMINATION

BY MR. SEISS:

Q. Good morning, Dr. Oskooii.

A. Good morning. Sorry, there was a pause here. Go ahead.

Q. Good morning, Dr. Oskooii. My name is Ben Seiss, I'm an attorney with the Alabama Attorney General's office. I represent Alabama Secretary of State Wes Allen in this lawsuit filed by the Plaintiffs.

I'm going to be asking you some questions about this lawsuit, and this deposition is an opportunity for us to record your testimony in this matter.

Have you ever been deposed before?

A. Yes.

Q. How many times have you been deposed?

A. I have the precise number on my April 19th report. I believe it's four times, but if you take a look at my report, you can get a precise number.

Q. Thank you. And that's been in about the last four years; is that correct?

A. Yes.

Q. Have you ever been deposed over Zoom before?

A. I have. I'm just trying to think, maybe three times over Zoom, this might be the fourth time.

Q. Okay. Thank you.

So we have a court reporter here, and she will be creating a transcript of everything that is said. Because we need her to create an accurate transcript, it is important that you answer questions yes or no, rather than shaking your head or with a more informal uh-huh or huh-uh. That will be particularly important for this virtual format because she might not be able to detect a nonverbal response.

Does that make sense?

A. Yes.

Q. If you do not understand my question, please let me know, and I'll try and ask it again more clearly so that we can stay on the same page. Is that okay?

Page 10

A. Yes.
Q. Sometimes a witness will give an answer and then later in the deposition realize that he forgot or misspoke. If you need to add or correct any of your testimony during the course of this deposition, please let me know. Okay?
A. Okay. Thank you.
Q. Also, to help the court reporter, I will try not to talk over you and ask that you do the same. We should both wait until the other is done speaking. That's particularly important in this Zoom format because there could be a delay in either of us speaking.
Is that okay?
A. Yes.
Q. We will occasionally take breaks. If you need a break, please let me know, but if there's a question pending, I'll need you to answer the question before we break.
Is that okay?

Page 11

A. Yes.
Q. Is there any reason that you cannot provide truthful and complete testimony here today?
A. No.
Q. Okay. That's all the ground rules. Do you understand everything?
A. Yes.
Q. Do you have any questions before we begin?
A. No.
Q. Could you please state your name?
A. Yes. My name is Kassra A.R. Oskooii. And I can spell it if you need.
Q. What is your occupation?
A. I'm a associate professor of political science at the University of Delaware in the Department of Political Science and International Relations. That's my primary occupation.
MR. SEISS: I'm hearing a little background audio.
(Off-the-Record

Page 12

discussion held.)
Q. Is there anyone else in the room with you today, besides your attorneys, Mr. Cunger and Mr. Genberg?
A. No.
Q. Do you have any documents with you?
A. Yes. There are some documents here in front of me. I have my expert report submitted on April 19, 2024, and it's a clean copy.
Q. Is that it?
A. Well, there are other exhibits, I think, that are in folders that I have not opened.
Q. Okay. So you've been retained as an expert in this case; correct?
A. Yes.
Q. Briefly, could you explain what opinions you intend to express in this case?
A. Yes. So as the scope of work suggests, I was asked to evaluate Dr.

Page 13

Trende's expert report and share my opinions about his analysis, demographic analysis, data collection, and also the percentage of citizen voting age population in Mr. Fairfax's illustrative history seven. So basically related to demographic, demographic analysis inference.
Q. Thank you.
In all of your previous depositions, have those all been redistricting cases?
A. I would say broadly, voting-rights-related cases. I'm not sure if I can say all of them were specifically redistricting. And I can provide you an example if you want.
Q. Would it be fair to say the same thing about your trial testimony?
A. Trial testimony, yes. That is fair. It's all redistricting related.
Q. What have you done to prepare for this deposition?

Page 14

A. I looked over my report, primarily. I met with counsel for the Plaintiffs. And looked at Dr. Trende's report, just to refresh my memory. And I may have glanced briefly at Mr. Fairfax's report.
Q. Did you also participate by Zoom in Dr. Trende's deposition on Tuesday, May 7?
A. Yes. I was asked to participate on that Zoom.
Q. Did you listen to the entire deposition?
A. I would say most of it. Hopefully I didn't miss too much.
Q. So I plan to reference some of his testimony from that deposition, so please let me know if you don't remember.
A. Absolutely.
Q. And so all of your preparation, could you estimate how long you spent preparing for this deposition?
A. Including -- If you include Dr.

Page 15

Trende's attendance of Zoom deposition, if that's part of it. Okay. I would have to tally up my hours, but all in all, maybe twentyish hours, maybe more, maybe less.
Q. Okay. Thank you.
What field are you claiming to be an expert in for this case?
A. Field in political science? Are you asking about my --
Q. Yes. How would you describe the area that you are asserting expertise in in this litigation?
A. Well, let me start off by saying that I am an expert in American politics, with additional expertise in race and ethnic politics and political methodology. So I have a Ph.D. in political science that I received from the University of Washington.
Within those general areas, I have subfield or subarea expertise, one of them is voting rights, redistricting, statistics, demographic analysis.

Page 16

Q. You're not a lawyer; correct?
A. No.
Q. I think in your resume you say that you're an expert in political psychology?
A. Yes. Political psychology is one of the subfields you try to understand, for instance, what are the psychological underpinnings of public opinion or political behavior, such as -- one of the areas that I focused on is how perceptions of discrimination impact individuals' willingness to partake in politics, in different forms.
Q. Thank you.
Can political psychology explain why people vote the way they do?
A. Yes.
Q. Does political psychology have any relevance to racially polarized voting?
MR. GENBERG: Object to the form.
A. Any relevance? Are you talking about the specific mechanical analysis of

Page 17

RPV, like the statistical analysis?
Q. Never mind.
What classes are you currently teaching?
A. This semester, I'm not teaching any classes because my wife gave birth to our second daughter on January 12th, and so I am -- I'm not on teaching load, but I have service and research load.
Q. What classes have you typically taught in the last few years?
A. Yeah. So I teach courses both at undergraduate and graduate level in American politics, various topics related to American politics. I have taught courses related to voting rights and redistricting, demographic data collection and analysis. Most of it or primarily has been at the higher level undergraduate course. And so -- In terms of American politics, you know, there obviously is a big field, we talk about elections, partisanship, public behavior, racial

Page 18

attitudes, and a range of other questions -- or topics, I should say.

Q. Thank you.

What is the typical subject matter of your scholarship?

A. Well, I would say it's about American political behavior. But I've published on a variety of topics, if I recall correctly, twenty-two peer-reviewed journal publications I've listed on my CV, and I'm happy to talk about them individually, if you like.

Q. So I just looked over the titles of the articles that you list in your CV, and feel free to dispute this characterization, but it appears that none of them would be directly related to this type of litigation.

Is that a fair assessment?

MR. GENBERG: Objection to form.

A. Can you specify what you mean by this type of litigation? What specifically are you referring to?

Page 19

Q. Sure. I looked at the articles on your CV, and they seemed to mostly relate to -- I forget what you said earlier, but kind of how political behavior and in terms of race, a lot related to discrimination, related to Muslims in America, it seems like that is different from redistricting litigation?

MR. GENBERG: Object to the form.

A. Well, in redistricting litigation, you need to be able to analyze data, download data, analyze data, draw inferences. So all of that is within all these peer-reviewed empirical studies.

In addition to that, I do have two very specific publications with respect to ecological inference and racially polarized voting, which is directly related to redistricting, one of which is one of the top journals in the country, Sociological Methods and Research. And I have used, in these publications, data sets that are -- that have been brought up in

Page 20

this case, namely American Community Survey.

So I would say my publications and experience is certainly relevant to what we're talking about today.

Q. Okay. Thank you. What year were you born?

A. 1985.

Q. Where did you grow up?

A. So I originally was born in Tehran, Iran, and then later on moved, and now I'm here in the United States.

Q. At what age did you move to the United States?

A. I believe it was around age fourteen, but I'm not 100 percent sure.

Q. What is your compensation rate in this case?

A. It's four hundred dollars per hour.

Q. And is that just a flat rate, no matter what?

A. Could you specify what you mean

Page 21

by no matter what?

Q. Some expert contracts will have a certain hour rate for travel versus doing substantive work. Is it fair to say that your hourly rate applies, regardless of the type of work that you're doing in this case?

A. Well, you brought up travel hours. The travel hours is half of the specified rate, so it's not the same. But in terms of the work that I conducted for the report that I submitted, and preparation for deposition, and this deposition or any other substantive matter moving forward, it is the standard four hundred that I have listed.

Q. And your payment in this case is not contingent on any opinions?

A. No.

Q. And it's not contingent on a particular outcome in this case?

A. No.

Q. So it's correct that you've

Page 22

written an expert report in this case?
A. Yes, I have.
(Defendant's Exhibit 1 was marked for identification.)
Q. I have a copy of your report, and I am going to be sharing it. And let's mark that as Exhibit 1. Can you see that on your screen?
A. Yes. I can see the cover page of what appears to be my expert report.
Q. Is it relatively easier to read?
A. Than? You said relative, relative to --
Q. Sorry. Can you see it okay?
A. Oh, sorry. Yeah. I can see it, although if you want, if you refer to very specific parts, I'd appreciate a little bit of a zoom. But I also have a clean copy in front of me; if you tell me the page number, I can go to that.
Q. Okay. Just let me know if you need me to zoom in.

Page 23

A. Thank you.
Q. So this is, I think, a twenty-eight-page document, that includes two appendices; is that correct?
A. Yeah. I have twenty-eight pages, and then I have appendices that are not part of the twenty-eight pages.
Q. And you submitted this report on April 19th of this year?
A. Yes.
Q. Who prepared this report?
A. I did.
Q. So I've scrolled to page twenty-eight. There is a statement on page twenty-eight that says that: You declare under penalty of perjury that the foregoing is true and correct; is that correct?
A. That is correct.
Q. And is that your signature at the bottom of the page?
A. Yes.
Q. Did you sign this document?
A. Yes.

Page 24

Q. Did you read it before you signed the document?
A. Yes.
Q. So everything was true and correct when you signed the document?
A. Excluding any potential typos, yes.
Q. Of course. Is everything you state in this report still true and correct?
A. Yes.
Q. Have you changed any of the opinions you state in your report since you signed it?
A. No.
Q. Have you been paid for your report in this case yet?
A. Sorry. Could you repeat that? It cut off.
Q. Have you been paid yet for your report in this case?
A. As of yesterday, no. I don't know if they paid me today or not.

Page 25

Q. Have you read the Complaint in this case?
A. No.
Q. Do you have an understanding of what this lawsuit is about?
A. I mean, generally, I believe this lawsuit is about --
MR. GENBERG: I'll object to anything you know by conversations with attorneys. You don't have to answer based on that.
A. Just based on reports that I read, it seems to me this is a -- perhaps a Section 2 of the Voting Rights Act case, where in this particular instance, Mr. Fairfax drew illustrative districts for the purpose of Gingles 1 and then Dr. Trende have shared his opinions about that.
Q. When did you first hear about this lawsuit?
A. I believe it was sometime mid-March of this year.
Q. How did you first hear about this

Page 26

lawsuit?
A. I was contacted by Plaintiffs' counsel.
Q. Do you know anything about this lawsuit before becoming an expert?
A. No, I didn't. I didn't know much at all.
Q. What facts or data were you provided by counsel that you relied upon in preparing your expert report?
A. Well, I mentioned that in my report, and I'm happy to go over that. But basically I was given the expert report of Mr. Fairfax. I was also -- I also received Dr. Trende's expert report. Those were the primary sources of data, I believe, that I received when I worked on my report and submitted my report.
Q. Did counsel tell to you make any --
A. Excuse me. I just need to clarify one more thing I just remembered. Obviously, I received also Mr. Fairfax's

Page 27

block assignment file, or shade file, I don't know if it was shade file or block assignment file, but I obviously needed that to be able to conduct the analysis that I did, otherwise I wouldn't know where he drew the districts.
Q. Understood.
Did counsel tell you to make any assumptions in your report?
A. No.
Q. Okay. To get a better understanding of your opinions in this case, I'm going to ask you some more specific questions about parts of your report.
I know you said that you're not a lawyer but are you familiar with the U.S. Supreme Court case Thornburg versus Gingles?
A. Yes, I have some familiarity.
Q. Could you explain what you know about Thornburg versus Gingles?
A. Well, Thornburg versus Gingles

Page 28

established the three-prong test that plaintiffs typically have to satisfy when they're bringing a Section 2 of the Voting Rights Act claim. And in addition to those three Gingles prongs, my understanding is that the Court also considers other types of evidence in the senate factors, and get a holistic picture.
Q. Could you -- Based on your understanding, could you explain what those three prongs are that you referenced?
A. Yeah. So the first prong is whether a minority group is numerous and compact enough to compose a majority in a single-member district; whether the minority population is politically cohesive; and whether the majority population is also politically cohesive and poses a block to deny minority-preferred candidates from becoming elected.
Q. And where do you see your opinions in this case fitting into those three prongs?

Page 29

MR. GENBERG: Objection to form.
A. Well, I would say primarily, it seems to me that a Gingles 1 inquiry. But I know Dr. Trende also brought up some sort of effectiveness analysis, which that would be relevant to perhaps other factors related to racially polarized voting analysis and whether whites can vote as a block to successfully deny minority's preferred candidate from becoming elected.
Q. Did you offer any opinions in your report about Dr. Trende's effectiveness analysis?
A. I did not offer any opinions in the April 19 report about his so-called effectiveness analysis.
Q. Do you intend to offer opinions in this case about Dr. Trende's effectiveness analysis?
A. Well, since I read the report, if I'm asked about it, and if someone asks my opinion about it, I'm happy to share it.
Q. What is your opinion about Dr.

Page 30

Trende's effectiveness analyses?
A. Well, I don't find it particularly credible.
Q. Why is that?
A. Well, for the simple reason that when I looked at it, Dr. Trende mentioned that according to his effectiveness analysis, that a district composed of 25 percent black voting age population in that region of the map would perform for the black-preferred candidates. And he stated that Democrats are the black-preferred candidates.
And I believe that the current -- under the current enacted map, there is a District 2 or 7 in that region that is about 29 or so percent BVAP, which is black voting age population, BVAP. And looking at like, say, 2022 Attorney General's race, in that district that 29 percent BVAP the Democrat lost. If you look at all the other elections, it doesn't seem like at 29 percent BVAP district in that region of the

Page 31

map is performing.
So just based on that, I just don't know how Dr. Trende can state that a 25 percent BVAP district would perform.
Q. Okay. Thank you.
So you expressed opinions about the citizen voting age population, or CVAP, about Mr. Fairfax's districts; correct?
A. Yes. For his illustrative plan 1.
Q. Is it fair to say that your opinions about CVAP are relevant to the sufficiently large or numerosity aspect of Gingles 1?
A. I mean, it's up to the Court to decide what's relevant. But it's a data point that gets at answering the question of whether the district is majority/minority or majority, in this case, black CVAP.
Q. You also have a section in your report about Dr. Trende's dot density plots; is that correct?

Page 32

A. That is correct.
Q. How does that opinion fit into the Gingles analysis?
A. Well, that opinion fits into the Gingles analysis because, obviously, Mr. Fairfax had to draw the district lines. And I believe -- You would need to ask Dr. Trende this, but I believe he's trying to make a point that -- and I might say uneffectively or unconvincing to me, trying to make the point that race predominated when Dr. Fairfax drew the districts as he drew them.
My understanding, based on his report, is that he's trying to show racial and ethnic concentration in different regions to make such a claim, as well as it's relevant to Gingles 1 in the sense that he's also using that kind of clout or information on making inferences of where Mr. Fairfax picked up concentrations of different populations.
Q. Is it correct that you are only

Page 33

expressing opinions as to Fairfax Plan 1?
A. Yes. I did not see the other plans. But I understand there are other plans.
Q. Do you intend to offer any opinions in this case about Dr. Fairfax's additional plans?
A. If I'm asked to; otherwise, no.
Q. You don't currently have any opinions about those additional plans; correct?
A. Correct. Because I'm not aware of the specifics of those plans.
Q. Do you recall from Dr. Trende's deposition the discussion about the difference between frequentist and Bayesian approaches to statistics?
A. Yeah. I believe that topic came up.
Q. Can you explain the difference between those two approaches?
A. Absolutely. So a frequentist approach basically, to keep it simple,

Page 34

because Dr. Trende made it a little bit too complicated, is you're relying on the data at hand to try and make -- that make inferences about a certain population or point estimate, et cetera.

And a frequentist basically says that there's a fixed, true, unknown value. And then takes the approach if we repeated the same study time after time, whether the true value would be covered with a range of confidence interval based on a certain degree of probability.

But the short, simple way is that frequentists rely on the data at hand, which is different than a Bayesian perspective or method in which one brings in prior knowledge about a certain topic. Prior, as they call it. Prior probabilities, prior knowledge, prior data, prior studies, and uses the current study and data at hand to draw inferences about probabilities or outcomes or what is most probable or not.

Page 35

I would say that's the short definition of frequentist and Bayesian approaches.

Q. Yeah. I certainly understand that to be a complicated subject, especially for nonstatisticians.

A. It's also very theoretical. It's a theoretical perspective.

Q. So I'm going to try and sum up what you just said, and I'd like to see if you agree or disagree with my summary.

Would it be fair to say that the frequentist approach assigns probabilities to data, while the Bayesian approach assigns probabilities to hypotheses?

A. I wouldn't quite put it that way, no. And that's not what I said.

Q. What is incorrect about what I just said?

MR. GENBERG: Objection. Form.

A. Well, what I can tell you is that, you know, a frequentist approach is basically saying: What is the probability

Page 36

that the true unknown parameter would fall within the confidence interval that one calculates based on a confidence level that one identifies. And so you have a point estimate, which is what the data is telling you, that's your best approximation of the underlying or unknown population.

And then based on the confidence level, you create a confidence interval. So confidence intervals are sensitive in change based on the confidence level that you set.

So if you set a, say, 67 percent confidence interval, what you're saying is that if you did the study in the same way a hundred times, sixty-seven out of hundred times, the true unknown parameter would fall within the range of confidence intervals based on that 67 percent confidence level.

A 67 percent confidence interval is narrower than saying 90 percent, which the American Community Survey uses. And

Page 37

then it's also narrower obviously as you go up to like 95 percent, 99 percent. You can also come up with 100 percent probability if one wishes.

In the Bayesian approach, using prior and the current data comes up with a posterior probability. And the Bayesian approach can tell you what is the most likely outcome rather than the frequentist approach is talking about the probability in which the unknown value falls within an interval.

But in a frequentist way approach, the point estimate is still your best approximation of the underlying parameter -- Actually, I'm happy to explain why that is the best, if you wish.

Q. We will come to that later, I think, but I appreciate that.

Are we dealing with a frequentist or Bayesian approach in this case as to estimating the black citizen voting population for Mr. Fairfax's SD7 in plan 1?

Page 38

A. We're dealing only with a frequentist approach because I think Dr. Trende is taking a frequentist approach because he calculated confidence intervals. And therefore, he's taking that, so I'm responding to that.

But we can also take a Bayesian approach to these perspectives, and I'm happy to expand on that too.

Q. Is it correct that you said that we're taking a frequentist approach because that's the approach that Dr. Trende took?

A. Yeah. By definition, he calculated confidence intervals, and the way he has interpreted them, he has said that -- he's taken a frequentist approach, which doesn't tell him what's the most probable outcome, it just tells him that a certain degree of probability, whether the true unknown parameter falls within the interval that he choose to calculate based on 90 percent and 95 percent confidence level.

Page 39

But, again, I would say he has left out a critical piece in his assessment, and that the point estimate is still the best approximation of the underlying data. That is what the data is telling us.

Point estimate is constant; confidence intervals can change and are sensitive to the level that you set.

Q. Isn't CVAP data published in a frequentist approach?

A. Well, I wouldn't say it's published in a frequentist approach; it's the data that's published. And you could also take a Bayesian perspective in making inferences about CVAP data.

But if you're referring to as the margin of error, that is a frequentist type of way of thinking about things.

Q. So the CVAP estimate that Mr. Fairfax calculated in this case has a margin of error; correct?

A. Well, actually, we don't know the

Page 40

precise margin of error of the District 7 citizen voting age population. And Dr. Trende, one of the few things that we agree on, it seems, is that he also says that he cannot actually calculate or there is no specific method that he knows that he can calculate precisely the margin of error. And the reason for that is because citizen voting age population is provided at the lowest level, at the block-group level. And when you draw districts and if you have block groups that are disaggregated to census blocks, which is a lowering unit, which you don't have CVAP data reported, you don't have margins of error for CVAP at the block level.

So if you have some of those blocks that are within your district, then you cannot accurately calculate the margin of error. And that's why -- That's not only reason, but that's one of the reasons that the redistricting cases that I have seen or been part of, people rely on point

Page 41

estimates, because point estimates also are best approximation of the citizen voting age population composition, given the data.

Q. Thank you. I can promise you we are going to get into that in great detail. I am mostly trying to stick at a higher level right now, and then we'll drill down into these specific things later on.

A. Absolutely.

Q. Do you consider yourself to be an expert in the frequentist approach?

A. Well, the expertise -- I understand both frequentist and Bayesian approaches.

Q. What's your expertise in the frequentist approach?

A. Very simply, since you want a higher level answer, when you're computing confidence intervals, that's a more -- and making inferences based on that, that's a more frequent -- that's the frequentist approach. Credible intervals, which is used for RBV analysis using King's

Page 42

ecological inference, it's a Bayesian approach. So I have used. I understand both at a higher level.

Q. Can you say that last sentence again about using the Bayesian approach?

A. Sorry. What specifically?

Q. Could you repeat what you just said about the Bayesian approach? I missed that.

A. Oh, okay. So the Bayesian approach, as I mentioned, because you're taking into consideration priors, as we call them, it's taking to be a credible interval, not a confidence interval, what it's referred to as. And in a Bayesian approach, you know, you can think of racially polarized voting analysis using Dr. Gary King's ecological inference method, that's a Bayesian approach to coming up with vote estimates for candidates by race and ethnicity.

Q. Do you consider yourself to be an expert in the Bayesian approach?

Page 43

A. I have expertise in both. I have some general expertise in statistics, so you would have to know the difference between the two.

Q. Have you ever used the Bayesian approach in support of your testimony in litigation, as an expert?

A. Yes. In conducting racially polarized voting analysis, relying on ecological inference, it goes by column, you are using Bayesian approach.

Q. Have you ever used the Bayesian approach in terms of Gingles 1?

A. Not that I can think of. But it wasn't needed, really. You don't need to use it necessarily, that's why I think it was not really used.

Q. What is the definition of a p-value?

A. So p-value is basically a statistical tool for examining a hypothesis in a sense of rejecting a new hypothesis. What is the probability that the difference

Page 44

in point estimates that you found are a rare occurrence, which would give you the confidence that the effect sizes are different or not within a certain threshold. You have .05, .01 p-value, .10 which is a 10 percent threshold.

Q. What is the no hypothesis?

A. The no hypothesis is that there's no difference between the two point estimates that you calculated based on whatever study, or there's no -- Yeah. That's good.

Q. So I'd like to give you a hypothesis, and then I'd like you to give me the null hypothesis based on that statement. So if the hypothesis were: I think the true BCVAP percentage is greater than 50 percent, what is the null hypothesis of that statement?

A. I would first ask you what makes you believe that?

Q. I'm not sure how that's relevant. I'm --

Page 45

A. Oh, no, it is very relevant, actually. Because you said I think. Based on what premise are you thinking that?

Q. Based on the point estimate that I calculate.

A. So you're saying your point estimate is above 50 percent?

Q. Well, why does it matter the reason that I think the BCVAP is above 50 percent in determining what the null hypothesis is of that statement?

MR. GENBERG: Object to the form.

A. The hypothesis is not something you come up out of thin air. I don't just walk around and say I'm going to hypothesize that there's a tornado coming at five p.m. You have to have prior studies and data and literature that you base your hypothesis off. It's not just a simple mere conjecture.

Q. Okay. So let's go back and assume that I calculated BCVAP and got a point estimate of above 50 percent and that

Page 46

is the reason that I think the true BCVAP percentage in a district is above 50 percent. What is the null hypothesis?
A. That's not how hypothesis are. You can't just run this study and say I found this as my hypothesis. That's your finding. And I would say that's your finding.
Q. What is the relationship between error margins and p-values?
A. Well, p-values is typically used -- They're very much related. But p-values is typically used when we're testing hypothesis. But margins of errors, in given context, can also be used to test hypotheses, which we're not doing here in this particular case.
Q. Can you explain the last sentence that you just said?
A. Yeah. We're not testing hypotheses in this case. The task at hand is what is the best approximation of the citizen age voting population.

Page 47

Q. So if we have an error margin that's calculated at the 95 percent confidence interval, the corresponding p-value would be .05?
A. That's one way you can think about it. Or you can just say the confidence level is 95 percent, that's easier.
Q. If the true population were outside of the confidence interval, is it fair to say that you would be unlikely to get a polling result like that?
MR. GENBERG: Object to the form.
A. Well, I'm not sure I completely understand your question here.
Q. So if you have a 95 percent confidence interval, would it be fair to say that there's less than a 5 percent probability of getting a poll result outside of the error margin?
A. I would say that there's a 5 percent probability that the true value is not within the interval that you

Page 48

calculated.
Q. Okay.
A. And then if you said 100 percent, I would say -- Never mind. Keep going.
Q. What is the standard confidence interval used in peer-reviewed literature?
MR. GENBERG: Objection to form.
A. Well, you know, it depends whether we have a one-tailed or two-tailed hypothesis testing.
Q. Could you explain what you mean by that?
A. Well, if you have a directional hypothesis, you have a one-tailed hypothesis testing. If it's -- If you're agnostic to the direction of the hypothesis, even though you have priors, it would be two-tailed.
So in many of the peer-reviewed journal articles, the standard is 95 percent, or .05. However, if you have one-tailed, that would translate into 90 percent. But there's also studies that

Page 49

have used 67 percent. For instance, Dr. Gary King from Harvard has used credible intervals of 67 percent to draw inferences.
Q. What is the largest p-value that you've used in your published work?
A. I use all of them. But in terms of what exactly?
Q. Where you would be comfortable making conclusions from.
A. About effect sizes?
Q. Sure.
A. You still make conclusions regardless of what your p-value is. I guess, could you specify what sorts of conclusion?
Q. Is it fair to say that political scientists will almost never reject a null hypothesis on the basis of p-values above 0.1?
MR. GENBERG: Objection to form.
A. That they would almost never reject it?
Q. Reject the null hypothesis on the

Page 50

basis of p-value above 0.1.
A. I think it's fair to say that most of the publication have that threshold of .1 or .05. But I can't speak for -- There are other conditions in which they can make the case of why, for instance, 67 percent or other threshold should be used. So that's the answer.
Q. Is it fair to say for p-values above 0.1, that the evidence just isn't strong enough to warrant rejection of the null hypothesis?
MR. GENBERG: Objection to form.
A. Again, depends on the study. But in most political science articles, that's the threshold, is .1 or .05. That's all I can tell you. That's where in respect to a effect size difference or hypothesis testing, where, you know, academics, for the most part, use those thresholds.
Q. I am going to pull up on the screen what's going to be marked as Exhibit 2.

Page 51

(Off-the-Record discussion held.)
(Recess taken.)
Q. Dr. Oskooii, did you talk about the subject matter of your deposition on the break?
A. Yes.
Q. What did you talk about?
A. Nothing too specific, besides it was brought up to what extent my country of origin has to do with the deposition or the opinions that I'm providing in this case.
Q. Understood. Thank you.
(Defendant's Exhibit 2 was marked for identification.)
Q. So I'm going to be sharing what we'll mark as Exhibit 2, which contains excerpts of a book called All of Statistics.
Do you see that on your screen?
A. I see a cover page that says All of Statistics.

Page 52

Q. Yes. Do you know who Larry Wasserman is?
A. Not that I recall at the moment.
Q. I've scrolled to page four of the document. Can you see Dr. Wasserman's name in the top left-hand corner?
A. I just see it says Larry Wasserman, Department of Statistics, Carnegie Mellon University, and it seems like address and country and also an email address.
Q. Is Carnegie Mellon a good university?
A. That's a matter of opinion. I mean, it's -- Who are you asking? I would say sure, it is a good university.
Q. Does it have a good math department?
A. I don't know that.
Q. Do you have any reason to doubt that a professor of statistics at Carnegie Mellon has a substantial expertise in statistics?

Page 53

MR. GENBERG: Objection to form.
A. I mean, I sure hope so.
Q. Is Carnegie Mellon a reputable university?
A. I would say so, yes.
Q. Do you have any reason to dispute that Dr. Wasserman was an editor of the Journal of the American Statistical Association at the time of writing this book?
A. I don't know that.
Q. Do you have any reason to dispute that he was an editor of the Annals of Statistics at the time of writing this book?
A. I don't know that information.
Q. Are you familiar with those two statistical journals?
A. Very broadly, yes.
Q. Would it be fair to say that those are top statistics journals?
A. They're some of the top, yes.
Q. Okay. I am going to scroll to

Page 54

page 92. And I apologize about this PDF. Are you able to see that okay?

A. What's the year of publication of this piece?

Q. Let me see. I'm not sure, off the top of my head.

A. Is this a peer-reviewed publication, or what is this?

Q. I see at the bottom it says corrected second printing 2005. It looks like 2003 would be my guess.

A. Is that the original date or is that preprint or reprint?

Q. I believe it to be the original date of this publication.

A. 2003?

Q. That's what it appears to be from this document, yes.

A. So what's 1959?

Q. I think that is the year that Dr. Wasserman was born.

A. Huh. Never seen that in publication, your date of birth, but, sure.

Page 55

Q. Yeah. I'm not sure about that.

MR. GENBERG: You don't happen to have a full version of this document, do you?

MR. SEISS: Not easily accessible. I think there's one, if you kind of just like Google it, you can find one. But maybe on another break we can work to provide it, but I don't have one readily accessible.

A. So you said, this is a 2003 -- You're presenting this to me as a 2003 publication, correct, Counsel?

Q. I want you to assume that that is the case.

A. But you don't know?

Q. I don't know. And what year the publication is from is not going to be relevant to how we discuss this document.

A. Well, the reason I say that, because, oftentimes, these sorts of books have corrected versions, they correct things, so I just want to make sure.

Page 56

Q. Sure. And I know at least at the bottom of this page, it references a corrected second printing in 2005.

A. And you have the 2003 version?

Q. I think that's right. But I just want you to assume that what we talk about in this is in this book, and we'll talk about whether you agree or disagree with the things in this.

MR. GENBERG: Before we begin questions, I just want to note for the Record that we have an excerpt starting at page 92, starting with 6.12 definition at the top and carries on for a few pages.

Q. Okay. So I have a --

A. What I was going to say, also, the right side of this page, I don't know if it's like that on your side, but it's like you can't even read it. It's all, like -- Do you see what I'm saying, Counsel? The right side, it says there's example and then there's text missing and washed out.

Page 57

Q. Yes, I do. So I've scrolled to the next page, and I'll represent that you're seeing part of page 93 on the previous page.

A. Which that one also has cut-off words, but okay.

Q. Yes. So on the left side of this page you're seeing page 92.

A. But on the right side, you also have stuff that's cut off.

Q. Okay.

A. I mean, that's --

Q. We'll read what's on the document. To the extent that you're not able to read it, we can go from there.

A. Okay.

Q. I am scrolling to page 92. Do you see where it discusses theta at the top?

A. Okay.

Q. And so theta is what we're interested in on this page; is that fair to say?

A. Well, what does theta represent in this particular equation or in this particular context? Theta could mean many different things.

Q. I'll represent that theta is the statistic of interest in what we're about to talk about.

A. Okay.

Q. So in our case, the statistics we're interested in is the BCVAP percentage in Mr. Fairfax's District 7; correct?

A. That's what you were saying theta should represent?

Q. Yes.

A. Okay.

Q. Below the first warning on this page, Dr. Wasserman writes: Commonly, people use 95 percent confidence intervals, which corresponds to choosing an alpha of .05.

Do you disagree with what Dr. Wasserman wrote here?

MR. GENBERG: Objection to form.

A. I would agree that commonly 95 percent confidence levels are used. Yes, I agree with that.

Q. Okay. Now let's look at the second warning. It says there: There is much confusion about how to interpret a confidence interval. A confidence interval is not a probability statement about theta, since theta is a fixed quantity, not a random variable.

Did I read that correctly?

A. If a frequentist interpretation, theta is a fixed variable. That's the underlying or the unknown true parameter.

Q. Was that a yes?

A. I believe I answered that question as a yes, yeah.

Q. Do you recall during Dr. Trende's deposition, him testifying that people often get confused about interpreting confidence intervals?

A. I vaguely remember something coming up about that.

Q. Do you remember Dr. Trende stating that confidence intervals are not direct probability statements about the true value of BCVAP in Mr. Fairfax's District 7?

MR. GENBERG: Objection to form.

A. They're not direct probability estimates. It's about the probability that the unknown parameter would fall within an interval range.

Q. Is it fair to say that Dr. Trende's statements, as I just expressed them, are in accordance with what Dr. Wasserman says on this page?

MR. GENBERG: Objection to form.

A. I don't know. I need to read the entire section of this to know what Dr. Wasserman is stating and to what extent that's same or different to the assertions that Dr. Trende is making.

Q. I'm asking about just these two warnings that we just read out loud. Is what I expressed that Dr. Trende said in

his deposition consistent with these two warnings?

MR. GENBERG: Objection to form.

A. I would have to read the two warnings. If I could read it, I would be happy to answer the question.

Q. Sure. Please take your time and read those two warnings.

A. Okay. So the second warning, basically, where it says there's much confusion about how to interpret a confidence interval, if you read further, it says: Some text interpret confidence intervals as follows. If I repeat the experiment over and over, the interval will contain the parameter 90 percent of the time. This is correct but useless since we rarely repeat the same experiment over and over. And so the useless seems to be more like an opinion that Dr. Wasserman is interjecting. He's agreeing that that's a statement that you can say that is correct.

And so I agree to the extent it's

hypothetical, because you're not going to run the ACS hundred more times. You don't have that. So I don't know if it's useless, but that's a fact.

So now I'm going to read the second section.

It's basically saying -- So this is the semantics. Dr. Wasserman is basically saying, you don't have to say -- there's no need to introduce the idea of repeating the same experiment over and over again. And the reason we would do that for students or people who are -- who don't understand statistics as well, is to just make it easier for them to understand the underlying theoretical concept of what an interval is trying to get at.

There's nothing here that is inconsistent with what I have said. At least, to be clear, the warning exclamation point part, warning, exclamation point part two on page 92, and then the following paragraph that starts: On day 1. That's

the only thing I've read here.

Q. Okay. Thank you.

I'm going to scroll to page 93. And I'd like to look at the -- I'm highlighting it on my screen, if you can see where my mouse is, and I'll read that out loud.

A. Okay.

Q. And I understand that some of it is cut off. There is nothing wrong with stating that 16 is a 75 percent confidence interval, but that is not a probability statement about theta.

Do you agree with that statement?

A. Well, what is --

MR. GENBERG: Objection to form.

A. What is 16? What is a 16? What does it reference to? You're taking one sentence out of a textbook and asking me if I agree or disagree.

Q. Do you agree that if we're discussing a 75 percent confidence interval, and we're concerned about theta,

that the confidence interval doesn't say anything about the probability of theta?

MR. GENBERG: Objection to form.

A. What the confidence -- I don't know the context here. But what I can tell you is that with what the confidence interval is telling us what is the probability that the theta, as you're saying, would fall within the interval.

Q. Okay. I'm going to scroll to page 156, which is a page in this exhibit. Dr. Wasserman writes here that: A p-value is, quote, a measure --

A. Excuse me. Where are you, so I can follow along? What specific -- Where are you?

Q. Give me one second. You mean, I'm in the very bottom of the page, where it says: Informally, the p-value is a measure of the evidence against H0. The smaller the p-value, the stronger the evidence against H0.

Did I read that correctly?

A. Yes.

Q. H0 is the null hypothesis; is that correct?

MR. GENBERG: Do you want more time to read more of the document? I know we don't have that much of the document here.

A. Yeah. I want to be helpful and answer the questions. Usually when you say H0, it is the new hypothesis, so I would assume that's what Dr. Wasserman is referring to here.

Q. Yes. I'd like you to assume that H0 is the null hypothesis.

A. Okay. Perfect.

Q. Do you agree with the statement that we just read at the bottom of this page?

A. Generally, I agree with that, yeah.

Q. I'm scrolling to page 157. I am looking at the table about 60 percent of the way down the page, where it says

Page 66

p-value and evidence, as the two columns.
Do you see that?
A. Yeah, I do see that.
Q. So for p-values of less than .01, Dr. Wasserman characterizes this as very strong evidence against the null hypothesis.
Do you agree with that statement?
A. I actually don't know if that is what he's claiming or that is what he's saying other people are saying about this.
Q. Assume that that is what he is saying. Do you agree with that assessment?
A. I would say it's one form of evidence against the null hypothesis. I don't know if we could characterize it as very strong or somewhat strong. That's a matter of opinion a little bit.
Q. It seems like in this table, we're making relative comparisons about p-values. So we'll go through these other three in the column and then maybe see if you agree with the relative comparisons at

Page 67

the end.
A. Sure.
Q. So for p-values between .01 and .05, Dr. Wasserman lists that as strong evidence against the null hypothesis; is that correct?
A. That's what the table says.
Q. Do you agree with what the table says?
A. The only thing I can agree on on the table is that, typically, .1 is a threshold of statistical significance, and that if the p-value is greater than .1, typically speaking, but not all cases, because there are caveats, social scientists would not reject the null hypothesis.
But I don't know if I agree with this weak, strong, very strong characterization, assuming that's even Dr. Wasserman's characterization or maybe he's saying that's what other people are saying, and he has a bunch of warnings about that

Page 68

too. I don't know.
Q. Do you disagree with anything that's in this table?
A. I just expressed my opinion about this table, so you would have to get a little bit more specific about that.
Q. Okay. On page six of your report you state that you received Mr. Fairfax's initial report. Does that refer to his report dated February 2, 2024?
A. You are talking about paragraph ten; right?
Q. Yes.
A. Yeah. I received the report that had an illustrative map district. And the focus of that report -- or should I say Dr. Trende's opinions about the report centered primarily around District 7, at least when it comes to the composition of black citizen voting age population.
Q. And you reviewed Dr. Fairfax's report; is that right?
A. I looked at it, yes.

Page 69

Q. But you haven't reviewed his rebuttal report dated April 19, 2024; correct?
A. I don't recall. I haven't reviewed that.
Q. You've seen the error margins that Dr. Trende has calculated for the BCVAP of Dr. Fairfax's illustrative District 7 in his claim 1; correct?
A. Well, he claims to have calculated a margin of error.
Q. Do you remember what the margin of error he calculated was at the 90 percent confidence interval?
A. No. You would have to refresh my memory and show me that, please.
Q. If I told you that the margin of error that he calculated at the 90 percent confidence interval was 2.6, would you have any reason to doubt me?
A. No, I don't have reason to doubt you. I doubt the actual calculation of that margin of error, however.

Page 70

Q. Okay. And then at the 95 percent confidence interval, if I told you that he calculated a 3.1 percent margin of error, would you have any reason to doubt that?
MR. GENBERG: Objection to form.
A. I'll take your word for it that he calculated a margin of error and you're saying it's that number.
Q. Well, here --
A. Like, I believe you, I'm just not sure I buy the calculation, is what I'm saying.
Q. Okay. Using Dr. Trende's margin of error, is it correct that 50 percent falls within the 90 and 95 percent confidence intervals?
A. Is that his point estimate? What's his point estimate?
Q. Well, isn't it correct that Dr. Trende calculates quite a few point estimates for the BCVAP in Mr. Fairfax's SD7?
A. Yeah. He has several point

Page 71

estimates that he reports.
Q. Is it fair to say that -- Scratch that.
Do you recall those point estimates being between -- and I'll just use a liberal range, 48 and 52 percent?
A. I mean, I recall seeing point estimates around 50 percent, if that's what you're asking.
Q. Yeah. And I'm not trying to be difficult or hyperbole, just going through each of the point estimates would not be a valuable use for our time.
So assuming that the point estimates fall between -- fall around 50 percent, is it fair to say that using Dr. Trende's calculated confidence intervals at 90 and 95th percentile, that 50 percent would fall within those confidence intervals?
A. If you're saying -- Let's say his point estimate is 50, and then you're saying the 95 percent margin of error is

Page 72

plus/minus 3, then his confidence then would be 47 at the lowest end to the highest end of 53, with 50 being the point estimate. So in that particular case, 50 is within the confidence interval.
Q. So assume that the margin of error that we're talking about is plus or minus 3.
A. Perfect.
Q. Does 50 fall within the confidence interval if the point estimate is 49?
A. If the confidence interval is plus -- margin of error is plus/minus 3, then, yes.
Q. What about at 51?
A. Under the same conditions that we're talking about, yes.
Q. What about at 51.5?
A. If we're still saying the point estimate is 50 plus/minus 3, then, yes, that's inside -- by definition, inside the confidence interval.

Page 73

Q. You've worked frequently with surveys and samples in your peer-reviewed literature; is that fair?
A. Yes.
Q. Do you typically publish confidence intervals associated with your point estimates?
A. Depends on the context.
Q. Could you explain more?
A. Well, if I'm hypothesis testing, for instance, then in publications, we use confidence intervals or bins.
Q. Is it fair to say hypothesis testing refers to the frequentist approach?
MR. GENBERG: Objection to form.
A. In a very general sense, I'll agree to that.
Q. When a point value is inside the confidence interval, have you ever made conclusions about the point estimate being correct?
MR. GENBERG: Objection to form.
A. What do you mean by correct?

Q. The true value of the data.
A. We don't know the true value of the data unless we have some sort of simulation study, you told me the true value.
Q. So is the answer to my question no?
MR. GENBERG: Objection to form.
A. No. I didn't understand your question, so I asked for clarification.
Q. I'd like to turn to page 19 of Mr. Fairfax's rebuttal report. And I'm not sure exhibit -- I think we're at Exhibit 3.
COURT REPORTER: That's right.
(Defendant's Exhibit 3 was marked for identification.)
Q. Let's mark this as Exhibit 3.
Dr. Oskooii, can you see that on your screen?
A. Yeah. I can see rebuttal expert report of Anthony E. Fairfax, dated April 19, 2024.

Q. Okay. I'm going to turn to paragraph 19, which spans pages 10 and 11.
A. Okay.
Q. Can you see that on your screen?
A. Yes. I see page 10 at the top end, and then I assume the next page is page 11.
Q. And I'll just scroll down to show you this is, in fact, page 11.
A. Thank you.
Q. Can you read paragraph 19 just to yourself? You don't have to read it out loud. And then let me know when you've finished reading.
A. Will do.
MR. GENBERG: Do you want to read the entire section for context as well?
A. Okay. I've read it.
Q. I'm going to read the last sentence out loud: Thus, every person above the 50 percent point makes it even more likely that the actual value falls above 50 percent, despite any small

estimated margin of error.
Did I read that correctly?
A. Yes.
Q. Do you agree with Mr. Fairfax's sentence that I just read out loud?
A. To be honest, I don't know what the context here is since I did not look at this report. I think what he's trying to say is that 50 percent is the best approximation of the CVAP if the point estimate is above 50 percent or 50 percent. That's my interpretation with just reading it without knowing what else he wrote and everything.
Q. Mr. Fairfax doesn't say what you just said; correct?
A. I stated my interpretation, not the exact word of Mr. Fairfax.
Q. Does Mr. Fairfax use the phrase most likely estimate?
A. Let me see. Are you talking about even more likely? I don't see most likely.

Q. You referred earlier in this deposition to the point estimate being the most likely estimate; is that correct?
A. No. I said it's the best approximation of the underlying value. It's what the data is showing us, the point estimate. And I said point estimate is constant, the confidence interval is sensitive to the confidence level that one sets, and it changes.
Q. Is most likely estimate, or MLE, a common term in statistics?
A. Yeah. Most likely you can use that as a -- in statistics.
Q. What does the most likely estimate mean in the context of a point estimate and confidence intervals?
MR. GENBERG: Objection to form.
A. Well, we wouldn't characterize -- I wouldn't characterize it that way. What the confidence interval, again, is trying to tell us is that whether the interval contains the unknown true parameter within

Page 78

a certain degree of probability.
Q. So just looking at what Mr. Fairfax states in the last sentence of this paragraph -- and I want you to ignore your read of the sentence, I'm just looking at what Mr. Fairfax says.
Would a fair restatement of this sentence be that: The higher your point estimate is above your target, the more likely the true value of the data is above your target?
MR. GENBERG: Objection to form.
A. You can make a statement of the true value being within a certain interval, based on the confidence level that you set. So I'm not sure exactly if that's what Mr. Fairfax is saying or not, just based on this one sentence, but my opinion is that is what I just stated.
Maybe I can give an example, if that helps.
Q. Sure.
A. Okay. So the thing about I think

Page 79

what confuses a lot of people about confidence intervals -- and I don't blame people, I mean, my students constantly are confused about that as well -- is that we have a confidence level that we set, and we want to assign a certain probability that the unknown parameter would fall within the range of numbers that we want to -- that we're calculating based on that level.
So using the example that we had just talked about, if let's say our point estimate is 50 percent, and our margin of error at the 95 percent confidence level is plus/minus 3 percent, you would say that at the 95 percent confidence level, the interval would be from 47 to 53, with 50 being our point estimate.
You would feel good about 95 percent, wouldn't you, like as a lay person, you say: Oh, 95 percent, I'll take that. That's very nice; right? Like it's a very high degree of probability that the true value would be inside the range that I

Page 80

just presented. Right?
What if I told you I want to do even better for you, Counsel? I'm going to give you 100 percent. Do you know what the confidence interval for 100 percent would be?
Q. I assume infinite.
A. See, you have a good understanding of statistics. It would be minus infinity to infinity, within the context of CVAP percentages since we're not talking about proportions. I would tell you that, Counsel, it's from 0 to 100 percent with 50, and I'm going to give you 100 percent probability. How great is that?
But does that make any sense? When you know, prior knowledge, now, Bayesian way of thinking, prior knowledge you know that about 47 percent of District 7 is voting age population black. Do you think there's a chance that not a single person is a citizen? What about the 100

Page 81

percent?
You know that this jurisdiction has whites, Hispanics, other racial ethnic groups, not just blacks. With 100 percent probability, if I said: Hang your hat on that 100 percent CVAP, are you going to assign, are you going to be as confident about the 100 percent as you are about the point estimate? Any reasonable person would come back and say: Those outer edges, it's completely unreasonable.
And this is what Dr. Trende fails to admit. The point estimate is the best approximation that we have. And that's what we can say about the point estimate. It's still unknown. It's a sample.
Best available data, I can tell you my best approximation is the point estimate.
Q. So when you say best approximation, are we talking about it's 50 percent likely that the point estimate is the true value?

Page 82

A. No. I'm telling you, that's the best approximation. I can't assign a likelihood function to that. We don't know the true value.

Now, if I brought in my Bayesian -- If I put a Bayesian hat on, I would tell you under that condition, I would say: Okay. Well, let's take into prior knowledge about the jurisdiction into consideration, because that's what Bayesians would do. And I would say: Counsel, 47 percent of -- give or take, of the black voting age population within District 7 of the illustrative map for Mr. Fairfax is black voting age population, 47. And I would tell you that, well, I know about 10 percent is Hispanic voting age population. Okay?

Then I would tell you that based on the CVAP percentages, I would say well citizenship rates of Hispanics is much lower than the voting age population, relative to the citizenship rates of

Page 83

African-Americans or whites, nonHispanic whites, and also nonHispanic black or African-American. In fact, based on the point estimate data at hand, I know that if the Hispanic voting age population in District 7 is about 10 percent, the CVAP estimate is half that. Okay?

Using that prior knowledge, when I see a point estimate of BCVAP of 50 percent, I am confident, under this Bayesian perspective, that that is the most likely outcome, because it's a proportion to the population.

When you have Hispanic CVAP that are suddenly much more in proportion to the total CVAP, that's going to change the BCVAP and white CVAP because they have higher citizenship rates and naturally will lower the HCVAP of populations who have lower citizenship rates, particularly in Hispanics and also many areas Asian-Americans.

So taking a Bayesian perspective,

Page 84

then, I would tell you that 50.11 is the most likely outcome. And if you told me: But, Dr. Oskooii, 100 percent probability, 0 to 100, that would be pretty unreasonable, that I hang my hat on 0 or 100, even though you're telling me 100 percent probability.

And I think any reasonable person would say that's just not something that we can even say, that it's 0 percent or 100 percent, despite 100 percent probability.

Q. Thank you.

So you calculated -- You estimated the BCVAP in Southern District 7 in Fairfax's plan 1 to 50.11 percent; is that correct?

A. Yes.

Q. That's the point estimate; correct?

A. That is the point estimate.

Q. And that point estimate is above 50 percent?

A. It's 50.11, so, yes, it's above

Page 85

50 percent.

Q. So because the point estimate is above 50 percent, does that mean it more likely than not that the true value is above 50 percent?

A. I just answered that question, Counsel, with a frequentist approach and also a Bayesian approach.

Q. Under the frequentist approach, is the answer to my question yes or no?

A. Under the frequentist approach, I would say the best approximation, given the data, as the point estimate. And under the frequentist approach, I would ask you what kind of confidence level do you want? You say you want 95 percent. And I would calculate the confidence interval based on that level.

And then all I could tell you is that there's 5 percent probability that the interval does not contain the unknown parameter. That's what I could tell you.

But I could still say that 50

Page 86

percent is the best approximation, given the data that we have. We don't have any other data, we don't have anything else. So based on that data, that's what the data is telling you.

Q. Is it fair to say, then, emanating from your point estimate is a bell curve, and the top of the bell curve, being your point estimate, is the best approximation of the data; is that fair?

A. The mean of the distribution, I think what you're referring to. So you just showed me a statistic book which Dr. Wasserman said: Well, we're not running hundred studies, so we shouldn't talk about it that way. But then, now you're talking about it that way.

And what I can tell you, theoretically, statistical theory, the central limit theorem -- or theory would tell you if you have a population with a mean and standard deviation, and if you take random samples from that population,

Page 87

so you repeat it, let's say you do hundred ACS studies. Okay? Then the distribution of the means would be normally distributed, that 68 percent of the means would be within one standard deviation of the distribution of the means.

Q. So if we -- So for your point estimate of 50.11 percent, does that mean that 50 percent -- it's 50 percent likely to be above that point estimate and 50 percent likely to be below that estimate?

A. I'm not understanding. I didn't say that. I said the point estimate is 50.11, and then you can assign an interval to that. Remember, you get the point estimate first, that's what you get. That's what the data is telling you. The interval is what you're calculating to make inferences about an unknown true parameter, and it's usually really done in the context of hypothesis testing, which we're not doing here.

If the Court wants to know what

Page 88

is our best approximation of the citizen voting age population, given the best available data and the best methods of obtaining that available data, based on my analysis, it's 50.11 in District 7. That's what I can tell you.

Q. Does that best approximation mean that it's more likely than not that the true BCVAP value for District 7 is above 50 percent?

A. Which approach are we taking?

Q. The approach that -- The frequentist approach.

A. Okay. So the frequentist approach, I think we've covered this multiple times, the frequentist approach, all it can tell you is whether the true value is within the range of intervals given the confidence level. Okay?

Now, if you took the Bayesian approach, which I provide you a hopefully good example, and we know that voting age population of black Americans and we know

Page 89

the voting age population of Hispanics and whites and then we know the citizenship rates, and then I look at the point estimates, doing it that way, we can make those kind of statements that you're trying to make.

Q. So we have to use a Bayesian approach in order to make probability statements; correct?

A. No. No. You're still making probability statements in the frequentist approach, you're just doing it differently.

Q. Probability statements about the true value of the data, is that fair, we have to use a Bayesian approach for that?

MR. GENBERG: Objection to form.

A. A Bayesian approach will give you a probabilistic estimate of the unknown.

Q. Is Mr. Fairfax using a Bayesian approach?

MR. GENBERG: Objection to form.

A. I don't know what Mr. Fairfax is using. All I can tell you is that when I

looked at his first report, with the illustrative 7, the first map, if that was his first report, he just reported point estimates.

This whole ordeal was brought up by Dr. Trende, who, by the way, I faced in other cases, where he has never calculated margin of errors, talked about frequentists or Bayesian, has never undermined or tried to undermine the credibility of ACS. And by the way, he has done it in Gingles 1 cases in Dodge City, Kansas, where I drew twelve illustrative maps, and not once did he doubt the point estimates in a jurisdiction in which the ideal size of a district was 5,555 or so people, as opposed to 143,000 in the senatorial district. This whole thing is Dr. Trende, so you would have to ask him.

All I can tell you, we rely on point estimates in these cases, even the opposition does, in this case -- in Dodge City, which he was the opposition, in

Washington state he was the opposing expert, he provided point estimate, no mention of frequentists, Bayesian, or margin of errors. And I'm forgetting one more time he did it too.

Q. And we'll talk about the examples that Dr. Trende uses CVAP that you note in your report later.

So this last sentence in paragraph 19 that we read, does this sentence sound more like a Bayesian sentence or a frequentist sentence?

A. You would have to ask Mr. Fairfax. I'm not comfortable trying to get into his head trying to see if he's trying to take a Bayesian approach. Because he knows the underlying VAP population. So he's not coming into this dataset blind. No one dropped him from Mars and said go to Alabama and you have no idea what the heck is going on and just make statements about CVAP. He has priors and he has calculated voting age population, so you would have to

ask him.

Q. So you can't tell just based on the sentence that we're looking at whether he's using a Bayesian or a frequentist approach?

A. Based on one sentence in a report, long report that I have not read, I cannot tell precisely which approach he is taking or trying to take or whatnot.

MR. SEISS: I'm at a reasonable stopping point, if you want to take a break, or I'm happy to keep going.

THE WITNESS: Sure. A break would be good.

(Recess taken.)

Q. Did you discuss the substance of your testimony while we were on break?

A. Nothing substantive, no.

(Off-the-Record discussion held.)

Q. Okay. On pages six and seven of your report you discuss the sources of the data that you utilize. You say for the

block equivalency file for the enacted senate plan, you said that you downloaded the file from Dave's Redistricting; is that correct?

A. Yes. But I also found the block equivalency file on the U.S. Census and provide a link to that.

Q. Sure. What is Dave's Redistricting?

A. It's a redistricting application for the purpose of drawing district lines. It's a very well-known, famous one.

Q. Do you ever use Dave's Redistricting to draw maps?

A. Yes.

Q. Do you find the information to be contained on Dave's Redistricting to be reliable?

A. You would have to show me what information. I'm assuming any sort of application may have some inaccuracies, that's why you do data quality checks, which I do. But generally speaking, DRA, I

Page 94

find it to be reliable.
Q. Sure. So you also say that you used CVAP disaggregated data from the redistricting data hub, or RDH; is that correct?
A. Yes. Disaggregated from block-group level to block level, yes.
Q. Do you find RDH to be reliable?
A. Yes. With the same caveats. And I've used it many times before.
Q. Sure. What is the American Community Survey, or ACS?
A. So I provide the history of that so I'm not going to reanswer that. But basically it's a survey of Americans on a rolling basis, you know, monthly basis that gets released on a yearly basis. You have one-year survey estimates for various variables, one of them being citizen voting age population, which doesn't exist in the U.S. Census. And then you have the five-year estimates as well. You used to have a three-year estimate, but, to my

Page 95

knowledge, that has been discontinued. And I don't recall what exact year. So . . .
Q. You say on page nine that the ACS does not provide a count of the United States population. In fact, it is not intended to do so.
What do you mean by that?
A. Like, enumeration, like the U.S. Census. It's a sample.
Q. So you said that the ACS is a sample?
A. That's right. It is.
Q. And you don't dispute that samples carry uncertainty with them?
A. I don't dispute that. They come with a margin of error.
Q. Even at the statewide level there's a margin of error for the ACS; correct?
A. If it's not an enumeration, which it's not, it has a margin of error. That can be calculated, again, with a certain confidence level.

Page 96

Q. Is it fair to suggest that this error that we're talking about exists unless you survey every single person?
MR. GENBERG: Objection to form.
A. Well, if it's a sample, you can calculate a margin of error, because, you know, in the case of ACS, they're taking a random sample of the population, they're not counting every single individual within a certain area.
Q. So if you surveyed everyone, you don't have a sample anymore; correct?
A. Yeah. You have the enumeration, for the sake of differentiating between the two.
Q. Do you agree that error margins still exist, even if people don't mention or acknowledge them?
MR. GENBERG: Objection to form.
A. Yeah. I'm not sure what you mean by that.
Q. Let's say someone sees a poll of five hundred people that places Joe Biden's

Page 97

job approval at 42 percent.
A. That seems pretty high to me. Just joking. Is that their best estimate? Yeah. Go ahead.
Q. Is there an error margin associated with that point estimate?
A. If there's a sample, you can calculate one. Basically, you take the critical value, or the V-score and then you times that by the standard deviation divided by the square root of the sample size. I apologize if I'm speaking too fast.
Q. So if somebody estimates Joe Biden's approval to be at 42 percent, and they don't report a margin of error, that doesn't mean that there's not a margin of error; correct?
A. If it's a sample, then you can calculate the margin of error.
Q. Do you agree that ACS data always has error margins, regardless of whether the error margin is reported?

Page 98

MR. GENBERG: Objection to form.
A. Again, you can calculate it, so by definition it has error margins. You can calculate 95 percent at 67. I believe that the ACS usually uses 90 percent.
Q. Have you utilized polls in your scholarship?
A. Yes.
Q. Have you fielded polls?
A. Yes.
Q. The polls you fielded have error margins; correct?
A. Again, if it's a sample, you can calculate it.
Q. So the specific CVAP data that you've used in your report is the 2021 five-year data; correct?
A. Yes. Five-year ACS.
Q. Why did you use that specific CVAP set?
A. Well, because Mr. Fairfax had calculated 2021 CVAP percentages for illustrative District 7 and 25 and perhaps

Page 99

others.
Q. Was the 2022 five-year CVAP data available at the time you wrote your report?
A. Great question. Redistricting data hub, five-year 2022 estimate disaggregated from block group to block level was not available.
Q. Do you know when that became available?
A. I still don't think it's available, the RDH. Although, don't quote me, I haven't checked since submitting the report.
Q. Okay. Sure.
What years do the 2021 five-year ACS data encompass?
A. So five years, 2021, 2020, 2019, 2018, 2017.
Q. Yes. I apologize for making you count backward.
A. No worries.
Q. What level of census geography is

Page 100

that data reported at?
A. Well, it's -- What I can tell you is that it's reported -- at the lowest level, it's reported at the block-group level. So we don't have ACS estimate at the U.S. Census block level.
Q. What is a block group?
A. It's a combination of blocks. It's a -- So, you know, you could have five blocks, for example, contained within a block group. It's a larger geographic area.
Q. Do you know how many block groups there are, roughly, in Alabama?
A. Off the top of my head, I cannot. But if I pull up the data, I can tell you exactly that amount.
Q. I'll represent to you that that number is three thousand four hundred thirty-eight. Do you have any reason to doubt that?
A. I think that seems reasonable.
Q. Who decides what the boundaries

Page 101

are for block groups?
A. Well, the U.S. Census, you know, uses blocks and block groups and tracts. And I don't know who specifically decides, if that's what you're asking.
Q. How often do block-group lines change?
A. Well, I don't know how often. But, like, there could be developments in areas where there was no development, or something, and then that information goes up. And every ten years, I would imagine, would be the most appropriate time, so you keep things consistent in those ten-year periods when the U.S. Census is conducting its enumeration and publishes it.
Q. Okay. Thank you.
Do you know how many people are in a block group, on average, in Alabama?
A. Yeah. I think I calculated that and I put it in my report. I believe I said the average is about twelve hundred people, or so.

Q. Yeah. I'm not -- I don't remember the exact figure from your report. But I know in Dr. Trende's report he calculated it at one thousand two hundred and eighty.

A. Well, if you'll give me a moment. I'm pretty sure I mentioned it. Yes. When I calculated paragraph, I think, 32, where I said senate legislative districts in Alabama boast an ideal population size of one hundred forty-three thousand five hundred fifty-one, which is vastly different from Alabama's block-group population of only one thousand two hundred eighty, with a minimal zero and maximum of five thousand five hundred thirty-four.

Q. Okay. Great.

You touched on this a bit earlier, but what is a census block?

A. Well, it's a smaller, again, geographic unit in which the United States collects demographic information during Decennial Census.

Did you say block or block group?

Q. Just a block.

A. Yes, that was the answer.

Q. To the best of your understanding, would it be fair to say that block lines change in the same way that block groups would change every ten years, roughly?

A. They could change.

Q. Do you know how many people are in a block, on average, in Alabama?

A. I don't know if I calculated that, but it has to be much lower, the average, and almost certainly has a minimum of zero because we know the block group is zero, so there are blocks within that block group that are zero.

Q. So I'll represent to you in Dr. Trende's report he calculated that number to be twenty-seven for the average size of a block in Alabama.

Does that sound reasonable?

A. I mean, I know it's much lower

than a block group, typically. So I'll just assume it is.

Q. What is a precinct?

A. So a precinct is a geographic location which voters in a certain area go and cast their ballots and votes are reported at the precinct level, and then get aggregated up to whatever jurisdiction.

Q. What is a voting tabulation district, or a VTD?

A. Yeah. That's created -- Typically, but not always, corresponds to precincts, but that's a tabulation based on census blocks that the U.S. Census has. Often they do go hand in hand, especially early on in the redistricting cycle before precincts change, because precincts do change -- I wouldn't say often but they do change, especially if you have new maps and new lines are drawn or redrawn, precincts can certainly change over a ten-year span.

Q. So is it fair to say that the VTDs are set roughly every ten years with

each census, but these inclines could change based on political considerations during the ten-year period?

MR. GENBERG: Objection to form.

A. I don't know what you mean by political. Yeah. I think I know what you mean, but it's not like a negative connotation, political, it's more like they need to change it because they changed boundaries, or maybe it makes sense to -- In the election administration, it might make sense, but we would have to see what reason they offer.

Q. Yes. That is what I inartfully meant.

Are blocks ever split?

A. By whom?

Q. Are blocks ever split by boundary lines in block groups?

A. I'm not sure I understand that question, by boundary lines in block groups?

Q. Let me try and phrase it

Page 106

differently.
Is it fair to say that whole blocks are the building blocks for block groups, typically?
A. Yes.
Q. Is the same true for precincts?
A. I would say for the most part. There are rare instances in which some states might break a block. Very rare. Very rare. And they would do it when they have trapped polygons within different jurisdictions. And I believe actually in Washington state, sometimes that happens.
Usually, they're not populous areas or areas of least development, but it's a very rare occurrence, my understanding.
Like as a map maker, I would not split blocks. It would not be advisable to split blocks, unless there is such a legitimate reason that the state wants to do that. Typically my understanding is you don't -- you cannot break blocks.

Page 107

Q. Yeah. I'm starting to get into my own personal curiosity versus the value of this case, so I'll move on from that.
Are block-group boundaries typically used during the redistricting process?
A. Yeah. You could use block, block group, tract, county boundaries, VTDs.
Q. Would it be fair to say that it's more likely that you're going to use precinct or VTD lines over block-group lines in constructing a district?
MR. GENBERG: Objection to form.
A. Depends on the jurisdiction at hand. It's not always the case. I would say for the most part, that generally is the case, where the base building block, you start with a precinct lines or VTDs, but sometimes that's not feasible. Again, depends on the jurisdiction.
Q. Do block-group boundaries match up with precinct boundaries?
MR. GENBERG: Objection to form.

Page 108

A. Not necessarily. Because sometimes certain blocks in a block could be in one precinct and then the other blocks in a block group could be in another precinct.
Q. So RDH disaggregates the five-year data from the block-group level to the block level; correct?
A. Correct.
Q. Why does it do that?
A. Well, because this dataset is typically used for the purposes of identifying the citizen voting age population of a jurisdiction by race and ethnicity. And because in the drawing of districts, it is often the case that block groups or VTDs or precincts do get split, and some blocks are within one district and other blocks inside a block group are another district.
You conduct that kind of disaggregation, and then you can aggregate up to a district to identify the estimate

Page 109

CVAP for a particular race or ethnicity.
Q. Thank you.
On page seven of your report you say that, quote -- I'll wait for you to flip to that page?
A. Thank you.
Q. Quote, RDH ensures that CVAP racial data conforms to the Office of Management and Budget, OMB, racial categories.
Did I read that correctly?
A. That is correct.
Q. Why is it necessary for RDH to do that?
A. Typically, we want to compare apples to apples. So when we're constructing a variable for a citizen voting age population, the way it's constructed is you have black alone or black -- and black in combination, as the black or African-American category. So you want to be consistent, and I would suppose that's one of the reasons.

Page 110

Q. Sure. So --
A. Sorry. Just to be clear. NonHispanic, black alone, or in combination, I should have said.
Q. Understood. Throughout section D of your report, you describe the ACS is a, quote, reliable source of data.
What do you mean by reliable?
A. It's a trusted source of data. They use state-of-the-art techniques to sample the population, they are nonpartisan, they are -- they use sampling techniques and the way they do it, I find them to be of high standard.
So basically what I'm saying is, the estimates that you get from the ACS, I trust them to be sound estimates. Rather than if you told me you went to District 7 and you conducted your own survey and told me: Well, I have it at 49 percent CVAP. Not knowing your methodology, I may not find your data gathering reliable.
Q. Sure. You said earlier the ACS

Page 111

uses the 90 percent confidence interval; is that correct?
A. That's the level that I believe that typically ACS, when providing margins of error, that's the level that they use.
Q. Is it correct that you could do some math to go from a 90 percent confidence interval to the 95 percent confidence interval?
MR. GENBERG: Objection to form.
A. Yeah. If you have the standard error, you could times that by 1.96, which is the critical Z value of a larger sample, and you would get 95 percent.
Q. Do you know why the ACS uses the 90 percent confidence interval instead of the 95 percent confidence interval?
A. Well, because, one of the reasons is that -- First of all, one thing that we haven't discussed, and I don't know if Dr. Trende brought up, the sample size plays a role in how wide of a band you will get.
So the larger the sample, the

Page 112

lower your intervals will be, the tighter around the point estimate it will be. So I think the ACS thinks that it's a reasonable approach to use 90 percent. And 90 percent is often used in academic research, too, although probably 95 percent is more typically used than 90.
Q. So on page ten of your report you say that: The ACS is the gold standard and best source of reliable data.
When you say that, you still acknowledge that error margins apply to ACS data; correct?
A. If I may read the entire sentence for the Record, that way we can --
Q. Sure.
A. ACS is the gold standard and best source of reliable data to estimate the proportion of eligible voters within he electoral jurisdiction, dash, meaning U.S. citizens above the age of eighteen.
And then I say: In fact, ACS is the only source of data that provides CVAP

Page 113

statistics by race and ethnicity at various geographic units across the United States.
Basically, I don't know of any better, more reliable dataset that is as this comprehensive to use it over ACS. It is the gold standard, top of the pile.
Q. Do you know if there's any source of data that we can use to estimate CVAP in Mr. Fairfax's SD7 in plan 1 besides the ACS?
A. To estimate citizens over the age of eighteen, I would say, no. What I know is that the ACS in Alabama -- Now, you could calculate registered voters if you wanted to, and they would be, obviously, citizens over the age of eighteen, but that's not all the citizens over the age of eighteen.
Q. On page nine you say that, quote, the ACS is designed to provide reliable annual estimates of various population characteristics for cities, counties, and other geographic regions with a population

Page 114

of sixty-five thousand or more.
Did I read that correctly?
A. Yeah. And that is from the U.S. Census's own description.
Q. So you then say that: The ACS provides, quote, sufficiently reliable statistics, close quote, for, quote, smaller geographic units, close quote, by aggregating five years' worth of data; is that correct?
A. I got a little bit lost with your quote stuff. I said: For smaller geographic units, the ACS provides sufficiently reliable statistics by aggregating several yearly estimates known as the five-year estimates.
Q. What smaller geographic units are you referring to in that sentence?
A. Areas, as they describe it, below sixty-five thousand people. So typically if the average block-group level is, you know, twelve hundred, you know, they're suggesting that it's best to use the

Page 115

five-year estimates. If you want to know -- Caveat: If you want to know the point estimate of a specific block group.
But if you want to use -- If you want to know just the state of Alabama, which is clearly more than sixty-five thousand people, one-year estimate would suffice.
Q. Is that statement that we just read, does that also come from a Census Bureau?
A. I mean, none of these are quotes. This is kind of what they describe during their methodology and things like -- of that nature.
Q. What is the lowest level of geography that ACS' one-year CVAP estimates report at?
A. Because I rely so much on five-year estimates, I would have to refresh my memory.
I wonder if they do get down to the block-group level or not. I'm not

Page 116

sure. I would have to go and look and refresh my memory on that one. Because I primarily rely on five-year estimates.
Q. Sure. So based on the sentence that we just read about smaller geographic units, would it be fair to say that one-year data would not be reliable for smaller geographic units?
A. Not as reliable as the five-year. It's still a point estimate, you're getting a point estimate. They're just saying, we don't have enough observations, essentially, so -- and it's low, that's small. Which makes sense, I mean, it's a sample. And therefore you should use a larger sample, which would be the five-year, because it aggregates five more years.
Q. On page nine, you discuss at least two advantages of the ACS. The first advantage is that it provides, quote, more updated data; is that correct?
A. Well, depends what year you're

Page 117

comparing to. In this context, I'm saying if you compare 2021, for instance, or 2022, five-year estimates, to the 2020 census, it's still collecting -- it's sampling the population after 2020. So by that account, it's bringing more updated data.
Q. So is it fair to say that only one of the five years in 2021 five-year ACS data, is more current data?
A. I think that's fair to say. Yeah. 2021 is more recent than 2020.
Q. And it's correct that three of the five years of 2021 ACS five-year data is older than the 2020 census data?
A. Yes. They were collected, some of them, prior to 2020, although, sometimes it's concurrently, because it takes the U.S. Census a long time to enumerate the entire population. And ACS is doing it on a monthly basis, so partially, you're right.
Q. So I guess it would be fair to say that for 2020, depending on when the

census stopped its count, ACS could be doing sampling or surveying after the census finished and some 2020 data could be more current?

A. Yeah. Something like that, yeah.

Q. So the second advantage -- or the second advantage that you list is that the ACS provides data not available in the census, like citizenship estimates by race; is that right?

A. That is what I said, yes.

Q. Are there disadvantages to using ACS data over the 2020 census data?

A. Depends what your question is.

Q. Is the fact that the ACS has error margins, while the census does not, constitute a disadvantage?

A. Well, I would say if you have an enumeration, the true unknown parameter is not unknown anymore. Right? Because you counted everybody. Wherein, a sample, it's a sample, so you don't know the true unknown parameter because you didn't survey

every single person in a jurisdiction.

So in that sense, then, U.S. Census is more advantageous. And that's why, for purpose of equal population, you rely on the U.S. Census total population data, not a sample, because it's an enumeration.

Q. For estimating BCVAP in Fairfax's SD7 in plan 1, is 2021 ACS five-year data -- Scratch that.

If we are looking at voting age population, for voting age population in Mr. Fairfax's Senate District 7, is the ACS five-year data more accurate than 2020 census data?

A. Well, I would have to make the comparison you might get the same result. But by definition, an enumeration is preferred over a sample, if you want to get at the underlying truth population parameter; whereas, sample, you don't know that value, with enumeration. If it's done correctly, hopefully, you know that value.

Q. Sure. So I think you wrote another advantage of using the ACS, on page ten, you say that VAP data is overly inclusive as it encompasses noncitizens, dash, individuals ineligible to vote.

Did I read that correctly?

A. That is correct. It includes all the individuals over the age of eighteen, regardless of their citizenship status.

Q. Why do we care about excluding people who are ineligible to vote?

MR. GENBERG: Objection to form.

A. Well, I don't know what context you're asking this, but I assume it's context of Gingles 1 or Gingles 1, 2, and 3, which all go hand in hand, really.

If you want to know whether a district will perform, whether it's an effective district or gives equal opportunity, it is ideal to know the potential electorate, not bunch of people who can't even vote because they're not citizens.

Q. Are there other groups of individuals over the age of eighteen that are ineligible to vote?

A. Yeah. There could be some, yeah.

Q. Can you give me some examples?

A. I think the example that was brought up by Dr. Trende, and he said he relies on another report which I didn't read, so I want to be on the Record that I have no idea what this other report is, is that felony disenfranchisement, you know, I think in Alabama -- Again, I'm working on the knowledge of -- or the stated claims based on Dr. Trende's report, that felons are ineligible to vote in Alabama, and so they could be citizens over the age of eighteen, but may not be able to register to vote.

Q. So did you read the section of Dr. Trende's report where he discussed the disparity between the disenfranchisement rate for African-Americans versus Alabamians in general?

Page 122

A. Yes. I recall reading something to that order.

Q. And the specific statistics that Dr. Trende referenced from Dr. Burch, who I understand you have not read her report, but those statistics were that 14.6 percent of African-Americans are disenfranchised in Alabama due to a disqualifying felony conviction versus 8.6 percent of Alabamians in general?

A. Question -- Sorry, clarification. 14 -- This is what I was not clear about. Is it 14.6 of the voting-age population, of the total population? Because, you know, under the age of eighteen, you could get a felony conviction, or of the citizen voting age population? That's what I was not clear about. And I'll leave it at that.

Q. Sure. Let's assume that it's the -- of the eligible voting population.

A. So citizens over the age of eighteen.

Q. And I might be wrong about that,

Page 123

but let's just assume that for the purpose of this, and I don't think it's going to be relevant to --

A. Hypothetically, you're saying.

Q. Sure.

If we were to remove felons -- remove people who have a disqualifying felony conviction that prevents them from voting, if we were to pull them out of the eligible voting population, do you agree that the percentage of eligible black voters would decrease relative to Alabamians on average?

MR. GENBERG: Objection to form.

A. I would first ask you, or ask the person in this hypothetical scenario how did they do that? I need to know exactly how did they come up with that, you know?

Q. Assuming that the 14.6 and 8.6 rates are correct, do you agree that the eligible black voter percentage would decrease relative to Alabamians on average?

MR. GENBERG: Objection to form.

Page 124

A. I don't mean to at all be difficult, you said correct. What do you mean -- How do we know the data is correct? Like, who conducted this -- Is it a survey, is it a sample, does it go down to the block-group level, to the block level? What's the -- You've got to give me, in this hypothetical, little bit more information so that I can provide you with the best possible answer.

Q. I appreciate your wanting to understand what the source of that data. That data came from Dr. Burch's report who is another expert for the Plaintiffs in this case. I just want you to assume that that data is correct.

A. But what level of geography is that data provided?

Q. We're talking about on the statewide level.

A. Okay. So we don't know -- Thank you for clarifying that. We don't know if there is variation across different

Page 125

counties, block groups, blocks, tracts, you're not telling me any of that.

Q. Correct.

A. So I couldn't tell you what effect it would have on District 7.

Q. I'm asking about in Alabama in general, if you take out people with a disqualifying felony conviction, would the percentage of black eligible voters go down relative to Alabamians as a whole?

MR. GENBERG: Objection to form.

A. Well, I would need to know also other information. What's the felony conviction of Hispanics in Alabama, Asians, American Indians? You can't just get proportions just relying on the white percentage, because that's going to impact -- if you were able to even do that exercise as hypothetical as you're presenting, that would impact the percentages for blacks, depending on what it is for Hispanics, Asians, or other groups, not just whites.

It's just not good analysis, frankly.

Q. So to be clear, I'm not asking about whites. I'm asking about Alabamians at large.

A. But your answer is baked into that. You're telling me only the felony disenfranchise rate of whites; right? You said it was whites -- Didn't you say whites?

Q. No. The numbers that I gave you were 14.6 percent for African-Americans and 8.6 percent for just Alabamians in general?

A. Oh, I see. I misunderstood. You're not telling me it's just the whites, total disenfranchised?

Q. Right.

A. What's the question again?

Q. Would the black eligible voting percentage go down relative to the eligible voting percentage for Alabamians as a whole?

MR. GENBERG: Objection to form.

A. So we have to rest on some majorly heavy assumptions here, that, first, your data is even reliable and correct. And the only thing that I can tell you, potentially, is that Alabama, as a whole, I can't tell you any specific parts, districts, this, that, that by this hypothetical that you're presenting, then, yeah, the simple math would dictate that you would have to reduce. But you don't know where to reduce, that's the point.

And I think that's what the issue I take with Dr. Trende's analysis is that it's a lot of guesswork, a lot of major assumptions. And it's just not reliable inference.

Q. Is it fair to say that your issue with Dr. Trende's use of the data is one of methodology?

A. No. It's also -- He doesn't describe where the source of data is. He doesn't talk about how this percentage was calculated. I even asked you, Counsel, and I assume you read his report, and you couldn't even tell me if the denominator is voting age population or citizen voting age population or total population, and I don't recall even Dr. Trende specifying that in his report.

Q. If we had the true data and methodology that you supported, that you found to be reliable, would you endorse an approach of removing felons from the eligible voting population?

A. That's a legal question. That's what the Court has to decide, whether that should be -- that's deemed appropriate or not.

The only thing that I can tell you is that you would have to -- ACS would have to basically have estimates on exactly what you're talking about to go to the block-group level. And even then, that creates issues with disaggregation, because then what's the base that you're comparing to? Is it VAP, total population? We don't know, you know.

So given that you can't even come up with that answer in a even modestly reliable way, I don't see how fruitful even that question is.

Q. But if we could do it, it wouldn't be reasonable to include felons who are ineligible to vote in a count of eligible voters; right?

MR. GENBERG: Objection to form. I think this is kind of asked and answered.

MR. SEISS: I disagree.

MR. GENBERG: Okay.

A. Not to side with counsel just because he's on the Plaintiff side, I don't care about that. I do think that I did answer it multiple times, Counsel. And if you don't think so, maybe there's another way you could ask the question. If I'm misunderstanding your question, I can find another way to answer it.

Q. We'll just move on. That's okay.

A. Okay.

Page 130

Q. So I think earlier you referenced this, and this is also on page nine of your report, which I'll read out loud: ACS total population estimates are not used in redistricting for population parity, parentheses, or equal population requirements.

Did I read that correctly?

A. Yes. That's right. Best practices use the total population enumeration by Decennial Census. Because there's no need for you to rely on a sample if you have the enumeration, so why would you do that?

If the U.S. Census had a citizenship question and enumerated that, then, yeah, then I wouldn't even rely on the ACS, unless I wanted to know more recent data or trends or something like that.

Q. Say we were doing redistricting in 2028, isn't the ACS going to provide more up-to-date information?

Page 131

A. Yes. The surveys are more recent. 2028 would be the 2020 census, Decennial Census.

Q. And you said that best practices would be to not use the 2028 ACS data over the 2020 census if we were trying to equalize population?

A. I think I --

MR. GENBERG: Objection to form.

A. I don't think I said 2028. You mentioned 2028.

Q. Can you explain what you meant by it being best practice to use the census over ACS for population parity?

A. Right. So the way it works -- apportionment works, and this is covered in Introduction to American Politics that I teach, is that every ten years, when it comes to the House of Representatives, because we have two senators, regardless of population size, some states will lose and gain congressional seats due to population shifts and movements. Okay? To make that

Page 132

determination, you rely on the U.S. Census, which is an enumeration of the total U.S. population.

And because it's an enumeration, there's no need for you to rely on the sample, because you've got the count and that count was used for apportionment. So that should be used, in my opinion, again, this is a legal judgment, it's up the Courts to decide if they want to use 2028 over 2020, that's -- that's not something that I can answer.

In my opinion, because he's used it for apportionment, you need to use the same data. And then in your example, 2028, well, just two more years, you're going to redraw anyways, the districts, and you can equalize based on 2030 U.S. Census.

Q. Have you ever done plans to comply with the equal population requirements?

A. Yes.

Q. What do you understand those

Page 133

requirements to be for congressional districts?

A. Well, with any districts, the concept is that you want the populations to be as nearly as equal as possible across the different districts. Now, certain states have very strict limits of plus/minus one person; others have plus/minus 5 percent deviation, so the least populous district, comparing that to the most populous, that difference within 5 percent.

Then for lower-level geographies, the Courts typically tolerate 10 percent deviation, although in some rare cases they may tolerate higher than 10 percent.

Q. Do you know what the level of population deviation that was permitted with the enacted senate plan in Alabama?

A. I don't recall if Mr. Fairfax mentioned it. But if I had to guess, I would say it's either 5 or 10 percent. I would say 10 percent usually is for senate

Page 134

district. But I don't know. You'd have to ask Mr. Fairfax since he's the one who drew the plans.
Q. I'll represent to you that plus or minus 5 percent or 10 percent overall deviation is what Alabama used with it's enacted senate plan.
A. So is it 5 percent or 10 percent?
Q. Well, it's 5 percent either direction from ideal.
A. So 10 percent total?
Q. Correct.
A. Okay. Thank you.
Q. So we have more population deviation to work with, theoretically, for a state legislative district over a congressional district; correct?
A. I don't know what you mean by work with. I think it's generally understood that when you're relying on smaller geographic units it's much harder to equalize population by one person. And that's why I think the Courts or states

Page 135

tolerate higher deviation have lower geographic units.
MR. SEISS: I'm at a decent stopping point if we'd like to break for lunch.
(Recess taken.)
Q. Dr. Oskooii, welcome back from lunch. Did you discuss the substance of your testimony during the lunch break?
A. Nothing of note, no.
Q. When you say of note, what do you mean?
A. I mean, nothing substantive. Just like how long is it going to take? You know, things of that nature, I mean.
Q. Sure. Understood. Thank you.
On pages three and four of your report, you list I think it's ten cases that you've worked on; is that correct? It's about ten cases, I'm not particularly concerned about the exact number.
A. Well, about, yeah.
Q. Have you been accepted as an

Page 136

expert in all of these cases?
A. Well, in the cases that I testified, yes.
Q. In the cases that you've testified, have you ever been challenged as an expert?
A. What do you mean by that? Like, did someone say that I'm not an expert, or something?
Q. Yes. I mean something more than just somebody thought your opinion was incorrect.
A. I mean, in Galveston County, Texas, no one said anything about my qualifications. I don't think anyone said anything in the Washington state hearing, or Dodge City, Kansas. I don't recall, at least, anyone doubting that I have expertise in these areas.
Q. So based on pages three and four, it looks like about half of those cases, you either haven't been deposed or testified at trial in; is that correct?

Page 137

A. I mean, I have it all listed, so you can look at it and have an accurate count. There's certainly cases that did not lead to a deposition or testifying stage for me.
Q. In which of these ten cases did you use ACS CVAP data?
MR. GENBERG: Objection to form.
A. That's a tough question. I mean, some of them are a while back, so I would have to work off a little bit more distant memory. But in Galveston County, Texas, I'm fairly sure I used CVAP data. I'm trying to think. Some of them were like I was a RVP expert, some of them mapping.
Like in the mapping cases, like Washington state, I used CVAP data; in Dodge City, Kansas, which was a municipality -- I said Kansas, it's in Kansas, for city council, I used CVAP data. Others, I used, you know, order file records. You know, depends on the nature of the analysis.

Page 138

I think Wicomico I used CVAP data also. And I think Federalsburg as well, but I'm not 100 percent sure.

Q. Can you say the name of the second-to-last one that you said, Comico, something of that nature?

A. Wicomico, Maryland, branch of NAACP versus Maryland.

Q. Okay. I see.

Okay. So by my count, and I understand there can be more, this is based on your current memory, you've listed five cases where you've used ASC/CVAP data?

A. Yeah. It's possible I used them in all those other cases too, I just can't recall 100 percent. But if there are submitted reports to the Court, you can, I'm sure, pull them up and see what I used.

Q. Sure. And I'm not trying to hold you to that representation of five. But let's just assume that it's these five cases.

So in Galveston, what was the

Page 139

racial or ethnic group that was the subject of the litigation?

A. Blacks and Hispanics.

Q. Were you drawing an illustrative district in that case?

A. No. I evaluated illustrative districts, but I did not draw them.

Q. Were the majority/minority illustrative districts in that case coalition districts between African-Americans and Hispanics?

A. Yes.

Q. And was there just one district at issue or were there multiple districts?

A. I believe there was one.

Q. So in Galveston, how did you use CVAP data?

A. I downloaded the ACS, I believe it was a five-year estimate, and I merged it in with election-level data. And I conducted racially polarized voting analysis, I evaluated the illustrative maps, things of that nature.

Page 140

Q. Were you analyzing whether the numerosity requirement for Gingles 1 was met?

A. I don't recall that being a very specific ask, but I'm sure -- I mean, that's part of the case comes up, Gingles 1 case.

Q. Fair.

Okay. Next, Washington. And that's the Palmer case; correct?

A. Yeah. Palmer case is a districting one, yes.

Q. What were the racial or ethnic groups at issue in the Washington case?

A. Well, I don't know "at issue" is the proper way of putting it. You had the sizable Native American population in the region of the remedial district; you had a sizable, obviously, in the Yakima County region, Yakima Valley, Latino or Hispanic population; you also had a big white population; and you had some African-American, although I don't recall

Page 141

exactly how much.

Q. So you used the word remedial. Was your work in this case at the remedial stage only?

A. Yes. I was not involved prior to the remedial stage.

Q. So it's correct that you wouldn't have been drawing a Gingles 1 illustrative plan at the remedial stage?

A. That's right. I did not do that.

Q. How was CVAP data used in the Washington case?

A. Five-year CVAP estimate by race and ethnicity that was disaggregated to -- from block groups of blocks. And by the way, data redistricting application has the RDH disaggregate data presumably because they think that's the best way of doing it, which I agree, their approach, relative at least Dr. Trende's four different approaches, it's definitely much better. So, yeah, that's how I used it.

Q. Okay. Next, Kansas, and that is

Page 142

the Coca case; correct? C-O-C-A.
A. Yes, that is correct.
Q. What was the work that you did with CVAP in the Kansas case?
A. There I was drawing Gingles 1 illustrative district. I submitted twelve maps I believe, twelve different illustrations. Single member district, it was a five-district plan. And the populations were nonHispanic white, Hispanic, and one district had a sizable black or African-American population and some other iterations, and then all the other racial and ethnic groups were pretty minor, small part, from what I recall.
But basically, in all these cases, I believe we don't just report one racial group, we tend to report multiple racial group CVAP percentages or proportions.
Q. Understood. So in the Kansas case, there was not a black majority district at issue; is that correct?

Page 143

A. There was no black majority district, correct.
Q. Okay. Next, the Wicomico case out of Maryland, W-I-C-O-M-I-C-O. How did you use CVAP data in that case?
A. I think I'm allowed to say in this case, because I don't know if I actually ended up submitting a report or not. This case, I think, settled before that, or whatnot.
But what I -- I think I can say I conducted some RPV analysis and used CVAP data for that. At the same time, I evaluated what would be akin to Gingles 1 districts related to black Americans or African-Americans.
And I don't know to what extent I can disclose all the work I did in evaluating those districts. One thing I can tell you is I did rely on CVAP data. And the question there was for -- was a district, primarily, district or two or three, primarily, for black or

Page 144

African-Americans.
Q. Did you have a nondisclosure agreement relative to that litigation?
A. I don't recall. I'd have to check back. It was a while. Because this case started originally when they asked me -- it was a while ago, I did some analysis, so I would have to go check to be sure. That's why I said I'm not 100 percent sure to what extent I can disclose the details of it. And I think it's still going through a stage of settlement, so I don't think it's appropriate for me at this point to divulge any details.
Q. Understood.
So to clarify, and, again, if you're not able to answer that, that's fine. Were you -- In this case, did you assess the numerosity requirement of Gingles 1 by looking at BCVAP?
A. Well, this was a -- This is a Section 2 case, so the extent to which the black population is numerous and compact

Page 145

enough plays a role, and that's something that I evaluated, in terms of the number of majority/minority districts.
So I would say yes, but -- so it wasn't necessarily -- like, it didn't go to a proper like subcommittee reports and so on and so forth.
Q. Is it fair to say that you never came to a conclusion about whether the majority/minority proposed districts in that case satisfied the numerosity requirement?
A. No. That's not correct. And I don't know to what extent I can share what I concluded.
Again, I would have to ask counsel for the Maryland ACLU to see what is it I can disclose or not.
Again, they're going -- As far as I know, they're still going through their settlement procedure and trying to figure out what's an equitable outcome.
Q. Okay. Understood.

Page 146

And then, last, the Federalsburg case.
A. Uh-huh.
Q. How did you use CVAP data in that case?
A. In a similar fashion as the Wicomico case.
Q. Majority black districts were at issue in that case as well?
A. Yeah. It was predominantly the district was about African-Americans or black Americans.
Q. You're saying that that case is at a similar stage as Wicomico?
A. No. I think that one, no one challenged my conclusion that RPV existed. And then it went through a -- I think they had some hearings that I wasn't involved in. But right now, they are, I think, in -- they changed from a at-large to a districted system.
And I think -- I hope I'm not misspeaking here. I think they've recently

Page 147

elected their first African-American, if not one or two Africans, in the history of the entire town in the town council. It was a very historic moment that the town itself was very proud of and advertised. So that's all I can tell you about that.
Q. You said you did racially polarized voting in that case. Did you also analyze Gingles 1 in that case?
A. I did some work on understanding the underlying districts, as related to numerosity and compactness and how many districts is possible and whatnot. But my primary focus, I think the report, at that stage, was about RPV and then later on I was asked to do other work that didn't result in a report.
Because, as I said, the town kind of came together and said they wanted to make the change, and it got to a settlement, I think. So I don't think they fought that much, the claims, and they decided to settle.

Page 148

Q. Understood. Thank you.
So say you have a district that is 50 percent Hispanic CVAP, is the Hispanic VAP likely to be higher or lower than 50 percent?
MR. GENBERG: Objection to form.
A. Well, I would have to know what the proportion of the other groups are. For instance, what if, you know, 40 percent of that jurisdiction was Asian or Asian-American and you had different citizenship rates, and let's say the Asian-American citizenship was much lower than the Hispanic one, that could alter the proportion of Hispanic CVAP relative to the proportion of Hispanic VAP.
Really, it isn't the case here, where the black CVAP is higher than BVAP because you're taking into consideration proportions of other groups that have different citizenship rates. So I wouldn't say it's always automatic or the case.
Q. So here you agree that the

Page 149

Hispanic voting age population percentage of Fairfax's SD7 in its plan 1 is higher than the Hispanic citizen voting age population percentage?
A. In relation to the proportion of the same data compared to those other race groups. So you have 10 point something percent BVAP -- Sorry. Correction. HVAP, Hispanic VAP, in District 7, but the corresponding HCVAP portion is slightly below 5 percent in the same district.
Q. Sure. So on page ten of your report.
A. I'm there.
Q. You say that Hispanics and Asians, quote, typically exhibit lower citizenship rates compared to nonHispanic white and black residents; is that correct?
A. Yeah. Typically speaking, that is the case.
Q. So assume you have a district that has no Asian-Americans in it, and assume the citizenship rates for the

remaining -- Well, let's assume that there are only Hispanics and then the other groups are nonHispanic whites and blacks, just to make the example simple. So no Asian-Americans are in this district.

I'd like you to also assume that the citizenship rates in this district mirror the citizenship rates of those races nationally. Are you with me?

A. You made it a little complicated but I think I'm with you. But keep going. Maybe throw in some Iranian-Americans too, and we'll make it a little bit less confusing.

Q. So in that district, is it fair to say that the HCVAP percentage is going to be higher than the HVAP percentage?

MR. GENBERG: Objection to form.

A. Do you mean the other way around? Because I think --

Q. Yes, I do.

A. Okay. So if you could restate your question, so I can answer it the way

you meant to ask.

Q. Sure.

So in the hypothetical that we just discussed, is it fair to say that the Hispanic voting age population percentage will be higher than the Hispanic citizen voting age population percentage?

MR. GENBERG: Objection to form.

A. Well, we don't have to rely on a hypothetical here, because that's precisely what's happening in District 7, right, because what you described, you have -- you said sizable white, nonHispanic white population, nonHispanic black population, Hispanic population, and you are working under the premise, at least nationally, that Hispanic citizenship rate is lower than black and white.

So if you have that, as in the case in SD7 of the illustrative map, then, yeah, that HCVAP is lower than HVAP.

Q. Have you ever seen an example where a district has an HCVAP percentage

that's higher than its HVAP percentage?

A. I may have seen that in California, but I'm not 100 percent sure. I can't recall specifics. That's such a detailed question.

Q. Sure.

So in Fairfax's illustrative District 7 in its plan 1, the BCVAP percentage is higher than the BVAP percentage; correct?

A. Correct.

Q. Would you say that's typically the case for a district, in that the black citizen voting age population is higher than the black voting age population by percentage?

MR. GENBERG: Objection to form.

A. No. That doesn't mean it's automatically the case, no.

Q. Have you seen any examples where the black citizen voting age population percentage of a district is lower than the black voting age population percentage of a

district?

A. I don't know if I recall specifics, but I would imagine, like -- I think in Wicomico that might be actually the case. The Wicomico County, I believe, I'm not 100 percent sure, I'd have to look, but BCVAP was lower than BVAP by several -- by -- I don't want to say specifics, but that was the case, I think. I'm pretty sure that was the case.

Q. So in Wicomico County was there a larger black noncitizen population than -- Was there a -- Why was it the case that black citizenship voting age population percentage was lower than black voting age population percentage in Wicomico County?

MR. GENBERG: Objection to form.

A. Because not all voting age population black people are citizens.

Q. Beyond African-Americans, or black people, what were the -- Scratch that.

Do you know the rough racial and

Page 154

ethnic breakdown of Wicomico County?
A. Predominantly black and white, I would say. I don't recall the specifics, but it's predominantly black and white.
Q. So there, was the citizenship rate of blacks lower than the citizenship rate of whites?
A. I'm not sure. I don't know if I looked into that specifically.
Q. Do you think that's likely to be the case if the black CVAP percentage was lower than the black VAP percentage?
A. No. Because the white CVAP I think was also lower than white VAP. But I'm not 100 percent sure. Again, you don't -- We're talking off distant memory. As much as I wish to have encyclopedic memory, I don't.
Q. Understood.
Are you aware of any cases, besides this one, involving an attempt to use BCVAP to satisfy the numerosity requirement of Gingles 1?

Page 155

A. I mean, I can only talk about the cases that I've been involved in. I'm sure there are many cases out there that use different measures, and CVAP is a commonly used data point.
Q. Can you clarify again, what, of the five cases that we talked about, involve using BCVAP to satisfy the numerosity requirement of Gingles 1?
A. Just so we're on the same page, which of those five cases?
Q. I'm asking you which of the five cases, Galveston, Washington, Kansas, Wicomico, or Federalsburg involved the use of BCVAP to satisfy the numerosity requirement of Gingles 1.
A. Thank you for the clarification. I believe Wicomico was one of them. I don't recall on the top of my head if Federalsburg, CVAP was used. But I'm pretty sure Wicomico CVAP -- BCVAP was used, but I'm not 100 percent sure.
Q. There hasn't been a court

Page 156

decision in Wicomico on Gingles 1; is that correct?
MR. GENBERG: Objection to form.
A. As far as I know. And as I mentioned to you, I think they decided to settle the case. But maybe my information is outdated, I don't know.
Q. Did you listen to Dr. Trende's testimony during his deposition about his general opinion about the use of CVAP in redistricting?
A. I mean, I remember stuff. But if you could point me to specifics, I'm happy to talk about it.
Q. Sure. And we'll get to that. What do you -- Based on reading Dr. Trende's report, and anything that you remember from his deposition, what do you understand his opinion to be of CVAP -- the use of CVAP in redistricting generally?
A. I think at one point he did say CVAP is reliable, the ACS and CVAP is reliable. And I think he said he used it

Page 157

in other cases, although he tried to claim that it was only remedial phase.
But we know in Dodge City, Kansas, because I was there, he used citizen voting age population to calculate for all racial groups, I believe. Or at least he did not dispute CVAP data in any way or try to make claims about margin of errors or confidence intervals or other similar topics.
Q. Okay. On pages eleven through twelve of your report, you go through some of the examples in which Dr. Trende has utilized CVAP data in the past; is that correct?
A. That I'm aware of, yes.
Q. So near the end, and I think it's at page twelve, you conclude, quote, Dr. Trende now seems to question the reliability of ACS estimates.
What evidence -- Scratch that.
Why do you think that Dr. Trende now seems to question the reliability of

ACS estimates?

A. Well, you would have to ask him why suddenly he wants to do that in this case. All I can tell you, that he tries to question it by juxtaposing, as I mentioned, block-group CVAP estimates with Decennial Census VAP or total population block-group counts, Where he's trying to say, oh, look you get some bizarre outcomes at that load geography level, geographic unit level.

So, yeah, he is trying to undermine it. But I guess in his deposition later on he said that he's not saying CVAP is unreliable or ACS is unreliable. So I guess he did clarify that he's not taking that position.

Q. So is it correct that your only support for your conclusion that Dr. Trende now seems to question the reliability of ACS estimates is this point about how he focuses on the overestimates of CVAP relative to VAP from the census?

A. That's one example I provided.

That's the one that was most obvious in my mind, in which he's trying to make claims about how you have potentially bizarre outcomes and this and that.

MR. GENBERG: You can look at Dr. Trende's report to refresh your recollection if there's anything else, if you want to.

A. Yeah. Actually, if you don't mind, because there's a section, maybe he made more points that I'm forgetting right now. Is that okay?

(Defendant's Exhibit 4 was marked for identification.)

Q. Sure. Would you like me to share it on the screen?

MR. SEISS: Well, how about we introduce his report as an exhibit, that would be Exhibit 4. And I will share it on the screen. And you guys should also have that to pull up.

A. Thank you.

Q. Dr. Oskooii, can you see what's on the screen currently?

A. Yes.

Q. Does this appear to be the expert report of Dr. Trende that you reviewed in this case? And I'm happy to scroll through it.

A. Just show me the date, if you can, that way we know we're on the same page, please.

Q. Sure.

Do you see on the screen that it says: Executed on 29 March 2024?

A. Oh, in that -- within that sentence? Yes. I see that. Delaware, Ohio.

I mean, so another way he tries to cast doubt, that I thought was disingenuous, he overexaggerates things. On page eight, point 3.1.3, CVAP data typically has substantial error margins. I mean, that's not true. Depends on the level of geography, depends on the

population size, whether margins of error are wider, narrower. Depends on the, you know, distribution of the data.

So you can't just, like, make these, I don't know, overarching claims like that, and then within the same report not state that as the population -- At least I didn't see it, and you can point me to the right spot, but that as the population increases, like we go from block-group level to tract level, and then we go, particularly at the county level, especially if the county is populous, that these error margins are smaller and smaller. So that's one example where in my opinion he's trying to undermine the credibility of CVAP.

Q. Dr. Oskooii, can you look at the screen as what I'm showing as page eleven?

A. Page eleven. Yeah.

Q. I'm going to read you the third sentence in the first full paragraph: However, because error margins are, in

Page 162

part, a function of the number of units that you sample, the accuracy of a poll will decline quickly as you examine smaller and smaller census groups.

Did I read that correctly?

A. Yes.

MR. GENBERG: Sorry, Ben, just so the Record is clear, you asked the question about -- at some point, all of Dr. Oskooii's -- all the bases for his opinion that Dr. Trende was trying to undercut the reliability of CVAP data. And Dr. Oskooii was continuing to flip through the report. So I don't think he had given, you know, an exhaustive answer for all the bases before we moved on to the next question.

So if you wanted an exhaustive answer, I don't think we gave Dr. Oskooii sufficient time to get there.

MR. SEISS: Sure. That's fair. And I'm happy to continue to go through those opinions. I think it makes sense to kind of break down each of those at once.

Page 163

Q. Dr. Oskooii, if you'd prefer to get all those opinions out in the Record first, I'm happy to do that.

A. Yeah. I mean, well, I was going, actually, to that page when he was talking about Colorado, which he's trying to insinuate -- I think he's trying to -- again, at the end of the day it's up for the Court to decide and how the Court wishes to interpret his opinions.

But in my opinion, is that one of the other examples he tries to use is that it's -- He does this hedging thing, where he would say something, and then make a general statement, such as, like you pointed out, because error margins are important function of number of units they sampled, the accuracy -- a poll, he doesn't talk about ACS, will decline quickly, as you examine smaller and smaller census groups.

Just before that, though, in the opening paragraph, he says: But the

Page 164

statewide ACS sample for Colorado is quite large. The entire state. How large? It's plus/minus 0.4.

So it's just like basically casting doubt, what I -- Again, I'm sure the Judge in this case, the Court in this case, will evaluate these. My opinion is that it is trying to call into question the credibility of ACS data.

And those are other examples -- There are other examples that I'm happy to look at.

Oh, and then the fact that he focuses on -- And I mention this, actually, in my report, he focuses on margin of errors placing heavy emphasize. We already talked about I can give you 100 percent margin of error, 100 percent probability that the true value would be within the interval and how that can be completely useless because you'd have to say 0 percent or 100 percent is your interval.

He does it by block-group level.

Page 165

My issue is that Mr. Fairfax is not coming in and telling you block-group level estimates of the CVAP. He's calculating the CVAP at a much higher unit.

So all this, what he's doing, in my opinion, is distraction, is another way of, like, trying to dig at ACS, trying to undermine its credibility. And I'm surprised by that, because he regularly uses CVAP data, and I've never seen him do something like this. So that's another example, just by what he's focusing on to show and not to show.

And if you'll allow me, I can look at more.

And then other examples, again, emphasizing on block groups, which Mr. Fairfax is not trying to estimate a block group CVAP, BCVAP, how he's trying to say, well, the confidence interval on page thirteen, he says: Using 90 percent confidence intervals, 15 of the 119 block groups have confidence intervals that

Page 166

include 0.

Again, trying to almost make the case that some of these findings or nonsensical or something. That's the way I am perceiving him, the tactic that he's taking.

Again, it's up for the Court to decide how the Court interprets these things.

Then, there are others. I mean, one second here.

Okay. Another way, page fourteen, second paragraph, he says: It is difficult to provide precise estimates for the illustrative district as a whole, since, as described below, census block groups are split. First of all, that's categorically false. Your estimate is your point estimate; you can come up with that point estimate.

Then he writes: This leads to further uncertainty about the point estimate I described below. I don't even

Page 167

understand that. You can get the point estimate.

So, again, using this kind of language of trying to say, oh, well, we can't even know what's going on, ACS, we can't even figure things out. That's the perception that I'm getting, based on this report, or these kind of statements.

And then, yeah, like Section 3.1.5: ACS and CVAP Data Produces Bizarre Outcomes, is the title. Again, if you wanted to cast doubt on ACS, those are the kind of statements you say where he would say something like, on page fifteen, towards the end: In other words, in roughly 10 percent of the building blocks of Mr. Fairfax's district, we know that the data upon which he relies on is not just wrong. Somehow, Dr. Trende knows the underlying truth, but it's spectacularly wrong.

I mean, if I say that stuff about a dataset, I mean, that suggests that you

Page 168

don't think that data is quite reliable. Although, to his credit, he did clarify that ACS is reliable in his deposition. So I guess I will ignore these big-time statements, and rely on his related statement that he thinks ACS is reliable. So these are just examples -- some examples.

Q. Okay. Thank you.

I'd like to read some of Dr. Trende's testimony from the rough transcript that we got from his deposition. And I would just like you to assume that this is what he said. This isn't a final transcript.

A. Yes. Can I ask counsel a question?

Q. Sure.

THE WITNESS: I can assume statements based on rough transcript?

MR. GENBERG: You can -- You don't have to assume -- Just for the purposes of answering the question, assume

Page 169

what counsel is saying is true, but just for just a hypothetical.

THE WITNESS: All right. Okay.

Q. Quote, But whether it's, referring to CVAP, is useful or not, isn't something I'm really opining on. I think that's a legal question for a judge to decide what happens when that VAP threshold is crossed. But the CVAP -- I think that should say is not. What I will say is that CVAP is always going to have these error margins.

Assuming Dr. Trende said this, does this statement question the reliability of the CVAP point estimates themselves?

A. What is -- I don't think in this particular section he's talking about point estimates.

And, again, as I mentioned, I believe that, and I could be wrong, you have the transcript. At some point, he does specifically say that he thinks CVAP

Page 170

is reliable. So he corrects himself.

Or if he didn't mean to insinuate what he was writing in his report, that CVAP is not reliable, based on those statements that he made, I guess he's correcting that or he's clarifying the Record that he thinks CVAP is reliable, and that it's up for the Court to decide whether to be used in this case.

And I agree, ultimately it is up to the Court to decide. We can -- As experts, we can just provide our opinions about the data and ultimately it is up for the Court to decide.

Q. Okay. Let's talk about the specific examples that you note of Dr. Trende using CVAP, that you cite in your report.

I am going to go back to pages eleven and twelve in your report.

So starting with Virginia, your report quotes a memo from December 27, 2021, from Bernard Grofman and Sean Trende

Page 171

to the Virginia Supreme Court; is that correct?

A. Yes. That's what I cite, yes.

Q. Do you know what the context is of this quote?

MR. GENBERG: Objection to form.

A. I believe the context here, from what I recall, was that essentially pointing out the same scenario that we're in today in this case, that when you have a sizable Latino and Asian-American population in the presence -- noncitizen -- as he says -- let me just read his stuff: We would simply note that (a) we have examined by VAP and CVAP data, and (b) the presence of noncitizen Latinos and Asian-Americans in a district can raise the black CVAP share above the black VAP share, making it a useful metric for assessing a district's actual electorate.

And that's essentially, I think, what Mr. Fairfax is saying. And I agree, if you want to know potential electorate

Page 172

power, electorate citizens over the age of eighteen, CVAP would be good metric to use, and I believe that he's saying that here.

But I also recall that in his deposition, I think someone -- again, Mr. Genberg asked him about this, and I didn't get a clear answer there. He just tried to say that, oh, well, he wrote this with other people. And I guess when you sign something, you don't stand by it, you can say you wrote it with other people, these are not exactly your statements. But that's for the Court, again, to decide. Because I assume he signed it or put his name on it, so I don't know why he would say that maybe these are not his opinions.

Q. Was Dr. Trende trying to draw an illustrative plan to satisfy Gingles 1 in the Virginia matter?

A. I believe they were redrawing -- He was part of, with Dr. Grofman, they were drawing -- redrawing the districts. So Voting Rights Act protections have to be

Page 173

considered, so I'm sure they considered that in their drawing. They can't ignore it, otherwise the plan would run afoul.

Q. You've drawn remedial districts before; correct?

A. That's right.

Q. Do you understand the numerosity requirement from Gingles 1 to apply to remedial districts?

A. Yeah. To a certain degree, it does. Because at the remedial phase, you're trying to -- Because at the illustrative phase, you're just illustrating to the Court that it's possible. Right? You're not saying this is the map or the district that the state or court should adopt. You're just saying: Hey, it is possible. There are other possibilities, but these are just some examples.

And at the remedial phase, if you persevere and you win the case, you have to draw those districts that perform and some

Page 174

of that performance is contingent obviously on the composition of the district.

So that's something that the Court will look at. And I think more often than not the Court would want those districts to be above 50 percent, even at the remedial stage. There could be cases in which the Court may not accept that, but that's up for the Court to decide.

Q. Can a district that is below the 50 percent threshold perform for the minority group?

A. It can potentially, yeah. You have to look at -- run performance analysis and see if it does perform or not.

But in a highly racially polarized environment, and I think that's why you have this Gingles standard, you know, it's understood that the minority group in question has to be above 50 percent to overcome substantial block voting.

And so all intents and purposes,

Page 175

I would imagine the vast majority of remedial maps in these cases are above 50 percent the majority/minority districts.

Q. Okay. Scrolling down to paragraph 29, you reference the Arizona matter; correct?

A. Yes.

Q. Did the Arizona matter involve majority black districts?

A. I don't know whether it was majority black districts or not. To me, it doesn't really matter, because they're trying to identify citizens over the age of eighteen in the United States. And the code is: To assess compliance with the Voting Rights Act, an analyst must identify the count of citizens who are at least eighteen years of age and are citizens of the United States.

It doesn't say: Only if they're Hispanic or only if they're black or only if they're Asian or white.

Q. Okay. Sorry, I missed a question

Page 176

on the Virginia matter. Were you involved in the Virginia matter?

A. No, I was not.

Q. Have you seen that memo before, before being engaged as an expert in this litigation?

A. Yes.

Q. How did you find that memo?

A. I believe I first came across of it maybe in the Dodge City case, but maybe in the Washington case.

I'll admit, I mean, prior to the Dodge City case, I've never heard of Dr. Trende -- well, at that point he was Mr. Trende, a Ph.D. student. And then he successfully, I think, recently defended his dissertation. So I did not know who he was, and I think I Googled his name trying to figure who is it that is an expert on the other side and came across some of those expert reports.

I saw that he was a special master in Virginia, I thought that was

Page 177

interesting given that I had never heard of him. And that's, I think, how I -- through that kind of process, I became familiar with Dr. Trende and his work, and so on and so forth.

Q. Is the same true, in terms of -- I'm sorry. Scratch that.

Were you involved in the Arizona matter?

A. No.

Q. Did you also find that memo in the same way that you found the Virginia memo?

A. No. The Arizona one, I researched more myself, after being very surprised to see this report that he submitted, where he's making all these claims about margin of error and uncertainty about the data, or, you know, supposed unreliability, which he then corrected.

Because I thought it was very peculiar. I'd never seen that before,

Page 178

because, you know, he has written expert reports before where I have been an expert, and he has never raised those issues. So I wanted to see if there were other times in which, and based on publicly available data, where he has actually made a huge deal out of margins of errors, and so on and so forth, and I couldn't find anything.

And so I came across this Arizona one, that -- and I thought it was interesting that he said that you have to -- you must identify counts of citizens who are at least eighteen years of age and are citizens of the United States. Where in his report -- Yeah.

Q. Okay. Thank you.

(Defendant's Exhibit 5 was marked for identification.)

Q. Okay. I am going to introduce what is going to be marked as Exhibit 5. Can you see this on your screen, Dr. Oskooii?

Page 179

A. Yes.

Q. Are you familiar with this document?

A. I think this is a very big document, that I recall, and there's a section written by Dr. Trende and Dr. Ansolabehere, I think, from Harvard. That is in this document where I found the claim that he made about must identify counts of citizens over the age of eighteen.

Q. Okay. Thank you. I'm going to try and --

A. It's a huge document.

Q. Yes. Got lucky. Okay. Do you see what's on your screen now?

A. Yes. The memo. Yes. I think that is the right one. It's with Dr. Ansolabehere. I apologize if I'm butchering his name, and then David Sutton, who I am not familiar with.

Q. Do you know what role Dr. Trende had in drafting this memo, if any?

A. I don't recall if I saw the role

Page 180

specifically. But go ahead and refresh my memory.

Q. Well, in many of your academic papers, those are coauthored; correct?

A. Yeah.

Q. Can you describe what the typical relationship you have with your coauthors when drafting a piece of scholarship?

A. Collaborative relationship, we each examine each other's work, we read through them, we do verification checks. Certain times certain people take lead in certain areas, but that doesn't mean you just leave them be and let them write it on their own without checking it.

That's a typical relationship, although I can't speak for all the coauthors. I'm sure there are dysfunctional ones out there.

Q. Do you always agree with your coauthors on everything that you say in a cowritten article?

A. Are you talking about

Page 181

peer-reviewed publications or memos to redistricting commissions?

Q. Anything that you've cowritten.

A. All I can tell you is, you show me something substantive in my article, I'm going to stand by it. And if I made a mistake, I'll say I made a mistake, this is an error, and I'm not going to pin it on my coauthors, if that's what you're referring to.

It's okay to make mistakes. I mean, it happens all the time. I'm just not going to say: Oh, well, Dr. Lajevardi wrote that part, so I don't know what this is all about.

Q. Okay. I'm going to page two of the section of Exhibit 5 that contains the memo that Dr. Trende cowrote.

Do you see that on your screen?

A. Yes.

Q. So the first sentence of the last paragraph on page two says: To assess compliance with the Voting Rights Act, an

analyst must identify the count of citizens who are at least eighteen years of age and are citizens of the United States.

Is that the sentence that you rely on in your report?

A. Yeah. That seems to be the one, yes.

Q. Do you see the citation to Romero v. City of Pomona at the end of that sentence?

A. There are two citations, looks like there, after that claim. I see them.

Q. And one of those citations is to Romero?

A. Sure. Yes.

Q. Are you familiar with Romero versus City of Pomona?

A. No.

Q. Do you know what federal judicial circuit Arizona is in?

A. I should know this answer, because I do cover judicial circuits in American politics. I don't want to make a

mistake. Go ahead and let me know.

Q. I'll represent to you that Arizona is the in the 9th Circuit.

A. I was actually going to guess 9th.

Q. So you don't have any reason to doubt that?

A. No. I think that's reasonable. I think -- I think -- I would have guessed 9th, I think. That's what I had in my mind, but I wasn't 100 percent sure.

Q. So I know you're not a lawyer, but would Romero be precedent in Arizona?

A. I'm not a lawyer. All I can say -- All I can say is that they, including Dr. Trende, are making a claim. And what it appears to me is that they're citing support for their claim. And that's all I can tell you.

Q. When you draw plans, do you have to follow the legal requirements for redistricting in those jurisdictions?

MR. GENBERG: Objection to form.

A. I mean, as long as there are certain state-specific requirements, like a state constitutional requirements, and then there are traditional redistricting principles on top of that, if some of them are not listed, that you may consider, depending on the jurisdiction.

Q. So let's use a fanciful hypothetical. Say, you're drawing a district in the city of Dodge City, and the Kansas Supreme Court has a decision that says you must have one district in your city council districts that is shaped like the letter S.

A. Like Sean?

Q. Yes.

A. Okay.

Q. Do you have to follow that decision when drawing a map in Kansas?

MR. GENBERG: Objection to form.

A. Well, has the Supreme Court decided that case? Has it been appealed? What stage are we at? I mean, these are a

legal matter. I let you guys --

MR. GENBERG: I think we're deviating off of Dr. Oskooii's role as an expert witness in this case.

Q. Okay. That's fine.

Dr. Oskooii, can you read the sentence out loud, on this page -- Well, excuse me. Can you read, starting with: Unlike the Decennial Census, and can you read the next three sentences out loud?

A. Absolutely. Quote, from Dr. Trende and coauthors: Unlike the Decennial Census, the ACS is conducted annually and is not a complete count of residents. Rather, it reflects a random sample of the population. Using the ACS data, the Census Bureau classifies adult citizens as people who are at least eighteen years of age and citizens of the United States. The ACS tabulations are available both annually and in five-year averages.

Q. Thank you.

So those, I guess, four sentences

that you just read, are those sentences consistent with Dr. Trende's opinion about CVAP in this case?

A. Like, he expressed a lot of opinions about CVAP. I would say that I don't think he disputes that ACS is a sample; that -- I think actually in his report he incorrectly said that ACS is still available at the three-year estimate, but I don't recall 100 percent. So that one, I would have to dispute, maybe it was a typo.

But, yeah, I mean, I don't disagree what he's writing here, if that's what you're asking. These are factual.

Q. Okay. Thank you.

Was Dr. Trende drawing an illustrative plan to satisfy Gingles 1 in this Arizona matter?

MR. GENBERG: Objection to form.

A. I'm not sure of the specifics of this case. You would have to ask him.

Q. Okay. Thank you.

MR. SEISS: We've been going for a little over an hour, is now a good time to take a break?

THE WITNESS: Sure.

(Recess taken.)

Q. Dr. Oskooii, did you discuss the substance of your testimony during the break?

A. No.

Q. I'd next like to talk about the Washington case, Palmer, which you were an expert in; correct?

A. Correct.

(Defendant's Exhibit 6 was marked for identification.)

Q. I am going to share what will be marked as Exhibit 6.

Can you see what's on the screen?

A. Yes, I can see what's on the screen.

Q. Does this appear to be Dr. Trende's case in the Washington case?

A. Appears to be one of them.

Q. Can you explain what you mean?

A. I believe we had at least two reports, if not more.

Q. Can you see the date at the top of the page?

A. It says 12/22/23.

Q. Okay. I'm going to scroll to page fifteen of the report. Do you see we're now on fifteen?

A. Yes.

Q. I'm going to read out loud the first three sentences of the 3.2 heading HCVAP: I was asked to identify the Hispanic citizen voting age population in the district with the highest Hispanic citizen voting age population in plaintiffs' proposed remedial districts, and to compare it to the HCVAP in the Enacted Plan District 15. Estimating this is a tricky task. Because the census only reports citizen voting age population at the block-group level, parentheses, see

Supra note 1, close parentheses, and because the districts divide block groups, the population estimates must be estimated for the blocks.

Did I read that correctly?

A. Can you scroll down so I can see the whole page, please?

Q. Yes.

A. One second, please. Okay. Thank you.

Q. Okay.

A. Yes. I read what you -- I mean, I read also, and I confirm what you read.

Q. Okay. I'm now going to scroll to page fifty. Do you see that we're on page fifty now?

And I am going to read the first sentence under the 4.2 heading HCVAP: I was asked to identify the Hispanic citizen voting age population in the district with the highest Hispanic citizen voting age population among the Yakima Valley districts and to compare it to the HCVAP in

the Enacted Plan District 15.
Did I read that correctly?
A. Yes. You read that correctly.
Q. I'd now like to turn back to your report in paragraph fifteen --
A. I apologize. Can you go back to that report again? I just want to make sure it's the same report, since you're going to ask me questions about it, Dr. Trende's Washington report.
Q. Yes. Sorry. When I zoom --
A. It's hard, because I don't have it all in front of me so I rely on you scrolling.
Q. Sure. Where would you like me to scroll to?
A. If you could, slowly go up in this. I just want to make sure it's the same report in which -- Hold on one second. Keep going up, please. Very slowly.
Is this a report where he has the dot plots on it?
Q. The dot plots?

A. Yes. The dot plots that he created in this case.
Q. Yes. I believe we scrolled through those.
A. Thank you. So in this report, this is a report where Dr. Trende is calculating citizen voting age population for whites and Hispanics, counts of them, at the block-group level. And he's counting ten or rounded up for HCVAP and white CVAP, and he's using point estimates here where there's uncertainty at the block-group level here.
That's the only thing -- If you're going to ask me about this report, I just wanted to make sure that this is the one that he's actually calculating HCVAP with block-group level pointing to point estimates to draw inferences about areas of overpopulation or underpopulation.
Q. Okay. I'd like to turn back to your report.
A. Sure.

Q. At paragraph thirty. In the last sentence of paragraph thirty, you state: Interestingly, he provided precise CVAP calculations down to the tenth percentage point, aiming to demonstrate that one of the Washington State legislative remedial plans had less than 50 percent Hispanic CVAP.
Did I read that correctly?
A. Yeah. And that is why I pointed out the block-group CVAP estimates to -- just before this, yes.
Q. What part of Dr. Trende's report supports your assertion that he was trying to demonstrate that a district was below 50 percent versus just showing that the district was relatively lower, in terms of CVAP, than another district?
A. I would have to look at the whole report to show you the exact location. But I remember he even mentioned during the hearing, or maybe one of the rebuttal reports, maybe not the initial report. The

point I'm trying to make is very simple. Okay? When it suits him to show that a district's CVAP population is just below 50 percent, he relies on point estimates. But if it doesn't suit him, I guess margin of error suddenly play a role.
That's all I'm trying to say. You can't have it both ways. Right? You can't have it say, oh, point estimate, point estimate, and then suddenly in a case like this one, you're bringing that into the equation. That's all I'm trying to say. It's the flip-flopping that's happening.
Q. So did either of the language that we read on pages twelve and fifty of the Washington report support your assertion that Dr. Trende was aiming to demonstrate that one of the Washington legislative remedial plans had less than 50 percent CVAP?
MR. GENBERG: Objection to form.
A. I'm saying within his reports, he

Page 194

relied on the point estimate to point out that the HCVAP in one of the districts was below 50 percent.

And so if he's going to -- I'm just asking a simple question. How come in that case, point estimate is good enough and very precise for you to make probabilistic statements that it is below 50 percent or it is above 50 percent, but in this case, he's not, he's claiming something else?

I'm just trying to show that there is this double standard. That's all. And I'm happy to look at all those -- If you give me an entirety of his report, I can point you to specific locations.

Q. In this paragraph, you assert that Dr. Trende, quote, without expressing any concerns about estimation uncertainty calculated CVAP; is that correct?

A. You have to read the rest of the sentence. In the context of, we're talking about block groups, block-groups CVAP

Page 195

estimates exceeding block-group VAP estimates, in that context.

Q. I'd like to go back to page fifteen of the Washington report.

Do you recall me reading out the sentence in this report saying that estimating this is a tricky task?

A. He's talking about the method of estimation here. He's not talking about the reliability of the estimates.

So in Alabama, in this case, he's not only talking about estimation difficulty, in terms of methods, which he has four different methods, and I'm happy to talk about why all of them make major assumptions that you don't need to make. But in addition to that, he's also raising estimation uncertainty, in terms of the actual values that we're looking at, and uncertainty about the ACS in general, which, again, he cleaned up and said ACS is reliable.

So two different things. I'm

Page 196

just making sure that doesn't get confused here. Nowhere in these reports, he's talking about margin of errors. And if he is, correct me if I'm wrong, I'm happy to say I was wrong.

Q. In your report in the Washington case, did you acknowledge the error margins for the ACS data that he used?

A. Actually, it's interesting in that report, is that I was specifically asked not to compute population estimates, citizen voting age population estimates, another expert was asked to do that, because I was asked to take a race blind approach, to not know where exactly the Hispanic population is. And that's the reason for -- And also, to answer your question, I have not, in any of those expert reports, presented CVAP margin of error.

Q. Why not?

A. Because the point estimate is our best approximation of the underlying truth.

Page 197

And if we want to know what is the best approximation, you rely on the point estimate.

Q. If we're trying to cross a specific threshold, isn't it important to know what the bounds are of the confidence interval?

A. Well, in what context?

Q. In the context of the Gingles 1 numerosity requirement.

MR. GENBERG: Objection to form.

A. Well, because it's not a hypothesis testing, I would say no. I'd say that for Gingles 1 assessment, you can rely on the point estimate of the best approximation, because that's where -- what you're getting from the data. The data is telling you it's 50.11 percent in the case of my calculation in District 7.

And as I mentioned to you, if I told you with 100 percent probability the true value would be within the interval, I would have to make the ridiculous statement

that it's from 0 to 100, and we know that's definitely not true.

So that's why we rely on point estimates in these particular use-case scenario.

Q. Isn't it important to know whether the target that we're trying to hit is within the confidence interval?

MR. GENBERG: Objection to form.

A. Depends what the objective is. Is it a hypothesis testing situation? That could be of relevance, certainly. But if you're asking me to identify what is our best estimate, best approximation of the citizen voting age population, because we don't have enumerated data on that, then you go with the point estimate.

Q. And the best estimate doesn't tell us anything about the true value that we're seeking; correct?

MR. GENBERG: Objection to form.

A. The best estimate is the best approximation of the underlying, unknown

true value. It could be wrong, obviously, but that's the best we have. In this context, in this setting, you want to use the best available data, the best methods, and the best estimate. If you have nothing else, I mean, if I knew -- If we all knew the underlying population parameter, we wouldn't be even doing this.

Q. So in that paragraph in your report that we've been talking about, paragraph thirty, which I've just flipped back to, you reference Dr. Trende calculating precise CVAP calculations down to the tenth percentage point; is that right?

A. Uh-huh. That's right.

Q. Why does that matter?

A. That is, he's getting so precise with the point estimate, and he's not mentioning his concerns about margin of errors in that case. And suddenly, now he's concerned about that, and he's raising a big deal with it.

It goes, again, at the double standard, the flip-flopping. Counsel, if you cared -- If you thought that was something that's really important, wouldn't Dr. Trende do that with every other case, present these margin of errors and say: Well, there's this margin of error, 95 percent, this is the range, and we don't know exactly where the true value is, and -- But he has not done that. So it strikes me as disingenuous and odd that he's suddenly doing that.

Q. Do you know if Dr. Trende was asked to provide margin of errors in any of the cases that you're referring to?

A. I don't know what he was asked to. I hope that, as an expert in the field, he uses independent judgment, as I have done, to provide the best possible methods and answers to the questions.

Q. So back to the tenth percentage point line. Does reporting additional significant digits eliminate the margin of

error?

A. Of course not. That's not my point.

Q. If he calculated CVAP to the ten thousandth percentage point, would that appreciably affect the margin of error?

A. Again, of course not. It's -- Maybe I'm not making my point very clear. I'm talking about the double standard of using the point estimate and providing a very precise estimate of the underlying truth in one case and in another case saying, well, you can't just look at point estimate, you have to look at all these range of outcomes or interval. That's all I'm saying.

Q. Okay. Did Palmer, the Washington case, involve majority black districts?

A. No, it did not.

Q. Was Dr. Trende drawing an illustrative plan to satisfy Gingles 1 in the Washington case?

A. Not that I'm aware of. I'm not

Page 202

sure if he was part of the illustrative stage or whether he came in later.

Q. Okay. Next I'd like to talk about the Kansas case. You may have answered this earlier, and I've forgotten. But did the Kansas case involve majority black districts?

A. No, it did not involve majority black districts.

Q. Was Dr. Trende trying to draw an illustrative plan to satisfy Gingles 1 as to majority black districts in that case?

A. No. He was taking a similar approach of evaluating someone else's work. So the way he is evaluating Mr. Fairfax's illustrative map, he was asked to evaluate the illustrative plans that I created.

Q. How did Dr. Trende use CVAP hat data in the Kansas case?

A. He used point estimates and presented data using only point estimates. I think he did -- I don't recall, but I think he did his dot plot scenario, where

Page 203

he placed the racial and ethnic minority group on top of the white dots in attempting to make a claim about some sort of line-choosing technique.

And for that, what's interesting is that each district -- So I think Dodge City, about, has twenty-eight thousand people in it, that's far lower than sixty-five thousand for one-year estimate. And then if you have five districts, I believe the ideal population size was somewhere around 5,555 or so.

In that case, which is much smaller sample size, he used point estimate at the block-group level and plotted them and reported them, doesn't matter if it's Hispanic or black. In fact, he did it for other racial groups too. So he didn't just do it for Hispanic and white, he also did it for other groups, relying only on point estimate and running with it.

Q. Has there been a decision in that Dodge City case yet?

Page 204

A. Not that I'm aware of.

Q. Okay. That's it for the -- Dr. Trende's usage of CVAP. We're going to shift gears a little bit.

So the process of sampling a population produces an error; correct?

MR. GENBERG: Objection to form.

A. Well, I think more precisely, you can calculate a margin of error if it's a random sample of a population.

Q. Is it fair if I call what you just described sampling error?

A. Sure. I could accept that, yeah.

Q. So as we discussed earlier, Dr. Trende calculated the error margin for the 2022 five-year ACS data at the 90 percent and 95 percent confidence intervals. Is that error that he's calculating a sampling error?

MR. GENBERG: Objection to form.

A. Yes. I mean, he's calculating the margin of error of the sample.

Q. So he calculated a margin of

Page 205

error at 2.6 percent for the 90 percent confidence interval and 3.1 percent at the 95 percent confidence interval. Do you dispute these margins of error?

A. I believe I was very clear in my report, or if I wasn't, I'll make it clear here. That he's guessing the margin of error, because in his own report he says he doesn't know -- there's a section he says he doesn't know of a way to calculate the margin of error precisely because block groups, if you have a margin of error, is disaggregated to blocks. But nevertheless, he proceeds to somehow calculate it.

So I don't even buy those numbers, in the sense of whether they're accurate or not.

Q. Okay. So I want to pull up Dr. Trende's report. You'll have to give me one second.

Okay. So we are expanding pages fourteen and fifteen of his report. Do you see that on the screen?

Page 206

A. Yes. And I have a clean copy in front of me if you want to refer to it.
Q. Sure. So I'm going to read out loud, starting at the last paragraph on page fourteen.
A. Sorry. Just give me a moment to get there.
Q. And this is Exhibit 4, to be clear, for the Record.
A. Right. Okay. Go ahead. I'm here. I think I have the -- I'm in the proper spot.
Q. Okay. So he writes: It is difficult to provide precise estimates for the illustrative district as a whole since, as described below, census block groups are split. This leads to further uncertainty about the point estimates as described below. However, we can look at all of the census block groups included, in whole or in part, in illustrative District 7, before splitting them.
Did I read that correctly?

Page 207

A. Yes. And his logic is problematic here.
Q. Please explain.
A. Well, because he makes two major assumptions in his calculations. One, he assumes that the voting age population -- the black voting age population across blocks are -- blocks within a block group are evenly distributed. So for his -- And I can talk about his method more in detail.
And then in one of his calculations, he assumes that citizenship, by race and ethnicity, those rates are equal across different racial and ethnic groups in the block-group level.
Q. Okay. And I guess what I'm trying to get at here, and I'll give the game away a little bit, is that there are two kinds of error that Dr. Trende talks about in his report, there's the sampling error, which is what he's calculating to be 2.6 percent and 3.1 percent, and then there's a separate, unknowable error,

Page 208

associated with having to disaggregate block-group data to the blocks.
So what you were just talking about, is it fair to say that that only pertains to the disaggregation source of error?
MR. GENBERG: Objection to form.
A. Well, first of all, I wouldn't call it an error. I wouldn't -- But the point I was trying to make with his assumptions was about the portion of his claim of uncertainty about the point estimates, because block groups are split to blocks. And some blocks in a block group are in a district and some are out. That's the point that I was trying to raise.
Q. Is it correct that for what we're looking at on the screen right now, this 2.6 and 3.1 percent margin of error, that Dr. Trende is using all of the block groups without splitting them?
MR. GENBERG: Objection to form.

Page 209

A. Sorry. Where do you see on page fourteen, 2.6?
Q. Sure. Let me read that again. I'm reading the sentence starting with "however", which is five lines up from the bottom.
A. Okay.
Q. However, we can look at all of the census blocks included, in all or in part, in illustrative District 7, before splitting them.
Did I read that correctly?
A. Correct.
Q. So, again, the margin of error that Dr. Trende is calculating to be 2.6 percent and 3.1 percent --
A. Counsel, I'm asking on page fourteen, where do you see the 2.6 percent? Is it a different page?
Q. I'm sorry. If you look on to the next page, I have it spanned between pages fourteen and fifteen on the screen.
A. Oh, sorry. I'm looking at the

Page 210

clean copy, sorry about that. So you're saying it's now on page fifteen?
Q. Yes. I apologize.
A. No worries. No worries at all.
Okay. I see that now. It says with a 90 percent error margin of plus/minus 2.6 percent and with a 95 percent error margin of 3.1 percent. I see that now. Thank you.
Q. So do you agree that this 2.6 percent and 3.1 percent margin of error is only the error associated with the sampling error we discussed previously and not the disaggregation error, which I know you quibble with that phrase?
MR. GENBERG: Objection to form.
A. He's calculating the margin of error of the block groups that are fully in the districts. So he's not calculating the margin of error for the district as a whole.
Q. No. So, again, that sentence beginning with "however", does it not say

Page 211

that we can look at all of the census block groups included, in whole or in part?
A. Wait. Wait a second. Yeah.
So what he's saying that I'm going to look at block groups with big margins of errors that are barely in the district, and I'm going to calculate the margin of error, is that what the insinuation is? Creates a problem, don't you think?
Q. No, I do not think that.
A. Yeah. Because he's saying I'm just going to throw in all the blocks, whether they are fully entailed within the district or not, I'm going to throw them all in my calculation. What if the blocks that he's throwing in there are barely in District 7, and he's bringing the margin of error that are bigger -- happen to be bigger in those blocks and tacking them onto the margin of error calculations?
Q. Can disaggregating block-group level data to the block level ever decrease

Page 212

the margin of error?
A. We don't have the margin of error of CVAP data that is disaggregated to the block level. Because the margin of error is only available, the lowest level is block-group level.
And that's why I asserted that he's guessing the margin of error of the district as a whole, and the reason that's applicable in this particular case is because there are block groups that are split in which some blocks are in SD7 and some blocks of a block group are outside of it.
If you drew a district in which all the block groups in that district were wholly entailed in that district, then, yeah, you could calculate the margin of error, because you don't have the issue of the blocks being split into blocks.
Q. So you agree that when we go from a bigger geographic unit to a smaller geographic unit, the margin of error of

Page 213

CVAP would increase; correct?
A. Well, the population matters, and also the dispersion of the data matters.
Q. Assuming your sample size goes down from the census block-group level to the census block, isn't the margin of error increasing?
A. Yeah. I would say it is accurate to say that generally speaking, lower sample size produces bigger margin of error than larger sample size. That's not in dispute here.
I'm saying, he can't calculate the margin of error accurately. That's all I'm saying.
Q. If the margin of error is lower at the block-group level than it is in the block pieces that are within SD7 or without SD7 isn't the way in which Dr. Trende has calculated the margin of error to be the, quote, best case scenario for what the margin of error could possibly be for Fairfax's Senate District 7?

Page 214

MR. GENBERG: Objection to form.
A. I'm not following here, because, what, is he assuming that the part that's split those blocks have lower or higher sample size? I'm not following.
Q. Is it necessarily the case that when you have a block group and you split it, that the resulting parts are smaller than the block-group size?
A. No. Because you could have one block in a block group that has all the population.
Q. Assume that there is some population in each of the split pieces.
A. That's a lot of assumptions here. But if you have all the populations in all these different pieces, and if you lower the sample size, then I think it's fair to say that the margin of error will increase by lowering the sample size. That's fine.
Q. So Dr. Trende is saying that it doesn't matter whether we split -- we include the pieces of a block group that

Page 215

are within SD7 because the error margin would only be increasing in that scenario; is that fair?
MR. GENBERG: Objection to form.
A. I mean, you're trying to represent -- It's not very clear from the writing that that's what he's saying. But, sure, let's just, for the sake of argument, assume that that's what he's saying and he has this margin of error, and let's just assume that I accept that these are accurate margins of errors.
Q. Okay. Do you plan to testify to an alternative estimate for the error margin?
A. I didn't calculate the error margin, so I'm relying on point estimates.
Q. Do you know how Dr. Trende calculated the error margin?
A. Again, apparently, he's only relying on blocks that are wholly -- I guess, in part, in a company -- in district. So I'm assuming that's how he

Page 216

calculated it, but I'm not 100 percent sure.
Q. Do you recall Dr. Trende's deposition testimony about the math that he used to calculate the overall margin of error?
A. I don't recall the specifics. That's a very detailed question.
Q. I will represent to you that he testified in his deposition that you can take the square root of the summed squared variances for standard deviations of the block groups to get the overall margin of error.
Do you understand what I've just said?
A. I don't think he would have said that. That doesn't seem accurate. I mean, I think he does know how to calculate it, and I think the way you presented it, not to his defense, is not accurate.
I think he used the critical value and timesed it by the standard

Page 217

deviation divided by square root of the sample size. I think that's how he did it, and I can accept that.
Q. Okay. So you don't have any reason to dispute the error margin that Dr. Trende calculated?
A. That's what he says he has done, but I didn't look specifically at his code in that part to see if there are any mistakes in the calculations; that maybe he left some blocks out, or he included blocks that have zero population, that are barely inside -- block groups, zero population, barely inside SD7. I don't know. So . . .
Q. And we will talk about those things. But, again, what you're talking about is error associated with the disaggregation of block-group data to the block level and not a sampling error associated with ACS data at the block-group level?
A. No. That's not what I'm saying. I'm talking about his margin of error

Page 218

calculation.
Q. Can you tell me where Dr. Trende discusses splitting block groups in his --
A. No. He's not talking about splitting them. He said he included block groups that are in whole or in part in illustrative 7. What if he included block groups that have zero population that are, like, there's one block out of that block group in that District 7, and then he's using that to inflate -- and that could inflate the margin of error when there's even zero people there? That's all I'm saying.
But I'm not going to quibble about the margin of error difference between 2.6 and 3.1.
MR. SEISS: Fair enough. Is now a good time for another ten-minute break?
THE WITNESS: Sure.
(Recess taken.)
Q. Okay. Dr. Oskooii, did you talk about the substance of your testimony

Page 219

during the break?
A. Yeah. I mentioned one thing, that -- about the whole margin of error calculation. And I just want to make sure that, you know, I'm clear on this. Because initially, when you said margin of error, I thought you were talking about the total margin of error, regardless of race and ethnicity.
So the point I was trying to make is that, what if Dr. Trende included no population blocks that are within SD7 that don't have black people, and then that could inflate the black CVAP margin of error at the district level?
And as a result of that, on page seventeen, I think that's why he says that -- page fifteen, sorry, the top paragraph, he says: It also suggests that even though we cannot calculate precise error margins for the BCVAPs of the complete districts, and then he goes on to say we should be skeptical of the CVAP hovering within a

Page 220

couple points of 50 percent. So he, himself, says he can't calculate it precise.
So I think that was the point I was trying to make. I just wanted to make sure I was clear, because maybe I'm getting tired or something, I couldn't quite figure out exactly what you were asking me.
Q. You and me both.
Okay. Going back to your report on page thirteen. Do you see that on the screen?
A. Yes. I'm sorry. Yes. I see it.
Q. Okay. I'm going to read out loud a portion of paragraph 32: However, Mr. Fairfax's aim is not to determine BCVAP counts at the block-group level, where margins of error, MOE, are often observed due to the smaller sample size. Instead, Mr. Fairfax is computing CVAP proportions at a significantly larger geographic scale, namely, state senatorial districts.
Did I read that correctly?

Page 221

MR. GENBERG: I think you missed the word larger, did you say larger margins of error are often observed due to the smaller sample size?
MR. SEISS: I'm not sure. But if I missed it, that should be included in the quote.
A. Okay.
Q. With that caveat, did I read the paragraph --
A. Yes, you did.
Q. Okay.
A. Yes. You read that sentence, not the entire paragraph, but, yes.
Q. But if you split a block group between District A and District B, you have to know how many people there are to allocate to District A versus District B; correct?
A. Yeah. Well, you need to know -- You need to know how many people, correct.
Q. Do you agree that Mr. Fairfax's SD7 in plan 1 splits block groups?

Page 222

A. Yeah. That appears to be the case.
Q. Do you know how many block groups he splits?
A. I don't recall on the top of my head.
Q. If I represented that his SD7 split over thirty block groups, would you have any reason to disagree?
A. No.
Q. And if there are one hundred and nineteen block groups contained in whole or in part in Fairfax's SD7 in plan 1, that would mean that roughly one-quarter of the block groups are split?
MR. GENBERG: Objection to form.
A. Roughly speaking.
Q. On page seventeen of Dr. Trende's report. Sorry. Lot of reports, unfortunately.
A. Yeah. I hear you.
Q. Okay. Do you see page seventeen on the screen?

Page 223

A. Yes.
Q. I am looking at the third line in the last paragraph. Dr. Trende says: The researcher must also estimate the racial makeup of the portion of the block group that is contained within the district.
Did I read that portion correctly?
A. Yes.
Q. Do you agree that this process leads to further uncertainty about our point estimates?
A. Well, it's an estimate. You have to employ estimation technique, which the RDH does, and Dr. Trende has his own estimation techniques. Because we don't know -- I should say, because the census -- American Community Survey does not report CVAP at the block level.
Q. So we can't know what the error is for disaggregating block-group level data to the block level; right?
MR. GENBERG: Objection to form.

Page 224

A. We don't know the margin of error, as I've been saying this whole time.
Q. The margin of errors that Dr. Trende calculated, at 2.6 and 3.1 percent, does not encompass the error associated with disaggregating ACS data to the block level; correct?
MR. GENBERG: Objection to form.
A. I thought you said he included all the block groups, wholly and in part, in his estimation, and I read that. But then he said that he can't precisely do it, so I'm a little bit lost here.
Q. Okay. I'd like to go to page sixteen of the report, that I just pulled up, that is Trende's report.
A. Okay.
Q. Paragraph 3.1.6 reads: Estimating the Black CVAP for District 7 requires piling inference on top of inference.
Did I read that correctly?
A. Yes.

Page 225

Q. Do you agree with that heading?
A. No.
Q. Why not?
A. Because it exaggerates the difficulty attached when he says: Piling inference on top of inference, as if we can't have a good approximation of the citizen voting age population using valid techniques.
Q. Okay. So, again, your point estimate for the BCVAP in Fairfax's plan 1 using 2021, five-year ACS data was 50.11 percent; correct?
A. Yep.
Q. I believe you testified earlier that you did not calculate the margin of errors for your point estimate; is that correct?
A. That's right. Because the block group data was disaggregated to block levels. And I wanted to answer the question of what is our best approximation of the citizen voting age population in

District 7.
Q. Could you have calculated the margin of error?
A. No. Not precisely. Because, again, block groups are split between districts. And this is something that Dr. Trende himself admits.
Q. So I believe you testified that you relied on RDH's disaggregation process?
A. Yes. The data, yes.
Q. Can you explain how RDH disaggregates the block-group CVAP data to the block level?
A. Yeah. I have the read-me file, which, in their own words, discusses their technique as part of the appendix in my report. So that's there.
But basically, one of the main things that RDH does, which I think prevents us from making assumptions that we don't need to make, is that RDH uses the proportion of voting age population of each race and ethnicity at the block level and

uses the proportion of the citizen voting age population at the block-group level, or those counts by race and ethnicity, in their disaggregation.
Dr. Trende, on the other hand, uses either/or in his techniques. He doesn't use both in one technique. And there are major assumptions you make if you leave one of them out. If you don't look at the proportion of citizen voting age population at the census block-group level by race and ethnicity, you're assuming that citizenship rates are equally distributed across race and ethnicity, and we know that's not the case, and that's a strong assumption.
And if you ignore the voting age population proportion by race and ethnicity, you're assuming that -- in the block, census blocks, you're assuming that BVAP is equally distributed across blocks nested within the block group that split. And we don't need to make those assumptions

if we take both of the equations together. There's no need for that.
We can just figure out what the proportion of BVAP across blocks in the block group and what's the composition of BCVAP in a block group and use that information or disaggregation to estimate BCVAP.
Q. Okay. Thank you. You're aware Dr. Trende utilizes six different methods to estimate CVAP; is that correct?
A. I recall four. I recall four primary methods, but maybe he has some auxiliary methods that I don't --
Q. Sure. And when we talk about the methods, I think it will come to light that we're both sort of right. And so we'll see that in a minute.
(Defendant's Exhibit 7 was marked for identification.)
Q. So I'm going to share Dr. Trende's supplemental report. I don't

believe that's been marked as an exhibit, so let's mark that as Exhibit 7.
A. Counsel, is this supplemental report the same one I based my expert opinion on or is this a new report that I haven't seen?
Q. I believe you have not seen this one.
A. Okay. So you're asking me questions about something I haven't seen. Okay.
Q. Yes. I understand that. I am going to scroll to page four.
A. I have a clean copy. Page four. I have a clean copy, for the Record, in front of me, of this report. Page four.
Q. And I've asked you to flip to this page just to show you how Dr. Trende has labeled the six methods. And I'll represent to you that he used these same six methods in the initial report, and you can just assume that to be -- You can dispute that if you want, but I'd ask you

to assume that to be true for these questions.
A. Okay. You're saying he used the same six methods in the initial report?
Q. I believe that to be the case, yes.
A. Why are we not looking at the initial report, then?
Q. This table is a helpful depiction of the six methods in a easy-to-read way.
A. I don't know, Counsel. I didn't get the impression that he used six methods in the first report. So I'm happy to, if you can point it out -- Because I'm wondering, based on my criticism, if he made changes.
Q. Okay. Let's go back to Dr. Trende's report. And we are going to go to page nineteen. Do you see that page nineteen on the screen, or is it in front of you?
A. Yes. It's in front of me.
Q. Okay. I'm going to read a few

lines from the last full paragraph on page nineteen.
Regardless, there have been attempts to do this. One way that has been suggested is to look at the overall citizenship rate for a given block group, and then to apply that rate to the voting age population of the blocks.
And then later, going on to page twenty, Dr. Trende discusses that we have to choose between capping block groups at 100 percent citizenship rate or leaving it uncapped.
Do you recall this first method, which can be uncapped versus capped, in Dr. Trende's report?
A. Yes. And the first one, the uncapped one, this is where he does admit, which credit to him for admitting it, this, however, forces us to assume that citizenship is spread evenly across block groups, without any real justification for doing so.

And I would add an additional thing, that he should have said this assumes citizenship by race and ethnicity is spread evenly across the block group. So basically has no justification for doing it, then he comes up with this estimate. That's what I understand.
And then in the second part, he says that although there are instances in which the total CVAP in a block group exceeds total VAP in a block group, and he automatically assumes that it's some sort of error rather than, let's say, population shifts or movement with the recency of data.
So because he uses the first technique, which is not good, which he admits, then he kind of thinks -- he wants to cap it at 100 percent, which means that he's deleting data at this point, to calculate CVAP -- BCVAP.
Q. So for -- I'm sorry?
A. No. I was saying, that's my

understanding of these two methods and my response to them.
Q. Okay. Thank you.
So for the uncapped version of method one that we're talking about, do you know where this method comes from?
A. No. I just evaluated the logic of the method and provided my criticism.
Q. Do you know if Dr. Trende came up with this method himself?
A. I believe from the deposition he tried to insinuate either a coauthor came up with it or maybe a Court came up with it or something like that. I don't remember.
Q. I'll represent to you that he said in the deposition that it came from a District Court opinion in the 11th Judicial Circuit, the Circuit Court of Appeals in the 11th Circuit.
A. Just for a point of clarification, is that a case that he was involved in or one of -- or how did he, you know -- Did he do that in that case; is

Page 234

that what he's saying?

Q. I don't believe that he testified as to that. I don't think -- I don't believe that he was involved in that, but I'm not sure.

A. So his justification is, because someone else did it, he's doing it. Got it.

Q. So in the capped version of method one, what is Dr. Trende's justification for capping the citizenship rate at 100 percent?

A. Well, he's operating under the assumption that it's impossible for there to be more citizen voting age population than voting age population in a block group. And for that reason, he's capping it at 100 percent.

There could be perfectly reasonable reasons, for lack of a better term, that that could happen, given that we're talking about 2021 and 2022 ACS CVAP estimates and comparing the 2022 data, and

Page 235

there could have been shifts in populations, for example, that explains that.

And you don't even have to go there. You don't even have to go cap things and delete data if you use a different method than what he's using, or he's claimed someone else has used, where you're coming up with a citizenship rate and then multiplying that by the voting age population by race and ethnicity in blocks. It's not -- Not great.

Q. Okay. Thank you. So the next method Dr. Trende talks about is on page twenty. And I think that this discussion will kind of resolve our discussion about whether there are four or six methods.

And so he says on page twenty that: Another method has been employed to instead mimic the disaggregation/aggregation approach used for estimating political outcomes in split precincts. This can be done manually or it

Page 236

can be done using the split_precinct_analysis command in the eiExpand package in R.

Did I read that correctly?

A. Yes. So I understand this to be then, so we're clear, on the supplemental report page four, that seems to me the bottom two methods, and I'm not sure what happened to the middle part methods that you were saying. To me, that's methods -- What he's trying to get at is three and four.

So I don't know what happened to method 2, pop weight, method two, weight separate, because that's not in this initial report that you're just following along.

Q. Let's look further down. I'm looking at the last paragraph on page twenty, which is on the screen now, and I'll read that out loud.

If we apply this metric, assuming that both the BCVAP and total CVAP are

Page 237

apportioned similarly to the VAP within the district -- and I'm going to skip over the numbers. If we weight the BCVAP and CVAP separately, we get some different numbers.

A. Yes. I see that.

Q. So I'll represent to you that for each of the manual calculation and eiExpand method that there is a population weighted and weighted separately approach. So there are two different approaches for each of the method two and the eiExpand.

A. But you haven't told me what method two is. Method one was capped and not capped, so what's method two?

Q. Method two is what we read in this paragraph on page twenty beginning with "another method that has been employed to mimic the disaggregation approach used for estimating political outcomes in split precincts".

A. Well, that's the eiExpand approach, which he says eiExpand and eiExpand separate.

Page 238

Q. So he says that, the next sentence: This can be done manually or it can be done using the command.

So I'll represent to you that method two, when we're looking at this table on page four of the supplemental report, is the manual calculation.

A. So it's the same exact number, so why is that even there? It's the same thing, so he's just doing it, I guess, manually, whatever that means, and then he's using a function to do it. So why is that a separate method?

Q. Sir, I'd like you to look at --

A. Sorry. It's like basically saying: I wrote the sentence "I love statistics" with my hand and then I typed it and then submit it to them and I say I wrote -- these are two different methods of same thing.

Q. I'd like you to look at the footnote at the bottom of page twenty-one. It reads: The only reason to check both

Page 239

ways is that the eipackage discards block groups with less than 2 percent of the population contained within the district.

A. Well, that's wrong. If it did, he wouldn't get the same answers. It's 2 percent intersection of the polygons, not 2 percent population, necessarily, although you could presume to do that too.

That's why he's getting the same exact numbers. But regardless, let's just assume that handwriting method two is the same as typing method two.

My quibble with method two is that notice at no point he's using the share of the black voting age population in a block nested within a block group. He's assuming that black voting age population, by relying only on that, is evenly distributed across blocks within block groups.

But he is, at least here, he is looking at BCVAP specifically, rather than a citizenship rate, in which he didn't do

Page 240

that in method one.

If he had combined his two methods and used BVAP share at the block level, nested within a block, and then used BCVAP at the block-group level, that would have been a more accurate approach, because it prevents him from making the strong assumption that he doesn't need to make.

And then there are other quibbles that I have with his technique that's different at least from RDH that RDH takes a step further. But that's the main crux of the criticism.

Q. Okay. I'd like to look at page twenty. I'd like to read the line, it's about two-thirds of the way down, the first full paragraph -- I'm sorry, last full paragraph, on page twenty, starting with "examine".

A. Sorry. Could you, with your mouse, point to --

Q. I'll highlight.

A. Sorry. I saw it. Yeah.

Page 241

Q. Okay. Dr. Trende says: Examine the percentage of the relevant voting age population contained in the blocks within the district, and then apply that percentage to the CVAP of the block group.

And so I'm not understanding when you're saying that Dr. Trende does not consider VAP at the block level when he makes this statement that I just read.

A. Does he say black voting age population? Does he say by race and ethnicity? He just says relevant, whatever that is. I looked at his code, I didn't see him doing that.

What does relevant voting age population contained in the blocks within district? He's talking about ratio of voting age population of each block in the block group.

Q. Okay. Do you recall during Dr. Trende's deposition that he described the method two, population-weighted method, as being the method used by your colleague,

Page 242

Dr. Collingwood, in the Washington case?
A. Well, that would be wrong if he said that. Because the handwriting method is not what Dr. Collingwood used, Dr. Collingwood used the eiExpand package.
Q. So is Dr. Trende's eiExpand package the same as what Dr. Collingwood used in the Washington case?
A. I did not look at the code or evaluate the code from Dr. Collingwood for the Washington case. In fact, I stated way from any CVAP calculations because I was drawing the maps race blind, and I did not want to be exposed to the concentration of HCVAP in specific areas. Particularly, because when I submitted the five maps, I had to make some adjustments to those five maps, so I didn't want to look at anyone's code to even remotely understand where the concentrations of CVAP are.
So I don't know if this is true or not. But from what I know, given that Dr. Collingwood is one of my coauthors, who

Page 243

I stand behind, what I do know is that Dr. Collingwood would use race redistricting data hub if it's available. If it's unavailable, then one may use some of these techniques, although not the way Dr. Trende has done it.
Q. Okay. On pages four and five of your report, you state, and you might also say this in your CV, that you're a contributor to eiCompare.
A. Yeah.
Q. Is that related to eiExpand?
A. Yes. EiExpand is a package that helps with precinct split for performance analysis. It helps with gathering RPV estimates more efficiently and be able to plot them in an easy-to-understand manner. It's basic and has a series of functions that would help one make things, you know -- presentation of data, I would say primarily, more efficient.
Because when you do RPV analysis, especially if you do it for multiple racial

Page 244

groups and multiple elections, it can be overwhelming. There's a lot of estimates, and especially if you have to do it by district or whatnot, and depending on the case. So we came up with this eiExpand package to make things a little bit more efficient.
Q. So I guess I'm a little bit confused about that. So you're a contributor to eiCompare and eiExpand?
A. Yeah. EiExpand, I contributed primarily in designing the way the data should be structured for the relevant performance or RPV outputs, so that we could plot them in a much more efficient way, using the GG plot 2 package. So I was more of the engineer or designer of the proof of concept or concept. I contributed to that part. I don't know if I contributed to any other parts. I would say that was my primary contribution of the eiExpand package.
Q. Do you find the eiExpand

Page 245

methodology to be reliable?
A. EiExpand is not a methodology, it's a series of functions.
Q. Do you find eiExpand series of functions to be reliable?
A. Yeah. I mean, they do the jobs, they take the data, results, transform them, in a way that you can plot them. I mean, with any package, there could be, maybe, some issues that could arise when the other underlying packages get updated and so you have to constantly keep up with that and, you know, improve the package.
That's just the name of the game of coding, software development.
Q. So your report outlines three variances that could explain the difference between your CVAP point estimate at 50.11 percent and Dr. Trende's point estimates which are -- and I think these are the words you used, slightly below 50 percent; is that correct?
A. Yes.

Page 246

Q. I think we've talked extensively about the second variance, and so we're not going to cover that anymore.

As an initial matter, do these variances mean that Dr. Trende's point estimates are incorrect?

MR. GENBERG: Objection to form.

A. Incorrect in what sense?

Q. So you used the term variance to describe these three situations. Does that mean that Dr. Trende's point estimates are wrong?

A. I think they have shortcomings -- His methods have shortcomings that produce those numbers. And those numbers are different from two other people who computed CVAP, namely, myself, 5.11 percent -- Sorry, 50.11 percent. And independently, Mr. Fairfax calculated CVAP, black CVAP, and we both have it above 50 percent, and Dr. Trende is under it.

Q. Okay. I'd like to talk about the first variance that you identified in your

Page 247

report. And I'll pull that up on the screen. That is paragraph forty on page sixteen.

A. Okay.

Q. Can you see that?

A. Yes.

Q. Can you explain this first variance?

A. Well, these are factors that contribute to the differences, just to be clear, that I believe could contribute to the differences.

The first, basically, all I'm saying is that, you know, in his data, which is also the case in redistricting data hub, there are three categories for black alone and black in combination.

So you have B1, as he calls it, which is black or African-American American alone; there is B2 that he has, that is black or African-American and white, in combination; and then B3, which is American Indian, Alaska Native, and black or

Page 248

African-American.

What I'm saying here is that he leaves out the B3, RDH data does not leave out B3. And that's one difference between RDH data, which I aggregated up from block level to the district level, and what Dr. Trende has done.

Q. Do you know what definition of BCVAP Dr. Fairfax used when calculating BCVAP in his SD7 in plan 1?

A. I believe he also calculated black alone or in combination. However, I think he did not include American Indian, Alaska Native, and black American.

Q. Okay. So if Dr. Trende were trying to replicate the way in which Mr. Fairfax estimated CVAP, he would need to use the same BCVAP definition; right?

A. I disagree.

Q. Why?

A. Because he's not just replicating. He's trying to, with different methods -- He's not reproducing.

Page 249

He's trying to, with different methods, identify the black citizen voting age population. He knows better, based on his code, that he should have added B1 to B2 to B3.

So to intentionally leave out B3 when he has it and basically not take into consideration in his code, it's like saying, well, okay, somebody didn't include it, I don't think that should have happened, but still I'm going to do what they did.

Q. Okay. Do you know how many black plus American Indian and Alaska Natives there are in Mr. Fairfax's SD7 in plan 1?

A. No. I don't have that number.

Q. Okay. So you don't happen to know what the point estimate -- what your point estimate would have been had you excluded black plus American Indian and Alaska Native?

A. No. Because it shouldn't have been excluded, when you're estimating black

Page 250

alone or in combination.
Q. Okay. I'd like to move to the third variance now.
A. Okay.
Q. Which is in paragraph forty-six of your report, on page eighteen.
A. Right.
Q. I think we talked about this a bit already, but if you want to explain it again, you're welcome to.
A. I mean, if we talked about it, there's no need.
Q. So in the first line, you use the phrase: Seems to overlook; is that correct?
A. Yes.
Q. Do you know whether he did or did not overlook this scenario?
A. Based on my analysis of his code, it appears to me that he overlooked it. The reason I said "seem", I gave him the opportunity to clarify if he didn't overlook it, because I wanted to be fair

Page 251

about it.
So if he didn't overlook it, I would love to see where in his code we can show evidence that he didn't overlook the scenario, then I would say, okay, he didn't include it.
Q. Okay. In the middle of this paragraph, you say that: These occurrences are rare; is that correct?
A. That is right.
Q. What does rare mean?
A. Not common.
Q. Do you know how often this situation arises in Mr. Fairfax's illustrative Senate District 7?
A. No, I don't know about District 7. I just know that this scenario can arise, because, remember, he also calculated CVAP in the same approach with District 25.
But I do say -- I'm fair about it, I do say this is a rare occurrence. So out of all the factors, this would have

Page 252

been probably one of the smallest contributors out of the three of any difference between our estimates.
Q. I'm sorry, did you say that you're aware Mr. Fairfax estimated BCVAP for Senate District 25?
A. Yeah. I thought he did for Senate District 25, at least based on what I read from their reports, both Mr. Fairfax and Dr. Trende.
Q. Okay.
A. Am I mistaken?
Q. I've got in one of his appendices that BCVAP is reported from Maptitude, District 25. But I believe that he did not calculate it himself in the way that he did for Senate District 7, in plan 1.
A. So are you suggesting he used two different methods, in appendix and then in the main body of the report?
Q. I'm suggesting that he did not need to rely on BCVAP for Senate District 25 because BVAP was higher than 50 percent

Page 253

in that district.
A. Okay.
Q. If we have a block with zero population in the 2020 census, isn't it likely that in the 2021 census -- excuse me, 2021 ACS five-year data, that the population in that block would be low?
MR. GENBERG: Objection to form.
A. ACS provides block-group estimates, that's the lowest. So I don't know how you can assume that. Because you're comparing block to block grouping. The lowest level of ACS is to block group.
Q. So help me understand this first sentence in paragraph forty-six. So you say that Dr. Trende, his approach seems to overlook scenarios where a block within a block group does not contain a voting-age value for a specific race/ethnicity in 2020 but does have a value in the more recent 2021 ACS CVAP data.
I'm not understanding that.
A. Yeah. I appreciate you pointing

Page 254

that out. I just read it, I realize there's a potential typo here. A blocks within block groups, it should say. Blocks within block groups do not contain. I should have said that.

Because if you read, I actually input it -- my footnote 20 from redistricting data hub and they describe this scenario in their own words, and that's perhaps a better way to look at it, what I'm trying to get at here.

Q. So is it right that it's RDH's disaggregation to the block level that's reporting population in a block based on the 2021 five-year census?

A. Let me, just for clarity, I read what they write. It's pretty clear what they say. In footnote 20, starting with the quote, In the scenario no blocks in a block group contain a value for a particular race/ethnicity combination in 2020, but have a value in the 2021 estimates, total CVAP population or total

Page 255

citizen estimate population was used as a proxy, depending on the variable.

Because I should note that the reason it says citizen, total citizen estimate, RDH also provides you with citizen estimate regardless of voting age, so that's in their data, if that's of interest to anyone.

Q. For this third variance, isn't the only way that this variance is relevant, if the additional population in the 2021 ACS data is black?

MR. GENBERG: Objection to form.

A. Well, yeah. We're talking about estimating BCVAP. So if you have a BCVAP value at the block-group level for 2021, and then you don't have corresponding BVAP in blocks -- in that block group for the 2020 census, then RDH has a way of dealing with that, rather than deleting the data. Because there could be population shifts in movement and suddenly, now, that block group does have black residents of voting

Page 256

age population or citizen voting age population.

So that's -- Again, it's a rare occurrence. I'm very up front about it, but, nevertheless, it's another good way of dealing with things that's sensible, and that doesn't delete data. Because it's not good to delete data.

Q. So do we know if any of these rare situations apply to black citizens?

MR. GENBERG: Objection to form.

A. Yeah. Could you -- What do you mean by that?

Q. So in the context of your third variance, which you describe the occurrence of which as rare, do we know -- Do you know whether any of these situations apply when black citizens are the additional population in the 2021 ACS block data?

A. Just so we're clear, these are not variance, these are factors that could explain the variance or the difference between my estimate and Dr. Trende's

Page 257

estimates for BCVAP.

I don't have -- I did not look to see how many times that's the case. But if there are those scenarios, which can happen, then RDH has a way of dealing with it. But again, it's a rare occurrence.

If I had to say out of all these three what's the number -- top factor contributing to the difference, I would say it's the actual technique that I describe about proportion of VAP at the block level, and then using BCVAP at the block-group level, that will be the number one factor.

And then the other factor, second, would be excluding American Indian. And then the third factor -- American Indian and black, and then third factor at a much lower level would be this.

Because if it's a rare occurrence, it will be slight differences in percentages, potentially. I would say maybe less than .3, depending on how many times it would occur. That's why I'm

Page 258

saying it's a rare occurrence. So I want to be fair to Dr. Trende and not claim that this is such a big deal or something.

MR. SEISS: We are at our usual break point, but I only have a few more questions. So I don't think it will be ten more minutes and then break, let me make sure I don't have any more questions and then come back. Does that approach make sense?

THE WITNESS: Since you think you might have questions, and I've been drinking this water, is it okay if we take the break and you take what you need to ask your questions?

MR. SEISS: That's fine. Let's take another ten-minute break.

THE WITNESS: I appreciate it. Thank you.

(Recess taken.)

Q. Dr. Oskooii, did you talk about the substance of your testimony on the break?

Page 259

A. We talked about that counsel for the Plaintiffs may have some questions after you're done for me, and be prepared for that.

Q. Okay. So the last thing that I would like to talk about is the section of your report that criticizes Dr. Trende's use of dot SD plots. So I'm going to pull up a page from Dr. Trende's report, and that's page twenty-three.

A. Page twenty-three. Okay.

Q. Yes. Do you see that on the screen?

A. Yeah. I see it on the screen. I'm just trying to pull up the paper copy too. Here, I have it here too.

Q. Sure.

A. Thank you.

Q. Okay. The second sentence in the paragraph, I'm going to read out loud. It states: These should be read in conjunction with the choropleth maps above, as they provide different types of

Page 260

information.

Did I read that correctly?

A. Yes.

Q. Do you know what "these" refers to in that sentence?

A. It seems to me he's referring to a dot density map, like such as Figure 10, which he says ten black citizens and white -- I think that's a typo. I think from his code, he meant voting age population.

Q. So Dr. Trende believes that the dot density plots shouldn't be considered in isolation; correct?

A. That's what he claims.

Q. Do you know if any of Dr. Trende's opinions as to the concentration of black voters in Mr. Fairfax's District 7 would change if instead of layering the blue circles over the orange Xs, he layered the orange Xs over the blue circles?

A. I mean, you would have to ask him if his opinions would change if he did it that way.

Page 261

All I can tell you is that his claim, first of all, that you need to look at these dot plots in conjunction with the other plots on Figure 9 is problematic. The reason for that is, he only -- If you go to Figure 9, so you can see it, he only -- you passed by it, Figure 9. Here, he's looking at precincts in three different counties. Right? Shaded by BCVAP, which again, by the way, again in typo, he did BVAP. We don't know the concentration of other racial groups, like Hispanics or whites looking at something like this. Okay?

So I can look at this at the precinct level and look at a dot plot, that it's black voting age population and white voting age population at the block-group level of just the district, not the entire -- like the area surrounding it is not there or the county lines are not there for me to even see it, since -- in Figure 11.

So I disagree with his claim that

looking at conjunction you can draw inferences, because you can't. It's very difficult.

And he received a lot of criticism, by the way, in Washington about doing it this way. And I think that has an effect -- as I express in my report, this has an effect of hiding the white population overstating the concentration of the black population in different regions, as I illustrated, once I flip things and put white over black.

Q. In this section, isn't Dr. Trende assessing the compactness of the black population?

A. That's what he claims to do, yeah.

Q. Okay. Dr. Oskooii, do you have any opinions that you intend to offer at trial about Dr. Trende's reports that we haven't talked about today?

A. The only thing I would say is that I'm not sure I entirely agree with

your last characterization, that he only tries to provide these dot plots to talk about population compactness. If that's the case, why is he even plotting white in there?

And, second, page twenty-seven, he actually makes claims that suggest racial predominance or like using race as a motivating factor, because Figure 13, page twenty-seven, says: As you can see, direct quote, there's a heavy concentrated black population in Montgomery. But to achieve 50 percent plus status that this has to isolated black population throughout the countryside.

To me, it's not just about the message that he's trying to send with compactness, reading it this way. But the Court may disagree. That's the only thing I would add there.

And I think I already mentioned effectiveness approach, that I thought was not good, given that you do have a District

2, I believe, inactive map is 29 percent that's not performing. So how is he able to say at least -- even if you go below that -- as low as 25 percent VAP that district will perform?

Q. What population do you understand Dr. Trende to be analyzing in his effectiveness analysis?

A. He's looking at -- It seems to me, he's looking at BVAP, and he's trying to say how many races are one at different levels of BVAP, which his kind of analysis makes a lot of assumptions, which don't match reality.

I think the best way to know if a certain threshold of BVAP is likely to perform or not is to actually draw that district and show it, reconstitute those precincts and then aggregate up the votes and show whether it performs or not.

Q. Did you look at Dr. Trende's code as to the effectiveness analysis to see if that's what he did?

A. I recall looking at the code; I don't have it memorized. But he uses basic combination of RPV, racially polarized voting, estimates and different thresholds of black voting age population to draw inferences.

And I'm saying, you don't even have to do that. You can just draw a district in that region, if he claims 25 percent will perform, and see if it performs by just aggregating the vote totals for candidates at the precinct level, all the way up.

Q. Do you understand that Dr. Trende's effectiveness analysis here is looking at Mr. Fairfax's SD7 in plan 1?

A. Figure 12 is Illustrative District 7. I think that's the same thing in Figure 14 for District 25. But the 25 percent one I was talking about is his comments about Illustrative District 7.

Q. But you don't know whether his effectiveness analysis is looking at

District 7 in Mr. Fairfax's plan versus the inactive plan?

A. It is looking at the Illustrative District 7. He's saying that you could lower the BVAP in that region to 25 percent BVAP instead of, let's say 50 percent, and that district still would perform for black-preferred candidates.

And I'm saying in that region, the inactive map does have a district, where the BVAP is 29 percent, I think, that it is not performing.

So that's why I cast doubt in this sort of analysis. And I say the best way to show performance, perhaps, is to just draw the district. Like I challenge him to draw a 20 percent VAP district in that region that Mr. Fairfax has drawn a district and show me that that performs.

Q. So I think you referenced Senate District 2 as being a district that has a similar BVAP to what we're talking about, and that doesn't perform; is that correct?

A. Yeah. Don't quote me on the number. It's in that region. There is a region in that district, senate district, that has, from what I recall seeing, 29 percent VAP.

Q. Do you know if Mr. Fairfax's District 7 contains any of the inactive Senate District 2?

A. Well, that doesn't matter, because -- See, this is why this is a problem, what I'm trying to say with Dr. Trende's analysis. It doesn't matter, because he thinks that the distribution of votes in the level of RPV is equally distributed, so if you just lower the BVAP back to 25 percent, magically, it performs. I'm saying: Draw the district. Show me. That's all I'm saying.

Because he didn't draw it. If he draws it, I think, based on what you see in that region, it's not going to perform.

Q. Okay. Do you have any other opinions that you intend to offer at trial

that we haven't already discussed?

A. Well, I mean, if other information comes to light, then I reserve the right to express opinions of, you know, other things that I have not seen yet or studied in detail that are -- that are part of this case.

MR. SEISS: Okay. That is all that I have. Thank you, Dr. Oskooii.

THE WITNESS: Thank you.

MR. GENBERG: I have a few questions.

EXAMINATION

BY MR. GENBERG:

Q. Dr. Oskooii, could you turn to page four of Dr. Trende's supplemental expert report, please?

A. The supplemental is another report. Right? It's the -- This one. Okay. Thank you. Sorry. I'm just getting a little confused with all these supplemental. Dates would be perfect, because that you can easily distinguish the

order of it.

Q. So Table 1, the table at the top, it says: Estimated Black CVAP of District 7, Fairfax Map 2; correct?

A. Yeah. I see that, Table 1.

Q. If I represent to you that the six methods listed in this table, full method one, capped method one; method two, population weighted; method two, weighted separate; EI Expand, EI Expand separate, are the same methods as Dr. Trende utilized in his first report, would your criticisms of those methods be the same as the criticisms you had in your rebuttal report of April 19th?

A. If you represent to me that these are the exact same methods, then, yeah, my criticism would be the same.

Q. Okay. Is it your opinion that eiExpand is a reliable series of functions?

A. Yeah. They are correct functions. They do the job correctly. And, again, if there are other underlying

Page 270

packages that get updated and change things, we have to update our code on the eiExpand side. That's just a normal package development of any package, whether it's eiExpand or GG plot 2 or anything else.

Q. Is the reliability of the output dependent on the inputs into eiExpand?

A. Well, yeah, I mean, based on the way you use a function, you can -- You can use a function in different ways. Those are just the functions.

So depending on what kind of input you have, we have to judge the reliability of your estimates, I have to know how you're using that function and what sorts of input you're putting in there.

Like, the function is not going to magically give you the, quote/unquote, correct answer, it depends on what kind of data you put in and how you're using those functions or altering them.

Page 271

Q. And is it your opinion that Dr. Trende is not using the appropriate inputs into eiExpand in his BCVAP calculation?

A. Would you repeat that question.

Q. Sure. Is it your opinion that Dr. Trende's data inputs into eiExpand are -- that his inputs are not appropriate?

A. Well, I don't know if his inputs are inappropriate in a sense that he seems to put in ACS data. They just -- I don't agree with his approach in the way he disaggregates.

Like, he could have used the eiExpand function and altered it to or just added more lines of code, as he's done with other stuff, to try to get the ratio of black voting age population in blocks nested in the block group, and then also used the black CVAP at the block-group level. That could have been done, I think.

But I have not done that, because I use RDH data, and I find that to be more accurate because they take all these

Page 272

different steps that I mentioned. So -- And it's easier, too, because once the disaggregation has been done, you can pull in that data and aggregate it up to the district level, and you don't have to do all this, like, editing code and going left and right and up and down, trying to get to that estimate.

MR. GENBERG: Thank you. That's all I have.

MR. SEISS: No follow-up for me.

(The deposition was concluded at 4:54 p.m., May 10, 2024.)

Page 273

REPORTER'S CERTIFICATE

STATE OF ALABAMA,

ELMORE COUNTY,

I, Angela Smith McGalliard, Registered Professional Reporter, Certified Realtime Reporter, Certified Court Reporter and Commissioner for the State of Alabama at Large, do hereby certify that the above and foregoing proceeding was taken down by me by stenographic means, and that the transcript was produced by computer aid under my supervision, and that the foregoing represents a true and correct transcript of the proceedings occurring on said date and at said time.

I further certify that I am neither of kin nor of counsel to the parties to the action; nor in any manner interested in the result of said case.

Signed on May 13, 2024.

Angela Smith McGalliard

ANGELA SMITH MCGALLIARD, RPR, CRR,
AL CCR Lic. No. 98, Expires 9/30/2024
Notary Expiration 8/13/2027

Page 274

To: JACK GENBERG, ESQ.
Re: Signature of Deponent Kassra A.R. Oskooii, Ph.D.
Date Errata due back at our offices: 30 days

Greetings:
This deposition has been requested for read and sign by the deponent. It is the deponent's responsibility to review the transcript, noting any changes or corrections on the attached PDF Errata. The deponent may fill out the Errata electronically or print and fill out manually.

Once the Errata is signed by the deponent and notarized, please mail it to the offices of Veritext (below).

When the signed Errata is returned to us, we will seal and forward to the taking attorney to file with the original transcript. We will also send copies of the Errata to all ordering parties.

If the signed Errata is not returned within the time above, the original transcript may be filed with the court without the signature of the deponent.

Please Email the completed errata/witness cert page to CS-SOUTHEAST@VERITEXT.COM
or mail to
Veritext Production Facility
2000A Southbridge Parkway, Suite 400
Birmingham, AL 35209
800-808-4958

Page 275

ERRATA for ASSIGNMENT #6689462
I, the undersigned, do hereby certify that I have read the transcript of my testimony, and that

___ There are no changes noted.
___ The following changes are noted:

Pursuant to Civil Procedure, Rule 30. ALA. CODE § 5-30(e) (2017). Rule 30(e) states any changes in form or substance which you desire to make to your testimony shall be entered upon the deposition with a statement of the reasons given for making them. To assist you in making any such corrections, please use the form below. If additional pages are necessary, please furnish same and attach.

Page _____ Line ______ Change ________________________
______________________________________________________
Reason for change ____________________________________
Page _____ Line ______ Change ________________________
______________________________________________________
Reason for change ____________________________________
Page _____ Line ______ Change ________________________
______________________________________________________
Reason for change ____________________________________
Page _____ Line ______ Change ________________________
______________________________________________________
Reason for change ____________________________________
Page _____ Line ______ Change ________________________

Page 276

Page _____ Line ______ Change ________________________
______________________________________________________
Reason for change ____________________________________
Page _____ Line ______ Change ________________________
______________________________________________________
Reason for change ____________________________________
Page _____ Line ______ Change ________________________
______________________________________________________
Reason for change ____________________________________
Page _____ Line ______ Change ________________________
______________________________________________________
Reason for change ____________________________________
Page _____ Line ______ Change ________________________
______________________________________________________
Reason for change ____________________________________

____________________________________
DEPONENT'S SIGNATURE

Sworn to and subscribed before me this ___ day of

_________________, _______.

__________________________________
NOTARY PUBLIC / My Commission Expires:_____________

**0**

**0** 80:13 84:4,5 84:10 164:21 166:1 198:1
**0.1** 49:19 50:10
**0.1.** 50:1
**0.4.** 164:3
**01** 44:5 66:4 67:3
**05** 44:5 47:4 48:21 50:4,16 58:20 67:4

**1**

**1** 3:10 22:4,8 25:17 29:3 31:10,14 32:18 33:1 37:23 43:13 50:4,16 62:23 67:11,13 69:9 84:15 90:11 113:9 119:9 120:15,15 140:2,6 141:8 142:5 143:14 144:20 147:9 149:2 152:8 154:23 155:9,16 156:1 172:18 173:8 186:18 189:1 197:9,14 201:21 202:11 221:23 222:13 225:11 248:10 249:15 252:17 265:16 269:2,5
**1.96** 111:12
**10** 44:5,6 75:2,5 82:17 83:6 133:14,16,22,23 134:5,8,11 149:7 167:16 260:7 272:13
**100** 20:16 37:3 48:3 80:4,5,13 80:15,23 81:4,6 81:8 84:3,4,6,6 84:10,11 138:3 138:16 144:9 152:3 153:6 154:15 155:22 164:17,18,22 183:11 186:10 197:21 198:1 216:1 231:12 232:19 234:12 234:18
**10th** 1:21
**11** 75:2,7,9 261:22
**119** 165:22
**11th** 233:17,19
**12** 265:17
**12/22/23** 188:7
**12th** 17:7
**13** 263:9 273:20
**14** 3:7 122:12 265:19
**14.6** 122:6,13 123:19 126:12
**143,000** 90:17
**15** 3:15 165:22 188:20 190:1
**150** 5:15,20
**1531** 1:5 5:4
**156** 64:11
**157** 65:21
**159** 3:15
**16** 3:11 4:1 63:11,17,17
**17** 3:13
**178** 3:17
**18307** 273:21
**187** 4:1
**19** 3:17 12:10 29:15 69:2 74:11,23 75:2 75:11 91:10
**1959** 54:19
**1985** 20:8
**19th** 8:19 23:9 269:15

**2**

**2** 3:11 25:14 28:3 30:16 50:23 51:15,18 68:10 120:15 144:22 236:14 239:2,5,6 244:16 264:1 266:21 267:8 269:4 270:5
**2.6** 69:19 205:1 207:22 208:20 209:2,15,18 210:7,10 218:17 224:4
**20** 254:7,18 266:17
**2000a** 274:21
**2003** 54:11,16 55:11,12 56:4
**2005** 54:10 56:3
**2017** 99:19 275:7
**2018** 99:19
**2019** 99:18
**2020** 99:18 117:3,5,11,14 117:16,23 118:3 118:13 119:14 131:2,6 132:11 253:4,19 254:22 255:19
**2021** 98:16,22 99:16,18 117:2 117:8,11,13 119:9 170:23 225:12 234:22 253:5,6,21 254:15,22 255:12,16 256:19
**2022** 3:23 30:19 99:2,6 117:2 204:16 234:22 234:23
**2024** 1:21 12:10 68:10 69:2 74:23 160:13

272:13 273:20
**2028** 130:22 131:2,5,10,11 132:10,15
**2030** 132:18
**21** 4:4
**22** 3:6,10
**228** 4:4
**25** 30:8 31:4 98:23 251:20 252:6,8,15,23 264:4 265:9,19 265:19 266:5 267:16
**268** 3:7
**27** 170:22
**29** 30:17,20,22 160:13 175:5 264:1 266:11 267:4
**2:21** 1:5 5:4

**3**

**3** 3:13 72:1,8,14 72:21 74:13,16 74:18 79:14 120:16 257:22
**3.1** 70:3 205:2 207:22 208:20 209:16 210:8,11 224:4
**3.1.** 218:17
**3.1.3** 160:20
**3.1.5** 167:10
**3.1.6** 224:18
**3.2** 188:13
**30** 274:3 275:6,7
**30030** 5:17,22
**32** 102:8 220:15
**340** 5:16,21
**35209** 274:22
**36130** 6:5,10

**4**

**4** 3:15 159:14,20 206:8
**4.2** 189:18
**40** 148:9
**400** 274:21
**42** 97:1,15
**47** 72:2 79:16 80:20 82:12,15
**48** 71:6
**49** 72:12 110:20
**4:54** 272:12

**5**

**5** 3:10,17 47:18 47:21 85:20 133:9,11,22 134:5,8,9 149:11 178:18 178:21 181:17
**5,555** 90:16 203:12
**5-30** 275:6
**5.11** 246:17
**50** 44:18 45:7,9 45:23 46:2 70:14 71:8,15 71:18,22 72:3,4 72:10,21 75:21 75:23 76:9,11 76:11 79:12,16 80:14 81:21 83:9 84:22 85:1 85:3,5,23 87:9,9 87:10 88:9 148:3,5 174:6 174:11,20 175:2 192:7,15 193:3 193:20 194:3,9 194:9 220:1 245:21 246:20 252:23 263:13 266:6
**50.11** 84:1,15,23 87:8,14 88:5 197:18 225:12 245:18 246:18
**501** 6:4,9
**51** 3:11 72:16
**51.5** 72:19
**52** 71:6
**53** 72:3 79:16

**6**

**6** 4:1 187:15,18
**6.12** 56:13
**60** 65:22
**6689462** 275:1
**67** 36:13,19,21 49:1,3 50:6 98:4
**68** 87:4

**7**

**7** 3:6 4:4 14:9 30:16 40:1 58:11 60:5 68:18 69:9 80:21 82:14 83:6 84:14 88:5 88:9 90:2 98:23 110:18 119:13 125:5 149:9 151:11 152:8 197:19 206:21 209:10 211:18 213:23 218:7,10 224:19 226:1 228:20 229:2 251:15,17 252:17 260:17 265:18,21 266:1 266:4 267:7 269:4
**74** 3:13
**75** 63:11,22

**8**

**8.6** 122:9 123:19 126:13
**8/13/2027** 273:23
**800-808-4958** 274:23

**9**

**9** 261:4,6,7
**9/30/2024** 273:22

**90** 36:22 38:22 48:22 61:16 69:13,18 70:15 71:18 98:5 111:1,7,16 112:4,4,7 165:21 204:16 205:1 210:6
**92** 54:1 56:13 57:8,17 62:22
**93** 57:3 63:3
**95** 37:2 38:22 47:2,7,16 48:20 58:18 59:1 70:1 70:15 71:23 79:13,15,18,20 85:16 98:4 111:8,14,17 112:6 200:7 204:17 205:3 210:7
**95th** 71:18
**98** 273:22
**99** 37:2
**9:05** 7:9
**9th** 183:3,5,10

**a**

**a.m.** 7:9
**a.r.** 1:18,23 7:10 7:14 11:13 274:2
**able** 9:16 19:11 27:4 54:2 57:15 121:17 125:18 144:17 243:16 264:2
**above** 7:11 45:7 45:9,23 46:2 49:18 50:1,10 75:21,23 76:11 78:9,10 84:21 84:23 85:3,5 87:10 88:9 112:21 171:18 174:6,20 175:2 194:9 246:20 259:22 273:8 274:15
**absolutely** 14:19 33:22 41:9 185:11
**academic** 112:5 180:3
**academics** 50:19
**accept** 174:8 204:13 215:11 217:3
**accepted** 135:23
**accessible** 55:6 55:10
**accordance** 60:13
**account** 117:5
**accuracy** 162:2 163:18
**accurate** 9:11 119:14 137:2 205:17 213:8 215:12 216:18 216:21 240:6 271:23
**accurately** 40:19 213:14
**achieve** 263:12
**acknowledge** 96:18 112:12 196:7
**aclu** 6:14 145:17
**acs** 62:2 87:2 90:10 94:12 95:3,10,18 96:7 97:21 98:5,18 99:17 100:5 110:6,16,23 111:4,15 112:3 112:9,12,17,22 113:5,10,13,20 114:5,13 115:17 116:20 117:8,13 117:19 118:1,8 118:13,15 119:9 119:13 120:2 128:17 130:3,18 130:22 131:5,14 137:7 139:18 156:22 157:20 158:1,14,20 163:19 164:1,9 165:7 167:5,10 167:12 168:3,6 185:13,16,19 186:6,8 195:20 195:21 196:8 204:16 217:20 224:6 225:12 234:22 253:6,9 253:13,21 255:12 256:19 271:10
**act** 25:14 28:4 172:23 175:16 181:23
**acting** 7:4
**action** 273:18
**actual** 69:22 75:22 171:20 195:19 257:10
**actually** 37:16 39:23 40:5 45:2 66:9 106:12 143:8 153:4 159:9 163:5 164:14 178:6 183:4 186:7 191:17 196:9 254:6 263:7 264:17
**add** 10:5 232:1 263:20
**added** 249:4 271:15
**addition** 19:15 28:4 195:17
**additional** 15:15 33:7,10 200:22 232:1 255:11 256:18 275:9

**address** 52:10 52:11
**adjustments** 242:17
**administration** 105:11
**admit** 81:13 176:12 231:18
**admits** 226:7 232:18
**admitting** 231:19
**adopt** 173:17
**adult** 185:17
**advantage** 116:21 118:6,7 120:2
**advantageous** 119:3
**advantages** 116:20
**advertised** 147:5
**advisable** 106:19
**affect** 201:6
**afoul** 173:3
**african** 83:1,3 109:21 121:22 122:7 126:12 139:11 140:23 142:12 143:16 144:1 146:11 147:1 153:20 247:19,21 248:1
**africans** 147:2
**age** 13:4 20:13 20:15 30:9,18 31:7 40:2,9 41:3 46:23 68:20 80:21 82:13,15 82:17,22 83:5 88:2,22 89:1 91:23 94:20 108:13 109:18 112:21 113:11 113:16,17 119:11,12 120:8 121:2,16 122:13 122:15,17,21 128:3,3 149:1,3 151:5,7 152:14 152:15,21,23 153:14,15,18 157:5 172:1 175:13,18 178:13 179:10 182:2 185:18 188:15,17,22 189:20,21 191:7 196:12 198:15 207:6,7 225:8 225:23 226:22 227:2,10,17 231:8 234:15,16 235:10 239:15 239:17 241:2,10 241:15,18 249:2 253:18 255:6 256:1,1 260:10 261:17,18 265:5 271:17
**aggregate** 108:22 264:19 272:4
**aggregated** 104:8 248:5
**aggregates** 116:17
**aggregating** 114:9,15 265:11
**aggregation** 235:21
**agnostic** 48:16
**ago** 144:7
**agree** 35:11 40:3 56:8 59:1,3 61:23 63:14,20 63:21 65:16,19 66:8,13,23 67:8 67:10,18 73:17 76:4 96:16 97:21 123:10,20 141:19 148:23 170:10 171:22 180:20 210:10 212:21 221:22 223:10 225:1 262:23 271:11
**agreed** 1:15 2:2 2:9,18
**agreeing** 61:21
**agreement** 144:3
**ahead** 8:2 97:4 180:1 183:1 206:10
**aid** 273:11
**aim** 220:16
**aiming** 192:5 193:18
**air** 45:14
**akin** 143:14
**al** 1:6,9 5:5,8 273:22 274:22
**ala** 275:6
**alabama** 1:2 5:2 6:4,5,9,10 7:4 8:5,6 91:20 100:14 101:19 102:10 103:11 103:21 113:13 115:5 121:12,15 122:8 125:6,14 127:5 133:19 134:6 195:11 273:2,7
**alabama's** 102:13
**alabamians** 121:23 122:9 123:13,22 125:10 126:4,13 126:21
**alaska** 247:23 248:14 249:14 249:21
**allen** 1:9 5:8 8:7

**allocate** 221:18
**allow** 165:14
**allowed** 143:6
**alpha** 58:19
**alter** 148:14
**altered** 271:14
**altering** 270:23
**alternative** 215:14
**america** 19:7
**american** 15:14 17:14,15,20 18:7 20:1 36:23 53:8 83:3 94:11 109:21 125:15 131:17 140:17 140:23 142:12 147:1 148:11,13 171:11 182:23 223:18 247:19 247:19,21,22 248:1,13,14 249:14,20 257:15,16
**americans** 83:1 83:22 88:23 94:15 121:22 122:7 126:12 139:11 143:15 143:16 144:1 146:11,12 149:22 150:5,12 153:20 171:17
**amm** 1:5 5:4
**amount** 100:17
**analyses** 30:1
**analysis** 13:2,3 13:7 15:23 16:23 17:1,18 27:4 29:5,8,13 29:16,19 30:8 32:3,5 41:23 42:17 43:9 88:5 126:1 127:13 137:23 139:22 143:12 144:8 174:14 236:2 243:15,22 250:19 264:8,12 264:22 265:15 265:23 266:14 267:12
**analyst** 175:16 182:1
**analyze** 19:11 19:12 147:9
**analyzing** 140:1 264:7
**angela** 1:19 5:11 7:1 273:4,22
**annals** 53:13
**annual** 113:21
**annually** 185:13 185:20
**ansolabehere** 179:7,18
**answer** 9:12 10:3,21 25:10 41:18 50:8 61:6 65:9 74:6 85:10 103:3 124:10 126:6 129:3,17 129:21 132:12 144:17 150:23 162:15,18 172:7 182:21 196:17 225:21 270:21
**answered** 59:16 85:6 129:11 202:5
**answering** 31:17 168:23
**answers** 200:20 239:5
**anthony** 74:22
**anymore** 96:12 118:20 246:3
**anyone's** 242:18
**anyways** 132:17
**apologize** 54:1 97:12 99:20 179:18 190:6 210:3
**apparently** 215:20
**appealed** 184:22
**appeals** 233:18
**appear** 160:4 187:22
**appearances** 5:13 6:1
**appearing** 5:17 5:22 6:5,10
**appears** 18:16 22:11 54:17 183:17 188:1 222:1 250:20
**appendices** 23:4 23:6 252:13
**appendix** 226:16 252:19
**apples** 109:16 109:16
**applicable** 212:10
**application** 93:10,21 141:16
**applies** 21:5
**apply** 112:12 173:8 231:7 236:22 241:4 256:10,17
**apportioned** 237:1
**apportionment** 131:16 132:7,14
**appreciably** 201:6
**appreciate** 22:18 37:19 124:11 253:23 258:18
**approach** 33:23 34:8 35:13,14 35:22 37:5,8,10 37:14,21 38:2,3 38:8,11,12,16 39:11,13 41:11

41:16,22 42:2,5
42:8,11,16,19
42:23 43:6,11
43:13 73:14
85:7,8,9,11,14
88:11,12,13,15
88:16,21 89:8
89:12,15,17,20
91:16 92:5,8
112:4 128:10
141:19 196:15
202:14 235:21
237:9,18,22
240:6 251:19
253:16 258:9
263:22 271:11
**approaches**
33:17,21 35:3
41:14 141:21
237:10
**appropriate**
101:13 128:14
144:13 271:2,7
**approval** 97:1
97:15
**approximation**
36:6 37:15 39:4
41:2 46:22
76:10 77:5
81:14,18,21
82:2 85:12 86:1
86:10 88:1,7
196:23 197:2,16
198:14,23 225:7
225:22

**april** 8:19 12:10
23:9 29:15 69:2
74:22 269:15
**area** 15:11
96:10 100:12
104:5 261:20
**areas** 15:20
16:11 83:21
101:10 106:15
106:15 114:19
136:19 180:13
191:19 242:15
**argument** 215:8
**arises** 251:14
**arizona** 3:17
175:5,8 177:8
177:14 178:9
182:20 183:3,13
186:19
**art** 110:10
**article** 180:22
181:5
**articles** 18:14
19:1 48:20
50:15
**asc** 138:13
**asian** 83:22
148:10,11,13
149:22 150:5
171:11,17
175:22
**asians** 125:14
125:22 149:16
**asked** 12:23
14:10 29:21

33:8 74:10
127:23 129:11
144:6 147:16
162:8 172:6
188:14 189:19
196:11,13,14
200:14,16
202:16 229:17
**asking** 8:9 15:9
52:15 60:21
63:19 71:9
101:5 120:14
125:6 126:3,4
155:12 186:15
194:5 198:13
209:17 220:8
229:9
**asks** 29:21
**aspect** 31:13
**assert** 194:17
**asserted** 212:7
**asserting** 15:11
**assertion**
192:14 193:18
**assertions** 60:19
**assess** 144:19
175:15 181:22
**assessing**
171:19 262:14
**assessment**
18:19 39:3
66:13 197:14
**assign** 2:13 79:6
81:7 82:2 87:14

**assignment** 27:1
27:3 275:1
**assigns** 35:13,15
**assist** 275:8
**associate** 11:16
**associated** 73:6
97:6 208:1
210:12 217:17
217:20 224:5
**association** 53:9
**assume** 45:22
55:14 56:6
65:11,13 66:12
72:6 75:6 80:7
104:2 120:14
122:19 123:1
124:15 128:1
138:21 149:21
149:23 150:1,6
168:13,19,22,23
172:14 214:13
215:9,11 229:22
230:1 231:20
239:11 253:11
**assumes** 207:6
207:12 232:3,12
**assuming** 67:20
71:14 93:20
123:19 169:13
213:4 214:3
215:23 227:12
227:19,20
236:22 239:17
**assumption**
227:16 234:14

240:8

**assumptions**
27:9 127:2,15
195:16 207:5
208:11 214:15
226:20 227:8,23
264:13

**attach** 275:9

**attached** 225:5
274:7

**attempt** 154:21

**attempting**
203:3

**attempts** 231:4

**attendance** 15:1

**attitudes** 18:1

**attorney** 6:3,8
8:4,5 30:19
274:12

**attorneys** 12:3
25:10

**audio** 11:22

**automatic**
148:22

**automatically**
152:19 232:12

**auxiliary**
228:14

**available** 81:17
88:3,4 99:3,8,10
99:12 118:8
178:5 185:20
186:9 199:4
212:5 243:3

**avenue** 5:16,21
6:4,9

**average** 101:19
101:22 103:11
103:14,20
114:21 123:13
123:22

**averages** 185:21

**aware** 33:12
154:20 157:16
201:23 204:1
228:9 252:5

**b**

**b** 171:15 221:16
221:18

**b1** 247:18 249:4

**b2** 247:20 249:4

**b3** 247:22 248:3
248:4 249:5,6

**back** 45:21
81:10 135:7
137:10 144:5
170:19 190:4,6
191:21 195:3
199:12 200:21
220:10 230:17
258:9 267:16
274:3

**background**
11:22

**backward** 99:21

**baked** 126:6

**ballots** 104:6

**band** 111:22

**barely** 211:6,17
217:12,14

**base** 45:19
107:17 128:22

**based** 25:10,12
28:9 31:2 32:14
34:11 36:3,8,11
36:19 38:21
41:20 44:10,15
45:2,4 78:15,17
79:9 82:19 83:3
85:17 86:4 88:4
92:2,6 104:13
105:2 116:4
121:14 132:18
136:20 138:11
156:16 167:7
168:20 170:4
178:5 229:4
230:15 249:3
250:19 252:8
254:14 267:20
270:9

**bases** 162:10,15

**basic** 243:18
265:2

**basically** 13:6
26:13 33:23
34:6 35:23
43:20 61:10
62:7,9 94:15
97:8 110:15
113:3 128:18
142:16 164:4
226:18 232:5

238:15 247:13
249:7

**basis** 49:18 50:1
94:16,16,17
117:20

**bayesian** 33:16
34:15 35:2,14
37:5,7,21 38:7
39:15 41:13
42:1,5,8,10,15
42:19,23 43:5
43:11,12 80:19
82:5,6 83:11,23
85:8 88:20 89:7
89:15,17,19
90:9 91:3,11,16
92:4

**bayesians** 82:11

**bcvap** 44:17
45:9,22 46:1
58:10 60:4 69:8
70:21 83:9,17
84:14 88:9
119:8 144:20
152:8 153:7
154:22 155:8,15
155:21 165:19
220:16 225:11
228:6,8 232:21
236:23 237:3
239:22 240:5
248:9,10,18
252:5,14,22
255:15,15 257:1
257:12 261:9

271:3

**bcvaps** 219:21

**becoming** 26:5
28:20 29:10

**beginning** 7:9
210:23 237:16

**behalf** 5:17,22
6:5,10

**behavior** 16:10
17:23 18:7 19:4

**believe** 8:19
20:15 25:6,21
26:16 30:14
32:7,8 33:18
44:21 54:14
59:16 70:10
98:4 101:21
106:12 111:3
139:15,18 142:7
142:17 153:5
155:18 157:6
169:21 171:7
172:3,20 176:9
188:3 191:3
203:11 205:5
225:15 226:8
229:1,7 230:5
233:11 234:2,4
247:11 248:11
252:15 264:1

**believes** 260:11

**bell** 86:8,8

**ben** 8:4 162:7

**benjamin** 6:2

**bernard** 170:23

**best** 36:6 37:15
37:17 39:4 41:2
46:22 76:9 77:4
81:13,17,18,20
82:2 85:12 86:1
86:9 88:1,2,3,7
97:3 103:4
112:10,17
114:23 124:10
130:9 131:4,13
141:18 196:23
197:1,15 198:14
198:14,18,22,22
199:2,4,4,5
200:19 213:21
225:22 264:15
266:14

**better** 27:11
80:3 113:4
141:21 234:20
249:3 254:10

**beyond** 153:20

**biden's** 96:23
97:15

**big** 17:22
140:21 168:4
179:4 199:23
211:5 258:3

**bigger** 211:19
211:20 212:22
213:10

**bins** 73:12

**birmingham**
274:22

**birth** 17:6 54:23

**bit** 22:18 34:1
66:18 68:6
102:18 114:11
124:8 137:11
150:13 204:4
207:18 224:13
244:6,8 250:9

**bizarre** 158:9
159:3 167:10

**black** 30:9,11,12
30:17 31:20
37:22 68:19
80:21 82:13,15
83:2 88:23
109:19,20,20,21
110:3 123:11,21
125:9 126:19
142:12,22 143:1
143:15,23
144:23 146:8,12
148:18 149:18
151:14,18
152:13,15,21,23
153:12,14,15,19
153:21 154:2,4
154:11,12
171:18,18 175:9
175:11,21
201:18 202:7,9
202:12 203:17
207:7 219:13,14
224:19 239:15
239:17 241:10
246:20 247:17

247:17,19,21,23
248:12,14 249:2
249:13,20,23
255:12,23
256:10,18
257:17 260:8,17
261:17 262:10
262:12,14
263:11,14 265:5
266:8 269:3
271:17,19

**blacks** 81:4
125:21 139:3
150:3 154:6

**blame** 79:2

**blind** 91:18
196:14 242:13

**block** 27:1,2
28:19 29:9
40:10,12,16
93:1,5 94:7,7
99:7,7 100:4,6,7
100:11,13 101:1
101:3,6,19
102:13,19 103:1
103:1,2,6,7,11
103:15,16,21
104:1 105:19,21
106:3,9 107:4,7
107:7,11,17,21
108:2,4,7,8,16
108:19 114:21
115:3,23 124:6
124:6 125:1
128:20 141:15

158:6,7 161:11
164:23 165:2,17
165:18,22
166:16 174:21
188:23 189:2
191:9,13,18
192:11 194:23
194:23 195:1
203:15 205:11
206:16,20 207:8
207:15 208:2,13
208:14,21
210:18 211:1,5
211:22,23 212:4
212:6,11,13,16
213:5,6,17,18
214:7,9,11,11
214:23 216:13
217:13,18,19,20
218:3,5,7,9,9
220:17 221:15
221:23 222:3,8
222:12,15 223:5
223:19,21,22
224:6,10 225:19
225:20 226:5,12
226:13,23 227:2
227:11,20,22
228:5,6 231:6
231:11,21 232:4
232:10,11
234:16 239:1,16
239:16,19 240:3
240:4,5 241:5,8
241:18,19 248:5

253:3,7,9,12,12
253:13,17,18
254:3,4,13,14
254:20 255:16
255:18,22
256:19 257:11
257:12 261:18
271:18,19
**blocks**   40:13,18
100:8,10 101:3
103:16 104:14
105:16,18 106:3
106:3,19,20,23
108:2,4,18,19
125:1 141:15
167:16 189:4
205:13 207:8,8
208:2,14,14
209:9 211:13,16
211:20 212:12
212:13,20,20
214:4 215:21
217:11,11
219:12 227:20
227:21 228:4
231:8 235:11
239:19 241:3,16
254:2,3,19
255:18 271:17
**blue**   260:19,20
**boast**   102:10
**body**   252:20
**book**   51:19
53:10,15 56:7
86:13

**books**   55:21
**born**   20:7,10
54:21
**bottom**   23:20
54:9 56:2 64:18
65:17 209:6
236:8 238:22
**boundaries**
100:23 105:10
107:4,8,21,22
**boundary**
105:18,21
**bounds**   197:6
**branch**   138:7
**break**   10:19,22
51:6 55:8 92:12
92:13,17 106:9
106:23 135:4,9
162:23 187:3,8
218:19 219:1
258:5,7,14,17
258:23
**breakdown**
154:1
**breaks**   10:18
**briefly**   12:19
14:5
**bringing**   28:3
117:6 193:11
211:18
**brings**   34:16
**broadly**   13:13
53:19
**brought**   19:23
21:8 29:4 51:10

82:5 90:5
111:21 121:7
**budget**   109:9
**building**   106:3
107:17 167:16
**bunch**   67:23
120:21
**burch**   122:4
**burch's**   124:13
**bureau**   115:11
185:17
**butchering**
179:19
**buy**   70:11
205:15
**bvap**   30:17,18
30:20,23 31:4
148:18 149:8
152:9 153:7
227:21 228:4
240:3 252:23
255:17 261:11
264:10,12,16
266:5,6,11,22
267:15

**c**

**c**   142:1,1 143:4
143:4
**calculate**   38:21
40:5,7,19 45:5
85:17 96:6 97:8
97:20 98:2,4,14
113:14 157:5
204:9 205:10,14
211:7 212:18

213:13 215:16
216:5,19 219:20
220:2 225:16
232:21 252:16
**calculated** 38:4
38:14 39:21
44:10 45:22
47:2 48:1 69:7
69:11,13,18
70:3,7 71:17
84:13 90:7
91:22 95:22
98:22 101:20
102:4,8 103:12
103:19 127:23
194:20 201:4
204:15,23
213:20 215:19
216:1 217:6
224:4 226:2
246:19 248:11
251:19
**calculates** 36:3
70:20
**calculating** 79:9
87:18 165:3
191:7,17 199:13
204:18,21
207:21 209:15
210:17,19 248:9
**calculation**
69:22 70:11
197:19 211:16
218:1 219:4
237:7 238:7

271:3
**calculations**
192:4 199:13
207:5,12 211:21
217:10 242:12
**california** 152:3
**call** 34:18 42:13
164:8 204:11
208:9
**called** 29:15
51:19
**calls** 247:18
**candidate** 29:10
**candidates**
28:20 30:11,13
42:21 265:12
266:8
**cap** 232:19
235:5
**capped** 231:15
234:9 237:13,14
269:8
**capping** 231:11
234:11,17
**care** 120:10
129:16
**cared** 200:3
**carnegie** 52:9
52:12,21 53:3
**carries** 56:14
**carry** 95:14
**case** 1:5 5:4
12:17,21 15:7
20:1,18 21:7,17
21:21 22:1

24:17,21 25:2
25:14 27:13,18
28:22 29:18
31:20 33:6
37:21 39:21
46:17,21 50:6
51:12 55:15
58:9 72:4 90:22
96:7 107:3,15
107:17 108:16
124:15 139:5,9
140:6,7,10,11
140:14 141:3,12
142:1,4,22
143:3,5,7,9
144:6,18,22
145:11 146:2,5
146:7,9,13
147:8,9 148:17
148:22 149:20
151:20 152:13
152:19 153:5,9
153:10,13
154:11 156:6
158:4 160:6
164:6,7 166:3
170:9 171:10
173:22 176:10
176:11,13
184:22 185:4
186:3,22 187:11
187:23,23 191:2
193:10 194:6,10
195:11 196:7
197:18 198:4

199:21 200:5
201:12,12,18,22
202:4,6,12,19
203:13,23
212:10 213:21
214:6 222:2
227:15 230:5
233:21,23 242:1
242:8,11 244:5
247:15 257:3
263:4 268:7
273:19
**cases** 13:12,14
40:22 67:14
90:7,12,21
133:15 135:18
135:20 136:1,2
136:4,21 137:3
137:6,16 138:13
138:15,22
142:17 154:20
155:2,3,7,11,13
157:1 174:7
175:2 200:15
**cast** 104:6
160:18 167:12
266:13
**casting** 164:5
**categorically**
166:18
**categories**
109:10 247:16
**category** 109:21
**cause** 7:11

**caveat** 115:2
221:9
**caveats** 67:15
94:9
**ccr** 1:20 273:22
**census** 40:13
93:6 94:21 95:9
99:23 100:6
101:2,15 102:19
102:23 104:14
104:14 105:1
115:10 117:3,14
117:18 118:1,3
118:9,13,16
119:3,5,15
130:11,15 131:2
131:3,6,13
132:1,18 158:7
158:22 162:4
163:20 166:16
185:9,13,16
188:21 206:16
206:20 209:9
211:1 213:5,6
223:17 227:11
227:20 253:4,5
254:15 255:19
**census's** 114:4
**center** 5:15,20
**centered** 68:17
**central** 86:20
**cert** 274:18
**certain** 21:3
34:4,11,17
38:19 44:4 78:1

78:14 79:6
95:22 96:10
104:5 108:2
133:6 173:10
180:12,12,13
184:2 264:16
**certainly** 20:4
35:4 103:14
104:21 137:3
198:12
**certificate** 273:1
**certified** 7:2,3
273:5,6
**certify** 7:5 273:8
273:16 275:2
**cetera** 34:5
**challenge** 266:16
**challenged** 136:5 146:16
**chance** 80:22
**change** 36:11
39:8 83:16
101:7 103:6,7,9
104:17,18,19,21
105:2,9 147:20
260:18,22 270:1
275:11,13,14,16
275:17,19,20,22
275:23 276:1,3
276:4,6,7,9,10
276:12,13,15
**changed** 24:12
105:9 146:20

**changes** 77:10
230:16 274:7
275:4,5,7
**characteristics** 113:22
**characterization** 18:16 67:20,21
263:1
**characterize** 66:16 77:19,20
**characterizes** 66:5
**check** 144:5,8
238:23
**checked** 99:13
**checking** 180:15
**checks** 93:22
180:11
**choose** 38:21
231:11
**choosing** 58:19
203:4
**choropleth** 259:22
**circles** 260:19
260:20
**circuit** 182:20
183:3 233:18,18
233:19
**circuits** 182:22
**citation** 182:8
**citations** 182:11
182:13
**cite** 170:17
171:3

**cities** 113:22
**citing** 183:17
**citizen** 13:4 31:7
37:22 40:2,8
41:2 46:23
68:20 80:23
88:1 94:19
108:13 109:17
122:16 128:3
149:3 151:6
152:14,21 157:5
188:15,17,22
189:19,21 191:7
196:12 198:15
225:8,23 227:1
227:10 234:15
249:2 255:1,4,4
255:6 256:1
**citizens** 112:21
113:11,16,17
120:23 121:16
122:21 153:19
172:1 175:13,17
175:18 178:12
178:14 179:10
182:1,3 185:17
185:19 256:10
256:18 260:8
**citizenship**
82:21,23 83:18
83:20 89:2
118:9 120:9
130:16 148:12
148:13,21
149:17,23 150:7

150:8 151:17
153:14 154:5,6
207:12 227:13
231:6,12,21
232:3 234:11
235:9 239:23
**city** 90:12,23
136:17 137:18
137:20 157:3
176:10,13 182:9
182:17 184:10
184:10,13 203:7
203:23
**civil** 7:6 275:6
**claim** 28:4
32:17 69:9
157:1 179:8
182:12 183:16
183:18 203:3
208:12 258:2
261:2,23
**claimed** 235:8
**claiming** 15:6
66:10 194:10
**claims** 69:10
121:13 147:22
157:8 159:2
161:5 177:18
260:14 262:16
263:7 265:9
**clarification**
74:10 122:11
155:17 233:21
**clarify** 26:22
144:16 155:6

158:15 168:2
250:22
**clarifying**
124:22 170:6
**clarity** 254:16
**classes** 17:3,6
17:10
**classifies** 185:17
**clean** 12:11
22:19 206:1
210:1 229:14,15
**cleaned** 195:21
**clear** 62:20
110:2 122:12,18
126:3 162:8
172:7 201:8
205:5,6 206:9
215:6 219:5
220:6 236:6
247:11 254:17
256:20
**clearly** 9:22
115:6
**close** 114:7,8
189:1
**clout** 32:19
**coalition** 139:10
**coauthor**
233:12
**coauthored**
180:4
**coauthors** 180:7
180:18,21 181:9
185:12 242:23

**coca** 142:1
**code** 175:15
217:8 241:13
242:9,10,19
249:4,8 250:19
251:3 260:10
264:21 265:1
270:2 271:15
272:6 275:6
**coding** 245:15
**cohesive** 28:17
28:18
**collaborative**
180:9
**colleague**
241:23
**collected** 117:15
**collecting** 117:4
**collection** 13:3
17:17
**collects** 102:22
**collingwood**
242:1,4,5,7,10
242:23 243:2
**colorado** 163:6
164:1
**column** 43:10
66:22
**columns** 66:1
**combination**
100:8 109:20
110:4 247:17,22
248:12 250:1
254:21 265:3

**combined** 240:2
**come** 37:3,18
45:14 81:10
95:15 115:10
123:18 129:2
166:19 194:5
228:16 258:9
**comes** 37:6
68:19 131:19
140:6 232:6
233:6 268:3
**comfortable**
49:8 91:14
**comico** 138:5
**coming** 42:20
45:16 59:23
91:18 165:1
235:9
**command** 236:2
238:3
**comments**
265:21
**commission**
3:19 276:23
**commissioner**
2:19 5:12 7:5
273:7
**commissions**
181:2
**common** 77:12
251:12
**commonly**
58:17 59:1
155:4

**community**   20:1
36:23 94:12
223:18
**compact**   28:14
144:23
**compactness**
147:12 262:14
263:3,18
**company**
215:22
**compare**   109:15
117:2 188:19
189:23
**compared**   149:6
149:17
**comparing**
117:1 128:22
133:10 234:23
253:12
**comparison**
119:17
**comparisons**
66:20,23
**compensation**
20:17
**complaint**   25:1
**complete**   11:3
185:14 219:21
**completed**
274:18
**completely**
47:14 81:11
164:20
**compliance**   2:5
175:15 181:23

**complicated**
34:2 35:5
150:10
**comply**   132:20
**compose**   28:14
**composed**   30:8
**composition**
41:3 68:19
174:2 228:5
**comprehensive**
113:5
**compute**   196:11
**computed**
246:17
**computer**
273:11
**computing**
41:18 220:20
**concentrated**
263:11
**concentration**
32:16 242:14
260:16 261:11
262:9
**concentrations**
32:21 242:20
**concept**   62:16
133:4 244:18,18
**concerned**
63:23 135:21
199:22
**concerns**   194:19
199:20
**conclude**   157:18

**concluded**
145:15 272:12
**conclusion**
49:15 145:9
146:16 158:18
**conclusions**
49:9,12 73:20
**concurrently**
117:17
**condition**   82:7
**conditions**   50:5
72:17
**conduct**   27:4
108:21
**conducted**
21:11 110:19
124:4 139:21
143:12 185:13
**conducting**   43:8
101:15
**conference**   1:20
7:9
**confidence**
34:11 36:2,3,8,9
36:10,11,14,18
36:20,21 38:4
38:14,22 39:8
41:19 42:14
44:3 47:3,7,10
47:17 48:5
58:18 59:2,7,7
59:21 60:2
61:12,13 63:11
63:22 64:1,4,6
69:14,19 70:2

70:16 71:17,19
72:1,5,11,13,23
73:6,12,19 77:8
77:9,17,21
78:15 79:2,5,13
79:15 80:5
85:15,17 88:19
95:23 111:1,8,9
111:16,17 157:9
165:20,22,23
197:6 198:8
204:17 205:2,3
**confident**   81:7
83:10
**confirm**   189:13
**conforms**   109:8
**confused**   59:20
79:4 196:1
244:9 268:21
**confuses**   79:1
**confusing**
150:14
**confusion**   59:6
61:11
**congressional**
131:22 133:1
134:17
**conjecture**
45:20
**conjunction**
259:22 261:3
262:1
**connotation**
105:8

**consider** 41:10 42:22 184:6 241:8
**consideration** 42:12 82:10 148:19 249:8
**considerations** 105:2
**considered** 173:1,1 260:12
**considers** 28:6
**consistent** 61:1 101:14 109:22 186:2
**constant** 39:7 77:8
**constantly** 79:3 245:12
**constitute** 118:17
**constitutional** 184:3
**constructed** 109:19
**constructing** 107:12 109:17
**contacted** 26:2
**contain** 61:16 85:21 253:18 254:4,20
**contained** 93:17 100:10 222:12 223:6 239:3 241:3,16
**contains** 51:18 77:23 181:17 267:7
**context** 46:15 58:3 64:5 73:8 75:17 76:7 77:16 80:11 87:20 117:1 120:13,15 171:4 171:7 194:22 195:2 197:8,9 199:3 256:14
**contingent** 21:18,20 174:1
**continue** 162:21
**continued** 6:1
**continuing** 162:13
**contracts** 21:2
**contribute** 247:10,11
**contributed** 244:11,18,20
**contributing** 257:9
**contribution** 244:21
**contributor** 243:10 244:10
**contributors** 252:2
**conversations** 25:9
**conviction** 122:9,16 123:8 125:8,14
**copies** 274:13
**copy** 12:11 22:6 22:19 206:1 210:1 229:14,15 259:15
**corner** 52:6
**correct** 8:23 10:5 12:17 16:1 21:23 23:4,17 23:17,18 24:5 24:10 31:8,23 32:1,23 33:11 33:12 38:10 39:22 55:13,22 58:11 61:17,22 65:3 67:6 69:3,9 70:14,19 73:21 73:23 76:16 77:3 84:16,19 89:9 93:4 94:5 95:19 96:12 97:18 98:12,17 108:8,9 109:12 111:2,6 112:13 114:10 116:22 117:12 120:7 123:20 124:2,3 124:16 125:3 127:4 134:12,17 135:19 136:23 140:10 141:7 142:1,2,23 143:2 145:13 149:18 152:10 152:11 156:2 157:15 158:17 171:2 173:5 175:6 180:4 187:12,13 194:20 196:4 198:20 204:6 208:18 209:13 213:1 221:19,21 224:7 225:13,18 228:11 245:22 250:15 251:9 260:13 266:23 269:4,21 270:21 273:13
**corrected** 54:10 55:22 56:3 177:21
**correcting** 170:6
**correction** 149:8
**corrections** 274:7 275:9
**correctly** 18:9 59:11 64:23 76:2 109:11 114:2 119:23 120:6 130:8 162:5 189:5 190:2,3 192:9 206:23 209:12 220:23 223:8 224:22 236:4 260:2 269:22

**corrects** 170:1
**corresponding**
47:3 149:10
255:17
**corresponds**
58:19 104:12
**council** 137:20
147:3 184:13
**counsel** 1:17
2:10,12 7:8 14:2
26:3,9,19 27:8
55:13 56:21
80:3,13 82:12
85:7 127:23
129:14,17
145:17 168:16
169:1 200:2
209:17 229:3
230:11 259:1
273:17
**count** 95:4
99:21 118:1
129:8 132:6,7
137:3 138:10
175:17 182:1
185:14
**counted** 118:21
**counties** 113:22
125:1 261:9
**counting** 96:9
191:10
**country** 19:20
51:10 52:10
**countryside**
263:15

**counts** 158:8
178:12 179:9
191:8 220:17
227:3
**county** 107:8
136:13 137:12
140:19 153:5,11
153:16 154:1
161:12,13
261:21 273:3
**couple** 220:1
**course** 10:6
17:20 24:8
201:2,7
**courses** 17:12
17:16
**court** 1:1 2:6
5:1 7:3,17 9:8
10:9 27:18 28:6
31:15 74:14
87:23 128:13
138:17 155:23
163:9,9 164:6
166:7,8 170:8
170:11,14 171:1
172:13 173:14
173:17 174:4,5
174:8,9 184:11
184:21 233:13
233:17,18
263:19 273:6
274:16
**courts** 132:10
133:14 134:23

**cover** 22:10
51:22 182:22
246:3
**covered** 34:10
88:15 131:16
**cowritten**
180:22 181:3
**cowrote** 181:18
**create** 9:11 36:9
**created** 104:11
191:2 202:17
**creates** 128:21
211:9
**creating** 9:9
**credibility**
90:10 161:17
164:9 165:8
**credible** 30:3
41:22 42:13
49:2
**credit** 168:2
231:19
**critical** 39:2
97:9 111:13
216:22
**criticism** 230:15
233:8 240:13
262:5 269:18
**criticisms**
269:12,14
**criticizes** 259:7
**cross** 197:4
**crossed** 169:9
**crr** 1:19 273:22

**crux** 240:12
**cs** 274:18
**cunger** 5:19
12:4
**curiosity** 107:2
**current** 30:14
30:15 34:20
37:6 117:9
118:4 138:12
**currently** 17:3
33:9 160:2
**curve** 86:8,8
**cut** 24:19 57:5
57:10 63:10
**cv** 1:5 5:4 18:10
18:14 19:2
243:9
**cvap** 31:7,12,20
39:10,16,20
40:14,15 76:10
80:11 81:6
82:20 83:6,14
83:16,17 91:7
91:22 94:3
98:15,20,22
99:2 109:1,7
110:20 112:23
113:8 115:17
137:7,13,17,20
138:1,13 139:17
141:11,13 142:4
142:19 143:5,12
143:20 146:4
148:3,15,18
154:11,13 155:4

155:20,21
156:10,19,20,22
156:22 157:7,14
158:6,14,21
160:20 161:17
162:12 165:3,4
165:10,19
167:10 169:5,9
169:11,15,23
170:4,7,17
171:15,18 172:2
186:3,5 191:11
192:3,8,11,18
193:3,21 194:20
194:23 196:19
199:13 201:4
202:18 204:3
212:3 213:1
219:14,23
220:20 223:19
224:19 226:12
228:11 232:10
232:21 234:22
236:23 237:3
241:5 242:12,20
245:18 246:17
246:19,20
248:17 251:19
253:21 254:23
269:3 271:19
**cycle** 104:16

**d**

**d** 3:2 110:5
**dash** 112:20
120:5

**data** 13:3 17:17
19:12,12,12,22
26:8,16 31:16
34:2,14,19,21
35:14 36:5 37:6
39:5,5,10,14,16
40:14 41:3
45:18 74:1,3
77:6 78:10
81:17 83:4
85:13 86:2,3,4,4
86:10 87:17
88:3,4 89:14
92:23 93:22
94:3,4 97:21
98:15,17 99:2,6
99:17 100:1,16
108:7 109:8
110:7,9,22
112:10,13,18,23
113:8 114:9
116:7,22 117:6
117:9,9,13,14
118:3,8,13,13
119:6,9,14,15
120:3 124:3,12
124:13,16,18
127:3,18,21
128:7 130:19
131:5 132:15
137:7,13,17,20
138:1,13 139:17
139:20 141:11
141:16,17 143:5
143:13,20 146:4

149:6 155:5
157:7,14 160:20
161:3 162:12
164:9 165:10
167:10,18 168:1
170:13 171:15
177:19 178:6
185:16 196:8
197:17,17
198:16 199:4
202:19,21
204:16 208:2
211:23 212:3
213:3 217:18,20
223:22 224:6
225:12,20
226:10,12
232:15,20
234:23 235:6
243:3,20 244:12
245:7 247:14,16
248:3,5 253:6
253:21 254:8
255:7,12,20
256:7,8,19
270:22 271:6,10
271:22 272:4
**dataset** 91:18
108:11 113:4
167:23
**date** 7:5 54:12
54:15,23 130:23
160:8 188:5
273:15 274:3

**dated** 68:10
69:2 74:22
**dates** 268:22
**daughter** 17:7
**dave's** 93:3,8,13
93:17
**david** 179:19
**davin** 6:13
**davis** 6:7
**day** 62:23 163:8
276:19
**days** 274:3
**de** 5:16,21
**deal** 178:7
199:23 258:3
**dealing** 37:20
38:1 255:19
256:6 257:5
**decatur** 5:16,21
**december**
170:22
**decennial** 3:20
102:23 130:11
131:3 158:6
185:9,12
**decent** 135:3
**decide** 31:16
128:13 132:10
163:9 166:8
169:8 170:8,11
170:14 172:13
174:9
**decided** 147:23
156:5 184:22

**decides** 100:23
101:4
**decision** 156:1
184:11,19
203:22
**declare** 23:15
**decline** 162:3
163:19
**decrease** 123:12
123:22 211:23
**deemed** 128:14
**defendant's** 3:8
22:3 51:14
74:15 159:13
178:17 187:14
228:19
**defendants** 1:10
5:9 6:6,11
**defended**
176:16
**defense** 216:21
**definitely**
141:21 198:2
**definition** 35:2
38:13 43:18
56:13 72:22
98:3 119:18
248:8,18
**degree** 34:12
38:19 78:1
79:22 173:10
**delaware** 11:18
160:15
**delay** 10:14

**delete** 235:6
256:7,8
**deleting** 232:20
255:20
**democrat** 30:21
**democrats**
30:12
**demographic**
13:2,7,7 15:23
17:17 102:22
**demonstrate**
192:5,15 193:19
**denominator**
128:2
**density** 31:22
260:7,12
**deny** 28:19 29:9
**department**
11:18 52:8,18
**dependent**
270:8
**depending**
117:23 125:21
184:7 244:4
255:2 257:22
270:13
**depends** 48:8
50:14 73:8
107:14,20
116:23 118:14
137:22 160:22
160:23 161:2
198:10 270:21
**depiction** 230:9

**deponent** 274:2
274:6,7,10,16
**deponent's**
274:6 276:18
**deposed** 8:13,17
9:2 136:22
**deposition** 1:17
1:23 2:3,4,15,19
8:11 10:3,7
13:23 14:8,13
14:17,22 15:1
21:13,14 33:15
51:5,11 59:19
61:1 77:2 137:4
156:9,18 158:13
168:3,12 172:5
216:4,10 233:11
233:16 241:21
272:12 274:6
275:8
**depositions** 2:7
13:11
**describe** 15:10
110:6 114:19
115:13 127:21
180:6 246:10
254:8 256:15
257:10
**described**
151:12 166:16
166:23 204:12
206:16,18
241:21
**description**
114:4

**designed** 113:20
**designer** 244:17
**designing**
244:12
**desire** 275:7
**despite** 75:23
84:11
**detail** 41:5
207:10 268:6
**detailed** 152:5
216:8
**details** 144:11
144:14
**detect** 9:17
**determination**
132:1
**determine**
220:16
**determining**
45:10
**development**
101:10 106:15
245:15 270:4
**developments**
101:9
**deviating** 185:3
**deviation** 86:22
87:5 97:10
133:9,15,18
134:6,15 135:1
217:1
**deviations**
216:12
**dictate** 127:9

**difference** 33:16
33:20 43:3,23
44:9 50:18
133:11 218:16
245:17 248:4
252:3 256:22
257:9
**differences**
247:10,12
257:20
**different** 16:14
19:7 32:16,22
34:15 44:4 58:4
60:19 102:13
106:11 124:23
133:6 141:20
142:7 148:11,21
155:4 195:14,23
207:14 209:19
214:17 228:10
235:7 237:4,10
238:19 240:11
246:16 248:23
249:1 252:19
259:23 261:8
262:10 264:11
265:4 270:11
272:1
**differentiating**
96:14
**differently**
89:12 106:1
**difficult** 71:11
124:2 166:14
206:14 262:3

**difficulty**
195:13 225:5
**dig** 165:7
**digits** 200:23
**direct** 60:3,7
263:10
**direction** 48:16
134:10
**directional**
48:13
**directly** 18:17
19:18
**disadvantage**
118:17
**disadvantages**
118:12
**disaggregate**
141:17 208:1
**disaggregated**
40:12 94:3,6
99:7 141:14
205:13 212:3
225:20
**disaggregates**
108:6 226:12
271:12
**disaggregating**
211:22 223:21
224:6
**disaggregation**
108:22 128:21
208:5 210:14
217:18 226:9
227:4 228:7
235:21 237:18

254:13 272:3
**disagree** 35:11
56:8 58:21
63:20 68:2
129:12 186:14
222:9 248:19
261:23 263:19
**discards** 239:1
**disclose** 143:18
144:10 145:18
**discontinued**
95:1
**discrimination**
16:12 19:6
**discuss** 55:19
92:16,22 116:19
135:8 187:6
**discussed**
111:20 121:20
151:4 204:14
210:13 268:1
**discusses** 57:18
218:3 226:15
231:10
**discussing**
63:22
**discussion** 12:1
33:15 51:2
92:20 235:15,16
**disenfranchise**
126:8
**disenfranchised**
122:7 126:16
**disenfranchis...**
121:11,21

**disingenuous**
160:19 200:11
**disparity**
121:21
**dispersion**
213:3
**dispute** 18:15
53:6,12 95:13
95:15 157:7
186:11 205:4
213:12 217:5
229:23
**disputes** 186:6
**disqualifying**
122:8 123:7
125:8
**dissertation**
176:17
**distant** 137:11
154:16
**distinguish**
268:23
**distraction**
165:6
**distributed** 87:3
207:9 227:13,21
239:19 267:15
**distribution**
86:11 87:2,6
161:3 267:13
**district** 1:1,2
5:1,2 28:15 30:8
30:16,20,23
31:4,18 32:6
40:1,18 46:2

58:11 60:5
68:15,18 69:9
80:20 82:14
83:6 84:14 88:5
88:9 90:16,17
93:11 98:23
104:10 107:12
108:18,20,23
110:18 119:13
120:18,19 125:5
133:10 134:1,16
134:17 139:5,13
140:18 142:6,8
142:9,11,23
143:2,22,22
146:11 148:2
149:9,11,21
150:5,7,15
151:11,23 152:8
152:13,22 153:1
166:15 167:17
171:17 173:16
174:2,10 184:10
184:12 188:16
188:20 189:20
190:1 192:15,17
192:18 197:19
203:6 206:15,21
208:15 209:10
210:20 211:7,15
211:18 212:9,15
212:16,17
213:23 215:23
218:10 219:15
221:16,16,18,18

223:6 224:19
226:1 233:17
237:2 239:3
241:4,17 244:4
248:6 251:15,16
251:20 252:6,8
252:15,17,22
253:1 260:17
261:19 263:23
264:5,18 265:9
265:18,19,21
266:1,4,7,10,16
266:17,19,21,21
267:3,3,7,8,17
269:3 272:5
**district's**  171:20
193:3
**districted**
146:21
**districting**
140:12
**districts**  25:16
27:6 31:8 32:12
40:11 102:9
108:16 127:7
132:17 133:2,3
133:6 139:7,9
139:10,14
143:15,19 145:3
145:10 146:8
147:11,13
172:22 173:4,9
173:23 174:6
175:3,9,11
184:13 188:18

189:2,23 194:2
201:18 202:7,9
202:12 203:10
210:19 219:21
220:22 226:6
**divide**  189:2
**divided**  97:11
217:1
**division**  1:3 5:3
**divulge**  144:14
**document**  23:3
23:22 24:2,5
52:5 54:18 55:3
55:19 57:14
65:5,6 179:3,5,8
179:13
**documents**  12:6
12:8
**dodge**  90:12,22
136:17 137:18
157:3 176:10,13
184:10 203:6,23
**doing**  21:3,6
46:16 87:22
89:4,12 117:19
118:2 130:21
141:18 165:5
199:8 200:12
231:23 232:5
234:7 238:10
241:14 262:6
**dollars**  20:19
**dot**  31:22
190:22,23 191:1
202:23 259:8

260:7,12 261:3
261:16 263:2
**dots**  203:2
**double**  194:13
200:1 201:9
**doubt**  52:20
69:20,21,22
70:4 90:14
100:21 160:18
164:5 167:12
183:7 266:13
**doubting**
136:18
**download**  19:12
**downloaded**
93:2 139:18
**dr**  3:10,15 4:5
7:23 8:3 12:23
14:3,8,23 25:17
26:15 29:4,12
29:18,23 30:6
31:3,22 32:7,12
33:6,14 34:1
38:2,12 40:2
42:18 49:1 51:4
52:5 53:7 54:20
58:17,21 59:18
60:1,11,13,17
60:20,23 61:20
62:8 64:12
65:11 66:5 67:4
67:20 68:16,21
69:7,8 70:13,19
71:16 74:19
81:12 84:3

86:13 90:6,18
91:7 102:3
103:18 111:20
121:7,14,20
122:4,4 124:13
127:13,18 128:5
135:7 141:20
156:8,16 157:13
157:18,22
158:18 159:5
160:1,5 161:18
162:9,11,12,18
163:1 167:19
168:10 169:13
170:16 172:17
172:21 176:13
177:4 178:22
179:6,6,17,21
181:13,18
183:16 185:3,6
185:11 186:2,17
187:6,22 190:9
191:6 192:13
193:18 194:18
199:12 200:5,13
201:20 202:10
202:18 204:2,14
205:18 207:19
208:21 209:15
213:19 214:21
215:18 216:3
217:5 218:2,22
219:11 222:18
223:3,15 224:3
226:6 227:5

228:10,22
229:18 230:17
231:10,15 233:9
234:10 235:14
241:1,7,20
242:1,4,4,6,7,10
242:23 243:1,5
245:19 246:5,11
246:21 248:6,9
248:15 252:10
253:16 256:23
258:2,21 259:7
259:9 260:11,15
262:13,18,20
264:7,21 265:14
267:11 268:9,15
268:16 269:11
271:1,6
**dra** 93:23
**drafting** 179:22
180:8
**draw** 19:12 32:6
34:21 40:11
49:3 93:14
139:7 172:17
173:23 183:20
191:19 202:10
262:1 264:17
265:5,8 266:16
266:17 267:17
267:19
**drawing** 93:11
108:15 139:4
141:8 142:5
172:22 173:2

184:9,19 186:17
201:20 242:13
**drawn** 104:20
173:4 266:18
**draws** 267:20
**drew** 25:16 27:6
32:12,13 90:12
134:2 212:15
**drill** 41:7
**drinking** 258:13
**dropped** 91:19
**due** 122:8
131:22 220:19
221:3 274:3
**duly** 7:15
**dysfunctional**
180:19

**e**

**e** 3:2 74:22
275:6,7
**earlier** 19:4
77:1 102:19
110:23 130:1
202:5 204:14
225:15
**early** 104:16
**easier** 22:12
47:8 62:15
272:2
**easily** 55:5
268:23
**east** 5:15,20
**easy** 230:10
243:17

**ecological** 19:17
42:1,18 43:10
**edges** 81:11
**editing** 272:6
**editor** 53:7,13
**effect** 2:5 44:3
49:10 50:18
125:5 262:7,8
**effective** 120:19
**effectiveness**
29:5,13,16,19
30:1,7 263:22
264:8,22 265:15
265:23
**efficient** 243:21
244:7,15
**efficiently**
243:16
**ei** 269:10,10
**eicompare**
243:10 244:10
**eiexpand** 236:3
237:7,11,21,22
237:23 242:5,6
243:12,13 244:5
244:10,11,22,23
245:2,4 269:20
270:3,5,8 271:3
271:6,14
**eight** 23:3,5,7
23:14,15 100:20
160:20 203:7
**eighteen** 112:21
113:12,16,18
120:8 121:2,17

122:15,22 172:2
175:14,18
178:13 179:10
182:2 185:18
250:6
**eighty** 102:5,15
**eipackage** 239:1
**either** 10:14
133:22 134:9
136:22 193:15
227:6 233:12
**elected** 28:20
29:10 147:1
**election** 105:11
139:20
**elections** 17:22
30:22 244:1
**electoral** 112:20
**electorate**
120:21 171:20
171:23 172:1
**electronically**
274:8
**eleven** 157:11
161:19,20
170:20
**eligible** 112:19
122:20 123:10
123:11,21 125:9
126:19,20
128:11 129:9
**eliminate**
200:23
**elmore** 273:3

**else's** 202:14
**email** 52:10
274:18
**emanating** 86:7
**emphasize**
164:16
**emphasizing**
165:17
**empirical** 19:14
**employ** 223:14
**employed**
235:19 237:17
**enacted** 30:15
93:1 133:19
134:7 188:20
190:1
**encompass**
99:17 224:5
**encompasses**
120:4
**encyclopedic**
154:17
**ended** 143:8
**endorse** 128:9
**engaged** 176:5
**engineer** 244:17
**ensures** 109:7
**entailed** 211:14
212:17
**entered** 275:8
**entire** 14:12
60:17 75:17
112:14 117:19
147:3 164:2
221:14 261:19

**entirely** 262:23
**entirety** 194:15
**enumerate**
117:18
**enumerated**
130:16 198:16
**enumeration**
95:8,20 96:13
101:16 118:19
119:7,18,22
130:11,13 132:2
132:4
**environment**
174:17
**equal** 119:4
120:19 130:6
132:20 133:5
207:14
**equalize** 131:7
132:18 134:22
**equally** 227:13
227:21 267:14
**equation** 58:2
193:12
**equations** 228:1
**equitable**
145:22
**equivalency**
93:1,6
**errata** 274:3,7,8
274:10,12,13,15
274:18 275:1
**error** 39:18,22
40:1,7,15,20
46:10 47:1,20

69:6,11,13,18
69:23 70:3,7,14
71:23 72:7,14
76:1 79:13
95:16,18,21
96:2,6,16 97:5
97:16,18,20,22
97:23 98:3,11
111:5,12 112:12
118:16 160:21
161:1,14,23
163:16 164:18
169:11 177:18
181:8 193:6
196:7,20 200:7
201:1,6 204:6,9
204:12,15,18,19
204:22 205:1,4
205:8,11,12
207:19,21,23
208:6,9,20
209:14 210:6,8
210:11,12,13,14
210:18,20 211:8
211:19,21 212:1
212:2,4,8,19,23
213:6,10,14,16
213:20,22
214:19 215:1,10
215:14,16,19
216:6,14 217:5
217:17,19,23
218:12,16 219:3
219:6,8,15,20
220:18 221:3

223:20 224:2,5 226:3 232:13
**errors** 46:14 90:8 91:4 157:9 164:16 178:7 196:3 199:21 200:6,14 211:6 215:12 224:3 225:17
**especially** 35:6 104:15,19 161:13 243:23 244:3
**esq** 6:14 274:1
**esquire** 5:14,19 6:2,7
**essentially** 116:13 171:8,21
**established** 28:1
**estimate** 14:21 34:5 36:5 37:14 39:3,7,20 45:4,7 45:23 70:17,18 71:22 72:4,11 72:21 73:20 76:11,20 77:2,3 77:7,7,11,16,17 78:9 79:12,17 81:9,13,15,19 81:22 83:4,7,9 84:18,20,21 85:2,13 86:7,9 87:8,10,11,13 87:16 89:18 91:2 94:23 97:3 97:6 99:6 100:5 108:23 112:2,18 113:8,11 115:3 115:7 116:10,11 139:19 141:13 165:18 166:18 166:19,20,23 167:2 186:9 193:9,10 194:1 194:6 196:22 197:3,15 198:14 198:17,18,22 199:5,19 201:10 201:11,14 203:9 203:14,21 215:14 223:4,13 225:11,17 228:7 228:11 232:6 245:18 249:18 249:19 255:1,5 255:6 256:23 272:8
**estimated** 76:1 84:14 189:3 248:17 252:5 269:3
**estimates** 41:1,1 42:20 44:1,10 60:8 70:21 71:1 71:5,8,12,15 73:7 89:4 90:4 90:14,21 94:18 94:22 97:14 110:16,17 113:21 114:15 114:16 115:1,17 115:20 116:3 117:3 118:9 128:18 130:4 157:20 158:1,6 158:20 165:3 166:14 169:15 169:19 189:3 191:11,19 192:11 193:4 195:1,2,10 196:11,12 198:4 202:20,21 206:14,18 208:13 215:17 223:12 234:23 243:16 244:2 245:19 246:6,11 252:3 253:10 254:23 257:1 265:4 270:15
**estimating** 37:22 119:8 188:20 195:7 224:19 235:22 237:19 249:23 255:15
**estimation** 194:19 195:9,12 195:18 223:14 223:16 224:11
**et** 1:6,9 5:5,8 34:5
**ethnic** 15:16 32:16 81:3 139:1 140:13 142:14 154:1 203:1 207:14
**ethnicity** 42:21 108:15 109:1 113:1 141:14 207:13 219:9 226:23 227:3,12 227:14,19 232:3 235:11 241:12 253:19 254:21
**evaluate** 12:23 164:7 202:16 242:10
**evaluated** 139:6 139:22 143:14 145:2 233:7
**evaluating** 143:19 202:14 202:15
**evenly** 207:9 231:21 232:4 239:18
**everybody** 118:21
**evidence** 2:15 28:7 50:10 64:20,22 66:1,6 66:15 67:5 157:21 251:4
**exact** 76:18 95:2 102:2 135:21 192:20 238:8 239:10 269:17

**exactly** 49:7 78:16 100:17 123:17 128:18 141:1 172:12 196:15 200:9 220:8
**exaggerates** 225:4
**examination** 3:4 7:11,21 268:13
**examine** 162:3 163:20 180:10 240:19 241:1
**examined** 7:15 171:15
**examining** 43:21
**example** 13:17 56:22 78:20 79:10 88:22 100:10 121:6 132:15 150:4 151:22 158:23 161:15 165:12 235:2
**examples** 91:6 121:5 152:20 157:13 163:12 164:10,11 165:16 168:7,8 170:16 173:20
**exceeding** 195:1
**exceeds** 232:11
**except** 2:11
**excerpt** 3:11 56:12
**excerpts** 51:19
**exclamation** 62:20,21
**excluded** 249:20 249:23
**excluding** 24:6 120:10 257:15
**excuse** 26:21 64:14 185:8 253:5
**executed** 160:13
**exercise** 125:19
**exhaustive** 162:15,17
**exhibit** 3:10,11 3:13,15,17 4:1,4 22:3,8 50:22 51:14,18 64:11 74:13,13,15,18 149:16 159:13 159:19,20 178:17,21 181:17 187:14 187:18 206:8 228:19 229:1,2
**exhibits** 3:8 12:13
**exist** 94:20 96:17
**existed** 146:16
**exists** 96:2
**expand** 38:9 269:10,10
**expanding** 205:21
**experience** 20:4
**experiment** 61:15,18 62:11
**expert** 3:15 4:2 12:9,17 13:1 15:7,14 16:4 21:2 22:1,11 26:5,10,13,15 41:11 42:23 43:7 74:21 91:2 124:14 136:1,6 136:8 137:15 160:4 176:5,19 176:21 178:1,2 185:4 187:12 196:13,19 200:17 229:4 268:17
**expertise** 15:11 15:15,21 41:12 41:15 43:1,2 52:22 136:19
**experts** 170:12
**expiration** 273:23
**expires** 273:22 276:23
**explain** 12:19 16:16 27:21 28:10 33:20 37:16 46:18 48:11 73:9 131:12 188:2 207:3 226:11 245:17 247:7 250:9 256:22
**explains** 235:2
**exposed** 242:14
**express** 12:20 262:7 268:4
**expressed** 31:6 60:12,23 68:4 186:4
**expressing** 33:1 194:18
**extensively** 246:1
**extent** 51:10 57:14 60:18 61:23 143:17 144:10,22 145:14

**f**

**faced** 90:6
**facility** 274:20
**fact** 62:4 75:9 83:3 95:5 112:22 118:15 164:13 203:17 242:11
**factor** 257:8,13 257:14,16,17 263:9
**factors** 28:7 29:6 247:9 251:23 256:21
**facts** 26:8

**factual** 186:15
**fails** 81:12
**fair** 13:18,21
  18:19 21:4
  31:11 35:12
  47:11,17 49:16
  50:2,9 53:20
  57:22 60:11
  71:2,16 73:3,13
  78:7 86:6,10
  89:14 96:1
  103:5 104:22
  106:2 107:9
  116:6 117:7,10
  117:22 127:17
  140:8 145:8
  150:15 151:4
  162:20 204:11
  208:4 214:18
  215:3 218:18
  250:23 251:21
  258:2
**fairfax** 3:14
  25:16 26:14
  32:6,12,21 33:1
  39:21 74:22
  76:15,18,19
  78:3,6,17 82:15
  89:19,22 91:14
  98:21 133:20
  134:2 165:1,18
  171:22 220:20
  246:19 248:9,17
  252:5,9 266:18
  269:4

**fairfax's** 13:5
  14:5 26:23 31:8
  33:6 37:23
  58:11 60:4 68:8
  68:21 69:8
  70:21 74:12
  76:4 84:15
  113:9 119:8,13
  149:2 152:7
  167:17 202:15
  213:23 220:16
  221:22 222:13
  225:11 249:15
  251:14 260:17
  265:16 266:1
  267:6
**fairly** 137:13
**fall** 36:1,18 60:9
  64:9 71:15,15
  71:19 72:10
  79:7
**falls** 37:11 38:20
  70:15 75:22
**false** 166:18
**familiar** 27:17
  53:17 177:3
  179:2,20 182:16
**familiarity**
  27:20
**famous** 93:12
**fanciful** 184:8
**far** 145:19 156:4
  203:8
**fashion** 146:6

**fast** 97:13
**feasible** 107:19
**february** 68:10
**federal** 7:6
  182:19
**federalsburg**
  138:2 146:1
  155:14,20
**feel** 18:15 79:18
**felons** 121:14
  123:6 128:10
  129:7
**felony** 121:11
  122:8,16 123:8
  125:8,13 126:7
**field** 15:6,8
  17:22 200:18
**fielded** 98:9,11
**fifteen** 167:14
  188:9,10 190:5
  195:4 205:22
  209:22 210:2
  219:18
**fifty** 102:12
  189:15,16
  193:16
**figure** 102:2
  145:21 167:6
  176:19 220:7
  228:3 260:7
  261:4,6,7,22
  263:9 265:17,19
**file** 27:1,1,2,3
  93:1,3,6 137:21
  226:14 274:12

**filed** 8:7 274:15
**filing** 2:18
**fill** 274:7,8
**final** 168:14
**find** 30:2 55:7
  93:16 94:1,8
  110:13,22
  129:20 176:8
  177:11 178:8
  244:23 245:4
  271:22
**finding** 46:7,8
**findings** 166:3
**fine** 144:18
  185:5 214:20
  258:16
**finished** 75:14
  118:3
**first** 7:15 25:19
  25:23 28:12
  44:20 58:16
  87:16 90:1,2,3
  111:19 116:20
  123:15 127:3
  147:1 161:22
  163:3 166:17
  176:9 181:21
  188:13 189:17
  208:8 230:13
  231:14,17
  232:16 240:16
  246:23 247:7,13
  250:13 253:14
  261:2 269:12

**fit** 32:2
**fits** 32:4
**fitting** 28:22
**five** 45:17 94:22 96:23 98:17,18 99:2,6,16,18 100:9 102:11,16 102:16 108:7 114:1,9,16,20 115:1,6,20 116:3,9,17,17 117:3,8,8,13,13 119:9,14 138:12 138:20,21 139:19 141:13 142:9 155:7,11 155:12 185:21 203:9,10 204:16 209:5 225:12 242:16,17 243:7 253:6 254:15
**fixed** 34:7 59:9 59:13
**flat** 20:21
**flip** 109:5 162:13 193:13 200:2 229:17 262:11
**flipped** 199:11
**flopping** 193:13 200:2
**focus** 68:16 147:14
**focused** 16:11
**focuses** 158:21 164:14,15
**focusing** 165:12
**folders** 12:14
**follow** 64:15 183:21 184:18 272:11
**following** 7:12 62:22 214:2,5 236:16 275:5
**follows** 7:16 61:14
**footnote** 238:22 254:7,18
**force** 2:5
**forces** 231:20
**foregoing** 7:7 23:16 273:9,13
**forget** 19:3
**forgetting** 91:4 159:11
**forgot** 10:4
**forgotten** 202:5
**form** 2:11 16:21 18:20 19:9 29:1 35:20 45:12 47:13 48:7 49:20 50:13 53:1 58:23 60:6 60:15 61:3 63:16 64:3 66:14 70:5 73:15,22 74:8 77:18 78:12 89:16,21 96:4 96:19 98:1 105:4 107:13,23 111:10 120:12 123:14,23 125:11 126:23 129:10 131:9 137:8 148:6 150:18 151:8 152:17 153:17 156:3 171:6 183:23 184:20 186:20 193:22 197:11 198:9,21 204:7,20 208:7 208:23 210:16 214:1 215:4 222:16 223:23 224:8 246:7 253:8 255:13 256:11 275:7,9
**format** 9:16 10:13
**forms** 16:14
**forth** 145:7 177:5 178:8
**forty** 102:11 247:2 250:5 253:15
**forward** 21:15 274:12
**fought** 147:22
**found** 44:1 46:6 93:5 128:9 177:12 179:8
**foundation** 6:14
**four** 8:19,23 20:19 21:15 52:4 100:19 102:16 135:17 136:20 141:20 185:23 195:14 228:12,12 229:13,14,16 235:17 236:7,12 238:6 243:7 268:16
**fourteen** 20:16 166:13 205:22 206:5 209:2,18 209:22
**fourth** 9:6
**frankly** 126:2
**free** 18:15
**frequent** 41:21
**frequentist** 33:16,22 34:6 35:2,13,22 37:9 37:13,20 38:2,3 38:11,16 39:11 39:13,18 41:11 41:13,16,21 59:12 73:14 85:7,9,11,14 88:13,14,16 89:11 91:12 92:4
**frequentists** 34:14 90:8 91:3

**frequently** 73:1
**front** 12:9 22:20
  190:13 206:2
  229:16 230:20
  230:22 256:4
**fruitful** 129:4
**full** 2:5 55:3
  161:22 231:1
  240:17,17 269:7
**fully** 210:18
  211:14
**function** 82:3
  162:1 163:17
  238:12 270:10
  270:11,16,19
  271:14
**functions**
  243:18 245:3,5
  269:20,22
  270:12,23
**furnish** 275:9
**further** 2:1,8,17
  61:12 166:22
  206:17 223:11
  236:18 240:12
  273:16

**g**

**gain** 131:22
**galveston**
  136:13 137:12
  138:23 139:16
  155:13
**game** 207:18
  245:14

**gary** 42:18 49:2
**gathering**
  110:22 243:15
**gears** 204:4
**genberg** 3:7
  5:14 7:20 12:4
  16:21 18:20
  19:9 25:8 29:1
  35:20 45:12
  47:13 48:7
  49:20 50:13
  53:1 55:2 56:10
  58:23 60:6,15
  61:3 63:16 64:3
  65:4 70:5 73:15
  73:22 74:8
  75:16 77:18
  78:12 89:16,21
  96:4,19 98:1
  105:4 107:13,23
  111:10 120:12
  123:14,23
  125:11 126:23
  129:10,13 131:9
  137:8 148:6
  150:18 151:8
  152:17 153:17
  156:3 159:5
  162:7 168:21
  171:6 172:6
  183:23 184:20
  185:2 186:20
  193:22 197:11
  198:9,21 204:7
  204:20 208:7,23

  210:16 214:1
  215:4 221:1
  222:16 223:23
  224:8 246:7
  253:8 255:13
  256:11 268:11
  268:14 272:9
  274:1
**general** 6:3,8
  15:20 43:2
  73:16 121:23
  122:10 125:7
  126:13 156:10
  163:15 195:20
**general's** 8:5
  30:19
**generally** 25:6
  65:19 93:23
  107:16 134:19
  156:20 213:9
**geographic**
  100:11 102:21
  104:4 113:2,23
  114:8,13,17
  116:5,8 134:21
  135:2 158:10
  212:22,23
  220:21
**geographies**
  133:13
**geography**
  99:23 115:17
  124:17 158:10
  160:23

**georgia** 5:16,21
**getting** 47:19
  116:10 167:7
  197:17 199:18
  220:6 239:9
  268:20
**gg** 244:16 270:5
**gingles** 25:17
  27:19,22,23
  28:5 29:3 31:14
  32:3,5,18 43:13
  90:11 120:15,15
  140:2,6 141:8
  142:5 143:14
  144:20 147:9
  154:23 155:9,16
  156:1 172:18
  173:8 174:18
  186:18 197:9,14
  201:21 202:11
**give** 10:2 44:2
  44:13,14 64:17
  78:20 80:4,14
  82:12 89:17
  102:6 121:5
  124:7 164:17
  194:15 205:19
  206:6 207:17
  270:20
**given** 26:13 41:3
  46:15 85:12
  86:1 88:2,19
  129:2 162:14
  177:1 231:6
  234:21 242:22

263:23 275:8
**gives**   120:19
**glanced**   14:5
**go**   8:2 22:21
26:12 37:1
45:21 57:15
66:21 91:19
97:4 104:5,15
111:7 116:1
120:16 124:5
125:9 126:20
128:19 144:8
145:5 157:12
161:10,12
162:21 170:19
180:1 183:1
190:6,17 195:3
198:17 206:10
212:21 224:14
230:17,18 235:4
235:5 261:6
264:3
**goes**   43:10
101:11 200:1
213:4 219:22
**going**   8:9 22:7
27:13 35:9 41:5
45:15 48:4
50:21,22 51:17
53:23 55:18
56:16 62:1,5
63:3 64:10
71:11 75:1,19
80:3,14 81:6,7
83:16 91:21

92:12 94:14
107:10 123:2
125:17 130:22
132:16 135:14
144:12 145:19
145:20 150:11
150:16 161:21
163:4 167:5
169:11 170:19
178:20,21
179:11 181:6,8
181:13,16 183:4
187:1,17 188:8
188:12 189:14
189:17 190:9,20
191:15 194:4
204:3 206:3
211:5,7,13,15
218:15 220:10
220:14 228:22
229:13 230:18
230:23 231:9
237:2 246:3
249:11 259:8,20
267:21 270:19
272:6
**gold**   112:9,17
113:6
**good**   7:23 8:1,3
44:12 52:12,16
52:17 79:18
80:8 88:22
92:14 126:1
172:2 187:2
194:6 218:19

225:7 232:17
256:5,8 263:23
**google**   55:7
**googled**   176:18
**graduate**   17:13
**great**   41:5 80:15
99:5 102:17
235:12
**greater**   44:17
67:13
**greetings**   274:5
**grofman**   170:23
172:21
**ground**   11:6
**grounds**   2:13
**group**   28:13
40:10 94:7 99:7
100:4,7,11
101:6,19 102:13
103:1,15,17
104:1 107:4,8
107:11,21 108:4
108:7,19 114:21
115:3,23 124:6
128:20 139:1
142:18,19 158:6
158:7 161:11
164:23 165:2,19
174:12,20
188:23 191:9,13
191:18 192:11
195:1 203:2,15
207:8,15 208:2
208:15 211:22
212:6,13 213:5

213:17 214:7,9
214:11,23
217:18,20
218:10 220:17
221:15 223:5,21
225:20 226:12
227:2,11,22
228:5,6 231:6
232:4,10,11
234:17 239:16
240:5 241:5,19
253:9,13,18
254:20 255:16
255:18,23
257:12 261:18
271:18,19
**grouping**
253:12
**groups**   40:12
81:4 100:13
101:1,3 103:7
105:19,22 106:4
108:17 121:1
125:1,23 140:14
141:15 142:14
148:8,20 149:7
150:3 157:6
162:4 163:21
165:17,23
166:17 189:2
194:23,23
203:18,20
205:12 206:16
206:20 207:15
208:13,21

210:18 211:2,5
212:11,16
216:13 217:13
218:3,6,8
221:23 222:3,8
222:12,15
224:10 226:5
231:11,22 239:2
239:20 244:1
254:3,4 261:12
**grow** 20:9
**guess** 49:14
54:11 117:22
133:21 158:12
158:15 168:4
170:5 172:9
183:4 185:23
193:5 207:16
215:22 238:10
244:8
**guessed** 183:9
**guessing** 205:7
212:8
**guesswork**
127:14
**guys** 159:21
185:1

**h**

**h0** 64:20,22
65:2,10,14
**half** 21:9 83:7
136:21
**hand** 34:3,14,21
46:21 52:6 83:4
104:15,15

107:15 120:16
120:16 227:5
238:17
**handwriting**
239:11 242:3
**hang** 81:5 84:5
**happen** 55:2
211:19 234:21
249:17 257:5
**happened** 236:9
236:13 249:11
**happening**
151:11 193:14
**happens** 106:13
169:8 181:12
**happy** 18:11
26:12 29:22
37:16 38:9 61:6
92:12 156:13
160:6 162:21
163:3 164:11
194:14 195:14
196:4 230:13
**hard** 190:12
**harder** 134:21
**harvard** 49:2
179:7
**hat** 81:5 82:6
84:5 202:18
**hcvap** 83:19
149:10 150:16
151:21,23
188:14,19
189:18,23
191:10,17 194:2

242:15
**head** 9:13 54:6
91:15 100:15
155:19 222:6
**heading** 188:13
189:18 225:1
**hear** 25:19,23
222:21
**heard** 176:13
177:1
**hearing** 11:21
136:16 192:22
**hearings** 146:18
**heavy** 127:2
164:16 263:11
**heck** 91:20
**hedging** 163:13
**held** 12:1 51:2
92:20
**help** 10:9
243:19 253:14
**helpful** 65:8
230:9
**helps** 78:21
243:14,15
**hey** 173:18
**hiding** 262:8
**high** 79:22 97:2
110:14
**higher** 17:19
41:6,18 42:3
78:8 83:18
133:16 135:1
148:4,18 149:2
150:17 151:6

152:1,9,14
165:4 214:4
252:23
**highest** 72:3
188:16 189:21
**highlight**
240:22
**highlighting**
63:5
**highly** 174:16
**hispanic** 82:17
83:5,14 140:20
142:11 148:3,4
148:14,15,16
149:1,3,9 151:5
151:6,15,17
175:21 188:15
188:16 189:19
189:21 192:7
196:16 203:17
203:19
**hispanics** 81:3
82:21 83:21
89:1 125:14,22
139:3,11 149:15
150:2 191:8
261:12
**historic** 147:4
**history** 13:5
94:13 147:2
**hit** 198:7
**hobbs** 4:1
**hold** 138:19
190:19

**holistic** 28:8
**honest** 76:6
**hope** 53:2 146:22 200:17
**hopefully** 14:15 88:21 119:23
**hour** 20:20 21:3 187:2
**hourly** 21:5
**hours** 15:3,4 21:9,9
**house** 131:19
**hovering** 219:23
**hub** 94:4 99:6 243:3 247:16 254:8
**huge** 178:6 179:13
**huh** 9:14,14 54:22 146:3 199:16
**hundred** 20:19 21:16 36:16,16 62:2 86:15 87:1 96:23 100:19 101:22 102:4,11 102:12,14,16 114:22 222:11
**hvap** 149:8 150:17 151:21 152:1
**hyperbole** 71:11
**hypotheses** 35:15 46:16,21
**hypothesis** 43:21,22 44:7,8 44:14,15,16,19 45:11,13,19 46:3,4,6,14 48:10,14,15,17 49:18,23 50:12 50:18 65:2,10 65:14 66:7,15 67:5,17 73:10 73:13 87:21 197:13 198:11
**hypothesize** 45:16
**hypothetical** 62:1 123:16 124:8 125:19 127:8 151:3,10 169:2 184:9
**hypothetically** 123:4

**i**

**idea** 62:10 91:20 121:10
**ideal** 90:15 102:10 120:20 134:10 203:11
**identification** 22:5 51:16 74:17 159:15 178:19 187:16 228:21
**identified** 246:23
**identifies** 36:4
**identify** 108:23 175:13,16 178:12 179:9 182:1 188:14 189:19 198:13 249:2
**identifying** 108:13
**ignore** 78:4 168:4 173:2 227:17
**illustrated** 262:11
**illustrating** 173:14
**illustrations** 142:8
**illustrative** 13:5 25:16 31:9 68:15 69:8 82:14 90:2,13 98:23 139:4,6,9 139:22 141:8 142:6 151:20 152:7 166:15 172:18 173:13 186:18 201:21 202:1,11,16,17 206:15,21 209:10 218:7 251:15 265:17 265:21 266:3
**imagine** 101:12 153:3 175:1
**impact** 16:12 125:18,20
**important** 9:12 9:15 10:13 163:17 197:5 198:6 200:4
**impossible** 234:14
**impression** 230:12
**improve** 245:13
**inaccuracies** 93:21
**inactive** 264:1 266:2,10 267:7
**inappropriate** 271:9
**inartfully** 105:14
**inclines** 105:1
**include** 14:23 129:7 166:1 214:23 248:13 249:9 251:6
**included** 206:20 209:9 211:2 217:11 218:5,7 219:11 221:6 224:9
**includes** 23:3 120:7
**including** 14:23 183:15
**inclusive** 120:4

**inconsistent**
  62:19
**incorrect**  35:18
  136:12 246:6,8
**incorrectly**
  186:8
**increase**  213:1
  214:19
**increases**
  161:10
**increasing**
  213:7 215:2
**independent**
  3:17 200:18
**independently**
  246:19
**indian**  247:23
  248:13 249:14
  249:20 257:15
  257:17
**indians**  125:15
**individual**  96:9
**individually**
  18:12
**individuals**
  16:12 120:5,8
  121:2
**ineligible**  120:5
  120:11 121:3,15
  129:8
**inference**  13:8
  19:17 42:1,18
  43:10 127:16
  224:20,21 225:6
  225:6

**inferences**  19:13
  32:20 34:4,21
  39:16 41:20
  49:3 87:19
  191:19 262:2
  265:6
**infinite**  80:7
**infinity**  80:10
  80:10
**inflate**  218:11
  218:12 219:14
**informal**  9:14
**informally**
  64:19
**information**
  32:20 53:16
  93:16,20 101:11
  102:22 124:9
  125:13 130:23
  156:6 228:7
  260:1 268:3
**initial**  68:9
  192:23 229:21
  230:4,8 236:16
  246:4
**initially**  219:6
**input**  254:7
  270:14,17
**inputs**  270:8
  271:2,6,7,8
**inquiry**  29:3
**inside**  72:22,22
  73:18 79:23
  108:19 217:13
  217:14

**insinuate**  163:7
  170:2 233:12
**insinuation**
  211:9
**instance**  16:8
  25:15 49:1 50:6
  73:11 117:2
  148:9
**instances**  106:8
  232:9
**intend**  12:20
  29:17 33:5
  262:19 267:23
**intended**  95:6
**intentionally**
  249:6
**intents**  174:23
**interest**  58:6
  255:8
**interested**  57:22
  58:10 273:18
**interesting**
  177:1 178:11
  196:9 203:5
**interestingly**
  192:3
**interjecting**
  61:21
**international**
  11:19
**interpret**  59:6
  61:11,13 163:10
**interpretation**
  59:12 76:12,17

**interpreted**
  38:15
**interpreting**
  59:20
**interprets**  166:8
**intersection**
  239:6
**interval**  34:11
  36:2,9,14,21
  37:12 38:21
  42:14,14 47:3
  47:10,17,23
  48:6 59:7,7
  60:10 61:12,15
  62:17 63:12,23
  64:1,7,9 69:14
  69:19 70:2 72:5
  72:11,13,23
  73:19 77:8,21
  77:22 78:14
  79:16 80:5
  85:17,21 87:14
  87:18 111:1,8,9
  111:16,17
  164:20,22
  165:20 197:7,22
  198:8 201:15
  205:2,3
**intervals**  36:10
  36:19 38:4,14
  39:8 41:19,22
  49:3 58:18
  59:21 60:2
  61:14 70:16
  71:17,20 73:6

73:12 77:17
79:2 88:18
112:1 157:9
165:22,23
204:17
**introduce**  62:10
159:19 178:20
**introduction**
131:17
**involve**  155:8
175:8 201:18
202:6,8
**involved**  141:5
146:18 155:2,14
176:1 177:8
233:22 234:4
**involving**
154:21
**iran**  20:11
**iranian**  150:12
**isolated**  263:14
**isolation**  260:13
**issue**  127:12,17
139:14 140:14
140:15 142:23
146:9 165:1
212:19
**issues**  128:21
178:3 245:10
**iterations**
142:13

**j**

**jack**  5:14 274:1
**james**  6:7

**january**  3:22
17:7
**jesse**  5:19
**job**  97:1 269:22
**jobs**  245:6
**joe**  96:23 97:14
**joking**  97:3
**journal**  18:10
48:20 53:8
**journals**  19:20
53:18,21
**judge**  164:6
169:7 270:14
**judgment**  132:9
200:18
**judicial**  182:19
182:22 233:17
**jurisdiction**
81:2 82:9 90:15
104:8 107:14,20
108:14 112:20
119:1 148:10
184:7
**jurisdictions**
106:12 183:22
**justification**
231:22 232:5
234:6,11
**juxtaposing**
158:5

**k**

**kansas**  90:12
136:17 137:18
137:19,20
141:23 142:4,21

155:13 157:4
184:11,19 202:4
202:6,19
**kassra**  1:18,23
7:10,14 11:13
274:2
**keep**  33:23 48:4
92:12 101:14
150:11 190:20
245:12
**khadidah**  1:6
5:5
**kin**  273:17
**kind**  19:4 32:19
55:7 85:15 89:5
108:21 115:13
129:11 147:18
162:23 167:3,8
167:13 177:3
232:18 235:16
264:12 270:13
270:21
**kinds**  207:19
**king**  49:2
**king's**  41:23
42:18
**knew**  199:6,6
**know**  9:21 10:7
10:19 14:18
17:21 22:22
24:23 25:9 26:4
26:6 27:2,5,16
27:21 29:4 31:3
35:22 39:23
42:16 43:3 48:8

50:19 52:1,19
53:11,16 55:16
55:17 56:1,17
60:16,17 62:3
64:5 65:5 66:9
66:16 67:18
68:1 74:2 75:13
76:6 80:4,18,20
81:2 82:3,16
83:4 87:23
88:22,23 89:2
89:22 94:16
96:7 99:9 100:9
100:13 101:2,4
101:8,18 102:3
103:10,12,15,23
105:5,6 111:15
111:20 113:3,7
113:12 114:22
114:22 115:1,2
115:5 118:22
119:21,23
120:13,17,20
121:11 122:14
123:17,18 124:3
124:21,22
125:12 127:11
129:1,1 130:18
133:17 134:1,18
135:15 137:21
137:22 140:15
143:7,17 145:14
145:20 148:7,9
153:2,23 154:8
156:4,7 157:3

160:9 161:3,5
162:14 167:5,17
171:4,23 172:15
174:19 175:10
176:17 177:19
178:1 179:21
181:14 182:19
182:21 183:1,12
196:15 197:1,6
198:1,6 200:9
200:13,16 205:9
205:10 210:14
215:18 216:19
217:14 219:5
221:17,20,21
222:3 223:17,20
224:1 227:14
230:11 233:6,9
233:23 236:13
242:21,22 243:1
243:19 244:19
245:13 247:14
248:8 249:13,18
250:17 251:13
251:16,17
253:11 256:9,16
256:16 260:4,15
261:11 264:15
265:22 267:6
268:4 270:16
271:8
**knowing**   76:13
110:21
**knowledge**
34:17,19 80:18

80:19 82:9 83:8
95:1 121:13
**known**   93:12
114:15
**knows**   40:6
91:17 167:19
249:3

**l**

**l**   1:14
**labeled**   229:19
**lack**   234:20
**lajevardi**
181:13
**language**   167:4
193:15
**large**   7:4 31:13
126:5 146:20
164:2,2 273:8
**larger**   100:11
111:13,23
116:16 153:12
213:11 220:21
221:2,2
**largest**   49:4
**larry**   52:1,7
**latino**   140:20
171:11
**latinos**   171:16
**law**   5:15,20
**laws**   2:6
**lawsuit**   8:7,10
25:5,7,20 26:1,5
**lawyer**   16:1
27:17 183:12,14

**lay**   79:19
**layered**   260:19
**layering**   260:18
**lead**   137:4
180:12
**leading**   2:11
**leads**   166:21
206:17 223:11
**leave**   122:18
180:14 227:9
248:3 249:6
**leaves**   248:3
**leaving**   231:12
**left**   39:2 52:6
57:7 217:11
272:6
**legal**   128:12
132:9 169:7
183:21 185:1
**legislative**   102:9
134:16 192:6
193:20
**legitimate**
106:21
**leon**   5:16,21
**letter**   184:14
**level**   17:13,19
36:3,9,11,20
38:23 39:9
40:10,10,16
41:7,18 42:3
47:7 77:9 78:15
79:5,9,13,15
85:15,18 88:19
94:7,7 95:17,23

99:8,23 100:4,5
100:6 104:7
108:7,8 111:3,5
114:21 115:16
115:23 124:6,6
124:17,20
128:20 133:13
133:17 139:20
158:10,10
160:23 161:11
161:11,12
164:23 165:2
188:23 191:9,13
191:18 203:15
207:15 211:23
211:23 212:4,5
212:6 213:5,17
217:19,21
219:15 220:17
223:19,21,22
224:7 226:13,23
227:2,11 240:4
240:5 241:8
248:6,6 253:13
254:13 255:16
257:11,13,18
261:16,19
265:13 267:14
271:20 272:5
**levels**   59:2
225:21 264:12
**liberal**   71:6
**lic**   273:22
**light**   228:16
268:3

**likelihood** 82:3
**likely** 37:9 75:22 76:20,22 76:23 77:3,11 77:13,15 78:10 81:22 83:12 84:2 85:4 87:9 87:11 88:8 107:10 148:4 154:10 253:5 264:16
**limit** 86:20
**limits** 133:7
**line** 200:22 203:4 223:2 240:15 250:13 275:11,14,17,20 275:23 276:1,4 276:7,10,13
**lines** 32:6 93:11 101:6 103:6 104:20 105:19 105:21 107:11 107:12,18 209:5 231:1 261:21 271:15
**link** 93:7
**list** 18:14 118:7 135:18
**listed** 18:10 21:16 137:1 138:12 184:6 269:7
**listen** 14:12 156:8
**lists** 67:4
**literature** 45:18 48:6 73:3
**litigation** 15:12 18:18,22 19:8 19:11 43:7 139:2 144:3 176:6
**little** 11:21 22:18 34:1 66:18 68:6 114:11 124:8 137:11 150:10 150:13 187:2 204:4 207:18 224:13 244:6,8 268:21
**ln** 3:5,9
**load** 17:8,9 158:9
**location** 104:5 192:20
**locations** 194:16
**logic** 207:1 233:7
**long** 14:21 92:7 117:18 135:14 184:1
**look** 8:20 30:21 59:4 63:4 76:7 89:3 116:1 137:2 153:6 158:8 159:5 161:18 164:12 165:15 174:4,14 192:19 194:14 201:13,14 206:19 209:8,20 211:1,5 217:8 227:9 231:5 236:18 238:14 238:21 240:14 242:9,18 254:10 257:2 261:2,15 261:16 264:21
**looked** 14:1,3 18:13 19:1 30:6 68:23 90:1 154:9 241:13
**looking** 30:18 65:22 78:2,5 92:3 119:11 144:20 195:19 208:19 209:23 223:2 230:7 236:19 238:5 239:22 261:8,13 262:1 264:9,10 265:1,16,23 266:3
**looks** 54:10 136:21 182:11
**lose** 131:21
**lost** 30:21 114:11 224:13
**lot** 19:5 79:1 127:14,14 186:4 214:15 222:19 244:2 262:4 264:13
**loud** 60:22 63:7 75:13,20 76:5 130:3 185:7,10 188:12 206:4 220:14 236:21 259:20
**love** 238:16 251:3
**low** 116:13 253:7 264:4
**lower** 82:22 83:19,20 103:13 103:23 112:1 133:13 135:1 148:4,13 149:16 151:17,21 152:22 153:7,15 154:6,12,14 192:17 203:8 213:9,16 214:4 214:17 257:18 266:5 267:15
**lowering** 40:13 214:20
**lowest** 40:10 72:2 100:3 115:16 212:5 253:10,13
**lucky** 179:14
**lunch** 135:5,8,9

**m**

**m** 6:2 143:4
**made** 2:10 34:1 73:19 150:10 159:11 170:5

178:6 179:9
181:6,7 230:16
**magically**
267:16 270:20
**mail** 274:10,19
**main** 226:18
240:12 252:20
**major** 127:14
195:15 207:4
227:8
**majority** 28:14
28:17 31:19,19
139:8 142:22
143:1 145:3,10
146:8 175:1,3,9
175:11 201:18
202:6,8,12
**majorly** 127:2
**make** 2:13 9:18
26:19 27:8 32:9
32:11,17 34:3,3
49:12 50:6
55:23 62:15
78:13 80:17
87:18 89:4,6,8
91:21 105:12
119:16 131:23
147:20 150:4,13
157:8 159:2
161:4 163:14
166:2 181:11
182:23 190:7,18
191:16 193:1
194:7 195:15,16
197:23 203:3

205:6 208:10
219:4,10 220:5
220:5 226:21
227:8,23 240:8
242:17 243:19
244:6 258:7,9
275:7
**maker** 106:18
**makes** 44:20
75:21 105:10
116:14 162:22
207:4 241:9
263:7 264:13
**makeup** 223:5
**making** 32:20
39:15 41:20
49:9 60:20
66:20 89:10
99:20 171:19
177:17 183:16
196:1 201:8
226:20 240:7
275:8,8
**management**
109:9
**manner** 243:17
273:18
**manual** 237:7
238:7
**manually**
235:23 238:2,11
274:8
**map** 30:10,15
31:1 68:15
82:14 90:2

106:18 151:20
173:16 184:19
202:16 260:7
264:1 266:10
269:4
**mapping** 137:15
137:16
**maps** 3:22 90:13
93:14 104:19
139:23 142:7
175:2 242:13,16
242:18 259:22
**maptitude**
252:14
**march** 25:22
160:13
**margin** 39:18
39:22 40:1,7,19
47:1,20 69:11
69:12,17,23
70:3,7,13 71:23
72:6,14 76:1
79:12 90:8 91:4
95:16,18,21
96:6 97:5,16,17
97:20,23 157:8
164:15,18
177:18 193:5
196:3,19 199:20
200:6,7,14,23
201:6 204:9,15
204:22,23 205:7
205:11,12
208:20 209:14
210:6,8,11,17

210:20 211:8,18
211:21 212:1,2
212:4,8,18,23
213:6,10,14,16
213:20,22
214:19 215:1,10
215:15,17,19
216:5,13 217:5
217:23 218:12
218:16 219:3,6
219:8,14 224:1
224:3 225:16
226:3
**margins** 40:15
46:10,14 69:6
96:16 97:22
98:3,12 111:4
112:12 118:16
160:21 161:1,14
161:23 163:16
169:12 178:7
196:7 205:4
211:6 215:12
219:20 220:18
221:2
**mark** 22:8
51:18 74:18
229:2
**marked** 22:4
50:22 51:15
74:16 159:14
178:18,21
187:15,18
228:20 229:1

**mars** 91:19
**maryland** 138:7
  138:8 143:4
  145:17
**master** 176:23
**match** 107:21
  264:14
**math** 52:17
  111:7 127:9
  216:4
**matter** 8:12
  18:5 20:22 21:1
  21:14 45:8 51:5
  52:14 66:18
  172:19 175:6,8
  175:12 176:1,2
  177:9 185:1
  186:19 199:17
  203:16 214:22
  246:4 267:9,12
**matters** 213:2,3
**maximum**
  102:15
**mcgalliard** 1:19
  5:11 7:1 273:4
  273:22
**mean** 18:21
  20:23 25:6
  31:15 48:11
  52:15 53:2
  57:12 58:3
  64:17 71:7
  73:23 77:16
  79:3 85:3 86:11
  86:22 87:8 88:7

95:7 96:20
97:17 103:23
105:5,7 110:8
115:12 116:14
124:1,3 134:18
135:12,13,15
136:7,10,13
137:1,9 140:5
150:19 152:18
155:1 156:12
160:17,22 163:4
166:10 167:22
167:23 170:2
176:12 180:13
181:12 184:1,23
186:13 188:2
189:12 199:6
204:21 215:5
216:18 222:14
245:6,9 246:5
246:11 250:11
251:11 256:13
260:21 268:2
270:9
**meaning** 112:20
**means** 87:3,4,6
  232:19 238:11
  273:10
**meant** 105:15
  131:12 151:1
  260:10
**measure** 64:13
  64:20
**measures** 155:4

**mechanical**
  16:23
**mellon** 52:9,12
  52:22 53:3
**member** 28:15
  142:8
**memo** 170:22
  176:4,8 177:11
  177:13 179:16
  179:22 181:18
**memorized**
  265:2
**memory** 14:4
  69:16 115:21
  116:2 137:12
  138:12 154:16
  154:17 180:2
**memos** 181:1
**mention** 91:3
  96:17 164:14
**mentioned**
  26:11 30:6
  42:11 102:7
  131:11 133:21
  156:5 158:5
  169:20 192:21
  197:20 219:2
  263:21 272:1
**mentioning**
  199:20
**mere** 45:20
**merged** 139:19
**message** 263:17
**met** 14:2 140:3

**method** 34:16
  40:6 42:19
  195:8 207:10
  231:14 233:5,6
  233:8,10 234:10
  235:7,14,19
  236:14,14 237:8
  237:11,13,13,14
  237:15,17 238:5
  238:13 239:11
  239:12,13 240:1
  241:22,22,23
  242:3 269:8,8,8
  269:9
**methodology**
  15:16 110:21
  115:14 127:19
  128:8 245:1,2
**methods** 19:21
  88:3 195:13,14
  199:4 200:20
  228:10,13,14,16
  229:19,21 230:4
  230:10,12 233:1
  235:17 236:8,9
  236:10 238:19
  240:3 246:14
  248:23 249:1
  252:19 269:7,11
  269:13,17
**metric** 171:19
  172:2 236:22
**mid** 25:22
**middle** 236:9
  251:7

**mimic** 235:20 237:18

**mind** 17:2 48:4 159:2,10 183:11

**minimal** 102:15

**minimum** 103:14

**minor** 142:15

**minority** 28:13 28:16,19 31:19 139:8 145:3,10 174:12,19 175:3 203:1

**minority's** 29:9

**minus** 72:1,8,14 72:21 79:14 80:10 133:8,9 134:5 164:3 210:7

**minute** 218:19 228:18 258:17

**minutes** 258:7

**mirror** 150:8

**missed** 42:8 175:23 221:1,6

**missing** 56:22

**misspeaking** 146:23

**misspoke** 10:4

**mistake** 181:7,7 183:1

**mistaken** 252:12

**mistakes** 181:11 217:10

**misunderstan...** 129:20

**misunderstood** 126:14

**mle** 77:11

**modestly** 129:3

**moe** 220:18

**moment** 52:3 102:6 147:4 206:6

**montgomery** 6:4,9 263:12

**monthly** 94:16 117:20

**morning** 7:23 8:1,3

**motivating** 263:9

**mouse** 63:6 240:21

**move** 20:13 107:3 129:22 250:2

**moved** 20:11 162:16

**movement** 232:14 255:22

**movements** 131:23

**moving** 21:15

**multiple** 88:16 129:17 139:14 142:18 243:23 244:1

**multiplying** 235:10

**municipality** 137:19

**muslims** 19:6

**n**

**n** 1:14 3:2

**naacp** 138:8

**name** 8:4 11:12 11:13 52:5 138:4 172:15 176:18 179:19 245:14

**narrower** 36:22 37:1 161:2

**nationally** 150:9 151:16

**native** 140:17 247:23 248:14 249:21

**natives** 249:14

**naturally** 83:18

**nature** 115:15 135:15 137:22 138:6 139:23

**near** 157:17

**nearly** 133:5

**necessarily** 43:16 108:1 145:5 214:6 239:7

**necessary** 2:9 109:13 275:9

**need** 9:10 10:5 10:19,21 11:14

19:11 22:23 26:21 32:7 43:15 60:16 62:10 105:9 123:17 125:12 130:12 132:5,14 195:16 221:20 221:21 226:21 227:23 228:2 240:8 248:17 250:12 252:22 258:14 261:2

**needed** 27:3 43:15

**negative** 105:7

**neither** 273:16

**nested** 227:22 239:16 240:4 271:18

**never** 17:2 48:4 49:17,21 54:22 90:7,9 145:8 165:10 176:13 177:1,23 178:3

**nevertheless** 205:13 256:5

**new** 43:22 65:10 104:19,20 229:5

**nice** 79:21

**nine** 95:3 113:19 116:19 130:2

**nineteen** 222:12 230:19,20 231:2

**noncitizen**
  153:12 171:12
  171:16
**noncitizens**
  120:4
**nondisclosure**
  144:2
**nonhispanic**
  83:1,2 110:3
  142:10 149:17
  150:3 151:13,14
**nonpartisan**
  110:12
**nonsensical**
  166:4
**nonstatisticians**
  35:6
**nonverbal**  9:17
**normal**  270:3
**normally**  87:3
**northern**  1:2
  5:2
**notarized**
  274:10
**notary**  273:23
  276:23
**note**  56:11 91:7
  135:10,11
  170:16 171:14
  189:1 255:3
**noted**  275:4,5
**notice**  2:18
  239:14
**noting**  274:7

**null**  44:15,18
  45:10 46:3
  49:17,23 50:12
  65:2,14 66:6,15
  67:5,16
**number**  1:5 5:4
  8:18,21 22:21
  70:8 100:19
  103:19 135:21
  145:2 162:1
  163:17 238:8
  249:16 257:8,13
  267:2
**numbers**  79:8
  126:11 205:16
  237:3,4 239:10
  246:15,15
**numerosity**
  31:13 140:2
  144:19 145:11
  147:12 154:22
  155:9,15 173:7
  197:10
**numerous**  28:13
  144:23

**o**

**o**  1:14 142:1
  143:4,4
**object**  16:21
  19:9 25:8 45:12
  47:13
**objection**  18:20
  29:1 35:20 48:7
  49:20 50:13
  53:1 58:23 60:6

  60:15 61:3
  63:16 64:3 70:5
  73:15,22 74:8
  77:18 78:12
  89:16,21 96:4
  96:19 98:1
  105:4 107:13,23
  111:10 120:12
  123:14,23
  125:11 126:23
  129:10 131:9
  137:8 148:6
  150:18 151:8
  152:17 153:17
  156:3 171:6
  183:23 184:20
  186:20 193:22
  197:11 198:9,21
  204:7,20 208:7
  208:23 210:16
  214:1 215:4
  222:16 223:23
  224:8 246:7
  253:8 255:13
  256:11
**objections**  2:10
  2:13
**objective**
  198:10
**observations**
  116:12
**observed**
  220:18 221:3
**obtaining**  88:4

**obvious**  159:1
**obviously**  17:21
  26:23 27:3 32:5
  37:1 113:15
  140:19 174:1
  199:1
**occasionally**
  10:18
**occupation**
  11:15,20
**occur**  257:23
**occurrence**  44:2
  106:16 251:22
  256:4,15 257:6
  257:20 258:1
**occurrences**
  251:8
**occurring**
  273:14
**odd**  200:11
**offer**  29:11,14
  29:17 33:5
  105:13 262:19
  267:23
**offered**  2:15
**office**  6:3,8 8:5
  109:8
**offices**  274:3,10
**oftentimes**
  55:21
**oh**  22:16 42:10
  45:1 79:20
  126:14 158:8
  160:14 164:13
  167:4 172:8

181:13 193:9
209:23
**ohio** 160:16
**okay** 9:7,23
10:7,8,16,23
11:6 12:16 15:2
15:5 20:6 22:15
22:22 27:11
31:5 42:10
45:21 48:2
53:23 54:2
56:15 57:6,11
57:16,20 58:8
58:15 59:4 61:9
63:2,8 64:10
65:15 68:7 70:1
70:13 75:1,3,18
78:23 82:8,18
83:7 87:2 88:14
88:19 92:21
99:15 101:17
102:17 124:21
129:13,22,23
131:23 134:13
138:9,10 140:9
141:23 143:3
145:23 150:22
157:11 159:12
166:12 168:9
169:3 170:15
175:4,23 178:16
178:20 179:11
179:14 181:11
181:16 184:17
185:5 186:16,23

188:8 189:9,11
189:14 191:21
193:2 201:17
202:3 204:2
205:18,21
206:10,13
207:16 209:7
210:5 215:13
217:4 218:22
220:10,14 221:8
221:12 222:22
224:14,17
225:10 228:9
229:9,11 230:3
230:17,23 233:3
235:13 240:14
241:1,20 243:7
246:22 247:4
248:15 249:9,13
249:17 250:2,4
251:5,7 252:11
253:2 258:13
259:5,11,19
261:14 262:18
267:22 268:8,20
269:19
**older** 117:14
**omb** 109:9
**once** 90:13
162:23 262:11
272:2 274:10
**ones** 180:19
**opened** 12:15
**opening** 163:23

**operating**
234:13
**opining** 169:6
**opinion** 16:9
29:22,23 32:2,4
52:14 61:20
66:18 68:4
78:18 132:8,13
136:11 156:10
156:19 161:16
162:10 163:11
164:7 165:6
186:2 229:5
233:17 269:19
271:1,5
**opinions** 12:20
13:2 21:18
24:13 25:18
27:12 28:22
29:11,14,17
31:6,12 33:1,6
33:10 51:12
68:17 162:22
163:2,10 170:12
172:16 186:5
260:16,22
262:19 267:23
268:4
**opportunity**
8:11 120:20
250:22
**opposed** 90:16
**opposing** 91:1
**opposition**
90:22,23

**oral** 7:11
**orange** 260:19
260:20
**ordeal** 90:5
**order** 89:8
122:2 137:21
269:1
**ordering** 274:13
**origin** 51:11
**original** 54:12
54:14 274:13,15
**originally** 20:10
144:6
**oskooii** 1:18,23
7:10,14,23 8:3
11:14 51:4
74:19 84:3
135:7 160:1
161:18 162:12
162:18 163:1
178:23 185:6
187:6 218:22
258:21 262:18
268:9,15 274:2
**oskooii's** 3:10
162:10 185:3
**outcome** 21:21
37:9 38:18
83:12 84:2
145:22
**outcomes** 34:22
158:9 159:4
167:11 201:15
235:22 237:19

**outdated** 156:7
**outer** 81:10
**outlines** 245:16
**output** 270:7
**outputs** 244:14
**outside** 47:10,20
  212:13
**overall** 134:5
  216:5,13 231:5
**overarching**
  161:5
**overcome**
  174:21
**overestimates**
  158:21
**overexaggerates**
  160:19
**overlook** 250:14
  250:18,23 251:2
  251:4 253:17
**overlooked**
  250:20
**overly** 120:3
**overpopulation**
  191:20
**overstating**
  262:9
**overview** 3:19
**overwhelming**
  244:2
**own** 107:2
  110:19 114:4
  180:15 205:8
  223:15 226:15
  254:9

**p**

**p** 1:14 43:19,20
  44:5 46:10,11
  46:12 47:4 49:4
  49:13,18 50:1,9
  64:12,19,21
  66:1,4,21 67:3
  67:13
**p.m.** 45:17
  272:12
**package** 236:3
  242:5,7 243:13
  244:6,16,22
  245:9,13 270:4
  270:4
**packages**
  245:11 270:1
**page** 9:23 22:10
  22:20 23:3,13
  23:14,20 51:22
  52:4 54:1 56:2
  56:13,17 57:2,3
  57:4,8,8,17,22
  58:17 60:14
  62:22 63:3
  64:11,11,18
  65:18,21,23
  68:7 74:11 75:5
  75:6,7,9 95:3
  109:3,5 112:8
  113:19 116:19
  120:2 130:2
  149:12 155:10
  157:18 160:10
  160:20 161:19

  161:20 163:5
  165:20 166:12
  167:14 181:16
  181:22 185:7
  188:6,9 189:7
  189:15,15 195:3
  206:5 209:1,17
  209:19,21 210:2
  219:16,18
  220:11 222:18
  222:22 224:14
  229:13,14,16,18
  230:19,19 231:1
  231:9 235:14,18
  236:7,19 237:16
  238:6,22 240:14
  240:18 247:2
  250:6 259:9,10
  259:11 263:6,9
  268:16 274:18
  275:11,14,17,20
  275:23 276:1,4
  276:7,10,13
**pages** 23:5,7
  56:14 75:2
  92:21 135:17
  136:20 157:11
  170:19 193:16
  205:21 209:21
  243:7 275:9
**paid** 24:16,20
  24:23
**palmer** 4:1
  140:10,11
  187:11 201:17

**paper** 259:15
**papers** 180:4
**paragraph**
  62:23 68:11
  75:2,11 78:4
  91:10 102:8
  161:22 163:23
  166:13 175:5
  181:22 190:5
  192:1,2 194:17
  199:9,11 206:4
  219:18 220:15
  221:10,14 223:3
  224:18 231:1
  236:19 237:16
  240:17,18 247:2
  250:5 251:8
  253:15 259:20
**parameter** 36:1
  36:17 37:16
  38:20 59:14
  60:9 61:16
  77:23 79:7
  85:22 87:19
  118:19,23
  119:21 199:7
**parentheses**
  130:6 188:23
  189:1
**parity** 130:5
  131:14
**parkway** 274:21
**part** 15:2 23:7
  40:23 50:20
  57:3 62:21,21

106:7 107:16
140:6 142:15
162:1 172:21
181:14 192:13
202:1 206:21
209:10 211:2
214:3 215:22
217:9 218:6
222:13 224:10
226:16 232:8
236:9 244:19
268:6
**partake** 16:13
**partially** 117:20
**participate** 14:7
14:10
**particular**
21:21 25:15
46:17 58:2,3
72:4 109:1
169:18 198:4
212:10 254:21
**particularly**
9:15 10:13 30:3
83:20 135:20
161:12 242:15
**parties** 1:16
2:12 273:17
274:13
**partisanship**
17:23
**parts** 22:18
27:14 127:7
214:8 244:20

**passed** 261:7
**past** 157:14
**pause** 8:2
**payment** 21:17
**pdf** 54:1 274:7
**peculiar** 177:23
**peer** 18:9 19:14
48:6,19 54:7
73:2 181:1
**penalty** 23:16
**pending** 10:20
**people** 16:17
40:23 58:18
59:19 62:13
66:11 67:22
79:1,3 90:16
96:17,23 101:18
101:23 103:10
114:20 115:7
120:11,21 123:7
125:7 153:19,21
172:9,11 180:12
185:17 203:8
218:13 219:13
221:17,21
246:16
**perceiving**
166:5
**percent** 20:16
30:9,17,20,23
31:4 36:13,19
36:21,22 37:2,2
37:3 38:22,22
44:6,18 45:7,10
45:23 46:3 47:2

47:7,16,18,22
48:3,21,23 49:1
49:3 50:7 58:18
59:2 61:16
63:11,22 65:22
69:14,18 70:1,3
70:14,15 71:6,8
71:16,18,23
75:21,23 76:9
76:11,11 79:12
79:13,14,15,19
79:20 80:4,5,14
80:15,20 81:1,4
81:6,8,22 82:12
82:17 83:6,10
84:3,7,10,11,11
84:15,22 85:1,3
85:5,16,20 86:1
87:4,8,9,9,11
88:10 97:1,15
98:4,5 110:20
111:1,7,8,14,16
111:17 112:4,4
112:6 122:6,9
126:12,13 133:9
133:12,14,16,22
133:23 134:5,5
134:8,8,9,11
138:3,16 144:10
148:3,5,9 149:8
149:11 152:3
153:6 154:15
155:22 164:17
164:18,21,22
165:21 167:16

174:6,11,21
175:3 183:11
186:10 192:7,16
193:4,21 194:3
194:9,9 197:18
197:21 200:8
204:16,17 205:1
205:1,2,3
207:22,22
208:20 209:16
209:16,18 210:6
210:7,8,8,11,11
216:1 220:1
224:4 225:13
231:12 232:19
234:12,18 239:2
239:6,7 245:19
245:21 246:17
246:18,21
252:23 263:13
264:1,4 265:10
265:20 266:5,6
266:11,17 267:5
267:16
**percentage** 13:4
44:17 46:2
58:10 123:11,21
125:9,17 126:20
126:21 127:22
149:1,4 150:16
150:17 151:5,7
151:23 152:1,9
152:10,16,22,23
153:15,16
154:11,12 192:4

199:14 200:21
201:5 241:2,5
**percentages**
80:11 82:20
98:22 125:21
142:19 257:21
**percentile**  71:18
**perception**
167:7
**perceptions**
16:11
**perfect**  65:15
72:9 268:22
**perfectly**  234:19
**perform**  30:10
31:4 120:18
173:23 174:11
174:15 264:5,17
265:10 266:7,23
267:21
**performance**
174:1,14 243:14
244:14 266:15
**performing**
31:1 264:2
266:12
**performs**
264:20 265:11
266:19 267:16
**period**  105:3
**periods**  101:15
**perjury**  23:16
**permitted**
133:18

**persevere**
173:22
**person**  75:20
79:20 80:23
81:9 84:8 96:3
119:1 123:16
133:8 134:22
**personal**  107:2
**perspective**
34:16 35:8
39:15 83:11,23
**perspectives**
38:8
**pertains**  208:5
**pg**  3:5,9
**ph.d.**  1:18,23
7:10,14 15:17
176:15 274:2
**phase**  157:2
173:11,13,21
**phrase**  76:19
105:23 210:15
250:14
**picked**  32:21
**picture**  28:8
**piece**  39:2 54:4
180:8
**pieces**  213:18
214:14,17,23
**pile**  113:6
**piling**  224:20
225:5
**pin**  181:8
**placed**  203:1

**places**  96:23
**placing**  164:16
**plaintiff**  129:15
**plaintiffs**  1:7
5:6,18,23 8:8
14:3 26:2 28:2
124:14 188:18
259:2
**plan**  14:16 31:9
33:1 37:23
84:15 93:2
113:9 119:9
133:19 134:7
141:9 142:9
149:2 152:8
172:18 173:3
186:18 188:20
190:1 201:21
202:11 215:13
221:23 222:13
225:11 248:10
249:15 252:17
265:16 266:1,2
**plans**  33:3,4,7
33:10,13 132:19
134:3 183:20
192:7 193:20
202:17
**play**  193:6
**plays**  111:21
145:1
**please**  9:21 10:7
10:19 11:12
14:18 61:7
69:16 160:10

189:7,9 190:20
207:3 268:17
274:10,18 275:9
275:9
**plot**  202:23
243:17 244:15
244:16 245:8
261:16 270:5
**plots**  31:23
190:22,23 191:1
259:8 260:12
261:3,4 263:2
**plotted**  203:15
**plotting**  263:4
**plus**  72:1,7,14
72:14,21 79:14
133:8,9 134:4
164:3 210:7
249:14,20
263:13
**point**  31:17 32:9
32:11 34:5 36:4
37:14 39:3,7
40:23 41:1 44:1
44:9 45:4,6,23
62:21,21 70:17
70:18,20,23
71:4,7,12,14,22
72:3,11,20 73:7
73:18,20 75:21
76:10 77:2,6,7
77:16 78:8
79:11,17 81:9
81:13,15,18,22
83:4,9 84:18,20

84:21 85:2,13
86:7,9 87:7,10
87:13,15 89:3
90:3,14,21 91:2
92:11 97:6
112:2 115:2
116:10,11
127:11 135:4
144:14 149:7
155:5 156:13,21
158:20 160:20
161:8 162:9
166:19,20,22
167:1 169:15,18
169:22 176:14
191:11,18 192:5
193:1,4,9,10
194:1,1,6,16
196:22 197:2,15
198:3,17 199:14
199:19 200:22
201:3,5,8,10,13
202:20,21
203:14,20
206:18 208:10
208:12,16
215:17 219:10
220:4 223:12
225:10,17
230:14 232:20
233:20 239:14
240:21 245:18
245:19 246:5,11
249:18,19 258:5

**pointed**   163:16
  192:10
**pointing**   171:9
  191:18 253:23
**points**   159:11
  220:1
**polarized**   16:20
  19:18 29:7
  42:17 43:9
  139:21 147:8
  174:17 265:3
**political**   11:17
  11:18 15:8,16
  15:17 16:4,6,10
  16:16,19 18:7
  19:4 49:16
  50:15 105:2,6,8
  235:22 237:19
**politically**   28:16
  28:18
**politics**   15:14,16
  16:13 17:14,15
  17:21 131:17
  182:23
**poll**   47:19 96:22
  162:2 163:18
**polling**   47:12
**polls**   98:6,9,11
**polygons**   106:11
  239:6
**pomona**   182:9
  182:17
**ponce**   5:15,20
**pop**   236:14

**population**   13:4
  28:16,18 30:9
  30:18 31:7 34:4
  36:7 37:23 40:2
  40:9 41:3 46:23
  47:9 68:20
  80:21 82:13,15
  82:18,22 83:5
  83:13 86:21,23
  88:2,23 89:1
  91:17,23 94:20
  95:5 96:8
  102:10,14
  108:14 109:18
  110:11 113:21
  113:23 117:5,19
  119:4,5,12,12
  119:20 122:13
  122:14,17,20
  123:10 128:3,4
  128:4,11,23
  130:4,5,6,10
  131:7,14,21,22
  132:3,20 133:18
  134:14,22
  140:17,21,22
  142:12 144:23
  149:1,4 151:5,7
  151:14,14,15
  152:14,15,21,23
  153:12,14,16,19
  157:5 158:7
  161:1,7,10
  171:12 185:16
  188:15,17,22

189:3,20,22
  191:7 193:3
  196:11,12,16
  198:15 199:7
  203:11 204:6,10
  207:6,7 213:2
  214:12,14
  217:12,13 218:8
  219:12 225:8,23
  226:22 227:2,11
  227:18 231:8
  232:13 234:15
  234:16 235:11
  237:8 239:3,7
  239:15,17 241:3
  241:11,16,18,22
  249:3 253:4,7
  254:14,23 255:1
  255:11,21 256:1
  256:2,19 260:10
  261:17,18 262:9
  262:10,15 263:3
  263:12,14 264:6
  265:5 269:9
  271:17
**populations**
  32:22 83:19
  133:4 142:10
  214:16 235:2
**populous**
  106:14 133:10
  133:11 161:13
**portion**   149:10
  208:11 220:15
  223:5,7

**poses** 28:19
**position** 158:16
**possibilities** 173:19
**possible** 124:10 133:5 138:14 147:13 173:15 173:18 200:19
**possibly** 213:22
**posterior** 37:7
**potential** 24:6 120:21 171:23 254:2
**potentially** 127:5 159:3 174:13 257:21
**poverty** 5:15,20
**power** 172:1
**practice** 131:13
**practices** 130:10 131:4
**precedent** 183:13
**precinct** 104:3,4 104:7 107:11,18 107:22 108:3,5 236:2 243:14 261:16 265:12
**precincts** 104:13,17,17,20 106:6 108:17 235:23 237:20 261:8 264:19
**precise** 8:18,21 40:1 166:14 192:3 194:7 199:13,18 201:11 206:14 219:20 220:3
**precisely** 40:7 92:8 151:10 204:8 205:11 224:12 226:4
**predominance** 263:8
**predominantly** 146:10 154:2,4
**predominated** 32:11
**prefer** 163:1
**preferred** 28:19 29:10 30:11,12 119:19 266:8
**premise** 45:3 151:16
**preparation** 14:20 21:13
**prepare** 13:22
**prepared** 23:11 259:3
**preparing** 14:22 26:10
**preprint** 54:13
**presence** 171:12 171:16
**present** 6:13 200:6
**presentation** 243:20
**presented** 80:1 196:19 202:21 216:20
**presenting** 55:12 125:20 127:8
**presumably** 141:17
**presume** 239:8
**pretty** 84:4 97:2 102:7 142:14 153:9 155:21 254:17
**prevents** 123:8 226:20 240:7
**previous** 13:10 57:4
**previously** 210:13
**primarily** 14:2 17:18 29:2 68:18 116:3 143:22,23 243:21 244:12
**primary** 11:20 26:16 147:14 228:13 244:21
**principles** 184:5
**print** 274:8
**printing** 54:10 56:3
**prior** 2:15 34:17 34:18,18,19,19 34:20 37:6 45:17 80:18,19 82:8 83:8 117:16 141:5 176:12
**priors** 42:12 48:17 91:22
**probabilistic** 89:18 194:8
**probabilities** 34:19,22 35:13 35:15
**probability** 34:12 35:23 37:3,7,10 38:19 43:23 47:19,22 59:8 60:3,7,8 63:12 64:2,8 78:1 79:6,22 80:15 81:5 84:3 84:7,11 85:20 89:8,11,13 164:18 197:21
**probable** 34:23 38:18
**probably** 112:6 252:1
**problem** 211:9 267:11
**problematic** 207:2 261:4
**procedure** 7:7 145:21 275:6
**proceeding** 273:9
**proceedings** 7:12 273:14

**proceeds** 205:14
**process** 3:21
   107:6 177:3
   204:5 223:10
   226:9
**produce** 246:14
**produced**
   273:11
**produces**
   167:10 204:6
   213:10
**production**
   274:20
**professional** 7:2
   273:5
**professor** 11:16
   52:21
**promise** 41:4
**prong** 28:1,12
**prongs** 28:5,11
   28:23
**proof** 244:18
**proper** 140:16
   145:6 206:12
**proportion**
   83:12,15 112:19
   148:8,15,16
   149:5 226:22
   227:1,10,18
   228:4 257:11
**proportions**
   80:12 125:16
   142:20 148:20
   220:20

**proposed**
   145:10 188:18
**protections**
   172:23
**proud** 147:5
**provide** 11:3
   13:16 55:9
   88:21 93:7
   94:13 95:4
   113:20 124:9
   130:22 166:14
   170:12 200:14
   200:19 206:14
   259:23 263:2
**provided** 7:6
   26:9 40:9 91:2
   124:18 158:23
   192:3 233:8
**provides** 112:23
   114:6,13 116:21
   118:8 253:9
   255:5
**providing** 51:12
   111:4 201:10
**proxy** 255:2
**psychological**
   16:8
**psychology** 16:5
   16:6,16,19
**public** 16:9
   17:23 276:23
**publication**
   50:3 54:3,8,15
   54:23 55:13,18

**publications**
   18:10 19:16,22
   20:3 73:11
   181:1
**publicly** 178:5
**publish** 73:5
**published** 18:8
   39:10,13,14
   49:5
**publishes**
   101:16
**pull** 50:21
   100:16 123:9
   138:18 159:22
   205:18 247:1
   259:8,15 272:3
**pulled** 224:15
**purpose** 25:17
   93:11 119:4
   123:1
**purposes**
   108:12 168:23
   174:23
**pursuant** 275:6
**put** 35:16 82:6
   101:21 172:14
   262:12 270:22
   271:10
**putting** 140:16
   270:17

**q**

**qualifications**
   136:15
**quality** 93:22

**quantity** 59:9
**quarter** 222:14
**question** 9:21
   10:20,21 31:17
   47:15 59:17
   61:6 74:6,10
   85:6,10 99:5
   105:21 118:14
   122:11 126:18
   128:12 129:5,19
   129:20 130:16
   137:9 143:21
   150:23 152:5
   157:19,23 158:5
   158:19 162:8,16
   164:8 168:17,23
   169:7,14 174:20
   175:23 194:5
   196:18 216:8
   225:22 271:4
**questions** 2:11
   2:12 8:10 9:12
   11:9 18:1 27:14
   56:11 65:9
   190:9 200:20
   229:10 230:2
   258:6,8,12,15
   259:2 268:12
**quibble** 210:15
   218:15 239:13
**quibbles** 240:9
**quickly** 162:3
   163:19
**quite** 35:16
   70:20 164:1

168:1 220:7
**quote**  64:13
99:12 109:4,7
110:7 113:19
114:6,7,7,8,12
116:21 149:16
157:18 169:4
171:5 185:11
194:18 213:21
221:7 254:19
263:11 267:1
270:20
**quotes**  115:12
170:22

**r**

**r**  236:3
**race**  15:15 19:5
30:19 32:11
42:21 108:14
109:1 113:1
118:9 141:13
149:6 196:14
207:13 219:8
226:23 227:3,12
227:14,18 232:3
235:11 241:11
242:13 243:2
253:19 254:21
263:8
**races**  150:8
264:11
**racial**  17:23
32:15 81:3
109:8,9 139:1
140:13 142:14

142:18,19
153:23 157:6
203:1,18 207:14
223:4 243:23
261:12 263:8
**racially**  16:20
19:17 29:7
42:17 43:8
139:21 147:7
174:16 265:3
**raise**  171:17
208:17
**raised**  178:3
**raising**  195:17
199:22
**random**  59:10
86:23 96:8
185:15 204:10
**range**  18:1
34:10 36:18
60:10 71:6 79:8
79:23 88:18
200:8 201:15
**rare**  44:2 106:8
106:9,10,16
133:15 251:9,11
251:22 256:3,10
256:16 257:6,19
258:1
**rarely**  61:18
**rate**  20:17,21
21:3,5,10
121:22 126:8
151:17 154:6,7
231:6,7,12

234:12 235:9
239:23
**rates**  82:21,23
83:18,20 89:3
123:20 148:12
148:21 149:17
149:23 150:7,8
207:13 227:13
**rather**  9:13 37:9
110:17 185:15
232:13 239:22
255:20
**ratio**  241:17
271:16
**rbv**  41:23
**rdh**  94:4,8
99:12 108:6
109:7,13 141:17
223:15 226:11
226:19,21
240:11,11 248:3
248:5 255:5,19
257:5 271:22
**rdh's**  226:9
254:12
**read**  22:12 24:1
25:1,13 29:20
56:19 57:13,15
59:11 60:16,22
61:4,5,8,12 62:5
63:1,6 64:23
65:5,17 75:11
75:12,16,18,19
76:2,5 78:5
91:10 92:7

109:11 112:14
114:2 115:10
116:5 120:6
121:9,19 122:5
128:1 130:3,8
161:21 162:5
168:10 171:13
180:10 185:6,8
185:10 186:1
188:12 189:5,12
189:13,13,17
190:2,3 192:9
193:16 194:21
206:3,23 209:3
209:12 220:14
220:23 221:9,13
223:7 224:11,22
226:14 230:10
230:23 236:4,21
237:15 240:15
241:9 252:9
254:1,6,16
259:20,21 260:2
274:6 275:2
**readily**  55:10
**reading**  2:3
75:14 76:12
122:1 156:16
195:5 209:4
263:18
**reads**  224:18
238:23
**real**  231:22
**reality**  264:14

**realize** 10:4
254:1
**really** 43:15,17
87:20 120:16
148:17 169:6
175:12 200:4
**realtime** 7:3
273:6
**reanswer** 94:14
**reason** 11:2
30:5 40:8,21
45:9 46:1 52:20
53:6,12 55:20
62:12 69:20,21
70:4 100:20
105:13 106:21
183:6 196:17
212:9 217:5
222:9 234:17
238:23 250:21
255:4 261:5
275:13,16,19,22
276:3,6,9,12,15
**reasonable** 81:9
84:8 92:10
100:22 103:22
112:3 129:7
183:8 234:20
**reasons** 40:21
109:23 111:18
234:20 275:8
**rebuttal** 3:13
69:2 74:12,21
192:22 269:14

**recall** 18:9
33:14 52:3
59:18 69:4 71:4
71:7 95:2 122:1
128:5 133:20
136:17 138:16
140:4,23 142:15
144:4 152:4
153:2 154:3
155:19 171:8
172:4 179:5,23
186:10 195:5
202:22 216:3,7
222:5 228:12,12
231:14 241:20
265:1 267:4
**received** 15:18
26:14,17,23
68:8,14 262:4
**recency** 232:14
**recent** 117:11
130:19 131:2
253:20
**recently** 146:23
176:16
**recess** 51:3
92:15 135:6
187:5 218:21
258:20
**recollection**
159:7
**reconstitute**
264:18
**record** 8:12
11:23 51:1

56:12 92:19
112:15 121:9
162:8 163:2
170:7 206:9
229:15
**records** 137:22
**redistricting**
3:18,21 13:12
13:16,21 15:22
17:17 19:8,10
19:19 40:22
93:3,9,10,14,17
94:4 99:5
104:16 107:5
130:5,21 141:16
156:11,20 181:2
183:22 184:4
243:2 247:15
254:8
**redraw** 132:17
**redrawing**
172:20,22
**redrawn** 104:20
**reduce** 127:10
127:11
**refer** 22:17 68:9
206:2
**reference** 14:16
63:18 175:5
199:12
**referenced**
28:11 122:4
130:1 266:20
**references** 56:2

**referred** 42:15
77:1
**referring** 18:23
39:17 65:12
86:12 114:18
169:5 181:9
200:15 260:6
**refers** 73:14
260:4
**reflects** 185:15
**refresh** 14:4
69:15 115:21
116:2 159:6
180:1
**regardless** 21:5
49:13 97:22
120:9 131:20
219:8 231:3
239:10 255:6
**region** 30:10,16
30:23 140:18,20
265:9 266:5,9
266:18 267:2,3
267:21
**regions** 32:17
113:23 262:10
**register** 121:17
**registered** 7:2
113:14 273:5
**regularly** 165:9
**reject** 49:17,22
49:23 67:16
**rejecting** 43:22
**rejection** 50:11

**relate** 19:3
**related** 13:6,14 13:21 17:14,16 18:17 19:5,6,18 29:7 46:12 143:15 147:11 168:5 243:12
**relating** 2:7
**relation** 149:5
**relations** 11:19
**relationship** 46:9 180:7,9,16
**relative** 22:13 22:14 66:20,23 82:23 123:12,22 125:10 126:20 141:19 144:3 148:15 158:22
**relatively** 22:12 192:17
**released** 94:17
**relevance** 16:20 16:22 198:12
**relevant** 20:4 29:6 31:12,16 32:18 44:22 45:1 55:19 123:3 241:2,12 241:15 244:13 255:11
**reliability** 157:20,23 158:19 162:12 169:15 195:10 270:7,15
**reliable** 93:18 94:1,8 110:7,8 110:22 112:10 112:18 113:4,20 114:6,14 116:7 116:9 127:3,15 128:9 129:4 156:22,23 168:1 168:3,6 170:1,4 170:7 195:22 245:1,5 269:20
**relied** 26:9 194:1 226:9
**relies** 121:8 167:18 193:4
**rely** 34:14 40:23 90:20 115:19 116:3 119:5 130:12,17 132:1 132:5 143:20 151:9 168:5 182:5 190:13 197:2,15 198:3 252:22
**relying** 34:2 43:9 125:16 134:20 203:20 215:17,21 239:18
**remaining** 150:1
**remedial** 140:18 141:2,3,6,9 157:2 173:4,9 173:11,21 174:7 175:2 188:18 192:6 193:20
**remember** 14:18 59:22 60:1 69:12 87:15 102:2 156:12,18 192:21 233:14 251:18
**remembered** 26:22
**remote** 1:20 7:8
**remotely** 5:17 5:22 6:5,10 242:19
**remove** 123:6,7
**removing** 128:10
**repeat** 24:18 42:7 61:14,18 87:1 271:4
**repeated** 34:8
**repeating** 62:11
**replicate** 248:16
**replicating** 248:22
**report** 3:10,13 3:16 4:2,4 8:19 8:20 12:10 13:1 14:1,4,6 21:12 22:1,6,11 23:8 23:11 24:9,13 24:17,21 26:10 26:12,13,15,17 26:18 27:9,15 29:12,15,20 31:22 32:15 68:7,9,10,14,16 68:17,22 69:2 74:12,22 76:8 90:1,3 91:8 92:7 92:7,22 97:16 98:16 99:4,14 101:21 102:2,3 103:19 109:3 110:6 112:8 115:18 121:8,10 121:14,20 122:5 124:13 128:1,6 130:3 135:18 142:17,18 143:8 147:14,17 149:13 156:17 157:12 159:6,19 160:5 161:6 162:13 164:15 167:8 170:3,18 170:20,22 177:16 178:15 182:5 186:8 188:9 190:5,7,8 190:10,19,21 191:5,6,15,22 192:13,20,23 193:17 194:15 195:4,6 196:6 196:10 199:10 205:6,8,19,22 207:20 220:10 222:19 223:18

224:15,16
226:17 228:23
229:4,5,16,21
230:4,8,13,18
231:16 236:7,16
238:7 243:8
245:16 247:1
250:6 252:20
259:7,9 262:7
268:17,19
269:12,14
**reported**  40:14
90:3 97:23
100:1,3,4 104:7
203:16 252:14
**reporter**  7:2,3,4
7:17 9:8 10:9
74:14 273:5,6,6
**reporter's**  273:1
**reporting**
200:22 254:14
**reports**  25:12
71:1 138:17
145:6 176:21
178:2 188:4,22
192:23 193:23
196:2,19 222:19
252:9 262:20
**represent**  8:6
57:2 58:1,5,13
100:18 103:18
134:4 183:2
215:6 216:9
229:20 233:15
237:6 238:4

269:6,16
**representation**
138:20
**representatives**
131:19
**represented**
222:7
**represents**
273:13
**reprint**  54:13
**reproducing**
248:23
**reputable**  53:3
**requested**  274:6
**requirement**
140:2 144:19
145:12 154:23
155:9,16 173:8
197:10
**requirements**
130:7 132:21
133:1 183:21
184:2,3
**requires**  224:20
**research**  17:9
19:21 112:5
**researched**
177:15
**researcher**
223:4
**reserve**  268:3
**residents**
149:18 185:14
255:23

**resolve**  235:16
**respect**  19:16
50:17
**respective**  1:17
**responding**  38:6
**response**  9:17
233:2
**responsibility**
274:6
**rest**  127:1
194:21
**restate**  150:22
**restatement**
78:7
**result**  47:12,19
119:17 147:17
219:16 273:19
**resulting**  214:8
**results**  245:7
**resume**  16:3
**retained**  12:16
**returned**  274:12
274:15
**review**  274:7
**reviewed**  18:9
19:14 48:6,19
54:7 68:21 69:1
69:5 73:2 160:5
181:1
**ridiculous**
197:23
**right**  41:7 56:5
56:17,21 57:9
68:12,22 74:14
79:21 80:1

95:12 117:21
118:10,20 126:8
126:17 129:9
130:9 131:15
141:10 146:19
151:11 159:11
161:9 169:3
173:6,15 179:17
193:8 199:15,16
206:10 208:19
223:22 225:19
228:17 248:18
250:7 251:10
254:12 261:9
268:4,19 272:7
**rights**  13:14
15:22 17:16
25:14 28:4
172:23 175:16
181:23
**role**  111:22
145:1 179:21,23
185:3 193:6
**rolling**  94:16
**romero**  182:8
182:14,16
183:13
**room**  12:2
**root**  97:11
216:11 217:1
**rosborough**
6:13
**rough**  153:23
168:11,20

**roughly**  100:14
  103:8 104:23
  167:16 222:14
  222:17
**rounded**  191:10
**rpr**  1:19 273:22
**rpv**  17:1 143:12
  146:16 147:15
  243:15,22
  244:14 265:3
  267:14
**rule**  275:6,7
**rules**  2:6 7:6
  11:7
**run**  46:5 62:2
  173:3 174:14
**running**  86:14
  203:21
**rvp**  137:15

**s**

**s**  1:14 184:14
**sake**  96:14
  215:8
**sample**  81:16
  95:9,11 96:5,8
  96:12 97:7,11
  97:19 98:13
  110:11 111:13
  111:21,23
  116:15,16
  118:21,22 119:6
  119:19,21 124:5
  130:12 132:6
  162:2 164:1
  185:15 186:7

203:14 204:10
  204:22 213:4,10
  213:11 214:5,18
  214:20 217:2
  220:19 221:4
**sampled**  163:18
**samples**  73:2
  86:23 95:14
**sampling**
  110:12 117:4
  118:2 204:5,12
  204:18 207:20
  210:12 217:19
**satisfied**  145:11
**satisfy**  28:2
  154:22 155:8,15
  172:18 186:18
  201:21 202:11
**saw**  176:22
  179:23 240:23
**saying**  15:13
  35:23 36:14,22
  45:6 56:20
  58:12 62:7,9
  64:9 66:11,11
  66:13 67:22,22
  70:8,12 71:21
  71:23 72:20
  78:17 110:15
  116:11 117:1
  123:4 146:13
  158:14 169:1
  171:22 172:3
  173:15,17
  193:23 195:6

201:13,16 210:2
  211:4,12 213:13
  213:15 214:21
  215:7,9 217:22
  218:14 224:2
  230:3 232:23
  234:1 236:10
  238:16 241:7
  247:14 248:2
  249:9 258:1
  265:7 266:4,9
  267:17,18
**says**  23:15 34:6
  40:4 51:22 52:7
  54:9 56:21 59:5
  60:14 61:10,13
  64:19 65:23
  67:7,9 78:6
  160:13 163:23
  165:21 166:13
  171:13 181:22
  184:12 188:7
  205:8,9 210:5
  217:7 219:17,19
  220:2 223:3
  225:5 232:9
  235:18 237:22
  238:1 241:1,12
  255:4 260:8
  263:10 269:3
**scale**  220:21
**scenario**  123:16
  171:9 198:5
  202:23 213:21
  215:2 250:18

251:5,17 254:9
  254:19
**scenarios**
  253:17 257:4
**scholarship**
  18:5 98:7 180:8
**science**  11:17,19
  15:8,17 50:15
**scientists**  49:17
  67:16
**scope**  12:22
**score**  97:9
**scratch**  71:2
  119:10 153:21
  157:21 177:7
**screen**  22:9
  50:22 51:21
  63:5 74:20 75:4
  159:17,21 160:2
  160:12 161:19
  178:22 179:15
  181:19 187:19
  187:21 205:23
  208:19 209:22
  220:12 222:23
  230:20 236:20
  247:2 259:13,14
**scroll**  53:23
  63:3 64:10 75:8
  160:6 188:8
  189:6,14 190:16
  229:13
**scrolled**  23:13
  52:4 57:1 191:3

**scrolling** 57:17 65:21 175:4 190:14
**sd** 259:8
**sd7** 37:23 70:22 113:9 119:9 149:2 151:20 212:12 213:18 213:19 215:1 217:14 219:12 221:23 222:7,13 248:10 249:15 265:16
**seal** 274:12
**sean** 170:23 184:15
**seats** 131:22
**second** 17:7 54:10 56:3 59:5 61:9 62:6 64:17 118:6,7 138:5 166:11,13 189:9 190:19 205:20 211:3 232:8 246:2 257:15 259:19 263:6
**secretary** 8:6
**section** 25:14 28:3 31:21 60:17 62:6 75:17 110:5 121:19 144:22 159:10 167:9 169:18 179:6 181:17 205:9 259:6 262:13
**see** 22:8,10,15 22:16 28:21 33:2 35:10 51:21,22 52:5,7 54:2,5,9 56:20 57:18 63:6 66:2 66:3,22 74:19 74:21 75:4,5 76:21,22 80:8 83:9 91:15 105:12 126:14 129:4 138:9,18 145:17 160:1,12 160:15 161:8 174:15 177:16 178:4,22 179:15 181:19 182:8,12 187:19,20 188:5 188:9,23 189:6 189:15 205:23 209:1,18 210:5 210:8 217:9 220:11,13 222:22 228:17 230:19 237:5 241:14 247:5 251:3 257:3 259:12,14 261:6 261:22 263:10 264:22 265:10 267:10,20 269:5
**seeing** 57:3,8 71:7 267:4
**seeking** 198:20
**seem** 30:22 216:18 250:21
**seemed** 19:2
**seems** 19:7 25:13 29:3 40:4 52:9 61:19 66:19 97:2 100:22 157:19 157:23 158:19 182:6 236:7 250:14 253:16 260:6 264:9 271:9
**seen** 40:23 54:22 69:6 151:22 152:2,20 165:10 176:4 177:23 229:6,7 229:10 268:5
**sees** 96:22
**seiss** 3:6 6:2 7:19,22 8:4 11:21 55:5 92:10 129:12 135:3 159:18 162:20 187:1 218:18 221:5 258:4,16 268:8 272:11
**semantics** 62:8
**semester** 17:5
**senate** 28:7 93:2 102:9 119:13 133:19,23 134:7 213:23 251:15 252:6,8,17,22 266:20 267:3,8
**senatorial** 90:17 220:22
**senators** 131:20
**send** 263:17 274:13
**sense** 9:18 32:18 43:22 73:16 80:17 105:10,12 116:14 119:2 162:22 205:16 246:8 258:10 271:9
**sensible** 256:6
**sensitive** 36:10 39:9 77:9
**sentence** 42:4 46:18 63:19 75:20 76:5 78:3 78:5,8,18 91:9 91:11,12,12 92:3,6 112:14 114:18 116:4 160:15 161:22 181:21 182:4,10 185:7 189:18 192:2 194:22 195:6 209:4 210:22 221:13 238:2,16 253:15 259:19 260:5
**sentences** 185:10,23 186:1

188:13

**separate** 207:23
236:15 237:23
238:13 269:10
269:10

**separately**
237:4,9

**series** 243:18
245:3,4 269:20

**service** 17:9

**set** 36:12,13
39:9 78:15 79:5
98:20 104:23

**sets** 19:22 77:10

**setting** 199:3

**settle** 147:23
156:6

**settled** 143:9

**settlement**
144:12 145:21
147:21

**seven** 13:6
36:16 92:21
103:20 109:3
263:6,10

**seventeen**
219:17 222:18
222:22

**several** 70:23
114:15 153:7

**shade** 27:1,2

**shaded** 261:9

**shaking** 9:13

**shaped** 184:13

**share** 13:1
29:22 145:14
159:16,20
171:18,18
187:17 228:22
239:15 240:3

**shared** 25:18

**sharing** 22:7
51:17

**shift** 204:4

**shifts** 131:23
232:14 235:1
255:21

**short** 34:13 35:1

**shortcomings**
246:13,14

**show** 32:15
69:16 75:8
93:19 160:8
165:13,13 181:4
192:20 193:2
194:12 229:18
251:4 264:18,20
266:15,19
267:17

**showed** 86:13

**showing** 77:6
161:19 192:16

**side** 56:17,18,21
57:7,9 129:14
129:15 176:20
270:3

**sign** 23:22 172:9
274:6

**signature** 2:2
23:19 273:21
274:2,16 276:18

**signed** 24:1,5,14
172:14 273:20
274:10,12,15

**significance**
67:12

**significant**
200:23

**significantly**
220:21

**similar** 146:6,14
157:10 202:13
266:22

**similarly** 237:1

**simple** 30:5
33:23 34:13
45:20 127:9
150:4 193:1
194:5

**simply** 41:17
171:14

**simulation** 74:4

**single** 28:15
80:22 96:3,9
119:1 142:8

**sir** 238:14

**situation** 198:11
251:14

**situations**
246:10 256:10
256:17

**six** 68:7 92:21
228:10 229:19

229:21 230:4,10
230:12 235:17
250:5 253:15
269:7

**sixteen** 224:15
247:3

**sixty** 36:16
114:1,20 115:6
203:9

**sizable** 140:17
140:19 142:11
151:13 171:11

**size** 50:18 90:15
97:12 102:10
103:20 111:21
131:21 161:1
203:11,14 213:4
213:10,11 214:5
214:9,18,20
217:2 220:19
221:4

**sizes** 44:3 49:10

**skeptical** 219:23

**skip** 237:2

**slight** 257:20

**slightly** 149:10
245:21

**slowly** 190:17
190:20

**small** 75:23
116:14 142:15

**smaller** 64:21
102:20 114:8,12
114:17 116:5,8
134:21 161:14

161:15 162:3,4
163:20,20
203:14 212:22
214:8 220:19
221:4
**smallest** 252:1
**smith** 1:19 5:11
7:1 273:4,22
**social** 67:15
**sociological**
19:21
**software** 245:15
**somebody** 97:14
136:11 249:9
**somewhat** 66:17
**sorry** 8:1 22:15
22:16 24:18
42:6 110:2
122:11 149:8
162:7 175:23
177:7 190:11
206:6 209:1,20
209:23 210:1
219:18 220:13
222:19 232:22
238:15 240:17
240:20,23
246:18 252:4
268:20
**sort** 29:4 74:3
93:20 203:3
228:17 232:12
266:14
**sorts** 49:14
55:21 270:17

**sound** 91:11
103:22 110:17
**source** 110:7,9
112:10,18,23
113:7 124:12
127:21 208:5
**sources** 26:16
92:22
**southbridge**
274:21
**southeast**
274:18
**southern** 1:3 5:3
5:15,20 84:14
**span** 104:21
**spanned** 209:21
**spans** 75:2
**speak** 50:4
180:17
**speaking** 10:12
10:15 67:14
93:23 97:12
149:19 213:9
222:17
**special** 176:22
**specific** 16:23
19:16 22:18
27:14 40:6 41:8
51:9 64:15 68:6
98:15,19 115:3
122:3 127:6
140:5 170:16
184:2 194:16
197:5 242:15
253:19

**specifically**
13:15 18:22
42:6 101:4
154:9 169:23
180:1 196:10
217:8 239:22
**specifics** 33:13
152:4 153:3,8
154:3 156:13
186:21 216:7
**specified** 21:10
**specify** 18:21
20:23 49:14
**specifying** 128:5
**spectacularly**
167:20
**spell** 11:14
**spent** 14:21
**split** 105:16,18
106:19,20
108:17 166:17
206:17 208:13
212:12,20 214:4
214:7,14,22
221:15 222:8,15
226:5 227:22
235:22 236:2
237:19 243:14
**splits** 221:23
222:4
**splitting** 206:22
208:22 209:11
218:3,5
**spot** 161:9
206:12

**spread** 231:21
232:4
**square** 97:11
216:11 217:1
**squared** 216:11
**stage** 137:5
141:4,6,9
144:12 146:14
147:15 174:7
184:23 202:2
**stand** 172:10
181:6 243:1
**standard** 21:15
48:5,20 86:22
87:5 97:10
110:14 111:11
112:9,17 113:6
174:18 194:13
200:2 201:9
216:12,23
**start** 15:13
107:18
**started** 144:6
**starting** 56:12
56:13 107:1
170:21 185:8
206:4 209:4
240:18 254:18
**starts** 62:23
**state** 6:3,8 7:4
8:6 11:12 24:9
24:13 31:3 68:8
91:1 106:13,21
110:10 115:5
134:16 136:16

137:17 161:7
164:2 173:16
184:2,3 192:2,6
220:22 243:8
273:2,7
**stated** 30:11
76:17 78:19
121:13 242:11
**statement** 23:14
44:16,19 45:11
59:8 61:22
63:13,14 65:16
66:8 78:13
115:9 163:15
168:6 169:14
197:23 241:9
275:8
**statements** 60:3
60:12 89:5,9,11
89:13 91:21
167:8,13 168:5
168:20 170:5
172:12 194:8
**states** 1:1 5:1
20:12,14 78:3
95:5 102:21
106:9 113:2
131:21 133:7
134:23 175:14
175:19 178:14
182:3 185:19
259:21 275:7
**statewide** 95:17
124:20 164:1

**stating** 60:2,18
63:11
**statistic** 58:6
86:13
**statistical** 17:1
43:21 53:8,18
67:12 86:19
**statistics** 3:12
15:23 33:17
43:2 51:20,23
52:8,21,23
53:14,21 58:9
62:14 77:12,14
80:9 113:1
114:7,14 122:3
122:6 238:17
**status** 120:9
263:13
**stay** 9:23
**stenographic**
273:10
**step** 240:12
**steps** 272:1
**stick** 41:6
**stipulated** 1:15
2:1,8,17
**stipulation** 7:7
**stipulations**
7:18
**stone** 1:6 5:5
**stopped** 118:1
**stopping** 92:11
135:4
**strict** 133:7

**strikes** 200:10
**strong** 50:11
66:6,17,17 67:4
67:19,19 227:15
240:7
**stronger** 64:21
**structured**
244:13
**student** 176:15
**students** 62:13
79:3
**studied** 268:6
**studies** 19:14
34:20 45:18
48:23 86:15
87:2
**study** 34:9,20
36:15 44:11
46:5 50:14 74:4
**stuff** 57:10
114:12 156:12
167:22 171:13
271:16
**subarea** 15:21
**subcommittee**
145:6
**subfield** 15:21
**subfields** 16:7
**subject** 18:4
35:5 51:5 139:1
**submit** 238:18
**submitted** 12:10
21:12 23:8
26:18 138:17
142:6 177:17

242:16
**submitting**
99:13 143:8
**subscribed**
276:19
**substance** 92:16
135:8 187:7
218:23 258:22
275:7
**substantial**
52:22 160:21
174:21
**substantive**
21:4,14 92:18
135:13 181:5
**successfully**
29:9 176:16
**suddenly** 83:15
158:3 193:6,10
199:21 200:12
255:22
**suffice** 115:8
**sufficient**
162:19
**sufficiently**
31:13 114:6,14
**suggest** 96:1
263:7
**suggested** 231:5
**suggesting**
114:23 252:18
252:21
**suggests** 12:23
167:23 219:19

**suit** 193:5
**suite** 5:16,21 274:21
**suits** 193:2
**sum** 35:9
**summary** 35:11
**summed** 216:11
**supervision** 273:12
**supplemental** 4:4 228:23 229:3 236:6 238:6 268:16,18 268:22
**support** 43:6 158:18 183:18 193:17
**supported** 128:8
**supports** 192:14
**suppose** 109:22
**supposed** 177:20
**supra** 189:1
**supreme** 27:18 171:1 184:11,21
**sure** 13:14 19:1 20:16 44:22 47:14 49:11 52:16 53:2 54:5 54:23 55:1,23 56:1 61:7 67:2 70:11 74:13 78:16,22 92:13 93:8 94:2,11 96:20 99:15 102:7 105:20 110:1,23 112:16 116:1,4 120:1 122:19 123:5 135:16 137:13 138:3,18,19 140:5 144:9,10 149:12 151:2 152:3,6 153:6 153:10 154:8,15 155:2,21,22 156:15 159:16 160:11 162:20 164:5 168:18 173:1 180:18 182:15 183:11 186:21 187:4 190:8,15,18 191:16,23 196:1 202:1 204:13 206:3 209:3 215:8 216:2 218:20 219:4 220:6 221:5 228:15 234:5 236:8 258:8 259:17 262:23 271:5
**surprised** 165:9 177:16
**surrounding** 261:20
**survey** 20:2 36:23 94:12,15 94:18 96:3 110:19 118:23 124:4 223:18
**surveyed** 96:11
**surveying** 118:2
**surveys** 73:2 131:1
**sutton** 179:19
**sworn** 7:15 276:19
**system** 146:21

**t**

**t** 1:14,14
**table** 65:22 66:19 67:7,8,11 68:3,5 230:9 238:6 269:2,2,5 269:7
**tabulation** 104:9,13
**tabulations** 185:20
**tacking** 211:20
**tactic** 166:5
**tailed** 48:9,9,14 48:18,22
**take** 8:20 10:18 38:7 39:15 61:7 70:6 79:20 82:8 82:12 86:23 91:16 92:9,11 97:8 125:7 127:13 135:14 180:12 187:3 196:14 216:11 228:1 245:7 249:7 258:13,14 258:17 271:23
**taken** 1:18 38:16 51:3 92:15 135:6 187:5 218:21 258:20 273:9
**takes** 34:8 117:17 240:11
**talk** 10:10 17:22 18:11 51:4,8 56:6,7 58:7 86:15 91:6 127:22 155:1 156:14 163:19 170:15 187:10 195:15 202:3 207:10 217:15 218:22 228:15 246:22 258:21 259:6 263:2
**talked** 79:11 90:8 155:7 164:17 246:1 250:8,11 259:1 262:21
**talking** 16:22 20:5 37:10 68:11 72:7,18 76:21 80:12 81:21 86:16 96:2 124:19 128:19 154:16 163:5 169:18

180:23 194:22 195:8,9,12 196:3 199:10 201:9 208:3 217:16,23 218:4 219:7 233:5 234:22 241:17 255:14 265:20 266:22
**talks** 207:19 235:14
**tally** 15:3
**target** 78:9,11 198:7
**task** 46:21 188:21 195:7
**taught** 17:11,15
**teach** 17:12 131:18
**teaching** 17:4,5 17:8
**technique** 203:4 223:14 226:16 227:7 232:17 240:10 257:10
**techniques** 110:10,13 223:16 225:9 227:6 243:5
**tehran** 20:11
**tell** 22:20 26:19 27:8 35:21 37:8 38:17 50:17 64:5 77:22 80:12 81:17 82:6,16,19 84:1 85:19,22 86:18 86:21 88:6,17 89:23 90:20 92:2,8 100:2,16 125:4 127:5,6 128:2,16 143:20 147:6 158:4 181:4 183:19 198:19 218:2 261:1
**telling** 36:5 39:6 64:7 82:1 84:6 86:5 87:17 125:2 126:7,15 165:2 197:18
**tells** 38:18
**ten** 68:12 101:12,14 103:7 104:21,23 105:3 112:8 120:3 131:18 135:18 135:20 137:6 149:12 191:10 201:4 218:19 258:6,17 260:8
**tend** 142:18
**tenth** 192:4 199:14 200:21
**term** 77:12 234:21 246:9
**terms** 17:20 19:5 21:11 43:13 49:6 145:2 177:6 192:17 195:13 195:18
**test** 28:1 46:15
**testified** 7:16 136:3,5,23 216:10 225:15 226:8 234:2
**testify** 215:13
**testifying** 59:19 137:4
**testimony** 8:12 10:6 11:4 13:19 13:20 14:17 43:6 92:17 135:9 156:9 168:11 187:7 216:4 218:23 258:22 275:2,7
**testing** 46:13,20 48:10,15 50:19 73:10,14 87:21 197:13 198:11
**texas** 136:14 137:12
**text** 56:22 61:13
**textbook** 63:19
**thank** 8:22 9:7 10:8 13:9 15:5 16:15 18:3 20:6 23:1 31:5 41:4 51:13 63:2 75:10 84:12 101:17 109:2,6 124:21 134:13 135:16 148:1 155:17 159:23 168:9 178:16 179:11 185:22 186:16,23 189:9 191:5 210:9 228:9 233:3 235:13 258:19 259:18 268:9,10 268:20 272:9
**theorem** 86:20
**theoretical** 35:7 35:8 62:16
**theoretically** 86:19 134:15
**theory** 86:19,20
**thereto** 2:16
**theta** 57:18,21 58:1,3,5,12 59:8 59:9,13 63:13 63:23 64:2,8
**thin** 45:14
**thing** 13:19 26:22 63:1 67:10 78:23 90:18 111:19 127:4 128:16 143:19 163:13 191:14 219:2 232:2 238:10,20 259:5 262:22 263:19 265:18
**things** 39:19 40:3 41:8 55:23 56:9 58:4 101:14 115:14

135:15 139:23
160:19 166:9
167:6 195:23
217:16 226:19
235:6 243:19
244:6 256:6
262:11 268:5
270:2
**think**   9:5 12:14
16:3 23:2 37:19
38:2 42:16
43:14,16 44:17
45:2,9 46:1 47:5
50:2 54:20 55:6
56:5 74:13 76:8
78:23 80:22
84:8 86:12
88:15 99:11
100:22 101:20
102:8 105:6
112:3 117:10
120:1 121:6,12
123:2 127:12
129:11,16,18
130:1 131:8,10
134:19,23
135:18 136:15
137:14 138:1,2
141:18 143:6,9
143:11 144:11
144:13 146:15
146:17,19,22,23
147:14,21,21
150:11,20 153:4
153:9 154:10,14

156:5,21,23
157:17,22
162:14,18,22
163:7 168:1
169:6,9,17
171:21 172:5
174:4,17 176:16
176:18 177:2
179:4,7,16
183:8,9,9,10
185:2 186:6,7
202:22,23 203:6
204:8 206:11
211:10,11
214:18 216:17
216:19,20,22
217:2 219:17
220:4 221:1
226:19 228:16
234:3 235:15
245:20 246:1,13
248:13 249:10
250:8 258:6,11
260:9,9 262:6
263:21 264:15
265:18 266:11
266:20 267:20
271:20
**thinking**   39:19
45:3 80:19
**thinks**   112:3
168:6 169:23
170:7 232:18
267:13

**third**   161:21
223:2 250:3
255:9 256:14
257:16,17
**thirds**   240:16
**thirteen**   165:21
220:11
**thirty**   100:20
102:16 192:1,2
199:11 222:8
**thornburg**
27:18,22,23
**thought**   136:11
160:18 176:23
177:22 178:10
200:3 219:7
224:9 252:7
263:22
**thousand**
100:19 102:4,11
102:14,16 114:1
114:20 115:7
203:7,9
**thousandth**
201:5
**three**   9:5 28:1,5
28:11,23 66:22
94:23 100:19
102:11 117:12
135:17 136:20
143:23 185:10
186:9 188:13
236:11 245:16
246:10 247:16
252:2 257:8

259:10,11 261:8
**threshold**   44:5,6
50:3,7,16 67:12
169:8 174:11
197:5 264:16
**thresholds**
50:20 265:4
**throw**   150:12
211:13,15
**throwing**
211:17
**tighter**   112:1
**time**   2:14,14 9:6
34:9,9 53:9,14
61:7,17 65:5
71:13 91:5 99:3
101:13 117:18
143:13 162:19
168:4 181:12
187:2 218:19
224:2 273:15
274:15
**times**   8:16,20
9:5 36:16,17
62:2 88:16
94:10 97:10
111:12 129:17
178:4 180:12
257:3,23
**timesed**   216:23
**tired**   220:7
**title**   167:11
**titles**   18:13
**today**   11:4 12:3
20:5 24:23

171:10 262:21
**together** 147:19
228:1
**told** 69:17 70:2
74:4 80:2 84:2
110:18,19
197:21 237:12
**tolerate** 133:14
133:16 135:1
**took** 38:12
88:20
**tool** 43:21
**top** 19:20 52:6
53:21,22 54:6
56:14 57:19
75:5 86:8
100:15 113:6
155:19 184:5
188:5 203:2
219:18 222:5
224:20 225:6
257:8 269:2
**topic** 33:18
34:17
**topics** 17:14
18:2,8 157:10
**tornado** 45:16
**total** 83:16
119:5 122:14
126:16 128:4,23
130:4,10 132:2
134:11 158:7
219:7 232:10,11
236:23 254:23
254:23 255:4

**totals** 265:12
**touched** 102:18
**tough** 137:9
**towards** 167:15
**town** 147:3,3,4
147:18
**tract** 107:8
161:11
**tracts** 101:3
125:1
**traditional**
184:4
**transcript** 9:9
9:11 168:12,15
168:20 169:22
273:11,14 274:7
274:13,15 275:2
**transform** 245:7
**translate** 48:22
**trapped** 106:11
**travel** 21:3,8,9
**trende** 3:15 4:3
4:5 25:17 29:4
30:6 31:3 32:8
34:1 38:3,12
40:3 60:1,20,23
69:7 70:20
81:12 90:6,18
91:7 111:21
121:7 122:4
128:5 157:13,19
157:22 158:18
160:5 162:11
167:19 169:13
170:17,23

172:17 176:14
176:15 177:4
179:6,21 181:18
183:16 185:12
186:17 191:6
193:18 194:18
199:12 200:5,13
201:20 202:10
202:18 204:15
207:19 208:21
209:15 213:19
214:21 215:18
217:6 218:2
219:11 223:3,15
224:4 226:7
227:5 228:10
229:18 231:10
233:9 235:14
241:1,7 243:5
246:21 248:7,15
252:10 253:16
258:2 260:11
262:13 264:7
269:11 271:2
**trende's** 13:1
14:3,8 15:1
26:15 29:12,18
30:1 31:22
33:14 59:18
60:12 68:17
70:13 71:17
102:3 103:19
121:14,20
127:13,18
141:20 156:8,17

159:6 168:11
186:2 187:23
190:10 192:13
204:3 205:19
216:3 222:18
224:16 228:23
230:18 231:16
234:10 241:21
242:6 245:19
246:5,11 256:23
259:7,9 260:16
262:20 264:21
265:15 267:12
268:16 271:6
**trends** 130:19
**trial** 2:14 13:19
13:20 136:23
262:20 267:23
**tricky** 188:21
195:7
**tried** 90:9 157:1
172:7 233:12
**tries** 158:4
160:17 163:12
263:2
**true** 23:17 24:4
24:9 34:7,10
36:1,17 38:20
44:17 46:1 47:9
47:22 59:14
60:4 74:1,2,4
77:23 78:10,14
79:23 81:23
82:4 85:4 87:19
88:9,17 89:14

106:6 118:19,22 128:7 160:22 164:19 169:1 177:6 197:22 198:2,19 199:1 200:9 230:1 242:21 273:13
**trust** 110:17
**trusted** 110:9
**truth** 119:20 167:20 196:23 201:12
**truthful** 11:3
**try** 9:21 10:10 16:7 34:3 35:9 105:23 157:8 179:12 271:16
**trying** 9:4 32:8 32:10,15 41:6 62:17 71:10 76:8 77:21 89:5 91:14,15,15 92:9 131:6 137:14 138:19 145:21 158:8,11 159:2 161:16 162:11 163:6,7 164:8 165:7,7 165:18,19 166:2 167:4 172:17 173:12 175:13 176:18 192:14 193:1,7,12 194:12 197:4 198:7 202:10 207:17 208:10 208:16 215:5 219:10 220:5 236:11 248:16 248:22 249:1 254:11 259:15 263:17 264:10 267:11 272:7
**tuesday** 14:8
**turn** 74:11 75:1 190:4 191:21 268:15
**twelve** 90:13 101:22 114:22 142:6,7 157:12 157:18 170:20 193:16
**twenty** 18:9 23:3,5,7,14,15 103:20 203:7 231:10 235:15 235:18 236:20 237:16 238:22 240:15,18 259:10,11 263:6 263:10
**twentyish** 15:4
**two** 18:9 19:16 23:4 33:21 43:4 44:9 48:9,18 53:17 60:21 61:1,4,8 62:22 66:1 96:15 102:4,14 116:20 131:20 132:16 143:22 147:2 181:16,22 182:11 188:3 195:23 207:4,19 233:1 236:8,14 237:10,11,13,14 237:15 238:5,19 239:11,12,13 240:2,16 241:22 246:16 252:18 269:8,9
**type** 18:18,22 21:6 39:18
**typed** 238:17
**types** 28:6 259:23
**typical** 18:4 180:6,16
**typically** 17:10 28:2 46:11,13 67:11,14 73:5 104:1,12 106:4 106:22 107:5 108:12 109:15 111:4 112:7 114:20 133:14 149:16,19 152:12 160:21
**typing** 239:12
**typo** 186:12 254:2 260:9 261:10
**typos** 24:6

**u**

**u** 1:14
**u.s.** 27:17 93:6 94:21 95:8 100:6 101:2,15 104:14 112:20 114:3 117:18 119:2,5 130:15 132:1,2,18
**uh** 9:14,14 146:3 199:16
**ultimately** 170:10,13
**unavailable** 243:4
**uncapped** 231:13,15,18 233:4
**uncertainty** 95:14 166:22 177:19 191:12 194:19 195:18 195:20 206:17 208:12 223:11
**unconvincing** 32:10
**under** 23:16 30:15 72:17 82:7 83:10 85:9 85:11,13 122:15 151:16 189:18 234:13 246:21 273:12
**undercut** 162:11

**undergraduate**
17:13,19
**underlying** 36:7
37:15 39:5
59:14 62:16
77:5 91:17
119:20 147:11
167:20 196:23
198:23 199:7
201:11 245:11
269:23
**undermine**
90:10 158:12
161:16 165:8
**undermined**
90:9
**underpinnings**
16:9
**underpopulati...**
191:20
**undersigned**
275:2
**understand**
9:20 11:7 16:7
33:3 35:4 41:13
42:2 47:15
62:14,15 63:9
74:9 105:20
122:5 124:12
132:23 138:11
156:19 167:1
173:7 216:15
229:12 232:7
236:5 242:19
243:17 253:14

264:6 265:14
**understanding**
25:4 27:12 28:5
28:10 32:14
80:9 87:12
103:5 106:17,22
147:10 233:1
241:6 253:22
**understood**
27:7 51:13
110:5 134:20
135:16 142:21
144:15 145:23
148:1 154:19
174:19
**uneffectively**
32:10
**unfortunately**
222:20
**unit** 40:13
102:21 158:10
165:4 212:22,23
**united** 1:1 5:1
20:12,14 95:4
102:21 113:2
175:14,19
178:14 182:3
185:19
**units** 113:2
114:8,13,17
116:6,8 134:21
135:2 162:1
163:17
**university** 11:17
15:18 52:9,13

52:16 53:4
**unknowable**
207:23
**unknown** 34:7
36:1,7,17 37:11
38:20 59:14
60:9 77:23 79:7
81:16 85:21
87:19 89:18
118:19,20,23
198:23
**unquote** 270:20
**unreasonable**
81:11 84:5
**unreliability**
177:20
**unreliable**
158:14,15
**update** 270:2
**updated** 116:22
117:6 245:11
270:1
**usage** 204:3
**use** 43:16 49:6
50:20 58:18
71:6,13 73:11
76:19 77:13
89:7,15 93:13
98:19 107:7,10
110:10,12 111:5
112:4 113:5,8
114:23 115:4
116:15 127:18
130:10 131:5,13
132:10,14 137:7

139:16 143:5
146:4 154:22
155:3,14 156:10
156:20 163:12
172:2 184:8
198:4 199:3
202:18 227:7
228:6 235:6
243:2,4 248:18
250:13 259:8
270:10,11
271:22 275:9
**used** 19:22
41:23 42:2 43:5
43:12,17 46:11
46:13,15 48:6
49:1,2,5 50:7
59:2 94:3,10,22
98:16 107:5
108:12 112:5,7
130:4 132:7,8
132:13 134:6
137:13,17,20,21
138:1,13,14,18
141:2,11,22
143:12 155:5,20
155:22 156:23
157:4 170:9
196:8 202:20
203:14 216:5,22
229:20 230:3,12
235:8,21 237:18
240:3,4 241:23
242:4,5,8
245:21 246:9

248:9 252:18
255:1 271:13,19
**useful** 169:5
171:19
**useless** 61:17,19
62:4 164:21
**uses** 34:20 36:23
91:7 98:5 101:3
111:1,15 165:10
200:18 226:21
227:1,6 232:16
265:2
**using** 32:19 37:5
41:23 42:5,17
43:11 70:13
71:16 79:10
83:8 89:19,23
92:4 118:12
120:2 155:8
165:21 167:3
170:17 185:16
191:11 201:10
202:21 208:21
218:11 225:8,12
235:7 236:1
238:3,12 239:14
244:16 257:12
263:8 270:16,22
271:2
**usual** 7:17 258:4
**usually** 65:9
87:20 98:5
106:14 133:23
**utilize** 92:23

**utilized** 98:6
157:14 269:11
**utilizes** 228:10

**v**

**v** 4:1 97:9 182:9
**vaguely** 59:22
**valid** 225:8
**valley** 140:20
189:22
**valuable** 71:13
**value** 34:7,10
37:11 43:19,20
44:5 47:4,22
49:4,13 50:1
60:4 64:12,19
64:21 66:1
67:13 73:18
74:1,2,5 75:22
77:5 78:10,14
79:23 81:23
82:4 85:4 88:9
88:18 89:14
97:9 107:2
111:13 119:22
119:23 164:19
197:22 198:19
199:1 200:9
216:23 253:19
253:20 254:20
254:22 255:16
**values** 46:10,11
46:12 49:18
50:9 66:4,21
67:3 195:19

**vap** 91:17 120:3
128:23 148:4,16
149:9 154:12,14
158:7,22 169:8
171:15,18 195:1
232:11 237:1
241:8 257:11
264:4 266:17
267:5
**variable** 59:10
59:13 109:17
255:2
**variables** 94:19
**variance** 246:2
246:9,23 247:8
250:3 255:9,10
256:15,21,22
**variances**
216:12 245:17
246:5
**variation**
124:23
**variety** 18:8
**various** 17:14
94:18 113:1,21
**vast** 175:1
**vastly** 102:12
**verification**
180:11
**veritext** 274:10
274:20
**veritext.com**
274:18
**version** 55:3
56:4 233:4

234:9
**versions** 55:22
**versus** 21:3
27:18,22,23
107:2 121:22
122:9 138:8
182:17 192:16
221:18 231:15
266:1
**video** 1:20 7:9
**virginia** 170:21
171:1 172:19
176:1,2,23
177:12
**virtual** 9:15
**vote** 16:17 29:8
42:20 120:5,11
120:22 121:3,15
121:18 129:8
265:11
**voter** 123:21
**voters** 104:5
112:19 113:14
123:12 125:9
129:9 260:17
**votes** 104:6
264:19 267:14
**voting** 13:4,14
15:22 16:20
17:16 19:18
25:14 28:3 29:7
30:9,18 31:7
37:22 40:2,9
41:2 42:17 43:9
46:23 68:20

80:21 82:13,15
82:17,22 83:5
88:2,22 89:1
91:23 94:19
104:9 108:13
109:18 119:11
119:12 122:13
122:16,20 123:9
123:10 126:19
126:21 128:3,3
128:11 139:21
147:8 149:1,3
151:5,7 152:14
152:15,21,23
153:14,15,18
157:5 172:23
174:22 175:16
181:23 188:15
188:17,22
189:20,21 191:7
196:12 198:15
207:6,7 225:8
225:23 226:22
227:1,10,17
231:7 234:15,16
235:10 239:15
239:17 241:2,10
241:15,18 249:2
253:18 255:6,23
256:1 260:10
261:17,18 265:4
265:5 271:17
**vs** 1:8 5:7
**vtd** 104:10
107:11

**vtds** 104:23
107:8,18 108:17

**w**

**w** 6:7 143:4
**wait** 10:11
109:4 211:3,3
**waived** 2:4,19
**walk** 45:15
**want** 13:17
22:17 41:17
55:14,23 56:6
56:11 65:4,8
75:16 78:4 79:6
79:8 80:2 85:15
85:16 92:11
109:15,22 115:1
115:2,4,5
119:19 120:17
121:9 124:15
132:10 133:4
153:8 159:8
171:23 174:5
182:23 190:7,18
197:1 199:3
205:18 206:2
219:4 229:23
242:14,18 250:9
258:1
**wanted** 113:15
130:18 147:19
162:17 167:12
178:4 191:16
220:5 225:21
250:23

**wanting** 124:11
**wants** 87:23
106:21 158:3
232:18
**warning** 58:16
59:5 61:9 62:20
62:21
**warnings** 60:22
61:2,5,8 67:23
**warrant** 50:11
**washed** 56:23
**washington** 6:4
6:9 15:19 91:1
106:13 136:16
137:17 140:9,14
141:12 155:13
176:11 187:11
187:23 190:10
192:6 193:17,19
195:4 196:6
201:17,22 242:1
242:8,11 262:5
**wasserman** 3:12
52:2,8 53:7
54:21 58:17,22
60:14,18 61:20
62:8 64:12
65:11 66:5 67:4
86:14
**wasserman's**
52:5 67:21
**water** 258:13
**way** 16:17 34:13
35:16 36:15
37:13 38:15

39:19 47:5
65:23 77:20
80:19 86:16,17
89:4 90:6,11
103:6 109:18
110:13 112:15
129:4,19,21
131:15 140:16
141:16,18
150:19,23 157:8
160:9,17 165:6
166:4,12 177:12
202:15 205:10
213:19 216:20
230:10 231:4
240:16 242:11
243:5 244:12,16
245:8 248:16
252:16 254:10
255:10,19 256:5
257:5 260:23
261:10 262:5,6
263:18 264:15
265:13 266:15
270:10 271:11
**ways** 193:8
239:1 270:11
**we've** 88:15
187:1 199:10
246:1
**weak** 67:19
**weight** 236:14
236:14 237:3
**weighted** 237:8
237:9 241:22

269:9,9
**welcome** 135:7 250:10
**went** 110:18 146:17
**wes** 1:9 5:8 8:6
**whatnot** 92:9 143:10 147:13 244:4
**white** 83:17 125:16 140:21 142:10 149:18 151:13,13,18 154:2,4,13,14 175:22 191:11 203:2,19 247:21 260:8 261:17 262:8,12 263:4
**whites** 29:8 81:3 83:1,2 89:2 125:23 126:4,8 126:9,10,15 150:3 154:7 191:8 261:13
**wholly** 212:17 215:21 224:10
**wicomico** 138:1 138:7 143:3 146:7,14 153:4 153:5,11,16 154:1 155:14,18 155:21 156:1
**wide** 111:22
**wider** 161:2
**wife** 17:6
**willingness** 16:13
**win** 173:22
**wish** 37:17 154:17
**wishes** 37:4 163:10
**witness** 2:3 7:10 10:2 92:13 168:19 169:3 185:4 187:4 218:20 258:11 258:18 268:10 274:18
**wonder** 115:22
**wondering** 230:15
**word** 70:6 76:18 141:2 221:2
**words** 57:6 167:15 226:15 245:21 254:9
**work** 12:22 21:4 21:6,11 49:5 55:9 134:15,19 137:11 141:3 142:3 143:18 147:10,16 177:4 180:10 202:14
**worked** 26:17 73:1 135:19
**working** 121:12 151:15
**works** 131:15 131:16
**worries** 99:22 210:4,4
**worth** 114:9
**write** 180:14 254:17
**writes** 58:17 64:12 166:21 206:13
**writing** 53:9,14 170:3 186:14 215:7
**written** 22:1 178:1 179:6
**wrong** 63:10 122:23 167:19 167:21 169:21 196:4,5 199:1 239:4 242:2 246:12
**wrote** 58:22 76:13 99:3 120:1 172:8,11 181:14 238:16 238:19

**x**

**x** 3:2
**xs** 260:19,20

**y**

**yakima** 140:19 140:20 189:22
**yeah** 17:12 22:16 23:5 28:12 33:18 35:4 38:13 44:11 46:20 55:1 59:17 65:8 65:20 66:3 68:14 70:23 71:10 74:21 77:13 96:13,20 97:4 101:20 102:1 104:11 105:6 107:1,7 111:11 114:3 117:11 118:5,5 121:4,4 127:9 130:17 135:22 138:14 140:11 141:22 146:10 149:19 151:21 158:11 159:9 161:20 163:4 167:9 173:10 174:13 178:15 180:5 182:6 186:13 192:10 204:13 211:3,12 212:18 213:8 219:2 221:20 222:1,21 226:14 240:23 243:11 244:11 245:6 252:7 253:23 255:14 256:12 259:14 262:17 267:1 269:5,17 269:21 270:9

**year** 20:6 23:9 25:22 54:3,20 55:17 94:18,22 94:23 95:2 98:17,18 99:2,6 99:16 101:14 104:21 105:3 108:7 114:16 115:1,7,17,20 116:3,7,9,17,23 117:3,8,13 119:9,14 139:19 141:13 185:21 186:9 203:9 204:16 225:12 253:6 254:15
**yearly** 94:17 114:15
**years** 8:23 17:11 99:16,18 101:12 103:7 104:23 114:9 116:18 117:8,13 131:18 132:16 175:18 178:13 182:2 185:18
**yep** 225:14
**yesterday** 24:22

**z**

**z** 111:13
**zero** 102:15 103:15,16,17 217:12,13 218:8 218:13 253:3
**zoom** 9:3,5 10:13 14:7,11 15:1 22:19,23 190:11

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.