FILED
2024 Jun-21  PM 04:37
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| KHADIDAH STONE, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Case No. 2:21-cv-1531-AMM |
| | ) | |
| WES ALLEN, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

## SECRETARY ALLEN'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND BRIEF IN SUPPORT

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................... i

EXHIBITS ................................................................................................ ii

INTRODUCTION ....................................................................................1

STATEMENT OF UNDISPUTED FACTS .................................................3

ARGUMENT .........................................................................................13

I.   The Minority Group Is Not "Sufficiently Large." ..........................14

    A.   BVAP, not BCVAP, provides the "clear lines" §2 requires. ..............15

    B.   If "citizens eligible to vote" is the appropriate population, Plaintiffs' must account for all groups ineligible to vote, not just non-citizens. ......................................................................21

    C.   Based on their own estimations, Plaintiffs have failed to show that illustrative SD7 is majority-BCVAP. ...............................................24

II.  Plaintiffs' Alternative Remedy Is Not "Reasonably Configured." ..................28

    A.   Fairfax Plan 3 violates numerous traditional redistricting principles. ................................................................................28

    B.   Race predominates in Fairfax Plan 3. ..................................33

CONCLUSION .....................................................................................35

CERTIFICATE OF SERVICE ...............................................................37

# EXHIBITS

|  | Exhibit |
|---|:---:|
| Sean Trende, Ph.D., Expert Report | **1** |
| Sean Trende, Ph.D., Supplemental Report | **2** |
| Sean Trende, Ph.D., Deposition Transcript | **3** |
| Sean Trende, Ph.D., Deposition Exhibits 1-3 | **4** |
| Sean Trende, Ph.D., Deposition Exhibits 4-5 | **5** |
| Sean Trende, Ph.D., Deposition Exhibits 6-14 | **6** |
| Anthony Fairfax, Expert Report | **7** |
| Anthony Fairfax, Appendix | **8** |
| Anthony Fairfax, Amended Rebuttal Report Redline | **9** |
| Anthony Fairfax, Rebuttal Appendix | **10** |
| Anthony Fairfax, Supplemental Rebuttal Report | **11** |
| Anthony Fairfax, Supplemental Rebuttal Appendix | **12** |
| Anthony Fairfax, Deposition Transcript | **13** |
| Anthony Fairfax, Deposition Exhibits 1-4 | **14** |
| Anthony Fairfax, Deposition Exhibits 5 | **15** |
| Anthony Fairfax, Deposition Exhibits 6-13 | **16** |
| Kassra Oskooii, Ph.D., Expert Report | **17** |
| Kassra Oskooii, Ph.D., Deposition Transcript | **18** |
| Kassra Oskooii, Ph.D., Deposition Exhibits | **19** |
| Traci Burch, Ph.D., Expert Report | **20** |
| Traci Burch, Ph.D., Deposition Transcript + Exhibits | **21** |
| Stephen Blacklocks & Michael Kruse, *Scientific Evidence and Confidence Intervals: Theory and Fallacy*, Bureau of National Affairs (2008). | **22** |

## INTRODUCTION

Secretary Allen moves for summary judgment on Plaintiffs' claim that §2 of the Voting Rights Act requires an additional majority-minority State Senate district in Northern Alabama near Huntsville. Following discovery, no genuine dispute of material fact exists as to the first *Gingles* precondition: that "the 'minority group must be sufficiently large and geographically compact to constitute a majority in a reasonably configured district." *Allen v. Milligan*, 599 U.S. 1, 18 (2023) (citation omitted) (alteration adopted)).

Plaintiffs submit four illustrative plans trying to meet this requirement. The first three fail the "sufficiently large" mandate because none contains an additional district in the Huntsville area that is majority black voting-age population (BVAP). Plaintiffs thus assert that their new districts are majority black citizen voting-age population (BCVAP), but as a legal matter, that's the wrong test. The "clear-edged" "majority-minority rule relies on an objective, numerical test: Do minorities make up more than 50 percent of the *voting-age population* in the relevant geographic area?" *Bartlett v. Strickland*, 556 U.S. 1, 18 (2009) (plurality op.) (emphasis added). And as a factual matter, the imprecise sampling data on which Plaintiffs rely fails to prove by a preponderance of the evidence that their illustrative districts are majority BCVAP.

1

Thus, in his rebuttal report, Plaintiffs' mapdrawer Anthony Fairfax stretched the lines of his new district to string together a BVAP majority. But this fourth plan (designated "Plan 3") is not reasonably configured and is an unconstitutional racial gerrymander as well. Unlike any other Senate district in the State's Enacted Plan, Plan 3 includes a district (the new majority-minority district) composed solely of four split counties. Plan 3 also splits more counties statewide than the Enacted Plan does, pairs more incumbents than the Enacted Plan does, and sacrifices compactness both regionally and statewide. By any reasonable metric, Plan 3 is not reasonably configured. And an analysis of Northern Alabama's demographics shows why Plan 3 sacrificed those traditional districting principles—to sort voters based on their race.

While many §2 claims proceed to a bench trial, *see Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1343 (11th Cir. 2015), many others are weeded out at summary judgment because of the first *Gingles* precondition. *See, e.g.*, *Strickland*, 556 U.S. 1; *Al-Hakim v. State of Fla.*, 892 F. Supp. 1464 (M.D. Fla. 1995); *see also Burton v. City of Belle Glade*, 178 F.3d 1175, 1199 (11th Cir. 1999). As a matter of law, either a minority group is sufficiently large or it is not. The numbers are not in dispute. Nor do the parties disagree about the contours of Plaintiffs' illustrative plans or the data upon which the plans were constructed. As the Seventh Circuit put it shortly after *Gingles* was decided, the "creation of preconditions—a choice of clear rules over muddy efforts to discern equity—shields the

2

courts from meritless claims and ensures that clearly meritorious claims will survive summary judgment." *McNeil v. Springfield Park Dist.*, 851 F.2d 937, 942 (7th Cir. 1988). The preconditions "appropriately clos[e] the courthouse to marginal cases," like Plaintiffs here. *Id.* at 943.

## STATEMENT OF UNDISPUTED FACTS

1.    According to the U.S. Census Bureau's 2020 Decennial Census, the total population of Alabama is 5,024,279, comprising 63.12% white, 27.16% black, 5.26% Hispanic, and 4.75% other. DE164-7 (Fairfax Initial) at 16. The voting-age population (VAP) is similar, with 65.47% white, 25.9% black, 4.26% Hispanic, and 4.59% other. *Id.* at 16. The estimated citizen voting-age population (CVAP) is also similar according to the 2022 1-year estimates from the American Community Survey (ACS): 67.7% white, 25.6% black, 2.6% Hispanic, and 4.13% other. *Id.* at 17.

