FILED
2024 Jun-21  PM 10:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |
|---|---|
| KHADIDAH STONE, *et al.*,<br><br>　　　*Plaintiffs*,<br><br>　　vs.<br><br>CHRIS REP. PRINGLE*, et al.,*<br><br>　　　*Defendants*. | Case No.: 2:21-cv-1531-AMM |

## REPRESENTATIVE CHRIS PRINGLE'S
## <u>MOTION FOR SUMMARY JUDGMENT</u>

**<u>OF COUNSEL:</u>**

Dorman Walker (ASB-9154-R81J)
BALCH & BINGHAM LLP
Post Office Box 78 (36101)
445 Dexter Avenue, Suite 8000
Montgomery, AL 36104
Telephone: (334) 269-3138
Email: dwalker@balch.com

Michael P. Taunton (ASB-6853-H00S)
BALCH & BINGHAM LLP
1901 Sixth Avenue North, Suite 1500
Birmingham, AL 35203
Telephone: (205) 226-3451
Email: mtaunton@balch.com

**JUNE 21, 2024**

# **TABLE OF CONTENTS**

EXHIBITS ................................................................................................ ii

**INTRODUCTION**........................................................................................1

**STATEMENT OF UNDISPUTED FACTS**........................................................1

   I.  Undisputed Facts Concerning Rep. Chris Pringle..........................................1

   II. Undisputed Facts Related To Plaintiffs' Standing. ......................................5

   III.Undisputed Facts Related To Plaintiffs' Substantive Claims. ......................6

**LEGAL STANDARD** ...............................................................................16

**ARGUMENT** ........................................................................................17

   I.  Rep. Pringle Is Entitled To Summary Judgment On All Claims Against Him
      Because He Is Not a Proper Defendant To This Action................................17

   II. Plaintiffs Have Failed To Establish That They Have Standing To Challenge
      The Huntsville Senate Districts. ................................................................20

      1.  The Alabama State Conference of the NAACP does not have
         associational standing because it does not have members. ......................22

      2.  Greater Birmingham Ministries cannot prove associational standing to
         challenge the Huntsville Senate Districts because it has not identified any
         member in the Huntsville-area who could bring those claims in their own
         right....................................................................................................24

   III.Plaintiffs' Claims Fail On The Merits. .........................................................26

      1.  The Minority Group Is Not "Sufficiently Large."...................................26

         A. BVAP, not BCVAP, provides the "clear lines" §2 requires. ..............27

         B. Plaintiffs fail to account for everyone ineligible to vote, not just non-
           citizens.............................................................................................29

         C. Plaintiffs' calculations show that illustrative SD7 is not majority-
           BCVAP...............................................................................................30

      2.  Plaintiffs' Alternative Remedy Is Not "Reasonably Configured." ..........31

         A. Fairfax Plan 3 mocks traditional redistricting principles....................31

      B. Race predominates in Fairfax Plan 3.........................................................33

**CONCLUSION** ......................................................................................35

i

## **EXHIBITS**

Evidentiary Submission of Alabama Secretary of State, Wes Allen, (Doc. 164), relied upon by Rep. Chris Pringle:

| **EXHIBIT** | **DOCUMENT** |
|:---:|:---|
| **1** | Sean Trende, Ph.D., Expert Report |
| **2** | Sean Trende, Ph.D., Supplemental Report |
| **3** | Sean Trende, Ph.D., Deposition Transcript |
| **4** | Sean Trende, Ph.D., Deposition Exhibits 1-3 |
| **5** | Sean Trende, Ph.D., Deposition Exhibits 4-5 |
| **6** | Sean Trende, Ph.D., Deposition Exhibits 6-14 |
| **7** | Anthony Fairfax, Expert Report |
| **8** | Anthony Fairfax, Appendix |
| **9** | Anthony Fairfax, Amended Rebuttal Report Redline |
| **10** | Anthony Fairfax, Rebuttal Appendix |
| **11** | Anthony Fairfax, Supplemental Rebuttal Report |
| **12** | Anthony Fairfax, Supplemental Rebuttal Appendix |
| **13** | Anthony Fairfax, Deposition Transcript |
| **14** | Anthony Fairfax, Deposition Exhibits 1-4 |
| **15** | Anthony Fairfax, Deposition Exhibit 5 |
| **16** | Anthony Fairfax, Deposition Exhibits 6-13 |
| **17** | Kassra Oskooii, Ph.D., Expert Report |
| **18** | Kassra Oskooii, Ph.D., Deposition Transcript |

| 19 | Kassra Oskooii, Ph.D., Deposition Exhibits |
|---|---|
| 20 | Traci Burch, Ph.D., Expert Report |
| 21 | Traci Burch, Ph.D., Deposition Transcript + Exhibits |
| 22 | Stephen Blacklocks & Michael Kruse, *Scientific Evidence and Confidence Intervals: Theory and Fallacy*, Bureau of National Affairs (2008). |

Supplemental Evidentiary Submission of Rep. Chris Pringle (Doc. 167):

| ECF (EX.) | DOCUMENT |
|---|---|
| **1 (23)** | Declaration of Rep. Chris Pringle |
| **2 (24)** | Declaration of Sen. Steve Livingston |
| **3 (25)** | Rep. Chris Pringle's Verified Objections and Responses to Plaintiffs' First Interrogatories to Defendants |
| **4 (26)** | Plaintiffs' Responses to Defendant Allen's Discovery Requests |
| **5 (27)** | Greater Birmingham Ministries Supplemental Discovery Responses |
| **6 (28)** | Fed. R. Civ. P. 30(b)(6) Deposition of Alabama State Conference of the NAACP President, Bernard Simelton |
| **7 (29)** | Exhibits to Deposition of Alabama State Conference of the NAACP President, Bernard Simelton |
| **8 (30)** | Fed. R. Civ. P. 30(b)(6) Deposition of Greater Birmingham Ministries Executive Director, Scott Douglas, with exhibits |

## INTRODUCTION

Rep. Chris Pringle moves for summary judgment on the basis that:

1. Plaintiffs' sole remaining claims challenge *Senate* districts in the Huntsville and Montgomery areas, but as the *House* Chair of the Alabama Permanent Legislative Committee on Reapportionment, Rep. Pringle had no involvement with the formation of the challenged Senate Redistricting Plan, and would have no involvement with any remedy;

2. No Plaintiff has established standing to bring a challenge to the Senate districts in the Huntsville region; and

3. It is clear that Plaintiffs cannot meet the first precondition of *Gingles* in the Huntsville region.

Thus, all of Plaintiffs' claims against Rep. Pringle – and Plaintiffs' Huntsville-area claims against both Defendants – are due to be resolved in Defendants' favor.

## STATEMENT OF UNDISPUTED FACTS

### I.    Undisputed Facts Concerning Rep. Chris Pringle.

1.    On November 16, 2021, Plaintiffs filed a complaint against multiple defendants, including State Representative Chris Pringle, challenging the 2021 redistricting plans – SB1 (the "Senate Redistricting Plan") and HB2 (the "House Redistricting Plan") – of numerous Alabama Senate and House districts. (Complaint, Doc. 001, ¶ 5) (challenging 12 Senate districts and 21 house districts).

2.      On December 6, 2023, however, Plaintiffs filed the current operative complaint, leaving only the challenges against Alabama Senate Districts 25 and 26 in the Montgomery-area (the "Montgomery Senate Districts"), and Alabama Senate Districts 2, 7, and 8 in the Huntsville-area (the "Huntsville Senate Districts") (collectively, the "Challenged Senate Districts"). (Fourth Am. Compl., Doc. 126, ¶¶ 3–4.) Plaintiffs dropped all claims against State House districts. (*Id.*)

3.      Rep. Pringle was sued in his official capacity as House Chair of the Alabama Permanent Legislative Committee on Reapportionment (the "Committee"). (Doc. 126, ¶ 22.) Rep. Pringle represents "Alabama House District 101 in the Alabama Legislature, [and serves as] the House Chair of the [Committee]," alongside State Sen. Steve Livingston who serves as the Senate Chair. (Decl. of Rep. Chris Pringle, ¶ 2; Decl. of Sen. Livingston, ¶ 2, true and correct copies of which are included at Docs. 167-1 and 167-2, respectively.)

