FILED
2024 Jul-19  PM 07:48
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| KHADIDAH STONE, EVAN MILLIGAN, GREATER BIRMINGHAM MINISTRIES, and the ALABAMA STATE CONFERENCE OF THE NAACP, <br><br> *Plaintiffs*, <br><br> vs. <br><br> WES ALLEN, in his official capacity as Secretary of State of Alabama, <br><br> *Defendant*. | No. 2:21-cv-01531-AMM |

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................... i

TABLE OF EXHIBITS RELIED UPON ................................................ ii

TABLE OF AUTHORITIES ............................................................. iv

INTRODUCTION ...........................................................................1

RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS ......1

   I.   Response to Secretary Allen's Statement of Undisputed Facts. ....................1

   II.  Partial Response to Rep. Pringle's Statement of Undisputed Facts ...............7

PLAINTIFFS' STATEMENT OF ADDITIONAL FACTS ....................................8

LEGAL STANDARD ......................................................................10

ARGUMENT ...............................................................................11

   I.   Plaintiffs Have Standing to Challenge the Huntsville/Decatur Area Senate Districts. ...................................................................................11

      A.   The Alabama NAACP has associational standing .....................................12

      B.   Greater Birmingham Ministries has standing. ...........................................13

   II.  The Minority Group in the Huntsville/Decatur Region Is "Sufficiently Large." ...................................................................................14

      A.   Plaintiffs' use of CVAP is proper. ...........................................................14

      B.   The minority group in the Huntsville/Decatur region is sufficiently large. ...............................................................20

      C.   The Secretary wrongly asserts that Plaintiffs cannot rely on CVAP unless they also remove every other ineligible individual. .........................................25

   III.   Plaintiffs' Illustrative Plan 3 Is Reasonably Configured. ..........................28

      A.   Plaintiffs' Illustrative Plan 3 balances traditional districting criteria. .......30

      B.   Race did not predominate in Plaintiffs' Illustrative Plan 3 ........................33

CONCLUSION .............................................................................35

CERTIFICATE OF SERVICE ............................................................38

**TABLE OF EXHIBITS RELIED UPON**

Plaintiffs rely upon exhibits from the Evidentiary Submission of Secretary

Allen, DE164, as well as exhibits from their own Evidentiary Submission, DE171.

| Defendant's Exhibit No. | Exhibit Description | ECF No. |
|---|---|---|
| 1 | Sean Trende, Ph.D., Expert Report | 164-1 |
| 2 | Sean Trende, Ph.D., Supplemental Report | 164-2 |
| 3 | Sean Trende, Ph.D., Deposition Transcript | 164-3 |
| 7 | Anthony Fairfax, Expert Report | 164-7 |
| 8 | Anthony Fairfax, Appendix | 164-8 |
| 9 | Anthony Fairfax, Amended Rebuttal Report Redline | 164-9 |
| 10 | Anthony Fairfax, Rebuttal Appendix | 164-10 |
| 11 | Anthony Fairfax, Supplemental Rebuttal Report | 164-11 |
| 12 | Anthony Fairfax, Supplemental Rebuttal Appendix | 164-12 |
| 13 | Anthony Fairfax, Deposition Transcript | 164-13 |
| 17 | Kassra Oskooii, Ph.D., Expert Report | 164-17 |
| 18 | Kassra Oskooii, Ph.D., Deposition Transcript | 164-18 |
| 20 | Traci Burch, Ph.D., Expert Report | 164-20 |

| Plaintiffs' Exhibit No. | Exhibit Description | ECF No. |
|---|---|---|
| 1 | Reapportionment Committee Redistricting Guidelines | 171-1 |
| 2 | Benard Simelton Deposition Transcript | 171-2 |

| 3 | Exhibits to Benard Simelton Deposition | 171-3 |
|---|---|---|
| 4 | Plaintiffs' Responses to Defendant Allen's Discovery Requests | 171-4 |
| 5 | Plaintiff Greater Birmingham Ministry's First Supplemental Responses to Defendant Allen's Discovery Requests | 171-5 |
| 6 | Scott Douglas Deposition Transcript | 171-6 |
| 7 | Exhibits to Scott Douglas Deposition | 171-7 |
| 8 | Randy Hinaman Deposition Transcript | 171-8 |
| 9 | Exhibits to Randy Hinaman Deposition | 171-9 |
| 10 | Jim McClendon Deposition Transcript | 171-10 |
| 11 | Exhibits 1-5 to Jim McClendon Deposition | 171-11 |
| 12 | Exhibits 6-15 to Jim McClendon Deposition | 171-12 |
| 13 | Exhibit 16 to Jim McClendon Deposition | 171-13 |

# TABLE OF AUTHORITIES

## Cases

*Abrams v. Johnson*, 521 U.S. 74 (1997)...................................................................32

*Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254 (2015)....................................12

*Alexander v. S.C. State Conf. of the NAACP*, 144 S. Ct. 1221 (2024)....................34

*Allen v. Milligan*, 599 U.S. 1 (2023) ................................................................ passim

*Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, --- F. Supp. 3d ---,
    2023 WL 7037537 (N.D. Ga. Oct. 26, 2023) .................................................30, 34

*Alves v. Bd. of Regents of the Univ. Sys. of Ga.*,
    804 F.3d 1149 (11th Cir. 2015) ...........................................................................10

*Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*,
    103 F.4th 765 (11th Cir. 2024) ............................................................................13

*Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 611 (2021)...................14

*Barnett v. City of Chicago*, 141 F.3d 699 (7th Cir. 1998)........................................20

*Bartlett v. Strickland*, 556 U.S. 1 (2009)...........................................................16, 21

*Benavidez v. City of Irving*, 638 F. Supp. 2d 709 (N.D. Tex. 2009) .................19, 22

*Benavidez v. Irving Indep. Sch. Dist.*, 690 F. Supp. 2d 451 (N.D. Tex. 2010) .......23

*Buckley v. Valeo*, 424 U.S. 1 (1976)........................................................................14

*Bush v. Vera*, 517 U.S. 952 (1996)....................................................................31, 33

*Campos v. City of Houston*, 113 F.3d 544 (5th Cir. 1997)......................................20

*Chisom v. Roemer*, 501 U.S. 380 (1990)................................................................25

*Cisneros v. Pasadena Indep. Sch. Dist.*, No. 4:12-CV-2579,
    2014 WL 1668500 (S.D. Tex. Apr. 25, 2014) .....................................................18

*Colonial Pipeline Co. v. Ceco Pipeline Servs. Co.*, No. 2:19-CV-1334-AMM,
    2022 WL 4283098 (N.D. Ala. July 13, 2022) .....................................................24

*Concrete Pipe & Prod. of California, Inc. v. Constr. Laborers Pension Tr. for S.
    Cal.*, 508 U.S. 602 (1993) ...................................................................................22

*Elizondo v. Spring Branch Indep. Sch. Dist.*, No. 4:21CV1997,
    2023 WL 2466401 (S.D. Tex. Feb. 13, 2023) ..............................................19, 21

*Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153 (11th Cir. 2008) .......13, 14

*Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*,
775 F.3d 1336 (11th Cir. 2015) .................................................................... passim

*Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*,
996 F. Supp. 2d 1353 (N.D. Ga. 2014) ................................................................32

*Greater Birmingham Ministries v. Sec'y of State*,
992 F. 3d 1299 (11th Cir. 2021) .............................................................11, 12, 13

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977)........................11

*Johnson v. DeSoto Cnty. Bd. of Comm'rs*, 204 F.3d 1335 (11th Cir. 2000) .....25, 28

*Kumar v. Frisco Indep. Sch. Dist.*, 476 F. Supp. 3d 439 (E.D. Tex. 2020).......22, 31

*LULAC v. Perry*, 548 U.S. 399 (2006).................................................15, 20, 27, 32

*Mo. State Conf. of the NAACP v. Ferguson-Florissant School District*,
201 F. Supp. 3d 1006 (E.D. Mo. 2016)..........................................................23, 27

*NAACP v. Alabama*, 357 U.S. 449 (1958) ..............................................................14

*NAACP v. Button*, 371 U.S. 415 (1963) ..................................................................14

*Nairne v. Ardoin*, No. CV 22-178-SDD-SDJ,
2024 WL 492688 (M.D. La. Feb. 8, 2024) ........................................................13

*Negron v. City of Miami Beach*, 113 F.3d 1563 (11th Cir. 1997)................... passim

*North Carolina v. Covington*, 585 U.S. 969 (2018) ................................................34

