IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| KHADIDAH STONE, *et al.*, ) | |
| ) | |
| *Plaintiffs*, ) | |
| ) | |
| v. ) | Case No. 2:21-cv-1531-AMM |
| ) | |
| WES ALLEN, *et al.*, ) | |
| ) | |
| *Defendants*. ) | |

### SECRETARY ALLEN'S REPLY IN SUPPORT OF PARTIAL SUMMARY JUDGMENT (DOC. 166)

In an effort to contrive an issue for trial, Plaintiffs label as "disputed" most of Defendant's facts but then just restate Defendant's facts in their own words, *see, e.g.*, DE172 at 11 ¶20, assert non sequiturs, *id.* at 8-14 ¶¶1, 2, 6, 7, 12, 15, 19, 22, 23, 30, 31, 37, 41, offer legal conclusions, *id.* at 9-10, 13 ¶¶8, 12, 30, or contradict their own expert's testimony, *id.* at 12-14, ¶¶25, 26, 34, 35, 39. These attempts, even if credited, do not raise a *genuine* dispute of *material* fact.

What Plaintiffs do not dispute seals the deal. They admit that three of their four illustrative §2 districts lack a majority-black voting-age population. DE172 at 11, 13-14 ¶¶22, 32, 38. The Supreme Court in *Bartlett v. Strickland* could not have been clearer: To satisfy the first *Gingles* precondition, the minority group must "make up more than 50 percent of the voting-age population in the relevant geographic area." 556 U.S. 1, 18 (2009). Thus, the "crossover districts" presented in

1

Plaintiffs' first three plans provide no evidence of vote dilution. *Id.* at 21. This "rule draws clear lines for courts and legislatures alike." *Id.* at 17.

The citizenship estimates relied on by Plaintiffs cannot resuscitate those three plans. In the *Gingles* 1 context, courts use this sample data derived from survey responses only to confirm that an illustrative district which already has a majority-minority voting-age population will likely perform for the minority group. No court has yet done what Plaintiffs want this Court to do: use citizenship estimates to allow a crossover district to sidestep *Strickland*'s 50%+1 voting-age population line.

The only way Plaintiffs can satisfy *Strickland*'s "majority-minority requirement" is with a racially gerrymandered plan. *Id.* at 17. In this final plan, Senate District 7 carefully cuts across parts of four counties to pick up only the densest pockets of the black voting-age population. Plaintiffs do not dispute that illustrative SD7 is composed solely of four split counties, includes thirty-two of the thirty-five highest BVAP precincts in those counties, is among the least compact in the Plan, and pairs incumbents. DE172 at 14 ¶¶42-47. These features reveal that when race went up against the State's non-racial redistricting principles, race won every time. This was a "balancing act" in name only. DE164-13 (Fairfax depo) at 32:22. Plan 3 is not reasonably configured; and worse, it is "unexplainable on grounds other than race." *Alexander v. S.C. State Conf. of the NAACP*, 144 S. Ct. 1221, 1236 (2024).

## RESPONSE TO PLAINTIFFS' "ADDITIONAL FACTS"

1. Disputed in part. SD7's BCVAP estimate in Plan 3 suffers from the same statistical uncertainty as SD7's BCVAP estimates in Plans 1, 2, and 2A do—namely, the confidence intervals derived from the ACS's known sampling error includes values below the 50%+1 threshold. DE164-9 ¶¶17, 81 (Fairfax Rebuttal Redline).

4. Undisputed.

5. Disputed. Seven of Plan 3's ten majority-black districts were left unchanged. Of the three that were changed, one became more compact (SD25), and two became less compact (SDs 7, 26). DE164-8 at 247-49; DE164-10 at 163-65.

6-7. Undisputed.

8. The first sentence is a legal conclusion masquerading as an assertion of fact. *See Alexander*, 144 S. Ct. at 1240. The geographical contours of Mr. Fairfax's Illustrative Plans are undisputed. Undisputed that Mr. Fairfax testified as quoted. The third sentence is anything but "clear, unambiguous," and "simple." DE85 at 12.

