FILED

2024 Sep-20  PM 04:11
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

KHADIDAH STONE, *et al.*,                )
                                         )
    *Plaintiffs*,                         )
                                         )        No. 2:21-cv-1531-AMM
v.                                       )
                                         )
WES ALLEN, *et al.,*                     )
                                         )
    *Defendants*.                        )


## PLAINTIFFS' MOTION IN LIMINE TO PRECLUDE CERTAIN
## TESTIMONY OF DR. SEAN TRENDE

Plaintiffs move this Court for an order precluding three areas of proffered testimony by Defendant's expert Dr. Sean Trende that is based on unreliable methods. *See United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc). Specifically, Defendants cannot carry their burden to demonstrate the reliability and helpfulness of Dr. Trende's testimony as to: (i) adjusting the eligible voting population in Plaintiffs' illustrative districts to account for felony disenfranchisement, (ii) estimating the illustrative districts' Black citizen voting-age population percentage, and (iii) whether the illustrative districts are compact or reasonably configured.

## LEGAL STANDARD

The "Federal Rules of Evidence 'assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (quoting *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. at 579, 597 (1993)). "The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion." *Frazier*, 387 F.3d at 1260.

Federal Rule of Evidence 702 requires that expert testimony "is based upon sufficient facts or data, is the product of reliable principles and methods, and [that] the witness has applied the principles and methods reliably to the facts of the case." *Frazier*, 387 F.3d at 1259 (cleaned up). A court must exclude "opinion evidence that

1

is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Four illustrative factors guide courts assessing the reliability of an expert's methods under *Daubert*: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Frazier*, 387 F.3d at 1262.  While "not all of [these factors] will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion," *id.,* "[t]he trial judge in *all* cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted," Fed. R. Evid. 702 advisory committee's note (2000 amends.) (emphasis added).

## ARGUMENT

I.     **Dr. Trende's Attempts to Lower the Eligible Voting Population in Plaintiffs' Illustrative Districts by Speculating on the Number and Racial Makeup of Individuals with Disqualifying Felony Convictions within Each District Is Unreliable.**

Dr. Trende speculates that none of Plaintiffs' expert Tony Fairfax's illustrative Huntsville districts would have a majority-Black eligible voting population if individuals with disqualifying felony convictions were removed from the count. ECF 164-1 (Trende Rep.) at 21. But Dr. Trende admittedly lacks any data informing him how many individuals—or the race and ethnicity of those

individuals—residing *within* these districts are impacted by a disqualifying felony conviction, or any scientific basis to make a reliable estimation of these figures. ECF No. 164-3 (Trende Dep.) at 125:6-18. His uninformed and unprecedented attempt to apply state-level numbers to specific districts represents the type of "unscientific speculation" "connected to existing data only by the *ipse dixit* of the expert" that courts must reject. *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1306 (11th Cir. 2014); *Joiner*, 522 U.S. at 146.

Plaintiffs' expert Dr. Traci Burch provided an estimate from the Sentencing Project that Black Alabamians face higher rates of felony disenfranchisement than Alabamians as a whole: 14.7% as compared to 8.6%. ECF No. 164-20 (Burch Rep.) at 18. Dr. Trende seized upon this figure to baselessly assume that people with disqualifying felony convictions are evenly distributed across the state, by race and total numbers, and thus that disqualifying felony conviction rates in the illustrative districts mirror the state-level rates. Trende Dep. 125:6-18. Dr. Trende misapplies these estimates without even knowing how they were derived. *Id.* at 128:16-18.

Dr. Trende's sole rationale for this assumption is his unfounded speculation that Dr. Burch meant that data to apply to the Huntsville and Montgomery areas in the same proportions as statewide. Trende Dep. 125:12-18 ("since I assumed that Dr. Burch is not just talking about Alabama in general, but the areas that are of interest in this case, uhm, I used her statewide estimate of the voting eligible

population."). Yet he admits this speculation is not based upon anything she wrote in her report. Trende Dep. 126:6-15. Courts exclude this type of unscientific speculation that presents "simply too great an analytical gap between the data and the opinion offered." *Joiner*, 522 U.S. at 146; *Milligan v. Allen*, 691 F. Supp. 3d 1343, 1354 (N.D. Ala. 2023) (excluding expert testimony because it was based on "*ipse dixit*" opinions, which led to a "cursory conclusion").

