

FILED

2024 Oct-04  AM 11:42
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

KHADIDAH STONE, et al.,

       *Plaintiffs*,

    vs.

WES ALLEN, et al.,

       *Defendants*.

Case No.: 2:21-cv-1531-AMM

**PLAINTIFFS' BRIEF IN OPPOSITION TO**
**SECRETARY ALLEN'S MOTION TO EXCLUDE SELECTED**
**TESTIMONY OF MR. ANTHONY FAIRFAX AND DR. KASSRA OSKOOII**

According to the Defendant Secretary of State, citizen voting-age population (CVAP) is irrelevant to the *Gingles* 1 inquiry where "the illustrative district lacks a majority-minority voting-age population," and the use of a Black CVAP point estimate derived from the 5-year American Community Survey (ACS) is untested and unreliable. The former depends on circular reasoning and defies binding precedent, and the latter ignores the many decisions endorsing the reliability of CVAP point estimates to meet the *Gingles* 1 numerosity requirement.

When the relevant majority-minority voting-age population (VAP) *is* the Black CVAP due to meaningful citizenship disparities in relevant population groups, *see Negron v. City of Miami Beach*, 113 F.3d 1563, 1569 (11th Cir. 1997), courts need not take account of the minority population's level of VAP, *see, e.g.*, *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 402 (2006) ("*LULAC*") (holding that Latinos having a VAP majority in a district "is not dispositive, since the relevant numbers must account for citizenship"). The "weight of authority indicates that a CVAP majority will typically constitute an effective majority" for *Gingles* 1. *United States v. Vill. of Port Chester*, 704 F. Supp. 2d 411, 440 (S.D.N.Y. 2010).

*Second*, the Secretary attempts to repackage an unsuccessful summary-judgment argument about when CVAP should be used as the proper *Gingles* 1 metric into an argument about methodological novelty. Setting aside this distraction and engaging in the actual methodological issue, the Secretary has little to show. "ACS

data *is* Census data," *Benavidez v. City of Irving*, 638 F. Supp. 2d 709, 729–30 (N.D. Tex. 2009), and "[t]he presumption is that census figures are continually accurate," *Johnson v. DeSoto Cnty. Bd. of Comm'rs,* 204 F.3d 1335, 1341 (11th Cir. 2000).

The Supreme Court relied upon an ACS CVAP point estimate in its *Gingles* 1 inquiry in *LULAC*, 548 U.S. at 428, and courts have repeatedly rejected arguments about margins of error extending below 50% CVAP, *see, e.g.*, *Kumar v. Frisco Indep. Sch. Dist.*, 476 F. Supp. 3d 439, 492–94 (E.D. Tex. 2020); *Benavidez*, 638 F. Supp. 2d at 721. When plaintiffs present another reliable data source supporting an eligible voting majority in the illustrative district—here, voter registration figures from the Secretary—this strengthens the reliability of the CVAP estimate. *See, e.g.*, *Johnson*, 204 F.3d at 1342 (accepting voter registration data "as credible and as reliable" for a *Gingles I* analysis); *United States v. Osceola Cnty.*, 475 F. Supp. 2d 1220, 1230 & n.18 (M.D. Fla. 2006); *cf. also Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1307 (11th Cir. 2020) (analyzing voter registration statistics to determine which racial group constituted the majority of the electorate).

The Court should deny the motion.

## **ARGUMENT**

I.   **Plaintiffs' Experts' CVAP Testimony is Relevant to the *Gingles* 1 Inquiry.**

In *LULAC*, the Supreme Court explained that for purposes of the first *Gingles* precondition, "the relevant numbers *must* include citizenship" because "only eligible

voters affect a group's opportunity to elect candidates." 548 U.S. at 429. Both before and after *LULAC*, the Eleventh Circuit and others have required the use of CVAP in *Gingles* 1 analyses, *see, e.g.*, *Reyes v. City of Farmers Branch*, 586 F.3d 1019, 1023 (5th Cir. 2009); *Negron*, 113 F.3d at 1569 (holding that CVAP is the relevant *Gingles* 1 figure unless there is no "significant difference" in citizenship rates); *Romero v. City of Pomona*, 883 F.2d 1418, 1425 (9th Cir. 1989), *abrogated in part on other grounds by Townsend v. Holman Consulting Corp.*, 914 F.2d 1136 (9th Cir. 1990).

