FILED

2024 Oct-04  AM 11:42
U.S. DISTRICT COURT
N.D. OF ALABAMA

# <u>EXHIBIT A</u>

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| KHADIDAH STONE, *et al.,* | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Case No.: 2:21-cv-1531-AMM |
| | ) | |
| WES ALLEN, in his official capacity as Alabama Secretary of State, *et al.,* | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Defendants.* | ) | |

**SECRETARY ALLEN'S OBJECTIONS AND RESPONSES
TO PLAINTIFFS' REQUESTS FOR ADMISSION**

Pursuant to Fed. R. Civ. P. 26 and Fed. R. Civ. P. 36, Alabama Secretary of State Wes Allen hereby responds to the *Stone* Plaintiffs' Requests for Admission dated April 10, 2024.

**General Statement**

Secretary Allen's Responses to each request are made subject to all objections as to privilege, competence, relevance, materiality, propriety, and admissibility, as well as any and all other obligations and grounds that would require the exclusion of evidence. Secretary Allen reserves the right to make any and all such objections at the appropriate time.

**General Objections**

Secretary Allen objects to the Instructions to the extent that they purport to impose any requirements or obligations different from those contained in the applicable Federal Rules of Civil Procedure, the applicable local Rules of this Court, applicable orders of the Court, and/or related agreements.

**REQUEST FOR ADMISSION 1.**  Admit that the State of Alabama argued in a brief before the U.S. Supreme Court in 2019 in *United States Department of Commerce v. State of New York*, No. 18-966, that the Supreme Court "has made clear" in litigation under Section 2 of the Voting Rights Act "that it is not enough to say that a minority group forms the majority of the total population in a given area, or even forms 'a bare majority of the voting-age population'; rather, 'the relevant numbers must include citizenship' since 'only eligible voters affect a group's opportunity to elect candidates.'"

**RESPONSE:**  Admitted that an *amicus* brief, to which the State of Alabama was a signatory, made this statement in the context of arguing for inclusion of a citizenship question on the 2020 Census because "[t]he current source of citizenship data—the American Community Survey (ACS)—has flaws recognized by everyone . . . that make its use for redistricting hazardous and prone to litigation" insofar as, "[c]ompared to Census data, ACS data is less accurate, less granular, less compatible

with other census data, and less authoritative."  Brief of Oklahoma, Alabama, *et al.,*
*United States Department of Commerce v. State of New York*, No. 18-966, at 3
(2019); *see id.* at 11-20.  (A copy of the State's full brief is attached as Exhibit A.)
As Plaintiffs have noted in their own discovery responses, the 2020 Census did not
include a citizenship question.


**REQUEST FOR ADMISSION 2.**  Admit that the State of Alabama argued in a
brief before the U.S. Supreme Court in 2019 in *United States Department of
Commerce v. State of New York*, No. 18-966, that in litigation under Section 2 of the
Voting Rights Act, "[f]ailure to take into account citizenship risks creating majority-
minority districts ['] only in a hollow sense.[']"

**RESPONSE:** Admitted that an *amicus* brief, to which the State of Alabama was a
signatory, made this statement (as corrected *supra*) in the context of arguing for
inclusion of a citizenship question on the 2020 Census because "[t]he current source
of citizenship data—the   American Community Survey (ACS)—has flaws
recognized by everyone . . . that make its use for redistricting hazardous and prone
to litigation" insofar as, "[c]ompared to Census data, ACS data is less accurate, less
granular, less compatible with other census data, and less authoritative."  Brief of
Oklahoma, Alabama, *et al., United States Department of Commerce v. State of New
York*, No. 18-966, at 3 (2019); *see id.* at 11-20.  (A copy of the State's full brief is

attached as Exhibit A.)  As Plaintiffs have noted in their own discovery responses, the 2020 Census did not include a citizenship question.

**REQUEST FOR ADMISSION 3.**  Admit that the State of Alabama argued in a brief before the U.S. Supreme Court in 2019 in *United States Department of Commerce v. State of New York*, No. 18-966, that "[b]ecause of demographic and socioeconomic differences between minority populations and the national population, States cannot assume that the percentage of minority voter-eligible residents in a given area matches the percentage of minority residents in the same area. A higher proportion of the country's minority population consists of children under the age of eighteen, and there are disparities in the rates of citizenship among ethnicities."

**RESPONSE:** Admitted that an *amicus* brief, to which the State of Alabama was a signatory, made this statement (with citation to Brief of U.S., *Evenwel v. Abbott,* No. 14-940, at 33 (U.S. Sept. 25, 2015)) in the context of arguing for inclusion of a citizenship question on the 2020 Census because "[t]he current source of citizenship data—the  American Community Survey (ACS)—has flaws recognized by everyone . . . that make its use for redistricting hazardous and prone to litigation" insofar as, "[c]ompared to Census data, ACS data is less accurate, less granular, less compatible with other census data, and less authoritative."  Brief of Oklahoma, Alabama, *et al.,*

*United States Department of Commerce v. State of New York*, No. 18-966, at 3 (2019); *see id.* at 11-20.  (A copy of the State's full brief is attached as Exhibit A.) As Plaintiffs have noted in their own discovery responses, the 2020 Census did not include a citizenship question.

**REQUEST FOR ADMISSION 4.**  Admit that on February 19, 2021, the Census Bureau issued a statement that it had received a letter from the U.S. Department of Justice "stating that the CVAP data from the ACS, on which it has traditionally relied, are adequate for its enforcement of Section 2 of the Voting Rights Act," and that "DOJ did not request compilation or release of additional citizenship or CVAP data beyond this ACS data."[1]

**RESPONSE:**  Admitted that a press release entitled *Census Bureau Statement on American Community Survey Data* appears at the website address provided in the footnote, that the press release is dated February 19, 2021, and that the Request accurately quotes from a portion of the press release, but noted that USDOJ's letter is not provided or quoted in the press release.  Denied that ACS data are adequate for purposes of redistricting or redistricting litigation.

---

[1] *See* https://www.census.gov/newsroom/press-releases/2021/statement-american-community-survey.html.

*Respectfully Submitted,*

Steve Marshall
  *Attorney General*

/s/ Misty S. Fairbanks Messick
Edmund G. LaCour Jr. (ASB-9182-U81L)
  *Solicitor General*
A. Barrett Bowdre (ASB-2087-K29V)
  *Deputy Solicitor General*
Soren A. Geiger (ASB-0336-T31L)
  *Assistant Solicitor General*
James W. Davis (ASB-4063-I58J)
  *Deputy Attorney General*
Richard D. Mink (ASB-4802-M76R)
Misty S. Fairbanks Messick (ASB-1813-T71F)
Brenton M. Smith (ASB-1656-X27Q)
Benjamin M. Seiss (ASB-2110-O00W)
Charles McKay (ASB-7256-K18K)
  *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Facsimile: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Barrett.Bowdre@AlabamaAG.gov
Soren.Geiger@Alabama.AG.gov
Jim.Davis@AlabamaAG.gov
Richard.Mink@AlabamaAG.gov
Misty.Messick@AlabamaAG.gov
Brenton.Smith@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov
Charles.McKay@AlabamaAG.gov

**Counsel for Secretary Allen**

## CERTIFICATE OF SERVICE

I certify that on April 30, 2024, I served the foregoing by electronic mail to all counsel of record for the Plaintiffs.

/s/ Misty S. Fairbanks Messick
*Counsel for Secretary Allen*

No. 18-966

================================================

In The
# Supreme Court of the United States

———————— ✦ ————————

UNITED STATES DEPARTMENT
OF COMMERCE, et al.,

*Petitioners,*

v.

