*Stone v. Allen*

**Rebuttal Expert Report of Dr. Traci Burch**

**April 19, 2024**

<u>Scope of the report</u>

I was asked to address two main arguments raised by the defense experts. First, I was asked to respond to the argument, made by Dr. Reilly, that racial disparities between Black and White Alabamians are the result of the "cultural practices"[1] of Black people rather than systemic discrimination. Second, I was asked to address Dr. Carrington's argument that voting patterns by race reflect partisanship rather than racial attitudes or policy preferences. I respond to each report in turn below.

<u>Dr. Reilly's Argument that Racial Disparities Do Not Result from Racial Discrimination</u>

Dr. Reilly argues that racial discrimination does not account for the racial disparities in educational attainment, income, and other outcomes related to political participation that are described in my report. He attempts to support this claim in two ways. First, he argues that because Black people have worse outcomes relative to White people in other states, racial discrimination cannot be the cause of racial disparities in Alabama. Second, he implies that the ensuing "six decades after the Civil Rights Act" and "a truly massive focus on registering and turning out minority voters in Alabama and throughout the United States" have erased the effects of racial discrimination on outcomes in Alabama and the rest of the country; thus, any remaining disparities are due to other, non-discriminatory or "tertiary variables."[2]

In making these arguments, however, Dr. Reilly demonstrates little familiarity with any mainstream literature on race in political science, economics, history, sociology, or related disciplines. He fails to engage with foundational research on race and voter turnout, educational attainment, employment, or criminal justice. He ignores a large body of contemporary evidence that contradicts his claims, including evidence where courts have found that Alabama continues to discriminate against Black people in education, criminal justice, and voting in the contemporary period.

Any serious discussion of the rigorous, widely-accepted, peer-reviewed research available on these topics would lead to the opposite of Dr. Reilly's conclusion: Black people still face structural barriers in education, employment, health, and voting in Alabama. I undertake that discussion below.

*Claim 1: Black People Have Worse Outcomes Everywhere*

First, Dr. Reilly argues that racial discrimination does not affect voting in Alabama because racism is a "locally unique variable"[3] but racial disparities between Black and White

---

[1] Reilly Report, 13.
[2] Reilly Report, 8.
[3] Reilly Report, 3.

21-cv-01531
11/12/2024 Trial
Plaintiffs Exhibit 13

people exist everywhere. Dr. Reilly then provides tables of racial disparities between Black and White outcomes along several dimensions in other states as proof that racial discrimination in Alabama does not affect outcomes in that state. (Dr. Hood provides these tables of racial disparities in various outcomes in other states as well.) There are several examples of these kinds of claims. For instance, Dr. Reilly states in his report:

> *However, the awkward reality is that white students perform better educationally than Black students in every single state, and in almost every single county of the United States – i.e., Alabama is in no way an outlier here – and racism seems to have very little to do with this: the size of contemporary group gaps in SAT scoring and college attendance correlates only slightly with documented levels of historical racism.*[4]

Elsewhere, Dr. Reilly states:

> *However, given the number of well-performing Southern states just listed which are not known for exceptionally high rates of crime, it could also simply be the case that serious racism is no longer significantly more prevalent in the American South than in many other locales, race relations are arguably often better, and constant assertions that this is not so are becoming a bit of a calumny.*[5]

Dr. Reilly fails to support any of these speculations with evidence and instead relies on vague turns of phrase that prevent any real analysis. For example, what does Dr. Reilly mean by "documented levels of historical racism?" What is "serious racism?" How does he define "locally unique" racism? In the footnote to the first statement, he seems to be arguing that "historical racism" is something that occurred in the "old south," but does not explain what he considers to be "historical racism," the "old south," or why he thinks that Black Americans were exposed to "serious" racism there but not anywhere else. Does he mean slavery? Or Jim Crow?

At other times, the report contains other language that suggests that Dr. Reilly views racial discrimination as interpersonal attitudes. However, his claims about improving interpersonal racial attitudes are thinly supported. For example, in Footnote 42, Dr. Reilly argues that race relations are better in the United States and the south today based on data from 25 years ago, even though more recent polling clearly shows a large decline in the belief that race relations are "very" or "somewhat good" among both Black and White adults since then (Figure 1).[6] He dismisses the voluminous academic literature on "racial resentment"[7] by citing a 2013 article from a radio station in Footnote 41. Dr. Reilly's other example of improving race relations, interracial marriage, does not consider the measure that scholars tend to use, which involves acceptance of a close relative marrying a person of a different race. When using that

---

[4] Reilly Report, 9.
[5] Reilly Report, 24.
[6] "Race Relations." Gallup. Available online https://news.gallup.com/poll/1687/race-relations.aspx. Accessed 5 Apr 2024.
[7] For a brief review of this literature, see Wilson, David C., and Darren W. Davis. "Reexamining racial resentment: Conceptualization and content." *The Annals of the American Academy of Political and Social Science* 634, no. 1 (2011): 117-133.

21-cv-01531
11/12/2024 Trial
Plaintiffs Exhibit 13

measure, there exists a larger number of Americans (14%) who say that they would struggle to accept interracial marriage of their close relatives to Black people.[8]

*Figure 1: Perceptions of Race Relations in the United States.*



The claim that racism is "a locally unique variable" is crucial to Dr. Reilly's argument but the term is never defined nor is the overall claim ever substantiated. I would reject the idea that Black people experienced racial discrimination only in the past and only in the "old south." Moreover, I do not agree that racial discrimination encompasses only *de jure* systems such as Jim Crow or interpersonal attitudes and stereotypes. Black people have faced racial discrimination throughout the United States; we should and do see persistent racial gaps in outcomes in multiple states as a result. It also is true that Black people have faced and continue to face structural barriers to better outcomes in Alabama.

For instance, if we think of educational segregation as a marker of "serious racism," there is clear evidence of historical and contemporary educational segregation in districts across the United States. According to a Pro Publica investigation, by 2014, school districts in 45 states and the District of Columbia had been subject to court-ordered or voluntary desegregation orders

---

[8] See Pew Research Center. 2017. "Intermarriage in the U.S. 50 Years After Loving v Virginia." Available online https://www.pewresearch.org/social-trends/2017/05/18/2-public-views-on-intermarriage/. Accessed 15 Apr 2024. Djamba, Yanyi K., and Sitawa R. Kimuna. "Are Americans really in favor of interracial marriage? A closer look at when they are asked about black-white marriage for their relatives." *Journal of Black Studies* 45, no. 6 (2014): 528-544.

