FILED

2024 Oct-11  PM 02:58
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

ALABAMA STATE CONFERENCE )
OF THE NAACP, *et al.*, )
     )
    *Plaintiffs*, )
     )   Case No. 2:21-cv-1531-AMM
v. )
     )
WES ALLEN, )
     )
    *Defendant*. )

## DEFENDANT'S REPLY IN SUPPORT OF MOTION TO EXCLUDE
## SELECTED TESTIMONY OF MR. FAIRFAX AND DR. OSKOOII (DOC. 181)

Mr. Fairfax's and Dr. Oskooii's "best guesses" that SD7 is majority BCVAP should be excluded. They are irrelevant because SD7—which is minority BVAP in Plans 1, 2, and 2A—automatically fails *Gingles* 1 as a crossover district. *See generally Bartlett v. Strickland*, 556 U.S. 1 (2009) (plurality op.).  And they are the product of numerous methodological flaws rendering them unreliable.

The throughline in Plaintiffs' attempt to salvage this testimony is a failure to grapple with the fundamental distinction between this case (where there is no dispute about SD7's black VAP *minority*) and the cases they rely upon (where there is no dispute about the districts' Hispanic VAP *majority*). Those cases use CVAP to confirm that the Hispanic VAP majority is not "hollow"—i.e., that Hispanics have an actual opportunity to elect after accounting for citizenship. *See, e.g.*, *League of United Am. Citizens v. Perry*, 548 U.S. 399, 429 (2006). Much less precision is required in measuring performance (where the VRA does not guarantee success) as opposed to determining the actual count that *Bartlett* requires.

"Statistics are a mischievous tool, especially in court, if they are not prepared and offered with a convincing explanation of their mathematical characteristics and limitations." *Overton v. City of Austin*, 871 F.2d 529, 545 (5th Cir. 1989) (Jones, J., concurring). And Mr. Fairfax and Dr. Oskooii do little to nothing to explain their point estimates' limitations. Plaintiffs are essentially asking this Court to endorse

1

methodology that would fail if offered during a statistics exam. *Daubert* serves the precise role of excluding such unreliable methodology.

**I.     ACS CVAP estimates are relevant only where disparate citizenship rates suggest that a district would not perform for the minority group.**

"[T]he majority-minority rule relies on an objective, numerical test: Do minorities make up more than 50 percent of the voting-age population in the relevant geographic area?" *Bartlett*, 556 U.S. at 18. CVAP testimony about a minority-BVAP district is irrelevant to this inquiry.

Plaintiffs have yet to offer an analogous case suggesting otherwise. They continue to ignore that, in every case they cite, Hispanics made up the relevant population. *See* Doc. 173 (MSJ Reply) at 7 (collecting cases). In those cases, whether Hispanics constituted a VAP majority was not at issue. *See* Doc. 173 (MSJ Reply) at 7; *United States v. Vill. of Port Chester*, 704 F. Supp. 2d 411, 425 (S.D.N.Y. 2010) (56.27% HCVAP, 77.27% HVAP). Those cases' use of CVAP was different: to confirm that a "bare [VAP] majority" was not hollow (i.e., that an immigrant-heavy district would still perform for Hispanic voters). *LULAC*, 548 U.S. at 429; *accord Negron v. City of Miami Beach*, 113 F.3d 1563, 1569 (11th Cir. 1997) ("In order to elect a representative or have a meaningful potential to do so, a minority group must be composed of a sufficient number of voters[.]").

*LULAC* and *Negron*—Plaintiffs' only "binding precedent"—do not say that "courts need not take account of the minority population's level of VAP." *Contra*

Doc. 200 (Resp.) at 2. In *LULAC*, "the parties agree[d] that the relevant numbers must include citizenship." 548 U.S. at 429. Immediately before relying on that stipulation, the Supreme Court took account "[t]hat Latinos are now a bare majority of the district's voting-age population[.]" *Id.* at 402. But that bare majority wasn't "dispositive … to determine the group's opportunity to elect candidates" because of the significant Latino non-citizen population. *See generally id.* Of course "*Bartlett* neither explicitly nor implicitly overruled *LULAC*," Doc. 200 (Resp.) at 4; there is no tension between the two. There must be a VAP majority, *see Bartlett*, 556 U.S. at 18, but if there is a concern that a VAP majority is "hollow" because of the minority group's low citizenship rate, a plaintiff may use CVAP to demonstrate performance (or the lack thereof), *see LULAC*, 548 U.S. at 429.[1]

    *Negron* is no different. The Eleventh Circuit held that "the requirement that voting age population data be further refined by citizenship data applies only where there is reliable information indicating a significant difference in citizenship rates between the majority and minority populations." 113 F.3d at 1570. When there is "no indication" of "any disparity between black and white citizenship rates[,]" there is no need to refine the voting-age population by citizenship. *Id.* at 1568. Here, black

