# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

ALABAMA STATE CONFERENCE OF
THE NAACP, EVAN MILLIGAN, and
GREATER BIRMINGHAM MINISTRIES,

*Plaintiffs*,

vs.

WES ALLEN, in his official capacity as
Secretary of State of Alabama,

*Defendant*.

No. 2:21-cv-01531-AMM

## PLAINTIFFS' REPLY IN SUPPORT OF MOTIONS TO EXCLUDE IN PART DEFENDANT'S EXPERTS DR. WILFRED REILLY AND DR. M.V. HOOD III, AND TO PRECLUDE IRRELEVANT EVIDENCE AND TESTIMONY

The Secretary's opposition fails to connect the cross-state party affiliation and voting comparison of Black Americans and testimony of Drs. Reilly and Hood, any testimony of the Fayette Republicans, or any voter fraud evidence or the testimony of Greg Biggs to any of the relevant contested factual or legal issues in this case.

As to Drs. Reilly and Hood, the Secretary asserts that the challenged testimony is relevant to "the weight that should be given to racially polarized voting" in the Section 2 inquiry. Opp. (Doc. 202) at 7. The Secretary's implication is that the current legal standard is unconstitutional because of similar partisanship and voting patterns of Black Americans across different states. Beyond the fact that the Supreme Court rejected Alabama's challenge to the Voting Rights Act's (VRA) constitutionality just last year, *Allen v. Milligan*, 599 U.S. 1, 41–42 (2023), this argument is a strawman. These experts offer no evidence that actually informs the racially polarized voting (RPV) inquiry in Alabama or elsewhere, insofar as they fail to measure Black voting patterns in the relevant areas of Alabama, fail to consider white voting patterns anywhere, and grossly overstate the ease of proving legally significant RPV. And, by not defending Dr. Reilly's analysis of national educational studies, the Secretary effectively concedes its irrelevance, which does not address racial gaps in Alabama specifically.

As to the Fayette Republicans, the Secretary doubles down on the relevance of Ms. Branyon and Mr. McCollum's experience in Fayette County by contending

it relates to "the general experience of black voters being able to participate in Republican Party politics." Opp. 14. But the Secretary offers no evidence connecting this experience in Fayette County to that in Madison or Montgomery. Instead, he asks the Court to jettison an "intensely local appraisal," *Thornburg v. Gingles*, 478 U.S. 30, 79 (1986), for generalizations about Black Republicans that he could equally apply to Fayette County in Georgia or Pennsylvania.

Finally, the Secretary identifies only the impeachment of Dr. Bagley as to one sentence of his report as the basis for dozens of voter-fraud exhibits. But he does not even mention Mr. Biggs or explain why impeachment exhibits merit admission.

## I. Drs. Reilly and Hood's Cross-State Comparisons of Black Voters should be Excluded.

The Secretary's defense of Drs. Reilly and Hood's opinions about the party affiliation of Black people and voting patterns in Alabama versus other states depends on a legal and factual strawman and confirms this testimony's irrelevance.

*First*, the Secretary erects the legal base of the strawman by implying that proof of racial polarization in voting leads to "an inference of vote dilution." Opp. 8. Yet he contradicts this position elsewhere in the brief, correctly recognizing that proving a Section 2 claim requires more than just RPV and more than just the *Gingles* preconditions. *Id.* 5–6. The Section 2 standard recognizes that "a district is not equally open . . . when minority voters face—unlike their majority peers—bloc voting along racial lines, arising against the backdrop of substantial racial

2

discrimination within the State, that renders a minority vote unequal to a vote by a nonminority voter." *Milligan*, 599 U.S. at 25. The totality inquiry is "peculiarly dependent upon the facts of each case." *Id.* at 19. Section 2 does not "require[] courts to be suspicious whenever too many people are voting Republican," Opp. 8, but instead asks courts to perform "an intensely local appraisal" and a "searching practical evaluation of the 'past and present reality'" of the districts at issue. *Milligan*, 599 U.S. at 19 (quoting *Gingles*, 478 U.S. at 79). Allowing an evidentiary showing in pursuit of manufactured defenses would waste the court's time and confuse the issues.

