FILED

2024 Oct-24  PM 01:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| ALABAMA STATE CONFERENCE OF THE NAACP, et al., | |
| Plaintiffs, | Case No. 2:21-cv-01531-AMM |
| v. | |
| WES ALLEN, in his official capacity as Alabama Secretary of State, | |
| Defendant. | |

## JOINT STATEMENT OF UNDISPUTED FACTS

Pursuant to this Court's September 16, 2024 Order Setting Trial, Pretrial Conference, and Pretrial Deadlines, ECF No. 180, the parties in the above captioned case submit the following joint statement of undisputed facts that are stipulated for purposes of trial:

## I.    Plaintiffs

### A. The Alabama State Conference of the N.A.A.C.P. ("Alabama NAACP")

1.    Plaintiff Alabama NAACP is the state conference of the National Association for the Advancement of Colored People, Inc. The Alabama NAACP is the oldest, and considers itself one of the most significant, civil rights organizations in Alabama.

1

2.     The Alabama NAACP works to advance its vision of political, educational, social, and economic equality of Black Americans and all other Americans and the Alabama NAACP regularly engages in efforts to register and educate voters and encourage Black people to engage in the political process by turning out to vote.

3.     The Alabama NAACP states that two of its central goals are to eliminate racial discrimination in the democratic process, and to enforce federal laws and constitutional provisions securing voting rights.

**B. Greater Birmingham Ministries ("GBM")**

4.     Plaintiff GBM was founded in 1969 in response to the challenges posed by the mid-twentieth century Civil Rights movement and its transformative impact in Birmingham, Alabama, and across the United States. GBM describes itself as a multi-faith, multi-racial, non-profit membership organization that provides emergency services to people in need and engages people to build a strong, supportive, engaged community and a more just society for all people.

5.     GBM describes itself as dedicated to advancing social justice through political participation across Alabama. GBM states that it actively opposes state laws, policies, and practices that it believes result in the exclusion of vulnerable groups or individuals from the democratic process.

6.      GBM states that to accomplish its goals, it regularly communicates with its members and works to register, educate, and increase voter turnout and efficacy, particularly among Black, Latinx, and low-income people and people with disabilities.

### C. Evan Milligan

7.      Plaintiff Evan Milligan is Black.

8.      Plaintiff Evan Milligan resides in Montgomery, Alabama.

9.      Plaintiff Evan Milligan is a U.S. citizen and a lawfully registered voter in State Senate District 26.

## II.    Defendants (current and former)

### A. Current Defendant Wes Allen

10.     Hon. Wes Allen is the Alabama Secretary of State and the chief elections official in the State of Alabama. Secretary Allen is sued in his official capacity. He was born in 1975.

11.     Secretary Allen provides uniform guidance for election activities in the State and issues certificates of election to Members of the Alabama Legislature. Ala. Code §§ 17-1-3, 17-12-21. Secretary Allen also has responsibility for certifying the names of primary and general election candidates for the State Legislature. Ala. Code §§ 17-13-5(b), 17-9-3(b).

**B. Former Defendants Sen. Jim McClendon and Rep. Chris Pringle**

12.     Former Defendants Senator Jim McClendon and Representative Chris Pringle were Senate and House Chairs of the Alabama Permanent Legislative Committee on Reapportionment ("the Committee"), respectively, during the 2021 redistricting cycle. Ala. Code § 29-2-51. They were sued in their official capacity as Senate and House Chairs of the Committee.

13.     As Senate and House Chairs, Sen. McClendon and Rep. Pringle led the Committee, which was responsible for the preparation and development of redistricting plans for the State following the decennial census and presided over the meetings of the Committee.

14.     The Committee was tasked with making a "continuous study of the reapportionment problems in Alabama seeking solutions thereto" and reporting its investigations, findings, and recommendations to the Legislature as necessary for the "preparation and formulation" of redistricting plans for the Senate, House, State School Board, and congressional districts in the State of Alabama. Ala. Code §§ 29-2-51, 29-2-52.

15.     As Senate Chair of the Committee, Senator McClendon had a lead role in carrying out the process of drawing the Alabama State Senate Map in 2021.

16.     Senator McClendon delegated to Randy Hinaman responsibility for the actual drawing of the 2021 Alabama State Senate map in accordance with his instructions.

