*STONE V. ALLEN* - No. 2:21-cv-01531 (N.D. Ala.)
**EXPERT REPORT OF DR. JOSEPH BAGLEY, PH. D**
**February 2, 2022**
**AMENDED November 4, 2024**

I.     CREDENTIALS

I am an Assistant Professor of History at Georgia State University, Perimeter College. My specific areas of study are United States constitutional and legal history, politics, and race relations, with a focus on the Deep South. I earned a Ph.D. in 2013 from Georgia State and an M.A. (2007) and B.A. (2004) from Auburn University. My first book, *The Politics of White Rights: Race, Justice, and Integrating Alabama's Schools*, is an analysis of federal school desegregation litigation and political change. It was published in November 2018 by the University of Georgia Press in the *Politics and Culture of the Twentieth Century South* series. My current projects include a book manuscript examining the struggle for voting rights in the South, focusing on Alabama, Georgia, and the Carolinas.

My academic work has been cited in the *Case Western Law Review*, the *Journal of Urban History*, *Rural Sociology*, the *Alabama Civil Rights and Civil Liberties Law Review*, and in the *New York Times Magazine* (*NYTM*).[1] I have written book and manuscript reviews for, among others, the University Press of Kansas, *Law and History Review*, the *Journal of Southern History*, the *Alabama Review*, *Mississippi Historical Quarterly*, *Georgia Historical Quarterly*, *Urban History*, and *History of Education Quarterly*.[2]

I have been certified as an expert in all previous voting rights litigation in federal courts wherein I have been presented as a testifying expert. I most recently submitted an expert report and testified in a deposition in *NAACP v. Raffensperger* (N.D. GA, 2023). Before that, I testified at trial in *South Carolina State Conference of Branches of the NAACP v. Alexander* (D.S.C., 2022); the court therein tendered me

---

[1] Wendy Parker, "Why Alabama School Desegregation Succeeded (And Failed)," 67 *Case Western Law Review*, 1091 (2017); Rebecca Retzlaff, "Desegregation of City Parks and the Civil Rights Movement: The Case of Oak Park in Montgomery, Alabama," *Journal of Urban History* 47.4, 715 (2019); Erika Frankenberg, "The Impact and Limits of Implementing Brown: Reflections from Sixty-Five Years of School Segregation and Desegregation in Alabama's Largest School District," 11 *Alabama Civil Rights and Civil Liberties Law Review*, 33 (2019); Bryan Mann, "Segregation Now, Segregation Tomorrow, Segregation Forever? Racial and Economic Isolation and Dissimilarity in Rural Black Belt Schools in Alabama," *Rural Sociology* 86.3, 523 (2021). Nikole Hannah-Jones, "The Resegregation of Jefferson County," *The New York Times Magazine*, Sept. 6, 2017.

[2] "'The Beginning of the End' of Klan Terror: Joseph Bagley Reviews James Turner's Memoir of Three Trials," *Law and History Review*, *The Docket* (2019); Review of Camille Walsh, *Racial Taxation: Schools, Segregation, and Taxpayer Citizenship, 1869-1973*, *The Alabama Review* 74.4 (2021), pp. 340-43; Review of Leeann G. Reynolds, *Maintaining Segregation: Children and Racial Instruction in the South, 1920-1955*, *The Alabama Review* 72.2 (2019), pp. 154-57; Review of Tracy E. K'Meyer, *From Brown to Meredith: The Long Struggle for School Desegregation in Louisville, Kentucky, 1955—2007*, *The Journal of Southern History* 80.4 (2014), pp. 1019-2; Review of Stephanie Rolph, *Resisting Equality: The Citizens' Council, 1954-1989*, *Journal of Mississippi History* 82.3, pp. 233-35; Review of Wayne and Shirley Weigand, *The Desegregation of Public Libraries in the Jim Crow South: Civil Rights and Local Activism*, *Georgia Historical Quarterly* 102.3, 2018, pp. 296-97.

as an expert in "American political history, southern legal history, political analysis, historical methods, the history of race discrimination and voting with a particular focus on South Carolina and southern race relations and southern politics and law." I submitted an expert report and a rebuttal report in that case, in which plaintiffs alleged racial gerrymandering and intentional discrimination in the drawing of the state's Congressional districts following the 2020 Census. I also submitted a report and rebuttal report in the state House phase of that litigation.[3]

Prior to the South Carolina litigation, I submitted two reports and testified at a preliminary injunction hearing in *Milligan v. Merrill* (N.D. Ala. 2022), a redistricting case in which plaintiffs alleged that Alabama violated §2 of the Voting Rights Act in the drawing of its Congressional districts following the 2020 Census. I also submitted a report, testified in a deposition and at trial in *People First of Alabama v. Merrill* (N.D. Ala. 2020), a case in which plaintiffs challenged certain voting restrictions imposed by the state in the context of the Covid-19 pandemic.

I am compensated at the rate of $150 per hour for my work in preparing this report. This compensation is not dependent upon my findings. I reserve the right to revise my opinions as stated herein upon further research or findings. I append to this report a C.V., which lists in full my educational background, publications, and prior testimony.

## II.    PURPOSE, METHODOLOGY, SUMMARY FINDINGS

I have been asked by plaintiffs' counsel in this case to examine any relevant historical and contemporary evidence and to provide my opinion relevant to whether Alabama Senate Bill 1, the 2021 Alabama State Senate Redistricting law ("S.B. 1"), establishing the map redrawing the state's Senate districts following the release of the 2020 Census data, may result in an impairment of Black voters' ability to participate fully and equitably in the political process and to elect candidates of their choice, based on the "totality of the circumstances" test, as applied using the factors set forth by the U.S. Senate Judiciary Committee during the amendment of §2 of the Voting Rights Act in 1982 and subsequently referenced by the Supreme Court in *Thornburg v. Gingles*, 478 U.S. 30 (1986, "*Gingles I*") (the "Senate Factors").

Plaintiffs have asked me to focus my analysis on the greater metropolitan areas of Montgomery and Huntsville-Decatur ("the challenged areas"), which I understand are their focus in challenging the legality of the 2021 state Senate map. In my opinion, Senate Factors 1, 3, 5, 6, 7, and 8 are present in Alabama in ways that substantially limit equal access to the political process for Black voters, especially in the challenged areas. I offer no opinions or analysis as to the other Senate Factors.

My analysis adheres to the common standards of historiography. This report thus draws upon existing, relevant, and well-regarded historiographical works, that is, valuable secondary sources, including peer-reviewed academic journal articles and scholarly books. It relies as well upon primary sources in the form of historical and contemporaneous press coverage, U.S. Justice Department documents, Census data, campaign literature, and relevant caselaw. These represent common sources for scholars in the humanities and the social sciences to reference, and I weigh all of these against one another, objectively, as is common in the field.

---

[3] *South Carolina NAACP v. McMaster*, Consent Decree entered (D.S.C., 2022).

There are seven core Senate Factors and two "additional" factors that courts have indicated might be considered to the extent that they are appropriate. These include:

- The "extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process" [Factor 1]

- The "extent to which voting in the elections of the state or political subdivision is racially polarized" [Factor 2]

- The "extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group" [Factor 3]

- If "there is a candidate slating process, whether the members of the minority group have been denied access to that group" [Factor 4]

- The "extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process" [Factor 5]

- Whether "political campaigns have been characterized by overt or subtle racial appeals" [Factor 6]

- The "extent to which members of the minority group have been elected to public office in the jurisdiction" [Factor 7]

- Whether "there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group" [Factor 8, Additional Factor]

- And "Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous" [Factor 9, Additional Factor].

These factors allow scholars and courts to undertake a "practical evaluation of the past and present realities" and to determine "whether the political process is equally open to minority voters" (*Gingles I* at 478). As the Court held in *Gingles*, other additional factors may be considered, and there is no requirement that all factors be considered or that any particular weight be assigned to any one factor.[4]

While Factor 2 carries great weight in voting rights litigation, racially polarized voting ("RPV") analysis is generally the purview of specially trained political scientists. Plaintiffs may or may not employ such scholars to conduct RPV analysis, I note here that numerous courts have found that voting in Alabama is racially polarized. This Court, for example, in *Milligan v. Merrill*, recently took notice of "ample evidence of intensely racially polarized voting." 582 F. Supp. 3d 924 (N.D. Ala., 2022), at 936. It referred elsewhere to "the veritable mountain of undisputed evidence that in all the districts at issue in this case,

---

[4] United States Senate, 97th Congress, 2nd Session, Report No. 97-417, pp. 28-9.

and in all statewide elections, voting in Alabama is polarized along racial lines." *Id*. 1019. In the Supreme Court's affirmation of that case, Chief Justice Roberts explained, "Plaintiffs' experts described the evidence of racially polarized voting in Alabama as 'intens[e],' 'very strong,' and 'very clear.' Even Alabama's expert conceded," Chief Justice Roberts wrote, "'that the candidates preferred by white voters in the areas that he looked at regularly defeat the candidates preferred by Black voters.'" *Allen v. Milligan*, 599 U.S. 1 (2023), 22.

My findings as to the relevant Senate Factors, with a focus on the challenges areas and districts, include:

- Factor 1: Alabama's recent history of discrimination against Black citizens continues to the present day, including in the challenged areas. In recent decades, for example, the Alabama Legislature – under the control of white Democrats and Republicans – has sought to limit the ability of Black voters to elect candidates of their choice, to limit Black voters' ability to elect more than a token number of candidates of choice, to use redistricting as a vehicle for manipulating Black voters to the benefit of one white-controlled party or the other, and to engage in racial gerrymandering in pursuit of one or more of these goals.

- Factor 3: At-large voting systems with enhancing devices have been a tool continuously used by white lawmakers in Alabama – from Redemption to the present day – to dilute Black voters' strength and prevent the election of Black candidates, including in the challenged areas. Additionally, the Legislature has enacted voting requirements that make it more difficult for poor citizens to vote, and these measures disproportionately affect Black citizens, due to the state's history of discrimination.

- Factor 5: Across-the-board socioeconomic disparities in the challenged areas strongly support a finding that this factor is present. Additionally, recent findings of discriminatory intent on the part of state and local officials, ongoing desegregation litigation, renewed white flight, and more demonstrate the enduring nature of racial discrimination and its effect on electoral politics.

- Factor 6: Alabama has a long and enduring history, including in the challenged areas, of candidates using racial appeals. From the 1960s until recently, those appeals were coded in nature, or what I call colormasked. Within the last decade, however, racial appeals, including those employed by lawmakers in the challenged areas, have become more overt again.

- Factor 7: Despite candidates running for numerous statewide offices, only three Black candidates have served in statewide office and none in this century. Black candidates have fought their way into the legislature, thanks to federal voting rights enforcement. This includes in the challenged areas, though as I explain below, white lawmakers have engaged in illegal racial gerrymandering in those areas in the last decade. Also, all Black candidates who won these offices did so in majority Black districts created in order to comply with federal law. Black citizens are still not proportionally represented in the state Senate.

- Factor 8: The state legislature's lack of responsiveness to the desires of Black voters is demonstrated by its failure, just last year, to create a second majority-Black congressional district, when directed to do so by a federal court, and to expand Medicaid, as well as by various bleak episodes described in detail under Factors 3 and 5.

III.    FACTOR 1: A HISTORY OF DISCRIMINATION TOUCHING THE RIGHT TO VOTE

Factor 1 asks us to examine the "extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process."

As this Court found in *Milligan v. Merrill* in 2022, "Alabama's extensive history of repugnant racial and voting-related discrimination is undeniable and well documented." 582 F. Supp. 3d 924 (N.D. Ala. 2022), at 1020. The *Milligan* Court found, "Even if we focus primarily on the more recent evidence, we find that these Senate Factors [1, 3, and 5] still weigh against Defendants." *Id.*, 1020. Similarly, this Court in *People First of Alabama v. Merrill* in 2020 determined, "Black Alabamians have consistently overcome barriers to exercising their fundamental right to vote, only to later have that right curtailed. 491 F.Supp.3d 1076, at 1104. Likewise, the court in *Alabama State Conference of the NAACP v. Alabama*, also in 2020, found that "Alabama's history of discrimination against African Americans in all areas of life is long, well-documented, and undisputed." 612 F.Supp.3d 1232 (M.D. Ala. 2020), 1286.

