FILED

2024 Nov-07  AM 11:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

JIM MCCLENDON                                                     April 18, 2024
Khadidah Stone, et al. vs Wes Allen, et al.                                    1

IN THE UNITED STATES COURT
FOR THE NORTHERN DISTRICT OF ALABAMA

KHADIDAH STONE, ET AL.,      )
                             )
PLAINTIFFS,                  )
                             )
                             )
                             )    CASE NO.
VS.                          )    2:21-CV-01531-AMM
                             )
                             )
                             )
WES ALLEN, ET AL.,           )
                             )    DEPOSITION OF:
DEFENDANTS.                  )    JIM MCCLENDON

S T I P U L A T I O N S

IT IS STIPULATED AND AGREED, by and between the parties through their respective counsel, that the deposition of:

JIM MCCLENDON

may be taken before Dannah Moody, Commissioner and Notary Public, State at Large, at the offices of St. Clair County District Courthouse, 100 6th Avenue, Ashville, Alabama  35953, on the 18th day of April 2024, commencing at approximately 10:00 a.m.



IT IS FURTHER STIPULATED AND AGREED that the signature to and reading of the deposition by the witness is waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of the trial, or at the time said deposition is offered in evidence, or prior thereto.



APPEARANCES


FOR THE PLAINTIFFS:

     Davin Rosborough
     Attorney at Law
     American Civil Liberties Union Foundation
     125 Broad Street
     New York, New York  10004
     drosborough@aclu.org
     212-549-2500

     Jacob Van Leer
     Attorney at Law
     American Civil Liberties Union Foundation
     915 15th Street Northwest
     Washington, D.C.  20005
     jvanleer@aclu.org
     212-549-2500


FOR THE DEFENDANTS:

     Dorman Walker
     Attorney at Law
     Balch & Bingham, LLP
     445 Dexter Avenue, Suite 8000
     Montgomery, Alabama  36104
     dwalker@balch.com
     334-834-6500

     Michael Taunton
     Attorney at Law
     Balch & Bingham, LLP
     1901 Sixth Avenue North, Suite 1500
     Birmingham, Alabama  35203
     mtaunton@balch.com
     205-226-3451

     Ben Seiss
     Attorney at Law
     Office of the Attorney General
     501 Washington Avenue
     PO Box 300152
     Montgomery, Alabama  36130
     ben.seiss@alabamaag.gov



EXAMINATION INDEX

Examination by Mr. Rosborough                          5
Examination by Mr. Walker                             83
Examination by Mr. Rosborough                         85

EXHIBIT INDEX

PX-1   Public Hearing Transcript Excerpt        26
PX-2   Talking Points                           30
PX-3   Redistricting Guidelines                 36
PX-4   Functionality Examination               40
PX-5   Committee Meeting Transcript Excerpt     43
PX-6   2021 Senate Map                          51
PX-7   2017 Senate Map                          51
PX-8   Census Placed By District and By County  55
PX-9   Resident Kirkpatrick's Letter            62
PX-10  Public Hearing Transcript Excerpt        64
PX-11  Prior State Senate Districts-Huntsville  67
PX-12  2021 State Senate Districts-Huntsville   68
PX-13  2021 State Senate Map Boundaries         69
PX-14  Resident Baker's Letter                  73
PX-15  Congressional Redistricting Excerpt      77
PX-16  Caucus Case Transcript Excerpt           80



I, Dannah Moody, a Court Reporter of Birmingham, Alabama, and a Notary Public for the State of Alabama at Large, acting as Commissioner, certify that on this date, pursuant to Rule 30 of the Alabama Rules of Civil Procedure and the foregoing stipulation of counsel, there came before me on the 18th day of April 2024, at the offices of St. Clair County District Courthouse, 100 6th Avenue, Ashville, Alabama 35953, commencing at 10:00 a.m., JIM MCCLENDON, witness in the above cause, for oral examination, whereupon the following proceedings were had:

JIM MCCLENDON,

having been duly sworn, was examined and

testified as follows:

EXAMINATION

BY MR. ROSBOROUGH:

Q.      Good morning, Senator McClendon.

A.      Good morning.

Q.      I appreciate your time.

A.      What's your first name again?

Q.      I'm sorry.  I'm Davin Rosborough.

A.      Davin?  Got it.  Okay.  Thank you, Davin.

Q.      Thank you.  Appreciate you being here today especially in your retirement.  You



understand you're testifying under oath today?

A.      I do.

Q.      Is there anything that might prevent you from understanding my questions or answering truthfully today?

A.      No.

Q.      You've been deposed before, correct?

A.      I have.

Q.      Okay.  Do you recall how many times?

A.      No, I don't.

Q.      More than once, is it fair to say?

A.      More than once.

Q.      Okay.  I'll just go over a few ground rules just because it's probably been a little bit. I'll ask questions.  If you don't understand the question, let me know.  If you answer the question, I'll assume that you understood the question.  Is that fair?

A.      Fair.

Q.      Also the court reporter here is typing everything that you and I are saying, so it's important that we do our best for only one of us to speak at a time so please allow me to finish my questions and sentences and I will allow you to finish your answers before jumping into the next



question.  If that sounds okay?

A.          Sounds fine.

Q.          Great.  All right.  Senator McClendon, without disclosing the content of any discussions with your attorney, what did you do to prepare for your deposition today?

A.          My attorney and I met Monday of this week and just talked about it, but that was about it.

Q.          Okay.  Are the attorneys you met with present in this room?

A.          Yes.

Q.          Okay.  Was anyone else present for the preparation?

A.          No.

Q.          Did you discuss your testimony today with anyone who's not an attorney?

A.          No.  Well, I told my wife where I was going to be, but, you know, nobody else.

Q.          Okay.  Did you review any documents in preparation for your testimony today?

A.          I did look at -- I think I looked at one page, a map, that my attorney showed me to look at. It had to do with -- I think it's the two of the Senate districts in north Alabama.  And we also looked at a map of what I think must be 25 --



Senate district 25, but that's it.  We didn't --
that was all.

Q.       Okay.  Did you do anything else to prepare
for the deposition today?

A.       No.

Q.       All right.  I know you've been deposed
before so I won't spend too much time on
background, but you're from St. Clair County,
Alabama; is that correct?

A.       That's correct.

Q.       How much of your life have you spent here?

A.       Way over half.  You know, I had a period
of time, left for college.  And then I was in the
military, and then I lived in other places, but I'm
back to my home farm.

Q.       And where else within Alabama have you
lived?

A.       I lived in Leeds, Alabama, lived in
Mountain Brook, Alabama, and had a house on Logan
Martin Lake that was really a vacation home.  I
lived in Guntersville for a short stretch waiting
to be drafted.

Q.       Okay.  Other than the places you've lived
in Alabama, are there other parts of the state you
feel you've got familiarity with?



A.          Yes.

Q.          And what other parts of the state do you feel like you have familiarity with?

A.          Well, not all of it, but a lot of it. It's kind of hard for me to answer that question. Hey, I lived in Mobile for a while.

Q.          Okay.

A.          Was born there.  I don't know how long I was there, but I know I had to be a while.

Q.          You lived in Mobile in early childhood?

A.          Yes.  Or infancy.

Q.          Okay.  What would you say your level of familiarity is with the Montgomery area?

A.          I'm not sure how to answer that question. I'd say fairly familiar.  I have a general -- general idea about Montgomery.  I mean, I was down there in the legislature for 20 years.

Q.          Are there any particular parts in the Montgomery area you feel more familiar with than others?

A.          Yeah.  Downtown around the Capital.

Q.          Okay.  Are you -- what is your level of familiarity, if any, with the Huntsville area?

A.          Not as much as the Montgomery area.  I can't even remember the last time I was in



Huntsville.

Q.        What, if any, is your familiarity with the Decatur area?

A.        Minimal.

Q.        Okay.  Have you noticed any trends in the Huntsville area over the past decade or so?

A.        Increasing population.

Q.        Okay.  Anything else?

A.        No, I don't think so.  I'm not sure what you're after.

Q.        When did you first seek elective office?

A.        2001.

Q.        And what office were you seeking?

A.        Alabama House of Representatives.

Q.        What district were you running for?

A.        50.

Q.        And why did you decide to run for Alabama State House?

A.        I'm trying -- I got very disgusted with my state representative.

Q.        Do you recall why you were disgusted with your state representative?

A.        Of course, I do.

Q.        And why was that?

A.        I had an issue and I asked him for some



help and he told me he was powerless.

