FILED

2024 Dec-13  PM 11:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| ALABAMA STATE CONFERENCE OF THE NAACP, et al., <br><br>    Plaintiffs, <br><br>  v. <br><br> WES ALLEN, in his official capacity as Alabama Secretary of State <br><br>    Defendant. | Case No. 2:21-cv-01531-AMM |

## PLAINTIFFS' POST-TRIAL PROPOSED
## FINDINGS OF FACT & CONCLUSIONS OF LAW

1

# PROPOSED FINDINGS OF FACT

I.    The Parties ...........................................................................................6
      A.    Plaintiffs .....................................................................................6
            1.    Alabama NAACP.................................................................6
            2.    Greater Birmingham Ministries ........................................8
            3.    Evan Milligan ..................................................................11
      B.    Current and Former Defendants: Secretary of State Merrill, Sen. Jim McClendon and Rep. Chris Pringle ...............................11
II.   Factual Background ........................................................................13
      A.    The 2020 Census, and Alabama's Demographics ...................13
      B.    Joint Legislative Committee's Stated Redistricting Criteria ............18
      C.    The 2021 Legislative Process for Redistricting ....................21
      D.    Characteristics of the Enacted 2021 Plan ...........................26
III.  *Gingles* Precondition 1: Viability of Majority-Minority District............28
      A.    *Gingles* I Experts..................................................................29
      B.    Numerosity ...............................................................................32
            1.    The Use of CVAP is Appropriate to Determine Numerosity in the Huntsville/Decatur Area. ...................................32
            2.    The Black Population is Sufficiently Large to Constitute a Majority in Two Additional Districts. ........................50
      C.    Geographic Compactness .......................................................52
            1.    Plan 1...............................................................................53
            2.    Plan 2A.............................................................................55
            3.    Plan 3...............................................................................57
            4.    Dr. Trende's Population Compactness Commentary ..............59
      D.    Reasonable Configuration ......................................................63
            1.    Equal Population ..............................................................64
            2.    Contiguity.........................................................................65
            3.    Communities of Interest and Political Subdivisions................65
            4.    Dr. Trende's Opinion that the Illustrative Districts are not Reasonably Configured.............................................71
      E.    Racial Predominance...............................................................72
IV.   *Gingles* Precondition 2: Political Cohesion of Black Voters....................76
V.    Gingles Precondition 3: Success of White Bloc Voting............................81

**VI.    The Totality of Circumstances Affecting Electoral Opportunities for Black Alabamians ........................................................................83**

    A.    Alabama's History of Discrimination in Voting, Education, Employment, Health, and other Areas ................................................83

    B.    The Extent of Racially Polarized Voting ...........................................116

        1.    Degree of racial polarization.......................................................116

        2.    Black electoral success in relation to racial makeup of population.................................................................................117

        3.    The relationship between race and party identification and alignment.................................................................................118

        4.    Race and Partisanship in Voter Behavior and Candidate Success. ..........................................................................................131

    C.    Senate Factor 4: Candidate Slating Processes...................................142

    D.    Senate Factor 6: Racial Appeals........................................................146

    E.    Senate Factor 7: Lack of Black Electoral Success.............................152

    F.    Senate Factor 8: Unresponsiveness of Elected Officials to Minority-Group Needs.......................................................................................154

    G.    Senate Factor Nine: Tenuousness of Policy......................................159

## PROPOSED CONCLUSIONS OF LAW

**I.    Jurisdictional Issues** .................................................................**162**
    A.    Plaintiffs Have Standing..................................................162
    B.    Section 2 Creates a Private Right of Action....................165
**II.   Plaintiffs Satisfied the First *Gingles* Precondition...................169**
    A.    Numerosity ........................................................................171
        1.    Plaintiffs properly relied on CVAP to meet the *Gingles* 1 numerosity requirement. .......................................171
        2.    CVAP is appropriate where there is a minority group of sufficient size with a significantly lower citizenship rate than other sufficiently large racial or ethnic groups. ................................177
        3.    Numerous courts have used CVAP to determine *Gingles* 1 status in cases brought by Black voters. ............................................180
        4.    Alabama law does not bar CVAP to determine numerosity for the first *Gingles* precondition.................................182
        5.    Courts universally accept point estimates for *Gingles* 1 CVAP determinations, and every court to consider confidence interval arguments has rejected them. ...............................................185
    B.    Geographic Compactness and Reasonable Configuration. ...............188
        1.    Compactness Measures .......................................190
        2.    Equal Population ................................................198
        3.    Contiguity...........................................................198
        4.    Respect for Communities of Interest and Political Subdivisions ...............................................199
    C.    Racial predominance ........................................................205
**III.  Plaintiffs have Satisfied the Second and Third Gingles Preconditions 214**
**IV.   Based on the Totality of Circumstances, Plaintiffs Have Proven That The 2021 Senate Plan Violates Section 2 of the VRA. ...................223**
    A.    Senate Factors 1, 3, and 5 Weigh in Favor of Plaintiffs ..................224
        1.    Alabama's Prior History of Public and Private Discrimination in Voting, Education, Employment, Health, and Other Areas. ..225
        2.    Because of Alabama's history discrimination and continued use of certain voting practices, Black voters are less likely to turnout to vote or otherwise participate in the political process. ........231
    B.    Senate Factor 2: Extent of Racially Polarized Voting ....................247

  C.  Senate Factor 4: Candidate Slating ....................................268
  D.  Senate Factor 6: Racial Appeals......................................275
  E.  Senate Factor 7: Election to Office in the Jurisdiction ....................277
  F.  Senate Factor 8: Lack of Responsiveness .........................279
  G.  Senate Factor 9: Tenuousness .......................................282
**V.  Irreparable Harm and the Equities** .........................................**284**
**VI. Remedy** .......................................................................**286**

## PROPOSED FINDINGS OF FACT

### I.    The Parties

#### A.    Plaintiffs

##### 1.    Alabama NAACP.

1.    Plaintiff Alabama State Conference of the National Association for the Advancement of Colored People ("Alabama NAACP") is the state conference of the National Association for the Advancement of Colored People, Inc. The Alabama NAACP is the oldest, and considers itself one of the most significant, civil rights organizations in Alabama. Joint Statement of Undisputed Facts ("JSUP"), Doc. 230 ¶ 1.

2.    The Alabama NAACP works to advance its vision of political, educational, social, and economic equality of Black Americans and all other Americans and the Alabama NAACP regularly engages in efforts to register and educate voters and encourage Black people to engage in the political process by turning out to vote. Doc. 230 ¶ 2.

3.    The Alabama NAACP's central goals are to eliminate racial discrimination in the democratic process, and to enforce federal laws and constitutional provisions securing voting rights. Doc. 230 ¶ 3; *see* Tr. 154:12-17, 155:17-21, 174:20-179:16 (Simelton).

4.    The Alabama NAACP works toward its mission of ensuring the political, educational, social, and economic equality of all Alabamians by increasing

voter registration and voter turnout; participating in voter registration and "get-out-the-vote" drives; and raising awareness about the adverse effects of racial discrimination in voting. Tr. 154:12-155: 21, 174:20-179:16, 191:6-11 (Simelton); *see also* Tr. 148:1-5 (Peoples).

5.    The Alabama NAACP is a membership organization and everyone who is a member of a local branch or unit within the State of Alabama is also a member of the Alabama NAACP. Tr. 158:8-159:1 (Simelton). Between 90 and 95 percent of the Alabama NAACP's eligible members are registered to vote. Tr. 160:7-15 (Simelton). Approximately 95 percent of the Alabama NAACP's membership is African American. Tr. 160:24-161:1 (Simelton).

6.    The Alabama NAACP has active branches in Madison County with 350 members, Montgomery County, and Morgan County with 75 members, including members in the cities of Huntsville, Decatur, and Montgomery. Tr. 157:17-158:7, 161:7-162:2, 173:23-174:19 (Simelton). About 95 percent of the Madison County branch's members, and 90 percent of the Morgan County branch's members are Black registered voters. Tr. 161:7-12, 161:25-162:7 (Simelton).

7.    The Alabama NAACP has identified numerous members who are Black registered voters residing in Madison, Montgomery, Decatur, Lawrence, and Limestone Counties, including the current President of the Huntsville/Madison County branch of the Alabama NAACP, Tr. 161:13-17, 174:17-19; a member who

is both on the Alabama NAACP's executive committee and the Vice President of the Huntsville/Madison County Branch, Tr. 161:13-23, 174:17-19; a former President of the Huntsville/Madison County Branch, Tr. 174:81-19; the Political Action Chair of the Huntsville/Madison County Branch, Tr. 161:13-17; the President of the Decatur/Morgan County Branch, Tr. 163:4-15; the president of the metro-Montgomery branch, Tr. 174:1-19; members of the Montgomery Branch, Tr. 174:1-19; PX 2 at 4; a past president of the Lawrence County Branch. Tr. 174:13-19; PX 2 at 4.

8.     Ms. Mary Peoples, a fact witness, is also a Black registered voter and a member of the Huntsville/Madison County branch. Tr. 119:23-24, 121:13-22.

9.     The NAACP has identified at least one member in each part of the state in which districts dilute Black voting strength (that is, "pack" or "crack" Black voters) who could be drawn into a new majority-Black district that could be created in that area, as demonstrated by Mr. Fairfax's illustrative plans. Tr. 275:1-276:9 (Fairfax); Doc. 245-1 at 1.

## 2.     Greater Birmingham Ministries.

10.     Plaintiff Greater Birmingham Ministries ("GBM") is a faith-based 501(c)(3) non-profit organization, whose mission is to serve people, build community, and pursue justice. Tr. 487:22-488:5 (Douglas).

11.    GBM was founded in 1969 in response to the challenges posed by the mid-twentieth century Civil Rights movement, and it describes itself as a multi-faith, multi-racial, non-profit membership organization that provides emergency services to people in need and engages people to build a strong, supportive, engaged community and a more just society for all people. Doc. 230 ¶ 4.

12.    GBM describes itself as dedicated to advancing social justice through political participation across Alabama, and states that it actively opposes state laws, policies, and practices that it believes result in the exclusion of vulnerable groups or individuals from the democratic process. Doc. 230 ¶ 5.

13.    GBM's interfaith work with faith communities is statewide, and it also carries out its systems change work of pursuing justice statewide. Tr. 492:10-14 (Douglas). Its systems-change work includes advocacy and engagement on issues such as criminal justice, environmental justice, education funding, public transportation, and voting rights. Tr. 492:15-20 (Douglas).

14.    GBM states that to accomplish its goals, it regularly communicates with its members and works to register, educate, and increase voter turnout and efficacy, particularly among Black, Latinx, and low-income people and people with disabilities. Doc. 230 ¶ 6.

15.    GBM has both organizational members and individual members. Tr. 488:6-20 (Douglas).

16.     Organizational members in the Huntsville/Decatur and Montgomery areas include the Episcopal Diocese of Alabama, the Christian Methodist Episcopal Church, the African American Methodist Episcopal Church, and the African Methodist Church Zion, the latter three of which have predominantly African American members. Tr. 488:21-489:13 (Douglas). These include congregations such as the St. John AME Church (Huntsville), Grady - Madison AME Church (Madison), Wayman Chapel AME Church (Decatur), and St. John, St. Paul, and St. Peter AME Churches (all in Montgomery). PX 2 at 4. Other congregational members include the Conley Chapel CME, Bethel CME, and Pine Grove CME in Huntsville; New Jones Chapel CME and Garner Memorial CME in Decatur; and Hall Memorial CME in Montgomery. PX 5 at 2. All of these congregations have individual members who are Black registered voters. PX 2 at 4; PX 5 at 2.

17.     The leader of a GBM member church is a Black registered voter who lives in Huntsville. Tr. 489:14-18 (Douglas); *see also* Tr. 161:13-17 (Simelton).

18.     GBM's organizational members participate in the governance of GBM by providing representatives to serve on the board of directors as well as providing financial and volunteer contributions. Tr. 490:1-6 (Douglas).

19.     GBM also has approximately 2,700 individual members, who join GBM by making a financial donation and a commitment to the principles and values

of GBM. Tr. 490:17-491:2 (Douglas). GBM's Board of Directors also has 10 individual member representatives. Tr. 490:14-16 (Douglas).

20.    GBM has individual members who live in the City of Huntsville and Montgomery County who identify as Black and are registered voters. PX 2 at 4. GBM has identified at least one such member who is a Black registered voter and lives in Montgomery County. PX 5 at 2; Tr. 491:3-11 (Douglas).

21.    The Court finds GBM has identified at least one member in each part of the state in which districts dilute Black voting strength who could be drawn into a majority-Black district that could be created in that area. Tr. 275:1-276:9 (Fairfax); Doc. 245-1 at 1.

### 3.    Evan Milligan.

22.    Plaintiff Evan Milligan is Black and a U.S. citizen in Montgomery County, Alabama who is lawfully registered to vote in State Senate District 26. Doc. 230 ¶¶ 7-9.

23.    Under any of Plaintiffs' Illustrative Plans, Mr. Milligan would reside in a majority-Black district, whether new or unpacked.

### B.    Current and Former Defendants: Secretary of State Merrill, Sen. Jim McClendon and Rep. Chris Pringle

24.    Defendant Wes Allen is sued in his official capacity as Alabama Secretary of State. Doc. 230 ¶ 10. As Secretary of State, Defendant Allen is the chief elections official in the State of Alabama. Doc. 230 ¶ 11. He must provide uniform

guidance for election activities in the State and certify the elections of members to the Alabama Legislature and Congress. Ala. Code §§ 17-1-3, 17-12-21. Defendant Allen also has responsibility for certifying the names of primary and general election candidates for the State Legislature and Congress, as well as issuing Certificates of Election following tabulation of vote results. Ala. Code §§ 17-13-5(b), 17-9-3(b), 17-12-21.

25.     Former Defendants Senator Jim McClendon and Representative Chris Pringle were Senate and House Chairs of the Alabama Permanent Legislative Committee on Reapportionment ("the Committee"), respectively, during the 2021 redistricting cycle. Ala. Code § 29-2-51. They were sued in their official capacity as Senate and House Chairs of the Committee. Doc. 230 ¶ 12.

26.     As Senate and House Chairs, Sen. McClendon and Rep. Pringle led the Committee, which was responsible for the preparation and development of redistricting plans for the State following the decennial census and presided over the meetings of the Committee. Doc. 230 ¶ 13.

27.     The Committee was tasked with making a "continuous study of the reapportionment problems in Alabama seeking solutions thereto" and reporting its investigations, findings, and recommendations to the Legislature as necessary for the "preparation and formulation" of redistricting plans for the Senate, House, State

School Board, and congressional districts in the State of Alabama. Ala. Code §§ 29-2-51, 29-2-52. Doc. 230 ¶ 14.

28.    As Senate Chair of the Committee, Senator McClendon had a lead role in carrying out the process of drawing the Alabama State Senate Map in 2021. Doc. 230 ¶ 15.

29.    Senator McClendon delegated to Randy Hinaman responsibility for the actual drawing of the 2021 Alabama State Senate map in accordance with his instructions. Doc. 230 ¶ 16.

## II.    **Factual Background**

### A.    **The 2020 Census, and Alabama's Demographics**

30.    The U.S. Census Bureau conducted a decennial census of the U.S. population in 2020, the results of which were published on August 12, 2021. Doc. 230 ¶ 25.

31.    The decennial census is an enumeration or count of the American population, and it provides a snapshot of the American population as of April 1 in the aught year of each new decade. Tr. 236:12-14, 356:15-16 (Fairfax). As part of the decennial census, the Census Bureau collects, *inter alia*, information about the racial and ethnic identity of each person in the United States. Tr. 234:17-23, 235:19-236:9. The decennial census includes data for the total population and voting age population, but it does not include data on citizenship. Tr. 234:20-21, 237:14-16. In

the redistricting dataset produced in accordance with Public Law 94-171, the Census Bureau publishes this and other demographic information for the entire United States, aggregated at a number of geographic levels, including state, county, census tract, census block group, and individual census block (the smallest unit of census geography). Tr. 237:21-238:4.

32.    The 2020 Decennial Census reports the racial identity of the U.S. population according to one or more of several racial categories: white, Black or African American, American Indian or Native Alaskan, Asian, Hawaiian or Pacific Islander, or Another Race. When completing the census form, an individual can select more than one racial category. Tr. 235:19-236:9 (Fairfax). The population of individuals that select Black Alone and Black in combination with any race can be summed to create a population category known as "Any Part Black." PX 6 ¶ 15 n.10. With respect to ethnicity, the Bureau reports the U.S. population's ethnic identity as either Hispanic or Non-Hispanic. Tr. 235:19-236:9.

33.    In addition to the decennial census, the Census Bureau publishes the American Community Survey (ACS), a rolling survey of the American population. The Census Bureau sends out about three million surveys a year for the ACS. Tr. 236:16-18 (Fairfax). Unlike the limited subject matter of data collected in the decennial census, the scope of the ACS is vast: it includes socioeconomic data on income, education, poverty, housing (values, type, etc.), access to healthcare, and

more. Tr. 237:8-11. The ACS also includes population estimates, and unlike the decennial census, the ACS provides data on citizenship. Tr. 237:14-16. The ACS is published annually in one-year, three-year, and five-year datasets. Tr. 236:19-24. The five-year ACS provides data down to the block group level. Tr. 236:23.

34.    According to the decennial censuses of 2010 and 2020, Alabama's total population grew from 4,779,736 to 5,024,279 persons—an increase of 5.12%—between 2010 and 2020. PX 6 ¶ 22.

35.    The total Black population of Alabama also increased between 2010 and 2020, both in raw numbers and as a proportion of the total population. In 2010, the Black population of Alabama was 1,281,118, which was 26.80% of the state's total population. In 2020, the Black population of Alabama increased to 1,364,736, which was 27.16% of the state's total population. PX 6 ¶ 23.[1]

36.    The total white population of Alabama decreased between the 2010 and 2020 decennial censuses, both in raw numbers and as a proportion of the total population. The white population of Alabama was 3,204,402 in 2010, which was 67.04% of the total population. PX 6 ¶ 23. Alabama's white population decreased to 3,171,351 persons in 2020, which was 63.12% of the total population. PX 6 ¶ 22.

---

[1] This data uses the "Any Part Black" racial category from the U.S. Census Bureau's PL94-171 dataset. *See* PX 6 ¶ 23, tbl.1; *see also id.* at ¶ 22; *Georgia v. Ashcroft*, 539 U.S. 461, 474 (2003) (stating that "we believe it is proper to look at *all* individuals who identify themselves as black" when a "case involves an examination of only one minority group's effective exercise of the electoral franchise.").

37.    Between 2010 and 2020, Alabama's total Hispanic population grew substantially, from 185,602 to 264,047. This reflects a shift from 3.88% of the total population in 2010 to 5.26% of the population in 2020. PX 6 ¶ 23, tbl. 1.

38.    According to the decennial censuses of 2010 and 2020, Alabama's Voting Age Population (VAP) grew from 3,647,277 to 3,917,166 persons—an increase of 7.40%—between 2010 and 2020. PX 6 ¶ 24.

39.    The Black VAP of Alabama increased between 2010 and 2020, both in terms of raw numbers and as a proportion of total VAP. In 2010, the Black VAP of Alabama was 917,500, which was 25.16% of the state's total VAP. PX 6 ¶ 25. In 2020, the Black VAP of Alabama increased to 1,014,372, which was 25.90% of the state's total VAP. PX 6 ¶ 25.

40.    Although the white VAP of Alabama increased slightly between 2010 and 2020, it decreased a proportion of total VAP. In 2010, the white VAP of Alabama was 2,530,761 in 2010, which was 69.39% of the total VAP. PX 6 ¶ 25. In 2020, the white VAP of Alabama was 2,564,544 persons, which was 65.47% of the total VAP. PX 6 ¶ 25.

41.    Between 2010 and 2020, Alabama's Hispanic VAP increased from 118,336 to 166,856. This reflects a shift from 3.24% of the total VAP in 2010 to 4.26% of the VAP in 2020. PX 6 at tbl. 2.

42.    According to the 2022 1-Year ACS, the Citizen Voting Age Population (CVAP) for the state of Alabama was 3,862,490. Black CVAP (or BCVAP) for the state of Alabama was 989,181, or 25.6% of total CVAP. White CVAP was 2,615,344, or 67.7% of total CVAP. Due to substantial growth in the total Hispanic population, Hispanic CVAP represented 98,557, or 2.6% of total CVAP. PX 6 ¶ 26, tbl. 3.

43.    Madison, Morgan, and Limestone counties all saw their total populations and VAP grow between the 2010 and 2020 censuses. PX 6 ¶¶ 27, 29, 32, 34, 37, 39. In each of these counties, the Black population and Black VAP grew between 2010 and 2020, both in raw numbers and in its proportional share of the population. PX 6 ¶¶ 28, 30, 33, 35, 38, 40. Meanwhile, in each of these counties, the white population and white VAP decreased as a percentage of the total population between 2010 and 2020. PX 6 ¶¶ 28, 30, 33, 35, 38, 40. In each of these counties, the Latino population and VAP increased significantly. PX 6 ¶¶ 28, 30, 33, 35, 38, 40. However, according to 2021 5-year ACS data, in each of these counties, Latino CVAP is a substantially lower share of the population than is Latino VAP. PX 6 ¶¶ 31, 36, 41 & tbl.11.

44.    In Montgomery County, the total population decreased slightly but VAP increased between the 2010 and 2020 censuses. PX 6 ¶¶ 42, 44. Between 2010

and 2020 in Montgomery County, the Black population and Black VAP increased, while the white population and white VAP decreased. PX 6 ¶¶ 43, 45.

45.    In Crenshaw County, total population and VAP decreased slightly between the 2010 and 2020 censuses. PX 6 ¶¶ 47, 49. Between 2010 and 2020 in Crenshaw County, the Black population and Black VAP increased, while the white population and white VAP decreased. PX 6 ¶¶ 48, 50.

**B.    Joint Legislative Committee's Stated Redistricting Criteria**

46.    On May 5, 2021, the Permanent Legislative Committee on Reapportionment (the "Committee")—the Committee responsible for preparing and developing redistricting plans for the State following each decennial census— enacted guidelines for the 2021 redistricting cycle. Doc. 230 ¶ 17.

47.    The guidelines state that they are based on the requirements of the U.S. Constitution, Alabama Constitution, and policies that "are embedded in the political values, traditions, customs, and usages of the State of Alabama." Doc. 230 ¶ 18.

48.    The criteria for redistricting set by the Committee begin with requirements under the U.S. Constitution and federal law, including compliance with the one-person, one-vote requirement. The Committee instructed that state legislative districts "shall be drawn to achieve substantial equality of population among the districts and shall not exceed an overall population deviation range of ±5%," and must comply with Section 2 of the Voting Rights Act, meaning that

districts have "neither the purpose nor the effect of diluting minority voting strength." Doc. 230 ¶ 19.

49.   The Committee stated that districts cannot be drawn "in a manner that subordinates race-neutral districting criteria to considerations of race, color, or membership in a language minority group, except that race, color, or membership in a language-minority group may predominate over race-neutral districting criteria to comply with Section 2 of the Voting Rights Act, provided there is a strong basis in evidence in support of such a race-based choice." Doc. 230 ¶ 20.

50.   Each district must also be "contiguous and reasonably compact," under the criteria. Doc. 230 ¶ 21.

51.   The criteria next require compliance with the Alabama Constitution, including that:

   a.  Districts are "drawn to reflect the democratic will of all the people concerning how their governments should be restructured";

   b.  Districts are drawn based on total population except that voting-age population may be considered to comply with Section 2 of the Voting Rights Act and other laws;

   c.  The number of Senate districts is set at 35 and House districts at 105;

   d.  All districts must be single-member districts; and

   e.  All districts must be contiguous with each other.

Doc. 230 ¶ 22.

52.    The criteria require compliance with redistricting policies that are "embedded in the political values, traditions, customs, and usages of the State of Alabama . . . to the extent that they do not violate or subordinate the foregoing policies prescribed by the Constitution and laws of the United States and of the State of Alabama," including:

    a.  Avoiding contests between incumbents where possible;

    b.  Permitting contiguity by water but not point-to-point or long-lasso contiguity;

    c.  Respect for "communities of interest, neighborhoods, and political subdivisions to the extent practicable," with a community of interest "defined as an area with recognized similarities of interests, including but not limited to ethnic, racial, economic, tribal, social, geographic, or historical identities."

    d.  Minimization of the number of counties in each district; and

    e.  Preservation of the cores of existing districts.

Doc. 230 ¶ 23.

53.    The Committee's Redistricting Guidelines state that "In establishing legislative districts, the Reapportionment Committee shall give due consideration to all the criteria herein. However, priority is to be given to the compelling State

interests requiring equality of population among districts and compliance with the Voting Rights Act of 1965, as amended, should the requirements of those criteria conflict with any other criteria." Doc. 230 ¶ 24.

**C.    The 2021 Legislative Process for Redistricting**

54.    On August 12, 2021, the U.S. Census Bureau released the results of the 2020 Decennial Census. Doc. 230 ¶ 25.

55.    After the Census data were released, Senator McClendon worked with Senators to develop new Senate districts. Doc. 230 ¶ 26.

56.    The Permanent Legislative Committee on Reapportionment (the Committee) consists of members of both the State House and Senate, with the Speaker of the House appointing one House member from each of the seven Congressional districts and four additional House members, and the Lieutenant Governor appointing one Senator from each of the seven Congressional districts and four additional Senators. See Ala. Code § 29-2-51(c). Doc. 230 ¶ 27.

57.    The 2021 Committee included twenty-one members—fifteen white Republican members and six Black Democratic members. Doc. 230 ¶ 28.

58.    The first public meeting was held on May 5, 2021, when the Committee adopted redistricting guidelines. Doc. 230 ¶ 29.

59.    All Committee meetings were required to be open to the public. The Committee guidelines provide that "All interested persons are encouraged to appear

before the Reapportionment Committee and to give their comments and input regarding legislative redistricting. Reasonable opportunity will be given to such persons, consistent with the criteria herein established, to present plans or amendments redistricting plans to the Reapportionment Committee, if desired, unless such plans or amendments fail to meet the minimal criteria herein established." Doc. 230 ¶ 30.

60.    Between September 1 and 16, the Committee held twenty-eight public hearings across the State. Doc. 230 ¶ 31. No proposed maps had been released to the public at this point. Doc. 230 ¶ 36.

61.    Every hearing, except one that was held at 6:00 pm at the Statehouse in Montgomery, was held between the hours of 9:00 am and 5:00 pm. Remote access was provided for the hearings. Doc. 230 ¶ 32.

62.    Governor Kay Ivey called the Special Legislative Session on redistricting in Alabama to begin on October 28, 2021. Doc. 230 ¶ 33.

63.    On October 26, 2021, the Committee held its third public meeting of this redistricting cycle, which commenced in 2020. Doc. 230 ¶ 34.

64.    A member of the Committee, Rep. Chris England, a Black legislator, published the proposed maps on Twitter on October 25, 2021. Doc. 230 ¶ 35.

65.    The Committee released the maps to the public on the day of the October 26, 2021, Committee meeting. Doc. 230 ¶ 36.

66.    The Committee House Chair, the Committee Senate Chair, their staff, and/or mapdrawer Randolf Hinaman met with each incumbent legislator or their staff, either in person or online, unless a legislator declined to meet. Doc. 230 ¶ 37.

67.    During the map-drawing process, individual legislators generally viewed and provided feedback on draft maps of their districts and adjoining districts, not maps of the entire state. Doc. 230 ¶ 38.

68.    When drawing the map, Mr. Hinaman used the 2017 Senate map as a starting point. Doc. 235-2 at 30:11-16. Beyond adjusting for population deviation, uniting counties and precincts, and general acknowledgment of the Committee's redistricting guidelines, Mr. Hinaman did not consider other factors when drawing the Senate districts. Doc. 235-2 at 57:5-15; 59:17-60:4.

69.    One of the Redistricting Criteria followed by Mr. Hinaman was to maintain the existing 2017 Senate districts as much as possible in the new 2021 map. Doc. 235-1 at 22:19-25; Doc. 235-2 at 33:11-16. In fact, Senator McClendon considered changing the 2017 lines too much as problematic. Doc. 235-1 at 34:21-23.

70.    Other than showing the completed maps to their legal counsel, neither Senator McClendon nor Mr. Hinaman took steps to determine whether the map complied with the Voting Rights Act. Doc. 235-1 at 38:9-22; Doc. 235-2 at 53:19-54:16. Mr. Hinaman did not consider racial demographics at all while drawing the

Senate districts, Doc. 235-1 at 28:9-15; 28:22-29:1; 29:14-17; 60:2-5, Doc. 235-2 at 46:14-21, and he only reviewed the racial demographics of his districts immediately before he submitted the map to the Redistricting Committee, Doc. 235-2 at 46:22-47:8. When he examined the racial demographics of the districts, Mr. Hinaman only looked at that data to ensure already existing majority-Black districts continued to retain their majority-Black status. Doc. 235-2 at 48:19-49:23. He did not make any changes to the map after viewing the racial demographic data. Doc. 235-2 at 51:16-21.

71.    Mr. Hinaman was not given any instructions to keep communities of interest together, Doc. 235-2 at 75:8-10, and he, in fact, did not try to keep any together. Doc. 235-2 at 75:11-14. For example, in Huntsville, Mr. Hinaman was aware that there is a concentrated Black community in Huntsville that he considered to constitute a community of interest. Doc. 235-2 at 72:10-73:5. Nevertheless, he stated "he wasn't focused on" the fact that his map split that community into three separate districts. Doc. 235-2 at 73:6-13. He never considered keeping what he believed to be a community of interest together. Doc. 235-2 at 73:16-18.

72.    Similarly, Senator McClendon could not recall specific discussions of communities of interest in any meeting he attended with Mr. Hinaman and other Senators. Doc. 235-1 at 85:19-24. When asked how he defined communities of interest, Senator McClendon named geographic boundaries such as county lines or

schools districts but could not be more specific. Doc. 235-1 at 48:19-49:8. Senator McClendon did not consider several aspects of the communities of interest definition provided in the Guidelines, including ethnic or racial identities, tribal identities, social identities, or historical identities. Doc. 235-1 at 49:9-50:3.

73.   Other than the Shoals community in Northwest Alabama, Senator McClendon could not recall any specific communities of interest that he considered. Doc. 235-1 at 49:9-50:12.

74.   Sen. McClendon explained that he understood that racial-polarization analysis was only done by Dr. M.V. "Trey" Hood III for state legislative districts where "it looked like there might possibly be a racial issue." Doc. 230 ¶ 39.

75.   No racial polarization analysis for any district was conducted by Dr. Hood and provided to Committee members before or during the October 26, 2021, meeting. Doc. 230 ¶ 40.

76.   Committee members received demographic and population data for each district. Doc. 230 ¶ 41.

77.   Neither the Committee's legal counsel, Mr. Dorman Walker, nor Dr. Hood, who conducted racial-polarization analysis for the state legislative districts, attended the Committee meeting on October 26, 2021. Doc. 230 ¶ 42.

78.   Rep. Laura Hall, a Black Committee member, moved to postpone any vote on the proposed maps until the Committee members and the public had more

time to review the maps and accompanying racial-polarization analysis. Doc. 230 ¶ 43.

79.    The House and Senate Maps drawn by Mr. Hinaman and presented by the House and Senate Chairs passed out of Committee. Doc. 230 ¶ 44.

80.    The Black member of the Committee voted against each of the House and Senate Maps drawn by Randolf Hinaman and presented by the House and Senate Chairs. Doc. 230 ¶ 45.

81.    The Special Legislative Session for redistricting began two days later, on October 28, 2021. Doc. 230 ¶ 46.

82.    On November 1, 2021, the full Senate considered the State Senate map and passed the map along racial and party lines. Doc. 230 ¶ 47.

83.    Governor Ivey signed the State Senate map into law on November 4, 2021. Doc. 230 ¶ 48.

### D.    Characteristics of the Enacted 2021 Plan

84.    The Enacted Plan splits 100 census places (i.e., cities, town, and census-designated places). Doc. 230 ¶ 49.

85.    The Enacted Plan splits thirteen voting districts (VTDs). Doc. 230 ¶ 50.

86.    The Enacted Plan splits nineteen counties. Doc. 230 ¶ 51.

87.    The Enacted Plan features four districts that each split three counties. PX 59 at 166-167.

88.    The mean Reock compactness score for districts in the Enacted Plan is 0.41. Doc. 230 ¶ 52.

89.    The mean Polsby-Popper compactness score for districts in the Enacted Plan is 0.26. Doc. 230 ¶ 53.

90.    The mean Convex Hull compactness score for districts in the Enacted Plan is 0.74. Doc. 230 ¶ 54.

91.    The lowest Reock compactness score for a single district in the Enacted Plan is 0.19, for SD12. Doc. 230 ¶ 55.

92.    The lowest Polsby-Popper compactness score for a single district in the Enacted Plan is 0.12, for SD11 and SD22. Doc. 230 ¶ 56.

93.    The lowest Convex Hull compactness score for a single district in the Enacted Plan is 0.54, for SD22. Doc. 230 ¶ 57.

94.    The Reock compactness score for SD7 in the Enacted Plan is 0.26. Doc. 230 ¶ 58.

95.    The Polsby-Popper compactness score for SD7 in the Enacted Plan is 0.14. Doc. 230 ¶ 59.

96.    The Convex Hull compactness score for SD7 in the Enacted Plan is 0.59. Doc. 230 ¶ 60.

97.    In the Enacted Plan, Alabama A&M University is contained within SD8. Doc. 230 ¶ 61.

98.    The Reock compactness score for SD25 in the Enacted Plan is 0.24. Doc. 230 ¶ 62.

99.    The Polsby-Popper compactness score for SD25 in the Enacted Plan is 0.14. Doc. 230 ¶ 63.

100.    The Convex Hull compactness score for SD25 in the Enacted Plan is 0.65. Doc. 230 ¶ 64.

101.    In the Enacted Plan, SD25 spans three counties: Crenshaw, Montgomery, and Elmore. Doc. 230 ¶ 65.

102.    In the Enacted Plan, the town of Pike Road is split between SD25 and SD26. Doc. 230 ¶ 66.

## III.    *Gingles* Precondition 1: Viability of Majority-Minority District

103.    Plaintiffs offered three illustrative plans developed by Mr. Anthony Fairfax: Illustrative Plans 1, 2A, and 3. Tr. 233:12-16.[2] Each plan demonstrates the potential to create two additional reasonably configured majority-Black state senate

---

[2] Plan 2A "was developed to address a comment by Dr. Trende in his report," namely that Mr. Fairfax had "originally used the 2021 five-year ACS [CVAP] estimate . . . [a]nd when [Dr. Trende] imported the data for the 2022 five-year ACS data estimate, he found that SD7 had dropped below 50 percent in CVAP." Accordingly, Mr. Fairfax "created a new plan" that "meets that sufficiently large component of Gingles" using 2022 5-year ACS data. Tr. 264:8-13; *see also* PX 8 ¶ 26.

Plan 3 "was also a response to a comment from Dr. Trende" regarding Mr. Fairfax's "use of CVAP" for determining numerosity. According, Mr. Fairfax presented Plan 3, in which SD7 "meets that Gingles 1 numerosity requirement for BVAP as well as BCVAP." Tr. 270:17-20. *See also* PX 8 ¶ 59. An early iteration of Plan 3 "was created when [Mr. Fairfax] was looking at a variety of different options" early on, using "the enacted plan was the starting point." Tr. 270:22-271:3.

districts beyond those in the Enacted Plan—for a total of ten majority-Black districts. *See* Tr. 231:6-8, 276:15-18 (Fairfax); PX 6 ¶ 53; PX 8 ¶¶ 27, 60; *see* PX 10 ¶ 9.

## A.    *Gingles* I Experts

104.   The Court admitted Plaintiffs' expert Anthony Fairfax as an expert in map drawing, demographics, and the use of census data for redistricting. Tr. 230:16-21.

105.   Mr. Fairfax has extensive redistricting experience. *See* PX 7. He has worked on redistricting issues through the last four decennial redistricting cycles, and in the course of his decades of experience, he has developed approximately one thousand redistricting plans. Mr. Fairfax has drawn plans for jurisdictions ranging from small cities and towns to large congressional district state plans. Tr. 226:17-228:8; PX 6 ¶ 3. About half of his redistricting work has involved state legislative plans. Tr. 228:10-12.

106.   Mr. Fairfax has testified as an expert witness in litigation on numerous occasions, about half of which has involved Section 2 of the Voting Rights Act, Tr. 229:1-8; PX 6 ¶ 4-12; *see* PX 7, including in redistricting litigation in the state of Alabama. Tr. 226:13-25; PX 6 ¶¶ 4, 8. He has been qualified as an expert in all cases in which he has testified, and courts have responded favorably to his expert testimony. Tr. 229:13-25; PX 6 ¶ 8.

107.   Since 1991, Mr. Fairfax has had extensive experience working with census demographic data for redistricting purposes. Tr. 230:1-4.

108.   The Court finds that Mr. Fairfax is eminently qualified and highly credible, and that he supported his opinions with specific and detailed testimony about how he balanced traditional redistricting criteria to draw the Illustrative Plans and demonstrate that the best estimates of voting-eligible Black residents in the Montgomery and Huntsville-Decatur regions are sufficiently large and geographically compact to constitute two additional majority-Black state senate districts.

109.   Plaintiffs' expert Dr. Kassra Oskooii is an associate professor with tenure at the University of Delaware in the Department of Political Science and International Relations. Tr. 348:19-22. He has been a University of Delaware professor since 2016. PX 15 at 1. He has written at least twenty-two articles which have gone through the double-blind peer-reviewed process in which an editorial board determined the article was suitable for publication in a journal. PX 15 at 1-3.

110.   Dr. Oskooii's research expertise is in American politics and methodology, with subfield areas of expertise in political behavior, public opinion, political psychology, and race and ethnic politics. His work is highly quantitative in nature. Tr. 350:3-7. He employs statistical analysis in his research by implementing and analyzing surveys and using precinct-level election data and demographic data

including the U.S. Census's American Community Survey and Decennial Census. Tr. 350:24-351:5.

111.  Dr. Oskooii teaches statistical analysis and redistricting courses including instruction on traditional districting principles, how to collect data, and how to analyze jurisdictions using American Community Survey and Decennial Census data. Tr. 351:13-352:4.

112.  Dr. Oskooii has been retained as an expert witness in voting rights cases about a dozen times. Tr. 352:5-9. His testimony has never been excluded. Tr. 353:6-11. In the three cases Dr. Oskooii appeared in court and testified, the courts credited his opinion, including adopting a remedial plan he submitted for the Washington State Legislature. Tr. 352:17-24, 353:12-23.

113.  The Court admitted, without objection, Dr. Oskooii as an expert in map drawings, statistical analysis, and U.S. Census data including the American Community Survey and the Decennial Census. Tr. 353:24-354:5.

114.  The Court finds that Dr. Oskooii is eminently qualified and highly credible.

115.  The Secretary's expert Dr. Sean Trende is a senior elections analyst at Real Clear Politics and a non-tenure track lecturer at Ohio State University. Tr. 934:5-7, Tr. 1040:23-25. He received his Ph.D. in 2023. Tr. 1040:15-16. He has written only one article which has gone through the double-blind peer-reviewed

process in which an editorial board determined the article was suitable for publication in a journal. Tr. 1040:17-22.

116.    Dr. Trende has been retained as a testifying expert at least thirty-two times, including numerous redistricting cases. DX 7 at 32-34. Courts have criticized his superficial analysis, Tr. 1073:2-14; flawed analysis, Tr. 1068:5-12; misleading maps, Tr. 1055:16-1056:10; and self-serving and unreliable testimony. Tr. 1056:14-22.

117.    The Court admitted, without objection, Dr. Trende as an expert in redistricting, political methodology, and survey methods. Tr. 940:23-941:3. Although the Court finds Dr. Trende knowledgeable about the topics on which he testified, it found much of his testimony to be contradictory, outcome-oriented, and based on unreliable methods and beset with errors. As such, it gives little weight to Dr. Trende's testimony.

### B.    Numerosity

118.    Illustrative Plans 1, 2A, and 3 include two additional districts with eligible Black voting-age majorities, one in the Huntsville-Decatur region and one in the Montgomery region.

### 1.    The Use of CVAP is Appropriate to Determine Numerosity in the Huntsville/Decatur Area.

119.    The Court credits Mr. Fairfax's assessment that SD7 in Plans 1 and 2A satisfy *Gingles* 1's numerosity requirement. Tr. 252:8-12, 266:2-4.

*a. CVAP is an appropriate measure of a minority community's ability to constitute an electoral majority, particularly where there is a significant difference in citizenship rates.*

120.    Mr. Fairfax determined that Citizen Voting-Age Population ("CVAP") data provided a more accurate reflection of numerosity for Gingles 1 purposes in the Huntsville-Decatur region, given the high "number of noncitizens in that area." Tr. 252:15-18; see PX 6 ¶ 74; *id.* ¶ 15. In particular, there are "extreme high noncitizen percentages" among Latino and Asian populations in the area around Huntsville and Decatur, compared to the "very, very small percentage of noncitizens for [the] black [population]." Tr. 253:22, 254:2-3; *see also* Tr. 254:17-21 ("[C]onsidering the low percentage of black noncitizens compared to the relatively high percentage of non-black noncitizens, specifically the Latino and Asian population, the CVAP data is the more appropriate dataset to use when it comes to the sufficiently large component of Gingles 1.").

121.    Dr. Oskooii testified that where there are racial and ethnic disparities in citizenship rates, CVAP is a more accurate indicator of electoral power than Voting-Age Population ("VAP") data. Tr. 359:2-14. He testified that using VAP data causes an underestimation of the share of eligible voters for groups that have significantly higher citizenship rates, particularly if there is another group in the jurisdiction that has a substantially lower citizenship rate. Tr. 357:4-11.

122.    Dr. Trende, in his previous work as a special master drawing Virginia's Congressional and state legislative districts, co-authored a memo to the Supreme Court of Virginia that twice expressed the same point: that the presence of non-citizen Latinos and Asian Americans in a district can raise the Black CVAP share above the Black VAP share, making Black CVAP a useful metric for assessing such a district's actual electorate. Tr. 1042:8-1043:20.

123.    The State of Alabama stated in an amicus brief before the U.S. Supreme Court in 2019 in the census citizenship case, that, in litigation under Section 2 of the Voting Rights Act, "the relevant numbers must include citizenship" since "only eligible voters affect a group's opportunity to elect candidates." Br. of Seventeen States as Amici Curiae in Supp. of Petitioners, *Dep't of Commerce v. New York*, 588 U.S. 752 (2019) (No. 18-966, 2019 WL 1112684); *see* PX 4 at 2-3.

124.    In the Huntsville-Decatur region, there is a significant difference in citizenship rates by race and ethnicity. Mr. Fairfax testified that he "didn't just start out using [CVAP]." Tr. 285:6. Rather, once he had developed a "derivation of Plan 3, which had BVAP and BVCAP above 50[%]" and a version of what became Plan 1, he "did research" and "looked at that area," ultimately "determin[ing] that that area [around Huntsville and Decatur] had a significantly high number of non-citizens for the state" and then "decide[d] whether the component, the majority-minority status component should be CVAP." Tr. 284:16-20, 285:6-11.

125.   In Madison County, only 1.2% of the Black VAP are noncitizens. Tr. 253:15-23; PX 60 at 5. The non-citizenship rate of the non-Black VAP in Madison County is 3.74, which is more than three times higher than the non-citizen rate for the Black VAP. Tr. 253:15-23; *see* PX 60 at 5. Mr. Fairfax noted "that the Latino population and Asian Population [in Madison County] have extreme high noncitizen percentages at 32 and 34 percent" respectively. Tr. 253:15-23; *see* PX 60 at 5 (32.71% non-citizenship rate for Latino VAP and 34.88% non-citizenship rate for Asian VAP).

126.   In Morgan County, Black VAP has only a "very, very small percentage of noncitizens," at .09%. Tr. 254:1-5; *see* PX 60 at 6. Meanwhile, the "non-black [noncitizen VAP] is 5 percent." Tr. 254:1-5; *see* PX 60 at 6 (5.04% non-citizenship rate for non-Black VAP). "[O]nce again, you have the Latino [voting-age] population at 51 percent [noncitizens], high. And the Asian [voting-age] population at 29 percent [noncitizens]." Tr. 254:1-5; *see* PX 60 at 6 (51.64% non-citizenship rate for Latino VAP and 29.61% non-citizenship rate for Asian VAP).

127.   In Limestone County, the Black VAP has "virtually[] no noncitizens." Tr. 254:8-12; see PX 60 at 7 (0% non-citizenship rate for BVAP). The non-citizenship rate of the non-Black population is 2.34 percent, with non-citizenship rates of the Latino and Asian VAP at 26.49 and 33.07, respectively. Tr. 254:8-12; *see* PX 60 at 7.

128. Within Mr. Fairfax's illustrative SD7, the disparities in citizenship rates appear even more stark. For example, in Illustrative Plan 1, the citizenship rate of SD7's Black VAP is approximately 99.96%, whereas the non-Black VAP citizenship rate is approximately 87.44% (in large part due to a substantial Hispanic population with a VAP citizenship rate of about 40.77%). PX 60 at 6, 10.

129. Crucially, these groups with high non-citizen VAP percentages are significant in terms of population. Dr. Oskooii testified that 10.1% of the voting-age population in Plan 1's illustrative SD7 is Hispanic, and there are vastly different citizenship rates between Hispanic Americans and white and Black Americans. Tr. 358:12-359:1, 359:25-360:11.

130. As Mr. Fairfax noted, the city of Huntsville has the largest population of noncitizens in the state of Alabama with 6,517 persons (or 3.76% of the city) while the city of Decatur has the sixth largest with 2,874 persons (6.56% of the city). Tr. 253:1-4; PX 6 ¶ 78; PX 60 at 9.

131. Morgan and Madison counties, which make up most of SD7, have significant noncitizen populations. Madison County has the second largest population of noncitizens VAP in Alabama with 9,591 persons (3.13% of the county) while Morgan County has the ninth largest with 4,205 persons and one of the highest percentages at 4.43% of the county. PX 6 ¶ 75; Tr. 253:7-10.

132.    Dr. Trende did not rebut Mr. Fairfax's and Dr. Oskooii's assessments that there were significant racial and ethnic citizenship rate disparities in the Huntsville-Decatur region. Dr. Trende did not analyze citizenship rates in the Huntsville-Decatur region and has no opinion about citizenship rate disparities between Hispanic Americans and white and Black Americans.[3] Tr. 1062:12-19.

133.    CVAP data is available in the ACS but not the Decennial Census. Tr. 356:9-12, 360:24-361:2, 1041:18-24.

134.    The Decennial Census is an enumeration of the entire U.S. population conducted every ten years by the U.S. Census Bureau.[4] Tr. 361:3-6. The ACS is a monthly survey conducted by the U.S. Census Bureau and released on a yearly basis. Tr. 360:14-20. The ACS also aggregates five one-year estimates, which it releases as five-year estimates. *Id.* The 5-year estimates' larger sample size allows the ACS to provide CVAP estimates by race and ethnicity all the way down to the census block-group level. Tr. 362:15-21.

135.    ACS data is reliable. *See, e.g.*, Tr. 355:19-20. Mr. Fairfax testified that ACS data is "the best data that's out there"— "it's widely used" by "researchers"

---

[3] Mr. Fairfax testified that he "could have used the same research and analysis for Montgomery," but he "didn't have to," given that his preferred district configuration met the numerosity requirement for both majority BVAP and BCVAP. Tr. 289:9-20.

[4] Using Decennial Census data is preferred in some circumstances. For example, Dr. Oskooii testified that the Decennial Census's enumeration should be used to determine total population for population parity purposes (as Mr. Fairfax did). Tr. 361:9-15.

and "[i]t's also . . . a primary source in litigation. . . . [I]t's the standard to use." Tr. 255:1-7. Dr. Oskooii testified that the ACS samples approximately 3.5 million households and housing quarters annually and has an incredibly high response rate for a survey at around 90%. Tr. 361:17-362:8. Dr. Oskooii contrasted the ACS's response rate with public opinion polls that have response rates of approximately 5-10%. *Id.*

136.    The use of the 5-Year ACS CVAP data is standard and reliable in Section 2 litigation, particularly for areas of sufficient population like Alabama's state senate districts. There is no other nationwide dataset that provides CVAP data estimates down to the neighborhood or group of neighborhoods level. PX 8 ¶¶ 4.a & 8. Courts have found that ACS 5-year estimates are reliable for the purpose of Section 2 analysis, and the DOJ states that ACS CVAP data continues to meet its statistical needs in enforcing Section 2 of the VRA. PX 8 ¶¶ 4.a, 8.

137.    Dr. Trende testified about finding bizarre results at the lowest levels of Census geography when comparing ACS CVAP data and Decennial Census VAP data. However, he conceded that those results were not present at larger geographic levels, like the illustrative districts at issue here. Tr. 1041:7-11; *see also* Tr. 364:1-20, 373:21-374:2. Although sampling error could result in overstating the CVAP in some block groups and understating it in others, when both types of block groups

are aggregated together, the net effect is the cancellation of each of the high and low errors.[5] PX 8 ¶ 12.

138.   The Court finds that Black CVAP is the most accurate measure of the Black community's ability to constitute an electoral majority in the Huntsville-Decatur region.

### b. *Illustrative SD7 Black CVAP estimates.*

139.   The Decennial Census publishes data at the block level, the smallest geographic unit designated by the U.S. Census. The next census level up from a block is a block group—a collection of census blocks—which is the lowest level of census geography at which the American Community Survey publishes data. Tr. 362:15-363:9. Black CVAP data is available down to the block-group level. Tr. 255:8-9. Black VAP data is available down to the block level. Tr. 368:19-22.

140.   When block groups are split by district lines, certain blocks of a block group are in one district and the other blocks within that block group are in another district. Tr. 365:6-10. To estimate BCVAP for an illustrative district, the block-group BCVAP has to be proportioned to the blocks within the district. Tr. 365:4-18, 367:21-368:12.

---

[5] Block groups with high and low CVAP estimates are randomly dispersed across the state and across individual districts. PX 8 ¶ 12. For example, when reviewing the 2022 5-Year ACS's state-level total CVAP, the estimate is 3,824,040 persons with a margin of error of +/- 3,037 persons or +/- 0.08%. When the 2022 5-Year CVAP "block group level" estimates are aggregated to the state level, the sum of the total CVAP is 3,824,110 persons with calculated margin of error of +/- 0.54%. The difference is only 70 persons. PX 8 ¶¶ 14-15.

141.  The most precise method to estimate how much BCVAP should be allocated to each block within a split block group is to determine what percentage of that block group's BVAP is contained in that block. Tr. 365:2-18. After BCVAP is allocated to all blocks within the district boundaries, adding up the BCVAP in all blocks will produce the total BCVAP estimate for the district. Tr. 368:13-18; *see also* Tr. 255:12-17. This process is known as "disaggregation," and reflects the standard in the field when drawing districting maps. Tr. 255:20-21.

142.  The Redistricting Data Hub[6] uses this method to disaggregate Black CVAP to Black VAP, and Dr. Oskooii used the Redistricting Data Hub data for his illustrative SD7 Black CVAP estimate. Tr. 365:19-23, 366:11-17; PX 208.

143.  Dr. Oskooii estimated Plan 1's illustrative SD7 BCVAP to be 50.11% using 2021 ACS 5-year estimates. Tr. 376:4-6. Dr. Trende agrees that the Redistricting Data Hub is a reliable source of redistricting data and is not aware of any errors in the way the Redistricting Data Hub carries out its methodology to disaggregate CVAP data down to the block level. Tr. 1060:10-22.

144.  Mr. Fairfax used Maptitude for Redistricting—a software that is well known and widely used without issue in many states—to calculate CVAP. PX 8 ¶ 16. Maptitude includes a function for disaggregation, which allowed Mr. Fairfax to

---

[6] The Redistricting Data Hub hosts election datasets and demographic datasets such as the ACS. It is used by practitioners and academics. Dave's Redistricting Application—one of the most famous redistricting applications—relies on the Redistricting Data Hub's BCVAP disaggregation data for its underlying CVAP data in mapdrawing. Tr. 365:24-366:8.

accurately calculate his illustrative SD7 Black CVAP estimate. Tr. 255:12-17; *see* PX 8 ¶ 16; PX 8 ¶ 3.c. Mr. Fairfax derived a similar estimate of Plan 1's illustrative SD7 BCVAP using 2021 ACS 5-year estimates: 50.16%. PX 6 ¶ 81; *see* Tr. 252:8-12.

145.    Dr. Trende has no reason to question the accuracy of Maptitude's Black CVAP point estimate calculations or the data Maptitude uses. Tr. 1060:23-1061:7.

146.    Dr. Trende wrote his own code to calculate his BCVAP point estimates and margins of error. Tr. 367:8-13, 1057:10-1058:8. There is a potential for error when coding that could change the results. Tr. 1058:9-11. In fact, Dr. Trende's code contained an error in his margin of error calculations that did change those results. Tr. 1059:3-1060:8. He did not catch this error even after the discovery of margin of error coding errors in a subsequent case spurred him to immediately check his code in this case again. Tr. 1058:15-1059:2.

147.    Dr. Trende employs various methods to calculate BCVAP point estimates. Tr. 1060:11-16; DX 8 at 4. He uses the same methods to calculate BCVAP point estimates for Plan 1's and Plan 2's SD7. Tr. 1061:8-10. Dr. Trende did not employ the most precise Black CVAP estimation method in any of his methods. Tr. 366:24-367:7. His methods rest on unnecessary, untenable assumptions. Tr. 367:14-20.

148.   Dr. Trende's discrepancies with Dr. Oskooii's BCVAP point estimate for Plan 1's SD7—in all of Dr. Trende's methods—could be due to: Dr. Trende's coding errors; Dr. Trende's exclusion of the racial category Black in combination with American Indian or Alaska Native[7]—which Dr. Trende conceded could have lowered his BCVAP point estimate by approximately .5%; and his deletion of data by eliminating CVAP counts in block groups where the Decennial Census shows 0 VAP for that block group. Tr. 374:3-376:3, 1066:21-1067:7.

149.   Additionally, several of Dr. Trende's BCVAP estimation methods are especially imprecise. One method uses an overall citizenship rate, which baselessly assumes that citizenship rates are equally distributed across different racial and ethnic groups, when we know that is not the case. Tr. 372:1-18, 1062:2-1064:4. Using an overall citizenship rate rather than the Black citizenship rate produces a lower Black CVAP estimate because the large Hispanic voting-age population in illustrative SD7 (10.1% of VAP) with a citizenship rate under 50% decreases the overall citizenship rate relative to the Black citizenship rate.[8] Tr. 372:19-373:5.

150.   Dr. Trende employs another method in which he uses the overall citizenship rate and then deletes CVAP counts that exceed total VAP at the block-

---

[7] Dr. Trende testified that he included the racial category Black in combination with American Indian or Alaska Native when he analyzed Plan 2's SD7 in his supplemental report. Tr. 1066:2-20.

[8] 10.1% Hispanic VAP reduces to 4.4% Hispanic CVAP due to the much lower Hispanic citizenship rate. Tr. 379:4-6.

group level. Tr. 1064:5-18. Dr. Oskooii testified that this method, which removes observations from the ACS, deletes data, and is a result of Dr. Trende's problematic use of an overall citizenship rate. Tr. 373:6-20.

151.    Two of Dr. Trende's methods disaggregate BCVAP to total VAP—rather than BVAP—at the block level and therefore make the faulty assumption that all blocks within a block group have the same concentration of BVAP. Tr. 368:23-371:25, 1064:19-1066:1; DX 7 at 20-21.

152.    The Court gives greater weight to Dr. Oskooii's BCVAP point estimate for Plan 1's SD7, and Mr. Fairfax's BCVAP point estimates for Plans 1, 2, 2A, and 3 than to Dr. Trende's BCVAP point estimates.

153.    Even so, Dr. Trende also calculated majority-Black CVAP point estimates for Plan 2's SD7 with all his methods and all datasets except the method employing the overall citizenship rate which deletes block-group CVAP counts using the 2021 5-year ACS data. Tr. 1061:23-1062:1, DX 8 at 4. Dr. Trende calculated majority-Black CVAP point estimates for Plan 1's SD7 using 2020 5-year ACS data with all his methods except the one employing the overall citizenship rate which deletes block-group CVAP counts. DX 7 at 20-21.

154.    The Court finds that Illustrative SD7's and SD25's estimated BCVAP is a majority of total CVAP in Plans 1, 2A, and 3.

> c. *Point estimates are the best approximation of Black CVAP and may be relied upon to determine Black CVAP without applying a confidence interval.*

155.   Dr. Oskooii testified that the Black CVAP point estimate is the best approximation of Black CVAP in a district, Tr. 376:7-10, and Dr. Trende testified that the point estimate is the maximum likelihood estimate of CVAP in a district. Tr. 1048:11-13. Dr. Oskooii testified that it is appropriate to rely on the Black CVAP point estimate to report the share of eligible voters in the illustrative SD7 without including a confidence interval. Tr. 378:15-18. Mr. Fairfax agreed, testifying that margins of error are "not commonly used" in Section 2 litigation, and "[u]sually the map drawer will use the point value and relate that." Tr. 312:4-7; *see id.* 312:16-17. Based on the Black CVAP point estimate and other data known about illustrative SD7—Black VAP data from the Decennial Census, and the citizenship rates of Black, white, and Hispanic voting-age persons[9] in the district—Dr. Oskooii concluded that it is more probable than not that the illustrative SD7 is a BCVAP-majority district. Tr. 378:19-379:10.

---

[9] Dr. Trende testified he had no opinion about whether the citizenship rate for Black people and people with Hispanic ancestry in the Huntsville region are similar. Tr. 1062:16-19. At his deposition, Dr. Trende testified that if the Black citizenship rate were significantly higher than the overall citizenship rate in the Huntsville region, the BCVAP point estimate would be at least somewhat higher than using this method. Tr. 1063:19-1064:4; *see supra* ¶¶ 124-132. Dr. Trende's disregard of reliable ACS data showing racial and ethnic citizenship rate disparities unjustifiably depresses the Black citizenship rate, and artificially lowers his BCVAP estimates.

156.    Similarly, Mr. Fairfax noted that "four different methods" of assessing the Black eligible voter population—including methods relied upon by Dr. Trende and supplemental analysis of voter registration data—indicate that SD7 is a majority Black district, which makes him "very confident" in the point estimates. Tr. 346:3-12.

157.    A confidence interval is created by taking the margin of error of a survey and adding and subtracting the margin of error by the point estimate to get the confidence interval range. Tr. 376:18-21.

158.    Dr. Oskooii testified that the point estimate is constant, while confidence intervals change depending on the level of confidence sought. Tr. 377:7-12. Dr. Trende agreed that a confidence interval of less than the 90% and 95% he estimated would be narrower and tighter around the point estimate. Tr. 1049:8-1050:3.

159.    Drs. Oskooii and Trende and Mr. Fairfax agree that CVAP margins of error cannot be calculated accurately for the illustrative SD7 and other districts which split block groups.[10] Tr. 312:4-7, 377:13-22, 380:15-22, 414:15-415:5, 1056:23-1057:9; PX 8 at 17. Dr. Trende attempted to calculate a margin of error for

---

[10] Splitting block groups while mapdrawing is very common. Block groups do not typically correspond to precinct boundaries, so when a mapdrawer abides by traditional redistricting principles in trying to keep precincts whole as much as possible, the district will split block groups. Tr. 380:13-18; see PX 8 ¶ 16 ("state legislative districts routinely split block groups on the edge of the districts").

block groups wholly or partially contained within illustrative SD7, which is a larger area than the illustrative SD7. Tr. 377:23-378:5, 1057:2-4. Dr. Oskooii testified that Dr. Trende computed a margin of error for a district that Mr. Fairfax did not draw. Tr. 377:23-378:5. We do not know the true margin of error for the illustrative SD7 and cannot assume that including block groups not fully contained within the district boundaries necessarily decreases the margin of error. Tr. 378:6-14.

160.    Additionally, Dr. Trende's repeated errors in calculating the margin of error suggest the margin of error is difficult to estimate. Dr. Trende calculated the margin of error incorrectly here and in the *Pierce* case in North Carolina—the only other instance in which he calculated a margin of error. Tr. 1058:15-1060:8. Dr. Trende's error in this case was in his client's favor, as it was in *Pierce*. Tr. 1058:24-1059:2.[11] Despite again checking his code in this case after his coding errors were

---

[11] Dr. Trende was asked whether his error—changing a minus sign in the formula to a plus sign—would inflate his margin of error calculation, and he testified that it would not. Tr. 160:2-5. That testimony is incorrect.

This is illustrated by recalculating the margin of error using Dr. Trende's numbers. Using Dr. Trende's equation—$1/y * sqrt(moex^2 + (p^2 * moey^2))$—and his numbers for the 90% confidence interval, derives $1/129045 * sqrt(2934^2 + (.436^2 * 3893^2)) = 0.02626675822$, or 2.6%. Using Dr. Trende's equation—$1/y * sqrt(moex^2 + (p^2 * moey^2))$—and his numbers for the 95% confidence interval, derives $1/129045 * sqrt(3496^2 + (.436^2 * 4638^2)) = 0.03129691284$, or 3.1%. Using the correct ACS formula with the minus sign—$1/y * sqrt(moex^2 - (p^2 * moey^2))$—and his numbers for the 90% confidence interval, derives $1/129045 * sqrt(2934^2 - (.436^2 * 3893^2)) = 0.0185454031$, or 1.9%. Using the correct ACS formula with this minus sign—$1/y * sqrt(moex^2 - (p^2 * moey^2))$—and his numbers for the 95% confidence interval, derives $1/129045 * sqrt(3496^2 - (.436^2 * 4638^2)) = 0.02209938907$, or 2.2%.

discovered in *Pierce*, he still did not discover his coding error here, remaining unaware of the error until Plaintiffs' counsel brought it to his attention at trial. Tr. 1058:18-23.

161.    Relying on CVAP point estimates without applying confidence intervals is the standard practice in the field. Tr. 312:4-7, 382:2-3. Dr. Oskooii testified that he has never applied a confidence interval to a CVAP point estimate nor has he seen any jurisdiction or mapdrawer do so before Dr. Trende in this case.[12] Tr. 379:11-380:1. Similarly, Mr. Fairfax testified that margins of error around point estimates are "not commonly used" in "map drawing or litigation." Tr. 312:4-7. He testified that relying on the lower end of a confidence interval to determine a district's CVAP is "not done. It's not done in redistricting. It's not done in litigation for redistricting, as well. The standard is to use the point value." Tr. 346:13-17.

162.    Dr. Trende did not calculate a margin of error or confidence interval for a CVAP point estimate prior to this case. Tr. 1050:13-22.

---

[12] Dr. Oskooii testified that he uses confidence intervals in his racially polarized voting studies because there is interest in the proportion of votes between candidates and racial ethnic groups, and confidence intervals can serve as a guide as to whether the difference in proportions is statistically significant. But even when analyzing racially polarized voting, one can compare point estimates across candidates and racial groups to draw inferences about whether it is more probable than not that a group is voting for a candidate. Dr. Oskooii distinguished the application of confidence intervals in racially polarized voting studies as opposed to in BCVAP estimates because in the latter there is no margin of error at the block level to compute an accurate confidence interval. Tr. 380:2-381:14.

163.   As a consultant to the Arizona Independent Redistricting Commission, Dr. Trende reported that a 50.4% Hispanic CVAP district was majority Hispanic without applying a confidence interval to his point estimate. Tr. 1052:5-12.

164.   As an expert presenting a proposed remedial districting plan in Washington State, Dr. Trende testified to the Court during the evidentiary hearing that his proposed district with Hispanic CVAP estimates of 50.3% and 51.1% was majority Hispanic, and that it being over 50% HCVAP was a requirement because his counsel requested that he draw a majority-Hispanic district. Tr. 1052:25-1055:14. He did not apply a confidence interval to his Hispanic CVAP point estimate or testify that the district he presented as majority-Hispanic may not truly be majority-Hispanic due to CVAP estimation uncertainty. *Id.*

165.   Dr. Trende's contention that his testimony in this case does not represent a shift in his position on the necessity of reporting confidence intervals is not credible. Tr. 1050:13-1055:14. The Court finds Dr. Trende's assertion that CVAP point estimates cannot be relied upon is motivated, at least in part, by this litigation.

166.   The Black CVAP point estimate is the best approximation of Black CVAP in a district, and it is appropriate to rely on the Black CVAP point estimate to report the share of eligible voters in the illustrative SD7 without including a confidence interval.

167.   Black CVAP is more likely than not a majority of total CVAP in the illustrative SD7 and SD25 in Illustrative Plans 1, 2A, and 3. Black VAP is a majority of total VAP in Plan 3's SD7 and in all plans' SD25.

> d. *CVAP Data Cannot Be Adjusted by Removing the Disenfranchised Population.*

168.   CVAP and VAP data cannot be adjusted by removing people who are ineligible to vote due to a disqualifying felony conviction with any reasonable degree of reliability. Tr. 382:19-383:5.

169.   Statewide estimates of the disenfranchised population cannot be applied at the census block level to remove BCVAP from the illustrative SD7; such an application would require the untenable assumption that every census block in Alabama has the same rate of disenfranchised population, by race and ethnicity. Tr. 383:6-17; PX 8 ¶ 21. Even Dr. Trende, who offered the opinion about accounting for the disenfranchised population within the illustrative SD7, testified that—other than speculating about the intentions of the expert who provided the statewide estimates in her report—he had no reason to believe the statewide percentages were equivalent in the Greater Huntsville area. Tr. 1044:6-15.

170.   Dr. Trende further testified that he had not conducted any analysis to ascertain disqualifying felony conviction figures at the local level. Tr. 1044:16-18. The U.S. Census Bureau does not provide the necessary data to remove the disenfranchised population from CVAP and VAP data. Tr. 383:18-22.

171.  Dr. Trende testified that in his previous redistricting work as an expert and special master, he never removed people with disqualifying felony convictions from the CVAP or VAP count of an illustrative district and he never expressed the opinion that the eligible voting population should be refined by applying statewide data ratios to a district level. Tr. 1045:2-11.

172.  Dr. Oskooii testified that he has never seen an expert adjust a district's CVAP by removing people with disqualifying felony convictions. Tr. 383:23-25.

173.  Mr. Fairfax agrees that the standard for redistricting is to use CVAP point estimates without deducting some estimated disenfranchised population, and he notes that "Dr. Trende does not point to other cases in which courts have required or even suggested this." PX 8 ¶ 21; *see* Tr. 321:8-9.

174.  Mr. Fairfax noted that "both of the new majority BCVAP districts in each plan (SD 7 and SD 25) have over 51% Black registered voters, undermining the notion that statewide felony conviction rates make these illustrative districts unreliable or below 50%+1." PX 8 ¶ 21. Dr. Trende did not analyze voter registration data. Tr. 1045:12-14.

### 2.  The Black Population is Sufficiently Large to Constitute a Majority in Two Additional Districts.

   *a.  Illustrative SD7.*

175.   The Black population in the Huntsville-Decatur region is sufficiently large to constitute a majority in a state senate district, using either VAP or CVAP as the relevant population measure.

176.   In Illustrative Plan 1, Mr. Fairfax concludes that SD7 meets the numerosity requirement with a Black CVAP of 50.16% according to 2021 5-year ACS data. Tr. 252:8-12; PX 6 ¶ 81. Dr. Oskooii likewise concludes that SD7 meets the numerosity requirement with a Black CVAP of 50.11% according to 2021 5-year ACS data. Tr. 376:4-6; PX 14 ¶¶ 37-38.

177.   In Illustrative Plan 2A, Mr. Fairfax concludes that SD7 meets the numerosity requirement with a BCVAP of 50.19% according to 2022 5-year ACS data. Tr. 266:2-4; PX 10 ¶ 7.

178.   The state's own voter registration data confirms that eligible Black residents make up approximately 51.3% of registered voters in Plan 2A's SD7. Tr. 266:8-11; PX 8 ¶ 50. Dr. Trende did not analyze voter registration data by race and ethnicity. Tr. 1045:12-14.

179.   In Illustrative Plan 3, Mr. Fairfax concludes that SD7 in Plan 3 meets the numerosity requirement for both VAP and CVAP. Tr. 272:7-9. Plan 3's SD 7 has a Black CVAP of 50.41% according to 2022 5-year ACS data and a Black VAP of 50.04% according to data from the 2020 Decennial Census. PX 8 ¶ 81.

180.   The state's own voter registration data confirms that eligible Black residents make up more than 52.7% of registered voters in Plan 3's SD7. Tr. 272:13-14; PX 8 ¶ 82.

### b. Illustrative SD25

181.   In all three plans, SD25 meets the numerosity requirement using both VAP and CVAP. Tr. 256:12-13; 266:16-23; 272:22-24.

182.   In Plan 1, SD 25 has a Black VAP of 51.59% using data from the 2020 Decennial Census and a Black CVAP of 55.42% according to 2021 5-year ACS data. PX 6 ¶ 81; PX 59 at 8.

183.   The configuration of SD25 did not change between the various plans. Tr. 266:14-15; 272:19-21. Shifting to the 2022 5-year ACS results in a Black CVAP of 54.84%. PX 8 ¶¶ 49, 81.

### C.   Geographic Compactness

184.   Mr. Fairfax concludes that each of the three Illustrative Plans is made up of districts that are reasonably compact. Tr. 260:11-13; 268:15-16; 274:10. Moreover, all ten majority Black districts are reasonably compact in each of the three Illustrative Plans. Tr. 256:17; 266:24-267:2; 273:3.

185.   Mr. Fairfax measured geographic compactness using the three most widely used compactness measures: Reock, Polsby-Popper, and Minimum Convex Hull. PX 6 ¶¶ 19.d & 84; Tr. 242:10-11. These compactness measures "are the

standard that experts use to determine a compactness for a plan and for a district." Tr. 260:21-21.

### 1.    Plan 1.

186.    Mr. Fairfax analyzed four metrics of plan-wide compactness and concludes that Illustrative Plan 1's districts "are reasonably compact" and generally perform better than those in the Enacted Plan. Tr. 258:20-13; 260:11-13. Dr. Trende does not disagree with Mr. Fairfax's opinion that Illustrative Plan 1 has reasonably geographically compact districts. Tr. 1079:18-21.

187.    First, Mr. Fairfax performed a district-by-district comparison, which compares the compactness scores of each district in Illustrative Plan 1 against those of its counterpart in the Enacted Plan—i.e., "it looks at District 1 of the illustrative plan and compares it with District 1 of the enacted plan." "[I]n the illustrative plan, nine of the districts performed better," compared to only "five of the districts" that performed better in the Enacted Plan. Tr. 259:11-18; *see* PX 6 ¶ 85.

188.    Second, Mr. Fairfax compared each of the majority Black districts on a district-by-district basis. Two of the majority-black district[s] . . . performed better [in the Illustrative Plan], and one performed better in the enacted plan." Tr. 259:21-260:2; *see* PX 6 ¶ 86.

189.    Third, Mr. Fairfax compared the plans' mean compactness scores on each compactness measure. Illustrative Plan 1's mean compactness scores are

"comparable" to those of the Enacted Plan. Although "the enacted plan performs slightly better" overall, the difference between the mean scores for the two plans is either .01 for the Polsby-Popper and Convex Hull measures and .02 for the Reock measure. Tr. 258:25-259:5; PX 6 ¶ 87. Mr. Fairfax explained that such a "very, very slight" difference in mean score could result from the "movement of one [voting district]." Tr. 259:5-7.

190.    Fourth, Mr. Fairfax compared the compactness scores of the ten majority Black districts against the Enacted Plan's minimum compactness scores. All the majority-black districts performed better than the Enacted Plan's minimal values. Tr. 260:6-10; PX 6 ¶ 88.

191.    This comparison is particularly valuable: as Mr. Fairfax explained, "when the Legislature passes or approves a plan, they're also approving the metrics that they use." Tr. 326:25-326:1. Thus, when a district outperforms the lowest compactness scores approved by the legislature, it "gives a good emphasis that it's reasonably compact" according to the state's assessment. Tr. 326:25-327:5. Notably, both the Senate Chair of Alabama's Redistricting Commission and Alabama's own map drawer testified all districts in the Enacted Plan are reasonably compact— including those with lower compactness scores than Mr. Fairfax's Illustrative SD7 and SD25. McClendon Dep. (Doc. 235-1) at 60:24-61:3; Hinaman Dep. (Doc. 235-2) at 59:9-12.

192.   At the district level, in Illustrative Plan 1, both SD7 and SD25 "were more compact than the lowest measured scores in the enacted plan." Tr. 258:10-11.

193.   Illustrative Plan 1's SD7 and SD25 are also more compact than their counterparts in the Enacted plan. PX 6 ¶ 89.

194.   Plan 1's SD7 has a Reock score of .31, a Polsby-Popper score of .16, and a Convex Hull score of .58, making it more compact than the Enacted Plan's analogous district in two of the three compactness measures. PX 6 ¶ 89 & tbl. 22; *see* Tr. 257:25-258:3. Dr. Trende did not analyze the geographic compactness of Plan 1's SD7. Tr. 1079:12-14.

195.   SD25 has the same configuration across each illustrative plan, and "all three [compactness] measures made it more compact for the illustrative plan." Tr. 258:4-6. Illustrative SD25 outperforms the Enacted Plan's analogous district across the board, with a Reock score of .32, a Polsby-Popper score of .23 and a Convex Hull score of .77 in Plan 1. PX 6 ¶ 89 & tbl. 22. Dr. Trende did not analyze the geographic compactness of Illustrative SD25. Tr. 1078:21-23.

**2.    Plan 2A.**

196.   Looking at the same plan-wide compactness comparisons, Mr. Fairfax concluded that Illustrative Plan 2A "is reasonably compact" and "performed slightly better than the enacted plan" overall. Tr. 267:23-268:1.

197.   In a district-by-district comparison, Illustrative Plan 2A has eight districts that are more compact than their Enacted Plan counterparts, compared to only six districts in the Enacted Plan that are more compact than the analogous districts in Plan 2A. PX 8 ¶ 54; Tr. 268:5-6.

198.   Mr. Fairfax's comparison of Illustrative Plan 2A's ten majority Black districts on a district-by-district basis reveals that two of Plan 2A's majority Black districts are more compact than the Enacted Plan's analogous districts, while only one of the Enacted Plan's majority Black districts is more compact than its counterpart in Plan 2A. PX 8 ¶ 55; Tr. 268:7-9.

199.   Illustrative Plan 2A's mean compactness scores are very close to those of the Enacted Plan. The difference between the means for the two plans is .01 for Polsby-Popper and the Convex Hull measures and .02 for the Reock measure. PX 10 ¶ 7; Tr. 268:4-5.

200.   Finally, Mr. Fairfax compared each of Plan 2A's majority Black districts to the Enacted Plan's minimum compactness scores. Every majority Black district in Plan 2A is more compact than the least compact districts in the Enacted Plan. PX 8 ¶ 57; Tr. 268: 9-11.

201.   At the district level, both SD7 and SD25 in Illustrative Plan 2A "performed better" than the lowest compactness scores in the Enacted Plan. Tr. 267:9-12.

202.   Illustrative Plan 2A's SD7 and SD25 are each more compact than their counterparts in the Enacted Plan. Tr. 267:3-8. Plan 2A's SD7 has a Reock score of .34, a Polsby-Popper score of .15, and a Convex Hull score of .58, making it more compact for two of the three measures. PX 74 at 26. SD25 is unchanged in Plan 2A and remains more compact for all measures. PX 8 ¶ 58; PX 74 at 27.

### 3.   Plan 3.

203.   Looking at the same plan-wide compactness comparisons, Mr. Fairfax notes that Illustrative Plan 3 performs better on one metric, the Enacted Plan performs slightly better on two metrics, and the plans perform the same on the remaining metric. Tr. 273:22-274:10. Mr. Fairfax concludes that "Plan 3 is reasonably compact." *Id.*

204.   In a district-by-district comparison, Illustrative Plan 3 has seven districts that are more compact than their Enacted Plan counterparts, and the Enacted Plan also has seven districts that are more compact than the analogous districts in Plan 3. PX 10 ¶ 8; Tr. 273:25-274:2.

205.   Comparing Illustrative Plan 3's ten majority Black districts on a district-by-district basis, one of Plan 3's districts is more compact than its counterpart in the Enacted Plan, while two of the Enacted Plan's majority Black districts are more compact. PX 8 ¶ 87; Tr. 274:3-5.

206.   Illustrative Plan 3's mean compactness scores are very close to those of the Enacted Plan. Although the enacted plan performs "slightly better," the difference between the means for the two plans is either .01 for the Convex Hull measures and Polsby-Popper measures or .02 for the Reock measure. Tr. 274:24-25; PX 8 ¶ 88.

207.   Finally, Mr. Fairfax again compared Illustrative Plan 3's majority-black districts against the Enacted Plan's minimum compactness scores. He found that "[a]ll ten majority-black districts performed better than the least compact measure in the enacted plan." Tr. 274:5-7; PX 8 ¶ 89.

208.   At the district level, in Plan 3, SD7 and SD25 "as well as the other majority-black districts, performed better than the enacted plan's minimal or least compact measures." Tr. 273:12-17; *see* PX 8 ¶ 89.

209.   Although SD7 in the Enacted Plan performs "slightly better" on compactness measures than SD7 in Illustrative Plan 3, the scores are "similar." Tr. 273:4-9. Plan 3's SD7 has a Reock score of .25, a Polsby-Popper score of .13, and a Convex Hull score of .56, making it comparably compact to its Enacted Plan counterpart, with only minor differences in scores. PX 8 ¶ 90; *see* PX 70 at 157.

210.   SD25 remains unchanged in Illustrative Plan 3 and continues to perform better than its Enacted Plan counterpart on all three measures. Tr. 273:10-11; PX 8 ¶ 90; PX 70 at 158.

211.   In his supplemental report, Dr. Trende purports to conduct a "regional analysis" of the compactness scores of arbitrarily selected districts in Northern Alabama for Plans 2 and 3.

212.   Mr. Fairfax testified that a regional analysis of compactness scores is "usually not done unless the criteria tells you to do so," such as in North Carolina, which requires analysis of "cluster groups." In Alabama, however, "there's no criteria that tells you to regionally look at different areas. Usually, you'll look at the entire plan as a whole." Tr. 268:23-269:2.

213.   Mr. Fairfax testified that Dr. Trende's brief discussion of "cut edges" for Plans 2 and 3 refers to a "more recent compactness measure" that "is not a standard that's being used right now." Tr. 269:5-6.

**4.    Dr. Trende's Population Compactness Commentary.**

214.   Dr. Trende presented an analysis of the compactness of the Black population within the illustrative districts drawn by Mr. Fairfax.

215.   Dr. Trende created a "dot density map" purporting to show the location of Black and white population within the illustrative districts and a "color thematic" or "choropleth map" that imply that SD7 contains several precincts with a significant amount of BVAP. Tr. 384:10-18; *see* PX 8 ¶ 22.

216.   Mr. Fairfax testified that it is "not standard at all" among demographers to use such maps to measure compactness for the purposes of Gingles 1. Tr. 262:9-11.

217.   Dr. Trende did not produce a minority population compactness analysis in his work as a special master drawing Virginia's Congressional and state legislative maps or as a consultant to the Arizona Independent Redistricting Commission. Tr. 1073:15-19.

218.   Mr. Fairfax testified that Dr. Trende's choropleth maps are "misleading," in part, because majority Black districts in general are "mostly made up of areas that may have different concentrations of Black population." Tr. 260:22-262:2. Further, "it's not uncommon for . . . a majority-black district to have majority-black precincts" in it; to the contrary, by definition "[y]ou can't create necessarily majority-black district without including majority-black precincts." Tr. 337:20-338:8.

219.   Dr. Trende's dot density maps possess flaws which detract from the accuracy and clarity of their visual portrayal of Black population.

220.   First, the maps include rounding, so that if there are anywhere between 5 and 14 Black VAP within a census block, the maps will portray one dot for that population. Tr. 1074:22-1076:8. If there are 15 white VAP within that census block,

the white population will be depicted with two dots and therefore appear to be twice as large as a Black population of 14 Black VAP.[13] *See id.*

221.   Second, the maps either superimpose Black population on top of white population or (after criticism from Dr. Oskooii) superimpose white population on top of Black population, obscuring whichever population is underneath. Tr. 384:19-385:25; PX 195, PX 196, PX 198. Dr. Oskooii explained that if you only can see one racial group, you may assume these areas are highly concentrated with that racial group, but there could be similar amounts of voting-age population of the other racial group in the area that you cannot see.[14] Tr. 385:1-7.

222.   Dr. Trende does not present a mathematical computation of Black population compactness. Tr. 260:22-261:3, 1067:10-15; PX 8 ¶ 22 ("Neither of the two maps provide quantifiable metrics to determine the population compactness only a presentation of dots and colored precincts."). His opinion that the Black population is not compact within Mr. Fairfax's illustrative SD7 and SD25 is solely based upon

---

[13] The dot density maps only include dots for Black and white population. They do not include dots for Hispanic, Asian American, or any other racial or ethnic group. Tr. 1074:12-21.

[14] Reading Dr. Trende's choropleth map in conjunction with the dot density maps does not help the viewer to see the concentration of Black population within Plan 1's illustrative SD7. Tr. 388:11-389:5; DX 7 at 23. It is comparing apples and oranges. The choropleth map shows precinct-level BVAP concentrations, which are larger geographies than the block-level BVAP concentrations shown in the dot density maps. *Id.* The choropleth map shades entire precincts with BVAP concentrations between 0 and 30% with the same color, failing to account for variations within the precincts or between precincts at those levels. *Id.* Finally, the choropleth map shades counties rather than the illustrative districts. *Id.*

his own subjective visual assessment of his imprecise and muddied dot density and choropleth maps. Tr. 1067:16-1068:4.

223.   Further, Dr. Trende uses the dot density maps to attempt to critique SD7 for including "underpopulated areas" in addition to urban areas. *See, e.g.*, DX 7 at 24; Tr. 261:14-20. However, Mr. Fairfax explained that it is common during the map drawing process to have a district where rural areas and urban areas are combined. PX 8 ¶ 23; Tr. 262:5-8.

224.   Dr. Trende fails to consider whether the preservation of communities of interest may explain Mr. Fairfax's inclusion of Black population that Dr. Trende deems noncompact. Tr. 1069:7-16, 1070:2-8, 1070:17-1073:1. Dr. Trende cannot explain why the enacted plan shares features of Mr. Fairfax's illustrative districts that Dr. Trende criticized as contributing to the illustrative districts' noncompact Black population. Tr. 1069:17-1070:1, 1073:24-1074:6. And Dr. Trende, who did not draw any of his own maps, does not demonstrate an alternative to Mr. Fairfax's plans that purports to surpass Mr. Fairfax's plans in its maintenance of Black population compactness. Tr. 1070:9-16, 1076:18-20.

225. Even assuming, arguendo, that Dr. Trende's Black population compactness analyses were relevant to a material issue before the Court,[15] his imprecise dot density and choropleth maps—and the subjective conclusions he

---

[15] *But see, infra,* Conclusions of Law Section II.B.1.

reaches by looking at them without considering abundant relevant information—do not assist the Court in determining whether the Black population within Mr. Fairfax's illustrative districts is geographically compact, or whether Mr. Fairfax elevated the use of race over traditional districting principles when drawing the illustrative districts.

### D.    Reasonable Configuration

226.    Illustrative Plans 1, 2A, and 3 are reasonably configured and adhere to traditional redistricting criteria. *See* Tr. 263:21-22, 270:4-7; PX 6 ¶¶ 95-97; PX 8 ¶¶ 95-97; PX 10 ¶ 9.

227.    As Mr. Fairfax explained, a map drawer creates reasonably configured districts by considering "traditional redistricting criteria." Tr. 241:11-13. Dr. Trende agrees. Tr. 1076:11-13. In addition to compliance with the Voting Rights Act and U.S. Constitution, Mr. Fairfax prioritized the traditional redistricting criteria of equal population, geographic compactness, contiguity, and respect for political subdivisions and communities of interest. Tr. 244:2-23; PX 6 ¶¶ 12(c), 17. The Supreme Court has identified these criteria in determining whether a district is reasonably configured for purposes of the first Gingles precondition. PX 6 ¶ 17. Mr. Fairfax also referenced Alabama's Reapportionment Committee's redistricting guidelines—which also include those criteria—and "attempted to follow all of the other [criteria]" therein. Tr. 245:14-16; PX 6 ¶ 17; *see also* PX 32. Dr. Trende

testified that population compactness is not a traditional redistricting criterion. Tr. 1076:14-17.

228.   Alabama's Reapportionment Committee's redistricting guidelines require that "priority is to be given to . . . compliance with the Voting Rights Act of 1965 . . . should the requirements of [that] criteri[on] conflict" with others. PX 32 at 4; *see also* Tr. 344:18-345:3.

229.   The Illustrative Plans seek to avoid creating a plan that would run afoul of Section 2 of the Voting Rights Act or the Constitution by including two additional majority Black state senate districts without eliminating any of the eight pre-existing majority Black state senate districts or prioritizing race over other factors. PX 6 ¶ 55; PX 8 ¶¶ 29, 62.

### 1.   Equal Population.

230.   Each Illustrative Plan falls within the acceptable population deviation range of +/-5% for each district and performs better than the Illustrative Plan (which has an overall population deviation of 9.97%, *see* PX 6 tbl. 20) on this criterion. Plan 1 has an overall range of 9.73%. PX 6 ¶ 54 & Tbl. 20. Plan 2A falls has an overall range of 9.64%. PX 10 ¶ 7. Plan 3 has an overall range of 9.66%. PX 8 ¶ 61.

2.    **Contiguity.**

231.    Each Illustrative Plan includes contiguous districts, outside of one point-contiguous area that is carried over from the Enacted Plan. PX 6 ¶ 63; PX 8 ¶¶ 37; 70.

3.    **Communities of Interest and Political Subdivisions.**

232.    Mr. Fairfax's Illustrative Plans respect a wide variety of communities of interest and political subdivisions.

233.    As Mr. Fairfax explained, "cities and towns . . . and villages would be considered political subdivisions because they have a governmental body. But the cities, towns and villages would also be communities of interest." The voting districts created by the government are considered political subdivisions. Tr. 262:25-263:14. "[L]andmark areas" refer to "a dataset included in Caliper that includes colleges and universities, military bases, airports. These are somewhat recognizable areas that people . . . accept as communities of interest." Tr. 262:25-263:14.

234.    Illustrative Plan 1 and the Enacted Plan perform comparably in terms of preservation of political subdivisions and communities of interest, and overall Plan 1 "fares a little better than the enacted plan." Tr. 263:17. Plan 1 splits fewer Landmark areas than the Enacted Plan (93 versus 99). PX 6 ¶ 66. Plan 1 also splits fewer voting districts ("VTDs") (11 versus 13). PX 6 ¶ 67. Although Plan 1 splits

slightly more census places (cities, town, and CDPs) than the Enacted Plan, the numbers are similar (105 versus 100). PX 6 ¶ 65.

235.  Illustrative Plan 2A also "performs slightly better overall than the enacted plan" in terms of respecting political subdivisions and communities of interest. 269:20-22. PX 8 ¶ 39. Plan 2A splits fewer Landmark areas than the Enacted Plan (95 versus 99). PX 10 ¶ 7. Plan 2A minimizes VTD splits, splitting three fewer than the Enacted Plan (10 versus 13). Although Plan 2A splits slightly more census places (cities, towns, and CDPs) than the Enacted Plan, the numbers are similar and even improve upon Illustrative Plan 1 (103 versus 100). PX 8 ¶ 41.

236.  Illustrative Plan 3 and the Enacted Plan also perform comparably in terms of preservation of political subdivisions and communities of interest, and overall Plan 3 "performs slightly better." Tr. 274:18-19. Plan 3 splits fewer Landmark areas than the Enacted Plan (98 versus 99). PX 8 ¶ 73. Plan 3 splits fewer VTDs than the Enacted Plan (12 versus 13). PX 8 ¶ 74. Although Plan 3 splits slightly more census places (cities, town, and CDPs) than the Enacted Plan, the numbers are similar (105 versus 100). PX 8 ¶ 72.

237.  In terms of larger levels of geography, both Plan 1 and Plan 2A split the same number of counties (19) as the Enacted Plan. PX 6 ¶ 68; PX 8 ¶ 42. Plan 3 performs comparably, splitting only two more counties than the Enacted Plan (21 versus 19). PX 8 ¶ 75.

238. The new illustrative districts themselves respect communities of interest and political subdivisions. Illustrative SD25 is wholly contained within two counties— Montgomery and Crenshaw—unlike in the Enacted Plan which stretches the district into Elmore County. Mr. Fairfax removed the extension into Elmore County, making the district more compact. Illustrative SD 25 wholly contains the towns of Brantley, Dozier, Glenwood, Petrey, Pike Road, Rutledge, and the city of Luverne. The Illustrative district makes the Town of Pike Road whole, when it was split in two by the Enacted Plan. Mr. Fairfax expanded SD25 to include almost half of the city of Montgomery, with the remaining portion in SD26. Tr. 256: 2-8. PX 6 ¶¶ 61-62; *see also* Tr. 1596:12-13; 1605:1-6 (testimony from Dr. Patricia Payne about the "close community" in the Town of Pike Road and its "shared common interests"). SD25 does not change between the three Illustrative Plans. Tr. 266:14-15; 272:19-21; PX 8 ¶¶ 36, 69.

239. In Illustrative Plan 1, SD7 includes the cores of Huntsville and Decatur, along with the whole towns of Triana and Mooresville, and follows the boundary lines of the entire CDP of the Redstone Arsenal. Huntsville and Decatur are part of the third largest Combined Statistical Area in Alabama. SD 7 also includes all of Alabama A&M, the state's largest HCBU, unlike the Enacted Plan which separated the university into the more rural SD8. Tr. 248:14-249:6; 249:13-16; PX 6 ¶¶ 56-60.

240.   Illustrative Plan 2A's SD7 makes only "slight change[s]" from Illustrative Plan 1, to include the Harvest CDP and "add[] a variety of different VTDs in Decatur and Limestone." Tr. 265:6-9; *see* PX 8 ¶¶ 30-35.

241.   Illustrative Plan 3's SD7 also includes the Harvest CDP and continues to connect the cores of Huntsville and Decatur while including Alabama A&M University, wholly encompassing the towns of Triana and Mooresville, and following the boundaries of the Redstone Arsenal CDP. It also includes the towns of Courtland and North Courtland, which—along with Huntsville and Decatur—are part of the state's third largest Combined Statistical Area. Illustrative Plan 3 keeps the city of Madison wholly in adjacent SD2. Tr. 271:17-25; PX 8 ¶¶ 63-68.

242.   Mr. Fairfax further considered communities of interest by employing socioeconomic data in developing each iteration of SD7. He created a "thematic map overlay," which allowed him to see that "there were commonalities in median household income and median housing values in the Huntsville area as well as the Decatur area," which supported the "choice to actually include [those areas] together" in a district. Tr. 249:17-25; *see* PX 6 ¶ 59; PX 61 at 2-3; *see also* PX 8 ¶ 34 (Plan 2A). As relevant for Illustrative Plan 3, "[t]hose same bottom two quintiles" of median household income and median housing value that "showed up in Huntsville as well as Decatur" also appear in "the towns of Courtland and North Courtland." Tr. 272:4-6; *see* PX 8 ¶ 67.

243.   Ms. Mary Peoples, a Black resident of Huntsville, testified to the common interests between communities in Huntsville and Decatur. Ms. Peoples has family that live in Decatur. Tr. 120:11-16. She worked for many years at Redstone Arsenal, and she testified that it was common for her coworkers to commute to Redstone Arsenal from both Huntsville and Decatur, noting that it was an easy, straight shot on the highway. Tr. 131:1-13.

244.   Ms. Peoples travels to Decatur to shop. Tr. 131:16-18. And when watching the local news in Huntsville she often sees stories about Decatur. Tr. 131:19-132:1.

245.   Ms. Peoples testified about Alabama A&M, a historically Black college located in Huntsville, which she attended. Tr. 122:11-12, 123:16-17, 129:23-130:2. She explained that the area surrounding Alabama A&M is predominantly Black and has little in common with Jackson County because of the differences in educational and job opportunities. Tr. 130:11-21.

246.   Mr. Benard Simelton, a Black resident of the Huntsville Area who serves as president of the Alabama NAACP, testified to the common interests between communities in Huntsville and Decatur. Tr. 152:5-6, 152:21-153:2, 154:1-2. Huntsville and Decatur have many economic ties including "anything to do with the defense industry." Tr. 170:17-18. In fact, Mr. Simelton avoids Interstate 565 during rush hour because of the high volume of people commuting to Huntsville for

work and returning home to Decatur and other communities in the evening. Tr. 168:6-18. The community shares access to Huntsville International Airport, which is in close proximity between the cities. Tr. 171:6-7.

247. Mr. Simelton testified that local news outlets in the region—both television and newspapers—report on events in both Huntsville and Decatur. Tr. 171:8-172:4. He testified to communal social events, including those at "the convention center where a lot of concerts occur," and sporting events, at which residents of the entire region gather to support semi-pro baseball, hockey, and soccer teams. Tr. 169:24-25; 170:3-5.

248. Mr. Simelton testified that, when the Huntsville NAACP chapter has events, they invite members of the Decatur NAACP and vice versa because they share common interests. Tr. 164:1-18.

249. Mr. Simelton testified to educational opportunities in the region, noting that Madison County contains Oakwood, Alabama A&M, a small Faulkner campus, the University of Alabama-Huntsville, and a campus of Calhoun Community College. Tr. 173:7-13. Oakwood College and Alabama A&M—which have Alabama NAACP college chapters—draw students from both Decatur and Huntsville. Tr. 173:16-23.

### 4. Dr. Trende's Opinion that the Illustrative Districts are not Reasonably Configured.

250. Dr. Trende did not conclude that Plan 1's illustrative SD7 was unreasonably configured. Tr. 1005:8-10.

251. Dr. Trende testified that what makes a district reasonably configured is whether it adheres to traditional redistricting criteria. Tr. 1076:11-13. He further testified that adhering to one redistricting criterion may come into conflict with adhering to others, and that tradeoffs between redistricting criteria are inevitable.[16] Tr. 1076:23-1077:4.

252. Yet Dr. Trende nevertheless reaches an opinion that illustrative SD7 in Plans 2, 2A, and 3 is not reasonably configured despite failing to analyze the plans' adherence to the vast majority of traditional redistricting criteria,[17] including: preservation of communities of interest; contiguity; avoidance of the splits of cities, towns, census-designated places, landmark areas, voter tabulation districts, and precincts;[18] observance of natural boundaries, such as rivers; preservation of the cores of prior districts; minimization of population deviations; and avoidance of

---

[16] Dr. Trende did not attempt to reconcile these competing demands by drawing any of his own maps. Tr. 1076:18-20.

[17] Alabama's redistricting guidelines did not affect Dr. Trende's analysis either, Tr. 1079:15-17, and he does not agree or disagree that Mr. Fairfax's illustrative plans fare equal to or better than the enacted plan using the State's redistricting criteria. Tr. 1081:18-21, 1082:25-1083:5, 1084:8-11.

[18] Other than opining about a handful of split precincts in Plan 3's illustrative SD7. Tr. 1078:3-7.

incumbent pairing.[19] Tr. 1069:7-16, 1070:24-1072:20, 1077:8-1079:1. Of the sparse criteria he analyzed, he applied them inconsistently across the illustrative plans: he did not analyze the geographic compactness of SD25 or Plan 1's SD7, and he only analyzed counties split by Plan 3's SD7. Tr. 1078:21-23, 1079:12-14; DX 7; DX 8.

253.   Without analyzing those criteria, Dr. Trende cannot reasonably conclude where Mr. Fairfax chose to adhere to them at the expense of the sparse criteria he does analyze. For example, Dr. Trende did not analyze communities of interest here, even though as a special master drawing maps in Virginia, he concluded it was worth sacrificing compactness to preserve a community of interest. Tr. 1071:23-1072:9.

254.   The Court gives little weight to Dr. Trende's opinions regarding the reasonableness of the illustrative districts' configurations.

## E.    Racial Predominance

255.   Mr. Fairfax considered race while developing plans that illustrate the first Gingles precondition can be met, but his use of race did not predominate over other factors.

256.   Mr. Fairfax explained how he used racial data sparingly in his map drawing process. He testified to what he does when creating an illustrative plan: "[I]n the beginning, I will look at where the minority community exists. And then I

---

[19] Dr. Trende testified that he is not entirely sure that avoiding incumbent pairing qualifies as a traditional redistricting principle. Tr. 1079:2-5.

turn it off and won't turn it on, but maybe periodically. But I always use the other criteria labels more than race." Tr. 241:20-242:5 (emphasis added); see also id. 279:21-281:14 (Q: "So if someone were standing over your shoulder watching the process of developing this map, would they see the Black VAP and Black CVAP population columns to the far right, or would they be off screen?" A: "They would be off screen. You would have to scroll to check them.").

257.   Mr. Fairfax prioritized other criteria that the Supreme Court has identified as valuable in determining whether a district is reasonably configured under Gingles 1, including equal population, compactness, contiguity, preserving political subdivisions, and respecting communities of interest. PX 6 ¶ 17. Mr. Fairfax testified about how he constantly balances those criteria and makes "trade offs" between them as needed. *E.g.*, Tr. 246:18-247:14; *see id*. 287:4-7 ("I balanced the criteria for the Illustrative Plan 3. I balanced the criteria for . . . the Illustrative Plan 1 and 2A, so I am still balancing the criteria for all of them.").

258.   Mr. Fairfax also relied upon socioeconomic data, including data on income, poverty, education, health, and housing. PX 6 ¶ 17. For example, to bring together similarly situated communities within SD7, he used a "thematic map overlay" of socioeconomic data and identified "commonalities in median household income and median housing values in the Huntsville area as well as the Decatur area" and "the towns of Courtland and North Courtland," which supported the

"choice to actually include [those areas] together" in a district. Tr. 249:17-25; 272:4-6; *see* PX 6 ¶ 59; PX 61 at 2-3; PX 8 ¶¶ 34, 67.

259.   The Court concludes that Mr. Fairfax's testimony is credible. Race did not predominate in his map drawing—it goes without saying that Mr. Fairfax would know if race predominated in a plan that he created, "because [he] drew the plan." Tr. 345:5-7.

260.   Defendant's expert witnesses do not contend that race predominated in the drawing of SD25 in any illustrative plan. *See* DX 7; DX 8.

261.   Defendant's expert witnesses do not contend that race predominated in the drawing of SD7 in Illustrative Plan 1. *See* DX 7; Tr. 1081:22-24.

262.   Nor do Dr. Trende's choropleth maps of SD7 in Plans 2 and 3 indicate racial predominance. As Mr. Fairfax explained, those maps are "misleading," in part because Dr. Trende "uses the 30 percent breakpoint" at the low end of his coloration scheme, which is "a significant amount of black population percentage" and results in visual misrepresentation of the actual racial composition of each geographic subunit shown outside of the boundaries of the illustrative districts. Tr. 337:20-23. His VTD-level maps are further misleading, as they operate higher levels of geography, masking the fact that "at the block level, you can clearly see that there are other areas that are [high in] [B]lack [population] in those areas" surrounding the

district and blocks with low black population within the district. Tr. 337:24-338:1. "So it's not as if [SD7] grabs only the [B]lack areas" in these counties. Tr. 338:2-3.

263.   Dr. Trende continued a practice of inconsistently applying his analyses by examining the BVAP of precincts included and excluded only in Plan 3's SD7, but not in Plan 1's or 2's SD7, or in SD25. Tr. 1082:6-9; DX 7; DX 8.

264.   At most, Dr. Trende's critiques demonstrate that the illustrative Black majority districts contain several precincts that are themselves majority Black.[20] As Mr. Fairfax explained, "[y]ou can't create necessarily [a] majority-black district without including majority-black precincts or VTDs . . . ." Tr. 338:4-8.

265.   The Secretary attempted to draw a connection between a hypothetical Legislature engaged in racial gerrymandering by packing Black population into districts and Mr. Fairfax's illustrative maps that demonstrate the potential to create new majority Black state senate districts. The Court finds that analogy is unpersuasive.

266.   As Mr. Fairfax explained, "the only way you can meet the *Gingles* 1" requirement is to have illustrative districts that were not majority Black but "become black [majority]." Tr. 308:5-10. That is different from analyzing a "plan that has existing majority-black districts" for signs of excessive packing, for example. *Id.*

---

[20] Dr. Trende concedes that Mr. Fairfax chose to exclude a 60% BVAP precinct and include a 21% BVAP precinct—both on the district's boundaries—with the effect of making Plan 3's SD7 more compact. Tr. 1082:14-24.

**IV.**    ***Gingles* Precondition 2: Political Cohesion of Black Voters**

267.    Plaintiffs' expert, Dr. Baodong Liu, analyzed the extent to which the candidate preferences of Black and white voters in Alabama have differed in the Montgomery and Huntsville areas—that is, the extent to which voting in Alabama is racially polarized.

268.    Dr. Liu holds a Ph.D. in Political Science from the University of New Orleans and is a tenured Professor of Political Science, Presidential Societal Impact Scholar, and the Director of Graduate Studies in the Department of Political Science at the University of Utah. PX 16 at 2; PX 17.

269.    Dr. Liu has over 25 years of expertise in the areas of American political behavior and voting patterns and the role of race, and political methodology including analyzing aggregate data using technology. Tr. 17:4-25 (Liu). He has published several books and numerous peer reviewed articles addressing the role of race in political voting patterns. PX 16 at 2; PX 17; Tr. 18:3-24.

270.    The Court accepts, without opposition, Dr. Liu as an expert in racial polarization analysis, voter behavior, and ecological inference. Tr. 19:23-20:3.

271.    Dr. Liu concluded that Black voters consistently vote with high levels of cohesiveness for the same candidates, and that white voters consistently and with high levels of cohesiveness vote for different candidates. PX 16 at 6; Tr. 21:3-24. He opined that the "level of racially polarization" in both the Montgomery and

Huntsville regions based on his "empirical analysis has been significant." Tr. 21:10-24; PX 16 at 6.

272.　To reach his conclusions, Dr. Liu performed a statistical analysis of voting patterns in a series of elections using the Ecological Inference ("EI") method developed by Dr. Gary King at Harvard. PX 16 at 4; Tr. 24:13-26:13.

273.　He selected the elections for this analysis based on three critical criteria: 1) biracial elections involving at least one Black candidate and one white candidate; 2) all endogenous biracial elections in the last 10 years; and 3) all statewide exogenous biracial elections during the last 10 years, with results limited to the geographic areas under dispute. PX 16 at 6; Tr. 26:15-27:10, 27:22-28:7.

274.　Biracial elections are those in which voters were presented with a choice between or among Black and non-Black candidates. PX 16 at 6; Tr. 28:23-29:4. Dr. Liu testified about how he and most other experts in this field consider elections with this type of candidate pool as the most probative for assessing racially polarized voting ("RPV"), because they allow an analysis of how voters behave when faced with a choice between a candidate from their own racial group and a candidate not from their own racial group which more often will measure the true preference of the groups. PX 16 at 6; Tr. 29:5-21.

275.　Defendant's expert Dr. Hood also wrote an article in Social Science Quarterly where he stated that in analyzing RPV, the elections that are "more

relevant are those that feature a minority candidate from the racial or ethnic group suing the jurisdiction in question," and he testified that he "certainly" continues to stand by that statement. Tr. 1244:12-22 (Hood).

276.   Dr. Liu explained that he analyzed elections over the last ten years because that period both allows "us to see whether or not there's a pattern of voting by different racial groups," and will also allow a reasonable projection for the next ten years. PX 16 at 6; Tr. 27:11-21.

277.   An endogenous election is one that is conducted for the office that is at issue in a case and in the area of the state at issue, while an exogenous election is one that concerned an electoral office at a different level of government or in a part of the state outside the area of study. PX 16 at 6; Tr. 26:15-27:2.

278.   Dr. Liu used EI to analyze fourteen biracial elections for results in the Huntsville area, including three endogenous contests and eleven biracial elections in the Montgomery area. PX 16 at 6; Tr. 26:17-27:10.

279.   In the Huntsville area, in the three endogenous State Senate races Dr. Liu analyzed—the 2022 State Senate District 2 election, the 2018 and 2022 State Senate District 7 elections—Black voters supported the same candidate with over 80% of the vote in two elections, and 63% in another, and White voters only provided support ranging from 21.3% to 27.9% to the same candidates. PX 16 at 7.

280.   Dr. Liu found, and the Court accepts, that these results showed a pattern of racially polarized voting, with a "significant majority" voting for the same candidate, all of whom were Black, and the white majority voting against those candidates, revealing a "high level" of RPV. PX 16 at 7.

281.   In terms of the exogenous, statewide races, Dr. Liu analyzed eleven biracial elections, but did so only with regard to the results in the "exact State Senate districts that are inside Huntsville region, i.e., State Senate Districts 2, 3, 7, 8, and 9," and State Senate districts 25 and 26 in the Montgomery region. Tr. 28:8-22.

282.   The exogenous elections Dr. Liu analyzed were the 2014 Secretary of State, Lt. Governor, and State Auditor races, the 2018 Lt. Governor, State Auditor, and Public Service Commission races, and the 2022 Gubernatorial, U.S. Senate, Secretary of State, Attorney General, and Alabama Supreme Court Place 5 Associate Justice elections. PX 16 at 6.

283.   Across these exogenous elections in the Huntsville area, Black voters supported the same candidates with over 82% of the vote in every election, and less than 19% of white voters supported that candidate in those same elections. PX 16 at 8-9; Tr. 31:12-32:13.

284.   Dr. Liu testified, and the Court agrees, that this reflects a high level and strong pattern of racially polarized voting in the Huntsville region. PX 16 at 9; Tr. 324:14-21.

285.   Dr. Liu also conducted the same analysis for the 2020 non-partisan, biracial Decatur mayoral runoff, and found the "same pattern" of racial polarization, with Black voters supporting the same (Black) candidate with 74% of the vote, and white voters providing less than 30% to that candidate. PX 18 at 9; Tr. 52:7-20.

286.   In Montgomery, Dr. Liu testified to, and the Court accepts, a "consistent" and "high level of RPV." PX. 16 at 10; Tr. 33:16-20. Across the eleven elections analyzed, Black voters supported the same candidates with over 89% of the vote in all eleven elections, and less than 11% of white voters supported those same candidates. PX 16 at 9-10; Tr. 32:22-33:24.

287.   Dr. Liu also conducted an RPV same analysis for the 2019 and 2023 non-partisan, biracial Montgomery mayoral runoffs, and found the "same pattern" of racial polarization, with Black voters supporting the same (Black) candidate with 87% and 91% of the vote, and white voters providing less than 30% to that candidate in both elections. PX 18 at 9; Tr. 52:7-20.

288.   None of the Secretary's experts, all political scientists themselves, performed a racially polarized voting analysis themselves or contested the accuracy of Dr. Liu's analysis including his results, or his methodology or data. Tr. 819:13-21, 830:6-8 (Reilly); Tr. 1046:15-17 (Trende); Tr. 1185:13-22 (Carrington); Tr. 1226:1-5 (Hood); Tr. 1459:5-8, 1475:18-1476:8 (Bonneau).

289.   Additionally, Dr. Hood agreed voting in Alabama was racially polarized in the races he analyzed for another recent and ongoing case, Tr. 1245:8-14, Dr. Carrington did "not dispute the existence of statistical racially-polarized voting in Alabama," Tr. 1185:13-22 (Carrington), and Dr. Bonneau agreed that Dr. Liu's analysis shows polarized voting between black and white voters in the specific elections he analyzed, Tr. 1459:5-8.

290.   The Secretary also conceded that in the two regions at issue, "a majority of white voters support -- tend to support Republicans, a majority of black voters tend to support Democrats." Tr. 1695 (Court colloquy with Mr. Davis).

291.   Based on this thorough and uncontested record, the Court finds that Black voters in the Huntsville and Montgomery regions are highly cohesive in their voting patterns, as are White voters in support of different candidates.

## V.    Gingles Precondition 3: Success of White Bloc Voting

292.   The Court also finds, primarily based on Dr. Liu's testimony, that Black-preferred candidates have been entirely unable to win elections in state Senate districts in the Huntsville areas due white bloc voting, and unable to win elections to state Senate in Montgomery except in a Black-majority district.

293.   As detailed above, white support for Black preferred candidates never exceeded 30% in any election Dr. Liu analyzed and never exceeded 20% in any of the exogenous elections.

294.    Across all fourteen elections, except in supermajority-Black State Senate District 26, Black-preferred candidates lost every election. PX 16 at 10, 14; Tr. 33:18-24 (Liu).

295.    In contrast to the consistent losses of Black preferred candidates in Enacted Districts 7 and 25 across all eleven elections Dr. Liu analyzed, Dr. Liu found that the Plaintiffs' Illustrative Plan 1 would have allowed Black-preferred candidates to prevail in all of those elections in both redrawn districts. PX 16 at 10-11, 13-14; Tr. 37:3-9.

296.    He did so by performing an effectiveness analysis, comparing the racial configuration of one map to the racial configuration of another and then look at how voters voted in the particular configuration. PX 16 at 10-11; Tr. 34:3-20.

297.    The Court finds Dr. Liu credible, his analysis methodologically sound, and credits Dr. Liu's testimony and conclusions.

298.    Defendants' expert Dr. Trende also agrees that all of Plaintiffs' illustrative plans allow Black voters to elected preferred candidates. Tr. 1045:16-25.

299.    In terms of Dr. Trende's testimony that Black voters could elect candidates of choice when they form approximately 25% of the voting-age population in a Huntsville-area district, however, his opinions do not undercut a finding that White bloc voting stifles the ability of Black voters to elect preferred candidates, for several reasons.

300.   First, Dr. Trende did not contest the accuracy of Dr. Liu's RPV analysis, which showed much lower levels of white crossover voting in past elections than Dr. Trende proposed. Tr. 1046:15-17.

301.   Second, Dr. Trende characterized his effectiveness analysis as "just a theoretical exercise," which did not look at voting patterns and turnout for Black and white voters outside of the illustrative districts. Tr. 1046:18-21.

302.   Third, Dr. Trende did not assess whether enacted SD2 or SD7 in the Huntsville-Decatur area performed for Black voters at 29% and 23% BVAP, respectively, and indeed they did not, as Black candidates lost in those districts. 1047:9-1048:9 (Trende).

303.   The Court finds that white bloc voting consistently prevents Black voters from being able to elect preferred candidates in the Huntsville and Montgomery regions.

## VI.   The Totality of Circumstances Affecting Electoral Opportunities for Black Alabamians

### A.   Alabama's History of Discrimination in Voting, Education, Employment, Health, and other Areas

304.   Alabama has a long and sordid history of voting-related discrimination that continues to affect the ability of Black people to participate in the political process. Tr. 533:1-545:2 (Bagley); Tr. 174:20-179:16 (Simelton); Tr. 497:21-499:25 (Douglas); PX 19 at 5-21; Doc. 230 ¶¶ 67-87.

305.   Alabama's history of discrimination dates to the State's admission to the union. Before the Civil War, Black people were barred from voting in the state. After the passage of the Reconstruction Acts and Amendments, Alabama was forced to allow Black men access to the franchise, and the 1867 Alabama Constitution granted every male person over the age of 21—who satisfied the citizenship and residency requirements—the right to vote. This meant that for the first time in Alabama's history, Black people voted and held public office. Women of all races remained disenfranchised. Doc. 230 ¶ 73.

306.   In response, white leaders reformed the Democratic party with the intent of "redeeming" the State and re-establishing white supremacy. This was accomplished by using violence to deter Black people from political participation and, once the Redeemers returned to political office, to pass racially discriminatory laws to cement their control. Doc. 230 ¶ 74.

307.   In 1874, Democratic candidates were elected to public office in large numbers. On election day, in Eufaula, Alabama, members of a white paramilitary group known as the White League killed several unarmed Black Republican voters and turned away thousands of voters from the polls. Doc. 230 ¶ 75.

308.   The following year, in 1875, the Alabama Legislature adopted a new State Constitution and passed a series of local laws and ordinances designed to strip

Black Americans of the civil rights they enjoyed briefly during Reconstruction. Doc. 230 ¶ 76.

309.  At the 1901 Constitutional Convention, 155 white male delegates gathered in Montgomery with the express intention "to establish white supremacy in the State." Doc. 230 ¶ 77.

310.  The Convention ratified changes to the constitution that required literacy tests as a prerequisite to register to vote and mandated payment of an annual $1.50 poll tax, which was intended to and had the effect of disenfranchising Black voters. *United States v. Alabama*, 252 F. Supp. 95, 99 (M.D. Ala. 1966); Doc. 230 ¶ 78.

311.  Violent intimidation of Black voters continued throughout the 1880s and 1890s, and by the twentieth century white leaders in Alabama had declared Black disenfranchisement a policy goal. PX 19 at 5.

312.  In 1900, 100,000 Black people had voted in Alabama. But, after the passage of the 1901 Constitution, the number of Black registered voters in Alabama dropped to 2,980, whereas white registrants numbered 191,492. By 1908, only 3,742 Black people were registered voters, while white voter registration had risen to 250,381. *United States v. Alabama*, 252 F. Supp. 95, 99 (M.D. Ala. 1966).

313.  After the United States Supreme Court invalidated white-only primaries in 1944, Alabama passed the "Boswell Amendment" to its Constitution in

1946, adding an "understanding requirement" meant to give registrars broad discretion to deny African Americans the ability to register to vote. A federal court ruled that this provision was purposefully used to counteract the Supreme Court's invalidation of the white primary. *Davis v. Schnell*, 81 F. Supp. 872, 878-80 (S.D. Ala. 1949), *aff'd*, 336 U.S. 933 (1949). Doc. 230 ¶¶ 79-80.

314.    In response to *Schnell*, Alabama replaced its understanding requirement with a literacy test, again with the purpose of preventing African Americans from registering to vote. PX 19 at 14, 17.

315.    After the Supreme Court outlawed the white primary in 1944, many Alabama counties shifted to at-large elections, the intent of which was to prevent African Americans from electing their candidates of choice. Doc. 230 ¶ 81.

316.    In 1951, Alabama enacted a law prohibiting single-shot voting in municipal elections, the intent of which was to prevent African Americans from electing their candidates of choice. Doc. 230 ¶ 82.

317.    In 1957, the Alabama Legislature transformed the boundaries of the city of Tuskegee into a twenty-eight-sided figure designed to fence out African Americans from the city limits and ensure that only white residents could elect city officials. *Gomillion v. Lightfoot*, 364 U.S. 339 (1960); Doc. 230 ¶ 83; PX 19 at 16.

318.    In 1964 and 1965, Dallas County Sheriff Jim Clark, Alabama state troopers, and vigilantes violently assaulted peaceful Black protesters attempting to

gain access to the franchise. On March 7, 1965, in what became known as Bloody Sunday, state troopers viciously attacked and brutally beat unarmed peaceful civil rights activists crossing the Edmund Pettus Bridge in Selma, where less than 5 percent of Black voters were registered to vote. Bloody Sunday helped pave the way for the passage of the Voting Rights Act in 1965 and Alabama was declared a "covered" state under Section 4(b) of the Act. Doc. 230 ¶ 85.

319.    Prior to 1960, the Legislature failed to reapportion for 50 years. As a result, Alabama's entire legislative apportionment scheme was struck down in *Reynolds v. Sims*, 377 U.S. 533 (1964), which held "that, as a basic constitutional standard, the Equal Protection Clause requires the seats in both houses of a bicameral state legislature must be apportioned on a population basis[,]" *id.* at 568. On remand, a three-judge court found that, in devising remedial maps to correct the malapportionment, the "Legislature intentionally aggregated predominantly Negro counties with predominantly white counties for the sole purpose of preventing the election of Negroes to [State] House membership." *Sims v. Baggett*, 247 F. Supp. 96, 108-09 (M.D. Ala. 1965). Doc. 230 ¶ 67.

320.    Following Reynolds and the 1970 Census, a three-judge federal court drew new district lines. *Sims v. Amos*, 336 F. Supp. 924, 940 (M.D. Ala. 1972). The court rejected the proposed map of Alabama Secretary of State Mabel Sanders Amos

because of its racially "discriminatory effect" on Black voters. Id. at 936. Doc. 230 ¶ 68.

321.   In the 1980s, the United States Attorney General denied preclearance under Section 5 of the VRA to maps drawn by the Legislature to redistrict State House and Senate maps because of their discriminatory effect on Black voters in Jefferson County and the Black Belt. PX 19 at 7-8. Shortly thereafter, a three-judge court rejected Alabama's proposed interim remedial state maps in part because Alabama's maps "had the effect of reducing the number of 'safe' black districts" in and near Jefferson County. *Burton v. Hobbie*, 543 F. Supp. 235, 238 (M.D. Ala. 1982). The court later undertook an "examination of [the] merits" of Alabama Act No. 82-629, the Legislature's enacted plan, with the court concluding that "the configuration of certain Black Belt districts [in Act No. 82-629] caused retrogression of black voting strength (particularly in districts 45 and 88)," which included the Black community in Montgomery, "and that there was unnecessary fragmentation of minority communities." *Burton v. Hobbie*, 561 F. Supp. 1029, 1035 (M.D. Ala. 1983); *see* Tr. 535:16-24 (Bagley); PX 19 at 7-8.

322.   After the 1990 census, the State entered a consent decree to resolve a Voting Rights Act lawsuit filed on behalf of Black voters. Doc. 230 ¶ 69 ((citing *Brooks v. Hobbie*, 631 So.2d 883, 884 (Ala. 1993)); *see* Tr. 536:5-11; 536:22-537:7 (Bagley).

323.   Black legislators elected to the Alabama legislature in the 1970s and 1980s were elected in districts created as the result of successful VRA litigation. Tr. 536:12-21 (Bagley). For example, after the *Burton* litigation in the 1980s, 19 Black people were elected to the House (out of 105) and 5 were elected to the Senate (out of 35). PX 19 at 8.

324.   After the 1990 Census, the Legislature initially failed to enact a new congressional redistricting plan. *See Wesch v. Hunt,* 785 F. Supp. 1491, 1494-95 (S.D. Ala. 1992). A voter in Alabama's First Congressional District sued the state and asserted that holding the 1992 election under the old map would violate the one person, one vote rule. *Id.* at 1492-93. Several Black voters intervened in the action as plaintiffs to assert a Section 2 claim. *Id.* at 1493. The parties submitted various redistricting plans for the court's consideration, and the court retained its own expert. *Id.* at 1493, 1495.

325.   The district court ultimately ordered that congressional elections be held according to a plan that closely tracked the original plaintiff's proposed plan. *See Wesch v. Folsom,* 6 F.3d  1467-68r. 1993). That plan created one "significant majority African-American district with an African-American population of 67.53%." *Id.* at 1468; *Wesch,* 785 F. Supp. at 1498, 1581.

326.   The *Wesch* court did not decide whether Section 2 "require[d] the creation of such a district under the circumstances" because the parties stipulated

that according to the 1990 census data, the "African American population in the State of Alabama is sufficiently compact and contiguous to comprise a single member significant majority (65% or more) African American Congressional district," and that "a significant majority African American Congressional district should be created." *Id.* at 1498-99. The court found that the new plan "create[d] a majority African-American district that provide[d] African-Americans a reasonable opportunity to elect a candidate of their choice, and d[id] so without the need for extensive gerrymandering." *Id.* at 1499. The map for the new plan was drawn in large part by cartographer Randy Hinaman. Doc. 235-2 at 15:24-16:2. In the 1992 election held using the court-ordered map, voters in District 7 elected Alabama's first Black Congressman (Earl Hilliard) in over 90 years. Tr. 537:10-24 (Bagley).

327.    The 1990s were a pivotal point where white candidates accelerated their flight from the Democratic party to the Republican party. It was not coincidental that that pivot came at a time when Black political leaders began exercising power within the Legislature to draw this state legislative plan. Tr. 537:10-24.

328.    In the 1990 redistricting cycle, white legislators in both political parties attempted to manipulate Black voters for political advantage. White Democrats wanted to unpack court-drawn districts with Black populations of around 65% to move Black voters into their own majority-white districts to help Democrats cling to power in the legislature. White Republicans, however, wanted to pack Black

90

voters into *more* majority-Black districts so that the surrounding districts had more white voters, which, in Republicans' view, made the districts more likely to elect a Republican. Tr. 540:17-541:15 (Bagley).

329.  Alabama House Representative Mike Hubbard, part of the leadership in the Republican Alabama legislature, relied on this strategy to flip the legislature to Republican control. Mr. Hubbard pressured White Democratic legislators to flip parties. White Democrats who failed to switch parties were then targeted by Mr. Hubbard, who . He made a concerted effort to have Republicans defeat these white Democrats. He commissioned a study, used the 2006 and 2008 elections as experiments for his strategies, and his efforts culminated in Republicans winning an all-white supermajority of the Legislature in 2010. Tr. 538:13-539:9 (Bagley).

330.  Before the 2010 state senate and house elections, Republican senate and house members plotted to depress Black voter turnout to help Republicans win by keeping a referendum issue that they believed to be popular among Black voters off the ballot. In recorded conversations, legislators referred to Black Alabamians as "illiterates," "Aborigines" and "Indians." In 2011, a court found that that these "recordings represent compelling evidence that political exclusion through racism remains a real and enduring problem in this State" and that "racist sentiments" remain "regrettably entrenched in the high echelons of state government." *United States v. McGregor*, 824 F. Supp. 2d 1339, 1345-47 (M.D. Ala. 2011).

331.  After the 2010 Census, the Legislature enacted a plan that further packed Black voters into state senate and house districts based on racial targets. Black voters and legislators successfully challenged 12 state legislative districts as unconstitutional racial gerrymanders. See *Ala. Legis. Black Caucus v. Alabama*, 231 F. Supp. 3d 1026, 1348-49 (M.D. Ala. 2017); *see also* Tr. 539:17-540:4 (Bagley); Doc. 230 ¶ 70.

332.  In 2022 and 2023, a three-judge panel preliminarily enjoined two different congressional districting plans that had been adopted by the Alabama Legislature following the 2020 Census. The three-judge court found that both the Legislature's 2021 plan and 2023 plan likely violated the Voting Rights Act, *see Milligan v. Merrill*, 582 F. Supp. 3d 924 (N.D. Ala. 2022), and *Milligan v. Allen*, 690 F. Supp. 3d 1226 (N.D. Ala. 2023). The former decision was upheld in full by the U.S. Supreme Court, *see Allen v. Milliga*n, 599 U.S. 1, 22 (2023), and the latter was left in place after the Court declined to stay the injunction, *see Allen v. Milligan*, 144 S. Ct. 476 (2023). Doc. 230 ¶ 70.

333.  Beyond redistricting, Alabama has employed and continues to employ other voting practices that impair Black electoral success. *See, e.g., Pleasant Grove v. United States*, 479 U.S. 462, 466-67 (1987) (state law permitting discriminatory annexations); *Hunter v. Underwood*, 471 U.S. 222 (1985) (discriminatory state misdemeanor disfranchisement law). Since around the 1990s, this discrimination has

continued and includes, among other practices, at-large elections with numbered posts, restrictions on assistance for low literacy voters, limited hours and locations for registering and voting, voter purges, and misinformation, and intimidation, as set out below

334.    **At-Large Elections with Numbered Posts.** In 1986, for instance, a court found that the Alabama legislature enacted state laws requiring numbered posts for nearly every at-large voting system in Alabama with the intent to dilute Black voting strength, and that numbered posts had the effect of diluting Black voting strength in at-large elections. *Dillard v. Crenshaw Cnty.*, 640 F. Supp. 1347, 1357-58 (M.D. Ala. 1986). The court also found that from the late 1800s to the 1980s, the "Alabama legislature, which was responsible for the at-large systems in the [defendant] counties, has consistently enacted at-large systems for local governments during periods when there was a substantial threat of black participation in the political process." *Id.* at 1361; *see also* Tr. 543:4-545:2 (Bagley); PX 19 at 16-21.

335.    Ultimately, a defendant class of 17 county commissions, 28 county school boards, and 144 municipalities were sued for employing at-large election systems with a racially discriminatory effect and intent. These cases resulted in settlements with about 180 jurisdictions, which required them to adopt new election systems including single-member districts, limited voting, and cumulative voting

systems, in an attempt to purge the state's election systems of intentional discrimination. Tr. 543:4-544:3 (Bagley); PX 19 at 20; PX 245.

336.   There were also successful Section 2 litigation challenges to the Montgomery County commission, Montgomery city council, the Madison County commission and school boards, the City of Huntsville, and the City of Decatur in the 1980s and 1970s. Tr. 543:4-545:2 (Bagley); PX 19 at 20-21; *see, e.g.*, *Buskey v. Oliver*, 565 F. Supp. 1473 (M.D. Ala. 1983); *Hendrix v. McKinney*, 460 F. Supp. 626, 630 (M.D. Ala. 1978).

337.   In 2020, a federal court dismissed a long-running case filed by a white resident of Decatur, Gary Voketz. Mr. Voketz had successfully pushed a vote on a referendum to switch from a 5-member mayor-council to a 3-member council-manager system that would include a mayor-councilor and a council member elected at-large. The referendum passed in 2010, but the Decatur City Council argued that switching to the three-member council would eliminate the existing majority-Black district. The city council argued that the change would violate the VRA and the Fourteenth Amendment and refused to implement the change. Mr. Voketz filed suit to force the change, but the litigation dragged on until changes in state law required a new referendum. Thereafter, the Court dismissed the case as moot without ruling on the VRA defense. Tr. 544:23-545:2 (Bagley); PX 19 at 21; *see Voketz v. City of Decatur*, No. 5:14-CV-00540-AKK, 2020 WL 5529618, at *2 (N.D. Ala. Sept. 15,

2020) (noting the Decatur city council's admission that the referendum "required eliminating the African American majority district, potentially violating § 2 of the VRA by diluting minority voting power").

338. Federal courts have recently enjoined other local at-large election systems with numbered posts enacted by the State Legislature. *See, e.g.*, *Jones v. Jefferson Cnty. Bd. of Educ.*, No. 2:19-CV-01821-MHH, 2019 WL 7500528, at *4 (N.D. Ala. Dec. 16, 2019) (finding that the state legislature intentionally discriminated in enacting an at-large multimember districting plan in violation of the VRA); *Ala. State Conf. of the NAACP v. City of Pleasant Grove*, No. 2:18-cv-02056, 2019 WL 5172371, at *1 (N.D. Ala. Oct. 11, 2019) (ordering changes to the city's at-large voting system to remedy an alleged Section 2 of the VRA violation); *see also* Tr. 562:18-563:2 (Bagley); PX 19 at 20-21.

339. **Restrictions on Voter Assistance.** In March 2024, the Alabama Legislature enacted Alabama Senate Bill 1 ("SB 1") relating to absentee ballot applications. SB 1 places certain restrictions on the way people may assist voters with their absentee ballot applications. SB 1's Submission Restriction criminalizes the act of returning a potential voter's absentee ballot application. Ala. Code § 17-11-4(c)(2). The Payment and Gift Provisions criminalize the act of accepting anything of value from or providing anything of value to a third party for

distributing, ordering, requesting, collecting, prefilling, completing, obtaining, or delivering a voter's absentee ballot application. Ala. Code §§ 17-11-4(d)(1)-(d)(2).

340.    Several civil rights groups, including Plaintiffs Alabama NAACP and GBM, filed a lawsuit against the Alabama Attorney General alleging that SB 1 violated the First Amendment to the U.S. Constitution and Section 208 of the VRA. Section 208 directs that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508. While the court dismissed the First Amendment claims, it granted a preliminary injunction against SB 1's Submission Restriction and Payment and Gift Provisions to permit voters who are blind, disabled, or unable to read or write, within the meaning of the VRA, to receive assistance from the person of their choice. *Ala. State Conf. of NAACP v. Marshall*, No. 2:24-CV-00420-RDP, 2024 WL 4282082, at *7 (N.D. Ala. Sept. 24, 2024), *stay pending appeal denied* No. 24-13111, 2024 WL 4481489 (11th Cir. Oct. 11, 2024).

341.    Congress enacted Section 208 to give force to the VRA's nationwide ban on literacy tests and its "implicit requirement" that voters who are illiterate or otherwise struggle literacy "may not be denied assistance at the polls." S. Rep. 97-417, at 63 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 177, 241. Indeed, prior to the VRA's ban on literacy tests, Alabama law required people to complete voter

registration forms without assistance. *See, e.g.*, *Alabama v. United States*, 304 F.2d 583, 587 (5th Cir.), *aff'd*, 371 U.S. 37 (1962). Similarly, in 1970, the U.S. Department of Justice objected under Section 5 to an Alabama law that, like SB 1, required applicants for mail-in absentee voter registration to complete a written questionnaire without assistance.[21] In 1988, a federal court enjoined an intentionally discriminatory Alabama law that required those disproportionately Black people with limited literacy skills to swear an oath of illiteracy before receiving help, and restricted voters to only five-minutes in the polling booth. *See Harris v. Siegelman*, 695 F. Supp. 517, 526-28 (M.D. Ala. 1988) (describing then-recent "instances where black voters were harassed with the five-minute rule or were refused clearly needed assistance because they did not meet the state's rigorous assistance standard or because the white poll officials arbitrarily decided that assistance was not needed"). These "subtle" literacy tests were "engineered to deny blacks the right to vote" based on reality that, in the Reconstruction-era, over two-thirds of Black and less than a quarter of White adults were illiterate "because, prior to the Civil War, most of the slave States made it a crime to teach Negroes how to read or write." *Nw. Austin Mun. Util. Dist. No. 1 v. Holder*, 557 U.S. 193, 219-20 (2009) (cleaned up); *see Harris*, 695 F. Supp. at 523.

---

[21] Letter from Jerris Leonard, Asst. Atty. General, U.S. Dep't of Justice, to MacDonald Gallion, Alabama Attorney General (Mar. 13, 1970) https://www.justice.gov/crt/case-document/file/1277176/dl?inline.

342.    Today, more Black people than White Alabamians continue to struggle with literacy, which can make it more difficult for Black voters to complete the tasks required to vote without assistance. Tr. 176:20-177:23 (Simelton); Tr. 497:13-499:25 (Douglas); Tr. 646:19-23 (Williams). Among Alabama students, only 31.8% of Black versus 59.5% of White students are proficient in English language arts. PX 11 (Burch Report) at 9 n.31; *see also* Tr. 675:8-17 (Burch). As a result of SB 1, GBM has decided to no longer help with absentee voting applications. Tr. 647:18-648:12 (Douglas). Therefore, because of these racial disparities in literacy skills and the threat of criminal prosecution that SB 1 engenders among assistors, SB 1's restrictions have had a racially disparate impact and will continue to serve as barriers for Black voters.

343.    **Limits on Hours and Locations for Voting and Registration.** Soon after *Shelby County*, the State began enforcing its strict voter ID law. Governor Bentley in 2015 closed 31 Motor Vehicle Division offices in disproportionately Black and rural areas, harming those residents' ability to obtain voter ID. PX 19 at 29; PX 372 at 1. After the U.S. Department of Transportation concluded that these actions adversely impacted Black residents and voters, the State reopened offices. PX 19 at 30; PX 372 at 1. Because persons could register to vote and obtain the photo ID necessary to vote at these driver's license offices, the closures likely affected the ability of Black people to vote. Tr. 632:21-22 (Bagley); PX 19 at 30.

344.   Relatedly, in 2016, the Secretary and the Alabama Department of Law
Enforcement (ALEA) entered a settlement with the U.S. Department of Justice. The
settlement brought Alabama into compliance with the NVRA's requirement that
driver's licenses offices offer opportunities to register to vote. Tr. 918:10-919:23
(Archer). Similarly, in December 2013, the Alabama NAACP and the Secretary
entered into a settlement agreement to bring Alabama into compliance with certain
NVRA provisions, which required the State to provide opportunities to register to
vote for people who visited state welfare offices. Tr. 175:3-176:9 (Simelton).
Because Black people are disproportionately on food assistance, Tr. 681:14-17
(Burch), the State's twenty-year failure to comply with the NVRA likely had a
racially disparate impact, Tr. 175:21-176:9 (Simelton).

345.   Alabama also offers neither early in-person voting, nor no-excuse
absentee voting. PX 11 at 13. The State's failure to make these methods of voting
available contributes to increased wait times for voters at the polls. Black voters are
more likely to have lower-income jobs and are less likely to own vehicles than
whites. Tr. 679:17-21; 684:23-685:10 (Burch); PX 11 at 14, 22. Election Day is not
a holiday. Tr. 1338:4-6 (Coley). This requires some Black voters to choose between
voting or other important priorities. *See* Tr. 470:10-471:7 (Milligan); Tr. 1337:19-
1338:3 (Coley). These circumstances and the State's lack of early voting result in

Black voters waiting longer to vote than White voters. Tr. 686:7-13 (Burch); PX 11 at 13, 19.

346. **Voter Purges and Intimidation.** Alabama's recent violation of the NVRA 90-day provision also likely had a disparate impact on Black voters. Tr. 177:24-179:16 (Simelton). For example, before the 2024 elections, the Secretary was enjoined from instructing local officials to move 3,251 registered voters to inactive status based on his initial claim that these registrants were likely to be noncitizens. *See Ala. Coal. for Immigrant Just. v. Allen*, No. 2:24-CV-1254-AMM, 2024 WL 4510476 (N.D. Ala. Oct. 16, 2024). But the Secretary "later admitted that his purge list included thousands of United States citizens (in addition to far fewer noncitizens, who are ineligible to vote)," despite his erroneous decision to "refer[] everyone on the purge list to the Alabama Attorney General for criminal investigation." *Id*. at *1. Black citizens were among the voters who were wrongly moved from active status and threatened with criminal prosecution for registering to vote. Tr. 179:6-16 (Simelton).

347. **Misinformation and Administrative Delays.** From the 1960s to today, white election officials have at times required Black people to needlessly wait for long periods of time for voting-related services or simply failed to provide Black voters with the correct information or forms needed to either vote or run for elected office. In 1974, for example, when Mr. McCollum ran as the first Black candidate

for elected office in Fayette County, a white election official in the probate judge's office required him to wait in the hallway for three hours before providing him with the necessary candidate qualifying forms. Tr. 1363:14-1364:25 (McCollum); *see, e.g.*, *Hale Cnty. v. United States*, 496 F. Supp. 1206, 1211 (D.D.C. 1980) (three-judge court) (describing a Black person's experience, similar to Mr. McCollum, of being forced to wait hours to register); *United States v. Parker*, 236 F. Supp. 511, 517 (M.D. Ala. 1964) (describing Montgomery County's practice of requiring Black applicants to "wait in line for unreasonable periods of time" to register). Today, the refusal or failure of state and local election officials to provide accurate information or timely responses to inquiries can make it more difficult for Black people to vote. *See, e.g.*, *Braxton v. Town of Newbern*, No. 2:23-CV-00127-KD-N, 2024 WL 3519193, at *2 (S.D. Ala. July 23, 2024) 2024 WL 3519193, at *2 (stipulating that a town's intentionally discriminatory refusal to hold or make any preparations to notify Black voters about municipal elections violated the Fifteenth Amendment and Section 2); *Dillard v. Town of N. Jones*, 717 F. Supp. 1471, 1477 (M.D. Ala. 1989) (finding that a mayor's intentionally discriminatory failure to provide a Black candidate with the proper forms violated Section 2); *see also* Tr. 643:20-644:13 (Williams) (testifying that information barriers can make it more difficult for those disproportionately Black voters with felony convictions to restore their voting rights; *Greater Birmingham Ministries v. Sec'y of State*, 105 F. 4th 1324, 1335 (11th

Cir. 2024) (ordering the Secretary to disclose the records of people with felony convictions that disqualified from voting).

348.   In the wake of *Shelby County v. Holder*, three political subdivisions in Alabama have been re-subjected to preclearance review under Section 3(c) of the VRA. *See, e.g.*, *Braxton*, 2024 WL 3519193, at *3 (Town of Newbern); *Jones*, 2019 WL 7500528, at *4-5 (Jefferson County); *Allen v. City of Evergreen*, No. 13-0107, 2014 WL 12607819, at *2 (S.D. Ala. Jan. 13, 2014) (City of Evergreen). Alabama is the only state in the nation where courts have ordered more than one jurisdiction to be re-subjected to preclearance under Section 3(c) of the VRA. Tr. 562:18-563:2 (Bagley).

349.   Today, Alabama has a majority-vote requirement in all primary elections. Doc. 230 ¶ 72.

350.   Of course, this discrimination in voting parallels Alabama's history of discrimination against Black people in education, employment, and other areas.

351.   With respect to education, because Alabama only begrudgingly began to desegregate in the 1970s, 38% of the state's *current* electorate were educated in segregated schools. Tr. 676:10-16 (Burch); PX 13 at 4. Indeed, several witnesses attended *de jure* segregated schools. *See* Tr. 122:7-10 (Peoples); Tr. 152:16-18 (Simelton); Tr. 485:23-486:1 (Douglas); McClendon Dep. (Doc. 235-1) 82:2-10 (McCollum); *see also* Tr. 464:11-25 (Milligan) (noting his mother's and other living

individuals' experiences with segregation); Tr. 880:1-24 (Branyon) (describing her brother's experiences with segregation). That number, however, underestimates the portion of Alabama's electorate affected by state-sponsored or other forms of discrimination. Many Black people in the challenged areas who are *today* only in their 40s *or younger* have also *personally* experienced discrimination or protested discriminatory laws or policies. *See* Tr. 455:10-456:21, 459:3-15 (Milligan); Tr. 881:21-883:9 (Branyon); Tr. 1339:19-1340:21 (Coley); *see also* Tr. 1119:7-1120:1-4 (Roberts).

352.   In the area of education, this recent history includes the use of public funds to "foster or support racial segregation, albeit fraudulently, within Alabama's system of education," *United States v. Carter*, 614 F. Supp. 3d 1081, 1110 n.6 (M.D. Ala. 2022) (Limestone County); *see* Tr. 551:2-13 (Bagley); racially disparate treatment in discipline, *Hereford v. Huntsville Bd. of Educ.*, No. 5:63-CV-00109-MHH, 2015 WL 13398941, at *3 & n.4 (N.D. Ala. Apr. 21, 2015); inequitable access to advanced courses, *see, e.g.*, i*d.* at *2; *Hereford v. Huntsville Bd. of Educ.*, No. 5:63-CV-00109-MHH, 2017 WL 5483734, at *8 & n.18 (N.D. Ala. Nov. 14, 2017); *Lee v. Butler Cnty. Bd. of Educ.* ("*Butler*"), No. 70–T–3099, 2000 WL 33680483, at *2 (M.D. Ala. Aug. 30, 2000) (statewide); *Lee v. Autauga Cnty. Bd. of Educ.* ("*Autauga*"), 59 F. Supp. 2d 1199, 1209-10 (M.D. Ala. 1999) (City of Prattville); *see also* PX 19 at 23 (discussing a recent settlement to remedy racial discrimination

in discipline and access to advanced courses in Madison County); Tr. 549:24-550:11 (Bagley) (same); segregated school dances, Tr. 551:22-24 (Bagley); *see, e.g.*, *Godby v. Montgomery Cnty. Bd. of Educ.*, 996 F. Supp. 1390, 1411 (M.D. Ala. 1998); *Lee v. Randolph Cnty. Bd. of Educ.*, 160 F.R.D. 642, 644 (M.D. Ala. 1995); and inferior facilities at predominately Black schools, *Butler*, 2000 WL 33680483, at *2 (statewide); *Autauga*, 59 F. Supp. 2d at 1209-10 (City of Prattville); *see* Tr. 546:25-551:13 (Bagley) (summarizing this recent history); PX 19 at 23-28 (same); Tr. 676:1-677:1 (Burch) (similar).

353.  Through the 1990s, Black adults have faced further systemwide racial discrimination in higher education. *Knight v. Alabama*, 900 F. Supp. 272 (N.D. Ala. 1995) (vestiges of segregation in the State's university system), *Groves v. Ala. State Bd. of Educ.*, 776 F. Supp. 1518 (M.D. Ala. 1991) (discrimination in college testing).

354.  Black people also experience racial discrimination in public and private employment. *See, e.g.*, *Weatherly v. Ala. State Univ.*, 728 F.3d 1263 (11th Cir. 2013) (hostile work environment created by "high-level employees" at a public university); *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160 (11th Cir. 2010) (racially discriminatory promotions at a state agency); *Ferrill v. Parker Group, Inc*., 168 F.3d 468, 472 (11th Cir. 1999) (segregated employment); *Sims v. Montgomery Cnty. Comm'n*, 119 F.3d 9 (11th Cir. 1997) (table) (affirming class action settlement at 890 F. Supp. 1520); *James v. City of Montgomery*, 99 F.3d 1154 (11th Cir. 1996)

(table);[22] *Allen v. Ala. State Bd. of Educ.*, 190 F.R.D. 602 (M.D. Ala. 2000) (statewide class action settlement regarding teacher tests); *Reynolds v. Ala. Dep't of Transp.,* No. 85-T-665, 1994 WL 899259 (M.D. Ala. Mar. 16, 1994) (statewide class action settlement); *United States v. City of Montgomery*, 948 F. Supp. 1553, 1570 (M.D. Ala. 1996) (citywide class settlement); *Shuford v. Ala. State Bd. of Educ.*, 846 F. Supp. 1511 (M.D. Ala. 1994) (statewide class settlement); *Sims v. Montgomery County Comm'n*, 766 F. Supp. 1052 (M.D. Ala. 1991) (liability finding in a Title VII class action).

355.   In Alabama, about 700 charges of racial discrimination were filed with the Equal Employment Opportunity Commission in each of the fiscal years 2020, 2021, and 2022. Nationally about fifteen percent of those charges are found to have merit. Tr. 704:18-22 (Burch). Ms. Mary Peoples testified to her knowledge about instances of racial employment discrimination at the Redstone Arsenal facility that continue today. Tr. 135:10-21.

356.   People living in Alabama's Black Belt also face structural barriers to employment, such as a lack of manufacturing jobs in business growth. Tr. 705:6-18

---

[22] As summarized by another court, in *James v. City of Montgomery*, the Eleventh Circuit affirmed a jury verdict that the City of Montgomery had subjected a Black police officer to "a racially hostile environment." *United States v. City of Montgomery*, 948 F. Supp. 1553, 1563 (M.D. Ala. 1996). The *James* litigation also included evidence of systematic discrimination against Black communities insofar as the Black police officer's superiors made remarks to him indicating "their lack of motivation toward protecting the citizens of predominantly black communities" and their "general practice of assigning officers to different communities based on the officers' races." *Id.*

(Burch). In the Black Belt counties, very few were above the statewide average of 22.4 businesses per 1,000 residents. *Id*. Some Non-Black Belt counties—including Elmore County—are below that threshold, as well. *Id*. Job losses to automation can differentially affect low-skilled workers—especially in the Black Belt. *Id*. And Black people's lack of high-speed Internet access can limit access to remote work. *Id*.

357.  "[R]igorously conducted" national studies "controlling for all manner of differences between people, such as education and human capital" demonstrate continued racial discrimination in employment.  For example, resumes with "Black-sounding names" were less likely to get called back than identical resumes with "White-sounding names." Tr. 703:6-17 (Burch). Black applicants are also more penalized for having drug convictions than white applicants. Tr. 703:21-23 (Burch). And Black persons without criminal convictions are less likely to get called back by an employer than a White person with a criminal conviction. Tr. 703:24-704:2 (Burch). Thus, even controlling for non-racial factors, race remains a predictor of Black people's success (or lack thereof) in the labor market. Tr. 704:10-15 (Burch).

358.  Black people face further discrimination in transportation and infrastructure, *see* PX 372 (U.S. Department of Transportation's 2016 finding that Alabama discriminated against Black people in violation of the Civil Rights Act by partially closing driver's license offices); *see also* Tr. 467:16-468:15 (Milligan)

(discussing the State's history of intentional discrimination in public transportation funding and in infrastructure decisions); Tr. 495:15-496:21 (Douglas) (similar); Tr. 864:4-23 (Branyon) (discussing the county commission's refusal to fund public transit); healthcare, PX 368 (agreement between the United States and the state health agency to address allegations of discrimination in public health services); *see also* Tr. 1291:13-1292:20 (Landers) (discussing the State's failure to expand Medicare and racial disparities in maternal and infant mortality), and even in their private lives, *see, e.g.*, *Sims v. Montgomery Cnty. Comm'n*, 934 F. Supp. 1314, 1328 (M.D. Ala. 1996) (sheriff's refusal to promote people in interracial marriages).

359.    Housing discrimination has also continued in Alabama. *See, e.g.*, *Hall v. Lowder Realty Co*., 263 F. Supp. 2d 1352, 1362 (MD Ala. 2003) (describing a jury's determination that a real estate company was "engaging in nothing short of the severely condemned practice of racial segregation" in Montgomery County). In 2020, for example, the U.S. Department of Housing and Urban ("HUD") development determined that the Decatur Housing Authority ("DHA") had engaged in widespread and long-standing racial discrimination against Black tenants and applicants. HUD found that Black tenants occupied 100% of the units in the Westgate Gardens building, whereas 94% of the tenants in the Towers building were White. DHA had assigned Black people to Westgate Gardens, despite available units

in the Towers. DHA also provided the Black tenants at the Westgate Gardens with fewer amenities and poorer facilities. Tr. 553:22-554:1 (Bagley); PX 19 at 29.

360.   From schools to the state capitol, Black persons are forcibly subjected to the state government's publicly funded veneration of symbols widely associated with white supremacy. Tr. 1339:19-1340:4 (Coley) (describing the recent decision to remove the Confederate flag from the state capitol grounds; Tr. 1120:6-20 (Roberts) (describing the negative effect that Alabama Legislature's designation of Robert E. Lee Day has on Black students); *accord Jones v. UPS Ground Freight*, 683 F.3d 1283, 1303 (11th Cir. 2012); *Scott v. Sch. Bd. of Alachua Cnty.*, 324 F.3d 1246, 1249 (11th Cir. 2003).

361.   Furthermore, Black people have at times experienced racial discrimination in the legal system. Black people have been discriminatorily excluded from juries, *see, e.g.*, *Adkins v. Warden*, 710 F.3d 1241, 1258 (11th Cir. 2013); *McGahee v. Ala. Dep't of Corr.*, 560 F.3d 1252, 1257-59 (11th Cir. 2009); *Bui v. Haley*, 321 F. 3d 1304, 1318 (11th Cir. 2003); *Battles v. City of Huntsville*, 324 So. 3d 403, 414 (Ala. Crim. App. 2020); *Hall v. Thomas*, 977 F. Supp. 2d 1129, 1162-63 (S.D. Ala. 2013); *Stephens v. Haley*, 823 F. Supp. 2d 1254, 1276-78 (S.D. Ala. 2011); *Rice v. State*, 84 So. 3d 144, 145 (Ala. Crim. App. 2010); *Freeman v. State*, 651 So. 2d 576, 583 (Ala. Crim. App. 1994) (discussing Montgomery County's "pattern" of striking Black jurors); *Moore v. State*, 661 So. 2d 770 (Ala. Crim. App.

1994); *see also Hardin v. City of Gadsden*, 837 F. Supp. 1113, 1123 (N.D. Ala. 1993) (adopting reforms to increase Black participation in juries); *Pruitt v. State*, 871 So. 2d 101 (Ala. Crim. App. 2004) (remanding for consideration of evidence of a *Batson* violation in Montgomery County). And, even controlling for factors such as crimes severity, criminal history, and demographic context, Black people still receive longer sentences than White Alabamians. Tr. 688:5-12 (Burch); PX 13 at 13.

362.   Black Alabamians are also disproportionately impacted by Alabama's moral Turpitude laws, Tr. 640:4-22, 642:19-643:7 (Williams), which prohibit individuals convicted of certain crimes from being able to vote. Tr. 638:8-18. Returning citizens—eligible people reentering society seeking to restore their voting rights—face difficulty seeking employment, experience housing insecurity, and have lower literacy problems. Tr. 642:2-17, 643:17-644:13. Even after a returning citizen restores their voting rights, they must register to vote with specific types of identification that many individuals Ms. Williams serves do not recognize or understand, and who are disproportionately Black. Tr. 644:19-645:11, 646:19-23, 647:2-12.

363.   This history of discrimination in voting, education, employment, healthcare, transportation, housing, and the legal system results in other disparities.

364.   With respect to voting disparities, both statewide and in the counties at issue, White voters cast ballots at higher rates than Black voters. PX 11 at 5-8.

365.  In 2022, the most recent state legislative election, 89% of White Alabama residents were registered to vote statewide, compared with 84% of Black Alabama residents, according to Secretary of State data. PX 11 at 5.

366.  At the county level, the registration disparity is noticeably and consistently larger. According to the Secretary of State's data, White registration outpaced Black registration by 8.3 percentage points in Crenshaw County, 14.1 percentage points in Elmore County, 13.3 percentage points in Limestone County, 8.6 percentage points in Madison County, and 8.4 percentage points in Morgan County. Montgomery County was the only county with the reverse pattern; there, the Black voter registration rate was 1.3 percentage points higher than the White registration rate. PX 11 at 5.

367.  In the 2020 general election, 96.1% of White Alabamians were registered to vote, compared with 93.9% of Black Alabamians, according to the Secretary of State's data. PX 11 at 5.

368.  However, according to Current Population Survey data for the 2020 general election, 71% of White Alabamians were registered to vote, compared with 61% of Black Alabamians. PX 11 at 6.

369.  In the 2018 general election, 88.4% of White Alabama residents were registered to vote compared with 88% of Black Alabama residents, according to the Secretary of State's data. PX 11 at 6.

370.   However, voter registration data may not be as reflective of voters' actual intentions and expectations as voter turnout data. Tr. 693:20-24 (Burch).

371.   Turnout disparities also exist between Black and White residents statewide and in the counties at issue. PX 11 at 5-6.

372.   In the 2020 general election, statewide White turnout was 66.3% compared with Black turnout of 57%—a 9.3 percentage point gap, according to the Secretary of State's data. PX 11 at 5.

373.   Using the 2020 Current Population Survey, statewide turnout of White Alabama residents was 63.0%, compared with 54.9% of Black Alabama residents— a gap of 8.1 percentage points. PX 11 at 6.

374.   In the counties at issue, White turnout exceeded Black turnout in Crenshaw County by 10.8 percentage points, Elmore County by 16.2 percentage points, Limestone County by 9.7 percentage points, Madison County by 11.8 percentage points, Montgomery County by 11.8 percentage points, and Morgan County by 13.9 percentage points, according to the Secretary of State's data. PX 11 at 7.

375.   In the 2018 general election, statewide White turnout was 48.7% compared with Black turnout of 45.4%—a gap of 3.3 percentage points, according to the Secretary of State's data. PX 11 at 8.

376.   In the counties at issue, White turnout exceeded Black turnout by 6.1 percentage points in Crenshaw County, 12.4 percentage points in Elmore County, 3.6 percentage points in Limestone County, 6.3 percentage points in Madison County, 6.8 percentage points in Montgomery County, and 8.2 percentage points in Morgan County, according to the Secretary of State's data. PX 11 at 8.

377.   In Alabama, socioeconomic disparities in education also heavily impact the political participation of Black voters. Educational attainment is the most important predictor of voting. PX 11 at 8-9. Historical and contemporary discrimination in education has resulted in Black Alabamians graduating from high school and college at lower rates than white Alabamians. Less than 20 percent of Black Alabamians have a bachelor's degree or higher as compared to 30 percent of white Alabamians. Over 50 percent of Black Alabamians either dropped out of high school or have only a high school diploma. PX 11 at 10. In comparison, only about 40 percent of white Alabamians dropped out of high school or have only a high school diploma. *Id.* In fact, White residents fare better in every county examined in this case. PX 11 at 9. Studies show that people in lower categories of educational attainment are much less likely to vote than people who have achieved a bachelor's degree or higher. Tr. 672:22-673:2. In "priority" schools in Alabama, or those schools with a D or F rating, seventy percent of students in those schools are Black.

PX 19 at 25. Of the 206 schools themselves, 24 of them are in Montgomery County. *Id*. In Huntsville, there are 11. *Id.*

378.    There are also large disparities concerning unemployment in Alabama. Black unemployment is more than twice as high as White unemployment statewide, and the gap is even larger in counties like Montgomery. PX 11 at 12, 15. Statewide, the unemployment rate for white civilians is almost four percent. PX 11 at 15. For Black civilians, it rises to nearly ten percent. PX 11 at 15. In Montgomery County, about four percent of White civilians are unemployed. For Black civilians, the number rises to over eight percent. PX 11 at 15. Statewide, Black family poverty is almost three times as high compared to White family poverty. PX 11 at 12. The poverty rate for white families statewide is seven percent. For Black families, it increases to 23 percent. Accordingly, Black families are more likely than white families to receive SNAP benefits. PX 11 at 13. In Montgomery County, 29 percent of Black families receive SNAP assistance whereas only about six percent of White families receive SNAP benefits. PX 11 at 16. Tr. 546:9-21. All of these factors increase the "costs" associated with voting, which directly impacts political participation. Tr. 670:13-25.

379.    Black Alabamians also face health-related disparities both statewide and in the challenged areas. In Alabama, Black people are less likely to have health insurance as compared to White people. PX 11 at 13. Statewide, only eight percent

of white people lack health insurance. For Black people, that number increases to 11 percent. Scholars look at infant mortality rate as a measure of the overall health of the population. PX 11 at 17. In 2022, the infant mortality rate for white people was 4.3 percent. For Black people, the number grew to 12.4 percent, much higher than 6.7 percent figure reflective of the total population. PX 11 at 17 n.41. Additionally, there is a statewide disparity in life expectancy at birth. PX 11 at 18. Black women are expected to live more than a year less than white women. PX 11 at 18. White women are expected to live to be 77.6 years old whereas white women are expected to live until they are 78.8 years old. PX 11 at 18. There is an even larger disparity between men. Black men are only expected to live until they are 69.9 years old. PX 11 at 18. White men are expected to live to be 73.5 years old. PX 11 at 18.

380.   Additionally, Alabama's Chief Medical Officer, Dr. Karen Landers, testified that Black Alabamians suffered disproportionately from several chronic health problems, including hypertension, diabetes, obesity, and cardiovascular disease, and have less access to health care. Tr. 1290:16-1291:12. She agreed that these worse health outcomes negatively affect Black Alabamians' ability to maintain decent employment and participate in community activities. Tr. 1290:15-25.

381.   Statewide, Black Alabamians are more than twice as likely than white Alabamians to lack access to a vehicle, with over 8% of Black Alabamians lacking such access PX 11 at 13, 22. These disparities exist in the challenged areas as well.

PX 11 at 13, 22. For example, in Montgomery almost three times as many Black households, almost 10%, lack access to a vehicle than white households in Montgomery. Tr. 685:8-10 (Burch).

382.   In 2020, the United States Department of Housing and Urban Development found that the Decatur Housing Authority had engaged in widespread racial discrimination against Black applicants and tenants. PX 19 at 29; *see also* Tr. 553:20-554:1 (Bagley). HUD determined that the Decatur Housing Authority had been segregating its tenants with Black tenants living in the Westgate Gardens, which had lower quality facilities, while White tenants lived in the Towers, which had higher quality facilities. PX 19 at 29-30.

383.   Although white people are a majority of the population in Alabama, Black people are a majority of the people in prison or on parole in Alabama. PX 11 at 19. In Alabama, Black people comprise 53.3% of people in prison and 51.6% of people in prison. Tr. 688:23-699:2 (Burch). 14.7% of otherwise-eligible Black Alabamians are estimated to be ineligible to vote due to a felony conviction, compared to 8.6% of the Alabamians. PX 11 at 18. Even when studies control for factors like crime severity, criminal history, and demographic context, Black people still serve longer sentences than white people in Alabama. Tr. 688:8-12 (Burch); PX 11 at 13.

## B.    The Extent of Racially Polarized Voting

384.    The second Senate Factor concerns "the extent to which voting in the elections of the state or political subdivision is racially polarized," *Gingles*, 478 U.S. at 37, which concerns the "degree and nature of the bloc voting," *Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1225 (11th Cir. 2000) ("*Solomon II*").

385.    The Court examines several sources of evidence from both fact and expert testimony.

### 1.    Degree of racial polarization.

386.    As explained during the discussion of the preconditions, the Court finds that voting is highly and consistently racially polarized in the Huntsville and Montgomery regions.

387.    In Huntsville, most races reflect Black support for the same candidate at over 80%, and white support for that same candidate under 20% (and always under 30%). PX 16 at 8-9; Tr. 32:22-33:24.

388.    In Montgomery, Black voters supported the same candidates with over 89% of the vote in all eleven elections, and less than 11% of white voters supported those same candidates. PX 16 at 9-10; Tr. 31:1-24.

389.    As explained in the preconditions sections, none of the Secretary's experts performed a racially polarized voting analysis themselves or contested the accuracy of Dr. Liu's analysis including his results, or his methodology or data.

390.   This finding is reinforced by the fact that courts have repeatedly recognized the high degree of racially polarized voting in Alabama. *See, e.g., Milligan v. Allen*, 690 F. Supp. 3d 1226, 1314 (N.D. Ala. 2023) (three-judge court) (finding that undisputed expert testimony "fully supports the State's stipulation" that "*Gingles* II and III are again satisfied"); *Milligan v. Merrill*, 582 F. Supp. 3d 924, 1018 (N.D. Ala. 2022) (three-judge court), *aff'd sub nom. Allen v. Milligan*, 599 U.S. 1 (2023) ("voting in Alabama, and in the districts at issue in this litigation, is racially polarized for purposes of the second and third *Gingles* requirements"); *Ala. State Conf. of NAACP v. Alabama*, No. 2:16-CV-731-WKW, 2020 WL 583803, at *17 (M.D. Ala. Feb. 5, 2020) (accepting the undisputed statistical evidence proving the existence of racially polarized voting statewide); *Jones v. Jefferson Cnty. Bd. of Educ.*, No. 2:19-cv-01821-MHH, 2019 WL 7500528, at *2 (N.D. Ala. Dec. 16, 2019) (finding that voting is racially polarized in Jefferson County elections); *United States v. McGregor*, 824 F. Supp. 2d 1339, 1345-46 & n.3 (M.D. Ala. 2011) (finding that voting is racially polarized across Alabama).

### 2.    Black electoral success in relation to racial makeup of population.

391.   Another factor courts have examined in probing the nature and extent of racially polarized voting is the success of Black candidates in relation to the white voting-eligible population in the district. *See, e.g., Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 700 F. Supp. 3d 1136, 1359 (N.D. Ga. 2023)

392.   In the current Alabama Legislature, all but one Black House member and every Black Senator was elected from a majority-Black district. Doc. 230 ¶ 117; Tr. 1258:23-1259:3, 1259:7-9 (Hood).

393.   Of the five contested races in 2022 in which Black candidates ran for State Senate, two prevailed, in districts with white voting-age populations (WVAP) of 42% and 33%, and three lost, in districts ranging from 59% WVAP to 68% WVAP. *See* PX 18 at 7-8; DX 393.

### 3.   The relationship between race and party identification and alignment.

394.   In analyzing the nature of racially polarized voting, an important factor to consider is the extent to which racial identity and racial issues influence partisan alignment in the first place before assuming that partisanship and race are distinct. Tr. 710:5-23 (Burch).

395.   Several experts from both the Plaintiffs and Defendants spoke to the significant role that civil rights and racial issues played in creating Alabama's current partisan alignment, and the endurance of the racial identity and racial issues in influencing party identification.

396.   Plaintiff's expert historian Dr. Joseph Bagley testified about the general consensus that race has been the primary driving factor in the political realignment process in the South, including in Alabama. Tr. 564:5-11.

397.   Plaintiffs' expert Dr. Traci Burch also testified that the scholarly consensus is that race is very important to parties and partisanship and vote choice and politics at large, Tr. 708:3-16, explaining how the exodus of white voters from Democratic Party between 1958 and 1980 was driven in significant part by racial attitudes rather than income or other non-race-related policy preferences, Tr. 708:19-24

398.   Defense expert Dr. M.V. Hood testified that he believes that race and civil rights are part of the story in terms of issues that motivated partisan realignment in the South. Tr. 1264:16-18.

399.   Moving forward in time, Dr. Burch testified about how racial attitudes explained an increasingly large part of candidate choice and partisanship between white voters in the South between 1972 and 2000 more than ideological shifts or other policy preferences. Tr. 708:25-709:4.

400.   In the 1990s and 2000s, Dr. Bagley explained, this shift accelerated in Alabama, with strategies by Republican party elites like Mike Hubbard to target state legislative districts held by white Democrats in particular where some voters split tickets for Republicans in national or statewide races sometimes voted Republican. Tr. 538:15-22.

401.   Dr. Burch also testified about how the election of Barack Obama caused the electorate to become more polarized along racial lines. Beginning with 2008,

minority voters, Black, Latino, and Asian shifted their support towards Democratic presidential candidates, and support for Democratic candidates among white voters decreased. Tr. 709:8-7101:4.

402.    Dr. Burch found that white respondents who think that the Democratic party is mostly African-American are less favorable towards Democrats overall and more favorable to Republican and take more conservative positions on policy. The idea that parties have racial identities is another indicator that partisanship is increasingly tied to race. 710:7-23.

403.    Defense expert Dr. Bonneau agreed "you can't examine partisanship in Alabama without thinking about the role of race," Tr. 1486:22-24, and that the race of the voter is a driving factor in their political party affiliation, Tr. 1531:20-22. He acknowledged that for some voters, even if they are making choices based on party, race is a factor in making that party or candidate choice. Tr. 1486:14-17.

404.    In terms of policies, Dr. Bonneau testified that "there are policy reasons relating to racial issues for why black voters choose to more frequently vote for Democratic candidates." Tr. 1486:18-21.

405.    Specifically, Dr. Bonneau testified that "one reason why black voters identify with the Democratic Party is that black voters prefer to associate with the Democratic Party because they see it as being supportive of civil and voting rights and expanding equal protection." Tr. 1482:12-17. He also agreed that "Black voters

also tend to support Democratic candidates because they believe the party has been more open in nominating and electing African-American officials." Tr. 1482:20-24. Unsurprisingly, Dr. Bonneau has no reason to disagree that much of Black support for the Democratic Party has relied upon the party's willingness to support racial policy positions in favor of Black interests. Tr. 1483:3-8.

406.    Dr. Bonneau also agreed that it is possible that Black voters' support for the Democratic Party is also due to the Republican Party's use of racially coded language during election campaigns. Tr. 1486:9-13.

407.    On a similar note, the Secretary's expert Dr. Reilly agreed many Black voters perceive the Republican party as racist. Tr. 836:2-4. He added that "in perspective terms," one of the two primary issues holding back the GOP statistically is perceptions of racism. Tr. 836:22-25.

408.    The only witness who tried to minimize the role of race in party alignment was defense expert Dr. Adam Carrington, though he admittedly focused only on white voters. Tr. 1137:4-6.

409.    Dr. Carrington testified that he believes "nonracial partisan reasons, such as in the economic sphere, the foreign policy sphere, and also the sphere of social issues . . . are more explanatory of the long-term shift" of white voters to the Republican Party than race and racial issues. Tr. 1137:1-3.

410.   The Court assigns no weight to Dr. Carrington's opinions, however, for several reasons.

411.   First, Dr. Carrington lacks the necessary expertise to offer the opinions he does here. Dr. Carrington's self-proclaimed areas of scholarly expertise are: (i) American political institutions; and (ii) the intersection of religion and politics. Tr. 1171:22-1172:3. His scholarship has predominantly focused on the period from roughly the 1860s to the early 1900s. Tr. 1172:17-20.

412.   Dr. Carrington lacks expertise in the study of the post-Reconstruction politics of the American South. He did not focus on this area during his doctoral studies, Tr. 1172:11-16, he has not published any scholarly work particularly looking at the post-Reconstruction politics of the American South, Tr. 1173:16-23, and he has not taught any courses specifically focused on the politics of the American South, Tr. 1173:24-1174:1.

413.   Dr. Carrington also lacks essential knowledge about Alabama's politics and history. Tr. 1132:23-25. For example, Dr. Carrington does not know who Judge Robert Vance was, Tr. 1192:9-13, despite the important role Judge Vance played in leading the Alabama Democratic party in the 1960s and 1970s.[23]    And Dr. Carrington incorrectly speculated that Fred Gray was the founder of what once was

---

[23] *See generally* Michael Megelsh, *Robert Smith Vance*, Encyclopedia of Ala. (Feb. 26, 2024), https://encyclopediaofalabama.org/article/vance-robert-smith/.

an all-white Christian academy. *See* Tr. 1203:2-8. In fact, Mr. Gray is a renowned civil rights attorney who in 1970 became the first Black person elected to the Alabama Legislature since Reconstruction and who litigated numerous landmark cases, including *Gomillion v. Lightfoot*, 364 U.S. 339 (1960), *Browder v. Gayle*, 142 F. Supp. 707 (M.D. Ala. 1956), *aff'd* 352 U.S. 903 (1956), and *Carr v. Montgomery Bd. of Educ.*, 289 F. Supp. 647 (M.D. Ala. 1968), *aff'd*, 395 U.S. 225 (1969).

414.    Dr. Carrington seeks to opine on the relative weight that racial versus non-racial factors played in the realignment of Southern white voters. Tr. 1174:14-17. But Dr. Carrington has never published any scholarship analyzing the role of race, racial attitudes, or racial appeals on partisan alignment or voter participation. Tr. 1174:18-1175:6.

415.    Second, Dr. Carrington did not conduct the required "intensely local appraisal" of the Alabama State Senate districts in the Montgomery and Huntsville areas at issue in this case. *Gingles*, 478 U.S. at 79. Instead, Dr. Carrington engaged in a far-ranging and extremely attenuated survey of how various factors *may* have influenced white voters across America over a roughly 60-year period. *See generally* DX 3.

416.    Dr. Carrington did not analyze how the factors he identified impacted "Alabama state-level elections for the Legislature." Tr. 1189:2-1190:3. Nor did he include a comparison of "Alabama state legislative elections to [his] broader analysis

of the South in [his] report." Tr. 1190:7-10. For example, Dr. Carrington opined on the impact of the rise of the "New Left" on national politics, but failed to analyze the "influence of the New Left within Alabama state politics." Tr. 1192:2-4.

417.   Third, Dr. Carrington's analysis of the shift of white voters in the South to the Republican Party ignores key evidence and is contradicted by the more reliable testimony of Plaintiffs' experts Drs. Bagley and Burch, and even other defense experts including Drs. Bonneau and Hood. Dr. Bagley and Dr. Burch based their opinions on a wide-ranging consideration of the historical records, political analysis, and survey data specific to Black and white people in Alabama. In contrast, Dr. Carrington focused on national trends and failed to give any consideration to the experiences of Black Alabamians.

418.   In any event, Dr. Carrington does not dispute that statistical racially polarized voting exists in Alabama, Tr. 1185:18-22, and he acknowledges that race has "played a role in the political realignment of white voters in Alabama" from 1964 until today." Tr. 1186:2-11. Although he takes issue with Plaintiffs' experts for placing too much weight on race as a factor in the political realignment of Southern white voters, he did not conduct any statistical analysis to measure the relative influence of any of the other causal factors he identified. *See* Tr. 1186:12-17. Further, in reaching his conclusions about the presence of racially polarized voting, Dr. Carrington did not analyze the voting patterns of Black voters nor how

the factors he raised in his report impacted Black voters' voting patterns. Tr. 1190:11-16.

419.   Dr. Carrington opined on the impact of the rise of the "New Left" on national politics but failed to analyze the "influence of the New Left within Alabama state politics." Tr. 1192:2-4.

420.   Dr. Carrington identified the rise of modern conservatism as a purportedly ***non-racial*** factor in the political realignment of Southern white voters. Yet, he admitted that a key element of the modern conservatism movement "was an increase emphasis on states' rights," Tr. 1192:19-21, including a "preference for state control over the voluntariness and pace of integration," Tr. 1193:3-8.

421.   Dr. Carrington further admitted that post-1964, segregationists in Alabama would have preferred the Republicans' position on integration than the national Democrats' position, Tr. 1193:17-21, and that Senator Barry Goldwater's 1964 Republican presidential campaign and George Wallace's 1968 Democratic presidential campaign positions in opposing the Civil Rights Act and aggressive federal integration efforts would have increased their appeal to pro-segregationists in Alabama. Tr. 1196:13-23; Tr. 1197:2-12. Of course, Goldwater and Wallace both won Alabama in 1964 and 1968, respectively. Dr. Carrington further conceded that, after the Civil Rights Act, Alabama Democrats, like Governor Wallace, did not adopt the same "more aggressive integration position[s] as the national Democratic

Party" and, as a result, there were still Alabama segregationists "that may still have supported Democrats at the state level." Tr. 1197:16-24.

422.   Dr. Carrington also identified anti-communism as another purportedly "non-racial" factor influencing the political realignment of Southern white voters, despite anti-communism rhetoric often being used to tarnish the Civil Rights Movement. *See* PX 21 at 5. For instance, Dr. Carrington acknowledged that politicians accused Dr. Martin Luther King, Jr. and other Civil Rights leaders of having communist sympathies. Tr. 1203:24-1204:24. In fact, Dr. Carrington noted that his own research found that politicians had made links between communism and the Civil Rights leaders. Tr. 1204:5-14. Dr. Carrington's report fails to mention that connection.

423.   Dr. Carrington identified that the religious identity of voters and the political parties' respective positions on abortion and LGBTQ rights constituted another "non-racial" factor influencing political realignment in the South.

424.   Dr. Carrington failed to analyze whether Black Alabamians have comparable levels of religious observance as their white counterparts. Tr. 1207:5-8. But he did not dispute Pew Research surveys finding that 94% of Black Alabamians identify as Christian, and 88% of Black Alabamians see religion as very important. Tr. 1207:9-13. He failed to account for why Black and white Alabamians have such

wildly divergent voting patterns despite Black and white Alabamians having the same levels of religious identification. *See* DX 3.

425.   On abortion too, Dr. Carrington did not analyze whether the policy preferences between white Christians and Black Christians differ. Tr. 1207:16-21. He does not dispute that Pew Research has found that 48% of Black Alabamians believe that abortion should be illegal in all or most cases.  Tr. 1208:2-11.

426.   Similarly, on LGBTQ rights, Dr. Carrington did not analyze whether "Black Christians in Alabama hold similar views on LGBTQ right as white Christians." Tr. 1208:12-15.  But he does not dispute that Pew Research has shown that 47% of Black Alabamians oppose same-sex marriage and only 45% are in favor. Tr. 1208:16-1209:2.

427.   Dr. Carrington also showed signs of bias.  In a 2023 article titled "The Supreme Court's Voting Rights Decision was a Missed Opportunity," Dr. Carrington argued that "the Supreme Court's decision continued with a line of precedent at odds with important constitutional principles." Tr. 1210:12-1211:1. The "missed opportunity" referenced in his article's title was for the Supreme Court to "reunderstand the Voting Rights Act more towards precedent that had occurred prior to the 1982 amendment for particular – conscious discrimination." Tr. 1211:16-22.

428.   Fourth, Dr. Carrington failed to account for much of the relevant scholarship concerning race and politics in the last 75 years of the South or

selectively quoted it, which Dr. Bagley showed contradict Dr. Carrington's views and support a greater role of race in the partisan realignment in Alabama.

429.   Dr. Carrington cites, for example, to the political scientists Merle and Earl Black, who observed, 22 years ago, that "modern southern politics involves more than its obvious racial divisions." PX 21 at 4. But he ignores what these scholars had to say about Alabama: that the Republican Party's political strategy at the time had an explicit racial component, which was to "sweep the white conservatives and carry majorities of the white moderates." PX 21 at 4.

430.   He also acknowledged that role of Lee Atwater in Republican politics, and his discussion of using subtle racial appeals that did not explicitly invoke race to motivate white, Southern voters. PX 21 at 9.

431.   Dr. Carrington also ignores the scholarship of Dr. Patrick Cotter, Professor Emeritus of Political Science at the University of Alabama, who Dr. Bagley explained wrote from the same critical vantage point of the early 2000s that, according to the prevailing view at the time, race was the "most important" of the "social issues" that was driving white Alabama voters to the Republican Party at the time. PX 21 at 4.

432.   Dr. Carrington also did not consider evidence brought forth by Dr. Bagley that Mike Hubbard and others in the Alabama Republican Party pursued partisan goals by targeting and seeking to eliminate white Democrats, in part by

trying to manipulate the issues that appeared on the ballot in 2010, controlling the redistricting process to whitewash districts in favor of Republicans in the post-2010 Census redistricting cycle, and relying on racial appeals involving the election of President Obama and increased immigration from nonwhite people into Alabama, which together assisted in the GOP takeover of the Alabama legislature in 2010 and to maintain that control. PX 21 at 4-5.

433.   As the dean of Alabama historians, Professor Wayne Flynt, explained, when Mike Hubbard was running for reelection in 2014: "The most fundamental thing about Alabama is race and they know that. And in a day when you can no longer talk like George Wallace did because 70-80 percent of African Americans are registered to vote and it hurts the state and it hurts you with people like the Business Council of Alabama and corporate types. What you can do is you use Obama as a metaphor and everybody understands what that's about. It's not about Obama and it's not about race in Washington and it's not about race in America. But it's about race in Alabama." PX 21 at 12.

434.   Dr. Carrington also misses important Alabama-specific testimony by Dr. Bagley about how the tenuous coalition in the Democratic Party began to break down as Black political power grew, such that by the 2000s, many white Alabamians came to view the state Democratic Party as too heavily controlled by Black political interests, and leadership in the state Republican Party saw a way to use this fact to

help create a white Republican super-majority, a goal that was realized in 2010. PX 21 at 15.

435.    In sum, Dr. Carrington's lack of relevant expertise, his bias, and his flawed analysis – which did not include an "intensely local appraisal" of the districts at issue – each seriously undermine the credibility of his testimony. The Court gives no weight to Dr. Carrington's opinions.

436. Fact witness testimony from knowledgeable Black and White Alabamians familiar with the political process in the state also points to an enduring role of race in influencing partisan alignment.

437.    Greater Birmingham Ministries Executive Director Scott Douglas testified that in his decades of experience, "race is politics in Alabama," Tr. 493:16, meaning that "from representation in elected bodies to implementation of public policies, race has been entrenched as a factor in decisions that leaders often make." Tr. 493:18-21.

438.    Sen. Jim McClendon testified that about substantive policy issues that influence partisan alignment on which Black and White voters in Alabama in general have different views, such as on the preservation of confederate monuments, and the prevalence of racial discrimination. McClendon Dep. 79:22-25, 80:4-11.

439.    In sum, the whole of the evidence points to race as an important factor in driving present-day partisan affiliation in Alabama.

### 4.    Race and Partisanship in Voter Behavior and Candidate Success.

440.    Finally, there was a good deal of testimony from both fact and expert witnesses bearing on the relative impact of race and partisanship in both candidate selection and success.

### a. Race and party in voter choice.

441.    In terms of fact witnesses, several defense witnesses testified to how race still matters in selecting candidates.

442.    Senator McClendon testified that in his experience, Black voters tend to vote for Black candidates. McClendon Dep. 78:9-19. Mr. Bill McCollum, a Black Republican candidate from Fayette County, provided similar testimony. Tr. 1381:23-25.

443.    Similarly, Ms. Valerie Branyon testified that even though she was a Republican, Black voters including Democrats encouraged her to run and supported her, and that she won her 2024 race for a Fayette County Commission District that was around 50% Black. Tr. 876:10-877:9.

444.    Expert testimony from both Plaintiffs' and Defendant's witnesses also revealed the continued salience of race as a factor driving candidate choices.

445.    On the Plaintiffs' side, Dr. Liu analyzed two non-partisan mayoral races in Montgomery, in 2019 and 2023, and found despite removing the partisan cue, Black voters preferred the Black candidate with percentages of 87.2% to 91.1% of

their vote, while only 21.6% and 29.6% of white voters supported the Black candidate. PX 18 at 8-9; Tr. 52:10-20. Similarly, in the 2020 Decatur non-partisan mayoral runoff, 74% of Black voters supported the Black candidate, while only 29.2% of white voters supported him. PX 18 at 9; Tr. 52:19-20. This provides evidence that race, rather than party, was driving voting behavior. PX 18 at 8; Tr. 52:21-53:4.

446.  Dr. Bonneau agreed that the Montgomery and Decatur nonpartisan biracial mayoral races showed starkly racially polarized voting even without partisan cues on the ballot. Tr. 1502:22-25.

447.  While he speculated that the Black candidate's previous election to partisan office as a probate judge may have given the voters a partisan cue, Tr. 1457:20-1458:17, he admitted that he had no qualms with a prior research finding he quoted in his book that removing partisanship from the ballot essentially eliminates the relationship between voters' party identification and vote choice, Tr. 1503-23-1504:16.

448.  Dr. Bonneau also did not know whether probate judges have high name recognition, Tr. 1505:5-11, and he did not consider whether any of these particular candidates actually had high name recognition in association with a political party, whether these candidates had appeared with partisan figures during their campaigns,

or anything else that these candidates may have done to give their voters partisan cues, Tr. 1504:19-1505:4.

449.  Dr. Liu also used Dr. Bonneau's own state legislative county-level data and unlike Dr. Bonneau's analysis, analyzed racial voting patterns in biracial versus uniracial elections. PX 18 at 7-8; Tr. 45:14-46:14 (Liu).

450.  While biracial elections continued to exhibit strong racial polarization, with Black voters preferring the Black Democratic candidates by significant margins and white voters supporting the white Republicans, where Black voters were presented with a choice of two white candidates, Democrat and Republican, the strong polarization disappeared. PX 18 at 7-8; Tr. 45:20-46:4.

451.  Dr. Liu testified that this showed race matters more than party, or if the results are skewed because of Dr. Bonneau's data, that it undermines any of Dr. Bonneau's state legislative analysis. Tr. 46:5-14.

452.  Unsurprisingly, Dr. Bonneau agreed that it is absolutely possible that both race and party affect voters' choices in Alabama, Tr. 1531:14-19, and clarified that he was not testifying that "political parties have replaced race in driving voting choices in Alabama," but rather agrees that "that the race of the candidate may be an important factor affecting voter choice," Tr. 1494:3-9.

453.  Dr. Hood also acknowledged that in his analysis of Black voting patterns in Alabama, the highest degree of support for a Democratic candidate in

Alabama among Black voters among all the races and years he analyzed in this exit polls were for President Obama, in 2008 and 2012. Tr. 1241:18-23.

454.   Additionally, Dr. Hood agreed that in the same exit polls he relied upon for his testimony here in 2008 and 2012, in the 2008 Democratic primary, Hillary Clinton, received 72 percent of the White vote, while Barack Obama received 84 percent of the Black vote, and 89%. In the 2008 general election, in the Senate race, white voter support for U.S. Senator Jeff Sessions was 89 percent against Vivian Davis Figures, a black candidate, with Sessions receiving 58 percent of the white Democratic vote, and Figures winning 90 percent of the Black vote. On the presidential side, Barack Obama won 98 percent of black voters in Alabama, and John McCain won 88 percent of white voters, with 51 percent of white Democrats supporting McCain as well. Tr. 1247:24-1248:25.

455.   While Dr. Bonneau offered testimony about one Republican primary and one Democratic primary for the proposition that race was not a driving factor in voters' choices, his own concessions counsel against giving these races any weight.

456.   Regarding the House District 73 primary where Black Republican Kenneth Paschal won in Shelby County, Dr. Bonneau believes the race is very unusual, that he cannot draw much of a general conclusion from it, that he is not aware of any other Black Republicans who have won election to the State Legislature

since Reconstruction, and that he was not aware of any other Black Republicans defeating white Republicans in a state legislative primary. Tr. 1521:18-1522:20.

457.   In terms of the 2022 House District 74 primary, Dr. Bonneau only looked at the race after counsel made him aware of it, he decided to note it because it is a "rare thing" that a white Democrat defeated a Black Democrat in the primary in a majority-Black district, and he agrees it was low-turnout election. Tr. 1519:14-1521:25.

458.   In sum, Dr. Bonneau agreed there was no evidence that these two races represent any sort of broader pattern or trend in Alabama elections. Tr. 1524:11-15. And he did not analyze primaries where Black Republicans lost or anything beyond the Paschal race regarding Black Republicans. Tr. 1524:2-4.

459.   Dr. Bonneau also analyzed patterns of straight-party-ticket voting in Alabama to support the idea that a significant number of Alabama voters were voting based on party rather than race.

460.   But in all three elections Dr. Bonneau examined for straight-ticket voting, every single Republican candidate for statewide office was white, he was not aware of any State Senate races where the Republican candidate was Black, and he agreed it is rare in Alabama to have a Black Republican on the general election ballot, and thus, agreed that Republican straight-ticket voters may know that the candidates they're voting for are all white. Tr. 1492:16-1493:14.

461.   Dr. Bonneau also acknowledged that Black voters may well be aware that all of the candidates at least in 2022 that they were voting for were Black. Tr. 1493:15-18.

462.   Dr. Bonneau's straight-ticket voting analysis did not examine racial voting patterns, thereby limiting its utility as well. Tr. 1493:19-25.

463.   Finally, Dr. Bonneau acknowledged he was not offering any causal opinions, Tr. 1477:7-9, and his analysis in this case focused primarily on whether the race of the candidate matters, which he admits is a different question than whether Black voters have an equal opportunity to elect preferred candidates. Tr. 1529:17-24. That analysis, as he admitted, does not inform whether white voters are more or less likely to support Black candidates, setting party aside. Tr. 1530:11-17.

464.   The weight of the evidence shows that the race of the candidate, above and beyond party affiliation, still matters for both Black and white voters in Alabama.

### b. Race and Party in Candidate Success.

465.   In terms of Black candidate success, there are several facts that are not disputed.

466.   First, no Black citizen has held any statewide office in Alabama in the twenty-first century. Doc. 230 ¶¶ 93-101.

467.   Second, the only Black Alabamians to ever win a contested election to statewide office are Justices Oscar Adams and Ralph Cook in the 1980s and 1990s, both whom were appointed first and thus who ran as incumbents, giving them a significant advantage. PX 21 at 16; Tr. 1527:1-7 (Bonneau).

468.   Third, it was not until 2010 that Republicans won a majority in the Alabama State Legislature, Doc. 230 ¶ 120, but even prior to then, Dr. Bonneau was not aware of any Black candidates other than Justices Adams and Cook winning -in Alabama statewide elections or non-majority-Black districts, Tr. 1527:17-21.

469.   Despite this evidence, Dr. Bonneau contended that partisan affiliation better explains the lack of Black candidates' success more than does their race. But when tested, the basis for these opinions rest on thin reeds.

470.   Dr. Bonneau agrees that Black Democrats' very limited success statewide before realignment and total lack of statewide success after realignment compared to the white Democrats' consistent success before realignment and limited, but existing success, after realignment is a salient factor. Tr. 1528:15-21. He also agreed that white Democrats continued to win state legislative races in Alabama well into the 2000s. Tr. 1529:10-12.

471.   Dr. Bonneau agrees that the evidence in this case does not allow him to rule out race as a reason for lack of success of black candidates, Tr. 1530:18-22, and

that race is likely a reason why some African American candidates in Alabama do not have electoral success. Tr. 1531:2-13.

472.    Although Dr. Bonneau cites the success of Rep. Paschal in a majority-white district as evidence that Black candidates can succeed if they run as Republicans, he also concedes that there are not many examples of Black Republican candidates defeating White Republican candidates in Alabama, and that he is not aware of any Black person winning a contested Republican primary election for statewide office. Tr. 1531:2-9.

473.    Ultimately, Dr. Bonneau agreed that the race of the candidate could be a reason why Black Republicans underperform White Republicans. Tr. 1531:10-13.

474.    The parties also stipulated that four Black candidates ran in the Alabama 2024 congressional district 2 primary, and that they finished in the bottom four slots behind four white candidates and together received 6.2% of the total vote. Doc. 230 ¶ 106.

475.    Similarly, Black candidates ran in Republican primaries in another Alabama congressional district and state legislative district in 2024, in the U.S. Senate Republican primary in 2022, and another Alabama congressional district primary in 2010, and all not only lost but finished behind multiple white candidates. Doc. 230 ¶¶ 107-113.

476.   Of the three Black Republicans who the Secretary called to testify, only one—Valerie Branyon—won election to office, and that was in a Fayette County Commission district that was approximately 50% Black and that had consistently elected Black candidates since its creation due to Voting Rights Act litigation, and occurred after she lost two previous elections and won narrowly with about 1,000 total people voting. Tr. 852:6-853:23.

477.   Bill McCollum is an African American resident of Fayette County who testified that he ran for office four times in Fayette County. Mr. McCollum first ran as a Democrat in the 1970s, and then three additional times as a Republican, losing every race including in 2024 and in 2022 to a white Democrat previously convicted of taking bribes from bootleggers. Tr. 1370:1-1372:11.

478.   Cedric Coley is an African American Republican who has ran for office several times and lost each race, including a 2024 Republican primary for a Montgomery County Commission district when he lost to a white candidate and received approximately 19% of the vote in a two-way race. Tr. 1329:13-1330:12, 1335:21-23. Mr. Coley has also worked as a campaign strategist on behalf of other several other Black Republicans running for Alabama state legislature, and other than Rep. Paschal, all of them lost their races. Tr. 1342:19-1343:15.

479.   Dr. Bonneau also analyzed Democratic candidates who lost state legislative races in 2022 to examine the correlation between Black voters and

Democrats, but did not examine anything about white voters, and did not difference in vote choice for Black voters depending on candidate race. Tr. 1494:15-1495:11. He also did not examine the role party plays in these races. Tr. 1498:13-17.

480.    In terms of this analysis, in addition to Dr. Liu showing that the race of the candidate mattered for Black voters, Dr. Bonneau admitted several methodological shortcomings: that his analysis did not involve comparison of races in the relevant regions, Tr. 1499:5-19, that his county-level analysis has a small unit size problem, and that it overweighs counties that have more than one district. Tr. 1499:20-1501:3.

481.    Dr. Bonneau also agreed that he was not considering racial voting patterns here at all, and that it was possible better Black candidate performance could result from higher levels of Black voter support or because they run in higher BVAP districts. Tr. 1501:4-1502:17.

482.    Dr. Bonneau also attempted to use the 2018 and 2022 District 2 State Senate races to show that the white Democratic candidate in 2018 and Black Democratic candidate in 2022 performed similarly in their losses, but admitted that this comparison  does not account for different district lines, demographics, or turnout, and does not consider whether Black or white voters supported each candidate similarly or differently. Tr. 1496:2-1497:13.

483.   Dr. Bonneau also performed some analyses of judicial elections in Alabama. There, he admitted that in the only three Alabama State Supreme Court elections in which incumbents lost in a 22-year period, two of the losses were Black candidates, and one was a white Republican who was defeated by a white Democrat. Tr. 1511:6-12.

484.   Regarding marginally higher vote percentages for the two Black Democrats who lost in 2000 compared to the two white Democrats who lost, Dr. Bonneau admitted that the two Black Democrats were incumbents, and all else being equal, judicial incumbents have a formidable advantage, and it can certainly be true that higher vote totals for a Black candidate were informed by a high percentage of Black voters who voted for that candidate. Tr. 1513:23-1514:10.

485.   Finally, Dr. Bonneau performed a regression analysis that sought to show that Black Democratic candidates to the Alabama Supreme Court performed better than White Democratic candidates. But he acknowledged a data error in his coding, and previously testified that after correcting the error, his analysis of showed that Black Democratic candidates for the Supreme Court received significantly lower vote shares on average than white Democratic candidates. Tr. 1517:8-16.

486.   At trial, Dr. Bonneau walked back that testimony based on another data error, and says that he would not have run the analysis again because he does not think it would yield results they are interesting or significant. Tr. 1413:21-1414:9.

487.   Regardless, Dr. Bonneau still agrees that in his analysis of Alabama state supreme court elections, we cannot eliminate race as the reason why Black Democrats perform worse than white Democrats, and as between race and party race may be a factor here, but party is not since the analysis compared white Democrats to Black Democrats. Tr. 1517:17-1518:9.

488.   Based on evidence from fact and expert witnesses including empirical analyses, historical and contemporary contextual evidence, and the experience of knowledgeable Alabamians, the Court finds that voting in the Huntsville and Montgomery regions of Alabama remains starkly polarized by race, and that these patterns cannot be explained by mere partisan affiliation and are better explained by the influence of race and racial politics and attitudes.

## C.   Senate Factor 4: Candidate Slating Processes

489.   Witness testimony—largely from the Secretary's own witnesses—demonstrates that the Republican Party has not equally supported Black Republicans, that Black people lack roles in its leadership, and that it is not open to candidates who support issues important to Black voters.

490.   First, in Alabama, Black Republican candidates have less success than white Republicans in receiving financial contributions or endorsements from elected officials in Republican primaries.

491.   For example, no incumbent elected officials endorsed Mr. Coley in his 2024 race for Montgomery County Commission. Tr. 1329:24-1330:10. Mr. Coley testified that, when running for office, "it matters" whether a candidate has substantial financial support. Tr. 1319:2-4. He believes the fundraising disparities and endorsements from elected officials factored into his loss to a white Republican in the 2024 Montgomery County Commission primary. Tr. 1318-3-1319:15.

492.   Although Ms. Branyon received support from the Republican Party after her deposition was taken in August 2024, she did not any receive financial or logistical support from the party in her 2020 race. Tr. 874:7-20; *see* Tr. 858:3-24.

493.   Black Republicans received significantly less campaign contributions than white candidates in the Republican primaries in 2024 for Congressional District 3 and State House District 27, in 2022 for U.S. Senate, and in 2010 for Congressional District 5. Doc. 230 ¶¶ 107-114.

494.   Second, Black Alabamians are significantly underrepresented in the Republican Party's leadership. For example, Mr. Coley testified that Black people hold 2 of 30—that is 6.67%—of the seats on the Montgomery County Republican Executive Committee, Tr. 1332:17-24 (Coley), but Black people are 56.33% of the VAP in Montgomery County, PX 6 at 26 tbl.14 (Fairfax Report).

495.   Third, the Republican Party is not open to candidates who support issues important to Black voters. It is undisputed that Black voters and civic groups

are strongly supportive of certain issues, like the need to remedy discrimination, opposition to symbols of the Confederacy, increased funds for health and public transportation, and reform of drug laws and policing. *See, e.g.*, Doc. 230 at 79:22-25, 80:4-11 (McClendon); Tr. 132:6-133:21 (Peoples); Tr. 154:12-155:12, 162:10-163:3 (Simelton); Tr. 497:2-8 (Douglas); Tr. 561:23-562:15 (Bagley); Tr. 864:6-23 (Branyon); Tr. 1338:9-1339:4, 1339:19-1341:19 (Coley); Tr. 1482:9-19 (Bonneau).

496.   Despite both Black voters' interest in these issues and their connection to historical discrimination, Republican politicians have been less interested in addressing these issues, Tr. 864:6-23 (Branyon); Tr. 1338:9-1339:4 1339:19-1341:19 (Coley). For example, the Republican Senate majority recently passed laws that made it harder for the City of Huntsville to retain a diversity officer, Tr. 149:19-150:5 (Peoples), *see* Ala. Senate Bill 129 (2024), and more difficult for cities to remove monuments to the Confederacy, *see* Ala. Memorial Preservation Act, Ala. Code §§ 41-9-230–237. Several Black Republicans testified to their own disappointment in Republicans' lack of support for increased public transit funding and criminal justice reform. Tr. 864:4-865:12 (Branyon); 1338:9-1339:4 (Coley).

497.   The Alabama Republican Party is majority White. Tr. 1337:13-15 (Coley). All Alabama Republican state legislators, except one, are White. Doc. 230 ¶ 103. The Party's local leadership is predominately White. Tr. 1332:17-24 (Coley).

All Republicans who ran for statewide office in 2022 were White. Tr. 1492:16-1493:14 (Bonneau).

498.    Generally, the Republican Party is also perceived as White. For example, 97.2% of Americans think that the typical Republican is White. Tr. 710:5-23 (Burch). Moreover, White respondents who think that the Democratic Party is mostly Black are less favorable towards Democrats overall and more favorable to Republicans and take more conservative positions on political issues. Tr. 710:5-23 (Burch). The Democratic Party is perceived as the party that supports civil rights and "racial liberalism" while the Republican party is associated with "racial conservativism," including greater resistance to government programs to redress the racial inequality. *See* Tr. 707:23-706:16 (Burch); Tr. 1193:17-1196:23 (Carrington).

499.    No Black Republican since Reconstruction has ever been successful in a contested primary for any statewide or federal office. Tr. 1531:6-9 (Bonneau).

500.    In 2024, six Black candidates lost in the Republican primaries for Congressional Districts 2 and 3, and Alabama State House District 27. Doc. 230 ¶¶ 106–110. Yet, support for these Black candidates in these Republican primaries never exceeded 8.7% of the total votes. *Id.*

501.    Black people have lost other Republican primaries for other offices, including Congress and the U.S. Senate. *See, e.g.,* Doc. 230 ¶¶ 111, 113.

502.   Except for Mr. Paschal, no other Black Republican has won election to the State House since Reconstruction. Doc. 230 ¶ 103; Tr. 1421:16-18 (Bonneau).

503.   In the Congressional District 2 Republican primary, one Black candidate had held local elected office and a leadership role in the State Republican Party and another held a county appointed position. Doc. 230 ¶ 106. Yet, all four Black candidates *combined* received only 6.2% of the vote. *Id*. Every Black candidate was outperformed by a White candidate who had recently graduated college, had never held elected office or a role in the party, and worked as a real estate agent. *Id.*

D.   **Senate Factor 6: Racial Appeals**

504.   In the last decade, both overt and subtle racial appeals have defined political campaigns in Alabama. PX 19 at 30-33; Tr. 555:21-557:10, 558:10-561:7 (Bagley).

505.   Alabama's 2017 U.S. Senate election featured racial appeals from both candidates: Judge Roy Moore and former Senator Doug Jones. Tr. 555:21-556:3. During the campaign, Moore insisted that the United States would be better off without any of the Reconstruction Amendments. This would of course include the 13th Amendment, which ended slavery, and the Fifteenth Amendment, which established voting rights for Freedmen. In the context of life before the Thirteenth Fourteenth and Fifteenth Amendments, Moore described the antebellum South as

"great" because "at the time when families were united — even though we had slavery. They cared for one another. People were strong in the families. Our families were strong. Our country had a direction." PX 19 at 32; Tr. 556:4-13.

506.  Moore used racial appeals in political advertisements as well. In one ad containing two Black men, his campaign indicated "democratic operatives in Alabama are registering thousands of felons across the state," which is reminiscent of the infamous George H. W. Bush campaign ad featuring the face of William Horton, a Black man. Tr. 556:14-25. These advertisements are attempts at labeling opponents as soft on crime, using racist stereotypes of Black people. Tr. 556:25-557:5.

507.  Doug Jones used racial appeals to attract Black voters when he ran against Roy Moore in the 2017 election for U.S. Senate. Jones sent mailers to Black voters highlighting Moore's connections to hate groups like the Ku Klux Klan. PX 19 at 33. Another mailer argued Moore was "not on our side," in reference to racialized sides, noting he led the fight to keep schools segregated in Alabama. PX 19 at 33; Tr. 558:10-20. A different mailer from Jones explicitly appealed to Black men, reading: "Think if a black man went after high school girls, anyone would try to make him a senator?" with the face of a black individual above the words giving a skeptical look. PX 19 at 33; Tr. 558:22-559:5. Jones also emphasized his prosecution of the 16th Street Baptist Church bombers from 1963. One ad stated:

"Klansmen bombed a black church in Birmingham, killing four little goals. U.S. attorney Doug Jones prosecuted the Klansmen and got justice for Alabama." PX 19 at 33.

508.   More recent racial appeals came from Alabama U.S. Senator Tommy Tuberville. He has said white nationalists are not racist, for example, and indicated that he believes "inner-city" teachers are lazy and unqualified. PX 19 at 30. Laziness is a common racial trope invoked against Black people. PX 19 at 30. The term "inner-city" has a long history of being coded to invoke the post white-flight core of metropolitan areas with predominately Black populations. PX 19 at 30. In 2023, Tuberville said "The Covid really brought it out how bad our schools are and how bad our teachers are – in the inner city. Most of them in the inner city, I don't know how they got degrees, to be honest with you. I don't know whether they can read and write ... They want a raise, they want less time to work, less time in school. We ruined work ethic in this country." PX 19 at 30. Suggestions that Black teachers are both unqualified and undeserving of college degrees has been a widespread racist argument since initial school desegregation in Alabama. PX 19 at 30-31.

509.   Former Alabama Secretary of State John Merrill also evoked laziness when dismissing efforts to make voting disproportionately easier for Black voters. He described voting by mail and automatic voter registration as "a sorry, lazy way out" and that he was "not going to embarrass [civil rights icons like John Lewis] by

allowing somebody that's too sorry to get up off their rear to go register to vote." PX 19 at 33.

510.  In the 2018 election for Chief Justice of the Alabama Supreme Court, Tom Parker boasted in his campaign ads about having "taken on and beaten the Southern Poverty Law Center" in an ad featuring California congresswoman Maxine Waters, a Black woman. PX 19 at 33; Tr. 560:19-561:1. A court recently found this statement alongside images of Congresswoman Waters shows that "one of the motives of the ad was to draw attention to race." *Ala. State Conf. of the NAACP v. Alabama*, 612 F. Supp. 3d 1232, 1309 (M.D. Ala. 2020); Tr. 560:19-561:1.

511.  Mo Brooks, former U.S. Congressman for Alabama's 5th District that includes Huntsville and Decatur, has repeatedly claimed that his political opponents are waging a "war on whites." PX 19 at 31. Brooks has characterized people who receive assistance through the Supplemental Nutrition Assistance, or SNAP, program as "slackers" and "welfare queen," an old racial appeal suggesting that Black citizens are cheating the welfare system by using the example of a single African-American woman. PX 19 at 31; Tr. 559:13-560:5. Brooks also invoked the phrase "bloc vote" when describing Black voters, saying: "They are trying to motivate the African American vote to vote-bloc for Democrats by using every Republican as a racist tool that they can envision." PX 19 at 31.

512.   Alabama State legislators from the challenged regions have made racist appeals as well. In metropolitan Montgomery, former State Representative Will Dismukes served as a chaplain for the Prattville Dragoons, a Sons of Confederate Veterans group that lobbied to maintain state funding for a Confederate memorial park. PX 19 at 31. Dismukes also spoke repeatedly about the "hateful days of Reconstruction and glorified the days of the redemption that followed" which "established white supremacy in the state" of Alabama. Tr. 560:6-18.

513.   In 2020, Dismukes described George Floyd, a Black man, as a "drugged career criminal" and encouraged people to channel their anger over the removal of Confederate monuments into "something constructive as our ancestors did by rebuilding their homes and lives during the hateful years of Reconstruction. They were courageous during the War for Southern Independence and afterwards," he said, "and we, their descendants [sic] must be as well." PX 19 at 31; Tr. 560:6-18. Dismukes also repeatedly used the phrase "Deo vindice," or "God will vindicate [the South]," meaning the Confederacy. PX 19 at 31-32. When asked to apologize for those statements, he rebukes "it's time for people to stop being so sensitive and apologetic and take a stand before our country is Gone with the Wind," with the latter phrase being a reference to the "Lost Cause of the Confederacy" by way of the popular novel and film. PX 19 at 31-32.

514.    Former state Senator Scott Beason made racial appeals targeting the Latino community, suggesting the Alabama Legislature could "unload the clip and do what has to be done" in passing anti-immigration legislation. PX 19 at 32. In an attempt to walk back his comments, Beason said: "I began telling the story about a family visiting a big city when some guy with a knife or gun jumps out from behind some bushes and comes at them," and then "The story talks about how a Democrat handles the situation, I think I said the Democrat tells the guy he'll put together a charity basketball league or something to raise money to help him. The second family, that father has a gun but takes only one shot. The third family, and that father also has a gun, but he empties the clip. He solves the problem." PX 19 at 32.

515.    Beason also called Black people "aboriginees" while caught on wiretap he voluntarily wore. Another white Alabama lawmaker, Larry Dixon, referenced Black people as "illiterates" during the exchange. PX 19 at 32.

516.    Finally, former co-chair of the Redistricting Committee Representative Pringle ran a campaign ad indicating "that if you are white like him, that everybody tries to blame all of society's problems on you," in an appeal to white grievance. Tr. 560:19-561:7.

517.    Current Montgomery County Republican Party Elections Chair Cedric Coley offered explicit racial appeals as well, testifying that he posts public images on his Instagram to encourage people to vote Republican. Tr. 1347:22-24. Among

those images was one showing "a dark gray hand over a blue background" in the form of "a fist" associated with the phrase "black power," with "the image of a Democratic Donkey on it," with text reading "Not mobs . . . Walk away from violence, walk away from hypocrisy, walk away from globalist Democrats." Tr. 1348:16-1349:16. Next to the "dark gray hand" was "a white hand over a red background[,]" with an "emblem of the Republican Party, the elephant on the white hand." Tr. 1349:17-22. The "white hand" was making a hand gesture that "the FBI categoriz[es] ... as white supremacist," Coley said, above text that said, "vote Republican." Tr. 1349:20-1350:10.

**E.    <u>Senate Factor 7: Lack of Black Electoral Success</u>**

518.    Black people in Alabama remain underrepresented, as a proportion of the population, in public office, and Black Alabamians have been almost entirely unable to succeed in running for office unless a majority of the relevant electorate is Black. Doc. 230 ¶¶ 93-94, 102-03, 117.

519.    Black candidates have been elected to the state legislature since the 1970s, though mostly via the creation of majority-minority districts obtained through federal voting rights litigation. PX 19 at 33.

520.    Even though Black people comprise approximately 27% of Alabama's population, only 20% of Alabama's State Senate delegation is Black. Doc. 230 ¶ 117; PX 19 at 34.

521.    Not a single current statewide official who ran for the office is Black. Doc. 230 ¶ 93.

522.    Every single Black State Senator in the current Alabama Senate and all but one Black State Representative in the current Alabama House were elected in majority-Black districts. Doc. 230 ¶ 117.

523.    There are currently no Black Senators representing any of the districts inside the Huntsville-Decatur-Albertville CSA. PX 19 at 34.

524.    Until this year due to successful litigation by VRA Plaintiffs in *Milligan v. Allen*, since the start of the Twentieth century, Alabamians had never elected a Black person to Congress outside of the majority-Black district 7, and only since 1992 when a court order first established district 7 as a majority-Black district. Doc. 230 ¶ 102.

525.    Only two Black people have ever been elected to statewide office, and both ran as incumbents after first being appointed. No Black person has won election to statewide office in Alabama since 1996 (or before 1982). Doc. 230 ¶ 94.

526.    Kenneth Paschal is the only Black Republican ever elected to the Alabama State legislature since Reconstruction, there has never been a Black Republican elected to the Alabama State Senate since Reconstruction, and there has never been a Black Republican elected to statewide office. Doc. 230 ¶ 103.

### F.    Senate Factor 8: Unresponsiveness of Elected Officials to Minority-Group Needs

527.    Witnesses from both parties provided testimony about some of the particularized needs of Black Alabamians and how the Legislature and other elected officials have not only failed to meet them, but actively and consistently opposed efforts to ameliorate them.

528.    With respect to healthcare, there is unrebutted testimony that the refusal to expand Medicaid disproportionately harms black communities. Tr. 650:3-651:8 (Williams).

529.    Some 300,000 families, who are disproportionately African Americans, have been denied the benefit of Medicaid expansion, which would increase the health care outcomes of those impacted families. Tr. 497:3-8 (Douglas).

530.    Even Dr. Landers, the Secretary's witness, testified to witnessing the positive effects of Medicaid expansion in 1990s and how it began to address disparities for the underserved population in Alabama. Tr. 1297:6-21. Alabama has an opportunity to expand Medicaid further under the ACA; it has not done so. Tr. 1297:22-1298:5.

531.    Dr. Burch testified about how Black Alabamians lack equal educational opportunities in numerous respects, but with respect to public school funding, Alabama remains in the bottom in the United States, with many districts in the relevant areas lower than the state average. Tr. 702:9-13.

532.  With respect to redistricting itself, the three-judge panel in *Milligan* found that "the circumstances surrounding the enactment of the 2023 Plan reflect "a significant lack of responsiveness on the part of elected officials to the particularized needs" of Black voters in Alabama." *Milligan v. Allen*, 690 F. Supp. 3d 1226, 1315 (N.D. Ala. 2023) (listing the mysterious and hidden process by which the proposed remedial plan was introduced and passed, the introduction of legislative findings that removed references to preventing vote dilution the fact they were drafted not by legislators but by the Alabama Solicitor General, and State's view that "the Legislature could remedy the vote dilution we found without providing the remedy we said was required: an additional opportunity district").

533.  In terms of the State Senate map at issue here, elected officials also ignored public comments about the plan. Senator McClendon did not read all of the submissions submitted by the public regarding the map. McClendon Dep. Tr. 63:3-7, failed to provide Mr. Hinaman with the public's submissions, McClendon Dep. Tr. 63:8-10, and he failed to make changes to the map in response to public submissions about District 26 packing Black voters in unnecessarily – comments that he heard "often." McClendon Dep. Tr. 66:6-14.

534.  Mr. Hinaman did not fully attend any of the public hearings regarding redistricting, Hinaman Dep. Tr. 43:24-44:9, did not recall any specific input from the public about the Senate districts, Hinaman Dep. Tr. 44:16-19; and could not

name an instance where he made changes to the Senate map in response to public input, Hinaman Dep. Tr. 45:7-14; 46:3-8.

535.   There is also consistent evidence of the failure of white legislators to participate in black-community events and respond to outreach in the Montgomery and Huntsville areas. Mr. Simelton testified that he has "not seen any white legislators at any of the Decatur events that [he] ha[s] attended" and does not "think [he's] seen any at the Huntsville Madison County branch events either." Tr. 165:15-17. Mr. Simelton has never had any Huntsville-based white legislators reach out to him to discuss civil rights issues. Tr. 180:20-22.

536.   Ms. Peoples testified that she has contacted two Black state representatives, Rep. Laura Hall and Rep. Anthony Daniels. Tr. 136:9-14; 136:24-137:1. Her chapter invited Rep. Hall to be a guest speaker at an event and presented her with an award, while Mr. Daniels called her back. Tr. 136:15-22. Ms. Peoples' state senator has never reached out to Blacks in Government nor asked to speak at any Blacks in Government events. Tr. 150:21-24.

537.   Mr. Milligan testified that "the members of the Legislative Black Caucus would be . . . the most responsive to outreach, Tr. 461:12-15, and although he would reach out to white Senators from the Montgomery area as well, "often, there wasn't a response back," Tr. 462:17-21.

538.   Witnesses also testified regarding the failure of white elected officials to be responsive to the concerns of the minority community. As a Black American, Mr. Coley testified to facing difficulties in aligning himself with the Republican Party on criminal justice reform Tr. 1338:9-1339:4.

539.   Ms. Williams testified how, over the years, GBM has supported legislation that would provide better access for people living in poverty that would provide better health care and  a higher minimum wage, and almost every one of those bills were defeated. Tr. 649:17-21.

540.   Mr. Douglas testified about his experience being part of a coalition to raise the minimum wage in the state of Alabama. After convincing the city council and mayor pass an ordinance to raise the minimum wage from $7 and a quarter to $10.10 an hour, the Legislature convened and met and passed a new law that nullified the proposed minimum wage ordinance and preempted any other municipality in the state anywhere else in the state from doing the same. Tr. 494:13-23.

541.   Ms. Peoples testified about how Alabama's anti-diversity-equity-and-inclusion law may prevent the city of Huntsville from appointing a new officer of Diversity Equity and Inclusion. Tr. 149:19-150:5.

542.   Additionally, Mr. Milligan testified that public transportation ridership in Montgomery is "over 90 percent" African-American. Tr. 469:7-15.

543.   Mr. Douglas testified that, historically, public transportation across the state including Birmingham, Huntsville, Montgomery, Mobile, and the rural areas are deficient because the state legislature passed a constitutional limit forbidding the use of gas taxes and road taxes to pay for public transportation in the 1950s in direct response to the public transportation desegregation movement. Tr. 501:10-24.

544.   Ms. Branyon testified that Fayette County fails to provide public transportation services as well. Tr. 864:6-7. This means many people cannot get to the store to get their food and are charged tremendous amounts of money to access transportation. Tr. 864:8-10. Some citizens in Fayette County cannot tend to their medical needs because they lack transportation. Tr. 864:11-15.

545.   Further, Mr. Simelton testified about SB 1 having a racially disparate impact on African Americans "[b]ecause through [the Alabama NAACP's] work," it seemed that a "more significant number of African-Americans" needed "assistance with helping them to not only read, but also understand[ing] . . . what is required on the application and how to get it submitted to the proper authorities." Tr. 177:19-23.

546.   Mr. Roberts testified to how "celebrating Robert E. Lee Day" reflects a lack of "care" for Black people, because "Robert E. Lee is associated with the Confederacy" and the Confederacy is closely associated with the enslavement of Black people. Tr. 1119:11-1120:4. Mr. Roberts later added that the State of Alabama celebrates Robert E. Lee Day "per legislative act" by Alabama's State "legislature."

Tr. 1126:16-1127:9. Across Alabama, schools still bear the names of former Confederate leaders, Mr. Roberts testified. Tr. 1120:18-20. The testimony of these witnesses was unrebutted.

### G.     Senate Factor Nine: Tenuousness of Policy

547.     The Legislature's redistricting criteria requires compliance with Section 2 of the VRA, among other laws. Doc. 230 ¶ 19. The Legislature also explicitly required "priority [] to be given to the compelling state interests requiring equality of population among districts and compliance with the Voting Rights Act of 1965, as amended, should the requirements of those criteria conflict with any other criteria." Doc. 230 ¶ 24.

548.     Despite the Legislature's clear mandate to prioritize compliance with the VRA, Senator McClendon failed to instruct Mr. Hinaman about which guidelines to prioritize in his mapdrawing. Doc. 235-1 at 24:19-21; Doc. 235-2 at 18:2-10; 24:13-16; 58:14-20. In fact, Senator McClendon failed to advise or even monitor whether Mr. Hinaman's map complied with the Voting Rights Act. Doc. 235-1 at 39:5-10; 47:5-13. Mr. Hinaman, in turn, failed to consider race at all in the mapdrawing process, Doc. 235-1 at 28:9-15; 28:22-29:1; 29:14-17; 60:2-5, Doc. 235-2 at 46:14-21, until the very end before he submitted the map to the Redistricting Committee, Doc. 235-2 at 46:22-47:8. And when he did look at the racial demographics of the Senate map, Mr. Hinaman only used the data to ensure already existing majority-Black districts continued to

perform as majority-Black districts. Doc. 235-2 at 48:19-49:23. Ultimately, he did not make any changes to the map after viewing the racial demographic data. Doc. 235-2 at 51:16-21.

549.     Other than consulting with their counsel, neither Senator McClendon nor Mr. Hinaman took steps to determine whether the map complied with the Voting Rights Act. Doc. 235-1 at 38:9-22; Doc. 235-2 at 53:19-54:16. For instance, when cracking the Black community in Huntsville, Mr. Hinaman did nothing to ensure that he would not violate the VRA. Doc. 235-2 at 74:20-75:1. Neither Mr. Hinaman nor Senator McClendon could recall if any party conducted a racial polarization of the State Senate districts. Doc. 235-1 at 42:20-23; 60:6-11; Doc. 235-2 at 56:21-57:4.

550.     Despite the Legislature's clear mandate to prioritize Section 2 compliance, the map drawers instead prioritized less important criteria over compliance. For instance, except for adjusting for population deviation and uniting counties and precincts, Mr. Hinaman failed to consider other factors, including compliance with the VRA. Doc. 235-2 at 57:5-15; 59:17-60:4. Senator McClendon similarly recalled that the only changes made to the Huntsville districts were to account for changes in population and for incumbent preferences. Doc. 235-1 at 69:3-10; 69:18-21.

551.     The Legislature similarly required that the map drawers respect "communities of interest, neighborhoods, and political subdivisions to the extent practicable[.]" Doc. 230 ¶ 23(c). Despite this, Mr. Hinaman was not given any

instruction to keep communities of interest together, Doc. 235-2 at 75:8-10, and he in fact did not try to keep any together. Doc. 235-2 at 75:11-14. For instance, Mr. Hinaman was aware that there is a concentrated Black community in Huntsville. Doc. 235-2 at 72:10-23. He agreed that this could be considered a community of interest, and that he in fact considered the Black community in Huntsville to constitute a community of interest. Doc. 235-2 at 72:24-73:5. Nevertheless, he stated "he wasn't focused on" the fact that his map split that community into three separate districts. Doc. 235-2 at 73:6-13. He never considered keeping that community together. Doc. 235-2 at 73:16-18. When asked how he defined communities of interest, Senator McClendon named geographic boundaries such as county lines or schools districts but could not be more specific. Doc. 235-1 at 48:19-49:8. Other than the Shoals community, Senator McClendon could not recall any specific communities of interest he considered. Doc. 235-1 at 49:9-50:12. Neither could he recall specific discussions of communities of interest in any meeting he attended with Mr. Hinaman and other Senators. Doc. 235-1 at 85:19-24.

## CONCLUSIONS OF LAW

### I. <u>Jurisdictional Issues</u>

#### A. <u>Plaintiffs Have Standing</u>

552.   An organization has associational standing if: (1) its "members would otherwise have standing to sue in their own right;" (2) the "interests it seeks to protect are germane to the organization's purpose;" and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). The Alabama NAACP and GBM satisfy the three *Hunt* factors in the challenged regions. *See Greater Birmingham Ministries v. Sec'y of State (*"*GBM*"), 992 F.3d 1299, 1316 (11th Cir. 2021) (holding that both the Alabama NAACP and GBM had standing to assert a §2 claim against an Alabama law when both organizations identified members harmed by the law).

553.   First, there is no serious dispute that protecting the right to vote is germane to both organizations' purposes. *See GBM*, 992 F.3d at 1316 (finding that a §2 lawsuit was germane to GBM's and the Alabama NAACP's purposes "focus on voter rights and equal opportunity for minority voters").

554.   Second, Plaintiffs request prospective injunctive relief that does not require the participation of individual members in the lawsuit. *See GBM*, 992 F.3d at 1316 (finding that the "voting rights claims asserted" and the "injunctive relief

requested" does not "require the participation of the individual members"). "If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. Indeed, in all cases in which we have expressly recognized standing in associations to represent their members, the relief sought has been of this kind." *Hunt*, 432 U.S. at 343 (citation omitted).

555.   Third, the Alabama NAACP and GBM have both identified members who are Black registered voters residing in the Huntsville-Decatur and Montgomery regions who would have standing to sue in their own right. *See GBM*, 992 F.3d at 1316 (holding that GBM and the Alabama NAACP could assert claims on behalf of its individual members); *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1163 (11th Cir. 2008) (permitting the Florida NAACP to assert claims on behalf of its individual members); *see also Ala. Legis. Black Caucus v. Alabama* ("*ALBC*"), 575 U.S. 254, 270 (2015) (finding that an organization had standing to challenge gerrymandered legislative districts where it identified members in those districts).

556.   In a racial vote-dilution claim under Section 2 of the Voting Rights Act, an individual has standing to pursue a claim if they are a Black registered voter who resides in a "packed or cracked" district but could be redrawn into a new majority-Black district. *Harding v. Cnty. of Dallas*, 948 F.3d 302, 307 (5th Cir. 2020) (quoting

*Gill v. Whitford*, 585 U.S. 48, 67, 69 (2018)); *see also Nairne v. Ardoin*, No. CV 22-178-SDD-SDJ, 2023 WL 7673856, at *5 (M.D. La. Nov. 14, 2023) ("the relevant standing inquiry" is whether Plaintiffs live in a "a reasonably compact area that could support additional" majority-Black districts); *Thompson v. Kemp*, 309 F. Supp. 3d 1360, 1365 (N.D. Ga. 2018) (Plaintiffs alleged sufficient injury where they live in an area "where African–American voters are sufficiently numerous and geographically compact to comprise a majority of voters in at least one additional House district").

557.  Here, both the Alabama NAACP and GBM have named specific individual members who live in areas in the Montgomery and Greater Huntsville (and in the case of GBM, a congregational member leader as well) areas that are either cracked (Huntsville/Decatur and SD 25) or packed (SD 26), and thus could reside in a new majority-Black district that would remedy that vote dilution. *See supra* ¶¶ 5-9, 15-21.

558.  Additionally, individual Plaintiff Evan Milligan has standing to challenge vote dilution in Montgomery as a Black registered voter living in a packed district. *See supra* ¶¶ 22-23.

559.  The Court concludes that both Alabama NAACP and GBM have established associational standing, and Mr. Milligan has individual standing.

## B.    <u>Section 2 Creates a Private Right of Action</u>

560.    Plaintiffs possess a private right of action to bring their Section 2 claim.[24] The VRA's text and decades of binding precedent correctly foreclose any argument that the VRA lacks a private right of action. *Morse v. Republican Party of Va.*, 517 U.S. 186, 232 (1996) (plurality opinion) (quoting S. Rep. No. 97-417, at 30 (1982)); *see id*. at 240 (Breyer, J., concurring) (same).  Plaintiffs also brought their claim under 42 U.S.C. § 1983, Doc. 126 at 43, which provides another basis for this Court's jurisdiction.

561.    Section 2 of the Voting Rights Act is privately enforceable by persons such as the plaintiffs in this case. In *Morse*, the Supreme Court concluded that "the existence of the private right of action under Section 2 . . . has been clearly intended by Congress since 1965." 517 U.S. at 232 (omission in original) (internal quotation omitted).

562.    Furthermore, in 1975, Congress amended the general enforcement mechanism in Section 3 to make explicit that private parties can sue to enforce the VRA. Section 3 originally gave enforcement authority only to the Attorney General of the United States. The 1975 amendments set forth the judicial procedures governing actions by "the Attorney General or an aggrieved person . . . under any statute to enforce the voting guarantees of the fourteenth and fifteenth amendment."

---

[24] Plaintiffs incorporate by reference their briefing in opposition to the Secretary's motion to dismiss on this ground. *See* Doc. 138.

52 U.S.C. §§ 10302(a), (b), and (c); *see Morse*, 517 U.S. at 233 (explaining that the 1975 amendments to the VRA recognized that private rights of action were available to enforce the VRA); *Ala. State Conf. of the NAACP v. Alabama*, 949 F.3d 647, 651-52 (11th Cir. 2020), *vacated as moot*, 141 S. Ct. 2618 (2021).[25] Justice Stevens's opinion for the court, Justice Breyer's concurrence, and Justice Thomas's dissent in *Morse* all recognized that the amended Section 3 gives a right of action under the VRA to private parties. *Morse,* 517 U.S. at 233; *see also id.* at 240 (Breyer, J., concurring) (recognizing that, in amending § 3, Congress gave "a private right of action to enforce § 10 [of the VRA], no less than it did to enforce §§ 2 and 5"; *id.* at 289 (Thomas, J., dissenting) ("As appellants accurately state, § 3 explicitly recognizes that private individuals can sue under the Act." (cleaned up)). "A ruling that Section Two does not provide a private right of action would badly undermine the rationale offered by the Court in *Morse*." *Milligan*, 582 F. Supp. 3d at 1031.

563.  The Eleventh Circuit agrees that the VRA contains a private right of action. *See, e.g.*, *Ala. State Conf. of NAACP*, 949 F.3d at 653; *Ford v. Strange*, 580 F. App'x 701, 705 n.6 (11th Cir. 2014) ("A majority of the Supreme Court has indicated that Section 2 of the [VRA] contains an implied private right of action.").

---

[25] The Eleventh Circuit's decision was vacated by the Supreme Court because the case had become moot, 141 S. Ct. 2618 (2021), but the portion discussing private Section 2 enforcement is consistent with the history of the VRA and the fact that private parties have sued States under Section 2 for decades. *See, e.g.*, *ALBC*, 575 U.S. 254 (private challenge against the State of Alabama); *LULAC*, 548 U.S. at 407 (private challenge against state officials); *Chisom v. Roemer*, 501 U.S. 380 (1991) (same)

And recent decisions from the Fifth Circuit (which postdate the outlier Eighth Circuit decision on which the Secretary heavily relies) also agree that Section 2 is privately enforceable. *See Robinson v. Ardoin*, 86 F.4th 574, 588 (5th Cir. 2023); *see also Miss. State Conf. of NAACP v. State Bd. of Election Comm'rs*, No. 3:22-CV-734-DPJ-HSO-LHS, 2024 WL 3275965, at *10-11 (S.D. Miss. July 2, 2024) ("[F]ind[ing] Chief Judge Smith's dissent in [*Arkansas State Conf., of the NAACP v. Arkansas Bd. of Apportionment*, 86 F.4th 1204 (8th Cir. 2023)] to express the more persuasive analysis."). No other court has adopted the Eighth Circuit's flawed interpretation of the VRA, and precedent forecloses this argument.

564.    Moreover, as this Court previously determined, "accepting the defendants' argument would require the court to ignore decades of controlling Section Two jurisprudence." *Stone v. Allen*, 717 F. Supp. 3d 1161, 1172 (N.D. Ala. 2024). "Since the passage of the Voting Rights Act, federal courts across the country, including both the Supreme Court and the Eleventh Circuit, have considered numerous Section Two cases brought by private plaintiffs." *Milligan*, 582 F. Supp. 3d at 1031 (collecting cases). "Congress is undoubtedly aware of [the Court] construing § 2 to apply to districting challenges." *Milligan*, 599 U.S. at 39. "Some of those challenges . . . were brought by private parties." *Stone*, 717 F. Supp. 3d at 1173. "[S]tare decisis carries enhanced force when a decision ... interprets a statute ... [because] unlike in a constitutional case, critics of our ruling can take their

objections across the street, and Congress can correct any mistake it sees." *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 456 (2015). "Because Congress has spurned multiple opportunities to reverse the Supreme Court's and lower courts' treatment of private-party-plaintiff Section Two actions, the Supreme Court itself would require a superspecial justification to warrant reversal. No superspecial justification exists here." *Stone*, 717 F. Supp. 3d at 1173 (cleaned up).

565.    Plaintiffs also pled a cause of action to enforce Section 2 rights under the VRA through § 1983. *See* Fourth Am. Compl. (Doc. 226) ¶¶ 7, 10, 176. A "major purpose" of Congress's enactment of § 1983 was to "benefit those claiming deprivations of constitutional and civil rights." *Maine v. Thiboutot*, 448 U.S. 1, 9 (1980); *accord Talevski*, 599 U.S. at 175-76. This circuit has also held a related voting rights law enforceable under § 1983. *See Schwier v. Cox*, 340 F.3d 1284, 1294-97 (11th Cir. 2003); *see also Vote.Org v. Callanen*, 89 F. 4th 459, 478 (5th Cir. 2023). And, it is doubtful that *Gonzaga* applies, as it involved § 1983 enforcement of laws enacted under the Spending Clause, as opposed to the VRA, which was enacted under the Reconstruction Amendments. *Cf. Schwier*, 340 F.3d at 1291 n.5 (noting the Supreme Court's reluctance to "infer enforceable rights from Spending Clause statutes").

566.    But even under *Gonzaga*, Section 2 is enforceable via Section 1983. To meet *Gonzaga*, plaintiffs must show the "provision in question is 'phrased in terms

of the persons benefited' and contains 'rights-creating,' individual-centric language with an 'unmistakable focus on the benefited class.'" *Talevski*, 599 U.S. at 183 (citations omitted). "Once a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983." *Gonzaga*, 536 U.S. at 284.

567.    Section 2 is enforceable under section 1983 because it meets this test. First, Section 2 contains paradigmatic rights creating language. *See* Doc. 138 at 11-12. The Supreme Court has explicitly held that Section 2's reference to "the right of any citizen," 52 U.S.C. § 10301(a), confirms that the "right to an undiluted vote" does not belong to the "minority as a group," but to the group's "individual members." *Shaw*, 517 U.S. at 917. This "right is presumptively enforceable by § 1983," *Gonzaga*, 536 U.S. at 284, and this presumption can only be rebutted in "exceptional cases." *Livadas v. Bradshaw*, 512 U.S. 107, 133 (1994). Section 2's plain rights-creating language thus presumptively permits § 1983 enforcement.

568.    In light of this clear guidance from the Supreme Court, and a long history of litigation recognizing a private right of action under the VRA that has been ratified repeatedly by Congress as it reauthorized the VRA, the Secretary's argument that the VRA does not authorize suits by private parties is meritless.

## II.    Plaintiffs Satisfied the First *Gingles* Precondition

569.    A claim under Section 2 of the VRA alleging racial vote-dilution claim has two components. The first component is that "plaintiffs must satisfy three

'preconditions.'" *Allen v. Milligan*, 599 U.S. 1, 18 (2023). These three preconditions require the plaintiff to prove that: (1) the minority group is "sufficiently large and [geographically] compact to constitute a majority in [an additional] reasonably configured district"; (2) that the minority group "is politically cohesive"; and (3) "that the white majority voted sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate." *Id.* (cleaned up).

570.    The Court concludes that Plaintiffs have met these requirements.

571.    *Gingles* 1 requires a plaintiff to show that the minority group is "sufficiently large and geographically compact to constitute a majority" in more than the existing number of districts. *Gingles*, 478 U.S. at 50. "The first [precondition], focused on geographical compactness and numerosity, is 'needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district.'" *Milligan*, 599 U.S. at 18 (quoting *Growe v. Emison*, 507 U.S. 25, 40 (1993)).

572.    Plaintiffs typically satisfy *Gingles* 1 by offering a hypothetical redistricting plan for the jurisdiction at issue that contains one or more additional majority-minority districts. *See Milligan*, 599 U.S. at 20 (describing plaintiffs' reliance on "illustrative maps—that is, example districting maps that Alabama could enact"). These proposed districts are "not cast in stone"—they are illustrative only. *Clark v. Calhoun Cnty.*, 21 F.3d 92, 95 (5th Cir. 1994) ("*Clark I*"); *Bone Shirt v.*

*Hazeltine*, 461 F.3d 1011, 1019 (8th Cir. 2006) (noting that the "ultimate end of the first *Gingles* precondition is to prove that a solution is possible, and not necessarily to present the final solution to the problem"). If Plaintiffs prevail, the Alabama Legislature "will be given the first opportunity to develop a remedial plan." *Clark I*, 21 F.3d at 95.

573.   The first *Gingles* precondition contains two components: numerosity and compactness.

## A.    <u>Numerosity</u>

574.   Plaintiffs "asserting § 2 liability must show by a preponderance of the evidence that the [eligible] minority population in the potential election district is greater than 50 percent." *Bartlett v. Strickland*, 556 U.S. 1, 19–20 (2006).

575.   Based on the foregoing findings of fact, Plaintiffs satisfy the numerosity component of the first *Gingles* precondition because in each of their illustrative districts, the Black CVAP estimate exceeds 50%. This satisfies the standard set forward in *Bartlett* and uses the best available measure of the relevant population within the electorate of the illustrative districts. *See supra*, Proposed Findings of Fact ("PFOF") § V.B.1.a.

### 1.    **Plaintiffs properly relied on CVAP to meet the *Gingles* 1 numerosity requirement.**

576.   The Supreme Court and Eleventh Circuit have made CVAP the default metric for *Gingles* 1 except in situations where there are no substantial differences

in citizenship rates between racial or ethnic groups of more than nominal size. *See League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 402 (2006) ("*LULAC*") (holding that Latinos having a VAP majority in a district "is not dispositive, since the relevant numbers must account for citizenship"); *Negron v. City of Miami Beach, Fla.*, 113 F.3d 1563, 1568-69 (11th Cir. 1997) (holding that the "proper statistic for deciding whether a minority group is sufficiently large and geographically compact is voting age population as refined by citizenship" assuming that "data is available and indicates a significant difference in the citizenship rates of the majority and minority populations."). In *LULAC*, the Supreme Court explained calculating whether a district was sufficiently large using citizen-voting age population ("CVAP") numbers "fits the language of § 2 because only eligible voters affect a group's opportunity to elect candidates." 548 U.S. at 429.

577. Indeed, despite the Secretary's implication otherwise, the *Bartlett* court itself measured *Gingles* 1 numerosity using CVAP. 556 U.S. at 9. In that case, the North Carolina Supreme Court incorporated the logic of *LULAC v. Perry* as it considered a Section 2 challenge to the state legislative redistricting plan, reasoning that "dictum in *Perry* from a unanimous Court indicates a majority should be determined by the number of minority citizens of voting age, not by its total population," *Pender Cnty. v. Bartlett*, 361 N.C. 491, 500 (2007), *aff'd sub nom. Bartlett v. Strickland*, 556 U.S. 1 (2009), and held that since because "the African-

American minority group in [the district] does not constitute a numerical majority of citizens of voting age, [the district] does not meet the first *Gingles* precondition," *id.* at 507.

578.   The U.S. Supreme Court affirmed, repeating the Supreme Court of North Carolina's language, and finding *Gingles* 1 unsatisfied "because African–Americans do not 'constitute a numerical majority of citizens of voting age.'" *Bartlett*, 556 U.S. at 9. The *Bartlett* court reasoned that "it is a special wrong when a minority group has 50 percent or more of the *voting population* and could constitute a compact voting majority but, despite racially polarized bloc voting, that group is not put into a district." *Id.* at 19 (emphasis added). The dissent rephrased in clarifying, affirmative terms, complaining that "[i]n the plurality's view, only a district with a minority population making up 50% or more of the citizen voting age population (CVAP) can provide a remedy to minority voters lacking an opportunity 'to elect representatives of their choice.'" *Bartlett*, 556 U.S. at 27 (Souter, J., dissenting); *see also Reyes v. City of Farmers Branch*, 586 F.3d 1019, 1023 (5th Cir. 2009) (rejecting argument that *Bartlett* "held that only voting-age population matters under the first Gingles test—not citizen voting-age population"—as having "no merit"). The Secretary thus misreads the majority's use of shorthand "voting population" as requiring VAP as the metric, when in fact it calls for CVAP.

579. Even prior to *Bartlett*, the Eleventh Circuit had earlier approved CVAP as a default measure for numerosity. *Negron*, 113 F.3d at 1569. There, the court concluded that the only circumstance in which CVAP would be *inappropriate* to use in assessing *Gingles* 1 numerosity would be when the data did not indicate that the citizenship rate varied significantly between racial groups in the relevant area. *Id.* It reasoned, adopting the Ninth Circuit's decision in *Romero v. City of Pomona*, 883 F.2d 1418 (9th Cir. 1989), *abrogated in part on other grounds by Townsend v. Holman Consulting Corp.*, 914 F.2d 1136 (9th Cir. 1990), that to illustrate minority voters' possibility "to elect a representative or have a meaningful potential to do so, a minority group must be composed of a sufficient number of voters or of those who can readily become voters through the simple step of registering to vote. In order to vote or to register to vote, one must be a citizen." *Negron*, 113 F.3d at 1569. Further, "because 'a section 2 claim will fail unless the plaintiff can establish that the minority group constitutes an effective voting majority in a single-member district,' [...] the proper statistic for deciding whether a minority group is sufficiently large and geographically compact is voting age population as refined by citizenship." *Id.* (cleaned up).

580. District courts continue to look to *Negron* for guidance in assessing numerosity. *See, e.g.*, *United States v. Osceola Cnty., Fla.*, 475 F. Supp. 2d 1220, 1229 (M.D. Fla. 2006) ("To decide 'whether a minority group is sufficiently large

and geographically compact,' the proper type of data to be examined is 'voting age population as refined by citizenship.'" (quoting *Negron*)); *United States v. Vill. of Port Chester*, 704 F. Supp. 2d 411, 440 (S.D.N.Y. 2010) ("While traditional districting principles typically require the use of total population in drawing district boundaries, in determining whether the minority group at issue has a sufficient majority in an illustrative district to satisfy the first Gingles precondition, courts look to the VAP, and in particular to the CVAP, as the relevant population in the district.") (citing *Negron*).

581.    Other circuit courts have embraced CVAP as well. The Fifth, Seventh, and Ninth Circuits use CVAP as the yardstick to measure *Gingles* 1 numerosity is measured in every case. *See Campos v. City of Houston*, 113 F.3d 544, 548 (5th Cir. 1997) ("We hold that courts evaluating vote dilution claims under section 2 of the Voting Rights Act must consider the citizen voting-age population of the group challenging the electoral practice when determining [numerosity]"); *Romero*, 883 F.2d at 1425(explaining that "*Thornburg* repeatedly makes reference to effective voting majorities . . . as the touchstone for determining geographical compactness," because "the purpose of geographical compactness is to first determine whether minorities are capable of commanding a majority vote in a single-member district"); *Barnett v. City of Chicago*, 141 F.3d 699, 704 (7th Cir. 1998) ("We think that citizen voting-age population is the basis for determining equality of voting power that best

comports with the policy of the statute."); *see also Perez v. Pasadena Indep. Sch. Dist.*, 165 F.3d 368, 372 (5th Cir. 1999) (affirming district court which "required that plaintiffs demonstrate that Hispanics would represent a majority of voting-age citizens in a proposed district.").

582.   Further, district courts across the country have held that CVAP provides the proper metric for assessing numerosity. For example, in *France v. Pataki*, plaintiffs' illustrative plan failed the *Gingles* 1 numerosity standard because, "[w]hile recognizing that New York City contains a high-proportion of immigrants who are non-citizens who are ineligible to vote . . . plaintiffs' plan failed to take citizenship into account." 71 F. Supp. 2d 317, 326 (S.D.N.Y. 1999) (concluding "in Voting Rights cases, the proper measure of population is the total citizens eligible to register and vote, not the total population"). Other district courts have reasoned similarly. *See, e.g.*, *Baldus v. Members of Wis. Gov't Accountability Bd.*, 849 F. Supp. 2d 840, 854 (E.D. Wis. 2012) ("For the obvious reason that non-citizens are not entitled to vote, we cannot ignore citizenship status, particularly given the Supreme Court's express endorsement of the centrality of this point."); *Meza v. Galvin*, 322 F. Supp. 2d 52, 59–60 (D. Mass. 2004) (assessing that a number of "the circuits, and ... district courts, that have directly reached the issue have held that citizenship voting age population data, where readily available, should be used in the *Gingles* analysis."); *Milwaukee Branch of N.A.A.C.P. v. Thompson*, 929 F. Supp.

1150, 1161 (E.D. Wis. 1996) (concluding "citizenship rates can be taken into account in resolving the issue whether a plaintiff has satisfied the first Gingles condition. . . . Those ineligible to vote are not among those whose votes have been diluted within the meaning of section 2 of the Act.").

583.  Of course, while it is "true that some cases […] use voting-age population rather than citizen voting-age population […] they are cases in which, as far as appears, noncitizens were not a significant part of the relevant population." *Barnett*, 141 F.3d at 705 (concluding that "the proper benchmark for measuring proportionality is citizen voting-age population").

### 2. CVAP is appropriate where there is a minority group of sufficient size with a significantly lower citizenship rate than other sufficiently large racial or ethnic groups.

584.  There is a "significant difference in citizenship rates" between Black and non-Black VAP in the Huntsville-Decatur area that causes the Black VAP metric to underestimate the size of illustrative SD7's eligible Black population. *Negron*, 113 F.3d at 1569; *see supra* PFOF Section III.B.1.a. As a result, the "proper statistic for deciding whether a minority group is sufficiently large and geographically compact is voting age population as refined by citizenship," because "the foundational inquiry for the first *Gingles* precondition is whether 'the minority group has the potential *to elect* a representative of its own choice in some single-member district.'" *Negron*, 113 F.3d at 1569 (quoting *Growe v. Emison*, 507 U.S. 25, 39

(1993)) (emphasis in original); *see also Rios-Andino*, 51 F. Supp. 3d at 1223 (holding that minority group CVAP comprise[s] the relevant population for *Gingles* I purposes" because "a proposed remedial district can only satisfy § 2 if it consists of a sufficient number of potential voters, not just persons of the relevant race or ethnicity").

585.    Where a particular racial group within a district has a disproportionately large non-citizenship rate and is of a non-trivial size, this is sufficient to make CVAP the appropriate metric for Section 2 purposes because data that included those noncitizens would misrepresent the actual composition of the eligible voting population. *See, e.g.*, *Barnett*, 141 F.3d at 702, 705 (finding CVAP to be the proper metric "because more than 40 percent of the Latinos in Chicago are not U.S. citizens"); *Rios-Andino*, 51 F. Supp. 3d at 1223 (using CVAP where Latinos in relevant area had a non-citizenship rate of 24%); *Milwaukee Branch of N.A.A.C.P.*, 929 F. Supp. at 1161 (discussing the need to use CVAP and citing evidence that "63.3% of Hispanics of voting age in the city of Milwaukee are citizens" as grounds for denying summary judgment).

586.   As Defendant's expert previously made clear in his work for the Supreme Court of Virginia, the use of CVAP in drawing *Gingles* 1 districts is proper where there is a large minority population that has a significantly lower citizenship rate than other sizeable racial or ethnic groups in the relevant area. Tr. 1042:8-

1043:20 (Trende) (noting that "the presence of non-citizen Latinos and Asian-Americans in a district can raise the black CVAP share above the black VAP share, making it a useful metric for assessing a district's actual electorate," and that, when using BVAP, "the actual electorate would probably be slightly more heavily African-American due to higher rates of non-citizenship among Hispanic and Asian-American populations").

587.    The Court also rejects the Secretary's argument that Plaintiffs properly relying on BCVAP for the *Gingles* 1 requirement must also meet a 50% BVAP threshold.

588.    BVAP carries no relevance when BCVAP is "the proper statistic for deciding whether a minority group is sufficiently large and geographically compact." *Negron*, 113 F.3d at 1569; *accord LULAC*, 548 U.S. at 429 (explaining that a majority-Latino-VAP district was technically majority-minority, "but only in a hollow sense, for the parties agree that the relevant numbers must include citizenship"); *McConchie v. Scholz*, 577 F. Supp. 3d 842, 858 (N.D. Ill. 2021) (rejecting the relevance of a VAP majority of the minority group when CVAP was under 50%).

589.    The Secretary's argument about a lack of cases relying solely on CVAP when the relevant VAP population is less than 50% also misses the mark. He ignores, for example, cases that rely solely on CVAP without considering or even reporting

on the VAP of the relevant group at all, meaning it is entirely possible but also entirely irrelevant whether the VAP fell under 50%. *See, e.g.*, *Coca v. City of Dodge City*, No. 6:22-CV-01274-EFM, 2024 WL 3360446, at *8–10 (D. Kan. July 10, 2024); *Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1392 (E.D. Wash. 2014); *Benavidez v. City of Irving*, 638 F. Supp. 2d 709, 722 (N.D. Tex. 2009); *United States v. Osceola Cnty.*, 475 F. Supp. 2d 1220, 1230-31 (M.D. Fla. 2006).

590.  In this case, where the sizeable Latino population in the Huntsville-Decatur area has a disproportionately large non-citizenship rate, *see* PX 60 at 6, 10 (Hispanic population has a VAP citizenship rate of about 40.77%), using CVAP is the appropriate metric for *Gingles* 1 purposes.

### 3.  Numerous courts have used CVAP to determine *Gingles* 1 status in cases brought by Black voters.

591.  As multiple courts have recognized, the logic of this reasoning should not differ based on whether the minority population whose numerosity is being evaluated is Black or Latino.

592.  For example, in *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 700 F. Supp. 3d 1136, 1198 (N.D. Ga. 2023), the court used CVAP to determine majority-Black status of existing districts.

593.  In *Jones v. Jefferson County Board of Education*, No. 2:19-CV-01821-MHH, 2019 WL 7500528, at *2 (N.D. Ala. Dec. 16, 2019), this Court analyzed BCVAP for *Gingles* 1 purposes, finding that the Black population was "sufficiently

populous and geographically compact enough to be a majority of the citizen voting age population in at least two out of five single-member districts." No. 2:19-CV-01821-MHH, 2019 WL 7500528, at *2 (N.D. Ala. Dec. 16, 2019).

594.    Likewise, in *Fairley v. Hattiesburg*, No. 2:06-cv-167–KS–MTP, 2008 WL 3287200 (S.D. Miss. Aug. 7, 2008), *aff'd*, 584 F.3d 660 (5th Cir. 2009), the Court concluded that for evaluating the numerosity of the Black population in the illustrative district, "the minority group satisfies the numerosity element of the first *Gingles* factor if it can demonstrate that it constitutes a majority of the citizen voting-age population in a district." *Id.* at *6 (citations omitted). The Court reasoned that using BCVAP to determine whether the Black population satisfied *Gingles* 1's numerosity element "fits the language of Section 2 because only eligible voters affect a group's opportunity to elect candidates." *Id.* at *6 & n.15 (quoting *LULAC*, 528 U.S. at 429).

595.    In *Black Political Task Force v. Galvin*—decided before *LULAC v. Perry*—the court noted that there was an "unresolved issue" as to whether, when evaluating the numerosity of Black voters in the *Gingles* 1 illustrative district, it "should concern itself with the percentage of the minority population that is simply of voting age (VAP) or the percentage of the minority population that is composed of citizens who are of voting age (CVAP)." 300 F. Supp. 2d 291, 300 (D. Mass. 2004) (three-judge court). Following the analysis of *Perez*, *Negron*, and *Barnett,* the

court reasoned that "[b]ecause non-citizens cannot vote (or even register to vote), the use of CVAP data, when and where available, seems more concinnous than the use of VAP data." *Id*.[26]

596.   For the foregoing reasons, it is appropriate to use CVAP data to assess the numerosity of the Black voting population in illustrative Senate District 7.

### 4.  Alabama law does not bar CVAP to determine numerosity for the first *Gingles* precondition.

597.   In his closing argument, counsel for the Secretary argued that state law does not "allow[] the legislature to use anything other than census data" from the decennial census at any point in the districting process. Tr. 1654:15-22 (citing Ala. Const. §§ 198-201; Ala. Code § 17-14-70.1).

598.   This argument misstates Alabama law. None of the provisions the Secretary cites prevents the Legislature—much less private litigants—from using CVAP data provided by the Census Bureau for purposes of complying with Section 2 of the Voting Rights Act.

599.   Section 200 of the Alabama Constitution details the "[d]uty of [the] Legislature to fix number of senators" and specifically addresses the "equality of senatorial districts." It does not facially require the use of any particular data. Rather, it merely states that senatorial apportionment shall occur "after each subsequent

---

[26] Ultimately, the court concluded that it "need not make a definitive choice" because neither party identified a material difference in Black VAP and CVAP in the relevant area. *Id.*

decennial census." Ala. Const. § 200. Even if Section 200 implicitly required use of decennial census data, it would only do so for one-person-one-vote purposes—that is, ensuring that the total "number of inhabitants" in each district is "as nearly equal to each other . . . as may be." *Id.*

600.   The Secretary also cited Sections 198 and 199 of the Alabama Constitution, which are not applicable in this case, as they address only the state's House of Representatives. In any event, these provisions only require the use of decennial census data for purposes of apportioning House districts that are sufficiently equal in total population consistent with the one-person-one-vote requirement. Ala. Const. § 198; *see id.* § 199 ("It shall be the duty of the legislature . . . to fix by law the number of representatives and apportion them among the several counties of the state, according to the number of inhabitants in them . . . .").

601.   The Secretary's reading of these provisions is not only untethered from their text, it would also lead to untenable absurdities. If these constitutional provisions limited the Legislature to *only* using data "ascertained by the decennial census of the United States" reflecting "the number of inhabitants in [each district]"—*i.e.*, total population data—for ensuring Section 2 compliance (or presumably at any other point in the redistricting process), they would necessarily also preclude the Legislature's reliance on Voting Age Population data, which also does not reflect the total "number of inhabitants." *See* Ala. Const. § 198. Of course,

the Secretary himself advocates for the use of VAP in this case, and total population figures are generally not used for *Gingles* 1 numerosity purposes, as they include large numbers of people under the age of eighteen.

602.    The Secretary also invoked Section 201 of the Alabama Constitution. That provision is irrelevant, as it does not require any data to be used for a particular purpose; it speaks to an alternative source of data for complying with equal population requirements. Section 201 permits the state to conduct its own enumeration of "all inhabitants of this state" for "apportionment" purposes, "[s]hould any decennial census of the United States not be taken . . . ." Ala. Const. § 201.

603.    The Secretary cited Section 17-14-70.1 of the Alabama Code as well, which he "believe[s] also prevents the Legislature from using ACS data." Tr. 1654:20-22. Not so. This provision details the "[l]egislative findings" in support of the state's new congressional districting plan adopted after the Supreme Court enjoined the use of the state's enacted congressional districts as likely violative of Section 2 in *Allen v. Milligan*, 599 U.S. 1 (2023). These legislative findings were enacted in July of 2023 and could not have impacted the drawing of the 2021 state senate map, and they do not address state legislative districting—they merely describe "[t]he Legislature's intent in adopting the [remedial] congressional plan." Ala. Code § 17-14-70.1(2).

604. Accordingly, the Court holds that Alabama law does not prohibit the Legislature or private Section 2 plaintiffs from relying on ACS CVAP data for purposes of demonstrating the existence of the first *Gingles* precondition or otherwise complying with Section 2 of the Voting Rights Act.

**5. Courts universally accept point estimates for *Gingles* 1 CVAP determinations, and every court to consider confidence interval arguments has rejected them.**

605. Courts universally rely upon CVAP point estimates to determine whether plaintiffs meet *Gingles* I's numerosity requirement. *See, e.g., LULAC*, 548 U.S. at 428. Plaintiffs need not prove that a 90% or 95% confidence interval surrounding the minority CVAP point estimate contains no values at or below 50% to demonstrate a sufficiently numerous minority population for *Gingles* I, and no court has held as such. Rather, every court to consider attempts to impose a confidence-interval requirement has rejected it. *See, e.g., Elizondo v. Spring Branch Indep. Sch. Dist.*, No. 4:21CV1997, 2023 WL 2466401, at *4 (S.D. Tex. Feb. 13, 2023), *report and recommendation adopted,* No. 4:21CV1997, 2023 WL 2465779 (S.D. Tex. Mar. 10, 2023); *Kumar v. Frisco Indep. Sch. Dist.*, 476 F. Supp. 3d 439, 492-94 (E.D. Tex. 2020); *Fabela v. City of Farmers Branch, Tex.*, No. 3:10-CV-1425-D, 2012 WL 3135545, at *6 (N.D. Tex. Aug. 2, 2012); *Benavidez*, 638 F. Supp. 2d at 721; *see also NAACP, Spring Valley Branch v. E. Ramapo Cent. Sch. Dist.*, 462 F. Supp. 3d 368, 390 (S.D.N.Y. 2020), *aff'd sub nom. Clerveaux v. E. Ramapo*

*Cent. Sch. Dist.*, 984 F.3d 213 (2d Cir. 2021) ("Defendant's argument that voters' preference cannot be determined with 95% confidence where a confidence interval goes below 50% is unavailing") (internal citation omitted)

606.  To the extent there is any concern about whether a plaintiff has met their preponderance burden on *Gingles* 1 through a CVAP estimate, courts have pointed to the propriety of consulting additional data to build confidence in the estimate including voter registration data, VAP data by race and ethnicity, and citizenship rates by race and ethnicity. *See, e.g., Osceola Cnty.*, 475 F. Supp. 2d at 1230 & n.18 (explaining that "[v]oter registration data is considered a reasonable proxy for citizen voting-age population" and that evidence of a "Hispanic registration level" over 50% "supports a finding that this District has a majority Hispanic CVAP."); *see also Johnson v. DeSoto Cnty. Bd. of Comm'rs*, 204 F.3d 1335, 1342 (11th Cir. 2000).

607.  Here, Plaintiffs' experts relied on such data to provide additional assurances that allows the Court to conclude that SD7 is majority-BCVAP. Tr. 378:19-379:10 (Oskooii).

608.  As explained above, Dr. Oskooii testified that BVAP, HVAP; and Black, white, and Hispanic citizenship rate data gave him confidence that, in conjunction with the BCVAP point estimate, SD7 was majority BCVAP. Tr. 378:19-379:10.

609.    Mr. Fairfax testified that using recent voter registration data produced by the Secretary's office, he determined that Illustrative SD7 in his Plans 2, 2A, and 3 have Black registered voter majorities over 51 or 52 percent—figures that Defendant does not dispute. *See* Tr. 266:8-11; 272:13-14; PX 8 ¶ 50, 82; *see also* Tr. 1045:12-14 (Defendant's expert, Dr. Trende, did not analyze voter registration data by race and ethnicity).

610.    A requirement that plaintiffs demonstrate a minority CVAP estimate far enough above 50%, such that a 90% or 95% confidence interval around the estimate only contains values above 50% minority CVAP, is inconsistent with civil plaintiffs' burden to prove the elements of their claims by a preponderance of the evidence. *Cf. Coca*, 2024 WL 3360446, at *14 (rejecting the argument that 95% confidence intervals were required around the point estimates that plaintiffs' and defendant's experts agreed represented the "most likely scenario," and reasoning that the court "is not looking for statistical certainty" but "merely preponderance of the evidence, i.e., 51% certainty—not 95% certainty").

611.    The *impossibility* of precisely calculating margins of error for districts which split block groups provides yet another reason not to require their use. *See* Tr. 312:4-7, 377:13-22, 380:15-22 (Oskooii); 1056:23-1057:9 (Trende); PX 8 ¶ 17.

***

612.   Accordingly, the Court concludes that Illustrative Plans 1, 2A, and 3 each include two additional districts—SD7 and SD25—in which the Black population is "sufficiently large . . . to constitute a majority in a single-member district," *Gingles*, 478 U.S. at 50, and therefore meet the numerosity requirement of the first *Gingles* precondition.

**B.    Geographic Compactness and Reasonable Configuration.**

613.   Another requirement under the first precondition is that Plaintiffs prove that the relevant minority population in the regions at issue is sufficiently geographically compact to form a new majority-minority district. Section 2 compactness "refers to the compactness of the minority population," as reflected *through* the drawing of illustrative districts, "not to the compactness of the contested district." *LULAC*, 548 U.S. at 433.

614.   Additionally, the district must be "reasonably configured," meaning it "comports with traditional districting criteria, such as being contiguous and reasonably compact." *Milligan*, 599 U.S. at 18. The Court also looks to "other traditional districting criteria," such as "equal population[]," respect for "existing political subdivisions, such as counties, cities, and towns," and "keeping together communities of interest." *Id.* at 20, 34.

615.   "Compactness analysis is concerned less with aesthetics and more with functionality: compactness 'is critical to advancing the ultimate purposes of § 2,

ensuring minority groups equal opportunity . . . to participate in the political process and to elect representatives of their choice.'" *Milligan v. Merrill*, 582 F. Supp. 3d 924, 956 (N.D. Ala. 2022) (quoting *LULAC*, 548 U.S. at 434 (alteration in original)); *see also Houston v. Lafayette Cnty.*, 56 F.3d 606, 611 (5th Cir. 1995) (quoting *Clark I*, 21 F.3d at 95) ("The first *Gingles* precondition does not require some aesthetic ideal of compactness, but simply that the black population be sufficiently compact to constitute a majority in a single-member district."). "[C]ompactness is a relative term tied to certain practical objectives under § 2; the requirement is not that a district be compact, but that it be "sufficiently" compact under § 2. The term is a "practical" or "functional" concept, which must be considered in relation to § 2's laudatory national mission of opening up the political process to those minorities that have been historically denied such." *Dillard v. Baldwin Cnty. Bd. of Educ.*, 686 F. Supp. 1459, 1466 (M.D. Ala. 1988).

616.    When considering the configuration of illustrative districts, courts do "not have to conduct a beauty contest between plaintiffs' maps and the State's." *Milligan*, 599 U.S. at 21 (cleaned up). Accordingly, "Plaintiffs are not required to produce a plan that 'meets or beats' the [state's] Plan on any particular traditional districting criteria to satisfy *Gingles* I." *Milligan v. Allen*, 691 F. Supp. 3d 1343, 1351 (N.D. Ala. 2023). "An illustrative plan may be reasonably configured even if it does not outperform the [state's] Plan on every (or any particular) metric."

*Milligan*, 690 F. Supp. 3d at 1301. Indeed, "[t]he standard does not require the Plaintiffs to offer the *best* map; it requires them to offer a reasonable one." *Id.*

617.   Here, the illustrative plans offered by Plaintiffs satisfy the traditional principles of compactness, contiguity, equal population, and respect for communities of interest and political subdivisions.

### 1.    Compactness Measures

618.   Reasonable compactness is itself a traditional redistricting criterion. *See Milligan*, 599 U.S. at 18.

619.   Courts routinely examine numerical compactness scores of illustrative districts and maps to assess geographical compactness. Mr. Fairfax measured compactness using the three most widely used compactness measures: Reock, Polsby-Popper, and Minimum Convex Hull. PX 6 ¶¶ 19.d & 84; Tr. 242:10-11.

620.   Mr. Fairfax's thorough and uncontested compactness analysis proves that, at a plan-wide level, each Illustrative Plan contains reasonably compact districts that perform better than—or at least comparably to—the Enacted Plan's. *See, e.g.*, *Alpha Phi Alpha Fraternity*, 700 F. Supp. 3d at 1213-14, 1229-30 (finding "very close" compactness scores when illustrative plan's mean fell .01 below the enacted plan and concluding that the illustrative and enacted plans' compactness are "comparable").

621.   At the district level, Mr. Fairfax's analysis also confirms that the illustrative majority Black districts are reasonably compact: illustrative SD25 is more compact than its Enacted Plan counterpart in each Illustrative Plan; illustrative SD7 is either more compact than, or comparably compact to, its Enacted Plan counterpart in each Illustrative Plan; and each version of illustrative SD7 and SD25 is more compact than the least compact districts approved by the Legislature as being reasonably compact. *See, e.g.*, *id.* at 1214 (finding "that, generally, the [illustrative] majority-Black districts are equivalently, if not slightly more compact than the Enacted . . . majority-Black districts" when some had "identical compactness scores," one "fare[d] worse on both compactness scores by 0.03 points," and two others "fared better" on Reock scores by 0.03 and 0.06 points and Polsby-Popper by 0.07 and 0.13 points); *id.* at 1221-22 (comparing majority Black districts against their "corollary Enact Senate Plan district[s]" and against "the least compact district's measures on the Enacted Senate Plan" to conclude that illustrative majority-Black districts "are nearly identical to the compactness scores on the Enacted Senate Plan").

622.   Based upon the foregoing findings of fact, the Court concludes that the illustrative plans comport with the principle of geographical compactness because they are comparable in compactness to the enacted plan. *See Houston*, 56 F.3d at 611 (district court "clearly erred in finding that the black population . . . was not

sufficiently geographically compact," given "the district in the plaintiff residents' proposed plan [was] not substantially less compact than districts—which the County assert[ed] are compact—in the County's [enacted] plans"); *see also Alpha Phi Alpha Fraternity*, 700 F. Supp. 3d at 1213-14, 1221-22, 1229-30; *Montes*, 40 F. Supp. 3d at 1393-96 (holding that the illustrative district was geographically compact by "looking at the maps of the proposed districts" and comparing its Reock scores to those of other districts).

623.  The Secretary's expert does not contest Mr. Fairfax's analysis directly and instead relies on supplemental critiques that do not undermine the illustrative plans' satisfaction of the traditional redistricting principle of compactness.

624. Dr. Trende did not employ any of the standard measures of compactness in his response to Illustrative Plan 1. *See* PX 8 ¶ 21.

625.  First, and most importantly, Dr. Trende's Section 2 compactness conclusions are drawn largely from his own subjective assessment of these misrepresentative maps, without reference to most of the other criteria and priorities that factor into reasonable configuration. Dr. Trende demands that the Court engage in a "granular analysis of the distribution of minority populations within an illustrative district to the exclusion of other criteria and priorities," but "[e]xisting law does not require" such an analysis. *Nairne v. Ardoin*, 715 F. Supp. 3d 808, 850 (M.D. La. 2024).

626.    Rather, "the purpose of illustrative maps is to *illustrate* that creating another majority Black district is possible, consistent with other requirements under Section 2 caselaw." *Id.* (quoting *Robinson v. Ardoin*, 86 F.4th 574, 593 (5th Cir. 2023)) (cleaned up); *see Gingles*, 478 U.S. at 50 (requiring that the minority group be "sufficiently . . . *geographically* compact to constitute a majority") (emphasis added)). "The drawing of a VRA compliant map balances multiple criteria and is considerably more complicated and nuanced than suggested by the oversimplistic and unhelpful compactness measure advanced by Trende." *Nairne*, 715 F. Supp. 3d at 850.

627.    As other courts have previously concluded when Dr. Trende has attempted to introduce nontraditional analyses of population distribution—rather than geographical compactness—"to the exclusion of other criteria and priorities," the Court holds that his methods and opinions are "fundamentally flawed and completely useless in evaluating *Gingles* I compactness." *Id.*; *see also id.* at 850-851 ("reject[ing] Dr. Trende's approach to addressing compactness" via population distribution analysis and accepting the use of "Reock and Polsby-Popper to evaluate the compactness of [the] Illustrative Plan," which "are the gold standard for evaluating the compactness in the context of redistricting").

628.   Second, Dr. Trende's emphasis of the ten lowest scoring districts in Illustrative Plans 2 and 3 is unhelpful to the Secretary—every iteration of illustrative SD7 and SD25 are more compact than districts enacted by the state.

629.   Third, Dr. Trende's regional analysis of compactness scores from an arbitrary selection of districts in Northern Alabama is untethered from the *Gingles* analysis and finds no support in the precedent. *See* Tr. 268:23-269:2.

630.   Fourth, the Court gives limited weight to Dr. Trende's brief discussion of the more novel (and less standard) "cut edges" analysis, in light of the undisputed evidence that the illustrative districts are reasonably compact according to the more widely accepted measures employed by Mr. Fairfax. *See* Tr. 269:5-6.

631.   Fifth, Dr. Trende's critique of SD7's visual appearance in Plan 3 also fails to rebut the conclusion that the illustrative district is reasonably compact. In addition to reviewing numerical compactness measures, courts (rather than experts) occasionally conduct an "eyeball test" to assess compactness visually. *See, e.g.*, *Milligan*, 599 U.S. 1, 20 (2023). But Section 2's compactness analysis requires more than just creative writing skills. *See* DX 8 at 16 (describing SD7 as "a baby dragon with an overbite in flight").

632.   The *Gingles* 1 standard was not a "beauty contest," and may need to make trade-offs among traditional districting principles. *Milligan*, 599 U.S. at 20-21. Rather, the Supreme Court recently affirmed the three-judge panel's conclusion

that "[c]ompactness analysis is concerned less with aesthetics and more with functionality." *Milligan*, 582 F. Supp. 3d at 956.

633.   As explained by Judge Thompson in the seminal *Dillard* litigation, in the *Gingles* 1 context, compactness "does not mean that a proposed district must meet, or attempt to achieve, some aesthetic absolute, such as symmetry or attractiveness. An aesthetic norm, by itself, would be . . . an unworkable concept, resulting in arbitrary and capricious results, because it offers no guidance as to when it is met." *Dillard*, 686 F. Supp. at 1465-66. "The degree of geographical symmetry or attractiveness is therefore a desirable consideration for districting, but only to the extent it aids or facilitates the political process, and only as one among many considerations a court should include, the principal one being § 2's vote dilution prohibition, in determining whether there is sufficient compactness for a majority black district." *Id.* at 1466.

634.   The illustrative districts in this case do not resemble the limited set of highly irregular districts that have failed courts' eyeball tests, for example, a "monstrosity" of a district in Georgia that stretched across "hundreds of miles across rural counties and narrow swamp corridors" to connect "four discrete, widely spaced urban centers that have absolutely nothing to do with each other," *Miller*, 515 U.S. 908-09, or a district that used a 300 mile "long, narrow strip" to connect towns on the Mexico border to Austin, in central Texas, *see LULAC*, 548 U.S. at 424; *contra*

*Abbott v. Perry*, 585 U.S. 579, 615 (2017) (finding that a state "justifiably" drew a noncompact majority-minority district that followed a highway corridor); *Lawyer v. Dep't of Justice*, 521 U.S. 567, 580-82 (1997) (affirming that race did not predominate in a remedial district whose "shape does not stand out as different from numerous other" state-enacted districts, despite it splitting three counties to follow a river); *Soto Palmer v. Hobbs*, 686 F. Supp. 3d 1213, 1225 (W.D. Wash. 2023) (rejecting argument "that because Yakima is 80+ miles away from Pasco, the Latino populations of those cities are 'farflung segments of a racial group with disparate interests,'" where the evidence showed "that the community as a whole largely shares a rural, agricultural environment, performs similar jobs in similar industries, has common concerns regarding housing and labor protections, uses the same languages, participates in the same religious and cultural practices").

635.    The shortcomings of Defendant's critique of SD7's visual compactness in Plan 3 have been thoroughly explained by courts. In *Houston v. Lafayette County*, the Fifth Circuit concluded that a district court "clearly erred in concluding that the black population of Lafayette County was not sufficiently geographically compact" due to an illustrative district "being too oddly shaped." 56 F.3d at 610-11 ("The first *Gingles* precondition does not require some aesthetic ideal of compactness. . . ."). The Court stressed that an irregular district boundary "does not automatically mean failure to meet the first *Gingles* precondition," as a district's shape can be affected

by many acceptable considerations, such as following "existing census block lines" or other boundaries, which can "lend themselves to irregular shapes" and cause a district to "look ragged in places." *Id.* at 611 & n.4; *see* Tr. 251:2-15 (Mr. Fairfax describing his use of VTDs as "building block[s]," which can "overlap census tracts" and the choices made to "select the entire VTD" or "to follow the boundaries" of other geographies, like "the Redstone Arsenal").

636.   As is the case here, the illustrative district in *Houston* was "not nearly as 'bizarre' as those rejected" in Supreme Court decisions. 56 F.3d at 611 (internal citation omitted). Further, "the district in the [*Houston*] plaintiff residents' proposed plan [was] not substantially less compact than districts—which the County assert[ed] are compact—in the County's [enacted] plans." *Id.*

637.   Here, SD7 in Illustrative Plan 3 is *more* compact on quantifiable compactness measures than districts in the Enacted Plan, which the state's map drawer and the Senate Chair of the Redistricting Committee asserted are compact. Similarly, SD7 is certainly not less visually compact than several districts enacted by the state. *See, e.g.*, PX 58 at 49 (Enacted SD7), 53 (Enacted SD11), 54 (Enacted SD12), 57 (Enacted SD 15), 63 (Enacted SD 21), 64 (Enacted SD 22), 67 (Enacted SD25); 72 (Enacted SD 30).

638.   Finally, Dr. Trende does not fare any better in his attempts to bypass well-accepted numerical measures of compactness by creating dot density maps that

purport to show the distribution of Black and white populations within the illustrative districts and choropleth maps that purport to analyze the compactness of the Black population within the illustrative districts. As described in the above findings of fact, *see supra* ¶¶ 220-227, Dr. Trende's techniques are not quantifiable, and his dot density and choropleth maps possess severe flaws that render their visual representation of black and white population density misleading.

639.   For these reasons, the Court concludes that the illustrative plans comply with the traditional redistricting principle of compactness.

**2.    Equal Population.**

640.   Relative population equality, or the one-person-one-vote principle, is a traditional redistricting principle. *Reynolds v. Sims*, 377 U.S. 533, 562–63 (1964); *Shaw v. Reno*, 509 U.S. 630, 651–52 (1993).

641.   There is no dispute that all the districts in the illustrative plans have sufficiently balanced population for state legislative districts.

642.   Based upon the foregoing findings of fact, the Court concludes that the illustrative plans comply with the requirements of equal population.

**3.    Contiguity.**

643.   The contiguity of areas within a district is a traditional redistricting principle. *See Milligan*, 599 U.S. at 18.

644.   Plaintiffs' illustrative plans satisfy the principle of contiguity. The Enacted Plan has a point contiguous area in SD8. Since the illustrative plans were designed to retain a sizable amount of the Enacted Plan, the plans contain the same point contiguity. *See* PX 6 ¶ 19.c n.20. There is no dispute that, otherwise, all of the plans are composed of contiguous geographic units.

645.   Based upon the foregoing findings of fact, the Court concludes that the illustrative plans are made up of contiguous districts.

### 4. Respect for Communities of Interest and Political Subdivisions.

646.   Courts have recognized that "maintaining communities of interest" is a traditional redistricting principle. *E.g.*, *LULAC*, 548 U.S. at 433 (internal quotations omitted). "A State is free to recognize communities that have a particular racial makeup" so long as there is "some common thread of relevant interests." *Miller v. Johnson*, 515 U.S. 900, 920 (1995). Respect for existing political subdivisions, such as counties, cities, and towns, is a related traditional redistricting principle. *Milligan*, 599 U.S. at 20; *see* Tr. 262:25-263:14 (Fairfax)  (explaining the "overlap" between these principles including, for example, that "cities and towns . . . and villages would be considered political subdivisions" and would "also be communities of interest.")

647.   "[M]embers of a racial group in different areas—for example, rural and urban communities—could share similar interests and therefore form a compact district if the areas are in reasonably close proximity." *LULAC*, 548 U.S. at 435. In

accordance with this principle, the Court affirmed in *Milligan* that an illustrative district that joined an urban city (Mobile) to a rural community (the Black Belt) was reasonably configured, *Milligan*, 599 U.S. at 1503–05, and affirmed this Court's finding that the illustrative plans respected communities of interest in doing so, *see Milligan*, 582 F. Supp. 3d at 1014-15. The inquiry thus is whether communities share relevant and sufficient characteristics.

648.   These shared characteristics may include "shared broadcast and print media, public transport infrastructure, and institutions such as schools and churches," *Vera*, 517 U.S. at 964, as well as "economic conditions" of the communities, and the "interests that reflect it," *see Lawyer*, 521 U.S. at 581 (finding that a community of interest existed in a district with a "predominantly urban, low-income population" that "regarded themselves as a community"). For example, in *Theriot v. Parish of Jefferson*, 185 F.3d 477 (5th Cir. 1999), the Fifth Circuit found that a majority-Black district for a parish council included "low-income residents who are less-educated, more often unemployed, and more poorly-housed" and thus shared "common social and economic needs." *Id.* at 486; *see also id.* at 486 n.20 (noting that political organizations that drew their memberships from "predominantly black neighborhoods" had worked on "issues of housing, education, and poverty" in the majority-Black district, many of which "continue[d] to infect the communities" there). The court held that, "[g]iven the common thread which binds

the black voters within [that district], they are entitled to an effective voice in the electoral process and to an influence over the outcome of elections." *Id.* at 487 (internal quotations omitted); *see also Milligan*, 582 F. Supp. 3d at 1012 (finding that a region "stands out to us as quite clearly a community of interest" because of the population's shared characteristics, including socioeconomic factors like "concentrated poverty, unequal access to government services, and lack of adequate healthcare").

649.    The preservation of such communities is directly relevant to the Section 2 compactness inquiry. For purposes of Section 2, "[a] district is sufficiently geographically compact if it allows for effective representation. For example, a district would not be sufficiently compact if it was so spread out that there was no sense of community, that is, if its members and its representative could not effectively and efficiently stay in touch with each other . . . ." *Dillard*, 686 F. Supp. at 1466.

650.    As detailed in the Court's findings of fact, substantial fact witness testimony identified common shared broadcast and print media, public transport infrastructure, schools, and churches as well as other economic, social, and historical threads that bind voters within SD25 and SD7. *See supra* ¶¶ 228-49; *Dillard*, 686 F. Supp. at 1466 (emphasizing that "[t]he evidence also reflected that there would be a strong sense of community within the proposed black district"). For example, SD7

includes the cores of Huntsville and Decatur (and in Illustrative Plan 3, the towns of Courtland and North Courtland), which together form the bulk of the state's third largest Combined Statistical Area. *See supra* ¶¶ 241-42, 258.

651.  Witnesses testified to myriad connections between these communities, including a regional airport, shared highway corridor and commuting patterns, and shared entertainment venues and churches. Witness testimony also spoke to the importance of Alabama A&M, the state's largest HCBU, to the Black community in Huntsville and Decatur; although the Enacted Plan isolated the university in the more rural SD8, Illustrative SD7 reconnects it with that community. *See supra* ¶¶ 239, 241, 245, 249.

652.  Illustrative SD7 also wholly includes the Redstone Arsenal CDP, which is a primary employer of residents throughout the illustrative district. *See supra* ¶¶ 239, 241, 243.

653.  SD25 also respects communities of interest. For example, it contains about half of the city of Montgomery, with the other half falling in the neighboring majority Black SD26. It also unifies Pike Road, a community by Defendant's own witness which was split in two by the Enacted Plan. *See supra* ¶¶ 102, 238.

654.  In developing the illustrative districts, Mr. Fairfax considered communities of interest by employing socioeconomic data, including median

household income and median housing values. *See Theriot*, 185 F.3d at 486; *Milligan*, 582 F. Supp. 3d at 1012.

655.    Mr. Fairfax's quantifiable analysis shows that each illustrative plan performs comparably to (in fact, slightly better than) the Enacted Plan in preserving political subdivisions and communities of interest, including Landmark areas, VTDs, and census places (cities, town, and CDPs). Accordingly, the Illustrative Plans sufficiently respect political subdivisions and landmark areas.

656.    Illustrative Plans 1 and 2A perform identically to the Enacted Plan in terms of the number of county splits, as each has 19 splits. Plan 3 is substantially close, with only two additional splits. The fact that one of plaintiffs' plans includes marginally more splits does not render it unreasonably configured: there is no requirement to "conduct a county-split beauty contest" to satisfy *Gingles* 1. *Milligan*, 690 F. Supp. 3d at 1313; *see Milligan*, 599 U.S. at 20 (noting favorably that "*some* of plaintiffs' proposed maps split the same number of county lines as . . . the State's map") (emphasis added); *Milligan*, 582 F. Supp. 3d at 1012 (concluding that illustrative plans perform "at least as well as the [enacted] Plan" in respecting existing political subdivisions despite some illustrative plans splitting seven counties, while the enacted plan split six).

657.    Nor is it significant that Plan 3 includes one district that splits four counties. The Enacted Plan features four districts splitting three counties each, PX

59 at 166-167, and the marginal distinction between the two has little bearing on the Plans' reasonableness. *See Milligan*, 691 F. Supp. 3d at 1351 ("Plaintiffs are not required to produce a plan that 'meets or beats' the 2023 Plan on any particular traditional districting criteria to satisfy *Gingles* I."); *see, e.g.*, *Alpha Phi Alpha Fraternity Inc.*, 700 F. Supp. 3d at 1296, 1312, 1336 (concluding that individual illustrative districts "respect[] political subdivision" despite splitting one or two additional counties compared to the enacted district). Accordingly, the illustrative plans sufficiently respect county lines.

658. Notably, the Alabama Legislature's Reapportionment Committee guidelines state that districts should respect "communities of interest, neighborhoods, and political subdivisions to the extent practicable." Doc. 230 ¶ 23; *see* PX 6 ¶¶ 17, 19.e (describing Mr. Fairfax's attention to this guideline). Yet, as described in the Court's findings of fact, the state's map drawer, Mr. Hinaman, testified that he did not make any effort to keep any specific communities of interest together, nor was he instructed to do so by the Reapportionment Committee. Hinaman Dep. (Doc. 235-2) at 75:8-14; *see also* McClendon Dep. (Doc. 235-1) at 85:19-24 (Senate Chair did not recall any specific discussion of communities of interest in meetings between map drawer and senators). Of relevance, Mr. Hinaman "knew there was [a] substantial African American community in the city of Huntsville," which he "think[s] . . . is a community of interest," yet he did not

consider this community of interest when drawing a map that split it across three districts. Doc. 235-2 at 72:10-73:18. The Court concludes that Mr. Fairfax did a substantially better job of considering communities of interest—and thus following the state's own guidelines—than the Legislature itself.

659.    Based upon the foregoing findings of fact, the Court concludes that the illustrative plans respect communities of interest and preexisting political subdivisions.

## C.    Racial predominance

660.    The Secretary does not contend (or at least did not elicit any evidence or testimony supporting a contention) that race predominated in the drawing of Illustrative SD25. *See* DX 7; DX 8.

661.    Further, he does not contend that race predominated in the drawing of Illustrative Plan 1's SD7. *See* DX 7; Tr. 1081:22-24.

662.    The Secretary argues, however, that SD7 in Illustrative Plans 2A and 3 do not adhere to traditional redistricting principles due to the predominance of race. At core, the Secretary argues that because Mr. Fairfax considered race to provide the court with illustrative districts that meet the requirements of the first *Gingles* precondition, those districts necessarily subordinated other criteria to race, making them racial gerrymanders that cannot possibly comply with traditional redistricting principles. The Secretary's argument misstates both the facts and the law.

663.    Mr. Fairfax did not subordinate traditional districting factors to race in drawing the illustrative plans. He testified to his prioritization of traditional criteria, including equal population, compactness, contiguity, preserving political subdivisions, and respecting communities of interest, and offered extensive explanations of how he constantly balances those criteria and makes tradeoffs between them as needed. *See, e.g.*, PX 6 ¶ 17; Tr. 246:18-247:14; 287:4-7. Mr. Fairfax only considered race to an extent necessary to develop plans that illustrate the first *Gingles* precondition can be met. He candidly explained when he viewed racial data in Maptitude during his map drawing process and confirmed that he "always use[s] the other criteria labels more than race." Tr. 241:20-242:5; *see also id.* 279:21-281:14.

664.    Accordingly, the use of race did not predominate in Mr. Fairfax's drawing of the Illustrative Plans. *See* , 582 F. Supp. 3d at 1006 (crediting *Gingles I* expert's testimony that he "worked hard to give 'equal weighting' to all traditional redistricting criteria" and "prioritized race only to the extent necessary to answer the essential question asked of him as a *Gingles I* expert" and "clearly explained that he did not prioritize it to any greater extent"); *id.* (noting that expert "acknowledged that tradeoffs between traditional districting criteria are necessary, and he did not ignore any criteria"); *see also Milligan*, 599 U.S. at 31 (plurality op.) (citing the same expert testimony to conclude that "the line between racial predominance and racial

consciousness . . . was not breached here" and "evidence of racial predominance in [the expert's] maps was exceedingly thin").

665.   Defendant's argument erroneously conflates racial gerrymandering standards with the *Gingles* 1 analysis. By its very nature, Section 2 requires that plaintiffs propose illustrative districts that are majority-minority districts, which requires race consciousness. "The very reason a plaintiff adduces a map at the first step of *Gingles* is precisely *because of* its racial composition—that is, because it creates an additional majority-minority district that does not then exist." *Milligan*, 599 U.S. at 34 n.7 (emphasis in original). It is permissible then to consider race when developing illustrative plans to satisfy the first *Gingles* precondition or to remedy a violation. *See id.* at 40–41 ("[T]his Court and the lower federal courts . . . have authorized race-based redistricting as a remedy for state districting maps that violate § 2.").

666.   In holding that the consideration of race does not preclude satisfying *Gingles* I, the Supreme Court rejected the argument that the *Milligan* plaintiffs' illustrative plans failed *Gingles* I because race was a consideration in their design. *See Milligan*, 599 U.S. at 24 (rejecting Alabama's argument that "the illustrative plan that plaintiffs adduce for the first *Gingles* precondition cannot have been 'based' on race"); *see also LULAC*, 548 U.S. at 433 (explaining that the *Gingles* 1 compactness analysis is different than the analysis in a racial gerrymandering case).

667.  *Gingles* 1 requires minority voters to show that a challenged electoral scheme has caused a diminution of electoral power they would otherwise have the potential to exercise. *See Gingles*, 478 U.S. at 50 n.17. And it directs plaintiffs to make that showing by demonstrating "objective[ly]" and "numerical[ly]" that an "election district could be drawn in which minority voters form a majority." *Bartlett*, 556 U.S. at 18. Accordingly, "the first *Gingles* factor is an inquiry into causation that *necessarily* classifies voters by their race. *Clark v. Calhoun Cnty., Miss.* (*Clark II*), 88 F.3d 1393, 1407 (5th Cir. 1996) (emphasis added). The *Milligan* Court reaffirmed that it is permissible to consider race when developing illustrative plans to satisfy the first *Gingles* precondition. Indeed, as the majority stressed, "[t]he very reason a plaintiff adduces a map at the first step of *Gingles* is precisely *because of* its racial composition—that is, because it creates an additional majority-minority district that does not then exist." *Milligan*, 599 U.S. at 34 n.7 (emphasis in original); *see also id.* at 40–41 ("[T]his Court and the lower federal courts . . . have authorized race-based redistricting as a remedy for state districting maps that violate § 2.").

668.  In holding that the consideration of race does not preclude satisfying *Gingles* I, the Supreme Court rejected the argument that the *Milligan* plaintiffs' illustrative plans failed *Gingles* I because race was a consideration in their design. *See Milligan*, 599 U.S. at 24 (rejecting Alabama's argument that "the illustrative

plan that plaintiffs adduce for the first *Gingles* precondition cannot have been 'based' on race").

669.    Despite this, in response to questioning from the court, counsel for the Secretary refused to concede that "at least to some degree in order to be able to attempt the task" required by Section 2, "a *Gingles* 1 expert's work cannot be race blind." *See* Tr. 1691:17-1692:2 ("I would have to think about that. . . . I think it was Justice Alito in his dissent said he wasn't so sure maybe it should be race blind."); *but see id.* at 1694:2-10 ("We might not agree with that case law, but I think current case law permits a *Gingles* 1 expert to do this."). As Justice Alito recently wrote on behalf of a majority of the Court, a map-drawer can review "racial data" for the "lawful purpose" of ensuring that a map "complied with [the Court's] Voting Rights Act precedent." *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 22 (2024)

670.    Even if Mr. Fairfax had equally prioritized compliance with Section 2 of the VRA alongside other considerations in making choices in his map drawing process, that would be permissible under these precedents and Alabama's Reapportionment Committee's own redistricting guidelines. *See* PX 32 at 4 (requiring that "priority is to be given to . . . compliance with the Voting Rights Act of 1965 . . . should the requirements of [that] criteri[on] conflict" with any others); *see, e.g.*, *Ala. Legislative Black Caucus v. Alabama*, 231 F. Supp. 3d 1026, 1051

(M.D. Ala. 2017) ("Compliance with federal law *must* be a higher priority" than "maintaining communities of interest and preserving county boundaries.").

671.   And even if a showing of racial predominance could defeat a plaintiff's attempt to satisfy *Gingles* I, such a showing has not been made here. Mr. Fairfax considered race appropriately for the purposes of satisfying *Gingles* I, balancing it with the other traditional redistricting principles he considered, and not allowing race to predominate. Based on his demeanor, and careful and deliberate explanations, the Court credits Mr. Fairfax's direct testimony to this effect. *See Milligan*, 599 U.S. at 31 (crediting an expert who denied that race predominated in his illustrative plan); *see also Alexander*, 602 U.S. at 19 (crediting a state map-drawer who "steadfastly denied relying on race" in drawing a plan); *Milligan*, 582 F. Supp. 3d at 1004 (crediting *Gingles I* experts on this point).

672.   The Court finds that race did not predominate in Mr. Fairfax's illustrative plans or in the process he used to develop them.

673.   Defendant's purported evidence to the contrary is unavailing.

674.   As a preliminary matter, the Court assigns very little weight to the testimony of Defendant's only *Gingles* 1 expert, Dr. Trende. Compared to Mr. Fairfax and Dr. Oskooii, Dr. Trende's work was "considerably less thorough": together, Plaintiff's experts base their "opinions on a wide-ranging consideration of the requirements of federal law and all or nearly all traditional redistricting criteria,

but [Dr. Trende] considered only [two] traditional redistricting criteria" (or fewer for some maps): compactness and county splits. *Milligan*, 582 F. Supp. 3d at 1006. Additionally, Dr. Trende's credentials are "considerably weaker" than Dr. Oskooii's or Mr. Fairfax's: "he does not have the academic record or the record of peer-reviewed publications" that Dr. Oskooii has, and, unlike either Mr. Fairfax or Dr. Oskooii, his expert testimony in redistricting litigation has been consistently rejected or given little weight by courts. *Id*. The Court also "question[s] the basis" Dr. Trende's opinions. *Id.* In addition to numerous concerns already articulated about the reliability of his analyses, we are concerned about numerous other instances in which [Dr. Trende] offered an opinion without a sufficient basis (or in some instances any basis)." *Id.* at 1006-07.

675. As relevant here, "districting involves myriad considerations—compactness, contiguity, political subdivisions, natural geographic boundaries, county lines, pairing of incumbents, communities of interest, and population equality." *Milligan*, 599 U.S. at 35 (citing *Miller*, 515 U.S. at 916). "[Q]uantifying, measuring, prioritizing, and reconciling these criteria requires map drawers to make difficult, contestable choices," *id.* (internal quotation marks & citation omitted), yet Dr. Trende failed to analyze or even consider nearly any of those considerations and choices faced by Mr. Fairfax. The omissions in Dr. Trende's analysis are glaring and significant.

676.   The crux of Dr. Trende's argument is that "sole reason" for introducing Plans 2A and 3 was to meet the *Gingles* 1 numerosity threshold according to 2022 5-year ACS CVAP data and VAP data from the 2020 Decennial Census, respectively, in response to his initial critiques. DX 8 at 13, 24. To the contrary, courts look favorably upon map drawing experts like Mr. Fairfax who "[take] seriously" a defense witness's "criticism" of their initial plan and respond by preparing additional plans that are "responsive to th[ose] concern[s]." *Singelton I*, 582 F. Supp. 3d at 1005–06.

677.   Dr. Trende's choropleth maps of SD7 in Plans 2 and 3 do not prove impermissible racial predominance. These maps are misleading in several ways— for example, Dr. Trende uses 30 percent BVAP as his lowest category on his coloration scheme, which obscures "a significant amount of black population percentage" and results in visual misrepresentation of the actual racial composition of each geographic subunit shown outside of the boundaries of the illustrative districts. *See* Tr. 337:20-23. His VTD-level maps are further misleading, as they operate higher levels of geography, masking how, at the block level, there are blocks with high Black populations outside of the district and blocks with low Black populations within the district. *Id.* 337:24-338:3.

678.   At most, Dr. Trende's critiques prove that the illustrative majority Black districts contain several blocks or VTDs that are themselves majority Black.

As Mr. Fairfax explained, "it's not uncommon for . . . a majority-black district to have majority-black precincts," because "[y]ou can't create necessarily [a] majority-black district without including majority-black precincts or VTDs . . . ." Tr. 338:4-8; *see Milligan*, 599 U.S. at 34 n.7; *Lawyer*, 521 U.S. at 582.

679.    As to Plan 3's SD7, Dr. Trende suggests that every choice Mr. Fairfax made must have been due to race, because it includes most (though not *all*) of the majority Black VTDs in the area. But again, there is nothing abnormal about a majority Black district including many majority black precincts. Mr. Fairfax testified that as he was developing SD7 in Plan 3, "there were slightly different configurations," such that the final one he presented "wasn't the only one"—rather, he "pick[ed] the best one[] out of the bunch" in terms of reasonable configuration from the options with "a majority-black BVAP and a majority-Black CVAP." Tr. 323:19-24. On the other hand, Dr. Trende failed to analyze the vast majority of the relevant redistricting principles. He concedes that Plan 3's SD7 is not "the *only* way to achieve a 50% + 1 BVAP in the area." DX 8 at 29 (emphasis in original).

680.    For reasons already addressed, Dr. Trende's critique of the visual appearance of SD7 in Plan 3 is not convincing evidence of racial predominance. *See Gunn v. Chickasaw Cnty.*, 166 F.3d 341 (5th Cir. 1998) (rejecting argument that "the plaintiffs' proposed majority-black districts are so bizarrely-shaped that they were obviously drawn solely based on race" because "[t]he first *Gingles* precondition does

not require some aesthetic ideal of compactness, but simply that the black population be sufficiently compact to constitute a majority in a single-member district.") (quoting *Clark I,* 21 F.3d at 95).

681.   The Court concludes that race did not predominate in the drawing of the illustrative plans.

\* \* \*

682.   Based upon the foregoing findings of fact and conclusions of law, the Court holds that Plaintiffs have established the first *Gingles* precondition. *See supra*, Findings of Fact § III.

## III.   Plaintiffs have Satisfied the Second and Third Gingles Preconditions

683.   The second and third *Gingles* preconditions require that "the minority group [ ] be able to show that it is politically cohesive, and that "the white majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate." *Milligan*, 599 U.S. at 18 (quoting *Gingles*, 478 U.S. at 52).

684.   The second precondition concerns "the political cohesiveness of the minority group," and is used to "show[] that a representative of its choice would in fact be elected." *Id.* at 18–19.

685.   The third precondition reveals whether "'the challenged districting thwarts a distinctive minority vote' at least plausibly on account of race." *Id.* at 19.

686.   These preconditions hold particular importance because the risk of minority vote dilution "is greatest 'where minority and majority voters consistently prefer different candidates' and where minority voters are submerged in a majority voting population that 'regularly defeat[s]' their choices." *Id.* at 18 (quoting *Gingles*, 478 U.S. at 48).

687.   Because voters cast their ballots in secret, courts usually examine the existence and extent of racially polarized voting by reference to statistical analyses performed by experts—the ecological inference or "EI" method "is currently the 'gold standard' for use in racial bloc voting analyses." *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 301 F. Supp. 3d 1297, 1305 (M.D. Ga. 2018), *aff'd,* 979 F.3d 1282 (11th Cir. 2020); *see also Nairne* , 715 F. Supp. 3d at 860 ("Experts agree and courts recognize that EI produces the most reliable estimates"); *Alpha Phi Alpha Fraternity*, 700 F. Supp. 3d at 1264 ("Courts have recognized ecological inference ("EI") as an appropriate analysis for determining whether a plaintiff has satisfied the second and third *Gingles* preconditions.").

688.   Here, the Court finds, and Defendants do not dispute, that Plaintiffs' expert Dr. Baodong Liu reliably estimated racial voting patterns using EI.

689.   In analyzing the second and third *Gingles* preconditions, the Eleventh Circuit and Supreme Court have provided several guidelines. First, "a court may consider endogenous elections more important than exogenous elections," *Solomon*

*II*, 221 F.3d at 1227, but courts do not clearly err by declining to afford them special weight, particularly where there are few and doing so could skew the results, *Johnson v. Hamrick*, 296 F.3d 1065, 1078 (11th Cir. 2002).

690.   Second, "a pattern of [RPV] that extends over a period of time is more probative . . . than are the results of a single election." *Gingles*, 478 U.S. at 57. However, there is no minimum number of elections that must be analyzed. *See id.* at 57 n.25 ("The number of elections that must be studied in order to determine whether voting is polarized will vary according to pertinent circumstances."). In *Gingles*, the Supreme Court affirmed a finding of RPV based on data from "three election years." *Id.* at 61; *see also Wright*, 979 F. 3d at 1310 (holding that twelve endogenous and exogenous elections over a ten year period were sufficient); *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1130 (3d Cir. 1993) ("seven elections over a period of ten years is not such a small sample that a court would be unable to discern the presence of a pattern of white bloc voting usually defeating the minority voters' candidate of choice.").  At the same time, courts may conclude that recent elections are more probative than older elections. *Wright*, 979 F.3d at 1301.

691.   Third, courts may properly accord greater weight to biracial elections—elections involving candidates of different racial groups, including the minority group at issue in the case. *Johnson v. Hamrick*, 196 F.3d 1216, 1221 (11th Cir. 1999). The Eleventh Circuit has not only allowed this weighting of biracial elections but

has suggested that doing so will frequently be warranted. *See Davis v. Chiles*, 139 F.3d 1414, 1418 & n.5 (1998) (observing that "evidence drawn from elections involving black candidates is more probative"); *Nipper v. Smith*, 39 F.3d 1494, 1540 (1994) (en banc) (plurality op.) ("[T]he most probative evidence of whether minority voters have an equal opportunity to elect candidates of their choice is derived from elections involving black candidates.").[27]

---

[27] Other circuits have also relied on biracial elections to determine whether voting is racially polarized and agreed that biracial elections provide the most probative evidence about the existence of racially polarized voting. *See, e.g.*, *Sanchez v. State of Colorado*, 97 F.3d 1303, 1317, 1321 (10th Cir. 1996) (holding plaintiffs established racial polarized voting based on an expert who limited his analysis to elections featuring Hispanic and non-Hispanic white candidates); *Harvell v. Blytheville Sch. Dist.* No. 5, 71 F.3d 1382, 1386 & n. 4, 1390, 1396-98 (8th Cir. 1995) (en banc) (reaching the same conclusion when plaintiff's expert relied entirely on elections involving Black and white candidates); *Citizens for a Better Gretna v. City of Gretna, La.*, 834 F.2d 496, 504 (5th Cir. 1987) (declining to "consider evidence of elections in which only whites were candidates" and affirming finding of liability under Section 2); *Pope v. Cnty. of Albany*, 94 F. Supp. 3d 302, 330 (N.D.N.Y. 2015) ("The Court finds that Dr. Liu's analysis of bi-racial elections was not too narrow."); *see also Bone Shirt*, 461 F.3d at 1020–21 ("Endogenous and interracial elections are the best indicators of whether the white majority usually defeats the minority candidate." (footnote omitted)); *United States v. Blaine Cnty.*, 363 F.3d 897, 911 (9th Cir. 2004) ("[C]ontests between white and Indian candidates . . . are most probative of white bloc voting." (internal citation and quotation marks omitted)); *Rural W. Tenn. Afr.-Am. Affs. Council v. Sundquist*, 209 F.3d 835, 840 (6th Cir. 2000) ("courts are not foreclosed from considering electoral races involving only white candidates, [but] that case does not suggest (as the State seems to argue) that white-white contests are necessarily entitled to the same weight as those involving a minority candidate."); *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 864 (5th Cir. 1993) (en banc) ("This court has consistently held that elections between white candidates are generally less probative in examining the success of minority-preferred candidates, generally on grounds that such elections do not provide minority voters with the choice of a minority candidate."); *Jenkins*, 4 F.3d at 1128 ("As a general matter, we believe that elections involving white candidates only are much less probative of racially polarized voting than elections involving both black and white candidates."); *Westwego Citizens for Better Gov't v. City of Westwego*, 872 F.2d 1201, 1208 n.7 (5th Cir. 1989) ("the evidence most probative of racially polarized voting must be drawn from elections including both black and white candidates."); *Black Pol. Task Force v. Galvin*, 300 F. Supp. 2d 291, 304 (D. Mass. 2004) ("The VRA focuses on the opportunity of minority voters to elect representatives of their choice, and we believe that this opportunity is best and most easily measured in elections that offer black voters the chance to

692.    In *Gingles* itself, the Supreme Court found racial polarization based on data drawn only from biracial elections. *See Gingles*, 478 U.S. at 52-54. Thus, "implicit in the *Gingles* holding is the notion that black preference is determined from elections which offer the choice of a black candidate." *Citizens for a Better Gretna*, 834 F.2d at 503–04. "[T]he Voting Rights Act's guarantee of equal opportunity is not met when '[c]andidates favored by blacks can win, but only if the candidates are white.'" *Rural W. Tenn. African-Am. Affairs Council v. Sundquist*, 209 F.3d 835, 840 (6th Cir. 2000) (quoting *Smith v. Clinton*, 687 F. Supp. 1310, 1318 (E.D. Ark.) (three-judge court), *aff'd mem.* 488 U.S. 988 (1988)); *see also Rogers v. Lodge*, 458 U.S. 613, 62 (1982) (finding "overwhelming evidence of bloc voting along racial lines" where "no black had ever been elected" to office). Elections involving only White candidates "may reveal little about" Black voters' ability to elect their preferred candidates because Black voters may not meaningfully prefer any of the White candidates at all. *Nipper*, 39 F.3d at 1540 (op. of Tjoflat, J.); *see also Sanchez*, 97 F.3d at 1321 (discussing "Anglo versus Anglo" elections and cautioning against "the myopic presumption there is a minority preferred candidate in any race in which the minority votes").

---

support a viable black candidate against a viable white candidate."); *Smith v. Clinton*, 687 F. Supp. 1310, 1316 (E.D. Ark. 1988) (three-judge court) ("we believe it is proper to give considerable weight to the evidence of polarization in elections between black and white candidates. In Thornburg, the Supreme Court relied heavily on such evidence. Further, in a functional assessment of the political process, one of the most important factors is the extent to which members of the minority group have been elected to office in the jurisdiction.").

693.   Elections featuring only white candidates "do not contain a candidate that the Court can be sure is minority preferred and who, consequently, can serve as a benchmark for measuring the level of black voter support that is a true indicator of other candidates who are black preferred." *Askew v. City of Rome*, 127 F.3d 1355, 1379 n.9 (11th Cir. 1997).

694.   The Eleventh Circuit and courts within it have therefore consistently credited racial polarization findings based on analysis derived wholly from biracial elections. *See Solomon v. Liberty Cnty.*, 899 F.2d 1012, 1013 (11th Cir. 1990) (en banc) ("*Solomon II*") (Kravitch, J., specially concurring) (opinion for five judges holding election racially polarized based solely on evidence drawn from elections involving Black and white candidates); *id.* at 1037 (Tjoflat, C.J., specially concurring) (opinion for remaining five judges agreeing with Judge Kravitch's analysis of racial polarized voting but disagreeing with other aspects of her opinion); *Askew*, 127 F.3d at 1379 n. 9 (adopting district court decision as its own) ("The Court also concludes that it need not analyze the instant white only elections to gain an accurate picture of the black community's ability to elect its preferred candidates."); *Milligan I*, 582 F. Supp. 3d at 1016–17 (crediting Dr. Liu's testimony based on analysis of biracial elections); *Milligan*, 690 F. Supp. 3d at 1297 (same); *Alpha Phi Alpha Fraternity*, 700 F. Supp. 3d at 1343 (crediting analysis where the expert "focused on elections that include at least one Black candidate, an approach that

multiple courts have endorsed in other cases because they are the most probative for measuring racial polarization.").

695.   Fourth, "[a]s a part of these preconditions, plaintiffs do not have to prove that race is the sole or predominant cause of the voting difference between the minority and majority voting blocs, nor must plaintiffs disprove that other race-neutral reasons, such as partisanship, are causing the racial bloc voting. *Alpha Phi Alpha Fraternity*, 700 F. Supp. 3d at 1264. In *Solomon II*, the Eleventh Circuit properly placed inquiries about whether "the degree and nature of the bloc voting weigh against an ultimate finding of minority exclusion from the political process" outside the preconditions and into the totality analysis. 221 F.3d at 1225.[28]

696.   This conclusion follows from *Gingles* itself, where "seven justices. . . agreed that proof of the second and third prerequisites does not require showing the cause(s) of racial polarization." *Ga. State Conf. of the NAACP v. Georgia*, No. 121CV05338-ELB-SCJ-SDG, 2023 WL 7093025, at *19 (N.D. Ga. Oct. 26, 2023) (three-judge court). The four-justice plurality portion of *Gingles* held that it "only

---

[28] Other circuits agree with this approach as well. *See United States v. Charleston Cnty.*, 365 F.3d 341, 348 (4th Cir. 2004) ("[E]xpanding the inquiry into the third Gingles precondition to ask not merely whether, but also why, voters are racially polarized . . . would convert the threshold test into precisely the wide-ranging, fact-intensive examination It is meant to precede."); *Goosby v. Town Bd. of Town of Hempstead, N.Y.*, 180 F.3d 476, 493 (2d Cir. 1999) ("ratify[ing] the approach taken by the district court to consider the political partisanship argument under the 'totality of circumstances' analysis rather than as part of the third Gingles precondition"); *Milwaukee Branch of the N.A.A.C.P. v. Thompson*, 116 F.3d 1194, 1199 (7th Cir. 1997) (agreeing that courts should "postpone this kind of inquiry to their consideration of the totality of the circumstances"); *Sanchez*, 97 F.3d at 1313 ("at the threshold, we are simply looking for proof of the correlation between the race of the voter and the defeat of the minority's preferred candidate.")

the correlation between race of voter and selection of certain candidates, not the causes of the correlation, matters." 478 U.S. at 63. Justice O'Connor's concurrence, joined by three other justices, similarly agreed that as to the preconditions as opposed to the totality of circumstances, defendants cannot rebut "statistical evidence of divergent racial voting patterns . . . by offering evidence that the divergent racial voting patterns may be explained in part by causes other than race." *Id.* at 100 (O'Connor, J., concurring).

697.   In this case, Dr. Liu analyzed fourteen biracial elections for results in the Huntsville area, including three endogenous contests, and eleven biracial elections in the Montgomery area. PX 16 at 6; Tr. 26:17-27:10 (Liu). The results showed extremely high levels of racially polarized voting in both regions: in Huntsville, Black voters supported the same candidates with over 80% of the vote in all but one election, and less than 25% of white voters supported that candidate in those same thirteen elections. PX 16 at 7-9; Tr. 30:25-32:21 (Liu). The one remaining race also showed racial cohesion, just by lesser margins. PX 16 at 7. Across all 14 elections, Black-preferred candidates lost every time. PX 16 at 7-9; Tr. 32:14-21 (Liu).

698.   In Montgomery, the levels of racial cohesion were even more stark: Black voters supported the same candidates with over 89% of the vote in all eleven elections, and less than 11% of white voters supported those same candidates. PX

16 at 9-10; Tr. 32:22-33:24 (Liu). Except in supermajority-Black State Senate District 26, Black-preferred candidates lost every election. PX 16 at 10, 14; Tr. 33:18-24 (Liu).

699.    These levels of RPV are similar to that in *Milligan*, in which the Supreme Court affirmed findings based in part on Dr. Liu's analysis of thirteen biracial elections, where Black Alabama voters "supported their candidates of choice with 92.3% of the vote while white voters supported Black-preferred candidates with 15.4% of the vote." 599 U.S. at 22.

700.    In contrast to the consistent losses of Black preferred candidates in Enacted Districts 7 and 25 across all eleven elections Dr. Liu analyzed, Dr. Liu found that the Plaintiffs' Illustrative Plan 1 would have allowed Black-preferred candidates to prevail in all of those elections in both redrawn districts. PX 16 at 10-11, 13-14; Tr. 37:3-9.

701.    Defendants' expert Dr. Trende also agrees that all of Plaintiffs' illustrative plans for allow Black voters to elected preferred candidates. Tr. 1045:16-25.

702.    While Dr. Trende offers the opinion that Black voters could elect candidates of choice when they form approximately 25% of the voting-age population in a Huntsville-area district, *see supra* ¶¶ 299-302, his analysis does not undercut Plaintiffs' showing under *Gingles* 3.

703.    Dr. Trende characterized his effectiveness analysis as "just a theoretical exercise," which did not look at voting patterns and turnout for Black and white voters in actual elections run, and ignored that even at 29% BVAP, Black voters had not elected a Black or otherwise preferred candidate in State Senate District 2. But in analyzing the third precondition, we must analyze "the "usual predictability of the majority's success,'" and do so by considering past elections and whether "white residents voted as a bloc to defeat the black-preferred candidate." *Wright* , 979 F.3d at 1304 (quoting *Gingles*, 478 U.S. at 51). Dr. Trende's "theoretical exercise" does not undermine Dr. Liu's analysis of prior elections which shows consistent defeat for Black-preferred candidates due to white bloc voting.

704.    Because of this Court's finding of Dr. Liu's credibility, the amount and recency of elections he analyzed, the consistency of the findings of strong racial polarization in both the Montgomery and Huntsville regions across every election, and the lack of any expert testimony disputing Dr. Liu's findings, the Court concludes that the Plaintiffs have satisfied the second and third *Gingles* preconditions.

## IV.    Based on the Totality of Circumstances, Plaintiffs Have Proven That The 2021 Senate Plan Violates Section 2 of the VRA.

705.    Beside the *Gingles* preconditions, a plaintiff "must also show, under the 'totality of circumstances,' that the political process is not 'equally open' to minority voters." *Milligan*, 599 U.S. at 18.

706.   To undertake the totality-of-the-circumstances determination, courts use the nine factors drawn from a report of the Senate Judiciary Committee accompanying the 1982 amendments to the VRA, i.e., the "Senate Factors." *Ga. State Conf. of the NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1342 (11th Cir. 2015). But courts are not limited to considering these factors, nor is there a requirement that "any particular number of factors be proved, or that a majority of them point one way or the other." *Id.* (internal quotations omitted).

707.   The two "most important" factors are: racially polarized voting (Senate Factor 2) and a lack of Black electoral success (Senate Factor 7). *Gingles*, 478 U.S. at 48 n.15; *see also Fayette*, 775 F.3d at 1347 n.9. Here, their undisputed presence alone "point[s] commandingly" in Plaintiffs' favor. *Fayette*, 775 F.3d at 1347 n.9.

## A.    <u>Senate Factors 1, 3, and 5 Weigh in Favor of Plaintiffs</u>

708.   Senate Factor 1 asks the extent to which Alabama has "any history of official discrimination" that "touched the right of the members of minority group to register, to vote, or otherwise to participate in the democratic process," *Gingles*, 478 U.S. at 36-37 (citation omitted); Senate Factor 3 asks whether Alabama uses "voting practices or procedures that may enhance the opportunity for discrimination," *id*. at 37, and Senate Factor 5 asks whether Black people "bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate effectively in the political process," *id*.

709.   Under the results test, it is irrelevant whether the state or local entities engaged in discrimination insofar as "the source of past pervasive discrimination does not change its impact on present-day black access." *McIntosh Cnty. Branch of the NAACP v. City of Darien* ("*McIntosh NAACP*"), 605 F.2d 753, 759 & n.5 (5th Cir. 1979). Similarly, "pervasive private discrimination should be considered, because such discrimination can contribute to the inability of blacks to assert their political influence and to participate equally in public life." *United States v. Marengo Cnty. Comm'n* ("*Marengo Cnty.*"), 731 F.2d 1546, 1568 & n.37 (11th Cir. 1984).

710.   The Court analyzes Senate Factors 1, 3, and 5 together because "much of the evidence that is probative of one of them is probative of more than one of them." *Milligan*, 582 F. Supp. 3d at 1020; *accord Miss. State Conf. of NAACP*, 2024 WL 3275965, at *34 (same); *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 700 F. Supp. 3d 1136, 1268 (N.D. Ga. 2023) (same).

### 1.    Alabama's Prior History of Public and Private Discrimination in Voting, Education, Employment, Health, and Other Areas.

711.   In the Section 2 context, the Senate Factors "expressly include an historical focus." *Milligan*, 582 F. Supp. at 1020. Historical evidence is "relevant to whether the political process today is 'equally open' to minority voters" because it may "prove that black voters are still affected by unequal access to the political process." *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 81 F.4th 1328, 1333 (11th Cir. 2023) (Pryor, C.J., with Grant and Brasher, JJ., concurring in the

denial of rehearing en banc). The Court therefore rejects the Secretary's invitation to focus exclusively on the recent evidence related to these factors. While "the most relevant historical evidence is relatively recent history," "even long-ago acts of official discrimination give context to the [*Gingles*] analysis." *Veasey v. Abbott*, 830 F.3d 216, 232, 257 (5th Cir. 2016) (en banc); *accord Milligan*, 599 U.S. at 14 (considering Alabama's history beginning in Reconstruction as well as the specific circumstances of the challenged plan from the 1990s onward); *LULAC*, 548 U.S. at 440 (noting Texas's history "stretching back to Reconstruction") (citation omitted).

712.   Every Black Alabamian who testified at trial offered a powerful reminder of either the palpable recency of past discrimination or the ways in which official discrimination personally touched their lives.[29] For example, Ms. Peoples and Mr. McCollum both attended segregated schools in Alabama. *See supra* ¶ 351. Even in the 1970s, Mr. McCollum faced discrimination from election officials and was forced to leave a segregated restaurant. Tr. 1363:14-1364:25, 1374:6-14. Ms. Branyon similarly testified to her family's experiences with racist violence and segregation. Tr. 880:1-881:14. Ms. Branyon herself was both a victim of discrimination by the Alabama Department of Transportation and a beneficiary of a

---

[29]   The fact that some Alabama residents, like Mr. Simelton, Tr. 152:9-20, and Mr. Douglas, Tr. 485:23-486:1, were "educated in other . . . States also maintaining segregated and unequal school systems" is a "matter of no legal significance." *Cf. Gaston Cnty. v. United States*, 395 U.S. 285, 293 n.9 (1969) (discussing a literacy test's discriminatory effect in a particular county). "[T]he source of past pervasive discrimination does not change its impact on present-day black access." *McIntosh NAACP*, 605 F.2d at 759 & n.5; *see also Marengo Cnty.*, 731 F.2d at 1568 n.37 (similar).

class action brought against the State. *See supra* ¶ 351; *see generally Brown*, 597 F.3d at 1167-70 & n.3 (describing the history of the *Reynolds* case and affirming a jury award against the state transportation agency for not promoting a Black engineer). And Ms. Branyon represents a majority-Black district that was drawn to remedy VRA violation. Tr. 876:21-878:4. Younger witnesses, like Mr. Milligan and Mr. Coley, also testified about their families' experiences with discrimination, *see supra* ¶ 351, the negative effects of Ku Klux Klan rallies, Tr. 459:10-15 (Milligan), and the State's veneration of the Confederacy, *see supra* ¶¶ 361, 496, and the present-day effects of past discrimination in the areas of transportation and infrastructure, Tr. 463:14-466:10 (Milligan).

713.    If Alabama's history of segregated schools, preventing Black persons from running for or being elected to office, and discrimination in state agencies is sufficiently recent for multiple witnesses have firsthand experience with that history, then it seems "insufficiently distant" for the Court to disregard it here. *Milligan*, 582 F. Supp. 3d at 1020. "The racial bias of Alabama's former leaders and White citizens, while certainly 'outdated,' unfortunately still affects Black Alabamians' health and socioeconomic status today." *People First of Ala. v. Merrill*, 491 F. Supp. 3d 1076, 1174 (N.D. Ala. 2020). "[P]ast discrimination can severely impair the present-day ability of minorities to participate on an equal footing in the political process." *Marengo Cnty.*, 731 F.2d at 1567.

714.   Thus, the Court will consider past discrimination to the extent that it offers context, but the Court gives more weight to evidence after 1990. *See Milligan*, 599 U.S. at 14 (recounting the State's redistricting history since the 1990s); *Miss. State Conf. of NAACP*, 2024 WL 3275965, at *37 (beginning the Senate Factors analysis in 1990).

715.   "Alabama's extensive history of repugnant racial and voting-related discrimination is undeniable and well documented." *Milligan*, 599 U.S. at 22 (citation omitted). Alabama's "unrelenting historical agenda" from the nation's founding through at least the modern Civil Rights Movement was to "keep its black citizens economically, socially, and politically downtrodden, from the cradle to the grave." *Dillard*, 640 F. Supp. at 1357-60 (recounting the State's efforts from the 1950s to the 1980s to "discriminate against black persons in all [] areas of their lives," including education, employment, recreational and cultural facilities, transportation, healthcare, and the legal system).

716.   In the 1950s and 1960s, Alabama placed various barriers in the way of black voters, including discriminatory districting, *Gomillion v. Lightfoot*, 364 U.S. 339 (1960), *Sims v. Baggett*, 247 F. Supp. 96 (M.D. Ala. 1965) (three-judge court), overtly racist plots by state officials, *United States v. McLeod*, 699 385 F.2d 734, 750-51 (5th Cir. 1967), *United States v. Clark*, 249 F. Supp. 720 (S.D. Ala. 1965), flagrant efforts to stop Black persons from holding office, *Hadnott v. Amos*, 394 U.S.

358 (1969), restrictions on assistance for those disproportionately Black voters who were illiterate, *Alabama v. United States*, 304 F.2d 583, 587 (5th Cir.), *aff'd*, 371 U.S. 37 (1962), *Gilmore v. Greene Cnty. Democratic Party Exec. Comm.*, 435 F.2d 487, 491-92 (5th Cir. 1970), *United States v. Atkins*, 323 F.2d 733, 736 (5th Cir. 1963), *United States v. Penton*, 212 F. Supp. 193, 197 (M.D. Ala. 1962), fees-related to voting, *United States v. Alabama*, 252 F. Supp. 95 (M.D. Ala. 1966) (three-judge court), and state or other laws requiring at-large elections with numbered places, *Bolden v. City of Mobile*, 542 F. Supp. 1050, 1068 (S.D. Ala. 1982); *Hale Cnty. v. United States*, 496 F. Supp. 1206, 1218-19 (D.D.C. 1980) (three-judge court); *Hendrix v. McKinney*, 460 F. Supp. 626, 630 (M.D. Ala. 1978); *Smith v. Paris*, 257 F. Supp. 901 (M.D. Ala. 1966), *aff'd* 386 F.2d 979 (5th Cir. 1967); *United States v. Democratic Exec. Comm. of Barbour Cnty.*, 288 F. Supp. 943 (M.D. Ala. 1968).

717.   "But history did stop in 1960." *Milligan*, 599 U.S. at 40. Recent history reveals a similar pattern of Alabama officials violating the rights of Black voters, including through discriminatory redistricting plans, *Allen v. Milligan*, 599 U.S. 1 (2023); *Milligan v. Allen*, 690 F. Supp. 3d 1226 (N.D. Ala. 2023) (three-judge court); *Ala. Legis. Black Caucus v. Alabama*, 231 F. Supp. 3d 1026 (M.D. Ala 2017) (three-judge court); *Allen v. City of Evergreen*, No. 13-107, 2013 WL 1163886, at *1 (S.D. Ala. Mar. 20, 2013), *final judgment* 2014 WL 12607819 (S.D. Ala. Jan. 13, 2014), overtly racist plots by state legislators, *United States v. McGregor*, 824 F. Supp. 2d

1339, 1345-48 (M.D. Ala. 2011), flagrant attempts to stop Black persons from holding office, *Braxton v. Town of Newbern*, No. 2:23-CV-00127, 2024 WL 3519193 (S.D. Ala. July 23, 2024); *United States v. City of Calera*, No. CV-08-BE-1982, 2008 WL 11512029 (N.D. Ala. Oct. 29, 2008), *modified*, 2009 WL 10730411 (N.D. Ala. Oct. 23, 2009), restrictions on assistance for those disproportionately Black voters who are illiterate, *Ala. State Conf. of the NAACP v. Marshall*, No. 2:24-CV-00420, 2024 WL 4282082 (N.D. Ala. Sept. 24, 2024); Tr. 675:6-22 (Burch), fees-related to voting, *People First*, 491 F. Supp. 3d at 1106-1107; Tr. 686:20-687:17 (Burch), state laws requiring at-large elections with numbered posts, *Jones v. Jefferson Cnty. Bd. of Educ.*, No. 2:19-cv-1821, 2019 WL 7500528 (N.D. Ala. Dec. 16, 2019); *Ala. State Conf. of the NAACP v. City of Pleasant Grove*, No. 2:18-cv-02056, 2019 WL 5172371 (N.D. Ala. Oct. 11, 2019); *see supra* ¶¶ 322-349 (summarizing Alabama's history of voting discrimination from the 1990s onward).

718.   Troublingly, several recent cases include at least some evidence of intentional discrimination by state or local officials. *See, e.g.*, *Braxton*, 2024 WL 3519193, at *2 (local); *People First*, 491 F. Supp. 3d at 1173 (state); *Jones*, 2019 WL 7500528, at *4 (state); *McGregor*, 824 F. Supp. 2d at 1345-47 (state); *Allen*, 2014 WL 12607819, at *2 (local).

719.   Since 1982, more than 50 voting changes proposed by the State or its local subdivisions were blocked or altered under Section 5 of the VRA because of

their potential discriminatory purpose or effect. *See* PX 244, PX 245, PX 246. These include objections to Alabama state senate and house districts. *See* Tr. 535:16-20 (Bagley).

720.   Alabama's use of majority vote requirements in primaries is a classic dilutive practice that may impede Black electoral success. *See, e.g.*, *Gingles*, 478 U.S. at 39 (addressing majority-vote requirements).

721.   Of course, this discrimination in voting parallels Alabama's recent history of public and private discrimination against Black people in education, employment, housing, transportation, and other areas. *See supra* ¶¶ 351-362.

**2.    Because of Alabama's history discrimination and continued use of certain voting practices, Black voters are less likely to turnout to vote or otherwise participate in the political process.**

722.   The Secretary does not dispute much of this recent evidence. None of the State's experts questioned this history. And, indeed, the Secretary stipulated that courts have found that both the State's 2021 and 2023 congressional plans likely violated Section 2. *See* Doc. 230 ¶ 71. This stipulation, the numerous other recent judicial or administrative findings of discrimination, *see supra* PFOF Section VI.A, the undisputed evidence of present-day racial disparities in socioeconomic status, *id.*, and disparities in turnout, *id.__*, are sufficient to satisfy Factors 1, 3, and 5.

723.   "[D]isproportionate educational, employment, income level, and living conditions arising from past discrimination tend to depress minority political

participation." *Wright*, 979 F.3d at 1304 (alterations adopted and quotation omitted). For that reason, "[w]here these conditions are shown, and where the level of black participation is depressed, plaintiffs need not prove any further causal nexus between their disparate socio-economic status and the depressed level of political participation." *Id*. "Once lower socio-economic status of blacks has been shown, there is no need to show the causal link of this lower status on political participation." *See United States v. Dallas Cnty. Comm'n*, 739 F.2d 1529, 1537 (11th Cir. 1984)("*Dallas I*").

724.    Nonetheless, the Secretary: (1) asks the Court to disregard some of Plaintiffs' evidence, particularly, information related to voter turnout and evidence concerning the disparate racial impact of certain recent voting-related practices; (2) argues, through Dr. Hood, that racial disparities in various socioeconomic areas are not unique to Alabama and, therefore, cannot be a basis for Section 2 liability; and, (3) through Dr. Reilly and (to a lesser extent) Dr. Carrington, he claims that factors, like the age, culture, campaign expenditures, and partisanship, better explain the causes of ongoing racial disparities in political participation, electoral success, and socioeconomic status than Alabama's history of past or present discrimination.

725.    The Court rejects each of these contentions.

726.    *First*, the Court credits Plaintiffs' reliance on voter turnout to measure electoral inequality and on voting practices that "may enhance the opportunity for

discrimination," *Gingles*, 478 U.S. at 37, including the driver's license office closures, SB 1's restrictions on assistance for absentee voters, and other voting laws.

727.  Plaintiffs are correct to focus on turnout as a better measure of electoral participation than voter registration. The Court credits Dr. Burch's testimony that voter turnout is the "best estimate of whether a person is voting and participating in politics." Tr. 693:2-8. Where, as here, Black and White registration are disparate but not drastically separated, "the combination of somewhat lower registration rates and lower turnout rates may show that the effects of past discrimination still linger." *Dallas I*, 739 F. 2d at 1538; *see also Wright*, 979 F.3d at 1307 (affirming VRA violation where voter registration rates were roughly the same, but Black people experienced "depressed turnout"). Indeed, the Supreme Court recently affirmed a Section 2 finding in which the plaintiffs satisfied Senate Factors 1, 3, and 5, *Milligan*, 599 U.S. at 22; despite Alabama raising this same argument, *Milligan*, 582 F. Supp. 3d at 1022 (rejecting Alabama's argument that "racial parity in rates of voter registration and turnout means that those plaintiffs cannot demonstrate depressed political participation").

728.  Under Senate Factor 3, Plaintiffs also need not prove that each identified voting practice itself would violate Section 2. *See White*, 412 U.S. at 766 (concluding that majority-vote and number-place laws "enhanced the opportunity for discrimination," even though these laws were "neither in themselves improper

nor invidious"); *Alpha Phi Alpha Fraternity*, 700 F. Supp. 3d at 1272 (finding that a certain practice satisfied Senate Factors 1 and 3, despite a prior ruling that these practices did not themselves violate Section 2). Rather, it is enough to show that the practices "*may* enhance the *opportunity* for discrimination," *Gingles*, 478 U.S. at 37 (emphasis added); *see also id*. at 40 (finding Senate Factor 3 satisfied where a state had a "majority vote requirement for primary elections," despite "acknowledging that no black candidate . . . had failed to win solely because of this requirement"); *Rogers*, 458 U.S. at 625 (finding Factors 1 and 3 were met where, among other things, a property requirement had "made it difficult for blacks to serve as chief registrar").

729.    Plaintiffs are correct then to rely on evidence of restrictions on assistance for illiterate voters, driver's license office closings, NVRA violations, and photo ID and witness requirements. Despite the limited scope of the *Marshall* injunction under Section 208, *see supra* ¶ 340, SB 1's restrictions have had a disparate impact on Black voters who are more likely to need assistance with voting, *see supra* ¶¶ 339-42; *cf. Marengo Cnty.*, 731 F. 2d at 1570 (finding that a county's failure to "assist those [voters] who need assistance" enhanced the opportunity for discrimination); *Lodge*, 639 F. 2d at 1363 (noting that the State's use of literacy requirements are "obvious" evidence of restricted the access to the political process). That Black people are more likely to struggle with literacy is itself significant

evidence of inequality in political access. *See Perkins*, 675 F. 2d at 209; *Hale Cnty.*, 496 F. Supp. at 1214 (finding evidence of vote dilution where Black Alabamians were more likely to be "[p]oorly educated" and so would "have comparatively more difficulty in filling out forms and complying with other formalities" for voting).

730.    At driver's license offices, people can register to vote and obtain the government ID necessary to drive and vote, so the State's decision to close these offices (even partially or temporarily) had a negative impact on Black voters. *Cf. Marengo Cnty.*, 731 F. 2d at 1570 (holding that a county's limited hours and locations for registration "exacerbated the deficiencies in black participation"). Relatedly, it is significant that the State failed for two decades to comply with the NVRA's requirements to provide more registration opportunities at state driver's license and welfare offices. *See supra* ¶ 344; *Cf. Marengo Cnty.*, 731 F. 2d at 1570 (holding that the "failure of the registrar to abide by state law" that required voter registration to occur at certain times and places, "unquestionably discriminated against blacks" who benefited from more expansive opportunities to register). The State's failure to comply with the NVRA had a disparate impact on Black voters who are less likely to be registered to vote, *see supra* ¶¶ 364-68, but who are overrepresented among Alabamians on welfare, *see supra* ¶ 378. Indeed, the NVRA's purpose is to remedy "discriminatory and unfair registration laws and

procedures" that "disproportionately harm voter participation by various groups, including racial minorities." 52 U.S.C. § 20501(a)(3).

731.    The Secretary questioned Dr. Bagley, Tr. 527:7-528:8, 595:19-596:11, and Dr. Burch, Tr. 756:22-758:1, about the Section 2 violation identified in *People First*, 491 F. Supp. 3d at 1180, because the injunction against the witness requirement was later stayed on *Purcell* grounds, *Merrill v. People First of Ala.*, 141 S. Ct. 190 (2020). But this decision, which included a declaratory judgment, *People First*, 491 F. Supp. 3d at 1093, 1180, was never overturned on appeal. Tr. 596:5-8 (Bagley). Thus, the *People First* court's declaratory judgment that Alabama violated Section 2 "remains factually relevant as a contemporary example of State-sponsored discrimination" based on a judge's detailed findings after a full trial. *See Veasey v. Abbott*, 830 F. 3d 216, 257 n.54 (5th Cir. 2016) (en banc) (discussing a vacated case).

732.    Thus, in addition to the judicial findings of Sections 2 and 5 violations, Senate Factors 1 and 3 are satisfied because of the existence of recent "potentially dilutive electoral devices"—including SB 1, driver's license office closures, NVRA violations, witness and photo ID laws, and majority-vote requirements—that can restrict Black voters' access to the political process, *see Gingles*, 478 U.S. at 56.

733.    *Second*, the Secretary relies on evidence from Dr. Hood's report to assert that, because Black voters in various states are poorer or less educated than White voters, the existence of racial disparities in Alabama are irrelevant to the

Section 2 violation. This misses the point of the Section 2 analysis in every way. Section 2 involves an "intensely local appraisal of the electoral mechanism at issue." *Milligan*, 599 U.S. at 19 (citation omitted). Racial disparities in other states are therefore irrelevant. Indeed, no court has ever relied on similar testimony.

734.   Importantly, the Secretary ignores that people educated in segregated Alabama schools migrated to other states, Tr. 699:20-700:3 (Burch), and that other states have their own contentious histories of discrimination, Tr. 700:5-701:2 (Burch) (noting that districts in 45 states remained under desegregation orders as recently as 2014). For example, Connecticut, New York, Massachusetts, and Maryland all have both past and more recent histories of discrimination against Black people in education, voting, and other areas. *See, e.g.*, *Clerveaux*, 984 F.3d at 243-44; *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 611-12 (2d Cir. 2016); *United States v. City of Yonkers*, 96 F.3d 600, 618-19 (2d Cir. 1996); *Bridgeport Coal. of Fair Representation v. City of Bridgeport*, 26 F.3d 271, 277 (2d. Cir. 1994), *vacated on other grounds*, 512 U.S. 1283 (1994); *Baltimore Cnty. Branch of the NAACP v. Baltimore Cnty.*, No. 21-cv-03232, 2022 WL 657562, at *12-13 (D. Md. Feb. 22, 2022); *Floyd v. City of New York*, 959 F. Supp. 2d 540, 562-63 (S.D.N.Y. 2013); *Coal. for Equity & Excellence in Md. Higher Educ. v. Md. Higher Educ. Comm'n*, 977 F. Supp. 2d 507, 544 (D. Md. 2013); *Black Pol. Task Force*, 300 F. Supp. 2d at 313-14 (three-judge court). Similarly, people educated in other *de jure*

segregated states have moved to Alabama. *See* Tr. 152:9-20 (Simelton) and Tr. 485:23-486:1 (Douglas).

735. Indeed, in renewing the VRA and enacting its national ban on literacy tests in 1970, Congress had "before it this country's history of discriminatory educational opportunities in *both the North and the South*." *Oregon v. Mitchell*, 400 U.S. 112, 133 (1970) (opinion of Black, J.) (emphasis added). In reenacting the VRA, Congress heard "[e]xtensive testimony" that "racial minorities have long received inferior educational opportunities throughout the United States," and accepted "common knowledge" that the "interstate migration of such persons, particularly of Negroes from the Southern States." *Id*. at 233-35 (Brennan, J., concurring); *see also id*. at 283-84 (Stewart, J., concurring) (holding that the national literacy test ban "facilitates the free movement of citizens from one State to another" and "underlines [Congress's] awareness" that the "evil" of racial discrimination "in varying degrees manifests itself in every part of the country").

736. Regardless, the evidence still shows that Black Alabamians rank the amongst the lowest in many socioeconomic categories, including income and education, even as compared to *both* White people *and* other *Black people* in different states. Tr. 728:16-6 (Burch); *see generally* DX 5 at 8-19.

737.   *Third*, and finally, the Court affords no weight to Dr. Reilly's testimony that racial disparities in education, employment, voting, and other areas should be attributed to alleged cultural differences between Black people and other groups.

738.   Dr. Reilly's qualifications, reporting, and testimony were all considerably less thorough than Plaintiffs' experts, Dr. Burch and Dr. Bagley. Dr. Reilly offered little to no basis for his opinions. Dr. Reilly is considerably less credentialed than Plaintiffs' experts. He lacks the academic record or peer-reviewed publications of Plaintiffs' experts on topics that he testified about. For example, Dr. Reilly agreed that none of his academic research focused on politics in Alabama, nor is his research about Alabama at all. Tr. 817:20-818:3. None of his papers focused specifically on the political environment below the Mason-Dixon line. Tr. 818:4-6. He is no expert on Southern politics, nor is his focus on Alabama politics either. Tr. 818:7-15. Dr. Reilly also made public statements concerning his opinion that Black Alabamians have the lowest average IQ, alongside white Alabamians. Tr. 839:1-13.

739.   Dr. Reilly repeatably offered unsupported, generalized, speculative, and irrelevant opinions lacking sufficient evidential support and omitted broad swaths of social science literature about socioeconomic disparities. For example, Dr. Reilly claimed that "age" "generally and overall" correlates with voter turnout. Tr. 803:1-10. He reached this conclusion relying on "a study" showing "older people tend to be more civically involved." Tr. 803:6-22. Dr. Reilly testified that "the modal

average [age] for a white American is 58, black American is 27," which led him to

conclude Black voters' lower average age explains lower turnout rates relative to

white voters. Tr. 804:2-13. But Dr. Reilly never considered voting patterns by age

in Alabama, relying exclusively on a questionable read of the age data to form his

opinions. Tr. 837:11-22. And Dr. Reilly does not provide any statistical evidence of

how age might affect voting. Tr. 706:13-22 (Burch).

740.   Dr. Reilly testified that "higher rates of single motherhood among

African-Americans than whites" explains the median income gap, among "a number

of things." Tr. 785:1-9. But Dr. Reilly never elaborated on what these other "things"

are, and he admitted to "primarily relying on" a single article for his median income

gap reporting, using national data from the 1980s. Tr. 784:18-25. Dr. Reilly never

considered the median income gap between Black and White Alabamians. Tr.

824:11-15. He provides no statistical analysis to support his broad claim that racial

turnout gaps "shrink" when adjusted for his "other" variables. PX 13 at 13. For

example, Dr. Reilly does not provide any statistical evidence of how marital status,

not having a father, or age effects voting among adults, nor does he provide any

other scholarly literature or substantiation of these claims. Tr. 706:12-22 (Burch).

741.   On education, Dr. Reilly hypothesized that differences in "culture" and

"study time" explained the differences in educational attainment between Black

people and other groups. Tr. 799:4-21. But the same "blog post" suggested that racial

differences in study time can be influenced by racial disparities in access to advanced coursework. Tr. 701:5-16 (Burch). Dr. Reilly was unaware of Alabama's recent history of not providing Black students with equal access to advanced coursework. Tr. 827:8-12. Further, the source for his "study time" claim concerned "national disparities," and not Alabama disparities. Tr. 826:10-13.

742.    Dr. Reilly added that "culture" and "parental expectations, in terms of grades" explain the average differences in study time, without any further elaboration. Tr. 801:2-8. Dr. Reilly's conclusions about cultural practices leading to racial disparities were not supported using peer-reviewed surveys or other studies, and Dr. Reilly failed to engage with any of the peer-reviewed work in social science over the past decades that have consistently concluded that discrimination, not culture, explains these disparities. Tr. 697:19-698:3 (Burch). The only scholarly research Dr. Reilly cites is a 2003 book, but Dr. Reilly fails to account for the ensuing 20 years of research that directly contradicts this book or racial effect of inadequate school funding in Alabama. Tr. 701:5-702:21 (Burch); *see* PX 13 at 1-14.

743.    Dr. Reilly testified that race relations have been pretty good lately, despite Dr. Burch presenting data showing otherwise. Tr. 815:1-17. He added that "work-for vote-for question[s]" can be "pretty classic measures of racial bias." Tr. 815:18-24. But Dr. Reilly never presented any research or data supporting this opinion; rather, he admitted to relying on Gallup poll data from 2002 "pointing out

that people [ranked] race relations as fairly good for quite a while" to help form his race relations opinions, and that more recent polling shows a steep decline in Americans' belief that race relations are very or somewhat good. Tr. 829:2-9.

744.    Dr. Reilly testified that sentencing disparities between Black and white people are explained by different crimes Black and white individuals commit. Tr. 811:15-812:12. He did not consider sentencing differences between Black and white Alabamians in his report, Tr. 827:13-15, and Dr. Reilly did not attempt to explain how sentencing disparities persist for Black and white Alabamians who commit the same crimes. The research does not support Dr. Reilly's claim that the racial disparities are caused by Black people committing more serious crimes. Rather, studies of controlling for racial differences criminal behavior and incarceration rates *in Alabama* find that differences in behavior do not explain the racial gap, despite it explaining gaps elsewhere. Tr. 705:19-706:11 (Burch); *see* PX 13 at 12-13.

745.    Finally, the Court rejects Dr. Reilly's testimony for an additional reason. His unsupported testimony about Black people as culturally or morally inferior and, thus, less ambitious and more crime prone than other groups often bore an uncomfortable resemblance to "powerful racial stereotypes," *Buck v. Davis*, 580 U.S. 100, 121 (2017); *see also Turner v. Murray*, 476 U.S. 28, 35 (1986) (plurality opinion); *Turner v. Fouche*, 396 U.S. 346, 359-60 (1970); *Smelter v. S. Home Care Servs. Inc.*, 904 F.3d 1276 (11th Cir. 2018). Expert testimony along these lines is

inherently "bizarre and objectionable." *Buck*, 580 U.S. at 119 (criticizing reliance on expert testimony that black people are "violence prone"); *cf. also Peña-Rodriguez v. Colorado*, 580 US 206, 211 (2017) (criticizing a jury's reliance on generalized beliefs about "Mexican" culture); *Floyd*, 959 F. Supp. 2d at 587 (rejecting expert testimony that "echoe[d] the stereotype that black men are more likely to engage in criminal conduct than others"). Courts cannot and will not credit such testimony particularly where, as here, the expert largely bases his highly generalized conclusions on outdated or nonacademic sources and national, rather than Alabama-specific, data. *See, e.g.*, Tr. 826:10-13 (Reilly), Tr. 697:19-698:3, 701:5-16 (Burch); *see Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311 (11th Cir. 1999) (rejecting expert opinion based on "unreliable sources"); *Clark II*, 88 F.3d at 1399 (rejecting, in a VRA case, expert conclusions that were based on "political science literature, not an intensely local appraisal of the social and political climate" of the relevant jurisdiction) (citation omitted).

746.    Troublingly, Alabama politicians themselves have long relied on these same stereotypes about Black people's alleged culture to justify discriminatory voting practices, *Underwood v. Hunter*, 730 F.2d 614, 621 (11th Cir. 1984), *aff'd*, 471 U.S. 222, 232 (1985) (quoting state officials' claims that Black people were prone to "corrupt[ion]" and to committing certain crimes); *McGregor*, 824 F. Supp. 2d at 1345-47 (state legislators devising a "racist" scheme based on their stated belief

that Black people are prone to gambling and accepting bribes to vote), *Dillard*, 640 F. Supp. at 1357 (a state political leader describing Black people as prone to "criminal attitudes"), the unconstitutional exclusion of Black perspective jurors, *McGahee v. Ala. Dep't of Corrections*, 560 F.3d 1252, 1265 (11th Cir. 2009) (explaining that Alabama's baseless claim that Black perspective jurors had been struck because of "low intelligence" was "historically tied to racism"), and the *de jure* segregation of Black students, *Knight v. Alabama*, 787 F. Supp. 1030, 1071 (N.D. Ala 1991) (concluding that White Alabama "folklore," which characterized Black people as being "without ambition," helped to fuel the State's dismantling of agencies that had supported Black students), *aff'd in part, rev'd in part on other grounds*, 14 F.3d 1534 (11th Cir. 1994).

747. Dr. Reilly's lack of credentials, inconsistencies in his testimony, opinions based in little support, and apparent bias, render his testimony unreliable.

748. Further, although the Secretary's expert Dr. Carrington suggested that his opinion relates to Senate Factor 1's evaluation of Alabama's "history of official discrimination" touching the right to vote, *Gingles*, 478 U.S. at 36-37, he did not reach "any conclusions about the presence or lack thereof of official discrimination in Alabama," Tr. 1175:24-1176:9. He did not evaluate whether Alabama has passed any laws after 1965 that were intentionally discriminatory against Black

Alabamians, nor did he evaluate whether any such laws had a discriminatory effect on Black Alabamians. Tr. 1176:10-18.

749.    Alabama's argument that racial disparities in campaign expenditures or name recognition fails to disentangle Black voters' lack of electoral success. Past discrimination has resulted in socioeconomic disparities and the development of separate and insular societies. That is, because Black people tend to be poorer than White people in Alabama, s*ee supra* ¶¶ 345, 735, Black people are "not be able to provide the candidates of their choice with the same level of financial support that whites can provide theirs." *Gingles*, 478 U.S. at 70. Expensive elections make it harder for Black candidates to self-fund their campaigns or raise money from other Black people who have lower incomes and are more likely to be lower income than White people. *See*, *e.g.*, Tr. 500:1-501:1 (Douglas); Tr. 1332:5-10 (Coley); Tr. 1508:16-22 (Bonneau) (agreeing that if the cost for running of election becomes too high, needing to raise significant funds of money could deter candidates for minority groups from seeking office); *see, e.g.*, *Wright*, 979 F. 2d at 1296 (noting that a "more expensive" election "presents a particular barrier for African-American candidates"); *Marengo*, 731 F. 2d at 1571 (affirming that the expense of an at-large election campaign "contributes to dilution" because "blacks earn, on the average, less than half of the amount that whites earn").

750.    Similarly, Alabama's history of state-enforced segregation has created two separate societies. Today, Black and White Alabamians have separate churches, newspapers, radio stations, civic groups, community centers, neighborhoods, and, despite ongoing litigation, even separate schools. Tr. 127:18-129:18, 133:22-25 (Peoples); Tr. 455:10-457:3, 459:3-15, 472:10-24 (Milligan); Tr. 167:8-10, 170:10-12, 171:25-172:21 (Simelton); Tr. 488:2-10, 491:12-17 (Douglas); Tr. 1329:1-5 (Coley); Tr. 1556:17-23 (Payne). Black people's "continued separation from the dominant white society" can "help[] reduce black voting strength and participation in government." *McMillan v. Escambia Cnty., Fla*., 748 F. 2d 1037, 1044 (5th Cir. 1984) (Former Fifth);[30] *accord White*, 412 U.S. at 768 (affirming that a minority group's "cultural and language" insularity made "participation in [the majority] community processes extremely difficult"). Among other things, this separation can make it "especially difficult for African-American candidates" to raise money from the majority White community or otherwise "reach out to and communicate with the predominantly white electorate." *United States v. Charleston County,* 316 F.Supp.2d 268, 291 (D. S.C. 2003), *aff'd,* 365 F.3d 341 (4th Cir. 2004); *see* Tr. 500:1-501:1 (Douglas) (stating that Black candidates tend to fundraise from Black communities);

---

[30] *McMillian* was decided by a non-unit panel of the Former Fifth Circuit and is therefore binding on this Court. *See McMillian*, 748 F. 2d at 1037 n.* (citing Section 9(1) of Public Law 96-452); *Stein v. Reynolds Sec., Inc*., 667 F.2d 33, 34 (11th Cir. 1982) (explaining that a decision after October 1, 1981 "made by a non-unit panel of the Former Fifth, the full en banc court of the Former Fifth, or Unit B panel of the Former Fifth Circuit" is "binding precedent" in the Eleventh Circuit).

Tr. 874:13-15 (Branyon) (stating that she only knew "a few" Republicans and "not that many" in her district); Tr. 1319:1-13 (Coley) (discussing the significant impact of his White opponent's name recognition, familial connections, and endorsement from the White incumbent); *cf. also* PX 13 at 19 (Black people are less likely than Whites to know their poll worker). This social segregation means that the White electorate has "little interaction with most [minority] candidates" and, therefore, the "opportunity to become known as a person and to be trusted with public office is not equal." *See Stabler v. Cnty. of Thurston*, 129 F. 3d 1015, 1023 (8th Cir. 1997).

751.    Accordingly, because Black people in Alabama have experienced extensive discrimination in voting (Senate Factors 1 and 3) and discrimination in various other areas, which impacts their ability to participate in the political process (Senate Factor 5), these Senate Factors together all weigh heavily in favor of Plaintiffs and support a finding of dilution. *See Milligan*, 582 F. Supp. 3d at 1022.

### B.    Senate Factor 2: Extent of Racially Polarized Voting

752.    Senate Factor 2 considers "the extent to which voting in the elections of the state or political subdivision is racially polarized." *Gingles*, 478 U.S. at 37.

753.    This inquiry is broader, but not entirely distinct from, the questions posed by the second and third *Gingles* preconditions in that high levels of racially polarized voting create an inference of the "second factor weigh[ing] heavily in [the plaintiffs'] favor." *Wright*, 979 F.3d at 1305; *Teague v. Attala Cnty., Miss.*, 92 F.3d

283, 291 (5th Cir. 1996) ("The results of the statistical analyses in this case create a strong presumption in favor of a finding of black political cohesion and racial bloc voting."); *Miss. State Conf. of NAACP*, 2024 WL 3275965, at *41 ("the extent of the polarization between races across Mississippi provides at least circumstantial evidence that the divide is based on race.").

754.   This makes good sense, as "[t]he surest indication of race-conscious politics is a pattern of racially polarized voting," *Marengo Cnty.*, 731 F.2d at 1567, and "[o]ne may suspect vote dilution from political famine," *Johnson v. De Grandy*, 512 U.S. 997, 1017 (1994).

755.   Senator Factor 2 does allow inquiry into racially polarized voting beyond its mere existence, and the Court may consider evidence of both "the degree and nature of the bloc voting" including the intensity of the polarization and the role of "political or personal affiliation of different racial groups with different candidates." *Solomon II*, 221 F.3d at 1225.

756.   In line with the broader inquiry, courts may and have considered such evidence as the extent of the polarization, *see, e.g.*, *Wright*, 979 F.3d at 1305, success of Black candidates in primary elections, *see, e.g., Gingles*, 478 U.S. at 59; *Fayette Cnty.*, 775 F. 2d at 1340 n.5; the respective roles of partisanship and race in terms of the degree to which racial identity, issues, and politics inform partisan affiliation, *see, e.g.*, *Miss. State Conf. of NAACP,* 2024 WL 3275965, at *44; *Nairne v. Ardoin*,

715 F. Supp. 3d 808, 871 (M.D. La. 2024); *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 700 F. Supp. 3d 1136, 1359 (N.D. Ga. 2023), and candidate selection and success based on race and party, *see Alpha Phi Alpha*, 700 F. Supp. 3d at 1360; *see also Goosby v. Town Bd. of Town of Hempstead, N.Y.*, 180 F.3d 476, 495–96 (2d Cir. 1999); *Ala. State Conf. of NAACP v. Alabama*, 612 F. Supp. 3d 1232, 1292 (M.D. Ala. 2020).

757.    Contrary to the Secretary's position, however, "[n]either the Supreme Court nor the Eleventh Circuit has ever held" that Plaintiffs' must "prove racism determines the voting choices of the white electorate" *Askew*, 127 F.3d at 1382, or prove but-for "racial causation" in voting patterns, *Clerveaux*, 984 F.3d at 231–32.

758.    The Secretary argues that "*Solomon* requires a judgment for defendants if you agree that party better explains the election outcomes than race." Tr. 1696:17-27 (Court colloquy with Mr. Davis). The Court disagrees, for several reasons.

759.    First, the Supreme Court's decision in *Milligan* closed the door on this argument. The *Milligan* Court reaffirmed that Section 2 "turns on the presence of discriminatory effects, not discriminatory intent," explaining that "Congress has used the words 'on account of race or color' in the Act to mean 'with respect to' race or color." 599 U.S. at 25. In the context of a Section 2 vote-dilution case, this means lack of equal opportunity "when minority voters face—unlike their majority peers— bloc voting along racial lines, arising against the backdrop of substantial racial

discrimination within the State, that renders a minority vote unequal to a vote by a nonminority voter." *Id.* In other words, Plaintiffs must provide evidence of the role of race and racial discrimination in the political system interacting with racially polarized voting and the districting scheme at issue, but it need not prove but-for causation. *See id.; see also Clerveaux*, 984 F.3d at 231–32 (explaining that "the unique context of the Voting Rights Act and Congress's clear desire not to require a showing of racial animus indicate that 'on account of race or color' should not be interpreted to require but-for causation" and that "Section 2 claims do not rise or fall on racial causation."). To the extent that "Alabama suggests there is only one circumstance that matters"— whether race is the sole or primary factor driving voter choice—that "single-minded view of § 2 cannot be squared with the VRA's demand that courts employ a more refined approach." *Milligan*, 599 U.S. at 26 (cleaned up).

760. Second, even before *Milligan*, the language of *Solomon* itself undermined the Secretary's position. There, the Eleventh Circuit explained that circumstances such as "both the degree and nature of the bloc voting" may "*weigh against* an ultimate finding of minority exclusion from the political process," *Solomon II*, 221 F.3d at 1225 (emphasis added), rather than singlehandedly dictating an outcome—a position that would be at odds with the totality analysis.

761. Even *Alabama State Conference of the NAACP v. Alabama*, the case identified by the Secretary as the "best case" for him, Tr. 1697:17-21, explained that

*Solomon* "indicates that a state's evidence of non-racial causes is to be considered, *alongside all other relevant factors* bearing on the existence or not of vote dilution, at the totality-of-circumstances stage." 612 F. Supp. 3d at 1259 (emphasis added). Indeed, consistent with the precedent and the statutory "totality of circumstances" inquiry, 52 U.S.C. § 10301(b), that court correctly held that its Senate Factor 2 analysis was "not conclusive." 612 F. Supp. 3d at 1306-07; *see Gingles*, 478 U.S. at 45 (holding that the totality analysis does not require that "any particular" factor "be proved").

762. Third, Plaintiffs do not bear the weight "of negating all nonracial reasons possibly explaining" racially polarized voting and Black electoral defeat. *Teague,* 92 F.3d at 295; *see also Nipper*, 39 F.3d at 1513 (plurality op.) ("A defendant in a vote dilution case may always attempt to rebut the plaintiff's claim by introducing evidence of objective, non-racial factors."). Even the Secretary's most-favored case does not call for Plaintiffs to affirmatively disprove partisan politics playing some role in the electoral process or that race plays the only or predominant role. *See Ala. State Conf. of NAACP v*, 612 F. Supp. 3d at 1260 ("At the totality-of-circumstances stage, the State may introduce evidence that nonracial factors, such as partisan politics or party affiliation, are causing minority electoral defeats."); *see also Nipper*, 39 F.3d at 1526 & n.64 (plurality op.); *Lopez v. Abbott*,

339 F. Supp. 3d 589, 604 (S.D. Tex. 2018) ("plaintiffs do not bear the burden in the first instance to eliminate factors other than race as influencing voters.").

763.  Fourth, even in the Fifth Circuit case relied upon by the Secretary that imposes the most aggressive standard for Plaintiffs concerning the role of race and party, the court there reversed the district court's judgment not because the record showed that partisan affiliation may have played a meaningful role in addition to race, but because the "the record *indisputably prove[d]* that partisan affiliation, not race, best explains the divergent voting patterns among minority and white citizens in the contested counties." *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 850 (5th Cir. 1993) (emphasis added).

764.  Even in the context of intentional racial discrimination cases, which this is not, Plaintiffs may meet their burden by showing that the discriminatory purpose was "*a* motivating factor" and not necessarily the "'dominant' or 'primary' one." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977) (emphasis added); *see also Dallas I*, 739 F. 2d at 1541 ("To find a violation of the Fourteenth Amendment plaintiff does not have to prove that racial discrimination was a 'dominant' or 'primary' motive, only that it was a motive.").

765.  Thus, the Court has evaluated Senate Factor 2 in line with the types of evidence discussed above. Because the evidence here shows that race not only continues to play *some* meaningful role in the political process in polarized voting

in Alabama but still plays a *significant* one, this factor weighs heavily in favor

Plaintiffs under even the most stringent standard urged by the Secretary.

766.    First, in terms of the degree and consistency of RPV, the evidence here

creates a strong presumption in favor of Plaintiffs.

767.    In the Huntsville region, Black voters supported the same candidates

with over 80% of the vote in all but one election, and less than 25% of white voters

supported that candidate in those same thirteen elections, and Black-preferred

candidates lost every time. *See supra* PFOF Sections IV-V. In Montgomery, Black

voters supported the same candidates with over 89% of the vote in all eleven

elections, and less than 11% of white voters supported those same candidates, and

Black-preferred candidates lost except in supermajority-Black SD 26. *See id.*

768.    This case is much like *Milligan*, *Wright*, and *Mississippi State

Conference of the NAACP*, where the courts found severe polarization with little

exception. *See Wright*, 979 F.3d at 1305 (affirming a finding that elections in Sumter

County were "highly polarized," where "over 85% of African American voters voted

for the same candidate" and less than 10% of white voters voted for the same

candidate in ten of twelve elections analyzed); *Milligan*, 582 F. Supp. 3d at 1017

(crediting Dr. Liu's testimony in finding that "voting in Alabama is clearly and

intensely racially polarized" with Black support for Black candidates

"overwhelmingly in the 90[%] range," "and that the Black-preferred candidate was

defeated in every election except the one in the majority-Black district he considered."); *Miss. State Conf. of NAACP*, 2024 WL 3275965 at *32 (finding "racial polarization among voters in Mississippi is quite high" where "Black-preferred candidates are consistently unable to win elections unless running in a majority-minority district" and "[w]hite voters are also cohesive in voting for candidates that usually defeat the black-preferred candidates").

769.    Second, other quantitative analysis and direct evidence in the record shows that race continues to play a significant role in both voting patterns and candidate success regardless of partisanship.

770.    Plaintiffs' expert Dr. Liu showed evidence of racially polarized voting in Montgomery and Decatur in non-partisan races, meaning race had to have had at least some role apart from party, and Dr. Liu also used Dr. Bonneau's own data to show that the race of the candidates mattered for Black voters in the 2022 state legislative elections. PX 18 at 7-8; Tr. 45:14-46:14. Dr. Bonneau even admitted that it is absolutely possible that both race and party affect voters' choices in Alabama, Tr. 1531:14-19, was not testifying that "political parties have replaced race in driving voting choices in Alabama," and agreed that "that the race of the candidate may be an important factor affecting voter choice," Tr. 1494:3-9. Dr. Bonneau speculated that voters might know the partisan affiliation of certain candidates even in nonpartisan races. Tr. 1457:20-24. But former candidates in nonpartisan municipal

elections testified that these races do not involve running under party banners, Tr. 500:1-7 (Douglas), and that the parties do not offer support, Tr. 1333:4-20 (Coley).

771.    The parties also stipulated to a number of recent elections in which Black Republicans lost primaries to white Republicans, and the Secretary's witnesses Ms. Branyon, Mr. Coley, and Mr. McCollum testified to others. *See* Tr. 852:6-853:23 (Branyon); Tr. 1370:1-1372:11 (McCollum); Tr. 1329:13-1330:12, 1335:21-23, 1342:19-1343:15 (Coley). In the 2024 congressional elections, for example, four Black candidates, including, a Black elected official who is a former member of the State Republican Party's leadership, won fewer votes than one White recent college graduate. Doc. 230 ¶ 106; *see, e.g.*, *Fayette Cnty.*, 775 F. 3d at 1340 n.5 (noting that voting was "racially polarized" in a county where three Black candidates, including the vice chairman of the local Republican Party, lost in a primary election to "one white candidate, who was a newly registered voter"). Where, as here, no Black candidate, regardless of political party, can win elections, Senate Factor 2 points "commandingly" in favor of the Plaintiffs. *Id*. at 1347 n.9.

772.    This undercuts any argument that Black candidates are losing because they are running as Democrats rather than because of their race.

773.    Similarly, Dr. Hood admitted that the same exit polling data he relied upon to form his conclusions showed that Black and White voters preferred different candidates in the 2008 Democratic presidential primary, and that a majority of White

self-identified *Democrats* in nonetheless supported White Republicans Jeff Sessions and John McCain over Black Democrats Vivian Davis Figures and Barack Obama for U.S. Senate and President, respectively, in 2008. Tr. 1247:24-1248:25. Race therefore played a significant role beyond party here as well. *See, e.g.*, *Gingles*, 478 U.S. at 59-60 (finding "overwhelming" polarization where White Democrats voted against Black candidates in both primaries and general elections); *Carrollton Branch of NAACP v. Stallings*, 829 F.2d 1547, 1556-58 (11th Cir. 1987) (finding racial polarization based on the results of a biracial presidential primary election).

774. Further, we heard testimony from the Secretary's witnesses Ms. Branyon and Mr. McCollum, both Black Republican candidates, about receiving support from Black Democrats (in the case of Ms. Branyon), and about Black voters generally supporting Black candidates party aside (from Mr. McCollum). Tr. 876:10-877:9 (Branyon), 1381:21-24 (McCollum). Senator McClendon, who has many years of political experience himself apart from leading the State Senate mapdrawing process, also testified that that in his experience, Black voters tend to vote for Black candidates. McClendon Dep. 78:9-19.

775. Nor does Dr. Bonneau's analysis provide any affirmative probative evidence that partisanship dominated racial consideration in the voting choices of Alabamians. Dr. Bonneau was not offering any *causal* opinions, Tr. 1477:7-9, and his analysis in this case focused primarily on whether the race of the candidate

matters, which he admits is a different question than whether white voters are more or less likely to support Black candidates, setting party aside, Tr. 1529:17-1530:-17.

776.   Even when he does perform analysis that might have some nexus to voting choices, it does not advance the narrative that party dominates race in Alabama. Dr. Bonneau's analysis of straight-ticket voting as a source of partisanship overriding race falls short because every single Republican candidate for statewide office in the elections he analyzed was white, and he agreed that Republican straight-ticket voters may know that the candidates they are voting for are all white. Tr. 1492:19-1493:14. Similarly, he acknowledged that all 2022 Democratic statewide candidates were Black. Tr. 1492:16-18. And he performed no analysis of racial voting patterns whatsoever, making it far less informative on the race versus party inquiry. Tr. 1493:19-25.

777.   Dr. Bonneau also agreed that the State House District 73 primary where a Black Republican prevailed and the State House District 74 primary where a White Democrat prevailed did not provide any evidence that these two races represent any sort of broader pattern or trend in Alabama elections. Tr. 1524:11-15. Nor did he analyze primaries where Black Republicans lost or anything beyond the Paschal race regarding Black Republicans. Tr. 1524:2-4.

778.   On that topic, Dr. Bonneau's admissions regarding the lack of success of Black Republicans further undercut the Secretary's argument. He concedes that

there are not many examples of Black Republican candidates defeating White Republican candidates in Alabama, that he is not aware of a Black candidate winning a contested Republican primary election for statewide office, and that the race of the candidate could be a reason why Black Republicans underperform White Republicans. Tr. 1531:2-13.

779.   Additionally, there is no dispute that no Black candidates from either party has won statewide office in the current century in Alabama, and in the previous one, only two candidates prevailed: both in State Supreme Court races where they were first appointed and ran as incumbents. Dr. Bonneau also admitted that in the only three Alabama State Supreme Court elections in which incumbents lost in a 22-year period, two of the losses were Black candidates, and one was a White Republican who was defeated by a White Democrat. Tr. 1511:6-12. Race must play some role in this state of affairs.

780.   Dr. Bonneau also admitted that from his analysis of Alabama state supreme court elections, he cannot eliminate race as the reason Black Democrats perform worse than white Democrats, and while race may be a factor, party cannot be since the analysis compared white Democrats to Black Democrats. Tr. 1517:17-1518:9

781.   Third, assessing "the success of Black candidates in reference to different percentages of white voters" can provide "good evidence that partisanship

is not the best logical explanation of racial voting patterns." *Alpha Phi Alpha Fraternity*, 700 F. Supp. 3d at 1277; *see also Miss. State Conf. of NAACP*, 2024 WL 3275965, at *42 (citing the fact that "black legislative candidates in Mississippi have had virtually no success in federal or state elections outside majority-black districts" as evidence in favor of the plaintiffs under Senate Factor 2). Under Senate Factor 2, evidence that "white bloc voting was targeted against black candidates"—that is, that Whites vote more heavily against Black candidates than White candidates of the same party—can show that race, rather than party, is driving voting behavior. *See Ruiz v. City of Santa Maria*, 160 F. 3d 543, 553 (9th Cir. 1998) (collecting cases).

782.   As discussed above, all but one Black House member and every Black Senator in the Alabama legislature was elected from a majority-Black district, and in five contested races in 2022 in which Black candidates ran for State Senate, the district with the highest white voting-age population where a Black candidate prevailed was 42%, but a Black candidate lost in a district as low as 59% WVAP.

783.   Fourth, courts have considered evidence about why Black and White voters align with different parties to see what role race plays, if any. *See Nairne*, 715 F. Supp. 3d at 871 ("The historical realignment of Black voters from voting Republican to voting Democrat undercuts the argument that the vote is polarized along party lines and not racial lines."); *see also Miss. State Conf. of NAACP*, 2024 WL 3275965 at *43 (criticizing the defense expert for acknowledging that it is

"possible for political affiliation to be motivated by race," but "never examin[ing] the political positions of the two state parties — or any candidates — to determine whether race factored into partisan voting"); *Alpha Phi Alpha Fraternity*, 700 F. Supp. 3d at 1278 ("The history provided to the Court shows the complicated history between the current Republican Party and Black citizens," and "even Defendant's expert agreed that candidate choices and Black political alignment with the Democratic party is not just based on the party label").

784.  Here, Plaintiffs elicited testimony from both their own witnesses and the Secretary's that shed light on the significant ways in which race has historically informed and still drives partisan affiliation for many Alabama voters. As discussed above, Dr. Bagley offered detailed, credible testimony about the circumstances in Alabama about how racial issues drove partisan realignment, including the Alabama legislature, citing efforts by Mike Hubbard to target white Democratic districts. *See supra* PFOF Section VI.A.

785.  Critically, the Secretary's own expert Dr. Hood also testified that he believes that race and civil rights are part of the story in terms of issues that motivated partisan realignment in the South, Tr. 1264:16-18, as did Dr. Bonneau, who agreed "you can't examine partisanship in Alabama without thinking about the role of race," Tr. 1486:22-24, and that the race of the voter is a driving factor in their political party affiliation, Tr. 1531:20-22. Dr. Bonneau went further, admitting

"there are policy reasons relating to racial issues for why black voters choose to more frequently vote for Democratic candidates," Tr. 1486:18-21, including seeing the Party as more supportive of civil and voting rights, Tr. 1482:12-17, because "they believe the party has been more open in nominating and electing African-American officials," Tr. 1482:20-24, and more willing to support racial policy positions in favor of black interests, Tr. 1483:3-8.

786.   Similarly, both Dr. Bonneau and Dr. Reilly, the Secretary's experts, cited perceptions of racial appeals or racism in the Republican Party as a deterrent to Black voters. Tr. 836:2-4, 22-25 (Reilly); Tr. 1486:9-13 (Bonneau).

787.   Senator McClendon, who led the Reapportionment Committee efforts to enact the challenged map, testified that Black and White voters in Alabama in general have different views on issues that can affect partisan affiliation, such as the preservation of confederate monuments and the prevalence of racial discrimination. McClendon Dep. 79:22-25, 80:4-11.

788.   Only the Secretary's expert Dr. Carrington offered testimony about what he characterized as non-racial reasons that he believed drove white partisan affiliation more than race. But Dr. Carrington did not analyze Black voting patterns, nor how the "nonracial" issues he identified impacted Black voters. Tr. 1190:11-16. Most significantly, Dr. Carrington concedes that race "played a role in the political realignment of white voters in Alabama" from 1964 until today," Tr. 1186:2-11; *see*

*Miss. State Conf. of NAACP*, 2024 WL 3275965, at *44 (finding that Senate Factor 2 weighed in the plaintiffs favor where, as here, the state's expert conceded that civil rights "definitely played a role" in partisan realignment).

789.  Dr. Carrington also did not analyze how the factors he identified impacted voting in Alabama, Tr. 1189:2-1190:3, or compare "Alabama state legislative elections to [his] broader analysis of the South," Tr. 1190:7-10, which significantly undermines his testimony. *See Ala. State Conf. of NAACP*, 612 F. Supp. 3d at 1299 (rejecting an expert's testimony about the relationship between race and partisan sorting when he "did not consider facts *specific to Alabama judicial elections* that speak to the results of those election") (emphasis in original). As discussed above, Dr. Carrington's failure to consider why the factors he claimed moved white voters toward the Republican Party failed to move Black voters despite many Black voters sharing similar religiosity and views on social issues not only undermines the force of the opinions but also points to a significant role of race in partisan alignment.

790.  The strong weight of the evidence supports race as a major factor in Alabama's partisan alignment.

791.  In sum, the Court finds ample evidence that regardless of the role partisanship may play for some voters, race still plays a significant role in the polarization of Alabama voters.

792.    As such, this case is entirely distinguishable from the judicial elections case relied upon by the Secretary, *Alabama State Conference of the NAACP v. Alabama*, 612 F. Supp. 3d 1232 (M.D. Ala. 2020), in almost every respect.

793.    First, the court there found that "white Democratic primary voters appear to give equal support to black Democratic candidates" in judicial elections, which "suggests that black candidates are not penalized in appellate judicial elections by their race alone." *Id.* at 1292.

794.    That finding is absent, and indeed contradicted, here. Dr. Bonneau performed the same regression analysis here that he performed there, in this case across 2010-2022 Alabama State Supreme Court elections. But here, Dr. Bonneau admitted that he had miscoded his data, and that in fact, that the corrected regression analysis showed that Black Democratic candidates for the Supreme Court performed worse than white Democratic candidates at a level of statistical significance. Tr. 1517:8-16. After this was uncovered, Dr. Bonneau walked back the significance of his analysis altogether, pointing to his misidentification of the race of another candidate, making this analysis at best for the Secretary, a complete wash, and at worst, counter to the argument that race was not important. Tr. 1413:21-1414:9. In any event, unlike in the judicial elections case, Dr. Bonneau agreed here that we cannot eliminate race as the reason Black Democrats perform worse than white Democrats. Tr. 1517:17-1518:9.

795.   Second, the court in the judicial elections case pointed to evidence that "that an African-American Republican could win statewide in Alabama," *Ala. State Conf. of NAACP*, 612 F. Supp. 3d at 1292 (referring to testimony by a defense witness and plaintiff's expert). The Secretary adduced no such evidence here. Instead, Dr. Bonneau admitted that the one first Black Republican to ever win election to the Alabama State Legislature "very unusual," that he could not draw much of a general conclusion from it, that he was not aware of any other Black Republicans who have won election to the State Legislature since Reconstruction, and was not aware of any other Black Republicans defeating white Republicans in a state legislative primary. Tr. 1521:18-1522:20.

796.   Third, there was evidence in the judicial case that, particularly in terms of judicial elections, "the Alabama Democratic Party is significantly weaker than its Republican counterpart makes it even harder for any Democratic candidate — white or black — to get elected." *Ala. State Conf. of NAACP*, 612 F. Supp. 3d at 1293. There was no comparable testimony in this case. And instead, Dr. Bonneau acknowledged that Black Democrats' very limited success statewide before realignment and total lack of statewide success after realignment compared to the white Democrats' consistent success before realignment and limited, but existing success, after realignment was a "salient factor," Tr. 1528:15-21, that "white Democrats continued to win state legislative races in Alabama well into the 2000s,"

Tr. 1529:10-12, and that the evidence in *this case* does not allow him to rule out race as a reason for lack of success of Black candidates, Tr. 1530:18-22 (emphasis added).

797.   Fourth, the judicial elections court found it "noteworthy that roughly two-thirds of the Alabama electorate is voting for a party, not necessarily for particular candidates." *Ala. State Conf. of NAACP,* 612 F. Supp. 3d at 296. Here, however, Dr. Bonneau admitted that given that every Republican candidate for statewide office and State Senate was White, and the entire Democratic 2022 field for statewide office was Black, Republican straight-ticket voters may know that the candidates they are voting for are all white, Tr. 1492:16-1493:14, and that his straight-ticket voting analysis did not examine racial voting patterns, Tr. 1493:19-25, and thus we cannot know what percentage of White voters and Black voters used straight-ticket voting, *see* Tr. 56:4-13 (Liu).

798.   Fifth, in the judicial elections case, as to whether "party is a proxy for race," the court there found that almost all of plaintiffs' evidence came from one rebuttal expert who it found "did not consider facts specific to Alabama judicial elections that speak to the results of those elections," and who "considers no evidence specific to partisan realignment on Alabama's appellate courts," *Ala. State Conf. of NAACP*, 612 F. Supp. 3d at 1302, particularly ignoring key testimony and evidence about the role of tort reform.

799. Finally, the Secretary makes the argument that one "should not stereotype black voters and assume that they all want to be represented by the same state senators" because some Black voters oppose relief in this case. Tr. 1672:3-6. At the outset, this case was brought by Black residents of Alabama who are complaining that their voting rights are impaired because they are unable to elect the candidates of their choice in the challenged areas. Rather than stereotypes, Plaintiffs have presented essentially undisputed evidence that Black voters in the challenged areas overwhelmingly (almost always over 80% and often over 90% of Black voters) support the same candidates. *See supra* ¶¶ 278-286. This evidence of "bloc voting along racial lines, arising against the backdrop of substantial racial discrimination" can "authorize[ ] race-based redistricting as a remedy." *Milligan*, 599 U.S. at 25, 41; *see Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 189 (2017) (finding that a state had "good reasons" draw a majority-Black district where "careful assessment of local conditions and structures," including evidence of racially polarized voting, showed the need for a race-based remedy).

800. Moreover, the intensity of bloc voting by Black people in the challenged areas is itself substantial evidence that Black people in the challenged area would overwhelmingly support relief in this case. And, while Mr. McCollum and Ms. Branyon do not live in the challenged areas, even these Black Republican witnesses recognized that court-ordered remedial redistricting is sometimes

necessary. Tr. 1377:2-24 (McCollum); Tr. 878:2-4 (Branyon). Even assuming that some Black people might oppose relief, the mere fact that some Black people might be "equivocal" or "downright oppose[]" relief is "irrelevant in weighing the totality of circumstances." *Solomon v. Liberty County*, 865 F.2d 1566, 1584 (11th Cir.1988), *reh'g en banc* 899 F.2d 1012 (11th Cir.1990) (per curiam).

801.   In enacting Section 2, Congress "necessarily took into account and rejected as unfounded, or assumed as outweighed," the "risk that the judicial remedy might actually be at odds with the judgment of significant elements in the racial minority." *Gingles v. Edmisten*, 590 F. Supp. 345, 356 (E.D.N.C. 1984), *aff'd in part, rev'd in part sub nom. Thornburg v. Gingles*, 478 U.S. 30 (1986). Congress's "general rejection or assumption of these risks" was a "matter of political judgment" that is "not among the circumstances to be considered in determining whether a challenged electoral mechanism presently 'results' in racial vote dilution." *Id*. at 357. Thus, contrary to the Secretary's suggestions otherwise, it is "irrelevant for courts applying amended Section 2 to speculate or to attempt to make findings as to whether . . . some elements of the racial minority prefer to rely upon [the State's] processes rather than having the judicial remedy invoked." *Id*.; *see also Barnett*, 17 F. Supp. 2d at 758-59 (same).

802.   In sum, here, Plaintiffs provided extensive fact and expert testimony about the role race has played in party choice, and it is the Secretary who proffered

an expert, Dr. Carrington, who overgeneralizes and fails to analyze Alabama-specific history.

803.   The evidence strongly favors Plaintiffs on Senate Factor 2.

## C.     Senate Factor 4: Candidate Slating

804.   Under Senate Factor 4, courts ask, "if there is a candidate slating process, whether the members of the minority group have been denied access to that process." *Gingles*, 478 U.S. at 37 (internal quotation marks omitted).

805.   "In jurisdictions where there is an influential official or unofficial slating organization, the ability of minorities to participate in that slating organization and to receive its endorsement may be of paramount importance." *Marengo Cnty.*, 731 F.2d at 1569. To identify "structural barriers" to slating processes courts assess (1) whether Black candidates receive fewer endorsements or less financial and logistical support from the slating organization than white candidates, *White v. Regester*, 412 U.S. 755, 766-67 (1973); *Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.* ("*Mo. NAACP*"), 894 F.3d 924, 940-41 (8th Cir. 2018); *Marengo Cnty.*, 731 F.2d at 1569 & n.40 (citing *Perkins v. City of W. Helena*, 675 F.2d 201, 209-10 (8th Cir.), *aff'd mem.* 459 U.S. 801 (1982)); *Velasquez v. City of Abilene*, 725 F.2d 1017, 1022-23 (5th Cir, 1984); (2) whether minorities lack representation in the leadership of the dominant party or slating group, *Rogers*, 458 U.S. at 625; *White*, 412 U.S. at 766-67; *Marengo Cnty.*, 731 F.2d

at 1569; *Velasquez*, 725 F.2d at 1022-23, and (3) whether the party is open to supporting "candidates who seek to represent black interests," *Solomon I*", 865 F.2d 1566, 1582 (11th Cir.1988), *reh'g en banc* 899 F.2d 1012 (11th Cir. 1990), as opposed to minorities slated by a "white-dominated organization" who then do "not need the support of the [Black] community to win" and do "not therefore exhibit good-faith concern for the political and other needs and aspirations of the [Black] community," *White*, 412 U.S. at 767; *see also Clerveaux*, 984 F.3d at 242-43; *Goosby*, 180 F.3d at 495-97; *Velasquez*, 725 F.2d at 1022.

806.   Here, there is considerable evidence that the Republican Party has not equally supported Black Republicans, that Black people lack roles in its leadership, and that it is not open to candidates who support issues important to Black voters.

807.   *First*, it is undisputed that Black Republican candidates have had significantly less success than white Republicans in receiving financial contributions or endorsements from elected officials in Republican primaries. *See Mo. NAACP*, 894 F.3d at 941. For example, Mr. Coley—a Black Republican who received no endorsements from incumbent Republican commissioners in his 2024 campaign and lacked the Republican Party's support in his 2015 nonpartisan city council race, Tr. 1330:24-1330:1, 1333:4-20—testified that his lack of party support and inability to competitively fundraise factored into his primary election losses to White Republicans. *See supra* ¶ 491. While Ms. Branyon, another Black Republican

witness, received financial support from the Republican Party only after her deposition in this case in 2024 and won her election, and she never received similar financial or logistical support from the Party in her 2020 race. *See supra* ¶ 492; *see Gingles*, 478 U.S. at 76 (explaining that the "pendency" of litigation can "work[] a one-time advantage for black candidates in the form of unusual organized political support by white leaders concerned to forestall" Section 2 relief); *Davis v. Chiles*, 139 F. 3d 1414, 1417, n.2 (11th Cir. 1998) (same). These trial witnesses' experiences match the experiences of other Black Republicans who received and spent significantly less in campaign contributions than White candidates in Republican primaries in 2024 for Congressional District 3 and State House District 27, in 2022 for U.S. Senate, and in 2010 for Congressional District 5. *See supra* ¶ 493; *see* Doc. 230 ¶¶ 107-114.

808.   The lack of Black representation in the party's leadership, and the segregated nature of Alabama churches, civic groups, and social clubs, *see supra* ¶¶ 749, contribute to Black Republicans having a harder time raising funds, experiencing less name recognition, and having fewer political connections. Tr. 874:13-15 (Branyon testifying that she knew only "a few" Republicans and "not that many" in her district); Tr. 1319:1-13 (the White opponent of Mr. Coley relied on familial connections and the endorsement from the White incumbent); *see also* Tr. 500:1-501:1 (Douglas) (Black candidates tend to fundraise from Black people).

Black people's lack of "existing political ties or other institutional support" from White groups is evidence of racial inequalities in the slating process. *United States v. Vill. of Port Chester*, 704 F.Supp.2d 411, 434-35 (S.D.N.Y. 2010); *see Clerveaux*, 984 F. 3d at 239-41; *Perkins*, 675 F.2d at 209-10, *Charleston*, 316 F. Supp. 2d at 292-94; *Williams v. City of Dallas*, 734 F. Supp. 1317, 1381-83 (N.D. Tex. 1990).

809. The predictable result of this lack of endorsements or financial and logistical support for Black Republicans is that they have largely been unable to win primaries for federal, statewide, or state legislative offices. The State Republican Party is predominately white. *See supra* ¶ 497. No Black Republican since Reconstruction has ever been successful in a contested primary for any statewide or federal office. *See supra* ¶ 498. The record is replete with evidence of Black candidates' failure to gain any traction in Republican primaries for Senate, Congressional, and state legislative offices. *See, e.g.*, *supra* ¶¶ 498–502. Except for one single person, Mr. Paschal, no other Black Republican has won election to the State House since Reconstruction. *See supra* ¶¶ 501. This near total lack of electoral success in primaries among Black Republicans strongly "suggest[s] a lack of opportunity" in access to the slating process. *See Cofield v. City of LaGrange*, 969 F. Supp. 749, 777 (N.D. Ga. 1997).

810. Republican electoral support for Black candidates in primaries remains low regardless of candidate quality. In the Congressional District 2 Republican

primary, for example, four Black candidates ran—including candidates who had held local elected office, appointed government positions, and leadership roles in the State Republican Party—yet all four Black candidates *combined* received only 6.2% of the vote. *See supra* ¶ 474. These more qualified Black candidates performed worse than a white, recent college graduate who had never held any elected office or role in the party and worked as a real estate agent. *Id.*; *see Fayette*, 775 F. 3d at 1340, 1347 & nn.5 and 9 (concluding that the Senate Factors pointed "commandingly" in the plaintiffs' favor where a "newly registered" white voter defeated the "vice-chairman of the County Republican Party" in a primary election).

811.    *Second*, Alabama Republicans are a "white dominated organization" insofar as there is a distinct lack of Black representation in the Republican Party's leadership, including in the regions at issue in this case; the Alabama Republican Party is majority White; Republican leaders are mostly White; all Republican state legislators, except one, are White; all Republican candidates who ran for statewide office in 2022 were White; and the Republican Party is generally perceived as White. *See supra* ¶ 505; *see White*, 412 U.S. at 766-67 (finding it significant that a "white-dominated" group slated and sponsored winning candidates). For example, Black people hold only 2 of 30 seats (6.67%) on the Montgomery County Republican Executive Committee, despite comprising 56.33% of the VAP in Montgomery County. *See supra* ¶ 494; *see, e.g.*, *Marengo Cnty.*, 731 F.2d at 1569 (noting that

Black people held only 7 of the 34 seats on the dominant party's executive committee, despite Black people being half the county's population); *Velasquez*, 725 F.2d at 1022-23 (noting that only one minority person held a seat on the party's nominating committee); *Lodge v. Buxton*, 639 F. 2d 1358, 1379 (5th Cir. 1981)[31] (finding evidence of inequitable slating where Black people held only 1 of the 24 party county executive seats, but were half of the local population), *aff'd in relevant part Rogers*, 458 U.S. *at* 625.

812.    Further, the sad reality is that the person appointed by the State Republican Party chair to a taskforce to "open up the party" to more people, Tr. 1322:10-1324:14 (Coley), has publicly posted offensive racial appeals that urged people to vote against Vice President Kamala Harris, a Black candidate, and that associated her with well-known symbols of Black activism with "riots" and "mobs" while connecting the Alabama Republican Party with a "white supremacist" symbol. *See supra* ¶ 516; *see White*, 412 U.S. at 767 (discounting a dominated slating group's support for some Black candidates where, as here, the group had used "racial campaign tactics").

813.    Black voters have obtained representation in the State Democratic Party but only because of extensive litigation over many decades. *See, e.g., Hadnott v.*

---

[31] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the Fifth Circuit issued before October 1, 1981.

*Amos*, 394 U.S. 358 (1969); *Gilmore* , 435 F.2d 487; *Foster v. Jones*, No. 03-0574, 2004 WL 7344991 (S.D. Ala. June 17, 2004); *Henderson v. Harris*, 804 F. Supp. 288 (M.D. Ala. 1992) (three-judge court); *Henderson v. Graddick*, 641 F. Supp. 1192 (M.D. Ala. 1986) (three-judge court); *Harris v. Graddick*, 615 F. Supp. 239 (M.D. Ala. 1985); *Harris v. Graddick*, 593 F. Supp. 128 (M.D. Ala. 1984); *MacGuire v. Amos*, 343 F. Supp. 119 (M.D. Ala. 1972) (three-judge court); *United States v. Democratic Exec. Comm. of Barbour Cnty., Ala.*, 288 F. Supp. 943 (M.D. Ala. 1968); *Smith v. Paris*, 257 F. Supp. 901 (M.D. Ala. 1966), *aff'd*, 386 F.2d 979 (5th Cir. 1967); *Gray v. Main*, 291 F. Supp. 998 (M.D. Ala. 1966); *United States v. Exec. Comm. of Democratic Party of Dallas Cnty.*, 254 F. Supp. 537 (S.D. Ala. 1966); *see also Hawthorne v. Baker*, 750 F. Supp. 1090, 1092 (M.D. Ala. 1990) (three-judge court), *vacated*, 499 U.S. 933 (1991); *Harper v. Vance*, 342 F. Supp. 136 (N.D. Ala. 1972) (three-judge court).

814.   Third, the Republican Party is not open to candidates who support issues important to Black voters. Black voters in Alabama are strongly supportive of certain issues, like addressing racial discrimination, condemning the Confederacy, increasing funding for public transportation, and reform of drug laws and policing. *See supra* ¶ 495; *accord Gingles*, 478 U.S. at 66-67 (noting that Black voters' support for certain candidates can be driven by a shared experience with discrimination and poverty); *Clerveaux*, 984 F. 3d at 237-38. Despite the close

relationship between Black voters' interest in these issues and historical discrimination, the State Republican Party has not actively supported these issues and, recently, elected Republicans have acted in direct opposition to these interests. *See supra* ¶ 496.

815.    Thus, Senate Factor 4 weighs in favor of Plaintiffs. The evidence— including a lack of Republican financial or electoral support for Black candidates in primaries, the lack of Black leadership in the local Party, and Alabama Republicans' lack of support for race-related issues that are important to Black voters—shows that the existing slating process hinders Black voters' ability to elect the candidates of their choice. *See White*, 412 U.S. at 766-67; *Clerveaux*, 984 F. 3d at 239-40.

### D.    <u>Senate Factor 6: Racial Appeals</u>

816.    Senate Factor Six "asks whether political campaigns in the area are characterized by subtle or overt racial appeals." *Gingles*, 478 U.S. at 45. Evidence of overt "racism" or other racial appeals "can be very significant if it is present. But its absence should not weigh heavily against a plaintiff proceeding under the results test of section 2." *Marengo Cnty.*, 731 F.2d at 1571 (internal citation omitted).

817.    The Court finds Senate Factor 6 weighs heavily in favor of the Plaintiffs. Dr. Bagley offered several examples of racial campaign appeals in his expert report, some of which he testified about at trial. A reasonable person could interpret Dr. Bagley's examples, *see supra* ¶¶ 512-23, and others presented at trial,

*see supra* ¶¶ 524, as racial appeals. *See Milligan*, 582 F. Supp. at 1023 (evaluating racial appeals based on the perception of a "reasonable viewer"). These overt and subtle appeals generally stem from the public or campaign statements from elected officials or candidates for federal or local offices both statewide and within challenged jurisdictions. *See supra* PFOF Section VI.D.

818.    To the extent Dr. Carrington sought to opine on "overt or subtle racial appeals" under Senate Factor 6, *Gingles*, 478 U.S. at 37, he did not perform any analysis of contemporary statements by Alabama politicians. Tr. 1176:24-1177:6. Other than the statements in Dr. Bagley's report, Dr. Carrington did not review any other recent statements from Alabama politicians. Tr. 1177:10-13.

819.    Instead, Dr. Carrington offered incredible testimony on racial campaign appeals that contradicts the law and blinks reality. Dr. Carrington appears to take the position that, unless a person knows what is in a politician's heart when the statement is made, one cannot definitively determine evaluate an overt or subtle racial appeal. That is not the law. The "focus" of the racial appeal analysis "must be the minority's perception of the action." *Sanchez v. Colorado*, 97 F.3d 1303, 1323 (10th Cir. 1996); *see, e.g.*, *Stout v. Jefferson Bd. of Educ.*, 882 F.3d 988, 1014 (11th Cir. 2018) (affirming that a subtly coded flyer conveyed a "message of inferiority" to Black people, despite the flyer's creators denying any overt racial motives); *Milligan*, 582 F. Supp. 3d at 1023 (concluding that a "reasonable viewer might [] perceive[]" a

particular Alabama campaign commercial was a racial appeal, despite the candidate who created the commercial testifying that he did not intend it to be a racial appeal).

820.    Dr. Carrington declined to say one way or the other whether "a politician's position that white nationalists aren't racists" is a racial appeal. Tr. 1182:2-8. Although he did acknowledge that the statement would likely have repelled Black voters, Tr. 1184:13-17, Dr. Carrington refused to say whether Roy Moore's statements during his 2017 Senate campaign that America would have been better off without the Reconstruction Amendments and that the antebellum period "was a great time when the families were united" was a racial appeal. Tr. 1183:5-24.

821.    Of course, the Supreme Court in *Milligan*, 599 U.S. at 22, previously affirmed as careful factfinding the district court's conclusion that Mr. Moore's statements and others at issue in this case were racial appeals. *See Milligan*, 582 F. Supp. 3d at 1023-24. Thus, Senate Factor 6 also weighs in favor of Plaintiffs here.

### E.    <u>Senate Factor 7: Election to Office in the Jurisdiction</u>

822.    Senate Factor 7 concerns "the extent to which members of the minority group have been elected to public office in the jurisdiction." *Gingles*, 478 U.S. at 37.

823.    "If members of the minority group have not been elected to public office, it is of course evidence of vote dilution." *Marengo Cnty.*, 731 F.2d at 1571.

824.  In *Milligan*, a three-judge panel of this Court had "little difficulty finding that Senate Factor 7 weighs heavily in favor of the" Plaintiffs based on three factors, all of which are present in this case as well. 582 F. Supp. 3d at 1019.

825.  First, Black candidates never won election to Congress in Alabama outside of majority-minority districts, *see id.*, a fact that remains true today, *see* Doc. 230 ¶¶ 93-94, 102-03, 117.

826.  Second, the *Milligan* panel found that "[n]o Black person has won statewide office in Alabama since 1996" and "[t]here are currently no African-American statewide officials in Alabama," 582 F. Supp. 3d at 1019. The same remains true today and is reflected in the record of this case. Doc. 230 ¶ 94. *See also Alpha Phi Alpha Fraternity*, 700 F. Supp. 3d at 1284 (finding Senate Factor 7 weighed heavily in favor of Plaintiffs even though "Black candidates have achieved some success in statewide elections following 2000," as only four have been elected to statewide partisan office since Reconstruction).

827.  Third, the *Milligan* court found that the "overwhelming majority of African-American representatives in the Alabama Legislature come from majority-minority districts," which "were created to comply with the Voting Rights Act or the Constitution, 582 F. Supp. 3d at 1019. The same record is present in this case, and it is the type of fact the Eleventh Circuit has also found important in evaluating Senate Factor 7. *See Wright*, 979 F.3d at 1305–06 (11th Cir. 2020) (holding that Senate

Factor 7 "weighed heavily" in the plaintiffs' favor where the only Black members elected in the jurisdiction were elected in "single-member districts where African Americans make up a majority of the voting-age population").

828.  Black Alabamians have been almost entirely unable to succeed in running for office unless a majority of the relevant electorate is Black. Doc. 230 ¶¶ 93-94, 102-03, 117. Even though Black people comprise approximately 27% of Alabama's population, only 20% of Alabama's State Senate delegation is Black, Doc. 230 ¶ 117; PX 19 at 34, all were elected from majority-Black districts. Doc. 230 ¶ 117, and there are no Black Senators representing any of the districts inside the Huntsville-Decatur-Albertville CSA, PX 19 at 34.

829.  Senate Factor 7 weighs heavily in favor of Plaintiffs.

## F.    Senate Factor 8: Lack of Responsiveness

830.  This factor considers whether "elected officials are unresponsive to the [minority's] particularized needs." *Gingles*, 478 U.S. at 45. "Unresponsiveness is considerably less important under the results test," though it can show that "minorities have insufficient political influence to ensure that their desires are considered by those in power," *Marengo Cnty.*, 731 F.2d at 1572.

831.  "[E]xamples of a lack of responsiveness include shortfalls in funding for education and the failure to expand Medicaid, the redistricting plan itself, and the failure of some white legislators to participate in black-community events." *Miss.*

*State Conf. of NAACP*, 2024 WL 3275965, at *52. Unresponsiveness may also include the "failure to respond to complaints of racial discrimination, failure to identify concerns of the minority community, scarcity of outreach sessions in the minority community, [and] failure to respond to unequal school resources and disparate discipline and educational opportunities . . . ." *NAACP, Spring Valley Branch v. E. Ramapo Cent. Sch. Dist.*, 462 F. Supp. 3d 368, 413 (S.D.N.Y. 2020), *aff'd sub nom. Clerveaux v. E. Ramapo Cent. Sch. Dist.*, 984 F.3d 213 (2d Cir. 2021) (internal citations omitted).

832.   Numerous witnesses testified to the failure of White politicians in the challenged areas, include State Senators, to participate in Black community events or respond to particular concerns that are important to the Black community. Tr. 165:15-17, 180:20-22 (Simelton); Tr. 136:9-137:1, 150:21-24 (Peoples); Tr. 461:12-15, 462:17-21 (Milligan). *See Miss. State Conf. of NAACP*, 2024 WL 3275965, at *52.

833.   Public transportation provides a potent example of lack of responsiveness. Alabama's constitutional ban on using certain funding sources for transportation originated with the State's reaction to the Civil Rights Movement's efforts to integrate public buses. Tr. 501:10-24. This issue remains important for Black Alabamians in Montgomery who experience a deficient public transportation system, Tr. 469:7-15, and the same issues affect rural Fayette County, Tr. 864:6-7.

834.   The lack of responsiveness concerns not only inaction, but also new legislation that disproportionately denies the needs of Black Alabamians. The State Legislature recently killed the efforts of Birmingham and developing movements in Montgomery in Huntsville to raise the minimum wage, Tr. 649:17-21 (Williams); Tr. 494:13-23 (Douglas). The Alabama Legislature's anti-diversity-equity-and-inclusion law also may prevent Huntsville from appointing a new officer of Diversity Equity and Inclusion, Tr. 149:19-150:5 (Peoples), reversing what had been a positive development for Black residents of Huntsville. And the Alabama Legislature made "Robert E. Lee Day" a holiday, which has a negative impact on Black students and others in Alabama. Tr. 1119:11-1120:2-4, 1126:16-1127:9 (Roberts). The Legislature also recently enacted SB 1, which had a racially disparate impact on African Americans, who are most in need of the assistance that SB 1 prohibits. Tr. 497:13-499:25 (Douglas); Tr. 646:19-23 (Williams); Tr. 177:19-23 (Simelton).

835.   As discussed above in PFOF Section VI.A, Alabama ranks at the bottom of public education funding, an issue that disproportionately affects Black Alabamians, and is at the heart of many other disparities, as both Dr. Burch and Dr. Reilly testified. Tr. 702:9-13 (Burch); Tr. 802:19-25 (Reilly); *see NAACP, Spring Valley Branch*, 462 F. Supp. 3d at 413.

836.   The Legislature's refusal to accept federal funding to expand Medicaid also disproportionately harms Black communities and denies them benefits that

would help them obtain better employment and participate more easily in political and other community activities. Tr. 497:3-8 (Douglas); Tr. 1297:6-21, 1297:22-1298:5 (Landers); *see Miss. State Conf. of NAACP*, 2024 WL 3275965, at *52 (finding unresponsiveness in a state's refusal to expand Medicaid coverage).

837.    Moreover, the three-judge panel in *Milligan* recently found that the Legislature's decision in 2023 to enact a discriminatory congressional redistricting plan, despite court orders, reflected "a significant lack of responsiveness on the part of elected officials to the particularized needs" of Black voters in Alabama." 690 F. Supp. 3d at 1315. Not surprisingly, in terms of the State Senate map at issue here, elected officials also ignored public comments about the 2021 Senate plan, including those about District 26 packing Black voters in unnecessarily—comments that Senator McClendon heard "often" but ignored. McClendon Dep. Tr. 66:6-14. The mapdrawer to whom Sen. McClendon gave the reigns, Mr. Hinaman, could not name an instance where he made changes to the Senate map in response to public input. Hinaman Dep. Tr. 45:7-14; 46:3-8.

838.    Senate Factor 8 weighs in favor of the Plaintiffs.

## G.    <u>Senate Factor 9: Tenuousness</u>

839.    Although the tenuousness factor "is less important under the results test," it is not irrelevant, as "the tenuousness of the justification for a state policy may indicate that the policy is unfair." *Marengo Cnty.,* 731 F.2d at 1571.

840.   Under Senate Factor 9, a plan need not be an "egregiously flawed plan, the equivalent of a political gerrymander of squeezing the minority into as few districts as possible" for its justifications to be tenuousness. *Miss. State Conf. of NAACP*, 2024 WL 3275965, at *52. Instead, if there is no "specific, non-tenuous justification[] for why black-majority districts were not created in the" challenged areas then "this factor weighs in favor of the Plaintiffs." *Id.*

841.   Courts may weigh evidence presented under other Senate factors that demonstrate tenuousness. *See Nairne*, 715 F. Supp. 3d at 876.

842.   There is no substantial justification for Alabama's failure to draw a legislative map without two additional majority-Black (or otherwise performing) Senate districts in Huntsville and Montgomery areas.

*   *   *

843.   Based on the findings as to the Senate Factors and the preconditions, Plaintiffs have shown that the 2021 Alabama State Senate map and its lack of sufficient opportunity for Black voters in the Huntsville and Montgomery area interacts "with bloc voting along racial lines, arising against the backdrop of substantial racial discrimination within the State," rendering Black votes "unequal to a vote by a nonminority voter." *Milligan*, 599 U.S. at 25. As such, Plaintiffs have proven a violation of Section 2 of the Voting Rights Act in the challenged areas.

## V.    Irreparable Harm and the Equities

844.    Voting is "a fundamental political right, because [it is] preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). It "is the beating heart of democracy" and therefore "is of the most fundamental significance under our constitutional structure." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1315 (11th Cir. 2019) (citations omitted). "And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). So long as the Enacted Plan remains in force, it compels Plaintiffs to vote under a plan that violates Section 2. This harm, once realized, "cannot be undone through monetary remedies." *Dillard*, 640 F. Supp. at 1363; *see also Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010).

845.    Courts have "routinely" found that restrictions on fundamental voting rights threaten irreparable injury. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (collecting cases); *see also Dillard*, 640 F. Supp. at 1363. This reflects the unremarkable principle that "[o]nce an election occurs, there can be no do-over and no redress." *League of Women Voters of N.C.*, 769 F.3d at 247. That principle is no less true here.

846.   Additionally, the "protection of the Plaintiffs' franchise-related rights is without question in the public interest." *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005) ("*Cox*").

847.   Plaintiffs' requested injunction would protect their franchise-related rights by allowing them to participate in elections where districts are drawn in accordance with the VRA, and the Black electorate's vote is not diluted. Because the Voting Rights Act "should be interpreted in a manner that provides 'the broadest possible scope' in combating racial discrimination," *Chisom v. Roemer*, 501 U.S. 380, 403 (1991), "many courts have prevented elections from occurring" under illegal plans, *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 361 F. Supp. 3d 1296, 1301 (M.D. Ga. 2018), *aff'd*, 979 F.3d 1282 (11th Cir. 2020).

848.   Withholding an injunction would compromise those same rights. Between these alternatives, the public interest is "best served by ensuring . . . that all citizens . . . have an equal opportunity to elect the representatives of their choice." *Fayette Cnty.*, 118 F. Supp. 3d at 1349-50 (quoting *Cox*, 408 F.3d at 1355); *see also United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) ("Frustration of federal statutes and prerogatives are not in the public interest.").

849.   Protecting voting rights is in the public interest. The "cautious protection of the Plaintiffs' franchise-related rights is without question in the public interest." *Cox*, 408 F.3d at 1355.

## VI.  **Remedy**

850.  The Court hereby enjoins Defendant from qualifying candidates and conducting any forthcoming elections under the state Senate map in S.B. 1.

851.  Plaintiffs' illustrative maps are "not cast in stone," rather, the state "will be given the first opportunity to develop a remedial plan." *Clark I*, 21 F.3d at 95; *see Milligan*, 690 F. Supp. 3d at 1237 ("[F]ederal law dictates that the Alabama Legislature should have the first opportunity to draw a remedial plan.").

852.  Because the judiciary should not intrude on legislative policy any more than necessary, the Court must give the Legislature the first opportunity to suggest a legally acceptable plan to remedy the Section 2 violation. *See Upham v. Seamon*, 456 U.S. 37, 41 (1982); *White v. Weiser*, 412 U.S. 783, 794-95 (1973); *Tallahassee Branch of NAACP v. Leon Cnty.*, 827 F.2d 1436, 1438 (11th Cir. 1987).

853.  The Court therefore gives Defendants sixty days from the date of this Order to submit a remedial plan. Based on precedent, this gives more than sufficient time for the Legislature to devise a remedy. See Milligan *v. Allen*, No. 2:21-CV-1291-AMM, 2023 WL 5014089, at *2 (N.D. Ala. Aug. 6, 2023) (30-day delay in commencing remedial proceedings to afford the Legislature the opportunity to devise a remedial plan); *see also North Carolina v. Covington*, 585 U.S. 969, 971 (2018) (describing court giving legislature one month); *Thomas v. Bryant*, 919 F. 3d

298, 312-13 (5th Cir. 2019) (19 days); *Pope v. Cnty. of Albany*, 94 F. Supp. 3d 302, 352 (N.D.N.Y. 2015) (21 days).

854.    The Legislature enjoys broad discretion in devising a remedy for the identified Section 2 violation and may consider a wide range of potential remedies. *Cf. Bartlett*, 556 U.S. at 23.

855.    This includes the discretion to decide whether to devise a map containing two additional majority-Black districts in the challenged regions or two "crossover" districts (or a combination of the two) in which Black voters are less than a majority in the districts but remain "large enough to elect the candidate of its choice with help from voters who are members of the majority and who cross over to support the [Black-]preferred candidate." *Bartlett*, 556 U.S. at 13; *see also id.* at 23 ("The option to draw such districts gives legislatures a choice that can lead to less racial isolation, not more."); *Cooper*, 137 S. Ct. at 1470 (Section 2 did not require majority-Black districts in a state where 46% to 48% BVAP districts consistently led to the election of Black-preferred candidates); *Milligan*, 690 F. Supp. 3d at 1238 ("Under the Voting Rights Act, the statutory framework, and binding precedent, the appropriate remedy is, as we already said, a congressional districting plan that includes either an additional majority-Black district, or an additional district in which Black voters otherwise have an opportunity to elect a representative of their choice.").

856.    Courts have long recognized that Section 2 does not necessarily require the creation of majority-Black districts to remedy a violation. *See, e.g.*, *Branch v. Smith*, 538 U.S. 254, 309-10 (2003) (O'Connor, J., concurring in part); *Marengo Cnty.*, 731 F.2d 1546, 1560 n.24 (11th Cir. 1984); *Ala. State Conf. of the NAACP v. City of Pleasant Grove*, No. 2:18-cv-02056-LSC, 2019 WL 5172371, at *2 (N.D. Ala. Oct. 11, 2019); *Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 219 F. Supp. 3d 949, 958 (E.D. Mo. 2016); *United States v. Vill. of Port Chester*, 704 F. Supp. 2d 411, 449 (S.D.N.Y. 2010); *United States v. Euclid City Sch. Bd.*, 632 F. Supp. 2d 740, 770 (N.D. Ohio 2009); *Dillard v. Chilton Cnty. Bd. of Educ.*, 699 F. Supp. 870, 875 (M.D. Ala. 1988), *aff'd*, 868 F.2d 1274 (11th Cir. 1989) (Table); *Dillard v. Town of Cuba*, 708 F. Supp. 1244, 1245 (M.D. Ala. 1988).

857.    Nevertheless, while Section 2 does not guarantee electoral success for Black-preferred candidates, *LULAC*, 548 U.S. at 428, the Court "cannot authorize an element of an election proposal that will not with certitude completely remedy the Section 2 violation." *Dillard v. Crenshaw Cnty.*, 831 F.2d 246, 252 (11th Cir. 1987) (emphasis omitted); *see Milligan*, 690 F. Supp. 3d at 1294 (same). Rather, the remedial plan must "completely remed[y] the prior dilution of minority voting strength and fully provides equal opportunity for minority citizens to participate and to elect candidates of their choice." *United States v. Dallas Cnty. Comm'n*, 850 F.2d 1433, 1438 (11th Cir. 1988). The Court "cannot accept a remedial plan that (1)

perpetuates the vote dilution [it] found, or (2) only partially remedies it." *Milligan*, 690 F. Supp. 3d at 1294 (citations omitted).

858.   For that reason, the Court cautions the Legislature that the remedial map must contain additional two State Senate districts—one in the Huntsville-Decatur area and one in the Montgomery area—that provide Black voters with a "realistic opportunity" to consistently elect candidates of their choice. *See Wright*, 979 F.3d at 1299 (internal quotations omitted).

859.   To demonstrate that a "realistic opportunity" exists, a performance analysis must demonstrate "whether a purportedly remedial district completely remedies the vote dilution found in the prior plan." *Milligan*, 690 F. Supp. 3d at 1294–95 ("A performance analysis predicts how a district will function based on statistical information about, among other things, demographics of the voting-age population in the district, patterns of racially polarized voting and bloc voting, and the interaction of those factors."). Courts commonly rely on performance analyses to evaluate remedial plans. *See, e.g.*, *LULAC*, 548 U.S. at 427; *Dall. Cnty. Comm'n*, 850 F.2d at 1440; *Osceola County*, 474 F. Supp. 2d at 1256; *LULAC*, 457 F. Supp. 2d at 721.

860.   Although, "the Supreme Court has not dictated a baseline level at which a district must perform to be considered an 'opportunity' district . . . precedent does clearly tell us what criteria establish that a putative opportunity district will not

perform." *Milligan*, 690 F. Supp. 3d at 1295.  Namely, "[w]hen a performance analysis shows that a cohesive majority will 'often, if not always, prevent' minority voters from electing the candidate of their choice in the purportedly remedial district, there is a 'denial of opportunity in the real sense of that term.'" *Id.* (quoting *LULAC*, 548 U.S. at 427, 429). "And when voting is racially polarized to such a 'high degree' that electoral success in the alleged opportunity district is 'completely out of the reach' of a minority community, the district is not an opportunity district." *Id.* (quoting *Osceola Cnty.*, 474 F. Supp. 2d at 1256).

861.   If the Legislature fails to act within sixty days or fails to draw a map containing two additional effective remedial districts, however, then the Court must take up the unhappy task of devising a remedy. *See Covington*, 138 S. Ct. at 2554.

DATED this 13th day of December, 2024

Respectfully submitted,

/s/ Alison Mollman
Alison Mollman
Laurel Hattix
AMERICAN CIVIL LIBERTIES UNION OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 265-2754
amollman@aclualabama.org
lhattix@aclualabama.org

/s/ Deuel Ross
Deuel Ross*
NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.
700 14th Street NW Ste. 600
Washington, DC 20005
(202) 682-1300
dross@naacpldf.org

Leah Aden*
Stuart Naifeh*
Kathryn Sadasivan (ASB-517-E48T)
Brittany Carter*
Ashley Burrell*
Colin Burke*
NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
laden@naacpldf.org
snaifeh@naacpldf.org
ksadasivan@naacpldf.org
bcarter@naacpldf.org
aburrell@naacpldf.org
cburke@naacpldf.org

/s/ Davin M. Rosborough
Davin M. Rosborough*
Dayton Campbell-Harris*+
Theresa J. Lee*
Sophia Lin Lakin*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad St.
New York, NY 10004
(212) 549-2500
drosborough@aclu.org
dcampbell-harris@aclu.org
tlee@aclu.org
slakin@aclu.org

Jacob van Leer
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th St. NW
Washington, DC 20005
jvanleer@aclu.org

/s/ Sidney Jackson
Sidney Jackson (ASB-1462-K40W)
Nicki Lawsen (ASB-2602-C00K)
WIGGINS, CHILDS, PANTAZIS, FISHER & GOLDFARB
301 19th Street
North Birmingham, AL 35203
(205) 314-0500
sjackson@wigginschilds.com
nlawsen@wigginschilds.com

/s/ Jack Genberg
Bradley E. Heard*
Jack Genberg*
Jess Unger*

Michael Turrill*
Harmony R. Gbe*
James W. Ettinger*
HOGAN LOVELLS US LLP
1999 Avenue of the Stars Suite 1400
Los Angeles, CA 90067
(310) 785-4600
michael.turrill@hoganlovells.com
harmony.gbe@hoganlovells.com
jay.ettinger@hoganlovells.com

Jessica L. Ellsworth*
Shelita M. Stewart*
Amanda N. Allen*
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600
jessica.ellsworth@hoganlovells.com
shelita.stewart@hoganlovells.com
amanda.n.allen@hoganlovells.com

SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Avenue, Suite
340 Decatur, GA 30030
(404) 521-6700
bradley.heard@splcenter.org
jack.genberg@splcenter.org
jess.unger@splcenter.org

Avner Shapiro*
SOUTHERN POVERTY LAW CENTER
1101 17th Street NW
Suite 510
Washington, DC 20036
240-890-1735
avner.shapiro@splcenter.org

David Dunn*
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000
david.dunn@hoganlovells.com

Blayne R. Thompson*
HOGAN LOVELLS US LLP
609 Main St., Suite 4200
Houston, TX 77002
(713) 632-1400
blayne.thompson@hoganlovells.com

*Attorneys for Plaintiffs*

*Admitted *pro hac vice*

\+ Not admitted in New York

292

## CERTIFICATE OF SERVICE

I hereby certify that on December 13, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record in this case.

/s/ Davin M. Rosborough
Davin M. Rosborough
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
(212) 549-2500
drosborough@aclu.org
