FILED

2024 Dec-13  PM 11:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| ALABAMA STATE CONFERENCE OF THE NAACP, *et al.*, | ) ) ) | |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | Case No. 2:21-cv-1531-AMM |
| WES ALLEN, | ) ) ) | |
| *Defendant*. | ) ) | |

### DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to this Court's Orders, Defendant Allen respectfully submits his proposed findings of fact and conclusions of law.[1]

## BACKGROUND

### I.    Parties

1.    Plaintiffs in this case are the Alabama State Conference of the NAACP ("Alabama NAACP"), Greater Birmingham Ministries ("GBM"), and Evan Milligan. DE230 at 1-3.

---

[1] "Because the issue of vote dilution in § 2 cases presents intertwined questions of fact and law, to spare the reader repetition, the findings of fact and conclusions of law are not set out in separate sections. They are, though, set out with particularity." *Ala. St. Conf. of NAACP v. Alabama*, 612 F. Supp. 3d 1232, 1248 (M.D. Ala. 2020).

"DE" refers to docket entries in this case. "DX" and "PX" refer to the Defendant's Exhibits and Plaintiffs' Exhibits respectively. Pin cites align with ECF pagination unless otherwise noted.

2.      Plaintiff Alabama NAACP is the state conference of the National Association for the Advancement of Colored People, Inc. *Id*. ¶1.

3.      Plaintiff GBM was founded in 1969 in Birmingham, Alabama and describes itself as a multi-faith, multi-racial, non-profit membership organization that engages people to building a strong, supportive, engaged community and a more just society for all people. *Id*. ¶4.

4.      Plaintiff Evan Milligan is a black registered voter who resides in Montgomery, Alabama, and within State Senate District 26. *Id*. ¶¶7-9.

5.      Defendant in this case is Hon. Wes Allen, in his official capacity as Alabama Secretary of State. *Id*. ¶10.

6.      Secretary Allen provides uniform guidance for election activities in the State and issues certificates of election to members of the Alabama Legislature. He is also responsible for certifying the names of primary and general election candidates for the State Legislature. *Id*. ¶11.

7.      Senator Jim McClendon and Representative Chris Pringle were formerly Defendants in this case. *Id*. ¶12. They were Senate and House Chairs of the Alabama Permanent Legislative Committee on Reapportionment ("the Committee"), respectively, during the 2021 redistricting cycle. *Id*.

## II.    Experts

### *Defendant's Experts*

8.      Dr. Christopher Bonneau is a Professor of Political Science at the University of Pittsburgh. Tr. 1395:21-22. He received his B.A. in Political Science, Theology, and Humanities from Valparaiso University, an M.A. in Political Science from Ball State University, an M.A. in Political Science from Michigan State University, and a Ph.D. in Political Science from Michigan State University. DX1 at 2. Defendant retained Dr. Bonneau to consider whether black candidates in Alabama elections tend to perform worse than white candidates on account of their race. DX1 at 1. Dr. Bonneau was admitted without objection as an expert "in American political science, election analysis, and political research methodology." Tr. 1401:20-25.

9.      Dr. Adam Carrington is an Associate Professor of Political Science at Ashland University. Tr. 1128:17-19. Previously, he was an Associate Professor of Politics at Hillsdale College, where he taught for ten years. DX3 at 1; Tr. 1129:5-6. He holds an M.A. and Ph.D. in Political Science from Baylor University. DX4 at 1. His scholarship focuses on political institutions, particularly the presidency, Congress, the judiciary, and political parties. Tr. 1129:12-17. He has published and taught about party politics and the American South. Tr. 1133:21-23. Defendant retained Dr. Carrington to analyze the shift in the South generally and Alabama particularly from voting reliably Democratic to reliably Republican over the course of

3

the second half of the twentieth century. Tr. 1131:23-1132:1. Dr. Carrington was admitted as an expert "in political science, political parties and the partisan shift in the American South." Tr. 1133:24-1135:21.

10.     Dr. M.V. (Trey) Hood III is a professor at the University of Georgia in the Department of Political Science. DX5 at 2. He holds a Ph.D. in Political Science from Texas Tech University (1997) and a Master's in Political Science from Texas A&M University (1993). *Id*. Defendant retained Dr. Hood to analyze black voting patterns, sociodemographic disparities in Alabama and elsewhere, white support for minority candidates, and the change in black political metrics over time. *Id*. Dr. Hood was admitted without objection as an expert "in political science specifically in the areas of electoral politics, racial politics, election administration, and southern politics, [in] empirical social science research, and for the matters discussed in his report." Tr. 1218:9-16.

11.     Dr. Wilfred Reilly is a professor at Kentucky State University. Tr. 775:25-776:1. He earned a J.D. from the University of Illinois in 2005 and received his Ph.D. from Southern Illinois University in 2015. Tr. 776:8-10. Defendant retained Dr. Reilly to evaluate whether the levels of racially polarized voting in Alabama are unique from those found in other parts of the nation, as well as to evaluate whether socioeconomic disparities between black and white Alabamians are best explained as a result of past or present racial discrimination or other factors unrelated

to racial discrimination. DX9 at 3-4. Dr. Reilly was admitted without objection as an expert "in political science, statistics, race relations, and a study of the impact of racial discrimination on socioeconomic gaps." Tr. 779:20-780:1.

12.     Dr. Sean Trende is a Senior Elections Analyst for Real Clear Politics and lecturer at Ohio State University. Tr. 934:5-7. He earned a Ph.D. in political science and Master's Degree in Applied Statistics from Ohio State University, a B.A. in history and political science from Yale University, and a Juris Doctor and Master's Degree in political science from Duke University. Tr. 934:114-935:1. In 2021, he served as a special master to redraw the district lines for the Commonwealth of Virginia's House of Delegates, state Senate, and United States Congressional delegation. Tr. 939:13-940:1; DX7 at 5. The same year, he worked as a Voting Rights Act expert for the Arizona Independent Redistricting Commission. *Id*. And in 2019, he was appointed by the Supreme Court of Belize to address malapportionment issues in Belize's electoral divisions. Tr. 939:14-18. Defendant retained Dr. Trende to evaluate Senate Districts 7 and 25 in the illustrative plans submitted by Plaintiffs' expert Anthony Fairfax. *Id*.; DX8 at 3. Dr. Trende was admitted without objection as an expert "in redistricting, political methodology, and survey methods." Tr. 940:23-941:3.

*Plaintiffs' Experts*

13.    Mr. Anthony E. Fairfax is a demographic and mapping consultant and the CEO of CensusChannel LLC. He has a B.S. in Electrical Engineering from Virginia Tech and a Master of Geospatial Information Science and Technology from North Carolina State University. Plaintiffs retained Mr. Fairfax to produce an illustrative plan that adheres to traditional redistricting criteria and satisfies the first precondition of *Thornburg v. Gingles*.

14.    Dr. Kassra Oskooii is a professor in the Department of Political Science and International Relations at the University of Delaware. Tr. 348:19-22. He has a Ph.D. in Political Science from the University of Washington in Seattle, Washington. Tr. 349:21-24. He was asked to evaluate Dr. Trende's claims about demographic data collection estimation and analysis. Tr. 348:15-18.

15.    Dr. Baodong Liu is a professor in the Department of Political Science at the University of Utah. PX16 at 2; Tr. 14:24-25. He has a Ph.D. in Political Science from the University of New Orleans (1999) and an M.A. in Political Science from Oklahoma State University (1995). *Id.* Plaintiffs retained Dr. Liu to ascertain whether voting in the Huntsville and Montgomery regions is racially polarized, and to determine whether Plaintiffs' illustrative plan would enable black voters in both regions to elect their preferred candidates. PX16 at 3-4.

16.     Dr. Josephy Bagley is an assistant professor of history at Georgia State University, Perimeter College. DE182-3 at 2. He received his B.A. in History from Auburn University and his M.A. and Ph.D. from Georgia State. *Id*. at 2, 38. Plaintiffs retained Dr. Bagley to collect and collate "Senate factors" evidence.

17.     Dr. Traci Burch, Ph.D. is an associate professor of political science at Northwestern University and serves as a research professor at the American Bar Foundation. DE164-20 at 2. Dr. Burch received her B.A. in history from Princeton University and her Ph.D. in Government and Social Policy from Harvard University. *Id*. Plaintiffs retained Dr. Burch to opine on "Senate Factor Five": the extent to which socioeconomic disparities caused by historical discrimination affect black Alabamians ability to participate effectively in the political process. *Id.*

## III.    The 2021 Plan For State Senate Districts

18.     The Alabama Permanent Legislative Committee on Reapportionment ("the Committee") is responsible for preparing and developing redistricting plans for the State following each decennial census. DE230 ¶17. The Committee is composed of members from the State Senate and House. *Id*. ¶27 (citing Ala. Code § 29-2-51(c)).

19.     On May 5, 2021, the Permanent Legislative Committee on Reapportionment enacted guidelines for the 2021 redistricting cycle. *Id*. ¶29.

20.    The guidelines reflect the requirements of the United States Constitu-

tion, the Voting Rights Act, the Alabama Constitution, and policies "that are embed-

ded in the political values, traditions, customs, and usages of the State of Alabama."

*Id.* ¶¶17-19.

21.    To comply with the U.S. Constitution's one-person, one-vote require-

ment, the guidelines require State legislative districts to "be drawn to achieve sub-

stantial equality of population among the districts and shall not exceed an overall

population deviation range of ±5%." *Id*. ¶19. To comply with Section 2 of the Voting

Rights Act, districts must have "neither the purpose nor the effect of diluting minor-

ity voting strength." *Id*. ¶19.

22.    Districts must be "composed of contiguous and reasonably compact

geography." PX32 at 3.

23.    The guidelines require compliance with the following relevant portions

of the Alabama Constitution:

(i) "Sovereignty resides in the people of Alabama, and all districts should be drawn
to reflect the democratic will of all the people concerning how their governments
should be restructured."

(ii) "Districts shall be drawn on the basis of total population, except that voting age
population may be considered, as necessary to comply with Section 2 of the Voting
Rights Act or other federal or state law."

(iii) "The number of Alabama Senate districts is set by statute at 35 and, under the
Alabama Constitution, may not exceed 35."

(vii) "All districts will be single-member districts."

(viii) "Every part of every district shall be contiguous with every other part of the district."

*Id*.

24.    "The following redistricting policies are embedded in the political values, traditions, customs, and usages of the State of Alabama and shall be observed to the extent that they do not violate or subordinate the … policies prescribed by the Constitution and laws of the United States and of the State of Alabama:"

(i) Avoiding contests between incumbents whenever possible;

(ii) Permitting contiguity by water but not point-to-point or long-lasso contiguity;

(iii) Respect for "communities of interest, neighborhoods, and political subdivisions to the extent practicable," with a community of interest "defined as an area with recognized similarities of interests, including but not limited to ethnic, racial, economic, tribal, social, geographic, or historical identities."

(iv) Minimization of the number of counties in each district; and

(v) Preservation of the cores of existing districts.

PX32 at 4.

25.    "The total Alabama state population, and the population of defined subunits thereof, as reported by the 2020 Census, shall be the permissible database used for the development, evaluation, and analysis of proposed redistricting plans." *Id.* at 2; *see also* Ala. Const. art. IX, §§198-201; Ala. Code §17-14-70; *id.* §17-14-70.1.

26.    The United States Census Bureau released the results of the 2020 Decennial Census on August 12, 2021. DE230 ¶25.

27.    From September 1 to September 16, the Committee held 28 public hearings across the State. *Id*. ¶¶30, 31.

9

28.    Governor Kay Ivey called the Special Legislative Session on redistrict-ing in Alabama to begin on October 28, 2021. *Id.* ¶33.

29.    On November 1, 2021, the Senate passed the State Senate map along party lines. *Id*. ¶47.

30.    On November 4, 2021, Governor Kay Ivey signed into law SB1 of the 2021 Second Special Session of the Alabama Legislature. *Id.* ¶¶46, 48; *see* Ala. Act No. 2021-558. That law provides for the electoral districts of the Alabama Senate, depicted below. *See* Ala. Code §29-1-2.3.

31.    SB1 created eight majority-black Senate districts. DE126 ¶172.





PX353 (DE171-9 at 9).

## IV.    Plaintiffs' Section 2 Vote Dilution Claim

32.    Plaintiffs filed suit twelve days after the enactment of SB1, alleging 21 State House Districts and 12 Senate districts were racially gerrymandered in violation of the Fourteenth Amendment of the U.S. Constitution. DE1 ¶¶139-148.

33.    A three-judge court was empaneled. DE5.

34.    Three months later, Plaintiffs amended their complaint to add a vote dilution claim under Section 2 of the Voting Rights Act, alleging that black voters were "sufficiently numerous and geographically compact enough to form *nine* majority-*BVAP* Alabama Senate districts." DE54 ¶234 (emphasis added). Plaintiffs sought an additional majority-BVAP Senate District located in Montgomery, Alabama. *Id.* ¶6.

35.    On July 10, 2023, Plaintiffs filed a third amended complaint that maintained Section 2 of the Voting Rights Act required "*nine* majority-*BVAP* Alabama Senate districts." DE83 ¶207 (emphasis added).

36.    Six months later, Plaintiffs filed the operative complaint—the fourth amended complaint. DE126. It voluntarily dismissed their constitutional claims but alleged SB1 diluted black voting power by not including "*ten* Alabama Senate Districts in which Black voters constitute the majority." DE126 ¶172.

37.    The three-judge court was dissolved. DE127. The action returned to "the district judge to whom the case was originally assigned." *Id.* at 1.

38.    Plaintiffs' new theory is that "[a]lternative district lines could configure the State Senate map to provide two additional, reasonably configured State Senate districts comprised of a majority of Black voting-age *citizens*." DE126 ¶88 (emphasis added). Vote dilution is alleged around Huntsville and Montgomery. *Id*. ¶¶3, 4.

39.    In the Huntsville region, SB1 allegedly cracks black voters between Senate Districts 2, 7, and 8. *Id*. ¶4. In Montgomery, SB1 allegedly packs black voters into Senate District 26. *Id.* ¶3.

40.    To show that the black populations are "sufficiently large and geographically compact to constitute majorities of the voting-age population in at least one additional Alabama State Senate District" in both Montgomery and Huntsville, *id*. ¶79, Plaintiffs introduced three illustrative plans, Plans 1, 2A, and 3, created by Mr. Anthony Fairfax. Tr. 233:12-21.

41.    In each plan, illustrative Senate District 7 ("SD7") is the additional majority-minority district in the Huntsville region, and illustrative Senate District 25 ("SD25") is the additional majority-minority district near Montgomery.

42.    In Plans 1 and 2A, Mr. Fairfax used only black citizen voting age population ("BCVAP") as estimated by the American Community Survey to assess the numerosity of black voters in SD7. Tr. 252:8-12. In Plan 3, Mr. Fairfax used black voting age population ("BVAP") as enumerated by the Decennial Census to assess

the numerosity of black voters in SD7. Tr. 272:7-9 (concluding numerosity requirement for SD7 is satisfied "in both BVAP and [B]CVAP").

43.     In SD25, "majority-black status is already" achieved with BVAP, so there was "no need," in Mr. Fairfax's words, "to do that research" into whether to rely on BCVAP estimates. Tr. 290:2-11.

44.     Plaintiffs allege that "[u]nder the totality of the circumstances" SB1 bars black voters "from participating equally in the political process and electing candidates of [their] choice." DE126 ¶5.

## EVIDENTIARY RULINGS

45.     Plaintiffs filed motions in limine under Fed. R. Evid. 702 to preclude much of the testimony by Dr. Carrington, Dr. Reilly, Dr. Hood, and Dr. Trende. DE183; DE184; DE185. Plaintiffs also moved to preclude as irrelevant certain evidentiary material and fact-witness testimony proffered by Defendant. DE182.

46.     Defendant filed a *Daubert* motion to preclude Mr. Fairfax and Dr. Oskooii from offering certain opinions about the estimated black citizen voting age population in Plaintiffs' illustrative plans. DE181.

47.     After a hearing on the parties' pretrial motions, DE229, the Court denied all motions in limine except Defendant's motion as to Mr. Fairfax and Dr. Os-

kooii and Plaintiffs' motion as to Dr. Trende to have the benefit of their live testimony. Additionally, the Court reserved ruling on DE182 to the extent it pertained to testimony about voter fraud, which the parties resolved.

48.    Defendant maintains that Mr. Fairfax's and Dr. Oskooii's CVAP testimony should be excluded as irrelevant and unreliable for the reasons discussed in his motion, the reply in support of the motion, at the hearing on the motion, and during cross-examination at trial of both experts.

49.    Defendant also maintains—for the reasons discussed in his response to Plaintiffs' motion, at the hearing on the motion, and during his testimony at trial— that Plaintiffs' motion to exclude certain testimony from Dr. Trende should be denied because they fail to establish that this testimony is unreliable.

50.    For the reasons discussed *infra*, the Court grants Defendant's motion (DE181) and denies Plaintiffs' (DE185). Even were the Court to deny Defendant's motion in limine, the Court finds Defendant's expert testimony more credible and persuasive and therefore assigns it more weight. *See Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 596 (1993) ("Vigorous cross-examination" and "presentation of contrary evidence … are the traditional and appropriate means of attacking shaky but admissible evidence.").

# DISCUSSION

## I.    Plaintiffs Have Not Satisfied The *Gingles* Preconditions.

51.    To satisfy the three preconditions to a vote dilution claim brought under Section 2 of the Voting Rights Act, Plaintiffs must prove "(1) that the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district, (2) that the minority group is politically cohesive, and (3) that the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate." *Bartlett v. Strickland*, 556 U.S. 1, 8-9 (2009) (quoting *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986)). Plaintiffs have failed to establish the first and third preconditions.

### A.    In Plaintiffs' first two illustrative plans, the black population in the Huntsville area is not "sufficiently large."

52.    First, Plaintiffs must prove that an additional, reasonably configured district could be drawn in the Huntsville area in which black Alabamians "make up more than 50 percent of the voting-age population." *Strickland*, 556 U.S. at 18.

53.    Plaintiffs submitted three illustrative plans (Plans 1, 2A,[2] and 3) in an attempt to meet their burden. Tr. 233:12-21.

---

[2] The version of SD7 in Plan 2A replaces the version of SD7 in Plan 2. Plaintiffs no longer proffer Plan 2 as an illustrative plan. PX10 ¶¶2-3.