2.    The Alabama Permanent Legislative Committee on Reapportionment proposes redistricting plans for the State following each decennial census. Ala. Code §29-2-52. Among the Committee's relevant redistricting criteria are the following: districts "shall have minimal population deviation" (±5%); districts shall comply with the U.S. Constitution and §2 of the Voting Rights Act; districts "will be composed of contiguous and reasonably compact geography"; "[c]ontests between incumbents will be avoided whenever possible"; and "the number of counties in each district" shall be minimized. DE164-7 (Fairfax Initial) ¶18. The guidelines specify

that "[t]he total Alabama state population … as reported by the 2020 Census, shall be the permissible database used for the development, evaluation, and analysis of proposed redistricting plans." *Id.*

3.    On August 12, 2021, the U.S. Census Bureau released the results of the 2020 Census. DE126 ¶ 39; *see also* U.S. Census Bureau, *Decennial Census P.L. 94-171 Redistricting Data*, https://perma.cc/F6AQ-QS3Z.

4.    The Committee then drafted and later gave a favorable report to a Senate plan, which became SB1 during a special session on redistricting. DE126 ¶ 40, 52-53.

5.    On November 4, 2021, Governor Kay Ivey signed into law SB1 of the 2021 Second Special Session of the Alabama Legislature. DE126 ¶¶23, 77; *see* Ala. Act No. 2021-558. That law provides for the electoral districts of the Alabama Senate. *See* Ala. Code §29-1-2.3.

6.    Seven Alabama Senate Districts cover the Huntsville area: SD1, SD2, SD3, SD6, SD7, SD8, SD9. DE164-8 (Fairfax App'x) at 20, 22, 26. The total population of these districts is 1,042,167: 738,322 (70.84%) white, 164,536 (15.79%) black, and 81,130 (7.78%) Hispanic. *Id.* at 234. The total VAP is 811,002: 596,063 (73.5%) white, 121,278 (14.95%) black, and 49,346 (6.08%) Hispanic. *Id.* at 238. The estimated CVAP, using the 2022 5-year ACS data, is 779,804: 607,106 (77.85%) white; 117,369 (15.05%) black; and 26,954 (3.46%) Hispanic. DE164-10 (Fairfax Rebuttal App'x) at 16.

**7.**     No significant disparity exists in the citizenship rates between black and white Alabamians generally and in Northern Alabama specifically. DE164-7 (Fairfax Initial) at 17-18 (dividing VAP data from the 2020 Census by 1-year CVAP data from the 2022 ACS reveals a statewide black citizenship rate of 97.52% and a white citizenship rate of 100%.); DE164-8 (Fairfax App'x) at 98, 102 (using the same data, dividing SD7 in Fairfax Plan 1's VAP by its CVAP reveals a black citizenship rate of 100% and a white citizenship rate of 96.4%).

### The Data Underpinning Plaintiffs' Illustrative Plans

**8.**     Plaintiffs submit four alternative plans in an attempt to demonstrate that an additional majority-minority district—which they label Senate District 7—can be drawn in the Huntsville area.

**9.**     These plans were developed using 2020 Decennial Census data and ACS sampling data. DE164-7 (Fairfax Initial) ¶11; DE164-9 (Fairfax Rebuttal Redline) ¶3.

**10.**     The Census Bureau conducts the Decennial Census, and the data collected reflect a full enumeration of U.S. residents. DE164-1 (Trende Initial) at 10-11. Census data are reported at multiple levels: blocks (the lowest), block groups (a cluster of blocks), tracts, counties, and up to the State and national level. *Id.* As an actual count, census data "come without error margins" or "randomness." *Id.* at 11-12.

**11.**     Also conducted by the Census Bureau, the "American Community Survey (ACS) is an ongoing survey providing communities new data every year to plan investments and services."[1] DE164-1 (Trende Initial) at 9.

**12.**     ACS data are taken from a sample of the population. *Id.*; DE164-17 (Oskooii Rebuttal) ¶21. And as a sample, ACS data come with error margins. DE164-1 (Trende Initial) at 12-13; DE164-9 (Fairfax Rebuttal Redline) ¶14.

**13.**     "In 2022, the ACS interviewed 1,980,550 nationally," including "32,482 residents of Alabama," which is 0.65% of Alabama's population (based on the 2020 Census). DE164-1 (Trende Initial) at 14.

**14.**     Collection "occurs every month and is released every year." DE164-17 (Oskooii Rebuttal) ¶23. ACS data are published as 1-year and 5-year estimates. DE164-1 (Trende Initial) at 9. The 2022 5-year estimates, for example, "would include data from 2018, 2019, 2020, 2021, and 2022." *Id.*

**15.**     The 1-year estimates are not "designed to provide reliable … estimates of various population characteristics for cities, counties, and other regions with a population" of under 65,000. DE164-17 (Oskooii Rebuttal) ¶20.

**16.**     "The 5-year ACS produces demographic estimates for all census geographic units as low as the block-group level." *Id.* The ACS does not produce demographic

---

[1] https://www.census.gov/programs-surveys/decennial-census/about/census-acs.html (last visited June 21, 2024).

estimates for census blocks. Alabama has 3,438 block groups, and given the 2022 sample size of 32,482 people, this "means each [block] group averages 9.45 respondents." DE164-1 (Trende Initial) at 10, 14.

17.     The "Citizen Voting Age by Race and Ethnicity (CVAP) special tabulation" is published by the Census Bureau every year "from the most current [ACS] 5-year estimates."[2] The CVAP special tabulation "gives data, broken down by race and ethnicity, of the number of people in various locations who identify as U.S. Citizens." DE164-1 (Trende Initial) at 10. The Decennial Census no longer collects citizenship data. *Id.*; DE164-17 (Oskooii Rebuttal) ¶17.

18.     The Census Bureau began publishing CVAP data from "5-year estimates starting … in February of 2011."[3]

19.     To estimate CVAP for block groups that are split during the map drawing process, experts must disaggregate ACS block-group data using one or more "[d]isaggregation techniques." DE164-17 (Oskooii Rebuttal) ¶¶13, 20 n.11; *see also* DE164-1 (Trende Initial) at 22-24; DE164-2 (Trende Supp) at 7. Splitting block groups produces unknowable error apart from the ACS sampling error. DE164-9 (Fairfax Rebuttal Redline) ¶17; DE164-18 (Oskooii Depo) at 225:15-226:7.

---

[2]  https://www.census.gov/programs-surveys/decennial-census/about/voting-rights/cvap.html (last visited June 21, 2024); *see also* DE164-1 (Trende Initial) at 9.

[3]  *Id.*

**20.**    Fairfax Plans 1, 2, and 2A use ACS citizenship estimates in an attempt to demonstrate that SD7 contains a "majority of 'eligible' voters." DE164-7 (Fairfax Initial) ¶74; *see also* DE164-9 (Fairfax Rebuttal Redline) ¶5; DE164-17 (Oskooii Rebuttal) ¶¶21, 25. Fairfax Plan 1 uses 2021 5-year ACS data while Fairfax Plans 2 and 2A use 2022 5-year ACS data. DE164-9 (Fairfax Rebuttal Redline) ¶5. These three plans split block groups. By contrast, Fairfax Plan 3 uses 2020 Decennial Census data to calculate SD7's BVAP. *Id.* ¶6.

**21.**    Neither the 2021 5-year ACS data, nor the 2022 5-year ACS data were publicly available in 2021 when the Alabama Legislature approved SB1. *See* DE164-13 (Fairfax Depo) at 218:4-15, 219:4-220:8.