4.      Rep. Pringle and Sen. Livingston filed a Motion to Dismiss Plaintiffs' Fourth Amended Complaint on several grounds, (Doc. 130), and the Court entered an Order denying the Motion to Dismiss as to Rep. Pringle and granting as to Sen. Livingston. (Doc. 143.)

5.      "As House Chair of the Committee, [Rep. Pringle has] a leadership role in the development and design of proposed new districts for the House of Representatives." (Doc. 167-1, Pringle Decl., ¶ 5.)

2

6.  "As House Chair, [Rep. Pringle has] no role in the development or design of Senate districts." (*Id.* at ¶ 6.) His "only involvement with passage of the Senate districts that became SB1 was in presenting them to the House of Representatives after they were passed by the Senate, and in voting on them as a member of the Legislature." (*Id.* at ¶ 6.) (*See also* Rep. Pringle's Ver. Objs. and Resps. to Plffs. First Interrog. ("Pringle's Resps."), a true and correct copy of which is included at Doc. 167-3.)

7.  "In 2021, the House made no changes to the Senate's districts after they were passed by the Senate." (Doc. 167-1, Pringle Decl., ¶ 6.)

8.  "Rep. Pringle did not draw, evaluate or approve the Senate districts." (Doc. 167-3, Pringle's Resps., Resp. to Interrog. # 1.)

9.  Rep. Pringle has no knowledge of or involvement in what "the Committee and/or its agents, including Randy Hinaman, used as redistricting guidelines" as it relates to "any 2021 Senate redistricting map." (*Id.*, Resp. to Interrogs. # 2, #3, and #6.)

10.  Rep. Pringle has no knowledge of or involvement in "the 2021 redistricting cycle drafting timeline" as it relates to "any 2021 Senate redistricting map." (*Id.*, Resp. to Interrog. # 4 and #5.)

11.  Rep. Pringle does not know, and was not involved with, what "communities of interest that the Committee and/or its agents, including Randy

Hinaman, identified and credited when drafting and approving Alabama's state legislative districts during the 2021 redistricting cycle" for "any 2021 Senate redistricting map." (*Id.*, Resps. to Interrog. #7 and #8.)

12.    Rep. Pringle "has no knowledge of," and was not involved with, identifying, drawing, or seeking or receiving any input on the drawing or identification of any district "core" for any of the Challenged Senate Districts. (*Id.*, Resp. to Interrog. #9.)

13.    Rep. Pringle "has no knowledge of," and was not involved with, making any change and/or incorporating any feedback into "a draft map from a legislator" for any of the Challenged Senate Districts. (*Id.*, Resp. to Interrog. #10.)

14.    Rep. Pringle has no knowledge of or involvement in "how the Committee and its agents and employees, defined monitored, or reviewed its compliance with the VRA and the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution" as it relates to "any 2021 Senate redistricting map." (*Id.*, Resp. to Interrog. #11.)

15.    Rep. Pringle has no knowledge of or involvement in "how the Committee and its agents and employees selected districts to perform functionality examinations or effectiveness analyses" as it relates to "any 2021 Senate redistricting map." (*Id.*, Resp. to Interrog. #12.)

16.     Rep. Pringle has no knowledge of or involvement in "how and when racial data and awareness of racial composition were used in the drafting process of Alabama state legislative districts during the 2021 redistricting cycle" as it relates to "any 2021 Senate redistricting map." (*Id.*, Resp. to Interrog. #13.)

17.     Rep. Pringle was also "unaware of 'who drew, who directed the creation of, what criteria was relied upon, and who determined the criteria of each respective enacted map for State House of Representatives and State Senate' for 'the 1990, 2000, and 2010 redistricting cycles,'" especially as it relates to "any 2021 Senate redistricting map." (*Id.*, Resp. to Interrog. #14.)

18.     Rep. Pringle has no power to grant the relief requested by the Plaintiffs. (Doc. 167-1, Pringle Decl., ¶¶ 7–8.)

## II.     Undisputed Facts Related To Plaintiffs' Standing.

19.     Plaintiffs Khadidah Stone and Evan Milligan are each residents of Montgomery County, Alabama. (Doc. 126, ¶¶ 13–14.)

20.     When asked what facts support standing for the two plaintiff organizations—the Alabama State Conference of the NAACP (the "State Conference") and Greater Birmingham Ministries ("GBM")—Plaintiffs replied that "Organizational Plaintiffs assert standing based [on] 'associational standing,' that is, on behalf of impacted members." (Plff. Resps. to Defs. Disc. Reqs. ("Plff. Resps."), Resp. to Interrog. #2, a true and correct copy of which is included at Doc. 167-4.)

21.     The <u>Alabama State Conference</u> of the NAACP is the only NAACP-affiliated organization that is a party to this lawsuit. (Doc. 126 at 3–6). The <u>Alabama State Conference</u> of the NAACP is not a membership organization. (*See* Dep. of Benard Simelton, pp. 39:21–40:7, a true and correct copy of which is included at Doc. 167-6.) It does not itself have members; rather, the individuals it serves are members of different branches or colleges with the State of Alabama. (*Id.*)

22.     GBM purports to serve different groups around Alabama, yet it has not identified a single, individual member of GBM living in the Huntsville area. In its interrogatory responses, GBM did not list one name or address of a Huntsville resident that is a member of GBM. (*See* Doc. 167-4, Resp. to Interrog. #1.)

23.     In GBM Executive Director Scott Douglas's deposition, he was asked if he had "any names or information to provide about" GBM's individual members. (Dep. of Scott Douglas, pp. 65:23–66:2, a true and correct copy of which is included at Doc. 167-8.) Mr. Douglas responded by identifying the name of only one individual member—a Montgomery resident. (*See id.*, pp. 64:3–66:21.)

**III.     Undisputed Facts Related To Plaintiffs' Substantive Claims.**

24.     According to the U.S. Census Bureau's 2020 Decennial Census and the 2022 1-year estimates from the American Community Survey ("ACS"), the relevant Alabama total population, voting age population ("VAP") and estimated citizen voting age population ("CVAP") are:

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Total Pop. | 5,024,279 | 63.12% | 27.16% | 5.26% | 4.75% |
| VAP Pop. | 3,917,166 | 65.47% | 25.9% | 4.26% | 4.59% |
| Estimated CVAP Pop. | 3,862,490 | 67.7% | 25.6% | 2.6% | 4.13% |

(Fairfax Rpt. of Anthony Fairfax, pp. 15–17, a true and correct copy of which is included at Doc. 164-7.)

25.    The Committee proposes redistricting plans for the State following each decennial census. Ala. Code §29-2-52. Among the Committee's relevant redistricting criteria are that districts "shall have minimal population deviation" (±5%), shall comply with the U.S. Constitution and §2 of the Voting Rights Act, "will be composed of contiguous and reasonably compact geography," "[c]ontests between incumbents will be avoided whenever possible," and "the number of counties in each district" shall be minimized. (*Id.*, ¶ 18.)

26.    Relying on these guidelines, the Committee drafted and gave a favorable report to a draft Senate plan, later introduced as SB1 during a special session on redistricting. (Doc. 126, ¶¶ 52–53.)

27.    On November 4, 2021, Governor Kay Ivey signed into law SB1 of the 2021 Second Special Session of the Alabama Legislature. (Doc. 126, ¶¶ 23, 77.) *See also* Ala. Act No. 2021-558. That law provides for the electoral districts of the Alabama Senate. *See* Ala. Code §29-1-2.3.

7

28.     Seven Senate Districts cover the Huntsville area: SD1, SD2, SD3, SD6, SD7, SD8, SD9. (Appx. to Fairfax Rpt., 69, 71, 75, a true and correct copy of which is included at Doc. 164-8.) The total, VAP, and estimated CVAP populations are:

|  | Total | White | Black | Hispanic |
|---|---|---|---|---|
| Total Pop. | 1,042,167 | 738,322 (70.84%) | 164,536 (15.79%) | 81,130 (7.78%) |
| VAP Pop. | 811,002 | 596,063 (73.5%) | 121,278 (14.95%) | 49,346 (6.08%) |
| Estimated CVAP Pop. | 779,804 | 607,106 (77.85%) | 117,369 (15.05%) | 26,954 (3.46%) |

(*Id.* at pp. 283–94); (Reb. Rept. of Anthony Fairfax, p. 53, a true and correct copy of which is included at Doc. 164-10).