*Pierce v. N.C. State Bd. of Elections*, No. 4:23-CV-193-D,
2024 WL 307643 (E.D.N.C. Jan. 26, 2024) ......................................................18

*Reyes v. City of Farmers Branch*, 586 F.3d 1019 (5th Cir. 2009).........................16

*Reyes v. City of Farmers Branch*, No. 3:07-CV-900-O,
2008 WL 4791498 (N.D. Tex. Nov. 4, 2008).....................................................23

*Rios-Andino v. Orange Cnty.*, 51 F. Supp. 3d 1215 (M.D. Fla. 2014)........15, 17, 18

*Rodriguez v. Harris Cnty.*, 964 F. Supp. 2d 686 (S.D. Tex. 2013) ........................19

*Rogers v. Lodge*, 458 U.S. 613 (1982) ...................................................................25

*Romero v. City of Pomona*, 883 F.2d 1418 (9th Cir. 1989) ....................................20

*Singleton v. Allen*, 690 F. Supp. 3d 1226 (N.D. Ala. 2023) ........................29, 30, 32

*Singleton v. Allen*, 691 F. Supp. 3d 1343 (N.D. Ala. 2023) ..............................30, 32

*Singleton v. Merrill*, 582 F. Supp. 3d 924 (N.D. Ala. 2022) .............................32, 33

*Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151 (11th Cir. 2012)..........................21

*Thornburg v. Gingles*, 478 U.S. 30 (1986) .........................................................16, 26

*Tolan v. Cotton*, 572 U.S. 650 (2014) ...................................................................24

*Westwego Citizens for Better Gov't v. City of Westwego*,
   906 F.2d 1042 (5th Cir. 1990) .........................................................................25

*Wright v. Sumter Cnty. Bd. of Elections & Registration*,
   657 F. App'x 871 (11th Cir. 2016) ...................................................................10

*Wright v. Sumter Cnty. Bd. of Elections & Registration*,
   979 F.3d 1282 (11th Cir. 2020) .......................................................................26

**Constitutional Provisions**

Ala. Const. art. VIII, § 177(b) ...............................................................................25

Ala. Const. art. IX, § 198.........................................................................................1

Ala. Const. art. IX, § 200.........................................................................................1

 **Statutes**

52 U.S.C. § 10301 ...............................................................................................1-2

**INTRODUCTION**

The Secretary's motion for partial summary judgment is meritless. It ignores material factual disputes, misstates the law, and incorrectly draws numerous inferences in favor of the moving party. The Court should deny the motion and allow Plaintiffs to fully present this fact-specific and evidence-heavy Section 2 case at trial.

**RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS**

**I.    Response to Secretary Allen's Statement of Undisputed Facts.**

1.    <u>Plaintiffs' Response:</u> Disputed in part. According to the 2020 Census, Alabama's Voting Age Population (VAP) was 3,917,166 persons. DE164-7 at 15. Alabama's estimated Citizen Voting Age Population (CVAP) is 3,862,490. *Id*. at 16. The citizenship rates between Black VAP and non-Black VAP in illustrative Senate District 7 (SD7) are significantly different. DE164-8 at 98-105; DE164-10 at 12-23; DE164-12 at 11-17. The citizenship rates of illustrative SD7's Black VAP are 99.96%, 99.8%, and 99.9% in Plans 1, 2, and 2A, whereas the non-Black VAP citizenship rates are lower at 87.44%, 93.67%, and 93.01% (in large part due to a substantial Hispanic population with VAP citizenship rates of 40.77%, 42.75%, and 42.52%, respectively). *Id*.

2.    <u>Plaintiffs' Response:</u> Disputed as incomplete. The Alabama Constitution requires the redrawing of the state legislative districts every decade based on the results of the census. Ala. Const. art. IX, §§ 198-200. The Committee Guidelines require compliance with Section 2 of the Voting Rights Act (VRA), 52

1

U.S.C. § 10301, which requires that districts have "neither the purpose nor the effect of diluting minority voting strength." DE171-1 at 2. While the Guidelines list avoiding incumbent contests as one goal, they note that this principle "shall be observed only to the extent" it does not violate federal law including the VRA. *Id.* at 3.

3-5.　Plaintiffs' Response: Undisputed.

6.　Plaintiffs' Response: Disputed in part; the listed districts cover the Greater Huntsville area but Districts 1, 6, 8, and 9 also include areas outside of the Huntsville-Decatur-Albertville Statistical Area. *See* https://www2.census.gov/geo/maps/econ/ec2012/csa/EC2012_330M200US290M.pdf.

7.　Plaintiffs' Response: Disputed. The VAP data from the 2020 Census "includes both citizens and noncitizens above the age of 18 years." DE164-7 ¶ 74. SD7 contains a "significant population of noncitizens." *Id.* Thus, CVAP "represents a more accurate population group that only includes citizens above the age of 18 years." *Id.* There is a significant difference in the citizenship rates between Black VAP and non-Black VAP in illustrative SD7. DE164-8 at 147-54; DE164-10 at 49-55; DE164-12 at 15-21.

8.　Plaintiffs' Response: Disputed. Plaintiffs submit four plans which collectively show that the Black community in the Huntsville/Decatur area is sufficiently large and geographically compact to constitute a majority of the voting-

age population, citizen voting-age population, and registered voter population in an additional single-member district. DE164-7 ¶ 81 & tbl.21; DE164-9 ¶¶ 49-50, 81-82; DE164-11 ¶ 7.

9-11.   Plaintiffs' Response: Undisputed.

12.   Plaintiffs' Response: Disputed in part. The ACS "is considered the premier source of detailed population [information] . . . particularly CVAP estimates." DE164-17 ¶ 18. "ACS is the gold standard and best source of reliable data to estimate the proportion of eligible voters within electoral jurisdictions" and it is "the only source of data that provides CVAP statistics by race and ethnicity at various geographic units across the U.S." *Id.* ¶ 25. Courts consider CVAP data estimates reliable for VRA Section 2 analysis. DE164-9 ¶ 8.

13-14. Plaintiffs' Response: Undisputed.

15.   Plaintiffs' Response: Disputed in part. "[T]he ACS provides sufficiently reliable statistics by aggregating several yearly estimates known[] as 5-year estimates." DE164-17 ¶ 20. Mr. Fairfax and Dr. Oskooii only relied on 5-year ACS data in estimating the Black Citizen Voting Age Population (BCVAP) of SD7 in the illustrative maps. DE164-7 ¶ 11(e); DE164-9 ¶ 3(b)-(c); DE164-17 ¶ 37.

16.   Plaintiffs' Response: Disputed in part. Mr. Fairfax used 5-year ACS data to determine citizen populations. DE164-7 at 44 tbl.21; DE164-9 ¶ 26. While Dr. Trende reported that the ACS "interviewed 32,482 residents of Alabama" "in

2022," he also recognized that the 2022 5-year estimates "would include data from 2018, 2019, 2020, 2021, and 2022." DE164-1 at 9, 14. Accordingly, the Secretary entirely neglects to calculate the number of respondents in the five-year survey.

17-18. <u>Plaintiffs' Response:</u> Undisputed.

19.    <u>Plaintiffs' Response:</u> Disputed in part. The margin of error "reflects the potential error with a 90 percent confidence level." DE164-9 ¶ 18.

20.    <u>Plaintiffs' Response:</u> Disputed. The Fairfax plans show that SD7 contains a majority BCVAP and Black registered voters. DE164-7 ¶ 12(b); DE164-9 ¶¶ 4(b), 49-50, 81-82. Illustrative Plan 1 uses 2021 5-year ACS data, while other the illustrative plans use 2022 5-year ACS data that "was just released around the time of [Mr. Fairfax's] first report." DE164-9 ¶ 26.

21.    <u>Plaintiffs' Response:</u> Undisputed.

22.    <u>Plaintiffs' Response:</u> Disputed as incomplete. Mr. Fairfax and Dr. Oskooii estimate that the BCVAP in Plan 1's Illustrative SD7 is 50.16% and 50.11%, respectively. DE164-7 ¶ 81; DE164-17 ¶ 38.[1] And using the 2020 5-year ACS data that was available when the Enacted Plan was passed, Dr. Trende calculates BCVAP point estimates for Plan 1 of 50.1%, 49.2%, 50.4%, 50.9%, and 50.4%. DE164-1 at 23-24. Point estimates are "the maximum likelihood estimate" of the BCVAP

---

[1] CVAP estimates are also referred to as "point estimates." *See, e.g.*, DE164-3 at 41:2-18.

percentage in the illustrative district. DE164-3 at 243:19-23; DE164-18 at 37:7-9, 14-16.