9. Disputed. DE171-2 at 39:22, 40:5, 41:7-13, 42:6-18.

## ARGUMENT

### I. Plaintiffs Lack Standing.

As an initial matter, Plaintiffs lack standing to challenge Alabama Senate Districts in the Huntsville area because they've failed to show that any individual Plaintiff or member of an organizational Plaintiff lives there. Evan Milligan and Khadidah Stone live in Montgomery. The Alabama State Conference of the NAACP has no

3

members. And Greater Birmingham Ministries, after having received ample opportunity, has failed to identify a single member in the Huntsville region who could sue in his own right.

First, the State Conference's President revealed during his deposition that while local NAACP branches have members, "the State Conference itself does not have members." DE171-2 at 39:22. No local member, even one elected as President or Officer of the State Conference, "get[s] a membership to the State Conference." *Id.* at 40:5, 42:6-18. Further, no local member pays membership dues to the State Conference, which fills its coffers solely via fundraising and donations. *Id.* at 41:7-13. An organization with no members has no associational standing. *See Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1249 (11th Cir. 2020).

Second, GBM to date has not identified a single member living in the Huntsville area. Instead, it has provided the general statement that it "has individual members who live in the City of Huntsville." DE171-4 at 5.[1] GBM thinks this is sufficient, relying on the uncontroversial rule that an organization need not always provide the *legal names* of its affected members to establish standing. DE172 at 20.[2]

---

[1] Also, GBM has made no "specific allegations based on specific facts" that the churches and congregations GBM names "otherwise have standing to sue in their own right." DE171-4 at 5. *Am. All. for Equal Rts. v. Fearless Fund Mgmt.*, 103 F.4th 765, 771, 773 (11th Cir. 2024) (internal quotes omitted).

[2] Plaintiffs repeatedly cite the inapposite *Browning* decision, where a membership organization alleged "probabilistic injuries" flowing from a voter registration law with *statewide* application.

4

Even so, GBM must still "make specific allegations establishing that at least one identified member ha[s] suffered or [will] suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009); *see also Jacobson*, 974 F.3d at 1249 (The DNC "describes itself as having members," "but it failed to identify any."). Fundamentally, a court "cannot accept an organization's self-description of its membership regardless of whether it is challenged." *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1203 (11th Cir. 2018) (cleaned up) (quoting *Summers*, 555 U.S. at 499).[3] No Plaintiff has standing, making summary judgment appropriate.

## II. The Minority Group Is Not "Sufficiently Large."

In three of Plaintiffs' four plans, black Alabamians do not "make up more than 50 percent of the *voting-age population*" in SD7. *Strickland*, 556 U.S. at 18 (emphasis added); *see also id.* at 6, 12, 13, 20. The district's BVAP is 46.8% in Plan 1, 48.47% in Plan 2, and 48.38% in Plan 2A. DE164 at 100; DE164-10 at 14; DE164-12 at 13. These fail outright to satisfy *Gingles* 1 because Section 2 cannot "be invoked … where the racial minority is less than 50 percent of the voting-age population in the district to be drawn." *Strickland*, 556 U.S. at 6.

---

552 F.3d 1153, 1163 (11th Cir. 2008). The Eleventh Circuit has since clarified that "[t]his requirement of naming the affected members has never been dispensed with in light of statistical probabilities, but only where all members of the organization are affected by the challenged activity." *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1204 (11th Cir. 2018). Plaintiffs have not shown, or even alleged, such injury here.

[3] *Alabama Legislative Black Caucus* is not to the contrary. *Cf.* DE172 at 19. There, the Supreme Court found the organizational plaintiff's allegations of membership sufficient given "the absence of a state challenge" going to "inadequate member residency." 575 U.S. 254, 270 (2015).

5

Spurning this "objective, numerical test," Plaintiffs muddle what should be "clear lines" with citizenship approximations derived from sample survey results (that weren't even available until *after* the Legislature enacted the 2021 Plan). *Id.* at 17-18. Those clear lines define a "majority-minority district" as one in which "a minority group composes a numerical, working majority of the voting-age population." *Id.* at 13. Yet Plaintiffs' citizenship estimates suggest only that in illustrative SD7, black Alabamians compose a "working" (or "effective") *minority* "of the voting-age population." *Id.* These "effective minority districts" cannot "satisfy the first *Gingles* requirement." *Id.* at 14, 23.