Dr. Trende must speculate because he does not possess any data on disqualifying felony convictions on a more local level than statewide, and ignores key data in executing his guesswork. Trende Dep. 125:6-18. While Dr. Trende has testified in at least 21 redistricting cases,[1] he has never opined that the eligible voting population of a *Gingles* I district should exclude people with disqualifying felony convictions. *Id.* at 129:19-131:11. And he does not "know if it's possible or not" to conduct this analysis, indicating he has never seen another expert conduct this analysis either. *Id.* at 154:12-15.

Dr. Trende's haphazard estimates are also revealed by his failure to consider relevant data. *See, e.g., Chapman*, 766 F.3d 1296 at 1311 (affirming exclusion of expert testimony based on failure to consider alternative relevant facts and causes). Dr. Trende could have reviewed voter registration data—which necessarily does not

---

[1] Dr. Trende's CV lists 21 cases relating to "racial gerrymandering," "political gerrymandering," "map drawing," and the Voting Rights Act. Trende Rep. 32-34.

include individuals with disqualifying felony convictions—to assess whether Black voters could still comprise a majority in the illustrative district, but he did not. Trende Rep. 21; *cf.* ECF 164-9 (Fairfax Reb. Rep.) ¶ 21. This omission shows his analysis was uncareful and unscientific.

Dr. Trende's unscientific method has not been and cannot be tested, subjected to peer review and publication, has no known or potential rate of error, and is not generally accepted in the scientific community. *Cf. Frazier*, 387 F.3d at 1262. It lacks a "sufficiently verifiable, quantitative basis," *id.* at 1265, and should be excluded.

## II.   Dr. Trende's Methods for Estimating the Illustrative Huntsville Districts' BCVAP Are Unreliable.

Dr. Trende also employs several different methods to attempt to reach a specific Black Citizen Voting Age Population ("BCVAP") estimate for Mr. Farifax's illustrative Huntsville districts.[2] Dr. Trende's first method applies the overall citizenship rate for a census block group to the voting-age population

---

[2] These methods include Trende's "Full Method 1," "Capped Method 1," "Method 2, Population Weighted," and "EI Expand." ECF 164-2 (Trende Supp. Rep.) at 4; Trende Dep. 93:19-94:2.

("VAP") of the census blocks.[3] Trende Rep. 19.[4] His second method examines the percentage of the relevant VAP contained in the district, and then applies that percentage to the citizen voting-age population ("CVAP") of the block group. Trende Rep. 20. This second method can be applied by assuming that both the BCVAP and total CVAP are apportioned similarly to the VAP within the district, or by weighting the BCVAP and CVAP separately.[5] *Id.*

These estimation methods lack scientific validity and cannot be properly applied to the facts in issue because they unjustifiably fail to account for racial and ethnic citizenship-rate disparities, or they baselessly assume—disregarding contrary evidence—that Black voting-age population ("BVAP") is equally distributed across the census blocks nested within census block groups.

First, Dr. Trende's BCVAP estimation methods fail to consider that citizenship rates differ by race and ethnicity, inaccurately assuming that citizenship rates are equal across all races and ethnicities. Trende Dep. 88:17–23. Dr. Trende applies a single, blended citizenship rate for all races and ethnicities, despite

---

[3] Census blocks are the smallest geographic area for which the Census Bureau collects and tabulates decennial census data. Census block groups, which are a combination of census blocks, are the next level above census blocks in the geographic hierarchy and are the smallest geographic entity for which the Census Bureau's American Community Survey (ACS) publishes data. "Census Blocks and Block Groups," at 1, https://www2.census.gov/geo/pdfs/reference/GARM/Ch11GARM.pdf.

[4] Dr. Trende also employs a variation of this method that "artificially cap[s]" the CVAP number in block groups so that a block group's CVAP does not exceed its VAP. Trende Rep. 19-20.

[5] Dr. Trende calculates these methods both manually and by using the eiExpand package in R. Trende Rep. at 20-21.

admitting that he lacks "any real justification for doing so." Trende Rep. 19. He concedes that if the Black citizenship rate were significantly higher than the overall citizenship rate in the Huntsville region, the true BCVAP point estimate would be "at least somewhat higher than using [his methods]." Trende Dep. 89:24–90:6.

The Census Bureau's American Community Survey ("ACS") data shows this to be true. The illustrative Huntsville districts' Black citizenship rate is significantly higher than the overall citizenship rate, which Dr. Trende does not and cannot dispute. *See* ECF 164-8 (Fairfax Appx.) at 98–105 (ACS citizenship rate for Black voting-age population is 99.96% and citizenship rate for non-Black voting age-population is 87.44% in Plan 1's Illustrative Huntsville District); ECF 164-10 (Fairfax Supp. Rebuttal Appx.) at 11–17, 150–157; Trende Dep. 88:24–89:17, 96:9–15. Dr. Trende's disregard of reliable ACS data showing racial and ethnic citizenship rate disparities unjustifiably depresses the Black citizenship rate, and artificially lowers his BCVAP estimates.