Despite *LULAC*, the Secretary contends—citing *Bartlett v. Strickland*, 556 U.S. 1, 18 (2009)—that BVAP provides the correct metric. But *Bartlett* neither explicitly nor implicitly overruled *LULAC*. Rather, citizenship "was not before the Court in *Strickland*," and the question it addressed "was *quantitative*, how many— not *qualitative*, what kind of people." *Reyes*, 586 F.3d at 1023. Moreover, throughout Justice Kennedy's plurality opinion, he "discusses whether a minority population 'could constitute a compact voting majority,'" implying that "the inquiry must take account of both citizenship and voting age." *Id.*; *see also Bartlett*, 556 U.S. at 19 (citing favorably to decisions from appellate courts that recognized CVAP as the proper metric under *Gingles* 1); *id.* at 27 (Souter, J., dissenting) ("In the plurality's view, only a district with a minority population making up 50% or more of the citizen voting age population (CVAP) can provide a remedy to minority voters . . . .'").

Alabama's argument also contradicts the position that it just recently took as amicus before the Supreme Court: that the Court "has made clear in litigation under Section 2 of the Voting Rights Act that it is not enough to say that a minority group . . . forms a bare majority of the voting-age population; rather, the relevant numbers must include citizenship . . . ." Defs.' Resp. to RFAs at 2 (internal citations omitted) (Ex. A). Similarly, the Secretary's expert Dr. Trende co-authored a memorandum to the Arizona Independent Redistricting Commission informing it that "[t]o assess compliance with the Voting Rights Act, an analyst must identify the count of citizens who are at least 18 years of age and are citizens of the United States."[1]

Therefore, under both binding case law and the Secretary's own admission, testimony by Plaintiffs' experts regarding CVAP is relevant to the *Gingles* 1 inquiry.

## II.   Plaintiffs' Experts' CVAP Analysis Meets Accepted Reliability Criteria.

### A.   The Secretary does not raise a real *methodological* dispute about using ACS to determine CVAP, and his *legal* argument about the proper method of proof is not well-founded.

The Secretary first argues that Plaintiffs' experts' use of CVAP figures from the ACS is novel and "untested," because they cannot find other cases where Plaintiffs met *Gingles* 1 by drawing a reasonably configured district with a majority

---

[1] *See* Memorandum from Stephen Ansolabehere, Ph.D., David Sutton, Sean Trende to Ariz. Indep. Redistricting Comm'n re: Characteristics of Legislative District (LD) Map 17.0 at 2-3 (Jan. 20, 2022), https://irc.az.gov/sites/default/files/meeting-files/IRC%2520Comprehensive%25202022%2520Report%2520FINAL_0.pdf [https://perma.cc/782B-W6VU] (pp. 104–05 of document).

Black CVAP population but a Black VAP under 50%. *See* Br. 5–7. This mischaracterizes the case—Plaintiffs have offered *Gingles* 1 maps with BVAP and BCVAP majorities. *See* Doc. 164-9. But putting this aside, the Secretary's argument has nothing to do with the *methodology* at issue—i.e., whether using multi-year ACS figures to derive a CVAP point estimate as a technique is "novel" or tested. ACS data "is routinely relied upon in § 2 cases." *Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1392–93 (E.D. Wash. 2014); *see also Benavidez*, 638 F. Supp. 2d at 729–30 ("ACS data is thoroughly documented [and] has a high degree of accuracy"). As Dr. Oskooii explained, the 5-year ACS estimates are "the gold standard and best source of reliable data to estimate the proportion of eligible voters within electoral jurisdictions," Doc. 164-17 ¶ 25. Dr. Trende even conceded there was no alternative data source for determining CVAP. Trende Dep. (Doc. 164-3) at 38:10–18.