NEW YORK, et al.,

*Respondents.*

———————— ✦ ————————

**On Writ Of Certiorari To The
United States Court Of Appeals
For The Second Circuit**

———————— ✦ ————————

**BRIEF OF OKLAHOMA, ALABAMA, ARKANSAS,
FLORIDA, GEORGIA, INDIANA, KANSAS,
KENTUCKY (BY AND THROUGH GOVERNOR
BEVIN), LOUISIANA, GOVERNOR PHIL BRYANT
OF THE STATE OF MISSISSIPPI, MISSOURI,
MONTANA, NEBRASKA, SOUTH CAROLINA,
SOUTH DAKOTA, TEXAS, AND WEST VIRGINIA
AS AMICI CURIAE IN SUPPORT OF PETITIONERS**

———————— ✦ ————————

MIKE HUNTER
  Attorney General of Oklahoma
MITHUN MANSINGHANI
  Solicitor General
  *Counsel of Record*
OKLAHOMA OFFICE OF
  THE ATTORNEY GENERAL
313 NE Twenty-First St.
Oklahoma City, OK 73105
(405) 522-4392
mithun.mansinghani@oag.ok.gov

[Additional Counsel Listed On Inside Cover]

================================================



Additional Counsel for Amici

STEVE MARSHALL
Attorney General
  of Alabama

LESLIE RUTLEDGE
Attorney General
  of Arkansas

ASHLEY MOODY
Attorney General
  of Florida

CHRIS CARR
Attorney General
  of Georgia

CURTIS T. HILL, JR.
Attorney General
  of Indiana

DEREK SCHMIDT
Attorney General
  of Kansas

GOVERNOR MATT BEVIN
of the Commonwealth
  of Kentucky

JEFF LANDRY
Attorney General
  of Louisiana

GOVERNOR PHIL BRYANT
of the State
  of Mississippi

ERIC S. SCHMITT
Attorney General
  of Missouri

TIM FOX
Attorney General
  of Montana

DOUG PETERSON
Attorney General
  of Nebraska

ALAN WILSON
Attorney General
  of South Carolina

JASON R. RAVNSBORG
Attorney General
  of South Dakota

KEN PAXTON
Attorney General
  of Texas

PATRICK MORRISEY
Attorney General
  of West Virginia

i

## TABLE OF CONTENTS

Page

INTERESTS OF AMICI CURIAE ....................... 1

SUMMARY OF ARGUMENT ............................. 2

ARGUMENT ........................................................ 5

   I.  Census citizenship questions are histori-
cally and globally commonplace ............... 7

  II.  Amici States will benefit from accurate,
granular citizenship information when
complying with this Court's decisions in-
terpreting the VRA .................................... 11

      A.  ACS data is less accurate than decen-
nial census data ................................... 13

      B.  ACS data is less granular than decen-
nial census data ................................... 15

      C.  ACS data is not compatible with other
decennial census data ......................... 16

      D.  ACS data is not authoritative and sub-
ject to manipulation in litigation ........ 17

 III.  Including a citizenship question will not
have an adverse effect on participating
residents, nor did the administrative rec-
ord demonstrate it will cause a significant
undercount ................................................. 20

      A.  Census responses could not convey
whether the person responding is an
illegal immigrant ................................. 21

      B.  The Bureau is prohibited from shar-
ing census responses with law enforce-
ment ...................................................... 22

ii

TABLE OF CONTENTS—Continued

Page

C. There was no empirical evidence pre-
sented to the Secretary that asking
about citizenship will cause a signifi-
cant undercount................................... 25

CONCLUSION..................................................... 34

iii

## TABLE OF AUTHORITIES

Page

CASES

*Baldrige v. Shapiro*, 455 U.S. 345 (1982) ....... 21, 22, 23

*Benavidez v. Irving Indep. Sch. Dist.*, 690
    F. Supp. 2d 451 (N.D. Tex. 2010) ............................ 14

*Carey v. Klutznick*, 653 F.2d 732 (2d Cir. 1981) ......... 22

*Dep't of Commerce v. U.S. House of Representa-
tives*, 525 U.S. 316 (1999) ........................................ 17

*Fabela v. City of Farmers Branch*, No. 3:10-CV-
    1425-D, 2012 WL 3135545 (N.D. Tex. Aug. 2,
    2012) ................................................................. 14, 26

*Federation for American Immigration Reform v.
    Klutznick*, 486 F. Supp. 564 (D.D.C. 1980) .............. 28

*Franklin v. Massachusetts*, 505 U.S. 788 (1992) .... 5, 22

*FTC v. Dilger*, 276 F.2d 739 (7th Cir. 1960) .............. 24

*FTC v. Orton*, 175 F. Supp. 77 (S.D.N.Y. 1959)..... 22, 24

*Johnson v. Eisentrager*, 339 U.S. 763 (1950) ............... 5

*LaMorte v. Mansfield*, 438 F.2d 448 (2d Cir.
    1971) ....................................................................... 23

*LULAC v. Perry*, 548 U.S. 399 (2006) ................. 12, 13

*Luna v. Cty. of Kern*, 291 F. Supp. 3d 1088 (E.D.
    Cal. 2018)................................................................ 13

*Mo. State Conf. of NAACP v. Ferguson-Florissant
    Sch. Dist.*, 201 F. Supp. 3d 1006 (E.D. Mo.
    2016) ....................................................................... 14

iv

TABLE OF AUTHORITIES—Continued

Page

*Morales v. Daley*, 116 F. Supp. 2d 801 (S.D. Tex. 2000), *aff'd sub nom. Morales v. Evans*, 275 F.3d 45 (5th Cir. 2001)............................................6, 8

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .........32

*Patino v. City of Pasadena*, 230 F. Supp. 3d 667 (S.D. Tex. 2017).......................................................12

*Perez v. Perry*, No. SA-11-CV-360, 2017 WL 962686 (W.D. Tex. Mar. 10, 2017)............................15

*Perez v. Texas*, No. 5:11-cv-00360 (W.D. Tex.).............18

*Pope v. Cty. of Albany*, No. 11-CV-0726, 2014 WL 316703 (N.D.N.Y. Jan. 28, 2014) .............................14

*Rios-Andino v. Orange Cty.*, 51 F. Supp. 3d 1215 (M.D. Fla. 2014)..................................................13, 14

*Rodriguez v. Harris Cty.*, 964 F. Supp. 2d 686 (S.D. Tex. 2013)..................................................17, 26

*Senate of State of Cal. v. Mosbacher*, 968 F.2d 974 (9th Cir. 1992)...................................................24

*Seymour v. Barabba*, 559 F.2d 806 (D.C. Cir. 1977) .....................................................................23

*St. Regis Paper Co. v. United States*, 368 U.S. 208 (1961)....................................................................24

*Thornburg v. Gingles*, 478 U.S. 30 (1986).............11, 12

*U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779 (1995)........................................................................5

*United States v. Bethlehem Steel Corp.*, 21 F.R.D. 568 (S.D.N.Y. 1958) ..........................................23, 24

v

TABLE OF AUTHORITIES—Continued

Page

*United States v. Greenberg*, 200 F. Supp. 382 (S.D.N.Y. 1961) ........................................................21

*United States v. Int'l Bus. Machs. Corp.*, 20 Fed. R. Serv. 2d 1082 (S.D.N.Y. 1975) .............................24

*United States v. Little*, 321 F. Supp. 388 (D. Del. 1971) .........................................................................24

*United States v. Moriarity*, 106 F. 886 (C.C.S.D.N.Y. 1901) ..........................................................................6

*United States v. Village of Port Chester*, 704 F. Supp. 2d 411 (S.D.N.Y. 2010) ..............................13

*Utah v. Evans*, 536 U.S. 452 (2002) .............................7

*Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848 (5th Cir. 1999).....................................13

*Wisconsin v. City of New York*, 517 U.S. 1 (1996).........5

CONSTITUTIONAL PROVISIONS

Mass. Const. art. CXII ................................................18

N.Y. Const. art. III, § 5-a............................................18

Tenn. Const. art. II, §§ 4-6 ..........................................18

U.S. CONST. amend. XIV..............................................33

U.S. CONST. amend. XIV, § 1 ......................................34

U.S. CONST. amend. XV ...............................................33

U.S. CONST. amend. XV, § 1 ........................................34

vi

TABLE OF AUTHORITIES—Continued

Page

STATUTES

13 U.S.C. § 9(a)(2) .....................................................22

13 U.S.C. § 141(c) ........................................................1

13 U.S.C. § 213 ............................................................23

13 U.S.C. § 214 ............................................................23

Act of March 14, 1820, 3 Stat. 548 ..............................8

Act of March 23, 1830, 4 Stat. 383 ..............................8

Act of May 23, 1850, 9 Stat. 430..................................8

Act of March 3, 1879, 20 Stat. 475 ..............................8

Act of March 3, 1899, 30 Stat. 1014 ............................8

Act of July 2, 1909, 36 Stat. 1......................................8

Act of March 3, 1919, 40 Stat. 1291 ............................8

Act of June 18, 1929, 46 Stat. 21..................................8

Census Equity Act, H.R. 2661, 101st Cong. § 2(2)
    (1989)......................................................................28