21-cv-01531
11/12/2024 Trial
Plaintiffs Exhibit 13

since *Brown v. Board of Education* was decided in 1954.[9] Contemporary educational segregation particularly plagues districts in the southeast, including in Alabama, but also can be found in districts with larger Black populations across the country as shown in Figure 2.[10]

To take another example of educational discrimination that is not limited to the south, a report from the Federal Reserve Bank of St. Louis found that nationwide, school districts spend $7,329 per pupil on instruction for White students and $7,169 on instruction for Black students. These gaps seem small at first glance, but when multiplied across thousands of students, it can mean that districts serving a larger number of Black students can receive millions fewer dollars than a comparable White district. Further, the gap in local expenditures between Black and White students is even greater because Federal money helps close the gap in per-pupil expenditures to some extent.[11]

These issues affect outcomes for Black people nationwide but are particularly salient for Alabama. As I highlight in my previous report, Alabama was slow to desegregate after *Brown*. According to the Southern Educational Reporting Service 1961 Report, Alabama maintained segregated schools well into the 1960s even though several years had passed since the Supreme Court ordered schools to desegregate in *Brown v. Board of Education* in 1954.[12] By 1965, less than 1% of Black Alabama students were enrolled in integrated schools. Desegregation did not begin in Alabama until the early 1970s after decisions in *Lee v. Macon County* and *Swann v. Charlotte-Mecklenburg*.

The long system of *de jure* educational segregation in Alabama still has clear effects on today's electorate. In 2020, 38.6 percent of votes in the Alabama general election were cast by people aged 60 and older—people who were at least school age in 1965, when Alabama still maintained separate and unequal schools for Black and White students statewide.[13] In other

---

[9] Qiu, Yue and Nikole Hannah-Jones. 2014. "A National Survey of School Desegregation Orders." *Pro Publica*. Available online https://projects.propublica.org/graphics/desegregation-orders. Accessed 17 Apr 2024.

[10] Groeger, Lena V., Annie Waldman, and David Eads. 2018. "Miseducation: Is there Racial Inequality at Your School?" *Pro Publica* Available online https://projects.propublica.org/miseducation/. Accessed 5 Apr 2024.

[11] Rubinton, Hannah and Maggie Isaacson. 2022. "School District Expenditures and Race." Federal Reserve Bank of St. Louis. Available online https://research.stlouisfed.org/publications/economic-synopses/2022/02/16/school-district-expenditures-and-race. Accessed 4 Apr 2024.

[12] Southern Educational Reporting Service. 1961. A statistical summary, State by State, of segregation-desegregation activity affecting Southern schools from 1954 to present, together with pertinent data on enrollment, teachers, colleges, litigation and legislation. Southern Education Reporting Service: 1.

[13] Alabama Secretary of State. General Election Participation by Age. Available online https://www.sos.alabama.gov/sites/default/files/election-data/2021-06/2020%20General%20Election%20Participation%20by%20Age.pdf. Accessed 2 Apr 2024.

words, a substantial portion of Alabama's *current* electorate was educated under a discriminatory system of separate but unequal education.[14]

These effects of discriminatory educational systems in Alabama are not limited to the era of *de jure* segregation either. Courts have found that multiple school districts in Alabama provide Black students with unequal education to that provided to White students; districts began taking steps to remedy those disparities only in recent years. For instance, the Justice Department found in Madison County,

> . . . that Black students faced unnecessary barriers to participating In gifted and advanced programs, that they were subjected to exclusionary discipline at disparate rates when compared to their white peers, that Black high schoolers were more likely than their White peers to be referred for subjective infractions, and that the district's recruitment and hiring processes left several schools without a single Black faculty member.[15]

There are several other examples of educational discrimination that have been remedied only recently (if at all) such as segregated proms,[16] extracurricular activities,[17] and other aspects of school quality such as access to Advanced Placement classes and student discipline.[18] In Jefferson County in 2018, courts blocked an attempt to secede from that county's district by mostly White residents of the city of Gardendale because the secession was motivated by racial discrimination against Black children.[19] These and other examples show that, contrary to Dr. Reilly's assertion that "racism seems to have very little to do"[20] with outcome disparities between Black and White students, courts have found numerous ways in which local policies and

---

[14] According to data from the Census Bureau, 64% of Alabamians aged 60 and older were born in Alabama.

[15] US Department of Justice. "Justice Department Secures Resolution in Madison County, Alabama School Desegregation Case." Available online https://www.justice.gov/opa/pr/justice-department-secures-resolution-madison-county-alabama-school-desegregation-case. Accessed 8 Apr 2024. See also *Bennett et al. v. Madison County Board of Education*. Consent Order. https://www.justice.gov/media/1229821/dl.

[16] Gross, Jane and Ronald Smothers. 1994. "In Prom Dispute, a Town's Race Divisions Emerge." The New York Times. Available online. https://www.nytimes.com/1994/08/15/us/in-prom-dispute-a-town-s-race-divisions-emerge.html. Accessed 8 Apr 2024.

[17] US Department of Justice. "Justice Department Reaches Agreement with Alabama School District to End the Use of Race in Extracurricular Activities." Available online https://www.justice.gov/opa/pr/justice-department-reaches-agreement-alabama-school-district-end-use-race-extracurricular. Accessed 8 Apr 2024.

[18] See, for example, consent orders in *Hereford v. Huntsville Board of Education* (available online https://www.justice.gov/media/464346/dl and https://law.justia.com/cases/federal/district-courts/alabama/alndce/5:1963cv00109/108188/541/), Lee v. Macon County Board of Education Calhoun County School System (available online https://www.justice.gov/media/403291/dl), *Lee v. Chambers County Board of Education* (available online https://casetext.com/case/lee-v-bd-of-educ-1).

[19] *Stout v. Jefferson Cnty. Bd. Of Educ.*, 882 F.3d 988 (11th Cir. 2018).

[20] Reilly Report, 9.

21-cv-01531
11/12/2024 Trial
Plaintiffs Exhibit 13

structural inequalities leads to unequal educational outcomes between Black and White students in Alabama.