---

[1] SD7's performance is of no concern here; Dr. Trende showed that SD7 would perform for the black-preferred candidate at well below 50% BVAP. *See* Doc. 164-1 (Trende Initial) at 26-27; Doc. 164-2 (Trende Supp) at 16-17, 31-32. VAP is thus clearly "[]relevant" to analyzing ability to elect in this case. *Contra* Doc. 200 (Resp.) at 8.

and white citizenship rates are virtually identical. Doc. 166 (MSJ) ¶ 7. Thus, *Negron*

states that there is no reason to refine the voting-age population by citizenship.

Lastly, Plaintiffs suggest that Defendant's relevance argument is inconsistent

with its and Dr. Trende's prior positions. As support, Plaintiffs cite Defendant's dis-

covery responses, but they only quote the RFA itself and not Defendant's actual

response. *Compare* Doc. 200 (Resp.) at 5, *with* Doc. 200-1 (Ex. A) at 3-4. One can

see why:

> Admitted that an *amicus* brief, to which the State of Alabama was a
> signatory, made this statement in the context of arguing for inclusion of
> a citizenship question on the 2020 Census because "[t]he current source
> of citizenship data—the American Community Survey (ACS)—has
> flaws recognized by everyone … that make its use for redistricting haz-
> ardous and prone to litigation" insofar as, "[c]ompared to Census data,
> ACS data is less accurate, less granular, less compatible with other cen-
> sus data, and less authoritative.

Doc. 200-1 at 3-4 (citation omitted; alterations in original). Arguing that the decen-

nial census should include a citizenship question because ACS data are not good

enough to refine VAP where appropriate is not inconsistent. Similarly, Dr. Trende's

co-authored statement to the Arizona Independent Redistricting Commission, where

they "didn't do a Gingles 1 analysis," Doc. 164-3 (Trende Depo) at 244:6-7, merely

relies on a decision from the Ninth Circuit (of which Arizona is part). *See id.* at

154:16-23. Yet another situation where a Hispanic district's VAP majority wasn't a

concern.

4

## II. Substituting BCVAP estimates for BVAP enumeration is untested.

Plaintiffs state Defendant's methodological challenge too broadly. It's not that the mere "use of CVAP figures from the ACS is novel and 'untested.'" *Contra* Doc. 200 (Resp.) at 5. Instead, the challenge is to Mr. Fairfax and Dr. Oskooii's specific methodology of concluding that a district satisfies *Gingles* 1 based on CVAP point estimates despite a VAP minority. *See* Doc. 181 (Mot. to Exclude) at 5-7. It's the purpose for which the two experts utilize ACS CVAP data that is untested. *Cf. Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993) ("[S]cientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes."); *Concord Boat Corp. v. Brunswick Corp.,* 207 F.3d 1039, 1056 (8th Cir. 2000) ("Even a theory that might meet certain *Daubert* factors, such as … general acceptance, should not be admitted if it does not apply to the specific facts of the case."). This *is* a methodological challenge. *Contra* Doc. 200 (Resp.) at 6.[2]

And Plaintiffs make too much of the ACS being "the gold standard." *See id.* at 6. That is because the ACS is "the *only* source of … CVAP statistics by race and ethnicity at various geographic units across the U.S." Doc. 164-17 (Oskooii Report) ¶ 26; *accord* Doc. 164-18 (Oskooii Depo) at 112:8-113:18. While the ACS being the only option may be good enough to conduct a necessary "performance" analysis, it

---

[2] Plaintiffs' cases—concerned more with "performance" than with "numerosity"—are again of a different kind. *See, e.g.*, *Montes v. City of Yakima*, No. 12-cv-3108, 2014 WL 5796312 ¶ 50 (E.D. Wash. 2014) (Hispanic VAP majorities of 70.16% and 65.99%).

is not good enough to supplant *Bartlett*'s bright-line requirement and can be avoided using the tried-and-tested (and required) BVAP enumeration.

## III. Plaintiffs confirm that Mr. Fairfax and Dr. Oskooii cannot report their methodology's error rate.

Plaintiffs do not dispute that the error rate of their experts' methodology is unknown; they just say it doesn't matter. *See* Doc. 200 (Resp.) at 9. Their cited cases yet again involve confirming that Hispanic-VAP majorities possess electoral power after accounting for Hispanic non-citizens. *See* Doc. 173 (MSJ Reply) at 7. Much less precision is required to determine that a district's undisputed numerosity is not "hollow." Indeed, "Section 2 does not guarantee … an electoral advantage," *Bartlett*, 556 U.S. at 20; *Johnson v. De Grandy*, 512 U.S. 997, 1014 n.11 (1997) ("[T]he ultimate right of § 2 is … not a guarantee of electoral success[.]"). So while the precise error rate may be "unnecessary" to assess the undefined opportunity to elect (and where there is an undisputed VAP majority), the same cannot be said for assessing *Bartlett*'s clear 50%+1-VAP threshold. *See* Doc. 200 (Resp.) at 10.