*Second*, the Secretary's strawman depends upon misstating the nature of Section 2's racial-polarization inquiry. The inquiry does not merely ask about whether majorities of different racial groups vote for different candidates, as the Secretary implies. *See* Opp. 3–4. Section 2 asks whether the districting scheme at issue "operates to minimize or cancel out minority voters' ability to elect their preferred candidates," identifying where this "risk is greatest[:] where minority and majority voters consistently prefer different candidates" and where minority voters are submerged in structure with a white majority that "regularly defeat[s] their choices." *Milligan*, 599 U.S. at 17–18 (cleaned up) (quoting *Gingles*, 478 U.S. at 47–48); *see also United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1567 (11th

3

Cir. 1984) (the "surest indication of race-conscious politics is a pattern of racially polarized voting.").

Because this inquiry asks about both the presence and extent of RPV in the relevant community, and how those patterns affect minority voting opportunity given the nature of the district at issue, the inquiry is inherently localized, as the Secretary acknowledges: "one couldn't look at just [Jefferson County] to prove that voting is not racially polarized in another part of the State." Opp. 14. As such, courts consistently find evidence of racial polarization (or the purported lack thereof) in another state or even different parts of the same state irrelevant. *See, e.g.*, *Abbott v. Perez*, 585 U.S. 579, 615-16 (2018); *Abrams v. Johnson*, 521 U.S. 74, 93–94 (1997); *Gingles*, 478 U.S. at 79. Only evidence that "allow[s] the trier of fact reasonably to infer anything about whether or not the voting strength of the minority group has been impermissibly diluted" in the challenged electoral system is relevant. *Nipper v. Smith*, 39 F.3d 1494, 1527 (11th Cir. 1994). Black party affiliation in states like Ohio and California, Reilly Report (Doc. 184-1) at 6, or Black voting patterns in Connecticut or Michigan, Hood Report (Doc. 184-4) at 3, are neither "local" nor concern "the electoral mechanism at issue," *Milligan*, 499 U.S. at 19.

*Third*, the Secretary erects the factual foundation of his strawman. He argues that his experts' showing of a consistent level of Black support for the Democratic Party across a number of states means that "general election voting is therefore

'racially polarized' in any jurisdiction where a majority of white voters tend to support Republican candidates," and that "Section 2 does not (and should not) require courts to assume that the presence of Republican voters likely indicates vote dilution." Opp. 4. He suggests that Drs. Reilly and Hood's testimony is therefore relevant to "the weight that should be given to racially polarized voting." *Id.* This stacks false assumptions atop false assumptions.

Only Dr. Hood considered Black voting patterns, and even he did not consider "voting patterns of [B]lack voters nationally … in any jurisdiction," across the country, preventing any kind of comprehensive analysis. Opp. 2. And of course, neither expert actually analyzed white voting patterns at all, leaving entirely to speculation the extent to which their conception of racially polarized voting exists across the country. Beyond these glaring omissions, the Secretary seemingly assumes that majorities of Black and White voters supporting different candidates means that *Gingles* 2 and 3 are satisfied. But satisfying the *Gingles* preconditions requires *both* racially disparate voting patterns *and* proof that these voting patterns are legally significant in the context of the challenged districts—i.e., that white bloc voting usually thwarts the candidates of choice of minority voters. *See Milligan*, 599 U.S. at 19. This necessarily depends not just on a white Republican majority, but also the percentage of eligible voters of each racial group in the relevant district, how the challenged districts are drawn, the degree of racial polarization in each

5

group in that district, and other factors like voter turnout by race. Therefore, Drs. Reilly and Hood's limited comparison of Black political affiliation statewide in different states and voting patterns in a subset of states do not provide even an iota of the evidence necessary to set up their argument about constitutionality.

The Court should exclude Drs. Reilly and Hood's testimony on these issues.