## III.    The Process Leading to the Enactment of S.B. 1

### A. Joint Legislative Committee's Stated Redistricting Criteria

17.     On May 5, 2021, the Permanent Legislative Committee on Reapportionment (the "Committee")—the Committee responsible for preparing and developing redistricting plans for the State following each decennial census— enacted guidelines for the 2021 redistricting cycle.

18.     The guidelines state that they are based on the requirements of the U.S. Constitution, Alabama Constitution, and policies that "are embedded in the political values, traditions, customs, and usages of the State of Alabama."

19.     The criteria for redistricting set by the Committee begin with requirements under the U.S. Constitution and federal law, including compliance with the one-person, one-vote requirement. The Committee instructed that state legislative districts "shall be drawn to achieve substantial equality of population among the districts and shall not exceed an overall population deviation range of ±5%," and must comply with Section 2 of the Voting Rights Act, meaning that districts have "neither the purpose nor the effect of diluting minority voting strength."

20.     The Committee stated that districts cannot be drawn "in a manner that subordinates race-neutral districting criteria to considerations of race, color, or membership in a language minority group, except that race, color, or membership in a language-minority group may predominate over race-neutral districting criteria to comply with Section 2 of the Voting Rights Act, provided there is a strong basis in evidence in support of such a race-based choice."

21.     Each district must also be "contiguous and reasonably compact," under the criteria.

22.     The criteria next require compliance with the Alabama Constitution, including that:

    a.     Districts are "drawn to reflect the democratic will of all the people concerning how their governments should be restructured";

    b.     Districts are drawn based on total population except that voting-age population may be considered to comply with Section 2 of the Voting Rights Act and other laws;

    c.     The number of Senate districts is set at 35 and House districts at 105;

    d.     All districts must be single-member districts; and

    e.     All districts must be contiguous with each other.

23.    The criteria require compliance with redistricting policies that are "embedded in the political values, traditions, customs, and usages of the State of Alabama . . . to the extent that they do not violate or subordinate the foregoing policies prescribed by the Constitution and laws of the United States and of the State of Alabama," including:

a.    Avoiding contests between incumbents where possible;

b.    Permitting contiguity by water but not point-to-point or long-lasso contiguity;

c.    Respect for "communities of interest, neighborhoods, and political subdivisions to the extent practicable," with a community of interest "defined as an area with recognized similarities of interests, including but not limited to ethnic, racial, economic, tribal, social, geographic, or historical identities."

d.    Minimization of the number of counties in each district; and

e.    Preservation of the cores of existing districts.

24.    The Committee's Redistricting Guidelines stated that "In establishing legislative districts, the Reapportionment Committee shall give due consideration to all the criteria herein. However, priority is to be given to the compelling State interests requiring equality of population among districts and compliance with the

Voting Rights Act of 1965, as amended, should the requirements of those criteria conflict with any other criteria."

**B.    The 2021 Legislative Process for Redistricting**

25.    On August 12, 2021, the U.S. Census Bureau released the results of the 2020 Census.

26.    After the Census data were released, Senator McClendon worked with Senators to develop new Senate districts.

27.    The Permanent Legislative Committee on Reapportionment (the Committee) consists of members of both the State House and Senate, with the Speaker of the House appointing one House member from each of the seven Congressional districts and four additional House members, and the Lieutenant Governor appointing one Senator from each of the seven Congressional districts and four additional Senators. *See* Ala. Code § 29-2-51(c).

28.    The 2021 Committee included 21 members—15 white Republican members and six Black Democratic members.

29.    The first public meeting was held on May 5, 2021, when the Committee adopted redistricting guidelines.

30.    All Committee meetings were required to be open to the public. The Committee guidelines provide that "All interested persons are encouraged to appear before the Reapportionment Committee and to give their comments and input

regarding legislative redistricting. Reasonable opportunity will be given to such persons, consistent with the criteria herein established, to present plans or amendments redistricting plans to the Reapportionment Committee, if desired, unless such plans or amendments fail to meet the minimal criteria herein established."

31.    Between September 1 and 16, the Committee held 28 public hearings across the State.

32.    Every hearing, except one that was held at 6:00 pm at the Statehouse in Montgomery, was held between the hours of 9:00 am and 5:00 pm.  Remote access was provided for the hearings.

33.    Governor Kay Ivey called the Special Legislative Session on redistricting in Alabama to begin on October 28, 2021.

34.    On October 26, 2021, the Committee held its third public meeting of this redistricting cycle, which commenced in 2020.