Alabama's history of discrimination touching the right of its Black citizens to equitably engage in the political process has continued to the present day. I discuss recent examples of discrimination involving ballot access, vote dilution, and more under Factors 3 and 5. The state just last year was ordered to adopt a congressional redistricting plan drawn by a special master because this Court found that it had not only violated §2 but had failed to remedy the violation by refusing to draw a map with two majority-Black congressional districts. Accordingly, I focus here on state lawmakers' historical and ongoing manipulation of the redistricting process for Alabama's state legislative districts.

a.    State Legislative Redistricting, 1962 - 1990

Entering the 1960s, the Alabama legislature had not reapportioned itself since the adoption of the state's white supremacist, disenfranchising constitution in 1901. In early 1962, a three-judge court in *Sims v. Frink* gave the state a deadline of that summer to reapportion or insisted that the court would do it itself. The legislature then passed plans that the court deemed "obviously, [and] glaring[ly], discriminatory, arbitrary, and irrational." 208 F.Supp. 431, 437, 440. Given another chance, the legislature submitted plans that the court determined included districts for which there was no rational basis besides "preventing the election of a Negro House member." *Sims v. Baggett*, 247 F.Supp. 96, 109 (M.D. Ala. 1965). Following adoption of modifications directed by the court, two Black candidates were elected, the first to serve in the Alabama Legislature since Reconstruction.[5]

By January 1972, the *Sims* case had been consolidated with one filed by Montgomery's E.D. Nixon, Morris Dees, and Fred Gray (one of the newly elected Black legislators). Plaintiffs sought the

---

[5] Don Wasson, "New Legislators Take Oath, May Have to Take it Again," *Montgomery Advertiser*, Nov. 7, 1970.

creation of single-member districts, specifically in the "Negro ghetto areas" of Birmingham, Mobile, and Montgomery, and asserted that multi-member, at-large districts diluted the Black vote. The court rejected the state House and Senate plans on account of their discriminatory effect and their failure to satisfy the one-person, one-vote principle. It approved plaintiffs' plans, which used only single-member districts in both chambers – 105 for the House and 35 for the Senate – and it explicitly acknowledged that multi-member districts tended to discriminate against Black voters.[6] Fred Gray hailed the ruling, saying, "For the first time you have people living in a compact group who can have a man to consider and be responsive to their needs." Gray described it as "a breakthrough . . . not only for black people, but for people in various socio-economic groups."[7]

The Speaker of the House, Sage Lyons, called it "a terrific problem" to implement, even though the court had denied plaintiffs' motion to order midterm elections, delaying any elections under new plans until 1974. Lyons lamented, "The failure of the legislature to pass a realistic reapportionment plan is what precipitated this." One Black Belt legislator seemed to think, perhaps wishfully, that the new plan would more adversely affect the urban block, in a reversal of the last court-ordered reapportionment. Of course, his analysis rested almost completely on racial alignment: "I'll tell you what you're going to get from Jefferson County," he said, "Six Republicans, six Negroes, six Kluxers (referring to klansmen), and two fools. They won't be able to agree on anything," he predicted, "and I can beat every damn one of them." In the 1974 elections, Black voters were able to elect 13 Black candidates to the state legislature.[89]

During the 1980s redistricting cycle, as the court in *Burton v. Hobbie* noted, "For the third consecutive decade, the Alabama Legislature abrogated its duty and failed, on its own, to adopt a valid, enforceable reapportionment plan." 561 F. Supp. 1029 (M.D. Ala. 1983), at 1034. The state was subjected to two §5 objections and a merits-based finding by a federal court that legislators had caused a retrogression in Black voting strength and had unnecessarily cracked Black population.

After publication of the 1980 Census, in November 1981, William Burton filed suit in federal court on behalf of "all black citizens of Alabama" challenging the state legislative redistricting plan passed by the legislature earlier that fall – Act No. 81-1049. Among the named defendants was Montgomery County Probate Judge Walker Hobbie, whom plaintiffs argued was representative of a defendant class of state probate judges. *Burton v. Hobbie* was assigned to District Judge Truman Hobbs, then-Circuit Judge Frank Johnson, and the man who had taken Johnson's place in the Middle District of Alabama, Judge Myron

---

[6] Sims v. Amos, 336 F. Supp. 924, 936, MD, 1972

[7] Complaint and Amended Complaint in *Nixon v. Brewer* (Civil Action 3017-N), Frank Minis Johnson Papers, Library of Congress Manuscript Division, Washington D.C. [Hereinafter FMJ Papers] Box 10, Folder 2; Stan Bailey, "New Redistricting Plan Called 'Breakthrough' for Black People," *Alabama Journal, Jan. 4, 1972.*

[8] Sims v. Amos, 336 F.Supp. 924, 930-41 (MD, 1972); Act No. 3, Alabama Legislative Acts, 1973, Special and Regular Sessions, Volume 1, p. 6, ADAH Digital Collections, http://digital.archives.alabama.gov/cdm/compoundobject/collection/legislature/id/147440/rec/6; Don Wasson, "Wallace Calls Court Remap Plan 'Albatross' Around State's Neck," *Montgomery Advertiser*, Aug. 4, 1973; "The Reapportionment Order, Jan. 4, 1972, *Alabama Journal*; Stan Bailey, "New Redistricting Plan Called 'Breakthrough' for Black People," *Alabama Journal, Jan. 4, 1972.*

Thompson. The plaintiffs argued that Act No. 81-1049 was violative of one-person, one-vote; violative of §2 of the Voting Rights Act; was an illegal racial gerrymander, with respect to both houses of the state legislature; and had been enacted with discriminatory intent.[10]

The plaintiffs, represented by Fred Gray and Solomon Seay, along with Morris Dees and Jim Blacksher, argued that the "overriding policy" concern in drafting and enacting the plans was "the maximization of the opportunity for white incumbents to continue in office," and that this "perpetuated the racially discriminatory effect" of the state's "prior official policy of white supremacy."[11]

Blacksher wrote a letter to then Assistant Attorney General for the Civil Rights Division ("CRD") William Bradford Reynolds, urging the Justice Department to deny preclearance of the Act under Section 5. Blacksher noted that Black candidates for office had only recently been elected in Alabama and only from districts that had clear Black majorities. He submitted evidence that U.S. Senator Howell Heflin had been pilloried by the white public and in the press for his support for the 1982 Amendment to the Voting Rights Act ("VRA") that added a discriminatory effect standard and mooted the Supreme Court's *Mobile v. Bolden* decision, and Heflin's support for other measures in support of Black representation, including the nominations of Judge Thompson and Judge U.W. Clemon to the federal bench.[12]

Blacksher also noted that Black state Senator Michael Figures of Mobile had presented a plan that was dismissed because it failed to protect incumbents, while the approved plan pitted two incumbents against one another – Black House members Fred Horn and Ron Jackson. Representative and Co-Chair Rick Manley argued that Figures' plan was rejected due to the "local courtesy" rule, which Figures said would doom any proposal put forth by a Black legislator at that time. Manley admitted that compliance with the VRA was not really discussed and that he did not know the "meaning of racial vote dilution."[13]

In May 1982, the CRD notified the state of Alabama that Act 1981-1049 failed preclearance due to a retrogression of Black voting strength. The division noted, especially, the reduction in House districts with Black majorities in Jefferson County from seven to six and in the western Black Belt from five to one, and the reduction of Black population in 12 other House districts, including all ten urban House districts with Black voting age populations over 25 percent. It also listed "concomitant" reductions in the overlapping Senate districts and the packing of SD 33 in Mobile for the apparent purpose of limiting Black influence. The Black population in Montgomery, it surmised, had been cracked to avoid the election of a Black Senator. The court in *Burton* subsequently gave plaintiffs the opportunity to present an alternative plan, while the legislature convened in attempt to pass a plan that would gain preclearance.[14]

---

[10] Complaint in Burton et al. v. Hobbie et al. (Civil Action No. 81-0617-N), copy in Frank Minis Johnson Papers, Library of Congress Manuscript Division, Washington D. C., Box 280, Folder 6, pp. 1-6; McLemore, "The Second Reconstruction in Local Politics," pp. 127-29.

[11] Burton Complaint, pp. 6-7.

[12] McLemore, "The Second Reconstruction in Local Politics," pp. 125-32.

[13] Id.

[14] Wm. Bradford Reynolds to Honorable Charles A. Graddick, Attorney General of the State of Alabama, May 6, 1982, https://www.justice.gov/crt/voting-determination-letters-alabama; Burton v. Hobbie, 543 F.Supp. 235, 236-37.

The legislature convened in emergency special session and passed Act 82-629 in June, and plaintiffs submitted their plan. The Justice Department indicated that it needed more time to study the state's plan, and the *Burton* court found that plaintiffs' plan was not necessarily a clear remedy. The court thus allowed the state's plan to remain in place for the elections that fall, with certain modifications ordered by the court for districts in Jefferson County and with the understanding that legislators would be serving one-year terms, with new elections to be held in the fall of 1983. The court insisted that it would adopt a plan of its own for those elections if Act 82-629 did not get precleared.[15]

In August 1982, the CRD formally objected to Act 82-629. It found that there were viable alternatives to the House map that did not fragment Black population and split counties in the western Black Belt and that the state had failed to satisfactorily explain why it had rejected those alternatives.[16] White legislators finally agreed to work with their Black colleagues, namely Joe Reed and Thomas Buskey of the Black-activist Alabama Democratic Conference ["ADC"], on passage of what became Act 83-154, which was precleared and approved by the *Burton* court.[17]

The court, however, was compelled to rule at that time on the merits of Act 82-629, as the parties moved to let legislators elected in 1982 remain in office. The court concluded that "an examination of its merits is necessary," and it agreed with the CRD that Alabama violated the VRA, insofar as "the configuration of certain Black Belt districts caused retrogression of black voting strength (particularly in districts 45 and 88)" and that "there was unnecessary fragmentation of minority communities and insufficient adherence to county boundaries." *Burton v. Hobbie*, 561 F. Supp. 1029 (M.D. Ala. 1983), 1035. In elections that fall, 19 Black candidates were elected to the House (out of 105) and 5 were elected to the Senate (out of 35).[18]

Years later, Blacksher argued, "There is no doubt that the Attorney General's objection was influenced by the ringing mandate of the 1982 Voting Rights Act Amendments to provide protected minorities with equal access to the electoral process. And there is no doubt," he continued, "this federal mandate of full, equal access, under both Section 2 and Section 5, strengthened the negotiating power of black legislators and political leaders in the legislature's next attempt to obtain Section 5 preclearance before the federal court's 1983 deadline."[19]

As has been typical of politics in Alabama, racial progress begat white backlash. A state House campaign in the 1983 special election is exemplary. In House District 73, in Montgomery, Democratic candidate Ham Wilson, the winner of the 1982 election, faced a rematch with Republican Perry Hooper, Jr. – who would later become Chief Justice of the State Supreme Court. Wilson had received the endorsement in 1982 of the ADC. Hooper's campaign in 1983 turned this against him, labelling Wilson as the "handpicked" candidate of Joe Reed and the ADC. Wilson, in turn, denied that he had sought such

---

[15] Burton v. Hobbie, 543 F.Supp. 235, affirmed 459 U.S. 961 (1982).

[16] Assistant Attorney General for Civil Rights William Bradford Reynolds to Charles A. Graddick, Aug. 2, 1982, Civil Rights Division Section 5 Objection Letters by State, Alabama.

[17] Burton v. Hobbie, 543 F.Supp. 235, affirmed 459 U.S. 961 (1982).

[18] Reynolds to Graddick, Aug. 2, 1982, Civil Rights Division, Section 5 Objection Letters by State online; James Blacksher, et al., "Voting Rights in Alabama, 1982-2006," 17 *Southern California Review of Law and Social Justice* 2, Spring 2008: pp. 249-281, pp. 272-73.

[19] Blacksher, et al., "Voting Rights in Alabama, 1982-2006," pp. 273-74.

endorsement and disavowed it. Reed lamented the historical reality in Alabama that politicians would "always try to seek out black support, but when it is convenient, they attack us."[20]

Hooper ran an advertisement featuring a photo of the ADC primary election guide, which apparently indicated that Wilson was being endorsed by ADC. The ad described Hooper as "The true conservative candidate – with no ties to Joe Reed!" Wilson doubled down on his denials of any affiliation or connection, prompting the Hooper camp to run a blatantly racist ad under the banner, "LAST YEAR, JOE REED ELECTED HAM WILSON, JR. HERE IT IS IN BLACK AND WHITE." Below this boldface type were the vote tabulations for the four predominantly white polling places, which went for Hooper, and the two predominantly Black polling places, which went heavily for Wilson and gave him the edge in the 1982 election. The ad admonished voters, "This time, have it your way, Elect a strong candidate with no ties to Joe Reed!" The message in this obvious racial appeal was that a vote for Wilson was a vote for Black people, and a vote for Hooper would protect white rights – it was a message that would remain at the heart of the Republican Party's effort to effect a racial shift in Alabama politics.[21]

### b.  State Legislative Redistricting, 1990 - 2023

During the 1990s redistricting cycle, Black leaders were able to negotiate with white leaders in the legislature on a state legislative redistricting plan, the Reed-Buskey Plan, that passed the House but failed in the Senate. A Senate Committee plan cleared that body but not the House. Black plaintiffs subsequently brought suit in state circuit court with Section 2 and Section 5 claims seeking a court-approved plan. A consent decree approved by the court in *Sinkfield v. Bennett* essentially adopted Reed-Buskey and increased the number of majority Black districts in the House to 27 out of 105 and increased the majority Black districts in the Senate to 8 out of 35. The court retained jurisdiction until a new plan could be passed by the legislature.[22]

As more Black voters sent Black candidates of choice into office as Democrats, the 1990s became a pivotal point in white party realignment in Alabama. The Republican Party had been a nonentity in the state for most of the twentieth century. It had enjoyed limited success as the party of emancipation following the Civil War. It had been overthrown during the "Redemption," when white Democrats refashioned that party as the party of white supremacy. Between the enactment of the state's disenfranchising constitution in 1901 and the passage of the Civil and Voting Rights Acts in the 1960s, Democrats had total control of politics in the state of Alabama. Even as Black citizens began to break into politics as Democrats, little by little and by way of litigation, most white Alabamians continued to vote for white Democrats at the state and local level, even as they tended to vote for Republican presidential candidates.[23]

---

[20] McLemore, "The Second Reconstruction in Local Politics," pp. 142-45.