Q.      Do you remember the identity of that representative?

A.      I do.

Q.      And who was that?

A.      Do you really want to put that in here?  I mean, does it help you at all?

Q.      I'd like to know the answer to the question.

A.      Dave Thomas.

Q.      Dave Thomas.  Okay.  And was Representative Thomas a Republican or Democrat?

A.      Republican.

Q.      Okay.  Is it fair to say that you ran in -- you posed a primary challenge to Representative Thomas?

A.      Correct.  Well, actually no.  He dropped out.

Q.      Okay.  So did you run in the Republican primary for --

A.      Yes.  I'm sorry.  I didn't mean to interrupt you.  I apologize.

Q.      It's okay.  Did you have any opposition in the primary?

A.      I did.


800.211.DEPO (3376)
EsquireSolutions.com

Q.    And who was opposing you, if you remember?

A.    His last name was Routin.

Q.    Okay.

A.    From Pell City.

Q.    What was the result of the primary?

A.    I won.

Q.    You then presumably you moved on to the general election?

A.    Correct.

Q.    Did you have a general election opponent in that race?

A.    I think I did.  I think I did.

Q.    And what was the result of that election?

A.    I won.

Q.    Okay.  How long did you hold that office?

A.    Three terms.

Q.    During your time as a state representative in the House, when did you first become involved in redistricting?

A.    20 -- well, for the -- 2010 census.

Q.    And how did you first become involved in redistricting?

A.    I was House chair.

Q.    Did you seek out that position for -- affirmatively or was it offered to you?



A.      It was offered to me.

Q.      And any reason you decided to accept that role?

A.      Yeah.  I was very curious about the process.

Q.      What was your role as the House co-chair of the apportionment committee for the 2010 cycle?

A.      Correction.  House chair of reapportionment.

Q.      Thank you.  Let me ask that again.  What was your role as the House chair for the reapportionment committee for the 2010 cycle?

A.      To work with any of the House members that wanted to work with me and coordinate with the map drawer and to consult with the attorney that we were staying in the boundaries set by the Constitution and by the courts.

Q.      And do you recall who the map drawer was for that cycle?

A.      I do.

Q.      And who was that?

A.      Randy Hinaman.

Q.      When did you decide to run for Senate in Alabama?

A.      I ran in -- I don't know.  Maybe 2013 or



something like that.  I ran in 2014.  Is that right?  Yeah.  Let's see.  Yeah.

Q.       To the best of your recollection.

A.       2002 plus 12, 2014.  So I must have made the decision to 2013.

Q.       Why did you decide to run for Senate?

A.       I felt like I could be more effective for my district as a Senator than I was as a House member.

Q.       And why did you feel that you could be more effective as a Senator for your district?

A.       Just the rules of the House versus the rules of the Senate, the way it operated.

Q.       Can you say a little bit more about that? What about the Senate rules made it easier for you to be effective?

A.       One Senator can have far more influence on the body than one House member.  An easy example would be a House member can be at the mic for ten minutes more than once and the Senator can be there for almost unlimited hours.

Q.       Okay.  And did you face any primary opponents when you ran for Senate in 2014?

A.       Yes.

Q.       Do you recall how many opponents?



A.        I think there was just one.  Yeah.  I think there was just one.

Q.        And how did you fare in the primary?

A.        I won.

Q.        Okay.  Do you recall if you faced a general election opponent in 2014?

A.        I did.

Q.        Okay.  And do you recall who your opponent was?

A.        I cannot remember his name.  I remember he lived in Moody, but I can't remember his name.

Q.        And how did you fare in that race?

A.        I won.

Q.        How did you become the Senate Chair of the Reapportionment Committee?

A.        I was -- actually I was elected by the Republican Caucus members, but was really promoted but the pro tem since I was the only one that had experience in the process.

Q.        Do you recall approximately when you were appointed to that role or elected to that role as it may be?

A.        Not too long after we organized in 2014, so I would say probably 20 -- 2014.

Q.        And did you run for re-election in 2018?



A.        I did.

Q.        Do you recall if you had any primary opponents?

A.        You know, I did.  I can't remember who it was.

Q.        Do you recall if you had a general election opponent in 2018?

A.        I just don't know.

Q.        Okay.  When did you decide not to seek re-election for the following term?

A.        For this last election.  Well, I announced it probably a year prior to qualifying time.

Q.        And what was the reason or reasons you decided not to run for re-election?

A.        Well, 20 years in Montgomery, that was enough.

Q.        Can you say a little bit more about that? What do you mean by 20 years in Montgomery was enough?

A.        I don't know.  That pretty much wraps it up.  I served in the House and I served in the Senate and served a number of leadership roles and it was just time for somebody else.

Q.        Senator, what was your role in the 2021 State Legislature of redistricting process?



A.        Well, once again, I was -- this time I was Senate Chair of redistricting.  And my role really was to work with my fellow senators, all -- both parties that wanted somebody to work with them and to interact with our map drawer and to consult with my attorney to make sure we were in compliance with what we needed to be in compliance with.

Q.        Okay.  And you mentioned the map drawer, who was the map drawer?

A.        Randy Hinaman.

Q.        What were your interactions -- you mentioned interactions with the other senators of both parties, can you describe those a little bit more?

A.        Sure.  I would -- one thing I worked at was those that wanted to meet with the map drawer to try to work -- coordinate their schedules, tell them when they could be down there, check with the map drawer to see what his schedule was, and then to -- sometimes to discuss options that they had and always to review population shifts in their district to know if they need a bigger district or smaller district or to get back in the compliance.

Q.        Do you recall approximately how many Senators you met with during that process?



A.        You know, I don't.  I can't give you a number on that, but, you know, I was -- I was available.  I wouldn't say -- we could put it this way.  I met with everybody that wanted to meet with me and probably most of them did.  I either met or interacted with them and made arrangements for them to work with the attorney and the map drawer.

Q.        Okay.  Do you recall if you met with either of the Senators from the Montgomery area, specifically Senate Districts 25 and 26?

A.        I just don't recall.  I just don't recall.  I would think so if I was guessing, but we can't do that.

Q.        Okay.  Do you recall if you met with any of the Senators from the greater Huntsville area?

A.        I do remember two of them.  They were down several times to work on it.

Q.        And which two do you recall meeting with?

A.        Givhan and Butler.  Now Livingston's district was adjacent and probably continuous up there so he was in on it.  But Livingston, I had kind of anointed Livingston to follow me in that role because by that time I knew I was not coming back.  And so I wanted to get somebody kind of broken in a little bit for the job.  So Livingston



was in and out a good bit.  But not necessarily just for his district, but to sort of familiarize himself with the process.

Q.      Okay.  Do you recall the topics of conversation in the meetings with Senators Givhan and Butler?

A.      Well, the topic was where the lines are going to go.  What precincts go where, but that was -- that was what the discussion was.  It wasn't about fishing.

Q.      Okay.  Do you recall whether the committee -- let me pause there.  When I say the committee, will you understand that I'm referring to the Reapportionment Committee of which you were a co-chair in the 2021 cycle?

A.      Chair.

Q.      Well, Senate chair, but a committee co-chair, correct?

A.      No.

Q.      No.  Both just chairs.  Okay.  I will strike the word co-chair from my vocabulary for the rest of the day.

        Do you recall as a chair of the -- well, let me step back.  You understand when I'm referring to the committee in this context that I'm



referring to the Reapportionment Committee in 2021 of which you were a chair?

A.    I got it.

Q.    Okay.  Do you recall whether the committee held public hearings in advance of the redistricting special session in 2021?

A.    Yes.

Q.    What do you recall about those hearings?

A.    They were done electronically.  It was great.  It was masterful.

Q.    Did you participate in all of those public hearings?

A.    I did.

Q.    Do you recall when those hearings occurred in relation to when the State Senate map was publicly released?

A.    Yes.

Q.    And what is your recollection?

A.    All the meetings was prior to finalization of the map.

Q.    From your perspective what was the purpose of holding these public hearings?

A.    Input from the public.

Q.    Do you recall receiving feedback from the public?



A.      Yes.

Q.      How, if at all, did you incorporate that feedback during the districting process specifically for the State Senate map?

A.      Well, the members of the committee listened -- first, we had a transcript of everything that was made for review.  We paid attention to what people had to say.  That was the purpose of it, is to get input.  And so -- and frequently input would be from not just citizens but public officials, you know, from cities that don't want their city broken up and that sort of thing.  So, yeah, we just --

Q.      Did you discuss any of that feedback specifically with the map drawer, Mr. Hinaman?

A.      I think in general, yes.  I can't recall any specific conversations.

Q.      Do you recall if there were specific points of public feedback that you conveyed to Mr. Hinaman at all?

A.      No.

Q.      At what point did you begin working on the redistricting process for the Alabama State Senate map that led to the current map?

A.      We didn't -- it may have been July or



maybe August before we got information from the Census Bureau, so without that information you can't do anything.  So it was late.  It was very late.

Q.      Do you recall any steps you took in your role as a chair of the committee for the 2021 process before that census data came in?

A.      Well, from a housekeeping standpoint we had new facilities.  No.  Answer to your question is no.

Q.      Okay.  Do you recall if the committee met to consider or pass guidelines -- redistricting guidelines before the Census Bureau statistics came in?

A.      We did met, and we did adopt guidelines -- had a discussion of adopting, but I don't recall if we had the data at that point or if we did it prior to receiving the data.

Q.      How did you begin the process of creating a new State Senate map in 2021?

A.      Well, we had guidelines to go by.  One of those guidelines is we try to keep the districts similar if possible, particularly on behalf of the voter, so that's a good starting point, is where the existing lines.