54.     In Plans 1 and 2A, illustrative Senate District 7's "African-American voting-age population" does not "exceed[] that threshold" of 50%. *Strickland*, 556 U.S. at 20.

55.     SD7's black voting-age population ("BVAP") is 46.82% in Plan 1, PX59 at internal 149, and 48.38% in Plan 2A, DE164-12 at 13.[3]

56.     Thus, SD7 in Plans 1 and 2A is a "crossover district"—"one in which minority voters make up less than a majority of the voting-age population," but can "elect the candidate of [their] choice with help from voters who are members of the majority." *Strickland*, 556 U.S. at 13.

57.     Because "§ 2 does not require crossover districts," Plans 1 and 2A present no evidence of vote dilution in the Huntsville region. *Id.* at 23.

58.     Rather than using BVAP to satisfy *Strickland*'s 50%+1 voting-age population requirement, Plaintiffs rely solely on 5-year *citizenship* estimates from the American Community Survey ("ACS"). PX6 ¶¶15, 74. This attempt to circumvent *Strickland*'s "clear-edged" majority-VAP rule is misplaced and cannot salvage SD7 in Plans 1 and 2A.

---

[3] PX73 (Appendix B of Fairfax Supp Rebuttal Report) contains pages missing much of the right-hand margin, so this document references DE164-12 instead.

59.    BVAP data reported by the Decennial Census represent a "100-percent count," Tr. 314:1, while ACS citizenship estimates are "based on surveys" and constitute "sample data," Tr. 311:1-5. As the Supreme Court has recognized, "the census count represents the best population data available." *Karcher v. Daggett*, 462 U.S. 725, 738 (1983) (quotation omitted).

60.    Plaintiffs' position is that because only citizens are eligible to vote, and because the Huntsville region contains, in their view, a significant non-citizen population, PX6 ¶¶15, 78, the ACS estimate of SD7's black citizen voting-age population ("BCVAP") is the more appropriate metric to use for the first *Gingles* precondition than the Decennial Census's BVAP count.

61.    As an initial matter, the Court finds Plaintiffs' decision to use BCVAP internally inconsistent and bordering on pretextual. Plaintiffs waited until their Fourth Amended Complaint, filed over a year and a half after first pleading a §2 vote dilution claim, to allege that BCVAP is the more appropriate metric. DE126 ¶¶97-99. When changing their position to rely upon BCVAP, they alleged for the first time that an additional majority-black district could be drawn in the Huntsville area. *Id.* ¶88.

62.    They insist that the Huntsville region has a significant noncitizen population, which artificially deflates the BVAP share, in their view. *See* PX6 ¶15. But

Montgomery County has a similarly significant noncitizen population, as their expert Mr. Fairfax acknowledged. Tr. 289:9. Yet Plaintiffs did not rely on BCVAP in Montgomery, nor did Mr. Fairfax examine whether BCVAP would be the more appropriate metric to use in that part of the State. Tr. 289-90.

63.    In fact, Mr. Fairfax divulged that he decided to investigate the noncitizen population of Huntsville *after* creating a number of maps. Tr. 278:1-6, 284:16-20, 284:21-285:4. "[O]ne of the deciding factors" to move away from BVAP and toward BCVAP was that his majority-BVAP district "wasn't the best choice." Tr. 285-86. Compared to his majority-BCVAP district, it was far less compact and split more counties and precincts, as discussed *infra*.

64.    Plaintiffs' rationale becomes clear: they believe they should be permitted to abandon BVAP in favor of BCVAP because doing so allows them present a more compact district, and a small percentage of noncitizens just so happen to reside in the area. The Court doubts whether this "standard" provides "clear lines for courts and legislatures alike," as required by §2. *Strickland*, 556 U.S. at 17.

65.    "Whether citizenship should be taken into account for the first *Gingles* precondition is a question of law." *Negron v. City of Miami Beach, Fla.*, 113 F.3d 1563, 1570 (11th Cir. 1997).

66.    Citizenship estimates, in the right context, have served a particular, well-defined purpose: to determine whether *Hispanic* citizenship rates are so *low*

that a majority Hispanic VAP district would constitute a "hollow" majority, i.e., one that would not perform. *LULAC v. Perry*, 548 U.S. 399, 429 (2006); *see also* Tr. 951:12-25. Using CVAP to determine whether a majority Hispanic district would perform for Hispanic voters does not alter *Strickland*'s bright-line 50%+1 VAP requirement.

67.    As a matter of fact and commonsense, Hispanic VAP in such districts will always exceed Hispanic CVAP. But if a substantial number of the Hispanic voting-age population are not citizens, as is common in immigrant-heavy populations, then a bare majority HVAP district may not contain an "*effective* voting majority" of Hispanic voters. *Negron*, 113 F.3d at 1569 (quotation omitted) (emphasis added).

68.    In *Negron v. City of Miami Beach*, for example, §2 plaintiffs presented illustrative districts with Hispanic VAPs of 62%, 61%, and 55%. 113 F.3d at 1567. But these would not give Hispanics "a meaningful potential" "to elect a representative" because the Hispanic citizenship rate was 50% compared to a non-Hispanic rate of 88%—a *negative* 38% difference. *Id.* at 1567, 1569. As a result, HCVAP dropped below 50% in all three illustrative districts. *Id.* at 1567. The plaintiffs, accordingly, lost their §2 vote dilution case at *Gingles* step one.

69.     Likewise, in *LULAC*, one of the challenged districts "had a majority of Latino voting age population—although clearly not a majority of citizen voting age population and certainly not an effective voting majority." 548 U.S. at 425.

70.     Indeed, in every case the parties have presented to the court in which citizenship is taken into account for the first *Gingles* precondition, Hispanic VAP *exceeds* Hispanic CVAP.[4] Here, in contrast, BVAP falls well below BCVAP.

71.     At closing argument, counsel for Plaintiffs was unable to name another case where CVAP was used as Plaintiffs suggest it should be used here. Tr. 1679:21-1680:21. Plaintiffs' counsel was "confident" that such cases exist "because of the way that the Fifth and Ninth [Circuits] have interpreted the *LULAC* decision," *id.*; however, recent VRA cases out of the Fifth Circuit involving majority-black districts use BVAP only for *Gingles* 1. *See, e.g.*, *Robinson v. Ardoin*, 86 F.4th 574, 590 (5th Cir. 2023); *Miss. State Conf. of NAACP v. State Bd. of Election Comm'rs*, 2024 WL 3275965, at *18-*24 (S.D. Miss. July 2, 2024).

---

[4] *See, e.g.*, *Rios-Andino v. Orange County*, 51 F. Supp. 3d 1215, 1225 (M.D. Fla. 2014) (HVAPs of 52.7% and 54.6% were not majority-HCVAP) (citing Expert R. of Theodore S. Arrington ¶31, *id.*, 2013 WL 10163063); *Reyes v. City of Farmers Branch*, 586 F.3d 1019, 1021 (5th Cir. 2009) (HVAP of 75%); *Rodriguez v. Harris County*, 964 F. Supp. 2d 686, 736 (S.D. Tex. 2013) (HVAP of 69%); *Cisneros v. Pasadena Indep. Sch. Dist.*, No. 4:12-CV-2579, 2014 WL 1668400, at *6 (S.D. Tex. Apr. 25, 2014) (HVAPs of 79.9%, 81.9%, and 81.8%); *Rodriguez v. Harris County*, 964 F. Supp. 2d 686, 736 (S.D. Tex. 2013) (HVAP of 69%); Supplemental Expert R. of David Ely at 3-5, *Benavidez v. City of Irving*, No. 3:07-cv-1850, ECF 38-6 (N.D. Tex. 2009) (HVAPs of 63.8%, 66.4%, 70.9%); Expert R. of Robert M. Stein at 9, *Elizondo v. Spring Branch Indep. Sch. Dist.*, No. 4:21-cv-1997, ECF 41-1 (S.D. Tex. 2023) (HVAP of 71.8% and HCVAP of 52.8%).

72.    This would appear to be the first case to use BCVAP to push a BVAP crossover district over the 50% *Gingles* 1 threshold.

73.    Indeed, Mr. Fairfax, when asked on cross whether he had ever, "before this case," "determined that only Black CVAP is the appropriate metric to use in a *Gingles* 1 illustrative plan," answered, "I believe probably not." Tr. 343:3-7.

74.    Nor was Dr. Oskooii able to name a case "where a plaintiff has used CVAP data to argue that a minority voting age population district satisfies *Gingles* 1." Tr. 405:15-406:9.

75.    And Dr. Trende has never seen CVAP used as a substitute for VAP when the 50% VAP threshold is not crossed. Tr. 951:14-15.

76.    In theory, citizenship estimates could be used to confirm whether a majority-black VAP district would perform where black citizenship rates were significantly lower than white citizenship rates, although, again, Plaintiffs have not made the Court aware that any such case exists. Tr. 951:4-12. But where there is "no indication" of "any disparity between black and white citizenship rates," there is no need to refine black voting-age population by citizenship. *Negron*, 113 F.3d at 1568.

77.    Here, illustrative SD7 in Fairfax Plans 1 and 2A is not majority-BVAP; it would undoubtedly "perform" for black voters at well under 50% BVAP (DX7 at

27-28; DX8 at 32-33), and no significant disparity exists in the citizenship rates be-tween black and white Alabamians generally and in Northern Alabama specifically (Tr. 358:18-20). Both rates approach 100%. Tr. 358:18-20.

78.    Plaintiffs try to manufacture the necessary disparity by comparing black rates to non-black rates, but this creates a gap in the wrong direction. *See* Tr. 253-54, 358-59.

79.    The Court has found no example—and Plaintiffs have provided none—of a factfinder turning to citizenship estimates where the minority citizenship rate *exceeds* that of the majority. *Cf. Pope v. County of Albany*, No. 1:11-cv-736, 2014 WL 316703, at *13 n.23 (N.D.N.Y. Jan 28, 2014) (The "citizenship rate of black County residents over 18 years of age must be *less* than the citizenship rate of the population as a whole.").

80.    In short, the conditions predicate for using "voting age population as refined by citizenship" to "establish that the minority group constitutes an effective voting majority" plainly are not present here. *Negron*, 113 F.3d at 1569 (quotation omitted).

81.    Even if they were, SD7's fatal flaw remains: its BVAP in Plans 1 and 2A fails to clear the 50%+1 threshold established by *Strickland*.

82.    For that reason, this case is in important respects like *Pierce v. North Carolina State Board of Elections*, where the district court rejected an illustrative §2

district with a BCVAP of just over 50% but a BVAP of slightly under 50%. 713 F. Supp. 3d 195, 224, 227 (E.D.N.C. 2024). Presented with no evidence of a "significant black noncitizen population in the counties at issue," the court, citing *Negron*, rejected the plaintiffs' CVAP data and with it the attempt to use an illustrative crossover district as evidence of vote dilution. *Id.* at 225.

83.    Several additional complications Plaintiffs encounter when relying upon citizenship estimates to satisfy the first *Gingles* precondition bolster the Court's conclusion that BCVAP is the wrong metric to use in this case.

84.    *First*, SD7's CVAP estimate in Plan 1 is based on old data, specifically 2021 5-year ACS data. Tr. 315:18. Using the newer 2022 5-year ACS data, SD7's CVAP estimate in Plan 1 falls below 50%. Tr. 316:11-13.

85.    Accordingly, SD7 in Plan 1 is a crossover district using either BVAP or BCVAP. It cannot constitute evidence of vote dilution even under Plaintiffs' faulty CVAP framework.

86.    *Second*, CVAP estimates derived from ACS survey responses come with sampling error. Tr. 311:23-24; 406:10-12, 423:14-15; 950:14-15. In contrast, BVAP enumerations provided by the Decennial Census do not. Tr. 313:22-24.

87.    To account for sampling error, survey results (like political polls or ACS citizenship estimates) are expressed in terms of error margins and confidence intervals. Tr. 960:1-2, 10-12.

88.    A point estimate—for example, 50.19% BCVAP for SD7 in Plan 2A—is the most likely value that produces that particular survey result, but it is *not* the most likely value of the underlying population. Tr. 987:23-25, 998:25-999:2, 1000:8-14.

89.    The margin of error extends in both directions from the point estimate, creating the confidence interval, which provides a reasonable degree of certainty that the true population value falls somewhere within that interval. Tr. 997:16-25.

90.    But, as Dr. Trende explained, "the confidence interval doesn't tell us anything about where the true population is." Tr. 998:9-10. In other words, error margins and confidence intervals do not permit probability statements about whether it is more likely than not that the true population falls on one side of the point estimate or the other. Tr. 987:20-22, 997:16-25.

91.    Although Mr. Fairfax did not discuss the margin of error for SD7's CVAP estimate in his initial report, he later calculated it to be roughly plus or minus 2 to 3%. Tr. 312:2, 25.

92.    Dr. Trende calculated a similar margin of error, which Mr. Fairfax considered "very reasonable." PX9 ¶17; Tr. 313:14-18.[5]

---

[5] Dr. Trende calculated the sampling error by using a formula provided by the Census Bureau. https://www.census.gov/content/dam/Census/library/publications/2020/acs/acs_general_handbook_2020_ch08.pdf (last visited Dec. 4, 2024).

93.     Taking SD7's BCVAP point estimate in Plan 2A of 50.19%, PX10 ¶7, and using a +2% margin of error, the Court could reasonably conclude that SD7's true BCVAP value lies *somewhere* between 48.19% and 52.19%.

94.     Problematically for Plaintiffs, because the confidence interval extends below 50%, the Court cannot find by a preponderance of the evidence that SD7's BCVAP is above 50%. Tr. 989:18-990:2, 1000:15-24.

95.     Mr. Fairfax insists, contrarily, that because a little more of the confidence interval rests above 50% than below, it is more likely than not that SD7's true BCVAP population is greater than 50%. PX9 ¶19 ("every person above the 50% point makes it even more likely that the actual value falls above 50% despite any small, estimated margin of error"); Tr. 322:17.

96.     The Court does not credit this statement, as it contradicts sound principles of statistics along with every other expert to opine on margins of error and confidence intervals in this case.

97.     Dr. Trende, as noted *supra*, disagrees. Tr. 996:2-997:10.

---

Looking at the formula found on page 6, Plaintiffs pointed out that Dr. Trende's formula used a plus sign instead of a minus sign. Tr.1059:24-1060:1. Plaintiffs ignored the handbook's statements that "if the value under the square root is negative, then substitute a 'plus' for the 'minus' sign under the square root in formula (6)." Further, Plaintiffs never showed that any potential error would have reduced the sampling error from around 2% to below 0.2%, which would be necessary to rebut Dr. Trende's overall conclusion that the relationship between the point estimate and the 50% threshold are not statistically significant. Tr. 1060:2-8.

98.     Dr. Oskooii stated that "when you use confidence intervals, you cannot make statements about the probability of where exactly the true value is. All you can say is … whether the underlying true value falls in that range." Tr. 439:6-9; *see also* Tr. 425:19-22, 452:2-3. He even acknowledged that using ACS estimates, it is not possible to know the actual BCVAP population of SD7. Tr. 416:21-23.

99.     Dr. Liu, when describing point estimates and confidence intervals, said that the true value "could be as low as the low point, as high as the high point," and "everything between." Tr. 71:15-16. On cross, Dr. Liu was asked whether, if presented with a hypothetical "point estimate of 51%" support for a candidate by a particular racial group, he would be "willing to conclude that there is majority support for that candidate." Tr. 110. He answered that to make that conclusion would be "very questionable," given the confidence interval. Tr. 110. Because the interval would dip below 50%, he would not "have sufficient empirical evidence to conclude that" voting "is racially polarized." Tr. 111.

100.    Dr. Burch, when testifying about ACS estimates of education attainment, noted that when two values are "within the margin of error of each other … they would statistically be the same." Tr. 729:16-18.

101.    Dr. Bonneau, at one point in his report, concluded that the relationship between a point estimate and a threshold number (there, zero) was not statistically significant. DX1 ¶31. At trial, he explained that "estimates are by definition

imprecise," and when the margin of error "range" "includes 0," then the relationship between the estimate and the "0" threshold is "not statistically significant." Tr. 1490, 1537.

102. The margin of error problems do not end there for Plaintiffs. Illustrative SD7 splits block groups, and because ACS citizenship data are not available at the more granular block level, an additional, unknowable amount of error necessarily accompanies SD7's BCVAP estimates. Tr. 377:15-22; *see also* Tr. 236:23, 237:22.

103. A great deal of testimony at trial focused on so-called disaggregation and aggregation, a process by which CVAP can be estimated for a district that splits block groups. The Court finds this testimony largely irrelevant, as disaggregation in no way solves Plaintiffs' margin of error problem; in fact, it appears to compound it by making the error margin impossible to calculate. Tr. 377:15-22, 423:14-19.

104. "Statistics are mischievous tools, especially in court, if they are not prepared and offered with a convincing explanation of their mathematical characteristics and limitations." *Overton v. City of Austin*, 871 F.2d 529, 545 (5th Cir. 1989) (Jones, J., concurring). Plaintiffs and their experts have not convincingly explained their BCVAP estimates' characteristics and limitations.

105. *Finally*, Plaintiffs, through their expert Mr. Fairfax, insist that citizenship estimates are preferable to a BVAP enumeration as "a more appropriate racial population group to determine the majority of '*eligible*' voters (because noncitizens

are not eligible to vote and when there is a significant amount, they should be removed from the analyzed population group)." PX6 ¶74; *see also* PX14 ¶26.

106.   But if Plaintiffs are right that eligibility is what matters most, they should have accounted for citizens of voting age who are not eligible to vote under Alabama law, such as disenfranchised felons, just as they account for noncitizens. *See* Ala. Code §17-3-30.1. Mr. Fairfax acknowledged that such voters exist, yet he did not take them into account. Tr. 320:21-321:4. Dr. Burch reports that 8.6% of the eligible population in Alabama, and 14.7% of the black eligible population, is disenfranchised due to a disqualifying felony conviction. PX11 at 18. If those same ratios are present in the Huntsville area, illustrative SD7 in Fairfax Plan 1 would have a black *eligible citizen* population of just 46.8%. DX7 at 23.

107.   Voter registration data reported by Mr. Fairfax and relied upon by Plaintiffs cannot rehabilitate their CVAP estimates. *See* Tr. 266:8. Not all eligible voters are registered to vote, as Mr. Fairfax's own data demonstrate, PX70 at 10, PX9 ¶50. Also, his data do not report voter registration rates, which can and do fluctuate, Tr. 320:2-3. In fact, if some non-black citizens in District 7 registered to vote, the percentage of black registered voters might dip below 50 percent. Tr. 320:13-14.