### Fairfax Plan 1: SD7

**22.**    SD7's BVAP in Plan 1 is under 50%. DE164-8 (Fairfax App'x) at 100. The district's VAP is 39% white, 46.8% black, and 10.1% Hispanic. *Id.*

**23.**    Using ACS and Decennial Census data and a variety of disaggregation methods,[4] Defendants' expert Dr. Sean Trende estimates the black citizen voting-age population (BCVAP) for SD7 at 50.9%, 50.4%, 50.1%, 49.7%, 49.2%, 48.8%, 48.7%, 48.3%, 48.2%, 48%, and 47.8%. DE164-1 (Trende Initial) at 23-24.

---

[4] *See* DE164-1 (Trende Initial) at 19-23 (explaining that "[t]here's no obviously correct way to" allocate voters into individual blocks using block-group-level data and describing the six methods that he used to do so).

24.    Plaintiffs' expert Mr. Anthony Fairfax estimates BCVAP at 50.16% for SD7. DE164-7 (Fairfax Initial) ¶81. Likewise, Plaintiffs' expert Dr. Kassra Oskooii estimates BCVAP at 50.11%. DE164-17 (Oskooii Rebuttal) ¶38.

25.    An agreed-upon error margin for these CVAP estimates is between ±2.6% and ±3.1%. DE164-1 (Trende Initial) at 18, 25; DE164-9 ¶17 (Fairfax Rebuttal Redline) ¶17; DE164-13 (Fairfax Depo) at 197:1-2.

26.    Using the lower error margin of 2.6% and the highest estimated BCVAP share of 50.9%, it is statistically likely that the true value of SD7's BCVAP is somewhere between 48.3% and 53.5%. DE164-11 (Fairfax Supp Rebuttal) ¶7.

27.    In Fairfax Plan 1, "119 block groups are contained in whole or in part" within SD7. DE164-1 (Trende Initial) at 14. Applying the average number of respondents per block group of 9.45, *id.*, Plaintiffs' BCVAP estimations are based on a 5-year aggregate of survey answers from 1,125 residents. That's less than 1% of the population of illustrative SD7. DE164-7 (Fairfax Initial) at 33.

28.    Mr. Fairfax estimates that the total CVAP of SD7 is 100,955. DE164-7 (Fairfax Initial) at 44. The difference between 50% (50,477.5) and 50.16% (50,639: Fairfax's estimation) is 161.5 citizens. The difference between 50% and 50.11% (50,589: Oskooii's estimation) is 111 citizens.

29.    According to one of Plaintiffs' expert Dr. Traci Burch, in 2022, "318,681 people (8.6% of the voting eligible population) were barred from voting in Alabama

elections in 2022 due to a felony conviction. For Black Americans in Alabama, the rate is higher: … 14.7% of otherwise-eligible Black people in Alabama cannot vote due to a relevant felony conviction." DE164-20 (Burch Initial) at 18.

**30.**    Assuming that felons are evenly distributed across the State and Dr. Burch's ratios are both correct and constant, the BCVAP for SD7 would drop to 46.8% (using Mr. Fairfax's initial estimate of 50.16%) once ineligible felons are removed from the eligible voter tabulation. DE164-1 (Trende Initial) at 24.

## Fairfax Plan 2: SD7

**31.**    Over two months after his expert report was due, to "resolve Dr. Trende's concern that SD7 in Illustrative Plan 1 … would not be majority Black according to the 2022 5-Year ACS CVAP data[,]"[5] Mr. Fairfax submitted along with his rebuttal report two new illustrative plans, one being Plan 2. *See* DE148 (Amended Scheduling Order); DE164-9 (Fairfax Rebuttal Redline) at 2.

**32.**    SD7's BVAP in this plan is under 50%. DE164-10 (Fairfax Rebuttal App'x) at 14. The district's VAP is 37.61% white, 48.47% black, and 9.83% Hispanic. *Id.*

**33.**    Dr. Trende estimates the BCVAP percentage for SD7 at 51.1%, 50.5%, and 50.3%. DE164-2 (Trende Supp) at 7. Mr. Fairfax estimates SD7's BCVAP at 50.05%. DE164-9 (Fairfax Rebuttal Redline) ¶49.

---

[5] Using 2022 5-year ACS data, the estimate for the BCVAP percentage of SD7 in Fairfax's Plan 1 "did dip down to 49 point some percent." DE164-13 (Fairfax Depo) at 190:15-21.

**34.**    An agreed-upon error margin for these CVAP estimates is between ±2.7% and ±3.2%. DE164-2 (Trende Supp) at 6; DE164-13 (Fairfax Depo) at 197:2.

**35.**    Using an error margin of 2.7% and the highest estimated BCVAP share of 51.1%, it is statistically likely that the true value of SD7's BCVAP in Fairfax Plan 2 is somewhere between 48.4% and 53.8%. DE164-11 (Fairfax Supp Rebuttal) ¶7.

**36.**    Mr. Fairfax estimates that the total CVAP of SD7 is 102,776. DE164-10 (Fairfax Rebuttal App'x) at 16. The difference between 50% (51,388) and 50.05% (51,439: Fairfax's estimation) is just 51 citizens.

**Fairfax Plan 2A: SD7**

**37.**    Three months after his expert report was due, Mr. Fairfax submitted an additional illustrative plan—Plan 2A. DE164-11 (Fairfax Supp Rebuttal).

**38.**    SD7's BVAP in this plan is under 50%. DE164-12 (Fairfax Supp Rebuttal App'x) at 13. The VAP is 37.51% white, 48.38% black, and 10.04% Hispanic. *Id.*

**39.**    SD7's estimated BCVAP in Fairfax Plan 2A is 50.19%, according to Mr. Fairfax's estimation. DE164-11 (Fairfax Supp Rebuttal) ¶7. Using an error margin of 2.6%, it is statistically likely that the true value of SD7's BCVAP is somewhere between 47.59% and 52.79%. DE164-9 (Fairfax Rebuttal Redline) ¶17.

**40.**    Mr. Fairfax estimates that the total CVAP of SD7 is 103,382. DE164-12 (Fairfax Supp Rebuttal App'x) at 15. The difference between 50% (51,691) and 50.19% (51,887: Fairfax's estimation) is 196 citizens.

**Fairfax Plan 3: SD7**

**41.**     Mr. Fairfax submitted Plan 3 over two months after his expert report was due. *See* DE148 (Amended Scheduling Order); DE164-9 (Fairfax Rebuttal Redline) at 2.

**42.**     SD7's VAP in Fairfax Plan 3 is 36.51% white, 50.04% black, and 9.22% Hispanic. DE164-10 (Fairfax Rebuttal App'x) at 152; DE164-2 (Trende Supp) at 20.

**43.**     SD7 is composed entirely of four split counties—Lawrence, Limestone, Madison, and Morgan—and includes thirty-two of the thirty-five highest-BVAP precincts in those counties (leaving out the three precincts ranked 9th, 17th, and 22nd). DE164-2 (Trende Supp) at 30.