29.     No significant disparity exists in the citizenship rates between black and white Alabamians, generally, and in Northern Alabama, specifically. (Doc. 164-7, Fairfax Rpt., pp. 16–17) (dividing VAP data from the 2020 Census by 1-year CVAP data from the 2022 ACS reveals a statewide black citizenship rate of 97.52% and a white citizenship rate of 100%.); (Doc. 164-8, Appx. to Fairfax Rpt., pp. 147, 151) (using the same data, dividing SD7 in Fairfax Plan 1's VAP by its CVAP reveals a black citizenship rate of 100% and a white citizenship rate of 96.4%).

### The Data Underpinning Plaintiffs' Illustrative Plans

30.     Plaintiffs submitted four alternative plans in an attempt to demonstrate that an additional majority-minority district—which they label Senate District 7— can be drawn in the Huntsville area.

31.    These plans were developed using Decennial Census and American Community Survey data. (Doc. 164-7, Fairfax Rpt., ¶ 11); (Amend. Reb. Rpt. of Anthony Fairfax, ¶3, a true and correct copy of which is included at Doc. 164-9.)

32.    The Decennial Census is performed by the U.S. Census Bureau and the data collected reflect a full enumeration of U.S. residents. (Rpt. of Sean Trende, pp. at 7–8, a true and correct copy of which is included at Doc. 164-1.) Census data are reported at multiple levels: blocks (the lowest), block groups (a cluster of blocks), tracts, counties, and all the way up to the State and national level. (*Id.*) As an actual count, census data "come without error margins" or "randomness." (*Id.* at 8–9.)

33.    Alabama's 2021 Reapportionment Committee Redistricting Guidelines provide that the "total Alabama state population … as reported by the 2020 Census, shall be the permissible database used for the development, evaluation, and analysis of proposed redistricting plans." (Doc. 164-7, Fairfax Rpt., ¶ 18.)

34.    Also conducted by the Census Bureau, the "American Community Survey is an ongoing survey providing communities new data every year to plan investments and services." (Doc. 164-1, Trend Rpt., p. 6.)

35.    ACS data are taken from a sample of the population. (*Id.*); (Rpt. of Kassra Oskooii, ¶ 21, a true and correct copy of which is included at Doc. 164-17). And as a sample, ACS data come with error margins. (Doc. 164-1, Trende Rpt., pp. 9–10); (Doc. 164-9, Fairfax Amend. Reb. Rpt., ¶ 14).

36.    "In 2022, the ACS interviewed 1,980,550 nationally," including "32,482 residents of Alabama," which is 0.65% of Alabama's population (based on the 2020 Census). (Doc. 164-1, Trende Rpt., p. 11.)

37.    Collection "occurs every month and is released every year." (Doc. 164-17, ¶ 23.) Data are published as 1- and 5-year estimates. (Doc. 164-1, p. 6.)

38.    The 1-year estimates are not "designed to provide reliable … estimates of various population characteristics for cities, counties, and other regions with a population" of under 65,000. (Doc. 164-17, Oskooii Rpt., ¶ 20.)

39.    "The 5-year ACS produces demographic estimates for all census geographic units as low as the block-group level." (*Id.*) The ACS does not produce demographic estimates for census blocks. Alabama has 3,438 block groups, and given the 2022 sample size of 32,482 people, this "means each [block] group averages 9.45 respondents." (Doc. 164-1, Trende Rpt., pp. 7, 11.)

40.    The "[CVAP] special tabulation" is published every year "from the most current [ACS] 5-year estimates."[1] The CVAP special tabulation "gives data, broken down by race and ethnicity, of the number of people in various locations who identify as U.S. Citizens." (Doc. 164-1, Trende Rpt., p. 7.) The Decennial Census no longer collects citizenship data. (*Id.*); (Doc. 164-17, Oskooii Rpt., ¶ 17.)

---

[1] https://www.census.gov/programs-surveys/decennial-census/about/voting-rights/cvap.html (last visited June 19, 2024). (*See also* Doc. 164-1, Trende Rpt., p. 6.)

41.    To estimate CVAP for block groups that are split, experts must disaggregate ACS block-group data using "[d]isaggregation techniques." (Doc. 164-17, Oskooii Rpt., ¶¶ 13, 20, n.11); (*see also* Doc. 164-1, Trende Rpt., 19–21); (Suppl. Rpt. of Sean Trende, 4, a true and correct copy of which is included at Doc. 164-2). Splitting block groups produces unknowable error on top of the sampling error from ACS. (*See* Doc. 164-9, Fairfax Amend. Reb. Rpt., ¶ 17); (Dep. of Kassra Oskooii, pp. 225:15–226:7, a true and correct copy of which is included at Doc. 164-18.)

42.    Fairfax Plans 1, 2, and 2A use ACS citizenship estimates in an attempt to demonstrate that SD7 contains a "majority of 'eligible' voters." (Doc. 164-7, Fairfax Rpt., ¶ 74.) (*See also* Doc. 164-9, Fairfax Amend. Reb. Rpt., ¶ 5); (Doc. 164-17, Oskooii Rpt., ¶¶ 21, 25). Fairfax Plan 1 uses 2021 5-year ACS data while Fairfax Plans 2 and 2A use 2022 5-year ACS data. (Doc. 164-9, Fairfax Amend. Reb. Rpt., ¶ 5.) These three plans split block groups. By contrast, Fairfax Plan 3 uses 2020 Decennial Census data to calculate SD7's BVAP. (*Id.* ¶ 6.)

### Fairfax Plan 1: SD7

43.    SD7's BVAP in Plan 1 is under 50%. (Doc. 164-8, Appx. Fairfax Rpt., p. 149.) The district's VAP is 39% white, 46.8% black, and 10.1% Hispanic. (*Id.*)

44.    Using ACS and Decennial Census data and a variety of disaggregation methods, Defendants' expert Dr. Sean Trende estimates the black citizen voting age population (BCVAP) for SD7 at 50.9%, 50.4%, 50.1%, 49.7%, 49.2%, 48.8%,

48.7%, 48.3%, 48.2%, 48%, and 47.8%. (Doc. 164-1, Trende Rpt., pp. 20–21.)[2]

45.    Plaintiffs' expert Mr. Anthony Fairfax calculates a BCVAP of 50.16% for SD7. (Doc. 164-7, Fairfax Rpt., ¶ 81.) Likewise, Plaintiffs' expert Dr. Kassra Oskooii calculates a BCVAP of 50.11%. (Doc. 164-17, Oskooii Rpt., ¶ 38.)

46.    An agreed-upon error margin for these CVAP estimates is between ±2.6% and ±3.1%. (Doc. 164-1, Trende Rpt., pp. 15, 22); (Doc. 164-7, Fairfax Amend. Reb. Rpt., ¶ 17); (Dep. of Anthony Fairfax, p. 197:1–2, a true and correct copy of which is included at Doc. 164-13.)

47.    Using the lower error margin of 2.6% and the highest estimated BCVAP share of 50.9%, it is statistically likely that the true value of SD7's BCVAP is somewhere between 48.3% and 53.5%. (Suppl. Reb. Rpt. of Anthony Fairfax, ¶ 7, a true and correct copy of which is included at Doc. 164-11.)

48.    In Fairfax Plan 1, "119 block groups are contained in whole or in part within the boundaries of Mr. Fairfax's Illustrative District 7." (Doc. 164-1, Trende Rpt., p. 11.) Applying the average number of respondents per block group of 9.45, *id.*, Plaintiffs' BCVAP estimations are based on a 5-year aggregate of survey answers from 1,125 residents. That's less than 1% of the population of illustrative SD7. (Doc. 164-7, Fairfax Rpt., p. 32.)

---

[2] (*See* Doc. 164-1, 16-20) (explaining "[t]here's no obviously correct way to" allocate voters into individual blocks using block-group-level data and describing six methods that he used).

49.    Fairfax estimates the CVAP of SD7 is 100,955. (*Id.*, 43.) The difference between 50% (50,477.5) and 50.16% (50,639: Fairfax's calculation) is 161.5. The difference between 50% and 50.11% (50,589: Oskooii's calculation) is 111.

50.    According to one of Plaintiffs' experts, in 2022, "318,681 people (8.6% of the voting eligible population) were barred from voting in Alabama election in 2022 due to a felony conviction. For Black Americans in Alabama, the rate is higher: … 14.7% of *otherwise-eligible* Black people in Alabama cannot vote due to a relevant felony conviction." (Rpt. of Traci Burch, p. 18, a true and correct copy of which is included at Doc. 164-20.)