23.   <u>Plaintiffs' Response:</u> Disputed in part. Although Dr. Trende asserts "there's no obviously correct way" to disaggregate data, DE164-1 at 21-24, there exist other approaches that are "much better" than any of Dr. Trende's methods. DE164-18 at 141:11-22. For example, the method employed by the Redistricting Data Hub and described by Plaintiffs' experts is to disaggregate using the CVAP counts by race and ethnicity at the block-group level and the VAP counts by race and ethnicity at the block level. Dr. Trende, on the other hand, "uses either/or in his techniques" leading to "major assumptions" that "we know [are] not the case," such as citizenship rates being equally distributed across race and ethnicity and BVAP being equally distributed across blocks nested within split block groups. DE164-17 ¶¶ 13-15; DE164-18 at 108:6-109:1, 141:11-22, 226:8-228:8; DE164-9 ¶ 16 n.16; *cf.* DE164-1 at 21-24.

24.   <u>Plaintiffs' Response:</u> Undisputed.

25.   <u>Plaintiffs' Response:</u> Disputed. A ±2.6% margin of error would correspond to a 90% confidence interval. *See* DE164-1 at 18. The parties do not agree on the accuracy of these error margins, and Dr. Trende concedes that he "cannot calculate precise error margins for the BCVAPs of the complete districts." *Id*.; *see id.* at 25; *see also* DE164-18 at 204:23-205:17, 212:2-20; DE164-9 ¶ 17.

26.     <u>Plaintiffs' Response:</u> Disputed in part, for reasons stated in ¶ 25.

27.     <u>Plaintiffs' Response:</u> Disputed. For reasons stated in ¶ 16, the Secretary substantially undercalculates the number of survey respondents. Further, even if his "average" were correctly calculated, he assumes without support that respondents were perfectly distributed across block groups by attributing a statewide average to a smaller geography.

28-29. <u>Plaintiffs' Response:</u> Undisputed.

30.     <u>Plaintiffs' Response:</u> Disputed. State-level disenfranchisement statistics have "no relevancy locally for calculating the number of persons barred from voting within SD 7," DE164-9 ¶ 21, and the Secretary's expert's conclusions are "purely speculative," DE164-17 ¶ 36 n.17. Dr. Oskooii has "never encountered an expert adjusting a district's CVAP share based on felony convictions, especially when reliable block or block-group data on felony rates is unavailable to them." *Id.*

31.     <u>Plaintiffs' Response:</u> Disputed. Mr. Fairfax submitted his Illustrative Plan 2 as part of his rebuttal report to Dr. Trende's expert report to address Dr. Trende's critiques regarding SD7 in Illustrative Plan 1. DE164-9 ¶¶ 5-6, 26. Mr. Fairfax timely submitted his rebuttal report on April 19, 2024. *See* DE148; DE164-9. Mr. Fairfax submitted an amended rebuttal report to correct an inadvertent typographical error on April 30, 2024. DE164-9.

32-33. <u>Plaintiffs' Response:</u> Undisputed.

34.   <u>Plaintiffs' Response:</u> Disputed, for the reasons stated in ¶ 25.

35.   <u>Plaintiffs' Response:</u> Disputed, for the reasons stated in ¶ 25.

36.   <u>Plaintiffs' Response:</u> Undisputed.

37.   <u>Plaintiffs' Response:</u> Disputed. As stated in ¶ 31, Mr. Fairfax submitted Plan 2 in his timely rebuttal report to address Dr. Trende's critiques. Mr. Fairfax's brief Supplemental Rebuttal Report dated May 5, 2024, accounted for incongruous versions of the map and map files produced in his rebuttal report. DE164-11 ¶ 2.

38.   <u>Plaintiffs' Response:</u> Undisputed.

39.   <u>Plaintiffs' Response:</u> Disputed in part, for the reasons stated in ¶ 25.

40.   <u>Plaintiffs' Response:</u> Undisputed.

41.   <u>Plaintiffs' Response:</u> Disputed. Mr. Fairfax submitted Illustrative Plan 3 as part of his timely rebuttal report responding to Dr. Trende's criticisms of CVAP data to show that an Illustrative SD7 can be drawn that includes both BVAP and BCVAP majorities. DE164-9 ¶¶ 4(b), 5-6, 59; *see* DE148.

42-47. <u>Plaintiffs' Response:</u> Undisputed.

## II.   Partial Response to Rep. Pringle's Statement of Undisputed Facts[2]

19-20. <u>Plaintiffs' Response:</u> Undisputed.

---

[2] Although Representative Pringle has been dismissed from the case, DE170, Plaintiffs respond to his facts and arguments regarding standing.

21.   <u>Plaintiffs' Response:</u> Disputed. Individuals belong to branches or chapters of the NAACP. DE171-2 at 39:23-40:7. The branches or chapters "are elected to serve as [] member[s] of the state conference." *Id.* The Alabama NAACP has "around 5,000 members." *Id.* at 36:19-21. Members of the Alabama NAACP branches have educational and advocacy opportunities and pay dues to the NAACP unit of their choice. *Id.* at 74:3-5, 40:8-18.

22.   <u>Plaintiffs' Response:</u> Disputed. GBM has both individual and organizational members in the Huntsville/Decatur area. DE171-4 at 5; DE171-5 at 3; DE171-6 at 42:19-22, 53:10-13.

23.   <u>Plaintiffs' Response:</u> Disputed in part. Although GBM has not provided names of individual members in the Huntsville/Decatur area out of respect for each individual's right to "consent to having their identity disclosed," GBM has identified organizational members in the Huntsville/Decatur area that have "individual members who are Black registered voters who live in Madison County [and] Decatur." DE171-4 at 5; DE171-5 at 3.

### PLAINTIFFS' STATEMENT OF ADDITIONAL FACTS

1.   Both BCVAP and BVAP are over 50% in Illustrative Plan 3. DE164-9 ¶ 59; DE164-2 at 20. Both Plaintiffs' and the Secretary's experts have produced evidence that BCVAP is over 50% in Illustrative Plans 1, 2, and 2A. DE164-7 ¶ 81;

DE164-17 ¶ 38; DE164-9 ¶ 49; DE164-11 ¶¶ 5, 7; DE164-1 at 23-24; DE164-2 at 7; DE164-3 at 37:5-7.

2.      "[B]lock or block-group data on Black felony rates or counts is not available for the state of Alabama." DE164-17 ¶ 36 n.17.

3.      Black individuals constitute a majority of registered voters in Mr. Fairfax's illustrative districts. *See* DE164-9 ¶ 50 (51.28% of registered voters in Plan 2's SD7 are Black); *id.* ¶ 82 (52.74% of registered voters in Plan 3's SD7 are Black).

4.      When comparing compactness scores between Illustrative Plan 3 and the Enacted Plan on a district-by-district basis, each map includes seven districts that perform better than the corresponding district in the other map. DE164-11 ¶ 8.

5.      Nine of Illustrative Plan 3's ten majority-Black districts are more or equally as compact as the corresponding districts in the Enacted Plan. DE164-9 ¶ 87.

6.      In each illustrative map, all ten majority-Black districts are more geographically compact than the least-compact district in the Enacted Plan. DE164-7 ¶ 88; DE164-9 ¶¶ 57, 89. Alabama's map drawer and the Senate Chair of the Reapportionment Committee both testified that all districts in the Enacted Plan are reasonably compact, including those with lower compactness scores than illustrative SD7. DE171-8 at 59:9-12; DE171-10 at 60:24-61:3.

7.      The Enacted Plan contains four districts that each split three counties. DE164-8 at 258-59 (Enacted Districts 11, 17, 27, and 30).

8.    Consideration of race did not predominate Mr. Fairfax's drawing of any illustrative plan; at most, he considered race in balance with other criteria. DE164-13 at 47:8-16, 47:24-48:8, 118:4-9; 125:12-20; 150:14-20; 216:18-218:1; *see also id.* at 60:18-21; 63:8-10. Mr. Fairfax testified that "there are tradeoffs," such that "when you adjust one of the criteria, another may be reduced," which "is a balance that the map drawer has to make." *Id.* at 217:1-111. He gave various criteria equal weighting, and those tradeoffs went "back and forth" between factors, rather than always coming out in favor of one criterion over another. *Id.* at 217:12-218:1.

9.    The Alabama NAACP has identified individual members who are Black registered voters, residing in the challenged districts, who have standing to sue in their own right. *See* DE171-4 at 5; DE171-2 at 210:22-213:10.