Plaintiffs declare that no case requires them "to demonstrate that the minority community forms *both* a majority of VAP *and* CVAP." DE172 at 22. The VAP threshold is plainly required by *Strickland*, a case Plaintiffs all but ignore. The CVAP threshold, in the right context, serves a particular, well-defined purpose: to determine whether Hispanic citizenship rates are so *low* that a majority-Hispanic-VAP district would constitute a "hollow" majority, i.e., one that would not perform. *LULAC v. Perry*, 548 U.S. 399, 429 (2006). In *Negron v. City of Miami Beach*, for example, districts with Hispanic VAPs of 62%, 61%, and 55% would not give Hispanics "a meaningful potential" "to elect a representative" because the Hispanic citizenship rate was 50% compared to a non-Hispanic rate of 88%—a *negative* 38% difference. 113 F.3d 1563, 1567, 1569 (11th Cir. 1997).

6

This expected pattern, where minority VAP *exceeds* minority CVAP, appears in every single case Plaintiffs cite to justify their misuse of CVAP data. *See LULAC*, 548 U.S. at 424 (Hispanic VAP of "just **over 50%**" with HCVAP of 46%); *Negron*, 113 F.3d at 1567 (Hispanic VAPs of **62.3%**, **61.48%**, and **55.16%**); *Rios-Andino v. Orange County*, 51 F. Supp. 3d 1215, 1225 (M.D. Fla. 2014) (Hispanic VAPs of **52.7%** and **54.6%** were not majority-HCVAP) (citing Expert R. of Theodore S. Arrington ¶31, *id.*, 2013 WL 10163063); *Reyes v. City of Farmers Branch*, 586 F.3d 1019, 1021 (5th Cir. 2009) (Hispanic VAP of **75%**); *Cisneros v. Pasadena Indep. Sch. Dist.*, No. 4:12-CV-2579, 2014 WL 1668400, at *6 (S.D. Tex. Apr. 25, 2014) (Hispanic VAPs of **79.9%**, **81.9%**, and **81.8%**); *Rodriguez v. Harris County*, 964 F. Supp. 2d 686, 736 (S.D. Tex. 2013) (Hispanic VAP of **69%**); Supplemental Expert R. of David Ely at 3-5, *Benavidez v. City of Irving*, No. 3:07-cv-1850, ECF 38-6 (N.D. Tex. 2009) (Hispanic VAPs of **63.8%**, **66.4%**, **70.9%**); Expert R. of Robert M. Stein at 9, *Elizondo v. Spring Branch Indep. Sch. Dist.*, No. 4:21-cv-1997, ECF 41-1 (S.D. Tex. 2023) (Hispanic VAP of **71.8%** and HCVAP of 52.8%); Expert R. of David Ely at 6, *Kumar v. Frisco Indep. Sch. Dist.*, No. 4:19-cv-284, ECF 34-1 (E.D. Tex. 2020) (combined minority VAP of **50.94%** and CVAP of 50.03%).

Plaintiffs' case is the odd one out. In SD7, black VAP is *less* than black CVAP, and the racial groups at issue (black and white) have virtually identical citizenship rates in Alabama generally and in illustrative SD7 specifically. DE166 at 8

7

¶7; DE172 at 24 n.3. Where there is "no indication" of "any disparity between black and white citizenship rates," there is no need to refine voting age population by citizenship. *Negron*, 113 F.3d at 1568.

Plaintiffs try to manufacture the necessary disparity by comparing black rates to non-black rates, but this creates a gap in the wrong direction. Using their numbers, black citizenship rates are over 99.8% and non-black rates come in between 87% and 93%. DE172 at 24. Defendant has found no example—and Plaintiffs provide none—of a court turning to CVAP estimates where the minority citizenship rate *exceeds* that of the majority. *Cf. Pope v. County of Albany*, No. 1:11-cv-736, 2014 WL 316703, at *13 n.23 (N.D.N.Y. Jan. 28, 2014) (The "citizenship rate of black County residents over 18 years of age must be *less* than the citizenship rate of the population as a whole.").