Second, Dr. Trende's BCVAP estimation methods fail to incorporate available racial and ethnic data at the census-block level, baselessly treating all blocks within a block group as having the same racial and ethnic composition. Because CVAP data is reported only at the larger block-group level and even larger levels of geography, when the illustrative districts' boundaries split block groups, only the more granular block-level VAP data is available to measure the racial and

ethnic composition of the blocks that are inside the district boundaries. Yet Dr. Trende uses only total VAP (total voting age-population of all races and ethnicities) data at the block level for his BCVAP estimates, disregarding the available BVAP data. Trende Dep. 86:11-21. In failing to use BVAP data, he cannot account for uneven distributions of BVAP within blocks nested inside block groups. When the blocks inside the illustrative Huntsville district have a larger Black population than the blocks outside the district, Dr. Trende's BCVAP estimates do not reflect it.

In excluding this data, he did not "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in [his] field," but, rather, excluded the data simply because he "believe[s]" the method was described in an unknown district court opinion, and because an expert in one of the cases he participated in used that method. Trende Dep. 47:2-15 ("this metric I believe comes out of a district court case in 11"), 54:21-55:7, 65:21-66:2, 75:24-76:2, 76:14-77:2, 79:22-80:6, 88:2-7 ("Q: Why are you using the total citizenship rate percentage as opposed to the Black citizen voting age? A: Because that is the technique that was described in the district court opinion that I was following."), 91:21–92:1, 92:16-21. However, he does not name the case,[6] describe the court's reasoning, or explain why he agrees with it. *See id.*

---

[6] Plaintiffs' counsel has been unable to confirm that there is a district court opinion from the Eleventh Circuit which uses such a method.

Dr. Trende's BCVAP estimates should be excluded.

III.   **Dr. Trende's Testimony Regarding the Compactness of the Black Population within the Illustrative Districts is based on Unreliable Methods.**

Dr. Trende also attempts to assess the compactness of the Black population in Mr. Fairfax's illustrative districts by employing his own eyeball assessment of two maps he created—a dot density map and choropleth map—which purport to show the location of Black population. Trende Rep. 22-25, 27; ECF 164-2 (Trende Supp. Rep.) 6-10, 17-22; Trende Dep. 214:2-20,[7] 218:17-219. This eyeball assessment does not constitute reliable expert testimony based on any consistent or verifiable methodology. Dr. Trende also fails to provide a reliable opinion on the configuration of the districts because he employs a one-factor analysis that disregards other key districting considerations.

---

[7] "Q: Is your determination that the Black population in Huntsville and Decatur are discrete groups based on anything other than your eyeball assessment of their location on the map?

A: No. Since the courts have been satisfied with visual inspections of districts for purposes of determining compact—the reasonable compactness or reasonability of the district shape, I would imagine the same test could apply to population compactness, as well, especially since, to my knowledge, no state has a population compactness demand on its, ah—its own districts. So you don't even have a benchmark to compare to mathematically as you would with district compactness. And even within the terms of the VAR, the compactness of the white population is an irrelevant factor. It's only the population of the minority group that figures into the test." Trende Dep. at 214:2-20.

**A. Dr. Trende's Black population compactness testimony is unreliable.**

Dr. Trende's methodology for determining Black population compactness is unreliable because his sole method is his own subjective visual assessment of two maps he created: a shaded choropleth map and dot density map. Trende Rep. 22-25; Trende Supp. Rep. 6-10, 17-20.[8] His opinion lacks a "sufficiently verifiable, quantitative basis," and depends on the eye of the beholder. *Frazier*, 387 F.3d at 1265.