Rather, this is a transparent attempt by the Secretary to fit a legal argument about burden of proof—whether Plaintiffs can meet *Gingles* 1 by drawing a reasonably configured district with a majority Black CVAP population if the Black VAP is under 50%—into an expert methodology framework. His argument misses the mark. Yet were the Court to engage about the proper manner of proof on its merits, it should reject the Secretary's argument.

As a factual matter, the Secretary asserts that he is aware of "no reported case [that] has relied upon CVAP estimates to find that an illustrative district with a

BVAP under 50% satisfies *Gingles* 1." Br. 6. But he ignores cases that rely solely on CVAP without considering or even reporting on the VAP of the relevant group at all.[2] He also ignores the cogent point Dr. Trende made in a memorandum to the Supreme Court of Virginia: "the presence of non-citizen Latinos and Asian-Americans in a district can raise the black CVAP share above the black VAP share, making it a useful metric for assessing a district's actual electorate."[3]

The Secretary also fails to explain why BVAP carries any relevance if BCVAP is "the proper statistic for deciding whether a minority group is sufficiently large and geographically compact." *Negron,* 113 F.3d at 1569; *accord LULAC*, 548 U.S. at 429 (explaining that a majority-Latino-VAP district was technically majority-minority, "but only in a hollow sense, for the parties agree that the relevant numbers must include citizenship"); *McConchie v. Scholz*, 577 F. Supp. 3d 842, 858 (N.D. Ill. 2021) (rejecting the relevance of a VAP majority of the minority group when CVAP was under 50%). In other words, the VAP numbers carry little weight when CVAP is the proper metric to examine *Gingles* 1 numerosity.

---

[2] *See, e.g.*, *Coca v. City of Dodge City*, No. 6:22-CV-01274-EFM, 2024 WL 3360446, at *8–10 (D. Kan. July 10, 2024); *Harding v. Cnty. of Dallas*, 336 F. Supp. 3d 677, 689–90 (N.D. Tex. 2018), *aff'd*, 948 F.3d 302 (5th Cir. 2020); *Montes*, 40 F. Supp. 3d at 1392; *Benavidez*, 638 F. Supp. 2d at 722.

[3] *See* Memorandum from Bernard Grofman and Sean Trende to the Chief Justice and Justices of the Supreme Court of Virginia re: Redistricting Maps at 8 (Dec. 27, 2021), https://www.vacourts.gov/courts/scv/districting/2021_virginia_redistricting_memo.pdf [https://perma.cc/U46F-HRDK]

The Court should reject the Secretary's attempt to create a one-way ratchet—permitting reliance on CVAP data only when used to thwart a Section 2 plaintiff's claims, but requiring a VAP majority in all cases, even when irrelevant to analyzing whether minorities' have the ability to elect. Regardless, the Secretary's argument lacks any nexus to expert methodology and should be discarded at this stage.

**B.    CVAP Data from the 5-Year ACS as used by Plaintiffs' experts is reliable, with low error margins, and the point estimate is sufficient and commonly accepted for *Gingles* 1 purposes.**

The Secretary argues that because none of the experts can "calculate the precise margin of error" for the illustrative District 7 CVAP, this is "disqualifying," Br. 8, and that if the lower end of the confidence interval for the estimate falls even a hair below 50%, a Plaintiff cannot satisfy the *Gingles* 1 preponderance standard, Br. 9–10. But he offers no Voting Rights Act (VRA) case law in support of either point, and he premises his argument on a heavily criticized law review article from 1985. He also ignores that, in case after case, courts have rejected his argument and found the five-year ACS CVAP point estimates above 50% reliable for *Gingles* 1.