Voting Rights Act of 1965 ("VRA"), 52 U.S.C.
    § 10301............................................................*passim*

OTHER AUTHORITIES

Brief of New York et al. as Amici Curiae in Sup-
    port of Appellees, *Evenwel v. Abbott*, No. 14-
    940 (U.S. Sept. 25, 2015) .......................13, 16, 17, 18

Brief of U.S., *Evenwel v. Abbott*, No. 14-940 (U.S.
    Sept. 25, 2015)........................................................12

vii

TABLE OF AUTHORITIES—Continued

Page

*Census Equity Act: Hearings Before the Sub-comm. on Census & Population of the H. Comm. on Post Office & Civil Serv.*, 101st Cong. 43 (1989) (statement of C. Louis Kincannon) .............28

1 CHRON. 21 ...................................................................7

*Exclude Undocumented Residents from Census Counts Used for Apportionment: Hearing Before the Subcomm. on Census & Population of the H. Comm. on Post Office & Civil Serv.*, 100th Cong. 50 (1988) (testimony of John Keane) ....................................................................28

EXODUS 30:11-16 ..........................................................7

Expert Report of Jorge Chapa, Ph.D. (Univ. of Ill. at Urbana-Champaign), Doc. 128-5 (Aug. 8, 2011) .........................................................................18

Expert Report of Stephen Ansolabehere, Ph.D. (Harvard University), Doc. 272 (Aug. 31, 2011).........18

Frederick G. Bohme, *Twenty Censuses: Population and Housing Questions 1790-1980*, Bureau of the Census (Oct. 1979) .................................9

HAYMAN ALTERMAN, COUNTING PEOPLE: THE CENSUS IN HISTORY (1969)............................................7, 8

HERODOTUS, HISTORIES 2.177 .......................................7

LIVY, AB URBE CONDITA 42.4........................................7

viii

TABLE OF AUTHORITIES—Continued

Page

Nathaniel Persily, *The Law of the Census: How to Count, What to Count, Whom to Count, and Where to Count Them*, 32 CARDOZO L. REV. 755 (2001) ........................................................................17

NUMBERS 1-4 .................................................................7

36 Op. Att'y Gen. 362 (1930) .....................................22

Philip Harris, et al., *Evaluation Report Covering Place of Birth, U.S. Citizenship Status, and Year of Arrival* (Jan. 12, 2007) ...............................27

Ruth C. Silva, *The Population Base for Apportionment of the New York Legislature*, 32 FORDHAM L. REV. 1 (1963) .......................................18

*Statement of Former Census Directors on Adding a New Question to the 2010 Census* (Oct. 16, 2009) ................................................................29

The Twenty-Second Decennial Census, 18 U.S. Op. Off. Legal Counsel 184 (1994) ..........................8

31 The Writings of George Washington 329 (J. Fitzpatrick, ed. 1939) ...............................................21

U.S. Census Bureau, *A Compass for Understanding and Using American Community Survey Data: What State and Local Governments Need to Know* (Feb. 2009) .............................15

U.S. Census Bureau, *American Community Survey: Questionnaire Archive* ......................................10

U.S. Census Bureau, *American Community Survey: Response Rates* ................................................27

ix

TABLE OF AUTHORITIES—Continued

Page

U.S. Census Bureau, *History: 1960 (Population)* .........9

U.S. Census Bureau, *History: 1970 (Population)* .........9

U.S. Census Bureau, *History: 1980 (Population)* .........9

U.S. Census Bureau, *History: 1990 (Population)* .......10

U.S. Census Bureau, *History: 2000* ...........................10

U.S. Census Bureau, *Participant Statistical Ar-eas* ..........................................................................15

1

## INTERESTS OF AMICI CURIAE

Amici curiae are the States of Oklahoma, Alabama, Arkansas, Florida, Georgia, Indiana, Kansas, Kentucky (by and through Governor Bevin), Louisiana, Governor Phil Bryant of the State of Mississippi, Missouri, Montana, Nebraska, South Carolina, South Dakota, Texas, and West Virginia ("Amici States"). Amici States rely upon demographic information provided by the U.S. Department of Commerce when redistricting. 13 U.S.C. § 141(c). The Department's decision to include a citizenship question in the 2020 Census will improve Amici States' ability to comply with the Voting Rights Act of 1965 ("VRA"), codified at 52 U.S.C. § 10301, by affording States superior data on citizen voting age population. For this reason, sixteen States, including many of the undersigned amici, wrote to Secretary Ross urging him to adopt a citizenship question for the 2020 Census. *See* Administrative Record (A.R.) 1079-80 (Louisiana); 1155-57 (Texas); 1161-62 (Alabama); 1210-11 (Oklahoma, Arkansas, Florida, Georgia, Indiana, Kansas, Kentucky, Michigan, Mississippi, Nebraska, South Carolina, Tennessee, and West Virginia). These requests by the States were expressly considered by Secretary Ross in his decision to adopt the citizenship question. *See* Pet. App. 549a. And amici also filed a brief in the court below explaining the benefits a citizenship question would confer on the States. 18-cv-2921 D. Ct. Doc. 162 (June 1, 2018) (amici brief of eighteen States explaining support of citizenship question).

Nonetheless, the court below ignored the interests of the States in a census citizenship question. *See* Pet.

2

22. Indeed, the district court listed in detail the many stakeholders who opposed addition of the citizenship question, yet assiduously avoided mentioning that the Amici States supported adding the question and gave reasons for their support. *See* Pet. App. 58a-63a. Such a one-sided recounting by the district court of the record evidence before the Secretary is, unfortunately, characteristic of the decision under review. Amici States therefore have a strong interest in ensuring that their interests do not continue to get overlooked, and in rebutting assertions that the citizenship question was added to the 2020 Census for pretextual reasons, serving no legitimate purpose, despite the fact that the States themselves requested the question.

———————◆———————

## SUMMARY OF ARGUMENT

Citizenship questions on a census have existed for millennia throughout the Western world. In America, residents have been asked their citizenship by the Census Bureau over a *billion* times. Despite this lengthy history and practice, the court below saw only pretext and capriciousness in the Secretary's decision to reinstate the longstanding citizenship question in the 2020 Census. In the district court's view, asking about citizenship was arbitrary because it could serve no legitimate purpose and it will cause a severe undercount in the Census. This is wrong on both counts.

Including a citizenship question on the 2020 Census would yield significant benefits to Amici States by providing them superior data to use in their efforts to

3

comply with the VRA, as well as reducing litigation surrounding VRA compliance. The current source of citizenship data—the American Community Survey (ACS)—has flaws recognized by everyone, including Respondents, that make its use for redistricting hazardous and prone to litigation. Compared to Census data, ACS data is less accurate, less granular, less compatible with other census data, and less authoritative. Despite the substantial assistance a citizenship question would confer on the States, as reflected in the administrative record, the court below completely ignored this evidence and determined that the Secretary's decision had no legitimate purpose and therefore must have been pretextual. The district court's decision to ignore evidence not supportive of its ultimate conclusion should not be sanctioned by this Court.

The court below also determined that the citizenship question was arbitrary, and that Respondents have standing, because it may cause a significant amount of people not to respond to the census out of irrational fear, resulting in an undercount. But irrational fears cannot be the basis for holding that a census question is invalid—lest every census question beyond simple enumeration be invalidated. Certainly many, for example, may refuse to respond to the question on Hispanic origin due to the fears of repercussion. But whether it be questions about race, national origin, or citizenship, such trepidation is unwarranted: both as a practical matter and as a result of robust legal protections, answering any census question poses zero risk to census respondents. Rather, it is nonresponse that carries significant legal penalties. Respondents

4

cannot have standing, nor can an agency action be held invalid, based on a hypothetical injury that might result from actions of third parties that both are illegal and that the government actively seeks to prevent.

Moreover, the district court's conclusion that the citizenship question will reduce noncitizen response rate by 5.1% was based on a flawed reading of the data presented to the Secretary. That 5.1% figure rested on numerous unwarranted assumptions that are belied by the evidence in the administrative record. And other significant evidence indicated that a citizenship question would not cause any meaningful undercount. Thus, it was not only within the Secretary's discretion, but also correct, for him to reject the 5.1% figure heavily relied upon by the district court and instead accept the view that no sound empirical data demonstrated that a citizenship question will cause a meaningful undercount. Because the Secretary lawfully exercised his prerogatives to balance the risks and rewards of adding a citizenship question, the district court's decision to conduct its own balancing that lead to the opposite conclusion should be reversed.