*Figure 2: Educational Segregation*



Dr. Reilly makes similar claims about racial gaps in incarceration rates throughout the country. However, academic research has established that racially disparate treatment in the criminal justice system is not a "locally unique variable" either. For instance, scholars have documented in states across the country that racial disparities in arrest are caused partially by factors that make it more likely that police will stop or search Black people, such as spatially differentiated policing, racial residential segregation, and discrimination (Beckett, Nyrop, and

21-cv-01531
11/12/2024 Trial
Plaintiffs Exhibit 13

Pfingst 2006; Gelman, Fagan, and Kiss 2007; Ousey and Lee 2008; Pierson et al. 2020). Racial disparities also exist in bail decisions[21] and in sentencing in federal and state courts.[22] These disparities in the operation of the criminal justice system persist even after accounting for legally relevant factors such as criminal history, crime type, or other behavioral factors.

Dr. Reilly also compares Alabama's incarceration disparities favorably with other states as a way of minimizing the importance of the state's racial gap. Dr. Reilly dismisses Sowell's claim that lower gaps in incarceration rates in the south are caused by higher criminality across *all* racial groups by arguing that "well-performing Southern states are not known for exceptionally high rates of crime"[23] compared to the Northeastern and Midwestern states that he discusses at earlier points in his report. Dr. Reilly does not make the basis for this claim clear, but data from the FBI's Uniform Crime Report show that the South in fact has much higher violent and property crime rates than states in the Northeast and Midwest.[24] Moreover, as I will show later in this report, in Alabama, there is a disconnect between crime, arrest, incarceration, and the incarceration rate that renders Dr. Reilly's attempt to tie Alabama's incarceration disparity to purported "Black criminality" illogical.

In short, Dr. Reilly argues that the existence of racial disparities in socioeconomic and other outcomes in states outside Alabama absolves Alabama of their racially disparate outcomes because the nationwide nature of racial disparities proves that discrimination did not play a role in producing the disparities in Alabama. In making this argument, Dr. Reilly supposes that racial discrimination throughout the country in education, criminal justice, employment, or other arenas was somehow not "serious discrimination" or was otherwise "locally unique" to Alabama or the old south more generally. The fact that educational segregation, education funding disparities, sentencing disparities and other aspects of discrimination and disparate treatment exist outside of Alabama and the South and play a role in racially disparate outcomes elsewhere does not diminish their effect in Alabama.

*Claim 2: Factors Other than Discrimination Explain Outcomes*

---

[21] Arnold, David, Will Dobbie, and Crystal S. Yang. "Racial bias in bail decisions." *The Quarterly Journal of Economics* 133, no. 4 (2018): 1885-1932.

[22] Rehavi, M. Marit, and Sonja B. Starr. "Racial disparity in federal criminal sentences." *Journal of Political Economy* 122, no. 6 (2014): 1320-1354; Abrams, David S., Marianne Bertrand, and Sendhil Mullainathan. "Do judges vary in their treatment of race?." *The Journal of Legal Studies* 41, no. 2 (2012): 347-383; Feigenberg, Benjamin, and Conrad Miller. "Racial Divisions and Criminal Justice: Evidence from Southern State Courts." *American Economic Journal.* 13, no. 2 (2021): 207–40; Alesina, Alberto, and Eliana La Ferrara. 2014. "A Test of Racial Bias in Capital Sentencing." The American Economic Review 104 (11): 3397–433.

[23] Reilly Report, 24.

[24] Federal Bureau of Investigation. "2019 Crime in the United States: Table 4." Available online https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/topic-pages/tables/table-4. Accessed 8 Apr 2024.

21-cv-01531
11/12/2024 Trial
Plaintiffs Exhibit 13

To further support his claim that discrimination does not affect voter turnout or other outcomes in Alabama, Dr. Reilly argues that "MOST racial performance gaps, very many of which are popularly attributed to a single factor variable – be this racism or genetics - shrink dramatically or disappear totally when other factor variables are adjusted for." Dr. Reilly argues that instead, behavioral factors such as "individual qualities" and "cultural characteristics like valuing education" better account for these disparities.[25] He argues that racial gaps in voting, educational attainment, employment, and criminal justice outcomes can be explained by factors other than "racism." However, Dr. Reilly's report relies on outdated or discredited research to reach his conclusions while ignoring decades of peer-reviewed scholarly work that does not support his arguments. A more rigorous evaluation of the evidence supports the argument that past and present racial discrimination, including structural differences in opportunities, still contributes to racial disparities in outcomes between Black and White Alabamians.

Barriers to Equal Education

Dr. Reilly and I agree that there are racial disparities in educational attainment and other educational outcomes between Black and White Alabama adults. However, Dr. Reilly and I disagree about the extent to which racial discrimination contributes to educational disparities by race. Instead of examining segregation, unequal resources, and other drivers of educational disparities, Dr. Reilly points to differences in study habits as the main reason that Black students do not achieve equally to White students.[26] To support his claim, he relies on a newspaper article about Nigerian Americans, a book from 2003 and a blog post from Brookings.[27] The book cannot account for the ensuing 20 years of research and events that have taken place since 2003. Meanwhile, the Brookings blog post supports the opposite point from the one Dr. Reilly wants to make: the authors note that structural inequalities, such as access to higher level AP classes that assign more work, are likely to account for the observed differences in study time between White and minority students.[28]

Dr. Reilly does not examine important, systemic barriers to equal education faced by Black students in Alabama. I have mentioned already the sizeable portion of the electorate that was educated under Alabama's system of *de jure* segregation. There are issues in contemporary Alabama as well. A recent, growing body of research shows that school funding matters for student achievement.[29] Alabama already is in the bottom ten states with respect to spending per

---

[25] Reilly Report, 18.
[26] Reilly Report, 13.
[27] Reilly Report, 13.
[28] Hansen, Michael and Diana Quintero. 2017. "Analyzing the Homework Gap among High School Students." Available online https://www.brookings.edu/articles/analyzing-the-homework-gap-among-high-school-students/. Accessed 8 Apr 2024. This issue was raised in the 2017 order in *Hereford v. Huntsville Board of Education*.
[29] Lafortune, Julien, Jesse Rothstein, and Diane Whitmore Schanzenbach. "School finance reform and the distribution of student achievement." *American Economic Journal: Applied Economics* 10, no. 2 (2018): 1-26. Card, David, and A. Abigail Payne. "School finance reform, the distribution of school spending, and the distribution of student test scores." *Journal of public*

student on public schools;[30] per-pupil expenditures were even lower than the state average in all but three of the districts in the counties at issue in this case.[31] A study by the University of Alabama finds that lower test scores between Black and White students in Alabama result in part from a lack of qualified math and science teachers.[32] Although the state plans to expand broadband access in the future,[33] diminished access to broadband internet for students in the Black Belt also contributes to achievement gaps today.[34] Dr. Reilly ignores these important structural barriers to education faced by Black students in Alabama.