Plaintiffs' claim that "the range of error … is also not entirely unknown" is false. *See* Doc. 200 (Resp.) at 10. While the "sampling error … can be calculated directly from the ACS when using whole block groups," it is but one part of the total error that also contains additional, "unknown error result[ing] from disaggregating block-group-level data to census blocks." Doc. 181 (Mot. to Exclude) at 8 n.3 (em-

phasis and citations omitted). Plaintiffs' claim that "[t]he Secretary offers no competent evidence to indicate that any uncertainty through block group splits would drastically widen the margin of error," Doc. 200 (Resp.) at 10, is convenient spin that ignores their *Gingles* 1 burden.[3] Indeed, Plaintiffs failed to dispute that this disaggregation error is unknowable, which is sufficient grounds to exclude under *Daubert*. *Compare* Doc. 166 (MSJ) ¶ 19, *with* Doc. 172 (MSJ Resp.) ¶ 19.

Lastly, Plaintiffs claim that this Court can ignore the unknowable error rate because Dr. Oskooii claims that this case does not involve "hypothesis testing." *See* Doc. 200 (Resp.) at 10-11. But it's quite unclear why—given that we lack a true enumeration of SD7's CVAP—we *are not* testing Mr. Fairfax and Dr. Oskooii's hypothesis (guesses) that SD7 is above 50% BCVAP. Instead, Dr. Oskooii believes that "[t]he task at hand is what is the best approximation of the citizen voting age population." Doc. 164-18 (Oskooii Depo) at 46:9–23; *accord id.* at 198:6–17. That certainly doesn't sound like Plaintiffs' preponderance burden. Nonetheless, Dr. Oskooii cannot tell us how accurate the varying "best guesses" in this case are because he "can't assign a likelihood function to" the true BCVAP value, *id.* at 81:20-82:4. This inability to estimate the error of their "best guesses" makes Mr. Fairfax and Dr. Oskooii's methodology unreliable—particularly given the thin CVAP margins.

---

[3] Because the additional disaggregation error is unknowable, Plaintiffs' statement is true in reverse: *Plaintiffs* offer no competent evidence to indicate that any uncertainty through block group splits *does not* drastically widen the margin of error.

**IV.  Point estimates are unreliable to establish an actual count when the actual count target is included in the margin of error.**

Plaintiffs do not dispute that probability statements cannot be made about where a point estimate falls relative to the true BCVAP value where the margin of error includes values below 50%. *Compare* Doc. 181 (Mot. to Exclude) at 9, *with* Doc. 200 (Resp.) at 11-14. Nor do they dispute that *all* that can be said from a preponderance standpoint is that it is more likely than not that the true value falls *somewhere* within the confidence interval (about 47.5%-52.5%). *Compare* Doc. 181 at 9-10, *with* Doc. 200 at 11-14. Nor do Plaintiffs contest that there is no statistical basis for Mr. Fairfax's claim that the point estimate being above 50% makes it more likely than not that the true BCVAP value is above 50%. *Compare* Doc. 181 at 10-11, *with* Doc. 200 at 11-14. This is beyond sufficient to demonstrate unreliability in Mr. Fairfax and Dr. Oskooii's methodology of using a point estimate (where values below 50% are within the error margin) to conclude that SD7's true BCVAP is above 50%.

Plaintiffs instead distract by trotting out the familiar non-analogous cases where courts have apparently "rejected this precise argument." *Id.* at 11 (citations omitted). But frankly, almost all[4] of these cited cases got it wrong, which serves to

---

[4] *NAACP, Spring Valley Branch v. East Ramapo Central School District*, 462 F. Supp. 3d 368 (S.D.N.Y. 2020), is the new case here, and it supports Defendant's argument. It too was relying on CVAP to assess performance—in the context of *Gingles* 2 and 3, *see id.* at 380, 390, but Plaintiffs' cited language was not about one expert's use of CVAP, which the court spent pages criticizing. *See id.* at 387-89. Instead, the court was discussing a different expert's use of surname coding that relied on "the list of actual voters in an election." *Id.* at 382 The court explained that

reiterate Judge Jones's earlier warning: "Statistics are a mischievous tool, especially in court, if they are not prepared and offered with a convincing explanation of their mathematical characteristics and limitations." *Overton*, 871 F.2d at 545. One searches in vain in Mr. Fairfax's and Dr. Oskooii's reports for such an explanation.