## II. Dr. Reilly's Education Analyses are Unreliable and Irrelevant.

The Secretary does not dispute that Dr. Reilly's opinions about educational disparities rest on national data and studies. Opp. 9. Nonetheless, he argues that this educational disparity testimony is relevant to show "the Alabama socio-economic gaps plaintiffs point to occur everywhere[.]" *Id.* 10. Yet unlike Dr. Hood's comparison of Alabama-specific socioeconomic metrics to other states, Dr. Reilly "didn't break out Alabama" to form his education opinions. Reilly Dep. Tr. (Doc. 184-2) at 161:19-25. No Alabama-specific metrics about education exist in his report. The fifth Senate factor measures "disproportiona[lity]" at the state or local level. *See, e.g.*, *Wright v. Sumter Cnty. Bd. of Elections and Registration*, 979 F.3d 1282, 1294 (11th Cir. 2020). Dr. Reilly measured no state or local data to form his opinions about educational disparities. His testimony should be excluded.

## III. The Secretary Misstates the Applicable Law In Claiming the Proposed Testimony from Fayette Republicans is Relevant.

The Secretary misleadingly contends that whether Black candidates are able to participate in the political process anywhere in the state bears on this Court's

"intensely local appraisal," *Milligan*, 599 U.S. at 19, of whether Black voters have an equal opportunity to participate in the political process and elect candidates of choice in the Montgomery and Huntsville areas, Br. 1–2. The Court cannot infer that the experience of Black people or candidates in an entirely different region of the state bears on whether Black voters have an equal opportunity to participate in the Huntsville/Decatur, and Montgomery regions. *Cf. LULAC v. Perry*, 548 U.S. 399, 434 (2006) (explaining that different minority communities may have "different characteristics, needs, and interests"). Thus, the Secretary's effort to rely on evidence from entirely outside the relevant area invites this Court to go "astray" by ignoring the "clear" requirement that the "redistricting analysis must take place at the district level." *Cf. Abbott,* 585 U.S. at 615-16 (rejecting an RPV analysis that relied on "majority bloc voting" in only "one, small part of the district" at issue).

To be sure, non-challenged district-specific evidence can be relevant, particularly statewide evidence that includes the challenges areas. *Gingles*, 478 U.S. at 39–40 (considering Black registration statistics and electoral successes "both statewide and in the challenged districts"). But the testimony of these witnesses does not concern the State as a whole, a fact which the Secretary attempts to elide by either generally referring to the Republican party in place of the specific Fayette County Republican Party, *see, e.g.*, Opp. 12 ("[Two] Black citizens of Fayette County, Alabama, who will testify about their experiences with the Republican

7

Party") or by arguing that county parties generally do not "vary wildly" from the state Republican Party, *id.* at 14. But he provides no competent evidence connecting the two regions or explaining why these candidates experience in Fayette bears any more relation to the Montgomery and Huntsville regions than do the experience of Black Republicans elsewhere in the country. The county party is not the state party, and the Fayette County Republican Party is not the Madison nor the Montgomery Republican Party.

The Court should accordingly exclude their testimony.

**IV.     The Secretary Effectively Concedes that his Election-Crime Evidence is Irrelevant and Improper Impeachment Evidence.**

The Secretary admits that the sole relevance of his election-crime evidence is to "impeach" Dr. Bagley as to a single sentence in his report. Opp. 15. Yet the Secretary need not introduce exhibits into evidence if they intend to use them only for impeachment, *see* Fed. R. Civ. P. 26(a)(3)(A)(iii) (requiring the parties to identify before trial any document or exhibit it expects to offer at trial, unless the evidence is presented solely for impeachment), nor does an impeachment use beget admissibility, *see Alphonso v. Esfeller Oil Field Const., Inc.*, 380 F. App'x 808, 810 (11th Cir. 2010). Impeachment evidence is not always admissible evidence. *Id.* For example, a party "may not use [evidence] under the guise of impeachment for the primary purpose of placing before the jury substantive evidence which is not

8

otherwise admissible." *United States v. Miller*, 664 F.2d 94, 97 (5th Cir. 1981); *see also United States v. Libby*, 475 F. Supp. 2d 73, 79–80 (D.D.C. 2007).

Regardless, Plaintiffs do not intend to elicit testimony from Dr. Bagley regarding the single sentence in Dr. Bagley's report that mentions voter fraud. *See* Bagley Report (Doc. 182-3) at 10 (citing Dr. Bagley's reference to spurious claims of "voter fraud in the Black Belt" during a 1994 statewide campaign). This makes the election-related crimes evidence, as well as Mr. Biggs' testimony, improper impeachment.