35.    A member of the Committee, Rep. Chris England, a Black legislator, published the proposed maps on Twitter on October 25, 2021.

36.    The Committee released the maps to the public on the day of the October 26, 2021, Committee meeting.

37.    Beyond the Committee, the Committee House or Senate Chairs, their staff, and/or mapdrawer Randolf Hinaman met with each incumbent legislator or their staff either in person or online unless the legislator declined to meet.

38.    During the map-drawing process, individual legislators generally viewed and provided feedback on draft maps of their districts and adjoining districts, not maps of the entire state.

39.    Sen. McClendon explained that the Committee's lawyer Dorman Walker told him that racial-polarization analysis was only done by Dr. M.V. "Trey" Hood III for state legislative districts where "it looked like there might possibly be a racial issue."

40.    No racial-polarization analysis for any districts was conducted by Dr. Hood and provided to Committee members before or during the October 26, 2021, meeting.

41.    Committee members received demographic and population data for each district.

42.    Neither Mr. Walker nor Dr. Hood, who conducted racial-polarization analysis for the state legislative districts, attended the Committee meeting on October 26, 2021.

43.     Rep. Laura Hall, a Black Committee member, moved to postpone any vote on the proposed maps until the Committee members and the public had more time to review the maps and accompanying racial-polarization analysis.

44.     The House and Senate Maps drawn by Randolf Hinaman and presented by the House and Senate Chairs passed out of Committee.

45.     Black members of the Committee, all of whom are Democrats, voted against each of the House and Senate Maps drawn by Randolf Hinaman and presented by the House and Senate Chairs.

46.     The Special Legislative Session for redistricting began two days later, on October 28, 2021.

47.     On November 1, 2021, the full Senate considered the State Senate map, and passed the map along racial and party lines.

48.     Governor Ivey signed the State Senate map into law on November 4, 2021.

## IV.    Characteristics of the Enacted 2021 Alabama State Senate Plan

49.     The Enacted Plan splits 100 census places (i.e., cities, town, and census-designated places).

50.     The Enacted Plan splits 13 voting districts (VTDs).

51.     The Enacted Plan splits 19 counties.

52.     The mean Reock compactness score for districts in the Enacted Plan is 0.41.

53.     The mean Polsby-Popper compactness score for districts in the Enacted Plan is 0.26.

54.     The mean Convex Hull compactness score for districts in the Enacted Plan is 0.74.

55.     The lowest Reock compactness score for a single district in the Enacted Plan is 0.19, for SD12.

56.     The lowest Polsby-Popper compactness score for a single district in the Enacted Plan is 0.12, for SD11 and SD22.

57.     The lowest Convex Hull compactness score for a single district in the Enacted Plan is 0.54, for SD22.

58.     The Reock compactness score for SD7 in the Enacted Plan is 0.26.

59.     The Polsby-Popper compactness score for SD7 in the Enacted Plan is 0.14.

60.     The Convex Hull compactness score for SD7 in the Enacted Plan is 0.59.

61.     In the Enacted Plan, Alabama A&M University is contained within SD8.

62.     The Reock compactness score for SD25 in the Enacted Plan is 0.24.

63.    The Polsby-Popper compactness score for SD25 in the Enacted Plan is 0.14.

64.    The Convex Hull compactness score for SD25 in the Enacted Plan is 0.65.

65.    In the Enacted Plan, SD25 spans three counties: Crenshaw, Montgomery, and Elmore.

66.    In the Enacted Plan, the town of Pike Road is split between SD25 and SD26.

## V.    Other Stipulated Facts

67.    Prior to 1960, the Legislature failed to reapportion for 50 years. As a result, Alabama's entire legislative apportionment scheme was struck down in *Reynolds v. Sims*, 377 U.S. 533 (1964), which held "that, as a basic constitutional standard, the Equal Protection Clause requires the seats in both houses of a bicameral state legislature must be apportioned on a population basis[,]" *id.* at 568. On remand, a three-judge court found that, in devising remedial maps to correct the malapportionment, the "Legislature intentionally aggregated predominantly Negro counties with predominantly white counties for the sole purpose of preventing the election of Negroes to [State] House membership." *Sims v. Baggett*, 247 F. Supp. 96, 108-109 (M.D. Ala. 1965).