[21] Id.

[22] Sinkfield v. Bennett, No. CV-93-689-PR (Cir. Ct. Montgomery Co., Aug. 13, 1993); *Montgomery Advertiser*, Oct. 20, 1993.

[23] Glen Feldman, *Painting Dixie Red: When, Where, Why, and how the South Became Republican* (Gainesville: University of Florida Press, 2011), pp 337-38; Wayne Flynt, *Alabama in the Twentieth Century* (Tuscaloosa: University of Alabama Press, 2004), pp. 102-4; Merle Black and Earl Black, *The Rise of Southern Republicans* (New York: Belknap Press of Harvard, 2002), pp. 235-45.

In the 1990s, following the adoption of Reed-Buskey at the state legislative level and the creation of the state's first electable Black congressional district, flight accelerated. According to the University of Alabama political scientist Patrick Cotter, the Republican party's resurgence was driven by the "exploitation" of race. Republicans, Cotter wrote, "have drawn support from voters who harbor antiblack sentiments or who view the Democrats as too influenced by black political groups."[24] Or as the Montgomery lobbyist and former public service commissioner Pete Matthews observed, new Republican voters did "not like black people. I don't give a [expletive] who tells me they do," Matthews added, "I'm telling you they don't."[25]

White Democrats, for their part, had tried to stop the bleeding, manipulating Black population during the 1990s redistricting cycle to the benefit, not of Black voters, but of the state party, under the shadow of §5. When Republican-initiated litigation aimed at those efforts failed, party leadership sought to paint the Democratic Party Black and target the remaining white Democrats.[26] This was at a time in which, according to Cotter, neither Republicans or Democrats had "made a concrete effort to reduce the racial polarization in the state's politics. Indeed," Cotter concluded, "recent campaigns often include[d] actions that broaden[ed] the division."[27]

In 1994 Fob James won the gubernatorial election as a Republican, having previously served in that capacity as a Democrat. He defeated Democrat Jim Folsom Jr., who had ascended to the office upon the resignation of Guy Hunt amid an ethics scandal. Senior U.S. Senator Richard Shelby also switched parties that year. In 1996 Republicans captured the majority in Alabama's congressional delegation, with Bob Riley and Robert Aderholt beating Democratic incumbents in CDs 3 and 4, respectively. Jeff Sessions, who had previously made plainly racist remarks, was elected Attorney General. Perry Hooper was elected Chief Justice of the state Supreme Court. Secretary of State Jim Bennett switched to the GOP, as did two members of the state Board of Education.[28] Republicans made significant gains in the state legislature as well.[29]

The national face of the Republican surge in the 1990s was Georgia Congressman, and Speaker of the U.S. House, Newt Gingrich. Gingrich had reinvigorated the Southern Strategy and had mastered the art of coded racial appeals while, at the same time, capitalizing on backlash aimed at the Clinton Administration. His rhetoric allowed him to suggest, in barely veiled ways, that Black people mired in poverty in areas with "failing" schools and high crime were there because they lacked "middle class values" associated with white people. This colormasked rhetoric went hand-in-hand with calls for

---

[24] Patrick Cotter and Tom Gordon, "Alabama: The GOP Rises in the Heart of Dixie," in Alexander Lamis, Ed., *Southern Politics in the 1990s* (Baton Rouge: Louisiana State University Press, 1999), pp. 221-48, pp. 244-45.

[25] Cotter and Gordon, "Alabama: The GOP Rises in the Heart of Dixie," p. 245.

[26] Feldman, *Painting Dixie Red*, p. 326; Flynt, *Alabama in the Twentieth Century*, pp. 102-4; Black and Black, *The Rise of Southern Republicans*, pp. 314-15.

[27] Cotter and Gordon, "Alabama: The GOP Rises in the Heart of Dixie," p. 245.

[28] One being Bradley Byrne, who would later use a racial campaign appeal in his campaign for reelection to Congress. See Milligan v. Merrill, 582 F.Supp. 3d 924, 1023-24.

[29] Cotter and Gordon, "Alabama: The GOP Rises in the Heart of Dixie," pp, 235-39.

"freedom of association," school choice, and private school voucher programs – initiatives that dated back to the administrations of John Patterson and first-term George Wallace.[30]

White Republicans' legal challenges to the state's legislative efforts in the 1990s and early 2000s should be seen against this backdrop. They understood that creating some Black districts could help them win whitewashed adjacent districts and that *Shaw* and subsequent decisions might aid them in those efforts. At the same time, white Democrats supported unpacking Black districts in an effort to save themselves in adjacent districts. The upshot is that white lawmakers and strategists in *both* parties were keen to manipulate Black voters via redistricting for their own benefit. With the defections and increased electoral success, some could foresee that white lawmakers might soon have only a tenuous hold on power within the Democratic Party, perhaps even one day constituting a minority. Such a situation, not dissimilar from the "tipping point" phenomenon in public schools under desegregation orders, might see white people flee the Democratic Party entirely, leaving the Republican Party ascendant in the state.

Soon after the turn of the millennium, white Republicans filed a series of motions in the *Sinkfield* litigation and in newly filed lawsuits, including racial gerrymandering and one-person/one-vote claims, aimed at the 1993 consent decree, the legislature's failure to pass redistricting plan in 2001, and its passage of plans later that year. None of these was successful.[31] The legislature's state House and Senate plans were precleared by the CRD that year. Republican Party leadership pivoted to a new campaign strategy focused on targeting white Democrats and running hand-picked candidates to try and unseat the white Democrats with white Republicans. As former Republican Party Chairman and House Speaker Mike Hubbard explained in his book, *Storming the Statehouse*, "I commissioned an in-depth study of voting patterns in various districts represented by *white* Democratic legislators across the state. We looked at past results," he continued, "in presidential elections, gubernatorial contests, and other statewide offices and pinpointed the areas that cast the most Republican ballots yet continued to send Democratic lawmakers to Montgomery," meaning white Democrats.[32]

Republicans made gains across the state in 2006 and 2008, but they did not yet achieve what Hubbard *et al.* had identified as the ultimate goal – taking control of the legislature by eliminating white Democrats. Hubbard insisted, though, that Republicans would use their strategy from these elections as a "pilot program" for 2010.[33] By then, backlash to the election of the nation's first Black president had

---

[30] Kevin Kruse, *White Flight: Atlanta and the Making of Modern Conservatism* (Princeton: Princeton University Press, 2005), pp. 260-63; Black and Black, *The Rise of Southern Republicans*, pp. 5-7.

[31] Gustafson v. Johns, 434 F. Supp. 2d 1246 (S.D. Ala. 2006), summary of previous litigation at 1248-49, see also 1283-90; see also, "2000s Redistricting Case Summaries – Alabama," Redistricting Task Force for the National Conference of State Legislatures, https://www.senate.mn/departments/scr/REDIST/Redsum2000/redsum2000.htm; *Montiel v. Davis*, 215 F. Supp. 2d 1279 (S.D. Ala. 2002), esp. 1283-90.

[32] Mike Hubbard, with David Azbell, *Storming the Statehouse: The Campaign That Liberated Alabama from 136 Years of Democrat Rule* (Athens: University of Georgia Press, 2012), p. 116, emphasis added.

[33] Hubbard, *Storming the Statehouse*, p. 126

delivered the opportunity to finish the job.[34] In congressional and state legislative elections in 2010, Hubbard and other Republican leaders resolved to, in the words of the eminent Alabama historian Wayne Flynt, "Basically [run] against Barack Obama." Flynt explained that Republicans used "Obama as a metaphor, and everybody knows what that's about." It was not really about Obama himself, but it was about his race, and it was, Flynt said, "about race in Alabama." The Democratic Party, then, was tied to Obama because he was Black, to get white Alabamians to abandon white Democrats in favor of white Republicans.[35]

In the 2010 elections, the last white Democratic member of Congress from Alabama, Bobby Bright, was defeated. Congressman Parker Griffith was reelected but had been among the last of the white Democrats known as "Blue Dogs" to flip to the Republicans. Griffith was the first Republican elected to represent Alabama's CD 5 since Reconstruction. Terri Sewell won the seat in CD 7 held previously by Artur Davis, making her the only Black member of the delegation, and the only Democrat. In 45 years, from 1965 – not coincidentally the year after the Civil Rights Act was passed and the year the Voting Rights Act was passed – to 2010, the Alabama congressional delegation had undergone a complete metamorphosis. Republicans also ousted nearly every white Democrat from the state legislature, earning an all-white supermajority.[36]

The Republican supermajority dominated the redistricting process following the publication of the 2010 Census figures. Republican Senator Del Marsh explained after the 2010 elections, "We are in the majority and in a position, if we have to, to run over people."[37] There was no longer any incentive for GOP lawmakers, in other words, to bargain with Black members of the body, as they had done in some previous cycles in order to gain seats. This became apparent when the all-white Republican Senate majority drew shouting protests from Black members who opposed closing debate on a constitutional amendment that would remove racist and segregationist language from the state's constitution. As the *Montgomery Advertiser* reported, Black members said that Lieutenant Governor Kay Ivey and Marsh "showed blatant disrespect for the Democrats dealing with a historic and sensitive issue. [Black Senator Quinten] Ross questioned why the Republicans would not let them talk about an issue that affected them and their families but did not directly impact a single member of the majority." With the Republican

---

[34] Will Bunch, *The Backlash: Right-Wing Radicals, High-Def Hucksters, and Paranoid Politics in the Age of Obama* (New York: Harper Collins, 2011); Adia Harvey Wingfield and Joe R. Feagin, *Yes We Can? White Racial Framing and the Obama Presidency* (New York: Routledge, 2013); Terence Samuel, "The Racist Backlash Obama has Faced during his Presidency," *Washington Post*, April 22, 2016.

[35] Paul Gattis, "Six opinions from Wayne Flynt on Alabama politics, the Democratic Party, Mike Hubbard, Parker Griffith and Robert Bentley," *al.com*, May 15, 2014; Feldman, *Painting Dixie Red*, 315, 332, 338.

[36] Phillip Rawls, "GOP claims control of Ala. Senate," *Montgomery Advertiser*, Nov. 3, 2010; Markeisha Ricks, "Looking back at Tuesday's surprises," *Montgomery Advertiser*, Nov. 4, 2010; *al.com* and *Mobile Press-Register* Staff, "Republicans claim majority in Alabama House and Senate for 1st time in 136 years," *al.com*, Nov. 3, 2010; Camille Corbett, "Hubbard reflects on GOP takeover," *The Crimson White*, Oct. 23, 2012.

[37] Sebastian Kitchen, "Disaster brings unity to fighting Senate," *Montgomery Advertiser*, May 1, 2011.

ascendance, the legislature had become almost entirely polarized by race, with Black members in the minority. The Hubbard strategy had succeeded.[38]

Unsurprisingly then, when the new membership of the Permanent Joint Legislative Committee on Redistricting was revealed, it featured 16 members, 10 white Republicans and 6 Black Democrats. Black legislators protested this representation, favoring instead a nonpartisan commission to oversee the process, but, as subsequent events would reveal, these protestations amounted to nothing. Cochaired by Senator Gerald Dial and then-Representative Jim McClendon, the committee held public hearings and took input prior to maps being produced. Those maps were drawn behind the scenes by familiar characters including consultant Randy Hinaman and noted "gerrymander whiz" Thomas Hofeller.[39]

McClendon later explained the process: "The strategy was very simple, and it was understood by everybody. It was pretty commonplace. We did this for congressional districts, and we did this for House districts. We drew minority districts first. That's how you guarantee they get to keep what they've got," with "they" being Black voters. McClendon said, "Black people accounted for about 25 percent of the state's population, and 25 percent of our legislators are blacks. Are you getting the picture here? Yeah. So. Okay. What do you want?" This was in reference to the state's legislative delegation, not the congressional delegation, which still contained only Congresswoman Sewell.[40]

The Alabama Legislative Black Caucus filed a discriminatory intent claim and a §2 claim against the state legislative plans, and the Alabama Democratic Conference filed an intent claim and a racial gerrymandering claim. Plaintiffs alleged that the plans were drawn to pack Black voters into existing majority-minority districts, beyond what was necessary for VRA compliance, in order to whitewash surrounding districts – this, they recognized, was the post-GOP-takeover manifestation of the Hubbard strategy. A three-judge court denied or dismissed these claims but was reversed by the U.S. Supreme Court on the claims of racial gerrymandering. Justice Breyer noted that the plaintiffs had "presented much evidence at trial to show that the legislature had deliberately moved black voters into [certain] majority-minority districts … in order to prevent the percentage of minority voters in each district from declining." *Alabama Legislative Black Caucus v. Alabama*, 575 US 254, 135 S. Ct. 1257 (2015), at 1266-67.

On remand, the trial court determined that race predominated in 14 districts drawn by Hinaman and approved by the legislature and that only 2 of those survived strict scrutiny. Therefore, 12 districts – three Senate districts and nine House districts – were adjudged to be unconstitutional racial gerrymanders. Among the enjoined districts were several in the challenged areas in this litigation. For example, the court

---

[38] Id.