Q.        And do you recall specifically if that --
the existing lines were the starting point in
constructing the new --

A.        Well, they're just some of the things that
went into it.  Where did the incumbent legislators
live.  We didn't want to draw them out of their
district.  So there's a number of factors that go
in there.

Q.        Would you -- would it be fair to say that
keeping the districts as similar as possible was a
top priority for you in drawing the State Senate
map?

          MR. WALKER:  Object to the form.  You may
answer.

          THE WITNESS:  I may answer?

          MR. WALKER:  You may answer.

A.        So ask it again.  Let's get it right.

Q.        Would it be fair to say that keeping the
districts as similar as possible, and I'm referring
to the State Senate districts, was a top priority
for you in enacting the 2021 map?

          MR. WALKER:  Same objection.  You may
answer.

A.        No.

Q.        Why wouldn't that be fair to say?



A.      Because there's a number of guidelines we had to go by.  None of them are specifically a top priority, and, you know, they all have to be considered.

Q.      Of the priorities you had laid out in the guidelines, are there any that were more important than others to you in your role as chair?

A.      I can't think of any.

Q.      You -- am I correct you testified that Randy Hinaman did the actual drawing of the 2021 State Senate map?

A.      Correct.

Q.      What guidance did you provide to Mr. Hinaman when he started the process?

A.      Very little, if any.

Q.      Okay.  Do you recall anything that you said to him as he began the process?

A.      No.

Q.      Okay.  Do you recall instructing him about any particular priorities that you had for the map?

A.      No.

Q.      Do you recall providing Mr. Hinaman with any district specific instructions?

A.      No.

Q.      Do you recall providing Mr. Hinaman with



any region specific instructions?

A.          No.

Q.          Are you aware of any guidance that Mr. Hinaman received in drawing the map besides any guidance that you provided him?

A.          Yes.

Q.          And what other guidance was that?

A.          Our attorney.

Q.          Okay.  Beyond your attorney, are you aware of any other guidance Mr. Hinaman received in drawing the map?

A.          I'm not sure if this answers your question, but each legislature, each Senator had some ideas.  Well, most of them had an idea of where they -- so they would make suggestions.  I don't know if that's guidance in the way that you're talking about or not.

Q.          Outside of yourself, your attorney, the committee's attorney, and other Senators, are you aware of any guidance that Mr. Hinaman received in drawing the 2021 State Senate map?

A.          You know, there was a consultant, and I think he was in Atlanta.  And if I recall correctly, if there was some changes that were questionable from a Constitutional standpoint,



he was somebody we could refer that data to and get

an outside opinion.  But I really didn't

participate in that process, so I'm not that

familiar with it.

Q.      Do you recall if that consultant was

Dr. Hood from the University of Georgia?

A.      I don't recall.

Q.      Okay.  Were there any other map drawers

involved in the process of drawing the 2021 State

Senate map beyond Mr. Hinaman?

A.      There were other maps submitted to the

committee, but not -- but Mr. Hinaman didn't draw

them.

Q.      Do you recall specifically any other State

Senate maps that were submitted to the committee?

A.      I know Senator Singleton offered a map.

I'm thinking maybe Representative England did.  I

know we had one map offered by one of the Democrats

that pitted a bunch of Republican Senators running

against each other.

Q.      Okay.  Senator, I'd like to hand you what

we can mark as Exhibit 1.

                (Plaintiffs' Exhibit 1 was marked for

                  identification.)

Q.      Senator, do you recognize this document?



A.       Well, yeah, I think I know what it is.

Q.       Okay.  And what do you believe this is?

A.       This was one of the hearings that we held open to seeking public comment in the redistricting process.

Q.       Okay.  And to the best of your recollection were you present whether online or in person at this hearing?

A.       I think I was.

Q.       If you could turn to -- I think it's the second page in the exhibit, but it's marked page 19 in the top right.

A.       Yeah.

Q.       And if you see a few lines down there begins a statement by hearing officer.  Do you see that?

A.       The lines are numbered.  What number are you talking about?

Q.       Starting on line 4.

A.       I got it.

Q.       Do you recall who the hearing officer was?

A.       Well --

Q.       Well, let me refer you to the second page



if that helps to refresh your recollection, the back of the first page there.

A.          Hearing officer.  Yes, I know him.

Q.          Okay.  Who was the hearing officer?

A.          Mr. Dorman Walker.

Q.          Okay.  In response to a question the hearing officer, Mr. Walker, says -- I'm going to refer you down to line 13, part way through. Districts will be drawn without looking at party affiliation or without looking at race for the most part.  Did I read that correctly?

A.          That's what it says, yes.

Q.          Does that accurately reflect in your experience how the Senate map drawing process went?

A.          Yes, it does.

Q.          Okay.  Is it true then that in your experience partisanship was not a factor in drawing the 2021 State Senate districts?

A.          Race was not.  Is that what partisanship is?  I don't understand.

Q.          No.  Separately -- let's break those down separately.  So let me then ask you, you just testified then race was not a part of the consideration in drawing the State Senate districts in 2021; is that correct?



A.          Correct.

Q.          Okay.  Putting aside race, the statement we just read says that districts will be drawn without looking at party affiliation.  What do you take that to -- what did you take that to mean in the process of drawing the 2021 State Senate districts?

A.          Well, it seems pretty self-explanatory. When we were drawing the maps, you could see data displayed as you moved the lines.  Race was not displayed.

Q.          Was partisanship data displayed?

A.          No.

Q.          Okay.  In terms of race, when during the process of drawing the State Senate districts, if at all, did you consider race?

A.          Race was not considered.

Q.          Okay.  Do you recall testifying -- now, I'm taking you back a little bit, and you can put that aside if you'd like -- in the Alabama Legislature Black Caucus case in the previous decade?

A.          We'll try.

Q.          Okay.  Do you recall testifying then that you started the districting process by looking at



the minority districts in 2011 or 2012?

A.        I don't recall that statement or process.

Q.        Okay.  Did the map drawing process in 2021 start by looking at majority black voting age population districts to the best of your knowledge?

A.        No.

Q.        Okay.  If you know, do you recall how the process for creating the 2021 map did start?  State Senate map I should say.

A.        Like we previously discussed the starting point is existing lines.

Q.        Okay.  I'm going to hand over what we'll mark as Exhibit 2.

(Plaintiffs' Exhibit 2 was marked for identification.)

Q.        Senator McClendon, do you recognize this document?

A.        No.

Q.        If I told you that these were talking points provided by your attorney when the issue of the maps came before the Senate as a body, does that refresh your recollection?

A.        You know, so -- okay.  Make a statement or ask a question.  Do it again anyway since I've had a chance to look at this.



Q.        Okay.  Does it refresh your recollection if I say that you had testified during the deposition in the Milligan case a couple of years ago that these were talking points you were provided by your attorney when the issue of the map -- congressional map in that case, but the maps came before the Senate as a body?

A.        I really don't remember.

Q.        Okay.  Let's turn to the page with -- in the bottom right corner, ends in 534, the top says Hassell Senate Plan Number 1 prepared with McClendon Senate Plan Number 1.

A.        Okay.

Q.        All right.

A.        Go ahead.

Q.        Do you recall having seen these talking points before?

A.        I think so, yes.

Q.        Okay.  What, if any, is your recollection?

A.        This was a plan -- Hassell plan.  See, I didn't remember the name of it.  Was introduced -- I don't know who introduced it.  But in any event the important point pairs eight incumbent Senators in four different districts.  So it pitted a number of incumbents against each other, which was



contrary to the guidelines that we operate under.

Q.     Okay.  And when this refers to the McClendon Senate Plan Number 1, do you recall if that's ultimately the plan that passed and became the 2021 Senate map?

A.     I believe that's correct.

Q.     Okay.  If you could look part way down the page.  It's the third line under county and precinct splits.

A.     Yeah.

Q.     It says there, the McClendon Plan does a much better job of respecting communities of interest and keeping counties whole.

A.     Yeah.

Q.     Do you recall why you believed your -- the McClendon Plan did a better job -- a much better job of respecting communities of interest than the I guess the Hassell Senate Plan Number 1?

A.     Well, on keeping counties whole that's just a mathematical thing.  Pretty simple.  And communities of interest, that's not -- that's a little bit more than mathematical, but it's pretty easy to see when you split up a city multiple ways, but -- so okay.  Ask me the question.  I think I'm wandering around.



Q.       Do you recall -- do you recall what this meant to you that the McClendon Plan did a much better job of respecting communities of interest?

A.       Communities of interest, keeping those together is a part of the guidelines that we adopted early on.

Q.       And we'll come back to this a little bit more, but how did you evaluate what constituted communities of interest when working on the 2021 State Senate map?

A.       You know, that's just looking at the map and seeing -- seeing what -- sort of seeing where the lines go and seeing if you can avoid breaking these areas up.

Q.       And what sort of areas that you're talking about avoiding breaking up would you consider communities of interest?

A.       Well, I think a good example could be rural versus cities or urban areas, even perhaps downtown versus residential areas.

Q.       Okay.  So in general -- for instance, keeping the downtown area together versus splitting it and pairing it with a suburban and rural area would better reflect communities of interest?  Is that -- am I understanding that correctly?