108.   Given the significant differences between Decennial Census data and ACS data, it should be no surprise that Alabama's redistricting process is structured according to the former and not the latter. *See* Ala. Const. art. IX, §§198-201; Ala.

Code §17-14-70; *id.* §17-14-70.1; *see also* PX6 ¶18 (restating Alabama's 2021 Re-apportionment Committee Redistricting Guidelines, which provide that the "total Alabama state population … as reported by the 2020 Census, shall be the permissible database used for the development, evaluation, and analysis of proposed redistricting plans").

109.   If ACS data are permitted to supplant Decennial Census data whenever convenient to push an otherwise-deficient illustrative district across the *Gingles* 1 threshold, the consequence will be "constant redistricting" with its "accompanying costs and instability." *LULAC*, 548 U.S. at 421 (opinion of Kennedy, J.,); *see also Reynolds v. Sims*, 377 U.S. 533, 583 (1964) ("Limitations on the frequency of reapportionment are justified by the need for stability and continuity in the organization of the legislative system ….").

110.   During each year's fresh slate of §2 suits, federal courts will be asked to scrutinize Alabama's districting plan using data unavailable to the Legislature who enacted the plan and unapproved for the purpose of redistricting by Alabama law.[6]

---

[6] *See* https://www.census.gov/programs-surveys/acs/news/data-releases/2021/release-schedule.html (last visited Dec. 5, 2024) (Dec. 8, 2022, release date for 2021 5-year ACS data)/
https://www.census.gov/programs-surveys/acs/news/data-releases/2021/release-schedule.html (last visited Dec. 5, 2024) (Dec. 7, 2023, release date for 2022 5-year ACS data).

111.   Put differently, the State's plan may comply with §2 when passed (based on Census data) but *become* illegally dilutive of minority voting strength after three or four years (based on ACS data alone). Section 2 does not require State Legislatures during the redistricting process to guess about how they think populations and demographics will look years down the road. But that is the standard to which Plaintiffs are trying to hold the 2021 Alabama Legislature. The most direct way to avoid this impossible situation is to limit ACS data to its proper function: as a tool to confirm whether a district will perform for an immigrant-heavy minority group, not as a substitute for Census VAP data.

112.   In sum, Plaintiffs have failed to "show by a preponderance of the evidence that the minority population" in illustrative SD7 in Plans 1 and 2A "is greater than 50 percent." *Strickland*, 556 U.S. at 19-20.

**B.    Plaintiffs' remaining illustrative districts are not "reasonably configured."**

113.   In "case after case," the Supreme Court has emphasized that §2 "never requires adoption of districts that violate traditional redistricting principles." *Allen v. Milligan*, 599 U.S. 1, 29 n.4 & 30 (2023). Such districts are, by definition, not "reasonably configured," *id.* at 18, and cannot "demonstrate the existence of a proper remedy" for the alleged §2 violation, *Burton v. City of Belle Glade*, 178 F.3d 1175, 1199 (11th Cir. 1999).

114.   "[T]raditional race-neutral districting principles" are violated when they are subordinated "to racial considerations." *Miller v. Johnson*, 515 U.S. 900, 916 (1995).

115.   Plaintiffs' illustrative districts in the Huntsville and Montgomery areas subordinate Alabama's traditional districting principles to race.

116.   Because SD7 in Plans 1 and 2A fails *Gingles*'s numerosity requirement, there is no need to consider whether those two versions of the district are reasonably configured. That leaves only SD7 in Plan 3 and SD25 in Plan 1.

**SD7 in Plan 3**

117.   Due to "the uneven geographical dispersal of the African-American population" in the Huntsville area, *Sensley v. Albritton*, 385 F.3d 591, 597 (5th Cir. 2004), SD7 in Plan 3 "reaches out and grab[s]" at least five isolated clusters of black residents in Lawrence, Limestone, Madison, and Morgan counties, *LULAC*, 548 U.S. at 433; DX8 at 19-20.



PX69 at 5.

118.   Described by Dr. Trende as resembling "a baby dragon with an overbite in flight," DX8 at 18, the district's tail sweeps through Huntsville and then hooks northwest; its hindquarters twist away from Madison to capture the Redstone Arsenal and Huntsville International Airport; its wings span from Athens in the North to Decatur in the South (carefully covering only portions of both cities); and its head and neck protrude into the rural precincts west of Decatur. About two-thirds of the district sits above the Tennessee River, with the rest below.

119.   This version of SD7 is the only of the four presented by Mr. Fairfax with a BVAP over 50%. PX70 at 144, 146 (50.04%, to be precise—50 black voting-age persons over the threshold).

120.   Plaintiffs' illustrative plans must respect the State's criteria of geographic compactness, minimizing county splits, and avoiding incumbency contests.

*See* PX6 ¶19. Not only does SD7 in Plan 3 fare worse on each of these principles than the State's 2021 Plan, it does so in a superlative fashion. The districts the plan twists in the Huntsville area become some of the *least* compact in the State; the new majority-minority district cobbled together between Huntsville and Decatur contains the *most* county splits; and to top it off, the plan forces contests between incumbents even though the 2021 Plan demonstrates none need exist.

121.  The first *Gingles* precondition serves as a "gatekeeping mechanism" that here prevents Plaintiffs' claims based upon this unreasonably configured illustrative district from passing further. *Dillard v. Baldwin Cnty. Comm'rs*, 376 F.3d 11260, 1268 (11th Cir. 2004). Reasonableness is not merely in the eye of the beholder. Were it so, the "ascertainable and objective standards" enforced by the first *Gingles* precondition would give way to a veritable "Pandora's Box" of meritless §2 claims based on "vague, subjective criteria." *Id.* at 1268.

122.  The only explanation for SD7's unreasonable and contorted configuration is its subordination of traditional districting principles to its racial target of 50%+1 BVAP.

123.  The evidence of racial predominance in Plan 3 is clear-cut. A map that evinces a "policy of prioritizing mechanical racial targets above all other districting criteria (save one-person, one-vote)" constitutes "evidence that race motivated the

drawing of particular lines." *Ala. Legislative Black Caucus v. Alabama*, 575 U.S. 254, 267 (2015).

124.    Plan 3 is such a map. This becomes perspicuously clear through a comparison of Mr. Fairfax's Plan 3 not only to the Enacted Plan but to Mr. Fairfax's first plan, his preferred plan—"preferred" because with respect to traditional principles, "[i]t performs better." Tr. 285-86, 326.

 

DX7 at 7 (SD7 in Plan 1 on the left); DX8 at 19 (SD7 in Plan 3 on the right).

125.    The progression from Plan 1 to Plan 3 tells a story of ever-intensifying "racial tinkering," *Miller*, 515 U.S. at 919, for the sole purpose of hitting "an announced racial target," *Cooper*, 581 U.S. at 300. *See also* Tr. 1010, 1031:20-25.

126.    As discussed *supra*, SD7's BVAP in Plan 1 is below 50% while its BCVAP point estimate sits just above 50%, well within the margin of error. Although, in Mr. Fairfax's view, Plans 1 and 2A "were better than Illustrative Plan 3," Tr. 290:22, he came forward with Plan 3 to present a version of SD7 that achieved

the 50%+1 numerosity threshold with "BVAP as well." Tr. 270:17-20. There's the "announced racial target." *Cooper*, 581 U.S. at 300.

127.   As SD7's BVAP increased by about three percentage points from 46.8% in Plan 1 to 50.04% in Plan 3, essentially every traditional districting principle suffered.

128.   Thus, the bizarre contours SD7 takes in the third plan cannot be explained away by reference to some better-respected traditional principle. Instead, via comparison to SD7 in Plan 1, the district's shape in Plan 3 becomes "unexplainable on grounds other than race." *Alexander v. S.C. NAACP*, 144 S. Ct. 1221, 1236 (2024).

129.   First, to get from Plan 1 to Plan 3, the principles of avoiding county and precinct splits were subordinated to race.

130.   Plan 1, like the Enacted Plan, splits 19 counties; Plan 3 splits 21. PX6 at 48; PX9 at 37. Of those 21 splits, four lie in SD7.

131.   SD7 splits two precincts in Plan 1 but four in Plan 3. PX59 at internal 175; PX70 at 169; Tr. 333 at 25.

132.   SD7 in Plan 1 comprises portions of three counties; in Plan 3, SD7 is a patchwork of *four* partial counties. Tr. 329:20-330:8; DX8 at 32.

133.   These splits do not lead to a greater respect for compactness, incumbency protection, or any traditional districting principle. No, the only metric

that was given more weight as a result of these additional splits was the district's BVAP percentage. In fact, the splits were necessary to achieve the "50%-plus racial target." *Cooper*, 581 U.S. at 300.

134.    Dr. Trende's unrebutted testimony explains that the *only way* to achieve a 50% BVAP district in the Huntsville region is to split four counties. DX8 at 32. He independently calculated that "selecting the highest BVAP percent precincts, even without respect for contiguity," in Morgan, Madison, and Limestone Counties "will yield at best a 48.1% BVAP district within the constraints imposed by one-person-one-vote." DX8 at 32. That is consistent with SD7 in Fairfax Plans 1 and 2A, which do not extend into Lawrence County and thus do not exceed 50% BVAP. Therefore, Mr. Fairfax *needed* to pick up the black population in Lawrence County to hit his target, exalting his racial benchmark above the traditional principle of min-imizing county splits. Likewise, if any of the four precincts SD7 split were kept whole, the district's BVAP would drop below 50%. DX8 at 27.

135.    Second, to get from Plan 1 to Plan 3, keeping districts compact was subordinated to race. SD7's compactness scores are near the bottom of the pile in Plan 3 and about 25% less compact than in Plan 1. PX59 at internal 156-58; PX70 at 157-59; DX8 at 24-26; Tr. 326:20.

136.   Mr. Fairfax candidly acknowledges that "one of the deciding factors" that led him to use only BCVAP for SD7 in Plans 1 and 2A was that doing so allowed him to keep the district more compact. Tr. 285:25.

137.   Compactness was not given less weight in Plan 3 for the sake of improving another non-racial factor like splitting fewer counties or better respecting some community of interest. Instead, in Mr. Fairfax's own words, it had to take a hit "[i]n order to meet that BVAP." Tr. 336:1.[7]

138.   Mr. Fairfax insists, nonetheless, that he was simply "balancing the criteria" (Tr. 287) and making "trade offs" (Tr. 245:5), as all mapmakers do. That riposte does not work here. This was a "balancing act" in name only. Tr. 246:20, 286-87. When Plaintiffs inserted the goal of adding an additional majority-BVAP district in the Huntsville area, the only "trade off" made was to downgrade as many traditional districting principles as necessary to hit the racial target. Tr. 247:5.

139.   The Court visually confirms that race predominates in SD7 with a side-by-side examination of dot-density and choropleth maps of the area. These maps should be viewed in conjunction because they communicate "different complementary things." Tr. 1013:25-1014:6. Choropleths show percentages—how black or how white an area is—while dot density maps show the distribution of individuals

---

[7] Plan 3 also forces contests between two pairs of incumbents (four Senators total), whereas Plan 1 pairs one pair. Tr. 332; PX6 ¶92.

in a given area (where one blue dot equals ten black persons of voting age). *Id.* For example, looking at the Redstone Arsenal and the Wheeler National Wildlife Refuge precincts only in the choropleth map does not reveal just how unpopulated these areas are. Tr. 1017:6-21.[8] Likewise, looking at the head of the baby dragon in the dot-density map does not by itself depict the relatively high BVAP percentages those precincts contained.



DX8 at 28, 27.

140.   As these maps demonstrate, SD7 maneuvers through parts of four counties to pick up only the densest pockets of the black voting-age population. The district includes thirty-two of the thirty-five highest-BVAP precincts in Lawrence, Limestone, Madison, and Morgan counties (leaving out precincts ranked 9th, 17th,

---

[8] Plaintiffs and Dr. Oskooii criticized Dr. Trende initial dot density plots for layering the black population on top. Dr. Trende testified that he chose that layering because the compactness of the minority population is at issue, which is harder to assess with the white population layered on top. Tr. 1019:5-14.

and 22nd). DX8 at 29.[9] SD7 carefully plucks all of the top-BVAP precincts out of Huntsville and Decatur and then proceeds westward to split Lawrence County to pick up a few high-BVAP rural precincts. Those precincts from the Lawrence County split are crucial to nudging the district's BVAP above 50%. DX8 at 32.

141.    When asked how he could explain these features, Mr. Fairfax answered: "You can't create necessarily majority-black district without including majority-black precincts or VTDs in this particular case." Tr. 338:4-9. And of the other versions of Plan 3 that Mr. Fairfax privately prepared, this racially gerrymandered map "was the best one" that was both majority BVAP and BCVAP. Tr. 323:23-24.

142.    Plan 3 is a "'textbook example' of race-based districting" akin to North Carolina's racially predominate plans at issue in *Cooper v. Harris*, where the General Assembly dampened respect for traditional principles in order to achieve the "racial target" of creating majority-BVAP districts. 581 U.S. at 299. In *Cooper*, hitting the target meant sacrificing "county or precinct lines" a bit, resulting in "a district with stark racial borders." *Id.* at 300.

143.    Plan 3 is this and more. It subordinates numerous districting criteria to the 50%+1 BVAP target and produces "boundaries amplifying divisions between

---

[9] One of these precincts, sitting in the middle of Lawrence County, "is not contiguous to the district and cannot be added without including a sizeable White population" while the other two are further West in Lawrence County and are unnecessary to achieve the 50%+1 target. DX8 at 30-31.

blacks and whites." *Id.* at 300-01. No State could constitutionally enact such plan. When a State tried in *Cooper*, the plan was resoundingly rejected.

144.    In sum, SD7's "combination of a bizarre, noncompact shape and over-whelming evidence that that shape was essentially dictated by racial considerations of one form or another is exceptional." *Bush*, 517 U.S. at 973. That Plaintiffs subordinate traditional districting principles to race is obvious when comparing Plan 3 to the Enacted Plan. And it's obvious when comparing Plan 1 (with its BCVAP target) to Plan 3 (with its BVAP target). This is borne out by Plan 3's precise calibration of the racial composition of SD7 by scooping black Alabamians from Huntsville and lumping them together with black Alabamians from Decatur before sprinkling in just enough of Lawrence County to clear 50%+1. Plaintiffs cannot satisfy the first precondition with this Plan, both because race predominated in its drawing, *see Allen*, 599 U.S. at 33 (plurality op.) (noting that *Gingles* I map must not cross "[t]he line that we have long drawn … between consciousness and predominance"), and because that predominance resulted in a district that is not reasonably configured, *id.* at 18 (stating that to be "reasonably configured" a district must "comport[] with traditional districting criteria").

**SD25 in Plan 1**

145.    Plaintiffs' proposed majority-black district in the Montgomery area also subordinates traditional districting principles to racial considerations. Unlike

with SD7 in the Huntsville area, the Court does not have the benefit of a progression of maps showing precisely how Mr. Fairfax subordinated traditional principles to race in order to hit the racial target. Nevertheless, manifestations of race-predominant districting are present in illustrative SD25. *See Miller*, 515 U.S. at 917 ("Although by comparison with other districts the geometric shape of the [district] may not seem bizarre on its face, when its shape is considered in conjunction with its racial and population densities, the story of racial gerrymandering … becomes much clearer.").

146.    Under the Enacted Plan, SD26's BVAP is 66.1% and neighboring SD25's BVAP is 29.01%. PX59 at internal 289. In 2017, following remand from the Supreme Court, the Middle District of Alabama held that race predominated in SD26 and others in the 2012 State Senate Plan. *ALBC III*, 231 F. Supp. 3d 1026, 1045 (M.D. Ala. 2017). Under that previous plan, SD26's BVAP was 72.70%. *ALBC I*, 989 F. Supp. 2d 1227, 1263 (M.D. Ala. 2013).

147.    Mr. Fairfax served as the "Democratic Conference plaintiffs' mapmaker." *ALBC III*, 231 F. Supp. 3d 1026, 1047 (M.D. Ala. 2017); Tr. 228:14-16. The Court takes judicial notice that the State's remedial version of SD26 had a BVAP of 67.28%. *ALBC III*, No. 2:12-cv-691, Doc. 336-1 at 9 (M.D. Ala. filed May

30, 2017); *id.* Doc. 336-11 at 14 (filed May 30, 2017). Neither set of plaintiffs objected to the contours of SD26 in the 2017 Remedial Plan. *Id.* Doc. 366 ¶¶2, 7 (filed Sept. 20, 2017).

148.   Then, just months after the Legislature enacted the 2021 Plan, and just a few years after the *ALBC* court held that race predominated in SD26, Plaintiffs alleged that §2 requires more race-based districting in Montgomery in order to add a new majority-BVAP district (SD25). DE54 ¶¶6, 234.

149.   The City of Montgomery under the 2021 Plan is almost entirely contained within SD26, which itself is contained in one county—Montgomery County. *See* PX58 at 4 (shown right).



150.   Plaintiffs' illustrative plan splits Montgomery in half between SD25 and SD26.

151.   One of Mr. Fairfax's stated goals was to produce an illustrative plan that added majority-black districts "without eliminating any of the eight existing majority Black Senate Districts." PX6 ¶55.

152.  Thus, to achieve the racial goal of keeping SD26 majority-black after moving Southeast Montgomery into SD25, Mr. Fairfax needed to pick up more black population. He found those voters in Elmore County on the way to Lake Jordan.

153.  To get those voters, he split the city of Prattville between SD26 and SD30, which was entirely contained within SD30 in the Enacted Plan. Tr. 299:1-11.

154.  The Court finds that the illustrative plan subordinates the traditional districting principle of respecting communities of interest "to racial considerations." *Miller*, 515 U.S. at 916.

155.  Mr. Fairfax divulged at trial that he did not even look to see whether the communities joined, e.g. Lake Jordan and West Montgomery, had "something in common." Tr. 296:8.



156.    Illustrative SD25, as a result of chopping Montgomery in half, contains a heavily concentrated black population in the north, but still not enough to be majority-BVAP. Thus, to hit the 50%+1 mark, it extends southward to pick up isolated rural black populations throughout the countryside that have little, if anything, in common with the urban Montgomery population. DX7 at 29 (pictured left, each blue dot is 10 black voters, each orange x is ten white voters).