**44.**     SD7 in this plan is the third-least compact district by its Reock score and the second-least compact by its Polsby-Popper score. DE164-2 (Trende Supp) at 25.

**45.**     Fairfax Plan 3 splits 21 counties, while the Enacted Plan splits 19. DE164-2 (Trende Supp) at 32; DE164-9 (Fairfax Rebuttal Redline) ¶75; *id.* at 36.

**46.**     SD7 contains no whole counties; it is composed of "portions of four counties. No district in the Enacted Map splits four counties." DE164-2 (Trende Supp) at 33.

**47.**     Fairfax Plan 3 "pairs two incumbents in one district (SD8). The Enacted Plan does not pair any incumbents." DE164-9 (Fairfax Rebuttal Redline) ¶78.

## ARGUMENT

"To succeed in proving a § 2 violation under *Gingles*, plaintiffs must satisfy three 'preconditions.'" *Allen*, 599 U.S. at 18. For this motion, only the first is at issue. It requires the minority group to be "sufficiently large and geographically compact to constitute a majority in a reasonably configured district." *Id.* (cleaned up). A minority group is "sufficiently large" when it makes up "more than 50 percent of the voting-age population in the relevant geographic area[.]" *Strickland*, 556 U.S. at 18 (plurality op.). And "a district will be reasonably configured … if it comports with traditional districting criteria, such as being contiguous and reasonably compact." *Allen*, 599 U.S. at 18.

Plaintiffs have not provided an illustrative district in the Huntsville area that meets the first precondition. Their illustrative District 7s in Fairfax Plans 1, 2, and 2A all fail the "sufficiently large" requirement, and SD7 in Fairfax Plan 3 is not "reasonably configured" and is race predominate. Because satisfying "the *Gingles* threshold factors is a necessary precondition to section 2 relief," Secretary Allen is entitled to summary judgment on Plaintiffs' claim that §2 mandates an additional majority-minority district in the Huntsville area. *Nipper v. Smith*, 39 F.3d 1494, 1513 (11th Cir. 1994) (en banc) (plurality opinion).

13

## I.    The Minority Group Is Not "Sufficiently Large."

Plaintiffs' Fairfax Plans 1, 2, and 2A do not satisfy the first *Gingles* precondition because the BVAP in those plans indisputably falls short of 50%, according to data from the 2020 Decennial Census. Plaintiffs insist—in the name of counting adults who are *eligible* to vote—that the better metric is the ACS *estimate* of black *citizen* voting-age population, ignoring Supreme Court and Eleventh Circuit precedent to the contrary. But if eligibility to vote is what matters most, Plaintiffs must account for Alabamians who are ineligible to vote due to a disqualifying felony conviction, just as they account for Alabamians who are ineligible to vote due to their non-citizenship. Plaintiffs fail to do so. Finally, even if BCVAP were a proper metric here, Plaintiffs still fail to carry their burden. Plaintiffs cannot make a probability determination about whether the true BCVAP percentage is above *Gingles*'s 50%+1 threshold because the margin of error includes values that fall below 50%+1. Given that uncertainty, no "reasonable factfinder could find by a preponderance of the evidence" that the minority group is sufficiently large to constitute a majority in a single-member district. *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1317 (11th Cir. 2021) (internal quotation marks omitted).

### A.    BVAP, not BCVAP, provides the "clear lines" §2 requires.

To determine whether the minority population is "sufficiently large" for purposes of the first precondition, the Supreme Court has established "an objective, numerical test: Do minorities make up more than 50 percent of the *voting-age population* in the relevant geographic area?" *Strickland*, 556 U.S. at 18 (emphasis added); *see also id.* at 12, 13. This "rule provides straightforward guidance to courts and to those officials charged with drawing district lines to comply with §2." *Id.* at 18.

As in *Strickland*, here "[n]o one contends that the African-American voting-age population in" Fairfax Plans 1, 2, or 2A "exceeds that threshold" of 50%. *Id.* at 20. This makes illustrative SD7 a "crossover district"—"one in which minority voters make up less than a majority of the voting-age population," but can "elect the candidate of [their] choice with help from voters who are members of the majority." *Id.* at 13.[6] Because "§ 2 does not require crossover districts," Plans 1, 2, and 2A are not evidence of vote dilution. *Strickland*, 556 U.S. at 23. Nevertheless, Plaintiffs argue that the first *Gingles* precondition is satisfied because their "best approximation," using ACS data, is that black Alabamians constitute a majority of the *citizen* voting-age population in illustrative SD7. DE164-18 (Oskooii Depo) at 82:1-4. But while courts will sometimes use CVAP data to ensure that a district that is majority-

---

[6] Indeed, Plaintiffs' illustrative SD7 would "perform" for black voters at well below 50% BVAP. *See* DE164-1 (Trende Initial) at 29; DE164-2 (Trende Supp) at 18.

minority VAP will also likely contain an effective voting majority, it is legal error to use CVAP data as a means to nudge a crossover district across the 50%+1 line.

"Whether citizenship should be taken into account for the first *Gingles* precondition is a question of law." *Negron v. City of Miami Beach, Fla.*, 113 F.3d 1563, 1570 (11th Cir. 1997). Using CVAP data is appropriate "only where there is reliable information indicating a significant difference in citizenship rates between the majority and minority populations." *Id.* at 1569. In *Negron*, the Eleventh Circuit considered citizenship data to reject a §2 claim where the illustrative plans contained majority Hispanic VAP, but the Hispanic citizenship rate was 50.16%, compared to a non-Hispanic citizenship rate of 88.18%. *Id.* at 1567. Here, citizenship rates are virtually identical, with black Alabamians even leading white Alabamians by a few percentage points. DE164-8 (Fairfax App'x) at 98, 102.

In a similar case, a district court in North Carolina rejected an attempt to use CVAP data to skirt *Strickland*'s 50%+1 voting-age population requirement. There, the plaintiffs' illustrative district had a BCVAP of over 50% but a BVAP just under 50%. *Pierce v. N.C. State Bd. of Elections*, – F. Supp. 3d –, 2024 WL 307643, at *15 (E.D.N.C. Jan. 26, 2024), *aff'd* 97 F.4th 194 (4th Cir. 2024). Presented with no evidence of a "significant black noncitizen population in the counties at issue," the court rejected the plaintiffs' CVAP data and with it the attempt to use an illustrative crossover district as evidence of vote dilution. *Id.* at *15, *17.

That is not to say that citizenship data cannot be helpful in a §2 case. Sometimes "the minority population" seeking a §2 remedy includes "a substantial number of immigrants" with a significantly lower citizenship rate than that of the majority population. *Negron*, 113 F.3d at 1568. In that scenario, courts may require the plaintiff to use CVAP data to confirm "whether 'the minority has the potential *to elect* a representative of its own choice in some single-member district.'" *Id.* at 1569 (quoting *Growe v. Emison*, 507 U.S. 25, 39 (1993)); *see also* DE164-13 (Fairfax Depo) at 186:11-21 (recognizing the same). That's because the minority group (often Hispanic) might constitute "a bare majority of the voting-age population …, but only in a hollow sense." *LULAC v. Perry*, 548 U.S. 399, 429 (2006). Hollow in that *Gingles*'s majority-minority requirement could technically be satisfied "without ensuring that Latino voters in that remedial district would have the potential to elect a representative of their own choice." *Rios-Andino v. Orange County*, 51 F. Supp. 3d 1215, 1223-24 (M.D. Fla. 2014).