51.    Assuming that felons are evenly distributed across the State and Dr. Burch's ratios are both correct and constant, the BCVAP for SD7 would drop to 46.8% (using Mr. Fairfax's initial estimate of 50.16%) once ineligible felons are removed from the eligible voter tabulation. (Doc. 164-1, Trende Rpt., p. 21.)

**Fairfax Plan 2: SD7**

52.    To "resolve Dr. Trende's concern that SD7 in Illustrative Plan 1 … would not be majority Black according to the 2022 5-Year ACS CVAP data[,]"[3] Mr. Fairfax submitted two new illustrative plans, one being Plan 2. (*See* Doc. 146, Amend. Sch. Order); (Doc. 164-9, Fairfax Amend. Reb. Rpt.).

---

[3] Using 2022 5-year ACS data, the estimate for the BCVAP percentage of SD7 in Fairfax's Plan 1 "did dip down to 49 point some percent." (Doc. 164-13, Fairfax Dep., p. 190:15–21.)

53.    SD7's BVAP in Plan 2 is under 50%; its VAP is 37.61% white, 48.47% black, and 9.83% Hispanic. (Doc. 164-10, Appx. to Fairfax Reb. Rpt., p. 51.)

54.    Using different methods, Trende estimates the BCVAP percentage for SD7 at 51.1%, 50.5%, and 50.3%. (Doc. 164-2, Trende Suppl. Rpt., 4.) Fairfax calculates SD7's BCVAP to be 50.05%. (Doc. 164-9, Fairfax Am. Reb. Rpt., ¶ 49.)

55.    The agreed error margin for these estimates is between ±2.7% and ±3.2%. (Doc. 164-2, Trende Supp. Rep., 3); (Doc. 164-13, Fairfax Dep., 197:1–2).

56.    Using an error margin of 2.7% and the highest estimated BCVAP share of 51.1%, it is statistically likely that the true value of SD7's BCVAP in Fairfax Plan 2 is somewhere between 48.4% and 53.8%. (Suppl. Reb. Rpt. of Anthony Fairfax, ¶ 7, a true and correct copy of which is included at Doc. 164-11.)

57.    Mr. Fairfax estimates that the total CVAP of SD7 is 102,776. (Doc. 164-10, Appx. to Fairfax Reb. Rpt., p. 53.) The difference between 50% (51,388) and 50.05% (51,439: Fairfax's calculation) is just 51 citizens.

### Fairfax Plan 2A: SD7

58.    Months after Plaintiffs' initial expert reports were due, Fairfax submitted a new illustrative plan—Plan 2A. (Doc. 164-11, Fairfax Suppl. Reb. Rpt.)

59.    SD7's BVAP in this plan is under 50%. (Appx. to Suppl. Rep. of Anthony Fairfax, p. 17, a true and correct copy of which is included at Doc. 164-12.) The VAP is 37.51% white, 48.38% black, and 10.04% Hispanic. (*Id.*)

14

60.    SD7's estimated BCVAP in Fairfax Plan 2A is 50.19%, according to Mr. Fairfax. (Doc. 164-11, Fairfax Suppl. Rpt., ¶ 7.) Using an error margin of 2.6%, it is statistically likely that the true value of SD7's BCVAP is somewhere between 47.59% and 52.79%. (Doc. 164-9, Fairfax Amend. Reb. Rpt., ¶ 17.)

61.    Mr. Fairfax estimates that the total CVAP of SD7 is 103,382. (Doc. 164-12, Appx. to Suppl. Reb. Rpt., p. 19.) The difference between 50% (51,691) and 50.19% (51,887: Fairfax's calculation) is 196 citizens.

**Fairfax Plan 3: SD7**

62.    Mr. Fairfax submitted Plan 3 over two months after Plaintiffs' initial expert reports were due. (*See* Doc. 148); (Doc. 164-9, Fairfax Amend. Reb. Rpt.)

63.    SD7's voting age-population in Fairfax Plan 3 is 36.51% white, 50.04% black, and 9.22% Hispanic. (Doc. 164-10, p. 189); (Doc. 164-2, p. 17).

64.    SD7 includes thirty-two of the thirty-five highest-BVAP precincts in Lawrence, Limestone, Madison, and Morgan counties (leaving out the three precincts ranked 9th, 17th, and 22nd). (Doc. 164-2, Trende Suppl. Rpt., p. 27.)

65.    SD7's Reock and Polsby-Popper compactness scores make it the third-least and second-least compact district in Fairfax Plan 3, respectively. (Doc. 164-2, Trende Suppl. Rpt., p. 22.)

66.    Fairfax Plan 3 splits 21 counties, while SB1 splits 19. (Doc. 164-2, Trende Suppl. Rpt., 29); (Doc. 164-9, Fairfax Amend. Reb. Rpt., ¶ 75, p. 36).

67.    SD7 is composed of "portions of four counties. No district in the Enacted Map splits four counties." (Doc. 164-2, Trende Suppl. Rpt., p. 30.)

68.    Fairfax Plan 3 "pairs two incumbents in one district (SD8). The Enacted Plan does not pair any incumbents." (Doc. 164-9, Fairfax Amend. Reb. Rpt., ¶ 78.)

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 "mandates the entry of summary judgment" when "there is an absence of evidence" for an element essential to Plaintiffs' case. *Celotex Corp v. Catrett*, 477 U.S. 317, 322, 325 (1986). Although evidence should be viewed in the light most favorable to Plaintiffs, "'circumstantial evidence has no probative value against positive and uncontradicted evidence.'" *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1562, 1564 (11th Cir. 1989). When "evidence is merely colorable" or "not significantly probative," Plaintiffs lose. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *see also Ellis v. England*, 432 F.3d 1321, 1327 (11th Cir. 2005) (per curiam) (conclusory or unsupported statements are insufficient). There is no additional requirement that Defendants "*negate* the elements of the [Plaintiffs'] case." *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 885 (1990) (emphasis in original).

**ARGUMENT**

**I.     Rep. Pringle Is Entitled To Summary Judgment On All Claims Against Him Because He Is Not a Proper Defendant To This Action.**

When Plaintiffs' commenced this matter, they challenged 21 districts from the House Redistricting Plan, (Doc. 001, ¶ 5), and Rep. Chris Pringle was made a party in his official capacity as the House Chair of the Permanent Legislative Committee on Reapportionment (the "Committee"). (*Id.* at ¶ 22.)

Subsequently, however, Plaintiffs limited their suit solely to certain *Senate* districts in the Montgomery and Huntsville regions. (*See* Doc. 126 at ¶¶ 3–4.) Nonetheless, Plaintiffs left Rep. Pringle as a defendant in this suit, alleging he:

> was responsible for the 2021 maps challenged here [*i.e.*, the Senate Redistricting Map]. In that capacity [*i.e.*, House Chair], Defendant Pringle prepared and developed redistricting plans for the State following the decennial census and presided over the meetings of the Committee . . . . Defendant Pringle led the drawing of the challenged districts. Defendants Livingston and Pringle will likely lead efforts to re-draw the district to remedy their illegality if the Court orders the State to do so.

(*Id.* at ¶ 22.) None of this has been borne out by discovery. In fact, Rep. Pringle had essentially <u>no</u> involvement with the Senate Redistricting Plan, would <u>not</u> lead efforts to re-draw the Challenged Senate Districts, and should be dismissed.