## LEGAL STANDARD

Summary judgment is rarely appropriate in voting rights litigation "due to the fact-driven nature of the legal tests required by the Supreme Court and [Eleventh Circuit] precedent." *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1348 (11th Cir. 2015) ("*Fayette*"). "Summary judgment is appropriate only if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The Court does not weigh conflicting evidence or make credibility determinations." *See Wright v. Sumter Cnty. Bd. of Elections & Registration*, 657 F. App'x 871, 872 (11th Cir. 2016) (citing *Alves v. Bd. of Regents*

*of the Univ. Sys. of Ga.*, 804 F.3d 1149, 1159 (11th Cir. 2015)) (cleaned up) (reversing the grant of summary judgment in a Section 2 case where the parties presented conflicting expert testimony on material issues of fact).

This Court "must construe the facts and draw all rational inferences therefrom in the manner most favorable to the nonmoving party." *Fayette*, 775 F.3d at 1343. "Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts." *Id.* at 1347 (citation omitted). Here, "[g]iven the fundamental nature of the right at issue, the intensely local appraisal of the facts warranted, and the complex questions of fact and law that must be settled by the court," the Secretary's motion must be denied. *Id.* at 1349.

## ARGUMENT

### I.  Plaintiffs Have Standing to Challenge the Huntsville/Decatur Area Senate Districts.

An organization has associational standing if: (1) its "members would otherwise have standing to sue in their own right;" (2) the "interests it seeks to protect are germane to the organization's purpose;" and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). The Alabama NAACP and GBM satisfy all three *Hunt* factors in each challenged region. No one disputes that the Alabama NAACP and GBM satisfy the second and

11

third criteria. Protecting the right to vote is central and germane to both organizations' purposes and individual members' participation is not required in this suit for prospective and injunctive relief. *See Greater Birmingham Ministries v. Sec'y of State (*"*GBM*"), 992 F. 3d 1299, 1316 (11th Cir. 2021) (holding that GBM and the Alabama NAACP satisfy all three *Hunt* factors in a voting rights case).

A.   <u>The Alabama NAACP has associational standing.</u>

The Alabama NAACP has identified several individual members who are Black registered voters residing in the challenged districts who have standing to sue in their own right. *See* DE171-4 at 5; DE171-2 at 210:22-213:10. This is sufficient to confer standing here. *See Ala. Legis. Black Caucus v. Alabama* ("*ALBC*"), 575 U.S. 254, 270 (2015) (concluding that an organization had standing to challenge legislative districts where it identified members living in those districts); *GBM*, 992 F.3d at 1316 (holding that both the Alabama NAACP and GBM had standing to challenge an Alabama law where both organizations identified members impacted by the law).

Representative Pringle misstates the Alabama NAACP's membership structure in contending the organization lacks individual members. DE168 at 22-23. He cherry-picks and misconstrues Plaintiff testimony and disregards the overlapping membership structure of the State Conference: individuals belong to branches or chapters of the NAACP and those branches or chapters "are elected to serve as []

member[s] of the state conference." DE171-2 at 39:23-40:7. The Alabama NAACP President testified that it has "around 5,000 members[,]" *id.* at 36:19-21; that members may pay their dues to the NAACP unit of their choice, and that the national, state, and local branches share in members' dues, *id.* at 40:8-18. Under this structure, the Alabama NAACP undeniably has members with standing in their own right. *See GBM*, 992 F. 3d at 1316 (holding that the Alabama NAACP had standing to assert claims on behalf of its members); *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1163 (11th Cir. 2008) (same for Florida NAACP). "[C]ourts should not 'exalt form over substance' when assessing membership for associational standing," and so "individuals who make up the branches of [a state] NAACP can be said to be 'members' of the NAACP for purposes of associational standing." *Nairne v. Ardoin*, No. CV 22-178-SDD-SDJ, 2024 WL 492688, at *6 (M.D. La. Feb. 8, 2024).

   B.    <u>Greater Birmingham Ministries has standing.</u>

   Greater Birmingham Ministries ("GBM") has members in the Montgomery and Huntsville/Decatur areas. DE171-4 at 5; DE171-5 at 3; DE171-6 at 42:19-22, 53:10-16. But even if GBM did not, the NAACP has standing in the districts at issue, so Plaintiffs have already sufficiently proven standing. *See GBM*, 992 F.3d at 1317.

   GBM has confirmed that it has members in the relevant region who are "Black registered voters who live in Madison County [and] Decatur." DE171-4 at 5; DE171-5 at 3. Membership organizations are not required to provide the names of their

affected members to establish associational standing. *Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 773 (11th Cir. 2024); *see also Browning*, 522 F.3d at 1160. GBM has thousands of members across the state, DE171-6 at 52:6-15, including individuals, churches, and congregations in the Huntsville/Decatur area, *id.* at 53:10-13; DE171-5 at 3. This is enough to prove standing. *See ALBC*, 575 U.S. at 269-70 (accepting testimony that an organization had members statewide as sufficient to confer standing); *Browning*, 522 F.3d at 1163 (similar).

Moreover, courts routinely shield organizations from disclosing the personal information of individual members because to do so would chill members' associational rights in violation of the First Amendment. *See Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 611 (2021); *Buckley v. Valeo*, 424 U.S. 1, 66 (1976); *NAACP v. Button*, 371 U.S. 415, 429 (1963); *NAACP v. Alabama*, 357 U.S. 449 (1958). In the paradigmatic case, *NAACP v. Alabama*, a state court ordered the NAACP to produce, among other things, "names and addresses" of its members to the Alabama Attorney General. 357 U.S. at 451. On appeal, the Supreme Court permitted the NAACP to exercise its right to withhold its member list. *Id*. at 462-66.

## II.  The Minority Group in the Huntsville/Decatur Region Is "Sufficiently Large."

### A.  Plaintiffs' use of CVAP is proper.

The Secretary asks the Court to establish a novel rule under which using CVAP data would be required when it would *harm* VRA plaintiffs but prohibited

when it would *help* them. States cannot wield CVAP as both a sword and shield. Even if this were the rule (and it is not), Plaintiffs' Illustrative Plan 3—which contains a reasonably configured district with *both* majority-Black voting-age and citizen voting-age populations—creates a triable dispute. *See infra* Part III. Illustrative Plan 3's existence, standing alone, permits the Court to reject the Secretary's arguments here and deny summary judgment on the issue of numerosity.

In any event, the Secretary cites no case requiring a plaintiff to demonstrate that the minority community forms *both* a majority of VAP *and* CVAP. This is because no such case exists. Rather, in areas like the Huntsville/Decatur region where there is "a significant difference in citizenship rates," the "proper statistic for deciding whether a minority group is sufficiently large and geographically compact is voting age population as refined by citizenship." *Negron v. City of Miami Beach*, 113 F.3d 1563, 1569 (11th Cir. 1997); *see, e.g.*, *Rios-Andino v. Orange Cnty.*, 51 F. Supp. 3d 1215, 1223 (M.D. Fla. 2014) ("[C]itizens of voting age . . . comprise the relevant population for *Gingles* I purposes" because "a proposed remedial district can only satisfy § 2 if it consists of a sufficient number of potential voters, not just persons of the relevant race or ethnicity"). In *LULAC v. Perry*, the Supreme Court explicitly recognized that the "relevant numbers *must* include citizenship" in the *Gingles* I inquiry when doing so impacts the electoral majority. 548 U.S. 399, 429 (2006) (emphasis added). "This approach fits the language of § 2 because only

eligible voters affect a group's opportunity to elect candidates." *Id.*; *see also id*. at 443-44 (considering CVAP of Black and non-Black voters for a claim by Black plaintiffs).

But the Secretary selectively quotes one line from a case in which VAP data sufficed "to ensure that" "*citizens* of all races have equal opportunity to share and participate in our democratic processes and traditions" because disparate citizenship rates were not at issue. *Bartlett v. Strickland*, 556 U.S. 1, 25 (2009) (plurality op.) (emphasis added). He ignores that the *Bartlett* plurality approvingly cited *LULAC*'s application of the *Gingles* framework. *Bartlett*, 556 U.S. at 16, 18; *see also Reyes v. City of Farmers Branch*, 586 F.3d 1019, 1023 (5th Cir. 2009) (rejecting argument that *Bartlett* "held that only voting-age population matters under the first *Gingles* test—not *citizen* voting-age population"—as having "no merit").