Still, Plaintiffs insist that using CVAP better satisfies "the very practical purpose of *Gingles* I"—to show that "minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice." DE172 at 23 (quoting *Thornburg v. Gingles*, 478 U.S. 30, 50 n.17 (1986)). But here, unlike in *Negron* and in each of Plaintiffs' cited cases, there is no threat that a 50%+1 minority-VAP district would fail to give that minority that opportunity to elect. *Growe v. Emison*, 507 U.S. 25, 40 (1993). To the contrary, Dr. Trende's unrebutted testimony

8

shows that black voters would have the potential to elect their preferred candidate in illustrative SD7 at well below 50% BVAP. DE164-1 at 29; DE164-2 at 18.

Plaintiffs' misappropriation of CVAP data follows a rising trend. Section 2 plaintiffs tried the same thing in North Carolina. *See Pierce v. N.C. State Bd. of Elections*, – F. Supp. 3d –, 2024 WL 307643 (E.D.N.C. Jan. 26, 2024), *aff'd* 97 F.4th 194 (4th Cir. 2024). The district court caught on and rejected plaintiffs' illustrative crossover district for at least two reasons. First, citing *Negron*, the court found "no significant black noncitizen population in the counties at issue." *Id.* at *15. The same is true here. Ignoring that, Plaintiffs highlight the court's statement that "to use either black CVAP or BVAP" lies within "its discretion." *Id.* at *16. Curious choice, given the Eleventh Circuit's rule that "[w]hether citizenship should be taken into account for the first *Gingles* precondition is a *question of law*." *Negron*, 113 F.3d at 1570.

Second, the *Pierce* court, noting the margins of error that accompany CVAP data, faulted plaintiffs' expert for failing to "discuss th[e] margins of error or explain how he took the margins of error into account when he reaggregated the data to calculate precinct-level black CVAP." 2024 WL 307643, at *16. Again, the same is true here. Neither Mr. Fairfax nor Dr. Oskooii explain how they took the known sampling error into account or the additional, unknowable error arising from the disaggregation of SD7's block groups. Plaintiffs—despite citing this language from *Pierce*—fail to argue otherwise. DE172 at 25.

9

Neither party disputes that ACS results, by their nature, come with sampling error. DE164-1 at 18, 25. The ACS General Handbook, quoted by Dr. Trende, states:

> All estimates produced from sample surveys have uncertainty associated with them …. This uncertainty—called sampling error—means that estimates derived from the ACS will likely differ from the values that would have been obtained if the entire population had been included in the survey, as well as from values that would have been obtained had a different set of sample units been selected for the survey.

*Id.* at 13. ACS sampling error is calculable down to the block group level. Mr. Fairfax put SD7's margin of error at around "2.7, under three percent." DE164-13 at 197:2. Dr. Trende calculated an error margin between 2.6% and 3.1%. DE164-1 at 18, 25. Plaintiffs insult as "guesswork" the most favorable margin of error of 2.6%, calculated directly from the ACS sample data by both Mr. Fairfax and Dr. Trende. DE172 at 29, 31. What Plaintiffs call "guesswork," their own expert calls "very reasonable." DE164-9 ¶17.

Further betraying a misunderstanding of these concepts, Plaintiffs confuse this knowable error with the *unknowable*, *additional* error that necessarily accompanies the disaggregation of ACS data when block groups are split, as they are in SD7. *See* DE166 at 10 ¶19; DE164-18 at 226:2-6 ("Q. Could you have calculated the margin of error? A. No. Not precisely. Because again, block groups are split between districts."). Defendant ignores this unknowable error (for now), giving Plaintiffs the benefit of their "best-case scenario," *e.g.*, DE164-3 at 112:10-11, 20. DE166 at 28.