For example, Dr. Trende avers to the reader that they "can further see the disconnected nature of the population of the district" in the dot density maps, criticizing among other things the presence of the Wheeler National Wildlife Refuge between denser areas of population. Trende Rep. 23-24. He makes this critique without explaining why the *Enacted Plan* sandwiches the Wheeler National Wildlife Refuge between populations in a single district. *See* Fairfax Appx. 21. Dr. Trende continues with an unspecified visual methodology, telling the reader that they "can see" the Black population's distribution within the illustrative Huntsville district. Trende Supp. Rep. 6. Indeed, they can. Yet his report provides no qualitative point of comparison for what a compact population would look like within the same

---

[8] The choropleth map shades precincts on a color scale from 30 to 70 percent BVAP. Trende Rep. 23. The dot density maps include dots for every 10 Black citizens and dots for every 10 white citizens, with either the Black-citizen dots overlaid on top of the white-citizen dots, or vice versa. *Id.* at 24-25; Trende Supp. Rep. 6-9, 18-22.

district boundaries, or in any district at all;[9] nor does this method quantify population compactness in any way. When asked in deposition if mere visuals were enough to assess population compactness, Dr. Trende testified, "I would assume it would be acceptable here, as well, especially when you don't have a readily available reference to use for mathematical computations like you do for the Reock or Polsby-Popper score." Trende Dep. 218:23-219:3. But "[t]he trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" *Frazier*, 387 F.3d at 1265 (quoting Fed. R. Evid. 702 advisory committee's note (2000 amends.)).

Dr. Trende made no attempt to identify any communities of interest which may connect the Black population he claims are "discrete groups," and he did not compute the distance between these "discrete groups." Trende Dep. 174:8–17 (Dr. Trende did not analyze communities of interest because he does not think he "[has] the knowledge base in Alabama to do that"), 213:5-214:1. Perhaps he resorts to this musing because another court recently found another version of his attempt to criticize the compactness of Black population "fundamentally flawed," *Nairne v. Ardoin*, 22-CV-178-SDD-SDJ, 2024 WL 492688, at *22 (M.D. La. Feb. 8, 2024), but that makes his subjective musing no more reliable.

---

[9] At most, Dr. Trende criticizes the omission of the city of Madison from Plaintiffs' renderings of the illustrative Huntsville district. Trende Rep. 23. Yet the Enacted Plan also isolates the city of Madison in a district separate from Decatur and downtown Huntsville, so it is unclear how Dr. Trende's visual inspection methodology distinguishes the omission of Madison in one map from the omission of Madison in the other. *See* Fairfax Appx. 21.

Dr. Trende's visual assessment cannot be tested, has not been subjected to peer review and publication, has no known or potential rate of error, and is not generally accepted in the scientific community. *Cf. id*. at 1262. His conclusory opinion also encroaches on the Court's role. "The use of any eyeball test to assess irregularities . . . [is] a matter for the factfinder." *Alpha Phi Alpha Fraternity, Inc. v. Raffensperger*, No. 1:21-CV-5337-SCJ, 2023 WL 5674599, at *11 (N.D. Ga. July 17, 2023) (internal quotations omitted). This testimony should be excluded.

### B. Dr. Trende's testimony that the illustrative Huntsville districts are not reasonably configured is unreliable.

"Districting involves myriad considerations" and "quantifying, measuring, prioritizing, and reconciling these criteria requires map drawers to make difficult, contestable choices." *Milligan*, 599 U.S. at 35 (cleaned up). Yet after failing to analyze Fairfax Map 1's adherence to *any* traditional redistricting principles,[10] Dr. Trende testified he could determine whether a district is reasonably configured "on the basis of one criterion"—the compactness of the Black population. Trende Dep.

---

[10] Dr. Trende did not analyze any of the illustrative plans' adherence to contiguity; respect for city and town lines, census-designated places, landmark areas, natural boundaries, or communities of interest; avoidance of incumbency pairings, preservation of the cores of prior districts, or population deviation. Trende Dep. 165:1-169:12. The only traditional redistricting principle he analyzed for Map 2 was district compactness. Trende Supp. Rep. 2, 10-13. The only traditional redistricting principles he analyzed for Map 3 were district compactness and county splits. Trende Supp. Rep. 17, 22-24, 29-30. Dr. Trende did not analyze Map 1's district compactness or respect for county lines. Trende Dep. 211:9-11. Dr. Trende's opinions that minority population compactness and district compactness alone (Plan 2); and minority population compactness, district compactness, and county splits alone (Plan 3); render illustrative districts not reasonably configured, are likewise unreliable.

202:18-203:15, 211:19-24. This testimony "cherry-picks" data and fails to account for the "myriad considerations" map drawers must "reconcil[e]." *See In re Zantac (Ranitidine) Prod. Liab. Litig.*, 644 F. Supp. 3d 1075, 1158 (S.D. Fla. 2022) (collecting cases). On this precise topic, the Supreme Court recently found analysis of alleged racial gerrymandering that failed to take into consideration all the relevant traditional redistricting criteria unreliable. *See Alexander v. S.C. State Conf. of the NAACP*, 144 S. Ct. 1221, 1243 (2024) (declining to consider "flawed" expert testimony that "ignored certain traditional districting criteria such as geographical constraints") (citation omitted); *Milligan*, 599 U.S. at 34 (excluding expert testimony that "ignored certain traditional districting criteria").