1.    <u>Identifying a precise error margin for CVAP estimates is neither a requirement, nor does it render the point estimate unreliable.</u>

As a general matter, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable" and determine whether, in context, "they are reasonable measures of the reliability of expert testimony." *Kumho Tire Co. v. Carmichael*, 526

U.S. 137, 152 (1999). "This means that expert testimony that does not meet all or most of the *Daubert* factors may sometimes be admissible" if the court finds that an expert "employed an accepted method" and "applied that methodology reliably." *United States v. Brown*, 415 F.3d 1257, 1268 (11th Cir. 2005); *see also United States v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004) (the *Daubert* "factors are illustrative, not exhaustive; not all of them will apply in every case").

In the case of using 5-year ACS data to determine CVAP for *Gingles* 1 purposes, it is common not to be able to calculate margins of error with absolute precision due to the need to disaggregate population data when drawing district maps. Yet this technique that "is well known and widely used without issue in many states," Fairfax Rebuttal, Doc. 164-9 ¶ 16, and courts routinely find "the ACS's estimates of CVAP sufficiently reliable for use in voting rights litigation." *Cisneros v. Pasadena Indep. Sch. Dist.*, No. 4:12-CV-2579, 2014 WL 1668500, at *8 (S.D. Tex. Apr. 25, 2014).[4] "Actions to enforce the [VRA] have [ ] used citizenship data derived from sampling." *Dep't of Com. v. New York*, 588 U.S. 752, 818 (2019) (Breyer, J., concurring in part and dissenting in part). Indeed, the U.S. Department

---

[4] *See also Kumar v. Frisco Indep. Sch. Dist.*, 476 F. Supp. 3d 439, 482 (E.D. Tex. 2020) (finding ACS CVAP data "sufficiently probative" for *Gingles* 1 purposes); *Montes*, 40 F. Supp. 3d at 1393 (explaining that although ACS "data may not be perfectly accurate, it is routinely relied upon in § 2 cases"); *Rodriguez*, 964 F. Supp. 2d at 729 ("five-year aggregation of citizenship data provided by the ACS is a reliable indicator of the citizen voting-age population"); *Fabela v. City of Farmers Branch, Tex.*, No. 3:10-CV-1425-D, 2012 WL 3135545, *4–8 (N.D. Tex. Aug. 2, 2012) (finding ACS CVAP data the "most accurate data readily available").

of Justice has notified the Census Bureau that "the CVAP data from the ACS, on which it has traditionally relied, are adequate for its enforcement of Section 2 of the Voting Rights Act." Ex. A at 5.

Here, the range of error for CVAP in Illustrative District 7 is also not entirely unknown. Mr. Fairfax estimated a very small sampling error in the block-group ACS data of ±2.6%.[5] The Secretary offers no competent evidence to indicate that any uncertainty through block group splits would drastically widen the margin of error, yet Dr. Trende still tried to inject this "unnecessary . . . additional level of probability calculations into the equation" beyond the reported sampling error. *Benavidez*, 638 F. Supp. 2d at 721. Dr. Trende does so despite having provided CVAP point estimates without any noted reservations and without confidence intervals in several cases, as well as for the Supreme Court of Virginia and Arizona Independent Redistricting Commission. Oskooii Report (Doc. 164-17) at 12–13.

More importantly, while understanding the exact bounds of the confidence interval may be important in "hypothesis testing," it has far less value in the context of arriving at a CVAP estimate for *Gingles* 1 purposes. Oskooii Dep. 197:4–19 (Doc. 164-18); *see also id.* at 40:22–41:2 ("[In] the redistricting cases that I have seen or

---

[5] This error may be even smaller, and is not Plaintiffs' "best-case scenario" as the Secretary asserts in relying on Dr. Trende's calculations, because Dr. Trende's calculations imprecisely relied on entire block groups, which Dr. Oskooii warned could lead to overinflated estimates of the margin of error. Oskooii Dep. at 218:2-17 (Doc. 164-18).

been part of, people rely on point estimates, because point estimates also are best approximation of the citizen voting age population composition, given the data."). The *Gingles* 1 inquiry is not "testing hypotheses," but determining the "best approximation of the citizen age voting population." *Id.* at 46:20–23.