———————◆———————

5

## ARGUMENT

Citizenship still matters. It has always been and continues to be the hallmark of civic participation. *Johnson v. Eisentrager*, 339 U.S. 763, 769 (1950). It is nothing short of sovereignty as it exists at the atomic level. *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 838 (1995). The lack of reliable data on citizenship degrades each citizen's right to participate in free and fair elections. When legislators determine districts based on population without access to accurate statistics on citizenship, the result is that legally eligible voters may have their voices diluted or distorted. Matters of such constitutional importance should not be unnecessarily imperiled when the solution is as simple as a question on a census form.

In recognition of this commonsense principle, the Department has decided to include a question about citizenship on the 2020 Census. Such a question is hardly dissimilar to asking about a resident's age, name, race, sex, relationship status, Hispanic origin, and housing status—the other questions to be asked on the 2020 Census. And including a citizenship question stands to provide substantial, known benefits to States complying with the VRA.

Yet "[a]s one season follows another, the decennial census has again generated a number of reapportionment controversies." *Franklin v. Massachusetts*, 505 U.S. 788, 790 (1992); *see also Wisconsin v. City of New York*, 517 U.S. 1, 19 (1996) (noting "the plethora of lawsuits that inevitably accompany each decennial

6

census"). On the citizenship question in particular, challenges have twice been rejected: once at the dawn of the 20th century and then again at the turn of the 21st. *United States v. Moriarity*, 106 F. 886 (C.C.S.D.N.Y. 1901); *Morales v. Daley*, 116 F. Supp. 2d 801, 809 (S.D. Tex. 2000), *aff'd sub nom. Morales v. Evans*, 275 F.3d 45 (5th Cir. 2001). Once again, litigants have asked the courts to make decisions about what the Census should contain instead of leaving those decisions to the agency to which such discretion was committed by Congress.

Far from being unjustifiable and necessarily the product of pretext, the Bureau's decision to include a citizenship question reflects long historical practice and good public policy. Doing so would provide substantial benefits by reducing litigation under Section 2 of the VRA, allowing States to achieve greater certainty in redistricting, and promoting the equal suffrage of all citizens. The Secretary did not act arbitrarily by determining that these benefits outweigh the minimal costs of adding the question. The court below erred in not only failing to consider the benefits to the States conferred by a citizenship question, but also by engaging in its own freewheeling (and erroneous) determination that the costs imposed by the citizenship question outweighed these benefits.

7

## I. Census citizenship questions are historically and globally commonplace.

"Census taking is an age-old practice," *Utah v. Evans*, 536 U.S. 452, 496 (2002) (Thomas, J., concurring in part and dissenting in part). It has long been a tool to collect more information beyond a mere headcount. The Pharaohs of Ancient Egypt, in addition to a headcount, asked every inhabitant to declare how he earned his living. HERODOTUS, HISTORIES 2.177. The Bible records several censuses, which were not exclusively limited to headcounts. EXODUS 30:11-16 (collecting atonement monies); NUMBERS 1-4 (separately counting men above the age of 20 capable of military service); 1 CHRON. 21 (same). And Ancient Athens was known to have separately counted citizens, metics (*i.e.*, resident aliens), and slaves. HAYMAN ALTERMAN, COUNTING PEOPLE: THE CENSUS IN HISTORY 30 (1969).

Most notably, the Roman "census" (whence the English word derives) was established in the 6th century B.C. by King Servius Tullius to count the number of arms-bearing citizens. LIVY, AB URBE CONDITA 42.4-5. During the Roman Republic, the head of each family was required to appear in the Campus Martius to give under oath an account of himself, his family, and all his property, including: his full name, whether he was a freedman, his age, whether he was married, the number and names of children, a list of all his property, and his citizenship status. Officials made a list of citizens that was then published.

8

The first English census was taken by William I and published in the Domesday Book in 1086. Inhabitants were asked: what the local manor was called; who held it in 1066; who held it now; the area of land the manor encompassed; how many ploughs there were; how many freemen, sokemen, villans, cottages, and slaves there were; a description of the land's natural resources; a valuation of the property; and a description of how much property each freeman and sokeman had.[1]

"[F]rom the first census, taken in 1790, the Congress has never performed a mere headcount. It has always included additional data points, such as race, sex, and age of the persons counted." *Morales*, 116 F. Supp. 2d at 809. Between 1820 and 1950, almost every decennial census asked a question about citizenship in some form. Act of March 14, 1820, 3 Stat. 548, 550; Act of March 23, 1830, 4 Stat. 383, 389; Act of May 23, 1850, 9 Stat. 430, 433; Act of March 3, 1879, 20 Stat. 475, 477; Act of March 3, 1899, 30 Stat. 1014, 1015; Act of July 2, 1909, 36 Stat. 1, 3; Act of March 3, 1919, 40 Stat. 1291, 1294; Act of June 18, 1929, 46 Stat. 21, 22.

---

[1] Before the first decennial census in 1790, no modern nation in the Western world had conducted a census (although several colonial States did so). The Twenty-Second Decennial Census, 18 U.S. Op. Off. Legal Counsel 184, 188 (1994) (citing ALTERMAN, *supra*, at 164). The absence of a national census between the Domesday Book and Enumeration Clause appears to be explained by a fear that the biblical plague that beset the Jews after David's census would reprise itself. Indeed, the British seem to have only instituted their modern census after receiving assurances from the American example that nothing bad would happen if their people were enumerated. ALTERMAN, *supra*, at 205-07.

9

It was not until 1960—following more than 30 years of very low immigration levels—that the census omitted a question about citizenship, although even that census asked about each respondent's "[p]lace of birth" and "[i]f foreign born . . . the person's mother tongue" (as well as the birth country of each person's mother and father).[2] In 1970, the census included on its long-form questionnaire: "Where was this person born?" and "For persons born in a foreign country—Is the person naturalized?"[3] Again in 1980, the census asked a sample of respondents "In what state or foreign country was the person born?" and "If this person was born in a foreign country . . . Is this person a naturalized citizen of the United States?"[4] Then in 1990, the long-form, sent to about one in six households, directly asked respondents "Is this person a citizen of the

---

[2] U.S. Census Bureau, *History: 1960 (Population)*, www.census.gov/history/www/through_the_decades/index_of_questions/1960_population.html. A citizenship question *was* included on the 1960 Census questionnaire for all residents of New York state. *See* Frederick G. Bohme, *Twenty Censuses: Population and Housing Questions 1790-1980*, Bureau of the Census, at 71 (Oct. 1979), https://www.census.gov/history/pdf/20censuses.pdf.

[3] U.S. Census Bureau, *History: 1970 (Population)*, www.census.gov/history/www/through_the_decades/index_of_questions/1970_population.html.

[4] U.S. Census Bureau, *History: 1980 (Population)*, www.census.gov/history/www/through_the_decades/index_of_questions/1980_population.html.

10

United States?"[5] And it repeated this question in 2000.[6]

Following the 2000 Census, the Bureau decided to retire the long-form questionnaire and initiate the American Community Survey ("ACS"). The ACS features a question on citizenship, and this has been asked every year from 2005 until the present.[7]

In total, the federal government has asked a resident whether he is a citizen of this country more than a ***billion*** times since 1820.[8] Moreover, such census citizenship questions are the international norm, asked by many industrialized and developing countries across the globe. *See* Pet. App. 561a. Given this nearly unbroken history of asking about citizenship—repeatedly in the decennial census, and yearly in the ACS—it is a dramatic understatement to say that including a citizenship question on the upcoming census is "wholly unremarkable." Pet. 17. Claims that re-insertion of a question grounded in millennia of history is arbitrary or capricious, and must be based on

---

[5] U.S. Census Bureau, *History: 1990 (Population)*, www.census.gov/history/www/through_the_decades/index_of_questions/1990_population.html.

[6] U.S. Census Bureau, *History: 2000*, www.census.gov/history/www/through_the_decades/index_of_questions/2000_1.html.

[7] U.S. Census Bureau, *American Community Survey: Questionnaire Archive*, www.census.gov/programs-surveys/acs/methodology/questionnaire-archive.html.