Dr. Reilly also ignores continuing racial segregation in education. School segregation, along with other factors, is associated with student performance on assessment tests.[35] School segregation and inequality persist in Alabama and may have gotten worse since the 1990s.[36]

---

*economics* 83, no. 1 (2002): 49-82. Jackson, C. Kirabo, Cora Wigger, and Heyu Xiong. "Do school spending cuts matter? Evidence from the Great Recession." *American Economic Journal: Economic Policy* 13, no. 2 (2021): 304-335. Interestingly, Lafortune, Roghtsten, and Schanzenbach (2018) find that school funding reform did not help close income and racial gaps in achievement because funding increases did not flow in large amounts to the average low-income or minority student (4).

[30] U.S. Census Bureau. "2021 Public Elementary-Secondary Education Finance Data." Available online https://www.census.gov/data/tables/2021/econ/school-finances/secondary-education-finance.html. Accessed 17 Apr 2024.

[31] Tallassee City, Huntsville City, Madison City, Pike Road City, Decatur City, Hartselle City, Crenshaw County, Elmore County, Limestone County, Madison County, Montgomery County, and Morgan County. Alabama State Department of Education. "School System Per-Pupil Expenditures FY 2022." Available online https://www.alabamaachieves.org/wp-content/uploads/2023/12/RD_FR_20231226_SystemLevelPPE_FY2022_Final_Publish_v1.0.pdf . Accessed 15 Apr 2024.

[32] Katsinas, Stephen G. et al. "Internet Disparities in Alabama & the Black Belt." Available online https://ir-api.ua.edu/api/core/bitstreams/f817a3bf-aeca-4c7c-8030-7d20c8dff0c3/content. Accessed 15 Apr 2024. O'Brien, Sean, et al. "K-12 STEM Education in Alabama's Black Belt." Available online https://www.alreporter.com/wp-content/uploads/2022/03/STEM-in-K-12-Brief_Black-Belt-2022.pdf. Accessed 15 Apr 2024.

[33] Schuessler, Simon. 2024. "Around $188 M announced for broadband expansion in rural Alabama." Available online https://www.wsfa.com/2024/02/08/around-188m-announced-broadband-expansion-rural-alabama/. Accessed 19 Apr 2024.

[34] Katsinas, Stephen G. et al. "Internet Disparities in Alabama & the Black Belt."

[35] Reardon, Sean F., Demetra Kalogrides, and Kenneth Shores. "The geography of racial/ethnic test score gaps." *American Journal of Sociology* 124, no. 4 (2019): 1164-1221.

[36] See Mann, Bryan. And Rogers, Annah. (2021), Segregation Now, Segregation Tomorrow, Segregation Forever? Racial and Economic Isolation and Dissimilarity in Rural Black Belt Schools in Alabama. Rural Sociology, 86: 523-558 and "Justice Department Secures Resolution in Madison County, Alabama, School Desegregation Case." Available online https://www.justice.gov/opa/pr/justice-department-secures-resolution-madison-county-alabama-school-desegregation-case. Accessed 29 Jan 2024.

Figure 2 shows that several school districts in the state are characterized as high segregation. Nearly 40 districts in the state are still subject to court-ordered desegregation.[37]

Barriers to Equal Employment

Dr. Reilly argues that non-discriminatory factors fully can explain racial gaps in employment outcomes. To support this claim, he cites research by June O'Neill of the Congressional Budget Office as proof "that less than 1 percent of the wage gap between Black and White males appears directly attributable to racism."[38] However, that report was written in 1990 and thus is not able to take into consideration the decades of advances that have been made in the study of employment discrimination since then.[39] For instance, several famous audit studies (in which outcomes are compared between applicants who were identical on all factors other than race) show that racial differences in hiring persist even after controlling for education and human capital however measured. For instance, in an American Economic Review article that has been cited 7,288 times, Bertrand and Mullainathan find that identical resumes receive fewer callbacks for interviews when the name randomly assigned to the resume is more associated with African-Americans.[40] Gaddis also finds that racial gaps in employer responses persist after controlling for credentials (such as university selectivity).[41] Pager and Quillian find that Black applicants are penalized more for drug convictions than White applicants.[42]

Of course, Dr. Reilly does not examine any Alabama-specific structural barriers to employment opportunities for Black workers either. There is evidence of discrimination in Alabama's labor market: Alabamians filed about 700 charges of racial discrimination with the U.S. Equal Employment Opportunity Commission EEOC in each of FY 2020, 2021, and 2022.[43] Nationally, about 15% of charges are found to have merit.[44] Moreover, areas where Black

---

[37] Griesbach, Rebecca. 2023. "Judge Says Racial Motivation Not At Play in Decision to Close Alabama School." Available online https://www.al.com/educationlab/2023/09/judge-says-racial-motivation-not-at-play-in-decision-to-close-alabama-school.html. Accessed 8 Apr 2024.
[38] Reilly Report, 18.
[39] Lang, Kevin, and Ariella Kahn-Lang Spitzer. "Race discrimination: An economic perspective." *Journal of Economic Perspectives* 34, no. 2 (2020): 68-89.
[40] "" Bertrand and Mullainathan 2004. For a more recent example, see Kline, Patrick, Evan K. Rose, and Christopher R. Walters. "Systemic discrimination among large US employers." *The Quarterly Journal of Economics* 137, no. 4 (2022): 1963-2036.

[41] Gaddis, S. Michael. "Discrimination in the credential society: An audit study of race and college selectivity in the labor market." *Social Forces* 93, no. 4 (2015): 1451-1479.
[42] Pager, Devah, and Lincoln Quillian. "Walking the talk? What employers say versus what they do." *American sociological review* 70, no. 3 (2005): 355-380.
[43] U.S. Equal Employment Opportunity Commission. "FY 2009-2022 EEOC Charge Receipts for AL." Available online https://www.eeoc.gov/statistics/enforcement/charges-by-state/AL. Accessed 5 Apr 2024.
[44] U.S. Equal Employment Opportunity Commission. "Race-Based Charges (charges filed with EEOC FY 1997-FY2022)" Available online https://www.eeoc.gov/data/race-based-charges-charges-filed-eeoc-fy-1997-fy-2022. Accessed 5 Apr 2024.