Plaintiffs next adopt the fallacy of treating the confidence interval "as if it were the probability of some hypothesis or assertion." Doc. 164-22 (Blacklocks Article) at 3.[5] This is another distraction. The only way to make a more-likely-than-not statement about how a point estimate here relates to the true BCVAP value would be to use a confidence interval so low (and narrow—as to exclude 50%) that it would be well below the standards of the discipline. *See* Doc. 164-18 (Oskooii Depo) at 48:19-49:3. Using standard confidence intervals of 90% and 95%, the experts' dozen "best guesses" in this case are not good enough and thus are unreliable for concluding that SD7 satisfies *Gingles* 1.[6]

_____

"[t]he use of 95% confidence intervals 'depends entirely on the type of question you're asking and the type of research inquiry you're doing.'" *Id.* at 389-90. Confidence intervals were unnecessary for "using the voter file" (an actual count) but are "more helpful when testing samples of data." *Id.* at 390.

[5] Plaintiffs' piggybacked criticisms of the Cohen article—that address only Cohen's normative theory and not his positive statistical statements—fall flat. Wright and Miller's criticism of it (and the Kaye article that Plaintiffs cite) as "fancy statistical analysis" (code for "we don't understand") goes unexplained. *See* 21B FED. PRAC. & PROC. EVID. § 5122 (2d ed.). And Kaye's article just confirms Defendant's overall point: "that the liaison between a confidence interval and a posterior probability is an unholy union." D.H. Kaye, *Apples and Oranges: Confidence Coefficients and the Burden of Persuasion*, 73 CORNELL L. REV. 54, 57 (1987).

[6] Lastly, Plaintiffs argue that Defendant ignores statistics showing that the black registered voter percentage is above 50% in certain versions of SD7. Doc. 200 (Resp.) at 13-14. Ignoring that this data indisputably excludes some eligible voters (Mr. Fairfax's goal), Doc. 164-13 (Fairfax

**V.      That Mr. Fairfax's methodology is results-driven provides additional support for its exclusion.**

Mr. Fairfax concluded that SD7 in Plans 1, 2, and 2A satisfied *Gingles* 1 based solely on CVAP point estimates, Doc. 164-7 (Fairfax Initial) ¶ 74, but saw "no need" to do the same thing for his new Montgomery district despite comparable non-citizen populations, Doc. 164-13 (Fairfax Depo) at 176:18-177:9, 177:15-178:12. Mr. Fairfax withheld a plan with a majority-BVAP SD7 because it scored worse on traditional districting principles. *See id.* at 179:2-12-180:21-22.[7] And we've now seen what that baby-dragon district looks like. Mr. Fairfax used CVAP because it made his job of drawing an additional majority-minority district in the Huntsville area easier. That is textbook tailoring one's methodology to litigation outcomes. *See, e.g.*, *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995).

*      *      *

The Court should exclude Mr. Fairfax's and Oskooii's testimony to the extent it relies on CVAP to conclude that a minority-BVAP district is "sufficiently large."

---

Depo) at 207:8-11, Mr. Fairfax and Dr. Oskooii had no trouble concluding that *Gingles* 1 was satisfied for SD7 in Plan 1 without this post-hoc registration data because Mr. Fairfax didn't report that data then. *See* Doc. 200 (Resp.) at 14. And again, being reliable to confirm performance where a VAP majority is not disputed cannot render this data reliable to confirm an actual count.

[7] Defendant explained in detail the costs of SD7's switch from a BCVAP majority in Plan 1 to a BVAP majority in Plan 3. *See* Doc. 201 (Trende Mot. to Exclude Resp.) at 12-13.

Respectfully submitted,

Steve Marshall
  *Attorney General*

Edmund G. LaCour Jr. (ASB-9182-U81L)
  *Solicitor General*

James W. Davis (ASB-4063-I58J)
  *Deputy Attorney General*

Soren Geiger (ASB-0336-T31L)
Dylan Mauldin (ASB-3281-Z11M)
  *Assistant Solicitors General*

*/s/ Benjamin M. Seiss*
Misty S. Fairbanks Messick (ASB-1813-T71F)
Brenton M. Smith (ASB-1656-X27Q)
Benjamin M. Seiss (ASB-2110-O00W)
  *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Soren.Geiger@AlabamaAG.gov
Dylan.Mauldin@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Misty.Messick@AlabamaAG.gov
Brenton.Smith@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov

**Counsel for Defendant**

11

## CERTIFICATE OF SERVICE

I certify that on October 11, 2024, I electronically filed the foregoing notice with the Clerk of the Court using the CM/ECF system, which will send notice to all counsel of record.

/s/Benjamin M. Seiss
Counsel for Defendant