Finally, the Secretary does not even attempt to defend the relevance of Mr. Biggs in their reply, abandoning the issue.[1]

Accordingly, the Court should exclude both Mr. Biggs' testimony and the exhibits concerning alleged election crimes.

## CONCLUSION

For the reasons stated above, the Court should grant Plaintiffs' motions *in limine*.

---

[1] As discussed in Plaintiffs' Motion in Limine (Doc. 182) at 6-7, Mr. Biggs' testimony should also be excluded as a collateral matter under Federal Rule of Evidence 403 because its nonexistent probative value is substantially outweighed by its likelihood to confuse the issues. *See United States v. Terebecki,* 692 F.2d 1345, 1351 (11th Cir.1982) (impeachment testimony on a collateral issue was properly excluded by the trial judge).

DATED this 11th day of October, 2024　　Respectfully submitted,

/s/ Alison Mollman
Alison Mollman
Laurel Hattix
AMERICAN CIVIL LIBERTIES UNION OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 265-2754
amollman@aclualabama.org
lhattix@aclualabama.org

/s/ Deuel Ross
Deuel Ross*
NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.
700 14th Street NW Ste. 600
Washington, DC 20005
(202) 682-1300
dross@naacpldf.org

Leah Aden*
Stuart Naifeh*
Kathryn Sadasivan (ASB-517-E48T)
Brittany Carter*
Ashley Burrell*
Colin Burke*
NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
laden@naacpldf.org
snaifeh@naacpldf.org
ksadasivan@naacpldf.org
bcarter@naacpldf.org
aburrell@naacpldf.org
cburke@naacpldf.org

/s/ Davin M. Rosborough
Davin M. Rosborough*
Dayton Campbell-Harris*^
Theresa J. Lee*
Sophia Lin Lakin*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad St.
New York, NY 10004
(212) 549-2500
drosborough@aclu.org
dcampbell-harris@aclu.org
tlee@aclu.org
slakin@aclu.org

Jacob van Leer*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th St. NW
Washington, DC 20005
(202) 715-0815
jvanleer@aclu.org

/s/ Sidney Jackson
Sidney Jackson (ASB-1462-K40W)
Nicki Lawsen (ASB-2602-C00K)
WIGGINS, CHILDS, PANTAZIS, FISHER & GOLDFARB
301 19th Street
North Birmingham, AL 35203
(205) 314-0500
sjackson@wigginschilds.com
nlawsen@wigginschilds.com

/s/ Jack Genberg
Bradley E. Heard*
Jack Genberg*
Jess Unger*

10

David Dunn*
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000
david.dunn@hoganlovells.com

Blayne R. Thompson*
HOGAN LOVELLS US LLP
609 Main St., Suite 4200
Houston, TX 77002
(713) 632-1400
blayne.thompson@hoganlovells.com

Michael Turrill*
Harmony R. Gbe*
James W. Ettinger*
HOGAN LOVELLS US LLP
1999 Avenue of the Stars Suite 1400
Los Angeles, CA 90067
(310) 785-4600
michael.turrill@hoganlovells.com
harmony.gbe@hoganlovells.com
jay.ettinger@hoganlovells.com

SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Avenue, Suite 340 Decatur, GA 30030
(404) 521-6700
bradley.heard@splcenter.org
jack.genberg@splcenter.org
jess.unger@splcenter.org

Avner Shapiro*
SOUTHERN POVERTY LAW CENTER
1101 17th Street NW
Suite 510
Washington, DC 20036
240-890-1735
avner.shapiro@splcenter.org

Jessica L. Ellsworth*
Shelita M. Stewart*
Amanda N. Allen*
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600
jessica.ellsworth@hoganlovells.com
shelita.stewart@hoganlovells.com
amanda.n.allen@hoganlovells.com

*Attorneys for Plaintiffs*

\*Admitted *pro hac vice*

† Not admitted in the State of New York; practice limited pursuant to N.Y. App. R. 523.2

11

## CERTIFICATE OF SERVICE

I hereby certify that on October 11, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record in this case.

/s/ Davin M. Rosborough
Davin M. Rosborough
AMERICAN CIVIL LIBERTIES UNION
 FOUNDATION
125 Broad St.
New York, NY 10004
(212) 549-2500
drosborough@aclu.org
(proceeding)