68.     Following *Reynolds* and the 1970 Census, a three-judge federal court drew new district lines. *Sims v. Amos*, 336 F. Supp. 924, 940 (M.D. Ala. 1972). The court rejected the proposed map of Alabama Secretary of State Mabel Sanders Amos because of its racially "discriminatory effect" on Black voters. *Id*. at 936.

69.     After the 1990 census, the State entered a consent decree to resolve a Voting Rights Act lawsuit filed on behalf of Black voters. *See Brooks v. Hobbie*, 631 So.2d 883, 884 (Ala. 1993) (addressing a certified question about whether the State trial court had authority to approve a consent judgment, but not explaining why the parties desired such a judgment).

70.     After the 2010 census, Black voters and legislators successfully challenged 12 state legislative districts as unconstitutional racial gerrymanders. *See Ala. Legis. Black Caucus v. Alabama*, 231 F. Supp. 3d 1026, 1348-49 (M.D. Ala. 2017). Because Alabama was still required to preclear its districting under Section 5 of the VRA at the time, it had an obligation to "avoid retrogressing the ability of black voters to elect candidates of their choice." *Id.* at 1032. To that end, "Alabama pursued a policy of keeping the black population in each majority-black district at or above the percentage in that district in 2010." *Id.* at 1050. The *ALBC* plaintiffs' challenges to other districts failed.

71.     Most recently, a three-judge panel preliminarily enjoined two different congressional districting plans that had been adopted by the Alabama Legislature

following the 2020 census. The three-judge court found that both the Legislature's 2021 plan and 2023 plan likely violate the Voting Rights Act, *see Milligan v. Merrill*, 582 F. Supp. 3d 924 (N.D. Ala. 2022), and *Milligan v. Allen*, 690 F. Supp. 3d 1226 (N.D. Ala. 2023). The former decision was upheld in full by the U.S. Supreme Court, *see Allen v. Milligan*, 599 U.S. 1, 22 (2023), and the latter was left in place after the Court declined to stay the injunction, *see Allen v. Milligan*, 144 S. Ct. 476 (2023).

72.     Alabama has a majority-vote requirement in all primary elections.

73.     Before the Civil War, Black people were barred from voting in the state. After the passage of the Reconstruction Acts and Amendments, Alabama was forced to allow Black men access to the franchise, and the 1867 Alabama Constitution granted every male person over the age of 21—who satisfied the citizenship and residency requirements—the right to vote. This meant that for the first time in Alabama's history, Black people voted and held public office.  Women of all races remained disenfranchised.

74.     In response, white leaders reformed the Democratic party with the intent of "redeeming" the State and re-establishing white supremacy. This was accomplished by using violence to deter Black people from political participation and, once the Redeemers returned to political office, to pass racially discriminatory laws to cement their control.

75.    In 1874, Democratic candidates were elected to public office in large numbers. On election day, in Eufaula, Alabama, members of a white paramilitary group known as the White League, killed several unarmed Black Republican voters and turned away thousands of voters from the polls.

76.    The following year, in 1875, the Alabama Legislature adopted a new State Constitution and passed a series of local laws and ordinances designed to strip Black Americans of the civil rights they enjoyed briefly during Reconstruction.

77.    At the 1901 Constitutional Convention, 155 white male delegates gathered in Montgomery with the express intention "to establish white supremacy in the State."

78.    The Convention ratified changes to the constitution that required literacy tests as a prerequisite to register to vote and mandated payment of an annual $1.50 poll tax, which was intended to and had the effect of disenfranchising Black voters. *United States v. Alabama*, 252 F. Supp. 95, 99 (M.D. Ala. 1966).

79.    After the United States Supreme Court invalidated white-only primaries in 1944, Alabama passed the "Boswell Amendment" to its Constitution in 1946, adding an "understanding requirement" meant to give registrars broad discretion to deny African Americans the ability to register to vote.

16

80.    After a federal court invalidated the Boswell Amendment in 1949, Alabama replaced its understanding requirement with a literacy test, again with the purpose of preventing African Americans from registering to vote.

81.    After the Supreme Court outlawed the white primary in 1944, many Alabama counties shifted to at-large elections, the intent of which was to prevent African Americans from electing their candidates of choice.

82.    In 1951, Alabama enacted a law prohibiting single-shot voting in municipal elections, the intent of which was to prevent African Americans from electing their candidates of choice.

83.    In 1957, Alabama transformed the boundaries of the city of Tuskegee into a twenty-eight-sided figure designed to fence out African Americans from the city limits and ensure that only white residents could elect city officials. *Gomillion v. Lightfoot*, 364 U.S. 339 (1960).