[39] Michael Wines, "Republican Gerrymander Whiz Had Wider Influence Than Was Known," *New York Times*, Sept. 10, 2019; Wines and Richard Fausset, "North Carolina's Legislative Maps Are Thrown Out by State Court Panel," *New York Times*, Sept. 3, 2019; David Daley, "The Secrets of the Master of Modern Republican Gerrymandering," *The New Yorker*, Sept. 6, 2019; Eddie Burkhalter, "Gerrymandering expert worked with Alabama Republicans on 2011 redistricting lines, documents show," *Alabama Political Reporter*, Sept. 24, 2019.

[40] Brian Lyman, "Report: GOP redistricting expert was in touch with Alabama legislator, attorney," *Montgomery Advertiser*, Sept. 24, 2019; David Daley, "GOP Racial Gerrymandering Mastermind Participated in Redistricting in More States Than Previously Known, Files Reveal," *The Intercept*, Sept. 23, 2019.

determined that Mr. Hinaman split precincts in Senate District 26 in Montgomery in such a way as to pack Black blocks into SD 26 and put white blocks into SD 25. Similarly, the court found that "the drafters appear to have snaked around looking for black people" in House District 53 in Huntsville. *Alabama Legislative Black Caucus v. Alabama*, 231 F. Supp. 3d 1026 (M.D. Ala. 2017) at 1184. And, regarding House District 77 in Montgomery, the court found that "a similar phenomenon occurred" as it did in Senate District 26. That is, "in both districts: the drafters split [a] precinct along racial lines to place a higher percentage of black population in District 77 and keep the overall black population percentage in majority-white District 74 under 25 percent." *Id.*, 1297. The legislature passed remedial plans, which the Black Caucus challenged. The court dismissed the Caucus' claims in October 2017 on grounds of lack of standing and untimeliness.[41]

### c.  Other Notable Examples of Discrimination Touching the Right to Vote

Having focused on state legislative redistricting, I note here, briefly, other probative episodes of state discrimination affecting Black citizens' right to vote, excepting the use of at-large schemes, which I discuss below. The Voting Rights Act was not only modeled on casework and litigation that the CRD was directing in Alabama, its passage was occasioned, in large part, by the public reaction to the events of Blood Sunday in Selma. Shortly after it was enacted, a federal trial court found that the state's poll tax was "one of the last great pillars of racial discrimination" and "still bar[red] a large number of Negroes from the polls." *United States v. State of Alabama*, 252 F. Supp. 95 (M.D. Ala. 1966), 96-99. Federal courts and the CRD also invalidated or blocked literacy tests, poll list signature requirements, and term extensions that would "freeze" in office those "who were elected when Negroes were being illegally deprived of the right to vote," while also "freez[ing] Negroes out of the electorate." *Sellers v. Trussell*, 253 F. Supp. 915 (M.D., Ala. 1966), 917.[42]

As Black citizens registered and voted in increasing numbers and began to organize politically, the state sought to blunt the impact. The Supreme Court in *Hadnott v. Amos* (394 U.S. 358), held that the state was violating the Equal Protection Clause and shirking its duty under §5 in administration of certain election laws. And in 1972 the CRD blocked two state laws that would have limited assistance to illiterate voters in municipal elections and another that would have increased the number of signatures necessary for candidates to qualify to run as independents, measures that Assistant Attorney General for Civil Rights David Norman explained, "May well discourage or prohibit minority candidates from seeking nomination."[43]

---

[41] Mike Cason, "Federal court dismisses challenge to Alabama legislative districts," *Al.com*, Oct. 13, 2017; Alabama Legislative Black Caucus v. Alabama, Memorandum Order and Opinion, Oct. 12, 2017, Case 2:12-cv-00691-WKW-MHT-WHP, Document 372.

[42] Peyton McCrary, et al., "Alabama," in Chandler Davidson and Bernard Grofman, Eds, *Quiet Revolution in the South: The Impact of the Voting Rights Act, 1965-1990* (Princeton: Princeton University Press, 1994), pp. 48-49; CRD Section 5 Objection Letters Online, Alabama.

[43] David Norman, Assistant Attorney General, Civil Rights Division, to Leslie Hall, Assistant Attorney General, Alabama, April 4, 1972, and David Norman, Assistant Attorney General, Civil Rights Division, to William J. Baxley, Attorney General, Alabama, Aug. 14, 1972, CRD Section 5 Objection Letters Online, Alabama.

During the 1980s and 1990s, the CRD objected to changes in state and local election law, including court-packing schemes, changes in candidate qualification and nomination procedures, changes in voter registration procedures, voter purges, changes in voter identification requirements, racially motivated municipal severances, and racially selective annexations intended to protect white majorities.[44] During the 1990s and into the 2000s, Black plaintiffs and the CRD filed 2 claims targeting those same efforts, along with local redistricting schemes.[45]

In 1985 the state of Alabama enacted a new felon disenfranchisement law after the original provisions in the state constitution listing "crimes of moral turpitude" were found to have been enacted with discriminatory intent. *Hunter v. Underwood*, 471 U.S. 222. The law continues to disproportionately affect Black citizens.[46] And in 1988, in *Harris v. Siegelman*, a federal court found that state laws requiring any voter seeking assistance to "swear an oath to the inspectors that he or she is unable to write the English language" and limiting voters to 5 minutes in the voting booth "continue[d] . . . to have substantial adverse effects on the black citizens of this state." 695 F. Supp. 517 (M.D. Ala.) 528.

In 2015, the U.S. Department of Transportation found that the state's selective closure of drivers' license offices disproportionately affected Black people's ability to register to vote and thus violated the Civil Rights Act.[47]  In 2016, the state was forced to comply with the National Voter Registration Act and jettison its practice of requiring documentary proof-of-citizenship in order to register to vote.[48] In 2020, the state was enjoined from enforcing absentee voting requirements, including a witness signature requirement that would make it more difficult for minorities to vote absentee.[49] And in 2022 and 2023, this Court found that Alabama violated §2 of the Voting Rights Act in its failure to draw a second majority-Black congressional district.[50]

## IV.    FACTOR 3: THE USE OF AT-LARGE VOTING SCHEMES WITH ENHANCING DEVICES

Factor 3 asks us to examine The "extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group."

---

[44] Blacksher, et.al., "Voting Rights in Alabama, 1982-2006," pp. 255-58, 268-69; CRD Section 5 Objection Letters Online, Alabama.

[45] Civil Rights Division, Voting Section Litigation Online.

[46] "Barriers to Voting in Alabama," A Report by the Alabama Advisory Committee to the United States Commission on Civil Rights," February 2020.

[47] Astor, "Seven Ways Alabama Has Made It Harder to Vote"; German Lopez, "Voter suppression in Alabama: what's true and what's not," *Vox*, Dec. 12, 2017, https://www.vox.com/policy-and-politics/2017/12/12/16767426/alabama-voter-suppression-senate-moore-jones; McCrary et al., "Minority Representation in Alabama," p. 414; Blacksher, Voting Rights in Alabama, 1982-2006," pp 249-250.

[48] League of Women Voters v. Newby, 838 F.3d 1 (D.C. Cir. 2016).

[49] People First of Alabama v. Merrill, 491 F. Supp. 3d 1076 (N.D. Ala.).

[50] Milligan v. Merrill, 582 F.Supp. 3d 924, affirmed 599 U.S. 1 (2023), Remanded.

Alabama's ongoing history of racial discrimination in voting rights is chock-a-block with the use of vote dilution schemes aided by the kinds of enhancing devices targeted under Senate Factor Three. For example, the state has a majority vote requirement in primary elections.[51] Vote dilution became unnecessary after the enactment of the disenfranchising constitution in 1901 but made a comeback as Black citizens began to make gains in voter registration after World War II. White backlash against those gains, or the mere threat thereof, moved the Justice Department to file the lawsuits that formed the basis for the Voting Rights Act. The state's adoption of vote dilution systems accelerated rapidly with the passage of the VRA. Administrative action and litigation under the VRA, over decades, eventually led to the striking of many of these schemes. Some of that litigation has come very recently. Within the last five years, for example, at-large voting systems were twice struck in Jefferson County.

a. <u>Montgomery, Huntsville, and the Resurrection of At-large Systems: 1962</u>

The resurrection of vote dilution in Alabama can be traced to the white Citizens' Council movement. The Council movement emerged in the state in the 1950s in response to an NAACP campaign calling on school boards to adhere to the Supreme Court's 1954 *Brown v. Board* school desegregation ruling. The councils used economic reprisal to quash NAACP activity and to maintain segregation and disenfranchisement. Among the councils' leaders was Macon County's Sam Engelhardt, who orchestrated the racial gerrymandering of the City of Tuskegee that begat the Court's 1960 ruling in *Gomillion. V. Lightfoot*. Engelhardt had also introduced to Alabama lawmakers the concept of anti-single-shot laws.[52]

In places like Tuskegee, Montgomery, and Huntsville, where Black citizens were clawing their way into politics, they discovered that when white lawmakers reverted back to at-large voting schemes to avoid a Black candidate getting elected from a substantially Black ward or district, Black voters could cast votes for only their preferred candidate and thereby increase the chances of that person winning a seat on a city council or county commission or school board. Engelhardt and others used the state legislature to enact local laws that invalidated any ballot that did not contain a full slate of choices. This prevented Black preferred candidates getting elected via the "bloc vote," that is, the Black vote.[53]

In January 1962, Engelhardt was chairing a meeting of the state's Democratic Executive Committee in Montgomery. The motto on the party's emblem was still "White Supremacy for the Right." Frank Mizell rose at that meeting to explain how anti-single shot provisions might not be universally successful in preventing Black voters from electing Black candidates. He told fellow delegates, "We know that [Black voters] are easily manipulated by the connivors [*sic*]," in a plain reference to "scallowags" and carpetbaggers" of before, and that they "would be manipulated into single shotting, and if they did, it could happen as it did up in Huntsville."[54]

---

[51] "Primary election vote requirements by state," *Ballotpedia*.

[52] Bagley, *The Politics of White Rights*, pp. 14-22; Alabama Acts No. 221, 1961 and No. 570, 1961.

[53] Id.

[54] Dillard, et al. v. Crenshaw County et al. (Civil Action No. 85-T-1332-N), Case File, U.S. District Court for the Middle District of Alabama, Clerk's Office, Montgomery, Case Files Vol. III, No. 73; Lawrence Underwood McLemore, "The Second Reconstruction in Local Politics: Alabama

In Huntsville, Mizell explained, "a couple of negroes . . . might near got elected" to the city council because there was no anti-single-shot law in place, and no one had recognized the names on the ballot as Black candidates before it was almost too late. Immediately, he said, the city's legislative delegation "got the law changed" so that everyone had to "run by place number so that you could spot them" – with "them" being Black candidates" and "spot them" meaning that you could clearly see that they were Black.[55]

Mizell went on to remind the assembled of the "army of [Black] people who are here in Montgomery County harassing our Board of Registrars, who are harassing the Registrars throughout most of the State of Alabama; some counties they haven't moved into yet, but it is just a matter of time before they get into all of them, and in one county where they [*sic*] were few darkies registered, there has been probably increased 4 or 5 hundred percent already."[56]

He also warned the delegation that there were "several thousand negro voters" in some of the state's congressional districts. Given the uncertainty surrounding congressional redistricting at that time (lawmakers were in disagreement on how to deal with the state losing a seat, with many favoring an at-large, statewide election), he argued that Black voters could "come in, single shot vote . . . and you will begin to see negroes on your State [Democratic] Committee," or worse, in the congressional delegation itself, "because with that single shot they can assure that one of them will get a majority to start with."[57]

This was a situation, Mizell explained, that white people in Alabama were "becoming more painfully aware of every passing day." There was, of course, "increasing federal pressure too," from the Justice Department. And there was a "concerted desire and a campaign to register negroes in masse, regardless of the fact that many of them ordinarily cannot qualify because of their criminal records, or criminal attitudes, because of the fact that they are illiterate and cannot understand or pass literacy tests …" He concluded, "It has occurred to a great many people, including the Legislature of Alabama, that to protect the white people of Alabama, that there should be numbered places."[58] The legislature soon passed such laws, which, alongside other lately-adopted at-large systems, served their purpose into the 1980s and beyond.

### b. Montgomery on the Eve of *Dillard*: 1978 - 1985

Among the first at-large schemes to be declared unconstitutional by a federal court involved the Montgomery County Commission. The three-judge court in *Hendrix v. McKinney* in 1978 held, "The evidence demonstrates that the [relevant] at-large scheme enacted by the Alabama legislature in 1957 was not racially neutral." It noted that, "Not since 1875 had Montgomery County elected commissioners at large. For thirty-two years, until 1907, the governor appointed the county commissioners. Then for fifty years, Montgomery County operated under a plan whereby two commissioners were elected from single districts and three commissioners from a third district." 460 F.Supp. 626 (M.D. Ala. 1978). That changed

---

Grassroots Activists Fulfilling the Promise of the Voting Rights Act, 1960-1990," PhD. diss., Auburn University, 2012, pp. 187-88.

[55] Id.
[56] Id.
[57] Id.
[58] Id.

by way of Act 685 of the Alabama Legislature, which the Court determined was proposed in response to the passage of the Civil Rights Act of 1957.