A.      Let me think about that.  I'm getting in the weeds here, and I'm making up stuff.  So I'm not too sure about that.  Let's go back.  And I think easier to focus on urban versus rural.  That's a little easier for me to understand.

Q.      Okay.  So let's talk about then in general was your view that keeping urban areas together and keeping rural areas together to the extent possible better reflected communities of interest in the state?

A.      Yeah.  I can go along with that.

Q.      Moving down the document a little bit here.  The next header says significantly changes shapes of Senate districts.  Do you see where that is?

A.      I do.

Q.      All right.  And the first line says, first look at the Hassell Plan shows that it makes major changes to Senatorial districts from the top to bottom of the state.  Why would -- well, let me ask you first.  Did you see making major changes to the Senatorial districts as problematic?

A.      Yes.

Q.      And why is that?

A.      Well, for one standpoint is the voter.  A



voter has lived -- a great example is this blowing up our congressional districts recently.  We had people that had always been in congressional one and no longer.  So knowing -- knowing what district you vote in, for example, and knowing being familiar with those people running for office.  That's helpful from the voter standpoint.

It's also helpful from the officeholder standpoint.  If he's taken on projects that may take multiple terms to get completed, so it doesn't make any sense to rearrange -- dramatically rearrange districts unless it's absolutely necessary.

Q.       Okay.  And right below that, do you see where it says McClendon's SDs 4, 5, and 6 are largely combined into Hassell SD 2?

A.       I see that.

Q.       And do you know what part of the state those districts are in?

A.       The Senate districts are from top to bottom, aren't they, from north to south?  So I guess they're northern districts.

Q.       Do you recall whether this Hassell Plan was -- well, let me step back there.  Do you recall anything about those specific districts in your



plan versus the Hassell Plan?

A.    No.

Q.    Okay.  You can put that to the side. We're going to now hand over what we'll mark as Exhibit 3.

(Plaintiffs' Exhibit 3 was marked for identification.)

Q.    Senator, do you recognize this document?

A.    I do.

Q.    And what is it?

A.    It's the guidelines that was adopted by the Redistricting Committee.

Q.    These are the guidelines adopted by the Redistricting Committee for the 2021 maps?

A.    Yeah.

Q.    Okay.

A.    I believe that's the case.

Q.    As Senate chair what was your role in the adoption or selection of these criteria?

A.    Well, I chaired the meeting where they were discussed and voted on by the members of that committee including myself.

Q.    And do you recall where these criteria for redistricting were derived from?

A.    I do.



Q.        And where is that?

A.        They were derived from the previous guidelines, which we did ten years before.  We went in and did a little fine tuning, but that was the basis for them, is the ones we had used before.

Q.        Okay.  Do you happen to recall where the previous guidelines were derived from?

A.        No.

Q.        All right.  I'd like you to look down the page -- first page here to subsection F under section 2, criteria for redistricting.  Do you see where it says districts shall be drawn in compliance with the Voting Rights Act of 1965 as amended.  The Redistricting Plan shall neither have the purpose nor effect of diluting minority voting strength and shall comply with Section 2 of the Voting Rights Act in the United States Constitution?

A.        I do see that, yes.

Q.        Okay.  In your view what did it mean for the map to comply with Section 2 of the Voting Rights Act?

A.        I don't know right now.  I don't exactly know what Section 2 is.

Q.        Okay.  Let me ask more broadly.  In your




800.211.DEPO (3376)
EsquireSolutions.com

view for the 2021 cycle, what did it mean for the map to comply with the Voting Rights Act more broadly?

A.         In my view the Voting Rights Act -- well, it was put in place to prevent discrimination against groups of people.  So to be in compliance with it was to avoid -- avoid any discrimination on voting.

Q.         Okay.  And was trying to ensure that the State Senate map complied with the Voting Rights Act one of your responsibilities as chair?

A.         Yes.

Q.         How did you determine, if at all, whether the State Senate map complied with the Voting Rights Act?

A.         I turned to my attorney, and I asked him his opinion on what we did.

Q.         Outside of conversations with your attorney, did you take any other steps to determine whether or not the map complied with the Voting Rights Act?

A.         No.

Q.         Do you recall if you provided Mr. Hinaman any instructions about compliance with the Voting Rights Act?



A.          If the attorney provided instructions?

Q.          If you provided instructions.

A.          Ask me that again now.  I'm lost.

Q.          Sure.  I'm not asking you to reveal any conversations with your attorney.  I'm asking if you recall if you personally provided any instructions to Mr. Hinaman on compliance with the Voting Rights Act?

A.          You're asking me if I advised the map drawer.  The answer would be no.

Q.          Okay.  Did you personally do any work to monitor whether Mr. Hinaman's work complied with the Voting Rights Act?

A.          No.

Q.          Do you recall -- well, let me step back.
            Are you familiar -- strike that.
            Have you heard of the term racial polarization analysis?

A.          Yes.

Q.          Do you have any understanding without, getting into the technical aspects of it, of generally what that -- what that term refers to?

A.          No.

Q.          Okay.  What is your understanding of the role that racial polarization analysis plays in the



map drawing process, if any?

A.        My understanding at the time was if there appeared to be a conflict or if drawing of the map could have been contrary to the Voting Rights Act or Constitution that my attorney had -- and the map drawer had a specialist somewhere in another state, I think Atlanta, that they would consult with to see if that particular instance was a problem.

Q.        Okay.  And did you leave that determination to your attorney to make?

A.        Yes.

Q.        I'd like to hand over an exhibit that we'll mark as Exhibit 4.

                (Plaintiffs' Exhibit 4 was marked for
                    identification.)

Q.        Do you recognize this document?

A.        I do not.

Q.        Okay.  Do you have any understanding of what this -- well, let me direct you to the first page.  The title reads on the first page, Proposed Alabama State Senate District 18 Functionality Examination.  Do you have any recollection of what that meant?

A.        I do not.

Q.        Do you recall seeing this document during



the 2021 districting process?

A.       I do not.

Q.       Okay.  Do you have any knowledge of whether this is the analysis that the consultant in Georgia read?

A.       Ask me that again.

Q.       Sure.  You mentioned that there was an outside consultant in Georgia you believed that ran analysis when necessary.

A.       Yeah.

Q.       Do you believe that this is the product from that consultant?

A.       I don't know.

Q.       Okay.  If you look down at the bottom of the page on that first page under summary, it says from the analysis run there is no racial polarization voting present in proposed SD 18. Majority of both black and white voters supported Biden in 2020 and Maddox in 2018.  Do you have any recollection of reviewing this during the districting process in 2021?

A.       I do not.

Q.       Do you have any recollection of whether this analysis of whether racial polarized voting was present in proposed SD 18 affected the drawing



of the State Senate map?

A.        I do not, no.

Q.        If you flip through the document, is it correct that the functionality -- don't worry, we're not going to walk through all these.  Is it correct that the functionality examination for proposed Alabama Senate District 18 is the only Senate district functionality examination in this document?

A.        I have no clue.

Q.        Okay.  Do you recall whether any functionality examinations were performed for other State Senate districts?

A.        I do not recall.

Q.        Putting aside this document, do you recall whether any sort of racial polarization analysis was conducted on any specific State Senate districts?

A.        I do not recall.

Q.        Do you -- so you do not recall one way or another whether any State Senate districts had racial polarization analyses conducted?

A.        Correct.

          MR. ROSBOROUGH:  Okay.  We've been going for about an hour.  Is now a good time to get take



a five to ten minute break?

MR. WALKER: Sure.

(A recess was taken.)

Q.    Senator McClendon, we're going to hand you a document that we'll mark as Exhibit 5.

(Plaintiffs' Exhibit 5 was marked for identification.)

Q.    Do you recognize this document as excerpts of a transcript from the October 26, 2021 reapportionment committee meeting?

A.    I do.

Q.    Do you recall what the purpose of that meeting was?

A.    October 26th, it must have been to adopt a -- the maps for the House and Senate to present to the -- actually to present to one of the standing committees of the legislature.

Q.    Okay.  If you look at the bottom of page 8, going over to page 9.

A.    Yes.

Q.    Do you see where Representative England states the question, I asked you you're assuring me right now that a racial polarization study has been done.  And it says Mr. Chairman.  Is that you, do you believe?



A.        I believe it is, yeah.

Q.        Okay.  And you say according to my attorney, yes.  And then Representative England says, okay.  And then you say, according to the committee's attorney; is that correct?

A.        There it is right there.  All of that looks correct to me.

Q.        Okay.  Does this -- what do you recall if anything about this exchange?

A.        Nothing.

Q.        When you're answering Representative England regarding racial polarization study, do you have any idea what that is referring to?

A.        I do -- I do not.

Q.        Is it possible that it's the document we were just looking at, Exhibit Number 4?

A.        I don't know.  Yeah.  I guess it's possible, but I don't know.

Q.        Okay.  If you want to flip over to -- a few pages, the bottom of what's marked as page 18 in the bottom right corner.