157.    In sum, Plaintiffs' illustrative districts were "obviously drawn for the purpose of separating voters by race," *Shaw v. Reno*, 509 U.S. 630, 645 (1993), and they subordinate the State's traditional redistricting principles to Plaintiffs' own "predominant, overriding desire to create [two more] majority-black districts," *Abrams v. Johnson*, 521 U.S. 74, 81 (1997).

### C.    White bloc voting in the Huntsville and Montgomery areas is not "legally significant."

158.    At *Gingles* steps two and three, the "purpose of inquiring into the existence of racially polarized voting is twofold: to ascertain whether minority group members constitute a politically cohesive unit and to determine whether whites vote

sufficiently as a bloc usually to defeat the minority's preferred candidates." *Gingles*, 478 U.S. at 56.

159.   Plaintiffs' evidence shows that black Alabamians in the Huntsville and Montgomery areas are politically cohesive. As in every other State in the union with a sizeable black population, black citizens in Alabama overwhelmingly support the Democratic Party.

160.   However, Plaintiffs have not proven "racial bloc voting that is legally significant," as opposed to "statistically significant." *Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 212 (4th Cir. 2024) (cleaned up); *see also LULAC v. Clements*, 999 F.2d 831, 850 (5th Cir. 1993) (en banc).[10]

161.   "[I]n the absence of significant white bloc voting it cannot be said that the ability of minority voters to elect their chosen representatives is inferior to that of white voters." *Gingles*, 478 U.S. at 48 n.15.

162.   "The key inquiry under *Gingles*' third factor, then, is whether racial bloc voting is operating at such a level that it would actually minimize or cancel minority voters' ability to elect representatives of their choice, *if no remedial district were drawn*." *Pierce*, 97 F.4th at 212 (cleaned up) (emphasis added).

---

[10] In *Allen v. Milligan*, the State did not dispute "that white bloc voting usually defeated the election of minority-preferred candidates, so the Court did not opine on the evidence necessary to carry the plaintiffs' burden." *Pierce*, 97 F.4th at 216 (citing *Allen*, 599 U.S. at 22). On this record, Defendant now disputes that legally significant white bloc voting exists in the Huntsville and Montgomery areas.

163.   Thus, Plaintiffs must demonstrate that "black voters' candidates of choice 'would usually be defeated without a VRA remedy'"—that is, "unless BVAP in the contested districts exceeds 50% plus one vote." *Pierce v. N.C. State Bd. of Elections*, 713 F. Supp. 3d 195, 230 (E.D.N.C. 2024) (quoting *Covington v. North Carolina*, 316 F.R.D. 117, 168 (M.D.N.C. 2016)).

164.   Several cases exemplify this rule. First, in *Bartlett v. Strickland*, the Supreme Court laid the groundwork by holding "that § 2 does not require crossover districts." 556 U.S. at 13, 23. Instead, "§2 can require the creation of" "majority-minority districts," where "a minority group composes a numerical, working majority of the voting-age population." *Id.* at 13, 24.

165.   The "majority-minority rule" has obvious implications not only for the first *Gingles* precondition, as discussed *supra*, but for the third precondition as well. *Id.* at 18. On that point, the Supreme Court stated that in "areas with substantial crossover voting it is unlikely that the plaintiffs would be able to establish" *legally significant* white bloc voting. *Id.* at 24. "In those areas"—where districts below 50% BVAP would perform due to white crossover voting—"majority-minority districts would not be required in the first place." *Id.*

166.   The Supreme Court then applied that rule against North Carolina in *Cooper v. Harris*, where plaintiffs challenged two majority-minority congressional

districts as racial gerrymanders. 581 U.S. at 296. The Court held that North Carolina's §2 defense failed at the third *Gingles* precondition where "electoral history" showed that black voters could elect their preferred candidates at "less than a majority." *Id.* at 302. Because of "substantial crossover voting," "majority-minority districts would not be required" under §2. *Id.* at 306 (quoting *Strickland*, 556 U.S. at 24).

167.    In the parallel constitutional challenge to North Carolina's State House and Senate districts, the three-judge district court in *Covington v. North Carolina* likewise rejected the State's §2 defense at *Gingles*'s third step. The district court found dispositive the General Assembly's failure to analyze "whether majority bloc voting existed at such a level that the candidate of choice of African-American voters would usually be defeated *without a VRA remedy*." 316 F.R.D. at 168 (emphasis added).

168.    And most recently, again in North Carolina, §2 plaintiffs failed to prove legally significant white bloc voting in the northeastern portion of the State in part because their evidence did not "show that black voters' candidates of choice cannot win elections unless BVAP in the contested districts exceeds 50% plus one vote." *Pierce*, 713 F. Supp. 3d at 230.

169.    One probative way of demonstrating legally significant racial bloc voting is to conduct what some call a "district effectiveness analysis, which is a district-

specific evaluation used to determine the minority voting-age population level at which a district becomes effective in providing a realistic opportunity for voters of that minority group to elect candidates of their choice." *Pierce*, 97 F.4th at 213 (cleaned up).[11]

170.   If the analysis "yield[s] a 'minority voting-age population level' below 50% which provides 'a realistic opportunity for … voters of that minority group to elect candidates of their choice,'" then "legally significant racially polarized voting does not exist" in the challenged area. *Id.* at 232 (quoting *Covington*, 316 F.R.D. at 168 n.46).

171.   White bloc voting in the Huntsville and Montgomery areas is not "legally significant" on this evidentiary record because there appears to be enough white crossover voting to obviate the need for court-ordered majority-minority districts.

172.   Dr. Liu did not identify "the level of BVAP" in illustrative SD7 and SD25 "below which black voters' candidates of choice stop winning elections and start losing them." *Pierce*, 713 F. Supp. 3d at 231; *see also* Tr. 93-94 (admitting that he did not conduct such an analysis); PX16.

---

[11] "The results of such an assessment do not cease being probative for the third *Gingles* precondition simply because the litigation roles are reversed—i.e., here it is Plaintiffs, not the State, who advocate for a majority-minority district drawn on the basis of race." *Pierce*, 97 F.4th at 217-18.

173.   Dr. Trende did, and his analysis of the 2018 and 2022 statewide elections identified in Dr. Liu's report reveals that in illustrative SD7, the black preferred candidate would win every election when BVAP exceeds just 25%. DX7 at 28; *see also* Tr. 1038:16-1039:12.

174.   This is because the "Democratic candidate earns almost unanimous support from Black voters, and typically wins about 1/3 of the support from White voters." *Id.*

175.   This is bolstered by Dr. Liu's own racially polarized voting analysis, which shows "that black voters' candidates of choice would have won every endogenous and exogenous election" in illustrative SD7 in 2014, 2018, and 2022, "even though that district had a BVAP" of only 46.8%. *Pierce*, 97 F.4th at 214; PX16 at 13, Table 6.

176.   And in the Montgomery area, Dr. Trende found that in SD25, black voters' candidates of choice would begin winning elections regularly and consistently as BVAP approaches 45%, still well under 50%. DX7 at 28.

177.   In contrast, no expert testified "that the African-American voters' candidate of choice would usually be defeated unless" SD7 and SD25 were drawn "to be majority-black." *Covington*, 316 F.R.D. at 171.

178.   That the Legislature *could* have drawn crossover districts in the Huntsville and Montgomery regions but did not is of no consequence. States may draw a

crossover district "in the exercise of lawful discretion," but, again, §2 does not require crossover districts." *Strickland*, 556 U.S. at 23-24.

179.    So long as additional majority-minority districts are not "necessary for black-preferred candidates to win," legally significant white bloc voting is absent. *Pierce*, 97 F.4th at 217.

180.    That is the case here, where illustrative SD7 and SD25 would perform for black voters at well below 50% BVAP. Thus, Plaintiffs have failed to satisfy the third *Gingles* precondition.

181.    Plaintiffs' contrary approach to *Gingles* 3 provides no clear standard for when legally significant racially polarized voting is present and would produce strange results. For example, if a district were 51% white VAP and 49% black VAP, with white voters favoring Republican candidates 51% of the time and black voters favoring Democrats 51% of the time (and all voters voting in every election), Plaintiffs might say that racially polarized voting is present. But if that same district featured white voters voting Republican 85% of the time, and black voters voting for Democrats 90% of the time, thus electing Democrats in each election, racially polarized voting would *not* be present.

182.    And, then again, if in that district, Republicans successfully won over more black voters, such that 20% of them began favoring the GOP and electing Republicans in each election, racially polarized voting would again be present, despite

there being *less* racially polarized voting. That makes little sense and leaves both legislatures and courts without a meaningful standard.

## II. The "Totality of Circumstances" Confirms That The 2021 Map Does Not Violate Section 2.

183.   Only if Plaintiffs satisfy *Gingles*'s three preconditions does the Court then "consider[] whether, 'on the totality of circumstances,' minorities have been denied an 'equal opportunity' to 'participate in the political process and to elect representatives of their choice.'" *Abrams*, 521 U.S. at 91 (quoting 52 U.S.C. §10301).

184.   "[T]he inability to elect representatives of their choice is not sufficient to establish a violation unless, under the totality of circumstances, it can also be said that the members of the protected class have less opportunity to participate in the political process." *Chisom v. Roemer*, 501 U.S. 380, 397 (1991); *accord Johnson v. De Grandy*, 512 U.S. 997, 1011 (1994).

185.   "Electoral losses that are attributable to partisan politics do not implicate the protections of § 2." *Clements*, 999 F.2d at 863.

186.   Thus, "to be actionable, a deprivation of the minority group's right to equal participation in the political process must be on account of a classification, decision, or practice that *depends on race or color*, not on account of some other racially neutral cause." *Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1225 (11th Cir. 2000) (en banc) (emphasis added).

187.   "The general terms of the statutory standard 'totality of circumstances' require judicial interpretation. For this purpose, the Court has referred to the Senate Report on the 1982 amendments to the Voting Rights Act, which identifies factors typically relevant to a § 2 claim." *LULAC*, 548 U.S. at 426. These are colloquially known as the "Senate factors."

188.   The Senate factors appear nowhere in the text of §2 and cannot "override the plain language of § 2 itself," *Johnson v. DeSoto Cnty. Bd. of Comm'rs*, 72 F.3d 1556, 1563 (11th Cir. 1996), but courts frequently look to them when trying to determine whether the minority vote has been diluted "on account of race or color." 52 U.S.C. §10301(a). The balance of these factors favors Defendant.

189.   Plaintiffs have not carried their "ultimate burden" to prove that, under the totality of circumstances, the political process is not equally open to black Alabamians. *Askew v. City of Rome*, 127 F.3d 1355, 1375 (11th Cir. 1997). Federal courts at all levels have recognized that "[t]hings have changed in the South," *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 202 (2009), and Alabama is no different, *see Ala. NAACP v. Alabama*, 612 F. Supp. 3d 1232 (M.D. Ala. 2020).

190.   A "comprehensive, not limited, canvassing of relevant facts," *De Grandy*, 512 U.S. at 1011, strongly suggests that black Alabamians' relative difficulty "elect[ing] representatives of their choice" does not depend on "race or color," 52 U.S.C. § 10301. Instead, any such difficulty appears to be the predictable result

of bloc-voting for Democrat candidates in "one of the most Republican states in the entire South." *Ala. NAACP*, 612 F. Supp. 3d at 1291.

### 1.    Senate Factor 1: Alabama has overcome its history.

191.    The first Senate factor examines "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process." *Gingles*, 478 U.S. at 36-37.

192.    The Voting Rights Act was enacted "to enforce" the rights guaranteed by the Fifteenth Amendment. 79 Stat. 437. That amendment is "not designed to punish for the past." *Shelby County v. Holder*, 570 U.S. 529, 552-53 (2013). Moreover, "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980); *see also GBM v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1325 (11th Cir. 2021).

193.    Thus, "generalized assertion[s] of past discrimination in a particular … region [are] not adequate" to support Plaintiffs' §2 claims. *Shaw v. Hunt*, 517 U.S. 899, 909-10 (1996).

194.    Doubly so where, as here, "[o]vert discriminatory election devices have long been eliminated" and "[v]oter registration and turnout rates among African-

Americans and whites have reached parity." *Ala. NAACP*, 612 F. Supp. 3d at 1290 (citing *Shelby County*, 570 U.S. at 535, 548).

195.   Plaintiffs' fail to tie any alleged official discrimination to black Alabamians' ability to participate in the political process. PX19. Where they attempt to do so, the link is tenuous. Further, their expert's opinions regarding this first Senate factor are often irrelevant, overstated, missing significant context, or all of the above. Below are several examples of this pattern.

196.   Dr. Bagley's citations to DOJ objections to State and local preclearance submissions are irrelevant and stale. PX19 at 6-8. None pertain to discrimination in Huntsville or Montgomery, very few pertain to State laws, and the last objection to a State law was in 1994, thirty years ago. Moreover, given the State's burden of proof under the former preclearance scheme, DOJ refusals to preclear based on a law's retrogressive effect are not, without more, evidence of intentional discrimination.[12] *See League of Women Voters of Fla. v. Fla. Sec'y of State*, 66 F.4th 905, 923 (11th Cir. 2023).

197.   In that vein, the "failure of the legislature to pass a realistic reapportionment plan" in the 1970s, court-approved consent decrees, and the shifting racial

---

[12] Under preclearance, the entity seeking preclearance had to somehow prove a negative—that the law did not discriminate. *See* 28 C.F.R. 51.52(a). Thus, an objection by DOJ does not necessarily constitute a finding that the proposed change is in fact discriminatory in purpose. *See* 28 C.F.R. 51.52(c).

makeup of the State Legislature's Republican and Democratic caucuses are not evidence of intentional discrimination or that the State's political system is not equally open to black Alabamians today. PX19 at 6, 9, 11, 13.

198. For example, Dr. Bagley quotes the Speaker of the House in 1972 as saying it would be a "terrific problem" to implement a new redistricting plan. PX19 at 6. Dr. Bagley suggests the "problem" was that the plan would lead to the election of more black legislators. The sources he cites, however, plainly show that the "terrific problem" was one of logistics—conducting elections by districts for the first time—not political opportunity for black legislators. Tr. 574-580.

199. Elsewhere, Dr. Bagley quotes a lobbyist as saying in the 1990s that new Republican voters in Alabama did "not like Black people." PX19 at 10. But Dr. Bagley did nothing to assess the veracity of the lobbyist's statement and was unaware that the lobbyist was a Democrat speaking ill of his political opponents. Tr. 582-84. The Court does not credit this and other unsubstantiated accusations of racial bias pervading the electorate many years ago.

200. Dr. Bagley's proffered examples of State-sponsored discrimination after 1965 are incredibly sparse.

201. He submits *Alabama Legislative Black Caucus v. Alabama*, 231 F. Supp. 3d 1026 (M.D. Ala. 2017) (three-judge court), as one. PX19 at 14.

202.    Though the *ALBC* court found that racial considerations predominated in "14 of the 36" state districts at issue, 231 F. Supp. 3d at 1033, Dr. Bagley omits a critical detail: the Alabama Legislature drew these 14 districts in a race-conscious manner to "avoid retrogressing the ability of black voters to elect candidates of their choice," *id.* at 1032.

203.    Moreover, the allegations were from 2011, the court made no finding of "invidious discriminatory purpose," and it took the Supreme Court to step in and provide more guidance regarding how to comply with both the VRA and Equal Protection Clause. *See ALBC*, 989 F. Supp. 1227, 1288 (M.D. Ala. 2013), *vacated*, 575 U.S. 254 (2015).

204.    As Justice Thomas recounted in his *ALBC* dissent, "the 2006 amendments to § 5 … created an inflexible definition of 'retrogression' that Alabama understandably took as requiring it to maintain the same percentages of minority voters in majority-minority districts." *ALBC*, 575 U.S. at 302. Judge Thompson appears to have had a similar understanding of §5 many decades earlier, describing a plan that reduced a district "from 89% black to 67% black" as one with a "large retrogression[] in black voting strength." *Burton v. Hobbie*, 543 F. Supp. 235, 244-45 & n.3 (M.D. Ala. 1982) (Thompson, J., dissenting).

205.    Thus, Alabama's attempt to comply with federal law and preserve minority voting power—though under a mistaken view of §5—does not tend to suggest

a "history of official discrimination … that touche[s] the right of the members of the minority group to register, to vote, or otherwise to participate in the political process." *Gingles*, 478 U.S. at 36. Especially when the State's inability to walk that tightrope was sorely disputed by members of the federal judiciary.

206.    To wrap it up, Dr. Bagley cites a string of recent federal court decisions (and one USDOT letter) as "notable examples of discrimination touching the right to vote." PX19 at 14.

207.    First, in *Thompson v. Sec'y of State for the State of Ala.*, the Eleventh Circuit *upheld* Alabama's felon disenfranchisement law as having been purged of any "racially discriminatory motives." 65 F.4th 1288, 1298 (11th Cir. 2023); *Cf.* PX19 at 15.

208.    Second, the temporary closure of certain driver's license offices had everything to do with foot traffic and nothing to do with discrimination, as Defendant's witness Colonel Jon Archer thoroughly explained. *Cf.* PX19 at 15. The 31 field offices that were suspended accounted for only 2.1% of all driver's license transactions, and the suspension lasted only 30 days. Tr. 900-902, 904; DX128; DX256. Dr. Bagley conceded as much on cross and acknowledged that residents were still able to get a photo ID at other offices within the affected counties. Tr. 592-93. And contrary to Dr. Bagley's assertions, USDOT never found that the suspensions "affected Black people's ability to register to vote." PX19 at 15; Tr. 907; DX256.

209.    Third, "official discrimination" was not at issue in *League of Women Voters v. Newby*, 838 F.3d 1 (D.C. Cir. 2016). *Cf.* PX19 at 15.

210.    Fourth, *People First of Alabama v. Merrill* concerned a discriminatory effect, not intent, challenge against valid voting laws *as applied* to the 2020 elections during the COVID-19 pandemic. 491 F. Supp. 3d 1076 (N.D. Ala. 2020). The district "court emphasize[d] that its decision d[id] not undermine the validity of the Challenged Provisions outside of the COVID-19 pandemic or beyond the November 3 election," and the court thus "grant[ed] only narrowly tailored relief to address the additional burdens facing a limited class of voters who are particularly susceptible to complications from contracting COVID-19." *Id.* at 1093. Even that injunction, however, was stayed by the Supreme Court and then the case became moot following the 2020 election, so the decision was never tested on appeal. *See Merrill v. People First of Alabama*, 141 S. Ct. 25 (2020).