In such cases, using CVAP data to determine whether an immigrant-heavy district would "perform" for Hispanic voters does not alter *Strickland*'s bright-line 50%+1 voting-age population requirement. To the contrary, it adds to the plaintiff's burden. *Not only* must the minority group constitute a majority of the voting-age population, it *also* must constitute a majority of the citizen voting-age population. In *Negron*, for example, plaintiffs failed to satisfy the first *Gingles* precondition where

their illustrative districts contained "no Hispanic majority" after "citizenship [wa]s taken into account." 113 F.3d at 1568. This despite the fact that the Hispanic VAP was well over 50%, even hitting 62.3% in one illustrative district. *Id.* at 1567.

Here, BVAP in Fairfax Plans 1, 2, and 2A falls below 50%, and no significant disparity exists between black and white citizenship rates. This is not an occasion to use CVAP data to refine voting-age population data to determine ability to elect. *See supra* n.6. Plaintiffs are trying to take advantage of the heightened *Gingles* burden shouldered by a Hispanic minority group in order to lower *Strickland*'s 50%+1 BVAP threshold for the black minority group. This attempted end-run around the 50%+1 VAP requirement, if condoned, would erode the "clear lines" that *Strickland* drew "for courts and legislatures alike," which respect the "need for workable standards and sound judicial and legislative administration." 556 U.S. at 17. The Decennial Census is the bedrock of reapportionment and redistricting. ACS data have a role to play in redistricting but only in the unique scenario described above.

The Census Bureau conducts the Decennial Census once every ten years pursuant to its charge to count every U.S. resident. DE164-1 (Trende Initial) at 10-11. The resulting data tabulations come with no margins of error and provide the State Legislature with voting-age population data, broken down by race and ethnicity, at the block level. *Id.*; *see also* DE164-13 (Fairfax Depo.) at 194:21-23 (acknowledging the Census data come with "no margin of error"). Put simply, the "census count

represents the best population data available." *Karcher v. Daggett*, 462 U.S. 725, 738 (1983) (internal quotation marks omitted).

The ACS, in contrast, gathers its CVAP data on a rolling basis and is released once a year. DE164-1 (Trende Initial) at 10. The ACS collects data from only a sample of the population. For example, in 2022, the ACS "interviewed 32,482 residents of Alabama," amounting to 0.65% of Alabama's 2020 population of 5,024,279[7]; as such, ACS estimates come with known margins of error. DE164-1 (Trende Initial) at 12; *see also* DE164-13 (Fairfax Depo) at 197:1-2; *infra* Section I.C. The ACS tabulates CVAP data as low as the block-group level. DE164-17 (Oskooii Rebuttal) ¶20. But in redistricting, block groups are often split, so in order to estimate CVAP for a split block group, experts employ any number of "[d]isaggregation techniques," which create unknowable error on top of the sampling error. *Id.* ¶20 n.11; *see also, e.g.*, DE164-18 (Oskooii Depo) at 226:4.

Given the significant differences between Decennial Census data and ACS data, it should be no surprise that Alabama's redistricting process is structured according to the former and not the latter. *See* Ala. Const. art. IX, §§ 198-201; Ala. Code § 17-14-70; *id.* §17-14-70.1; *id.* §29-2-51; *see also* DE164-7 (Fairfax Initial)

---

[7] U.S. Census Bureau, QuickFacts, Alabama, https://www.census.gov/quickfacts/fact/table/AL/LFE046222 (last visited June 21, 2024).

¶18 (restating Alabama's 2021 Reapportionment Committee Redistricting Guide-
lines, which provide that the "total Alabama state population … as reported by the
2020 Census, shall be the permissible database used for the development, evaluation,
and analysis of proposed redistricting plans").

If ACS data are permitted to supplant Decennial Census data whenever con-
venient to push an otherwise-deficient illustrative district across the *Gingles* 1
threshold, the consequence will be "constant redistricting" with its "accompanying
costs and instability." *LULAC*, 548 U.S. at 421 (opinion of Kennedy, J.,); *see also*
*Reynolds v. Sims*, 377 U.S. 533, 583 (1964) ("Limitations on the frequency of reap-
portionment are justified by the need for stability and continuity in the organization
of the legislative system …."). Consider what might happen when the new 5-year
ACS estimates become available on December 12, 2024, a few weeks after this case
is scheduled for trial.[8] And then what happens if this case is pending on appeal when
the 5-year 2024 ACS data drops in December 2025? One thing seems likely: the
"serious intrusion on the most vital of local functions" will become an annual event.
*Abbott v. Perez*, 585 U.S. 579, 603 (2018) (internal quotation marks omitted).

---

[8] *See* https://www.census.gov/programs-surveys/acs/news/data-releases/2023/release-sched-
ule.html (last visited June 20, 2024).

During each year's fresh slate of §2 suits, federal courts will be asked to scrutinize the State's districting plan using data unavailable to the Legislature who enacted the plan. Put differently, the State's plan may comply with §2 when passed (based on Census data) but *become* illegally dilutive of minority voting strength after three or four years (based on ACS data alone). Section 2 does not require State Legislatures during the redistricting process to guess about how they think populations and demographics will look years down the road. But that is the standard to which Plaintiffs are trying to hold the 2021 Alabama Legislature. To avoid these turbulent waters and retain some modicum of control over its "duty and responsibility" to conduct redistricting, a State would be pressured to redistrict every year, following the latest release of 5-year ACS estimates. *Abbott*, 585 U.S. at 603. The most direct way to avoid this impossible situation is to limit ACS data to its proper function: as a tool to confirm whether a district will perform for an immigrant-heavy minority group, not as a substitute for Census VAP data.

**B.    If "citizens eligible to vote" is the appropriate population, Plaintiffs' must account for all groups ineligible to vote, not just non-citizens.**

Plaintiffs and their experts insist that BCVAP, rather than BVAP, is "a more appropriate racial population group to determine the majority of '*eligible*' voters (because noncitizens are not eligible to vote and when there is a significant amount, they should be removed from the analyzed population group)." DE164-7 (Fairfax Initial) ¶74 (emphasis added); *see also* DE164-17 (Oskooii Rebuttal) ¶25. On that

premise, Plaintiffs plug ACS data into their BCVAP estimations, wait for 50%+1 to pop out the other side, and then assume they have satisfied the first *Gingles* precondition. But Plaintiffs skip a crucial step: excluding the rest of the ineligible voting population. The parties agree that CVAP data do not account for at least one substantial category that is *ineligible* to vote: disenfranchised felons. *See* DE164-21 (Burch Depo) at 24:15; DE164-13 (Fairfax Depo) at 208:6-7. And the parties agree further that hundreds of thousands of disenfranchised felons live in Alabama.