For instance, at the motion to dismiss stage, Rep. Pringle provided a sworn declaration noting that, as *House* Chair, he had "**no role** in the development or design of Senate districts." (Doc. 167-1, Pringle Decl., ¶ 6) (emphasis added). Indeed, his

"only involvement with passage of the Senate districts that became SB1 was in presenting them to the House of Representatives after they were passed by the Senate, and in voting on them as a member of the Legislature." (*Id.*)

When pressed on these issues in discovery through interrogatories from the Plaintiffs, Rep. Pringle responded in his verified answers that:

- He "did not draw, evaluate or approve the Senate districts," (Doc. 167-3, Pringle's Resps., Resp. to Interrog. #1);

- He had nothing to do with instructing the Committee, its agents, or mapdrawer Randy Hinaman concerning any redistricting guideline as it related to the Senate Redistricting Plan, (*see id.*, Resps. to Interrogs. #2, #3, and #6);

- He had no knowledge of or involvement with the "the 2021 redistricting cycle drafting timeline" for the Senate Redistricting Plan, (*see id.*, Resps. to Interrogs. #4 and #5);

- He did not have knowledge of or involvement with identifying or otherwise utilizing communities of interest in the drawing of the Senate Redistricting Plan, (*id.*, Resps. to Interrogs. #7 and #8);

- He did not have knowledge of or involvement with identifying or otherwise utilizing any district "core" for the Senate Redistricting Plan, (*see*, at Resp. to Interrog. #9);

- He did not have knowledge of or involvement with drafting or incorporating changes to any draft Senate redistricting map, (*see id.*, Resp. #10);

- He had no knowledge of or involvement with ensuring compliance with the Voting Rights Act or the Constitution for the Senate Redistricting Plan, (*see id.*, Resp. to Interrog.# 11);

- He had no knowledge of or involvement with the selection or performance of functionality or effectiveness analyses for the Senate Redistricting Plan, (*see id.*, Resp. to Interrog. #12);

- He had no knowledge of or involvement with any use of racial data or awareness in the drawing of the Senate Redistricting Plan, (*see id*., Resp. to Interrog. #3); and

- He wasn't sure who drew prior redistricting maps. (*See id.*, Resp. to Interrog. #14.)

In short, Rep. Pringle had **<u>essentially no involvement with</u>** the Senate Redistrict Plan. Unsurprisingly, then, Plaintiffs did not seek to depose Rep. Pringle after receiving his interrogatory responses.

While Rep. Pringle may once have been a proper party when the Plaintiffs were challenging the House Redistricting Plan, (*see, e.g.*, Doc. 001), that time has passed. Rep. Pringle's role as House Chair involved (and involves) only "the development and design of proposed new districts for the House of Representatives"—districts that are no longer challenged. (Doc. 167-1, Pringle Decl., ¶ 5.) (*See also* 126, ¶ 2–6.) He <u>had</u> "no role in the development or design of Senate districts." (Doc. 167-1, Pringle Decl., ¶ 6.) (*See also* Doc. 167-3, Pringle's Resps.) Should Plaintiffs prevail in their suit, he will <u>have</u> no role in redrawing the Challenged Senate Districts. (Doc. 167-1, Pringle Decl., ¶¶ 4–8.) As House Chair, he did not cause the injury alleged in Plaintiffs' Fourth Amended Complaint. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (causation between the injury and conduct complained of is a "irreducible constitutional minimum"). And he will have no role in redressing their injury. *Id.,* at 571. He should be dismissed.

**II.    Plaintiffs Have Failed To Establish That They Have Standing To Challenge The Huntsville Senate Districts.**

The subject-matter jurisdiction of federal courts is limited to "Cases" and "Controversies." U.S. Const. art III, § 2. "To have a case or controversy, a litigant must establish that he has standing[.]" *Jacobson v. Florida Sec. of State*, 974 F.3d 1236, 1245 (11th Cir. 2020). When considering challenges to voting districts, courts have recognized that "injury results only to those persons domiciled in" the allegedly defective district. *Wright v. Dougherty Cnty., Ga.*, 358 F.3d 1352, 1355 (11th Cir. 2004) (quoting *Fairley v. Patterson*, 493 F.2d 598, 603 (5th Cir. 1974)); *People First of Alabama v. Merrill*, 487 F. Supp. 3d 1237, 1246 (N.D. Ala. 2020) (granting summary judgment against plaintiffs who did not vote in challenged counties).

Further, in order for an *organization* to assert standing on behalf of its associated members, it must demonstrate that "its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000); *see also Doe v. Stincer*, 175 F.3d 879, 882 (11th Cir. 1999). "In other words, standing for a traditional membership organization is limited by its membership." *Org. of Pro. Aviculturists, Inc. v. Kershner*, 564 F. Supp. 3d 1238, 1244 (S.D. Fla. 2021).

While Rep. Pringle does not generally challenge Plaintiffs' standing to bring its Montgomery Senate Districts-related claims,[4] no Plaintiff has demonstrated standing to bring Plaintiffs' Huntsville Senate Districts-related claims.

Rep. Pringle assumes, for instance, that Plaintiffs Stone and Milligan are residents of Montgomery County and can demonstrate standing to challenge Senate District 25 and/or 26. (Doc. 126, ¶¶ 13–14.) But, because these two Plaintiffs reside in Montgomery, they cannot demonstrate standing to bring claims related to the Huntsville Senate Districts because they lack an injury associated with those districts. *Wright*, 358 F.3d at 1355; *People First of Ala.*, 487 F. Supp. 3d at 1246.

Meanwhile, the two organizational plaintiffs – the Alabama State Conference of the NAACP (the "State Conference") and Greater Birmingham Ministries ("GBM") – bring their claims *solely* on their purported "associational standing.". (*See* Doc. 126, ¶¶ 17, 19); (Doc. 167-4, Plff. Resps., Resp. to Interrog. #2); (GBM's First Suppl. Resps. Resps. to Def. Allen's Disc. Reqs. ("GBM's Suppl. Resps."), Suppl. Resp. to Interrog. #2, a true and correct copy of which is included at Doc. 167-5.) The problem is that deposition testimony unexpectedly revealed that Alabama State Conference of the NAACP cannot meet the prerequisites for associational standing because the Alabama State Conference of the NAACP does

---

[4] While Rep. Pringle assumes most Plaintiffs' standing to bring their claims related to the Montgomery Senate Districts, Rep. Pringle reserves the right to challenge Plaintiffs' standing in the future should additional facts come to light or should the relevant facts change.

not actually have members, (Doc. 167-6, Simelton Dep., 39:23–40:7); and GBM has never identified a single member in the Huntsville-area who would have standing to bring its claims related to the Huntsville Senate Districts. (Doc. 167-4, Plff. Resps., Resp. to Interrog. #2); (Doc. 167-5, GBM's Suppl. Resps., Suppl. Resp. to Interrog. #2); (Doc. 167-8, Douglas Dep., 65:23–66:20).

As such, no Plaintiff has established standing to bring claims related to the Huntsville Senate Districts, and those claims must be dismissed.

### 1. The Alabama State Conference of the NAACP does not have associational standing because it does not have members.

First, as noted above, the State Conference relies *solely* on "associational standing" to bring its claims. (Doc. 167-4, Plff. Resps., Resp. to Interrog. #2) ("Organizational Plaintiffs assert standing based [on] 'associational standing,' that is, on behalf of impacted members."). Unremarkably, an organization cannot prove associational standing without proving that it has members. *People First of Ala.*, 491 F. Supp. 3d at 1134 (holding that "an organization's failure to prove that it has any members is fatal to its associational standing") (citing *Jacobson*, 974 F.3d at 1249).

Unexpectedly, though – and unlike other chapters or divisions of the NAACP, which may provide membership opportunities for individuals – Defendants learned that the Alabama State Conference of the NAACP does not actually have members. Specifically, during the course of his Fed. R. Civ. P. 30(b)(6) deposition, President of the State Conference, Benard Simelton, testified that "**the State Conference itself**

**does not have members**." (Doc. 165-6, Simelton Dep., 39:21–22) (emphasis added). Expanding on this, Mr. Simelton stated that individuals can be members of either local chapters or the national organization, but that the <u>State Conference</u> does not, itself, have members:

> Every member that serves in the State Conference is a member of a branch or a college chapter within the State Conference. And they are elected to serve as a member of the State Conference. But they're not – **. . . you don't get a membership to the State Conference**. And they pay their dues to the unit that they are wanting to associate with.

(*Id.* at 39:23–40:7) (emphasis added). President Simelton testified that the State Conference does not receive any form of "dues" or "fees" from individuals or sub-organizations. (*Id.* at 41:1–13.) There is no evidence before the court that the State Conference functions as a membership organization.[5] This fact is "fatal" to the State Conference's standing. *See Jacobson*, 974 F.3d at 1249 ("five of the six organizations failed to even allege, much less prove, that they have *any* members— voters or candidates. That failure is fatal to their associational standing.").