Employing CVAP here—the metric that most clearly and reliably demonstrates the minority group's ability to elect—satisfies the very practical purpose of *Gingles* I. "The reason that a minority group making such a challenge must show, as a threshold matter, that it is sufficiently large and geographically compact to constitute a majority in a single-member district is this: Unless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice." *Thornburg v. Gingles*, 478 U.S. 30, 51 n.17 (1986). The Secretary's

illogical proposal—which would permit reliance on CVAP data only when used to thwart minority plaintiffs' claims, but require a VAP majority in all cases, even when irrelevant to minority voters' ability to elect—erects an arbitrary additional hurdle that in no way comports with *Gingles* I's purpose.

The citizenship-disparity issue most commonly arises when evaluating whether a Latino community with lower citizenship rates is sufficiently large to form a *Gingles* I majority; however, the same logic applies when another group's "significant difference in citizenship rates" affects the overall size of a district's eligible population. *Negron*, 113 F.3d at 1569. Accounting for the disparate citizenship data avoids overinflating the total population denominator used to show whether the plaintiffs' minority group can form a majority for *Gingles* I purposes.

Plaintiffs have produced reliable evidence of a "significant difference in citizenship rates" warranting the use of CVAP in illustrative SD7. *Negron*, 113 F.3d at 1571; *see, e.g.*, *Rios-Andino*, 51 F. Supp. 3d at 1223. The citizenship rates of illustrative SD7's Black VAP are 99.96%, 99.8%, and 99.99% in Plans 1, 2, and 2A, respectively, whereas the non-Black VAP citizenship rates are 87.44%, 93.67%, and 93.01% (in large part due to a substantial Hispanic population with VAP citizenship rates of 40.77%, 42.75%, and 42.52%, respectively).[3] DE164-8 at 98-105; DE164-

---

[3] The Secretary appears to suggest that the Court should only compare the citizenship rates of the Black and white voting-age populations but ignore non-Black minority groups. DE166 at 19, 21.

10 at 12-23; DE164-12 at 11-17. These differences are large enough to meaningfully impact the racial composition of the district's eligible voter majority.

The Secretary's selective emphasis of one recent out-of-circuit district court case is misleading. The court in *Pierce* "recognize[d] its discretion to use either black CVAP or BVAP when evaluating whether [the illustrative plan] satisfies the first *Gingles* precondition." *Pierce v. N.C. State Bd. of Elections*, No. 4:23-CV-193-D, 2024 WL 307643, at *16 (E.D.N.C. Jan. 26, 2024) (citing *inter alia Negron*). That court noted several factors not at issue here that led it to use VAP data at the preliminary-injunction stage, including that those plaintiffs had suggested without explanation the district's "black CVAP is higher than BVAP," and that plaintiffs' expert did not even address "margins of error or explain how he took them into account" when reaggregating data. *Id.* at 15-16. Here, unlike in *Pierce*, Plaintiffs produced "reliable information" that shows—or at least creates a triable dispute about—a "significant difference in citizenship rates" in the illustrative district. *Negron*, 113 F.3d at 1569.

The Secretary does not dispute that the five-year ACS is the best available official data source for citizenship estimates, and data from the most recent ACS

---

In *Negron*, the Court compared the citizenship rate of the Hispanic VAP with the citizenship rate of the *entire* "non-Hispanic" VAP in the illustrative districts. 113 F.3d at 1567-68, 1570. Here, it would be illogical to intentionally exclude from consideration the citizenship rates of Hispanics and other non-Black minority groups when that data is necessary to answer "the foundational inquiry for the first *Gingles* precondition." *Id.* at 1569.

survey is the proper data to use when determining CVAP. *See* DE164-17 ¶¶ 18, 25; DE164-9 ¶ 8. Courts agree. *See, e.g.*, *Rios-Andino*, 51 F. Supp. 3d at 1224 ("[T]he five-year [ACS] estimates are reliable for communities of any size—all the way down to the 'census tract' and 'block group' level."); *Cisneros v. Pasadena Indep. Sch. Dist.*, No. 4:12-CV-2579, 2014 WL 1668500, at *9 (S.D. Tex. Apr. 25, 2014) ("ACS's five-year estimates of CVAP are reliable for the purposes of a Section 2 analysis."); *Rodriguez v. Harris Cnty.*, 964 F. Supp. 2d 686, 728 (S.D. Tex. 2013) (same).

The Secretary's primary complaint is that the ACS relies on a sample instead of a complete headcount. But the Eleventh Circuit has expressly endorsed the use of sample data from the Census Bureau as sufficient in Section 2 cases. *Negron*, 113 F.3d at 1570 ("The use of sample data is a long-standing statistical technique, whose limits are known and measurable. We will not reject the citizenship statistics solely because they are based on sample data without some indication that the sample was tainted in some way."). Courts assessing ACS CVAP estimates in the *Gingles* I context regularly use the point estimate from the most recent multi-year ACS survey. *See Benavidez v. City of Irving*, 638 F. Supp. 2d 709, 730 (N.D. Tex. 2009) (comparing 3-year ACS with most recent 1-year ACS to establish CVAP); *see also Elizondo v. Spring Branch Indep. Sch. Dist.*, No. 4:21CV1997, 2023 WL 2466401, at *4 (S.D. Tex. Feb. 13, 2023) (accepting an illustrative map based on 5-year ACS

survey as the "appropriate benchmark"). And despite the Secretary's criticisms of 1-year ACS data, *e.g.*, DE166 at 9, Mr. Fairfax only relied on 5-year ACS data in estimating the BCVAP of SD7 in his illustrative maps. DE164-7 ¶ 11(e); DE164-9 ¶ 3(b)-(c).

The Secretary poses an imagined concern that using ACS CVAP data will burst open the floodgates for VRA litigation. But, for years, courts have already used CVAP data, where appropriate, in litigation without issue. *See, e.g.*, *LULAC*, 548 U.S. at 438; *Negron*, 113 F.3d at 1569; *Campos v. City of Houston*, 113 F.3d 544, 548 (5th Cir. 1997); *Barnett v. City of Chicago*, 141 F.3d 699, 704 (7th Cir. 1998); *Romero v. City of Pomona*, 883 F.2d 1418, 1426 (9th Cir. 1989). The Court should decline the Secretary's invitation to depart from binding precedent here.

B.   The minority group in the Huntsville/Decatur region is sufficiently large.

Plaintiffs—and the Secretary—have produced ample evidence to at least raise a triable dispute about whether the BCVAP is over 50% in the additional majority-Black Huntsville/Decatur-area district in Illustrative Plans 1, 2, and 2A (the "BCVAP-Majority Plans"), which is sufficient to survive summary judgment.[4] Plaintiffs' experts calculate BCVAP point estimates above 50% in illustrative SD7.[5]

---

[4] Regardless, as noted *supra* in II.A, Plaintiffs have produced at least one illustrative map in which Black individuals are majorities of the voting age population, citizen voting age population, and registered voter population in SD7. DE164-9 ¶¶ 81-82. This alone raises a triable dispute of fact.

[5] Plaintiffs' experts Mr. Fairfax and Dr. Oskooii estimate BCVAP in Plan 1's Illustrative

Even Dr. Trende calculates SD7's BCVAP point estimates above 50% for Plan 2 using all six of his methods and calculates the BCVAP point estimates above 50% for Plan 1 using most of those methods.[6] Point estimates are "an appropriate benchmark that may be relied upon for determining the percentage of the CVAP in a demonstrative district." *Elizondo*, 2023 WL 2466401, at *4; *see* DE164-3 at 243:19-23 (conceding that point estimates are "the maximum likelihood estimate" of the BCVAP percentage); DE164-18 at 37:7-9, 14-16.

Unable to dispute that the BCVAP point estimates are over 50%, the Secretary insists this evidence "isn't good enough." DE166 at 30. But, at summary judgment, the Court must draw all reasonable inferences to Plaintiffs as nonmovants. *See, e.g.*, *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012). An expert opinion that the point estimate is above 50% "raise[s] a fact issue as to whether the CVAP in the demonstrative district exceeds 50%." *Elizondo*, 2023 WL 2466401, at *4 (denying summary judgment and rejecting argument that plaintiff failed to prove a CVAP-majority where some of the margin of error fell below 50%).

---

Huntsville/Decatur District is 50.16% and 50.11%, respectively. DE164-7 ¶ 81; DE164-17 ¶ 38. Mr. Fairfax estimates BCVAP in Plan 2's Illustrative Huntsville/Decatur District is 50.05% and that the illustrative district's BCVAP is 50.19% in Plan 2A. DE164-9 ¶ 49; DE164-11 ¶ 7. Plan 2A made only minor modifications to Plan 2. DE164-11 ¶¶ 5, 7.