10

Plaintiffs then charge Defendant with using this margin of error to hold them to a heightened burden of proof. DE172 at 29.[4] But Plaintiffs have not yet grasped how confidence intervals (margins of error) affect one's ability to make *probability* statements about values falling within those intervals. "In the courtroom … one common fallacy is to treat a [confidence interval (CI)] as if it were the probability of some hypothesis or assertion." DE164-22 at 3. Plaintiffs fall into that fallacy. "Another fallacy involving CIs is that values in the middle of the CI are somehow better supported or more probable than values near the extremes." *Id.* Plaintiffs step into that trap as well. But, given the nature of confidence intervals, "we can't know where any single sample result" (here the BCVAP estimate) "falls relative to the true value; lacking that knowledge, we have no way to tell where in a particular CI the true value is likely to be—assuming the CI covers the true value at all." *Id.*

Here, the most Plaintiff-favorable confidence interval is ±2.6%; the threshold that must be surpassed is 50%; and SD7's *best* "best guess" BCVAP estimate is 51.1% (courtesy of Dr. Trende). DE164-2 at 7. Avoiding the fallacies flagged above and following the principles of statistics discussed, all this tells us is that it is statistically likely that the true BCVAP is "somewhere in between" 48.4% and 53.8%.

---

[4] In doing so, Plaintiffs omit highly relevant context from Dr. Trende's deposition showing that this line of questions is solely about the threshold for statistical significance, not legal confidence. *See* DE164-3 at 113-116. Plaintiffs also ignore that Defendants' argument is precisely the opposite: that it is impossible to make a probability statement about a given outcome when that outcome is contained within the confidence interval. *See* DE166 at 27-28.

DE164-13 at 196:8-12. But we have "no way to tell where" in that range "the true value is likely to be." DE164-22 at 3; DE164-18 at 73:18-74:5 ("We don't know the true value of the data"). Nor can we conclude that "values in the middle" are "more probable than values near the extremes." DE164-22 at 3; DE164-18 at 81:20-82:1-4 (We "can't assign a likelihood function," like 50% likely, to the point estimate.). In sum, because Plaintiffs have drawn districts in which the CVAP estimates fall within the "interval range," that data alone—as a matter of basic statistics—cannot carry their burden of proving that SD7's CVAP is "more likely than not" majority-black.[5]

This failure of proof is of their own making. Plaintiffs could have accounted for the margin of error by analyzing SD7 using a statistical method like the Bayesian approach that permits probability statements, DE164-18 (Oskooii Depo) at 37:7-12, or by creating an illustrative district with a BCVAP of at least 52.7%. But they chose not to. Thus, Plaintiffs have not demonstrated that SD7 in Plans 1, 2, and 2A is more likely than not majority-BCVAP. This, independently from the fact that SD7's BVAP is under 50%, merits summary judgment with respect to these three plans.

---

[5] This is only exacerbated by Plaintiffs' failure to account, or even acknowledge, that disproportionately disenfranchised black felons will necessarily lower the pool of eligible voters in SD7, as their experts admit. *See* DE164-18 at 127:9-11; DE164-13 at 208:6-7. Plaintiffs efforts to use voter registration data to sweep under the rug their own expert's felon data (as well as their inadequate CVAP data) ignores that voter registration data changes every month and goes against Plaintiffs' intended goal of capturing the eligible voting population.

### III. Plan 3 Subordinates Traditional Redistricting Principles To Race.

All that remains is the baby dragon district. DE166 at 33.



Before submitting his initial expert report, Mr. Fairfax had already drawn a plan containing this 50.04% BVAP district, but he held it back because, he says, it was not his "preferred plan." DE164-13 at 179:9-21. Giving it a quick glance with demographic data superimposed, it is plain to see why. Race predominates in SD7. As shown above, SD7 includes all but three of the thirty-five highest-BVAP precincts in the four split counties. DE172 at 14. Plaintiffs' assurance that Mr. Fairfax's "express [racial] target" received "equal weighting" when balanced against traditional districting principles rings hollow. DE172 at 41-42. Mr. Fairfax used false balances when weighing race against Alabama's traditional districting principles. There was no "back and forth." DE164-13 at 217:12-218:1. Race always won.