When Dr. Trende testified regarding the compactness of the Black population in the *Nairne* plaintiffs' illustrative districts, the court found his testimony "oversimplistic" for failing to consider communities of interest, traditional boundaries, and equal populations among districts, all traditional redistricting principles he likewise fails to consider here. *Nairne*, 2024 WL 492688, at *22 ("The drawing of a VRA compliant map balances multiple criteria and is considerably more complicated and nuanced than suggested by the oversimplistic and unhelpful compactness measure advanced by Trende."). The *Nairne* Court explained, "Existing law does not require a granular analysis of the distribution of minority populations within an illustrative district to the exclusion of other criteria and

priorities." *Id.* (criticizing Dr. Trende's minority population compactness method for failing to consider precinct lines, political subdivision boundaries, geographic features, or communities of interest).

The Court should exclude Dr. Trende's unreliable testimony that the illustrative Huntsville districts are not reasonably configured.

## CONCLUSION

Plaintiffs respectfully request that this Court preclude Dr. Trende from offering testimony on any of the above-referenced topics.

DATED this 20th day of
September, 2024

Respectfully submitted,

/s/ Alison Mollman
Alison Mollman
Laurel Hattix
AMERICAN CIVIL LIBERTIES UNION OF
ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 265-2754
amollman@aclualabama.org
lhattix@aclualabama.org

/s/ Deuel Ross
Deuel Ross*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street NW Ste. 600
Washington, DC 20005
(202) 682-1300
dross@naacpldf.org

Leah Aden*
Stuart Naifeh*
Kathryn Sadasivan (ASB-517-E48T)
Brittany Carter*
Ashley Burrell*
Colin Burke*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
laden@naacpldf.org
snaifeh@naacpldf.org
ksadasivan@naacpldf.org
bcarter@naacpldf.org
aburrell@naacpldf.org
cburke@naacpldf.org

/s/ Davin M. Rosborough
Davin M. Rosborough*
Dayton Campbell-Harris*
Theresa J. Lee*
Sophia Lin Lakin*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
(212) 549-2500
drosborough@aclu.org
dcampbell-harris@aclu.org
tlee@aclu.org
slakin@aclu.org

Jacob van Leer*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th St. NW
Washington, DC 20005
jvanleer@aclu.org

/s/ Sidney Jackson
Sidney Jackson (ASB-1462-K40W)
Nicki Lawsen (ASB-2602-C00K)
WIGGINS, CHILDS, PANTAZIS,
FISHER & GOLDFARB
301 19th Street
North Birmingham, AL 35203
(205) 314-0500
sjackson@wigginschilds.com
nlawsen@wigginschilds.com

/s/ Jack Genberg
Bradley E. Heard*
Jack Genberg*
Jess Unger*

15

David Dunn*
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000
david.dunn@hoganlovells.com

Blayne R. Thompson*
HOGAN LOVELLS US LLP
609 Main St., Suite 4200
Houston, TX 77002
(713) 632-1400
blayne.thompson@hoganlovells.com

Michael Turrill*
Harmony R. Gbe*
James W. Ettinger*
HOGAN LOVELLS US LLP
1999 Avenue of the Stars Suite 1400
Los Angeles, CA 90067
(310) 785-4600
michael.turrill@hoganlovells.com
harmony.gbe@hoganlovells.com
jay.ettinger@hoganlovells.com

SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Avenue, Suite
340 Decatur, GA 30030
(404) 521-6700
bradley.heard@splcenter.org
jack.genberg@splcenter.org
jess.unger@splcenter.org

Avner Shapiro*
SOUTHERN POVERTY LAW CENTER
1101 17th Street NW
Suite 510
Washington, DC 20036
240-890-1735
avner.shapiro@splcenter.org

Jessica L. Ellsworth*
Shelita M. Stewart*
Amanda N. Allen*
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600
jessica.ellsworth@hoganlovells.com
shelita.stewart@hoganlovells.com
amanda.n.allen@hoganlovells.com

*Attorneys for Plaintiffs*

*Admitted pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on September 20, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record in this case.

/s/ Davin M. Rosborough
Davin M. Rosborough
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St.
New York, NY 10004
(212) 549-2500
drosborough@aclu.org