Putting aside Dr. Trende's off-base and newfound assertions, Dr. Oskooii and Mr. Fairfax gave the "best approximation of [CVAP], given the best available data and the best methods of obtaining that available data," *id.* at 87:23–88:5.

> 2.   Courts consistently accept CVAP point estimates to meet the *Gingles* 1's numerosity requirement, especially when supported by additional reputable data sources such as voter registration.

The Secretary next advances another argument that courts have consistently rejected: that a particular point estimate of CVAP above 50% does not satisfy a plaintiff's burden under *Gingles* 1, particularly if the likely margin of error has any value below 50%. Br. 9–10. Rather than citing any caselaw, the Secretary relies on a 1985 article by a law professor who argued (generally, and not in a VRA context) that meeting a preponderance standard requires the *entire* confidence interval exceed that 50% threshold. *See* Br. 7–8, 10 n.4, 11 (citing Neil B. Cohen, *Confidence in Probability: Burdens of Persuasion in a World of Imperfect Knowledge*, 60 N.Y.U. L.R. 385, 400 (1985)). The Secretary's position suffers from several problems.

First, the Secretary ignores all the cases where courts have rejected this precise argument in the VRA context. *See*, *e.g.*, *Elizondo v. Spring Branch Indep. Sch. Dist.*,

No. 4:21CV1997, 2023 WL 2466401, at *4 (S.D. Tex. Feb. 13, 2023), *report and recommendation adopted*, No. 4:21CV1997, 2023 WL 2465779 (S.D. Tex. Mar. 10, 2023); *Kumar*, 476 F. Supp. 3d at 492–94; *Fabela*, 2012 WL 3135545, at *6; *Benavidez*, 638 F. Supp. 2d at 721; *see also NAACP, Spring Valley Branch v. E. Ramapo Cent. Sch. Dist.*, 462 F. Supp. 3d 368, 390 (S.D.N.Y. 2020), *aff'd sub nom. Clerveaux v. E. Ramapo Cent. Sch. Dist.*, 984 F.3d 213 (2d Cir. 2021) ("Defendant's argument that voters' preference cannot be determined with 95% confidence where a confidence interval goes below 50% is unavailing") (internal citation omitted).

In *LULAC* itself, the Supreme Court accepted a CVAP point estimate for determining whether "Latinos in District 23 could have constituted a majority of the citizen voting-age population in the district" without any discussion of confidence intervals whatsoever. 548 U.S. at 428. Further, in *Kumar*, the defendants attempted to undermine an illustrative district of 50.03% CVAP, with their expert arguing that the confidence intervals dropped below 50% and so CVAP could "very possibly" be below 50%. 476 F. Supp. 3d at 493. The court held that this argument was asking it to "enforce an absolute clear and convincing evidence standard for meeting the 50% threshold requirement," which is not the legal standard. *Id.* It distinguished the case from ones in which courts found plaintiffs did not meet *Gingles* 1 because the minority CVAP point estimate was below 50% despite a VAP above 50%, and where the ACS CVAP point estimate was below 50% and the court found alternative forms

11

of analysis unreliable. *Id.*; *see also Fabela*, 2012 WL 3135545, at *7 (rejecting an argument concerning confidence intervals below 50% and concluding that "a point estimate is the most likely Hispanic CVAP percentage in each illustrative district").

Second, the Secretary's attempt to link confidence intervals that drop below 50% to the preponderance standard fails on its own merits. As one author aptly described in responding to the Cohen article relied upon by the Secretary, "by insisting that to satisfy the burden of persuasion, the entire confidence interval, rather than just a single number, must exceed the pertinent threshold," Cohen proposes an "incoherent" theory that "leads to a conception of the burden of persuasion that yields arbitrary and unjustifiable results." D.H. Kaye, *Apples and Oranges: Confidence Coefficients and the Burden of Persuasion*, 73 Cornell L. Rev. 54, 57 (1987). Wright & Miller also doubt the Cohen article's usefulness, grouping it with others that "have tried to puff up the preponderance standard with academic hot air, including fancy statistical analysis." § 5122 Policy Background; Burdens of Proof, 21B Fed. Prac. & Proc. Evid. § 5122 (2d ed.). The Secretary's demand of requiring plaintiffs to prove that there is a 90% or 95% chance (depending on the confidence interval) that the true BCVAP value falls above 50% imposes more like a beyond-a-reasonable doubt standard rather than what the law requires.