[8] This figure includes all residents enumerated from 1820 to 1830 and from 1850 to 1950, plus those who responded to the long-form questionnaire from 1980 to 2000, as well as all those surveyed in the ACS from 2005 to 2016.

11

impermissible motives, warrant great skepticism. Unfortunately, the court below was insufficiently critical of Respondents' claims (and at times, outright disdainful of Petitioners). Close scrutiny of the challenges to the citizenship question, however, reveal that they lack merit.

## II.  Amici States will benefit from accurate, granular citizenship information when complying with this Court's decisions interpreting the VRA.

A principal basis for the decision below is that the citizenship question could serve no legitimate purpose. *See*, *e.g.*, Pet. App 295a-299a. But the district court completely sidestepped the benefits the citizenship question would confer on the States—benefits that led the States to petition the Secretary to add the question and that the Secretary expressly considered in making his determination. *See supra*, 1-2.

States must comply with Section 2 of the VRA, which prohibits any practice that "results in a denial or abridgement of the right of any citizen . . . to vote on account of race or color." 52 U.S.C. § 10301. Claims under Section 2 most commonly involve allegations of vote dilution, *i.e.*, "the dispersal of [a minority group] into districts in which they constitute an ineffective minority of voters or by the concentration of [the minority] into districts where they constitute an excessive majority." *Thornburg v. Gingles*, 478 U.S. 30, 46 n.11 (1986). To establish a vote dilution claim, a "minority

12

group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single member district." *Id.* at 50 & n.16.

But this Court has made clear that it is not enough to say that a minority group forms the majority of the total population in a given area, or even forms "a bare majority of the voting-age population"; rather, "the relevant numbers must include citizenship" since "only eligible voters affect a group's opportunity to elect candidates." *LULAC v. Perry*, 548 U.S. 399, 429 (2006). Failure to take into account citizenship risks creating majority-minority districts "only in a hollow sense." *Id.* Thus, in order for States to achieve any certainty over whether their districts comply with Section 2, they must obtain information about the voting-eligible population. *See* A.R. 1155-56, 1210-11.[9]

In recent years, because "[t]he decennial census does not include a question on citizenship," "the sole source of citizenship data published by the Census Bureau now comes from the American Community Survey [ACS]." *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 687 (S.D. Tex. 2017) (citations omitted). Yet as Respondent the State of New York and other Respondents

---

[9] Because of demographic and socioeconomic differences between minority populations and the national population, States cannot assume that the percentage of minority voter-eligible residents in a given area matches the percentage of minority residents in the same area. Brief of U.S., *Evenwel v. Abbott*, No. 14-940, at 33 (U.S. Sept. 25, 2015). A higher proportion of the country's minority population consists of children under the age of eighteen, and there are disparities in the rates of citizenship among ethnicities. *Id.*

13

in this case have acknowledged elsewhere, ACS data is inferior for several reasons. Brief of New York et al. as Amici Curiae in Support of Appellees, *Evenwel v. Abbott*, No. 14-940, at 1-5 & 14-26 (U.S. Sept. 25, 2015) ("N.Y. Br., *Evenwel*"). In other words, up until this litigation, Respondents—and everyone else—acknowledged the inferiority of ACS citizenship data, as further explained below.

## A. ACS data is less accurate than decennial census data.

Statistical accuracy in Section 2 litigation is very important, as cases often come down to 1% or 2% differences in the citizen voting age population of a challenged district. *See*, *e.g.*, *LULAC*, 548 U.S. at 429; *Luna v. Cty. of Kern*, 291 F. Supp. 3d 1088, 1114 (E.D. Cal. 2018); *Rios-Andino v. Orange Cty.*, 51 F. Supp. 3d 1215, 1224-25 (M.D. Fla. 2014). But ACS data is less accurate than data obtained from the census. The ACS surveys only one out of every thirty-eight households, whereas a Census question would reach every resident. This smaller sample size translates to larger margins of error, even after taking into account the non-response rate to the Census. *See* A.R. 1210. Courts presume the decennial census data is accurate and reliable, *e.g.*, *Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848, 853-54 (5th Cir. 1999); *United States v. Village of Port Chester*, 704 F. Supp. 2d 411, 439 (S.D.N.Y. 2010), but the reliability of ACS data is a significant and costly focus of Section 2 litigation, particularly in cases involving small political units like town councils and

14

school districts for which ACS data has large margins of error. *See*, *e.g.*, *Benavidez v. Irving Indep. Sch. Dist.*, 690 F. Supp. 2d 451, 459-60 (N.D. Tex. 2010) (rejecting plaintiff's reliance on ACS data); *see also Mo. State Conf. of NAACP v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1033 & n.10 (E.D. Mo. 2016); *Pope v. Cty. of Albany*, No. 11-CV-0726, 2014 WL 316703, at *13 n.22 (N.D.N.Y. Jan. 28, 2014).

Indeed, litigants often must expend significant resources to cull separate corroborative data to successfully overcome criticisms of ACS data. *See*, *e.g.*, *Fabela v. City of Farmers Branch*, No. 3:10-CV-1425-D, 2012 WL 3135545, at *4-8 (N.D. Tex. Aug. 2, 2012). And even where the parties agree that it is appropriate to use ACS data, there is litigation over obscure technical issues about *how* to use the data. *See*, *e.g.*, *Rios-Andino*, 51 F. Supp. 3d at 1224-25 (resolving dispute over whether ACS data indicated proposed district had 50.19% or 48.0% Latino citizen voting age population). The inclusion of a citizenship question in the 2020 Census, especially when combined with the other statistical tools the Secretary proposes to use, would obviate these many problems and costs imposed by the inaccuracy of ACS data.

15

### B. ACS data is less granular than decennial census data.

ACS data is also less granular than decennial census data. Census data is available at the level of census block groups (600-3,000 people) and census tracts (1,500-8,000 people).[10] But because of the ACS's limited sample size, its 1-year estimates are only statistically reliable for areas of 65,000 people or more. *Perez v. Perry*, No. SA-11-CV-360, 2017 WL 962686, at *3 (W.D. Tex. Mar. 10, 2017). In other words, ACS data is reliable only for 6.6% of school districts, 10.4% of urban areas, and 25% of counties in the country.[11] The ACS's 3-year estimates are available for areas containing more than 20,000 people, and only the 5-year estimates are available for smaller areas such as census tract and block groups—although even here "block group estimates may contain large margins of error." *Id.*

Thus, the lack of a citizenship question on the census, and the status quo reliance on the ACS, has its harshest effects on small and rural communities—effects that Respondents like City of Chicago, City of New York, and City of San Francisco can happily ignore. *See also* A.R. 1161, 1210-11; Pet. App. 550a-552a. And even if census data is not available at the smallest,

---

[10] U.S. Census Bureau, *Participant Statistical Areas*, www2.census.gov/geo/pdfs/partnerships/PSAP_info_sheet.pdf.

[11] U.S. Census Bureau, *A Compass for Understanding and Using American Community Survey Data: What State and Local Governments Need to Know*, at 2-3 (Feb. 2009), www.census.gov/content/dam/Census/library/publications/2009/acs/ACSstateLocal.pdf.

16

census block level as Respondents argue, it is still far-superior at the block group and tract level than ACS data, which contain significant margins of error. Respondents themselves have previously argued to this Court that, without a citizenship question on the census, "[Citizen Voting Age Population] figures simply do not exist at the level of granularity that the States require for purposes of drawing state legislative districts." N.Y. Br., *Evenwel*, at 19.

## C. ACS data is not compatible with other decennial census data.

The ACS dataset does not mesh with the decennial census dataset. *See* A.R. 1210-11. ACS data is continually collected on a monthly basis and only later aggregated into one-, three-, and five-year estimates. The decennial census, by contrast, is a snapshot of the country taken once per decade. Further complicating matters, ACS geography (*e.g.*, urban areas, census tracts, block groups, *etc.*, as well as how those terms are defined) resets with the decennial census, which results in data discontinuity at precisely the time officials who are engaged in redistricting need race and citizenship data to ensure VRA compliance. Thus, any attempt to merge population data from the census with citizenship data from the ACS requires significant adjustments to the datasets.

Accordingly, it was bizarre for the district court to find that, because census citizenship data "is by definition quickly out of date," it cannot be helpful in

17

enforcing the VRA. Pet. App. 527a. That is true of *all* census data upon which *all* redistricting is premised. The district court's argument is not a criticism of the citizenship question; it is an attack on the census itself. Because VRA compliance and enforcement relies primarily on decennial census data—including for total population and racial demographic figures—it is *better* for the citizenship data to stem from that same source, rather than a completely separate survey.