21-cv-01531
11/12/2024 Trial
Plaintiffs Exhibit 13

Alabamians live lack access to jobs: in particular, people living in Alabama's Black Belt have been shown to face structural barriers to employment such as a lack of manufacturing jobs and business growth.[45]  According to a report by researchers at the University of Alabama, only 4 of the 24 Black Belt counties that they studied were above the statewide average of 22.4 businesses per 1,000 residents, while 8 were below 15 businesses per 1,000 residents.[46]  Job losses to automation, which detrimentally affects low-skilled workers, is expected to continue to plague the Black rural south in Alabama and other states.[47] Lack of high-speed internet access in the Black Belt also limits access to remote work.[48]

Barriers to Equality in Criminal Justice

Dr. Reilly argues that police do not discriminate against Black people, and instead the worse outcomes for Black people with respect to police can be explained by adjusting  "for the 240% over-representation of Blacks among serious criminals."[49]  In making this claim, Dr. Reilly relies on counts of unarmed Black deaths at the hands of police by the *Washington Post* as well as one largely discredited scholarly article by Roland Fryer.[50]  Dr. Reilly also ignores other widely cited research that finds racial bias in policing.[51]  Even the Fryer article cited by Dr. Reilly finds that police use force disproportionately against Black and Hispanic people.

---

[45] Katsinas, Stephen G., Nathaniel J. Bray, Jonathan Bowen, Emily Grace Corley, Noel E. Keeney, Hunter Whann, and Emily Jacobs.  "Black Belt Manufacturing and Economic Prospects."  Available online https://ir-api.ua.edu/api/core/bitstreams/a727f1dd-42a9-49f6-9fa7-5adc537a67fa/content.  Accessed 17 Apr 2024.
[46] Katsinas, et al. 2.
[47] Contractor, Harin and Spencer Overton.  2019.  "An Introduction to the Future of Work in the Black Rural South."  Available online https://jointcenter.org/wp-content/uploads/2019/12/Intro-to-the-Future-of-Work-in-the-Black-Rural-South.pdf.  Accessed 18 Apr 2024.
[48] Katsinas, Stephen G.  Noel E. Keeney, Emily Jacobs, Emily Grace Corley, and Hunter Whann.  "Internet Access Disparities in Alabama & the Black Belt."  Available online https://ir-api.ua.edu/api/core/bitstreams/f817a3bf-aeca-4c7c-8030-7d20c8dff0c3/content.  Accessed 18 Apr 2024.
[49] Reilly Report, 17.
[50] Reilly Report, 17-18.  At least three peer-reviewed articles in top academic journals, including one by a past winner of the Nobel Prize in Economics, have pointed out issues in Fryer's analysis.  See Knox, Dean, Will Lowe, and Jonathan Mummolo. "Administrative records mask racially biased policing." *American Political Science Review* 114, no. 3 (2020): 619-637; Durlauf, Steven N., and James J. Heckman. "An empirical analysis of racial differences in police use of force: A comment." *Journal of Political Economy* 128, no. 10 (2020): 3998-4002; Ross, Cody T., Bruce Winterhalder, and Richard McElreath. "Resolution of apparent paradoxes in the race-specific frequency of use-of-force by police." *Palgrave Communications* 4, no. 1 (2018).
[51] See Ross, Cody T., Bruce Winterhalder, and Richard McElreath. "Racial disparities in police use of deadly force against unarmed individuals persist after appropriately benchmarking shooting data on violent crime rates." *Social Psychological and Personality Science* 12, no. 3 (2021): 323-332; Knox, Lowe, and Mummolo 2020; Pierson, E., Simoiu, C., Overgoor, J., Corbett-Davies, S., Jenson, D., Shoemaker, A., Ramachandran, V., Barghouty, P., Phillips, C.,

Dr. Reilly attributes the incarceration gap between Black and White Alabamians to greater criminality among Black people. However, recent research demonstrates that the proportion of the disparity that is explained by differential arrest rates by race has "declined substantially since the 1980s, approximating 55% during the 2000s."[52] esearch shows that even in the 1980s, racial disparities in arrest for violent or other crimes did not explain fully the Black/White imprisonment gap *in Alabama*.[53]

Disparities in arrests for violent crime still do not account for the gap in Alabama today. If Dr. Reilly is right and Black people are 55.7% people in Alabama prison because Black people commit most of the crimes in the state, that state of affairs should be reflected in arrest data.[54] However, looking at the FBI's Uniform Crime Report data shows that a majority of people arrested for committing crimes in Alabama in 2022 were *White*, not Black.[55] Moreover, only 80 more Black people were arrested for committing crimes against persons in Alabama than White people in 2022 —a low number that cannot account for the 2:1 incarceration difference between Black and White violent offenders.[56] Prison *admissions* also cannot explain the large incarceration disparity—more White people are admitted to prison than Black people in Alabama.[57] In other words, most of the people getting arrested for crimes and admitted to prison in Alabama are White, but most of the people in prison in Alabama are Black.

This disconnect between arrest rates, prison admissions, and the makeup of the prison population shows that incarceration in Alabama is influenced by a more complex set of factors than just criminality—even than just the severity of crimes. Prosecutorial discretion or sentencing disparities, for instance, might explain that disconnect (for example, if Black people are convicted more often, sentenced more harshly or serve more time, and thus stay longer in prison than White people). Research shows that there is, in fact, racial bias in criminal justice in

---

Shroff, R. and Goel, S., 2020. A large-scale analysis of racial disparities in police stops across the United States. *Nature human behaviour*, *4*(7), pp.736-745; Gelman, Andrew, Jeffrey Fagan, and Alex Kiss. "An analysis of the New York City police department's "stop-and-frisk" policy in the context of claims of racial bias." *Journal of the American statistical association* 102, no. 479 (2007): 813-823.

[52] Baumer, Eric P. "Reassessing and redirecting research on race and sentencing." *Justice Quarterly* 30, no. 2 (2013): 231-261; 237; 238.