84.    In 1964 and 1965, Dallas County Sheriff Jim Clark, Alabama state troopers, and vigilantes violently assaulted peaceful Black protesters attempting to gain access to the franchise.

85.    On March 7, 1965, in what became known as Bloody Sunday, state troopers viciously attacked and brutally beat unarmed peaceful civil rights activists crossing the Edmund Pettus Bridge in Selma, where less than 5 percent of Black voters were registered to vote. Bloody Sunday helped pave the way for the passage

of the Voting Rights Act in 1965 and Alabama was declared a "covered" state under Section 4(b) of the Act.

86.    No person involved in the historical events described above (paragraphs 73 through 85) had a primary role in drawing the 2021 Senate map.

87.    Between 1965 and 2013, at least 100 voting changes proposed by Alabama State, county, city or political party officials were either blocked or altered pursuant to Section 5 of the Voting Rights Act. No objection was raised after 2008. The last sustained objection to an Alabama state law occurred in 1994.

88.    Alabama was the first state ever to be subjected to a statewide injunction prohibiting the state from failing to disestablish its racially dual school system. *Lee v. Macon Cnty. Bd. of Ed.*, 267 F. Supp. 458 (M.D. Ala.), *aff'd* 389 U.S. 215 (1967). The order resulted from the court's finding that the State Board of Education, through then-Governor George Wallace, had previously wielded its powers to maintain segregation across the state. *Id.*

89.    A trial court found that for decades, state officials ignored their duties under the statewide desegregation order. *See Lee v. Lee Cnty. Bd. of Educ.*, 963 F. Supp. 1122, 1128-30 (M.D. Ala. 1997). A court also found that the state did not satisfy its obligations to remedy the vestiges of segregation under this order until as late as 2007. *Lee v. Lee County Bd. of Educ.*, 476 F. Supp. 2d 1356 (M.D. Ala. 2007).

90.    In 1991, a trial court in *Knight v. Alabama*, 787 F. Supp. 1030 (N.D. Ala. 1991), found that Alabama had failed to eliminate the lingering and continued effects of segregation and discrimination in the University of Alabama and Auburn University, and at the state's public Historically Black Colleges and Universities (HBCUs).

91.    In 1995, the trial court issued a remedial decree analogous to the statewide injunction issued in *Lee v. Macon*, and the court oversaw implementation of that order for over a decade. *Knight v. State of Ala.*, 900 F. Supp. 272 (N.D. Ala. 1995). Alabama did not satisfy its obligations under that order until 2006. *Knight v. Alabama*, 469 F. Supp. 2d 1016 (N.D. Ala. 2006).

92.    Judge Bill Lewis is an African-American jurist who currently serves on the Alabama Court of Civil Appeals after his appointment earlier in 2024. Before joining the statewide appellate court, Judge Lewis was Presiding Judge of the 19th Judicial Circuit, where he served as a circuit judge since 2016, when he was appointed. He was originally appointed to the 19th Judicial Circuit in October 2016 and was then elected to that position in 2018 and 2024 after running unopposed in both the 2018 and 2024 Republican Primaries, and the 2018 general election.

93.    There are currently no Black statewide elected officials in Alabama regardless of political party. Judge Lewis is a Black statewide official, but he was appointed to his position in 2024 and has not run in any election for that office.

94.     Only one Black person has ever been elected to statewide office in a contested election in Alabama. In 1982 and 1988, the late Justice Oscar W. Adams, Jr. was elected in contested elections to two consecutive terms, after first being appointed. In 1994, Justice Ralph D. Cook won an unopposed statewide election, after first being appointed.

95.     In 2000, both Justice Cook and the then-recently appointed Justice John England, both Black Democrats, lost elections to white Republican candidates. All white Democrats running for a seat on the appellate courts in 2000 lost their election, with the exception of Sue Bell Cobb.

96.     In 2002, the only two Democrats elected to statewide office in Alabama were Lucy Baxley as Lieutenant Governor and Nancy Worley as Secretary of State. Both were white women.

97.     In 2006, only three Democrats were elected to statewide office in Alabama: Sue Bell Cobb, to the Alabama Supreme Court, and Jan Cook and Susan Parker, both to the Alabama Public Service Commission.  All three were white women.

98.     In 2008, Lucy Baxley was the only Democrat elected to statewide office in Alabama.  She was elected as President of the Alabama Public Service Commission.