The Court found that the bill's sponsor was motivated by discriminatory intent. In particular, he was aware of Black voter registration activity in Montgomery and determined to ensure that no Black candidate would get elected to the county commission from districts in the southern portion of the county where Black voters constituted a decided majority. The Court acknowledged, "Voting [in Montgomery County] to a substantial degree remains polarized by race," and held, "The effect of an at-large election system in combination with the minority status of blacks and the social pattern of racially polarized voting is a dilution of black voting strength." Beyond that, the Court wrote, citing to the previous year's Supreme Court decision in *Arlington Heights v. Metropolitan Housing Corp.*, "Judicial deference, the Court declared, is particularly inappropriate where racial discrimination is a motivating factor in a legislative decision." *Id*. 629-30.

Using the *Arlington Heights* framework, the Court noted again racially polarized voting and cited, in support of a historical background of discrimination, the Court's findings in *Sims v. Baggett* – that the Alabama Legislature had "created multi-county, multi-member districts for the sole purpose of preventing the election of Negroes to House membership." *Id*., 620 (internal quotation marks omitted). It reiterated that the sequence of events leading to the law's passage was indicative of lawmakers' antipathy to the Civil Rights Act of 1957 and the possibility of Black electoral success in Montgomery, and it discounted defendants' non-racial explanations for substantive departures. The upshot was that legislators were "vigilantly manning the barricade of segregation" when they adopted the at-large system for Montgomery County. *Id*., 631.

Four years later, Congress amended §2 of the VRA to incorporate the jurisprudence to which the Court in *Hendrix* was citing. The following year, 1983, plaintiffs filed suit against a city ordinance redrawing Montgomery's city council districts, arguing that the redraw diluted Black voting strength. In *Buskey v. Oliver*, the Court took notice of the fact that, "The black citizens of the City of Montgomery have a long history of being subjected to official and pervasive discrimination simply because of their race. The offenders have been their city, their county, and their state."[59] 565 F.Supp. 1473 (M.D. Ala. 1983), at 1475-76.

Furthermore, the Court found, "The evidence reflects a black citizenry still bereft of full economic, social, and political equality due to the lingering effects of a past, pervasive governmental policy of official

---

[59] The Court continued, "This discrimination, as documented in the records of this court, has manifested itself in practically every area of social and economic interaction, including maintaining racially segregated public transportation . . . maintaining racially segregated public parks and recreational facilities . . . maintaining racially segregated municipal airport facilities . . . maintaining racially segregated bus terminals . . . excluding black persons from the public library and museum . . . maintaining a segregated public school system . . . use of discriminatory examinations in promoting police officers to the position of sergeant . . . and racial discrimination in the hiring of county probate clerks . . . The defendant State and its agents [Montgomery County officials], have engaged in procedures and practices which have favored white applicants and discriminated against Negro applicants who were seeking to become registered voters." Citations omitted, 565 F.Supp. 1473 (1983), at 75-6.

discrimination based solely on race; it reflects a city still polarized by race, with only white council members being elected from predominantly white council districts and with only black council members being elected from predominantly black council districts; and it reflects a city council suffering from racial discord among its members and the city's [white] mayor," Emory Folmar. *Id.*, 1475. The Court found that Folmar had drafted the redistricting plan that was enacted by the legislature with racially discriminatory intent – more specifically, with the intent to reduce one district's Black voting age population as much as legally permissible in order to prevent the reelection of Black councilmember Joe Reed. Folmar was inspirational to Mike Hubbard in his efforts to "storm the statehouse" in the 2000s.[60]

Four months after the Court's ruling in *Buskey*, the city was rocked by what would become known as the "Todd Road Incident." Plainclothes police officers, without identifying themselves as police, followed a Black man into a house with guns drawn. They were attacked and disarmed by those gathered in the house, who turned out to be frightened visitors to the city from the Midwest, in town for a funeral. The occupants of the house, all of whom were Black, were charged with assault and various other charges and derided as "wild animals" by the chief of police.[61]  Two years later, white police officers arrested a Black man for refusing to identify himself. The individual in question, Michael Timmons, filed a civil suit arguing that the city ordinance under which he was charged, a "vagrancy" law, was unconstitutional. The court agreed, finding that, "Under the imprecise terms of the law, the right of any individual to walk the streets of Montgomery is left to the whims and prejudices of the police of this city and those who control the police." *Timmons v. City of Montgomery*, 658 F. Supp. 1086 (M.D. Ala.,1987), at 1090. The court likened the law to the state's own vagrancy law, which had been recently struck down.[62]

### c. *Dillard* and After: 1986 – Present

As Black citizens in the state's capitol fought racially discriminatory electoral systems and city ordinances, Black leaders targeted at-large electoral systems with enhancing devices like numbered place requirements across the state in what would become landmark litigation for the state of Alabama. The court in *Dillard v. Crenshaw County* held, in 1986, that "These racially inspired numbered place laws exist and operate today," and had "inevitably tainted these [at-large] systems wherever they exist in the state." 640 F. Supp. 1347 (M.D. Ala. 1986) at 1357-58. It continued:

> In adopting the laws, the state reshaped at-large systems into more secure mechanisms for discrimination. And as the evidence makes clear, this reshaping of the systems was completely intentional. This evidence adequately supports the conclusion that the at-large systems . . . are a product of intentional discrimination. Nevertheless, any remaining doubt that the systems were racially inspired is dispelled by further evidence that the systems were created in the midst of the state's unrelenting historical agenda, spanning from the late 1800's to the 1980's, to keep its black

---

[60] *Buskey v. Oliver*, 565 F.Supp. 1473 (M.D. Ala. 1983); Hubbard, *Storming the Statehouse*, pp. 139.

[61] Alvin Benn, "Montgomery's 'Todd Road' arrests made national headlines in 1983," *Montgomery Advertiser*, Feb. 26, 2018.

[62] Broughton v. Brewer, 298 F. Supp. 260 (S.D. Ala. 1969).

citizens economically, socially, and politically downtrodden, from the cradle to the grave (Id. 1357).

Plaintiffs' attorney Jim Blacksher asked the court to accept an analogy between the issue in *Dillard* and the landmark *Lee v. Macon* school desegregation litigation, in which Judge Johnson had issued a statewide structural injunction based on a finding the state was using its power over all school systems in the state to maintain segregation. Judge Johnson had also granted such relief in cases targeting Alabama's prison and mental health facilities.[63]

*Dillard* plaintiffs asked the court to find that there was a state policy of racially discriminatory intent and that the state had exerted control over voting practices. The court found that the state had "engaged in a pattern and practice of using at-large systems as an instrument of race discrimination" (1361). Plaintiffs were able to incorporate counties, municipalities, and local school boards across the state, so that the number of defendants eventually totaled 183. Of these defendants, 176 entered into consent decrees, including the City of Decatur. One month after the key ruling in *Dillard* in 1986, the Supreme Court handed down its landmark redistricting ruling in *Thornburg v. Gingles*, setting forth the standard inquiry that has been used in Section 2 cases ever since. The combination of *Gingles* and *Dillard* would soon compel those 183 local governments (17 county commissions, 28 county school boards, and 144 cities) in Alabama to discard at-large systems for single-member district plans. And the lynchpin was the *Dillard* court's finding of discriminatory intent against the state.[64]

Related litigation, or the threat thereof, forced or convinced white officials to replace discriminatory at-large systems. This included the City of Huntsville and Madison County, in 1988 and 1989. Plaintiffs filed an omnibus §2 case, indicating that all 5 places on the Madison County Commission, all 5 places on the Madison County Board of Education, and all 5 places on the Huntsville City Council were elected at-large, county-wide and that no Black person had ever been elected to any of the three bodies. Consent orders were entered, and the first Black citizens were subsequently elected to the commission, the board, and the council.[65]

Nearly two dozen similar at-large schemes fell to objection by the Justice Department under § 5 between 1971 and the end of preclearance under *Shelby County v. Holder*.[66] Others were never submitted, fell through the cracks of litigation, and have only been abandoned, by way legal action, within the last several years. For example, the Jefferson County Board of Education was forced in 2019 to abandon a multi-member at-large scheme that had limited Black electoral power to one single-member district while ensuring white membership on the board via multi-member elections elsewhere. Likewise, the City of

---

[63] Larry Yackle, *Reform and Regret: The Story of Federal Judicial Involvement in the Alabama Prison System* (New York: Oxford University Press, 1989); James v. Wallace, 382 F.Supp. 1177 (MD, 1974); Pugh v. Locke, 406 F.Supp. 318 (MD, 1976).

[64] McCrary, "Minority Representation in Alabama," pp. 288-89; McCrary, et al., "Alabama," pp. 61-64.

[65] Grayson v. Madison County, No. 84-V-5770-NE (N.D. Ala. June 2, 1988); Grayson v. Madison County, No. 84-V-5770-NE (N.D. Ala. Jan. 27, 1989).

[66] Civil Rights Division Section 5 Objections Letters by State Online, "Alabama," https://www.justice.gov/crt/voting-determination-letters-alabama.

Pleasant Grove was compelled in 2019 to adopt a remedial election system using cumulative voting in lieu of a dilutive voting system.[67]

Efforts to implement at-large systems continue. In 2020 this Court dismissed a long-running case filed by a white resident of Decatur, Gary Voketz. The plaintiff had successfully lobbied city residents to support a referendum to switch from a 5-member mayor-council to a 3-member council-manager system that would include a mayor-councilor and a council member elected at-large. The referendum passed in 2010, but the Decatur City Council argued that switching to the three-member council would eliminate the existing majority-Black district and therefore retrogress in violation of §5 and thus refused to implement the change. Voketz filed suit to force implementation, arguing that *Shelby County* applied retroactively and rendered the council's defense invalid. The litigation dragged on until changes in state law in 2019 required a new referendum, prompting the Court to dismiss the case as moot without ruling on any violation of the VRA.[68]

## V.    FACTOR 5: THE ONGOING EFFECTS OF PAST DISCRIMINATION

Factor 5 asks us to examine The "extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process." Here I consider current socioeconomic disparities and ongoing discrimination in the challenged areas.

### a.  Current Socioeconomic Disparities

As this Court found in *People First v. Merrill* in 2020, Black people in Alabama "are more likely to hold jobs that do not provide paid leave, cannot be performed remotely, and require more exposure to the public and, therefore, to COVID-19." 491 F. Supp. 3d 1076 (N.D. Ala.) at 1096. This Court acknowledged that the roots of those disparities were related to the state's history of racial discrimination. Other socioeconomic indicators underscore that connection. This Court more recently, in *Milligan v. Merrill*, found that, "[B]ecause white Alabamians tend to have more education and therefore higher income than Black Alabamians, they tend to be better able than Black Alabamians to afford a car, internet service, a personal computer, or a smart phone; . . . take time off from work; . . . afford to contribute to political campaigns; . . . afford to run for office; . . . [and to] have access to better healthcare, and (2) that [e]ducation has repeatedly been found to correlate with income [and] independently affects citizens' ability to engage politically." 582 F. Supp. 3d 924 (N.D. Ala., 2022), 975, internal quotation marks omitted.

Census data reveal that Black residents of the Montgomery and Huntsville metropolitan areas lag behind their white counterparts in nearly every meaningful category. They are more than twice as likely to live below the poverty line and to rely on Supplemental Nutritional Assistance Program ("SNAP") assistance. They are less likely to have obtained a bachelor's degree, to have health insurance, to have

---

[67] Jones v. Jefferson County Board of Education, No. 2:19-CV-01821-MHH (N.D. Ala., Dec. 16, 2019); Alabama State Conference of the NAACP v. City of Pleasant Grove, No. 2:18-cv-02056, 2019 (N.D. Ala., Oct. 11, 2019).

[68] Voketz v. City of Decatur, 5:14-cv-00540-AKK, Sept. 10, 2015 (N.D. Ala.), rev. 904 F.3d 902 (11th C.A.A., 2018), remand, Sept. 15, 2020.

broadband internet access, or any internet access at all, and to have access to a vehicle. They are more likely to be unemployed.[69] There is no way, historically, to account for these disparities apart from systemic discrimination, and when considered together, these factors point strongly toward a relative inability to participate in the political process.

The City of Decatur, Alabama anchors the western half of the Huntsville – Decatur – Albertville Combined Statistical Area ("CSA"). Linked from their respective foundings by the Tennessee River, the cities of Huntsville and Decatur have been connected by Interstate 565 since the early 1990s, when the region was growing at a tremendous rate. The two cities were beneficiaries of what has been described as a "second-phase aerospace boom," beginning with Star Wars Defense Initiative programs of the 1980s (the first phase dating to the 1960s with the opening of NASA's Marshall Space Flight Center and the Cummings Research Park). Corporations within the growing Military-Industrial Complex located to the area or expanded existing operations; this included Boeing opening a $400 million rocket-building facility in the Decatur area in 1997.[70]

The two cities also comprise a distinct tourist destination, per the Alabama Tourism Department: "Huntsville & Decatur" is listed among six "Destination Areas" in the North region of the state on the department's website. Earlier this year, the cities were profiled together as Phase I of the Tennessee Valley Authority's Tennessee RiverLine project, an effort to boost tourism in distinct regions along the river. According to the Federal Communications Commission, Huntsville and Decatur form the core market for five local television network markets (ABC, CBS, NBC, FOX, and PBS). Both cities are served by the Huntsville Hospital Health System, Huntsville International Airport, and Calhoun Community College.[71]

Black alone Census respondents in Decatur were more likely to live below the poverty line and rely on SNAP assistance, and they were less likely to have obtained a bachelor's degree, to have health insurance, to have broadband internet access, or any internet access at all, and to have access to a vehicle. They are more likely to be unemployed.[72]

Black citizens are grossly overrepresented in Alabama's prison system as well, and they are "employed" there, though not in the traditional sense. Not only are conditions in Alabama's prisons the subject of an ongoing Department of Justice lawsuit, the City of Montgomery is a named defendant in a

---

[69] Unites States Census, American Community Survey [ACS], 2021-2022 1-Year Estimates, Data.Census.gov.