A.        Okay.

Q.        Do you see the last entry where it says, Senator McClendon, starting with can I ask something?



A.        Yeah.

Q.        Okay.  And you state there, can I ask something?  The question you're asking, the answer is our attorney, mine and your attorney, sent that data off for districts that it looked like they might be possibly a racial issue.  Did I read that correctly?

A.        You read that correctly.

Q.        Okay.  Do you recall what you meant when you said that the attorney sent off data for districts where it looked like there might possibly be a racial issue?

A.        I really don't remember this conversation.

Q.        Okay.  So if you flip -- same part of the -- part of the same statement there, but if you flip over to the next page, page 19.

A.        Yeah.

Q.        So I'm going to read the last couple of sentences.  And if necessary to make changes in those districts just try to stay in compliance with the Voting Rights Act that we made those moves.  So you can ask that question about any one district and I will answer that by saying any district that looks like it needed to be done we did it.  Did I read that correctly?



A.      You read that just -- same thing I've got.

Q.      Okay.  Do you recall what you meant by that?

A.      I do not.

Q.      Do you recall if any changes were made to -- let me step back for a second.  When did you -- when do you recall seeing a full State Senate map from Mr. Hinaman in regards to this -- in proximity to the special session?

A.      I don't know exactly.

MR. WALKER:  Do you mean when it was completed?

MR. ROSBOROUGH:  Let me rephrase that. No.  You're right.  Let me ask a better question.

Q.      Do you recall approximately how long before that special session for redistricting started you saw a full draft map of the State Senate from Mr. Hinaman?

A.      It wasn't too long before this meeting because similarly we were running very tight time frame.  We couldn't have this meeting until we had a map.  So it wasn't far in advance of this meeting.

Q.      Do you recall -- do you know if any changes were made while Mr. Hinaman was drafting



the State Senate map to reflect an attempt to comply with the Voting Rights Act?

A.        Everything he did.  If he made a change, he and the attorney talked about the change.

Q.        Were you involved in any discussions with Mr. Hinaman about compliance with the Voting Rights Act?

A.        No.

Q.        Okay.  After there was a full draft map of the State Senate for Mr. Hinaman, do you recall if any changes were made at that point to address concerns under the Voting Rights Act?

A.        Not that I recall.

Q.        Okay.  Thank you.  You can put that transcript aside.  Actually if you would turn back to the redistricting guidelines, which I think we have as Exhibit Number 3.

So, Senator, turning back to the redistricting guidelines, I'm looking down at the bottom of page 2.  So this is in -- it would be J iii.

A.        Yeah.

Q.        Concerning communities of interest.

A.        Yeah.

Q.        The guidelines state districts shall



respect communities of interest, neighborhoods, and political subdivisions to the extent practicable and in compliance with paragraphs A through I.  A community of interest is defined as an area with recognized similarities of interest, including but not limited to ethnic, racial, economic, tribal, social, geographic, or historical identities.  The term communities of interest may in certain circumstances include political subdivisions such as counties, voting precincts, municipalities, tribal lands and reservations, or school districts. Is that -- did I read that correctly?

A.      Yes.

Q.      How in drawing the 2021 State Senate map, did you attempt to respect communities of interest?

A.      Well --

        MR. WALKER:  Objection to the form, but you may answer the question.

A.      We just did our best not to break up communities of interest.  It's kind of a vague answer, but it's kind of a vague question.

Q.      All right.  Well, fair enough.  Let me do better.  In seeking not to break up community's of interest, how did you define what was a communities of interest that you were avoiding breaking up?



800.211.DEPO (3376)
EsquireSolutions.com

A.       Well, this -- what you just read helps give you some starting points on identifying, you know, you could say city limits is a community of interest, but it would be a lot more than that. County lines could be communities of interest and school districts.  That's about as specific as I can get.  There's certainly not a one clear cut short brief definition.

Q.       Okay.  Do you recall any ethic or racial identities that were taken into account in considering communities of interest?

A.       No.

Q.       Do you recall any economic identities that were taken into account when considering communities of interest?

A.       No.

Q.       Do you recall any tribal identities taken into interest when considering communities of interest?

A.       No.

Q.       Do you recall any social identities taken into account when considering communities of interest?

A.       No.  I'm not even sure what that means.

Q.       Okay.  And do you recall any historical



identities taken into account in considering communities of interest?

A.        No.

Q.        Finally, do you recall any geographic identities taken into account when considering communities of interest?

A.        I do remember in the northern part of the state, the Tennessee river, there were -- there could be communities of interest on both sides of the river, for example.  But that's really about the best example I -- or only example I can give you.  The Shoals area, they call it.

Q.        And do you recall -- do you recall anything more about how you accounted for the communities of interest in the Shoals area?  You're referring to like Lawrence County and that sort of area?

A.        They -- they mentioned it at public hearings.  I think they mentioned it at public hearings.  I don't know how else I would've been aware of it.

Q.        Just to be clear that's the only specific geographic community of interest that you recall at this time taking account of?

A.        Yes.



Q.      Okay.  All right.  You can set that back aside.  Senator, we're going to hand over two exhibits in succession here.  The first one we're going to mark as Exhibit 6.

                (Plaintiffs' Exhibit 6 was marked for identification.)

Q.      And the second one we're going to mark as Exhibit 7.

                (Plaintiffs' Exhibit 7 was marked for identification.)

Q.      Okay.  Senator McClendon, first turning to Exhibit 6.  Do you recognize what this is?

A.      I believe it's the Senate map we ultimately approved.

Q.      And when you say the Senate map you ultimately approved, do you mean the 2021?

A.      Yes.

Q.      Okay.  Turning to the other exhibit we just handed you, Exhibit 7, do you recognize this as the prior Senate map that was enacted in 2017 after the ALDC litigation?

A.      I just don't know.

Q.      Okay.  I'll represent to you then for purposes of our conversation that this Exhibit 7 was the -- pulled from the docket in ALDC case as

the 2017 State Senate map, that that was enacted after the resolution of the case.  So even if you don't remember that, if you could assume that for purpose of our discussion, does that sound right?

A.      To the one that says Reapportionment Committee Senate Plan 2?

Q.      That's correct.

A.      Was the -- what now?

Q.      The 2017 Senate -- so the Senate plan that was in place prior to the 2021 map.

A.      Okay.  Stop.  Got it.

Q.      All right.  Do you recall the process of drawing the State Senate map in 2021 after -- at the end of the ALDC litigation?  Let me strike that and step back because there's --

You were part of the reapportionment process in 2011 and 2012, correct?

A.      Correct.

Q.      And is it correct that in 2012 I believe the legislature enacted and the Governor signed a State Senate plan?

A.      She did sign a plan.  I don't remember exactly when she was, but could've been '12.

Q.      2011, 2012 range?

A.      Somewhere, yeah.

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Q.        Okay.  Do you recall that there was litigation which stretched over a number of years challenging the --

A.        Yeah.

Q.        -- State House and State Senate plans?  Do you recall that ultimately after remand from the Supreme Court, the three-judge district court found that certain districts had been racially gerrymandered including three in the State Senate map that then needed to be -- that caused the State Senate map to needed to be redrawn?

A.        Man, only vaguely.

Q.        Okay.  I'll represent to you that this was pulled from the docket in that case then as the map that was redrawn in 2017 after that ruling.

A.        Okay.

Q.        So for purposes of our discussion I can ask even if you don't personally remember to assume that this is the prior map that was in place when the 2021 cycle started.  Is that fair?

A.        Which one is -- are you talking about?

Q.        I'm sorry.  Yes.  The one that says Reapportionment Committee Senate Plan 2.

A.        Got it.

Q.        That's the prior map, so starting 2021



this was the map that was in place.

A.        Okay.

Q.        And then Exhibit 6 is the -- I believe you identified as the 2021 Senate plan that was enacted when you were --

A.        That was the map prior to this map (indicating)?

Q.        That was the map after -- wait.  I'm sorry.  Not sure which ones you're pointing at. The Exhibit 6 that's labeled 2021 Alabama State Senate Plan, that was the map that --

A.        Prior to this map (indicating).

Q.        -- followed this one (indicating), correct?

A.        Okay.  Your witness has been lost here in this process.

Q.        I don't want to spend too much time here because I don't even have that many questions on these broad maps.

A.        Okay.

Q.        But I want to make sure though that we're on the same page as I do ask any questions.  So Exhibit 6, the one that reads 2021 Alabama State Senate Plan.

A.        Yes.



Q.        Do you agree with me to the best of your recollection that this is the map that you helped pass in the Senate that was signed by the Governor in the 2021 redistrict cycle?

A.        I think that's the case.

Q.        Okay.  And then I'll represent to you for purposes of our discussion that the other exhibit, Exhibit 7, was the prior map.  It was the map that was in place --

A.        Okay.

Q.        -- at the beginning of the redistricting cycle in 2012.

A.        All right.

Q.        Do you recall any major changes that were made to the State Senate map in the 2021 cycle?

A.        No.

Q.        Okay.  Senator, do you recall what changes, if any, were made in the Montgomery area to the State Senate districts particularly 25 and 26 when you were chair in the 2021 cycle?