211.    Finally, the preliminary injunctions imposed against Alabama's 2021 and 2023 congressional redistricting plans reflected a federal court's determination that those laws likely violated § 2. *See Singleton v. Allen*, 690 F. Supp. 3d 1226, 1237, 1318 (N.D. Ala. 2023). The court expressly reserved ruling on the constitutional claims of intentional discrimination brought by the *Singleton* and *Milligan* plaintiffs. *Id.* at 1321.

212.   These recent decisions do not show that the State Legislature has engaged in "pervasive purposeful discrimination." *United States v. Marengo Cnty. Comm'n*, 731 F.3d 1546, 1567 (11th Cir. 1984).

213.   While nothing can erase Alabama's distant history of official discrimination, the past is not the present. Just four years ago, the *Alabama NAACP* court concluded, after a full §2 vote dilution trial, that "Plaintiffs simply ha[d] not shown that, in present-day Alabama, there [were] any barriers keeping African Americans from participating in the political process as voters." *Ala. NAACP*, 612 F. Supp. 3d at 1290.

214.   Nor does Dr. Bagley contend that there are any laws presently enforced in Alabama that make it harder for black citizens to register to vote or cast a ballot than for white residents. Tr. 602.

215.   The first Senate factor thus favors the State.

##   2.    Senate Factor 2: Racial polarization in Alabama is a product of political partisanship, not racial bias.

216.   The second Senate factor looks at "the extent to which voting in the elections of the state or political subdivision is racially polarized." *Gingles*, 478 U.S. at 37.

217.   At first blush, this factor appears redundant with the second and third *Gingles* preconditions. But that's not the case. "There, the inquiry focused solely on 'how' black and white voters voted. The focus now, at the totality-of-circumstances

stage, is on evidence of causation, which looks to 'why' voters cast their ballots for certain candidates." *Ala. NAACP*, 612 F. Supp. 3d. at 1291.

218.    "[T]o be actionable, a deprivation of the minority group's right to equal participation in the political process must be on account of a classification, decision, or practice that *depends on race or color*, not on account of some other racially neutral cause." *Solomon*, 221 F.3d at 1225 (emphasis added).

219.    Thus, "what appears to be bloc voting on account of race [which is the inevitable result of satisfying the three *Gingles* preconditions], may, instead, be the result of political or personal affiliation of different racial groups with different candidates." *Ala. NAACP*, 612 F. Supp. 3d at 1291 (quoting *Solomon*, 221 F.3d at 1225) (alteration in original).

220.    If "black-preferred candidates lose because they are running as Democrats in a red State," and not because they are black, then there is no bloc voting *on account of race* and no illegal vote dilution for §2 to remedy. *Id.*; *see also Clements*, 999 F.2d at 854 ("The Voting Rights Act does not guarantee that nominees of the Democratic Party will be elected, even if black voters are likely to favor that party's candidates. Rather, § 2 is implicated only where Democrats lose because they are black, not where blacks lose because they are Democrats.").

221.    Plaintiffs claim that black-preferred candidates, all of whom are Democrats, regularly and consistently lose outside of majority-black districts. *See, e.g.*,

DE126 ¶¶98-99. This, by itself, "does not prove a lack of electoral opportunity but a lack of whatever else it takes to be successful in politics …. Section 2 does not bridge that gap—nor should it." *Uno v. City of Holyoke*, 72 F.3d 973, 981 (1st Cir. 1995); *see also Baird v. Consol. City of Indianapolis*, 976 F.2d 357, 361 (7th Cir. 1992) (§2 "is a balm for racial minorities, not political ones—though the two often coincide.").

222.   The only evidence of racially polarized voting Plaintiffs submit is the expert report of Dr. Liu, whose conclusions are limited to identifying the statistical *existence* of racially polarized voting, not its *cause*. PX16; Tr. 42:18-43:2, 73:24-74:4. But the second Senate factor supports a §2 claim only insofar as racial polarization approximates racial bias in voting, and because correlation is not causation, Plaintiffs need more than ecological inferences to support their claims.

223.   Defendant has presented substantial evidence that a majority of white voters in Alabama vote against minority-preferred candidates not for racial reasons, but for partisan and ideological ones. Thus, Plaintiffs' alleged denial of equal opportunity is a "a mere euphemism for political defeat at the polls." *Clements*, 999 F.2d at 859 (quoting *Whitcomb v. Chavis*, 403 U.S. 124, 153 (1971)).[13]

---

[13] At the preliminary injunction stage in *Singleton v. Merrill*, the State defendant was able during that hurried proceeding to collect only "very little evidence" that politics, not race, lies at the root of racially polarized voting. 582 F. Supp. 3d 924, 1018-19 (N.D. Ala. 2022) (referencing the election of Kenneth Paschal as the Defendants' sole evidentiary contribution for Senate factor 2). Defendant now comes with a panoply of evidence akin to that considered by the Middle

224.   Based on this evidence, the Court finds that (1) black Democratic candidates face no penalty at the polls for being black; (2) black and white voters in Alabama vote for parties, not for candidates; and (3) white Alabamians, like white Southerners generally, vote overwhelmingly Republican for ideological, not racial, reasons.

225.   As an initial matter, a comparison of racial voting patterns in Alabama with those nationally emphasizes the import of looking beyond "'how' black and white voters voted" to "'why' voters cast their ballots for certain candidates." *Ala. NAACP*, 612 F. Supp. 3d at 1291.

226.   Defense expert Dr. Hood examined black voting patterns in Alabama and in a group of 20 comparator States: Arkansas, Connecticut, Delaware, Florida, Georgia, Illinois, Louisiana, Maryland, Michigan, Mississippi, Missouri, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Texas, and Virginia. DX5 at 3. He chose these twenty because they each had a black population of 10% or greater, which Dr. Hood determined was a useful cutoff point because states with a lower black population may have had too few respondents in the survey data to be able to draw conclusive inferences. *Id.*; Tr. 1219:11-21. This

---

District of Alabama in *Alabama NAACP*, which found that Defendant's "politics, not race" evidence was "substantial" and proceeded to weigh this factor "heavily in favor of the State." 612 F. Supp. 3d at 1291, 1306.

comparison group included States scattered across the U.S. geographically and included both politically red and blue States. Tr. 219:22-1220:10.

227.   Dr. Hood was able to make inferences about voting patterns using survey data collected by the National Exit Polls and the Cooperative Election Studies (CES). These polls conducted from 2008-2022 analyzed two-party contested elections for President, Governor, U.S. Senate, and U.S. House (where available). DX5 at 3-6; Tr. 1219:3-1221:10. This data showed that both in Alabama and across all 20 of the comparison states, black voters' support for Democratic candidates, on average, exceeds 90%. DX5 at 5-6. This pattern transcended both geographic region and party control at the state level. *Id.*; Tr. 1225:6-25.

228.   Defense expert Dr. Reilly likewise testified about black voting patterns across the country. Analyzing reported party preferences of black voters in 17 States, Dr. Reilly found that 76-86% of black voters identified as Democrats or leaned Democrat. DX9 at 6; Tr. 791-92. There were no areas where a majority of black voters preferred Republican candidates. Tr. 792. The pattern was the same in southern and northern states, and in "red" and "blue" states. *Id.*

229.   Dr. Reilly further testified that he reviewed Dr. Liu's report on racially polarized voting, and that in each election Dr. Liu analyzed, the candidate favored by most black voters was a Democrat.

230.    Of the 11 Montgomery and Huntsville black-preferred candidates high-lighted in Dr. Liu's report, PX16, all eleven—Yolanda Flowers, Will Boyd, Wendell Major, Pamela Lafitte, Anita Kelly, Mr. Boyd again, Miranda Joseph, Cara McClure, Lula Albert-Kaigler, James Fields, and Ms. Joseph again—were Democrats, while all of the white-preferred candidates were Republicans. DX9 at 4-5.

231.    Those 11 black-preferred candidates are estimated to have received, re-spectively and in the order given, 94.3%, 95%, 95.9%, 95.7%, 95.6%, 95.8%, 92.8%, 96.6%, 91.3%, 89.6%, and 93.0% of the black vote in Montgomery. They are esti-mated to have received, respectively and in the order given, 89.7%, 82.2%, 84.7%, 86.5%, 86.4%, 91.1%, 92.8%, 93.6%, 82.8%, 84.5%, 89.9% of the black vote in Huntsville. Those percentages are in line with support of Democratic candidates by black voters not just across the State of Alabama, but nationally. DX9 at 5.

232.    As of 2023, just 11% of black Alabamians statewide voted or leaned Republican. This compares to 8% of black voters in California, 6% in Washington D.C., 8% in Florida, 12% in Georgia, 9% in Illinois, 8% in Louisiana, 8% in Mary-land, 8% in Michigan, 12% in Mississippi, 9% in New York, 10% in North Carolina, 13% in Ohio, 6% in Pennsylvania, 7% in South Carolina, 9% in Texas, and 8% in Viriginia. Nationally, the average percentage of black Republican partisans across these states was 8.29%. DX9 at 5-6.

233.   For those States just listed, the percentage of black voters who identified with the Democratic Party was above 70% in each one, and at or above 80% in six States, including Alabama. Tr. 791; DX9 at 5-6.

234.   The point being that the mere statistical fact that in Alabama white voters tend to support Republican candidates and black voters tend to support Democratic candidates is not itself evidence of racial bias in the electorate or suggestive of an electoral system diluting the voting strength of minority voters. Defendant's evidence demonstrates that black voters' "close to monolithic" support for Democratic candidates is a national phenomenon, not just an Alabama one. DX5 at 6. Thus, voting is necessarily "racially polarized" as a bare statistical matter in any jurisdiction where a majority of white voters tend to support Republican candidates. But that does not probe at the heart of the §2 inquiry: whether black voters face political defeat *on account of race*.

235.   Alabama is "a ruby red state—one of the most Republican states in the entire South," and, as the Middle District of Alabama recently recognized after a full §2 trial, this reality "has made it virtually impossible for Democrats—of any race—to win statewide in Alabama in the past two decades." *Ala. NAACP*, 612 F. Supp. 3d at 1291 (quotation omitted).

236.   "Since 2008, while all black Democrats have lost their statewide races [in Alabama], so have all white Democrats, with the exception of Doug Jones (2017 special U.S. Senate election)." *Id.*

237.   The court found that "the notion that African-American candidates lose solely because of their skin color is not supported by the evidence. There is a strong case that party, not race, is driving election results in Alabama …." *Id.* at 1293.

238.   Defense expert Dr. Bonneau, a political scientist who testified for the State defendant in *Alabama NAACP* as well, reviewed the 2022 State House and Senate election results and, using a multivariate regression model, determined that in general elections, where both Democratic and Republican voters participate, "Black Democrats perform better when they challenge white Republicans than white Democrats do." DX1 ¶¶14-16; Tr. 1417:19-1418:24.

239.   Specifically, "Black Democrats who lost contested seats for the State House averaged 29.1% of the vote in the counties in which they ran, while white Democrats averaged 23.7%." DX 1 ¶14. And "Black Democrats who lost contested seats" for the Senate "averaged 32.1% of the vote in the counties in which they ran, while white Democrats averaged 24.9%." DX 1 ¶15.

240.   Dr. Bonneau also analyzed Alabama's partisan Supreme Court elections. DX1 ¶¶5-12. He found that since 2000, only one Democrat has been elected to the Court: Sue Bell Cobb. *Id.*; *see also Ala. NAACP*, 612 F. Supp. 3d at 1247,

1280-81, 1291. Every other Democrat to run, including five black candidates, has lost. *Id.* And since 2012, the Democratic Party has not contested many Supreme Court elections, likely believing the elections were unwinnable. Tr. 1407:1-10.

241.   And for Supreme Court elections in 2000 and 2006 specifically, Dr. Bonneau found evidence that unsuccessful black Democratic candidates did not, on average, perform any worse than white Democratic candidates, suggesting that they were not penalized for being black. DX1 ¶9; Tr. 1407:25-1411:1, 1416:18-25.[14]

242.   "From these results, it reasonably can be inferred that white Democratic voters give equal or greater support to black Democratic candidates as they do to white Democratic candidates." *Ala. NAACP*, 612 F. Supp. 3d at 1292. This, in turn, "suggests that black candidates are not penalized" in State House and Senate races "by their race alone." *Id.*

243.   Dr. Bonneau, when testifying in *Alabama NAACP*, did not examine "an election with an African-American Republican." *Id.* Here, he does. DX1 ¶18. Kenneth Paschal, a black Republican, won election to represent District 73—anchored by Shelby County—in the Alabama House of Representatives. Paschal defeated a white Republican in the primary, and then proceeded to defeat a white Democrat by

---

[14] Dr. Boneau acknowledged that one paragraph in his report, ¶13, is affected by two errors: 1) miscoding one candidate as black who was white, and 2) miscoding three general elections as contested that were not. Tr. 1413-16. As a result, only one election for the Alabama Supreme Court between 2010 and 2022 featured a black candidate. Tr. 1413. Had he been aware of this data limitation, Dr. Bonneau would not have undertaken the regression analysis, because a case study of a single candidate in a single race is not likely to provide significant insight. Tr. 1414.

nearly 50 percentage points in the general election. He won in an 84.1% white VAP district in Shelby County and has since successfully run for reelection without opposition.

244.    Defense expert Trey Hood, who also examined the willingness of white Republican voters to vote for minority Republican candidates, found that given the racial makeup of Rep. Paschal's district "it would be virtually impossible for him to win a race, which he did, without white support." Tr. 1235 at 7-13.[15]

245.    Rep. Paschal's victory in the primary election is especially probative because primary elections, by definition, control for party. Tr. 1420:1-24, 1421:1.

246.    Dr. Hood then compared the vote share that Dr. Ben Carson—a former black Republican presidential candidate—received among the states in which he competed in the 2016 Republican Presidential Primary before dropping out after Super Tuesday. DX5 at 20. In the 15 primaries and caucuses in which Carson participated, his vote share ranged from 2.31% in New Hampshire to 10.8% in Alaska. *Id.* His vote share in Alabama was 10.24%—the second highest of any contest.

247.    Subsequently, Bill Lewis, who is black, was appointed to the Alabama Court of Civil Appeals by Governor Ivey, and then ran for a full term unopposed in

---

[15] Dr. Hood has published research on this issue of white Republican support for minority Republican candidates, and he has reviewed other peer-reviewed research on the topic. DX5 at 21. No study found that white voters discriminated against black candidates; to the contrary, several of the studies concluded that white conservative voters support minority Republican candidates at equal or greater rates compared to non-Hispanic white Republican candidates. *Id.*

the Republican primary and general election. Tr. 1423. This suggests that Republican voters, the majority of whom are white, "are satisfied with Judge Lewis such that no one decided to try and unseat him." DX1 ¶19.

248.  The Court also heard testimony from three black Republicans—Bill McCollum and Valerie Branyon from Fayette County, Alabama, and Cedric Coley from Montgomery. Bill McCollum was born in 1949 and experienced racial discrimination when running for Fayette County Sheriff in 1974. Tr. :1354, 1362-65. He moved away for work, and upon returning to Fayette County in the late 1990s, got involved in politics again. Tr. 1355, 1357, 1365-68, 1370-71. He ran for various political offices in Fayette County and never experienced any race-related hostility. Tr. 1365:5-12. He beat a white Republican in the primary for Fayette County Sheriff in 2002. Tr. 1367. When running for a seat on the Fayette County Board of Education in 2024, he received support from the County Republican Party and the Alabama Republican Party. Tr. 1360-61. White Republicans volunteered on his campaign, the local party paid for newspaper advertisements, and the State party sent out several mailers supporting his race. Tr. 1361-62. He has served on the local party's leadership for 15 years. Although his most recent race was unsuccessful, he testified that black Republican Tierre Agnew was elected to the County Board of Education this cycle in a 98% white district. Tr. 1360, 1369.

249.    Valerie Branyon was just elected to the Fayette County Commission, defeating incumbent John Underwood, a black Democrat. She received support from the County Republican Party and the State Republican Party. Tr. 856-58. The State Party paid for three mailers and U.S. Representative Aderholt, who is a white Republican, recorded a robocall supporting her candidacy. Tr. 858-59, 861. In 2020, she was encouraged by John Acker, who is white and was the leader of the local Republican party, and Bill McCollum to run for County Commission District 6. Tr. 863. Acker even offered to pay for her campaign. *Id.* She defeated a white Republican in the primary, but lost a close race to incumbent John Underwood in the general election. Tr. 861-62.

250.    Cedric Coley has been involved with the Montgomery County Republican Party since 2016. Tr. 1319. He describes the racial makeup of the local party as 75% white and 25% minority. Tr. 1320. He has felt welcomed by the leadership of the local party, and he was himself elected as a member at-large for the Executive Committee. Tr. 1320-21. The Chairman of the local party also appointed him to the position of "elections chair." Tr. 1321.[16]

---

[16] Plaintiffs' counsel confronted Mr. Coley with some of his social media posts in an apparent attempt to attack his good judgment. Tr. 1335. One in particular contains a call to vote Republican as well as a gesture—the "OK" gesture—that has been associated with white supremacy. Tr. 1349-50. Mr. Coley adamantly denied he ever intended to advocate white supremacy, and earlier testified that he petitioned the Governor to retire the flying of the Confederate flag on State Capitol grounds. Tr. 1340.

251.    These examples of black Republicans winning elections and receiving support from white Republicans as well as from the local and State Party apparatus itself suggest that white Republicans are not motivated to vote for or against a candidate based on the color of his skin.

252.    What matters more to most Alabama voters, the evidence shows, is the party banner under which a candidate is running.

253.    Alabama conducts partisan elections for seats in the State Legislature. "Partisan elections lead to partisan results." *Ala. NAACP*, 612 F. Supp. at 1295. Alabama also permits straight-ticket voting. Ala. Code §17-6-35. "Straight-ticket voting only exacerbates the phenomenon of partisan-driven elections results." *Ala. NAACP*, 612 F. Supp. at 1296. That's because when a voter casts a straight-ticket ballot, he is voting for a team, not for an individual player. Tr. 1424:17-1425:25. The voter's decision is necessarily based on the candidate's party affiliation and not on an individual characteristic, such as race. *Id.*

254.    Dr. Bonneau examined rates of straight-ticket voting and found that in 2022 almost half of ballots cast were straight-ticket Republican votes and another 21% straight-ticket Democratic. DX1 ¶3; Tr. 1426:1-14. Thus, as recognized by the Middle District of Alabama a few years ago, over "two-thirds of the Alabama electorate is voting for a *party*, not necessarily for particular *candidates*." *Ala. NAACP*, 612 F. Supp. 3d at 1296.