Plaintiffs' expert Dr. Traci Burch contends that 8.6% of the voting eligible population, and 14.7% of the black voting eligible population, is disenfranchised due to a disqualifying felony conviction. DE164-20 (Burch Initial) at 19. *See generally Thompson v. Sec'y of State for the State of Ala.*, 65 F.4th 1288 (11th Cir. 2023) (discussing Alabama's disenfranchisement laws and upholding same). Dr. Trende applied Dr. Burch's ratios of disenfranchised felons "to the CVAPs that Mr. Fairfax provides for District 7" in Plan 1 and discovered that "the district would have a Black eligible population of just 46.8%." DE164-1 (Trende Initial) at 24. The actual percentage of disenfranchised black felons in illustrative SD7 may be higher or lower than the statewide average of 14.7%, but Plaintiffs—ignoring their burden—have not even attempted to venture an evidentiary guess.

Also, the number of citizens making up the difference between the CVAP estimates and the 50% CVAP threshold is miniscule. Under Plan 1, the difference is

161.5 citizens according to Mr. Fairfax's estimations and 111 according to Dr. Oskooii's. Under Plan 2, it is just 51 citizens. And under Plan 2A, the difference is 196. *See supra* Statement of Undisputed Facts, ¶¶19, 28, 32. It seems highly unlikely that of the estimated 51,442 black citizens of voting age in SD7 under Plan 2, for example, fewer than 51 (0.01%) are disenfranchised due to a felony conviction. DE164-10 (Fairfax Rebuttal App'x) at 16.

When confronted with Dr. Burch's evidence, Dr. Oskooii said he has "never encountered an expert adjusting a district's CVAP share based on felony convictions." DE164-17 (Oskooii Rebuttal) ¶36 n.17. That's unsurprising, given that §2 plaintiffs do not usually turn to CVAP data to evade *Strickland*'s 50%+1 VAP requirement. *Cf. Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1025-26 (E.D. Mo. 2016) (knocking a few percentage points off a district's BVAP to account for disenfranchised felons where defendants turned to the ACS to suggest black voters were now a majority years after the 2010 census).[9]

Both Mr. Fairfax and Dr. Oskooii complain it would be too difficult to do the calculation while acknowledging that if they had the numbers, "the simple math would dictate that you would have to reduce" the black eligible-voting percentage.

---

[9] *See* Expert Report of Jonathon Rodden at 3, *Mo. State Conf. of the NAACP*, No. 4:14-cv-02077-RWS, ECF 85-17 (Sept. 30, 2015) (The "assumption of 'majority' voting-age status ignores the substantial and disproportionate impact of felony disenfranchisement on the electoral power of the African-American voters.").

DE164-18 (Oskooii Depo) at 127:9-11; *see also* DE164-13 (Fairfax Depo) at 208:6-7. To be blunt, the difficulty of producing the necessary evidence to satisfy the first *Gingles* precondition is not the State's problem. *See Voinovich v. Quilter*, 507 U.S. 146, 156 (1993). If indeed there's no easy or reliable way to estimate disenfranchised felon populations at a sufficiently local level, that suggests further that ACS data cannot provide in this case what Plaintiffs rely on it to provide: an accurate estimate of eligible voters in a particular electoral jurisdiction. This too counsels against permitting ACS data to supplant Decennial Census data where the minority group cannot meet *Strickland*'s 50%+1 threshold.

### C. Based on their own estimations, Plaintiffs have failed to show that illustrative SD7 is majority-BCVAP.

Even assuming BCVAP is in and BVAP is out and that Plaintiffs need not account for disenfranchised felons, Plaintiffs have not created a triable issue as to whether SD7 surpasses the 50% BCVAP threshold. This is for one simple reason: the "best case" margin of error extends below the 50%+1 threshold for every CVAP estimate calculated by Mr. Fairfax, Dr. Oskooii, and Dr. Trende, which no expert disputes. Thus, probability statements about where precisely within the margin of error the true value falls are impossible to make—a fundamental principle of statistics. DE164-3 (Trende Depo) at 24:7-13 (explaining that when dealing with confidence intervals and error margins, "they don't give you direct probability statements about the likelihood that a hypothesis is true or not"); *accord id.* at 117:10-13,

118:21-24, 119:7-24, 121:1-14, 136:17-137:22 138:22-139:4; *accord* DE164-18 (Oskooii Depo) at 60:7-10, 73:18-74:5, 81:20-82:4.[10] Plaintiffs, therefore, have adduced no evidence that SD7 is "more likely than not" majority BCVAP.

The margin of error exists to account for the problem that the ACS, "like all surveys," comes with "inherent uncertainty," such as "sampling error." DE164-1 (Trende Initial) at 12-13. The precise error for illustrative SD7's BCVAP, however, can only be estimated, not pinned down, because—in addition to the uncertainty that is inherent in sampling—an unknowable amount of error exists because illustrative SD7 splits block groups. *Id.* at 18; DE164-18 (Oskooii Depo) at 95:20-23, 226:2-7; DE164-13 (Fairfax Depo) at 197:1-2. Nevertheless, even without accounting for this unknowable error, the parties postulate that the ACS sampling error is at least ±2.6%. DE164-1 (Trende Initial) at 18; DE164-18 (Oskooii Depo) at 217:4-14, 218:15-17; DE164-13 (Fairfax Depo) at 197:1-2; DE164-9 (Fairfax Rebuttal Redline) ¶17. And no one disputes that the margin of error includes values *below* the 50%+1 threshold for every CVAP estimate. *See* DE164-13 (Fairfax Depo) at 196:8-12 ("the actual value is somewhere in between the margin of error within a ninety percent confidence"). But we do not and cannot know precisely where the true population value

---

[10] For a helpful four-page summary of how these statistical principles (error margins and confidence intervals) work in practice, what they can and cannot prove, and common fallacies that arise, *see* DE164-22 (Stephen Blacklocks & Michael Kruse, *Scientific Evidence and Confidence Intervals: Theory and Fallacy*, Bureau of National Affairs (2008)).

falls within those error margins. Nor can we know whether it is more likely to fall in the range above or below 50%+1. DE164-18 (Oskooii Depo) at 82:1-4; DE164-9 (Fairfax Rebuttal Redline) ¶17.

Federal courts have recognized the application of this basic statistical rule when evaluating ACS data. In *Missouri State Conference of the NAACP v. Ferguson-Florissant School District*, plaintiffs brought a §2 vote dilution challenge against their school district. 201 F. Supp. 3d 1006, 1015 (E.D. Mo. 2016), *aff'd* 894 F.3d 924 (8th Cir. 2018). The plaintiffs' expert, William Cooper, used 2010 Decennial Census data to create two illustrative plans in which there were four majority-BVAP subdistricts. *Id.* at 1029. As one of its defenses, the school district argued that more recent ACS data revealed the district's BVAP had increased since the 2010 Census, transforming the black minority group into the majority. *Id.* at 1025.