---

[5] The undersigned recognizes that Alabama district courts have found that the State Conference had associational standing in some cases in the past. *See e.g., People First of Ala.*, 491 F. Supp. 3d at 1134. However, in each circumstance that counsel is currently aware of, the district court appears to have <u>assumed</u> that the State Conference was an organization with members, and counsel is not aware of any contrary evidence or testimony in those cases. *See*, *e.g.*, *id.*; *id.* at n.43; *Ala. State Conf. of NAACP v. City of Pleasant Grove*, 372 F.Supp. 3d 1333, 1338 (N.D. Ala. 2019) (assuming that the State Conference has members). In this case, however, there is such contrary evidence, which counsel believes is appropriate to bring to the Court's attention. (*See*, *e.g.*, Doc. 167-6, Simelton Dep. 39:21–40:7.)

**2.    Greater Birmingham Ministries cannot prove associational standing to challenge the Huntsville Senate Districts because it has not identified any member in the Huntsville-area who could bring those claims in their own right.**

Similarly, Greater Birmingham Ministries cannot demonstrate associational standing because GBM has not pointed to any specific, individual members residing in the Huntsville-area who would otherwise "have standing to sue in their own right." *Friends of the Earth*, 528 U.S. at 181. Individual members will have standing if they can demonstrate that they have been "personally" injured by redistricting legislation. *U.S. v. Hays*, 515 U.S. 737, 744 (1995). In *Sanders*, voters in Dooly County, Georgia filed a claim alleging that the districting plan contained racially gerrymandered districts in violation of the Equal Protection Clause. *Sanders v. Dooly Cnty.*, 245 F.3d 1289, 1290 (11th Cir. 2001). The Eleventh Circuit noted: "the Supreme Court has **limited standing** on this kind of equal protection claim **to residents of the challenged district**." *Id.* at 1291 (emphases added) (citing *Hays*, 515 U.S. at 738) ("Where a plaintiff resides in a racially gerrymandered district, . . . the plaintiff has been denied equal treatment because of the legislature's reliance on racial criteria, and therefore has standing to challenge the legislature's action.").

> Voters in such districts may suffer the special representational harms racial classifications can cause in the voting context. On the other hand, where a plaintiff does not live in such a district, he or she does not suffer those special harms, and any inference that the plaintiff has personally been subjected to a racial classification would not be justified absent specific evidence tending to support that inference. Unless such evidence is present, that plaintiff would be asserting only a generalized

grievance against governmental conduct of which he or she does not approve.

*Hays*, 515 U.S. at 745. The same standards apply to standing under Section 2 of the Voting Rights Act. *See*, *e.g.*, *Ala. State Conf. of the NAACP v. State*, 264 F.Supp.3d 1280, 1290 (M.D. Ala. 2017) (collecting authorities and finding standing for individual plaintiffs who resided in the allegedly defective districts) (*rev'd on other grounds State v. Ala. State Conf. of NAACP*, 141 S.Ct. 2618 (2021)).

When asked to "[s]tate with specificity the facts supporting your assertion of standing," **GBM did not identify a single individual member living or voting in the Huntsville-area**. (Doc. 167-4, Plff. Resps., Resp. to Interrog. #2); (Doc. 167-5, GBM's Suppl. Resps., Suppl. Resp. to Interrog. #2.) Additionally, during his Fed. R. Civ. P. 30(b)(6) deposition, GBM Executive Director, Scott Douglas, was asked, "sitting here today, . . . do you have any names or information to provide about [individual members]?" (Doc. 167-8, Douglas Dep., 65:23–66:2.) Douglas responded, "[y]eah, one." (*Id.* at 66:4.) He then identified Ms. Presdelane Harris, a resident of Montgomery County – the same and the only individual identified by GBM in its supplemental responses to Defendants' Interrogatory #2. (*Id.* at 65:23–66:18); (Doc. 167-5, Suppl. Resp. to Interrog. #2.) When pressed to identify anyone further, Mr. Douglas did not do so, nor did GBM identify anyone further in its supplemental interrogatory responses. (Doc. 167-8, Douglas Dep., 66:19–20); (Doc. 167-5, Suppl. Resp. to Interrog. #2.)

As such, neither the State Conference nor GBM have appropriately supported their claims of associational standing in the Huntsville-area, and Rep. Pringle is entitled to summary judgment on such claims.

## III.   Plaintiffs' Claims Fail On The Merits.

"To succeed in proving a § 2 violation under *Gingles*, plaintiffs must satisfy three 'preconditions.'" *Allen v. Milligan*, 599 U.S. 1, 18 (2023) (quoting *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986)). The first precondition, *Gingles* 1, requires the 'minority group must be sufficiently large and geographically compact to constitute a majority in a reasonably configured district." *Id.* (quoting *Wis. Legislature v. Wis. Elections Comm'n*, 595 U.S. 398, 402 (2022) (per curiam) (alteration adopted)). "[S]ufficiently large" means "more than 50 percent of the voting-age population in the relevant geographic area[.]" *Barlett v. Strickland*, 556 U.S. 1, 18 (2009) (plurality op.). "[R]easonably configured" means the district adheres to "traditional districting criteria, such as being contiguous and reasonably compact." *Allen*, 599 U.S. at 18.

### 1.   The Minority Group Is Not "Sufficiently Large."

Plaintiffs' Fairfax Plans 1, 2, and 2A fail *Gingles* 1. The 2020 Census shows that the black voting-age populations (BVAP) in those plans is less than 50%. Plaintiffs' default to the ACS *estimate* of black *citizen* voting-age population fails to account for black Alabamians who cannot vote because of a felony conviction, and plaintiffs cannot show that a BCVAP-reliant district crosses the 50%+1 threshold.

## A.    BVAP, not BCVAP, provides the "clear lines" §2 requires.

Inherent in *Gingles* 1 is "an objective, numerical test: Do minorities make up more than 50 percent of the *voting-age population* in the relevant geographic area?" *Strickland*, 556 U.S. at 18 (emphasis added). Here, no party claims Fairfax Plans 1, 2, or 2A's BVAPs are greater than of 50%, meaning their SD7 is a crossover district. Because "§ 2 does not require crossover districts," Fairfax Plans 1, 2, and 2A don't meet *Gingles* 1. *Id.* at 23.

CVAP data are appropriate "only where there is reliable information indicating a significant difference in citizenship rates between the majority and minority populations." *Negron v. City of Miami Beach, Fla.*, 113 F.3d 1563, 1569 (11th Cir. 1997). But here, citizenship rates are virtually identical. (Doc. 164-8, Appx. to Fairfax Rpt., pp. 147, 151.) In a similar case, a North Carolina district court rejected using CVAP data to skirt *Strickland*'s 50%+1 VAP requirement where plaintiffs' illustrative district had a BCVAP over 50% and a BVAP below 50%. *Pierce v. N.C. State Bd. of Elections*, – F. Supp. 3d –, 2024 WL 307643, at *15 (E.D.N.C. Jan. 26, 2024), *aff'd* 97 F.4th 194 (4th Cir. 2024). Lacking evidence of a "significant black noncitizen population in the counties at issue," the court rejected the plaintiffs' CVAP data as evidence of vote dilution. *Id.* at *15, *17.

The Census Bureau conducts the Decennial Census once every ten years. (Doc. 164-1, Trende Rpt., pp. 7–8.) The resulting data tabulations come with *no*

27

*margins of error.* (*Id.*); (*see also* Doc. 164-13, Fairfax Dep., pp. 194:21-23) (Census data come with "no margin of error"). In contrast, the ACS's CVAP data is released annually, (Doc. 164-1, Trende Rpt., p. 7), and is collected from only a small sample of the population: in 2022, the ACS "interviewed 32,482 residents of Alabama," or only 0.65% of Alabama's 2020 population of 5,024,279;[6] as such, *ACS estimates come with known margins of error.* (*Id.* at 9.) (*See also* Doc. 164-13, Fairfax Dep., p. 197:1-2.) ACS tabulates CVAP data as low as the block-group level. (Doc. 164-17, Oskooii Rpt., ¶ 20.) But in redistricting, block groups are often split, and accommodating these splits causes unknowable error on top of the margins of error. (*Id.*, ¶ 20, n.11.) (*See also* Dep. of Kassra Oskooii, p. 226:4, a true and correct copy of which is included at 164-18.)