[6] Using 2020 ACS 5-year data, Dr. Trende calculates BCVAP point estimates for Plan 1 of 50.1%, 49.2%, 50.4%, 50.9%, and 50.4%. DE164-1 at 23-24. Using 2022 ACS 5-year data, he calculates BCVAP point estimates for Plan 2 of 51.1%, 50.3%, 50.5%, 51.1%, 50.5%, and 51.1%. DE164-2 at 7. Dr. Trende did not analyze the minor modifications in Illustrative Plan 2A due to the timing of his deposition, but he testified that it appeared to not look that different than Plan 2. DE164-3 at 37:5-7 ("I haven't seen 2A before, but it doesn't look like it's that different from 2.").

The Secretary instead declares that Plaintiffs should clear a higher hurdle of his own creation: proving that no portion of a 90% confidence interval (calculated using Dr. Trende's guesswork) around the CVAP point estimate dips below 50%. The Secretary's proposal conflicts with Plaintiffs' burden to prove *Gingles* I by a preponderance of the evidence. *Bartlett*, 556 U.S. at 19-20. Plaintiffs are not required to meet the Secretary's proposed heightened burden to prevail in court—and certainly not at summary judgment. *Compare* DE164-3 at 113:20-24 ("Q: What percentage confidence do you believe is appropriate to declare Illustrative District 7 to be majority BCVAP, in your opinion? A: Using the standard typical of the social sciences, it would be 95 percent.") *with Concrete Pipe & Prod. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 622 (1993) ("The burden of showing something by a preponderance of the evidence, the most common standard in the civil law, simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence.") (cleaned up).

Courts that have considered the Secretary's CVAP confidence interval proposal have rejected it. *See, e.g.*, *Kumar v. Frisco Indep. Sch. Dist.*, 476 F. Supp. 3d 439, 492-95 (E.D. Tex. 2020) (holding 50.03% minority group CVAP point estimate satisfied *Gingles* I and rejecting defendants' argument that plaintiff failed at *Gingles* I because the margin of error included values under 50%); *Benavidez v. City of Irving*, 638 F. Supp. 2d at 721 (rejecting argument that "90% confidence level

must lie entirely above 50% to justify concluding that there is a majority [minority group CVAP] in an illustrative district").

The Secretary does not cite any cases that impose a CVAP confidence interval requirement on Section 2 plaintiffs, and the cases he does cite do not help him. In *Missouri State Conference of the NAACP v. Ferguson-Florissant School District*, the court rejected a defendant's attempt at using ACS VAP data to supplant Census VAP data.[7] 201 F. Supp. 3d 1006 (E.D. Mo. 2016), *aff'd*, 894 F.3d 924 (8th Cir. 2018). That court confronted a choice absent here: whether to accept Decennial Census data or ACS data for the *same metric*. Although there is a high bar to supplant "presumptive[ly] accura[te]" Census data, *id.* at 1032-34, here, Plaintiffs could not supplant Census CVAP data if they tried—no such data exists. Instead, they rely on the Census for total population and VAP data, and supplement it as required with ACS CVAP data—the best available source of citizenship statistics. DE164-17 ¶¶ 12-13, 24-25 ("ACS is the *only* source of data that provides CVAP statistics by

---

[7] The Secretary's reliance on *Benavidez v. Irving Indep. Sch. Dist.*, 690 F. Supp. 2d 451 (N.D. Tex. 2010) suffers from the same deficiency. There, the Court declined to let a plaintiff use 2007 ACS total population data to supplant 2000 Census data *for the same metric*. *Id.* at 457. Further in *Benavidez*, the plaintiff's expert used one-year ACS data instead of the more reliable five-year ACS data used by Plaintiffs' experts in the present case, and the *Benavidez* illustrative district population of 23,335 people fell "well below the 65,000 level at which the Census Bureau publishes single-year ACS estimates that it considers reliable." *Id.* at 459. In contrast, here, Plaintiffs' illustrative maps include districts with populations from approximately 136,000 to 150,000. Even *Benavidez* noted that "ACS data may be sufficiently appropriate and accurate for . . . analysis of large populations" over 65,000. *Id.* at 464 n.18.

race and ethnicity at various geographic units across the U.S."); DE164-9 ¶ 8.[8]

To make matters worse, the Secretary's proposed 90% confidence interval test is beset by guesswork underpinning its margin of error calculations. This also creates a triable dispute. Dr. Trende admits that he cannot calculate the margin of error with precision because district boundaries split block groups (such that parts of the same block group lie inside and outside the district boundaries) and error margins cannot be computed below the block-group level. DE164-18 at 212:2-20; DE164-1 at 18; DE164-3 at 110:12-17; DE164-9 ¶ 17. Accordingly, in performing his margin of error guesswork, Dr. Trende's calculations imprecisely relied on entire block groups, which Dr. Oskooii warned could lead to overinflated estimates of the margin of error. DE164-18 at 218:2-17. With all the evidence weighing in Plaintiffs' favor, such guesswork is insufficient to warrant summary judgment. *See Colonial Pipeline Co. v. Ceco Pipeline Servs. Co.*, No. 2:19-CV-1334-AMM, 2022 WL 4283098, at *4 (N.D. Ala. July 13, 2022) ("[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.") (quoting *Tolan v. Cotton*, 572 U.S. 650, 651 (2014)).

The Court should reject the Secretary's attempts to improperly raise Plaintiffs'

---

[8] *Reyes v. City of Farmers Branch* is wholly inapposite. No. 3:07-CV-900-O, 2008 WL 4791498 (N.D. Tex. Nov. 4, 2008), *aff'd* 586 F.3d 1019 (5th Cir. 2009). Plaintiffs in that case used Spanish surnamed registered voter records rather than ACS data to estimate Hispanic CVAP, and the court questioned the reliability of this method when applied to the small area at issue. *Id.* at *9.

burden and should instead recognize that Plaintiffs have (at least) created a triable dispute given the consensus opinion that BCVAP point estimates above 50% provide sufficient evidence that those districts are majority-BCVAP.

C. <u>The Secretary wrongly asserts that Plaintiffs cannot rely on CVAP unless they also remove every other ineligible individual.</u>

Citing no case law, the Secretary insists that Plaintiffs cannot use CVAP because they can't also "exclud[e] the rest of the ineligible voting population," including those disenfranchised by a felony conviction. DE166 at 24-27. This is neither an accurate representation of the factual record nor the governing law.

First and foremost, whatever the conceptual underpinning of the Secretary's misguided argument may be, he entirely ignores undisputed data showing that the Black community in illustrative SD7 is sufficiently large to form a majority of registered voters despite any statewide disproportionate impacts of felony disenfranchisement. *See* DE164-9 ¶ 50 (51.28% of registered voters in Plan 2's SD7 are Black), ¶ 82 (52.74% of registered voters in Plan 3's SD7 are Black). Those numbers necessarily exclude anyone with felony convictions that preclude registering to vote in Alabama. Ala. Const. art. VIII, § 177(b). The evidence of voter registration bolsters proof of a Black citizen majority and contradicts the Secretary's speculation about the effect of felony convictions (and his unwarranted concerns about confidence intervals around ACS point estimates) *within* illustrative SD7. *See Johnson v. DeSoto Cnty. Bd. of Comm'rs*, 204 F.3d 1335, 1343 (11th Cir. 2000)

(accepting "voter registration evidence as credible and as reliable" and affirming *Gingles* I conclusions based on expert's analysis of "data derived from voter registration figures" and supported by "other evidence" of population statistics); *Westwego Citizens for Better Gov't v. City of Westwego*, 906 F.2d 1042, 1046 (5th Cir. 1990) (holding "minority voter registration data . . . is relevant to the first *Gingles* factor"); *cf. Chisom v. Roemer*, 501 U.S. 380, 385 (1990) (describing an illustrative district with a "majority black voter registration"); *Rogers v. Lodge*, 458 U.S. 613, 623 (1982) (considering voter registration to determine whether Black voters constituted a majority in the challenged at-large system); *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1307 (11th Cir. 2020) (same). At the very least, this undisputed voter registration evidence combined with ACS citizenship data creates a genuine dispute of material fact about the existence of a Black majority in the illustrative districts. *Fayette*, 775 F.3d at 1343 ("[T]he court must construe the facts and draw all rational inferences therefrom in the manner most favorable to the nonmoving party.").

The Secretary makes no meaningful attempt to prove otherwise. He misapplies state-level felony disenfranchisement statistics to a single senate district.[9]

---

[9] Plaintiffs introduced these state-level figures as evidence of discrimination for the purposes of the Senate Factors analysis. *See* DE164-20 at 2, 19-20; *see also Gingles*, 478 U.S. at 37.