13

First, race predominated over avoiding county and precinct splits. Plan 3 splits 21 counties, two more than the Enacted Plan does. DE164-9 at 36. SD7 alone splits four counties. No other district in Plan 3 or the Enacted Plan splits that many. Was this the product of balancing county splits against compactness, perchance, or a back and forth between county splits and incumbency protection? Of course not. Splitting counties was necessary to achieve the racial target. Dr. Trende's unrebutted testimony explains that the *only way* to achieve a 50% BVAP district in the Huntsville region is to split four counties. DE164-2 at 33. That's because selecting *all* of the highest BVAP precincts in Morgan, Madison, and Limestone Counties will fail to yield a district with a BVAP above 50%. *Id.* Similarly, SD7 splits four precincts. *Id.* at 28. If any of these four were kept whole, SD7's BVAP would drop below 50%. *Id.* This is a "textbook example" of subordinating traditional principles to "an announced racial target." *Cooper v. Harris*, 581 U.S. 285, 300-01 (2017).

Second, race predominated over compactness and incumbency protection. SD7's compactness is near the very bottom of the pile in Plan 3. DE164-2 at 25. And the area of the State where Plaintiffs allege vote dilution sees severely worse compactness scores on average than in the Enacted Plan. Plan 3 also pairs two incumbents in neighboring SD8. DE164-9 ¶78. Does compactness suffer because, during the balancing process, Mr. Fairfax gave greater weight to avoiding county splits? Obviously not. Or did he pair incumbents in order to make the Plan more compact?

14

No again. The pattern is unmistakable. When Plaintiffs' inserted the goal of adding an additional majority-minority district in the Huntsville area, the only "trade off" made was to downgrade as many traditional districting principles as necessary in order to hit the racial target. DE164-13 at 217:18. On this record, SD7 is "unexplainable on grounds other than race." *Alexander*, 144 S. Ct. at 1236.

As a final matter, the fact that SD7's BVAP in the racially gerrymandered Plan 3 barely exceeds 50% does not create a "triable dispute" on the issue of "numerosity" that precludes summary judgment with respect to the first three plainly deficient plans. DE172 at 22, 27 n.4. Otherwise, §2 plaintiffs could always cobble together bits and pieces from any number of fatally flawed illustrative plans to avoid summary judgment with respect to any specific illustrative plan. The "exacting requirements" of the *Gingles* preconditions would be illusory. *Allen v. Milligan*, 599 U.S. 1, 30 (2023). Here, the undisputed record reveals fatal flaws in each of Plaintiffs' plans. None should save the other from rejection by this Court, and none should proceed to trial.

## CONCLUSION

The Court should grant Secretary Allen summary judgment on Plaintiffs' Huntsville-area claim of vote dilution.

Steve Marshall
  *Attorney General*

*/s Edmund G. LaCour Jr.*
Edmund G. LaCour Jr. (ASB-9182-U81L)
  *Solicitor General*

James W. Davis (ASB-4063-I58J)
  *Deputy Attorney General*

Soren Geiger (ASB-0336-T31L)
  *Assistant Solicitor General*

Charles A. McKay (ASB-7256-K18K)
Misty S. Fairbanks Messick (ASB-1813-T71F)
Richard D. Mink (ASB-4802-M76R)
Benjamin M. Seiss (ASB-2110-O00W)
Brenton M. Smith (ASB-1656-X27Q)
  *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama  36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Soren.Geiger@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Charles.McKay@AlabamaAG.gov
Richard.Mink@AlabamaAG.gov
Misty.Messick@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov
Brenton.Smith@AlabamaAG.gov

**Counsel for Secretary of State Allen**

## CERTIFICATE OF SERVICE

I certify that on August 2, 2024, I electronically filed the foregoing notice with the Clerk of the Court using the CM/ECF system, which will send notice to all counsel of record.

/s/   Edmund G. LaCour Jr.
Counsel for Secretary Allen