Third, the Secretary ignores that "[t]he sum of an evidentiary presentation may well be greater than its constituent parts." *Bourjaily v. United States*, 483 U.S. 171,

179–80 (1987). Using recent voter registration data produced by the Secretary's office, Mr. Fairfax determined that Illustrative District 7 in his Plans 2, 2A (and 3, which the Secretary does not raise here) have Black registered voter percentages over 51%—figures that the Secretary has not disputed. *See* Doc. 164-9 at 13, 22, 33; Doc. 164-11 at 5. This is precisely the type of data courts have used in conjunction with ACS CVAP point estimates to confirm findings that a minority voting population exceeds the *Gingles* 1 threshold. *See, e.g.*, *Osceola Cnty.*, 475 F. Supp. 2d at 1230 & n.18 (explaining that "[v]oter registration data is considered a reasonable proxy for citizen voting-age population" and that evidence of a "Hispanic registration level" over 50% "supports a finding that this District has a majority Hispanic CVAP."); *see also Johnson*, 204 F.3d at 1342.

The Court should deny the Secretary's attempt to undermine Plaintiffs' well-supported data with inapposite, rejected theories and disregard of the factual record.

## C. The Secretary miscasts the reasons for Mr. Fairfax's methodological choices and distorts his use of BCVAP.

The Secretary asserts that Mr. Fairfax "opted to use citizenship estimates over census enumerations because doing so meant that SD7 would not have to stretch as far to capture 'enough' of the black population," and criticizes him for pursuing a results-oriented approach. Br. 14. The record says otherwise.

First, the Secretary contends that Mr. Fairfax used one metric (BVAP) to determine majority status in his Montgomery illustrative districts, but another

(BCVAP) in Huntsville, despite similar non-citizen populations. Br. 13. But this is wrong, as "[t]o determine majority Black district status," Mr. Fairfax used BCVAP for the Montgomery districts in addition to BVAP, Doc. 164-7 at 9, and testified that he did examine BCVAP in Montgomery in drawing his illustrative districts, *see* Fairfax Dep. (Doc. 164-14) at 177:14. The Secretary's statement about comparable non-citizen populations is also misleading, as this refers to the cities of Huntsville and Montgomery and not the illustrative districts—making his comment both over and under-inclusive. *See* Fairfax Report App'x (Doc. 164-8) at 337.[6]

Second, the Secretary mischaracterizes Mr. Fairfax's testimony about his focus on BCVAP as the determinative metric for *Gingles* 1 to wrongly suggest something nefarious. Mr. Fairfax merely testified that his analysis of non-citizen populations drove his choices in the Huntsville-Decatur area: "I looked at the noncitizen population and analyzed to see whether it was appropriate to use that measure and found out it was appropriate to use BCVAP." Fairfax Dep. (Doc. 164-13) at 171:18–21; *see also id.* at 175:11–16 (testifying that the non-citizenship rate is "significant enough" in the Huntsville-Decatur area that CVAP is "more representative").

---

[6] Defendant also ignores that that the citizenship rates of illustrative SD7's Black VAP are 99.96%, 99.8%, and 99.99% in Plans 1, 2, and 2A, and non-Black CVAP rates are 87.44%, 93.67%, and 93.01% (largely due to a substantial Hispanic population with CVAP rates of 40.77%, 42.75%, and 42.52%, respectively). ECF Nos. 164-8 at 98–105, 164-10 at 12–23, 164-12 at 11–17.