### D.  ACS data is not authoritative and subject to manipulation in litigation.

Finally, the ACS does not provide an authoritative dataset for States to rely upon. Rather, courts must wrestle with whether the relevant dataset should be the one-, three-, or five-year estimate. Nathaniel Persily, *The Law of the Census: How to Count, What to Count, Whom to Count, and Where to Count Them*, 32 CARDOZO L. REV. 755, 777 (2001) ("Each [range] . . . indicate[s] a different number of citizens, include[s] a different statistical range for each level of geography, and [is] amenable to different arguments as to their relative validity."). And litigants may further debate when the relevant time period should begin and end. *See, e.g.*, *Rodriguez v. Harris Cty.*, 964 F. Supp. 2d 686, 731-33 (S.D. Tex. 2013) (resolving whether to use 2005-2009 or 2006-2010 ACS data). In contrast, the decennial census occurs only once every ten years. There is no room for manipulation in selecting the relevant time-band— a virtue Respondents themselves have acknowledged. *See* N.Y. Br., *Evenwel*, at 19-20; *cf. also Dep't of Commerce*

18

*v. U.S. House of Representatives*, 525 U.S. 316, 348-49 (1999) (Scalia, J., concurring in part) (arguing for the interpretation "with minimal possibility of partisan manipulation").

\*       \*       \*

In the absence of reliable citizenship data from the federal census, States lack the resources to conduct their own statewide citizenship surveys. Some States—including Respondents New York and Massachusetts—used to do so in order to apportion state districts according to citizen populations. N.Y. Br., *Evenwel*, at 1-5. Yet because States lacked the expertise and resources of the Bureau, their data was intolerably inaccurate. Ruth C. Silva, *The Population Base for Apportionment of the New York Legislature*, 32 Fordham L. Rev. 1 (1963). As a result, several States specifically amended their Constitutions to require only apportionment by population. *See* N.Y. Const. art. III, § 5-a; Mass. Const. art. CXII; Tenn. Const. art. II, §§ 4-6.

As the cases cited above demonstrate, significant amounts of Section 2 litigation stem from the inaccuracies of ACS data, its incompatibility with decennial census data, and the lack of any authoritative dataset.[12] *See also* A.R. 1211. These uncertainties are compounded by the corresponding uncertainty as to

---

[12] For example, *compare* Expert Report of Jorge Chapa, Ph.D. (Univ. of Ill. at Urbana-Champaign), Doc. 128-5 (Aug. 8, 2011), *with* Expert Report of Stephen Ansolabehere, Ph.D. (Harvard University), Doc. 272 (Aug. 31, 2011). *Perez v. Texas*, No. 5:11-cv-00360 (W.D. Tex.).

19

how any particular court will view the same issues. This imposes significant costs on the States in both their attempts to redistrict and defending those attempts in court. The Bureau's simple step of adding a citizenship question to the Census, combined with data from administrative records, will reduce the likelihood and expense of litigation by providing a unified dataset that will be authoritative, accurate, and reliable. Legislatures can therefore draw districts with greater certainty. And citizens, in turn, can rest more confident that their fundamental right to vote is adequately protected.

In light of these benefits, the Secretary was eminently reasonable in exploring options to improve citizenship data, including by the addition of a citizenship question on the census. Yet the court below entirely ignored these concerns expressed by the States in the administrative record that was before the Secretary when he made his decision. *See supra*, at 1-2. As Petitioner argues, the Secretary also had ample reason to believe that reliance on federal administrative records alone would not produce data as comprehensive as combining those records with responses to a citizenship question.

Moreover, sole reliance on those federal records would again ignore the interests of the States, which traditionally have had ready access to Census data but not federal records data held by federal agencies. *See*, *e.g.*, Pet. App. 44a (acknowledging that reliance on administrative records for citizenship data would be through an "internal, confidential data file"). That the

20

Census Bureau can assemble an ad hoc team to provide the relevant data to federal litigators, A.R. 1279, provides little help to the States. The whole point of the States requesting a citizenship question on the census is so all parties can have access to the best possible data at the time States are engaged in redistricting. Promises that federal litigators can access data when bringing enforcement suits do not adequately protect States' interests—or those of voters.

### III. Including a citizenship question will not have an adverse effect on participating residents, nor did the administrative record demonstrate it will cause a significant undercount.

Respondents' principal contention—both to show standing and as a basis to demand that this Court begin dictating that content of the census questionnaire—is that inclusion of a citizenship question may eventually lead some not to respond to the census. A citizenship question will cause fear, so the argument goes, and fear will cause an undercount. But census respondents have no reason to fear that disclosing their citizenship status will negatively affect them in any way. And the empirical evidence before the Secretary when he made his decision did not show that a citizenship question will result in a significant undercount.

Respondents' fear of fear is nothing new. Even in the very first census the federal government had to grapple with worries of an undercount "because the

21

religious scruples of some, would not allow them to give in their lists" and others "fear[ed] . . . that it was intended as the foundation of a tax[, which] induced them to conceal or diminished theirs." *Baldrige v. Shapiro*, 455 U.S. 345, 353-54 n.8 (1982) (quoting 31 The Writings of George Washington 329 (J. Fitzpatrick, ed. 1939)). All of the most recent censuses, too, had an undercount that disproportionately affected Hispanic communities—despite a lack of a citizenship question. Pet. App. 139a. Certainly existing census questions that spawn their own fears, such as those about race and Hispanic origin, cannot have helped these undercount problems. Under Respondents theories, then, every modern census is unlawful. But fear itself is no reason to grind the census to a halt. And irrational fears cannot be the basis either for standing or for the judicial intervention that Respondents demand in this case.

### A. Census responses could not convey whether the person responding is an illegal immigrant.

As a matter of logic, noncitizen status does not imply illegal alien status. Even if the federal government sought to use census form responses to deport illegal immigrants, immigration officials would not be able to tell from the form whether a particular alien was here legally or illegally. *Cf. United States v. Greenberg*, 200 F. Supp. 382, 390-91 (S.D.N.Y. 1961) (noting that access to census lists "would be of little aid" in jury selection process).

22

As the U.S. Attorney General summarized long ago: "The sole purpose of the census is to secure general statistical information regarding the population and resources of the country, and replies are required from individuals only to permit the compilation of such general statistics. No person can be harmed in any way by furnishing the information required. The census has nothing to do with taxation, with military or jury service, with the compulsion of school attendance, with the regulation of immigration or with the enforcement of any national, state or local law or ordinance. There need be no fear that any disclosure will be made regarding any individual person or his affairs." *FTC v. Orton*, 175 F. Supp. 77, 79-80 (S.D.N.Y. 1959) (quoting 36 Op. Att'y Gen. 362, 366 (1930)).

## B. The Bureau is prohibited from sharing census responses with law enforcement.

Moreover, the Bureau is statutorily prohibited from sharing any data where an "individual . . . can be identified." 13 U.S.C. § 9(a)(2). "Sections 8(b) and 9(a) explicitly provide for the nondisclosure of certain census data." *Baldrige*, 455 U.S. at 355. This "confidentiality of individual responses has long been assured by statute." *Franklin*, 505 U.S. at 818 n.18 (Stevens, J., concurring in part). And "the history of the Census Act and the broad language of the confidentiality provisions of § 9 make abundantly clear that Congress intended both a rigid immunity from publication or discovery and a liberal construction of that immunity that would assure confidentiality." *Carey v. Klutznick*,

653 F.2d 732, 739 (2d Cir. 1981) (citation and quotation marks omitted). By its text, "[n]o discretion is provided to the Census Bureau on whether or not to disclose the information referred to in §§ 8(b) and 9(a)." *Baldrige*, 455 U.S. at 355. As a result, this prohibition has been interpreted as "a flat barrier to disclosure with no exercise of discretion permitted." *Seymour v. Barabba*, 559 F.2d 806, 808 (D.C. Cir. 1977).