[53] Crutchfield, Robert D., George S. Bridges, and Susan R. Pitchford. "Analytical and aggregation biases in analyses of imprisonment: Reconciling discrepancies in studies of racial disparity." *Journal of Research in Crime and Delinquency* 31, no. 2 (1994): 166-182.

[54] Alabama Department of Corrections. "Fiscal Year 2023 Annual Legislative Report." Available online https://doc.alabama.gov/docs/AnnualRpts/AnnualLegislativeStatReport-FY2023.pdf. Accessed 8 Apr 2024.

[55] Federal Bureau of Investigation. "Crime Data Explorer." Available online https://cde.ucr.cjis.gov/LATEST/webapp/#/pages/explorer/crime/arrest. Accessed 8 Apr 2024. Alabama Department of Corrections 2023.

[56] Federal Bureau of Investigation. "Crime Data Explorer."

[57] See Alabama DOC Monthly Statistical reports, which can be found here: https://doc.alabama.gov/StatReports.

21-cv-01531
11/12/2024 Trial
Plaintiffs Exhibit 13

Alabama. Prosecutors in Alabama have been found to use peremptory strikes against potential Black jurors in a racially discriminatory manner.[58] Moreover, even after controlling for factors such as crime severity, criminal history, and demographic context, Black people still receive longer sentences than White people in Alabama.[59] Dr. Reilly does not examine data on racial disparities in sentencing, jury selection, or other aspects of the criminal justice system in Alabama.

Race and Voting

Dr. Reilly draws several unsubstantiated conclusions about voting and voter turnout in Alabama. In my initial report, I find that the gap in turnout between Black and White Alabamians statewide in the 2020 general election is 9.3 percentage points, a figure that is supported by a separate analysis of Current Population Survey data. At the county level, I find even larger racial gaps, including 12 percentage points in Madison County, 13 percentage points in Morgan County, and 16 points in Elmore County. However, after conducing no statistical analysis on these or any other data, Dr. Reilly writes, "Almost certainly, none of these gaps are statistically significant (most county level gaps in racial turnout would not be, either)."[60] Dr. Reilly also discusses the "pattern" of registration gaps over time; however, as I explained in my first report, one must be careful when relying on registration rates because these totals may reflect "dead wood" rather than actual voter activity. The registration gap between Black and White Alabamians, as measured in the Current Population Survey, is 10 percentage points.

Dr. Reilly argues that many non-discriminatory factors, including "tertiary variables" such as age, marital status, criminal behavior, and fatherlessness, account for the racial disparity in voting in Alabama. Dr. Reilly includes educational attainment as one of these non-discriminatory factors. He provides no statistical analysis to support his claim that the gaps in voting "shrink dramatically or disappear totally when other factor variables are adjusted for."[61]

It is widely known and accepted among political scientists that, when Black people reach educational parity with White people, they vote at similar or even higher rates as education "is a very important individual-level determinant of Black political participation."[62] However, as I

---

[58] See Madison v. Commissioner, Alabama Department of Corrections (https://scholar.google.com/scholar_case?case=6333162242108775170&hl=en&as_sdt=206&as_vis=1https://www.google.com/search?client=firefox-b-1-d&q=b.+https%3A%2F%2Fscholar.google.com%2Fscholar_case%3Fcase%3D6333162242108775170%26hl%3Den%26as_sdt%3D206%26as_vis%3D1) and McGahee v. Alabama Department of Corrections (https://caselaw.findlaw.com/court/us-11th-circuit/1218771.html) for examples.

[59] Feigenberg and Miller 2021; Appendix table A2. Available online https://www.aeaweb.org/content/file?id=14354. Accessed 8 Apr 2024.

[60] Reilly Report, 15.

[61] Reilly Report, 16.

[62] Tate, Katherine. *From Protest to Politics*. Cambridge: Harvard University Press, 1993; 225. Verba, Sidney, Kay Lehman Schlozman, Henry Brady, and Norman H. Nie. "Race, ethnicity and political resources: Participation in the United States." *British Journal of Political Science* 23, no. 4 (1993): 453-497. Plutzer, Eric. "Demographics and the social bases of voter turnout." In

have argued throughout this report, educational opportunity is *not* available equally to Black and White people in Alabama. A widely cited study by Verba, Schlozman, Brady, and Nie found that racial disparities in political participation are shaped by unequal access to political resources such as education.[63] This finding is consistent with the idea that "race and education interact to affect participation."[64]

To conclude, Dr. Reilly's assertions that racial gaps in socioeconomic and incarceration outcomes in Alabama are the result of factors other than racial discrimination are not grounded in a serious examination of the scholarly literature. Recently published articles in highly regarded, peer-reviewed outlets support the notion that racial discrimination continues to plague African Americans' outcomes in Alabama.

<u>Factors other than Race Explain Racial Voting Patterns in Alabama</u>

In his report, Dr. Carrington concludes that the clear correlations between race and voting in Alabama are caused by differences in non-racial policy preferences across racial groups rather than racial attitudes or racial policy preferences. In his report, Dr. Carrington relies on national-level data to argue that racial gaps in partisanship are instead shaped by preferences on economic policy, foreign policy and social issues. I was asked to assess the role of race and racial attitudes in partisanship and vote choice. I do so by briefly reviewing the relevant literature in political science. The literature is clear: racial identity and racial attitudes shape partisanship and party cohesion and these two phenomena have become increasingly linked since 2008. Dr. Carrington ignores this recent quantitative and qualitative literature in political science that shows the importance of race to candidate choice, policy preferences, and partisanship.

Today, "political observers take for granted" the distinction of the Democratic Party as the party of civil rights and racial liberalism, while the Republican Party is associated with "greater resistance to government programs to redress problems of racial inequality."[65] Carmines and Stimson locate the origins of this distinction in the passage of the Civil Rights Act of 1964, when party elites such as Barry Goldwater clearly aligned themselves as anti-civil rights and party activists and masses gradually followed suit.[66] In fact, Lyndon Johnson, when signing the Civil Rights Act into law, said that by passing the law, "we have delivered the South to the Republican Party for your lifetime and mine."[67] Schickler, however, offers an important corrective to this narrative, pointing out that partisan realignment began much earlier than the 1960s and was the result of movement of African American constituents toward the Democratic

---

*The Routledge handbook of elections, voting behavior and public opinion*, pp. 69-82. Routledge, 2017.
[63] Verba, et al. 1993: 494.
[64] King, Gary, et al. *Designing Social Inquiry : Scientific Inference in Qualitative Research*, Princeton University Press, 1994.
[65] Schickler, Eric. *Racial realignment: The transformation of American liberalism, 1932-1965*. Princeton University Press, 2016: 1.
[66] Schickler 2016: 2; Carmines, Edward G., and James A. Stimson. *Issue evolution: Race and the transformation of American politics*. Princeton University Press, 1989.
[67] Schickler 2016: 2.