99.    In 2017, Doug Jones, a white Democrat, was elected to the U.S. Senate in Alabama during a statewide special election to fill a vacancy in the office.

100.    In 2018, Black Democratic candidates in Alabama for Lieutenant Governor, State Auditor, and the Public Service Commission lost statewide general elections to white Republican candidates. The Black Democratic candidates had less donations and less funding than their white Republican opponents.

101.    In 2022, Black candidates in Alabama for U.S. Senator, Governor, Attorney General, Secretary of State, and State Supreme Court lost statewide general elections to white candidates. Each of the Black candidates ran as a Democrat, had less donations and less funding than their white opponents, and was defeated by a Republican.

102.    Since the start of the Twentieth century, Alabamians have never elected a Black person to Congress outside of the majority-Black district 7, and only since 1992 when a court order first established district 7 as a majority-Black district.

103.    Kenneth Paschal is a Black Republican who currently represents District 73 in the Alabama House of Representatives. District 73 includes Shelby County and has an 84.1% white Voting Age Population (VAP). He is the only Black Republican in the State House. There are currently no Black Republicans in the state Senate or in any statewide positions to which they were elected.

104.    In order to fill a vacancy for HD 73, a special Republican Primary was held on March 30, 2021, in which five candidates participated. In this contest, Paschal finished second to Leigh Hulsey, a white candidate. With no candidate in the primary having received a majority of the vote, Paschal and Hulsey were forced into a runoff. Paschal defeated Hulsey 51.1% to 48.9% in the runoff, with Paschal receiving 1,476 votes, while Hulsey receiving 1,412 votes.

105.    Paschal faced a white Democrat, Sheridan Black, in the Special General Election on July 13, 2021. In this contest, Paschal won with 74.7% of the vote to 25.1% for Black, with Paschal receiving 2,743 votes, and Black receiving 920 votes. Representative Paschal then ran unopposed and was reelected as representative for House District 73 in 2022.

106.    In the 2024 Republican primary election for Alabama's U.S. Congressional District 2, the four Black candidates in the race—Belinda Thomas, Wallace Gilberry, Karla DuPriest, and Stacey T. Shepperson—finished 5th, 6th, 7th and 8th places out of 8 candidates, respectively, behind four white candidates and together received 6.2% of the total vote. Gilberry dropped out of the race prior to the election. The white candidates who performed better included a current State legislator (Greg Albritton), a former State legislator and local business owner (Dick Brewbaker), a lawyer who invested heavily in her own campaign (Caroleene Dobson), and a 2018 college graduate who is a real estate broker (Hampton Harris).

The Black candidates who stayed in the race were all small business owners, and one (Belinda Thomas) serves on the Newton City Council and served on the State Republican Executive Committee. Another Black candidate (Karla DuPriest) served as Mobile County's absentee ballot manager, and the third (Stacey T. Shepperson) as a community college professor.

107.   In the 2024 Republican primary election for Alabama's U.S. Congressional District 3, Black candidate Barron Rae Bevels finished in third place behind two white candidates, receiving 5.6% of the vote. Mike Rogers—the incumbent who has represented District 3 since 2003 and is current Chair of the House Armed Services Committee—won the primary election with 81.86% of the vote.

108.   In campaign finance reports, Bevels reported receipts of $270.00 and disbursements of $3,816.65. The winner of that election, Mike Rogers, reported receipts of $2,230,032.16 and disbursements of $1,547,906.78.[1]

109.   In the 2024 special Republican primary election for Alabama State House District 27, Black candidate Billy Ray Todd finished fifth of six, behind four white candidates, receiving 8.7% of the vote.

---

[1]

https://www.fec.gov/data/candidates/house/?q=H2AL03032&q=H4AL03087&election_year=2024&election_full=True

110.   In state campaign finance disclosures, Todd reported cash contributions of $3,743.70 and expenditures of $2,521.22.[2] The winner of the primary election, Jeana Ross, reported cash contributions of $167,394.00, other receipts of $11,234.21, and expenditures of $169,616.69.[3]  Ross had previously served as the Alabama Secretary of Early Childhood Education.

111.   In the 2022 Alabama Republican U.S. Senate primary, Black candidate Karla DuPriest finished fifth behind four white candidates, receiving 0.9% of the vote.