[70] Flynt, *Alabama in the Twentieth Century*, pp. 157-58.

[71] "Huntsville & Decatur," *Sweet Home Alabama*, Alabama Tourism Department; Lee Roop, "Huntsville, Decatur, Guntersville sharpen vision for Tennessee River banks," *Al.com*, Jan. 25, 2023; Huntsville Hospital System, https://www.huntsvillehospital.org/; FCC Huntsville-Decatur Networks, https://transition.fcc.gov/dtv/markets/maps_report1/Huntsville-Decatur-Florence_AL.pdf; Huntsville International Airport, https://www.flyhuntsville.com/; Calhoun Community College, https://calhoun.edu/.

[72] Unites States Census, American Community Survey [ACS], 2021-2022 1-Year Estimates, Data.Census.gov.

lawsuit alleging that Black inmates are being disproportionately denied parole in order to keep them working in "extremely lucrative" prison work systems.[73]

    b.  <u>Ongoing Discrimination in the Challenged Areas</u>

The socioeconomic realities outlined above are elevated by Black citizens' ongoing struggle to eliminate the vestiges of discrimination, especially in the challenged areas. For example, the City of Huntsville and surrounding Madison County are among nearly 50 school districts across the state that are still engaged in school desegregation litigation or under court orders, nearly 70 years after *Brown v. Board*. Those systems, most of which were put under initial court orders in the early 1960s, have failed to achieve "unitary status." Decatur City Schools achieved this only recently, though as I outline below, troubling disparities persist in that system.[74]

Last summer, the Madison County school board entered into a new Consent Decree with the Justice Department and private plaintiffs. Before Madison is released from litigation, school officials must prove that Black students have equitable access to gifted and Advanced Placement classes and are not disproportionately disciplined. The system agreed to recruit and hire more Black faculty and administrators and assign them equitably among the district's schools. It agreed to hire a Discipline Equity Consultant and form a Desegregation Advisory Committee comprised of community members. The school district continues to file reports with the court reflecting implementation of the order along with other information falling under the *Green* Factors, established under the landmark *Green v. New Kent County* (VA) litigation, including enrollment by race, dropout and graduation rates, minority transfers, magnet programs, student discipline, access to Advance Placement and International Baccalaureate courses, and participation in extracurricular activities.[75]

Huntsville City Schools officials must do the same. Huntsville City Schools in 2014 paid a former F.B.I. agent to investigate students' social media accounts, leading to the disproportionate expulsion of Black students.[76] In 2015 this Court found that "tenacious vestiges of *de jure* segregation" were "negatively affecting the way in which African-American students in the district were treated." *Hereford v. Huntsville Board of Education*, No. 5:63-CV-00109-MHH (N.D. Ala., 2015), at 3. In particular, the Court took notice of a lack of Advanced Placement courses in majority Black schools and what it described

---

[73] "Investigation of Alabama's State Prisons for Men," United States Department of Justice, Civil Rights Division, April 2, 2019, https://www.justice.gov/opa/press-release/file/1150276/download; New York Times Staff, "'No One Feels Safe Here': Life in Alabama's Prisons," *New York Times*, April 29, 2019, https://www.nytimes.com/2019/04/29/us/alabama-prison-inmates.html; Mike Cason, "New Department of Justice complaint says Alabama has not improved prison conditions since 2019 allegations," *al.com*, Nov. 23, 2021,  https://www.al.com/news/2021/11/new-department-of-justice-complaint-says-alabama-has-not-improved-prison-conditions-since-2019-allegations.html; Michael Levinson, "Prisoners Sue Alabama, Calling Prison Labor System a 'Form of Slavery,'" *New York Times*, Dec. 12, 2023.

[74] Id.

[75] Trisha Powell Crain, "Federal judge approves Madison County schools desegregation plan: What's next?," *Al.com*, July 6, 2022, https://www.al.com/news/2022/07/federal-judge-approves-madison-county-schools-desegregation-plan-whats-next.html.

[76] "Black Students Targeted and Disproportionately Suspended in Huntsville On-Line Scandal," Equal Justice Initiative, Nov. 17, 2014.

as a "constitutionally flawed" disciplinary system that had resulted in a "vast [racial] discrepancy" in student discipline. *Id.*, 31.

In 2017 the Court refused to entertain a pause in Huntsville's majority-to-minority transfer program, writing, "For black children who waited until 1865 to be recognized as United States citizens (with the ratification of the 13th amendment) and then waited until 1970 to be admitted into white classrooms in the Huntsville City public schools, the waiting must end, and the goals of the 1970 desegregation order in this case must be realized." Memorandum Order and Opinion, Nov. 13, 2017, No. 5:1963cv00109 - Document 541 (N.D. Ala. 2017), at 19. In the same order, the Court found that, "Black students in Huntsville city schools lag behind their white peers, and in many instances, to a significant degree," and that there continued to be a discrepancy in the number of Honors and Advanced Placement courses offered at predominantly white and predominantly Black schools. *Id.* 27. The Court also addressed ongoing discrepancies in student discipline. It indicated that a "drumbeat of messages" suggested that "some administrators have instructed some teachers not to follow the behavioral learning guide, and some teachers independently seem to reject the guide, preferring the district's prior disciplinary practices." *Id.* 31. The Court concluded its opinion, "It's 2017; for the good of all the children, it's time to do what's right." *Id.* 40.

Huntsville was released from court oversight in the area of transportation in 2020. It continues to seek release on the other *Green* Factors. In November 2023, it filed with the court its Ninth Consent Order Report. The school board indicated its intent to file, in February 2024, a "more thorough update" on the implementation of the most recent Consent Order in the ongoing desegregation case.[77]

Decatur City Schools applied for Unitary Status in 2008. In 2012 the court granted that status as to each *Green* Factor except faculty and staff assignment. The court cited evidence from a 2011 fairness hearing that showed that, even after the appropriate *Singleton* [faculty assignment] ratio had been achieved, race was still considered in faculty assignments to maintain no more and no less than a particular, rigid variance from that ratio." *Lee v. Macon County Board of Education*, Decatur City School System – Case No. 5:18-mc-898-RDP, Master Case No.: 2:70-CV-251-RDP (N.D. Ala. Jun. 19, 2019), at 2-3. The school system was granted an opportunity to demonstrate to the court that this was no longer the case. It did not do so until 2019, when it was finally granted unitary status and released from litigation.

Such release did not indicate an erasure of discrepancies covered under the *Green* Factors within Decatur City Schools. According to a report compiled by the Alabama Department of Education for the school year 2019 – 2020, Black students at the system's two high schools – Austin and Decatur – were substantially less likely to take Advanced Placement and Dual Enrollment classes and far more likely to receive in-school suspension or to be referred to a law enforcement officer.[78]

Meanwhile, Huntsville's efforts to achieve Unitary Status have been complicated by white parents complaining that schools are teaching their children "critical race theory" in violation of an Alabama

---

[77] Notice of Defendants' Filing of Ninth Consent Order Report, Nov. 15, 2023, Hereford v. Huntsville, CV-63-MHH-109-NE.

[78] "Civil Rights Data Collection," Alabama Department of Education, Reports and Data, School Performance.

Board of Education ban instituted, by way of a race-line vote, in 2021.[79]  The Alabama legislature last year considered a bill that would do the same in state schools and agencies. When the bill, designed to prevent the teaching of "divisive topics" and to "prevent racism in schools and state agencies," came before the House floor, Representative Prince Chestnut, a Black legislator, argued, "This is a slap in the face to every decent, hard-working Black Alabamian that's in this room, that's out of this room, and to the children and the unborn." He added, "It's divisive that not a single white person on this committee is going to vote against this bill."[80]  The Alabama Legislature thus continues to entertain laws that are vehemently opposed by Black lawmakers and citizens and that would support white parents' complaints about teaching children about such topics as diversity and equity, even as dozens of school systems across the state are still under school desegregation orders.

When the Alabama Department of Education in 2023 released a memorandum report to the National Board for Professional Teaching Standards, it began with a list of "Schools with a 4-Year Cohort Graduation Rate more than 10% less than the State 4-Year Cohort Graduation Rate for two (2) of the past three (3) years." Among the 19 schools listed were Montgomery's Johnson Abernathy Graetz High (Formerly known as Jefferson Davis, a school built in the 1970s for the purpose of shielding wealthy whites from compulsory assignment integration court orders[81]) and Percy Julian High School (Formerly known as Robert E. Lee). The student bodies at both schools, once all-white, are now overwhelmingly Black. The report next lists "Schools on the 'Failing Schools List' for three (3) out of the past five (5) years." Among those are Percy Julian, J.A. Graetz, and nine other predominantly Black Montgomery schools, as well as Huntsville's predominantly Black Ronald McNair Junior High and Martin Luther King Jr. Elementary. "Failing schools" are usually the product of white flight, which strips school systems of funding and robs Black communities of valuable economic and political resources, while the distinction tends to indicate that local Black leaders and educators are uniquely or solely responsible.[82]

As of December 2023, per the terms of the Alabama Accountability Act, schools that receive grades of D or F are no longer deemed "failing," but rather are designated "priority." There were 98,860 students enrolled in 206 "priority" schools during the 2022-23 school year. Seventy percent of those students were Black. Of the 206 schools themselves, 181 were majority Black student population. A remarkable 35 of those schools are in the challenged areas. Mongomery County Schools feature 24 schools on the list, and Huntsville City have 11.[83]

---

[79] Timothy Bella, "Fleischauer, "HUD: Decatur Housing Authority blocked Blacks from riverfront apartments," *Washington Post*, Feb. 4, 2022; Trisha Powell Crain, "After CRT complaint, Huntsville teacher training investigated by Alabama state officials," *Al.com*, Dec. 13, 2021.

[80] Kyra Myles, "Alabama Board of Education cements state's ban on critical race theory," WBHM, Oct. 15, 2021; Rebecca Griesbach, "'Divisive concepts' bill returns to Alabama legislature, called 'slap in the face," *Al.com*, April 13, 2023.

[81] Joseph Bagley, *The Politics of White Rights: Race, Justice, and Integrating Alabama's Schools* (Athens: University of Georgia Press, 2018), pp. 136-39.

[82] State Superintendent Eric G. Mackey to City and County Boards of Education, August 9, 2023.

[83] Trisha Powell Crain, "No more 'failing' schools. See which schools Alabama labels for 'priority,' expanded school choice, Al.com, Dec. 15, 2023.

The Accountability Act allows students in "failing/priority" schools to request transfer to another school in the district or in an adjacent district (with the latter's approval). Or students may request a tax rebate voucher to attend a participating private school. These options have failed to afford the vast majority of Black students in these underperforming schools better educational opportunity. Most of the participating private schools are predominantly white. Even were they not, many Black families cannot afford to provide transportation to a private school or neighboring district, nor can they afford to pay tuition up front before reimbursement. Charter schools have likewise not proved to be a reliable 'outlet' for Black students in "failing" schools. The language may have changed after years of using the term "failing," but the conclusion remains that public education is failing Black children in Alabama disproportionately, and this includes schools in the challenged areas.[84]

Montgomery is also among several Alabama school systems seeing renewed white flight, not just in the form of white families moving farther from the respective city centers, but in the way of white officials establishing overwhelmingly white splinter school systems. Alabama's first segregation academy – Montgomery Academy – was formed in the city in the immediate aftermath of *Brown*. In addition to white flight to that institution and several others, white families have, since that time, been fleeing the city for communities in Autauga and Elmore Counties to the north, and for communities in eastern Montgomery County.[85]

The Town of Pike Road successfully seceded from the Montgomery County school system in 2010. The independent system was intended to provide "a public school alternative to Montgomery Public Schools," which were, then and now, predominantly Black. The town itself incorporated in 1997 and grew, through annexations and developments like the wealthy, predominantly white community knows as "The Waters," from fewer than 400 initial residents at incorporation to above the 5,000 resident threshold necessary under Alabama law for municipalities to form independent systems in 2010. According to one city booster, Patty Payne, the town's leadership had sought to "preserve and protect what they saw as their preferred way of life" in the face of "encroachment" from the City of Montgomery. Another woman, who served as the town's firs clerk, explained, "In 1996 Montgomery annexed several large properties in and around Pike Road community and we, the residents, became concerned that the community we loved would soon be gone."[86]

Once the school system was established, Payne predicted that "growth in Pike Road [would] come from those individuals who have left Montgomery County because they wanted a choice in their public school operations and did not want to place a second mortgage on their home in order to pay for private school education for their children." And the town and school system indeed grew tremendously. Payne tried to explain that the City of Montgomery had a history distinct from Pike Road because the latter's ancestors had "lived off the land." Given the middle-class, suburban nature of Pike Road by that time, and considering the colormasked language Payne used, it is evident that white boosters wanted to establish a

---

[84] Id.