A.        No.

Q.        I'm going to hand you what we'll mark as Exhibit 8.

        (Plaintiffs' Exhibit 8 was marked for identification.)



Q.      And Exhibit 8, the title states Census Placed By District and By County and plan name 2021 Alabama Senate Plan.  Do you see that?

A.      Okay.  Wait a minute.

Q.      Sure.

A.      Alabama Senate Plan.  Where am I going to see that?

MR. WALKER:  Right here (indicating).

A.      There it is.  Yeah.  I got it.

Q.      Very small print.  All right.  And I'll represent to you that this was produced to us in this case by defendants and that this was a file generated by -- from the Maptitude software that Mr. Hinaman uses.

A.      Okay.

Q.      If you flip forward to page -- I think it's page 14 of 19.  In the bottom corner, it'll say -- it'll be the number ending in 94.

A.      Okay.  I got you.

Q.      Okay.  And have you seen this document before?

A.      I don't think I have.

Q.      Okay.  I'll represent to you at least for the purposes of these questions that this document breaks down the percentage by white or black racial



populations of specific census places that are

present in a given senatorial district.  If you

look at district -- do you see District 25 about

two-thirds of the way down the page?

A.        I do see 25.

Q.        Okay.  Do you see part way down where

Montgomery is listed?

A.        I do see Montgomery.

Q.        Okay.  And if you scroll over it looks

like -- and let me ask you -- do you recall which

State Senate District 25 is?  Is that Senator

Barfoot's district?

A.        I believe 25 is Barfoot, yes.

Q.        Okay.  Now, if you scroll -- if you look

over from where it says Montgomery, do you see

there's a figure showing that 42.79 percent of the

white population of the district of Montgomery is

in District 25 whereas only 20.41 percent black

population of the district of the City of

Montgomery is in District 25.  Do you see what I'm

referring to?

A.        Yeah.  I don't think -- I really don't

understand what this is about.  Take for example

Luverne right above it.  Okay.  17.15 makes up

100 percent and 8.61 makes up 100 percent.  What is



that about?

Q.      Right.  So I'll represent to you for the purposes of this document and these questions that the percent represents the percent of that racial group in that town that is present in the district. So in other words, all of the white --

A.      I got it.

Q.      All the white citizens of Luverne and all of the black citizens of Luverne are present in District 25 rather than being split between districts.

A.      I got it.

Q.      So then referring back to Montgomery, do you see where it says that 42.79 percent of the white residents of Montgomery as opposed to 20.41 percent of the black residents of Montgomery are located in District 25?

A.      I see that.

Q.      Do you have any understanding of why a much larger proportion -- more than twice in proportion percentage of white Montgomery residents are in District 25 as opposed to black residents?

A.      You know, I fall back on -- and I don't have those maps in front of me, but I could look at them and see if the district is similar in shape,



location, and the lines are similar to where it was before. So if you -- I guess it's just the way people -- where they are that live in that district and the way it has been historically.

Q.      Okay. And if you flip over to the next page where it says District 26.

A.      Yeah.

Q.      And do you see that for that district 51 -- I'm sorry. 57.21 percent of the white population of Montgomery is in that district whereas 79.59 percent of the black population of district -- of Montgomery is in District 26?

A.      I see that.

Q.      Okay. Do you have any understanding -- and is it your understanding that Districts 25 and 26 are the two Senate districts that make up Montgomery County?

A.      Well, I wasn't aware that that was the only two in Montgomery, but I know where they are. I know they're in Montgomery.

Q.      Thinking about these two districts together, do you have any idea why the -- such a large percent of the black population of Montgomery as opposed to the white population is in District 26 and vice versa for District 25?



A.        I do not.

Q.        Okay.  Do you recall examining the racial breakdown of those two districts in the 2021 redistricting cycle?

A.        No.  We didn't do race.

Q.        Okay.  And similarly you have no recollection to the best of your knowledge of any sort of functionality or racially polarized voting analysis being performed regarding either or both of those districts?

A.        No knowledge.

Q.        Okay.  Senator, do you recall from -- happy to look back at the guidelines -- that compactness is one of the criteria for --

          THE WITNESS:  Can we take a one minute break and let me send a text to my wife?

          MR. ROSBOROUGH:  Absolutely.

               (Off the record.)

Q.        Senator, do you recall that compactness is one of the districting requirements that's identified in the committee's districting guidelines?

A.        I do.

Q.        Okay.  Would you say that all of the State Senate districts in the 2021 plan are reasonably



geographically compact to the best of your understanding?

A.        Yes.

Q.        Okay.  Now, we were just talking about State Senate Districts 25 and 26, correct?

A.        Uh-huh.

Q.        Looking at the -- maybe let's go back to Exhibit 6, which is the map of the 2021 plan.

A.        Uh-huh.

Q.        So looking at Exhibit 6, do you have -- can you locate District 25 on that map?

A.        I see it.

Q.        Okay.  Do you -- if I were to represent to you that District 25 is one of the least compact districts in the state, do you have an idea on why that might be the case?

A.        You know, if I understand this other map, I would say the one that preceded the map on Exhibit 6, I'd say District 25 looks very much the same as it did on the previous map.

Q.        Okay.  Do you have any understanding of why in its previous form District 25 might have been one of least compact districts of the state?

A.        No.

Q.        We're going to hand over what we'll mark



as Exhibit 9.

(Plaintiffs' Exhibit 9 was marked for identification.)

Q.      Feel free to take a moment to look at that.  And when you're ready -- feel free to take your time, but when you're ready, do you recall seeing this document before?

A.      I do not.

Q.      Do you recall seeing documents like this during the 2021 redistricting process?

A.      Yes, I do.

Q.      And what do you understand this to be?

A.      This appears to be one of the residents, a citizen, giving her opinion of the Senate map.

Q.      Okay.  And when you received either at the hearings or in written form afterwards like this following up feedback, how, if, at all, did you incorporate that into the map drawing process?

A.      You know, I think that was really a document compiled that was provided to members of the committee to accumulate the opinions that we gathered from around the state.  I think that's the case.

Q.      Is it your recollection that what you're referring to is some sort of summary or just a



compilation?

A.    A compilation.

Q.    Okay.  Did you -- do you recall reading all of the different transcripts and letters and submissions?

A.    I read a lot, but I don't know if I read them all.

Q.    Okay.  Do you recall providing some or all of this material to Mr. Hinaman?

A.    No.

Q.    All right.  If you want to look at this specific -- the specific letter, Exhibit 9, if you look down in the third paragraph, which starts with first.  The writer Ms. Kirkpatrick refers to State Senate Districts 25 and 26, correct?

A.    Yeah.  That's what it says.

Q.    And those were the two districts which are both in Montgomery that we were just discussing?

A.    Yes.

Q.    And I'm going to skip down to the third line that's starting part way through, State Senate 25, however, is this oddly shaped district that ranges from the northern edge of Elmore County all the way down to all of Crenshaw County to the south.  Along the way District 25 grabs a chunk of



east Montgomery and most of the City of Pike Road. Both areas that are relativity densely populated and predominantly white.

What is your -- do you recall hearing that characterization of District 25?

A.        No, I don't.

Q.        What is your reaction to that characterization?

A.        You know, it's really easy to draw very handsome districts if you could just disregard the rest of the state.

Q.        Okay.  Do you agree that the parts of east Montgomery and most of the City of Pike Road that are in District 25 are predominantly white?

A.        I just -- I don't know.

Q.        Okay.  That's fine.  The beginning of the next paragraph says the current squiggly line drawn between State Senate Districts 25 and 26 is drawn along racial and party lines.  Do you agree with that characterization?

A.        I have no idea.

Q.        Okay.  All right.  You can put that aside. We're going the hand over what we'll mark as Exhibit 10.

(Plaintiffs' Exhibit 10 was marked for



identification.)

Q.      I'll represent to you again that these are excerpts and not the whole transcript here, but do you recognize what this document is an excerpt of?

A.      Yes.

Q.      And what is it?

A.      Look at the title page.  A reapportionment committee public hearing and it's got the date and the location is in the State House.

Q.      Okay.  And were you present either in person or virtually for this hearing?

A.      Yes, I was.

Q.      Okay.  If you look to what's marked in the top right corner as page 23.

A.      Yes.

Q.      You see there's testimony from a Reverend Rayford Mack.  Do you see that?

A.      I do.

Q.      Okay.  If you flip over to the next page, page 24, where his testimony continues, if you look down to the -- midway down the page to line 15.

A.      Uh-huh.

Q.      Do you see Reverend Mack's statement about State District 25 and 26 packing black voters in ways that do not reflect communities of interest



and numbers necessary to comply with the voting --
looks look some of the text is cut off -- with the
voting rights?

A.         I see that.  I see those words, that
sentence, yes.

Q.         Do you recall testimony like this about
black voters being packed in unnecessarily large
numbers into State Senate District 26?

A.         I remember hearing that phrase.

Q.         Okay.  And do you remember any actions
that you took in response to that feedback?

A.         I don't recall any changes coming about
because of that accusation.  We heard it so often.
It was -- but no.  Answer to your question, no.