255.    Further, Dr. Bonneau analyzed straight-ticket voting in 2018, 2020, and 2022 elections in the Huntsville area. Tr. 1438:18-1441:16. He found that a very high percentage of ballots cast for Democratic candidates were cast straight-ticket. *Id.* This trend held across all elections regardless of the race of the candidate. *Id.*

256.    "Thus, many straight-ticket voters are likely not looking at down-ticket candidates' qualifications (or, for that matter, their races or even their names), but merely under what party banner they are running." *Id.* This too is evidence that black voters' candidates of choice are losing on account of party, not race.

257.    Plaintiffs' racially polarized voting expert Dr. Liu ran an "ecological inference analysis" on three endogenous (State Senate) elections in the Huntsville area as well as 11 exogenous statewide elections and concluded that voting is racially polarized in the Huntsville and Montgomery regions. PX16.

258.    The "inferential limitation" of his ecological inference analysis is that it "cannot tell us about the reasons behind the observed (inferred) data." DX1 ¶21. It can be relevant only to identifying "how" black and white voters vote, not "why" they vote the way they do. DX1 ¶21; *Ala. NAACP*, 612 F. Supp. 3d at 1291.

259.    While agreeing that RPV could have multiple, non-racial causes, Tr. 97:4-7, Dr. Liu conceded that his initial report analyzed only whether RPV existed and did not offer any explanation for its cause. Tr. 42:18-43:2, 73:24-74:4.

260.    Exacerbating this inherent limitation is Dr. Liu's failure to control for the effect on voter behavior of party identity—"the single biggest determinant of vote choice in American politics." DX1 ¶22.

261.    Dr. Liu's initial RPV analysis examined only biracial elections in which the black candidate was running as a Democrat, and the white candidate was running as a Republican. This "leads to selection bias and potentially erroneous conclusions." DX1 ¶25; *see also Ala. NAACP*, 612 F. Supp. 3d at 1280 (citing Bonneau for same); Tr. 92-93, 117, 1459.

262.    A biracial election featuring a black Democrat against a white Republican does not control for party. Such elections can give the false impression of "what appears to be bloc voting on account of race may," when it may instead "be the result of political or personal affiliation of different racial groups with different candidates." *Solomon*, 221 F.3d at 1225.

263.    Primary election contests truly control for party, because both candidates are running under the same banner. Tr. 1458:22. In theory, some nonpartisan elections can control for party, because voters are "not reminded of which candidate is representing which party," Tr. 1503:2-21, but "often times do not," Tr. 1458:25-1459:1.

264.    In his rebuttal report, Dr. Liu for the first time looks at three nonpartisan mayoral runoff elections—Montgomery 2019, Montgomery 2023, and Decatur

2020. PX18 at 9. The two Montgomery elections featured the same black candidate, Steven L. Reed. Tr. 1458:1, 12.

265.    Dr. Bonneau has studied whether nonpartisan elections can feature many of the same characteristics as partisan elections. Tr. 1469, 1503. In his experience, they can and often do. *Id.* And with respect to the 2019 and 2023 Montgomery mayoral runoff elections, Dr. Bonneau opined that voters' likely were aware that Steven Reed is a Democrat. Tr. 1458.

266.    The Court credits Dr. Bonneau's opinion that primary elections better control for party than nonpartisan elections. The Court finds further that the 2019 and 2023 Montgomery mayoral elections do not sufficiently control for political party, given the identity of one of the candidates running.

267.    Finally, partisanship is not a proxy for race in Alabama. Defendant's evidence suggests that white Alabamians who vote Republican are motivated to do so for ideological reasons, not racial ones. White voters are the appropriate focus because it is their voting behavior, as that of the majority group, that allegedly causes black-preferred candidates to lose elections. *See Uno*, 72 F.3d at 981 (holding that "plaintiffs cannot prevail on a VRA §2 claim if there is significantly probative evidence that whites voted as a bloc for reasons wholly unrelated to racial animus").

268.   For most of the 20th century, Alabama was a one-party State, like every other State in the South, with the Democratic party dominant. But in 2010 Republicans won a majority in both houses of the State Legislature, around the same time that other southern state legislatures switched from "Democratic" to "Republican." Tr. 1189:22; 1212:10-15. The undisputed reason was the gradual shift by white southern voters from the Democratic party to the Republican party.

269.   The issues motivating this partisan shift are relevant to assessing *why* white Alabamians support Republican candidates today. If "conservative ideology, not race," better explains party preference, then black Democrats can hardly be said to lose elections to Republican opponents on account of race. *Ala. NAACP*, 612 F. Supp. 3d at 1300.

270.   Defense expert Dr. Carrington, a political scientist, examined how the development of the Republican and Democratic parties in the 20th and 21st centuries contributed to the partisan shift in the American South, including in Alabama, from reliably Democratic to dependably Republican. DX3.

271.   He concluded that after the Civil Rights era of the 1960s and '70s, the two parties' respective positions on non-racial issues—namely, economics, foreign policy, religion, abortion, and LGBTQ rights—better account for the partisan shift in the South than the parties' positions, if any, on racial issues. DX3 at 21-29.

272.   For example, the development of the parties on the issue of abortion into discernible "pro-life" and "pro-choice" camps provides a persuasive non-racial explanation for why white conservative Alabamians tend to support the Republican party. Dr. Carrington testified that the "Democratic Party is considered the natural home for pro-choice voters, generally advocating for pretty limited restrictions on a woman's right to terminate a pregnancy." Tr. 1153:20-22. "The Republican Party," in contrast, "has been seen as the more natural home for self-identified pro-life voters who want extensive regulations restricting or even outright banning abortion." Tr. 1153:23-25. This "stark" division between the parties on the issue of abortion has been clear to voters as far back as the 1980s. DX3 at 25.

273.   The Court credits Dr. Carrington's opinion that the parties' respective positions on the non-racial issue of abortion "contributed" to the partisan shift in the South, and in "Alabama in particular." Tr.1154:10-25.

274.   Dr. Carrington examined "data showing that a significant number of people vote on the basis of abortion," including a 2014 Pew Research survey revealing Alabama to have "the lowest support for legalized abortion in the entire nation." DX3 at 26. Dr. Carrington also found relevant the 2018 "sanctity of unborn life" amendment to the Alabama Constitution ratified by Alabamians by a 59-41% margin. DX3 at 26. "Because voters must approve constitutional amendments on a

statewide basis, the results of voting on those amendments provide a snapshot into Alabamians' ideology." *Ala. NAACP*, 612 F. Supp. 3d at 1300.

275.   Here, that snapshot shows an ideologically pro-life populace. Where white pro-life Alabamians decide to vote for a Republican candidate, there is no reason to insinuate that race has anything to do with their decision. *Id.* at 1301.

276.   Similarly, Defendant's evidence shows that Alabamians have traditional views about "marriage and family." *Id.* Those views align more closely with the Republican party than with Democratic party. The Court credits Dr. Carrington's conclusion that like "with abortion, the party development on this issue opened up a significant gap between the majority of Southern voters and the Democratic Party while the GOP better aligned with those voters." DX3 at 29.

277.   According to a 2014 Pew survey, a majority of Alabamians opposed same-sex marriage and believed that homosexuality "should be discouraged." DX3 at 29. "Alabama was the state with the least support for legal recognition of same-sex marriage in the entire country according to the Pew study." DX3 at 29.

278.   In 2006, Alabamians passed by an 81-19% margin the Sanctity of Marriage amendment to the Alabama Constitution, which declared that a "marriage contracted between individuals of the same sex is invalid in this state." DX3 at 29. The Court agrees with Dr. Carrington that these trends provide yet another example of a non-racial issue better explaining voting patterns than race.

279.   Dr. Bagley's critique of Dr. Carrington's conclusions with respect to these non-racial social issues falls flat. Dr. Bagley notes that black Alabamians also hold strong views on many of the same social issues, like religion, abortion, and marriage. Tr. 564-65. Therefore, if Dr. Carrington's theory is correct, then Dr. Bagley would expect to see black Alabamians voting for the Republican party in numbers comparable to their views on religion, abortion, and marriage. Tr. 564-65. PX21.

280.   Dr. Bagley ignores the obvious, non-racial answer. Two people can agree on one issue but disagree on another—the issue that ends up creating the partisan divide. Here, while white and black Alabamians might agree to a large extent on a number of social issues, white Alabamians are voting for the political party that espouses those same views. What matters here is the evidence that white Alabamians are voting consistent with their conservative ideology, as Dr. Carrington discusses. Tr. 1157.

281.   Dr. Burch, for her part, contends that all issues are racial, Tr. 763:23-24, 764:16-17, and thus race and civil rights are the *only* factors relevant to partisan realignment in the South since 1960. Tr. 761:23-762:9, 773:25-774:1. She testified, for example, that "economic anxiety is in and of itself explained by racial attitudes and racial anxieties." Tr. 764:16-17. This highly pessimistic view of what motivates people rests upon the notion that people are not in fact motivated by what they say

is important to them, but by some hidden, perhaps subconscious, view about race. Tr. 1160. In light of the more persuasive evidence to the contrary, the Court does not credit Dr. Burch's conclusion.

282.    While historical voting patterns are informative, the ultimate question is not why some voters switched to the Republican party in the '80s or '90s, but why they are voting as they do in 2024. Dr. Bagley conceded that he is offering no opinion that Alabama Republican voters today are motivated by racial bias. Tr. 584:13, 626:14, 626:1.

283.    Dr. Bagley acknowledged further that voters who care about non-racial issues such as abortion, Second Amendment rights, and climate change have clear partisan preferences. Alabamians in favor of abortion access, he said, will likely align with the Democratic party; those who feels strongly about protecting Second Amendment freedoms will likely identify with the Republican party; and a voter who favors strong government policies to fight against climate change will tend to vote Democratic. Tr. 628-29. Dr. Bagley recognizes that "many" Alabama voters know what positions the political parties take on such issues. Tr. 629:21.

284.    In sum, consistent with the Middle District of Alabama's conclusions four years ago, the Court finds that Defendant has "presented evidence—bearing on the totality of circumstances—of reasons why black-preferred candidates are losing that are unrelated to race. The State's evidence is not conclusive, but it well supports

the idea that African Americans are not losing … elections 'on account of race or color.'" *Ala. NAACP*, 612 F. Supp. 3d 1305-06 (quoting 52 U.S.C. §10301(a)).

285.   This factor "weighs heavily in favor of the State." *Id.* at 1306.

### 3.    Senate Factor 3: Alabama does not use practices or procedures that enhance the potential for discrimination.

286.   The third Senate factor examines "the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group." *Gingles*, 478 U.S. at 37.

287.   Plaintiffs' evidence fails to demonstrate an extensive, recent, or current use of any such voting practices or procedures in Alabama, much less in the challenged areas.

288.   Dr. Bagley mentions in his report that "the state has a majority vote requirement in primary elections," PX19 at 16, but he does not opine that the State adopted this requirement for nefarious reasons—much less that Alabama actively maintains majority-vote primaries to discriminate against its black population today. And he ignores that this system led to a black candidate defeating a white candidate in a Republican primary runoff election after the white candidate had garnered the most votes in the original primary election. *See* DX1 ¶18.

289.   Dr. Bagley asserts that Alabama's past use of numbered-place require-ments is evidence of discriminatory electoral systems. PX19 at 17. But Alabama's "numbered-post law was about giving advantage to incumbents against Klan-backed factions within the Democratic Party, not about racial discrimination." *Ala. NAACP*, 612 F. Supp. 3d at 1306.

290.   Dr. Bagley also opines about the use of at-large elections by local ju-risdictions that were found to be unconstitutional by a federal court in *Dillard v. Crenshaw County*, 650 F. Supp. 1347 (M.D. Ala. 1986); PX19 at 19-20. Although not at issue in the case, the *Dillard* court found that in the early 1960s, the Legislature had intentionally discriminated against black Alabamians when refashioning the at-large electoral systems. 650 F. Supp. 1356, 1361. The court then held that many counties shifted back to at-large elections "in response to both the Supreme Court's ban of all-white primaries and the Civil Rights Acts of 1957, 1964, and 1965." *Id.* at 1359. Those actions by counties and municipalities from over half a century ago are too stale to be held against the Alabama Legislature in 2024.

291.   Further Dr. Bagley discusses no at-large voting systems currently in ef-fect,[17] and he concedes that an at-large system no longer in use cannot cause vote dilution today. Tr. 596-97.

---

[17] Later in his report, he mentions that members of the Pike Road Town Council are elected at-large. PX19 at 27. The Court addresses Dr. Bagley's discussion of Pike Road *infra*.

292.   As supposed evidence of discriminatory election systems in Alabama, Dr. Bagley cites two municipal subdivisions that agreed to modify their electoral systems. These two instances—each of which was resolved by a consenting municipal defendant—cannot weigh against the State.

293.   Plaintiffs also identify recent absentee ballot legislation as enhancing the potential for discrimination. Benard Simelton, President of Plaintiff Alabama State Conference of the NAACP, testified that his organization was involved in another "voting rights lawsuit[]" challenging "legislation … that prevented organizations like the NAACP from assisting individuals with their absentee ballot application unless [they] were next of kin." Tr. 176:13-24. Tari Williams, the organizing director for Greater Birmingham Ministries, similarly testified about "a law that restricts organizations or individuals who receive a salary … from assisting people with absentee ballot applications." Tr. 649:5-9.

294.   The above testimony refers to an ongoing pre-enforcement challenge to Ala. Code §17-11-4—a law "enacted to prevent absentee ballot fraud." *Alabama State Conference of the NAACP v. Marshall*, 2024 WL 3893426, *1, 10 (N.D. Ala. 2024). Five of the six claims in that lawsuit have been dismissed for failure to state a claim. *Id*., 2024 WL 3893426, at *35; *see* Tr. 190:24-191:1.

295.   The court entered a preliminary injunction "only as to Section 208 blind, disabled, or illiterate voters." *Alabama State Conference of NAACP v. Marshall*, 2024 WL 4282082, at *6 (N.D. Ala. 2024). The injunction was unrelated to race as it applied to "*all* voters with disabilities." *Id.* at *1-2 (emphasis in original).

296.   In sum, "there is insufficient evidence that any current procedures" in Alabama's elections "were adopted or maintained for discriminatory reasons." *Ala. NAACP*, 612 F. Supp. 3d at 1307. This factor thus favors the State.

### 4.    Senate Factor 4: No formal slating process exists in Alabama.

297.   There is no slating process involved in Alabama's Senate elections, so this factor too suggests that Alabama's political processes are equally open to all Alabamians, regardless of race.

### 5.    Senate Factor 5: Plaintiffs have not shown that socioeconomic disparities are the product of discrimination.

298.   The fifth Senate factor analyzes "the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process." *Gingles*, 478 U.S. at 37.

299.   This factor requires Plaintiffs to demonstrate that disparate outcomes are attributable to past discrimination, and that these gaps make it harder for black Alabamians' "to participate in the political process." *Ala. NAACP*, 612 F. Supp. 3d at 1288.

300.    Indeed, the causal relationship between past discrimination and disparate outcomes is what tethers Plaintiffs' evidence to §2's "on account of race" inquiry, which in turn anchors §2 to its constitutional authority under the Fifteenth Amendment. *See* U.S. Const. amend. XV, §1 ("The right of citizens of the United States to vote shall be denied or abridged by the United States or by any State *on account of race, color, or previous condition of servitude*." (emphasis added)).

301.    Plaintiffs have failed to prove that socioeconomic disparities experienced by black Alabamians today are the effects of past racial discrimination.

302.    Dr. Bagley opines that some racial gaps exist in Huntsville and Montgomery and makes the blanket assertion that there "is no way, historically, to account for these disparities apart from systemic discrimination." PX19 at 21-22; *see also* Tr. 598-600. But when pressed at trial, he was unable to point to any steps that he, as a historian, took to analyze and identify racism as the cause of these gaps. Tr. 598:19-21 ("I don't know as a historian what other cause there would be.").

303.    Dr. Burch purports to identify "disparities in socioeconomic status between Black and White Alabamians that might affect voter registration and turnout." PX11 at 1. She expressly limits her testimony to an examination of the existence of disparities, not to their causes. *See id.* ("My understanding is that other experts will discuss the historical and contemporary discrimination that contributes to racial disparities."). She assumes "there probably are people who are prevented from voting,"

but she doesn't know how many, where they live, or why they can't vote. To use her own words, "all [she] can tell [us] is that there are disparities." Tr. 722:24-723:13.

304.    Dr. Burch offered similar opinions in *Pierce v. North Carolina State Board of Elections*. There, the district court dismissed her findings almost out of hand because they "contain[ed] no statistical analysis demonstrating that race discrimination by North Carolina *caused* the socioeconomic disparities." 713 F. Supp. 3d at 235 (emphasis added). Dr. Burch did not correct that glaring omission when submitting her report in this case.

305.    The Court does not credit Drs. Bagley's and Burch's Senate factor five evidence for the simple reason that they have not attempted to connect the dots between present disparities and past discrimination.

306.    Further, Defendant has undermined Plaintiffs' notion that historical discrimination must be the cause of present-day gaps by showing that these very same disparate outcomes occur everywhere in the nation and are more plausibly explained by non-racial variables.

307.    Defense expert Dr. Hood compared the size of socioeconomic gaps present in Alabama with those in the 20 other States with a black population larger than 10% of the total population. DX5 at 7-20. Specifically, he examined: educational attainment (both high school equivalent and bachelor's degree), food stamp rates,

median household income, per capita income, poverty, home ownership, unemployment, infant mortality, vehicle ownership, health insurance, internet access, and incarceration rates. *Id.*

308.   He concluded that any racial disparity between the white and black populations that is present in Alabama is also present in each of the 20 other States. DX5 at 20. In fact, the gaps are often larger in northern States, and nowhere did black residents fare better than white residents on any individual metric surveyed. *Id.*

309.   On 10 of the 13 measures analyzed, the disparity rate for Alabama was below the average disparity rate calculated for the comparison States. *Id.* And Alabama's disparity rate was never the worst (i.e. largest). *Id.*

310.   If the root cause of socioeconomic gaps is past official discrimination, we would expect to see starker gaps in States where racial discrimination was historically more prominent. Tr. 782-84. One might compare States where slavery was legal before the Civil War to States where it was not. Or States that were members of the former Confederacy, or "Jim Crow" States, or States that were covered by §5 of the VRA, to those States not in those categories.