The court, understanding that "ACS provides a population estimate with only a sufficient degree of certainty to say that the actual number is within a particular range," noted that "according to the ACS confidence interval, the single-race Black VAP could be as small as 22,800, which is actually less than the 2010 Census estimate of 24,030." *Id.* at 1034. Because 24,030 fell *within* the margin of error, it was impossible to make a probability determination that the true BVAP was more likely above 24,030 than below. Thus, the court concluded that the "error margins in the

2011-2013 ACS [we]re too large to constitute statistically significant evidence that the Black VAP outnumber[ed] the white VAP in the District." *Id.* at 1034.[11]

In sum, "Plaintiffs have failed to demonstrate that it is *more likely than not* that Plaintiffs' proposed district has a majority [B]CVAP." *Reyes v. City of Farmers Branch, Texas*, No. 3:07-CV-900-O, 2008 WL 4791498, at *19 (N.D. Tex. Nov. 4, 2008). The margin of error encompasses the 50%+1 threshold, so the actual BCVAP could just as easily sit *below* that threshold as it could above. *See* DE164-3 (Trende Depo) at 115:17-20 ("[I]f your error margin is including 50 percent, you can't say within a reasonable degree of scientific certainty that the district is, in fact, 50 percent plus one."); *accord id.* at 80:14-17, 113:6-19, 118:10-16, 133:10-23. All we know is that it is statistically likely that the actual BCVAP falls somewhere within the margin of error. But Plaintiffs' best guess—based on survey results from less than 1% of SD7's population—isn't good enough. That inherent statistical uncertainty cannot be resolved at trial, making summary judgment with respect to Fairfax Plans 1, 2, and 2A (the BCVAP plans) appropriate.

---

[11] Also, in *Benavidez v. Irving Independent School District*, the court rejected plaintiff's attempt to use Hispanic CVAP data to satisfy the first *Gingles* precondition, noting that if his "estimate of the number of eligible Hispanic voters … is off by *just 419 people*, assuming his total CVAP estimate is correct, the district would not be majority-minority." 690 F. Supp. 2d 51, 459 (N.D. Tex. 2010). Here, if Mr. Fairfax were off by just 196 people for SD7 in Plan 2A (the most Plaintiffs-favorable circumstance), for example, the district would not be majority-minority.

## II.    Plaintiffs' Alternative Remedy Is Not "Reasonably Configured."

Plaintiffs' fourth and final illustrative plan (Fairfax Plan 3) fails to satisfy the first *Gingles* precondition because it is an unreasonable and contorted configuration of Alabama's senate districts in the relevant Huntsville area. The lengths to which it must stretch, strain, and subvert Alabama's traditional redistricting principles to reach its racial target of 50%+1 BVAP prove that race predominates in Fairfax Plan 3. No reasonable factfinder could find this alternative remedy to be evidence of vote dilution, so summary judgment on Fairfax Plan 3 is warranted.

### A.    Fairfax Plan 3 violates numerous traditional redistricting principles.

In "case after case," the Supreme Court has emphasized that Section 2 "*never* requires adoption of districts that violate traditional redistricting principles." *Allen*, 599 U.S. at 29 n.4 & 30 (emphasis added and alteration adopted). Such districts are, by definition, not "reasonably configured," *id.* at 18, and cannot "demonstrate the existence of a proper remedy" for the alleged §2 violation, *Burton v. City of Belle Glade*, 178 F.3d 1175, 1199 (11th Cir. 1999). The parties here agree that Plaintiffs' illustrative plans must respect the State's criteria of geographic compactness, minimizing county splits, and avoiding incumbency contests. *See* DE164-7 (Fairfax Initial) ¶19. Not only does Mr. Fairfax's final illustrative plan fare worse on each of these principles than the State's 2021 Plan, but it does so in a superlative fashion. The districts he twists in the Huntsville area become the some of the *least* compact

in the State; the new majority-minority district he cobbles together between Huntsville and Decatur contains the *most* county splits; and to top it off, he forces contests between incumbents even though the 2021 Plan demonstrates none need exist.

The first *Gingles* precondition serves as a "gatekeeping mechanism" that here prevents Plaintiffs' claims based upon this unreasonably configured illustrative district from passing further. *Dillard v. Baldwin Cnty. Comm'rs*, 376 F.3d 1260, 1268 (11th Cir. 2004). Reasonableness is not in the eye of the beholder. *Contra, e.g.*, DE164-13 (Fairfax Depo) at 155:12-156:1 (finding it "difficult" to say that five or ten additional county splits would be "excessive"). Were it so, the "ascertainable and objective standards" enforced by the first *Gingles* precondition would give way to a veritable "Pandora's Box" of meritless §2 claims based on "vague, subjective criteria." *Dillard*, 376 F.3d at 1268.

***Compactness:*** "[Section] 2 does not require a State to create, on predominantly racial lines, a district that is not 'reasonably compact.'" *Bush v. Vera*, 517 U.S. 952, 979 (1996). Indeed, the Supreme Court has repeatedly "relied on the fact that [a] proposed district was not reasonably compact" when finding a State had gerrymandered its electoral districts by race. *Allen*, 599 U.S. at 27. These mangled maps make up a menagerie of sorts: from "a sacred Mayan bird" superimposed upon Houston, *Bush*, 517 U.S. at 974; to a "snakelike" district slithering through North

Carolina's tobacco country, *Shaw v. Reno*, 509 U.S. 630, 635 (1993); to an outright "monstrosity" in Georgia, *Miller v. Johnson*, 515 U.S. 900, 909 (1995).

SD7 fits right in, resembling what Dr. Trende describes as "a baby dragon with an overbite in flight." DE164-2 (Trende Supp) at 19.



Its tail sweeps through Huntsville and then hooks northwest; its hindquarters twist away from Madison to capture the Redstone Arsenal and Huntsville International Airport; its wings span from Athens in the North to Decatur in the South (carefully covering only portions of both cities); and its head and neck protrude into the rural precincts west of Decatur. About two-thirds of the ungainly beast lie above the Tennessee river, with the rest below.

Dr. Trende assessed Fairfax Plan 3 based on two of the industry-standard compactness measures Mr. Fairfax used (Reock and Polsby-Popper), with a higher score signifying a more compact district. DE164-2 (Trende Supp) at 26-27. Illustrative SD7's Reock score is 0.213, and its Polsby-Popper score is 0.133. *Id.* These scores make it the third-least compact out of thirty-five total districts under Reock and the second-least compact district under Polsby-Popper in the plan. *Id.* at 25-26.

Zooming out a bit, the districts of Northern Alabama take a huge hit in compactness under Fairfax Plan 3. "The mean Reock score in the Enacted Map in Northern Alabama is 0.422" compared to 0.345 for Fairfax Plan 3. *Id.* at 25. And under Polsby-Popper, "the compactness declines from 0.306 to 0.259." *Id.* at 26. Dr. Trende also examined "cut edges compactness," which "measures the number of blocks or precincts that are separated in order to create districts" (the higher the score, the more cut edges, the worse the compactness). *Id.* at 15. He found that the "Enacted Map removes 1652 edges. Fairfax Map 3 removes 1893." *Id.* at 27.