Alabama's redistricting process uses only decennial Census data and excludes ACS data. *See* Ala. Const. art. IX, §§ 198-201; Ala. Code § 17-14-70; *id.* §17-14-70.1; *id.* §29-2-51. (*See also* Doc. 164-7, Fairfax Rpt., ¶18) (restating Alabama's Redistricting Guidelines requirement that "total Alabama state population … as reported by the 2020 Census, shall be the permissible database used for the development, evaluation, and analysis of proposed redistricting plans"). If ACS data could supplant Decennial Census data, the result would be "constant redistricting"

---

[6] U.S. Census Bureau, QuickFacts, Alabama, https://www.census.gov/quickfacts/fact/table/AL/LFE046222 (last visited June 12, 2024).

with its "accompanying costs and instability." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 412 (2006) (opinion of Kennedy, J.); *see also Reynolds v. Sims*, 377 U.S. 533, 583 (1964) ("Limitations on the frequency of reapportionment are justified by the need for stability and continuity in the organization of the legislative system …."). Refusing ACS estimates as a proxy for reliable Census voting-age population data avoids this troubling and undemocratic scenario.

### B.    Plaintiffs fail to account for everyone ineligible to vote, not just non-citizens.

Plaintiffs argue BCVAP is "a more appropriate racial population group" than BVAP 'to determine the majority of '*eligible*' voters." (Doc. 164-7, Fairfax Rpt., ¶ 74) (emphasis added). (*See also* Doc. 164-17, Oskooii Rpt., ¶ 25.) But Plaintiffs' BCVAP calculations fail to exclude ineligible voters. CVAP data do not account for disenfranchised felons, and neither did Plaintiffs. (*See* Dep. of Traci Burch, p. 24:15, a true and correct copy of which is included at Doc. 164-21); (Doc. 164-13, Fairfax Dep., 208:6-7). But Plaintiffs acknowledge that 8.6% of the Alabama's voting-eligible population, and 14.7% of the black-voting-eligible population, is disenfranchised by disqualifying felony convictions. (Doc. 164-20, Burch Rpt., p. 18.) Dr. Trende applied Dr. Burch's ratios of disenfranchised felons "to the CVAPs that Mr. Fairfax provides for District 7" in Plan 1 and discovered that "the district would have a Black eligible population of just 46.8%." (Doc. 164-1, Trende Rpt., p. 21.) In other words, it fails *Gingles* 1.

## C.    Plaintiffs' calculations show that illustrative SD7 is not majority-BCVAP.

Even without adjusting for disqualified felons, Plaintiffs fail to cross *Gingle* 1's line, because their "best case" margin of error extends below the 50%+1 threshold for every CVAP estimate calculated by Mr. Fairfax, Dr. Oskooii, and Dr. Trende. Applying the smallest-agreed margin of error to each estimate yields a range with a lower end below 50%+1. And because we can't know where in the range the true BCVAP value falls, we can't know if it's above or below 50%. (Dep. of Sean Trende, p. 24:7–13, a true and correct copy of which is included at Doc. 164-3); (*accord* Doc. 164-18, Oskooii Dep, pp. 60:7-10, 73:18-74:5, 81:20-82:4.)[7] Nevertheless, the Parties the margin of error is at least ±2.6%. (Doc. 164-1, Trende Rpt., p. 15); (Doc. 164-18, Oskooii Dep., pp. 217:4–14, 218:15–17); (Doc. 164-13, Fairfax Dep., p. 197:1–2); (Doc. 164-9, Fairfax Amend. Reb. Rpt., ¶ 17). This margin of error includes values *below* the 50%+1 threshold for every CVAP estimate.[8] (*See* Doc. 164-13, Fairfax Dep., p. 196:8–12.) Plaintiffs cannot meet *Gingles* 1.

---

[7] For a helpful four-page summary of how these statistical principles (error margins and confidence intervals) work in practice, what they can and cannot prove, and common fallacies that arise, *see* Doc. 164-22, Stephen Blacklocks & Michael Kruse, *Scientific Evidence and Confidence Intervals: Theory and Fallacy*, Bureau of National Affairs (2008).

[8] For Fairfax Plans 1, 2, and 2A, SD7's estimated CVAP ranges from 51.1% down to 47.8%.

## 2.    Plaintiffs' Alternative Remedy Is Not "Reasonably Configured."

Plaintiffs' fourth illustrative plan (Fairfax Plan 3) fails *Gingles* 1 because it is an unreasonable configuration of Huntsville-area Senate districts.

### A.    Fairfax Plan 3 mocks traditional redistricting principles.

Section 2 "*never* requires adoption of districts that violate traditional redistricting principles." *Allen*, 599 U.S. at 29 n.4, 30 (emphasis added and alteration adopted). By definition such districts are not "reasonably configured," *id.* at 18, and cannot "demonstrate the existence of a proper [§2] remedy." *Burton v. City of Belle Glade*, 178 F.3d 1175, 1199 (11th Cir. 1999). The Parties agree Plaintiffs' illustrative plans must respect geographic compactness, minimizing county splits, and avoiding incumbency contests. (*See* Doc. 164-1, Fairfax Rpt., ¶ 19.) Yet Mr. Fairfax's final illustrative plan fares worse on each criterion than the State's 2021 Plan. His Huntsville-area districts are among the State's *least* compact; his new majority-minority district contains the *most* county splits; and he forces contests between incumbents even though the 2021 Plan demonstrates none need exist. This unreasonable configured district cannot pass *Gingles* 1. *Dillard v. Baldwin Cnty. Comm'rs*, 376 F.3d 1260, 1268 (11th Cir. 2004).

***Compactness:*** "[Section] 2 does not require a State to create, on predominantly racial lines, a district that is not 'reasonably compact.'" *Bush v. Vera*, 517 U.S. 952, 979 (1996). Senate District 7 is not compact. Standard compactness

measures—Reock and Polsby-Popper—show Fairfax Plan 3's SD7 Reock score is 0.213, and its Polsby-Popper score is 0.133. (Doc. 164-2, Trende Suppl. Rpt., pp. 23–24.) It's the plan's third-*least* compact district out of 35 total districts under Reock and the second-least compact district under Polsby-Popper in the plan. (*Id.*, pp. 22–23.) And the plan as a whole is no better. The average compactness score of all 35 districts is worse under Fairfax Plan 3. Dr. Trende determined that the "mean Reock Score of the Enacted Map is 0.395. The mean Reock Score of Fairfax Map 3 is 0.377." (*Id.*, p. 22.) And the "average Polsby-Popper score of the map declines from 0.257 to 0.249." (*Id.*, p. at 23.) Mr. Fairfax's own compactness analysis confirms that his Plan 3 is less compact on average than the 2021 Plan. (Doc. 164-9, Fairfax Amend. Reb. Rpt., ¶ 88.)[9] Also, despite SD7's abysmal compactness score, it barely manages to surpass 50% BVAP. (*Id.*, ¶ 81.)

**Incumbency Contests and County Splits:** Fairfax Plan 3 forces contests between incumbents although the Senate Redistricting Plan demonstrates none are necessary. (*Id.*, ¶ 93.) The Senate Redistricting Plan splits 19 counties and the Fairfax Plan 3 splits 21. (Doc. 164-13, Fairfax Dep., pp. 123:8–124:8.) Four of those fall within illustrative SD7, making it the only district in the Plan to contain *four* split counties. As such, SD7 makes the Senate Redistricting Plan worse: it is less

---

[9] According to Mr. Fairfax, his plan fares worse under the less-popular Convex-Hull compactness metric as well. (*Id.* at p. 36.)

compact, it has more county splits, and it pairs incumbents. Also, no Legislator could know to vote for something as malformed as Fairfax Plan 3 in order to avoid §2 liability. Section 2 is supposed to impose "exacting requirements" upon those who would transfer a traditional "duty and responsibility of the States" to "the federal courts." *Allen*, 599 U.S. at 30. And each *Gingles* precondition ought to serve "as a gatekeeper, ensuring that a plaintiff who proceeds to plenary review has a real chance to show a redressable violation of the ultimate §2 standard." *Strickland*, 556 U.S. at 31 (Souter, J., dissenting). Plaintiffs have no such chance.

### B.    Race predominates in Fairfax Plan 3.

At least eight members of the Supreme Court agree that a plaintiff cannot satisfy *Gingles* 1 if race is predominant in his alternative map. *See Allen*, 599 U.S. at 31–33; *id.* at 59 (Thomas, J., dissenting). Here, illustrative SD7 is "unexplainable on grounds other than race." *Alexander v. S.C. State Conf. of the NAACP*, 144 S. Ct. 1221, 1236 (2024) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999)).