*See* DE164-1 at 24; DE164-3 at 125:12-18; DE166 at 25-26.[10] But those statewide percentages have "no relevancy locally for calculating the number of persons barred from voting within SD 7," DE164-9 ¶ 21, and their expert's conclusions are thus "purely speculative," DE164-17 ¶ 36 n.17; *see id.* ("I have never encountered an expert adjusting a district's CVAP share based on felony convictions, especially when reliable block or block-group data on felony rates is unavailable to them."). This dispute alone means the Secretary's motion must fail.

Moreover, this not the law—no court has required a plaintiff to refine population data by felony disenfranchisement status to meet *Gingles* I.[11] Yet, the Secretary urges the Court to make perfect be the enemy of good. It would be absurd to preclude drawing illustrative maps that *better* account for eligibility—*i.e.*, by adjusting for noncitizens and those too young to vote—solely because available data does not permit "exclud[ing] the rest of the ineligible voting population." DE166 at

---

[10] Secretary Allen makes additional basic mathematics errors. When attempting to calculate how many Black citizens would need to be disenfranchised due to a felony conviction to fall below a majority in SD7, he entirely neglects that the denominator—the total population figure—would necessarily decrease by a substantially larger number due to disenfranchising convictions across *all* racial subgroups. *See* DE166 at 25-26.

[11] At most, the Secretary invokes an inapplicable out-of-circuit district court opinion considering whether the Black community was barred from bringing a Section 2 claim if they constituted a numerical majority of the jurisdiction's whole population. 201 F. Supp. 3d at 1019. The court rejected that argument as a matter of law. To the extent that the court considered felony disenfranchisement, it was to suggest that plaintiffs' detailed expert rebuttal analysis about "impediments to voting"—including "felony disenfranchisement, the lack of homeownership, and other socioeconomic indicators"—supported rejecting defendants' otherwise questionable population projections, given the especially "unique" facts of the case. *Id.* at 1025-28, 1035-36, 1083. That unique context is easily distinguishable, and, in any event, the Secretary here made no effort to present evidence related to felony disenfranchisement.

25; *see LULAC*, 548 U.S. at 429 (relying on "citizenship" rather than "voting-age population" as it better reflects "eligible voters" and thus "fits the language of § 2"). Even the Secretary's preferred population metric, VAP, removes a large subset of underage nonvoters from population figures without accounting for all forms of ineligibility. The Court should reject this attempt to impose an illogical standard that "cannot be reconciled with . . . precedent." *Allen v. Milligan*, 599 U.S. 1, 23, 38 (2023).

Plaintiffs have met their initial burden on the first *Gingles* precondition by presenting multiple illustrative maps containing a Black-majority district under court-approved population metrics. The Secretary does not dispute that "block or block-group data on Black felony rates or counts is not available for the state of Alabama." DE164-17 ¶ 36 n.17. His inability to produce evidence to support his novel effort to discredit those maps is, "[t]o be blunt, . . . the State's problem." DE166 at 27; *cf. Johnson*, 204 F.3d at 1341 (holding that, while plaintiffs bear the "burden to establish the first *Gingles* factor," "a burden rests on the party challenging the continuing accuracy" of population data "to introduce evidence to the contrary").

### III.   Plaintiffs' Illustrative Plan 3 Is Reasonably Configured.

Drawing all inferences in Plaintiffs' favor, the record raises a triable dispute and would support a finding that Illustrative Plan 3 is reasonably configured and race did not predominate in its drawing. *See, e.g.*, DE164-13 at 44:7-15, 44:22-45:7. The

Secretary's caricatures of Illustrative Plan 3 as otherwise ignore expert testimony. At minimum, the record—including conflicting opinions of expert witnesses as to whether plaintiffs "met the first *Gingles* precondition"—creates triable issues that demand "necessary credibility determinations and findings of fact" at trial. *Fayette*, 775 F.3d at 1347-48. The Secretary improperly seeks credibility determinations at summary judgment, which are particularly inappropriate in the inherently "fact-intensive" nature of Section 2 cases. *Gingles*, 478 U.S. at 46.

Plaintiffs' Illustrative Plan 3 is reasonably configured. A reasonably configured district "involves myriad considerations" that map drawers account for, like "compactness, contiguity, political subdivisions, natural geographic boundaries, county lines, pairing of incumbents, communities of interest, and population equality," among others. *Milligan*, 599 U.S. at 35. Proposed districts balancing these criteria in Section 2 litigation need not "meet or beat" the challenged map. *See Singleton v. Allen*, 690 F. Supp. 3d 1226, 1301 (N.D. Ala. 2023); *Vera*, 517 U.S. at 977. The record reflects just this balance. DE164-9 ¶¶ 80-97.

The Secretary argues that marginal differences between the Enacted Plan and Illustrative Plan 3 on cherrypicked factors render Plan 3 so unreasonable as to allow summary judgment in his favor. He alleges three problems that purportedly make Illustrative Plan 3 unreasonable as a matter of law: (1) that SD7 is less geographically compact than some, but not all, other districts in Illustrative Plan 3,

(2) SD7 has four county splits, and (3) Illustrative Plan 3 pairs two incumbents in one district. DE166 at 31-36. None have merit, much less support the grant of summary judgment.[12]

A. Plaintiffs' Illustrative Plan 3 balances traditional districting criteria.

Courts do "not have to conduct a beauty contest between plaintiffs' maps and the State's." *Milligan*, 599 U.S. at 21 (cleaned up). And so, geographically compact districts can, but need not necessarily be, "comparably compact" to districts in an enacted plan. *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, --- F. Supp. 3d ---, 2023 WL 7037537, at *29 (N.D. Ga. Oct. 26, 2023). Indeed, "[a]n illustrative plan may be reasonably configured even if it does not outperform the [Enacted] Plan on every (or any particular) metric." *Singleton*, 690 F. Supp. 3d at 1302.

Here, ample evidence demonstrates SD7's geographic compactness. SD7's compactness scores are better than scores accepted by the Legislature as reasonable in the Enacted Plan. DE164-10 at 25-28; DE164-9 ¶ 89; *see* DE171-8 at 59:9-12 (Alabama's map drawer testifying that all districts in the Enacted Plan are reasonably compact, including those with lower compactness scores than illustrative SD7); DE171-10 at 60:24-61:3 (same from Senate Chair of Reapportionment Committee). Moreover, SD7 is similarly compact to its enacted counterpart, with Reock and

---

[12] And in any event, Plaintiffs have produced three other illustrative plans that the Secretary does not challenge as unreasonably configured, which is sufficient to deny summary judgment.

Polsby-Popper measures differing by only 0.01. DE164-9 ¶ 90. Such minor differences do not demonstrate that an illustrative district lacks compactness. *See Alpha Phi Alpha*, 2023 WL 7037537, at *85. And again, illustrative districts need not "meet or beat" the compactness of an enacted plan to be reasonably compact. *See Singleton v. Allen*, 691 F. Supp. 3d 1343, 1351 (N.D. Ala. 2023).

The Secretary also incorrectly asserts that SD7's compactness scores and the scores of districts in an arbitrarily selected region around SD7 support judgment as a matter of law on the first *Gingles* precondition. This particular form of comparison is found nowhere in precedent. Rather, map drawers "make difficult, contestable choices" across the entire map that involve tradeoffs among redistricting criteria. *Milligan*, 599 U.S. at 35; *see also* DE164-13 at 111:2-112:23. Indeed, Illustrative Plan 3 and the Enacted Plan each feature the same number of districts that are more compact than their counterparts in the other plan. DE164-11 ¶ 8. And nine of Illustrative Plan 3's ten majority Black districts are either more compact or equal in compactness to corresponding districts in the Enacted Plan. DE164-9 ¶ 87. Every majority Black district in Illustrative Plan 3 is more compact than certain districts blessed by the Legislature in the Enacted Plan. *Id*. ¶ 89.

The Secretary contorts himself to contend that Illustrative Plan 3's SD7 is irregularly shaped. DE166 at 36, 38. Setting aside that SD7 outperforms the mathematical compactness scores of districts enacted by the state, there is no need

for such a compactness "beauty contest." *Milligan*, 599 U.S. at 21. Nor must SD7 have "the least possible amount of irregularity in shape" to be considered "reasonably compact." *Bush v. Vera*, 517 U.S. 952, 977 (1996) (rejecting this view as "impossibly stringent"). There is no "aesthetic ideal of compactness," *Kumar*, 476 F. Supp. 3d at 495-96, and still SD7 does not possess the "tentacles, appendages, bizarre shapes, or any other obvious irregularities that would make it difficult to find them sufficiently compact." *Milligan*, 599 U.S. at 20 (citation omitted).