14

Having determined that he could create reasonably configured districts in the Huntsville-Decatur area using BCVAP or BVAP, but that BCVAP was both the most appropriate metric and that it led to a comparatively more compact district, Mr. Fairfax's choice made good methodological sense. *See id.* at 173:22–174:6. Dr. Trende endorsed the same principle in informing the Supreme Court of Virginia that "the presence of non-citizen Latinos . . . in a district can raise the black CVAP share above the black VAP share, making it a useful metric for assessing a district's actual electorate."[7] That Mr. Fairfax did not have to justify BCVAP in Montgomery because his districts happened to be majority BVAP is of no consequence. Fairfax Dep. (Doc. 164-13) at 176:18–177:9.

## CONCLUSION

The Secretary contorts the standards for admissibility of expert testimony, ignores all of the caselaw concerning population metrics for *Gingles* 1, and contradicts Alabama's and Dr. Trende's prior statements. The Court should deny the Secretary's motion.

---

[7] *See* supra n.3.

DATED this 4th day of
October, 2024

Respectfully submitted,

/s/ Alison Mollman
Alison Mollman
Laurel Hattix
AMERICAN CIVIL LIBERTIES UNION OF
ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 265-2754
amollman@aclualabama.org
lhattix@aclualabama.org

/s/ Deuel Ross
Deuel Ross*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street NW Ste. 600
Washington, DC 20005
(202) 682-1300
dross@naacpldf.org

Leah Aden*
Stuart Naifeh*
Kathryn Sadasivan (ASB-517-E48T)
Brittany Carter*
Ashley Burrell*
Colin Burke*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
laden@naacpldf.org
snaifeh@naacpldf.org
ksadasivan@naacpldf.org
bcarter@naacpldf.org
aburrell@naacpldf.org
cburke@naacpldf.org

/s/ Davin M. Rosborough
Davin M. Rosborough*
Dayton Campbell-Harris*+
Theresa J. Lee*
Sophia Lin Lakin*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
(212) 549-2500
drosborough@aclu.org
dcampbell-harris@aclu.org
tlee@aclu.org
slakin@aclu.org

Jacob van Leer
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th St. NW
Washington, DC 20005
jvanleer@aclu.org

/s/ Sidney Jackson
Sidney Jackson (ASB-1462-K40W)
Nicki Lawsen (ASB-2602-C00K)
WIGGINS, CHILDS, PANTAZIS,
FISHER & GOLDFARB
301 19th Street
North Birmingham, AL 35203
(205) 314-0500
sjackson@wigginschilds.com
nlawsen@wigginschilds.com

/s/ Jack Genberg
Bradley E. Heard*
Jack Genberg*
Jess Unger*

David Dunn*
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000
david.dunn@hoganlovells.com

Blayne R. Thompson*
HOGAN LOVELLS US LLP
609 Main St., Suite 4200
Houston, TX 77002
(713) 632-1400
blayne.thompson@hoganlovells.com

Michael Turrill*
Harmony R. Gbe*
James W. Ettinger*
HOGAN LOVELLS US LLP
1999 Avenue of the Stars Suite 1400
Los Angeles, CA 90067
(310) 785-4600
michael.turrill@hoganlovells.com
harmony.gbe@hoganlovells.com
jay.ettinger@hoganlovells.com

SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Avenue, Suite
340 Decatur, GA 30030
(404) 521-6700
bradley.heard@splcenter.org
jack.genberg@splcenter.org
jess.unger@splcenter.org

Avner Shapiro*
SOUTHERN POVERTY LAW CENTER
1101 17th Street NW
Suite 510
Washington, DC 20036
240-890-1735
avner.shapiro@splcenter.org

Jessica L. Ellsworth*
Shelita M. Stewart*
Amanda N. Allen*
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600
jessica.ellsworth@hoganlovells.com
shelita.stewart@hoganlovells.com
amanda.n.allen@hoganlovells.com

*Attorneys for Plaintiffs*

*Admitted *pro hac vice*
+ Practice limited to federal court

17

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 4, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record in this case.

<u>/s/ Davin M. Rosborough</u>
Davin M. Rosborough
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
(212) 549-2500
drosborough@aclu.org