These protections reflect "a determination that the purpose of encouraging ready response to census inquiries would be better served by extending the privilege of confidentiality to the retained copies." *LaMorte v. Mansfield*, 438 F.2d 448, 452 (2d Cir. 1971) (Friendly, J.); *see also Baldrige*, 455 U.S. at 361 ("[T]he Census Act embod[ies] explicit congressional intent to preclude all disclosure of raw census data reported by or on behalf of individuals."). This "strong policy of nondisclosure" was implemented "to encourage public participation and maintain public confidence that information given to the Census Bureau would not be disclosed." *Id.* Indeed, the "Congressional purpose that filed information be kept inviolate is underscored by [o]ther section[s] which impos[e] substantial criminal sanctions for any unauthorized disclosure." *United States v. Bethlehem Steel Corp.*, 21 F.R.D. 568, 572 (S.D.N.Y. 1958) (citing 13 U.S.C. § 214); *see also* 13 U.S.C. § 213.[13]

---

[13] As one court noted: "One need not probe far to understand that when Congress imposed upon citizens the duty of disclosing information of a confidential and intimate nature, its purpose was to protect those who complied with the command of the statute.

24

As a result, courts have staunchly protected the confidentiality of census response forms. *FTC v. Dilger*, 276 F.2d 739, 744 (7th Cir. 1960) (holding retained copies of response forms are protected from disclosure); *United States v. Int'l Bus. Machs. Corp.*, 20 Fed. R. Serv. 2d 1082, 1975 WL 905 (S.D.N.Y. 1975) (holding the Bureau's refusal to release responses does not violate due process); *Orton*, 175 F. Supp. at 78-79 (holding responses are protected from disclosure to federal agencies); *Bethlehem Steel Corp.*, 21 F.R.D. at 572 (holding responses could not be disclosed because of Congress' "clear and unambiguous" intention to keep them privileged); *see also St. Regis Paper Co. v. United States*, 368 U.S. 208, 218 (1961) (noting the importance of "free and full" submissions by the public to the Bureau); *United States v. Little*, 321 F. Supp. 388, 392 (D. Del. 1971) ("[T]he information obtained by the census questionnaire is strictly confidential. It may not be used other than for statistical reporting and may never be disclosed in any manner so as to identify any individual who has answered the questions.") (citation omitted).

Not even States have a right to obtain census information that the Bureau deems confidential. *Senate of State of Cal. v. Mosbacher*, 968 F.2d 974, 978-79 (9th Cir. 1992) (California not entitled to Bureau's statistical methods because Enumeration Clause offers no

---

Apart from giving assurance to citizens that the integrity of the information would be preserved by the Government, another purpose was to encourage citizens to submit freely all data desired in recognition of its importance in the enactment of laws and other purposes in the national interests." *United States v. Bethlehem Steel Corp.*, 21 F.R.D. 568, 570 (S.D.N.Y. 1958).

25

right to disclosure). Nor, as a legal matter, should this Court rest its judgment on the assumption that federal executive officers will violate statutory law. We are not aware of any case where this Court has explicitly held that a party has standing to challenge a government action—much less prevail—when the plaintiff's injury stems from actions of third parties that are not only illegal, but also that the government actively and aggressively seeks to prevent.

### C. There was no empirical evidence presented to the Secretary that asking about citizenship will cause a significant undercount.

While it may be true that *any* census question may lead to nonresponse by certain persons—whether due to irrational fear, fatigue in answering a longer form, political defiance, or otherwise—that cannot be enough to invalidate the discretionary choices of the Secretary. Contrary to Respondents' assertions, no significant empirical evidence presented to the Secretary at the time of his decision demonstrated that a citizenship question is wholly untested or will lead to a massive undercount that both cannot be ameliorated and incontestably outweighs the statistical benefits of asking the question.

1.  Citizenship questions are not untested. Rather, they have consistently been included on *both* the decennial census and the ACS for many iterations. *Supra*, at 8-11. As previously noted, Americans have been

26

asked their citizenship status by the Census Bureau over a billion times. *Id.* Significant evidence in the administrative record justified this conclusion, including from Dr. Abowd, the Census Bureau's Chief Scientist, who informed the Secretary that "[s]ince the question is already asked on the American Community Survey, we would accept the cognitive research and questionnaire testing from the ACS instead of independently retesting the citizenship question." A.R. 1279; *see also* A.R. 1156; Pet. App. 550a, 560a. The Bureau also informed the Secretary that no particular precedent existed when adding a question. *See* A.R. 1296. While the district court took issue with the conclusion that no further testing was necessary, it relied primarily on evidence that was not in the administrative record at the time of the Secretary's decision. *See* Pet. App. 103a. The only administrative record item cited by the district court that recommended testing before adding a citizenship question was a comment letter that failed to address why ACS and long-form testing is insufficient. *Id.* (citing A.R. 8555-56). The Secretary acted well within his discretion to decide that the weight of the evidence supported the conclusion that additional testing was unnecessary.

2.   Courts have long recognized that the ACS, which includes a citizenship question, does not have an overall response rate that especially disadvantages minority communities. *Rodriguez*, 964 F. Supp. 2d at 730-31 (finding that ACS approximated the census tallies for ethnic and minority populations); *Fabela*, 2012 WL 3135545, at *6 (noting that the ACS significantly

27

over-represents the number of Hispanics in Dallas County). Further, when the citizenship question was introduced in the ACS in 2005, the response rate actually increased for the following four years.[14] *See also* A.R. 1156; Pet. App. 552a, 559a. The court below ignored these realities.

Further evidence from the Bureau itself suggests that the inclusion of a citizenship question would not significantly deter participation in census surveys. In 2006, the Bureau studied proposed modifications to ACS questions, including the citizenship question. Philip Harris, et al., *Evaluation Report Covering Place of Birth, U.S. Citizenship Status, and Year of Arrival* (Jan. 12, 2007).[15] The study concluded that revising that question to ask for more detailed information— namely, year of naturalization—did not impact either the overall response rate, which was greater than 95%, or the nonresponse rate to the citizenship question, which was about 3%. *Id.* at 15, 19. This high response rate—and the fact that even respondents who decline to answer the citizenship question (3%) are still counted in the broader survey—undermine Respondents' theory that reintroducing a citizenship question in the census will cause a massive undercount.

3.   Respondents and the district court claim that the Bureau has acknowledged for decades that asking

---

[14] U.S. Census Bureau, *American Community Survey: Response Rates*, www.census.gov/acs/www/methodology/sample-size-and-data-quality/response-rates/.

[15] www.census.gov/library/working-papers/2007/acs/2007_Harris_01.html.

28

about citizenship reduces response rates. Pet. App. 28a-29a. But closer examination belies these assertions. Most of the alleged acknowledgements were responses to the proposed exclusion of undocumented residents from the census entirely. For example, the court below cited *Federation for American Immigration Reform v. Klutznick*, but the issue in that case was not whether to ask about citizenship; rather it was whether the Bureau was required to "exclude [illegal aliens] from the apportionment base." 486 F. Supp. 564, 567 (D.D.C. 1980). Likewise, the 1988 and 1989 congressional testimony of Bureau officials related to a proposal to exclude undocumented residents from the census.[16] With respect to that proposal, Bureau officials were primarily concerned with the effect of asking, not about citizenship, but about legal residency.[17] Suffice it to say, asking whether someone is lawfully present raises very different concerns from asking whether he is a U.S. citizen. The 2009 letter from former Bureau directors supports that distinction, because it contrasted a proposed "untested" question about both "citizenship and immigration status" with the well-tested ACS citizenship question, which "only asks if respondents are U.S. citizens, not if they are in

---

[16] *See* Census Equity Act, H.R. 2661, 101st Cong. § 2(2) (1989), www.congress.gov/bill/101st-congress/house-bill/2661/text.

[17] *See Census Equity Act: Hearings Before the Subcomm. on Census & Population of the H. Comm. on Post Office & Civil Serv.*, 101st Cong. 43-44 (1989) (statement of C. Louis Kincannon); *see also Exclude Undocumented Residents from Census Counts Used for Apportionment: Hearing Before the Subcomm. on Census & Population of the H. Comm. on Post Office & Civil Serv.*, 100th Cong. 50 (1988) (testimony of John Keane).