21-cv-01531
11/12/2024 Trial
Plaintiffs Exhibit 13

Party as a result of the New Deal.[68] These new voters put pressure on Democrats at the local and state levels to liberalize on issues of civil rights.[69] That leftward movement of the national Democratic Party on race predates the 1964 Presidential Election.[70]

Despite disagreement over the timing and mechanisms, the literature provides strong support for the notion that the contemporary partisan alignment stems from the positioning of the two parties on the issue of race and civil rights. Schickler characterizes this system as "the post-New Deal party system in which Democrats were identified with African Americans and racial liberalism, while Republicans were associated with racial conservatism."[71] Barber and McCarty argue that for Democrats, left-ward ideological movement among elites in the party is a function of the election of African American and Latino representatives in southern majority-minority districts.[72] With respect to partisan sorting of the masses, research shows that the exodus of southern White voters from the Democratic Party from 1958 to 1980 was a reflection of racial attitudes rather than income or other non-race related policy preferences.[73] In the 1990s some observers argued that the importance of race to mass partisanship had faded;[74] however, more recent research, in some cases by those same authors, shows that the relationship of race and racial attitudes to partisanship is strong.[75] Valentino and Sears find that in the South, racial attitudes, more than ideological shifts or other policy preferences, explained an increasingly large part of candidate choice and partisanship among White voters between 1972 and 2000.[76] Work by M.V. Hood, III and several coauthors also finds support for the role of racial attitudes in partisanship. For instance, in their study of support for Confederate symbols and lost cause ideology, Cooper et al. find support "for racially motivated explanations for partisan change in

---

[68] Schickler 2016.
[69] Schickler 2016.
[70] Schickler 2016.
[71] Schickler 2016: 2.
[72] Barber, Michael, Nolan McCarty, Jane Mansbridge, and Cathie Jo Martin. "Causes and consequences of polarization." *Political negotiation: A handbook* 37 (2015): 39-43; 27.
[73] Kuziemko, Ilyana, and Ebonya Washington. "Why did the Democrats lose the South? Bringing new data to an old debate." *American Economic Review* 108, no. 10 (2018): 2830-2867.
[74] Abramowitz, Alan I. 1994. ""Issue evolution reconsidered: Racial attitudes and partisanship in the US electorate."" *American Journal of Political Science*:1-24. Kuklinski, James H, Paul M Sniderman, Kathleen Knight, Thomas Piazza, Philip E Tetlock, Gordon R Lawrence, and Barbara Mellers. 1997. ""Racial prejudice and attitudes toward affirmative action."" *American Journal of Political Science*:402-419. Sniderman, Paul M, and Edward G Carmines. 1997. ""Reaching beyond race."" *PS: Political Science & Politics* 30 (3):466-471.
[75] For instance, see Abramowitz, Alan, and Jennifer McCoy. 2019. "United States: Racial resentment, negative partisanship, and polarization in Trump's America." *The ANNALS of the American Academy of Political and Social Science* 681 (1):137-156.
[76] Valentino, Nicholas A., and David O. Sears. "Old times there are not forgotten: Race and partisan realignment in the contemporary South." *American Journal of Political Science* 49, no. 3 (2005): 672-688.

21-cv-01531
11/12/2024 Trial
Plaintiffs Exhibit 13

the South."[77] There is also support for the importance of race to partisan realignment in Alabama, although it took place later than in other states.[78]

Research that examines mass and elite partisanship from 2008 onward finds strong evidence of both partisan sorting and issue polarization along the lines of race in the electorate. However, Dr. Carrington ignores this work in his report and references no peer-reviewed articles examining the causes of partisan polarization nor candidate choice in this more recent time period. When examining such research, it becomes clear that the election of President Barack Obama, the first Black person elected to the presidency, was consequential to the relationship between race and partisanship and vote choice: although Obama's candidacy and election did not seem to affect the level of racial prejudice or resentment among White Americans overall, that election did shape the importance of those attitudes to partisanship and vote choice.[79] Political science research shows that race-related attitudes were an important predictor of support for President Obama, and the relationship between vote choice and racial attitudes was *stronger* in the 2008 presidential election than in those prior.[80] Similarly, Abramowitz and McCoy find that the relationship between racial attitudes and candidate preferences grew stronger beginning with the 2008 election, finding that "the presence of an African American presidential candidate on the ballot led to a sharp increase in the correlation between racial resentment and candidate feeling thermometer ratings among White working-class voters."[81] Racial attitudes also predicted White voters' willingness to vote for President Obama in the 2012 general election.[82] Several studies show that support for Obama would have been higher in Alabama and other states were it not for racial prejudice, which caused Obama to underperform.[83]

Attention to recent research also provides evidence that racial considerations shape evaluations of other candidates. Beginning with the 2008 presidential election, African

---

[77] Cooper, Christopher A., M. V. Hood III, Scott Huffmon, Quentin Kidd, H. Gibbs Knotts, and Seth C. McKee. "Switching sides but still fighting the Civil War in southern politics." *Politics, Groups, and Identities* 10, no. 1 (2022): 100-116.

[78] Hood III, Morris V., Quentin Kidd, and Irwin L. Morris. *The rational southerner: Black mobilization, republican growth, and the partisan transformation of the American south*. Oxford University Press, 2012.

[79] Tesler, Michael. 2016. "Post-racial or Most-racial?" In *Post-Racial or Most-Racial?* : University of Chicago Press.

[80] Tesler, Michael. 2013. "The return of old-fashioned racism to White Americans' partisan preferences in the early Obama era." *The Journal of Politics* 75 (1):110-123.

[81] Abramowitz, Alan, and Jennifer McCoy, 2019: 142.