112.   DuPriest reported receipts of $4,900.00 and disbursements of $4,900.00. Katie Boyd Britt, the winner of the primary election, reported receipts of $11,452,928.70 and disbursements of $9,744,197.22.[4]  Additionally, Britt was endorsed by the long-term incumbent Senator Richard Shelby.

113.   In the 2010 Republican primary election for Alabama's U.S. Congressional District 5, Black candidate Les Philip finished third behind the two white candidates, receiving 15.8% of the vote.

---

[2] https://fcpa.alabamavotes.gov/PublicSite/SearchPages/CommitteeFinancialSummary.aspx?Comm=31104

[3] https://fcpa.alabamavotes.gov/PublicSite/SearchPages/CommitteeFinancialSummary.aspx?Comm=31125

[4] https://www.fec.gov/data/candidates/senate/?q=S2AL00145&q=S2AL00228&election_year=2022&cycle=2022&election_full=true

114.    Philip reported no campaign donations for that race. Parker Griffith, the incumbent, reported receipts of $1,453,210.63 and disbursements of $1,509,989.43. Mo Brooks, who won that election, reported receipts of $961,210.63 and disbursements of $910,790.40.[5]    Brooks had served in the Alabama House of Representatives and later on the Madison County Commission.

115.    According to National Exit Poll data, in Alabama, the average Black support for Democratic Party Presidential, U.S. Senate, and gubernatorial candidates between 2008 and 2022 was 92.4%.

116.    When the Voting Rights Act (VRA) was first passed in 1965, there were no Black legislators in either chamber of the Alabama Legislature. In 1981, sixteen years later, 8.6% of State Senate seats and 12.4% of State House seats were held by black legislators.

117.    In 2024, 20.0% of State Senate seats and 24.8% of State House seats in Alabama are held by Black legislators. All but one of these Black House members are elected from majority-Black districts. All Black Senators are elected from majority-Black districts.

---

[5]

https://www.fec.gov/data/candidates/house/?q=H0AL05163&q=H8AL05109&election_year=2010&election_full=True

118.   At the time the VRA was enacted in 1965, Black voter registration in Alabama was 23.5%. By 1982, Black voter registration had increased 34-points to 57.7%.

119.   Of the 11 Montgomery and Huntsville "Black preferred candidates" (BPC) outlined in the partisan general elections in Dr. Baodong Liu's expert report, all eleven - Yolanda Flowers, Will Boyd, Wendell Major, Pamela Lafitte, Anita Kelly, Mr. Boyd again, Miranda Joseph, Cara McClure, Lula Albert-Kaigler, James Fields, and Ms. Joseph again – are Black and ran as Democrats, while all of the "white preferred candidates" (WPC) are White and ran as Republicans.

120.   It was not until 2010 that Republicans won a majority in the Alabama State Legislature.

121.   More than half of Alabamians reported going to religious services at least once a week, which is well above the national average.

122.   In a 2014 survey, 57% of Alabama respondents opposed the legal recognition of same-sex marriage. Among Black Alabamians, 47% opposed same-sex marriage and 45% supported it. Among White Alabamians, 62% opposed same-sex marriage and 28% supported it.

123.   In 2006, Alabama voters approved Amendment 774, also known as the "Sanctity of Marriage Amendment."

124.    Among its provisions, Amendment 774 said, "[m]arriage is inherently a unique relationship between a man and a woman" and therefore, "[a] marriage contracted between individuals of the same sex is invalid in this state."

125.    Amendment 774 further specified that, "The State of Alabama shall not recognize as valid any marriage or parties of the same sex that occurred or was alleged to have occurred as a result of the law of any jurisdiction regardless of whether a marriage license was issued."

126.    Alabama voters passed Amendment 774 by an overwhelming margin, 81%-19%.

DATED this 24th day of October 2024.

Respectfully submitted,

*/s/ Alison Mollman*
Alison Mollman
Laurel Hattix
AMERICAN CIVIL LIBERTIES UNION
OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 265-2754
amollman@aclualabama.org
lhattix@aclualabama.org

*/s/ Deuel Ross*
Deuel Ross*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street NW Ste. 600
Washington, DC 20005
(202) 682-1300
dross@naacpldf.org

Leah Aden*
Stuart Naifeh*
Kathryn Sadasivan (ASB-517-E48T)
Brittany Carter*
Ashley Burrell*
Colin Burke*
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
laden@naacpldf.org
snaifeh@naacpldf.org
ksadasivan@naacpldf.org
bcarter@naacpldf.org
aburrell@naacpldf.org