[85] Bagley, *The Politics of White Rights*, pp. 40, 227.

[86] Patty Payne, "Pike Road dispute centers around choice," *Montgomery Advertiser*, June 24, 2010.

public school system that was not only majority-white in its student population, but also under majority-white, if not all-white, leadership.[87]

As of the 2020 Census, the Pike Road CCD has a population of 23,023 – 9462 white alone and 8,375 Black or African American Alone. Members of the Town Council are elected at-large. The Council is comprised of only white members. The mayor is also white. There is one Black member of the Pike Road Board of Education. The members of the board are appointed by the town council.[88]

In 2018 Montgomery Public Schools closed Georgia Washington Middle School and sold the facility to Pike Road Schools. Black members of the Montgomery County Board of Education furiously described the sale as "the deliberate dismantling" of the Montgomery public school system and a "racial injustice." Arica Watkins-Smith, a Black member, explained that the school's namesake, a formerly enslaved women recruited from Hampton Institute by Booker T. Washington, had in 1893 established and subsequently run the school "because of segregation. You take a predominantly black middle school and sell it to a predominantly white school system," she said. "That is segregation."[89]

The Montgomery school board voted in opposition to the closure and sale but, due to a state takeover occasioned by budgetary shortfalls, was overridden by then-state superintendent of education Ed Richardson, a white man. At that time, Pike Road owed Montgomery $1.4 million in state funding that state officials had erroneously sent to the district. That mistake had been made two years prior, but the state had failed up to that point to restore the monies to Montgomery, over the ongoing protest of Black state Representatives Thad McClammy and John Knight. Montgomery board members argued that the funds from the sale would not solve the district's budgetary shortfalls after that fiscal year. Watkins-Smith said, "This doesn't roll over into other years but opens the door for charter schools so we can continue to look like a failing school system and they can say they tried everything. All I've got to say," she concluded, "is follow the money." Montgomery board member Robert Porterfield agreed, observing, "The sad thing about it is all of this has been done in an effort of supporting Pike Road and bringing in charter schools."[90] Seeming to support this conclusion, State Superintendent of Schools Eric Mackey earlier this year expressed his belief that the 2013 law designating schools as failing was designed [by State Senator Del Marsh] "to humiliate schools and to cause frustration and problems in high poverty communities so it can be used as an excuse to fund scholarships."[91]

Huntsville continues to wrestle with ongoing white flight. As this Court noted in its 2017 memorandum opinion in the *Hereford* case, "The Court already has mentioned some of the schools in the district that are wrestling with white flight. White flight harms school climate; it sends the unmistakable and indelible message that white parents would rather move or pay private school tuition than have their

---

[87] Id.

[88] 2020 Census Data; Town of Pike Road.

[89] Despite assurance to keep the name of the school, Pike Road officials renamed it "Pike Road High School – Georgia Washington Campus." *Montgomery Advertiser*, Oct. 18, 2023.

[90] Andrew Yawn, "MPS: Richardson orders four schools closed, sale of Georgia Washington," *Montgomery Advertiser*, Feb. 15, 2018. At that time, Montgomery Public Schools has 11 schools on the "failing" list, constituting 15 percent of all schools such designated across the state.

[91] Jemma Stephenson, "Alabama 'failing' list meant to 'humiliate' high poverty schools: Superintendent," *al.com*, April 14, 2023.

children attend a racially integrated school." *Hereford v. Huntsville Board of Education*, No. 5:1963cv00109 - Document 541 (N.D. Ala. 2017), at 30.

In nearby Athens, in Limestone County, in 2022, public officials, including a white principal and two white superintendents, were sentenced to prison for their roles in a fraud scheme that took money from Black public schools in order to benefit segregation academies. The three conspired to steal $5 million from public schools by falsely "enrolling" segregation academy pupils in the Limestone County and Athens public school system, thereby increasing the funding for those schools due to higher enrollment. In the federal criminal proceedings, Judge Myron Thompson was compelled to note that much of that money was sent to collaborating private schools in the Black Belt where, the court acknowledged, schools were almost entirely segregated, with Black students in the chronically under-funded public schools and white students in the private schools. Judge Thompson wrote, "The court is troubled by the lingering specter that public funds may have been used to foster or support racial segregation, albeit fraudulently, within Alabama's system of education."[92]

Finally, recent findings of discrimination in living conditions and housing in the challenged areas further cement that this factor is present. In May of this year, 2023, the United States Justice Department entered into an interim resolution agreement with the State of Alabama's Department of Public Health in the first ever environmental justice investigation under Title VI of the Civil Rights Act of 1964. The DOJ found abundant evidence that the state had been discriminating against Black residents of Lowndes County, the majority of whom not only lack access to functioning wastewater systems but have also been held criminally accountable for what Assistant Attorney General Kristen Clarke described as "injustices." Residents were cited for fashioning homemade wastewater systems when their septic tanks failed and began seeping up through the ground, leading to an outbreak of hookworm.[93]

Lowndes County lies within the Montgomery – Selma Combined Statistical Area and the Montgomery Metropolitan Statistical Area. Its past is inextricably linked with the state capitol, the state's history of race discrimination, and the national struggle for civil and voting rights.[94] Of its Black residents' more recent struggles, A.A.G. Clarke explained:

> For generations, Black rural residents of Lowndes County have lacked access to basic sanitation services. And as a result, these residents have been exposed to raw sewage in their neighborhoods, their yards, their playgrounds, schools and even inside their own homes. They have had to deal

---

[92] Josh Moon, "Former Athens superintendent, two others sentenced in virtual school case," *Alabama Political Reporter*, July 22, 2022; United States v. Carter, 614 F.Supp.3d 1081 (2022), 1110.

[93] Press Release, "Departments of Justice and Health and Human Services Announce Interim Resolution Agreement in Environmental Justice Investigation of Alabama Department of Public Health," May 4, 2023, U.S. D.O.J. Office of Public Affairs; Hadley Hitson, "DOJ finds evidence of discrimination in Lowndes County environmental justice investigation," *Montomery Advertiser*, May 4, 2023.

[94] Hasan Kwame Jeffries, *Bloody Lowndes: Civil Rights and Black Power in Alabama's Black Belt* (New York: New York University Press, 2010); James P. Turner, *Selma and the Liuzzo Murder Trials: The First Modern Civil Rights Convictions* (Ann Arbor: University of Michigan Press, 2018).

with sickness, disease and the public health risks that result from their reliance on straight-piping.[95] In fact, during our investigation, we heard from many Lowndes County residents who recounted that they could not recall a time when things were any different. Enough is enough.[96]

According to Clarke, Black residents of Lowndes had been "forced to pay the price to their dignity and safety from living in these conditions" and also "had to face the double penalty of being criminalized" for the same. The state knew about the problems and their disproportionate impact on Black citizens. And it failed to redress the situation.[97]

Lowndes and Montgomery are in the heart of the Black Belt. In 2016 the U.S. Department of Transportation (DOT) found that the state was discriminating against Black residents in the Black Belt. The U.S. DOT found that the Alabama Department of Transportation and the Alabama Law Enforcement Agency were violating Title VI of the Civil Rights Act by closing and reducing services at drivers' license offices in predominantly Black, rural, and poor areas of that state at a time when the state had just enacted a law requiring voters to present photo I.D. in order to cast a ballot. The state was forced to cancel closures and increase hours at certain offices throughout the Black Belt, to appoint a coordinator for a Title VI program, and to develop a plan to disseminate information to affected communities.[98]

In 2020, the U.S. Department of Housing and Urban Development ("HUD") found, after a three-year investigation initiated at the behest of the Justice Department, that the Decatur Housing Authority ("DHA") had engaged in widespread and long-standing racial discrimination against Black tenants and applicants. HUD investigators found that, at the time of a compliance review, "100% of the units in Westgate Gardens are occupied by black tenants," while, "In comparison, the tenant roster for The Towers indicated that 94% of the units are occupied by white tenants." The Towers include Jordan-Neill and Summer Manor apartments, high-rise buildings adjacent to the city's Rhodes Ferry Park with Tennessee River views. Black applicants were assigned to Westgate because, DHA officials determined, despite Black applicants not being offered units in The Towers, they preferred "garden-style units" to high rise units, "so they can sit on their porch and come and go as they please." HUD found that there had been numerous instances of Black applicants being offered units in Westgate and not The Towers, despite their

---

[95] Described by Clarke as "a method of guiding fecal matter, bathwater and other human wastewater away from a home by using a series of ditches or crudely constructed piping systems. The straight-piped wastewater festers in trenches and pools formed in residents' yards, woods and open areas. Without functioning septic systems, the heavier rainfall and flooding from climate change saturates the impermeable soil and the waste matter simply has nowhere to go. It remains on the ground's surface or backs up inside homes, exposing families to serious health risks. In Lowndes County, as many as 80% of homes not connected to municipal sewer systems either lack state-required septic systems or have failing systems not approved by the state's Health Department." See Press Release, n. 9 supra.

[96] Id.

[97] Id.

[98] Melanie Zanona, "Feds: Closing driver's license offices in Ala. violates civil rights," *The Hill*, Dec. 28, 2016.

being on both waiting lists and despite available units in The Towers being offered to white applicants instead.[99]

HUD also found dramatic disparities in amenities at the two complexes reminiscent of Jim Crow. Its report indicated, "The Towers are located on the banks of the Tennessee River and both properties are adjacent to a city park where community and social events are held. Tenants of The Towers have access to walking trails along the river and spectacular waterfront views. Each property has at least one community/meeting room, a library with hundreds of books, community kitchen, mobile food pantry, two pianos and an outdoor patio." By contrast, the report described Westgate as "a garden-style, isolated public housing development located in a highly concentrated minority area with a poverty rate of 61%." Its tenants, then-all-Black, did not have "similar or comparable amenities like those found at The Towers," and "none of the social activities that are provided to tenants in The Towers are offered to tenants at Westgate Gardens." A settlement reached between the city and HUD required the DHA to create a $200,000 fund for Black Westgate tenants and to repurpose and renovate a community center on Westgate grounds that had been used by Decatur Youth Services. DHA was also required to renovate, at Westgate, kitchens, bathrooms, parking areas, landscaping, and other facilities. The city was threatened with federal funding cutoff, pursuant to Title VI of the Civil Rights Act and the Fair Housing Act.[100]

## VI.   FACTOR SIX – RACIAL APPEALS

Factor 6 asks us to consider whether "political campaigns have been characterized by overt or subtle racial appeals" Political campaigns in Alabama that, between 1964 and the 1990s or so, used to feature thinly coded racial appeals have, since then and very recently, trended back towards more overt racial appeals. This has included campaigns by candidates for statewide office and those running for congressional and state legislative offices in Huntsville and Montgomery, the challenged areas.

Senator Tommy Tuberville has repeatedly stated his belief that white nationalists are not racist. He has indicated that he believes "inner-city" teachers are lazy and unqualified. Tuberville stated in 2023, "The Covid really brought it out how bad our schools are and how bad our teachers are — in the inner city. Most of them in the inner city, I don't know how they got degrees, to be honest with you. I don't know whether they can read and write. . .. They want a raise, they want less time to work, less time in school. We ruined work ethic in this country." "Inner-city" has long been used a coded phrase used to invoke the post white-flight core of urban areas, where Black people languished in poverty and crime, as it went, for no reasons other than their own.[101] Laziness is a common racist trope. And suggesting that Black teachers are unqualified and do not deserve degrees was a widespread racist argument during initial school desegregation.[102]

---

[99] Eric Fleischauer, "HUD: Decatur Housing Authority blocked Blacks from riverfront apartments," *Decatur Daily*, Aug. 9, 2020; Kate Smith, "Federal Investigation: White people given preferential treatment at Decatur Housing Authority," WAFF 48, Aug. 10, 2020.

[100] Fleischauer, "HUD: Decatur Housing Authority blocked Blacks from riverfront apartments."

[101] Shiva Kooragayala, "The problem with talking about "inner cities," *Urban Institute*, Nov. 3, 2016.

[102] Take for example, the tirade of a school superintendent in Dale County, Alabama in 1968. Black teachers, he argued, "They give tests and write words on the chalkboard with incorrectly spelled words. They are using verbs in the wrong place, using plural words in the wrong place, their sentences

Senator Tuberville has stated his belief that the U.S. military is "not an equal opportunity employer," as he believed General Charles Q. Brown would like it to be. When Brown, the first Black man to lead a service branch, was nominated to become the Chairman of the Joint Chiefs of Staff in 2023, Tuberville remarked on General Brown's desire to create more diversity among pilots, saying, "I heard some things that he talked about, about race and things that he wanted to mix into the military. Listen, I want it to be on merit. Don't give me this stuff about equal opportunity, because that's not what this military is about."[103] In fact, the U.S. military is an equal opportunity employer, dating to at least its desegregation by President Truman in 1948.