Q.         Okay.  Why did -- why were no changes made
in response to that accusation about the
unnecessarily large number of black voters in
Senate District 26?

A.         Say it again.

Q.         Sure.  Do you recall why -- I believe you
just testified a moment ago that you don't recall
making any changes in response to that criticism
that there were an unnecessarily large amount of
black voters placed in District 26.

So my question is, why to the best of your



recollection did the committee not make any changes

to the map to reflect that criticism?

A.       We didn't use race.

Q.       Okay.  You can put that aside.  Thank you.

Still going -- doing okay?  Want to take a break?

         (Discussion off the record.)

Q.       I'm going to hand over an exhibit that we

will mark as Exhibit 11.

         (Plaintiffs' Exhibit 11 was marked for

         identification.)

Q.       Okay.  Senator McClendon, do you recognize

the geographic area that this document is looking

at?

A.       Well, I see right in the middle it says

Huntsville.  That's a clue.

Q.       Okay.  And I'll represent to you that this

is a representation of the State Senate districts

in the Huntsville area that were in place going

into the 2021 redistricting session so the

districts in place from 2017 to '21.

A.       Okay.  This was prior to --

Q.       Prior to the '21 cycle.

A.       All right.  I'm with you.

Q.       All right.  Does that -- from your

recollection, does that seem feasible to you?



A.       Feasible.

Q.       Okay.  All right.  Now we're going to hand over what we'll mark as Exhibit 12.

(Plaintiffs' Exhibit 12 was marked for identification.)

Q.       And, Senator, do you recognize this map as representing a similar geographical area to the previous one?

A.       Yes.

Q.       Okay.  I'll represent to you that this is a map poll of the State Senate districts from the same applications Dave's redistricting website of the State Senate districts of the 2021 map in the Huntsville area.  Does that seem feasible to you?

A.       Yes.

Q.       Okay.  Looking with these two maps in front of you, do you recall changes that were made to the State Senate districts in the Huntsville area in the 2021 cycle?

A.       I recall that changes were made because of an increase in population.

Q.       Okay.  Do you remember any factors you considered in making changes to the Huntsville area State Senate district other than addressing population issues?



A.       No.  That was the -- that was the issue, was increase in population.

Q.       Okay.  So you don't recall any other particular factors that were taken into account in making changes to the Huntsville area districts other than addressing the change in population that's reflected in the 2020 Census?

A.       Change in population and getting the Senators, the incumbents, happy with what they had to deal with.

Q.       Okay.  So I think -- I just want to make sure the record is clear.  You've mentioned to the best of your recollection the changes in the Huntsville districts addressed population deviation and the wishes of the State Senators in that area, correct?

A.       Correct.

Q.       Were there any other considerations in drawing the Huntsville area State Senate districts in 2021 that you can remember?

A.       No.

Q.       I'm going to hand over now what we'll mark as Exhibit 13.

         (Plaintiffs' Exhibit 13 was marked for identification.)



Q.       And, Senator McClendon, does this appear to you to be similar lines in the City of Huntsville to the 2021 state district -- State Senate districts we were just looking at in Exhibit 11?

A.       Well --

Q.       I'm sorry.  My apologies.  In Exhibit 12.

A.       I'm looking at -- I've got Exhibit 12 and Exhibit 13.  And I'm --

Q.       I'll represent to you that the darker black or grey lines represent the district boundaries in this map.

A.       I would say I'm having a struggle --

Q.       Okay.

A.       -- making these two maps be of the same.

Q.       If I tell you this one is focused in just on the sort of center of Huntsville, does that help?

A.       No.

Q.       Okay.

A.       I'm trying.

Q.       That's fine.  I'll represent to you for the purposes of my questions that this is a map that shows some of the boundaries between Districts 2, 7, and 8 in the 2021 State Senate map in the



middle of Huntsville.  Does that -- is that fair -- you're fine to assume that for the purposes of my questions?

A.        I'll go along with your statement.

Q.        Okay.  And I'll represent to you as well that -- do you see these numerical values within the different precincts on the districts?

A.        I do.

Q.        Okay.  I'll represent to you that from this same application, Dave's Redistricting, that these are the black voting age population percentages of each district.  Is that -- will you take that assumption for purposes of my question?

A.        I don't understand.

          MR. WALKER:  Precinct.

A.        I don't understand.

Q.        Yeah.  On the precinct level.

A.        Okay.  When I look at this number, 79.2 percent right in the middle of the page on Exhibit 13.

Q.        Sure.

A.        What does that mean?

Q.        If you look at the boundaries of that particular gray figure there in the middle, which is within State Senate District 7, I'll represent



to you that that represents the black voting age population percentage of that particular precinct.

So you see the sort of lighter shaded lines to the left, the bottom, and the top of that grey area and then the harder darker line on the right side that those represent the boundaries of that precinct, which has a black voting population age of 79.2.

A.      Okay.  I finally figured out where this 13 fits on this map.  So now --

Q.      Okay.

A.      Why don't you start from there or something?

Q.      Sure, sure.  So I'm just going to represent to you that -- as we said the darker lines on here show the divisions between the 2021 plan between State Senate Districts 2, 7, and 8. And that the lighter boundaries and in some cases they correspond with darker boundaries represent precinct boundaries.

A.      Okay.

Q.      And within each precinct boundary, there is a numerical figure which represents the black voting age percentage of that particular precinct.

A.      Okay.



Q.      Okay.  Do you recall reviewing black voting age populations of the various precincts in the Huntsville area?

A.      I do not.

Q.      Do you believe you did review black voting age population for those precincts?

A.      No.

Q.      Okay.  Now do you recall any feedback or criticism of the 2021 State Senate map that the Huntsville State Senate boundaries broke up a substantial black community in the middle of Huntsville into three separate State Senate districts?

A.      No, I do not recall that.

Q.      Okay.  I'm going to -- keep this document by your side, if you will.  I'm going to hand over what we'll mark as Exhibit 14.

        (Plaintiffs' Exhibit 14 was marked for
         identification.)

Q.      All right.  And when you're ready, feel free to take time to look at this, but when you're ready, Senator, just let me know if you recognize this document?

A.      I do not recognize this document.

Q.      Do you recognize what type of document



this is?

A.       I do.

Q.       And what type of document is it?

A.       Similar to the last one I looked at where one of the -- some citizen that lives in the -- whatever district this is -- okay -- in Senate 7 made their comments on September 16th.  Let me look at --

Q.       Sure.  Take your time.

A.       -- what their purpose of the letter was.

Q.       Okay.

         MR. WALKER:  Take your time.

A.       I guess the heart of this one is when these -- when we had our public meetings.

Q.       Okay.  And when you mean public meetings, you mean those --

A.       Hearings.

Q.       For the 2021 cycle.

A.       Public hearings to discuss the redistricting.

Q.       And this -- this person, Ms. Baker, states they're a resident of Madison County, correct?

A.       Yes.

Q.       And they live in State Senate District 7, correct?



A.        Uh-huh.

Q.        All right.  And then if you scroll down to the third full paragraph of the text of the letter in the second sentence the letter says, the cracking of communities of interest in State Senate Districts 2, 7, and 3 have resulted -- and have resulted in my community being underfunded and poorly represented.  This cracking has diluted the minority vote as the lines are drawn right in the center of Madison County's black communities.  Do you recall receiving feedback like that during the 2021 session?

A.        I guess we're back to the cracking and packing discussion.  But yes, I heard those -- I heard those terms.

Q.        Okay.  Do you recall hearing those terms or criticisms specifically regarding the Huntsville State Senate area districts?

A.        Perhaps.

Q.        Okay.

A.        Perhaps.  Not vividly.

Q.        Do you recall you or the committee taking any action to address those comments or concerns in the Huntsville area?

A.        Well, number one, we didn't use race in



our maps.  Race didn't show up when we were drawing the districts.  And number two, at the point, you know, September 16th we hadn't come forward publicly with a map anyway.  So the answer -- I think the answer to your question is no, but I'm not -- okay.

Q.      Okay.  Senator McClendon, we spoke earlier a little bit about racial polarization analysis.  Do you recall that?

A.      I do recall that.

Q.      Do you recall -- well, let me go back.

        Do you have an understanding as -- from your work in the redistricting process of the term or the phrase racial polarization in voting?

A.      No, I don't.

Q.      Okay.  Do you have any idea what that phrase refers to?

A.      Yes, I do.

Q.      Okay.  What is that idea?

A.      Well, it has to do with using race and discriminating.  And in our case we had an expert on the outside that come give us advice if it looked like we were perhaps violating that concept.

Q.      Okay.  And the expert on the outside, what do you recall from working with that person, if at



all?

A.        Our attorney dealt with that person.

Q.        Okay.  You had no direct contact with that person?

A.        That is correct.

Q.        Okay.  Just give me one second.  We're going to hand you what we'll mark as Exhibit 15.

          (Plaintiffs' Exhibit 15 was marked for identification.)

Q.        I'll represent to you like some of these other documents these are excerpts and not a full transcript.  But when you get a moment and had a chance to look at that, let me know if you recognize what this is.