311.   The fact that larger racial gaps exist in States that were not former slave States, did not have Jim Crow laws, and were not covered by §5 of the VRA seriously undermines Plaintiffs' assumption that racial disparities in Alabama are the effect of official discrimination.

312.   This comparison of Alabama's racial socioeconomic disparities to those of other States does not contravene the "intensely local appraisal" required by §2, which the *Gingles* Court applied to "the design and impact of the contested electoral mechanisms," 478 U.S. at 79, not to socioeconomic disparities allegedly attributable to a State's history. Regardless, the national comparison helps make sense of the local data. Performing the "local appraisal" in a vacuum would fall short of the "comprehensive, not limited, canvassing of relevant facts" mandated by §2. *De Grandy*, 512 U.S. at 1011.

313.   Dr. Reilly, testifying as an expert for Defendant, likewise noted that socioeconomic gaps among racial groups are present throughout the country. For example, when it comes to income, Asian workers on average consistently out-earn white workers, and white workers consistently out-earn black workers. Tr. 780; DX9 at 18.

314.   Some, like Drs. Bagley and Burch, would say that such racial gaps can only be explained by systemic racism. Dr. Reilly disagrees. Tr. 781.

315.   Others touting the fringe theory of "genetic determinism" believe that performance gaps result from genetic differences between racial groups. Dr. Reilly disavows this view. Tr. 781.

316.    Dr. Reilly, in contrast, concludes that a combination of numerous non-racial variables better explain these gaps. Tr. 782. Using the household income example again, Dr. Reilly and others have found that family size, number of wage-earners, geographic region, age, work experience, test scores, and educational attainment together directly contribute to the income gap. Past discrimination, in comparison, has little if any explanatory value. Tr. 785-87.

317.    To put this into perspective, one national study found that while the average black household income was 83% of the average white household income, after controlling for age, region, work experience, and other non-racial factors, the gap reduced to less than 1%. Tr. 786; DX9 at 18.

318.    After controlling for non-racial factors, Dr. Reilly concludes that any socioeconomic gaps between black and white Alabamians shrink to statistical insignificance.

319.    This comports with what the Middle District of Alabama ultimately found in 2020 with respect to political participation gaps. "Voter registration and turnout rates among African-Americans and whites have reached parity," and "[t]he level of black participation in the political process is not depressed." *Ala. NAACP*, 612 F. Supp. 3d at 1290.

320.    Moreover, there is nothing unduly difficult about registering to vote in Alabama, as Plaintiffs' witness Tari Williams, the organizing director for Greater

Birmingham Ministries, acknowledged. Tr. 654; *accord* Tr. 1368 (Defendant's witness Bill McCollum); Tr. 869 (Defendant's witness Valerie Branyon); Tr. 191:6-192:3 (Benard Simelton); Tr. 1311-12 (Defendant's witness Cedric Coley). Benard Simelton, President of Plaintiff Alabama State Conference of the NAACP, testified that 90-95% of the 5,000 members of the NAACP in Alabama are registered to vote. Tr. 160:7-23. The only reason the percentage is not higher is because many of the remaining members are either too young to register or are ineligible to vote due to a disqualifying felony conviction. *Id.* Roughly 95% of the NAACP's membership in Alabama is black. Tr. 160:24-161:6. The same holds true for the 350 members of the Huntsville Branch of the NAACP and the 75 members of the Decatur Branch. Tr. 161.

321.   According to Dr. Burch's examination of 2022 data, the rate of voter registration in Alabama is about 89 percent for white residents and 84 percent for black residents. PX11 at 4-5 & n.15; DX9 at 15.[18]

322.   In 2018, the registration gap was less than one percent, at 88.4% of whites and 88% of blacks. DX9 at 15. And just two years ago, black registration rates exceeded white rates in Montgomery County. PX11 at 5.

---

[18] Dr. Burch calculates the registration rates by dividing citizenship estimates by race into Secretary of State registration totals. PX11 at 4-5 & n.15.

323.    Today's parity in voter registration rates follows an ever-improving historical trend. Dr. Hood analyzed black voter registration rates in Alabama at three points in time: 1965, when the VRA was passed; 1982, when §2 was amended; and 2024. The black voter registration rate increased from 23.5% in 1965 to 57.7% in 1982 and on to 95.2% in 2024.[19] *Id.* at 23.

324.    In search of a more sizeable gap, Dr. Burch turns to voter turnout rates. She identifies a turnout gap of around 8-10% between white and black Alabamians in 2018 and 2020 elections. PX11 at 6-7.

325.    Still, she has not connected this gap to past discrimination. At trial, she acknowledged that a meta-analysis (a study aggregating other study results) upon which she relied found that race does not have a statistically significant effect on voter turnout. Tr. 760:5-23. Instead, any gap is better explained by non-racial variables like "age …, education, residential mobility, region, media exposure, mobilization …, vote in previous election, party identification, political interest, and political knowledge." Tr. 761:1-11.

326.    Defendant's evidence confirms these non-racial explanations.

---

[19] Dr. Hood calculates registration rates by dividing voting-age population data by race into Secretary of State registration totals. DX5 at 23.

327.   First, Drs. Reilly and Burch agree that education may affect voter turn-out, and that racial gaps in educational attainment exist in Alabama. DX9 at 8; PX11 at 8.

328.   However, Dr. Burch's own evidence calls into question the severity of this gap. Notably, black adults in Madison County have higher rates of bachelor's degree attainment than white adults in neighboring Limestone and Morgan counties. Tr. 713:21-25. And black adults in Montgomery County have rates of bachelor's degree attainment comparable to those of white adults in neighboring Elmore County. Tr. 714:1-8.

329.   Of the remaining gaps, Dr. Burch again assumes they result from past discrimination. PX11 at 9-12. Dr. Reilly, however, has analyzed evidence pointing toward more benign, commonsense explanations.

330.   Dr. Reilly reviewed the average SAT scores of white, black, and Asian students. He found that white students on average have performed better education-ally than black students in every State in the nation, as well as nearly every county in the nation. DX9 at 9.

331.   But Asian students generally outperform both black *and* white students, DX9 at 9-10; Tr. 795-97, as do black Nigerian American students, Tr. 801-02. If

educational attainment gaps themselves are explained by racism, that would implausibly indicate that white Americans experienced more historical discrimination than Asian and black Nigerian Americans. Tr. 797-98.

332.    A better, and more intuitive, explanation for these score gaps is study time. Studies have shown, for example, that Asian students spend on average twice as much time studying than white students. Tr. 800-01; DX9 at 9, 13. And the study time gap is itself better explained by non-racial factors, such as cultural and parental expectations. Tr. 801.

333.    Other than education, age can be a good indicator of voter turnout. In general, older voters are more likely to cast a ballot than younger voters. In Alabama and nationally, the black population tends to be much younger, on average, than the white population. Tr. 803-04; DX9 at 13-14. At the mode nationally, the average black man is 27 years old while the average white man is 58. Tr. 787; DX9 at 14.

334.    Also, felony conviction rates naturally affect voter turnout. The Asian population tends to have fewer felony convictions than the white population, DX9 at 17, and the white population tends to have fewer felony convictions than the black population. Tr. 805. In Alabama, some felonies result in disenfranchisement. According to Dr. Burch, 14.7% of black Alabamians have a disenfranchising felony conviction compared to 8.6% of the total voting eligible population. PX11 at 18; Tr. 805.

335.  Plaintiffs have not shown that these differences in felony conviction rates are the result of discrimination in the criminal justice system. Rather, the data show that black Americans are more likely to be both offenders and victims of violent crime. FBI data reflect that black offenders in Alabama were arrested for far more violent crimes than Dr. Burch reported (and committed over twice as many violent crimes as well). *See* DX407; DX409; Tr. 740-41.[20] And the black victim crime rate is at least 2.4 times the white victim crime rate. DX9 at 14-15.

336.  Moreover, Dr. Reilly compared incarceration gaps among the 50 States and found that in every state, black persons are overrepresented in prisons in proportion to their percent of the overall population. Tr. 806-08. But while every State has an incarceration rate gap between white and black prisoners, the gap in Alabama is smaller than the gap in every other state in the country except for Hawaii. Tr. 809-10; DX9 at 22-23. Thus, if an incarceration gap is evidence that a State is treating black and white offenders differently, Alabama has the second-most equitable criminal justice system in the nation, bested only by the Aloha State. Tr. 810-11.[21]

337.  Further, family stability correlates significantly with civic participation. The rate of fatherlessness is 35.3% for white Americans, 52.6% for all Hispanic

---

[20] Dr. Burch conflates FBI terminology, specifically "crimes against persons" with "violent crimes," when attempting to demonstrate that "racial discrimination is responsible for racial disparities in the criminal justice system." PX13 at 12.

[21] Dr. Bagley contends that the effects of historic discrimination appear in Alabama's parole statistics. But he acknowledged on cross that this proposition was founded on untested and unconfirmed allegations in a complaint filed in a pending lawsuit. Tr. 601-02.

Americans, 65.7% for Native Americans and Alaska Natives, and 69% for African Americans. DX9 at 14; Tr. 804.

338.  Finally, Plaintiffs did not present a witness whose political participation was hampered by past discrimination. Instead, witnesses such as Benard Simelton, Mary Peoples, Scott Douglas, and Defendant's witness Bill McCollum—each of whom is old enough to have attended segregated schools—are all extremely politically active.

339.  Tellingly, Scott Douglas, President of GBM, and Benard Simelton, President of the Alabama State Chapter of the NAACP, have had zero communications with any GBM client or donor or Alabama NAACP member who wanted to become more involved in Alabama politics but found that he could not engage with either the Alabama Democratic or Republican parties. Tr. 515:11-25, 194:12-23.

340.  In sum, the Court credits Dr. Hood's and Dr. Reilly's testimony that socioeconomic gaps in Alabama are comparable to other States and are better explained by non-racial factors rather than official discrimination. Conversely, the Court does not credit Dr. Bagley's and Dr. Burch's mere identification of socioeconomic disparities as probative of vote dilution in the challenged areas. Critically, Plaintiffs' experts failed to analyze or explain whether or how these gaps are caused by discrimination.

341. Finally, the Court recounts the many mistakes and mischaracterizations in Dr. Bagley's and Dr. Burch's testimony that further undermine the credibility of their opinions.

342. First, Dr. Burch cites *Madison v. Commissioner, Alabama Department of Corrections*, 677 F.3d 1333 (11th Cir. 2012), in support of her assertion that "[p]rosecutors in Alabama have been found to use peremptory strikes against potential Black jurors in a racially discriminatory manner." PX13 at 13 & n.58. Neither the Eleventh Circuit nor the district court on remand found any such thing. *See Madison*, 761 F.3d 1240, 1255 (11th Cir. 2014). When confronted about this at trial, she made conflicting statements in an attempt to explain away her inaccuracy. Tr. 752-54.

343. Second, Dr. Burch invokes Alabama's requirement that voters present photo ID as evidence of racial disparities in voting, citing to a portion of the district court's opinion in *Greater Birmingham Ministries v. Merrill*. PX11 at 19 n.52 (citing 284 F. Supp. 3d 1253, 1269 (N.D. Ala. 2018)). She ignores both the fact that the State provides free IDs to all who qualify, and the district court's and Eleventh Circuit's finding that the photo ID requirement had neither a discriminatory purpose *or effect*. *GBM*, 284 F. Supp. at 1279-1283; *Greater Birmingham Ministries v. Secy' of State for State of Ala.*, 992 F.3d 1299, 1337 (11th Cir. 2021).

344.    Third, Dr. Burch cites the costs of notarization as a racially disparate obstacle to voting absentee, referencing a report she submitted in *People First of Ala. v. Merrill*, 491 F. Supp. 3d 1076, 1179 (N.D. Ala. 2020). PX11 at 19-20 & n.52. She failed to acknowledge, however, that the court in *People First* ultimately found that "plaintiffs failed to prove that the notary aspect of the witness requirement imposes even a slight burden on them, during or outside of the pandemic." 491 F. Supp. 3d at 1179.

345.    Finally, Dr. Burch writes that "[a] study by the University of Alabama finds that lower test scores between Black and White students in Alabama result in part from a lack of qualified math and science teachers." PX13 at 9 & n.32. Both articles focus on disparities between residents of the Black Belt and residents elsewhere in Alabama with no discussion (or even mention) of differences between black and white students. *Compare id.*, *with* PX149, *and* PX150. *See also* Tr. 718.

346.    Dr. Bagley, for his part, includes in his report a narrative of so-called "ongoing discrimination" that he claims "elevates" the socioeconomic disparities experienced by black Alabamians. PX19 at 23. For example, he writes about desegregation orders, opposition to the pedagogy of "Critical Race Theory," "white flight," and investigations by federal agencies.

347. Dr. Bagley contends that there are schools in the Huntsville area that remain under desegregation orders, affecting the educational attainment of black students in the area. However, he concedes that an ongoing desegregation order does not mean that a system is admitting or refusing to admit students on the basis of race. Tr. 605. He concedes as well that schools in Huntsville are working to improve education opportunities for their students, and he has not reviewed the most recent reports to determine what progress has been made. Tr. 605, 608-09.

348. Dr. Bagley opines that Montgomery schools are harmed by the presence of the nearby community of Pike Road, which he describes as a "white flight" community. PX19 at 26-27. The Court does not credit this characterization whatsoever. Dr. Bagley claims that the town and school system were formed for the purpose of having majority-white schools and majority-white, if not all white, leadership. *Id.* However, he did not investigate whether there were black citizens involved in forming the town or school system (there were). Tr. 614. And he acknowledges that the Pike Road Census County Division (CCD) has nearly equal black and white populations (9,462 white and 8,375 black). Tr. 615.

349. Defendant presented evidence demonstrating the inaccuracy of Dr. Bagley's description of Pike Road. Susan Copeland, a 13-year resident of Pike Road, alongside Doyle Fuller, served as the legal counsel for the Town of Pike Road for 25 years. During their tenure as legal counsel, race was never a factor motivating

any decision of Pike Road. Tr. 1570:4-9. When Pike Road was incorporated in October of 1997, it was approximately 40% black. Tr. 1553:12-20.

350.   Dr. Bagley's mischaracterization of Pike Road's leadership was discredited by Ms. Copeland's testimony. From 1998 to 2020, the Town of Pike Road always had at least one black member serving on the Town Council (1998-2004: Henry Curry and Charles Julius; 2004-2008: Charles Julius and Leroy Tolliver; 2008-2020: Leroy Tolliver). Tr. 1555:18-22; 1556:24. Moreover, these members were elected at-large by Pike Road residents, meaning a sufficient number of residents—black and white—elected black councilmen. Tr. 1555:23-24. In addition, some of the first Town Council meetings were held at Peace Baptist Church, a predominantly black congregation, which was the only public building part of the original incorporation. Tr. 1556:12-23.

351.   Ms. Copeland's testimony of the annexation process discredits Dr. Bagley's unsupported suggestions that black individuals were not wanted in Pike Road. The majority of the property annexed from Montgomery County into Pike Road was done through petition. Tr. 1557:25-1558:1. Black landowners successfully petitioned to have their property annexed into Pike Road. As long as the subject land was contiguous to Pike Road, *any* landowner was eligible to petition to have their land annexed into Pike Road. Tr. 1558:2-13. In fact, all petitions that met the legal requirements (i.e., involved contiguous land, included the deed to the property, and

was completed by the landowner) were presented to the Town Council, and Copeland could not remember any time that the Council ever denied a petition. Tr. 1560:2-7. Pike Road's decision to separate from the Montgomery Public School System and form an independent school system did not have anything to do with race. Tr. 1561-62. From the time Pike Road incorporated to the time Pike Road formed its own school system, there were no county schools located in the Pike Road municipal limits, and the Montgomery County School System did not try to build a public school within Pike Road's limits. Tr. 1562:25-1563:19. Accordingly, the town sought to build its own system so it could then build schools within the town limits.

352.    As the Pike Road student population grew, the town needed to purchase an additional facility to operate as the high school. The town purchased the Georgia Washington facility because the middle school was closing and it was the closest facility to the town limits. Tr. 1564:6-15. The school was closing regardless of whether or not it was sold to Pike Road. Tr. 1564:21-24. Georgia Washington, the school's namesake, was a former slave; she started the original Georgia Washington school and was a beloved member of the community. Tr. 1567:13-17. To recognize and honor her legacy, Pike Road keeps "Georgia Washington" in the name of the high school and maintains the burial plot of Ms. Washington on campus. Defendant's witness Dr. Patricia Payne, a Pike Road resident since 1997 and active member

of her community, described Dr. Bagley's accusation as "actually laughable, because we had black members on our council and on our education committee." Tr. 1599:20-1600:1. Pike Road, in her experience, is "a multiracial community" without any "solidly black or white" neighborhoods. Tr. 1596:16-19.

353.   Dr. Bagley devoted two paragraphs of his report to an op-ed Dr. Payne authored in 2010 advocating for a separate Pike Road school system. PX19 at 26-27. Quoting statements like "preserve and protect … their preferred way of life," "encroachment" from Montgomery, and "liv[ing] off the land," Dr. Bagley accused Dr. Payne of using "colormasked language." PX19 at 26. Dr. Payne vehemently denied using language with any racial undertones, and noted that Dr. Bagley never contacted her about her statements. Tr. 1594:10-20, 1599:1-19. "Had he done his research well," Dr. Payne remarked, Dr. Bagley would have discovered "that we had African-Americans on our first town council, that we met in a black church, that African-Americans were part of our planning committees for our education committees." Tr. 1620:24-1621:4.

354.   Dr. Bagley also opines about the presence of private schools in the Montgomery area that he refers to as "segregation academies," asserting that their presence is damaging to public school options in Montgomery. PX19 at 26. However, Dr. Bagley does not suggest that parents who send their children to private schools do so because they do not want their children to attend classes with black

children. Tr. 611. He further concedes that at least some children in Montgomery are able to attend better schools because of tuition and voucher options offered by the State. Tr. 609.