Zooming out further still, the average compactness score of all thirty-five districts is worse under Fairfax Plan 3. Dr. Trende determined that the "mean Reock Score of the Enacted Map is 0.395. The mean Reock Score of Fairfax Map 3 is 0.377." *Id.* at 25. And the "average Polsby-Popper score of the map declines from 0.257 to 0.249." *Id.* at 26. Mr. Fairfax's own compactness analysis confirms that his Plan 3 is less compact on average than the 2021 Plan. DE164-9 (Fairfax Rebuttal Redline) ¶88. Finally, the "Enacted Map removes 8,862 edges. Fairfax 3 removes 8,978." *Id.* at 27. Despite SD7's abysmal compactness score, it still barely manages to surpass 50% BVAP. DE164-9 (Fairfax Rebuttal Redline) ¶81.

***Incumbency Contests and County Splits:*** Fairfax Plan 3 forces contests between incumbents where the Enacted Plan demonstrates none are necessary. DE164-9 (Fairfax Rebuttal Redline) ¶93. The Enacted Plan splits 19 counties. Fairfax Plan 3

splits 21—even after closing up existing county splits in Blount and Chilton counties to bring down his numbers, DE164-13 (Fairfax Depo) at 123:8-124:8. Four of those splits fall within illustrative SD7, making it the only district in the Plan to contain *four* split counties. The principle of "minimizing county splits" doesn't seem to mean anything if a single district can split four counties and remain "reasonably configured." Why not five? And if an illustrative plan can insert an additional two splits without "violating traditional districting principles," why couldn't it insert ten more splits? Why not double the number of split counties in order to find that additional majority-minority district? When asked this very question, Mr. Fairfax could not place a "numerical value" on how many was too many. DE164-13 (Fairfax Depo at 155:17-18). Even an illustrative plan with thirty-eight county splits compared to the enacted plan's nineteen splits could, according to Mr. Fairfax, be reasonably configured. DE164-13 (Fairfax Depo) at 157:16-17; *see also id.* at 159.[12]

In his Rebuttal Report, Mr. Fairfax concluded that Plan 3 was reasonably configured in part because it split 19 counties, the same as the Enacted Plan. *See* DE164-9 (Fairfax Rebuttal Redline) at 36. But then he later realized his error and noted that Plan 3 splits 21 counties. *Id.* One element of his report that conspicuously did not change was his conclusion that Plan 3 contained a reasonably configured majority-

---

[12] Unbelievably, so could an illustrative plan that sacrifices contiguity, in Mr. Fairfax's view. *Id.* at 76.

minority district. *Id.* at 37. This too betrays an "ends justify the means" theory of §2 liability where traditional criteria can be ignored to draw majority-minority districts.

There are at least two takeaways. First, the baby dragon district makes Alabama's Senate Plan worse: it is less compact, it has more county splits; and it pairs incumbents. Second, there is no way a State legislator could divine during the redistricting process that §2 requires her to vote for something as malformed as Plan 3. Section 2 is supposed to impose "exacting requirements" upon those who would transfer a traditional "duty and responsibility of the States" to "the federal courts." *Allen*, 599 U.S. at 30. And each *Gingles* precondition ought to serve "as a gatekeeper, ensuring that a plaintiff who proceeds to plenary review has a real chance to show a redressable violation of the ultimate §2 standard." *Strickland*, 556 U.S. at 31 (Souter, J., dissenting). That gate is not wide enough to let in the baby dragon.

**B.      Race predominates in Fairfax Plan 3.**

Plaintiffs cannot satisfy *Gingles* 1 if race predominates in their alternative map. *See Allen*, 599 U.S. at 31-33; *id.* at 59 (Thomas, J., dissenting). Here, SD7's shape is "unexplainable on grounds other than race." *Alexander v. S.C. State Conf. of the NAACP*, 144 S. Ct. 1221, 1236 (2024).

In the two maps below, the relevant geographic unit (precincts on the left and populated census blocks on the right) are shaded by their BVAP percentage. *See* DE164-2 (Trende Supp) at 28-29.



Illustrative SD7 includes thirty-two of the thirty-five highest-BVAP precincts in Lawrence, Limestone, Madison, and Morgan counties (leaving out precincts ranked 9th, 17th, and 22nd). DE164-2 (Trende Supp) at 30.[13] It carefully plucks all of the top-BVAP precincts out of Huntsville and Decatur. And then it proceeds westward to split another county (Lawrence) to pick up a few more high-BVAP precincts.

Those additional precincts from the fourth county split are crucial to nudging the district's BVAP over 50%. Dr. Trende independently calculated that "selecting the highest BVAP percent precincts, even without respect for contiguity," in Morgan, Madison, and Limestone Counties "will yield at best a 48.1% BVAP district

---

[13] One of these precincts, sitting in the middle of Lawrence County, "is not contiguous to the district and cannot be added without including a sizeable White population" while the other two are further West in Lawrence County and are unnecessary to achieve the 50%+1 target. DE164-2 (Trende Supp) at 32.

within the constraints imposed by one-person-one-vote." DE164-2 (Trende Supp) at 33. That is consistent with SD7 in Fairfax Plans 1, 2, and 2A, which do not split Lawrence County and thus do not exceed 50% BVAP. *See, e.g.*, DE164-1 (Trende Initial) at 8 (calculating SD7's BVAP in Fairfax Plan 1 to be 46.8%). Therefore, Mr. Fairfax *needed* to pick up the black population in Lawrence County to hit his target, exalting his racial benchmark above the traditional principles of minimizing county splits and compactness. This is a textbook example of subverting race-neutral, traditional redistricting factors to "racial tinkering." *Miller*, 515 U.S. at 919.

SD7's "combination of a bizarre, noncompact shape and overwhelming evidence that that shape was essentially dictated by racial considerations of one form or another is exceptional." *Bush*, 517 U.S. at 973. That Plaintiffs subordinate traditional districting principles to race is obvious, borne out by their precise calibration of the racial compositions of their proposed districts by scooping black Alabamians from Huntsville and lumping them together with black Alabamians from Decatur before sprinkling in just enough of Lawrence County to clear 50%+1. Plaintiffs cannot satisfy the first precondition with this racial gerrymander.

## CONCLUSION

The Court should grant Secretary Allen summary judgment on Plaintiff's claim concerning the Huntsville area.

Steve Marshall
   *Attorney General*

*/s Edmund G. LaCour Jr.*
Edmund G. LaCour Jr. (ASB-9182-U81L)
   *Solicitor General*

James W. Davis (ASB-4063-I58J)
   *Deputy Attorney General*

Soren Geiger (ASB-0336-T31L)
   *Assistant Solicitor General*

Misty S. Fairbanks Messick (ASB-1813-T71F)
Brenton M. Smith (ASB-1656-X27Q)
Benjamin M. Seiss (ASB-2110-O00W)
   *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama  36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Soren.Geiger@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Misty.Messick@AlabamaAG.gov
Brenton.Smith@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov

***Counsel for Secretary of State Allen***

## CERTIFICATE OF SERVICE

I certify that on June 21, 2024, I electronically filed the foregoing notice with the Clerk of the Court using the CM/ECF system, which will send notice to all counsel of record.

/s/    Edmund G. LaCour Jr.
Counsel for Secretary Allen