The maps below show precincts (on the left) and census blocks (on the right) shaded by BVAP percentage. (*See* Doc. 164-2, Trende Suppl. Rpt., pp. 25–26.)



Illustrative SD7 includes 32 of the 35 highest-BVAP precincts in Lawrence, Limestone, Madison, and Morgan Counties. (*Id.*, p. 27.)[10] It carefully plucks all of the top-BVAP precincts out of Huntsville and Decatur, and then proceeds westward to split another Lawrence County to pick up more high-BVAP precincts. Those additional precincts from the fourth county split are crucial to nudging the district's BVAP over 50%. Dr. Trende calculated that "selecting the highest BVAP percent precincts, even without respect for contiguity," in Morgan, Madison, and Limestone Counties "will yield at best a 48.1% BVAP district within the constraints imposed by one-person-one-vote." (*Id.*, p. 30.) That is consistent with Fairfax Plans 1, 2, and 2A, which do not split Lawrence County and thus do not create an illustrative SD7 that exceeds 50% BVAP. (*See, e.g.*, 164-1, Trende Rpt., p. 5) (calculating SD7's BVAP in Fairfax Plan 1 to be 46.8%). Fairfax Plan 3 *had* to pick up the black population in Lawrence County to hit his target, exalting racial benchmarks above the traditional principles of minimizing county splits and compactness. This is a textbook example of subverting race-neutral redistricting factors to "racial tinkering." *Miller v. Johnson*, 515 U.S. 900, 919 (1995).

---

[10] One of these precincts, sitting in the middle of Lawrence County, "is not contiguous to the district and cannot be added without including a sizeable White population" while the other two are further West in Lawrence County and are unnecessary to achieve the 50%+1 target. (Doc. 164-1, Trende Rpt., p. 29.)

SD7's "combination of a bizarre, noncompact shape and overwhelming evidence that that shape was essentially dictated by racial considerations of one form or another is exceptional." *Bush*, 517 U.S. at 973. That Plaintiffs subordinated traditional districting principles to race is obvious, borne out by their precise calibration of the racial compositions of their proposed districts by scooping black Alabamians from Huntsville and Decatur before sprinkling in just enough of Lawrence County to get over the BVAP threshold. Plaintiffs cannot satisfy the first *Gingles* precondition with this racial gerrymander.

## <u>CONCLUSION</u>

Based on the foregoing, this Court should grant summary judgment in favor of Rep. Pringle on all of Plaintiffs' claims.

Done this 21st day of June, 2024.

*/s/ Michael P. Taunton*_____
*Counsel for Rep. Chris Pringle*

**OF COUNSEL:**
Dorman Walker (ASB-9154-R81J)
BALCH & BINGHAM LLP
445 Dexter Avenue, Suite 8000
Montgomery, AL 36104
Telephone: (334) 269-3138
Email: dwalker@balch.com

Michael P. Taunton (ASB-6853-H00S)
BALCH & BINGHAM LLP
1901 Sixth Avenue North, Suite 1500
Birmingham, AL 35203
Telephone: (205) 226-3451
Email: mtaunton@balch.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2024, I electronically filed the foregoing notice with the clerk of the Court using the CM/ECF system, which will send notice to all counsel of record.

| | |
|---|---|
| Blayne R. Thompson*<br>HOGAN LOVELLS US LLP<br>609 Main St., Suite 4200<br>Houston, TX 77002<br>(713) 632-1400<br>blayne.thompson@hoganlovells.com<br>Counsel for Plaintiffs | Michael Lovejoy Turrill*<br>Harmony R. Gbe*<br>HOGAN LOVELLS US LLP<br>1999 Avenue of the Stars Suite 1400<br>Los Angeles, CA 90067<br>(310) 785-4600<br>michael.turrill@hoganlovells.com<br>harmony.gbe@hoganlovells.com |
| David Dunn*<br>HOGAN LOVELLS US LLP<br>390 Madison Avenue New York, NY 10017<br>(212) 918-3000<br>david.dunn@hoganlovells.com | Jessica L. Ellsworth*<br>Shelita M. Stewart*<br>HOGAN LOVELLS US LLP<br>555 Thirteenth Street, NW Washington,<br>DC 20004<br>(202) 637-5600<br>jessica.ellsworth@hoganlovells.com<br>shelita.stewart@hoganlovells.com |
| Deuel Ross<br>Deuel Ross*<br>NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.<br>700 14th Street NW Ste. 600<br>Washington, DC 20005<br>(202) 682-1300<br>dross@naacpldf.org | Colin Burke<br>Leah C. Aden*<br>Stuart Naifeh*<br>Kathryn Sadasivan<br>Brittany Carter*<br>NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.<br>40 Rector Street, 5th Floor<br>New York, NY 10006<br>(212) 965-2200<br>laden@naacpldf.org<br>snaifeh@naacpldf.org<br>ksadasivan@naacpldf.org |

| | |
|---|---|
| | bcarter@naacpldf.org<br>cburke@naacpldf.org<br>Counsel for Plaintiffs |
| Bradley E Heard<br>SOUTHERN POVERTY LAW<br>CENTER<br>150 E. Ponce de Leon Ave, Suite 340<br>Atlanta, GA 30030<br>470-989-5426<br>bradley.heard@splcenter.org | Sidney Jackson<br>Nicki L. Lawsen<br>WIGGINS, CHILDS, PANTAZIS,<br>FISHER & GOLDFARB<br>301 19th Street North<br>Birmingham, AL 35203<br>(205) 314-0500<br>sjackson@wigginschilds.com<br>nlawsen@wigginschilds.com |
| Bradley E. Heard*<br>Jack Genberg*<br>Jess Unger*<br>SOUTHERN POVERTY LAW<br>CENTER<br>PO Box 1287<br>Decatur, GA 30031<br>(404) 521-6700<br>jack.genberg@splcenter.org<br>bradley.heard@splcenter.org<br>jess.unger@splcenter.org | Avner Shapiro<br>SOUTHERN POVERTY LAW<br>CENTER<br>1101 17th Street NW, Suite 510<br>Washington, DC 20036<br>240-890-1735<br>avner.shapiro@splcenter.org |
| Sophia Lin Lakin<br>Davin Rosborough<br>Julie A. Ebenstein*<br>Dayton Campbell-Harris*+<br>AMERICAN CIVIL LIBERTIES<br>UNION FOUNDATION<br>125 Broad Street<br>New York, NY 10004<br>(212) 549-2500<br>drosborough@aclu.org<br>jebenstein@aclu.org<br>dcampbell-harris@aclu.org | Alison Mollman<br>AMERICAN CIVIL LIBERTIES<br>UNION OF ALABAMA<br>P.O. Box 6179<br>Montgomery, AL 36106-0179<br>(334) 265-2754<br>amollman@aclualabama.org<br>kwelborn@aclualabama.org |

| | |
|---|---|
| Jacob van Leer*<br>American Civil Liberties Union<br>Foundation<br>915 15th Street NW<br>Washington, D.C. 20005<br>(603) 277-0314<br>jvanleer@aclu.org | |
| Edmund G. LaCour Jr.<br>James W. Davis<br>Alexander Barrett Bowdre<br>Misty S. Fairbanks Messick<br>Brenton M. Smith<br>Benjamin M. Seiss<br>Soren A. Geiger<br>OFFICE OF THE ATTORNEY<br>GENERAL STATE OF ALABAMA<br>501 Washington Avenue<br>P.O. Box 300152<br>Montgomery, Alabama 36130-0152<br>Telephone: (334) 242-7300<br>Fax: (334) 353-8400<br>Edmund.LaCour@AlabamaAG.gov<br>Barrett.Bowdre@AlabamaAG.gov<br>Jim.Davis@AlabamaAG.gov<br>Misty.Messick@AlabamaAG.gov<br>Brenton.Smith@AlabamaAG.gov<br>Ben.Seiss@AlabamaAG.gov<br>Reid.Harris@AlabamaAG.gov<br>Soren.Geiger@AlabamaAG.gov<br>Thomas.Wilson@AlabamaAG.gov | |

*/s/ Michael P. Taunton*_____
*OF COUNSEL*