The Secretary next asserts that Illustrative Plan 3 violates traditional redistricting principles as a matter of law because it splits two more counties than the Enacted Plan. But there is no "county-split beauty contest" requirement to satisfy *Gingles* I. *Singleton*, 690 F. Supp. 3d at 1313. Nor is it significant that Plan 3 includes a single district that splits four counties. *See* DE166 at 35. The Enacted Plan features four districts splitting three counties each, DE164-8 at 258-59, and the Secretary can offer no reason why the marginal distinction warrants judgment as a matter of law. *See Singleton*, 691 F. Supp. 3d at 1351 ("Plaintiffs are not required to produce a plan that 'meets or beats' the 2023 Plan on any particular traditional districting criteria to satisfy *Gingles* I.").

The Secretary also contends that Illustrative Plan 3 does not account for traditional districting principles because it pairs just one set of incumbents. But "incumbent protection is subordinate to the goal of remedying the § 2 violation and

the requirements of the Constitution," *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 996 F. Supp. 2d 1353, 1363 (N.D. Ga. 2014); *see also LULAC*, 548 U.S. at 440-41; *Abrams v. Johnson*, 521 U.S. 74, 84 (1997), not to mention that the State's own Guidelines agree, DE171-1 at 4 ("[P]riority is to be given to . . . compliance with the Voting Rights Act of 1965 . . . should the requirements of [that] criteri[on] conflict" with avoiding "contests between incumbents"). There is "no legal basis" for a rule requiring "that every remedial plan invariably protect every incumbent." *Singleton v. Merrill*, 582 F. Supp. 3d 924, 1015 (N.D. Ala. 2022).

An illustrative plan need not be the best plan nor the ideal plan for a legislature. Plaintiffs need only offer a plan that is "reasonably configured" to satisfy *Gingles* I. Illustrative Plan 3 outperforms the Enacted Plan on some criteria, ties it on others, and marginally underperforms it on a few. These tradeoffs are standard in map drawing. *Singleton*, 582 F. Supp. 3d at 1016. As Plaintiffs' expert explained: "the idea is to balance the criteria" of identified traditional districting principles. DE164-13 at 155:11-156:1. Evaluating how an expert made each tradeoff in their illustrative plan is best reserved for trial, not summary judgment. *Fayette*, 775 F.3d at 1347-48.

B.   Race did not predominate in Plaintiffs' Illustrative Plan 3.

The record does not support the Secretary's contention that race predominated in the drawing of Illustrative Plan 3. "[E]very single illustrative map ever adduced

at the first step of *Gingles* . . . w[as] created with an express target in mind—they were created to show, as our cases require, that an additional majority-minority district could be drawn. That is the whole point of the enterprise." *Milligan*, 599 U.S. at 33 & n.7. For that reason, race did not predominate Illustrative Plan 3's drawing simply because SD7 is a majority-minority district. *See Vera*, 517 U.S. at 958 ("Strict scrutiny does not apply merely because redistricting is performed with consciousness of race. Nor does it apply to all cases of intentional creation of majority-minority districts."). There is a clear "difference between being aware of racial considerations and being motivated by them." *Milligan*, 599 U.S. at 30 (citation omitted); *see also North Carolina v. Covington*, 585 U.S. 969, 976 (2018) (per curiam).

"Race does not predominate when a mapmaker adheres to traditional redistricting criteria, testifies that race was not the predominate factor motivating his design process, and explains that he never sought to maximize the number of majority-minority districts." *Alpha Phi Alpha*, 2023 WL 7037537, at *77 (quotations omitted and alterations adopted). Mr. Fairfax testified, "I used [race] to balance that with other criteria," and expressly denied that the changes made to SD7 in his illustrative plans were evidence of race predominating his map-drawing process. DE164-13 at 47:8-16, 47:24-48:8, 118:4-9; 125:12-20; 150:14-20; 216:18-218:1; *see also id.* at 60:18-21; 63:8-10. Like the *Milligan* map drawers, Mr. Fairfax gave

race "equal weighting," with other factors like "compactness, contiguity, and population equity." 599 U.S. at 31; *see* DE164-13 at 114:2-115:8; 216:18-218:1. The Supreme Court requires much more than Dr. Trende's speculative opinions on circumstantial evidence to prove racial predominance. *See Alexander v. S.C. State Conf. of the NAACP*, 144 S. Ct. 1221, 1234 (2024) (noting how "[p]roving racial predominance with circumstantial evidence alone is much more difficult," and that "we have never invalidated an electoral map in a case in which the [challenger] failed to adduce any direct evidence"); *id.* (party alleging racial predominance must "among other things, rul[e] out the competing explanation").

## CONCLUSION

For the foregoing reasons, the Court should deny the Secretary's motion for partial summary judgment.

DATED this 19th day of July, 2024

/s/ Alison Mollman
Alison Mollman
Laurel Hattix
American Civil Liberties Union of
     Alabama
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 265-2754
amollman@aclualabama.org
lhattix@aclualabama.org

/s/ Deuel Ross
Deuel Ross*

Respectfully submitted,

/s/ Theresa J. Lee
Davin M. Rosborough*
Julie A. Ebenstein*
Dayton Campbell-Harris*
Theresa J. Lee*
Sophia Lin Lakin*
American Civil Liberties Union
     Foundation
125 Broad St.
New York, NY 10004
(212) 549-2500
drosborough@aclu.org
jebenstein@aclu.org
dcampbell-harris@aclu.org

NAACP Legal Defense & Educational
     Fund, Inc.
700 14th Street NW Ste. 600
Washington, DC 20005
(202) 682-1300
dross@naacpldf.org

Leah Aden*
Stuart Naifeh*
Kathryn Sadasivan (ASB-517-E48T)
Brittany Carter*
Ashley Burrell*
Colin Burke*
NAACP Legal Defense & Educational
     Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
laden@naacpldf.org
snaifeh@naacpldf.org
ksadasivan@naacpldf.org
bcarter@naacpldf.org
aburrell@naacpldf.org
cburke@naacpldf.org

David Dunn*
Hogan Lovells US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000
david.dunn@hoganlovells.com

Blayne R. Thompson*
Hogan Lovells US LLP
609 Main St., Suite 4200
Houston, TX 77002
(713) 632-1400
blayne.thompson@hoganlovells.com

Michael Turrill*

tlee@aclu.org
slakin@aclu.org

Jacob van Leer*
American Civil Liberties Union
     Foundation
915 15th St. NW
Washington, DC 20005
jvanleer@aclu.org

/s/ Sidney Jackson
Sidney Jackson (ASB-1462-K40W)
Nicki Lawsen (ASB-2602-C00K)
Wiggins, Childs, Pantazis,
     Fisher & Goldfarb
301 19th Street
North Birmingham, AL 35203
(205) 314-0500
sjackson@wigginschilds.com
nlawsen@wigginschilds.com

/s/ Jack Genberg
Bradley E. Heard*
Jack Genberg*
Jess Unger*
Southern Poverty Law Center
150 E. Ponce de Leon Avenue, Suite
340 Decatur, GA 30030
(404) 521-6700
bradley.heard@splcenter.org
jack.genberg@splcenter.org
jess.unger@splcenter.org

Avner Shapiro*
Southern Poverty Law Center
1101 17th Street NW
Suite 510
Washington, DC 20036
240-890-1735
avner.shapiro@splcenter.org

Harmony R. Gbe*
James W. Ettinger*                      Jessica L. Ellsworth*
Hogan Lovells US LLP                    Shelita M. Stewart*
1999 Avenue of the Stars Suite 1400     Amanda N. Allen*
Los Angeles, CA 90067                   Hogan Lovells US LLP
(310) 785-4600                          555 Thirteenth Street, NW
michael.turrill@hoganlovells.com        Washington, DC 20004
harmony.gbe@hoganlovells.com            (202) 637-5600
jay.ettinger@hoganlovells.com           jessica.ellsworth@hoganlovells.com
                                        shelita.stewart@hoganlovells.com
                                        amanda.n.allen@hoganlovells.com


*Attorneys for Plaintiffs*

*Admitted *pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on July 19, 2024, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system which will send notification

of such filing to counsel of record in this case.

<div style="margin-left: 50%;">

/s/ Theresa J. Lee

Theresa J. Lee

American Civil Liberties Union
    Foundation

125 Broad St.

New York, NY 10004

(212) 549-2500

tlee@aclu.org

</div>

38