29

the country lawfully." *Statement of Former Census Directors on Adding a New Question to the 2010 Census* 1 (Oct. 16, 2009).[18]

4. The only empirical evidence in the administrative record at the time of the Secretary's decision suggesting the potential for an undercount with any significant statistical detail is the January 19, 2018 memorandum from Dr. Abowd. *See* A.R. 1277-85. The court below repeatedly relied on this memorandum as the sole piece of evidence for its oft-repeated conclusion that a citizenship question will lead to an increase in noncitizen response of 5.1%. Pet. App. 45a, 46a-49a, 141a-142a, 286a. But the court's uncritical reliance on the 5.1% figure was a grave mistake.[19]

Careful analysis of the January 19, 2018 memorandum shows it attempted to estimate the nonresponse rate to the citizenship question in three ways. First, the memorandum noted the nonresponse rate to the specific citizenship question among respondents to the ACS. A.R. 1280. But of course, these persons still

_____

[18] The remaining statements cited by Respondents and the district court were not positions of the Bureau, but merely private opinions of former Bureau officials.

[19] The court also cited Bureau memoranda from December 22, 2017 and January 3, 2018, but the January 19, 2018 memorandum offered a more detailed explanation of the figures stated in those earlier memoranda. Pet. App. 46a-47a. Similarly, the district court and respondents rely on an internal Census Bureau memo that relies on essentially the same analysis as the January 19, 2018 memo. *See* A.R. 5500-11. And the court relied heavily upon an August 6, 2018 memorandum (the "Brown Memo"), but this memorandum postdated the Secretary's decision. *See* Pet. App. 293a n.68.

responded to the survey, making it a poor measure of how many will refuse to respond to the Census overall (causing a potential undercount) because of the citizenship question.[20]

Next, the memorandum compared the non-response rate to the 2000 short-form census (which did not ask citizenship) with the 2000 long-form census (which did ask citizenship among many other things). It also compared the nonresponse rate to the 2010 census (no citizenship question) with the 2010 ACS (citizenship question among many others). Responses for all demographics were lower for the long-form census and ACS, but "[i]n th[e] 2010 comparison, [ ] the decline in self response was 5.1 percentage points greater for noncitizen households than for citizen households." A.R. 1280.[21]

This appears to be the origin of the 5.1% figure—but the flaws of reading it as a proxy for how many noncitizens will refuse to respond to the Census

---

[20] Nonresponse to particular questions can always be supplemented by administrative records—per the Secretary's decision to choose the hybrid approach. To the extent that Respondents point to this to show the low quality of the ACS citizenship responses, that just underscores the problems with the ACS itself. Adding the same question to the Census can't make things any worse. In any event, the ACS also has similar problems accurately measuring other demographics, such as those identifying as Native Americans, but Respondents do not suggest that the Census should stop asking about race. *See* A.R. 1289.

[21] The response rate to the 2010 Census was 79.9% for citizens and 71.5% for noncitizens. The response rate to the 2010 ACS was 66.1% for citizens and 52.6% for noncitizens. *See* A.R. 5506.

31

because of the citizenship question are manifest. The assumption that the citizenship question *caused* the lower differential response rates is wholly unwarranted. (Indeed, they are not even correlated in a statistically meaningful way). Numerous factors can explain why the nonresponse rate is higher on the ACS (or long-form census) than the short-form census. *See* A.R. 5506 (admitting that "there could be other reasons why households with noncitizens are particularly unwilling to respond to the ACS").

To start, the ACS and the long-form are much longer and more burdensome surveys (around 50 questions compared to the short-form's 8 questions). A.R. 1281; Pet. App. 552a-554a, 558a. It is logical that noncitizens, who are more likely to be economically disadvantaged, will be more deterred by the time burdens imposed by a much longer survey than citizens. Moreover, any one of those extra dozens of questions could have caused increased nonresponse in any given case, as opposed to the citizenship question. Increased nonresponse may also be due to the fact that the Census involves far greater outreach and follow-up than the ACS. Pet. App. 553a. It would not be surprising if such outreach was more effective among citizens than noncitizens, leading to the greater differential nonresponse rate. Many other factors also lead to differential nonresponse, including increased distrust of government in minority communities and targeting by interest groups that discourage participation in government surveys. Pet. App. 557a-559a. Any one of these factors may disproportionately affect noncitizen

32

households. Thus, it is wildly reckless to assume the entire 5.1% difference between citizen and noncitizen failure to respond is based on the citizenship question alone. The Secretary was right to reject that assumption. Had the Secretary relied on the 5.1% figure in the same manner as the district court, *that* decision may have violated the APA for failure to account for alternative explanations and other important aspects of the problem. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The January 19, 2018 memorandum also offered a third approximation of nonresponse caused by the citizenship question: the rate at which those who started the ACS online chose to stop taking the survey when they reached the citizenship question (the "breakoff rate"). A.R. 1281. The "breakoff rate" for Hispanics on the citizenship question was a mere 0.36%. *Id.* Meanwhile, the total breakoff rate for Hispanics at any point of the survey was 17.6%. In other words, only 2% of the breakoffs were attributable to the citizenship question. From these figures it is reasonable to assume that, of the 5.1% differential nonresponse rate for noncitizens relied upon so heavily by the district court, only 0.1% of nonresponse was attributable to the citizenship question (*i.e.*, 2% of 5.1%). The memorandum also estimated that, given a normal rate of cooperation after Non-Response Follow-Up (NRFU), the 5.1% differential nonresponse would result in 139,000 fewer correct enumerations. A.R. 1282. But if only 2% of those are attributable to the citizenship question, that means

33

that the estimated undercount resulting from the citizenship question is less than 3,000 people. In a country of 330,000,000, the citizenship question would cause an undercount of 0.001%. That's it.

In light of this evidence, the Secretary exercised his discretion in determining that the fears of an undercount did not override the benefits of a citizenship question. Pet. App. 556a-562a. Combined with the use of administrative records, the citizenship question will provide everyone—the DOJ, States, voters—access to better citizenship data than has existed for over a decade. Given all the benefits of adding a citizenship question detailed above, did the Secretary act arbitrarily and capriciously in determining that those benefits outweighed the risk of a 0.001% undercount? No.

\*     \*     \*

Every census question carries with it the risk of increased nonresponse rates. Yet even though Respondents claim that census responses will be lowered because of the "anti-immigrant policies, actions, and rhetoric targeting immigrant communities of President Trump," 18-cv-2921, D. Ct. Doc. 85 at 2, 12-13 (Apr. 30, 2018), they do not challenge the inclusion of questions on race and Hispanic origin. In other words, Respondents' view is that it is permissible for the government to ask about race, even though that information presumptively cannot form the basis of government action, *see* U.S. CONST. amend. XIV & XV. But it is *impermissible* for the government to ask about citizenship—information that government must often act

34

upon, *see* U.S. CONST. amend. XIV, § 1 (guaranteeing "the privileges or immunities of *citizens*" (emphasis added)); *id.* at amend. XV, § 1 (guaranteeing the "right of citizens of the United States to vote" regardless of race).

If indeed there is a significant undercount of immigrant residents in the 2020 Census, it will be because certain actors have politicized a commonsense issue by choosing to fan unsubstantiated fears that may deter noncitizens from participating in the Census. Respondents' attack on the citizenship question, filled with allegations that it is intended to harm minorities and designed to produce an undercount, risks becoming a self-fulfilling prophecy.

————————◆————————

## CONCLUSION

The Court should reverse the decision below.

Respectfully submitted,

MIKE HUNTER
   Attorney General of Oklahoma
MITHUN MANSINGHANI
   Solicitor General
   *Counsel of Record*
OKLAHOMA OFFICE OF
   THE ATTORNEY GENERAL
313 NE Twenty-First St.
Oklahoma City, OK 73105
(405) 522-4392
mithun.mansinghani@oag.ok.gov

March 6, 2019

35

Additional Counsel for Amici

STEVE MARSHALL
Attorney General
of Alabama

LESLIE RUTLEDGE
Attorney General
of Arkansas

ASHLEY MOODY
Attorney General
of Florida

CHRIS CARR
Attorney General
of Georgia

CURTIS T. HILL, JR.
Attorney General
of Indiana

DEREK SCHMIDT
Attorney General
of Kansas

GOVERNOR MATT BEVIN
of the Commonwealth
of Kentucky

JEFF LANDRY
Attorney General
of Louisiana

GOVERNOR PHIL BRYANT
of the State
of Mississippi

ERIC S. SCHMITT
Attorney General
of Missouri

TIM FOX
Attorney General
of Montana

DOUG PETERSON
Attorney General
of Nebraska

ALAN WILSON
Attorney General
of South Carolina

JASON R. RAVNSBORG
Attorney General
of South Dakota

KEN PAXTON
Attorney General
of Texas

PATRICK MORRISEY
Attorney General
of West Virginia