[82] Knuckey, Jonathan, and Myunghee Kim. "Racial resentment, old-fashioned racism, and the vote choice of southern and nonsouthern whites in the 2012 US presidential election." *Social Science Quarterly* 96, no. 4 (2015): 905-922.

[83] Stephens-Davidowitz, Seth. "The cost of racial animus on a black candidate: Evidence using Google search data." *Journal of Public Economics* 118 (2014): 26-40; Highton, Benjamin. "Prejudice rivals partisanship and ideology when explaining the 2008 presidential vote across the states." *PS: Political Science & Politics* 44, no. 3 (2011): 530-535.

American, Latino, and Asian support for Democratic presidential candidates increased.[84] Meanwhile, support for Democratic candidates among White voters decreased.[85] Abramowitz and McCoy find that with respect to candidate choice and racial resentment, "Donald Trump's heavy emphasis on racial issues led to a further increase in the strength of this relationship, especially among White voters without college degrees."[86] By 2016, racial resentment was strongly associated with how a voter evaluated candidates *even after controlling for other factors*: the correlation between the gap in evaluations of the two major party presidential candidates and racial resentment was .636 among White respondents.[87]

Partisanship also has been tied to racial attitudes in more recent research. Abramowitz and McCoy demonstrate that partisan sorting based on racial attitudes increased dramatically among White voters since 2004; they find "the relationship between racial resentment and candidate feeling thermometer ratings was about 2.6 times stronger in 2016 than in 2004 among all White voters, but it was more than four times stronger among White working-class voters."[88] Racial threat and racial anxiety also became more salient to partisanship and vote choice in the years since 2008. The strength of White identity politics--defined as "White Americans' feelings of marginalization in an increasingly diverse America"[89] --is becoming increasingly salient to vote choice[90] and is more important than economic anxiety in explaining vote choice.[91] Bartels finds that Republicans and Democrats are sharply polarized with respect to holding attitudes of ethnic antagonism.[92] Bonikowski et al. argue that these "outgroup antipathies" are part of broader ideologies on which partisans are increasingly sorting.[93]

---

[84] Sides, John, Michael Tesler, and Lynn Vavreck. 2019. "Identity crisis." In *Identity Crisis*. Princeton University Press; 25.

[85] Sides, Tesler, and Vavreck 2019: 26.

[86] Abramowitz and McCoy 2019: 142.

[87] Abramowitz and McCoy 2019: 142. Pearson's R, a measure of correlation, can range from -1 to 1, with 0 meaning no association, and +1 meaning perfectly positive association. A correlation over .6 is considered strong.

[88] Abramowitz and McCoy 2019: 143.

[89] Sides, Tesler, and Vavreck 2019: 87.

[90] Sides, Tesler, and Vavreck 2019: 89-90.

[91] Sides, Tesler, and Vavreck 2019: 90-91.

[92] Bartels, Larry M. 2020. "Ethnic antagonism erodes Republicans' commitment to democracy." *Proceedings of the National Academy of Sciences* 117 (37):22752-22759; 22757. Bartels defines ethnic antagonism using responses to survey items such as "discrimination against Whites is as big a problem today as discrimination against Blacks and other minorities." Not far behind are items positing that "things have changed so much that I often feel like a stranger in my own country," that immigrants get more than their fair share of government resources, that people on welfare often have it better than those who work for a living, that speaking English is "essential for being a true American" and that African-Americans "need to stop using racism as an excuse" (Bartels 2020: 22756).

[93] Bonikowski, Bart, Yuval Feinstein, and Sean Bock. 2021. "The Partisan Sorting of "America": How Nationalist Cleavages Shaped the 2016 US Presidential Election." *American Journal of Sociology* 127 (2):492-561.

In direct contradiction of Dr. Carrington's claims, research has shown that alternative explanations for polarization also became tied more strongly to racial attitudes. Several of the items Dr. Carrington discusses as not being "race-based issues" are increasingly tied to race.[94] Negative partisan affect, economic anxiety, and antidemocratic sentiments are themselves increasingly explained by racial attitudes and anxieties.[95] The relationship between economic inequality and partisan polarization has been shown to be a function of racial context.[96] Voters' positions on non-racial policy issues more generally have become more correlated with racial resentment.[97]

Recent studies have shown that party and race are linked in the American mind. Partisan sorting has caused parties to be explicitly identified with particular racial groups in the minds of some Americans; in particular, 97.2 percent of Americans think that the typical Republican is White.[98] Racial and partisan affect are increasingly linked, such that it is possible to activate one by activating the other.[99] Likewise, "White respondents who perceive the Democratic Party as African American are less favorable toward Democrats, more favorable toward Republicans, and take more conservative positions on political issues."[100]

In conclusion, the literature clearly supports the point that party and candidate choice is shaped by racial identity and racial attitudes in the electorate. This relationship has been strengthening in recent years. To say that factors other than racial considerations explain the voting patterns along racial dimensions in Alabama, as Dr. Carrington argues, ignores the past fifteen years of evidence in the literature that race and racial attitudes drive partisanship and vote choice. Racial attitudes are becoming *more* salient to partisanship and vote choice and vote choice over time.

---

[94] Carrington Report, 13.

[95] Abramowitz and McCoy 2019; Bartels 2020; Sides, Tesler, and Vavreck 2019; Stewart, Alexander J, Nolan McCarty, and Joanna J Bryson. 2020. "Polarization under rising inequality and economic decline." *Science advances* 6 (50):eabd4201.

[96] Hersh, Eitan D, and Clayton Nall. 2016. "The primacy of race in the geography of income-based voting: new evidence from public voting records." *American Journal of Political Science* 60 (2):289-303.

[97] Enders, Adam M, and Jamil S Scott. 2019. "The increasing racialization of American electoral politics, 1988-2016." *American Politics Research* 47 (2):275-303.

[98] Zhirkov, Kirill, and Nicholas A Valentino. 2022. "The Origins and Consequences of Racialized Schemas about US Parties." *Journal of Race, Ethnicity, and Politics*:1-21.

[99] Westwood, Sean J, and Erik Peterson. 2020. "The inseparability of race and partisanship in the United States." *Political Behavior*:1-23.

[100] Zhirkov and Valentino 2022: 17.

I declare under penalty of perjury that the foregoing is true and correct.

*/s/ Traci Burch/*

April 19, 2024

21-cv-01531
11/12/2024 Trial
Plaintiffs Exhibit 13