*/s/ Davin M. Rosborough*
Davin M. Rosborough*
Dayton Campbell-Harris*^
Theresa J. Lee*
Sophia Lin Lakin*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
(212) 549-2500
drosborough@aclu.org
dcampbell-harris@aclu.org
tlee@aclu.org
slakin@aclu.org

Jacob van Leer*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th St. NW
Washington, DC 20005
jvanleer@aclu.org

*/s/ Sidney Jackson*
Sidney Jackson (ASB-1462-K40W)
Nicki Lawsen (ASB-2602-C00K)
WIGGINS, CHILDS, PANTAZIS,
FISHER & GOLDFARB
301 19th Street
North Birmingham, AL 35203
(205) 314-0500
sjackson@wigginschilds.com
nlawsen@wigginschilds.com

*/s/ Jack Genberg*
Bradley E. Heard*
Jack Genberg*

cburke@naacpldf.org
David Dunn*
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000
david.dunn@hoganlovells.com

Blayne R. Thompson*
HOGAN LOVELLS US LLP
609 Main St., Suite 4200
Houston, TX 77002
(713) 632-1400
blayne.thompson@hoganlovells.com

Michael Turrill*
Harmony R. Gbe*
James W. Ettinger*
HOGAN LOVELLS US LLP
1999 Avenue of the Stars Suite 1400
Los Angeles, CA 90067
(310) 785-4600
michael.turrill@hoganlovells.com
harmony.gbe@hoganlovells.com
jay.ettinger@hoganlovells.com

Jess Unger*
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Avenue,
Suite 340 Decatur, GA 30030
(404) 521-6700
bradley.heard@splcenter.org
jack.genberg@splcenter.org
jess.unger@splcenter.org

Avner Shapiro*
SOUTHERN POVERTY LAW CENTER
1101 17th Street NW
Suite 510
Washington, DC 20036
240-890-1535
avner.shapiro@splcenter.org

Jessica L. Ellsworth*
Shelita M. Stewart^
Amanda N. Allen*
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600
jessica.ellsworth@hoganlovells.com
shelita.stewart@hoganlovells.com
amanda.n.allen@hoganlovells.com

**Counsel for Plaintiffs Alabama State Conference of the NAACP, Greater Birmingham Ministries, Evan Milligan**

*Admitted *pro hac vice*

^ Admitted in Washington State only

Respectfully submitted,

Steve Marshall
 *Attorney General*

/s/ James W. Davis (with permission)
Edmund G. LaCour Jr. (ASB-9182-U81L)
 *Solicitor General*
A. Barrett Bowdre (ASB-2087-K29V)
 *Principal Deputy Solicitor General*
Soren A. Geiger (ASB0336T31L)
 *Assistant Solicitor General*
James W. Davis (ASB-4063-I58J)
 *Deputy Attorney General*
Richard D. Mink (ASB-4802-M76R)
Misty S. Fairbanks Messick (ASB-1813-T71F)
Brenton M. Smith (ASB-1656-X27Q)
Benjamin M. Seiss (ASB-2110-O00W)
Charles A. McKay (ASB-7256-K18K)
 *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Facsimile: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Barrett.Bowdre@AlabamaAG.gov
Soren.Geiger@Alabama.AG.gov
Jim.Davis@AlabamaAG.gov
Richard.Mink@AlabamaAG.gov
Misty.Messick@AlabamaAG.gov
Brenton.Smith@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov
Charles.McKay@AlabamaAG.gov

J. Dorman Walker (ASB-9154-R81J)
BALCH & BINGHAM LLP
Post Office Box 78 (36101)

445 Dexter Avenue, Suite 8000
Montgomery, Alabama 36104
Telephone: (334) 269-3138
DWalker@Balch.com

Michael P. Taunton (ASB-6833-H00S)
Riley Kate Lancaster (ASB-1002-X86W)
BALCH & BINGHAM LLP
1901 Sixth Avenue North, Suite 1500
Birmingham, Alabama 35203
Telephone: (205) 251-8100
MTaunton@Balch.com
RLancaster@Balch.com

***Counsel for Secretary of State Allen***

## CERTIFICATE OF SERVICE

I hereby certify that on October 24, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record in this case.

/s/ Davin M. Rosborough
Davin M. Rosborough
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
drosborough@aclu.org

*Attorney for Plaintiffs*