Former Congressman Mo Brooks, who represented Huntsville and Madison County, routinely complained about what he called a "war on whites." He invoked the old buzz phrase – "bloc vote." Brooks said, for example, said "They are trying to motivate the African American vote to vote-bloc for Democrats by using every Republican as a racist tool that they can envision." He also channeled coded racial appeals, like Reagan's "welfare queen" appeal, of the past by characterizing recipients of social welfare programs as "slackers" who did not deserve hard-working people's tax dollars, in this case meaning white people.[104]

In the white-flight suburbs of metropolitan Montgomery, candidates have recently run using racial appeals. Former representative Will Dismukes, for example, a "chaplain" of the "Prattville Dragoons," a Sons of Confederate Veterans group, lobbied to maintain state funding for a Confederate memorial park. His group regretfully reported in 2020 that "The entire American corporate industrial complex bent over backwards patronizing the Black Lives Matter movement in the wake of the death of the drugged career criminal in Minneapolis," referring to George Floyd. Dismukes personally beseeched members to channel anger over the removal of Confederate monuments into "something constructive as our ancestors did by rebuilding their homes and lives during the hateful years of Reconstruction. They were courageous during the War for Southern Independence and afterwards," he wrote, "and we, their descendents [sic] must be as well."[105]

---

are incorrect, they are using words in places they do not fit, and none of them have any discipline. … These incapable Negro teachers is why these students are failing today in our white schools. If we have to lower our educational standards we might as well close the schools down and return to the jungles of prehistoric time." Bagley, *The Politics of White Rights*, p. 134.

[103] Caleb Ecarma, "[Tommy Tuberville Has Taken Another Breathtakingly Bad Stance on Diversity]," *Vanity Fair*, Sept. 27, 2023.

[104] Massie, "[Rep. Brooks: Dems' 'war on whites' behind some criticism of Sessions]"; Leada Gore, "[Rep. Mo Brooks: People who live 'good lives' should pay less for health insurance]," May 2, 2017, *al.com*; Jonece Starr Dunigan, "[Mo Brooks: 'War on whites' led to criticism of Jeff Sessions]," *al.com*, Jan. 12, 2020; Sam Levine, "[GOP Congressman Accuses Democrats Of Waging A 'War On Whites],'" *Huffington Post*, Aug. 4, 2014; Paul Gattis, "[No more 'war on whites': Rep. Mo Brooks says RNC chair wants 'better descriptive phrase],'" *al.com*, Aug. 8, 2014; Paul Gattis, "[Rep. Mo Brooks: Democrats 'dividing America by race' in 'waging a war on whites],'" *al.com*, Aug. 4, 2014; Chris Massie, "[Rep. Brooks: Dems' 'war on whites' behind some criticism of Sessions]," CNN.com, Jan. 12, 2016.

[105] Dismukes has repeated used the phrase "Deo vindice," or 'God will vindicate [the South]," meaning the Confederacy. Dismukes rejected calls to resign or apologize for his remarks, arguing, "We have enough people caving to the communist left. For the love of life, it's time for people to stop being so sensitive and apologetic and take a stand before our country is Gone with the Wind," with the latter

Former state Senator Scott Beason, in support of H.B. 56, the anti-immigrant legislation he sponsored in 2011, made a violent racial appeal steeped in layers of historical and contemporary animus. Beason touted the omnibus bill targeting the Latinx community as something that Alabama Legislature could use to "unload the clip and do what has to be done" to address illegal immigration. In an awkward attempt to roll back or contextualize the comment after the fact, Beason explained that he was within the context of a story he was telling a local Republican group at a breakfast. He invoked white fears of people of color in the "inner city" and growing white vigilantism and violence.[106] He said,

> I began telling the story about a family visiting a big city when some guy with a knife or gun jumps out from behind some bushes and comes at them," Beason said. "The story talks about how a Democrat handles the situation, I think I said the Democrat tells the guy he'll put together a charity basketball league or something to raise money to help him. The second family, that father has a gun but takes only one shot. The third family, and that father also has a gun, but he empties the clip. He solves the problem.[107]

Beason was also caught on a wiretap (that he was voluntarily wearing) during an F.B.I. investigation into an illegal pay-for-play scheme in 2011, calling Black people "aboriginees." The context for the comment was a consensus among white lawmakers that a gambling referendum ought to be kept off the ballot that fall because, according to those present, this would lead to Black voters being "bused" to the polls in federal buses, which, they reasoned, would not be good for white candidates. Another white lawmaker, Larry Dixon, insisted that "illiterates," in this context Black voters, would be incentivized by the referendum and vote against white Republicans.[108]

Roy Moore, twice removed from the state Supreme Court for failure to obey federal court orders, in his 2017 campaign for the U.S. Senate argued that the U.S. would be better off without the Reconstruction amendments and observed that, in his opinion, the antebellum period "was great at the time when families were united — even though we had slavery. They cared for one another. People were strong in the families. Our families were strong. Our country had a direction."[109]

---

being a reference to the Lost Cause of the Confederacy by way of the popular novel and film. See http://theprattvilledragoons.blogspot.com/; Paul Gattis, "Alabama Democrats call on GOP lawmaker to resign over Confederate support," *al.com*, June 20, 2020; Brent Wilson, "Alabama Democratic Party Seeks Resignation Of "Confederate Apologist" State Rep. Will Dismukes," *bamapolitics.com*.

[106] Liz Vinson, "A Cruel Legacy: Alabama Anti-Immigrant Law Remembered," SPCL, June 25, 2021; SPLC Victorious against Alabama Anti-Immigrant Law, SPCL Press Release, Oct. 29, 2013.

[107] Charles J. Dean, "Sen. Scott Beason catching flak over "empty the clip" comment," *Al.com*, Feb. 7, 2011

[108] Kim Chandler, "Sen. Scott Beason apologizes for comments revealed during bingo trial (video)," *al.com*, Sept. 27, 2011; United States v. McGregor, 824 F. Supp. 2d 1339 (M.D. Ala. 2011), 1335.

[109] Philip Bump, "Roy Moore: America was great in era of slavery, is now 'focus of evil in the world,'" *Washington Post*, Dec. 8, 2017; German Lopez, "Roy Moore was once again caught making that can be interpreted as okay with slavery: maybe he believes what he keeps saying," *Vox*, Dec. 11, 2017; Scott Douglas, "The Alabama Senate Race May Have Already Been Decided," *New York Times*, Dec. 11, 2017.

Former Senator Doug Jones, the preferred candidate of Black voters and Moore's opponent in the 2017 election also used racial appeals. Although Jones is white, his campaign sought to define the election in racial terms. He sent mailers to Black voters indicating that Moore, like George Wallace, had fought to preserve segregation and had ties to hate groups like ku klux klan. Those mailers argued that Moore was thus "not on our side," in an apparent reference to racial "sides." Another mailer sent to Black voters featured the skeptical face of a black man with the appeal: "Think if a black man went after high school girls [as Moore was alleged to have done] anyone would try to make him a senator?" Jones also repeatedly touted his prosecution of the 16th Street Baptist Church bombers from 1963. One ad stated, "Klansmen bombed a black church in Birmingham, killing four little girls. U.S. attorney Doug Jones prosecuted the Klansmen and got justice for Alabama." It concluded, "We've gone so far since those dark days but we still have a long way to go." Jones said that he stood "against violence and for unity."[110]

The following year, incumbent state Supreme Court Chief Justice Tom Parker boasted about having "taken on and beaten the Southern Poverty Law Center," a well-known Montgomery-based race advocacy organization. A federal court wrote determined that, "when juxtaposed with images of an African-American Democratic congresswoman from California who had no other reason to appear in an ad for an Alabama judicial race," the appeal to fighting the SPLC indicated that "one of the motives of the ad was to draw attention to race." *Alabama State Conference of the NAACP v. Alabama*, 612 F.Supp. 3d 1232 (M.D. Ala., 2020) at 1309.

Former Secretary of State John Merrill in 2020 dismissed efforts that would make it easier for poorer citizens, and therefore Black citizens disproportionately, to register and vote. Voting by mail or registering automatically were, according to Merrill, "a sorry, lazy way out." He said, "Just because you turned 18 doesn't give you the right to do anything." Merrill argued, "I'm not going to embarrass [civil rights icons like John Lewis] by allowing somebody that's too sorry to get up off of their rear to go register to vote." The late congressman Lewis supported these measures.[111]

## VII.   FACTOR SEVEN – BLACK CANDIDATES ELECTED TO OFFICE

Factor 7 asks us to consider the "extent to which members of the minority group have been elected to public office in the jurisdiction." Black citizens of Alabama currently hold no statewide offices. Only three Black candidates have held statewide office, and one of those was appointed. No Black person has served in statewide office in the state in the twenty-first century. Black candidates have been elected to the state legislature since the 1970s, though only through ongoing enforcement of federal voting rights litigation. As the Court observed in *Milligan*:

> Defendants do not dispute that Black Alabamians enjoy virtually zero success in statewide elections, but they urge us that Black candidates have enjoyed "a great deal of electoral success" in "elections statewide," by which they mean "Alabama's districted races for State offices," including the Legislature and the State Board of Education. But Defendants do not engage the

---

[110] "Race in Our Politics: A Catalog of Campaign Materials," Campaign Legal.org; Daniel Strauss, "Jones ad highlights prosecution of 16th Street church bombers," *PoliticoPro,* Dec. 23, 2017.

[111] Kyle Whitmire, "The John Merrill Show is on again. Somebody change the channel," *al.com*, April 22, 2020; Tierney Sneed, "AL Elections Chief Taunts Twitter Users Noting Hurdles In Absentee Voting Requirements," *TalkingPointsMemo.com*, April 21, 2020.

Milligan plaintiffs' point that nearly all of that success is attributable to the creation of majority-Black districts to comply with federal law. This silence makes sense: Defendants stipulated that "[t]he overwhelming majority of African-American representatives in the Alabama Legislature come from majority-minority districts." 582 F. Supp. 3d 924 (N.D. Ala., 2022), 1019.

As recently as 2018, the state was found to have engaged in racial gerrymandering of its state legislative districts. This included Senate District 26 and House District 77 in Montgomery County and House District 53 in Madison County.[112] Black people constitute roughly 27 percent of the state of Alabama's population but currently hold only 7 of 35 state Senate seats (20 percent), either in terms of Black candidates or Black candidates of choice. Put another way, white people constitute roughly 60 percent of the state's population, but white legislators occupy 80 percent of the state Senate seats.[113]

Currently, there are 2 Black Senators serving the Montgomery-Selma CSA in the Alabama Legislature – Kirk Hatcher and Robert Stewart. The population of the CSA is 45 percent Black. There are 3 white Senators. There are no Black Senators in the legislature representing the Huntsville-Decatur-Albertville CSA. The population of the CSA is 20.9 percent Black. There are 5 white Senators representing this CSA. Black citizens are not close to proportional representation in the challenges areas, in other words.[114]

## VIII.    FACTOR EIGHT: LACK OF RESPONSIVENESS

Factor 8 asks us to consider whether "there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group." The Alabama legislature's lack of responsiveness to Black citizens is demonstrated, *inter alia*, by lawmakers' failure, prior to recent litigation, to create a second majority-Black Congressional District and by the legislature's refusal to expand Medicaid under the Affordable Care Act. Senator Jim McClendon dismissed the possibility of drawing a second majority-minority district, saying, "There is probably a way to maneuver around [and create two majority-minority districts], but it would be gerrymandering at its best [and] doesn't make sense at all."[115] This Court, in 2023, held that the legislature's refusal to abide by a trial court and the U.S. Supreme Court's mandate to create a second majority-Black district was a clear example of lack of responsiveness.[116]

Black leaders in the legislature have insisted, "It is high time that we expand Medicaid to provide vital coverage to the more than 340,000 uninsured Alabamians," and have pleaded, "There's a reason this virus [Covid-19] is killing African Americans and those in poorer communities at a much higher rate. … outcomes are undoubtedly worse for those without coverage."[117]

---

[112] Alabama Legislative Black Caucus v. Alabama, 231 F. Supp. 3d 1026 (M.D. Ala. 2017).

[113] Alabama Legislature.

[114] Alabama Legislature; 2020 U.S. Census, Data.

[115] *Montgomery Advertiser*, Nov. 3, 5, 2021.

[116] Milligan v. Allen remand, 2023.

[117] Mike Cason, "Gov. Robert Bentley's task force recommends Medicaid expansion," *al.com*, Nov. 18, 2015; Anthony Daniels and Bobby Singleton, "Coronavirus crisis begs for Alabama Medicaid expansion," *Alabama Political Reporter*, April 17, 2020.

Representative Terri Sewell, the state's only Black member of Congress, has said, "Because of the State of Alabama's refusal to expand Medicaid, more than 200,000 low-income Alabamians who would otherwise qualify for health insurance coverage are being forced to go without care, putting their health and their lives at risk. If the State of Alabama won't expand access to health care for our underserved communities, local governments should have the power to do it themselves."[118]

Specific to Montgomery and Huntsville, I incorporate here the concerns raised under Factors 1 and 5 above – including across-the-board socioeconomic disparities, ongoing school desegregation litigation, white flight, and school "failures." These represent issues that Black lawmakers have raised in the legislature and beyond.

## IX.    CONCLUSION

In my opinion, Senate Factors 1, 3, 5, 6, 7, and 8 are present in Alabama, especially in the challenged areas, and support a finding, under the totality of the circumstances, that S.B. 1 impermissibly dilutes the voting strength of Black voters in violation of §2.



---

[118] Press Release from Office of Congresswoman Sewell, July 17, 2021, "Rep. Sewell Introduces COVER Now Act to Empower Local Governments to Overcome Obstruction to Medicaid Expansion."