A.        Okay.  Proceed.

Q.        Okay.  Do you recall testifying in a deposition in the congressional redistricting case in late 2021?

A.        I do.

Q.        Okay.  And does this appear to represent excerpts of the transcript from that deposition?

A.        I haven't read it all, but I guess so.

Q.        Okay.  Feel free to take time to look and, again, these are -- this is not the full transcript.  These are just excerpts from that



transcript for the sake of the trees.

A.      Let's assume this is correct.

Q.      Okay.  You do recall testifying at a deposition in that case in late 2021, correct?

A.      I do.

Q.      Okay.  If you would turn to page 87 of the transcript, lower right 87.

A.      Okay.

Q.      Do you recall -- if you look at line 11, you were asked the question, and so you are assuming that black voters would vote for a black representative.  And you answered, that's pretty -- a pretty safe bet here in Alabama.  Did I read that correctly?

A.      Yes, you did.

Q.      Okay.  Is -- was your testimony there that based on your experience that black voters in Alabama tend to vote for black candidates?

A.      Yes.

Q.      Okay.  And how if at all does that relate to your understanding of racially polarized voting in Alabama?

A.      I don't know.  I don't know what the link is there.

Q.      Okay.  Now, if you turn to page 108 in



JIM MCCLENDON
Khadidah Stone, et al. vs Wes Allen, et al.

April 18, 2024
79

this deposition.

A.      Okay.

Q.      And you look down to line 9.

A.      Yes.

Q.      You were asked the question, and in that time have you gained a general view of what the Democratic party in Alabama supports and what the Republican party in Alabama supports?  And you answered yes.  Do you -- is that -- do you still have a feeling like you have a sense of generally what each party represents in Alabama?

A.      I do.

Q.      Okay.  And then if you turn to -- do you recall that in this testimony you were asked questions about several different issues about that where parties might differ?

A.      Yeah.

Q.      Okay.  And one of those, for instance, was views of preservation of confederate monuments.  Does that ring a bell?

A.      Yeah.

Q.      Okay.  Do you agree that black and white voters in Alabama in general have different views on the preservation of confederate monuments?

A.      Yes.



Q.      Okay.  And similarly there was questions about differences in views about the prevalence of racial discrimination in Alabama.

Would you agree that black and white voters in Alabama in general have differing views about the prevalence of racial discrimination?

MR. WALKER:  Let me make an objection to the form, but you may answer the question.

A.      Okay.

Q.      Do you want me to restate that?

A.      No.  I'll agree.

Q.      Okay.  Can you think of any other issues related to race where black and white Alabamians might have differing views based on your experience?

A.      No.

Q.      Okay.  You testified at trial in the Alabama Legislature Black Caucus case a number of years ago.  Do you recall that generally?

A.      Generally, yes.

Q.      Okay.  Do you recall being asked the question -- well, let's just make this easier. Let's use the transcript.  We're going to hand over what we'll mark as Exhibit 16.

(Plaintiffs' Exhibit 16 was marked for



identification.)

Q.        Senator, do you recognize what this document is?

A.        I think I do, yes.

Q.        Okay.  And what do you believe it to be?

A.        I think it's a, like, transcript of a redistricting case around the 2010 Census and map drawing.

Q.        Okay.  Is this the -- do you believe this is Alabama Legislature Black Caucus case that was referred to?

A.        I do.

Q.        Let me -- and feel free to take a look at whatever you want to in there, but I'm going to, when you're ready, ask you to turn to page -- what's in the top right marked as page 3-239.

A.        Yeah.

Q.        Okay.  And do you see just starting right at the top of that page on line 1, you were asked, isn't it true, what I mean, Dr. McClendon, isn't it true that we were all raised in a racist political and social culture?  And answered, you know, I think you're probably right.  Do you recall that testimony?

A.        No, I don't recall it, but I see it here.


DEPOSITION SOLUTIONS

I don't doubt it.

Q.        Okay.  What did you mean in agreeing to the statement that you were -- you and the questioner were raised in a racist, political, and social culture?

A.        I went to a white high school.

Q.        Was that high school segregated based on race?

A.        There was no blacks.  It was all white. That's racial.

Q.        Are there other aspects of, you know, being raised in a racist, political, and social culture you can think of?

A.        No.

MR. ROSBOROUGH:  Senator McClendon, I thank you very much.  Subject to hearing what other attorneys have to say, those are all my questions for you today.

THE WITNESS:  You're very welcome.

MR. WALKER:  Just a second.

MR. ROSBOROUGH:  If you want to take five and think about it, that's fine.

MR. WALKER:  Okay.  Give me -- maybe shorten this up.

(A recess was taken.)



EXAMINATION

BY MR. WALKER:

Q.        Senator McClendon, you were asked -- I'm going to ask you some questions about parts of your testimony earlier today.  Okay.

A.        Fine.

Q.        And you were asked about communities of interest and rural areas and urban areas.  Do you know whether it is sometimes necessary to combine urban areas and rural areas in order to get population necessary for the idea for a district?

A.        Yeah.  You have to do that sometimes in order to meet your -- the number of people you need in that district, so yeah, joining rural and urban has to be done.  You have to ignore some of the others in order to meet the population requirement.

Q.        And those instances, combining rural and urban areas serve the goal of compactness?

        MR. ROSBOROUGH:  I object to the form.

A.        Yes.

Q.        You were asked earlier about what considerations you knew went into the drawing of the 2021 Huntsville area Senate districts and you listed some factors, but you didn't list the guidelines.  Were the guidelines considered when



the 2021 Senate districts were drawn?

A.        Yes.

Q.        And you were also asked about whether specific communities of interest or type of community interests were taken into account.  Do you recall that testimony?

A.        I do.

Q.        Just because you don't recall whether or not a specific community of interest or type of community of interest was taken into account that doesn't mean that it wasn't in fact taken into account, does it?

        MR. ROSBOROUGH:  I object to the form.

A.        Yes, yes.  It was taken into account.

Q.        Let me ask you:  Could -- was one of the purposes for Senators meeting with Randy Hinaman to tell him about communities of interest that they wanted to preserve in their districts?

A.        Yes.

        MR. ROSBOROUGH:  I object to the form.

Q.        And do you expect that that occurred --

        MR. ROSBOROUGH:  I object to the form.

Q.        -- when Senators met with Mr. Hinaman?

A.        It happened all the time.

Q.        Earlier you were asked about attending



Case 2:21-cv-01531-AMM    Document 235-1    Filed 11/07/24    Page 85 of 90

JIM MCCLENDON                                                   April 18, 2024
Khadidah Stone, et al. vs Wes Allen, et al.                              85

public hearings and receiving public input as part of the 2021 redistricting cycle.  Do you recall that testimony?

A.      I do.

Q.      Did Mr. Hinaman attend those public hearings?

A.      No.

Q.      Even if he did not attend the public hearings, do you know whether he could have received that feedback from Senators in the relevant districts?

A.      He probably did.

        MR. WALKER:  Okay.  Unless Mr. Rosborough has anything else, I believe we're done.

        MR. ROSBOROUGH:  I just have one or two follow-up questions.  Very briefly.

                    EXAMINATION

BY MR. ROSBOROUGH:

Q.      Were you present for some of the meetings that Mr. Hinaman had with Senators?

A.      Yes.

Q.      And do you recall any specific discussions of communities of interest in those meetings?

A.      No.

        MR. ROSBOROUGH:  Thank you.  That's all I



800.211.DEPO (3376)
EsquireSolutions.com

have.

          COURT REPORTER:  Do you want an electronic copy?

          MR. ROSBOROUGH:  Electronic copy only. Thank you.

          MR. WALKER:  Electronic, please.

               (The deposition of JIM MCCLENDON was concluded at 12:46 p.m.)

                    --oOo--



C E R T I F I C A T E

STATE OF ALABAMA    )
                    )
ETOWAH COUNTY       )


          I hereby certify that the above and foregoing proceedings were taken down by me in stenotype, and the questions and answers thereto were reduced to computer print under my supervision, and that the foregoing represents a true and correct transcript of the proceedings given by said witness upon said hearing.

          I further certify that I am neither of counsel nor of kin to the parties to the action, nor am I in anywise interested in the result of said cause.

          Signed the 30th day of April 2024.



Dannah Moody, Commissioner

/s/Dannah Moody
Dannah Moody
ACCR #688 - Expires September 30th, 2024
CCR, Commissioner State of Alabama
My Commission Expires April 7th, 2026

Reference No.: 11122258

Case:  Khadidah Stone, et al. vs Wes Allen, et al.

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

_____

Jim McClendon

NOTARIZATION OF CHANGES

(If Required)

Subscribed and sworn to on the _____ day of

_____, 20_____ before me,

(Notary Sign)_____

(Print Name)                        Notary Public,

in and for the State of _____



Reference No.: 11122258
Case:  Khadidah Stone, et al. vs Wes Allen, et al.


Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____


SIGNATURE:_____DATE:_____
Jim McClendon



Reference No.: 11122258
Case:  Khadidah Stone, et al. vs Wes Allen, et al.


Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____


SIGNATURE:_____DATE:_____
Jim McClendon