355.    To counter Dr. Bagley's testimony about Montgomery private schools, Defendant presented Josh Roberts, who is currently serving as President and Head of School at Alabama Christian Academy ("ACA"), a private Christian K-12 school founded in Montgomery in 1942. ACA along with Montgomery Academy, Saint James School, Trinity, and Montgomery Catholic, constitute the five Capital City Conference schools. Tr. 1092:19-1093:3. To characterize any of these as a "segregation academy" would be "deeply offensive," said Roberts. Tr. 1100:13-1102:1. All Capital City Conference schools accurately represent themselves as racially diverse, *id.*, and offer needs-based financial aid via the Alabama Accountability Act program. Tr. 1104:16-1107:7, 1124:7-19. Students receiving AAA benefits are not required to pay up front and wait for reimbursement. Tr. 1109:7-1110:16. Mr. Roberts also testified that while funding can impact a student's educational performance, many other things can as well, such as parental support, teacher engagement, class sizes, peer support, curriculum design, and adequate sleep. Tr. 1122:16-25, 1124:20-1126:9.

356.    The Court credits Mr. Robert's testimony, based on his personal knowledge and experience, about the quality and character of private education in

Montgomery over Dr. Bagley's unsupported accusations of "renewed white flight." PX19 at 26.

357.   Finally, Dr. Bagley opines in his report that "DOJ found abundant evidence that the state had been discriminating against Black residents of Lowndes County, the majority of whom not only lack access to functioning wastewater systems but have also been held criminally accountable …. Residents were cited for fashioning homemade wastewater systems when their septic tanks failed and began seeping up through the ground, leading to an outbreak of hookworm." PX19 at 28.

358.   The Court heard responsive testimony from Dr. Karen Landers, Chief Medical Officer for the Alabama Department of Public Health. Tr. 1294-96, 1306-07. Dr. Landers testified that the memorandum of understanding between ADHP and DOJ contained no admission of liability and no finding of noncompliance with federal law. Tr. 1307. She testified further that there had been no evidence of a hookworm outbreak in the region. Tr. 1299:19-1300:10. She then explained the various ways that ADHP was working hard to help the residents of Lowndes county with sewage issues. Tr. 1301-02. The Court credits Dr. Landers's testimony.

359.   Plaintiffs' inability to tie Alabama's history to current socioeconomic conditions requires the Court to find that this factor weighs in favor of the State.

### 6.    Senate Factor 6: Plaintiffs have not shown that political campaigns in Alabama are characterized by racial appeals.

360.    Just a couple election cycles ago the Middle District of Alabama concluded that "[t]here is no evidence that Alabama political campaigns *generally* … are characterized by racial appeals." *Ala. NAACP*, 612 F. Supp. 3d at 1311. Plaintiffs' evidence, comprising a few pages in Dr. Bagley's report, reveals no change since then.

361.    As an initial matter, Dr. Bagley does not cite a single example of a racial appeal from a state Senate race, much less one in the Huntsville or Montgomery areas. *See id.* (giving appeals slight weight that did not occur in endogenous elections).

362.    Worse yet, very few of the examples cited were part of a political campaign at all, even if they were uttered by a politician. And of those statements made off the campaign trail, some were made in private. Tr. 618:24-25.

363.    Statements occurring outside the context of a political race, and certainly those made in private, are not campaign "racial appeals," by definition, and have little if any "signaling effect to voters." *Ala. NAACP*, 612 F. Supp. 3d at 1311.

364.    And very few of these were "intrinsically racial." *Id.* Those of the "subtle," or, as Dr. Bagley puts it, "color masked" variety, Tr. 612, come with "no evidence that voters saw them that way," *Ala. NAACP*, 612 F. Supp. 3d at 1311. When

reading a racial intent into these statements, Dr. Bagley diverges from political science and slips into what Dr. Carrington described as "amateur psychology." Tr. 1146:1.

365.    Among the two or three ads that were actually part of a political campaign, one features Democrat Doug Jones's successful race for U.S. Senate in 2017. PX19 at 33. The ads were plainly designed to encourage black Alabamians to vote, not to intimidate them or engender antagonism against their preferred candidates. Tr. 621.

366.    Contrast Doug Jones's appeals *to* black voters with the situation described by the Supreme Court in *White v. Regester*—the decision from which Senate factor six's language was taken. In 1970s Dallas County, Texas, the "white-dominated" Democratic Party mechanism deployed "racial campaign tactics in white precincts to *defeat* candidates who had the overwhelming support of the black community." 412 U.S. 755, 767 (1973) (emphasis added). In other words, Dallas County Democrats were using racial appeals to stir up white voters against Democratic candidates preferred by black voters.

367.    Doug Jones's attempts to encourage rather than squelch black political participation is not the "[e]vidence of racism" Senate factor six is aimed at uncovering. *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1571 (11th Cir. 1984).

368.    What is left, arguably, are two ads, one by a candidate for State House and another by a candidate for Chief Justice of the Alabama Supreme Court. Tr. 618. Even if these ads are considered "racial appeals," they "do not demonstrate a pattern, practice, or routine of racial appeals across the election landscape." *Ala. NAACP*, 612 F. Supp. 3d at 1311.

369.    The Court gives this factor "no weight." *Id.* at 1316.

### 7.    Senate Factor 7: Minorities have achieved success in Alabama elections.

370.    Section 2 explains that "[t]he extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered" in evaluating a §2 claim's sufficiency. 52 U.S.C. § 10301(b). Cribbing from the statute, the seventh Senate factor examines "the extent to which members of the minority group have been elected to public office in the jurisdiction." *Gingles*, 478 U.S. at 37.

371.    While the relevant "minority group" is clear (black Alabamians), the relevant "jurisdiction" is less clear. That there is no specific "State or political subdivision" at issue where litigants seek to establish a *new* political district suggests that the relevant language from §2(b)—and its corresponding Senate factor—has at best limited applicability to this case.

372.    To the extent the seventh Senate factor applies here, the Court need not constrain its analysis to only statewide elections or legislative elections in the Huntsville and Montgomery areas. Given that legislative races are districted rather than statewide, the success of minority candidates in districted races for a State-level office (e.g., the State Legislature) warrants consideration.

373.    The *Alabama NAACP* court, finding this factor's language ambiguous where, as here, "[t]here [was] no political subdivision at issue," explained that "local, districted elections" within the broader jurisdiction (here, the State) are "entitled to some weight for purposes of the seventh senate factor," and concluded that "Senate factor 7 weighs in favor of Plaintiffs on statewide elections but weighs in favor of the State on elections statewide." 612 F. Supp. 3d at 1315.

374.    The *Alabama NAACP* court's interpretation accords with §2's text, asking only whether black Alabamians "have been elected to office *in the* State *or* political subdivision. 52 U.S.C. §10301(b) (emphasis added). An inquiry into districted elections is important in showing this factor and shows that minorities have achieved electoral success in Alabama.

375.    "Alabama has made remarkable progress in the election of people of color to public office in the last fifty years." *Ala. NAACP*, 612 F. Supp. 3d at 1315. Dr. Hood examined the number and percentage of black legislators elected to each chamber of the Alabama Legislature at three points in history: 1965, 1981, and 2024.

In 1965, there were no black legislators in Alabama. In 1981, there were 3 in the Senate (8.6%) and 13 in the House (12.4%). Today there are 7 in the Senate (20%) and 26 in the House (24.8%). DX at 22. And a quarter of the State Board of Education's members are black. *See* ALABAMA STATE DEP'T OF EDUC., STATE BD. OF EDUC., https://www.alabamaachieves.org/state-board-of-education/ (last visited Dec. 11, 2024). Accordingly, this factor "weighs in favor of the State on elections statewide." *Ala. NAACP*, 612 F. Supp. 3d at 1315

376.    To the extent the seventh Senate factor applies to cases like this one, it appears to favor Alabama.

### 8.    Senate Factor 8: Elected officials are responsive to minority needs.

377.    The eighth factor asks "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group." *Gingles*, 478 U.S. at 37. What meager, unsubstantiated evidence Plaintiffs have offered of this "highly subjective" factor, H.R. Rep. No. 97-227 at 30 (1981), Defendant has thoroughly rebutted. This factor weighs in favor of Defendant.

378.    *First*, Dr. Bagley cites the "lack of responsiveness" finding from the *Milligan* three-judge court in its September 9, 2023, order preliminarily enjoining Alabama's 2023 Congressional Plan. PX19 at 34. The court stated that the State's "view" that "the Legislature could remedy the vote dilution we found without

providing the remedy we said was required" "illustrates the lack of political will to respond to the needs of Black voters in Alabama in the way that we ordered." *Singleton v. Allen*, 690 F. Supp. 3d 1226, 1316-17 (N.D. Ala. 2023).

379.  "Redistricting is never easy," especially considering the "competing hazards of liability" posed by the race-neutral Constitution and §2. *Abbott v. Perez*, 585 U.S. 579, 585, 587 (2018). *Allen v. Milligan* is subject to more than one fair reading, and the Supreme Court has said elsewhere that remedying violations in "disparate-impact cases should concentrate on the elimination of the offending practice." *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 544 (2015). There is a colorable argument that the 2023 Plan attempted to do just that by uniting Black Belt counties into two compact districts and keeping Montgomery whole—treating them as well as other communities of interest that were preserved in the 2021 Plan. Moreover, at least eight Justices in *Allen* agreed that race cannot predominate in an illustrative map,[22] while only four expressly held that race did not predominate in some of the *Caster* Plaintiffs' maps.[23] Plus, five Justices questioned the constitutionality of continued race-based districting under §2.[24]

---

[22] *See Allen*, 599 U.S. at 33 (plurality) ("The line that we have long drawn is between consciousness and predominance."); *id.* at 59 (Thomas, J., dissenting) (A plaintiff cannot satisfy *Gingles* 1 "by drawing an illustrative map in which race was predominant.").

[23] *See id.* at 32-33 (plurality).

[24] *See id.* at 45 (Kavanaugh, J., concurring) (citing *id.* at 88 (Thomas, J., dissenting)).

380.    Plaintiffs here and those in the congressional cases have a certain view of what §2 requires, and the three-judge court preliminarily agreed with them. But for the State to embrace a different view does not necessarily communicate a purpose of discriminating against black Alabamians or refusing to respond to their needs. To the contrary, the very disagreement points to an additional obvious alternative explanation—other than race—for the Legislature's actions: the fear that it would be engaging in unconstitutional race-based sorting by adopting one of the *Milligan*, *Caster*, or *Singleton* plaintiffs preferred plans. *See Fusilier v. Landry*, 963 F. 3d 447, 464-65 (5th Cir. 2020) ("The choice to evade claims of racial gerrymandering … does not reveal discriminatory intent."). Even if that fear is not ultimately vindicated, it is well-founded.

381.    The Court is mindful that, when challenging the 2021 congressional plan, the *Milligan* plaintiffs put on expert evidence that a "race-neutral plan" would decrease District 7's BVAP to "around 50%," increase District 2's BVAP to "almost 40%," and would keep Montgomery County whole. *See Milligan v. Allen*, No. 2:21-cv-1530, Docs. 69 at 36, 68-4 ¶¶25, 27, 28 41 (N.D. Ala. filed Dec. 14-15, 2021). And when requesting relief for their gerrymandering claim, the *Milligan* plaintiffs argued that a plan with District 7 around 50% BVAP and District 2 at "almost 40%" would be a plan in which "Black voters are no longer artificially denied electoral

influence in a second district." *Milligan*, Doc. 69 at 36. Thus, the State could reasonably have thought that going beyond the *maximum* BVAP possible for District 2 in a "race-neutral plan" would constitute racial gerrymandering. *See Milligan*, Doc. 68-4 ¶41. Moreover, the *Singleton* plaintiffs had already argued that the State's 2021 plan was a racial gerrymander for having even one majority-BVAP district. *See Singleton v. Merrill*, 582 F. Supp. 3d 924, 951-52 (N.D. Ala. 2022). Thus, the State's decision to enact a 2023 plan with demographics that the *Milligan* plaintiffs had previously said would remedy purported "artificial[] deni[al]" of "electoral influence in a second district" appears to be driven by the Legislature's desire to avoid racial gerrymandering liability.

382.    Consider the plight of nearby Louisiana. Following the 1990 census, Louisiana enacted a plan containing a second majority-black congressional district. *Hays v. State of La.*, 936 F. Supp. 360, 363 (W.D. La. 1996). During the ensuing years, a federal court thrice held that the plan violated the Equal Protection Clause. *Id.* at 362. Following the 2020 Census, Louisiana enacted a plan with one majority-black district, but that violated §2 for not containing a second. *Robinson v. Ardoin*, 605 F. Supp. 3d 759 (M.D. La. 2022). The State enacted a new congressional map with a second majority-black district, and one week later was sued for racial gerrymandering. *Callais v. Landry*, 2024 WL 1903930 (W.D. La. Apr. 30, 2024). The court held that race predominated in Louisiana's new plan, notwithstanding the

State's argument that the plan merely reflected the racial remedy ordered by the *Robinson* court. *Id.* at \*17. The case is now pending before the Supreme Court,[25] which will again wade into an area of the law that has proven "notoriously unclear and confusing." *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring).

383.    *Second*, Dr. Bagley asserts that the Legislature's failure to enact certain Democratic policy items, such as Medicaid expansion, proves a lack of responsiveness to the needs of black Alabamians. The decision whether to expand the State's participation in a massive federal welfare program is a paradigmatic *political*, rather than racial, decision. Nor is it surprising that a politically conservative State declined the administrative costs and tax increases that Medicaid's expansion would likely have required. Dr. Bagley's accusation would suggest that whenever a "white majority" Republican legislature fails to legislate in a way preferred by Democrats, then the legislature must have done so *because* many Democrats are black. That line of reasoning, if condoned, threatens to "transform federal courts into weapons of political warfare," waged with baseless accusations of racism. *Alexander*, 602 U.S. at 11. The Court refuses to go there.

---

[25] *See Louisiana v. Callais*, No. 24-109 (U.S. filed June 18, 2024; probable jurisdiction noted Nov. 4, 2024)

384.   *Third*, Dr. Bagley incorporates by reference the "across-the-board socioeconomic disparities" from earlier in his report and in Dr. Burch's as evidence of the State's lack of responsiveness. Failure to "close the gaps" by state lawmakers is not evidence of a dismissive posture toward black Alabamians, lest §2 mutate into "an affirmative-action program" for political minorities. *Shaw v. Hunt*, 517 U.S. 899, 910 (1996).

385.   Contrast Dr. Bagley's "evidence" with that infecting 1970s Dallas County, Texas. *See White v. Regester*, 412 U.S. 755, 767 (1973) (noting that the Democratic Party did not "exhibit good-faith concern for the political or other needs and aspirations of the [black] community"). In the case leading to the Supreme Court's decision in *White v. Regester*, the district court recounted evidence of "a recurring poor performance on the part of the Dallas County delegation concerning the representation of black interests in the Texas House of Representatives":

> State legislators from Dallas County, elected county-wide, led the fight for segregation legislation during the decade of the 1950's. Indeed, the record reveals that during the late 1950's not one member of the Dallas County delegation voted against certain segregation measures introduced in the Texas House. Moreover, it has been shown that hostility toward the black community is still an integral part of Dallas County politics.

*Graves v. Barnes*, 343 F. Supp. 704, 726 (W.D. Tex. 1972). This is what "a significant lack of responsiveness" looks like—active hostility toward the black community and segregationist legislation.

386.    Thankfully, the record in this case paints nowhere near so dismal a picture. In sum, the Court does not find that the 2023 congressional plan, the failure to expand Medicaid, or the mere existence of socioeconomic disparities, amounts to evidence of "a significant lack of responsiveness … to the particularized needs" of black Alabamians.

387.    This factor weighs in favor of Defendant.

### 9.    Senate Factor 9: The State's districts are not "tenuous."

388.    The final Senate factor asks "whether the policy underlying" the "standard, practice or procedure" at issue "is tenuous." *Gingles*, 478 U.S. at 36-37. According to the Senate Report, an electoral practice is "tenuous" if "the procedure markedly departs from past practices or from practices elsewhere in the jurisdiction." S. Rep. 97-417, 29 n.117.

389.    The Alabama Legislature produced the 2021 Plan using the same commonplace process previous Legislatures had used: begin with the currently existing maps; evaluate where population had increased and decreased; and then—without incorporating race—add or reduce population to achieve equality.

390.    The "procedure" that produced the districts in the 2021 Map is "the very opposite of tenuous: It is weighty." *Ala. NAACP*, 612 F. Supp. 3d at 1316.

114

## CONCLUSION

The Court enters final judgment in favor of the State Defendant and against Plaintiffs.

Steve Marshall
  *Attorney General*

Edmund G. LaCour Jr. (ASB-9182-U81L)
  *Solicitor General*

James W. Davis (ASB-4063-I58J)
  *Deputy Attorney General*

*/s/ Soren Geiger*
Soren Geiger (ASB-0336-T31L)
Dylan Mauldin (ASB-3281-Z11M)
  *Assistant Solicitors General*

Charles A. McKay (ASB-7256-K18K)
Misty S. Fairbanks Messick (ASB-1813-T71F)
Richard D. Mink (ASB-4802-M76R)
Benjamin M. Seiss (ASB-2110-O00W)
Brenton M. Smith (ASB-1656-X27Q)
  *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama  36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Soren.Geiger@AlabamaAG.gov
Dylan.Mauldin@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Misty.Messick@AlabamaAG.gov
Brenton.Smith@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov
Charles.McKay@AlabamaAG.gov
Richard.Mink@AlabamaAG.gov

J. Dorman Walker (ASB-9154-R81J)
BALCH & BINGHAM LLP
445 Dexter Avenue, Suite 8000
Montgomery, Alabama 36104
Telephone: (334) 269-3138
DWalker@Balch.com

Michael P. Taunton (ASB-6833-H00S)
Riley Kate Lancaster (ASB-1002-X86W)
BALCH & BINGHAM LLP
1901 Sixth Avenue North, Suite 1500
Birmingham, Alabama 35203
Telephone (205) 251-8100
MTaunton@Balch.com
RLancaster@Balch.com

***Counsel for Secretary of State Allen***

## CERTIFICATE OF SERVICE

I certify that on December 13, 2024, I electronically filed the foregoing notice with the Clerk of the Court using the CM/ECF system, which will send notice to all counsel of record.

*/s/ Soren Geiger*
Counsel for Defendant