FILED
2025 Aug-22  AM 10:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **ALABAMA STATE CONFERENCE OF THE NAACP,** *et al.*, | ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Case No.: 2:21-cv-1531-AMM** |
| **WES ALLEN,** *in his official capacity as Alabama Secretary of State*, | ) ) ) ) ) | |
| **Defendant.** | ) ) | |

## INJUNCTION AND ORDER
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

In this redistricting case, the plaintiffs allege that Alabama's districting plan for the Alabama Senate dilutes the votes of Black Alabamians in the Huntsville and Montgomery areas in violation of Section Two of the Voting Rights Act of 1965, 52 U.S.C. § 10301 ("Section Two"). This case is one of four cases currently pending in the Northern District of Alabama that allege that Alabama's electoral maps dilute the votes of Black Alabamians in violation of Section Two: *Singleton v. Allen*, No. 2:21-cv-1291-AMM, *Milligan v. Allen*, No. 2:21-cv-1530-AMM, and *Caster v. Allen*, No. 2:21-cv-1536-AMM, challenge Alabama's congressional districting map. Final judgment in those cases recently entered after a bench trial; it held that Alabama's congressional districting plan violated both Section Two and the

Fourteenth Amendment to the United State Constitution. Those cases are now on a third appeal to the Supreme Court of the United States, and this one is ripe for decision.

These plaintiffs request an injunction barring Alabama Secretary of State Wes Allen from conducting elections for the 35-member Senate according to the plan the Alabama Legislature enacted in 2021 ("the Plan" or "the Enacted Plan"). That Plan has eight majority-Black districts. The districting plan for the Alabama Senate has included eight majority-Black districts since the 1990 census cycle. *See Montiel v. Davis*, 215 F. Supp. 2d 1279, 1281–82 (S.D. Ala. 2002).

Currently, all seven Black Senators were elected from majority-Black districts, and every Black Representative in the Alabama House except one was elected from a majority-Black district. Doc. 230 ¶ 117. There are no Black statewide elected officials in Alabama, Doc. 230 ¶ 93, and "[o]nly one Black person has ever been elected to statewide office in a contested election in Alabama[,]" and that person was elected after first being appointed, Doc. 230 ¶ 94.

Because the plaintiffs did not seek preliminary injunctive relief, Alabama Senators serve four-year terms, and Alabama law prohibits mid-decade redistricting for state legislative seats, the Secretary administered the 2022 Senate elections according to the Plan, and the plaintiffs seek relief for the 2026 and 2030 elections. *See* Ala. Const. art. IV, § 46, art. IX, § 200.

The parties have developed an extensive record. The Court has the benefit of an eight-day trial, live testimony from twenty witnesses (including ten experts), designated deposition testimony from three lay witnesses, reports and rebuttal reports from every expert, joint stipulations of fact that span twenty-seven pages, proposed findings of fact and conclusions of law that span more than 400 pages, and able argument by the forty-eight lawyers who have appeared in the litigation.

Based on the findings of fact and conclusions of law explained below, including the Court's assessments of the credibility of expert witnesses, the Court concludes that the plaintiffs have failed to establish a Section Two violation in the Huntsville area, and they have established a Section Two violation in the Montgomery area.

The record about the plaintiffs' Huntsville-area claim does not satisfy the applicable legal test for Section Two because it does not establish that as a group, Black voters are sufficiently numerous and geographically compact there to constitute a voting-age majority in an additional reasonably configured district. The plaintiffs offer only one Huntsville-area illustrative district in which Black voters comprise a voting-age majority, and the shape of that district, together with its compactness scores and its failure to serve traditional districting principles, foreclose a finding that it is reasonably configured.

On the other hand, the record about the plaintiffs' Montgomery-area claim

satisfies the applicable legal test for Section Two relief. The parties agree that Black voters comprise a voting-age majority in plaintiffs' Montgomery-area illustrative district. The shape of that district, together with its compactness scores and its adherence to county lines and other traditional districting principles, support a finding that it is reasonably configured. Further, the parties agree (as they must) that patterns of racially polarized voting are apparent in Alabama elections.

The Secretary nevertheless resists relief in the Montgomery area primarily on two grounds, and the Court rejects both arguments. There is no evidence (not even the Secretary's own expert witness) to support the Secretary's contention that considerations of race predominated in the plaintiffs' map-drawing process for their Montgomery-area illustrative district. Indeed, all the evidence probative of this issue establishes that race did not predominate in that process. Likewise, the evidence does not support the Secretary's contention that patterns of racially polarized voting are attributable only to voters' political party affiliations, divorced from considerations of race.

For these reasons, and because the evidence establishes that the totality of the circumstances supports Section Two relief, the Court finds a Section Two violation in the Montgomery area and **ENJOINS** Secretary Allen and his successors in office from conducting any Senate elections according to the Plan.

Under the statutory framework, Supreme Court precedent, and Eleventh

Circuit precedent, the appropriate remedy is a redistricting plan that includes either an additional majority-Black Senate district in the Montgomery area, or an additional district there in which Black voters otherwise have an opportunity to elect a Senator of their choice. *See, e.g.*, *Bartlett v. Strickland*, 556 U.S. 1, 24 (2009). Supreme Court precedent dictates that the Legislature should have the first opportunity to draw that plan. *See, e.g.*, *North Carolina v. Covington*, 585 U.S. 969, 979 (2018); *White v. Weiser*, 412 U.S. 783, 794–95 (1973). The Legislature enjoys broad discretion (broader than the Court's) and may consider a wide range of remedial plans.

As the Legislature considers such plans, it should be mindful of the practical reality, based on the ample evidence of intensely racially polarized voting adduced during the trial, that any remedial plan will need to include an additional district in the Montgomery area in which Black voters either comprise a voting-age majority or something quite close to it.

For the reasons set forth below, the Secretary's motion for judgment as a matter of law is **DENIED**. To facilitate timely remedial proceedings, a status conference is **SET** for **AUGUST 28, 2025,** at 10:00 AM in the Third Floor Courtroom, Robert S. Vance Federal Building and United States Courthouse, 1800 5th Avenue North Birmingham, Alabama 35203. The parties are **ORDERED** to file a joint status report with the parties' proposals for moving the case forward at or before noon Central Daylight Time on **AUGUST 27, 2025.**

# TABLE OF CONTENTS

I.   BACKGROUND ...........................................................................4

  A.  Procedural Posture ...............................................................4

  B.  Legal Background ................................................................5

  C.  Factual Background .............................................................13

  D.  Claims and Defenses ...........................................................19

    1.  Huntsville – Senate Districts 2, 7, and 8 ...................................19

    2.  Montgomery – Senate Districts 25 and 26 ..................................20

II.  STANDARD OF REVIEW ...........................................................21

III.  APPLICABLE LAW .................................................................21

IV.  ANALYSIS ..........................................................................31

  A.  Plaintiffs' Arguments ..........................................................31

    1.  *Gingles* I – Numerosity and Reasonable Compactness ...................31

      a.  Mr. Anthony Fairfax ...................................................35

        i.  Montgomery – Senate Districts 25 and 26 ........................41

          a. Numerosity ...................................................43

          b. Reasonable Configuration ....................................43

        ii.  Huntsville – Senate Districts 2, 7, and 8 .........................43

          a. Numerosity ...................................................46

          b. Reasonable Configuration ....................................53

      b. Dr. Kassra Oskooii ...................................................55

    2.  *Gingles* II and III – Racially Polarized Voting (Dr. Liu)...................61

    3.  The Senate Factors and Proportionality ....................................70

      a.  Stipulations ...........................................................72

      a.  The Plaintiffs' Expert Witness Testimony...............................73

       i. Dr. Joseph Bagley ...................................................73

       ii. Dr. Traci Burch ......................................................82

      b.  The Plaintiffs' Lay Witness Testimony At Trial ......................87

      c.   Designated Deposition Testimony ........................................92

  B.  Secretary Allen's Arguments ...........................................96

    1.  *Gingles* I – Numerosity and Reasonable Compactness ...........96

      a.  Montgomery – Senate Districts 25 and 26............................98

        i.   Numerosity .................................................98

        ii.  Reasonable Configuration ..............................98

      b.  Huntsville – Senate Districts 2, 7, and 8 ...........................100

        i.   Numerosity .................................................100

        ii.  Reasonable Configuration ..............................105

    2.  *Gingles* II and III – Racially Polarized Voting .......................112

    3.  The Senate Factors........................................................114

      a.  The Secretary's Expert Witness Testimony.........................114

        i.   Dr. Christopher Bonneau ...............................114

        ii.  Dr. Wilfred Reilly........................................119

        iii.  Dr. M.V. Hood, III .......................................125

        iv.  Dr. Adam Carrington....................................129

      b.  The Secretary's Lay Witness Testimony ...........................135

    4.  Legal Challenges to Section Two.....................................146

V.  FINDINGS OF FACT AND CONCLUSIONS OF LAW ...........................146

  A.  *Gingles* I – Numerosity ...............................................146

    1.  Illustrative Plans 1 and 2A – How to Measure the Black Population......146

    2.  Illustrative Plan 3.........................................................151

  B.  *Gingles* I – Reasonable Configuration ...........................151

    1.  Expert Credibility Determinations ...................................152

    2.  Huntsville .................................................................154

      a.  Visual Assessment and Traditional Districting Principles.................154

      b.  Geographic Compactness Scores ...............................162

    3.  Montgomery ..............................................................165

      a.  Visual Assessment...............................................165

     b.   Geographic Compactness Scores .........................................................165

     c.   Traditional Districting Principles ....................................................166

C.  *Gingles* II and III – Racially Polarized Voting ...........................................171

  1.  Expert Credibility Determinations ...........................................................172

  2.  Patterns of Racially Polarized Voting ......................................................173

  3.  Arguments About Legally Significant Racially Polarized Voting and Dr. Trende's Effectiveness Analysis ..................................................................175

  4.  Arguments About Party Politics................................................................177

D.  The Senate Factors.............................................................................................179

  1.  Credibility Determinations .......................................................................179

  2.  Senate Factor 2 .........................................................................................187

  3.  Senate Factor 7 .........................................................................................197

  4.  Senate Factors 1, 3, and 5 ........................................................................199

  5.  Senate Factor 6 .........................................................................................212

  6.  Senate Factor 8 .........................................................................................214

  7.  Senate Factor 9 and 4 ...............................................................................215

E.  Section Two is privately enforceable. ..............................................................216

  1.  Text of Section Two ..................................................................................218

  2.  Section Two Precedents ............................................................................233

     a.   Relevant Precedent ...............................................................................233

     b.   Congressional Ratification ...................................................................239

     c.   Statutory Stare Decisis .........................................................................241

F.  The plaintiffs have standing. ............................................................................243

VI.   REMEDY .................................................................................................................246

VII.  EVIDENTIARY RULINGS.....................................................................................248

VIII. THE SECRETARY'S MOTION FOR JUDGMENT AS A MATTER OF LAW........................................................................................................................248

APPENDIX A – COMMITTEE GUIDELINES .....................................................250

# I.    BACKGROUND

## A.    Procedural Posture

On November 4, 2021, Governor Kay Ivey signed into law Senate Bill 1, which provided a redistricting plan for Alabama Senate elections based on data from the 2020 census. Doc. 206-1.[1] On November 16, 2021, a group of plaintiffs sued the former Secretary (John Merrill)[2] and the co-chairs of the Legislature's Permanent Legislative Committee on Reapportionment ("the Committee") (Representative Chris Pringle, and Senator Jim McLendon, collectively "the Legislators"), alleging that the Plan violated both Section Two and the Fourteenth Amendment to the United States Constitution. Doc. 1 at 1 & ¶ 5. The Chief Judge of the United States Court of Appeals for the Eleventh Circuit convened a three-judge court. Doc. 5.

On December 6, 2023, the plaintiffs filed the operative complaint against Secretary Allen, Representative Pringle, and Senator Steve Livingston.[3] Doc. 126. In that complaint, the plaintiffs asserted a Section Two claim but no constitutional claims. *Id.* ¶¶ 170–76. The three-judge court thus dissolved itself, and the case

---

[1] Page number pincites are to the CM/ECF page number that appears in the top right-hand corner of each page. Citations to the trial transcript are identified by page number. That transcript may be found at Docs. 254–55, 257–60, 264–65.

[2] On January 16, 2023, Wes Allen became the Secretary. Pursuant to Federal Rule of Civil Procedure 25(d), Secretary Allen was substituted for former Secretary Merrill as defendant in this case. Doc. 76.

[3] Senator Livingston replaced Senator McClendon as the Senate co-chair of the Committee. *See* Doc. 230 ¶¶ 12, 15.

returned to the undersigned sitting alone as the originally assigned judge. Doc. 127.

Before trial, the Court dismissed the claim against Senator Livingston on legislative immunity grounds, Doc. 143, the Secretary moved for partial summary judgment, Doc. 166, and Representative Pringle moved for summary judgment, Doc. 168. The Court dismissed the claim against Representative Pringle on the plaintiffs' motion under Federal Rule of Civil Procedure 41(a)(2). Docs. 169, 170. The Court denied the Secretary's motion for partial summary judgment and denied as moot Representative Pringle's motion for summary judgment. Doc. 191.

The parties then stipulated the dismissal of plaintiffs Khadidah Stone and Laquisha Chandler. Doc. 204. The remaining plaintiffs are the Alabama State Conference of the NAACP ("the State Conference") and Greater Birmingham Ministries—two organizational plaintiffs suing on behalf of their members—and Evan Milligan, a Black registered voter residing in Montgomery. Doc. 230 at 1–3.

Trial commenced on November 12, 2024, and ended on November 21, 2024. After trial, the parties submitted proposed findings of fact and conclusions of law. Docs. 250, 251. The Secretary moved for judgment as a matter of law, Doc. 247, and that motion is fully briefed, Docs. 252, 261.

### B.    Legal Background

The Alabama Constitution requires the Legislature to divide the state's legislative seats into districts after each decennial census. Ala. Const. art. IX, §§

199–200. Redistricting "is primarily the duty and responsibility of the State[]." *Allen v. Milligan*, 599 U.S. 1, 29 (2023) (quoting *Abbott v. Perez*, 585 U.S. 579, 588 (2018)). "[F]ederal-court review of districting legislation represents a serious intrusion on the most vital of local functions," and when "assessing the sufficiency of a challenge to a districting plan, a court must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus." *Abbott*, 585 U.S. at 603 (quoting *Miller v. Johnson*, 515 U.S. 900, 915–16 (1995)) (internal quotation marks omitted).

Redistricting must comply with federal constitutional and statutory requirements. *Bartlett v. Strickland*, 556 U.S. 1, 7 (2009); *Reynolds v. Sims*, 377 U.S. 533, 554–60 (1964); *Wesberry v. Sanders*, 376 U.S. 1, 6 (1964); *see Allen*, 599 U.S. at 17–18, 30–31. As relevant here, "federal law impose[s] complex and delicately balanced requirements regarding the consideration of race" in redistricting. *Abbott*, 585 U.S. at 585. On the one hand, the Equal Protection Clause "restrict[s] the use of race in making districting decisions." *Id.* On the other hand, Section Two "often insists that districts be created precisely because of race." *Id.* at 586.

Section Two provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

6

> (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C. § 10301.

"The essence of a [Section Two] claim . . . is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [B]lack and [W]hite voters." *Allen*, 599 U.S. at 17 (quoting *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986)). That occurs "when a State's electoral structure operates in a manner that 'minimize[s] or cancel[s] out the[ir] voting strength,'" rendering "an individual . . . disabled from 'enter[ing] into the political process in a reliable and meaningful manner' 'in the light of past and present reality, political and otherwise.'" *Id.* at 25 (first quoting *Gingles*, 478 U.S. at 47 and then *White v. Regester*, 412 U.S. 755, 767 (1973)) (alterations in original). "A district is not equally open, in other words, when minority voters face—unlike their majority peers—bloc voting along racial lines, arising against the backdrop of substantial racial discrimination within the State, that

7

renders a minority vote unequal to a vote by a nonminority voter." *Id.*

"[A] plaintiff may allege a [Section Two] violation in a single-member district if the manipulation of districting lines fragments [cracks] politically cohesive minority voters among several districts or packs them into one district or a small number of districts, and thereby dilutes the voting strength of members of the minority population." *Shaw v. Hunt* (*"Shaw II"*), 517 U.S. 899, 914 (1996).

Intent is not an element of a Section Two violation, and "proof that a contested electoral practice or mechanism was adopted or maintained with the intent to discriminate against minority voters[] is not required under Section [Two]." *City of Carrollton Branch of NAACP v. Stallings*, 829 F.2d 1547, 1553 (11th Cir. 1987).

A basic history of state legislative redistricting in Alabama is helpful for a complete understanding of the claims raised in this action. In 1962, a federal district court struck down Alabama's state Senate districting plans after the Legislature failed to redraw the districts following the decennial census for approximately fifty years. *See Sims v. Frink*, 208 F. Supp. 431 (M.D. Ala. 1962). The Supreme Court affirmed. *See Reynolds v. Sims*, 377 U.S. 533 (1964).

On remand, that district court gave the Legislature the opportunity to draw a new map. *Sims v. Baggett*, 247 F. Supp. 96, 99 (M.D. Ala. 1965). Later, that court concluded that the multi-member Senate districts the Legislature adopted were constitutional, *id.* at 107, but found that the House districts "intentionally aggregated

8

predominantly [Black] counties with predominantly [W]hite counties for the sole purpose of preventing the election of [Blacks] to [state] House membership," *id.* at 109. The district court ordered the state to use a court-drawn plan for those House districts until the 1970 census was completed. *See id.* at 108–09; *Sims v. Amos*, 336 F. Supp. 924, 928 n.4, 931 (M.D. Ala. 1972). Under that plan, Fred Gray and Thomas Reed became the first Black members of the Alabama House of Representatives since Reconstruction.

The Legislature again failed to redistrict itself after the 1970 census, so the district court drew new single-member Senate and House districts. *See Sims*, 336 F. Supp. at 932, 936, 940. Under that plan, Richmond Pearson and U.W. Clemon became the first Black members of the Alabama Senate since Reconstruction.

Meanwhile, Congress had passed the Voting Rights Act of 1965, which required (among other things) Alabama to receive preclearance from either the Attorney General of the United States or a three-judge federal court before changing its voting procedures. *See Shelby Cnty. v. Holder*, 570 U.S. 529, 537 (2013).

After the 1980 census, the Legislature passed two state legislative redistricting plans that did not receive preclearance, and then passed a constitutional plan. *Burton v. Hobbie*, 561 F. Supp. 1029, 1032–35 (M.D. Ala. 1983). Circuit Judge Frank M. Johnson Jr. described the Legislature's previous failure to enact a plan that complied with federal court orders and the "invidious discrimination existing in both houses

of the Legislature." *See id.* at 1030–32. He explained that after decades of judicial intervention, the Legislature, for "the first time in Alabama's history," "provided an apportionment plan that is fair to all the people of Alabama." *Id.* at 1030.

After the 1990 census, federal courts again invalidated the Legislature's redistricting plan, and new state legislative districting plans were adopted in a state court consent judgment. *See Brooks v. Hobbie*, 631 So. 2d 883, 884 (Ala. 1993). That districting scheme, known as the Reed-Buskey Plan, included eight majority-Black Senate districts. *Montiel v. Davis*, 215 F. Supp. 2d 1279, 1281–82 (S.D. Ala. 2002). The United States Supreme Court upheld the Reed-Buskey Plan. *See Sinkfield v. Kelley*, 531 U.S. 28, 30–31 (2000). After the 2000 census, the Legislature redistricted and maintained the eight majority-Black state Senate districts. *Montiel*, 215 F. Supp. 2d at 1281–82.

After the 2010 census, the Legislature again redistricted. Since 2010, a supermajority of Republican members have controlled the Legislature. *See* Doc. 230 ¶ 120; *see also* Doc. 206-19 at 12. Many of the majority-Black districts, including all eight majority-Black Senate districts, were underpopulated for purposes of the requirement that districts contain nearly equal numbers of voting-age persons. *Ala. Legis. Black Caucus v. Alabama*, 231 F. Supp. 3d 1026, 1035–36 (M.D. Ala. 2017). A three-judge district court found that the Legislature's plans did not violate Section Two and were not racial gerrymanders in violation of the Fourteenth Amendment.

*Ala. Legis. Black Caucus v. Alabama*, 989 F. Supp. 2d 1227, 1280–87, (M.D. 2013), *vacated*, 575 U.S. 254 (2015). The Supreme Court vacated on the ground that the district court misapplied the law to the racial gerrymandering claim. *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 279 (2015).

During the pendency of that litigation, the Supreme Court ruled in another case that the preclearance requirement in Section Five of the Voting Rights Act was unconstitutional, and Alabama was no longer required to receive preclearance for its redistricting plans. *Shelby Cnty.*, 570 U.S. at 556–57.

On remand, the district court determined that twelve state legislative districts, including Senate District 26 in the Montgomery area, were unconstitutional racial gerrymanders. *Ala. Legis. Black Caucus*, 231 F. Supp. 3d at 1140, 1348–49. The Legislature then passed remedial districting plans. *See* 2017 Ala. Laws Act. No. 2017-347; 2017 Ala. Laws Act. No. 2017-348.

After the 2020 census, lawsuits were filed to challenge both the state legislative districting map (this action) and the congressional districting map (the *Singleton*, *Milligan*, and *Caster* actions). After the congressional redistricting plan (which included only one majority-Black district) was preliminarily enjoined on the ground that it likely violated Section Two, the Secretary and Legislators appealed, and the Supreme Court affirmed. *See Allen*, 599 U.S. 1.

The district court afforded the Legislature an opportunity to enact a new plan

11

that contains two majority-Black districts or two districts in which Black voters otherwise have an opportunity to elect a representative of their choice. *See Singleton v. Allen*, 690 F. Supp. 3d 1226, 1238 (N.D. Ala. 2023). But the Legislature again passed a plan that "include[d] only one majority-Black district" and did not include an additional Black-opportunity district. *See id.* The district court preliminarily enjoined the use of that plan, *see id.*, and the Secretary (but not the Legislators) again appealed to the Supreme Court and sought a stay, *Milligan* Docs. 274, 275, 276, 281.[4] The district court denied a stay, *Milligan* Doc. 289 at 5, and the Secretary sought a stay from the Supreme Court, which summarily denied the request with no noted dissents, *see Allen v. Milligan*, 144 S. Ct. 476 (2023) (mem.). The district court then ordered the Secretary to administer Alabama's 2024 congressional elections according to a court-ordered plan. *See Singleton v. Allen*, No. 2:21-cv-1291-AMM & No. 2:21-cv-1530-AMM, 2023 WL 6567895 (N.D. Ala. Oct. 5, 2023).

The congressional case proceeded to an eleven-day bench trial (in which the plaintiffs and the State presented much of the same evidence that was presented in this case, including ten of the same expert witnesses who opined on overlapping issues). After trial, the district court again concluded that the plaintiffs established a Section Two violation. *Singleton v. Allen*, Case No. 2:21-cv-1291-AMM & Case

---

[4] Citations to documents in the current round of congressional redistricting litigation in the district court are to the documents in the *Milligan* action.

No. 2:21-cv-1530-AMM, 2025 WL 1342947, at *125–71 (N.D. Ala. May 8, 2025). It also found that the Legislature intentionally discriminated against Black Alabamians in violation of the Fourteenth Amendment when it deliberately enacted a districting plan that it admitted did not contain the second opportunity district that the Supreme Court and the district court said was required. *Id.* at *194–213.

### C.    Factual Background

The 2020 cycle for state legislative redistricting began when the Committee—the body in charge of creating, proposing, and evaluating redistricting plans for the state, *see* Ala. Code § 29-2-52—passed redistricting guidelines ("the Legislature's redistricting guidelines"). Doc. 230 ¶ 17. The Legislature's redistricting guidelines applied to both state and congressional redistricting. *See* App. A.

The guidelines cover (among other things) how the Committee considered traditional districting criteria. *See id*. The guidelines "prioritized population equality, contiguity, compactness, and avoiding dilution of minority voting strength," and "encouraged, as a secondary matter, avoiding incumbent pairings, respecting communities of interest, minimizing the number of counties in each district, and preserving cores of existing districts." *Allen*, 599 U.S. at 15.

The Legislature's redistricting guidelines are reproduced in relevant part below and attached in full to this Order as Appendix A.

13

## II. CRITERIA FOR REDISTRICTING

a.    Districts shall comply with the United States Constitution, including the requirement that they equalize total population.

b.    Congressional districts shall have minimal population deviation.

c.    Legislative and state board of education districts shall be drawn to achieve substantial equality of population among the districts and shall not exceed an overall population deviation range of ±5%.

d.    A redistricting plan considered by the Reapportionment Committee shall comply with the one person, one vote principle of the Equal Protection Clause of the 14th Amendment of the United States Constitution.

e.    The Reapportionment Committee shall not approve a redistricting plan that does not comply with these population requirements.

f.    Districts shall be drawn in compliance with the Voting Rights Act of 1965, as amended. A redistricting plan shall have neither the purpose nor the effect of diluting minority voting strength, and shall comply with Section 2 of the Voting Rights Act and the United States Constitution.

g.    No district will be drawn in a manner that subordinates race-neutral districting criteria to considerations of race, color, or membership in a language-minority group, except that race, color, or membership in a language-minority group may predominate over race-neutral districting criteria to comply with Section 2 of the Voting Rights Act, provided there is a strong basis in evidence in support of such a race-based choice. A strong basis in evidence exists when there is good reason to believe that race must be used in order to satisfy the Voting Rights Act.

h.    Districts will be composed of contiguous and reasonably compact geography.

i.    The following requirements of the Alabama Constitution shall be complied with:

(i)    Sovereignty resides in the people of Alabama, and all districts should be drawn to reflect the democratic will of all the people concerning how their governments should be restructured.

(ii)    Districts shall be drawn on the basis of total population, except that voting age population may be considered, as necessary to comply with Section 2 of the Voting Rights Act or other federal or state law.

(iii)    The number of Alabama Senate districts is set by statute at 35 and, under the Alabama Constitution, may not exceed 35.

14

13    (iv)    The number of Alabama Senate districts shall be not less than one-fourth or
14    more than one-third of the number of House districts.

15     (v)    The number of Alabama House districts is set by statute at 105 and, under
16    the Alabama Constitution, may not exceed 106.

17    (vi)    The number of Alabama House districts shall not be less than 67.

18    (vii)   All districts will be single-member districts.

19    (viii)  Every part of every district shall be contiguous with every other part of the
20    district.

21    j.    The following redistricting policies are embedded in the political values,
22    traditions, customs, and usages of the State of Alabama and shall be observed to
23    the extent that they do not violate or subordinate the foregoing policies prescribed
24    by the Constitution and laws of the United States and of the State of Alabama:

25    (i)    Contests between incumbents will be avoided whenever possible.

26    (ii)    Contiguity by water is allowed, but point-to-point contiguity and long-lasso
27    contiguity is not.

28    (iii)    Districts shall respect communities of interest, neighborhoods, and political
29    subdivisions to the extent practicable and in compliance with paragraphs a
30    through i. A community of interest is defined as an area with recognized
31    similarities of interests, including but not limited to ethnic, racial, economic, tribal,
32    social, geographic, or historical identities. The term communities of interest may,
33    in certain circumstances, include political subdivisions such as counties, voting

1    precincts, municipalities, tribal lands and reservations, or school districts. The
2    discernment, weighing, and balancing of the varied factors that contribute to
3    communities of interest is an intensely political process best carried out by elected
4    representatives of the people.

5    (iv)    The Legislature shall try to minimize the number of counties in each district.

6    (v)    The Legislature shall try to preserve the cores of existing districts.

7     (vi)   In establishing legislative districts, the Reapportionment Committee shall
8    give due consideration to all the criteria herein. However, priority is to be given to
9    the compelling State interests requiring equality of population among districts and
10    compliance with the Voting Rights Act of 1965, as amended, should the
11    requirements of those criteria conflict with any other criteria.

12    g.    The criteria identified in paragraphs j(i)-(vi) are not listed in order of
13    precedence, and in each instance where they conflict, the Legislature shall at its
14    discretion determine which takes priority.

15

Doc. 190-21.

After the 2020 census data was released in August 2021, the Committee began developing new Senate districts. Doc. 230 ¶¶ 25–26. The Committee's expert cartographer was Randy Hinaman, Doc. 235-2 at 15–16, who has drawn Alabama's districting maps for many years, *see Allen*, 599 U.S. at 15. Mr. Hinaman testified that he began drawing the 2021 Plan by using the 2017 Senate plan that was enacted after the *Alabama Black Legislative Caucus* litigation. Doc. 235-2 at 30. He testified that he prioritized preserving the cores of the existing districts, *id.* at 33, and that he drew the map "race blind," only reviewing the racial makeup of the districts after the Plan was completed, *id.* at 46–47. He testified that when he evaluated the population of each district, he considered only the voting-age population ("VAP") and did not consider the citizen voting-age population ("CVAP"). *Id.* at 47–48.

"BVAP" refers to the Black share of the voting-age population within a district. Tr. 358; *see id.* at 946. The BVAP is derived from decennial census data, *id.* at 356, 943–44, and is based on a "full numeration"—a count—of the population, Doc. 189-7 at 10; *see* Doc. 206-6 at 6, 15; Doc. 206-14 at 6; Tr. 236–37, 361, 944.

"CVAP" refers to the citizen voting-age population within a district. Tr. 358, 946. Because there is no citizenship question on the decennial census, *id.* at 356, 946; Doc. 189-7 at 9, CVAP is an estimate derived from monthly surveys of a sample of the population conducted by the American Community Survey, a subset of the

Census Bureau, *see* Tr. 236–37, 360, 946–47; Doc. 206-6 at 6; Doc. 189-7 at 7, 11; Doc. 206-14 at 6–7. The American Community Surveys are a "rolling survey" of sample data that reflect estimates, not counts. Tr. 236, 310, 946–47.

The Senate plan Mr. Hinaman prepared passed the Committee, although all Black members of the Committee voted against it. Doc. 230 ¶¶ 44–45. Governor Ivey called a Special Legislative Session on redistricting to begin in October 2021. *Id.* 230 ¶ 33. The Legislature passed the Plan, and Governor Ivey signed it into law on November 4, 2021. *Id.* ¶¶ 47–48. The Plan appears below.



Doc. 195-19.

### D.    Claims and Defenses

The plaintiffs allege that the Plan "denies Black Alabamians an equal opportunity to participate in the political process and elect candidates of their choice" by cracking Black voters across Districts 2, 7, and 8 in the Huntsville area and packing Black voters into District 26 in the Montgomery area. Doc. 126 ¶¶ 2–4.

The Secretary denies that the Plan cracks or packs Black voters and argues that the totality of the circumstances do not support a finding of vote dilution. *Id.* at 28, ¶¶ 14, 18–19. He particularly argues that the totality of the circumstances do not support a finding of race-based vote dilution because vote choice in Alabama is driven by party, not race. *See* Tr. 1667.

### 1.    Huntsville – Senate Districts 2, 7, and 8

The plaintiffs allege that the Plan "unnecessarily cracks Black voters in State Senate Districts 2, 7, and 8 in Huntsville, thereby preserving three districts where candidates preferred by [W]hite voters reliably win." Doc. 126 ¶ 4. They assert that District 7 "split[s] the City of Huntsville and the Black community there into three parts." *Id.* ¶ 84. According to the plaintiffs, District 7 "cuts through Huntsville's Black community and splits communities of interest, taking a sharp eastern turn to capture heavily [W]hite communities rather than additional Black communities in Huntsville, which instead lie in the adjacent Senate Districts 2 and 8, to the west and east, respectively." *Id.* The plaintiffs provide three illustrative plans ("Illustrative

19

Plans 1, 2A, and 3") that they contend demonstrate that a remedial district (illustrative District 7) can be drawn in the Huntsville area. Doc. 206-6 at 31; Doc. 206-8 at 25; Doc. 206-10 at 2–3.

The Secretary denies that the Plan cracks Black voters into Districts 2, 7, and 8. Doc. 147 at 1, ¶ 4. He argues that District 7 in two of the plaintiffs' illustrative plans (Illustrative Plans 1 and 2A) does not meet the numerosity threshold the law requires and that Illustrative Plans 1, 2A, and 3 each propose a remedial District 7 that is not reasonably compact and does not comply with traditional districting criteria. Tr. 1657–60; Doc. 166 at 31–38. He also argues that the illustrative plans were impermissibly drawn on the basis of race. Tr. 1657–60; Doc. 166 at 31–38.

## 2.    Montgomery – Senate Districts 25 and 26

The plaintiffs allege that that the Plan "unnecessarily packs Black voters in Montgomery into [Senate] District 26, and surgically extracts communities with higher percentages of [W]hite [voting-age populations] from the core of Montgomery into [Senate] District 25." Doc. 126 ¶ 83. The plaintiffs provide one illustrative plan for a remedial district (illustrative District 25) in the Montgomery area. *See* Doc. 206-6 at 31, 36–37. District 25 remains the same in all three illustrative plans, *see* Tr. 266, 272, so the court refers to it as "Proposed District 25." They argue that Proposed District 25 is reasonably compact and "includes more of the city of Montgomery than before while maintaining the district's tie to the . . .

20

Black Belt." *Id.* at 1641.

The Secretary denies that Black voters are packed into Senate District 26. Doc. 147 at 1, ¶ 3. He contends that Proposed District 25 is not reasonably compact and does not comply with traditional districting criteria. *See* Tr. 1660. He also argues that it was impermissibly drawn on the basis of race. *See id.*

## II.    STANDARD OF REVIEW

"The usual standard of proof in civil litigation is preponderance of the evidence," *E.M.D. Sales, Inc. v. Carrera*, 604 U.S. 45, 47 (2025), and redistricting cases do not require a higher threshold, *see, e.g.*, *Cooper v. Harris*, 581 U.S. 285, 319 n.15 (2017). The Court thus considers whether the plaintiffs have proven their claims by a preponderance of the evidence.

## III.    APPLICABLE LAW

"For the past forty years, [federal courts] have evaluated claims brought under [Section Two] using the three-part framework developed in [the Supreme Court] decision *Thornburg v. Gingles*." *Allen*, 599 U.S. at 17 (citation omitted). "*Gingles* has governed . . . Voting Rights Act jurisprudence since it was decided 37 years ago" and the Supreme Court "ha[s] applied *Gingles* in one [Section Two] case after another, to different kinds of electoral systems and to different jurisdictions in States all over the country." *Id.* at 19.

"Congress has never disturbed [the] understanding of [Section Two] as

*Gingles* construed it." *Id.*; *see also id.* at 42 (Kavanaugh, J., concurring in part) ("In the past 37 years, . . . Congress and the President have not disturbed *Gingles*, even as they have made other changes to the Voting Rights Act.").

*Gingles* requires district courts to conduct a two-step analysis when considering redistricting challenges under Section Two. In the first step, the Court must consider whether the plaintiffs have established the three *Gingles* preconditions that: (1) as a group, Black voters in Alabama are "sufficiently large and [geographically] compact" to constitute a majority in an additional "reasonably configured district"; (2) Black voters are "politically cohesive"; and (3) each challenged district's "[W]hite majority votes sufficiently as a bloc to enable it . . . to defeat the [Black] preferred candidate." *Id.* at 18 (majority opinion) (internal quotation marks and citations omitted).

"Each *Gingles* precondition serves a different purpose." *Id*. "The 'geographically compact majority' and 'minority political cohesion' showings are needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district." *Growe v. Emison*, 507 U.S. 25, 40 (1993) (citations omitted). The minority political cohesion showing is needed to establish "that a representative of its choice would in fact be elected," and the racially polarized voting showing "'establish[es] that the challenged districting thwarts a distinctive minority vote' at least plausibly on account of race.'" *Allen*, 599 U.S. at

22

19 (alteration in original) (quoting *Growe*, 507 U.S. at 40).

"Unless these points are established, there neither has been a wrong nor can be a remedy." *Growe*, 507 U.S. at 40–41. Accordingly, if the plaintiffs fail to establish any one of these three preconditions, the Court need not consider the other two. *See Voinovich v. Quilter*, 507 U.S. 146, 158 (1993).

As to the first *Gingles* precondition, "a party asserting [Section Two] liability must show by a preponderance of the evidence that the minority population in the potential election district is greater than 50 percent." *Bartlett*, 556 U.S. at 19–20. As the Supreme Court has explained, "it is a special wrong when a minority group has 50 percent or more of the voting population and could constitute a compact voting majority but, despite racially polarized bloc voting, that group is not put into a district." *Id.* at 19.

Citizenship data may be relevant in a numerosity analysis. "[W]here there is reliable information indicating a significant difference in citizenship rates between majority and minority populations," the unit of analysis is "voting age population as refined by citizenship" data. *Negron v. City of Miami Beach*, 113 F.3d 1563, 1569 (11th Cir. 1997). "[S]uch a disparity is unlikely except in areas where the population includes a substantial number of immigrants." *Id.* The disparity in citizenship rates is important—because only citizens can vote, a district with a majority-minority VAP is "hollow" if the district does not have a majority-minority CVAP. *See League*

23

*of United Latin Am. Citizens v. Perry* ("*LULAC*"), 548 U.S. 399, 429 (2006) (plurality opinion in part); *Negron*, 113 F.3d at 1568.

Even if a group is sufficiently large, the majority-minority district must also be reasonably configured. *See Allen*, 599 U.S. at 18. "A district will be reasonably configured . . . if it comports with traditional districting criteria, such as being contiguous and reasonably compact." *Allen*, 599 U.S. at 18, 30 ("[Section Two] never require[s] adoption of districts that violate traditional redistricting principles.") (second alteration in original) (internal quotation marks omitted). Because the injury in a Section Two claim is vote dilution, the compactness analysis "refers to the compactness of the minority population, not to the compactness of the contested district." *LULAC*, 548 U.S. at 433 (quoting *Bush v. Vera*, 517 U.S. 952, 997 (1996) (Kennedy, J., concurring)). "If, because of the dispersion of the minority population, a reasonably compact majority-minority district cannot be created, [Section Two] does not require a majority-minority district . . . ." *Vera*, 517 U.S. at 979.

Compactness "is critical to advancing the ultimate purposes of [Section Two], ensuring minority groups equal 'opportunity . . . to participate in the political process and to elect representatives of their choice.'" *LULAC*, 548 U.S. at 434 (alteration in original) (quoting 42 U.S.C. § 1973(b)). A "minority group [that] is spread evenly throughout" the relevant geographic area (i.e., "substantially integrated throughout" that area) is not compact enough to "maintain that they would have been able to elect

24

representatives of their choice" in a single district. *Gingles*, 478 U.S. at 50 n.17.

"While no precise rule has emerged governing [Section Two] compactness, the inquiry should take into account traditional districting principles such as maintaining communities of interest and traditional boundaries." *LULAC*, 548 U.S. at 433 (internal quotation marks omitted) (quoting *Abrams v. Johnson*, 521 U.S. 74, 92 (1997)); *see also Ala. Legis. Black Caucus*, 575 U.S. at 272 (noting that traditional redistricting principles "includ[e] compactness, contiguity, . . . respect for political subdivisions or communities defined by actual shared interests, incumbency protection, and political affiliation") (internal citation and quotation marks omitted).

"A district that reaches out to grab small and apparently isolated minority communities is not reasonably compact." *LULAC*, 548 U.S. at 433 (internal quotation marks omitted) (quoting *Vera*, 517 U.S. at 979). "[B]izarre shaping of" a district that, for example, "cut[s] across pre-existing precinct lines and other natural or traditional divisions," suggests "a level of racial manipulation that exceeds what [Section Two] could justify." *Vera*, 517 U.S. at 980–81.

"When it comes to considering race in the context of districting, [the Supreme Court] ha[s] made clear that there is a difference 'between being aware of racial considerations and being motivated by them.'" *Allen*, 599 U.S. at 30 (quoting *Miller*, 515 U.S. at 916). Because the Voting Rights Act in itself "demands consideration of race," *Abbott*, 581 U.S. at 587, map drawers in Section Two cases will "be aware of

racial demographics," *Allen*, 599 U.S. at 30 (internal quotation marks omitted) (quoting *Miller*, 515 U.S. at 916). But "such race consciousness does not lead inevitably to impermissible race discrimination." *Id.* (internal quotation marks omitted) (quoting *Shaw v. Reno*, 509 U.S. 630, 646 (1993)). "The question whether additional majority-minority districts can be drawn, after all, involves a quintessentially race-conscious calculus." *Id.* at 31 (internal quotation marks and emphasis omitted) (quoting *Johnson v. De Grandy*, 512 U.S. 997, 1020 (1994)).

While race consciousness is permissible, "race may not be the predominant factor in drawing district lines unless [there is] a compelling reason." *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Cooper*, 581 U.S. at 291). "Race predominates in the drawing of district lines . . . when race-neutral considerations [come] into play only after the race-based decision had been made." *Id.* (second alteration in original) (internal quotation marks omitted) (quoting *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 189 (2017)).

"[T]he first *Gingles* condition requires the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." *De Grandy*, 512 U.S. at 1008. This requirement "relates to the availability of a remedy," *Nipper v. Smith*, 39 F.3d 1494, 1526 (11th Cir. 1994), and the plaintiffs must "demonstrate the existence of a proper remedy," *Burton v. City of Belle Glade*, 178 F.3d 1175, 1199 (11th Cir. 1999)

26

(collecting cases).

To determine whether the plaintiffs satisfy this requirement, the Court compares the Plan with each illustrative plan provided by the plaintiffs. *See LULAC*, 548 U.S. at 430 (quoting *De Grandy*, 512 U.S. at 1008) (stating requirement of "a comparison between a challenger's proposal and the 'existing number of reasonably compact districts'"). Further comparisons are not required; a Section Two "district that is reasonably compact and regular, taking into account traditional districting principles," need not also "defeat [a] rival compact district[]" in a "beauty contest[]." *Vera*, 517 U.S. at 977 (internal quotation marks and emphasis omitted).

The second and third *Gingles* preconditions rise and fall on whether the plaintiffs establish that voting in the challenged districts is racially polarized. *See, e.g., LULAC*, 548 U.S. at 427. As the Supreme Court has explained, "in the absence of significant [W]hite bloc voting it cannot be said that the ability of minority voters to elect their chosen representatives is inferior to that of [W]hite voters." *Voinovich*, 507 U.S. at 158 (quoting *Gingles*, 478 U.S. at 49 n.15).

If the plaintiffs establish all three *Gingles* requirements, the Court then must proceed to the second step of the Section Two analysis. In this step, the Court considers whether, "under the 'totality of circumstances,' . . . the political process is not 'equally open' to minority voters." *Allen*, 599 U.S. at 18 (quoting *Gingles*, 478 U.S. at 45–46); *see Bartlett*, 556 U.S. at 11–12. This "inquiry recognizes that

27

application of the *Gingles* factors is 'peculiarly dependent upon the facts of each case'" and requires the Court to "conduct 'an intensely local appraisal' of the electoral mechanism at issue, as well as a 'searching practical evaluation of the past and present reality.'" *Allen*, 599 U.S. at 19 (some quotation marks omitted) (quoting *Gingles*, 478 U.S. at 79).

"[I]t will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of [Section Two] under the totality of circumstances." *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1342 (11th Cir. 2015) (quoting *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1135 (3d Cir. 1993)).

> In this step, the court considers the Senate Factors, which include:
>
> the history of voting-related discrimination in the State or political subdivision; the extent to which voting in the elections of the State or political subdivision is racially polarized; the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting; the exclusion of members of the minority group from candidate slating processes; the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; the use of overt or subtle racial appeals in political campaigns; and the extent to which members of the minority group have been elected to public office in the jurisdiction.

*De Grandy*, 512 U.S. at 1010 n.9 (quoting *Gingles*, 478 U.S. at 44–45). "[E]vidence

28

demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group and that the policy underlying the State's or the political subdivision's use of the contested practice or structure is tenuous may have probative value." *Id.* (quoting *Gingles*, 478 U.S. at 45).

The Senate Factors are not exhaustive. Under controlling Supreme Court precedent, the Court may also consider whether the number of Black-majority districts in the map is roughly proportional to the Black share of the population in Alabama. *See LULAC*, 548 U.S. at 426; *accord De Grandy*, 512 U.S. at 1000. The Supreme Court has held that "whether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant area" is a "relevant consideration" in the totality-of-the-circumstances analysis. *LULAC*, 548 U.S. at 426; *accord De Grandy*, 512 U.S. at 1000. "[P]roportionality . . . is obviously an indication that minority voters have an equal opportunity, in spite of racial polarization to participate in the political process and to elect representatives of their choice . . . ." *De Grandy*, 512 U.S. at 1020 (internal quotation marks omitted) (quoting 42 U.S.C. § 1973(b)); *accord Ala. Legislative Black Caucus*, 989 F. Supp. 2d at 1286–87 (concluding that the totality of the circumstances weighed against a finding that the state legislative map violated Section Two in part because the number of majority-Black districts in the Legislature is "roughly proportional to the [B]lack voting-age population"), *vacated on other*

*grounds*, 575 U.S. 254 (2015).

But the proportionality evaluation is not dispositive. Section Two expressly provides that "nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population," 52 U.S.C. § 10301(b), and "[f]orcing proportional representation is unlawful and inconsistent with [the Supreme Court's] approach to implementing [Section Two]," *Allen*, 599 U.S. at 28.

"[T]he *Gingles* framework itself imposes meaningful constraints on proportionality," as "[i]ts exacting requirements" "limit judicial intervention to 'those instances of intensive racial politics' where the 'excessive role [of race] in the electoral process . . . den[ies] minority voters equal opportunity to participate.'" *Allen*, 599 U.S. at 26, 30 (some alterations in original) (quoting S. Rep. No. 97-417 at 33–34 (1982)).

The Court may also consider "any circumstance that has a logical bearing on whether" the challenged structure and its interaction with local social and historical conditions "affords equal 'opportunity.'" *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 668–69 (2021); *see also District of Columbia v. Wesby*, 583 U.S. 48, 60–61 (2018) (observing that a "totality of the circumstances" test "requires courts to consider the whole picture" and "recognize[s] that the whole is often greater than the sum of its parts" and "precludes [a] sort of divide-and-conquer analysis" in which

each factor is "viewed in isolation") (internal quotation marks omitted) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)).

The Section Two analysis "assess[es] the impact of the contested structure or practice on minority electoral opportunities on the basis of objective factors." *Gingles*, 478 U.S. at 44 (internal quotation marks omitted). Section Two protects against "electoral changes that are discriminatory in effect." *Allen*, 599 U.S. at 41 (internal quotation marks omitted). "[F]or the last four decades, [federal courts] have repeatedly applied the effects test of [Section Two] as interpreted in *Gingles* and, under certain circumstances, have authorized race-based redistricting as a remedy for state districting maps that violate [Section Two]." *Id.*

If the Court determines that the Plan violates Section Two, that would not be a determination that the plaintiffs are entitled to a plan of their choice, or to one of the illustrative plans submitted to satisfy *Gingles*; those maps are illustrative maps submitted for the purposes of establishing liability under Section Two.

## IV.    ANALYSIS

### A.    Plaintiffs' Arguments

The plaintiffs argue that they satisfy each *Gingles* precondition and prevail on an analysis of the totality of the circumstances.

#### 1.    *Gingles* I – Numerosity and Reasonable Compactness

To satisfy the first *Gingles* precondition, the plaintiffs must establish that

31

Black voters as a group are "sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district." *Allen*, 599 U.S. at 18 (internal quotation marks omitted) (quoting *Wis. Legislature v. Wis. Elections Comm'n*, 595 U.S. 398, 402 (2022)); *accord Growe*, 507 U.S. at 40.

The plaintiffs argue that they have established these requirements because their illustrative plans contain examples of remedial majority-Black districts in the Huntsville and Montgomery areas that are reasonably compact (three examples of a remedial district in Huntsville and one example of a remedial district in Montgomery). *See* Tr. 1641–43. The plaintiffs argue that their illustrative plans unite communities of interests and more predominantly Black portions of each of the metropolitan areas. *See id.* at 1641, 1643. To establish these assertions, the plaintiffs rely on the testimony of expert witnesses Anthony Fairfax and Dr. Kassra Oskooii.

The court already has explained BVAP and BCVAP. *See supra* Part I.C. BCVAP becomes relevant to redistricting "where there is reliable information indicating a significant difference in citizenship rates between majority and minority populations." *Negron*, 113 F.3d at 1569. For instance, where the citizenship rate of the minority population at issue in a district was 50.16 percent, and the non-minority citizenship rate was 88.18 percent, the Eleventh Circuit held that "the minority population include[d] a substantial number of immigrants" and that "refin[ing]" VAP data with CVAP data was appropriate to ensure a remedial district included a

meaningful majority of the minority population. *Id.* at 1567–69.

The Census Bureau provides data at various geographic levels. *See* Doc. 189-7 at 9. The smallest level is a "census block." Tr. 237, 362–63. Together, groups of census blocks form "block groups."  Doc. 189-7 at 9; Tr. 237–38, 362, 965. In turn, block groups form "census tracts," and tracts form counties. Doc. 189-7 at 9; Tr. 238, 965. The Census Bureau reports decennial census data down to the census block level. *See* Tr. 949, 965. The American Community Survey reports CVAP data down to the block group level. *See id.* at 255, 362, 948–49.

A redistricting map-drawer may have to split block groups between districts. *See id.* at 368, 948–49; Doc. 189-7 at 10, 16, 19. In that circumstance, the map-drawer is required to "estimate the racial makeup of the portion of the block group that is contained within [each] district." Doc. 189-7 at 16, 19; *see* Tr. 368, 948. This process is completed by using a "disaggregation" technique. Doc. 206-6 at 7; Doc. 189-7 at 22; Tr. 255; *see* Tr. 972.

Because the parties dispute the statistical reliability of CVAP data, the court defines statistical terms used by the parties. The best estimate, or most likely outcome, of survey data is referred to as the "point estimate." Tr. 75, 969–70. It is the "best approximation" based on the survey data. *Id.* at 376; *see id.* at 969–70.

Because the American Community Survey surveys a sample of the population, the point estimate comes with a "sampling error," which "means that

estimates derived from the [surveys] will likely differ from the values that would have been obtained if the entire population had been included in the survey, as well as from values that would have been obtained had a different set of sample units been selected for the survey." Doc. 189-7 at 12 (internal quotation marks and citations omitted); *see* Tr. 407–08, 957, 960.

The American Community Survey reports data from monthly surveys in one-year, three-year, and five-year estimates. Doc. 189-7 at 8; Tr. 236, 360. The five-year estimates are cumulative—that is, they are based upon the aggregation of data from the previous five years. Tr. 363, 947; *see* Doc. 206-14 at 9; Doc. 189-7 at 17.

The point estimate is often reported with a confidence interval. A confidence interval "is a range above and below the point estimate that the true unknown value likely falls in within a certain degree of probability." *Id.* at 376; *see id.* at 70 (explaining that a ninety-five percent confidence interval means that "95 out of 100 times" the true value is contained within that identified range). Sometimes the parties refer to this range as the "margin of error" or "error margin." *See, e.g.*, Tr. 377–78; Doc. 189-7 at 12–13.[5]

---

[5] Dr. Trende explained in his report that "[s]tatistics, which can be thought of as the mathematical study of uncertainty, allows us to quantify our uncertainty and express it through error margins." Doc. 189-7 at 12. To that end, "polls are accompanied by error margins, which are typically reported at a 95% degree of confidence." *Id.* So, "[i]f the error margin for [a] poll were +/- 4%, that would tell us that 95 out of every 100 polls conducted will have the 'true' population value within 4 points in either direction of the reported estimate [also known as the point estimate]." *Id.*

Inherent in this estimation is the possibility that the true value (based on a full enumeration of the population rather than a sample) falls outside of the confidence interval. *See id.* at 438, 962–63. For example, if a point estimate is reported with a 2.5-unit margin of error at a ninety percent confidence interval, the researcher estimates that ninety out of 100 times, the true value lies within a ±2.5-unit range of the point estimate. *See id.* at 70. There is a ten percent possibility that the true value lies outside of that margin. *Id.* at 437–38.

### a. Mr. Anthony Fairfax

Mr. Fairfax earned a Bachelor of Science in Electrical Engineering from Virginia Tech University and a Master of Geospatial Information Science and Technology from North Carolina State University. Doc. 206-6 at 4; Tr. 226. Mr. Fairfax has worked on redistricting issues for thirty years, Tr. 226–28, qualified as an expert in numerous redistricting lawsuits, *see* Doc. 206-6 at 5; Doc. 206-7 at 8–10, and developed approximately one thousand redistricting plans for states and municipalities, Tr. 228; Doc. 206-6 at 4. Approximately half of Mr. Fairfax's redistricting work has involved state legislative plans, and forty-to-sixty percent of his redistricting work has involved Section Two. Tr. 228–29.

At trial, Mr. Fairfax was admitted without objection "as an expert in map drawing, demographics, and the use of census data for redistricting." *Id.* at 230.

35

The plaintiffs asked Mr. Fairfax "to determine whether an illustrative plan could be developed that satisfied the first precondition of *Gingles* and adhere[d] to federal and state redistricting criteria for Alabama State Senate districts." *Id.* at 230–31. Mr. Fairfax opined that it is possible to draw two additional, reasonably configured majority-Black Senate districts that comply with traditional redistricting criteria—one each in the Montgomery and Huntsville areas. Doc. 206-6 at 7; Doc. 206-8 at 38.

In his original report, Mr. Fairfax observed that the 2020 census revealed that Alabama's BVAP increased to 25.9 percent of the state's voting-age population and White VAP decreased to 65.47 percent. *See* Doc. 206-6 at 49. He also reported that according to the 2022 one-year American Community Survey data, Alabama had a BCVAP of 25.6 percent and a White CVAP of 67.7 percent. *Id.*

Also in his reports, Mr. Fairfax offered three illustrative plans (the "Illustrative Plans"). Doc. 206-6 at 31; Doc. 206-8 at 14, 25; Doc. 206-10 at 2. Mr. Fairfax used 2022 one-year and 2021 five-year CVAP estimates and 2020 decennial census data to draw Illustrative Plan 1. *See* Doc. 206-6 at 6. Mr. Fairfax observed that the 2021 five-year CVAP estimates "would have been available for the Legislature" at the time it drew the Enacted Plan. Tr. 264. He used 2022 five-year CVAP estimates to draw Illustrative Plans 2 and 3. Doc. 206-8 at 6. The illustrative plans appear below:

36





Doc. 206-6 at 31; Doc. 206-8 at 14, 25.

Mr. Fairfax later supplemented his report because he "noticed that [he] had inadvertently and erroneously provided incorrect versions of the map" for Illustrative Plan 2, "even though all of the statistics included [for Illustrative Plan 2] reflected the correct and intended Illustrative Plan 2[A]." Doc. 206-10 at 2. Mr. Fairfax submitted a new plan ("Illustrative Plan 2A") that amended the lines of District 7 in Illustrative Plan 2. *Id.* The changes to Illustrative Plan 2 are "minimal," *id.*, and at trial, Mr. Fairfax testified that Illustrative Plans 2 and 2A are "[v]ery similar," Tr. 321. Illustrative Plan 2A appears below:



38

Doc. 207-23 at 2.

The differences in Illustrative Plan 2 and 2A are visible only by zooming in:



Doc. 206-10 at 3. Mr. Fairfax explained that "[t]he background color represents Illustrative Plan 2 while Illustrative Plan 2A is depicted using the black boundary lines, with bold red boundary lines reflecting the differences." *Id.*

At trial, Mr. Fairfax testified that he offered "[e]ssentially three" plans for the Court's consideration, Tr. 233, and on direct examination, he testified about only Illustrative Plans 1, 2A, and 3, *see id.* at 247–74. The plaintiffs draw no distinction between Illustrative Plan 2 and Illustrative Plan 2A other than what the Court has already described, and they offer no reason why the testimony about Illustrative Plan 2 does not also apply to Illustrative Plan 2A. Therefore, the Court considers all testimony about Illustrative Plan 2 applicable to Illustrative Plan 2A, and vice versa.

At trial, Mr. Fairfax testified about how he developed the Illustrative Plans.

He testified that he used the Enacted Plan as a starting point because "many times you want to leave as many districts as [possible] intact." *Id.* at 240; *see id.* at 264–65, 270, 277. Mr. Fairfax testified that he followed five traditional redistricting criteria when drawing the plans—equal population, respecting political subdivisions, compactness, contiguity, and preserving communities of interest. *Id.* at 244. He testified that he also attempted to follow other criteria found in the Legislature's redistricting guidelines. *Id.* at 245. He testified that "[t]here are always tradeoffs" when drawing a map, and that he "balance[d]" the criteria in an effort to create the "best plan" possible. *Id.* at 246–47.

Mr. Fairfax testified that he reviewed race at the beginning of the process to see "where the minority community exists" but then "turn[ed] it off." *Id.* at 242; *see id.* at 277–79. He acknowledged that he checked the minority BVAP and BCVAP periodically "to see if [he] me[]t th[e] sufficiently large component." *Id.* at 280–81. He testified that he "tend[s] to not consider race as much as the other [redistricting] criteria" and "always use[s] the other criteria labels more than race." *Id.* at 241–42.

Mr. Fairfax testified that he evaluated whether the proposed remedial districts in the Illustrative Plans are reasonably configured in part by reference to three statistical measures of compactness commonly used in redistricting: the Reock score, the Polsby-Popper score, and the Convex Hull score. Doc. 206-6 at 36, 44–47; Doc. 206-8 at 22; Tr. 258.

Mr. Fairfax defined each metric. He explained that the Reock score measures "the area of the district and divides into it the . . . smallest circle that fits around the district," and that "a finger or an arm sticking out makes the circle larger," which decreases the compactness measure. Tr. 242. He explained that the Polsby-Popper metric "is a perimeter measure." *Id.* This metric takes the "district boundaries and stretche[s] [them] out to a circle," which is "divided into the area of the district." *Id.* at 243. Mr. Fairfax explained that the Convex Hull metric is a "much more forgiving" measure that is described as "taking a rubber band and wrapping it around the district." *Id.* The polygon shape that is created is referred to as the convex hull. *Id.* The Convex Hull score is measured by "tak[ing] the area of that convex hull and divid[ing] [it] into the district." *Id.* Each metric "indicates a more compact district as the value moves closer to 1." Doc. 206-6 at 44–45.

Mr. Fairfax opined that the "measures are the standard that experts use to determine [the] compactness [of] . . . a district." Tr. 260. He testified that comparing compactness scores for an illustrative plan to a previously enacted plan is the "desirable" way to determine if a plan is sufficiently compact. Doc. 206-6 at 44–45; *see* Tr. 257. This is so because a comparison allows a mapmaker "to get a sense of what[] [is] acceptable." Tr. 328. He thus compared compactness scores of Illustrative Plans 1, 2A, and 3 to the compactness scores for the Enacted Plan. *Id.* at 257.

### i.  Montgomery – Senate Districts 25 and 26

41

Mr. Fairfax offered Proposed District 25 to demonstrate that it is possible to draw an additional reasonably configured remedial district in the Montgomery area. Mr. Fairfax did not change the boundary lines of Proposed District 25 in Illustrative Plans 1, 2A, or 3. Proposed District 25 appears in green below:



Doc. 206-6 at 37.

The boundaries of Proposed District 25 largely follow county lines. They keep Crenshaw County whole by following its boundary lines, and they keep a majority of Montgomery County whole by following its entire southern boundary line and much of its eastern and western boundary lines. *See id.*

42

### a. Numerosity

Senate Districts 25 and 26 are majority-Black on a BVAP metric. *Id.* at 40. Mr. Fairfax testified that he did not rely on BCVAP in the Montgomery area because "there[] [was] no need to" since "the majority-[B]lack status is already there." Tr. 290.

### b. Reasonable Configuration

Mr. Fairfax opined that Proposed District 25 is reasonably configured. First, he opined that Proposed District 25 is more compact than districts in the Plan using the Reock, Polsby-Popper, and Convex Hull metrics of compactness. Tr. 258. Mr. Fairfax also opined that Proposed District 25 "outperforms" the Plan on the number of counties contained within the district by splitting only two counties (District 25 in the Plan splits three). Doc. 206-6 at 36; Tr. 256. He observed that in Proposed District 25, "[a]lmost half (49.69%) of the [C]ity of Montgomery is contained within . . . [District] 25" and that, unlike the Plan, "the town of Pike Road is made whole" in Proposed District 25. Doc. 206-6 at 36. He conceded that Proposed District 25 creates a new split in the City of Prattville. Tr. 299.

### ii.  Huntsville – Senate Districts 2, 7, and 8

Mr. Fairfax offered three illustrative versions of District 7—one each in Illustrative Plans 1, 2A, and 3—to demonstrate that it is possible to draw a remedial district in the Huntsville area (the first such district in that area) without violating

43

traditional redistricting principles. Four versions of illustrative District 7 appear below. The first image is from Mr. Fairfax's original report and reflects what the parties denominate as Illustrative Plan 1:









Doc. 206-6 at 34; Doc. 206-8 at 16, 27; Doc. 207-23 at 3.

### a. Numerosity

In his report, Mr. Fairfax opined that the Black population in the Huntsville area is sufficiently large to constitute a majority in a district. Doc. 206-6 at 7. He used BCVAP and noncitizen data from the American Community Survey and BVAP data from the 2020 decennial census. *Id.* at 6; Doc. 206-8 at 4–5.

Mr. Fairfax used different metrics to evaluate the numerosity of the Black population in the Huntsville area in Illustrative Plans 1 and 2A than he used in Illustrative Plan 3. For Illustrative Plans 1 and 2A, Mr. Fairfax opined in his report that District 7 is majority-Black on a BCVAP metric, but not a BVAP metric. Doc. 206-6 at 43; Doc. 206-8 at 21; *see* Doc. 206-10 at 2; Tr. 283–85. Mr. Fairfax testified

46

that he "believe[d]" that he "probably [had] not" relied solely on CVAP to establish numerosity in any of his *Gingles* I work in other cases. Tr. 343.

Mr. Fairfax opined that because the Huntsville area contains a significant number of noncitizens, BCVAP is a more accurate and more appropriate estimate for Black eligible voters in that district. Doc. 206-6 at 40–42; *see* Doc. 206-8 at 21; Tr. 252–54, 284. He testified at trial that three counties in the Huntsville area— Madison, Morgan, and Limestone—have some of the highest noncitizenship rates in Alabama. *See* Tr. 253–54. He provided the following chart in his report to compare the noncitizenship rates of those counties to other counties in Alabama:

Alabama
**Counties**
**Noncitizen Voting Age Population**
(Sorted by Noncitizen Voting Age Population)

| County | TtlPop | VAP | NonCVAP | NonCVAP% |
|---|---|---|---|---|
| Jefferson County | 672,265 | 519,919 | 14,793 | 2.85% |
| Madison County | 389,781 | 306,047 | 9,591 | 3.13% |
| Montgomery County | 228,132 | 174,327 | 6,014 | 3.45% |
| Mobile County | 413,878 | 317,652 | 5,549 | 1.75% |
| Shelby County | 223,916 | 172,853 | 5,501 | 3.18% |
| Lee County | 175,126 | 138,601 | 5,449 | 3.93% |
| Marshall County | 97,923 | 73,200 | 4,527 | 6.18% |
| Tuscaloosa County | 231,558 | 184,343 | 4,490 | 2.44% |
| Morgan County | 123,102 | 94,921 | 4,205 | 4.43% |
| DeKalb County | 71,680 | 54,534 | 4,039 | 7.41% |
| Baldwin County | 233,420 | 184,024 | 3,564 | 1.94% |
| Blount County | 59,077 | 45,513 | 1,812 | 3.98% |
| Limestone County | 104,199 | 81,195 | 1,642 | 2.02% |
| Franklin County | 32,011 | 24,091 | 1,467 | 6.09% |
| Lauderdale County | 94,329 | 76,073 | 1,462 | 1.92% |
| Calhoun County | 116,162 | 91,563 | 1,406 | 1.54% |
| Houston County | 107,040 | 82,570 | 1,263 | 1.53% |
| Cullman County | 88,284 | 68,612 | 1,216 | 1.77% |
| Etowah County | 103,348 | 81,184 | 1,211 | 1.49% |
| Coffee County | 53,559 | 40,889 | 1,140 | 2.79% |
| Elmore County | 87,694 | 68,631 | 1,088 | 1.59% |
| Chilton County | 45,140 | 34,435 | 1,046 | 3.04% |
| Talladega County | 81,105 | 64,334 | 935 | 1.45% |
| Pike County | 32,997 | 26,777 | 861 | 3.22% |
| Dale County | 49,455 | 38,052 | 670 | 1.76% |
| Autauga County | 58,761 | 44,995 | 638 | 1.42% |
| Pickens County | 18,925 | 15,272 | 638 | 4.18% |
| Russell County | 58,849 | 44,689 | 528 | 1.18% |
| Colbert County | 57,270 | 45,293 | 527 | 1.16% |
| St. Clair County | 91,719 | 71,266 | 495 | 0.69% |
| Walker County | 64,978 | 50,569 | 458 | 0.91% |
| Barbour County | 24,877 | 19,726 | 421 | 2.13% |
| Jackson County | 52,618 | 41,766 | 420 | 1.01% |
| Tallapoosa County | 41,251 | 32,841 | 386 | 1.18% |
| Cherokee County | 25,069 | 20,343 | 335 | 1.65% |
| Winston County | 23,655 | 18,870 | 315 | 1.67% |
| Bullock County | 10,328 | 8,153 | 276 | 3.39% |
| Covington County | 37,542 | 29,315 | 274 | 0.93% |
| Dallas County | 38,326 | 29,288 | 255 | 0.87% |
| Chambers County | 34,612 | 27,421 | 239 | 0.87% |
| Lawrence County | 33,116 | 25,944 | 228 | 0.88% |
| Geneva County | 26,647 | 20,813 | 223 | 1.07% |
| Crenshaw County | 13,205 | 10,185 | 203 | 1.99% |
| Macon County | 19,198 | 16,019 | 170 | 1.06% |

Doc. 207-10 at 3.

He testified that Madison, Morgan, and Limestone have a non-Black noncitizen population of five percent or less of the total VAP in those counties. *See*

48

Tr. 253–54. Mr. Fairfax offered in his report the following charts reflecting the breakdown of citizenship rates by race in Madison, Morgan, and Limestone Counties:

**Alabama**
**Madison County**
Citizenship Data by Race

| Description | Total | Black | Black% | White | White% | Latino | Latino% | Asian | Asian% |
|---|---|---|---|---|---|---|---|---|---|
| Total: | 389,781 | 95,400 | 24.48% | 247,345 | 63.46% | 20,611 | 5.29% | 9,675 | 2.48% |
| Male: | 191,913 | 44,658 | 23.27% | 124,234 | 64.73% | 10,558 | 5.50% | 4,386 | 2.29% |
| Under 18 years: | 42,675 | 11,221 | 26.29% | 24,240 | 56.80% | 3,667 | 8.59% | 736 | 1.72% |
| Native | 42,021 | 11,204 | 26.66% | 24,183 | 57.55% | 3,399 | 8.09% | 442 | 1.05% |
| Foreign born: | 654 | 17 | 2.60% | 57 | 8.72% | 268 | 40.98% | 294 | 44.95% |
| Naturalized U.S. citizen | 232 | 17 | 7.33% | 28 | 12.07% | 75 | 32.33% | 105 | 45.26% |
| Not a U.S. citizen | 422 | 0 | 0.00% | 29 | 6.87% | 193 | 45.73% | 189 | 44.79% |
| 18 years and over: | 149,238 | 33,437 | 22.41% | 99,994 | 67.00% | 6,891 | 4.62% | 3,650 | 2.45% |
| Native | 139,375 | 31,699 | 22.74% | 98,189 | 70.45% | 3,665 | 2.63% | 794 | 0.57% |
| Foreign born: | 9,863 | 1,738 | 17.62% | 1,805 | 18.30% | 3,226 | 32.71% | 2,856 | 28.96% |
| Naturalized U.S. citizen | 4,558 | 1,097 | 24.07% | 1,118 | 24.53% | 672 | 14.74% | 1,554 | 34.09% |
| Not a U.S. citizen | 5,305 | 641 | 12.08% | 687 | 12.95% | 2,554 | 48.14% | 1,302 | 24.54% |
| Female: | 197,868 | 50,742 | 25.64% | 123,111 | 62.22% | 10,053 | 5.08% | 5,289 | 2.67% |
| Under 18 years: | 41,059 | 10,540 | 25.67% | 22,708 | 55.31% | 3,680 | 8.96% | 909 | 2.21% |
| Native | 40,330 | 10,375 | 25.73% | 22,672 | 56.22% | 3,427 | 8.50% | 663 | 1.64% |
| Foreign born: | 729 | 165 | 22.63% | 36 | 4.94% | 253 | 34.71% | 246 | 33.74% |
| Naturalized U.S. citizen | 214 | 18 | 8.41% | 30 | 14.02% | 38 | 17.76% | 126 | 58.88% |
| Not a U.S. citizen | 515 | 147 | 28.54% | 6 | 1.17% | 215 | 41.75% | 120 | 23.30% |
| 18 years and over: | 156,809 | 40,202 | 25.64% | 100,403 | 64.03% | 6,373 | 4.06% | 4,380 | 2.79% |
| Native | 146,596 | 38,821 | 26.48% | 98,123 | 66.93% | 3,929 | 2.68% | 547 | 0.37% |
| Foreign born: | 10,213 | 1,381 | 13.52% | 2,280 | 22.32% | 2,444 | 23.93% | 3,833 | 37.53% |
| Naturalized U.S. citizen | 5,927 | 1,116 | 18.83% | 1,587 | 26.78% | 660 | 11.14% | 2,334 | 39.38% |
| Not a U.S. citizen | 4,286 | 265 | 6.18% | 693 | 16.17% | 1,784 | 41.62% | 1,499 | 34.97% |
| Total | 389,781 | 95,400 | 24.48% | 247,345 | 63.46% | 20,611 | 5.29% | 9,675 | 2.48% |
| Under 18 years: | 83,734 | 21,761 | 25.99% | 46,948 | 56.07% | 7,347 | 8.77% | 1,645 | 1.96% |
| Native | 82,351 | 21,579 | 26.20% | 46,855 | 56.90% | 6,826 | 8.29% | 1,105 | 1.34% |
| Foreign born: | 1,383 | 182 | 13.16% | 93 | 6.72% | 521 | 37.67% | 540 | 39.05% |
| Naturalized U.S. citizen | 446 | 35 | 7.85% | 58 | 13.00% | 113 | 25.34% | 231 | 51.79% |
| Not a U.S. citizen | 937 | 147 | 15.69% | 35 | 3.74% | 408 | 43.54% | 309 | 32.98% |
| 18 years and over: | 306,047 | 73,639 | 24.06% | 200,397 | 65.48% | 13,264 | 4.33% | 8,030 | 2.62% |
| Native | 285,971 | 70,520 | 24.66% | 196,312 | 68.65% | 7,594 | 2.66% | 1,341 | 0.47% |
| Foreign born: | 20,076 | 3,119 | 15.54% | 4,085 | 20.35% | 5,670 | 28.24% | 6,689 | 33.32% |
| Naturalized U.S. citizen | 10,485 | 2,213 | 21.11% | 2,705 | 25.80% | 1,332 | 12.70% | 3,888 | 37.08% |
| Not a U.S. citizen | 9,591 | 906 | 9.45% | 1,380 | 14.39% | 4,338 | 45.23% | 2,801 | 29.20% |

Source: U.S. Census Bureau 2022 5-Year ACS Data (B05003 tables)
Note: Race populations are "Alone" or "Single Race" which include Hispanic or Latino population, thus percentages may exceed 100%. Percentages use the total amount for the denominator.

**Alabama**
**Morgan County**
Citizenship Data by Race

| Description | Total | Black | Black% | White | White% | Latino | Latino% | Asian | Asian% |
|---|---|---|---|---|---|---|---|---|---|
| Total: | 123,102 | 16,631 | 13.51% | 91,445 | 74.28% | 10,845 | 8.81% | 605 | 0.49% |
| Male: | 60,953 | 8,236 | 13.51% | 45,003 | 73.83% | 5,879 | 9.65% | 163 | 0.27% |
| Under 18 years: | 14,457 | 2,602 | 18.00% | 9,226 | 63.82% | 2,311 | 15.99% | 14 | 0.10% |
| Native | 14,144 | 2,572 | 18.18% | 9,064 | 64.08% | 2,190 | 15.48% | 14 | 0.10% |
| Foreign born: | 313 | 30 | 9.58% | 162 | 51.76% | 121 | 38.66% | 0 | 0.00% |
| Naturalized U.S. citizen | 53 | 30 | 56.60% | 12 | 22.64% | 11 | 20.75% | 0 | 0.00% |
| Not a U.S. citizen | 260 | 0 | 0.00% | 150 | 57.69% | 110 | 42.31% | 0 | 0.00% |
| 18 years and over: | 46,496 | 5,634 | 12.12% | 35,777 | 76.95% | 3,568 | 7.67% | 149 | 0.32% |
| Native | 43,125 | 5,596 | 12.98% | 34,851 | 80.81% | 1,226 | 2.84% | 108 | 0.25% |
| Foreign born: | 3,371 | 38 | 1.13% | 926 | 27.47% | 2,342 | 69.47% | 41 | 1.22% |
| Naturalized U.S. citizen | 786 | 38 | 4.83% | 377 | 47.96% | 337 | 42.88% | 34 | 4.33% |
| Not a U.S. citizen | 2,585 | 0 | 0.00% | 549 | 21.24% | 2,005 | 77.56% | 7 | 0.27% |
| Female: | 62,149 | 8,395 | 13.51% | 46,442 | 74.73% | 4,966 | 7.99% | 442 | 0.71% |
| Under 18 years: | 13,724 | 2,393 | 17.44% | 8,717 | 63.52% | 2,239 | 16.31% | 0 | 0.00% |
| Native | 13,529 | 2,393 | 17.69% | 8,713 | 64.40% | 2,119 | 15.66% | 0 | 0.00% |
| Foreign born: | 195 | 0 | 0.00% | 4 | 2.05% | 120 | 61.54% | 0 | 0.00% |
| Naturalized U.S. citizen | 18 | 0 | 0.00% | 0 | 0.00% | 18 | 100.00% | 0 | 0.00% |
| Not a U.S. citizen | 177 | 0 | 0.00% | 4 | 2.26% | 102 | 57.63% | 0 | 0.00% |
| 18 years and over: | 48,425 | 6,002 | 12.39% | 37,725 | 77.90% | 2,727 | 5.63% | 442 | 0.91% |
| Native | 45,978 | 5,972 | 12.99% | 37,297 | 81.12% | 1,106 | 2.41% | 75 | 0.16% |
| Foreign born: | 2,447 | 30 | 1.23% | 428 | 17.49% | 1,621 | 66.24% | 367 | 15.00% |
| Naturalized U.S. citizen | 827 | 19 | 2.30% | 247 | 29.87% | 375 | 45.34% | 199 | 24.06% |
| Not a U.S. citizen | 1,620 | 11 | 0.68% | 181 | 11.17% | 1,246 | 76.91% | 168 | 10.37% |
| Total | 123,102 | 16,631 | 13.51% | 91,445 | 74.28% | 10,845 | 8.81% | 605 | 0.49% |
| Under 18 years: | 28,181 | 4,995 | 17.72% | 17,943 | 63.67% | 4,550 | 16.15% | 14 | 0.05% |
| Native | 27,673 | 4,965 | 17.94% | 17,777 | 64.24% | 4,309 | 15.57% | 14 | 0.05% |
| Foreign born: | 508 | 30 | 5.91% | 166 | 32.68% | 241 | 47.44% | 0 | 0.00% |
| Naturalized U.S. citizen | 71 | 30 | 42.25% | 12 | 16.90% | 29 | 40.85% | 0 | 0.00% |
| Not a U.S. citizen | 437 | 0 | 0.00% | 154 | 35.24% | 212 | 48.51% | 0 | 0.00% |
| 18 years and over: | 94,921 | 11,636 | 12.26% | 73,502 | 77.43% | 6,295 | 6.63% | 591 | 0.62% |
| Native | 89,103 | 11,568 | 12.98% | 72,148 | 80.97% | 2,332 | 2.62% | 183 | 0.21% |
| Foreign born: | 5,818 | 68 | 1.17% | 1,354 | 23.27% | 3,963 | 68.12% | 408 | 7.01% |
| Naturalized U.S. citizen | 1,613 | 57 | 3.53% | 624 | 38.69% | 712 | 44.14% | 233 | 14.45% |
| Not a U.S. citizen | 4,205 | 11 | 0.26% | 730 | 17.36% | 3,251 | 77.31% | 175 | 4.16% |

Source: U.S. Census Bureau 2022 5-Year ACS Data (B05003 tables)

Note: Race populations are "Alone" or "Single Race" which include Hispanic or Latino population, thus percentages may exceed 100%. Percentages use the total amount for the denominator.

50

**Alabama**
**Limestone County**
Citizenship Data by Race

| Description | Total | Black | Black% | White | White% | Latino | Latino% | Asian | Asian% |
|---|---|---|---|---|---|---|---|---|---|
| Total: | 104,199 | 13,714 | 13.16% | 77,842 | 74.71% | 6,588 | 6.32% | 1,917 | 1.84% |
| Male: | 52,385 | 6,852 | 13.08% | 38,977 | 74.40% | 3,561 | 6.80% | 762 | 1.45% |
| Under 18 years: | 11,600 | 1,024 | 8.83% | 8,027 | 69.20% | 1,543 | 13.30% | 133 | 1.15% |
| Native | 11,372 | 1,024 | 9.00% | 7,984 | 70.21% | 1,378 | 12.12% | 113 | 0.99% |
| Foreign born: | 228 | 0 | 0.00% | 43 | 18.86% | 165 | 72.37% | 20 | 8.77% |
| Naturalized U.S. citizen | 138 | 0 | 0.00% | 43 | 31.16% | 75 | 54.35% | 20 | 14.49% |
| Not a U.S. citizen | 90 | 0 | 0.00% | 0 | 0.00% | 90 | 100.00% | 0 | 0.00% |
| 18 years and over: | 40,785 | 5,828 | 14.29% | 30,950 | 75.89% | 2,018 | 4.95% | 629 | 1.54% |
| Native | 38,943 | 5,828 | 14.97% | 30,547 | 78.44% | 1,166 | 2.99% | 56 | 0.14% |
| Foreign born: | 1,842 | 0 | 0.00% | 403 | 21.88% | 852 | 46.25% | 573 | 31.11% |
| Naturalized U.S. citizen | 1006 | 0 | 0.00% | 364 | 36.18% | 264 | 26.24% | 364 | 36.18% |
| Not a U.S. citizen | 836 | 0 | 0.00% | 39 | 4.67% | 588 | 70.33% | 209 | 25.00% |
| Female: | 51,814 | 6,862 | 13.24% | 38,865 | 75.01% | 3,027 | 5.84% | 1,155 | 2.23% |
| Under 18 years: | 11,404 | 1,365 | 11.97% | 7,708 | 67.59% | 1,187 | 10.41% | 411 | 3.60% |
| Native | 11,312 | 1,365 | 12.07% | 7,708 | 68.14% | 1,187 | 10.49% | 319 | 2.82% |
| Foreign born: | 92 | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 92 | 100.00% |
| Naturalized U.S. citizen | 92 | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 92 | 100.00% |
| Not a U.S. citizen | 0 | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| 18 years and over: | 40,410 | 5,497 | 13.60% | 31,157 | 77.10% | 1,840 | 4.55% | 744 | 1.84% |
| Native | 38,608 | 5,497 | 14.24% | 30,784 | 79.73% | 1,078 | 2.79% | 194 | 0.50% |
| Foreign born: | 1,802 | 0 | 0.00% | 373 | 20.70% | 762 | 42.29% | 550 | 30.52% |
| Naturalized U.S. citizen | 996 | 0 | 0.00% | 263 | 26.41% | 328 | 32.93% | 305 | 30.62% |
| Not a U.S. citizen | 806 | 0 | 0.00% | 110 | 13.65% | 434 | 53.85% | 245 | 30.40% |
| Total | 104,199 | 13,714 | 13.16% | 77,842 | 74.71% | 6,588 | 6.32% | 1,917 | 1.84% |
| Under 18 years: | 23,004 | 2,389 | 10.39% | 15,735 | 68.40% | 2,730 | 11.87% | 544 | 2.36% |
| Native | 22,684 | 2,389 | 10.53% | 15,692 | 69.18% | 2,565 | 11.31% | 432 | 1.90% |
| Foreign born: | 320 | 0 | 0.00% | 43 | 13.44% | 165 | 51.56% | 112 | 35.00% |
| Naturalized U.S. citizen | 230 | 0 | 0.00% | 43 | 18.70% | 75 | 32.61% | 112 | 48.70% |
| Not a U.S. citizen | 90 | 0 | 0.00% | 0 | 0.00% | 90 | 100.00% | 0 | 0.00% |
| 18 years and over: | 81,195 | 11,325 | 13.95% | 62,107 | 76.49% | 3,858 | 4.75% | 1,373 | 1.69% |
| Native | 77,551 | 11,325 | 14.60% | 61,331 | 79.08% | 2,244 | 2.89% | 250 | 0.32% |
| Foreign born: | 3,644 | 0 | 0.00% | 776 | 21.30% | 1,614 | 44.29% | 1,123 | 30.82% |
| Naturalized U.S. citizen | 2,002 | 0 | 0.00% | 627 | 31.32% | 592 | 29.57% | 669 | 33.42% |
| **Not a U.S. citizen** | **1,642** | **0** | **0.00%** | **149** | **9.07%** | **1,022** | **62.24%** | **454** | **27.65%** |

Source: U.S. Census Bureau 2022  5-Year ACS Data (B05003 tables)

Note: Race populations are  "Alone" or "Single Race" which include Hispanic or Latino population, thus percentages may exceed 100%. Percentages use the total amount for the denominator.

Doc. 207-10 at 5–7.

Mr. Fairfax testified at trial that because of the "low percentage of [B]lack noncitizens compared to the relatively high percentage of non-[B]lack noncitizens, specifically the Latino and Asian population, the CVAP data is the more appropriate dataset to use when it comes to the sufficiently large component of *Gingles* I." Tr.

254.

Mr. Fairfax explained that he considered the noncitizen population in the Huntsville area significant because "Huntsville had the leading . . . population of non-citizens in the state" and "Decatur had the sixth." *Id.* at 288. Mr. Fairfax conceded that Montgomery has the second largest noncitizen population in the state. *Id.* at 289; Doc. 207-10 at 9. He testified that he did not use BCVAP data when drawing the illustrative district in that area because "there[] [was] no need to." Tr. 289–90.

Mr. Fairfax testified that CVAP data is reliable and is frequently used in redistricting litigation. *Id.* at 254–55. He explained that he uses a disaggregation technique to estimate the CVAP and BCVAP at the district level because CVAP data is provided down to the block group level. *See id.* at 255. He testified that Illustrative Plans 1 and 2A had a majority BCVAP in District 7 using four different disaggregation methods, including the method used by the Secretary's expert. *See id.* at 345–46.

Mr. Fairfax acknowledged that CVAP data come with a margin of error, *id.* at 311–12, and conceded that, when accounting for the margin of error, his estimated BCVAP in District 7 in Illustrative Plan 2A—the only Illustrative Plan for which Mr. Fairfax calculated a margin of error—includes values below and above a majority, *id.* at 312, 321–22. He further testified that the margin of error is not

"commonly used" in redistricting. *Id.* at 311–12.

At trial, Mr. Fairfax also responded to a criticism by the Secretary's *Gingles* I expert, Dr. Sean Trende, that he did not account for members of the CVAP who are ineligible to vote for various reasons, such as a felony conviction. *See id.* at 320. Mr. Fairfax testified that accounting for such disqualifications is "not normally done" by experts in redistricting litigation. *Id.* at 321.

Illustrative Plan 3 is the only Illustrative Plan in which District 7 "satisfies majority Black status using both BVAP . . . and BCVAP." Doc. 206-8 at 6 (footnotes omitted); *see* Tr. 270, 272.

### b. Reasonable Configuration

Mr. Fairfax opined and testified that District 7 is reasonably configured in Illustrative Plans 1, 2A, and 3. *See* Doc. 206-6 at 7; Doc. 206-8 at 5; Tr. 258, 267, 273. Mr. Fairfax explained that the district boundaries in all three illustrative plans bring together portions of the city of Decatur with portions of Huntsville that have "similar socioeconomic makeup[s]." *See* Doc. 206-6 at 35; Doc. 206-8 at 17, 28. He also explained that District 7 in Illustrative Plans 1, 2, and 3 wholly contain Alabama A&M University, an historically Black university that Mr. Fairfax considers a community of interest, and include it with the urban areas of Huntsville. Doc. 206-6 at 35; Doc. 206-8 at 17–18, 29. By contrast, the Plan includes most of Alabama A&M University in District 8, which Mr. Fairfax opined "is a more rural district and

53

has less communities in common than the more urban areas of [District] 7." Doc. 206-6 at 35; Doc. 206-8 at 18.

Mr. Fairfax testified that on the measures of geographic compactness that he used, District 7 in Illustrative Plans 1, 2A, and 3 performed better than the lowest-scoring district in the Plan. Tr. 258, 267, 273. He testified at trial that Illustrative Plans 1 and 2A, which rely on BCVAP to satisfy *Gingles* I, were the "best" plans, *id.* at 290, and that using BCVAP data allowed him to create a more compact plan, *id.* at 285–86.

At trial, Mr. Fairfax acknowledged that he had to diminish the compactness of District 7 in Illustrative Plan 3 to reach majority-BVAP status, but opined that District 7 in that plan remains reasonably compact. *Id.* at 273–74, 335–36. He also acknowledged that District 7 in Illustrative Plan 3 splits more counties than does District 7 in the Plan, *id.* at 274, and splits more voting districts, *id.* at 333–34. He also acknowledged that the district includes thirty-two of the thirty-five highest-BVAP precincts in the four counties included in the district. *Id.* at 336. He testified that "it's not uncommon for . . . a majority-[B]lack district to have majority-[B]lack precincts." *Id.* at 338.

Mr. Fairfax also testified about Dr. Trende's use of dot density maps to evaluate the compactness of the Black population in the Huntsville area. *See id.* at 260–62. He criticized the maps as "misleading" because an area with "very little

54

population" will "show[] up as . . . a little amount of dots." *Id.* at 261. He testified

that dot density maps are not a standard method to evaluate the compactness of a

minority population and criticized Dr. Trende's conclusion that the maps reflected a

non-compact Black population because "majority-[B]lack districts are mostly made

up of areas that may have different concentrations of [B]lack population." *Id.* at 261–

62. Mr. Fairfax made the same point about the Montgomery area. *See id.* at 260–62.

### b. Dr. Kassra Oskooii

To establish the first *Gingles* precondition in the Huntsville area, the plaintiffs

also rely on the testimony of Dr. Kassra Oskooii. Dr. Oskooii earned a Master of

Science and Doctor of Philosophy in political science from the University of

Washington and a political methodology field certificate from the Center for

Statistics & the Social Sciences. Doc. 206-14 at 2–3; *see* Tr. 349. He works as a

tenured professor at the University of Delaware, where he researches and teaches

about political methodology, voting rights, and redistricting. Doc. 206-14 at 2; Tr.

348–49. He has published several papers on "ecological inference methods as it

pertains to racially polarized voting analysis." Doc. 206-14 at 4; *see* Tr. 350. His

research has been published in approximately twenty-two peer-reviewed journals.

Tr. 350. He also co-developed a software package called "eiCompare," which he

describes as "a reproducible code that quantifies, compares, and represents racially

polarized voting data." Doc. 206-14 at 5. Dr. Oskooii has qualified as an expert

witness in various redistricting cases. Tr. 353.

Dr. Oskooii was admitted at trial without objection as "an expert in map drawings, statistical analysis, and U.S. census data including the American Community Survey and the decennial census." *Id.* at 353–54.

The plaintiffs asked Dr. Oskooii to evaluate Dr. Trende's opinion about the reliability of CVAP data. Doc. 206-14 at 5; *see* Tr. 348. Dr. Oskooii evaluated only Illustrative Plan 1 and opined that CVAP data is an appropriate measure of the eligible voting population. Tr. 355–56; Doc. 206-14 at 14.

Dr. Oskooii opined in his report that CVAP data is "regularly used to estimate the proportion of eligible voters by race and ethnicity across electoral districts" and has two advantages over the use of decennial census data: (1) CVAP estimates are more recent data than census counts and (2) CVAP estimates provide estimates of data not included in decennial census data, such as CVAP estimates by race. Doc. 206-14 at 9–10.

At trial, Dr. Oskooii testified that the citizenship rates among Black and White voting-age populations in the Huntsville area are around ninety-five percent each, which he opined is "very high." Tr. 358. Dr. Oskooii testified that the citizenship rate "for [the] Hispanic population is below [fifty] percent" in the Huntsville area and that Hispanic people comprise approximately ten percent of the voting-age population in the Huntsville area. *Id.* at 401. Dr. Oskooii opined that the disparity in

Hispanic citizenship rates and Black and White citizenship rates renders the use of VAP an inaccurate metric for the populations by race in the Huntsville area. *See id.* at 359. He testified that using VAP to estimate a particular minority population in an area that has another minority population with a high noncitizenship rate can "underestimat[e]" the particular minority population at issue. *Id.* at 357.

Dr. Oskooii testified extensively about the reliability of CVAP data. *See id.* at 360–62. He testified that the American Community Survey receives an "incredibly high response rate" and surveys approximately one in every thirty-eight households each year. *Id.* at 361–62. He acknowledged the potential for American Community Survey data to inflate the CVAP of a region, which sometimes results in the CVAP of a block group exceeding the total VAP of that block group. *Id.* at 373. Dr. Oskooii testified that the issue of CVAP exceeding VAP does not appear when calculating the population of larger geographic units, such as an electoral district. *Id.* at 373–74. He further testified that the CVAP "certainly" does not exceed the total VAP in District 7 in Illustrative Plan 1. *Id.* at 364, 373.

Dr. Oskooii pointed out that Dr. Trende has relied on CVAP data in other redistricting litigation on the ground that it is a "useful metric for assessing a district's actual electorate." Doc. 206-14 at 11 (internal quotation marks omitted); *see* Tr. 357. He also testified that, in previous litigation, Dr. Trende relied on the CVAP point estimate at the block group level without raising issues about

confidence intervals or margins of error. Tr. 381–82; Doc. 206-14 at 12. He conceded at trial that three of the five years of data in the 2021 five-year American Community Survey are from before the 2020 census. *See* Tr. 398.

Dr. Oskooii testified about the techniques for disaggregating data to the district level when a block group is split between two districts. *See id.* at 365. Dr. Oskooii acknowledged that there are different disaggregation techniques, and he testified that he does not perform his own disaggregation calculation. *See id.* Instead, he relies on a program called the Redistricting Data Hub, which uses Dr. Oskooii's preferred disaggregation technique. *Id.* This technique involves configuring a "block-to-block group BVAP ratio" by taking the BVAP of a census block and dividing it by the BVAP of the block group. *Id.* The resulting percentage is multiplied by the BCVAP of the block group "to allocate the BCVAP accurately to the block level." *Id.*

Dr. Oskooii acknowledged that different disaggregation techniques result in different CVAP point estimates. *Id.* at 434–35. For example, Dr. Oskooii calculated a 50.11 percent BCVAP point estimate for District 7 in Illustrative Plan 1, which is different from Mr. Fairfax's BCVAP 50.16 percent point estimate, because the experts used different disaggregation methods. *Id.* at 433. When asked how to select a disaggregation method, Dr. Oskooii testified that one should look at the "logic behind the disaggregation and how it's implemented." *Id.* at 436.

On cross examination, Dr. Oskooii was asked how redistricting jurisdictions should determine when to use CVAP instead of VAP. Dr. Oskooii testified that it "depends on what the jurisdiction is looking for." *Id.* at 399. He testified that he would suggest CVAP as the appropriate data when a jurisdiction has a high noncitizen population, although there is "no bright line rule" for determining when a noncitizen population is high. *See id.* at 399–401. He testified that the citizenship rate is relevant when "the results are impacted" by noncitizenship rates. *Id.* at 401.

Dr. Oskooii acknowledged that because CVAP data is sample data, it comes with a margin of error. Tr. 406; *see* Doc. 206-14 at 13. Part of the uncertainty arises out of "item non-response," which occurs when an individual fills out a survey but leaves a question blank, Tr. 407–08. Dr. Oskooii conceded that the American Community Survey handles item non-response by imputing data—including citizenship data—based on other information in the survey. *Id.* at 408–10. He acknowledged that there is uncertainty about the imputation process and that it can generate error. *See id.* at 410–11.

Dr. Oskooii did not offer an estimated margin of error for District 7 in Illustrative Plan 1. *See id.* at 415. He testified that "[t]here[] [is] no good or sensible . . . calculation" of that margin of error and did not try to calculate it because "it's not relevant in describing the composition of the CVAP composition of this district."

59

*Id.* He testified that in his view a point estimate is sufficient to satisfy the numerosity requirement of *Gingles* I. *Id.* at 449.

Dr. Oskooii also testified about Dr. Trende's assertion that an illustrative plan drawn on the basis of CVAP should also consider those who are ineligible to vote based on felony convictions or other disqualifications and that, considering the rates of disenfranchised felons supplied by one of the plaintiffs' experts, Illustrative Plan 1 did not contain a majority-Black population in District 7. *Id.* at 382–83; *see* Doc. 189-7 at 23. Dr. Oskooii criticized Dr. Trende for using an "unverified statewide citizenship rate" that came "from a percentage that another expert [Dr. Burch] in another report has supplied." Tr. 383. He stated that the data was "not verified or detailed enough" for Dr. Trende to make these estimations for District 7 in Illustrative Plan 1. *Id.* at 384.

Dr. Oskooii also criticized Dr. Trende's use of dot density maps to "show population concentration in different regions." *Id.* Dr. Oskooii testified that by placing the markers that reflect the Black population on top of the markers that reflect the White population, Dr. Trende is "effectively hiding the concentration of White VAP in th[e] district." *Id.* Dr. Oskooii explained that this "superimposi[tion]" of the Black markers on top of the White markers is problematic because it may lead the reader to assume that areas with Black markers are all "really high concentrated areas," when actually they may be "areas that also have equal amounts or similar

60

amounts of [W]hite people in them." *Id.* at 384–85.

### 2. *Gingles* II and III – Racially Polarized Voting (Dr. Liu)

To establish the second and third *Gingles* requirements—that Black voters are "politically cohesive" and that each challenged district's White majority votes "sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate," *Allen*, 599 U.S. at 18 (internal quotation marks omitted) (quoting *Gingles*, 478 U.S. at 51)—the plaintiffs rely on stipulated facts and the expert testimony of Dr. Baodong Liu.

The plaintiffs rely on stipulated facts to argue that Black members of the Legislature have been elected because of majority-Black districts created to satisfy federal law. Doc. 250 ¶ 519. These stipulated facts are: (1) "There are currently no Black statewide elected officials in Alabama regardless of political party[,]" Doc. 230 ¶ 93; Doc. 250 ¶ 521; (2) "Only one Black person has ever been elected to statewide office in a contested election in Alabama[,]" and that person was elected after first being appointed, Doc. 230 ¶ 94; Doc. 250 ¶ 525; (3) "In 2024, . . . [a]ll Black Senators are elected from majority-Black districts[,]" Doc. 230 ¶ 117; Doc. 250 ¶ 522; and (4) currently, all Black Representatives in the Alabama House except one are elected from majority-Black districts, Doc. 230 ¶ 117. The plaintiffs also point out that no Black Senators represent the districts in the Huntsville area. Doc. 250 ¶ 523.

Dr. Liu works as a tenured professor of political science at the University of Utah, where he focuses on the "relationship between election systems and the ability of minority voters to participate fully in the political process and to elect representatives of their choice." Doc. 206-16 at 2; *see* Tr. 14, 17. Dr. Liu holds a doctoral degree in political science from the University of New Orleans, a graduate degree in political science from Oklahoma State University, and an undergraduate degree in law from East China University. Doc. 206-17 at 2; Tr. 16. Dr. Liu has written or edited nine books and published articles in many peer-reviewed journals. Doc. 206-16 at 2; Doc. 206-17 at 2–8; *see* Tr. 18. He has served as an expert witness in vote dilution cases in eight states, and has advised the United States Department of Justice on methodological issues concerning racially polarized voting. Tr. 19; Doc. 206-16 at 2–3; Doc. 206-17 at 18. Dr. Liu has been compensated at a rate of $300 per hour for his work on this case and his compensation does not depend on the substance of his testimony. Doc. 260-16 at 2.

At trial, Dr. Liu was qualified without objection "as an expert in racial polarization analysis, voter behavior, and Ecological Inference." Tr. 19–20. The plaintiffs asked Dr. Liu to (1) conduct a racial polarization analysis in the Huntsville and Montgomery regions and (2) analyze the effectiveness of the Illustrative Plans in allowing Black voters an opportunity to elect a candidate of their choice in state Senate elections. Doc. 206-16 at 1–2; Tr. 20.

Dr. Liu concluded that there is a "significant" pattern of "racially[ ]polarized voting between [B]lack voters and [W]hite voters in both elections involved in the State Senate electoral offices." Tr. 21. He explained that he used a two-step approach to conduct a racial polarization analysis. *Id.* at 23. He first evaluated "the cohesiveness of [B]lack voters" by considering whether "the majority of [B]lack voters voted for the same candidate" in biracial elections. *Id.* He then considered whether "the same candidate preferred by the majority [of] [B]lack voters is also shared by the majority [of] voters from the [W]hite voting group." *Id.*

Dr. Liu analyzed only biracial elections, which are "elections that involve both [B]lack and [W]hite candidates." *Id.* at 29; *see id.* at 65. He testified that his "role is to show to the Court" the "true preference" of Black voters when "given a choice between a [B]lack candidate and [W]hite candidate" and that *Gingles* requires him to consider the race of the candidate when evaluating racially polarized voting. *Id.* at 29; *see id.* at 67–68. At trial, Dr. Liu denied that examining biracial elections assumed that Black voters always preferred Black candidates. *Id.* at 114–15. He testified that Black voters could have expressed a preference for White candidates in the biracial elections he analyzed, but they did not. *Id.* at 114–17.

Dr. Liu first examined three biracial endogenous elections (elections for the offices at issue in this litigation) in the Huntsville area, including the 2022 Senate District 2 election, the 2022 Senate District 7 election, and the 2018 Senate District

7 election. Doc. 206-16 at 6; *see* Tr. 26–27. He did not analyze any endogenous elections in Montgomery. Tr. 73. He also considered eleven biracial exogenous elections (elections not for the district in dispute, Doc. 206-16 at 6, which in this case are almost all elections for statewide offices, Tr. 26–27).

Dr. Liu evaluated racially polarized voting in these fourteen elections by using a statistical procedure known as ecological inference, which he opined "has been widely used as the most-advanced and reliable statistical procedure for [racially polarized voting] estimates in not only academic research but also voting rights cases in the last two decades." Doc. 206-16 at 4; *see* Tr. 25. Dr. Liu explained that ecological inference uses two sources of data: (1) "the election outcome aggregated at [the] precinct level" and (2) "the demographic data provided by the U.S. census." Tr. 25. He testified that one benefit of ecological inference is that he can check the reliability of his estimations. *Id.* at 26. Dr. Liu testified that in each biracial election evaluated in his initial report, every Black candidate ran as a Democrat and every White candidate ran as a Republican. *Id.* at 92–93, 117.

Dr. Liu opined that all three endogenous elections were racially polarized, and that the Black candidates in all three elections were defeated "as a result of the high level" of racially polarized voting. Doc. 206-16 at 7; Tr. 31. He offered the following table to demonstrate his findings:

Table 1: Estimated Racial Support for Black Candidate in Endogenous Elections

| Election | Black Candidate(s) | White Candidate(s) | % vote cast for Black Cand | Black Support for Black Cand (95% CI)[6] | White Support for Black Cand (95% CI) | Black-Cand Won? | RPV? |
|---|---|---|---|---|---|---|---|
| 2022 SD2 | Kim Lewis | Tom Butler | 44.4% | 63.0% (.52-.75) | 23.9% (.12-.38) | No | Yes |
| 2022 SD7 | Korey Wilson | Sam Givhan | 37.2% | 82.9% (.74-.91) | 21.3% (.16, .27) | No | Yes |
| 2018 SD7 | Deborah Barros | Sam Givhan | 44.7 | 85.7 (.78-.94) | 27.9 (.25-.30) | No | Yes |

Doc. 206-16 at 7.

Dr. Liu's analysis of the eleven exogenous elections generated similar results. In these races, no Black-preferred candidate in Huntsville won, and the Black-preferred candidate lost seven out of the eleven elections in Montgomery. *Id.* at 9–10; *see* Tr. 32–33. Dr. Liu observed a "strong pattern of racially[ ]polarized voting" in all eleven elections. Tr. 32.

Dr. Liu thus concluded that all fourteen elections showed a "high level" of racially polarized voting in the Montgomery and Huntsville areas. *See* Doc. 206-16 at 8, 10. He observed that "there is overwhelming Black unity in voting" but that only ten to twenty percent of White voters vote for Black candidates in biracial elections in the Huntsville area, and less than ten percent of White voters vote for Black candidates in the Montgomery area. *Id.* at 11. He testified that "voting in Greater Huntsville and Montgomery regions of Alabama during the last [ten] years

is 'racially polarized' in that Black voters have expressed a clear preference for the same candidate," that "in the elections analyzed[,] the preferred candidate by Black voters was a Black candidate," and that "this preference was not shared by the [W]hite voters who were the majority of the electorate." *Id.* at 6.

Dr. Liu also performed an effectiveness analysis, which "is a comparative study of two or more redistricting plans" that "reports the different opportunities for racial minority voters (in this case, Black voters) to elect the candidates of their choice, given how the different redistricting plans have determined the racial configuration of a certain jurisdiction under legal dispute." *Id.* at 10. It also shows "the extent to which [racially polarized voting] has affected the election outcomes in the given jurisdiction." *Id.*

At trial, Dr. Liu explained that he used a two step "effective[ness] analysis," which involves (1) "compar[ing] the racial configuration of one map versus the racial configuration of another" and (2) evaluating "how voters voted in the particular configuration." Tr. 34. He stated that by comparing the results of an illustrative plan with the results of the Plan, he can "make [a] conclusion about whether or not one particular configuration has [a] better opportunity for the [B]lack-preferred candidates to win." *Id.*

Dr. Liu opined that Illustrative Plan 1 is "a much more effective plan at providing Black voters an opportunity to elect candidates of their choice than was

66

the Enacted Plan," Doc. 206-16 at 12, and "provides Black voters a realistic chance to elect candidate of their choice in two more State Senate districts (SD7 and SD25), in addition to SD 26," *id.* at 15; *see* Tr. 35–37.

Dr. Liu did not conduct an effectiveness analysis for Illustrative Plans 2 and 3. He provided the following tables to support his findings for Illustrative Plan 1:

**Table 6: Overall Performance in SD7 based on 11 Elections, Compared**

*Enacted Plan*

|  | Blk_pref_cand % | Wht_pref_cand % | BPC defeats |
|---|---|---|---|
| White | 21.6 | 77.4 | |
| Black | 89.7 | 9.3 | |
| Total | 38.1 | 60.9 | 11/11 |

*Plaintiffs' Plan*

|  | Blk_pref_cand % | Whte_pref_cand % | BPC defeats |
|---|---|---|---|
| White | 35.9 | 63.2 | |
| Black | 85.5 | 13.5 | |
| Total | 62.8 | 36.3 | 0/11 |

**Table 9: Overall Performance in SD25 based on 11 Elections, Compared**

*Enacted Plan*

|  | Blk_pref_cand % | Wht_pref_cand % | BPC defeats |
|---|---|---|---|
| White | 16.8 | 82.3 | |
| Black | 63.5 | 35.6 | |
| Total | 30.8 | 68.3 | 11/11 |

*Plaintiffs' Plan*

|  | Blk_pref_cand % | Whte_pref_cand % | BPC defeats |
|---|---|---|---|
| White | 20.1 | 79.0 | |
| Black | 88.5 | 10.6 | |
| Total | 53.1 | 46.2 | 0/11 |

67

**Table 10: Overall Performance in SD26 based on 11 Elections, Compared**

*Enacted Plan*

|  | Blk_pref_cand % | Wht_pref_cand % | BPC defeats |
|---|---|---|---|
| White | 27.0 | 72.0 | |
| Black | 93.2 | 6.0 | |
| Total | 71.5 | 27.5 | 0/11 |

*Plaintiffs' Plan*

|  | Blk_pref_cand % | Whte_pref_cand % | BPC defeats |
|---|---|---|---|
| White | 18.4 | 80.6 | |
| Black | 86.8 | 12.3 | |
| Total | 56.3 | 42.8 | 0/11 |

Doc. 206-16 at 13–14.

Dr. Liu also responded to the reports of four of the Secretary's experts: Dr. Trende, Dr. Wilfred Reilly, Dr. Chris Bonneau, and Dr. M.V. Hood III. Doc. 206-18; Tr. 22. *First*, Dr. Liu addressed the opinion of Dr. Trende that a Black-preferred candidate "would win regularly in District 7" in Illustrative Plan 1 even if the BVAP in that district were only twenty-five percent. Doc. 206-18 at 9–10 (internal quotation marks omitted). Dr. Liu opined that Dr. Trende "unrealistic[ally]" assumed that Black voters would unanimously support a Black-preferred candidate and that one-third of White voters would support the Black-preferred candidate, which is not supported by the data. *See id.* at 10; Tr. 38–39. He also testified that his calculations did not support Dr. Trende's assertion. *See* Tr. 39; Doc. 206-18 at 10.

*Second,* Dr. Liu addressed the opinions of Dr. Reilly and Dr. Bonneau that the voting patterns in Alabama are attributable to political party, not race. Doc. 206-18

at 3–7; Tr. 40–46. He testified that the Secretary's experts did "not object [to] the findings of [his] report of [the existence of] racially[ ]polarized voting," Tr. 22–23, and criticized them for failing to conduct a racial polarization analysis, which he opined is necessary to determine whether the second and third *Gingles* requirements are satisfied, *id.* at 96, 98. Dr. Liu testified that he was not concerned with voters' motivations for selecting candidates, only whether the voting patterns were racially polarized. *Id.* at 42–43; *see id.* at 74. He criticized Dr. Bonneau for using county-level data, which results in erroneous calculations, *id.* at 43–45, as well as Dr. Bonneau's analysis of straight-ticket voting, which is "not based on [an] actual racial breakdown" of the voters, *id.* at 56.

To address the role of political party, Dr. Liu evaluated several biracial, non-partisan, mayoral elections in the Montgomery and Huntsville areas in 2019, 2020, and 2023. Doc. 206-18 at 8–9. He testified that these elections demonstrated racially polarized voting even when party is not at issue. *See* Tr. 51–52. He explained that "[t]he [B]lack candidates received much less support from the [W]hite voting group and much more support from the [B]lack group. So it's racially polarized." *Id.* at 53.

*Third*, Dr. Liu addressed the opinion of Dr. Hood that racial bloc voting does not occur in Alabama based on a "cross-state analysis." Doc. 206-18 at 2. Dr. Liu criticized Dr. Hood for comparing "the voting patterns of Black voters in [twenty] other states to that of Alabama" without "provid[ing] any reason why he chose

th[ose] states"—particularly where he selected "states with at least [ten percent] of [a] Black population, despite the fact that Alabama's Black population share is . . . above the [twenty-five percent] level." *Id.* Dr. Liu also criticized Dr. Hood for "focus[ing] on the Black voter choices" without "look[ing] at the [W]hite voter choices for the same elections based on the same polls." *Id.* And he pointed out that "Dr. Hood did not perform any RPV analysis when purporting to analyze the existence or extent of racial bloc voting" in contradiction "to his own professional recommendation when it comes to empirical analysis of vote dilution claims." *Id.*

Dr. Liu also criticized Dr. Hood for failing to analyze Alabama Senate elections, instead relying on the success of one Black Representative (Kenneth Paschal) in a majority-White Alabama House of Representatives district. *See id.* at 3. Dr. Liu opined that Representative Pashcal's election did not occur in the Montgomery or Huntsville region and did not involve Senate districts. *Id.* He also opined that the voter turnout for that primary election was "extremely low," and that recent elections in the challenged areas show that White bloc voting occurs against Black candidates. *Id.*

### 3.    The Senate Factors and Proportionality

The plaintiffs next turn to the totality of the circumstances. They rely on stipulations of fact and testimony from two experts and several fact witnesses to support their arguments. The Court first discusses the stipulations and experts, and

then discusses the fact witnesses in the next sections.

Recall that the nine Senate Factors are:

(1) "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process";

(2) "the extent to which voting in the elections of the state or political subdivision is racially polarized";

(3) "the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group";

(4) "if there is a candidate slating process, whether the members of the minority group have been denied access to that process";

(5) "the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process";

(6) "whether political campaigns have been characterized by overt or subtle racial appeals";

(7) "the extent to which members of the minority group have been elected to public office in the jurisdiction";

(8) "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group"; and

(9) "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous."

*Gingles*, 478 U.S. at 36–37 (quoting S. Rep. No. 97-417 at 28–29).

### a.    Stipulations

The parties stipulated to several facts about the totality of the circumstances in Alabama today. They stipulated that twenty percent of state Senate seats and 24.8% of state House seats are held by Black legislators, and that all but one Black Representative and all Black Senators are elected from majority-Black districts. Doc. 230 ¶ 117. They also stipulated that "[o]nly one Black person has ever been elected to statewide office in a contested election in Alabama." *Id.* ¶¶ 93–94.

The parties also stipulated that multiple Black candidates ran in Republican primaries in recent congressional and state legislative elections, but all of them finished behind multiple White candidates. *See id* ¶¶ 106–07. For example, they stipulated, "In the 2024 Republican primary election for Alabama's U.S. Congressional District 2, the four Black candidates in the race . . . finished [fifth], [sixth], [seventh], and [eighth] places out of [eight] candidates, respectively, behind four [W]hite candidates and together received 6.2% of the total vote."; "In the 2024 special Republican primary election for Alabama State House District 27, Black candidate Billy Ray Todd finished fifth of six, behind four [W]hite candidates, receiving 8.7% of the vote."; "In the 2022 Alabama Republican U.S. Senate primary, Black candidate Karla DuPriest finished fifth behind four [W]hite candidates, receiving 0.9% of the vote." *Id.* ¶¶ 106, 109, 111.

### a. The Plaintiffs' Expert Witness Testimony

### i. Dr. Joseph Bagley

The plaintiffs also rely on the expert testimony of Dr. Joseph Bagley about the Senate Factors. Dr. Bagley holds graduate degrees in history from Auburn University and Georgia State University. Doc. 206-19 at 1; Doc. 206-20 at 1; Tr. 525. He works as an Assistant Professor of History at Georgia State University, where he focuses on "United States constitutional and legal history, politics, and race relations, with a focus on the Deep South." Doc. 206-19 at 1; *see* Tr. 525. He has published a book, numerous articles, and been accepted as an expert in other Alabama voting rights cases. *See* Doc. 206-19 at 1–2; Doc. 206-20 at 1–2; Tr. 526–28. Dr. Bagley was compensated at a rate of $150 per hour for his work and his compensation did not depend on the substance of his testimony. Doc. 206-19 at 2. At trial, Dr. Bagley was qualified without objection "as an expert in Alabama political history, political analysis, race relations, and historical analysis." Tr. 528.

The plaintiffs asked Dr. Bagley to analyze the Senate Factors, which he did according to "standards of historiography." Doc. 206-19 at 2. He opined that "Senate Factors 1, 3, 5, 6, 7, and 8 are present in Alabama in ways that substantially limit equal access to the political process for Black voters." *Id.*; *see* Tr. 531–32. Dr. Bagley testified that he did not evaluate Senate Factor 2 or conduct a racially polarized voting analysis, but he is aware that federal courts have found that racially

polarized voting exists in Alabama. Tr. 532. At trial, Dr. Bagley explained his understanding of the Senate Factors and the methods and sources he used in his analysis. *Id.* at 529–31. Based on his research, he testified that "the political process is not equitably open to [B]lack citizens of Alabama." *Id.* at 532.

As to Senate Factor 1, Dr. Bagley opined that "Alabama's recent history of discrimination against Black citizens continues to the present day." Doc. 206-19 at 4. Dr. Bagley traced the extensive history of federal judicial involvement in and supervision of Alabama redistricting efforts from the 1960s—"the first decade that the state was forced to reapportion the State Legislature for the first time"—to the present. Tr. 533; *see* Doc. 206-19 at 5–14. He testified that in each decade, he observed "a failure on the part of the Legislature to pass equitable plans." Tr. 533. Dr. Bagley testified that the 1990s were a particularly "pivotal point" in Alabama because Black citizens were gaining seats in the state and federal legislatures due to voting rights lawsuits and many White voters began switching their affiliation and votes from the Democratic Party to the Republican Party. *Id.* at 536–38.

Dr. Bagley also testified about what he described as other instances of official discrimination, such as Alabama's closure of several driver license offices, which he opined was done to serve political purposes and affected voters because of Alabama's requirement for voter identification. *See id.* at 541–42. He cited a finding by the United States Department of Transportation "that the state's closure of certain

74

driver's license offices had a discriminatory effect on [B]lack citizens in Alabama in violation of Title VI of the Civil Rights Act." *Id.* at 541–42; Doc. 206-19 at 15. On cross examination, Dr. Bagley conceded (1) that the Department's investigation concluded with an agreement in which Alabama agreed to reopen closed offices but did not admit liability, (2) that no court found that Alabama discriminated as part of the license center closures, and (3) that he had no evidence that the state intentionally closed license centers in areas with a heavy Black population. Tr. 592–93.

Dr. Bagley opined in his report that the Legislature's redistricting plans "were drawn behind the scenes by familiar characters including consultant Randy Hinaman and noted 'gerrymander whiz' Thomas Hofeller." Doc. 206-19 at 13. On cross examination, Dr. Bagley conceded that he did not have evidence that Mr. Hofeller drew the map but stated that "[h]e was just part of the process." Tr. 589.

Dr. Bagley also opined in his report that Alabama "was forced to comply with the National Voter Registration Act and jettison its practice of requiring documentary proof-of-citizenship in order to register to vote." Doc. 206-19 at 15 (citing *League of Women Voters v. Newby*, 838 F.3d 1 (D.C. Cir. 2016)); *see* Tr. 541–42. On cross examination, Dr. Bagley conceded that Alabama was not a party to the lawsuit he cited in support of that proposition and that the court did not determine that Alabama failed to comply with the National Voter Registration Act or order Alabama to perform any remedial act. Tr. 595.

As to Senate Factor 3, Dr. Bagley opined that Alabama has historically used "the kinds of enhancing devices targeted under" this Senate Factor. Doc. 206-19 at 16. He evaluated Alabama's use of at-large voting systems, anti-single-shot provisions, and other voting laws and concluded that those practices made it more difficult for Black citizens to vote or win election seats. *See id.* at 16–21; Tr. 542–44. He testified that municipalities in Alabama have been compelled to get rid of at-large voting schemes as recently as the 1980s. Tr. 543–44.

As to Senate Factor 5, Dr. Bagley opined that the Black population in Huntsville and Montgomery are "more likely to live in poverty," "more likely to be unemployed," "more likely to rely on food assistance benefits," "less likely to have broadband Internet service or any Internet access," and "less likely to have health insurance" than White Alabamians living in those areas. Tr. 546; *see* Doc. 206-19 at 21. He testified that similar racial disparities exist in the criminal justice system, public transportation, and housing. Tr. 553–54. Dr. Bagley testified that there is no way to account for these disparities "other than the state's history of discrimination." *Id.* at 554.

Dr. Bagley also opined that there are racial disparities in education in the Huntsville and Montgomery areas that are a result of the state's history of discrimination. *Id.* at 547. He opined in his report that thirteen of the schools listed on the Alabama Department of Education's "'Failing Schools List' for three (3) out

of the past five (5) years" are predominantly Black public schools in the Montgomery and Huntsville areas. Doc. 206-19 at 25. Of the 206 Alabama public schools in 2023 deemed "priority" (a new designation for formerly-classified "failing" schools), "181 were majority[-]Black student population," and twenty-four of those schools are Montgomery County Schools and eleven are Huntsville City Schools. *Id.* A trial, he testified that Madison County (in the Huntsville area) is still under a desegregation order and that the Decatur public school system remained under a desegregation order until 2019. *See* Tr. 549; *see also* Doc. 206-19 at 23.

Dr. Bagley also opined about the town of Pike Road, which is just east of Montgomery. Dr. Bagley opined that Pike Road was founded by citizens who wanted to remove their children from integrated public schools in Montgomery and is a "[W]hite flight community." *Id.* at 611; Doc. 206-19 at 26. Dr. Bagley opined that Pike Road's acquisition of Georgia Washington Middle School from the City of Montgomery was evidence of discrimination. *See* Doc. 206-19 at 27. Dr. Bagley included in his report a quote from an article written by Patty Payne, a "city booster," which stated that leadership of Pike Road "sought to 'preserve and protect what they saw as their preferred way of life' in the face of 'encroachment' from the City of Montgomery." *Id.* at 26. He opined that this sentiment demonstrates that "[W]hite boosters wanted to establish a public school system that was not only majority-

[W]hite in its student population, but also under majority-[W]hite, if not all-[W]hite, leadership." *Id.* at 26–27.

He also opined that Pike Road grew by annexing wealthy, predominantly White neighborhoods. *Id.* at 26; *see* Tr. 616. At trial, he testified that he would assume that Pike Road has also incorporated majority-Black neighborhoods "given the growth in the [B]lack population" in the town. Tr. 616. And he conceded that the Black and White share of the population is "pretty close" in Pike Road. *Id.* at 615.

As to Senate Factor 6, Dr. Bagley opined that racial appeals are present in campaigns by Alabama lawmakers in the Montgomery and Huntsville areas. Doc. 206-19 at 4. He defined a "racial appeal" as "an appeal that would only be directed at one race." Tr. 554. He testified that "racial appeals drive racially-polarized voting." *Id.*

Dr. Bagley opined that political campaigns between the 1960s and 1990s featured "thinly coded racial appeals" that have, "very recently, trended back towards more overt racial appeals," Doc. 206-19 at 30, that are expressed in "color masked language," Tr. 555. Dr. Bagley gave in his report examples of racial appeals from current and former elected officials in Alabama: (1) Senator Tommy Tuberville's "repeatedly stated" "belief that [W]hite nationalists are not racist" and that "'inner-city' teachers are lazy and unqualified"; (2) former Congressman Mo Brooks's complaints about "what he called a 'war on [W]hites'"; (3) former

Representative Will Dismukes's lobbying efforts "to maintain state funding for a Confederate memorial park," "beseech[ing] members to channel anger over the removal of Confederate monuments into 'something constructive . . . our ancestors did by rebuilding their homes and lives during the hateful years of Reconstruction," repeated use of "the phrase 'Deo vindice,' or 'God will vindicate [the South],'" and refusal to apologize for using that phrase because "it's time for people to . . . take a stand before our country is Gone with the Wind"; (4) former Alabama Supreme Court Chief Justice Roy Moore's 2017 acclamation of the antebellum period in the South as "'great at the time when families were united – even though we had slavery. They cared for one another. People were strong in the families. Our families were strong. Our country had a direction.'"; (5) former Senator Doug Jones's 2017 "mailers to Black voters" arguing that his opponent, Roy "Moore, like George Wallace, had fought to preserve segregation and had ties to hate groups like ku klux klan" and was "'not on our side'"; and (6) former Alabama Supreme Court Chief Justice Tom Parker's ad "boast[ing] about having 'taken on and beaten the Southern Poverty Law Center,' a well-known Montgomery-based race advocacy organization." Doc. 206-19 at 30–33, 31 n.105; Tr. 555–61.

On cross examination, Dr. Bagley conceded that many of the racial appeals he cited were not made in the course of a political campaign, but testified that he

believed the Senate Factors allowed him to consider a politician's comments made at any time. *See* Tr. 618–20.

As to Senate Factor 7, Dr. Bagley opined in his report that "Black citizens of Alabama currently hold no statewide offices[,]"[6] and that "[o]nly three Black candidates have held statewide office, and one of those was appointed." Doc. 206-19 at 33. He asserted that the Black candidates who have been elected to the Legislature have won their seats only because of the intervention of federal courts and the enforcement of voting rights laws. *Id.* at 4, 33; Tr. 561. He conceded on cross examination that there are no Democrats currently holding statewide office in Alabama, Tr. 621, and testified that White Democrats have held elected offices in the last decade, *id.* at 634–35. He testified that there are no Black Senators serving in the Huntsville area and there are two serving in the Montgomery area—both of whom represent majority-Black districts. *See* Doc. 206-19 at 34; Tr. 561.

As to Senate Factor 8, Dr. Bagley opined that "[t]he most glaring example" of the Legislature's lack of responsiveness to Black citizens' particular needs is the Legislature's recent refusal to draw a second majority-Black congressional district in 2023 as required by a federal court order in the Alabama congressional districting

---

[6] Dr. Bagley issued his report before Governor Ivey appointed Judge Lewis to the Alabama Court of Civil Appeals. After trial, Governor Ivey appointed Judge Lewis to serve as an Associate Justice on the Alabama Supreme Court, and he continues in that service.

litigation. Tr. 562; Doc. 206-19 at 34. He also opined that Alabama's failure to expand Medicaid, particularly in response to the COVID-19 pandemic, demonstrates a lack of responsiveness to the needs of the Black community. Doc. 206-19 at 34–35; *see* Tr. 562.

In his rebuttal report, Dr. Bagley responded to the reports of three defense experts: Dr. Bonneau, Dr. Reilly, and Dr. Adam Carrington. Tr. 563; *see generally* Doc. 206-21. Dr. Bagley addressed Dr. Bonneau's opinion that polarized voting is present in Alabama based primarily on political party, not race. *See infra* Part IV.B.3. Dr. Bagley attacked Dr. Bonneau's assertion that "all Democrats have a difficult time winning elections in Alabama" as incorrect because Democrats do not have a difficult time winning in majority-Black districts drawn in compliance with the Voting Rights Act. Doc. 206-21 at 17. Dr. Bagley also opined that other races for Alabama state offices—including the races of five White Democrats who won elections during a twenty-four-year period when no Black candidate was elected to statewide office—demonstrate that race is a significant factor in Alabamians' voting patterns. *See id.* at 16–17.

Next, Dr. Bagley addressed Dr. Reilly's assertion that because the overrepresentation of Black Alabamians in the prison system is no different than the overrepresentation across the nation, overrepresentation is not a consequence of racial discrimination. *See infra* Part IV.B.3. Dr. Bagley described Dr. Reilly's

assertion as "what-aboutism." Tr. 565. Dr. Bagley also testified that evaluation of the Senate Factors is "jurisdictionally focused" and does not involve other states. *Id.* at 566.

Finally, Dr. Bagley addressed Dr. Carrington's assertion that the partisan realignment from majority-Democrat to majority-Republican in Alabama occurred due to a variety of factors, such as economic or foreign policies, and not primarily racial issues. *See infra* Part IV.B.3. Dr. Bagley opined that Dr. Carrington's report may offer insight on the "party realignment nationally" but does not "explain party realignment specifically in Alabama," Tr. 563, and that Dr. Carrington relied on dated and national sources rather than contemporary sources relating to Alabama, Doc. 201-21 at 5–6. Dr. Bagley testified that most scholars acknowledge that "race has been the primary driving factor" behind party realignment even if they acknowledge that it was not the only factor. Tr. 564.

Dr. Bagley also cited statistics demonstrating that a "substantial number" of Black Alabamians support traditionally Republican stances on issues like abortion, LGBTQ rights, and same-sex marriage, but these voters identify with the Democratic Party, not the Republican Party. *Id.* at 564–65. He opined that "race" is "what[] [is] left [a]s an explanatory factor." *Id.* at 565.

### ii. Dr. Traci Burch

The plaintiffs also rely on the testimony of Dr. Traci Burch about the totality

of the circumstances. Dr. Burch earned a doctoral degree in Government and Social Policy from Harvard University. Doc. 206-11 at 1; Tr. 662. She works as a professor of political science at Northwestern University, where she has taught for seventeen years, and is a research professor for the American Bar Foundation. Tr. 662–63; Doc. 206-11 at 1; *see* Doc. 206-12 at 1. Dr. Burch was compensated at a rate of $400 per hour for her work in this case and her compensation did not depend on the substance of her testimony. Doc. 206-11 at 2.

Dr. Burch has published books, chapters, and peer-reviewed articles on race, political participation, and voter turnout. *Id.* at 1; Tr. 664–65. She has "served as a peer-reviewer for several journals in political science" and is currently the editor-in-chief of the *Law and Social Inquiry* journal. Tr. 661–65. At trial, she was qualified without objection "as an expert witness in political and social science and political behavior." *Id.* at 667.

Dr. Burch testified principally about Senate Factor 5. *See id.* at 669. Dr. Burch opined that socioeconomic disparities exist between Black and White Alabamians, *id.*, and the "large gaps in socioeconomic wellbeing" in Alabama "has been shown to affect voting, such that people who are worse off on those factors tend to vote less than people who are better off," *id.* at 695–96.

The plaintiffs asked Dr. Burch to "analyze whether and to what extent there are disparities in socioeconomic status between Black and White Alabamians that

might affect voter registration and turnout" statewide and in Crenshaw, Elmore, Limestone, Madison, Montgomery, and Morgan Counties. Doc. 206-11 at 1; Tr. 668–69. She found racial disparities in educational attainment, income, unemployment, healthcare, access to transportation, access to internet, and interaction with the criminal justice system, all of which she opined affect voting participation. *See* Doc. 206-11 at 8–9, 12–13, 17–18, 22–23.

Dr. Burch opined that on average, Black Alabamians have a lower educational attainment than White Alabamians and that the educational disparities "are caused, in part, by historical and contemporary discrimination in education that make Black Alabamians less likely to have graduated from high school and college relative to White Alabamians." Doc. 206-11 at 9; *see* Tr. 672, 674–78. She opined that educational attainment is "the most important predictor of voting," Tr. 670, and that "the relationship between education and voting is a causal one," Doc. 206-11 at 9.

Dr. Burch testified that Alabama's history of segregated public schools still impacts voting participation today. *See* Tr. 676. She observed that "in the 2020 general election, 38.6 percent of votes . . . were cast by people age 60 and older, people who were at least school age in 1965, which means they were partially educated during a time when Alabama still had segregated public schools." *Id.*

Dr. Burch opined that lower educational attainment impacts other socioeconomic factors that also affect voting rates for Black Alabamians. *See id.* at

671. She observed that "[u]nemployment rates across all the counties [analyzed] and statewide are higher . . . for [B]lack people in Alabama than for [W]hite people." *Id.* at 680. Similarly, she testified that the median household income in Black households is lower than White households statewide and in every county she analyzed. Doc. 206-11 at 12; Tr. 679. Data from the American Community Survey shows that "the median household income for Black Alabama households is $36,104, compared with $62,545 for White Alabama households." Doc. 206-11 at 12. She opined that this disparity contributes to the racial disparities in family poverty, access to internet, and access to transportation, Doc. 206-11 at 13; *see* Tr. 680–81, 684–85, which hampers voting participation due to an inability to vote absentee, locate voting information, or travel to polling locations, *see* Tr. 684–87, 723.

Dr. Burch testified that in Alabama, "Black family poverty is nearly three times as high as White family poverty," Doc. 206-11 at 12, and that in Montgomery, "family poverty rates are six times as high for [B]lack families than for [W]hite families." Tr. 681. Dr. Burch also noted that "a higher percentage of Black households than White households receive SNAP benefits." Doc. 206-11 at 13.

Dr. Burch testified that "statewide, Black Alabama households are more than twice as likely to lack access to a vehicle at home than White households," Doc. 206-11 at 13, and that in Montgomery, almost three times more Black households

"don't have access to a car" than White households, Tr. 685. She testified that access to transportation affects voting participation. *See id.* at 685–86.

Dr. Burch also testified that Black Alabamians are in demonstrably worse health than White Alabamians, and she gave as examples that (1) the infant mortality rate for Black infants is nearly three times higher than the rate for White infants, and (2) Black Alabamians have a shorter life expectancy rate than White Alabamians. Tr. 682–83; Doc. 206-11 at 17. She testified that Black Alabamians are more likely to be uninsured than White Alabamians statewide and in most counties she analyzed. Tr. 682. She testified that "poor health can lead to lower voter turnout." Tr. 683.

Dr. Burch also observed racial disparities in conviction and sentencing rates in Alabama independent of "factors such as crimes severity, criminal history, and demographic context." *Id.* at 687–88; *see id.* at 690–91. She testified that racial disparities in the criminal justice system directly affect voter turnout and that "14.7% of otherwise-eligible Black people in Alabama cannot vote due to a recent felony conviction." Doc. 206-11 at 18; Tr. 690.

Dr. Burch also responded to the expert reports of two of the Secretary's experts, Dr. Reilly and Dr. Carrington. *See* Tr. 697. Dr. Burch addressed Dr. Reilly's opinion that "racial disparities between [B]lack and [W]hite Alabamians are the result of cultural practices of [B]lack people rather than systemic discrimination." *Id.* She criticized Dr. Reilly for, among other things, failing to support his assertions

86

with peer-reviewed evidence or address contrary literature. *Id.* at 697, 702–06.

Dr. Burch also addressed Dr. Carrington's assertion that "racial gaps in partisanship are shaped by preferences on economic policy, foreign policy, and social issues," not race. *Id.* at 707. Dr. Burch criticized Dr. Carrington for relying on national data, and testified that the "scholarly consensus is that race is very important to parties and partisanship and vote choice." *Id.* at 707–08. She testified that her research demonstrated that "race [was] very important for explaining th[e] shift[] away from the Democratic party to the Republican party and the realignment in the South," *Id.* at 709; twice, she testified that race was the only factor driving that party realignment, *id.* at 761–62, 773–74. She opined that voting patterns on other factors identified by Dr. Carrington are "not disconnected from the movement of the parties on racial attitudes." *Id.* at 763. She opined that, for instance, "economic anxiety" and how people experience it are "a function of race and racial attitudes" and "the racial context in which [a person] live[s]." *Id.* at 764–65.

### b. The Plaintiffs' Lay Witness Testimony At Trial

The plaintiffs also offered the testimony of several lay witnesses about the totality of the circumstances: Evan Milligan, Scott Douglas, Benard Simelton, Tari Williams, and Mary Peoples.

Plaintiff Evan Milligan is a forty-three-year-old registered voter in District 26 in Montgomery. Tr. 453–54. Mr. Milligan grew up in Alabama and spent much of

his childhood in the Montgomery area. *See id.* at 453–54. He testified about his experiences seeing political rallies in Montgomery—some of which were "inspiring" and some of which were "frightening." *Id.* at 459. He recounted his experience witnessing "a protest march for Ku Klux Klan chapters in" Alabama and testified that he "actually s[aw] the hooded robes and . . . s[aw] some of the symbols that [he] had heard some stories about from the elders in [his] family." *Id.*

Mr. Milligan testified that District 26 in the Enacted Plan, the majority-Black district in the Montgomery area, "includes most of the predominantly [B]lack communities in Montgomery"—"southern, central, southwest, west side, and north of Montgomery." *Id.* at 472. He testified that the part of Montgomery included in District 25 in the Enacted Plan "is basically the most predominantly [W]hite neighborhoods in the eastern part of the city." *Id.*

Mr. Milligan testified about racial disparities in the Montgomery area in access to transportation and health care. *See id.* at 469–71. He also testified that the Legislature is not responsive to the needs of the Black community, and described how only Black legislators engaged with the social advocacy groups with which he was involved. *See id.* at 460–62. Mr. Milligan testified that "political representation gives . . . the [B]lack communities of Montgomery more access to leadership and to people that want to bring . . . new investment to communities that have been under[ ]resourced." *Id.* 473.

Scott Douglas works as the Executive Director of Greater Birmingham Ministries. *Id.* at 485. Mr. Douglas testified that Greater Birmingham Ministries has two forms of membership: (1) organizational membership, which primarily includes churches, and (2) individual membership. *Id.* at 488. He identified members in Montgomery County who are Black registered voters. *Id.* at 491; *id.* at 506–07. He did not identify any individual members in Huntsville. *Id.* at 502. Mr. Douglas testified that Greater Birmingham Ministries is participating in this litigation to achieve "a more responsive State Senate." *Id.* at 493.

Benard Simelton is a Black registered voter in Harvest, a city near Huntsville located in Limestone County, where he has resided since 2002. *Id.* at 152–53. Mr. Simelton is the president of the State Conference. *Id.* at 154. He testified that the State Conference is a "suborganization" of the national NAACP and that membership dues are shared by the local, state, and national NAACP. *Id.* at 156, 158. Mr. Simelton testified that within the State Conference, there are NAACP college chapters, branches, and youth councils, *id.* at 156, and that every member of a branch, chapter, or youth council in Alabama is a member of the State Conference "by association," *id.* at 158–59, 184–86. He explained that there is no way for a person to join the State Conference without joining a local unit. *Id.* at 184–86. Mr. Simelton testified that the State Conference has individual members who are Black registered voters in the Huntsville and Montgomery areas. *See id.* at 161, 163, 174.

89

Mr. Simelton also testified about the connection between the Huntsville and Decatur. He testified that members of the Huntsville and Decatur NAACP branches invite members of each other's branches to events because the two units "share a common interest of . . . ensuring . . . political and economic and social rights are protected." *Id.* at 164. Mr. Simelton also testified that he travels from Huntsville to Decatur around three or four times a year. *Id.* at 165–66. He observed that there is frequently heavy traffic between the cities, that Huntsville and Decatur share some economic interests and industries, and that the local Huntsville news reports on things happening in Decatur. *Id.* at 168–73.

Mr. Simelton testified that Black members of the Legislature have attended NAACP Huntsville events to discuss issues relating to the expansion of Medicaid and access to health care for Black Alabamians, but that he has not seen any White legislators at those events. *See id.* at 165. He testified that the only elected officials who have met with the NAACP about civil rights issues are Black Representatives. *Id.* at 180.

During the course of Mr. Simelton's testimony, counsel raised various privilege objections to questions about the NAACP's decision not to file a lawsuit in connection with previous decennial census data. *See id.* at 204–08, 210–13. In this ruling, the Court does not rely on any privileged information except in the limited instances where privilege was waived at a deposition.

Tari Williams works as the organizing director at Greater Birmingham Ministries. *Id.* at 638. In that position, she works to restore voting rights to Alabamians across the state. *Id.* at 639. She testified that Greater Birmingham Ministries disproportionately serves Black men to restore voting rights. *Id.* at 640–41. She testified that Greater Birmingham Ministries also offers workshops for individuals with literacy issues and that the majority of individuals attending those workshops are Black. *Id.* at 646. Ms. Williams testified that she has observed racial disparities in Alabama in areas such as educational opportunities, transportation, lack of access to internet, and ability to purchase food, clothing, or medications. *Id.* at 647–48, 650–52. She testified that, in her opinion, the Legislature has not been responsive to the needs of Black Alabamians. *See id.* at 649–50.

Mary Peoples is a Black voter in District 7 in Huntsville. *Id.* at 119–21, 147. Ms. Peoples has resided in Huntsville "[b]asically all [of her] life." *Id.* at 120. Ms. Peoples attended a segregated elementary and high school. *Id.* at 122. She testified that both of her children attended "[p]redominantly [B]lack" high schools in Huntsville. *Id.* at 127.

Ms. Peoples attended Alabama A&M University, an historically Black university. *Id.* at 122–23. She testified that the university is located on the north side of Huntsville in a predominantly Black neighborhood. *Id.* at 129–30. She testified that this area does not have "very much in common with Jackson County," the

county east of Huntsville, in terms of "educational level, educational opportunities offered, job opportunities offered, [and the] skill set of the people that are there in the community." *Id.* at 130.

Ms. Peoples also testified about the connection between Huntsville and Decatur. She testified that she traveled to Decatur for shopping, *id.* at 131, but stated that she could not recall making the trip since 2020, *id.* at 148. She testified that the local news in Huntsville reported on news in all cities surrounding Huntsville, including Decatur, Athens, Arab, and Scottsboro and that it was not uncommon for residents of those surrounding cities to commute to Huntsville to work at Redstone Arsenal. *Id.* at 131.

### c. Designated Deposition Testimony

The plaintiffs offered deposition testimony from two witnesses: Senator Jim McClendon and Randy Hinaman.

Mr. Hinaman is the cartographer who drew the Enacted Plan, and he has drawn Alabama's districting plans for many years. *See* Doc. 235-2 at 15–16. He drew the Plan based on 2020 census data. *See id.* at 21. He testified that "there was a general agreement" that the two Committee chairs, Representative Pringle and Senator McClendon, would divide the task of overseeing state legislative redistricting. *See id.* at 24–25. "Senator McClendon would focus on the [state] [S]enate map" and "Representative Pringle would focus on the state [H]ouse map."

*Id.* at 24–25.

Mr. Hinaman testified that he used Maptitude software to draw the Plan. *Id.* at 29. He used as a starting point the state Senate map that was passed by the Legislature as a remedial plan in 2017. *Id.* at 30. He met with various state Senators and adjusted the maps based on population and other concerns. *See id.* at 31–32.

Mr. Hinaman testified that he balanced the Legislature's redistricting guidelines and did not prioritize any guideline over another. *See id.* at 58. He testified that he did not "have race on the computer screen" and "drew the [Plan] race blind." *Id.* at 46. After he drew the Plan, he reviewed the racial data of the districts—that is, the BVAP of the districts—to "mak[e] sure that they still looked like they would function as a majority[-B]lack district." *Id.* at 46–49. Mr. Hinaman did not review CVAP data. *Id.* at 47–48.

Mr. Hinaman testified that no majority-Black districts were added in the Plan: "if they were a majority[-B]lack district in 2017, the senate map, I think they were [a] majority[-B]lack district in the 2021 map. I don't think there were any . . . additions." *Id.* at 49. Mr. Hinaman made no changes to the Plan after reviewing data related to race. *Id.* at 51, 55–56.

Mr. Hinaman testified that he believed all of the districts in the Plan are reasonably compact. *Id.* at 59. He testified about changes he made to districts in the Huntsville area based on either the Legislature's redistricting criteria or

conversations with Senators. *Id.* at 67–71. For example, he testified that he removed a county split in District 1 so that it no longer encompassed portions of Madison County, and that those portions of Madison County were mostly picked up by District 7. *Id.* at 66–67.

Mr. Hinaman also testified about the districts in the Montgomery area. He testified that the Plan places all majority-Black precincts except two into the majority-Black District 26. *Id.* at 79. He testified that District 25 in the Plan extends into the center of Montgomery to include two predominantly White precincts and a portion of a third. *Id.* at 80–81. He testified that he drew District 25 "based on discussions" with Senators. *Id.* at 81. But he testified that "when [he was] drawing this map, [he] did not have race on, so [he] didn't have the benefit of" the BVAP data and did not consider race at any time when he was drawing the district lines. *Id.* at 86–88.

Mr. Hinaman did not have a final version of the Plan until twenty-four hours before the Committee's meeting to vote on it. *Id.* at 40. He explained that the deadline was tight because "the census data was six months late." *Id.* To his knowledge, no further changes to the Plan were made. *Id.* at 43.

Senator McClendon testified that when drawing the Plan, the Committee started with the 2017 Plan. Doc. 235-1 at 22. He testified that they balanced all of the criteria in the Legislature's redistricting guidelines and that he did not instruct

Mr. Hinaman to prioritize any criteria over another. *Id.* at 24. He testified that neither race nor party was displayed on screen when Mr. Hinaman drew the Plan, and that "[r]ace was not considered" in the process of drawing the districts. *Id.* at 28–29. He also testified that he and Mr. Hinaman met with other Senators in part so that they could tell Mr. Hinaman about communities of interest that they preferred to preserve in their respective districts, although he did not recall specific discussions. *See id.* at 84–85.

Senator McClendon testified about the changes made to the districts in the Huntsville area. He testified that the changes were made because of "an increase in population" and "getting the Senators, the incumbents, happy with what they had to deal with." *Id.* at 68–69.

Senator McClendon testified about the racial makeup of districts in Montgomery. He testified that they did not examine racial data when drawing the Plan, but when he was asked if he had "any understanding of why . . . more than twice in proportion percentage of [W]hite Montgomery residents are in District 25 as opposed to [B]lack residents," Senator McClendon testified that he would consider whether "the district is similar in shape, location, and the lines are similar to where it was before" and "the way it has been historically." *Id.* at 58–60.

Senator McClendon testified that he considered all of the districts in the Plan reasonably compact. *Id.* at 60–61. With respect to the shape and compactness of

some districts compared to others, he testified that "it's really easy to draw very handsome districts if you could just disregard the rest of the state." *Id.* at 64.

Senator McClendon testified that many Alabamians were raised in a racist political and social culture as evidenced by his attendance at an all-White segregated high school. *Id.* at 81–82. He testified that based on his experience, Black voters in Alabama tend to vote for Black candidates. *Id.* at 78. He testified that Black and White voters in Alabama have differing opinions on racial issues in the state. *See id.* at 79–80.

## B.    Secretary Allen's Arguments

The Secretary's position is that the plaintiffs did not demonstrate that the Black population in the Huntsville and Montgomery areas is sufficiently large and geographically compact to constitute a majority in additional Senate districts. *See* Tr. 1654. He also argues that Proposed District 25 and District 7 in Illustrative Plan 3 were impermissibly drawn on the basis of race. *See* Tr. 1654, 1657–58; Doc. 251 ¶¶ 113–57. The Secretary concedes that Black voters are "politically cohesive" and that White Alabamians tend to vote as a bloc, but he argues that these voting patterns are attributable to party politics, not race. Tr. 1661. The Secretary contends that the Senate Factors do not support a finding of racially polarized voting and do not support a Section Two violation. *See id.* at 1662–74.

### 1.    *Gingles* I – Numerosity and Reasonable Compactness

The Secretary asserts that the Illustrative Plans do not satisfy the first *Gingles* precondition. He argues that Proposed District 25 is not reasonably configured, does not comport with traditional districting criteria, and was drawn on the basis of race. *See* Tr. 1660. He argues that District 7 in Illustrative Plans 1, 2, and 2A does not satisfy the numerosity requirement because (1) CVAP data is unreliable, (2) Eleventh Circuit precedent does not support a reliance on BCVAP to establish numerosity, particularly when the BVAP is below fifty percent, and (3) Alabama law does not permit the Legislature "to use anything other than census data." *See id.* at 1653–57. He acknowledges that District 7 in Illustrative Plan 3 is majority-Black according to a BVAP measure but argues that the district is not reasonably configured, does not comport with traditional districting criteria, and was impermissibly drawn on the basis of race. *See id.* at 1657–60.

The Secretary relies on Dr. Sean Trende as his *Gingles* I expert. Dr. Trende earned a Juris Doctor and a Master of Arts in political science from Duke University, a Master of Applied Statistics from The Ohio State University, and a Doctor of Philosophy in political science from The Ohio State University. Doc. 189-7 at 5, 33; Tr. 934–35. Dr. Trende works as a visiting scholar at the American Enterprise Institute, a lecturer at The Ohio State University, and a Senior Elections Analyst for Real Clear Politics, which is a company that "provides online content, aggregating polls." Tr. 934; *see* Doc. 189-7 at 3. He has taught several courses at higher education

universities, including a course on "Political Participation and Voting Behavior" that "spent several weeks covering all facets of redistricting." Doc. 189-7 at 5. Dr. Trende has served as a party expert as well as a court-appointed expert in redistricting litigation, *see id.* at 5–6; Tr. 939–40, although his testimony was found unreliable in a few of those cases, *see* Tr. 1055–56, 1068.

At trial, Dr. Trende was admitted without objection "as an expert in redistricting, political methodology, and survey methods." Tr. 940–41.

### a. Montgomery – Senate Districts 25 and 26

#### i. Numerosity

Dr. Trende did not contest that Proposed District 25 contains a majority BVAP and offered only limited comments in his report on the compactness and effectiveness of the district. Doc. 189-7 at 28–29. At trial, the Secretary conceded he does not contest numerosity for that illustrative district. Tr. 1660; *accord* Doc. 251 ¶¶ 54–112 (addressing numerosity only for Senate District 7 in Illustrative Plans 1 and 2A).

#### ii. Reasonable Configuration

Dr. Trende did not analyze the compactness of Proposed District 25, Tr. 1079–80, and he did not opine about the Reock, Polsby-Popper, or Convex Hull score of Proposed District 25. Instead, he testified that Mr. Fairfax "ha[d] to pick up isolated Black populations throughout the countryside" for Proposed District 25 to reach

98

majority-Black status. Doc. 189-7 at 29; *see* Tr. 1021. And the Secretary argues that Proposed District 25 is not reasonably configured because (1) it creates a new city split in Prattville, and (2) it connects central Montgomery with portions of Elmore and Crenshaw Counties without sufficient evidence that the district connects communities of interest. Tr. 1660.

Dr. Trende provided the following dot density map to demonstrate the racial demographics of the population in Proposed District 25:

Figure 13: Dot Density Map of Black and White populations, Illustrative District 25



(a) 1 blue dot represents 10 Black citizens, 1 orange x represents 10 White citizens.

Doc. 189-7 at 29.

Dr. Trende opined that "there is a heavily concentrated Black population in Montgomery[, b]ut to achieve 50% +1 status, the district has to pick up isolated

99

Black populations throughout the countryside." *Id.* As for effectiveness, he testified that Proposed District 25 would "perform at less than 50% BVAP." *Id.*

### b. Huntsville – Senate Districts 2, 7, and 8

Dr. Trende provided opinions on Illustrative Plans 1, 2, and 3. Dr. Trende did not evaluate Illustrative Plan 2A in his reports but evaluated it "minimally" before trial. Tr. 942–43. He testified that the changes to the proposed District 7 in Illustrative Plan 2 and Illustrative Plan 2A were "minimal" and did not impact his analysis of the compactness of the proposed District 7 in Illustrative Plan 2. *See id.* at 943. Dr. Trende attacked Mr. Fairfax's use of BCVAP data to draw District 7 in Illustrative Plans 1 and 2, *see id.* at 950, and he opined that District 7 in Illustrative Plan 3 is not reasonably compact and Mr. Fairfax "sacrifice[d] traditional redistricting principles" to draw it, Doc. 189-8 at 33.

### i. Numerosity

First, Dr. Trende opined that CVAP data does not establish that the versions of District 7 that appear in Illustrative Plans 1, 2, and 2A are majority-minority districts. *See* Tr. 1003–04; *accord* Doc. 189-7 at 7–8; Doc. 189-8 at 5. He testified that in his experience, CVAP has been used only to "double check" the relevant VAP, Tr. 951, and has never been used alone to establish numerosity, *id.* at 946, 951.

At trial, Dr. Trende acknowledged that he has relied on CVAP data in his expert opinions in other redistricting cases, *id.* at 952–55, and that he previously

opined that it could be a "useful metric for assessing a district's actual electorate," *id.* at 1043. But Dr. Trende testified that he has never relied on CVAP data to evaluate *Gingles* I and never where there was "a specific threshold that [needed] to [be] cross[ed]." *Id.* at 953–55; *see id.* at 1043. He testified that his use of CVAP in other cases is not inconsistent with his opinions in this case. *Id.* at 955.

At trial, Dr. Trende was careful to isolate his attack on CVAP data to a *Gingles* I analysis. He testified that he was not opining that the American Community Survey "is a bad source of information," but that data from the Survey come with error margins that must be taken into account if that data is used for a *Gingles* I analysis. *Id.* at 956. Dr. Trende testified that CVAP point estimates cannot be divorced from margins of error or confidence intervals, *id.* at 960, particularly when the point estimate of a population is "very close to the [fifty] percent threshold, and that [fifty] percent threshold is very important," *id.* at 950; *see* Doc. 189-7 at 12. He testified that "the accuracy of a poll will decline quickly as you examine smaller and smaller census groups," Doc. 189-7 at 13, and that CVAP estimates are based on a "fairly small sample"—approximately ten people in each block group are surveyed each year on average, Tr. 948.

Dr. Trende further testified about the uncertainty inherent in Mr. Fairfax's decision to split block groups between districts while relying on CVAP data to estimate the BCVAP of his illustrative districts. Dr. Trende opined that the necessity

101

of relying on a disaggregation method to draw an inference when splitting block groups "can be consequential" and can be dispositive on whether District 7 in Illustrative Plan 1 is a majority-Black district. Doc. 189-7 at 19–20; *see* Tr. 971. He testified that Mr. Fairfax split approximately thirty block groups in District 7 on average in the Illustrative Plans, Tr. 983, which required a disaggregation technique to estimate how many members of the BCVAP are within the portion of the block group located within the proposed remedial district, *see id.* at 972. Dr. Trende opined that there is "no obviously correct" way to allocate portions of the BCVAP when a block group is split, Doc. 189-7 at 21; Tr. 972, and that each method relies on "untestable assumptions," Tr. 978; Doc. 189-7 at 21. He testified that "[t]here[] [is] no known way to calculate the error margin" for data that has been disaggregated. Tr. 977. He also opined that relying on a point estimate from disaggregated CVAP data requires "piling inference on top of inference" because the researcher is required to disaggregate a quantity that is unknown because it is based on a sample estimate. Doc. 189-7 at 18 (emphasis omitted); *see* Tr. 983–84. He further testified that this uncertainty renders the use of the American Community Survey data—and thus CVAP data—uncertain for *Gingles* I purposes. *See* Doc. 189-7 at 11–14.

To emphasize his point, Dr. Trende identified instances where the CVAP point estimates were higher than the actual voting-age population. Tr. 976; Doc. 189-7 at 18. He testified that "citizens of voting age . . . should be a subset of the Voting[-

]Age Population," Tr. 976, but he found that the CVAP point estimates for District 7 in Illustrative Plan 1 exceed the total voting-age population in ten block groups using 2020 data, twelve block groups using 2021 data, and nine block groups using 2022 data, Doc. 189-7 at 17. Dr. Trende opined that these statistics demonstrate that the data on which Mr. Fairfax relies is "wrong." Doc. 189-7 at 17.

Dr. Trende opined that his "closest approximations" of the error margin of American Community Survey data is "around 3%," although he cannot "know exactly what that error margin is." *Id.* at 24. Dr. Trende acknowledged an error in the code he used to calculate the error margin, which would change the result of his calculation. Tr. 1059–60. But he testified that the error would not inflate the error margin. *Id.* at 1060. He explained that a three percent error margin would bring the BCVAP in Senate District 7 for Illustrative Plan 1 to "50% and values below." Doc. 189-7 at 24; *see* Tr. 989–90. He concluded similarly for District 7 in Illustrative Plan 2. *See* Doc. 189-8 at 6.

Dr. Trende testified that the error margins associated with Mr. Fairfax's and Dr. Oskooii's point estimates included estimates of fifty percent BCVAP and that he had not seen "any estimate of an error margin that suggests that the confidence interval would ever not include 50 percent plus 1 or would not include 50 percent." Tr. 980, 983. For example, he testified that Mr. Fairfax's point estimate of 50.16 percent BCVAP for Illustrative Plan 1 is inadequate to establish numerosity because

the confidence interval of this point estimate includes values "between [forty-eight] percent and [fifty-two] percent" and within those numbers, "the confidence interval does[] [not] give you any information about whether [the point estimate] is 48.1 percent or whether its 51.5 percent." *Id.* at 988–89. He testified that the error margins do not permit "meeting in the middle" of the confidence interval, *id.* at 989, and that the margins are important in this case because the point estimate is so close to fifty percent, meaning there is not a basis to confidently conclude that District 7 in Illustrative Plans 1 and 2 include a majority BCVAP, *id.* at 989–90.

In his report, Dr. Trende opined that because Mr. Fairfax justified his use of CVAP data based on a meaningful number of noncitizens present in the Huntsville area, Mr. Fairfax should consider all data related to persons ineligible to vote, including felony convictions. Doc. 189-7 at 23; Tr. 1001–02. Dr. Trende testified that he had not removed individuals disqualified from voting based on a felony conviction from the CVAP or VAP of an illustrative district. Tr. 1045. But he opined that the consideration of other evidence about disenfranchisement could affect the *Gingles* I consideration. *See id.* at 1002. For instance, Dr. Trende applied the statewide statistic offered by Dr. Burch—that 14.7 percent of Alabama's Black population could not vote due to a felony conviction—to District 7 in Illustrative Plan 1 and concluded that based on that statistic, the share of Black citizens eligible to vote would drop below a majority. Doc. 189-7 at 23; Tr. 1002.

### ii. Reasonable Configuration

Dr. Trende opined that District 7 in Illustrative Plans 2 and 3 is not reasonably configured. Doc. 189-8 at 8, 17; Tr. 1006, 1020–21. Dr. Trende did not challenge the compactness of District 7 in Illustrative Plan 1. Tr. 1079. Dr. Trende testified that he "tr[ied] to avoid testifying to the ultimate conclusion" on compactness because that determination is in "the province of the courts." *Id.* at 1006. Instead, Dr. Trende testified that he opined on factors that "support a conclusion." *Id.*

Dr. Trende testified that in evaluating compactness, he did not consider every traditional redistricting principle. *Id.* at 1070–72, 1077–80. For instance, he did not consider whether Huntsville, Decatur, and the Redstone Arsenal shared communities of interest, *id.* at 1070, and explained his belief that such evidence is for the court's consideration, *id.* at 1072.

Dr. Trende testified that adherence to certain traditional redistricting principles is required (such as equal population), and that "[s]ometimes a map is so distorted that . . . the other things [do not] matter" and that "at a certain point, . . . something becomes so badly compact that it becomes hard whatever other its virtues to justify it as reasonably configured." *Id.* at 1008. He testified that the fact finder is the appropriate arbiter of whether the other traditional redistricting criteria tradeoffs are permissible. *Id.*

Dr. Trende testified that, to a certain degree, his compactness analysis was

based on "an eyeball test." *Id.* at 1021; *see id.* at 1067. He testified that courts have endorsed eyeball tests in a *Gingles* I analysis, and in any event, statistical compactness measures, like the Reock score, require subjective analysis because social scientists have not "established the bounds" of the statistic that include a compact score. *Id.* at 1021–22; *see id.* at 1067–68.

Nevertheless, Dr. Trende evaluated statistical compactness measures in his report. He opined that the version of District 7 in Illustrative Plans 2 and 3 are less compact than District 7 in the Enacted Plan using the Reock score, Polsby-Popper score, and cut edges score. Doc. 189-8 at 12–15, 24–26; *see* Tr. 1023–30. Dr. Trende explained that the cut edges score is "a newer metric" where "all the census blocks in a map can be thought of as being connected by lines or edges," and the district is conceptualized "as removing those edges until there are no edges connecting one group to the rest." *Id.* at 1027–28. He explained that "the fewer edges that [are] remove[d], the more compact a map is thought to be." *Id.* at 1028. Dr. Trende testified that he used this metric because it was used in the Alabama congressional districting litigation. *See id.*

Dr. Trende opined that for the districts in North Alabama that Mr. Fairfax changed in the Illustrative Plans, the difference in the Enacted Plan scores and the Illustrative Plans is "more pronounced." *Id.* at 1023; *see id.* at 1027. He testified that the "regional mean" is the more relevant metric because a mapmaker may "change

106

radically" a district "and make its Reock score much worse," but that the change may be "covered up by [twenty] districts that do[] [not] get changed." *Id.* at 1024. For instance, he testified that District 7 in Illustrative Plan 1 "is made .03 points more compact under the Reock score" but that District 3 "goes from a Reock score of .59 to . . . .23, which is a substantial difference." *Id.* at 1024–25.

Dr. Trende asserted in his report that Illustrative Maps 1, 2, and 3 rely on irregular shapes to capture larger components of the Black population in District 7 and avoid areas with a higher White population. *See* Doc. 189-7 at 26; Doc. 189-8 at 3, 17–24. At trial, he testified that race predominated when Mr. Fairfax drew District 7 in Illustrative Plans 2 and 3. Tr. 1031–33, 1039.

With respect to Illustrative Plan 3, Dr. Trende testified that "District 7 has become very non-compact" and is one of the least compact districts statewide. *Id.* at 1028–29; *see* Doc. 189-8 at 25–26. He described District 7 in Illustrative Plan 3 as resembling "a baby dragon with an overbite in flight." Tr. 1011; Doc. 189-8 at 18. The Secretary offered the following visual illustration of Dr. Trende's description:



Doc. 166 at 33.

Dr. Trende provided two maps that he opines when read together can demonstrate a lack of compactness and the presence of race predominance. *See* Tr. 1013–14. First, Dr. Trende provided choropleth maps that reflect the percentage of the Black population in an area. *See id.* at 1014. In the choropleth maps, Dr. Trende shaded each precinct, or voting tabulation district (a census unit that generally aligns with precinct lines, Doc. 189-7 at 10), by BVAP. *See* Tr. 1014, 1032. Dr. Trende testified that choropleth maps do not illustrate the compactness of a district per se, but rather reflect the "distinct groupings" of the Black population in the relevant area. *Id.* at 1015. Dr. Trende offered the following choropleth map of District 7 in Illustrative Plan 3:

Figure 21: Fairfax Map 3, District 7, with VTDs shaded by BVAP



© OpenStreetMap contributors

Doc. 189-8 at 27. Dr. Trende testified at trial that this map demonstrates that District 7 in Illustrative Plan 3 "extend[s] over into Lawrence County to take in most of the [B]lack population there." Tr. 1033. He testified that it "takes in every precinct with a BVAP over [thirty] percent in the three counites before and almost every precinct with a BVAP above [thirty] percent in Lawrence County." *Id.* at 1033.

Dr. Trende took care to acknowledge the limitations of a choropleth map. One limitation is that the map only shows percentages, which can be misleading if, for instance, an area only has one resident but is reflected as one hundred percent White. *Id.* at 1017.

Because of these limitations, Dr. Trende also provided dot density maps that reflect "the distribution of individuals within the district." *Id.* at 1014. One of the

maps reflected the Black population around District 7 in Illustrative Plan 3:

Figure 16: Fairfax Map 3, District 7. One blue dot = 10 Black residents of voting age



Doc. 189-8 at 22. This map does not reflect the White population in the Huntsville

area; Dr. Trende acknowledged at trial that he "adjusted some of the maps that [he]

drew in response to some of the critiques that were made." Tr. 942.

Dr. Trende testified that there are "at best" two or three Black populations

"stitched together" in the Huntsville area. *Id.* at 1020. He testified that District 7 in

Illustrative Plan 3 contains "multiple populations" in the Huntsville area "that are

sometimes separated by completely unpopulated areas or by some heavily [W]hite

areas in between." *Id.* at 1021; *see* Doc. 189-8 at 20.

Dr. Trende testified that District 7 in Illustrative Plan 3 includes "every

precinct with a BVAP over [thirty] percent" in Morgan, Limestone, and Madison Counties and "almost every precinct with a BVAP above [thirty] percent in Lawrence County." *Id.* at 1033. He testified that if any of the precincts Mr. Fairfax split when drawing District 7 in Illustrative Plan 3 are made whole, "the BVAP for the district falls below [fifty] percent." *Id.* at 1034. He opined that the areas with a high Black population were "surgical[ly] cut[] out" and that "heavily [W]hite precincts" were avoided. *Id.*

Dr. Trende also opined that Illustrative Plan 3 disregards traditional redistricting criteria. He opined that the proposed District 7 increases the number of county splits from nineteen in the Enacted Plan to twenty-one in Illustrative Plan 3, and that four of those county splits are in District 7. Doc. 189-8 at 31–32. He also testified that District 7 in Illustrative Plan 3 does not include any whole counties within it. Tr. 1038. He opined that "the fourth county split is clearly driven by race" and that he is "skeptical" that a majority-minority district can be drawn without splitting the fourth county unless the mapdrawer is "overwhelming[ly] rel[ying] on race." Doc. 189-8 at 32.

Dr. Trende opined that District 7 in Illustrative Plan 3 "is one of only a handful of configurations in the area that will get a mapdrawer to 50% +1 BVAP," which, he asserted, is indicative that race predominated Mr. Fairfax's considerations when drawing the district. *Id.* at 26–27; *see* Tr. 1035.

111

### 2. *Gingles* II and III – Racially Polarized Voting

The Secretary concedes that "a majority of [W]hite voters . . . tend to support Republicans, [and] a majority of [B]lack voters tend to support Democrats." Tr. 1695; *see* Doc. 251 ¶ 159. He also concedes that "[i]f that is all it takes for there to be racially[ ]polarized voting to satisfy *Gingles* 2 and 3, the[] [plaintiffs] have met" their burden. Tr. 1695.

The Secretary "question[s]" the presence of White bloc voting in the Huntsville and Montgomery areas because an effectiveness analysis performed by Dr. Trende suggests that both Proposed District 25 and the three versions of the proposed District 7 in the Illustrative Plans would elect a Black-preferred candidate with a less-than-majority-BVAP. *See* Tr. 1695; Doc. 251 ¶¶ 171, 173–80; Doc. 189-7 at 27–29; Doc. 189-8 at 17, 32.

Dr. Trende examined the effectiveness of District 7 in Illustrative Plans 1, 2, and 3 in providing Black voters an opportunity to elect candidates of their choice. Doc. 189-7 at 27–28; Doc. 189-8 at 17, 32. Dr. Trende opined that all three Illustrative Plans would provide Black citizens an opportunity to elect candidates of their choice at a very low BVAP given the "substantial amount of crossover voting" in the specific area at issue. Doc. 189-7 at 27; *see* Doc. 189-8 at 17, 32; Tr. 1038–39. Although he did not perform an effectiveness analysis for District 7 in Illustrative Plan 2A, he testified that his opinions applied to that plan. *See* Tr. 1045–46. He

acknowledged that lowering the BVAP in the proposed remedial district would change the demographics of the district, and that he thus analyzed the effectiveness of "a different district." *Id.* at 1047.

With respect to Proposed District 25, Dr. Trende offered three sentences in his report: "I also recalculated the effectiveness analysis for District 25. Here, crossover voting is not as commonplace. Nevertheless, the district will still perform at less than 50% BVAP." Doc. 189-7 at 29. He also offered the following chart:



Figure 14: Number of Races won at different BVAPs, Illustrative District 25

Doc. 189-7 at 29–30. At trial, he conceded that he did not evaluate whether the current District 25, which has a twenty-nine percent BVAP, "has been performing for [B]lack voters." Tr. 1048.

The Secretary's other experts conceded that racially polarized voting exists in Alabama, but disputed the reasons for it. *See, e.g.*, *id.* at 1476, 1541, 1544 (Dr.

Bonneau); *id.* at 789–90 (Dr. Reilly); Doc. 189-5 at 5 (Dr. Hood); Tr. 1185 (Dr. Carrington). The Court turns to those arguments in its discussion of the Secretary's position about the totality of the circumstances.

### 3. The Senate Factors

The Secretary also contends that the totality of the circumstances does not support a finding of vote dilution. Doc. 147 at 28, ¶ 19. The Secretary argues that what appears to be racially polarized voting may simply be partisan politics reflected in the voting behavior of a particular racial group. *See* Tr. 1661–63. The Secretary argues that "the record shows that party is more important than race," *id.* at 1696, and he relies on the expert opinions of Dr. Christopher Bonneau, Dr. Wilfred Reilly, Dr. M.V. Hood, III, and Dr. Adam Carrington. He also relies on the testimony of several lay witnesses to dispute assertions in Dr. Bagley's report about the totality of the circumstances.

### a. The Secretary's Expert Witness Testimony

### i. Dr. Christopher Bonneau

Dr. Bonneau earned graduate degrees in political science from Ball State University and Michigan State University and works as a professor of political science at the University of Pittsburgh. Doc. 189-1 at 2; Doc. 189-2 at 1; Tr. 1395–96. He has co-authored or -edited three books and several chapters and articles on judicial elections. Doc. 189-1 at 2; *see* Tr. 1398. He has qualified as an expert witness

in three other redistricting cases, Doc. 189-1 at 1–2; Tr. 1399–1400, although this trial was his first time testifying as an expert in a legislative redistricting case, Tr. 1473. He was compensated at a rate of $350 per hour in this case and his compensation did not depend on the substance of his testimony. Doc. 189-1 at 1. At trial, Dr. Bonneau was admitted without objection as an expert in "American political science, election analysis, and political research methodology." Tr. 1401.

The Secretary asked Dr. Bonneau to (1) "ascertain whether Black candidates in elections in Alabama perform worse than [W]hite candidates on account of their race," and (2) respond to the opinions of Dr. Liu and Dr. Burch. Doc. 189-1 at 1. On the *first* task, Dr. Bonneau testified that he limited his analysis and opinions to the question whether the race of the candidate matters to their success, and he did not consider the race of the voter. Tr. 1529. When he explained his conclusions in this case, Dr. Bonneau testified that it can be difficult to reach conclusions with a small number of elections, but that "[y]ou have got to go to war with the data you have got, not the data you want." *Id.* at 1513.

In his report, Dr. Bonneau opined that voting in Alabama is primarily based on political party, not race. *See* Doc. 189-1 at 4–5, 10–12, 17. Dr. Bonneau examined statewide judicial and legislative elections and observed that approximately two-thirds of Alabamians vote by "straight-ticket." *Id.* at 4–5. He opined that "[t]he prevalence of straight ticket voting means that most voters are voting for a *political*

*party*, not a candidate." *Id.* at 4; *see* Tr. 1424–26. At trial, he testified that this evidence shows a "high degree" of Alabama voters vote for "teams, not players." Tr. 1426.

Dr. Bonneau conceded that he did not consider straight-ticket voting patterns by race of the voter, *see id.* at 1488, but opined that based on the relationship between Black voting patterns in favor of Democratic candidates and "the high number of Democratic votes that are cast via straight ticket, it would be likely that straight-ticket voting is being used by both [W]hites and African-Americans," *id.* at 1467–68.

Dr. Bonneau also evaluated several state House of Representatives elections: one when a White candidate (Philip Ensler) defeated a Black candidate (Malcolm Calhoun) in the Democratic primary in a majority-Black district in 2022, and another when a Black candidate (Kenneth Paschal) defeated a White candidate in a majority-White district in 2021. Doc. 189-1 at 10–11; *see* Tr. 1419, 1421–22. He opined that these elections "indicat[e] that race is not the driving force behind vote choice" and that voters "make selections based on the candidate's positions as well as their political party affiliation." Doc. 189-1 at 10–11.

Dr. Bonneau conceded on cross examination that these results are "rare." Tr. 1519–21. And he acknowledged that Representative Paschal was "the first [B]lack Republican to win election to the State House since Reconstruction." *Id.* at 1421.

116

Dr. Bonneau also testified about the success of a Black Republican: then-Judge Bill Lewis, who was appointed to serve as a state circuit court judge by Governor Robert Bentley and won re-election to that judicial seat unopposed. *See* Doc. 189-1 at 11; Tr. 1422–23. He opined that the lack of opposition for then-Judge Lewis's re-election "suggest[s] that his race was not a factor in the election." Doc. 189-1 at 11. On cross examination, Dr. Bonneau conceded that he did not draw any conclusions about voting patterns from Justice Lewis's judicial career because he was first appointed and ran unopposed for the only seat in which he was elected. Tr. 1523.

Dr. Bonneau also opined about Alabama Supreme Court elections between the 1980s and 2000. *Id.* at 1402–03; Doc. 189-1 at 3. He testified that both Black candidates and Democratic candidates enjoyed little success in Alabama judicial elections after the state became majority-Republican. *See* Doc. 189-1 at 3; Tr. 1408–09, 1416. And he attributed the lack of success for those candidates in part to lower campaign spending, *see* Tr. 1411–12; Doc. 189-1 at 7, which he believes is an "important factor" in election outcomes, Tr. 1411.

In his report, Dr. Bonneau opined that "[i]n a multivariate regression model including both the percentage of the registered [B]lack population and whether the losing [Alabama] state supreme court candidate was [B]lack as independent variables," Black candidates "perform 4.3 percentage points better than White

117

candidates." Doc. 189-1 at 9. At trial, Dr. Bonneau admitted a coding error in his data on this point (he coded certain uncontested elections as contested). *See* Tr. 1413. He testified that when he corrected this error, his results flipped: the data indicated greater success (as defined by vote share) for White Democrats than Black Democrats. *Id.* at 1517. Dr. Bonneau testified that after the correction, only one Black candidate would remain in the dataset for contested elections, and he would not have done this kind of analysis "[b]ecause when you are looking at whether or not the candidate was [B]lack as an independent variable, it's basically a case study of one person." *Id.* at 1413–14.

Dr. Bonneau also criticized Dr. Liu for examining only biracial elections; Dr. Bonneau argued that approach "assumes that there are differences based on the race of the candidate" and fails to account for the role of political party. *See* Doc. 189-1 at 13, Tr. 1459–60, 1543. Dr. Bonneau testified that based on his review of the data, "the explanation for the results in Alabama are far more consistent with political party" than the race of the candidate. Tr. 1460, 1543; *see* Doc. 189-1 at 17.

Dr. Bonneau also criticized Dr. Liu for failing to analyze an election in his initial report that controlled for race or party. Tr. 1420. He testified that Dr. Liu's analysis of nonpartisan elections may not effectively control for party because voters can know the partisan affiliation of a candidate even when the candidate does not run on a party platform. *See id.* at 1469. Dr. Bonneau testified that he did not evaluate

whether the candidates in the mayoral races Dr. Liu evaluated were correlated to a party. *See id.* at 1504–05.

Finally, Dr. Bonneau testified that ecological inference "techniques are widely used by courts" for a racially polarized voting analysis, although "they have some significant limitations." Doc. 189-1 at 11. He testified that he was unaware of any empirical methods that would better estimate racially polarized voting than ecological inference. Tr. 1474.

### ii.  Dr. Wilfred Reilly

Dr. Reilly holds a law degree from the University of Illinois College of Law and a doctoral degree in political science from Southern Illinois University. Doc. 189-9 at 1, 27; Tr. 776. He works as a professor of political science at Kentucky State University, where he has taught for approximately nine years. Tr. 776; Doc. 189-9 at 1. His research focuses on race relations, public law, political theory, and the statistical examination of gaps between racial groups. *See* Doc. 189-9 at 1–2; Tr. 777–79. He has published four books, four book chapters, and numerous articles. Doc. 189-9 at 1–2, 28–34; *see* Tr. 778.

Dr. Reilly's only experience as an expert witness other than this case is the testimony he offered in the Alabama congressional redistricting litigation. Tr. 817. In that litigation, the three-judge district court "assign[ed] very little weight to Dr. Reilly's testimony" because (1) his "opinions [did] not focus on and [were] not about

Alabama," (2) he "repeatedly offered opinion testimony without support," and (3) his "demeanor at trial" was "dogmatic, defensive, and deliberately confrontational" and "left [the district court] with the impression that his goal was to be evocative . . . rather than reliable and persuasive." *Singleton*, 2025 WL 1342947, at *151.

Dr. Reilly was compensated at a rate of $500 per hour for his work in this case and his compensation did not depend on the substance of his testimony. Doc. 189-9 at 2. At trial, Dr. Reilly was admitted without objection "as an expert in political science, statistics, race relations, and a study of the impact of racial discrimination on socioeconomic gaps." Tr. 779–80.

Dr. Reilly opined in his report that the assertion that Alabama "is experiencing racially polarized voting . . . due to Alabama-specific past or contemporary racism" is "incorrect." Doc. 189-9 at 3. Dr. Reilly agreed that Black and White Alabamians vote differently, but testified that "if Alabama is racially polarized than so is every other large state in the [United States]." *Id.* at 7; Tr. 830. He acknowledged Dr. Liu's observation that "[W]hites almost never vot[e] for 'Black[-]preferred candidates . . .' and Blacks almost never vot[e] for '[W]hite preferred candidates[,]'" but stated such an outcome can be explained by party affiliation. Doc. 189-9 at 4. Dr. Reilly opined that "race [is] totally non-predictive in a simple regression which incorporates candidate partisanship." *Id.*

At trial, he testified that Black voters demonstrated a "[m]assive preference for

Democrats" in the elections analyzed by Dr. Liu and that White voters preferred Republicans. Tr. 789. He also opined that this trend is consistent across the country. *See id.* at 791.

Dr. Reilly offered opinions on socioeconomic disparities in Alabama based on national data. *See* Doc. 189-9 at 7–25; Tr. 824. He testified that he classifies the causes of disparities into three schools of thought: (1) "culturalism," which considers various cultural factors as the cause of disparities, (2) "hereditarianism," or "[g]enetic determinism," which considers genetics as the cause of disparities, and (3) "racialist," which considers racism as "the only possible cause[]" of disparities. Tr. 780–81. Dr. Reilly testified that he adheres to the "culturalist" school of thought and believes that "multiple variables influence performance" on socioeconomic measures. *Id.* at 782.

Dr. Reilly conceded that socioeconomic disparities exist between Black and White Alabamians, *id.* at 822, but opined that many of the socioeconomic gaps in, for example, "voter turnout, test scoring, partisan voting by race, and incarceration . . . can be observed literally everywhere in the country, correlate little if at all with current or past rates of bias, and seem to be smaller/better in Alabama than in most other places." Doc. 189-9 at 25.

Dr. Reilly observed that "[W]hite students perform better educationally than Black students in every single state" and that "the size of contemporary group gaps in SAT scoring and college attendance correlates only slightly with documented levels

of historical racism." *Id.* at 9; *see* Tr. 795, 825. He observed that Asian American students outperformed White students on average in his evaluation of 2019 SAT scores. Tr. 797–98; Doc. 189-9 at 10. Dr. Reilly testified that "Nigerian Americans" are "the best-educated group in the United States." Tr. 827. He conceded that he was "[n]ot sure" that the source supporting this opinion was included in his report and that the article cited for the proposition in his report—a 2008 news article—was not peer-reviewed, Tr. 827–28; *see* Doc. 189-9 at 13 n.22, but stated that "[t]he performance of Nigerian Americans . . . in the USA is undisputed," Tr. 844.

Dr. Reilly clarified that he does not believe that disparities in education rates are a result of genetic traits, Tr. 798; *see id.* at 781–82, but, in accordance with his "culturalist" view, believes they could be caused by cultural factors like "[r]eading books," "study time," "parental expectations," income, and whether the individual is an athlete. *Id.* at 798–99, 801.

Dr. Reilly testified that there is a racial disparity in voter turnout and registration rates in Alabama, *id.* at 822, but opined that it is not a "statistically significant" gap, Doc. 189-9 at 15. He also opined that the disparity is not the result of racial discrimination, and he attributed it to age, fatherlessness, and felon disenfranchisement. *See* Doc. 189-9 at 7–15; Tr. 802–05. He testified "the modal average age for a [W]hite American is 58, [and] [B]lack American is 27," that "there are very significant differences in voting by age," and that a racial group that has, on

122

average, a lower modal age, "[i]t would tend to suggest that" the group would have a lower turnout. Tr. 803–04. He also testified that "[f]atherlessness, to put [it] bluntly, correlates very highly with crime, with . . . civic non-participation, with dropping out of school, with most negative variables." *Id.* at 804. And he testified that individuals with certain felony convictions cannot vote, and that "African-Americans" are more likely to have such convictions "than [W]hites, [W]hites more than Asians." *Id.* at 805.

Dr. Reilly also conceded that Black Alabamians are overrepresented in Alabama prisons, but opined that "there is no reason to think that" the difference between non-Black Alabama citizens and Black citizens who cannot vote due to a felony conviction "is due to bigotry or racism." Doc. 189-9 at 14. He observed that the "reported [Black] violent crime rate, across Alabama and the rest of the United States, is at least 2.4 times the [W]hite [rate]." *Id.* at 14–15. He also testified that racial disparities in incarceration rates "do not track with the measures of historic rac[ism]." Tr. 807. He testified that a 2021 survey showed that Alabama had the second smallest gap in incarceration rates between White and Black citizens nationwide. *See id.* at 809.

Dr. Reilly acknowledged that disparities in education levels could be caused by racism, but he opined that this "God-of-the-gaps" theory is a "fallacy in debate" because the argument could "go on indefinitely." *Id.* at 794–95. He also stated that

the voter registration gap does not "trend in the temporal direction which one would expect were racism a primary proximate cause here" as "the smallest registration gap on recent record was documented in the year 'closest to the past (2018).'" Doc. 189-9 at 15.

On cross examination, Dr. Reilly conceded that he is "not a professional expert on Southern politics" and that his academic work did not focus on Alabama politics. Tr. 817–18. He testified that he is "not a historian" or "an expert on Alabama history." *Id.* at 817. And he testified that he did not evaluate Alabama-specific data to form his opinions. *See id.* at 824–27.

Dr. Reilly also testified to various matters concerning his credibility. For instance, he confirmed that he posted on his social media accounts that "many/most people are banal idiots," *id.* at 839, and that "every prominent Black Lives Matter martyr was a scumbag criminal," *id.* at 840.

Dr. Reilly also confirmed that he posted that "humans still have the exact same taste and drives that we did when we were raping and eating Neanderthals," and that "people in the hood in particular understand these tastes and drives." *Id.* at 839–40. He testified that this characterization was based on the lack of "formal training in gentleese" in the "hood" and that it was not "genetic or anything like this." *Id.* at 839–40. He also testified he did not mean the term "hood" in "an entirely racial sense" but considered it to be "[a] lower income formerly red line neighborhood." *Id.* at 847. Dr.

124

Reilly appeared surprised that the plaintiffs "pa[id] a lot of attention to [his] social media" and said his social media account does not constitute "peer-reviewed research." *Id.* at 840–41.

### iii.  Dr. M.V. Hood, III

Dr. Hood earned graduate degrees in political science from Baylor University and Texas Tech University. Doc. 189-6 at 1; Tr. 1215. He works as professor of political science at the University of Georgia, where he has served on the faculty for more than twenty years, Doc. 189-5 at 2, and directs the Survey Research Center at the School of Public and International Affairs there, Tr. 1216; Doc. 189-6 at 1. His work focuses on electoral politics, racial politics, election administration, and Southern politics. Doc. 189-5 at 2; *see* Tr. 1216. He has co-authored two books and published numerous articles in peer-reviewed journals. *See* Doc. 189-6 at 1–6. Dr. Hood has qualified as an expert in numerous redistricting cases, including in Alabama. Tr. 1217–18. He was compensated at a rate of $400 an hour for his work and his compensation did not depend on the substance of his testimony. Doc. 189-5 at 2.

At trial, Dr. Hood was admitted without objection as an expert in "electoral politics, racial politics, election administration, and southern politics, . . . empirical social science research, and for the matters discussed in his report." Tr. 1218.

*First*, Dr. Hood testified about Black voting patterns. *See id.* at 1219; Doc. 189-

5 at 2. Dr. Hood compared Black voting patterns in Alabama to those of twenty other states with a Black population of ten percent or more. Doc. 189-5 at 3. Dr. Hood selected states with that percentage of a Black population because "if a state had less than [ten] percent African-American population, . . . [he] would be concerned that [there] would [be] too few African-American respondents in the survey data to be able to draw any kind of conclusive inferences." Tr. 1219.

Dr. Hood opined in his report that on average, Black support for Democratic candidates—in Alabama and the twenty other states considered—exceeds ninety percent. Doc. 189-5 at 3, 5. He testified that "[t]his pattern transcends both geographic region (South versus non-South) as well as [political] party control (Democratic versus Republican) at the state-level[,]" *id.* at 5; *see* Tr. 1225, and that Black voters' support of Democratic candidates is "monolithic," Tr. 1225. Dr. Hood did not evaluate the White electorate in any national or Alabama election, Tr. 1241–42, and did not perform a racially polarized voting analysis, *id.* at 1226. He opined that "the primary explanatory factor [in Alabama voting patterns] appears to be ideological congruence between the voter and the candidate." Doc. 189-5 at 21. Dr. Hood acknowledged that he did not perform a racially polarized voting analysis. *See* Tr. 1226.

*Second*, Dr. Hood considered racial disparities on various sociodemographic factors. *See id.* He "analyze[d] racial disparity rates between [W]hite and [B]lack

126

residents in Alabama" and compared Alabama's rates with twenty other states. Doc. 189-5 at 7; *see* Tr. 1226. He testified that racial disparities exist in Alabama and the twenty comparison states on factors such as education, healthcare, poverty, Internet access, and incarceration. *See* Tr. 1227–31; Doc. 189-5 at 7, 17–20. Dr. Hood opined that "[f]or ten of the thirteen measures analyzed ([seventy-seven percent]), the disparity rate for Alabama is below the average disparity rate calculated for the comparison states" and never "constitute[d] the maximum value among the states analyzed." Doc. 189-5 at 20. He did not evaluate the racial disparities specific to the Huntsville and Montgomery areas. Tr. 1251.

*Third*, Dr. Hood considered Dr. Ben Carson's presidential campaign. Doc. 189-5 at 20. He testified that Alabama provided Dr. Carson the second highest level of support that he received in the 2016 election. Tr. 1233; *see* Doc. 189-5 at 20. Dr. Hood conceded that he did not consider the racial demographics of the voters in that presidential election and that he did not evaluate the support for Dr. Carson specific to the Huntsville and Montgomery areas. Tr. 1252.

*Fourth,* Dr. Hood considered White support for minority Republican candidates. Doc. 189-5 at 21. He testified that, based on national data, "[W]hite conservatives were more than willing to support minority Republican candidates." Tr. 1234; *see id.* at 1253–54. He opined that "ideology trumps race in the case of [W]hite Republicans and their support for minority GOP nominees." Doc. 189-5 at 21.

To examine these findings in Alabama, Dr. Hood discussed the election of Representative Paschal, a Black Republican, from a majority-White district. Doc. 189-5 at 21; Tr. 1235. On cross examination, Dr. Hood conceded that Representative Paschal was the first Black Republican elected to the Legislature since Reconstruction; that his district is in Shelby County, which does not overlap with the districts at issue in this litigation; and that Representative Paschal's election is "[t]he only example of [W]hite voters electing a [B]lack Republican candidate in Alabama" included in his report. Tr. 1254–56. He also conceded that he did not analyze White support for minority candidates in the Huntsville or Montgomery areas. *Id.* at 1256.

*Fifth*, Dr. Hood examined whether Black political metrics have changed over time in Alabama. He studied the number of Black elected officials from the passage of the Voting Rights Act in 1965 to the present day. *See* Tr. 1236; Doc. 189-5 at 22. He testified that there were no Black members of the Legislature in 1965, three Black Senators and thirteen Black Representatives in 1981, and there are currently seven Black Senators and twenty-six Black Representatives. Doc. 189-5 at 22; *see* Tr. 1237.

Dr. Hood also studied Black voter registration rates. He observed that in 1965, 23.5 percent of eligible Black voters were registered to vote, and the number of eligible Black voters who were registered to vote increased to 95.2 percent in 2024.

Doc. 189-5 at 23; Tr. 1237. He thus opined that "there have been significant gains for [B]lack Alabamians across the last six decades." Doc. 189-5 at 23; Tr. 1238.

On cross examination, Dr. Hood agreed that of the thirty-three Black Alabama legislators, thirty-two are from majority-Black districts (with Representative Paschal as the sole exception). *See* Tr. 1258–59. And Dr. Hood acknowledged that "[a]t least some of the changes in [B]lack representation in Alabama over the last few decades" are due to "[l]itigation that created majority-[B]lack districts." *Id.* at 1259–60.

### iv.  Dr. Adam Carrington

Dr. Carrington earned graduate degrees in political science from Baylor University and now works as an associate professor of political science at Ashland University (formerly, he worked at Hillsdale College for ten years). Doc. 189-4 at 1; Tr. 1128–29. His research focuses on "American political institutions in their historical context, including the judiciary, the presidency, and political parties" and he has published a book, book chapters, and articles. Doc. 189-3 at 1; Doc. 189-4 at 1–3; *see* Tr. 1129–30.

This case was Dr. Carrington's first time testifying as an expert witness. Tr. 1131. He later testified at the trial in the Alabama congressional districting cases. *See Singleton*, 2025 WL 1342947, at *118–20. The three-judge district court "assign[ed] no weight" to his testimony in those cases because Dr. Carrington had "limited familiarity with Alabama history and politics" and he made "little to no effort to learn

about Alabama before opining about party affiliations here." *Id.* at *151. Dr. Carrington was compensated at a rate of $300 per hour for his work in this case and his compensation did not depend on the substance of his testimony. Doc. 189-3 at 1.

The Secretary offered Dr. Carrington "as an expert in political science, political parties[,] and the partisan shift in the American South." Tr. 1133–34. At trial, the plaintiffs re-raised the arguments presented in their motion in *limine* to preclude Dr. Carrington's testimony. *See id.* at 1134. In that motion, the plaintiffs argued that Dr. Carrington was unqualified to offer expert opinions on "any subject relevant to this case." Doc. 183 at 5. They argued that he is unqualified to testify about "the historical and political development" of "the racial realignment of Alabama voters in the mid-to-late [Twentieth] [C]entury" because his "expertise lies in [Nineteenth] Century political institutions." *Id.* at 3–5; *see* Tr. 1134–35.

The plaintiffs also argued that Dr. Carrington's testimony is not helpful. *See* Tr. 1134–35; Doc. 183 at 8–13. They argued that Dr. Carrington "fail[ed] to perform any localized analysis" that would help the Court evaluate "whether Black voters in the Huntsville and Montgomery regions have less opportunity to participate in the political process." Doc. 183 at 10–13. The Court heard argument on the motion pretrial and carried it with the case.

Dr. Carrington acknowledged at trial that none of his written work has focused on Alabama in the twentieth century. Tr. 1132. He also acknowledged that he is not

130

an expert in Alabama politics or history, but testified to his belief that he did not need to be such an expert to provide the opinions he offered in this case. *Id.* at 1132–33. The Secretary argued that Dr. Carrington has "a deep expertise in the American institution of political parties," Doc. 203 at 8, and that his study of political parties qualifies him "to reach conclusions about whether the causes for the partisanship in Alabama parallel in important respects the causes for the partisan shift in the South more broadly," Tr. 1135; *see* Doc. 203 at 13–14.

At trial, the Court admitted Dr. Carrington's testimony over the plaintiffs' renewed objections because Dr. Carrington was "candid about his limitations" as an Alabama-specific expert. Tr. 1135; *see* Doc. 203 at 13–14.

Dr. Carrington "sought to provide a fuller context for how Alabamians in 2024 come to identify with and vote for one of the two major political parties." Doc. 189-3 at 29. Dr. Carrington testified that the campaigns of former Alabama Governor George Wallace show the diminishing power of race in Alabama politics as early as 1971. *See* Tr. 1197–98. Dr. Carrington testified that in 1968, Wallace's "anti-integration viewpoint helped him attract supporters among [W]hite voters in Alabama when he ran for president," and that "at his 1971 inauguration," he declared "that the government of Alabama is for all people, [W]hite and [B]lack." *Id.* at 1197–98. Dr. Carrington acknowledged that Wallace might have been "faking that," but said that nevertheless, those statements show that "he already starts to moderate on those

questions as early as the early '70s." *Id.* at 1198.

Dr. Carrington testified that he does not dispute the existence of racially polarized voting in Alabama, only the reasons why voting is racially polarized. *Id.* at 1185. He testified that he did not deny "that race continues . . . to be a factor of some degree," but stated that it "is an oversimplified story to say that it is the dominant or overwhelming [factor] . . . behind all the other views." Tr. 1160–62; *see* Doc. 189-3 at 30.

At trial, Dr. Carrington testified about the history of the realignment of the South from majority-Democrat to majority-Republican. *See* Tr. 1136–56. He testified that the shift was not solely or primarily caused by race, but instead was caused by differences in factors such as economics, foreign policy, and social issues like religious ideology or abortion. *Id.* at 1136–37; *id.* at 1160–62; *see generally* Doc. 189-3. In making these determinations, Dr. Carrington analyzed factors that influenced Southern White voting patterns, Tr. 1157; *id.* at 1188, and did not analyze Black voting patterns, *id.* at 1190. He testified that Alabama patterns aligned with Southern patterns, but he did not study Alabama elections. *See id.* at 1189–90, 1212.

Dr. Carrington also testified about shifts in Southern voters who identify as religious; he testified that, although both parties have voters who identify as religious, the Democratic Party is "seen as a more natural home to the more secular voters," and that the Republican Party would therefore seem more attractive to religious Alabama

voters. *Id.* at 1152. He opined that race does not trump religion among Alabama voters, opining instead that voters' positions on social issues, such as abortion or LGBTQ issues, are the driving factors behind party affiliation. *See id.* at 1153–55.

On cross examination, Dr. Carrington conceded that he did not evaluate the religious beliefs or observance of Black voters or its effect on Black citizens' voting patterns. *Id.* at 1207. He acknowledged that a large percentage of Black Alabamians identify as Christian and that between forty-seven and forty-eight percent of Black Alabamians oppose abortion in most cases. *Id.* at 1207–08. He did not evaluate the views of Black Alabamians who identify as Christian on matters relating to LGBTQ issues, *id.* at 1208, or the differences in the voting patterns of Black and White Christians even when those voters share similar views on these issues, *see id.* at 1209.

Dr. Carrington also testified about racial appeals in several national campaigns. *See id.* at 1178. On cross examination, he conceded that, aside from his responses to statements in Dr. Bagley's report, he did not evaluate any recent campaign advertisements of Alabama politicians and did not reach any conclusions regarding whether Alabama campaigns are characterized by racial appeals. *See id.* at 1176–77. Dr. Carrington conceded that former Congressman Brooks's reference to a "war on [W]hites" may have been an "attempt[] to appeal to [W]hite voters." *Id.* at 1182–83.

On cross examination, Dr. Carrington also testified about matters going to his credibility and the reliability of his opinions. Dr. Carrington was asked about two

Alabamians with nationally prominent roles in the civil rights movement, Judge Robert S. Vance and attorney Fred Gray. *See id.* at 1192, 1203. In both instances, Dr. Carrington first claimed that he knew who they were, but then admitted that he could not offer any information about the relevant person or their work. *See id.* at 1192, 1203.[7]

Dr. Carrington also testified about an opinion piece he published that commented on legal issues in this case—the piece addressed the Supreme Court's decision in the congressional redistricting litigation, in which that Court affirmed the finding of the three-judge court that Alabama's congressional districting plan likely violated Section Two. *See id.* at 1209–10. Dr. Carrington called the Supreme Court's affirmance a "missed opportunity" for the Supreme Court to follow pre-1982 Voting Rights Act precedents. *Id.* at 1210–11.

---

[7] For the reader's background information, Mr. Gray was one of Alabama's first Black state legislators and is a Montgomery civil rights lawyer known for major civil rights litigation, including his representation of Rosa Parks, Martin Luther King, Jr., and the victims of the Tuskegee Syphilis Study. *See* Barclay Key, *Fred Gray*, Encyclopedia of Alabama (Apr. 15, 2008), https://encyclopediaofalabama.org/article/fred-gray/.

Judge Vance served on the United States Court of Appeals for the Eleventh Circuit and was the last federal judge assassinated in connection with his judicial service. *See* Michael Megelsh, *Robert Smith Vance*, Encyclopedia of Alabama (February 13, 2024), https://encyclopediaofalabama.org/article/vance-robert-smith/. He too participated in major civil rights litigation as a lawyer. The federal courthouse where the trial of this case was held is named for him, and a bust and portrait of him appear in the lobby.

### b. The Secretary's Lay Witness Testimony

The Secretary also offered the testimony of several lay witnesses to dispute various assertions in Dr. Bagley's report about the totality of the circumstances: Colonel Jonathan Archer, Dr. Karen Landers, Ms. Susan Copeland, Mr. Doyle Fuller, Dr. Patricia Payne, and Mr. Joshua Roberts.

Colonel Jonathan Archer serves as the Director of the Department of Public Safety at the Alabama Law Enforcement Agency ("ALEA"). *Id.* at 889. Colonel Archer previously served as the Chief of the Driver's License Division of ALEA, which is the agency "tasked with credentialing and examining applicants for Alabama driving privileges." *Id.* at 891.

Colonel Archer testified about Dr. Bagley's assertion that the closures of certain driver's license offices in 2015 was a recent act of official discrimination. *See* Doc. 206-19 at 15. Col. Archer testified that certain driver's license "field offices" were closed at that time due to financial and staffing concerns. Tr. 898. He testified that ALEA decided that "it would be better to suspend operations in those offices so th[e] examiners [at those locations] could remain at the district offices to serve more customers." *Id.* The suspension lasted for thirty days. *Id.* at 904. Colonel Archer stated that the closed offices affected 2.1 percent of total transactions (including the transactions of the county partner offices) and 4.43 percent of ALEA transactions. *Id.* at 901–02. He conceded that ALEA reopened the offices as part of

135

a memorandum of understanding with the United States Department of Transportation that did not admit liability for discriminating against Black Alabamians. *Id.* at 906, 920.

Dr. Karen Landers works as the Chief Medical Officer of the Alabama Department of Public Health ("the Department"), and she testified about the medical services offered to minority populations in Alabama. *Id.* at 1267, 1271–76, 1287–88, 1297. Dr. Landers has worked as a medical doctor in private practice since 1980 and has worked for the Department since 1982. *Id.* at 1267. She became the Chief Medical Officer of the Department in 2022. *Id.*

Dr. Landers testified about the Department's response during the COVID-19 pandemic. She testified that the Department engaged in outreach efforts to the minority community during the pandemic, *id.* at 1278, offered medical testing and care in sixty-six out of sixty-seven counties at the beginning of the pandemic, *id.* at 1279–80, and engaged in outreach programs in minority communities when the vaccine became available, *see id.* at 1283–84.

On cross examination, Dr. Landers acknowledged that Black Alabamians were disproportionately hospitalized with and died from COVID-19, *id.* at 1289–90; Black Alabamians are at a higher risk for underlying chronic health problems, such as diabetes or hypertension than White Alabamians, *id.* at 1290–91; and Black Alabamians have less access to health care than White Alabamians, *id.* at 1291. She

testified that racial disparities in health care "result from barriers like a lack of access to education and information" and that the Department is working to improve those disparities. *Id.* at 1298, 1305–06.

Dr. Landers testified about Dr. Bagley's assertion that the United States Department of Justice "found abundant evidence that [Alabama] had been discriminating against Black residents of Lowndes County." Doc. 206-19 at 28. She testified that that the Department entered a resolution agreement with the United States related to the residents in Lowndes County without adequate sewage disposal options, and that "no fault was found with the state of Alabama related to any discriminatory practices." Tr. 1294, 1301; *see id.* at 1307. She testified that progress has been made in sewage disposal in Lowndes County. *Id.* at 1301.

The Secretary offered the testimony of Susan Copeland and, through a deposition designation, Mr. Doyle Fuller, two attorneys who represent the town of Pike Road. Mr. Fuller is the attorney who incorporated Pike Road, Doc. 236–1 at 20, and Ms. Copeland began representing Pike Road with Mr. Fuller shortly after the town was incorporated, Tr. 1548. Mr. Fuller and Ms. Copeland assisted Pike Road in annexing property, establishing the Pike Road school system, and purchasing the Georgia Washington Middle School facility from the City of Montgomery. Tr. 1549; *see* Doc. 236-1 at 17, 30.

Mr. Fuller testified that Pike Road was created because its residents wanted

137

to preserve their rural lifestyle, including maintaining privacy in their backyards, having land, or having pets. Doc. 236-1 at 88–91. He testified that the town grew in part by annexing both White and Black communities. *See id.* at 27–28. Ms. Copeland testified that Pike Road annexed land for residents of all races and granted many Black landowners' petitions for Pike Road to annex their land. Tr. 1560.

Mr. Fuller and Ms. Copeland testified that Dr. Bagley's report did not accurately describe Pike Road. *See id.* at 1550; Doc. 236-1 at 40–41. Ms. Copeland testified that, unlike Montgomery, Pike Road is a small, rural town. Tr. 1551–52. Ms. Copeland testified that approximately forty percent of Pike Road residents were Black at the time of its incorporation. *Id.* at 1553. Ms. Copeland testified that although there are currently no Black members of the town council, *id.* at 1554; *id.* at 1572, a Black resident of Pike Road was elected to the council at-large from the time of its incorporation until 2020, *id.* at 1555–56; *see* Doc. 236-1 at 55. Mr. Fuller criticized Dr. Bagley for either "intentionally" omitting information about the annexation of predominantly Black neighborhoods into Pike Road in addition to predominantly White neighborhoods, or failing to "do his homework." Doc. 236-1 at 82.

The attorneys also testified about the formation of the Pike Road School System. They disputed Dr. Bagley's assertion that Pike Road residents had racial motives to create a separate school system. Tr. 1561–62; Doc. 236-1 at 48–49. Ms.

138

Copeland testified that students in the Pike Road area attended Montgomery County schools before Pike Road created its own school system, and that none of the county public schools were within Pike Road city limits. Tr. 1563. She testified that Pike Road intended to have its own school system from its incorporation. *Id.* at 1562. Mr. Fuller testified that "[a] significant number of the people who were involved in the formation of Pike Road were [B]lack" citizens and that "[t]hey were just as interested in establishing a decent school system as anybody else in Pike Road was." Doc. 236-1 at 49.

Ms. Copeland and Mr. Fuller testified about Pike Road's acquisition of the Georgia Washington Middle School facility. They testified that the town council and the mayor decided to purchase the school because Pike Road needed a high school. *See* Tr. 1564, 1575; Doc. 236-1 at 31, 59. Ms. Copeland explained that Georgia Washington Middle School was attractive to Pike Road because it was closing and was the closest facility to the Pike Road city limits. Tr. 1564. She testified that she believes the State of Alabama forced the Montgomery County school board to sell the facility to Pike Road over the school board's opposition. *Id.* at 1578. They testified that Montgomery and Pike Road agreed that Pike Road could purchase the property as long as it maintained the name of Georgia Washington, a former enslaved person who started the school. *See* Tr. 1567; Doc. 236-1 at 38–39. The

current name of the school is "Pike Road High School[ ]Georgia Washington Campus." Tr. 1577; *see* Doc. 236-1 at 32, 83.

Dr. Patricia Payne is a resident of Pike Road, Tr. 1582, who co-wrote an article that was quoted in Dr. Bagley's report, *see* Doc. 206-19 at 26. Dr. Payne previously worked part-time for the town and now volunteers as the director of the Pike Road Arts Center. *See* Tr. 1585–86. Dr. Payne testified about the creation of the Pike Road school system. She testified that students who lived in Pike Road were attending "at least [twenty-eight] different schools," and the residents of Pike Road wanted to "control the education of [Pike Road] citizens," *id.* at 1587. She also testified that the Montgomery County schools were "failing" and "not safe." *Id.* at 1598; *see id.* at 1605. Dr. Payne testified that there was no racial motivation behind the creation of the Pike Road school system, *id.* at 1587, and that there are Black students in the Pike Road school system, *id.* at 1618. Dr. Payne testified that Dr. Bagley's assertion that the residents of Pike Road had a racial motivation in creating the school system was "laughable" because there were "[B]lack members on [the] council and on [the] education committee." *Id.* at 1599–1600.

Dr. Payne also disputed portions of Dr. Bagley's report about a newspaper article she helped to write called "Pike Road Dispute Centers Around Choice." *See id.* at 1589. In the article, Dr. Payne stated that Pike Road's "leadership sought to 'preserve and protect what they saw as their preferred way of life' in the face of

'encroachment' from the City of Montgomery." Doc. 206-19 at 26. At trial, Dr. Payne testified that she was opining on the residents of Pike Road's frustration that they "had no voice" in the development of their town. Tr. 1594. Dr. Payne disputed Dr. Bagley's assertion that she was using "color-masked" language. Tr. 1599.

In the article, Dr. Payne stated that Pike Road and Montgomery had "distinct" histories because Pike Road residents "had lived off the land." Tr. 1598; *see* Doc. 206-19 at 26. She testified that she was referring to Pike Road residents' use of land to farm or raise livestock. *See* Tr. 1598. Dr. Payne testified that Dr. Bagley painted an unfair picture of Pike Road. Tr. 1620–21. She testified that he did not discuss that there were Black members of Pike Road's first town council, that the town council "met in a [B]lack church," or that Black residents "were part of [the] planning committees for [Pike Road] education committees." *Id.* at 1620–21.

Joshua Roberts works as the President of Alabama Christian Academy in Montgomery. *Id.* at 1089. Mr. Roberts testified that the "Capital City Conference" schools—a conference that includes five private schools in the Montgomery area, *id.* at 1092—market to and include a diverse student body. *See id.* at 1100. Mr. Roberts disputed Dr. Bagley's assertion that private schools in Montgomery are segregation academies and testified that the Capital City Conference schools have "a very specific campus unity policy" against discrimination. *Id.* at 1100–02. He testified that Alabama Christian Academy has a twenty-five to thirty-five percent Black student

population, *id.* at 1102, and had a Black homecoming queen and a Black student body president in 2024, *id.* at 1100–01. He also stated that all five Capital City Conference schools offer need-based scholarship opportunities for those unable to pay private school tuition and that the Alabama Accountability Act provides additional scholarship opportunities. *Id.* at 1105–07; *id.* at 1124.

The Secretary also offered the testimony of three Black Republicans: Valerie Branyon, Bill McCollum, and Cedric Coley. *See id.* at 849–51, 1309, 1319, 1354–56. Ms. Branyon is a Black registered voter who recently won a seat as a County Commissioner in Fayette County in a district that is approximately half White and half Black. *Id.* at 849–50, 853, 869. Ms. Branyon ran as a Republican in that election. *Id.* at 850–51. Ms. Branyon previously ran for County Commissioner as a Republican in 2020. *Id.* at 861. In that election, she defeated a White Republican in the primary, but lost to a Democrat in the general election. *Id.* at 861–62.

Ms. Branyon explained that she joined the Republican Party due to its stances on issues like abortion and same-sex marriage rights. *Id.* at 851. She testified that she received support from the local and state Republican Party and that the party helped her engage in campaign efforts like door knocking and advertising. *See id.* at 857–61. She testified that the state Republican Party also invited her to a training on how to successfully run for office. *Id.* at 861; *see id.* at 869.

Bill McCollum is a Black registered voter in Fayette County. *Id.* at 1353–54,

142

1368. Mr. McCollum testified that he joined the Republican Party because he "did[] [not] like a lot of the policies" advocated by the Democratic Party and preferred conservative values that align with the Republican Party. *Id.* at 1355–56. He currently serves as the vice-chairman of the Fayette County Republican Party and was nominated and elected to that position by party members fifteen years ago. *See id.* at 1356–57. He testified that he has been encouraged to run for the Chair of the Fayette County Republican Party but has "never had an interest in it." *Id.* at 1357. Mr. McCollum has been a member of the Alabama Republican Party State Executive Committee, the governing body for the state party, for more than fifteen years. *Id.* at 1358.

Mr. McCollum testified about his experiences running for office in five elections. He testified that he experienced resistance to his qualification as a candidate in the first election he entered in the 1970s. *See id.* at 1364–65, 1373. When he first ran for sheriff, the county administrator told him that "he didn't know if . . . he could register" Mr. McCollum to qualify as a candidate and made him wait in the courthouse for approximately three hours before returning to say that he could qualify. *Id.* at 1363–64. Mr. McCollum was the first Black candidate to qualify for an election in Fayette County. *Id.* at 1364. Mr. McCollum testified that he received financial and volunteer support from the Fayette County Republican Party and Alabama Republican Party duringhis most recent campaign in 2024. *See id.* at 1360–62.

Mr. McCollum also testified about discrimination that he has personally experienced. He testified that when he was originally hired as a police officer for the Fayette County Police Department, "the other officers said they [were not] going to work with [him]. . . . And said they'd quit before they'd work with a [B]lack and things of that nature." *Id.* at 1363. Mr. McCollum was also once asked to leave a restaurant because "it did not serve [B]lack people." *Id.* at 1374.

Cedric Coley is a Black Republican voter in Montgomery. *Id.* at 1308–09, 1311, 1318. Mr. Coley testified about his experience in the Republican Party. He testified that he joined the Republican Party around 2016 and that members of the Republican party were "welcoming." *Id.* at 1319–20; *see id.* at 1336. Mr. Coley is a member of the Montgomery County Republican Executive Committee and has been elected and appointed to various positions in the Montgomery County Republican Party. *See id.* at 1320–22; 1324. Mr. Coley is also involved in the Alabama Republican Party. He testified that he was appointed as regional director of the Alabama Outreach Coalition for the state Republican Party, served as co-chair for Mo Brooks's United States Senate campaign in Montgomery County, and "served as a field representative helping to consult candidates for State Legislature in the State Senate." *Id.* at 1322–23. As a field representative, the state party paid Mr. Coley to advise several Black and White Republican candidates running in an election. *Id.* at 1324–25. Mr. Coley testified that he is also a member of the Alabama

144

Minority GOP, which is a group that "specialize[s] in being a launch pad for minority Alabamians." *Id.* at 1323.

Mr. Coley testified that he is an "America First conservative" who believes there is a "globalist network of international cartels that are deliberately destroying our nation." *Id.* at 1345. He testified that he believes that these cartels are working through the American education system, economy, and "sections of the judicial system and some sections of intelligence agencies." *Id.* He testified that he believes the COVID-19 pandemic was a "plandemic" and a bioweapon created by China. *Id.* at 1344–45.

Mr. Coley testified that he does not believe that Republican candidates use racial appeals to attract voters. *Id.* at 1346–47. On cross examination, he was asked about his social media post of an image that depicted two hand gestures. On one side of the image, a White hand gesture, which Mr. Coley acknowledged has been described by the FBI as indicating White supremacy, appeared above the text "Jobs, vote for civility, vote for prosperity, vote for unity, vote for patriotism, vote Republican." *Id.* at 1349–50. On the other side of the image appeared a gray fist, which Mr. Coley acknowledged has been associated with communism, uprisings, and "[B]lack power," with text that read "Not mobs. . . . Walk away from violence, walk away from hypocrisy, walk away from globalist Democrats." *Id.* at 1348–49. At trial, Mr. Coley testified that he never intended to advocate for White supremacy.

145

*Id.* at 1352.

### 4.  Legal Challenges to Section Two

The Secretary argues that "Congress has not *expressly* authorized private persons to sue under Section 2," and whether Section 2 contains an implied private right of action is an "open" question unresolved by the courts. Doc. 131 at 28–29. The Secretary reasons that "Congress does not confer substantive rights when enforcing the provisions of the Fourteenth and Fifteenth Amendments," and the Voting Rights Act "created new remedies, . . . not new rights" that are privately enforceable. *Id.* at 13–14. It asserts that "Section 2 protects the right of any citizen to vote free from discrimination," which "was enshrined more than 150 years ago in the Fifteenth Amendment," and "[p]rotecting an existing right is not creating a new one." *Id.* at 22.

## V.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.    *Gingles* I – Numerosity

#### 1.    Illustrative Plans 1 and 2A – How to Measure the Black Population

*Gingles* requires the plaintiffs to establish that the Black population is sufficiently numerous in the Huntsville and Montgomery areas such that an additional remedial district may be drawn in each area. *See Allen*, 599 U.S. at 18. The plaintiffs rely on Illustrative Plans 1, 2A, and 3 to establish this numerosity requirement. *See* Doc. 250 ¶ 118. The Secretary argues that the proposed District 7

in Illustrative Plans 1 and 2A do not establish numerosity in Huntsville because those districts are not majority Black. Doc. 251 ¶¶ 51–112; Tr. 1654–57.

The plaintiffs acknowledge that neither district is majority BVAP. It is undisputed that the BVAP of District 7 in Illustrative Plan 1 is 46.82 percent, Doc. 207-9 at 8; Doc. 251 ¶ 55, and the BVAP of District 7 in Illustrative Plan 2A is 48.38 percent, Doc. 164-12 at 13; Doc. 251 ¶ 55. The plaintiffs contend that District 7 in Illustrative Plans 1 and 2A nevertheless establish numerosity because they are majority BCVAP. Doc. 250 ¶ 167; *see* Tr. 1639–41. They assert that the point estimate of the BCVAP for District 7 in Illustrative Plan 1 is 50.16 percent based on Mr. Fairfax's calculation, Doc. 250 ¶¶ 144, 176, and 50.11 percent based on Dr. Oskooii's calculation, *id.* ¶¶ 143, 176. They assert that the point estimate of the BCVAP for District 7 in Illustrative Plan 2A is 50.19 percent. *Id.* ¶ 177.

Under both federal and Alabama law, the default rule is to use census data for redistricting. *See Negron*, 113 F.3d at 1569; Ala. Const. art. IX, §§ 199–200 (providing that the Legislature should rely on "the decennial census of the United States" in dividing the state into legislative districts).

"Whether citizenship should be taken into account for the first *Gingles* precondition is a question of law." *Negron*, 113 F.3d at 1570 (emphasis omitted). Under binding precedent, a minority's share of the voting-age population may be "refined by citizenship" data to establish the first *Gingles* precondition "where there

147

is reliable information indicating a significant difference in citizenship rates between the majority and minority populations." *Id.* at 1569. When a difference in citizenship rates is relevant, it is important—because only citizens can vote, a remedial district with a majority-minority VAP may be "hollow" if the district does not have a majority-minority CVAP. *LULAC*, 548 U.S. at 429; *see Negron*, 113 F.3d at 1568–69 (explaining that Section Two plaintiffs must "establish that the minority group constitutes an effective voting majority in a single-member district") (internal quotation marks omitted) (quoting *Romero v. City of Pomona*, 883 F.2d 1418, 1425 (9th Cir. 1989)).

The Eleventh Circuit has not established a numerical threshold for the disparity in citizen and noncitizen populations that constitutes a "significant difference" in citizenship rates. In *Negron*, a group of Hispanic plaintiffs who lived in Miami Beach alleged that the election system for the city's governing commission violated Section Two. 113 F.3d at 1565. To establish numerosity, they offered three illustrative districts with a majority-Hispanic voting-age population. *Id.* at 1567. The district court considered the citizenship rate of the Hispanic population in Miami Beach—where "only 50.16[ percent] of the Hispanic residents . . . [were] citizens, while 88.18[ percent] of the non-Hispanic residents [were] citizens"—and found that the plaintiffs' illustrative districts did not satisfy the numerosity requirement. *Id.* at 1565, 1567.

148

On appeal, the Eleventh Circuit held that the district court appropriately considered citizenship data in determining whether the plaintiffs presented a majority-Hispanic illustrative district because of the "significant disparity between Hispanic and non-Hispanic citizenship rates" in Miami Beach. *Id.* at 1567. The Eleventh Circuit reasoned that when such a significant disparity is present, "the proper statistic for deciding whether a minority group is sufficiently large and geographically compact is voting[-]age population as refined by citizenship." *Id.* at 1569. The Eleventh Circuit concluded that the plaintiffs did not satisfy the first *Gingles* precondition because "when citizenship is taken into account, there is no Hispanic majority in any of the [proposed] districts." *Id.* at 1568.

The Eleventh Circuit limited the "refinement" of VAP with CVAP to cases where a "significant disparity" is present, and has made clear that this circumstance is rare. *See id.* at 1568–69. Indeed, "such a disparity is unlikely except in areas where the population includes a substantial number of immigrants." *Id.* at 1569.

Here, the plaintiffs urge this Court to ignore the BVAP of District 7 in Illustrative Plans 1 and 2A, which is below fifty percent, and rely only on the point estimate of the BCVAP of that district, which is more than fifty percent. Doc. 250 ¶¶ 176–78, 587. The Secretary argues (and this Court's independent review confirms) that if this Court took that approach, it would be the first district court in the nation to do so. *See* Tr. 1655; Doc. 251 ¶¶ 71–72, 79. Even Mr. Fairfax testified

that he "believe[d]" that he "probably [had] not" relied solely on CVAP to establish numerosity in any of his *Gingles* I work in other cases. Tr. 343.

The plaintiffs have not established a significant disparity in the citizenship rates of the Black and White populations in their proposed District 7. *See* Tr. 252–54; Doc. 207-10 at 3–7. The plaintiffs' argument about noncitizens in District 7 is about the Hispanic and Asian noncitizen populations—not the Black population, which is the minority population at issue. *See* Doc. 250 ¶ 120; Tr. 1639. The plaintiffs have cited, and the Court has found, no authority for relying on the citizenship rate of a minority population other than the one at issue in the litigation, for a numerosity analysis under *Gingles*. Where, as here, there is "no indication" that there is a "significant difference" between Black and White citizenship rates, the Court need not "refine" BVAP data with BCVAP data, nor rely on BCVAP data exclusively. *See Negron*, 113 F.3d at 1568.

Separately, Mr. Fairfax's admission that his reliance on CVAP data is selective deepens the Court's concern about relying on BCVAP to evaluate numerosity in the Huntsville area. Mr. Fairfax conceded that Montgomery has the second highest noncitizen population in Alabama, but testified that he did not rely on CVAP data there because he "didn't have to" rely on CVAP to draw his proposed District 25 because "the majority-[B]lack status is already there." Tr. 289–90; *see* Doc. 250 at 38 n.3. The Court cannot rely on BCVAP data merely where it serves

the plaintiffs' desired purposes.

Accordingly, the Court finds that Illustrative Plans 1 and 2A do not establish that the Black population in the Huntsville area is sufficiently large to satisfy the first *Gingles* I precondition, and the Court does not analyze those plans further as a basis for Section Two relief.

### 2.    Illustrative Plan 3

It is undisputed that Illustrative Plan 3 includes two majority-Black illustrative districts (Districts 25 and 7). *See* Tr. 1638–39, 1657, 1660; Doc. 189-7 at 28; Doc. 189-8 at 19. The BVAP of Proposed District 25 is 51.59 percent and the BVAP of District 7 in Illustrative Plan 3 is 50.04 percent. Doc. 206-8 at 32; Doc. 189-8 at 19. Accordingly, the Court finds that the plaintiffs have established that the Black population in the Huntsville and Montgomery areas is "sufficiently large" to accommodate an additional remedial district in those areas and turns to the question whether the proposed remedial districts in Illustrative Plan 3 are reasonably configured. *See Allen*, 599 U.S. at 18.

### B.    *Gingles* I – Reasonable Configuration

The Court proceeds in three steps: *first*, the Court makes its credibility determinations about the testimony of the parties' *Gingles* I expert witnesses. If the Court will not rely on an expert's testimony, the Court does not make a credibility determination for that expert. *Second*, the Court considers the configuration of the

plaintiffs' proposed District 7 in the Huntsville area. *Third*, the Court considers the configuration of the plaintiffs' Proposed District 25 in the Montgomery area.

### 1.   Expert Credibility Determinations

*First*, the Court finds Mr. Fairfax's testimony credible. The parties do not dispute his qualification as an expert, *see* Tr. 230, and he explained his methods and work clearly and consistently, *see, e.g.*, Doc. 206-6 at 8–14; Tr. 240–47. He answered cross-examination questions with care not to overstate his conclusions, *see, e.g.*, Tr. 281–82, 287–88, and the Court found his testimony both reliable and helpful.

*Second*, the Court finds Dr. Trende's testimony credible. The parties do not dispute his qualification as an expert, *see* Tr. 941, and he explained his methods and work clearly and consistently. The Court carefully observed Dr. Trende's demeanor during trial and found him to be candid. For instance, when Dr. Trende was confronted with an error in one of his calculations, he acknowledged it and testified that it would change, but not inflate, the resulting margin of error. *See id.* at 1059–60.

Dr. Trende took care to limit his testimony to his expertise and not to overstate his conclusions. For example, he testified that CVAP is not a "bad source of information," and opined only that it should not be relied upon exclusively to establish numerosity when the BVAP is below fifty percent and the BCVAP point

estimate is close to fifty percent. *Id.* at 956. In his testimony about disaggregation techniques, he acknowledged that there are "different ways" to disaggregate data, and did not opine that one method was better than the other. *See id.* at 977–80. Instead, he testified that all techniques rely on "untestable assumptions" that should be considered by the Court in its numerosity assessment. *Id.* at 978.

Dr. Trende offers only limited opinions on the reasonable configuration of the proposed remedial districts in Illustrative Plan 3. He did not analyze whether that plan respects political subdivisions, observes natural boundaries, preserves the cores of districts, or pairs incumbents. *Id.* at 1077–79.

When he was asked how he could testify that a district was not reasonably configured without considering all traditional districting principles, Dr. Trende responded that he had considered all the evidence, including the "progression" of District 7 in Illustrative Plans 1, 2, and 3, and the "increasingly distended" shape of District 7 in each plan. *Id.* at 1009–10. For example, he testified, "If you are going to justify it from a communities of interest point of view, . . . the question is, well, why didn't you include those communities of interest in the district in the first go around?" *Id.* at 1009.

The Court acknowledges that other courts have excluded Dr. Trende's testimony, found it unhelpful, or assigned it limited weight. *See* Tr. 1055–56, 1068; *Singleton v. Allen*, No. 2:21-cv-1291-AMM & No. 2:21-cv-1530-AMM, 2025 WL

1342947, at *101 (N.D. Ala. May 8, 2025). But Dr. Trende explained that the circumstances that precipitated those findings are not present here, *see* Tr. 1055–56, 1068, and the Court agrees. And Dr. Trende offers only a limited opinion in this case in any event. Accordingly, the Court finds Dr. Trende's testimony reliable and assigns it the appropriate weight.

### 2. Huntsville

#### a. Visual Assessment and Traditional Districting Principles

The Court begins its reasonableness analysis of District 7 in Illustrative Plan 3 with a visual assessment. As Dr. Trende testified, "to a certain degree," the compactness analysis "is an eyeball test." *Id.* at 1021. Federal courts regularly use visual assessments to evaluate compactness. *See, e.g.*, *Vera*, 517 U.S. at 960; *Singleton v. Merrill*, 582 F. Supp. 3d 924, 1010–11 (N.D. Ala. 2022); *Singleton*, 2025 WL 1342947, at *130; *Ala. State Conf. of NAACP v. Alabama*, 612 F. Supp. 3d 1232, 1265 (M.D. Ala. 2020). After all, a court cannot evaluate whether a district is reasonably configured without looking at it.

A bizarrely shaped illustrative remedial district can be a powerful indicator that the minority population is too dispersed to create a reasonably configured majority-minority district, in which case Section Two does not require a remedial district. *Vera*, 517 U.S. at 980. That is, a "bizarrely shaped" district may reflect an attempt to "reach[] out to grab small and apparently isolated minority communities,"

*id.* at 979, and a district with tentacles, appendages, or fingers may reflect an attempt to "combine[] two farflung segments of a racial group with disparate interests," *LULAC*, 548 U.S. at 433.

The Secretary makes two intertwined arguments about the configuration of District 7 in Illustrative Plan 3: one about the geographic dispersion of the Black population in Huntsville, Doc. 251 ¶¶ 117, 139, and one about the irregular shape of the remedial district that the plaintiffs propose, *id.* ¶¶ 118, 128, 144; Tr. 1657. *First*, he argues that the illustrative district "reaches out and grabs at least five isolated clusters of [B]lack residents in Lawrence, Limestone, Madison, and Morgan counties." Doc. 251 ¶ 117 (internal quotation marks and brackets omitted). Dr. Trende testified that his dot density map (pictured below) demonstrates that there is not a compact Black population in the Huntsville area and that, at best, there are multiple Black populations "stitched together." Tr. 1020–21.

Figure 16: Fairfax Map 3, District 7. One blue dot = 10 Black residents of voting age



Doc. 189-8 at 22.

*Second*, Dr. Trende described District 7 in Illustrative Plan 3 as "a baby dragon with an overbite in flight." Tr. 1011; Doc. 189-8 at 18. In his illustration, the Secretary added an eye and mouth to Mr. Fairfax's illustrative map:



156

Doc. 166 at 33. The Secretary described the dragon district as having "hindquarters" that "twist away from Madison to capture the Redstone Arsenal and Huntsville International Airport," "wings" that "span from Athens in the [n]orth to Decatur in the [s]outh (carefully covering only portions of both cities)," and a "head and neck" that "protrude into the rural precincts west of Decatur." Doc. 251 ¶ 118.

In the Court's visual assessment, it sees the same bizarre shapes and appendages—themselves evidence of a noncompact minority population—that Dr. Trende does. Once the dragon shape is seen, it is hard to unsee, and it forecloses a description of the district as free from appendages.

The plaintiffs offer three responses to the Secretary's visual assessment. *First*, the plaintiffs assert that Dr. Trende's dot density map does not accurately reflect the dispersion of the Black population in the Huntsville area. Doc. 250 ¶¶ 219–21. *Second*, the plaintiffs assert that the "critique of" the "visual appearance" of District 7 in Illustrative Plan 3 "fails to rebut the conclusion that [it] is reasonably compact" because the district respects traditional districting criteria and Section Two does not require them to win a "beauty contest." *Id.* ¶¶ 631–32; Tr. 1641. And *third*, the plaintiffs assert that District 7 in Illustrative Plan 3 is "certainly not less visually compact than several districts enacted by the state," including District 7 in the Enacted Plan. Doc. 250 ¶ 637. In short, although the plaintiffs do not dispute that District 7 in Illustrative Plan 3 physically resembles a dragon, they argue that it is

reasonably compact despite its shape.

The Court discusses each response in turn. *First*, the Court rejects the attack on Dr. Trende's dot density maps. The plaintiffs argue that Dr. Trende's dot density maps "include rounding, so that if there are anywhere between [five] and [fourteen] Black VAP within a census block, the maps will portray one dot for that population." Doc. 250 ¶ 220. The Court is mindful of the limitations of Dr. Trende's dot density maps. But many maps require the use of some rounding or range as a unit of measurement, and the use of such metrics does not render the maps useless.

*Second*, the Court rejects the plaintiffs' argument about the shape of District 7 in Illustrative Plan 3. The plaintiffs argue that the shape of an illustrative district is not dispositive of compactness. *Id.* ¶ 635. They point out that "a district's shape can be affected by many acceptable considerations, such as following 'existing census block lines' or other boundaries, which can 'lend themselves to irregular shapes' and cause a district to 'look ragged in places.'" *Id.* (quoting *Houston v. Lafayette Cnty.*, 56 F.3d 606, 610, 611 & n.4 (11th Cir. 1995)).

More particularly, the plaintiffs attempt to explain some aspects of the shape of the district by reference to various traditional districting principles. They justify the shape of the dragon's head, core, and the district's crossing of the Tennessee River on the ground that Mr. Fairfax joined communities of interests by (1) combining Huntsville and Decatur and (2) including Alabama A&M University and

158

the entirety of Redstone Arsenal in the same district. *See id.* ¶¶ 241–42. And Mr. Fairfax attempted to justify the inclusion of Courtland and North Courtland—which are in the head of the dragon—based on various socioeconomic data. *See* Tr. 272.

Even assuming *arguendo* the validity of these explanations, they are only partial: the plaintiffs offer no justification for the dragon's wing, which extends into Athens, or its tail, which extends into Harvest. *See, e.g.*, *id.* at 271. And other evidence about traditional districting principles indicates that they cannot justify the shape of the district: Dr. Trende opined (and the plaintiffs do not dispute) that the proposed District 7 increases the number of county splits from nineteen in the Enacted Plan to twenty-one in Illustrative Plan 3, and that four of those county splits are in District 7. Doc. 189-8 at 31–32. Dr. Trende also testified that District 7 in Illustrative Plan 3 does not include any whole counties within it. Tr. 1038. The plaintiffs cannot rely on traditional districting principles to explain why four of the twenty-one county splits in Illustrative Plan 3 appear in only one of the thirty-five Senate districts.

*Third*, the Court rejects the plaintiffs' comparison between District 7 in Illustrative Plan 3 and District 7 in the Enacted Plan. The plaintiffs argue that District 7 in Illustrative Plan 3 is at least as "visually compact" as other districts included in the Enacted Plan, including District 7. Doc. 250 ¶ 637. But the Enacted Plan appears

below, and the plaintiffs did not identify (and the Court does not see) any district in it that can be fairly described as a flying dragon:



Doc. 195-19.

Furthermore, a close-up of District 7 in the Enacted Plan appears below, and although it is not perfectly regular, it cannot fairly be described as having bizarre shapes or concerning appendages:

160



Doc. 195-8.

In any event, although the Court must "perform a comparable compactness inquiry for" District 7 in the Enacted Plan and District 7 in Illustrative Plan 3, *see LULAC*, 548 U.S. at 430, the Enacted Plan is not subject to a *Gingles* analysis—only the plaintiffs have the burden to establish the preconditions, which are focused on their illustrative remedial district, *see Allen*, 599 U.S. at 18. The shape of District 7 in the Enacted Plan does not alleviate the Court's concerns about the dragon-like shape of District 7 in Illustrative Plan 3.

161

And at its core, the plaintiffs' comparative argument does not overcome the foundational issue that the Black population in the area of District 7 is geographically dispersed and non-compact. Indeed, for all their criticism of Dr. Trende's dot-density map that displays the dispersion of the Black population there, the plaintiffs have not presented evidence that reveals a fundamentally different dispersion.

Ultimately, the result of the Court's visual assessment is not merely about aesthetics. The evidence supports findings that (1) the shape of District 7 in Illustrative Plan 3, both on its own and compared to the shape of District 7 in the Enacted Plan, is bizarre and does not serve traditional districting principles; and (2) the shape of District 7 in Illustrative Plan 3, when combined with evidence of the dispersion of the Black population in the area, demonstrates that the Black population there is too scattered to form a voting-age majority in an additional reasonably configured district. Accordingly, the Court cannot find that its visual assessment of District 7 in Illustrative Plan 3 indicates that there is a sufficiently compact minority population there to constitute a voting-age majority in an additional reasonably configured district.

### b.    Geographic Compactness Scores

The Court next considers industry-standard geographic compactness scores for District 7 in Illustrative Plan 3. After an exhaustive analysis, the Court finds that these scores do not alter the conclusions drawn from the visual assessment.

Dr. Trende opined that Illustrative Plan 3 "decreases the compactness of the districts relative to those in the Enacted [Plan]." Doc. 189-8 at 24. Mr. Fairfax conceded that the mean scores of the Enacted Plan were "slightly better" than the mean scores of Illustrative Plan 3, Tr. 273, but he opined that those scores were "very close," Doc. 206-8 at 33. He opined that "[t]he difference between the means for [Illustrative Plan 3 and the Enacted Plan] is either .01 for the Polsby-Popper and Convex Hull measures and .02 for the Reock measure." Doc. 206-8 at 33.

But *Gingles* focuses the Court's attention on the compactness of the minority population in the proposed remedial district, not on the overall compactness of an entire plan. 478 U.S. at 50; *see Allen*, 599 U.S. at 18. The critical question is whether a remedial district can be reasonably configured in the challenged area. *See Allen*, 599 U.S. at 18.

So the Court turns to the compactness scores for District 7 in Illustrative Plan 3. Mr. Fairfax testified that based on his analysis of the scores, District 7 in Illustrative Plan 3 "performed better than the [E]nacted [P]lan's minimal or least compact" district. *See id.* at 273–74. The Secretary does not dispute Mr. Fairfax's conclusion that the scores for District 7 in Illustrative Plan 3 are better than the least compact district in the Enacted Plan; the Secretary simply points out that the compactness scores of District 7 "are near the bottom of the pile in [Illustrative] Plan 3." Doc. 251 ¶ 135.

The Court assigns no weight to the argument that District 7 in Illustrative Plan 3 earns better compactness scores than the least compact district in the Enacted Plan. That point compares the illustrative District 7 to some other district, which may have different geographic and population factors that explain its boundaries but have no relevance to District 7 and that, in any event, the Court has not considered. The plaintiffs cannot defend the configuration of their illustrative remedial district by referring to another district entirely, without some analysis of why that district is configured as it is and why that configuration provides an apt comparison.

The Secretary relies on Dr. Trende's testimony that District 7 in Illustrative Plan 3 performed worse on the Reock and Polsby-Popper scores than did District 7 in the Enacted Plan. *See* Doc. 189-8 at 25–26. Dr. Trende testified that the district's "tail," "wing," and "head" increased the perimeter of the district, making it "more narrow, less stocky, and with more appendages, and all those things are punished by the metrics." Tr. 1029.

Mr. Fairfax does not dispute this analysis. He conceded that District 7 in the Enacted Plan received "slightly better" compactness scores than District 7 in Illustrative Plan 3, but he said he considered the scores to be "[s]imilar." Tr. 273.

The Court cannot reconcile Mr. Fairfax's assertion of similarity with the obvious physical differences in the shape of the districts. Compactness scores are one tool for the Court to consider in its reasonableness analysis, and Mr. Fairfax's

assertion of similarity illustrates the peril of evaluating scores in a vacuum or assigning them dispositive weight.

Ultimately, the Court's comparative analysis of the compactness scores confirms the finding that the visual assessment indicated: that the Black population in the area of District 7 is too geographically dispersed to form a voting-age majority in an additional reasonably configured district. Accordingly, the Court finds that the plaintiffs have not demonstrated a Section Two violation in the Huntsville area.

### 3. Montgomery

#### a. Visual Assessment

The Secretary does not argue that Proposed District 25 contains bizarre shapes, appendages, or fingers. The Court's independent visual assessment of Proposed District 25 confirms that it does not include such irregularities. The reality that Proposed District 25 adheres to the boundary lines of Crenshaw County in their entirety, adheres to the entire southern boundary line of Montgomery County, and adheres to much of the eastern and western boundary lines of Montgomery County, forecloses a finding that Proposed District 25 is bizarrely shaped.

#### b. Geographic Compactness Scores

The Court has the benefit of expert testimony from only Mr. Fairfax about the geographic compactness scores of District 25. Mr. Fairfax opined that Proposed District 25 received better compactness scores on the Reock, Polsby-Popper, and

165

Convex Hull metrics than did District 25 in the Enacted Plan. Tr. 258; Doc. 206-6 at 46. Dr. Trende did not evaluate the compactness scores of Proposed District 25, *see* Tr. 1078, and the Secretary did not dispute Mr. Fairfax's calculations, nor his conclusion that Proposed District 25 outperforms District 25 in the Enacted Plan on these metrics.

### c.    Traditional Districting Principles

The Secretary's sole argument about the configuration of Proposed District 25 is that the illustrative district is not reasonably configured because it "subordinates traditional districting principles to racial considerations." Doc. 251 ¶ 145–57; *see* Tr. 1660. To support his argument that race predominated when Mr. Fairfax drew Proposed District 25, *see* Doc. 251 ¶¶ 145–57; Tr. 1660, the Secretary relies on Dr. Trende's assessment of the "shape of the district and how it[ is] carved out," Tr. 1031, and maintains that Proposed District 25 "contains a heavily concentrated [B]lack population in the north," but must "extend southward to pick up isolated rural [B]lack populations throughout the countryside" to reach a majority-Black status, Doc. 251 ¶ 156.

As the Supreme Court explained, "Section [Two] itself 'demands consideration of race.'" *Allen*, 599 U.S. at 30–31 (quoting *Abbott*, 581 U.S. at 587). Indeed, "[t]he question whether additional majority-minority districts can be drawn, after all, involves a 'quintessentially race-conscious calculus.'" *Id.* at 31 (quoting *De*

*Grandy*, 512 U.S. at 1020) (emphasis omitted)). Race predominates "when 'race-neutral considerations [come] into play only after the race-based decision had been made.'" *Id.* (quoting *Bethune-Hill v. Virginia St. Bd. of Elections*, 580 U.S. 178, 189 (2017)). To demonstrate that race predominated when drawing district lines, "challengers will often need to show that the . . . map conflicts with traditional redistricting criteria." *Alexander v. South Carolina State Conf. of the NAACP*, 602 U.S. 1, 8 (2024).

Three categories of evidence establish that race did not predominate in the preparation of Proposed District 25: (1) evidence about Mr. Fairfax's map-drawing process; (2) the configuration of Proposed District 25; and (3) Dr. Trende's opinion testimony. The Court discusses each category in turn.

*First,* the evidence about Mr. Fairfax's map-drawing process establishes that race did not predominate in his design of Proposed District 25. Mr. Fairfax testified that when he drew the plaintiffs' illustrative plans, he used the Enacted Plan as a starting point because "many times you want to leave as many districts as [possible] intact." *Id.* at 240; *see id.* at 264–65, 270, 277.

Further, Mr. Fairfax testified that he followed five traditional redistricting criteria when drawing the plans—equal population, respecting political subdivisions, compactness, contiguity, and preserving communities of interest. *Id.* at 244. He testified that he also attempted to follow other criteria found in the

Legislature's redistricting guidelines. *Id.* at 245. He testified that "[t]here are always tradeoffs" when drawing a map, and that he "balance[d]" the criteria in effort to create the "best plan" possible. *Id.* at 246–47.

Mr. Fairfax testified that he reviewed race at the beginning of the process to see "where the minority community exists" but then "turn[ed] it off." *Id.* at 242; *see id.* at 277–79. He acknowledged that he later checked the minority BVAP and BCVAP periodically "to see if [he] me[]t th[e] sufficiently large component." *Id.* at 280–81.

Further, Mr. Fairfax testified that he "tend[s] to not consider race as much as the other [redistricting] criteria" and "always use[s] the other criteria labels more than race." *Id.* at 241–42. Mr. Fairfax testified that when he prepared the illustrative plans he was not "toggling race and compactness" only, but "look[ed] at all of the criteria and trading off those," *id.* at 295, and he considered race only to see "where the minority community exists." *Id.* at 241–42.

Additionally, Mr. Fairfax unequivocally testified that he did not prioritize race over other factors when drawing the illustrative plans. *See id.* at 301. Having observed his manner of testifying, the Court credits this testimony, which is consistent with his other testimony about how he balanced traditional districting criteria.

Accordingly, nothing in Mr. Fairfax's explanation of his map-drawing process

causes the Court concern that he considered race-neutral criteria only after he made race-based decisions. Rather, his testimony about his order of operations supports a finding that his map-making process was race-aware to the degree the law allows.

*Second*, other evidence about Proposed District 25 confirms that race did not predominate in Mr. Fairfax's design of Proposed District 25. In drawing Proposed District 25, Mr. Fairfax created a new city split in Prattville in Senate District 26 (the existing majority-Black district in the Montgomery area), *id.* at 299, but he made the town of Pike Road whole in Proposed District 25, *id.* at 256; Doc. 206-6 at 36. And the Secretary contends that Proposed District 25 connects urban portions of Montgomery with rural areas in Crenshaw County, Tr. 1660, but Mr. Fairfax actually removed a county split by excluding portions of Elmore County that are included in District 25 in the Enacted Plan, *see* Doc. 206-6 at 36. In each of these ways, the configuration of Proposed District 25 reflects that Mr. Fairfax deferred to the Legislature's priorities of avoiding city and county splits. *See* Doc. 171–1. Indeed, as far as county splits go, Mr. Fairfax's map outperforms the Legislature's Enacted Plan.

Additionally, the boundaries of Proposed District 25 largely follow county lines. Proposed District 25 keeps Crenshaw County whole by following its boundary lines. It also keeps a majority of Montgomery County whole by following its entire southern boundary line and much of its eastern and western boundary lines. The

Court cannot square this level of adherence to county lines with the Secretary's suggestion that race predominated in the drawing of Proposed District 25.

The Secretary asserts that Mr. Fairfax's decision to connect Black Alabamians in west Montgomery with portions of Elmore County was "to achieve the racial goal of keeping [Senate District] 26 majority-[B]lack after moving [s]outheast Montgomery into [Senate District] 25." Doc. 251 ¶ 152. But the Secretary did not rebut Mr. Fairfax's race-neutral explanation for that decision. Mr. Fairfax testified that District "26 had to be expanded because it lost population, so [he] expanded it [in]to Elmore," Tr. 294, because District 26 "is somewhat landlocked," and that he "d[id] not want to cross over an additional county boundary," so his "logical choice" was "to move into Elmore" County, Tr. 297–98. Here again, the Court cannot square this adherence to county lines with the Secretary's insistence that race predominated in Mr. Fairfax's process.

*Finally*, the Court rejects the Secretary's assertion that race predominated in the preparation of Proposed District 25 because Dr. Trende's testimony does not support it. Dr. Trende did not opine that race predominated in Proposed District 25, and instead opined only that Mr. Fairfax "ha[d] to pick up isolated Black populations throughout the countryside." Doc. 189-7 at 29. And Dr. Trende did not address the race-neutral reasons for Mr. Fairfax's map-drawing decisions, such as removing a county split. This is in stark contrast to the extensive opinion testimony Dr. Trende

170

offered in support of the Secretary's attacks on District 7 in Illustrative Plan 3. Accordingly, the Court finds that the Secretary did not adduce any evidence, let alone sufficient evidence, that race predominated in the preparation of Proposed District 25.

Because all the evidence probative of the issue of race predominance establishes that Mr. Fairfax did not allow race to predominate when drawing Proposed District 25, the Court finds that Mr. Fairfax did not allow considerations of race to predominate in his preparation of Proposed District 25. The Court further finds that Mr. Fairfax's map-making decisions (1) respected traditional districting principles and (2) were consistent with the trade-offs of those principles that are permitted to create an illustrative, reasonably configured majority-minority district to satisfy *Gingles* I.

Accordingly, the Court finds that the plaintiffs have established the first *Gingles* precondition for their claim of vote dilution in the Montgomery area, and the Court proceeds to analyze the second and third preconditions in that area.

### C.    *Gingles* II and III – Racially Polarized Voting

As explained below, there is no serious dispute that Black voters are "politically cohesive," nor that the challenged districts' White majority votes "sufficiently as a bloc to usually defeat [Black voters'] preferred candidate." *Allen*, 599 U.S. at 18.

### 1.    Expert Credibility Determinations

<u>Dr. Liu</u>

As an initial matter, the Court credits Dr. Liu's testimony. The parties do not dispute that Dr. Liu's training and experience qualify him to testify as an expert. *See* Tr. 19–20. His professional and academic work has focused on voting patterns and "political methodology that allows scholars to study voting by using data collected at [the] aggregate level," *id.* at 16–17, and he has published extensively on the relationship between race and voting patterns, *see* Doc. 206-16 at 2; Doc. 206-17 at 2–8; Tr. 18–19. At trial, Dr. Liu consistently explained the work he performed in this case and the conclusions that he reached. He employed commonly accepted methodologies, and the Court discerns no reason to question his methods or conclusions. None of the Secretary's experts conducted a racial polarization analysis to contradict Dr. Liu's findings, and as explained below, many of his conclusions are not disputed. Accordingly, the Court finds Dr. Liu's opinions credible, reliable, and helpful.

<u>The Secretary's Experts</u>

Although the Court recites concessions by the Secretary's experts in its analysis of the second and third *Gingles* preconditions, because their testimony focuses on the Senate Factors, the Court defers its credibility determination until that discussion.

## 2.    Patterns of Racially Polarized Voting

The only expert to conduct a racially polarization analysis—Dr. Liu—found a "high level" of racially polarized voting in the Montgomery area. Doc. 206-16 at 8, 10; *see* Tr. 31–33. The Court credits Dr. Liu's testimony that has consistently emphasized the clarity and extremity of the pattern of racially polarized voting he observed in Alabama. Based on the exogenous elections he analyzed, he testified that "[B]lack candidates typically lost their elections" in Montgomery because of "the consistent and highly racially[]polarized voting pattern" there, and that when a Black-preferred candidate won an election in that area, "they tend to win the . . . supermajority [B]lack district[]" there—District 26. Tr. 33.

As he must, the Secretary concedes that "in general elections most [B]lack voters prefer Democratic candidates, and most [W]hite voters in both the challenged areas prefer Republicans," and that "Plaintiffs' evidence shows that [B]lack Alabamians in the . . . Montgomery area[] are politically cohesive." *Id.* at 1661; Doc. 251 ¶ 159.

In addition, the Secretary's experts acknowledge that Black voters tend to vote cohesively. *See, e.g.*, Doc. 189-9 at 4–6 (Dr. Reilly); Doc. 189-5 at 5–6 (Dr. Hood). Dr. Bonneau testified at trial that he does not dispute Dr. Liu's racially polarized voting findings, Tr. 1476, 1541, 1544, and Dr. Carrington testified that he did not dispute the existence of racially polarized voting in Alabama, *id.* at 1185.

173

In closing arguments, the Secretary conceded "[t]hat a majority of [W]hite voters . . . tend to support Republicans, a majority of [B]lack voters tend to support Democrats," and "[i]f that is all it takes for there to be racially[ ]polarized voting" in a district, the plaintiffs' have met their burden. *Id.* at 1695. He also conceded in post-trial briefing that "[p]laintiffs' evidence shows that [B]lack Alabamians in the Huntsville and Montgomery areas are politically cohesive" and that "[B]lack citizens in Alabama overwhelmingly support the Democratic Party." Doc. 251 ¶ 159.

The stipulated facts supply the only missing piece: that the candidates cohesively preferred by Black voters consistently (nearly invariably) are defeated by the White majority. *See* Doc. 230 ¶¶ 93, 94, 117; Doc. 250 ¶¶ 521, 522, 525. In his post-trial briefing, the Secretary attempts to dispute this reality, suggesting in passing that "in the absence of significant" White bloc voting, "it cannot be said that the ability of minority voters to elect their chosen representative is inferior to that of [W]hite voters." Doc. 251 ¶ 161 (quoting *Gingles*). Outside of Black-opportunity districts, Black Alabamians have nearly zero opportunity to elect candidates of their choice.

The Court thus finds from an overwhelming preponderance of the evidence that Black voters in Alabama are "politically cohesive," and that Montgomery's "[W]hite majority votes sufficiently as a bloc to enable it . . . to defeat the [Black] preferred candidate." *Allen*, 599 U.S. at 18.

174

Accordingly, the Court cannot accept the Secretary's assertion that when Dr. Liu conducted his ecological inference analysis, his decision to analyze only biracial elections "leads to selection bias and potentially erroneous conclusions." Doc. 251 ¶ 261 (internal quotation marks omitted). The consensus of the evidence and parties on the critical patterns (and the absence of a rebuttal expert from the Secretary) obviates any basis for the Court to address or accept methodological quibbles about how the ecological inference analysis would best be conducted.

Nor does the Court doubt the ecological inference method. Dr. Liu opined that ecological inference "has been widely used as the most[ ]advanced and reliable statistical procedure for [racially polarized voting] estimates in not only academic research but also voting rights cases in the last two decades." Doc. 206-16 at 4. Dr. Bonneau conceded that "ecological inference techniques are widely used and accepted by courts for [racially polarized voting] analysis," and that he did not know of another method that would better estimate racially polarized voting estimates. Tr. 1474. And in any event, the decision to analyze only biracial elections was not unique to Dr. Liu—Dr. Bonneau's analysis of voting patterns (discussed in connection with the Senate Factors, *see infra* Part V.D.2) is similarly focused on the race of the candidate, not the race of the voter. *See* Tr. 1529, 1542–43.

### 3. Arguments About Legally Significant Racially Polarized Voting and Dr. Trende's Effectiveness Analysis

The Secretary makes a novel legal argument that "White bloc voting in the . . . Montgomery area[] is not 'legally significant.'" Doc. 251 at 45 (emphasis omitted). Citing *Pierce v. North Carolina State Board of Elections*, 97 F.4th 194 (4th Cir. 2024), the Secretary asserts that "White bloc voting in the . . . Montgomery area[] is not 'legally significant' on this evidentiary record because there appears to be enough [W]hite crossover voting to obviate the need for court-ordered majority-minority districts." *Id.* ¶ 171. He argues that "[s]o long as additional majority-minority districts are not 'necessary for [B]lack-preferred candidates to win,' legally significant [W]hite bloc voting is absent." *Id.* ¶ 179 (cleaned up).

To support this argument, the Secretary relies on Dr. Trende's effectiveness analysis in which he concluded, without explanation, that "crossover voting is not as commonplace" in Montgomery but that Proposed District 25 would nevertheless "perform at less than [fifty percent] BVAP." Doc. 189-7 at 29.

Dr. Trende's effectiveness analysis of Proposed District 25 in his report is scant, consisting of only three sentences and a chart. *See id.* at 29–30. At trial, he offered little testimony to explain his analysis, methodology, or findings about the BVAP below which the Black-preferred candidate would not routinely win in District 25. *See* Tr. 1045–48. Dr. Trende admitted at trial that he did not analyze whether District 25 in the Enacted Plan has been performing for Black voters. *Id.* at 1048.

176

On the other hand, Dr. Liu explained that Dr. Trende "unrealistic[ally]" assumed that Black voters would unanimously support a Black-preferred candidate and that one-third of White voters would support the Black-preferred candidate, which is not supported by the data. *See* Doc. 206-18 at 10; Tr. 38–39. And Dr. Liu conducted an effectiveness analysis by comparing election results in eleven statewide elections in District 25 in the Enacted Plan with Proposed District 25. *See* Doc. 206-16 at 10–12. Dr. Liu found that, in all eleven elections, the Black-preferred candidate lost in District 25 in the Enacted Plan but won in Proposed District 25. *See id.* at 12; *id.* at 14 (Table 9).

Accordingly, the Court finds that Dr. Trende's effectiveness analysis does not overcome the reality that racially polarized voting exists in the Montgomery area. Alabama's patterns of racially polarized voting are stark, and Black candidates' nearly universal losing streak in statewide elections and legislative elections in Alabama (outside majority-Black or very nearly majority-Black districts) is long. In some jurisdictions, evidence may establish that statistically observable differences in Black and White voting patterns are of little practical or legal significance. Not in Alabama.

### 4.    Arguments About Party Politics

Finally, the Court turns to the Secretary's argument that patterns of racially polarized voting in Alabama are attributable more to political party affiliations than

to race. The Secretary relies on Dr. Bonneau to support this argument, but Dr. Bonneau conceded at trial that he does not dispute Dr. Liu's racial polarization findings. *See* Tr. 1476, 1541, 1544. Likewise, the Secretary relies on Dr. Hood, who opined that Black Alabamians vote cohesively. *See* Doc. 189-5 at 5–6.

Under controlling precedent, *see Allen*, 599 U.S. at 18, the second and third *Gingles* preconditions do not require that the Court disentangle party and race. They direct the Court to assess only whether Black voters in Alabama are "politically cohesive," and whether each challenged district's "[W]hite majority votes sufficiently as a bloc to enable it . . . to defeat the [Black] preferred candidate." *Id.* (quoting *Gingles*, 478 U.S. at 51). The Court sees those patterns clearly from the evidence and stipulations, a consensus of experts agrees that the patterns are present, and that concludes the *Gingles* analysis.

The Court considers causation in its analysis of the totality of the circumstances (particularly Senate Factor 2). *See infra* Part V.D.2. And the Court understands that the Secretary agrees with this approach. *See* Doc. 251 ¶ 217 (State's proposed order, explaining that Senate Factor 2 is not "redundant with the second and third *Gingles* preconditions" because "[t]here, the inquiry focused solely on how [B]lack and [W]hite voters voted. The focus . . . at the totality-of-circumstances stage

. . . is on evidence of causation . . . .'") (quoting *Ala. State Conf. of NAACP*, 612 F. Supp. 3d at 1291).[8]

## D.    The Senate Factors

The Court begins its analysis of the totality of the circumstances aware that "it will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of [Section] 2 under the totality of the circumstances." *Ga. State Conf. of NAACP*, 775 F.3d at 1342 (internal quotation marks omitted). Consistent with this reality and for the reasons explained below, the Court finds that the plaintiffs have established that on balance, the totality of the circumstances weighs in favor of their request for relief in the Montgomery area.

The Court begins with its credibility determinations and then analyzes the Senate Factors. The plaintiffs have not raised a proportionality argument, and the Court rests no part of its analysis on a proportionality assessment.

### 1.    Credibility Determinations

<u>Dr. Bagley</u>

---

[8] *See also, e.g.*, *Pierce*, 97 F. 4th at 223; *United States v. Charleston Cnty., S.C.*, 365 F.3d 341, 347–49 (4th Cir. 2004); *Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1225 (11th Cir. 2000); *Lewis v. Alamance County*, 99 F. 3d 600, 615 n.12 (4th Cir. 1996); *Nipper*, 39 F.3d at 1536.

The Court credits much of Dr. Bagley's testimony. The parties do not dispute that Dr. Bagley's training and experience qualify him to testify as an expert. *See* Tr. 528. Dr. Bagley's credentials and familiarity with Alabama qualify him to opine on Alabama-specific matters. *See id.* at 525–28; Doc. 206-19 at 1; Doc. 206-20 at 1–2. Much of his research and writing have focused on Alabama, and he has experience testifying as an expert witness in voting rights cases, including in Alabama. *See* Tr. 525–28; Doc. 206-20 at 1–2.

At trial, Dr. Bagley walked back several overstatements in his report. *See, e.g.*, Tr. 589, 595, 615–16. These do not cause the Court to regard his testimony as unreliable or assign it little weight. In general, the Court found Dr. Bagley's opinions well-supported, and he was able to explain the basis for his conclusions. When he was confronted with an imprecise or overbroad statement, he responded candidly and fairly rather than dogmatically. *See, e.g.*, *id.* at 595. The Court has not relied on any opinion identified as an overstatement and finds each statement it relies on credible and helpful.

<u>Dr. Burch</u>

Likewise, the Court credits much of Dr. Burch's testimony. The parties do not dispute that her training and experience qualify her as an expert. *Id.* at 667. Dr. Burch's opinions and testimony were thorough, consistent, and generally well-supported with applicable social science literature and Alabama-specific data.

Throughout her testimony, including cross-examination, she had no difficulty articulating the basis for her opinions. Although the parties dispute the inferences the Court should draw from her data, her data are not in dispute. *See, e.g.*, *id.* at 819–20 (Dr. Reilly).

As with Dr. Bagley, the Court does not adopt or make findings about all of Dr. Burch's testimony because the Court need not accept all of it to make findings and draw conclusions. The Court finds all the statements it relies on credible and helpful.

<u>Dr. Hood</u>

The parties do not dispute that Dr. Hood's training and experience qualify him to testify as an expert. *See* Tr. 1218. His extensive published scholarship focuses on "electoral politics, racial politics, election administration, and Southern politics," Doc. 189-5 at 2, and he has qualified as an expert in multiple redistricting cases, including in Alabama, Doc. 189-5 at 2; *see* Tr. 1216–18.

But in three of those cases, Dr. Hood was impeached with his own academic publications, which stated that race was and is a driving force behind party politics in the South, directly contradicting his litigation opinion that voting patterns in Alabama are driven by party more than by race. *See Singleton*, 2025 WL 1342947, at *149–50. In this case, as in those cases, it is difficult to reconcile Dr. Hood's testimony with his published scholarship. At trial, Dr. Hood testified that "Alabama

was included" in the data he used in his 2015 article about White support for minority Republican candidates ("True Colors"). Tr. 1253–55. But at the trial in the Alabama congressional districting cases (which occurred after the trial in this case), Dr. Hood conceded that True Colors "did not consider any Alabama races" and "make[s] no specific findings as to [W]hite voter support for Black Republican candidates." *Singleton*, 2025 WL 1342947, at *149. And he conceded in those cases "that the article concludes that '[a]t a minimum, the level of [ideological] polarization in American politics masks racially prejudiced voting behavior and, at a maximum, it renders it inoperable because White conservatives view recent minority Republican nominees as at least as conservative as White GOP nominees, and their level of support reflects this.'" *Id.*

Nevertheless, out of an abundance of caution, the Court gives Dr. Hood every benefit of the doubt in this case. The impeachment evidence from the Alabama congressional redistricting litigation is not in the record in this case. Accordingly, the Court credits some aspects of Dr. Hood's testimony as specified below. Ultimately, it cannot credit his testimony about the impact of party and race on voting patterns in Alabama because (1) his findings improperly draw broad conclusions from very limited, atypical data, and (2) the Court cannot reconcile this testimony with the reality of election results in the state as stipulated by the parties.

Dr. Hood's findings are based in large part on one election in one district in

182

an area of the state not at issue in this case: the election of Representative Paschal, a Black Republican, from a majority-White district in Shelby County. *See* Tr. 1254–55; Doc. 189-5 at 21. But it is a gross understatement to say that this election is atypical—Dr. Hood conceded that Representative Paschal was the first Black Republican elected to the Legislature since Reconstruction, Tr. 1255, and Representative Paschal remains the only Black Republican in the Legislature. Accordingly, although the Court does not diminish the importance of Representative Paschal's election, that election does not support a finding that voting in Alabama, particularly in the Montgomery area at issue, is more about party than race.

Further, Dr. Hood's testimony does not match reality in Alabama. It is undisputed that no elected Black officials serve in a statewide office, Black Republican candidates in many 2024 primary elections garnered less than ten percent of the vote, and the only Black Alabamians elected to Congress since the start of the twentieth century were elected by Black-opportunity districts. *See* Doc. 230 ¶¶ 93, 107, 109, 111. It is also undisputed that in 2025, all Black Senators and all but one Black Representative (Representative Paschal) were elected by majority-Black districts. *Id.* ¶ 117. Dr. Hood's testimony does not align with these statistics and does little to account for them. Accordingly, the Court cannot credit Dr. Hood's opinion that voting in Alabama is driven by party and not race.

Dr. Bonneau

183

The Court credits Dr. Bonneau's testimony. The parties do not dispute that his training and experience qualify him to testify as an expert. *See* Tr. 1401. His opinions were clear and consistent throughout his testimony, and (unlike some of the Secretary's other experts) he relied on Alabama-specific data. Doc. 189-1 at 1. The Court observed Dr. Bonneau's demeanor as he testified, he was careful not to overstate his opinions, and he acknowledged that the small number of elections he studied limited them. Tr. 1513 ("You have got to go to war with the data you have got, not the data you want."). When confronted with an error in his report, he acknowledged it and testified candidly about its effects on his conclusions. *See, e.g.*, *id.* at 1413–14; 1532–33. And when he used data only for a limited purpose, he explained that. *See id.* 1499–1500, 1534–35. Accordingly, the Court finds his testimony reliable and helpful.

### Dr. Reilly

The Court assigns very little weight to Dr. Reilly's testimony for three reasons. *First*, most of Dr. Reilly's opinions do not focus on and are not about Alabama. Dr. Reilly admitted at trial that his expertise and academic research are not focused on Alabama, *id.* at 817–18, and that in his report about racial socioeconomic gaps, he chose not to examine Alabama-specific data, *see id.* at 824–27.

*Second*, Dr. Reilly repeatedly offered opinion testimony without support. The

Court distinguishes these opinions from overstatements because their underlying support was unreliable or completely absent. For at least one assertion in his report, he cited only websites (Wikipedia, Quora, and Reddit) with no scholarship or peer-reviewed backup. Doc. 189-9 at 11 n.19. When asked whether a source for an opinion was included in his report, he stated that he was "[n]ot sure" and relied on a non-peer reviewed article that "cites some research on that point." Tr. 827–28. Standing alone, Dr. Reilly's refusal to limit himself to well-founded opinions forecloses the Court's reliance on his testimony.

And *third*, the Court observed Dr. Reilly's demeanor at trial, particularly when he was cross-examined, and found that it was dogmatic, defensive, and deliberately confrontational. His manner of testifying left the court with the impression that his goal was to be evocative rather than reliable.

Dr. Reilly testified about some of his social media posts, and that testimony confirms this impression. For example, he posted that "people in the hood" understand the "same taste[s] and drives" as Neanderthal rapists, and tried to qualify the post by stating that he did not mean the term "hood" in "an entirely racial sense." *Id.* at 838–40, 847. And Dr. Reilly's apparent surprise that the plaintiffs' "pa[id] a lot of attention" to his social media posts and overall credibility further diminishes the Court's willingness to credit his testimony and assign it great weight. *Id.* at 840.

For these reasons, the Court does not find Dr. Reilly's methods or conclusions reliable or helpful.

Dr. Carrington

The Court assigns no weight to Dr. Carrington's testimony. Dr. Carrington offered opinions about "the historical development of party affiliations among Alabama voters from comprising the core of the Democratic 'Solid South' to becoming a dependably Republican state." Doc. 189-3 at 1; *see* Tr. 1131–32. But he conceded that his education "did not have a particular focus on the American South," he has never taught courses relating to Alabama politics or history, and he is not an expert in Alabama politics or history. Tr. 1132–33, 1172. He has published two articles relating to Alabama in the nineteenth century, but no other work about Alabama. *Id.* at 1132.

At the outset, Dr. Carrington's very limited familiarity with Alabama history and politics greatly reduced the potential value of his testimony in the Court's "intensely local appraisal of the electoral mechanism[s]" in Alabama. *Allen*, 599 U.S. at 19 (internal quotation marks omitted) (quoting *Gingles*, 478 U.S. at 79). He exacerbated this limitation by making little to no effort to learn about Alabama before opining about party affiliations here.

Dr. Carrington admitted that he did not conduct an Alabama-specific analysis of state elections for his report. *See* Tr. 1133, 1189–90. Nor did he study how any of

the factors that he identified as contributing to party realignment in the South impacted the party realignment in Alabama. *See id.* 1188–89. He opined about "the sixth [Senate] factor, which confronts the question of whether or not . . . political campaigns have been characterized by overt or subtle racial appeals," Doc. 189-3 at 2 (internal quotation marks omitted), but he conceded that he did not evaluate any Alabama campaign materials aside from those Dr. Bagley identified, Tr. 1176–77. Dr. Carrington put forth so little effort to learn about Alabama that he opined about segregationist viewpoints and party affiliations, but with no knowledge of numerous relevant prominent civil rights figures from Alabama. *See id.* at 1192, 1203.

Dr. Carrington's willingness to opine about Alabama without first learning about Alabama extends beyond the courtroom. Before he was retained as an expert in this case, he authored an opinion piece calling the Supreme Court's ruling in the Alabama congressional redistricting litigation a "missed opportunity." *Id.* at 1209–11. On cross-examination about the piece, he distinguished his work as an op-ed columnist from his scholarly work. *Id.* at 1211.

Dr. Carrington's lack of relevant expertise, together with his carelessness, forecloses the Court's reliance on his testimony.

### 2.   Senate Factor 2

**"[T]he extent to which voting in the elections of the state or political subdivision is racially polarized." *Gingles*, 478 U.S. at 37.**

The Court has already found that voting in the challenged districts is starkly

and intensely racially polarized, and that finding is based on substantial evidence, concessions, and the material agreement of the Secretary's experts. *See supra* Part V.C. In his Senate Factor 2 argument, the Secretary urges this Court to examine the cause of that pattern and find that it is attributable to party politics, not racial causes. *See* Tr. 1667; Doc. 251 ¶ 219. The Secretary draws on case law warning courts that patterns do not tell the whole story of how voters vote because "what appears to be bloc voting on account of race may, instead, be the result of political or personal affiliation of different racial groups with different candidates." *Solomon*, 221 F.3d at 1225; *see* Doc. 251 ¶ 219.

But when the Court looks past the pattern in this case, it sees no evidence that only party politics are at work. *First*, the Secretary offers Dr. Hood's testimony to suggest that "[r]acial polarization in Alabama is a product of political partisanship, not racial bias." Doc. 251 at 60 (emphasis omitted); *see id.* ¶¶ 226–27, 244–46. The Court has already explained that the basis for Dr. Hood's testimony is quite limited. *See supra* Part V.D.1.

*Second*, the Secretary offers the testimony of Dr. Bonneau that based on his review of the evidence, "the explanation for the results in Alabama are far more consistent with political party" than race. Tr. 1460, 1543; *see* Doc. 189-1 at 17. Dr. Bonneau examined certain elections and straight-ticket voting. *See generally* Doc. 189-1.

But the Court finds Dr. Bonneau's evidence limited and the Secretary's arguments from it overdrawn. Dr. Bonneau's selected data included certain judicial elections in the state (which he has studied before, and which analysis contained an error that reversed his conclusions, *see* Tr. 56–57, 1413, 1517), two rounds of state legislative elections in 2022 (one of which was flagged by counsel, *id.* at 1520, and with a focus on the election of Representative Paschal, whose success Dr. Bonneau acknowledged as "rare," *id.* at 1521), and the 2018 election of Bill Lewis to a circuit judgeship in Alabama state court (which was flagged for him by counsel and which he acknowledged as "unusual," *id.* at 1523–24). *See* Doc. 189-1. Between limitations and flaws, the Court does not see that this limited subset of data has the potential to tell the Court very much about how to view the relative influence of race and party in modern Alabama legislative elections.

The Court also sees significant limitations on Dr. Bonneau's opinions about straight-ticket voting—that approximately two-thirds of Alabamians vote by "straight ticket," and "[t]he prevalence of straight ticket voting means that most voters are voting for a *political party*, not a candidate." Doc. 189-1 at 4; *see* Tr. 1424–26. As Dr. Liu pointed out, "Dr. Bonneau does not explain whether he has any knowledge of these voters directly, nor the racial identities of these straight-ticket voters nor localities/precincts the[] voters resided in." Doc. 206-18 at 4; *see* Tr. 56. And even Dr. Bonneau acknowledged that he could not rule out that Black

189

candidates were penalized at the polls on account of race. *See* Tr. 1530. Ultimately, Dr. Bonneau's limited evidence simply does not support the Secretary's assertion that it has "presented substantial evidence that a majority of [W]hite voters in Alabama vote against minority-preferred candidates not for racial reasons, but for partisan and ideological ones." Doc. 251 ¶ 223.

*Third*, in connection with the Secretary's reliance on Dr. Bonneau, the Secretary relies on a recent case involving a Section Two challenge to Alabama's at-large process for electing appellate judges: *Alabama State Conference of the NAACP v. Alabama*, 612 F. Supp. 3d 1232 (M.D. Ala. 2020). That court found that Alabama is a "ruby red" state, which has made it "virtually impossible for Democrats – of any race – to win statewide in Alabama in the past two decades." *Id.* at 1291. But that finding was based on an evidentiary record that is absent here. And read in context, that finding does not stand for the broad proposition that racially polarized voting in Alabama is always simply party politics; rather, it supports the more limited proposition that in that case, "the notion that African-American candidates lose solely because of their skin color [wa]s not supported by the evidence." *Id.* at 1293.

Further, the Court is not looking at a record about two decades' worth of racially polarized voting in selected judicial elections. This record demonstrates a near-total absence of Black Alabamians in statewide office and legislative office

(outside of Black-opportunity districts) that dates all the way back to Reconstruction. Accordingly, the Court cannot reach the same conclusion that the *Alabama State Conference of the NAACP* court reached, and it cannot assign the weight to its conclusion that the Secretary urges us to assign.

*Fourth*, the Secretary relies on the recent election of Representative Paschal from a majority-White Alabama House district and the success of other Black Republicans in the state. *See, e.g.*, Doc. 251 ¶¶ 243–45 (Representative Paschal); *id.* ¶ 247 (then-Judge Bill Lewis); *id.* ¶ 248 (Bill McCollum); *id.* ¶ 249 (Valerie Branyon). The Court does not diminish the inherent significance of Representative Paschal's unusual election, but one election of one Black Republican from one majority-White district in 150 years is hardly a sufficient basis for the Court to find that patterns of racially polarized voting are caused by party more than race. Dr. Bonneau cannot help but agree. Tr. 1521–22.

The Secretary also relies on lay witness testimony of three Black Republicans, but this evidence is similarly limited. Doc. 251 ¶¶ 248–52. Only one of those individuals, Cedric Coley, lived and voted in the Montgomery area. Further, Mr. Colely was unsuccessful in his campaign as a Republican and received only approximately nineteen percent of the vote in the primary election. *See* Tr. 1330.

Both Mr. McCollum and Ms. Branyon have been successful in either primary or general elections as Republican candidates in Fayette County, *see id.* at 1367 (Mr.

191

McCollum); *id.* at 850–51 (Ms. Branyon), but the Secretary offers no evidence for the Court to draw a larger inference that these two Black Republicans—neither of whom live or were elected in the Montgomery area—are evidence of a larger pattern of a lack of political cohesion among Black Alabamians. This absence of evidence makes sense—even Ms. Branyon testified that Black voters encouraged her to run for office as a Democrat. *Id.* at 876–77.

Dr. Bonneau also testified about the victory of Philip Ensler, a White Democrat, over a Malcolm Calhoun, a Black Democrat, in a majority-Black district in the 2022 House of Representative election. *See id.* at 1519–21; Doc. 189-1 at 10. Dr. Bonneau testified that this election is "[a]nother indication that race is not the driving force behind vote choice" in Alabama. Doc. 189-1 at 10. But he again conceded on cross examination that this election result is a "rare." Tr. 1520.

The Court cannot reconcile the Secretary's assertion that White voters are willing to support minority candidates in large numbers with political reality. If the Secretary were right about this, Representative Paschal, then-Judge Lewis, Mr. McCollum, Ms. Branyon, and Representative Ensler would not be rare, and they or someone similarly situated would have a role and presence in the area of the challenged district in this case.

Ultimately, the rarity of Black electoral success in Alabama tells the Court that the Secretary may be substantially overstating White voters' willingness to

support minority candidates, particularly in Montgomery. This inference is consistent with record evidence in several respects. *First*, Dr. Liu testified about two Montgomery-area elections that provide insight about White support for Black candidates in both political parties—the 2024 Republican primary for the Montgomery County Commission District 3 and in congressional District 2. *See* Doc. 206-18 at 3. In the 2024 Republican primary for the Montgomery County Commission, "Justin Castanza, a [W]hite candidate, ran against Cedric Coley, a Black candidate" and "Castanza won the Republican nomination with 80.38% of the votes cast." *Id*. In the 2024 Republican primary in congressional District 2, Dr. Liu explained that the four Black candidates finished behind the four White candidates, and the four Black candidates "together received only 6.2% of the total vote," which suggests that White Republicans are not willing to support minority candidates in large numbers. *Id.*

*Second*, several stipulated facts are to the same effect: (1) "In the 2024 Republican primary election for Alabama's U.S. Congressional District 3, Black candidate Barron Rae Bevels finished in third place behind two [W]hite candidates, receiving 5.6% of the vote."; (2) "In the 2024 special Republican primary election for Alabama State House District 27, Black candidate Billy Ray Todd finished fifth of six[th], behind four [W]hite candidates, receiving 8.7% of the vote."; (3) "In the 2022 Alabama Republican U.S. Senate primate, Black candidate Karla DuPriest

finished fifth behind four [W]hite candidates, receiving 0.9% of the vote." Doc. 230 ¶¶ 107, 109, 111.

*Third*, the Court heard substantial evidence suggesting that race is a driving factor in Black Alabamians' party affiliations and voting patterns. More particularly, this evidence concerned the high percentage of Black Alabamians' who agree with traditionally Republican stances on social issues like abortion or same-sex marriage, but who nevertheless vote overwhelmingly for Democratic candidates. For instance, Dr. Bagley testified that "roughly half of Alabama's [B]lack citizens oppose abortion in nearly all cases" and that "a substantial number of [B]lack Alabamians oppose same-sex marriage." Tr. 564. He testified that if such social issues were the primary factors driving voting, "we would expect to see a concomitant number of [B]lack voters in Alabama voting Republican. And we don't." *Id.* at 564–65; *see* Doc. 206-21 at 14. The Secretary's expert on this issue, Dr. Carrington, acknowledged but could not explain this phenomenon. *See* Tr. 1152–62.

Notably, lay witnesses for the Secretary, Ms. Branyon and Mr. McCollum, testified that they align with the Republican party because of their values. *See id.* at 851–52 (Ms. Branyon's testimony that she identifies as a Republican in part because of her religion and beliefs about abortion and same-sex marriage); *id.* at 1356 (Mr. McCollum's testimony that he aligns with the Republican party because of "conservative values"). But as explained above, there is no evidence that Mr.

McCollum and Ms. Branyon are examples of a broader trend of Black participation in the Republican party in Alabama, much less in Montgomery.

The Secretary urges the Court to focus on the voting patterns of White Alabamians. He argues that "White voters are the appropriate focus because it is their voting behavior, as that of the majority group, that allegedly causes [B]lack-preferred candidates to lose elections." Doc. 251 ¶ 267. The Secretary relies on Dr. Carrington's testimony about the party shift in the South that, he says, occurred because of "respective positions on non-racial issues—namely, economics, foreign policy, religion, abortion, and LGBTQ rights." *Id.* ¶ 271 (citing Doc. 189-3 at 21–29). But as explained above, the Court assigns no weight to Dr. Carrington's testimony. *See supra* Part V.D.1.

Further, the Secretary cannot have it both ways. The Court cannot consider the Secretary's argument that Black-preferred candidates do not enjoy success in Alabama elections because they run as Democrats without also considering the reasons why Black Alabamians are overwhelmingly politically cohesive in their affiliation with the Democratic party. In any event, the evidence described above simply does not support a finding that White voters vote for Black-preferred candidates or Black candidates, particularly in the Montgomery area, where the Court conducts its "intensely local appraisal." *Allen*, 599 U.S. at 19 (quoting *Gingles*, 478 U.S. at 79).

Finally, acknowledging that race plays a key role in party attachments keeps the controlling legal standard honest and workable. It would be deeply contradictory for that standard to demand political cohesion in a minority group for the second and third *Gingles* preconditions, then deny Section Two relief based on that same cohesion because party politics tilt Senate Factor 2 against the minority group. Put differently, the Court's analysis is not confounded by partisanship based on race. As the Court understands it, *Gingles* accounts for partisanship based on race in its demand for political cohesion among the minority group, which will be absent in times or places where party affiliations are driven primarily by something other than race.

The Court understands the statutory command about the totality of the circumstances as an instruction to look at the whole picture, not as permission (let alone a requirement) to carve it up into parts and examine each part in isolation from the others. When the Court considers the whole picture, it cannot understand the patterns it sees as mere party politics. It acknowledges the well-known reality that party affiliations drive voting patterns, but it understands this evidentiary record as indicating that the Court cannot separate voters' racial considerations from their party affiliations, and that it must not ignore the role that voters' race plays in their partisan attachments. Accordingly, the Court finds that when it looks at racial cleavages in voting patterns in Alabama, what it sees is appropriately described as

196

racially polarized voting, and Senate Factor 2 weighs in favor of the plaintiffs.

### 3. Senate Factor 7

**"The extent to which members of the minority group have been elected to public office in the jurisdiction."** *Gingles*, 478 U.S. at 37.

The Court has little difficulty finding that Senate Factor 7 weighs heavily in favor of the plaintiffs.

Four jointly stipulated facts do most of the heavy lifting here:

93. There are currently no Black statewide elected officials in Alabama regardless of political party. Judge Lewis is a Black statewide official, but he was appointed to his position in 2024 and has not run in any election for that office.

94. Only one Black person has ever been elected to statewide office in a contested election in Alabama. In 1982 and 1988, the late Justice Oscar W. Adams, Jr. was elected in contested elections to two consecutive terms, after first being appointed. In 1994, Justice Ralph D. Cook won an unopposed statewide election, after first being appointed.

117. In 2024, 20.0% of State Senate seats and 24.8% of State House seats in Alabama are held by Black legislators. All but one of these Black House members are elected from majority-Black districts. All Black Senators are elected from majority-Black districts.

102. Since the start of the Twentieth century, Alabamians have never elected a Black person to Congress outside of the majority-Black district 7, and only since 1992 when a court order first established district 7 as a majority-Black district.

Doc. 230 ¶¶ 93–94, 102, 117. Since the time that the parties filed their jointly stipulated facts, a Black Alabamian won a seat in the United States House of

Representatives in District 2—a Black-opportunity district that was the result of Section Two litigation in the Alabama congressional districting cases.

The Secretary does not dispute that "Blacks have not been winning statewide elections in Alabama," but argues that this phenomenon is "because they have tended to run as Democrats," Tr. 1671—an argument that this Court has already rejected. *See supra* Part V.C.4. The Secretary does not (because he cannot) rebut the reality that Black Alabamians enjoy zero success in statewide elections, and near-zero success in legislative elections outside of Black-opportunity districts protected by federal law.

To be sure, Black Alabamians have made progress in electoral success. Dr. Hood reported that there were no Black Senators or Representatives in the Legislature in 1965, there were three Black Senators and thirteen Black Representatives in 1981, and there are currently seven Black Senators and twenty-six Black Representatives. Doc 251 ¶ 375 (citing Doc. 189-5 at 22).

But just as the Court refused to evaluate Black voters' partisan affiliations in a vacuum, it refuses to evaluate their electoral gains in a vacuum. Every gain in congressional elections has come as a result of federal law (primarily Section Two), and even Dr. Hood acknowledges that the reality is much the same for the gains in state legislative elections. *See* Tr. 1258–60. Accordingly, the Court rejects the Secretary's argument that Senate Factor 7 "has at best limited applicability to this

case." Doc. 251 ¶ 371. Senate Factor 7 weighs decidedly in favor of the Plaintiffs.

### 4.    Senate Factors 1, 3, and 5

**Senate Factor 1: "The extent of any history of official discrimination in the state . . . that touched the right of the members of the minority group to register, to vote, or otherwise participate in the democratic process."** *Gingles*, **478 U.S. at 36–37.**

**Senate Factor 3: "The extent to which the state . . . has used . . . voting practices or procedures that may enhance the opportunity for discrimination against the minority group."** *Id.* **at 37.**

**Senate Factor 5: "The extent to which members of the minority group in the state . . . bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate effectively in the political process."** *Id.*

The Court analyzes these three Senate Factors together because much of the evidence that is probative of one of them is probative of more than one of them. Alabama's history of racial and voting-related discrimination is undeniable and well documented. The Secretary argues that Alabama has come a long way, but the question before the Court is more pointed: has it come far enough for these factors to be neutral or to weigh in favor of the Secretary?

The Court is keenly aware of the instruction that "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Abbott*, 585 U.S. at 603 (internal quotation marks omitted). It should be apparent that the Court does not assign Alabama's shameful history dispositive weight, and it does not grant Section Two relief simply because it condemns past

discrimination. The Court has carefully considered an extensive record about both past and present discrimination, and a wealth of expert analysis of recent data about Black Alabamians' lives and voting patterns, along with other evidence.

All the evidence about Senate Factors 1, 3, and 5 tells the same story: official discrimination on the basis of race has affected Black Alabamians' lives and political participation for a long time, and it continues to affect Black Alabamians' lives and political participation today. The Court first discusses the parties' stipulated facts that bear on these Senate Factors, then considers relevant Alabama litigation history, then considers the lay testimony that offered firsthand recollections about official discrimination, and then considers the expert testimony about socioeconomic disparities and their impact on political participation.

<u>Stipulations</u>

The parties' stipulated description of at least two instances of official discrimination that bear on Senate Factors 1 and 3: (1) "After the 2010 census, Black voters and legislators successfully challenged [twelve] state legislative districts as unconstitutional racial gerrymanders. *See Ala. Legis. Black Caucus v. Alabama*, 231 F. Supp. 3d 1026, 1348–49 (M.D. Ala. 2017)[,]" Doc. 230 ¶ 70; and (2) "More recently, a three-judge panel preliminarily enjoined two different congressional districting plans that had been adopted by the Alabama Legislature following the 2020 census. The three-judge court found that both the Legislature's 2021 plan and

2023 plan likely violate the Voting Rights Act, *see Milligan v. Merrill*, 582 F. Supp. 3d 924 (N.D. Ala. 2022), and *Milligan v. Allen*, 690 F. Supp. 3d 1226 (N.D. Ala. 2023)[,]" Doc. 230 ¶ 71. The parties jointly acknowledge that "[t]he former decision was upheld in full by the U.S. Supreme Court, *see Allen v. Milligan*, 599 U.S. 1, 22 (2023), and the latter was left in place after the Court declined to stay the injunction, *see Allen v. Milligan*, 144 S. Ct. 476 (2023)." Doc. 230 ¶ 71.

More recently, the three-judge court found that the Legislature's 2023 plan violated Section Two and that the Legislature intentionally discriminated against Black Alabamians by refusing to enact a plan with an additional Black opportunity district that the district court and the Supreme Court said was required. *See Singleton*, 2025 WL 1342947, at *125–71, 194–213.

<u>Alabama's Litigation History</u>

The Court next makes findings based on judicial precedents in Alabama:

- Prior to 1960, the Legislature failed to reapportion for 50 years. As a result, Alabama's entire legislative apportionment scheme was struck down for violating the principle of one person, one vote. *Reynolds*, 377 U.S. at 568. On remand, a three-judge court found that, in devising remedial maps to correct the malapportionment, the "Legislature intentionally aggregated predominantly Negro counties with predominantly [W]hite counties for the sole purpose of preventing the election of Negroes to [State] House membership." *Sims*, 247 F. Supp. at 109.

- Following *Reynolds* and the 1970 Census, the Legislature again failed to redistrict and a three-judge federal court was forced to draw new district lines. *Sims*, 336 F. Supp. at 940. The court rejected the Alabama Secretary of State's proposed map because of its racially "discriminatory effect" on Black voters. *Id*. at 936.

- In the 1980s, the United States Attorney General denied preclearance under the Voting Rights Act to maps drawn by the Legislature to redistrict State House and Senate maps because of their discriminatory effect on Black voters in Jefferson County and the Black Belt. Letter from Wm. Bradford Reynolds, Assistant Att'y Gen., C.R. Div., U.S. Dep't of Just., Hon. Charles A. Graddick, Ala. Att'y Gen. (May 6, 1982), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/AL-1520.pdf. Shortly thereafter, a three-judge court rejected Alabama's proposed interim remedial state maps in part because Alabama's maps "had the effect of reducing the number of 'safe' [B]lack districts" in and near Jefferson County. *Burton v. Hobbie*, 543 F. Supp. 235, 237 (M.D. Ala. 1982).

- After the 1990 census, the State entered a consent decree to resolve a Voting Rights Act lawsuit filed on behalf of Black voters. *See Brooks*, 631 So. 2d at 884.

- In 1986, a federal court found that the state laws requiring numbered posts for nearly every at-large voting system in Alabama had been intentionally enacted to dilute Black voting strength, and that numbered posts had the effect of diluting Black voting strength in at-large elections. *Dillard v. Crenshaw County*, 640 F. Supp. 1347, 1357 (M.D. Ala. 1986). The court also found that from the late 1800s to the 1980s, Alabama had purposefully manipulated the method of electing local governments as needed to prevent Black citizens from electing their preferred candidates. *See id*.

- Federal courts recently ruled against or altered local at-large voting systems with numbered posts created by the Legislature to address their alleged racially discriminatory purpose or effect. *See, e.g.*, *Jones v. Jefferson Cnty. Bd. of Educ.*, No. 19-CV-01821, 2019 WL 7500528, at *2, *4, 2019 U.S. Dist. LEXIS 223556, at *9 (N.D. Ala. Dec. 16, 2019); *Ala. State Conf. of the NAACP v. City of Pleasant Grove*, No. 18-cv-02056, 2019 WL 5172371, at *1, 2019 U.S. Dist. LEXIS 179206 (N.D. Ala. Oct. 11, 2019).

- The Supreme Court struck down Alabama's discriminatory misdemeanant disfranchisement law, *Hunter v. Underwood*, 471 U.S. 222, 225 (1985), and a state law permitting certain discriminatory annexations, *City of Pleasant Grove v. United States*, 479 U.S. 462, 466–67, 472 (1987).

- Since the decision in *Shelby County v. Holder*, federal courts have ordered more than one political subdivision in Alabama to be bailed back into preclearance review under Section 3(c) of the Voting Rights Act. *See Jones*,

202

2019 WL 7500528, at *4–5, 2019 U.S. Dist. LEXIS 223556, at *12; *Allen v. City of Evergreen*, No. 13-0107, 2014 WL 12607819, at *2, 2014 U.S. Dist. LEXIS 191739, at *3–4 (S.D. Ala. Jan. 13, 2014).

- In 2018, in a case challenging the attempt by the City of Gardendale, which is 85% White, to form a school district separate from Jefferson County's more racially diverse district, the Eleventh Circuit affirmed a finding that "race was a motivating factor" in the city's effort. *Stout ex rel. Stout v. Jefferson Cnty. Bd. of Educ.*, 882 F.3d 988, 1000, 1009 (11th Cir. 2018).

- Alabama was subjected to a statewide injunction prohibiting the state from failing to disestablish its racially dual school system. *Lee v. Macon Cnty. Bd. of Educ.*, 267 F. Supp. 458, 480 (M.D. Ala. 1967) (per curiam), *aff'd sub nom. Wallace v. United States*, 389 U.S. 215 (1967). The order resulted from the court's finding that the State Board of Education, through Governor George Wallace, had previously wielded its powers to maintain segregation across the state. *Id.* at 462. A trial court found that for decades, state officials ignored their duties under the statewide desegregation order. *See Lee v. Lee Cnty. Bd. of Educ.*, 963 F. Supp. 1122, 1128–30 (M.D. Ala. 1997). A court also found that the state did not satisfy its obligations to remedy the vestiges of segregation under this order until as late as 2007. *Lee v. Lee Cnty. Bd. of Educ.*, 476 F. Supp. 2d 1356, 1367–68 (M.D. Ala. 2007).

- In 1991, a trial court in *Knight v. Alabama*, 787 F. Supp. 1030 (N.D. Ala. 1991), found that Alabama had failed to eliminate the lingering and continued effects of segregation and discrimination in the University of Alabama and Auburn University, and at the state's public Historically Black Colleges and Universities. *See id.* at 1377–78. In 1995, the trial court issued a remedial decree analogous to the statewide injunction issued in *Lee v. Macon*, and the court oversaw implementation of that order for over a decade. *Knight v. Alabama*, 900 F. Supp. 272, 349–73 (N.D. Ala. 1995). Alabama did not satisfy its obligations under that order until 2006. *Knight v. Alabama*, 469 F. Supp. 2d 1016, 1039 (N.D. Ala. 2006).

- After the 2010 census, Black voters and legislators successfully challenged twelve state legislative districts as unconstitutional racial gerrymanders. *See Ala. Legis. Black Caucus*, 231 F. Supp. 3d at 1348–49.

- In *United States v. McGregor*, 824 F. Supp. 2d 1339, 1345–47 (M.D. Ala. 2011), a federal court found that Alabama State Senators conspired to depress Black voter turnout by keeping a referendum issue popular among Black

voters (whom the Senators called "Aborigines") off the ballot. *Singleton*, 2025 WL 1342947, at *158–59.

These judicial precedents illuminate a pervasive and protracted history of official discrimination in voting rights in Alabama. This history spans numerous electoral contexts, census cycles, and jurisdictions. In multiple cases it has run well into the present era: several of the decisions recited above were issued in the last ten years and by federal judges who remain in service today. Against that backdrop, the Court turns to the evidentiary record in the case before it.

Lay Testimony About Firsthand Experiences of Official Discrimination

The Court heard at trial compelling testimony from Black Alabamians who personally experienced official discrimination, including several who attended segregated public schools. They described their experiences in detail:

- Evan Milligan, a Black Alabamian who was forty-three years old at the time of trial, testified about witnessing demonstrations by the Ku Klux Klan while growing up in Montgomery. Tr. 453, 459.

- Mary Peoples attended a segregated elementary and high school in Alabama. *Id.* at 122. She testified that both of her children attended "[p]redominantly [B]lack" high schools in Huntsville. *Id.* at 127.

- Senator McClendon testified that he attended a segregated, all White high school. Doc. 235-1 at 82.

- Bill McCollum testified that when he was originally hired as a police officer for the Fayette County Police Department, "the other officers said they [were not] going to work with [him]. . . . And said they'd quit before they'd work with a [B]lack and things of that nature." Tr. 1363. Mr. McCollum was also once asked to leave a restaurant because "it did not serve [B]lack people." *Id.* at 1374.

204

- When Mr. McCollum first ran for sheriff, the county administrator told him that "he didn't know if . . . he could register" Mr. McCollum to qualify as a candidate and made him wait in the courthouse for approximately three hours before returning to say that he could qualify. *Id.* at 1363–64. Mr. McCollum was the first Black candidate to qualify for an election in Fayette County. *Id.* at 1364.

The Secretary does not dispute these firsthand recollections. Instead, he asserts that this evidence cuts in his favor—that the "[p]laintiffs did not present a witness whose political participation was hampered by past discrimination" because the witnesses who are "old enough to have attended segregated schools . . . are all extremely politically active." Doc. 251 ¶ 338.

The Court emphatically rejects this assertion. It does not see political activism as evidence that these witnesses were not adversely affected by the official discrimination they experienced. It sees that they are politically active both despite that discrimination and because they experienced its harmful effects. Additionally, the Court refuses to give punitive effect to the political participation of Black Alabamians who have personally suffered the ill effects of official discrimination and responded with civic engagement in the democracy that discriminated against them.

Expert Testimony

The Court also has the benefit of expert testimony from both parties about these Senate Factors—from Dr. Bagley and Dr. Burch for the plaintiffs and Dr. Hood, Dr. Reilly, and Dr. Carrington for the Secretary. As an initial matter, the Court

205

repeats its findings that both Dr. Bagley and Dr. Burch are credible experts (even though it does not adopt or rely on every aspect of their testimony), and that the Court assigns less or no weight to the testimony of Dr. Reilly and Dr. Carrington. *See supra* at Part V.D.1. As explained below, the Court credits Dr. Hood's limited testimony about these Senate Factors and finds it irrelevant.

Dr. Bagley opined at length about Alabama's history of official discrimination, particularly with respect to voting rights and redistricting. *See* Docs. 206-19, 206-21. The Court already made findings about that history based on extensive judicial precedents, *see supra* Part V.D.4, and it regards those precedents as generally sufficient to establish the history. But Dr. Bagley did give the Court one additional detail about the history that illuminates its scope and recency: that school desegregation litigation in Huntsville and Madison County remains ongoing in federal courts to this day. Doc. 206-19 at 23.

Dr. Bagley and Dr. Burch both opined about socioeconomic disparities between Black Alabamians and White Alabamians on numerous dimensions: education, economics, housing, and health, among others. *See* Docs. 206-19, 206-11. The Court finds that many of these disparities are substantial and undeniable.

As one example, Dr. Bagley testified that the Black population in Huntsville and Montgomery are "more likely to live in poverty," "more likely to be unemployed," "more likely to rely on food assistance benefits," "less likely to have

206

broadband Internet service or any Internet access," and "less likely to have health insurance." Tr. 546; *see* Doc. 206-19 at 21. As another example, he testified that eleven of the schools labeled by the state as "'[f]ailing'" were predominantly Black public schools in Montgomery. Doc. 206-19 at 25.

Dr. Burch also identified substantial disparities, but from a systematic, statistical perspective. She testified that the unemployment rate for Black workers in Alabama is nearly twice that of White workers; the family poverty rate for Black Alabamians is nearly triple the rate for White Alabamians (and in Montgomery specifically, six times as high); the infant mortality rate for Black infants in Alabama is nearly three times higher than the rate for White infants in Alabama; and Black Alabama households are more than twice as likely to lack access to a vehicle at home than White Alabama households (and in Montgomery specifically, almost three times more likely). *See* Doc. 206-11 at 12–13, 15–17; Tr. 680–82, 685.

The Court also credits Dr. Burch's testimony that Black Alabamians have significantly lower educational attainment than White Alabamians. She reported that "[s]tatewide and at the county level, Black adult Alabamians were less likely to have graduated from high school or to have attained a bachelor's degree than White Alabama adults." Doc. 206-11 at 3. She also reported data establishing stark disparities among school-aged children. *See id.* at 9 n.31; Tr. 675.

Dr. Bagley and Dr. Burch both opined that these disparities are inseparable

from (and in large part the result of) the state's history of official discrimination. Dr. Bagley explained that from an historian's perspective, there is no way to account for these disparities "other than the state's history of discrimination." Tr. 554. And Dr. Burch explained that Black Alabamians' lower educational attainment in particular is "caused, in part, by historical and contemporary discrimination in education," including "separate-but-unequal" education. Doc. 206-11 at 9; *see* Tr. 675–78. And Dr. Burch linked educational attainment with "income, poverty, and employment," meaning that Black Alabamians' lower educational attainment in turn drives other socioeconomic disparities. Doc. 206-11 at 12.

The Court credits these explanations and accepts the experts' consensus that Black Alabamians' lower educational attainment is traceable to segregated public schools and dilapidated schools in predominantly-Black areas. Likewise, it seems near-obvious that communities with lower educational attainment are at greater risk for widespread unemployment and poverty than communities with higher educational attainment.

Dr. Bagley and Dr. Burch also opined that many of these disparities hinder Black Alabamians' opportunity to participate in the political process. Dr. Bagley reiterated his earlier explanation (1) that "[b]ecause [W]hite Alabamians tend to have more education and therefore higher income than Black Alabamians," White Alabamians "tend to be better able than Black Alabamians to afford a car, internet

service, a personal computer, or a smart phone; . . . take time off from work; . . . afford to contribute to political campaigns; . . . afford to run for office; . . . [and to] have access to better healthcare, and (2) that [e]ducation has repeatedly been found to correlate with income [and] independently affects citizens' ability to engage politically." Doc. 206-19 at 21 (internal quotation marks omitted).

Dr. Burch relied on a well-established scholarly consensus linking critical disparities to political participation. She testified that educational attainment is "very strongly associated with voting," Tr. 672, "[t]he powerful relationship between education and voter turnout is arguably the most well-documented and robust finding in American survey research," and "the relationship between education and voting is a causal one," Doc. 206-11 at 8–9 (internal quotation marks and citation omitted).

Dr. Burch specifically explained how Alabama's history of segregated public schools still impacts voting participation today: "In 2020 . . . 38.6 percent of votes in [the Alabama] general election were cast by people age 60 and older, people who were at least school age in 1965, which means they were partially educated during a time when Alabama still had segregated public schools." Tr. 676.

Dr. Burch further explained that lower educational attainment impacts other socioeconomic factors that also affect voting rates for Black Alabamians. She explained how racial disparities in family poverty, internet access, and access to

209

transportation hamper voting participation due to an inability to learn about candidates, absentee vote, locate voting information, and travel to polls. *See id.* 678, 684–86.

The Court credits this testimony, which is not disputed, and the Court says again that these are dynamics that strike the Court as near-obvious. That said, the Court does not make findings about all of Dr. Bagley's testimony, nor all of Dr. Burch's. It does not make findings about every instance of alleged official discrimination that was discussed in expert reports or at trial, nor every disparity that was discussed. For example, the Court makes no findings about racial disparities in interactions with the criminal justice system. Further, it makes no findings about the idea that Dr. Burch testified about, sometimes labeled as "structural racism," that attributes most or all socioeconomic disparities or other differences in the lives of Black Alabamians and White Alabamians to discrimination. The Court makes only those findings necessary to reach a conclusion about these Senate Factors, and no more.

In that regard, the Court says simply that the record reflects (without meaningful dispute) stark racial socioeconomic disparities that (1) are clearly traceable to Alabama's lengthy history of official discrimination, and (2) unsurprisingly hinder Black Alabamians' political participation.

The Court rejects the Secretary's argument, based on the testimony of Dr.

Hood and Dr. Reilly, that these kinds of racial disparities are everywhere in the United States, such that if they are assigned substantial weight, they will invariably drive a finding that the totality of the circumstances supports a Section Two plaintiff. Doc. 251 ¶¶ 307–13. This is for two reasons. *First*, the Secretary's assertion is overwrought: the Court does not consider socioeconomic disparities, nor their causes or effects, nor any other Senate Factor, in a vacuum. And the Court does not grant Section Two relief simply because Black Alabamians are worse off than White Alabamians on various metrics—the Court has analyzed substantial other evidence.

Federal law makes crystal clear that this is the legal standard, as it has for forty years, so the Court harbors no concern that any other federal court will grant Section Two relief simply because of socioeconomic disparities across races. For example, when racially polarized voting is absent, socioeconomic disparities alone will not support Section Two relief. Likewise, as evidenced by the Huntsville-area claim in this case, when a reasonably configured remedial district cannot be drawn because the minority population is too geographically dispersed, socioeconomic disparities alone will not support Section Two relief.

*Second*, the Secretary's assertion is too narrowly focused. The Court must do more than simply crunch numbers to analyze these Senate Factors properly. The bare fact of a statistical disparity is important, but insufficient, to generate a clear understanding of the presence or absence of the Factors.

### 5.    Senate Factor 6

**"Whether political campaigns have been characterized by overt or subtle racial appeals."** *Gingles*, 478 U.S. at 37.

The Court finds that Senate Factor 6 weights in favor of the plaintiffs, but to a lesser degree than do Senate Factors 2, 7, 1, 3, and 5. Dr. Bagley offered several examples of racial campaign appeals in his expert report, *see* Doc. 206-19 at 30–33, some of which he testified about at trial. The Court need not decide whether every example reflected a racial appeal, but at least three of them did.

Dr. Bagley testified about the 2017 United States Senate campaign between former Chief Justice of the Alabama Supreme Court Roy Moore and former United States Senator Doug Jones, and he testified that "both candidates in that campaign relied on racial appeals." Tr. 555. Roy Moore, who is White, acclaimed the antebellum period in the South as "'great at the time when families were united – even though we had slavery. They cared for one another. People were strong in the families. Our families were strong. Our country had a direction.'" Doc. 206-19 at 32–33; *see* Tr. 556. Doug Jones, who is White, "sent mailers to Black voters indicating that Moore . . . had fought to preserve segregation and had ties to hate groups like Ku Klux Klan" and "argued that Moore was thus 'not on our side,' in an apparent reference to racial 'sides.'" Doc. 206-19 at 33; *see* Tr. 558. Another mailer "featured the skeptical face of a [B]lack man with the appeal: 'Think if a [B]lack man went after high school girls [as Moore was alleged to have done] anyone would

212

try to make him a senator?'" Doc. 206-19 at 33; *see* Tr. 558–59.

The Secretary argues that Senator Jones's mailers cannot be evidence of vote dilution because the ads were designed "to pull [B]lack voters into the process." Tr. 1671; *see* Doc. 251 ¶¶ 365–67. But he does not dispute that they targeted Black voters, and Senate Factor 6 does not limit racial appeals in political campaigns to those that target White voters.

As another example, former Alabama Supreme Court Chief Justice Tom Parker stated that he had "'taken on and beaten the Southern Poverty Law Center,'" which is "a well-known Montgomery-based race advocacy organization," in an advertisement showing "images of an African-American Democratic congresswoman from California." Doc 206-19 at 33 (some internal quotation marks omitted) (quoting *Ala. State Conf. of NAACP*, 612 F. Supp. at 1309).

The Secretary argues that even if this campaign ad may be construed as a racial appeal, it "'do[es] not demonstrate a pattern, practice, or routine of racial appeals across the election landscape.'" Doc. 251 ¶ 368 (quoting *Ala. State Conf. of NAACP*, 612 F. Supp. at 1311); *see* Tr. 1670. There is no dispute that the statement was made as part of a campaign, nor that it is a racial appeal.

Based on this evidence, the Court finds that there is some evidence of racial appeals in Alabama campaigns, and Senate Factor 6 tilts in favor of the plaintiffs. At the same time, the Court cannot find that this factor weighs as heavily in favor of

the plaintiffs as the other factors that have already been discussed. Although the examples described above are prominent and recent, the record does not contain any systematic or statistical evaluation of the extent to which political campaigns are characterized by racial appeals, so the Court cannot determine whether these examples indicate that racial appeals occur frequently, regularly, occasionally, or rarely.

### 6.    Senate Factor 8

 **"Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group."** *Gingles*, 478 U.S. at 37.

The parties dispute whether the decisions that form the basis for their arguments about this factor are political or race-based. The Court declines to make a broad finding about the many public policy arguments the plaintiffs raise.

But evidence of a recent and significant occurrence tilts this factor in favor of the plaintiffs: the Legislature's refusal to draw an additional remedial district in its 2023 congressional districting plan after a three-judge district court and the Supreme Court determined that the congressional districting plan likely violated Section Two. In spite of these rulings, the Legislature convened, enacted new districting criteria that made the additional remedial district impossible to draw, and passed a new map that it admitted did not contain the additional remedial district. *See Singleton*, 2025 WL 1342947, at *18. After a trial, that three-judge court found not only that the

Legislature failed to respond to the particularized needs of Black Alabamians, *see id.* at *169–70, but also that the Legislature intentional discriminated against them, *see id.* at *197–213. Those findings are on appeal to the Supreme Court.

The Secretary argues that the Legislature's decision to pass the 2023 congressional plan does not demonstrate a lack of responsiveness to the needs of Black Alabamians in Montgomery. *See* Doc. 251 ¶¶ 379–82. He contends that the Legislature's decision to enact the 2023 plan based on its view of "what [Section Two] requires . . . does not necessarily communicate a purpose of discriminating against [B]lack Alabamians or refusing to respond to their needs." *Id.* ¶ 380. And he suggests that the Legislature's decision was driven by its "desire to avoid racial gerrymandering liability." *Id.* ¶ 381.

The Court cannot ignore that when the Legislature was faced with federal court orders finding likely vote dilution based on race, the Legislature responded with a plan that it admitted did not provide the required remedy for that dilution. The Court thus finds that Senate Factor 8 tilts in favor of the plaintiffs.

### 7.    Senate Factor 9 and 4

**Senate Factor 9: Whether the policy underlying the Plan is "tenuous." *Gingles*, 478 U.S. at 37.**

**Senate Factor 4: "[I]f there is a candidate slating process, whether the members of the minority group have been denied access to that process[.]" *Id.***

The Court makes no findings about Senate Factors 4 and 9.

*** 

Ultimately, the Court finds that every Senate Factor that it was able to make a finding about weighs in favor of the plaintiffs, and that no Senate Factors or other circumstances considered at this stage weigh in favor of the Secretary. The Court thus finds that the plaintiffs have established every element of a violation of Section Two in the Montgomery area, including that: (1) as a group, Black Alabamians are sufficiently numerous and geographically compact to constitute a voting-age majority in an additional reasonably configured Senate district in the Montgomery area; (2) voting in the challenged district is intensely racially polarized, such that Black voters are (nearly always) politically cohesive; (3) White voters ordinarily (nearly invariably) vote as a bloc to defeat Black-preferred candidates; and (4) under the totality of the circumstances in Alabama today, including all the relevant Senate Factors that the Court must consider, Black voters have less opportunity than other Alabamians to elect candidates of their choice to the Alabama Senate.

The Court turns to the Secretary's legal arguments.

### E.    Section Two is privately enforceable.

In the congressional districting litigation, the three-judge court (of which the undersigned was a member) rejected the assertion that Section Two is not privately enforceable. *See Singleton*, 2025 WL 1342947, at *171-81; *see also Caster*, No. 2:21-cv-1536-AMM, Doc. 401 at 446–73. The arguments about this issue in that

litigation were nearly identical to the arguments about this issue in this case. Accordingly, the Court adopts as its own, adapts as appropriate, and recites the relevant analysis of the three-judge court, as follows:

Since the passage of the Voting Rights Act, federal courts across the country, including both the Supreme Court and the Eleventh Circuit, have considered numerous Section Two cases brought by private plaintiffs. *See, e.g.*, *Allen*, 599 U.S. 1; *Brnovich*, 594 U.S. 647; *Bartlett*, 556 U.S. 1; *LULAC*, 548 U.S. 399; *Voinovich*, 507 U.S. 146; *Chisom v. Roemer*, 501 U.S. 380 (1991); *Hous. Laws.' Ass'n v. Att'y Gen. of Tex.*, 501 U.S. 419 (1991); *Gingles*, 478 U.S. 30; *Wright*, 979 F.3d 1282. And on the other side of the scale, only one federal appellate court—the United States Court of Appeals for the Eighth Circuit—has held that private parties may not sue to enforce Section Two. *See generally Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, 86 F.4th 1204 (8th Cir. 2023).

Accordingly, if the Court were to accept the Secretary's argument that private parties may not enforce Section Two, it would seriously disrupt longstanding and consistent federal law on this issue. The Court is not inclined to take that step.

The Court already rejected the Secretary's argument that Section Two is not privately enforceable in its order denying his motion to dismiss. *See* Doc. 143 at 17–20. Because the Secretary repeated the argument, Doc. 247; Doc. 229 at 6, the Court addresses it again.

217

### 1.    Text of Section Two

Federal law supplies two potential vehicles for private plaintiffs to sue under Section Two: either by way of a private right of action contained in Section Two itself, or pursuant to 42 U.S.C. § 1983 ("Section 1983"). Section Two contains no express private right of action, so the dispositive question is whether one is implied. To establish an implied private right of action, plaintiffs must show that Section Two confers both a private right and a private remedy. *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). If there is a private right, then private plaintiffs can presumptively sue under Section 1983, unless defendants show that Congress shut the door to a Section 1983 suit. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 & n.4 (2002). Then–Chief Justice Rehnquist, writing for the majority in *Gonzaga*, reasoned this way:

> Plaintiffs suing under § 1983 do not have the burden of showing an intent to create a private remedy because § 1983 generally supplies a remedy for the vindication of rights secured by federal statutes. Once a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983.

*Id.* at 284 (internal citation omitted). And then, the Secretary must "demonstrate that Congress shut the door to private enforcement." *Id.* at 284 n.4.

The Secretary concedes that Section Two created "new remedies," but contends those remedies were only public, not private. *See* Doc. 131 at 14–21. And the Secretary has not given any reasons why he believes Section Two did not create a private remedy separate and apart from the reasons why he asserts Section Two

did not create a private right. *See* Doc. 131 at 12–31.

The plaintiffs have availed themselves of Section 1983, Doc. 126 ¶¶ 170–76, and the Secretary does not assert that Congress has shut the door to a remedy under Section 1983, *see* Doc. 131 at 12–31, 20 n. 3. Accordingly, the essential question before the Court is whether Section Two creates a private right. If the Court concludes that it does, there is no basis to accept the Secretary's argument that Section Two is not privately enforceable.

Although the task of determining whether Section Two contains a private right is the Court's, the creation of that right (if it exists) is an exclusively legislative authority. "Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress. The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Sandoval*, 532 U.S. at 286 (internal citation omitted). Accordingly, the Court examines at the threshold "whether Congress *intended to create a federal right*." *Gonzaga*, 536 U.S. at 283.

A statute confers a private right "where the provision in question is phrased in terms of the persons benefitted and contains rights-creating, individual-centric language with an unmistakable focus on the benefited class." *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 183 (2023) (internal quotation marks omitted) (quoting *Gonzaga*, 536 U.S. at 284, 287). A statute does not confer a private

right when it contains no rights-creating language or focuses on persons or entities other than the benefited class. *See, e.g.*, *Sandoval*, 532 U.S. at 288–89.

The most recent binding Supreme Court precedent about rights-creating language is *Health & Hospital Corporation of Marion County*, 599 U.S. 166 (2023), a case concerning two statutory provisions about the rights of nursing home residents. *Id.* at 171. The Court applies here the same methodology the Supreme Court used to decide that case, which can be summarized in this way:

- First, the Court began its analysis by observing that the statutory provisions at issue "reside in" a statutory section that "expressly concerns '[r]equirements relating to residents' rights.'" *Id.* at 184 (emphasis omitted) (quoting 42 U.S.C. § 1396r(c)). In assigning weight to this observation, the Supreme Court relied on (1) the rule that "statutory provisions 'must be read in their context,'" and (2) the recognition in *Gonzaga* that "[t]his framing is indicative of an individual 'rights-creating' focus." *Id.* (first quoting *West Virginia v. EPA*, 597 U.S. 697, 721 (2022); and then quoting *Gonzaga*, 536 U.S. at 284).

- Next, the Court reviewed each statutory provision at issue and found that each one (1) discussed a specific right held by residents, with (2) a repeated focus on residents. *See id.* at 184–85.

- Then, the Court observed that the statutory provisions also discussed nursing homes, but found that this discussion did not undermine the focus of the provisions on residents' rights. The Court reasoned that "it would be strange to hold that a statutory provision fails to secure rights simply because it considers, alongside the rights bearers, the actors that might threaten those rights." *Id.* at 185.

- Finally, the Court distinguished the statutory provisions from the provisions in *Gonzaga*, which "lacked 'rights-creating language,' primarily directed the Federal Government's distribution of public funds, and had an aggregate, not individual, focus." *Id.* at 185–86 (quoting *Gonzaga*, 536 U.S. at 290).

Like the provisions at issue in *Health & Hospital Corporation of Marion*

*County*, Section Two resides in a statutory section that expressly concerns rights—in this case, voting rights for members of a class protected from discrimination based on race or color. The title of Section Two is "[d]enial or abridgement of right to vote on account of race or color through voting qualifications or prerequisites; establishment of violation." 52 U.S.C. § 10301. Following the Supreme Court's lead, the Court takes this context and framing as "indicative of an individual 'rights-creating' focus." *Health & Hosp. Corp. of Marion Cnty.*, 599 U.S. at 184 (quoting *Gonzaga*, 536 U.S. at 284).

Further, subsection (a) of Section Two expressly discusses "the right of any citizen of the United States to vote," and it expressly prohibits voting practices that abridge voting rights based on race, color, or language-minority status. 52 U.S.C. § 10301(a) (incorporating by reference 52 U.S.C. § 10303(f)(2)). And subsection (b) expressly discusses the voting rights of persons who are "members of a class of citizens protected by subsection (a)." *Id.* § 10301(b). In the next sentence, subsection (b) refers twice to "members of a protected class." *Id.* Together, these subsections protect citizens in the enumerated class from voting practices with discriminatory results, not just voting practices based on discriminatory intent (which the Fifteenth Amendment forbids based on race or color). *See Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 482 (1997); U.S. Const. amend. XV. Because Section Two is comprised only of a title and three sentences of text, the upshot of the foregoing analysis is that

221

every sentence of Section Two either refers to rights of the benefited class, contains rights-creating language that creates new rights for that specific class, or expressly focuses on the benefited class.

This precise and repetitive focus on the benefitted class distinguishes Section Two from the statutes at issue in *Sandoval* and *Gonzaga*, which the Supreme Court concluded did not confer implied private rights of action. In *Sandoval*, the statute at issue—Section 602 of Title VI of the Civil Rights Act, 42 U.S.C. § 2000d-1—did not even mention the benefited class: it said merely that "[e]ach Federal department and agency . . . is authorized and directed to effectuate the provisions of [Section 601]." 532 U.S. at 288–89 (quoting 42 U.S.C. § 2000d-1). Thus, the Court found that "the focus of § 602 is twice removed from the individuals who will ultimately benefit from Title VI's protection" because it "focuses neither on the individuals protected nor even on the funding recipients being regulated, but on the agencies that will do the regulating." *Id.* at 289.

Likewise, *Gonzaga* considered provisions of the Family Educational Rights and Privacy Act of 1974, 20 U.S.C. § 1232g ("FERPA"). *Gonzaga*, 536 U.S. at 278. One such provision stated that: "No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records . . . of students without the written consent of their parents . . . ," *id.* at 279 (quoting 20 U.S.C. § 1232g(b)(1)),

while another "direct[ed] the Secretary of Education to enforce this and other of the Act's spending conditions," *id.* (citing 20 U.S.C. § 1232g(f)). The Court found that the focus of these provisions was also "two steps removed from the interests of" the benefited class because they "speak only to" the regulating agency. *Id.* at 287. The Court concluded that the provisions at issue did not imply a private right because they "contain no rights-creating language, they have an aggregate, not individual, focus, and they serve primarily to direct the [regulating agency's] distribution of public funds to educational institutions." *Id.* at 290.

Unlike the statutes in *Sandoval* and *Gonzaga*, the language of Section Two "focuses . . . on the individuals protected." *Sandoval*, 532 U.S. at 289. It explicitly protects "the right of any citizen of the United States to vote" without being discriminated against, and then refers repeatedly to "members of a protected class," or some variation of that phrase. *See* 52 U.S.C. § 10301. It "serve[s] primarily" to protect citizens' rights and to prevent states from interfering with those rights. *See Gonzaga*, 536 U.S. at 290. If all of this is not rights-creating language with an "unmistakable focus on the benefited class," *Cannon v. Univ. of Chi.*, 441 U.S. 677, 691 (1979), it is difficult to imagine what is.

Indeed, Section Fourteen of the Voting Rights Act reinforces the idea that Congress contemplated suits by private parties when it enacted Section Two. Section 14(e) provides: "In any action or proceeding to enforce the voting guarantees of the

fourteenth or fifteenth amendment, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee, reasonable expert fees, and other reasonable litigation expenses as part of the costs." 52 U.S.C. § 10310(e). "[A]ny action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment" means *all* such actions or proceedings, because where Congress uses the word "any" and "'did not add any language limiting the breadth of that word,' . . . 'any' means all." *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1186 (11th Cir. 1997) (quoting *United States v. Gonzales*, 520 U.S. 1, 5 (1997))); *see also Deroy v. Carnival Corp.*, 963 F.3d 1302, 1316 (11th Cir. 2020) (recognizing that, in a statute, "'any' means 'every' or 'all'" (citing *United States v. Castro*, 837 F.2d 441, 445 (11th Cir. 1988))). And Section Two is unambiguously an action or proceeding to "enforce the voting guarantees of the . . . fifteenth amendment." 52 U.S.C. § 10310(e); *see Brnovich*, 594 U.S. at 656. Section Fourteen therefore anticipates that private litigants will sue to "enforce the guarantees of the . . . fifteenth amendment" alongside the United States. 52 U.S.C. § 10310(e).

The Eighth Circuit says, however, that the term "prevailing party" here refers only to defendants. *Ark. State Conf. NAACP*, 86 F.4th at 1213 n.4. As the Court sees it, that offers too strained a reading of the statute. Congress specified that a "prevailing party, other than the United States" should receive attorneys' fees, not that a "defendant" should receive attorneys' fees—which would have been a much

simpler and more direct way to prescribe that outcome, if that is what Congress had intended. In fact, the Supreme Court has construed identical language found in the attorney-fee provision of Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a-3(a) ("CRA"),[9] to refer to private plaintiffs. *See Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 401 n.1, 402 (1968) (per curiam) (holding that the term "prevailing party, other than the United States" in Title II's attorney-fee provision refers to private plaintiffs); *see also id.* at 402 ("Congress . . . enacted the provision for counsel fees [in Title II of the CRA] . . . to encourage individuals injured by racial discrimination to seek judicial relief under Title II."). Moreover, Congress has specifically stated that it intended private parties to be able to recover attorneys' fees if they prevailed on Section Two claims: Congress explained that "[f]ee awards are a necessary means of enabling *private citizens* to vindicate these Federal rights." *See* S. Rep. No. 94-295, at 40 (1975) (emphasis added); *see also* H. Rep. No. 97-227, at 32 (1981) ("It is intended that citizens have a private cause of action to enforce their rights under Section 2. . . . If they prevail they are entitled to attorneys' fees under [Section 14(e)] and [42 U.S.C. §] 1988.").

"[T]he words of a statute must be read in their context and with a view to their

---

[9] The CRA's attorney-fee provision reads as follows: "In any action commenced pursuant to this subchapter, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs, and the United States shall be liable for costs the same as a private person." 42 U.S.C. § 2000a-3(b).

place in the overall statutory scheme." *West Virginia*, 597 U.S. at 721. Thus, the reference in Section Fourteen of the Voting Rights Act to private plaintiffs suing to enforce their voting rights supports the determination that Section Two contains a private right of action. Viewing Section Two along with Section Fourteen reinforces Congress's intention to allow private parties to sue to enforce their right to vote free from discrimination. *See Morse v. Republican Party of Va.*, 517 U.S. 186, 234 (1996) (reasoning that the language referring to a "prevailing party, other than the United States" in Section Fourteen indicates "the existence of a private right of action under § 10").

As far as the Court can tell, no court has held under the first step of the analysis that Section Two does not create a private right. Rather, the one circuit court that has concluded that Section Two does not confer a private right of action, the Eighth Circuit, rested its decision on the second step of the analysis—a determination that Section Two does not create a private remedy. *See Ark. State Conf. NAACP*, 86 F.4th at 1216. Notably, the Eighth Circuit did not address the question whether private plaintiffs may sue under Section 1983 to enforce Section Two because the plaintiffs had not raised the issue. *Id.* at 1218.

The Eighth Circuit viewed the question whether Section Two creates a private right as an open one because, in addition to the rights-creating language the Court has described, Section Two also contains language that refers to states, and the court

was unsure "what to do when a statute focuses on both." *Id.* at 1209–10. But the Supreme Court has provided an unambiguous answer to that question that the Eighth Circuit did not consider.[10] In *Health & Hospital Corporation of Marion County*, the statutes at issue (like Section Two) referred to the rights of the benefitted class, but also directed requirements at "actors that might threaten those rights," and the Supreme Court still held that the statutes created private rights. 599 U.S. at 185. That a statutory provision discussing the rights of a benefitted class "also establish[es] who it is that must respect and honor these statutory rights," the Court explained, "is not a material diversion from the necessary focus on the [rights-holders]." *Id.* The Court further reasoned that "[t]he Fourteenth Amendment hardly fails to secure § 1983-enforceable rights because it directs state actors not to deny equal protection." *Id.* at 185 n.12.

Based on case precedent and the text of Section Two, the Court sees a clear answer to the question whether Section Two creates a private right: it does. Nevertheless, the Secretary urged us in its earlier motion to hold that Section Two does not confer a private right for four reasons. The Court discusses each in turn.

*First*, the Secretary argued in its earlier motion that for Section Two to create

---

[10] The Supreme Court issued *Health & Hospital Corporation of Marion County* after the Eighth Circuit heard oral argument but before the Eighth Circuit issued its decision. *See Health and Hosp. Corp. of Marion Cnty.*, 599 U.S. at 166; *Ark. State Conf. NAACP*, 86 F.4th at 1204.

a private right of action, it must create a new right not found elsewhere in federal law. *See* Doc. 131 at 14–23, 25. The Secretary claims that Section Two cannot do this because it was passed pursuant to Congress's power under Section Two of the Fifteenth Amendment, which gives Congress the power to enforce the rights guaranteed in the Fifteenth Amendment, but not the power to create new rights. *See* U.S. Const. amend. XV; *Brnovich*, 594 U.S. at 656; Doc. 131 at 14–15.[11]

The Secretary is wrong that to create a private right of action, Section Two must create a new right not found elsewhere in federal law. That premise runs headlong into controlling precedent. For example, in *Morse*, 517 U.S. 186, the Court found an implied private right of action in Section Ten of the Voting Rights Act, which, on the Secretary's logic, would also merely be protecting preexisting Fifteenth Amendment rights. *See id.* at 233 (holding that § 10 "established a right to vote without paying a fee"). And in *Allen v. State Board of Elections*, 393 U.S. 544 (1969), *abrogated by Ziglar v. Abbasi*, 582 U.S. 120, 132 (2017), the Supreme Court found an implied private right of action in Section Five of the Voting Rights Act. *See id.* at 557; *cf. Schwier v. Cox*, 340 F.3d 1284, 1297 (11th Cir. 2003) (finding an implied private right of action in the materiality provision of a similar statute passed under congressional Fifteenth Amendment enforcement power).

---

[11] The Supreme Court already has rejected, in this very case, the argument that Section Two exceeds congressional authority under the Fifteenth Amendment. *See Allen*, 599 U.S. at 41.

It is unsurprising, then, that the Secretary has cited no precedent holding that Congress cannot imply a private right of action to enforce an existing federal right. He relies on language found in *Sandoval* (quoted later in *Gonzaga*) referring to "new rights," but that language did not hold (or even suggest, in the context of those cases), that the protected right must be completely novel and found nowhere else in federal law. In *Sandoval*, the Court used the term "new rights" to explain that rights-creating language in one section of a statute did not necessarily imply a private right of action to enforce another section of the same statute. *See* 532 U.S. at 289 (cleaving a difference between Sections 601 and 602 of Title VI of the Civil Rights Act of 1964). *Sandoval* did not address the question whether Congress may grant a private right of action to enforce an existing federal right. Nor did *Gonzaga*, which merely quoted the sentence from *Sandoval* referring to "new rights" when explicating the general background principles for discovering congressional intent. *See Gonzaga*, 536 U.S. at 286–87. There was no discussion in *Gonzaga* of whether the rights referred to in the statute at issue were new or not. *See id.*

*Second,* the Secretary argued in its earlier motion that Section Two does not unambiguously confer individual rights because there is ambiguity about its focus, which the Secretary says one court has held is "unclear" because it includes both the conduct prohibited and the party regulated. *See* Doc. 131 at 24–27. But like the Eighth Circuit, the Secretary does not account for the instructions found in *Health*

229

*& Hospital Corporation of Marion County*. *See* 599 U.S. at 185. As the Court has already explained, if the statutory text at issue in that case created private rights while also mentioning actors and conduct that could threaten those rights, then the Court can discern no principled basis to conclude that Section Two does not likewise create private rights.

*Third*, the Secretary argued it is earlier motion that the mere use of the term "rights" is not enough to create a private cause of action, citing *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1 (1981). *See* Doc. 131 at 24–25. But the Court's analysis doesn't rest exclusively on the use of the word "rights." *See supra* Part V.E.1; *infra* Part V.E.2. In any event, *Pennhurst State* does not help the Secretary. There, the Supreme Court declined to find an implied right in a statute that provided that mentally handicapped persons "have a right to appropriate treatment, services, and habilitation" in "the setting that is least restrictive of . . . personal liberty." *Pennhurst State*, 451 U.S. at 13 (quoting 42 U.S.C. § 6010). The Court held that the reference to "a right" was precatory because it was found only in a "bill of rights" provision of the statute, while the enabling provisions of the statute were funding-related, and the bill of rights provision lacked "any language suggesting that [it] is a 'condition' for the receipt of federal funding" under the statute. *Id.* To the contrary, the Court reasoned, the language and structure of the statute "demonstrate[d] that it is a mere federal-state funding statute." *Id.* at 18.

230

*Pennhurst State* thus cautions that "[i]n expounding a statute, [the Court] must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *Id*.

The Court has not looked at the word "rights" in a vacuum; rather, it has considered the word within the statutory provision and the statute taken as a whole, in order to see whether the statutory provision is using "rights-creating language." *Sandoval*, 532 U.S. at 288 (quotation marks and citation omitted). And it is not merely the presence of the term "rights" in Section Two, but rather the entire provision's focus on the rights of "members of a protected class" and its place within the Voting Rights Act—a statute created, after all, for the sole purpose of enforcing a citizen's right to vote free from discrimination.

*Fourth,* the Secretary asserted in its earlier motion that the "federal review mechanism" in the Voting Rights Act indicates that Congress did not mean to imply a private right of action in Section Two. *See* Doc. 131 at 19–20. The Secretary relies on *Gonzaga* to argue that "where a statute provides a federal review mechanism, the Supreme Court has been less willing to identify individually enforceable private rights." *Id.* at 19–20 (internal quotation marks omitted) (quoting *Gonzaga*, 536 U.S. at 289–90).

This argument fails at the gate because FERPA, the statute at issue in *Gonzaga*, is fundamentally unlike Section Two. In *Gonzaga*, the Supreme Court

observed that its "conclusion that FERPA's nondisclosure provisions fail to confer enforceable rights [wa]s buttressed by the mechanism that Congress chose to provide for enforcing those provisions." 536 U.S. at 289. FERPA "expressly authorized the Secretary of Education to 'deal with violations' of the Act," and the Secretary did so by creating an office to field complaints from individuals and then initiate investigations, request a response from the institution subject to the complaint, find violations, and mandate steps to resolve them. *Id.* at 289–90 (emphasis omitted) (quoting 20 U.S.C. § 1232(g)(f)). But Congress chose no such extensive administrative procedures for Section Two, and they differ in kind from the Attorney General's prosecutorial discretion to bring Section Two lawsuits in court. Allowing the Attorney General to elect to bring a lawsuit is not the kind of detailed alternative "federal review mechanism" Congress created to enforce FERPA, which the *Gonzaga* Court was discussing. *See id.* at 290.

Even if the Attorney General's power to sue were like the elaborate federal review mechanism described in *Gonzaga* (and it is not), *Gonzaga* clarifies that the likeness is not "an independent basis for precluding private enforcement." *Id.* at 290 n.8. This fits with other jurisprudence allowing both private and public lawsuits to enforce federal rights. *See, e.g.*, *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 255 (2009) (finding a private right of action in Title IX of the Civil Rights Act despite it having an "express enforcement mechanism" in the form of "an

232

administrative procedure"). Put simply, the reality that the Attorney General may bring a lawsuit in federal court does not compel, or even suggest, the conclusion that Congress meant to imply no right of action for private individuals also to bring enforcement actions pursuant to Section Two of the Voting Rights Act.

### 2.    Section Two Precedents

Standing alone, the Court's conclusion that the text of Section Two implies a private right of action is a sufficient reason to hold the statute privately enforceable. But there is more. Relevant precedent also supports the Court's conclusion, including in particular two Supreme Court cases: *Morse* and *Allen*. And principles of congressional ratification and statutory *stare decisis* reinforce that result.

### a.    Relevant Precedent

As the three-judge Court explained in the Alabama congressional districting cases, "[a] ruling that Section Two does not provide a private right of action would badly undermine the rationale offered by the Court in *Morse*." *Singleton*, 582 F. Supp. 3d 924, 1031 (N.D. Ala. 2022). In *Morse*, the Supreme Court held that Section 10 of the Voting Rights Act contained a private right of action, reasoning that:

> Although § 2, like § 5, provides no right to sue on its face, "the existence of the private right of action under Section 2 . . . has been clearly intended by Congress since 1965." S. Rep. No. 97–417, at 30. We, in turn, have entertained cases brought by private litigants to enforce § 2. It would be anomalous, to say the least, to hold that both § 2 and § 5 are enforceable by private action but § 10 is not, when all lack the same express authorizing language.

233

517 U.S. at 232 (opinion of Stevens, J., with Ginsburg, J. joining) (some internal citations omitted); *see id.* at 240 (opinion of Breyer, J., with O'Connor, J. and Souter, J. joining) (agreeing that Section Ten confers a private right of action because Sections Two and Five do).

The Court's conclusion that Section Ten affords a private right of action turns in no small measure on its foundational observation that Section Two, like Section Five, is indeed enforceable by private right of action. *See id.* at 232. And the Court saw no reason for treating Section Ten any differently. *Id.* The very rationale for the Supreme Court's determination that Section Two affords a private right of action is that Congress has "clearly intended" that since 1965. *Id.* (quoting S. Rep. No. 97–417, at 30); *see also Singleton*, 582 F. Supp. 3d at 1031 ("[T]he understanding [in *Morse*] that Section Two provides a private right of action was necessary to reach the judgment that Section Ten provides a private right of action.").[12]

"When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound." *Seminole*

---

[12] In addition to observing that Sections Two and Five conferred private rights of action, the Court in *Morse* supported its conclusion that Section Ten confers a private right of action by reasoning that: the achievement of the Voting Rights Act's goals would be severely hampered if only the Attorney General could sue to enforce Section Ten; the Attorney General had urged the Court to find a private right of action; and other sections of the Voting Rights Act (specifically, Sections Three and Fourteen) contain language recognizing that private persons can sue to enforce their rights under the Voting Rights Act. *See Morse*, 517 U.S. at 231–34.

*Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996); *see also Dana's R.R. Supply v. Att'y Gen.*, 807 F.3d 1235, 1240 n.3 (11th Cir. 2015) (noting that a statement is dicta only if it "could have been deleted without seriously impairing the analytical foundations of the holding" (quoting *Denno v. Sch. Bd. of Volusia Cnty.*, 218 F.3d 1267, 1283 (11th Cir. 2000) (Forrester, J., concurring in part))); *United States v. Crawley*, 837 F.2d 291, 292 (7th Cir. 1988) (Posner, J.) (same). This holds true for any analysis that the court "explicat[es] and appl[ies]," even where the court "could have decided the case on other grounds." *United States v. Kaley*, 579 F.3d 1246, 1253 n.10 (11th Cir. 2009).

However, even if the Court were to treat *Morse*'s statements as dicta, the Court is "obligated to respect [them]." *Henderson v. McMurray*, 987 F.3d 997, 1006 (11th Cir. 2021) (Pryor, C.J.). "[T]here is dicta and then there is dicta, and then there is Supreme Court dicta." *Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006). As far as the Court sees it, at the very least, this is Supreme Court dicta with the support of five justices; and if it is a holding, plainly it would be controlling, despite the fractured votes. *See Marks v. United States*, 430 U.S. 188, 193 (1977). The Court will not upend it.

In the 117-page proposed order the Secretary submitted after trial and in his motion for judgment as a matter of law, he did not mention *Morse*. *See* Doc. 247 at 1; Doc. 251. In his earlier motion, the Secretary urged the Court to ignore the *Morse*

language on the ground that it is gravely wounded by *Sandoval*. *See* Doc. 92 at 23–24. The Supreme Court has spurned some private-right-of-action cases that were decided before *Sandoval*, describing them as part of an "*ancien regime*" in which "the Court assumed it to be a proper judicial function to provide such remedies as are necessary to make effective a statute's purpose." *Ziglar*, 582 U.S. at 131–32 (internal quotation marks and citation omitted). But *Morse* is not even mentioned in *Sandoval* and it is not part of the *ancien regime* that *Sandoval* criticized. As the Supreme Court explained in *Sandoval*, the headline case for abandoning the *ancien regime* was *Cort v. Ash*, 422 U.S. 66 (1975). *See Sandoval*, 532 U.S. at 287. *Morse* was decided twenty-one years after *Cort*. As an inferior federal court, the Court is required to "leav[e] to [the Supreme Court] the prerogative of overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (citation omitted); *see also United States v. Gibson*, 434 F.3d 1234, 1246 (11th Cir. 2006) ("It is not given to us to overrule the decisions of the Supreme Court.").

Furthermore, *Shelby County v. Holder* also suggested, albeit in dicta, that Section Two implies a private right of action, and *Shelby County* postdates *Sandoval*. In *Shelby County*, the Supreme Court invalidated Section Five's preclearance regime as unconstitutional. 570 U.S. at 537–38. In describing the statutory scheme, the Court explained that "[b]oth the Federal Government and individuals have sued to enforce § 2, and injunctive relief is available in appropriate cases to block voting

236

laws from going into effect." *Id.* at 537 (citations omitted). And in the final paragraph of the opinion, the Court ruled that its decision about Section Five "in no way affects the permanent, nationwide ban on racial discrimination in voting found in § 2." *Id.* at 557. The Secretary's earlier argument about *Sandoval* did not account for *Shelby County* either. *See* Doc. 92 at 23–24.

Other federal circuits apparently share the Court's understanding of Supreme Court jurisprudence, including the Eleventh Circuit. *See Ala. State Conf. NAACP v. Alabama*, 949 F.3d 647, 649 (11th Cir. 2020), *vacated on other grounds sub nom. Alabama v. Ala. State Conf. NAACP*, 141 S. Ct. 2618 (2021); *see also Robinson v. Ardoin*, 86 F.4th 574, 587–88 (5th Cir. 2023) ("We conclude that . . . there is a right for these [private] Plaintiffs to bring these [Section Two] claims."); *Mixon v. Ohio*, 193 F.3d 389, 406 (6th Cir. 1999) ("An individual may bring a private cause of action under Section 2 of the Voting Rights Act.").[13]

In 2020, the Eleventh Circuit explained the history of private enforcement of Section Two this way:

> The Voting Rights Act (VRA) is widely considered to be among the most effective civil rights statutes ever passed by Congress. Its success is largely due to the work of private litigants. For more than fifty years, private parties have sued states and localities under the VRA to enforce

---

[13] Most recently, a three-judge district court in the Southern District of Mississippi has followed *Robinson* and relevant Supreme Court precedent in holding that Section Two confers a private cause of action. *See Miss. State Conf. NAACP v. State Bd. of Election Comm'rs*, No. 3:22-cv-00734-DPJ-HSO-LHS (July 2, 2024) (per curiam).

the substantive guarantees of the Civil War Amendments. Today, private parties remain the primary enforcers of § 2 of the VRA.

*Ala. State Conf. NAACP*, 949 F.3d at 649 (footnotes omitted). The Eleventh Circuit went on to observe that "[t]he Department of Justice has filed only 4 of the 61 enforcement actions under § 2 since 2013." *Id.* n.2.[14] And the Circuit held that "[t]he VRA, as amended, clearly expresses an intent to allow private parties to sue the States. The language of § 2 and § 3, read together, imposes direct liability on States for discrimination in voting and explicitly provides remedies to private parties to address violations under the statute." *Id.* at 652. Although the Court is not bound by this Circuit precedent because it was vacated on mootness grounds, the analysis is persuasive.

The Court next turns to the Supreme Court's decision in the Alabama congressional districting cases. Although *Allen* did not resolve the specific question whether Section Two provides a private right of action, it is nevertheless instructive. In *Allen*, the Supreme Court recognized that "[b]y 1981, . . . only sixteen years[] [after the VRA was passed in 1965], many considered the VRA 'the most successful

---

[14] Indeed, the Department of Justice has previously observed that private plaintiffs have brought over 400 Section Two cases resulting in judicial decisions since 1982, while the Department of Justice itself has brought just 44 cases. *See* Brief of United States as Amicus Curiae at 1–2, *Turtle Mountain Band of Chippewa Indians v. Howe*, No. 23-3655, 2024 WL 1417744 (8th Cir. Mar. 25, 2024) (citing Ellen D. Katz et al., *To Participate and Elect: Section 2 of the Voting Rights Act 40*, Univ. Mich. L. Sch. Voting Rts. Initiative (2024), https://voting.law.umich.edu; Voting Section Litigation, U.S. Dep't of Just. (2024), https://perma.cc/V5XK-Z7L8).

civil rights statute in the history of the Nation.'" *Allen*, 599 U.S. at 10 (quoting S. Rep. No. 97–417, at 111 (1982)). "The Act 'create[d] stringent new remedies for voting discrimination,' attempting to forever 'banish the blight of racial discrimination in voting.'" *Id.* (quoting *South Carolina v. Katzenbach*, 383 U.S. 301, 308 (1966)). The Court described important amendments to Section Two enacted in 1982, and observed that since then, "[f]or the past forty years, [the Court has] evaluated claims brought under § 2 using the three-part framework developed in [its] decision in *Thornburg v. Gingles*, 478 U.S. 30 . . . (1986)." *Allen*, 599 U.S. at 17. That jurisprudence includes legions of Section Two claims asserted by private plaintiffs and adjudicated by the Supreme Court: *Gingles*, 478 U.S. 30; *Voinovich*, 507 U.S. 146; *Growe*, 507 U.S. 25; *De Grandy*, 512 U.S. 997; *Holder v. Hall*, 512 U.S. 874 (1994); *Vera*, 517 U.S. 952; *Shaw II*, 517 U.S. 89; *Abrams*, 521 U.S. 74; *LULAC*, 548 U.S. 399; *Cooper*, 581 U.S. 285; *Abbott*, 585 U.S. 579; *Brnovich*, 594 U.S. 647; *Wis. Legislature*, 595 U.S. 398; *Allen*, 599 U.S. 1.

### b.    Congressional Ratification

As the *Allen* Court explained repeatedly in the context of other attacks on Section Two, this long history of private plaintiffs bringing Section Two challenges means that Congress is "undoubtedly aware of [the Court's] constru[ction of] § 2," and "Congress has never disturbed [the Court's] understanding of § 2 as *Gingles* construed it." 599 U.S. at 19, 39. And Congress "can change that if it likes." *Id.*

It has long been the rule that "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239–40 (2009) (citation omitted). In none of its amendments to the Voting Rights Act has Congress ever questioned the then-unanimous view of the courts that Section Two was privately enforceable. *See generally* Pub. L. No. 91-285, 84 Stat. 314 (1970); Pub. L. No. 94-73, 89 Stat. 400 (1975); Pub. L. No. 97-205, 96 Stat. 131 (1982); Pub. L. No. 109-246, 120 Stat. 577 (2006). In its most recent amendment, in 2006, Congress expressly noted "the continued filing of section 2 cases that originated in covered jurisdictions" as "[e]vidence of continued discrimination" that supported the need to strengthen certain provisions of the Voting Rights Act. Pub. L. No. 109-246, 120 Stat. 577 (2006).

Indeed, the Senate Report to the 1982 amendment, which the Supreme Court has called the "authoritative source for legislative intent" behind Section Two, *Gingles*, 478 U.S. at 43 n.7, said that it "reiterates the existence of the private right of action under Section 2, as has been clearly intended by Congress since 1965," S. Rep. No. 97-417, at 30 (citing *Allen*, 393 U.S. 544). The House Report to the 1982 amendment echoes precisely the same congressional intent. *See* H. Rep. No. 97-227, at 32 (1981) ("It is intended that citizens have a private cause of action to enforce their rights under Section 2."). And the Senate Report to the 1975 amendment

explains that fee awards under Section Fourteen of the Voting Rights Act "are a necessary means of enabling *private citizens* to vindicate these Federal rights." S. Rep. No. 94-295, at 40 (1975) (emphasis added). Congress has not only ratified the federal courts' longstanding interpretation that Section Two may be enforced by private plaintiffs through inaction by failing to change the law, but these reports also explicitly state agreement with this interpretation.

The point is simple: if courts have consistently misunderstood a congressional enactment in case after case, court after court, decade after decade, surely Congress would have said so by now. Nearly forty years after *Gingles*—and nearly sixty years after the passage of the Voting Rights Act—it is appropriate to assign some degree of legal significance to this reality, even if only as a data point that confirms the Court's reading of the text.

### c.    Statutory Stare Decisis

In addition, statutory *stare decisis* principles counsel that the Court should stay the course in allowing private plaintiffs to sue under Section Two. "[S]*tare decisis* carries enhanced force when a decision . . . interprets a statute" because "unlike in a constitutional case, critics of [the Court's] ruling can take their objections" to Congress, which "can correct any mistake it sees." *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 456 (2015); *see also* Bryan A. Garner et al., The Law of Judicial Precedent 333 (2016) ("Stare decisis applies with special force to questions

of statutory construction. Although courts have power to overrule their decisions and change their interpretations, they do so only for the most compelling reasons—but almost never when the previous decision has been repeatedly followed, has long been acquiesced in, or has become a rule of property."). The Court is guided by decades of unbroken controlling precedent suggesting that Section Two implies a private right of action, and it sees no congressional effort to course correct. Accordingly, the Court thinks "statutory *stare decisis* counsels [its] staying the course." *Allen*, 599 U.S. at 39.

The Supreme Court has "identified several factors to consider in deciding whether to overrule a past decision, including . . . the workability of the rule it established . . . and reliance on the decision." *Knick v. Twp. of Scott*, 588 U.S. 180, 203 (2019) (internal quotation marks omitted) (quoting *Janus v. State, Cnty., & Mun. Emps.*, 585 U.S. 878, 917 (2018)). Allowing private plaintiffs to bring Section Two claims has proven to be a workable rule—having gone unquestioned for decades in multiple Supreme Court decisions. In fact, the ability of private parties to bring Section Two claims has become "the sort of stable background rule that fosters meaningful reliance." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2272 (2024) (internal quotation marks and citation omitted). There has been no "tinkering" with the ability of private parties to bring Section Two claims by the Supreme Court, lower courts (with one, lone exception), or Congress. *Id.* And

because "Congress has spurned multiple opportunities to reverse" the Supreme Court's and lower courts' treatment of private-plaintiff Section Two actions, "a superspecial justification" would be necessary to reverse course, and the Court sees none here. *Kimble*, 576 U.S. at 456, 458.

The federal courts (including the Supreme Court) have consistently and uniformly allowed private plaintiffs to enforce a high-profile congressional enactment for nearly sixty years, and the Court sees no indication in any congressional record that Congress believes all of that (or any of it) was mistaken.

*** 

In the Court's view, the text of Section Two compels the conclusion that private plaintiffs may enforce it, either through an implied private right of action, Section 1983, or both. And other doctrines confirm this understanding of the text. It is difficult in the extreme for the Court to believe that for nearly sixty years, federal courts have consistently misunderstood one of the most important sections of one of the most important civil rights statutes in American history, and that Congress has steadfastly refused to correct the apparent error.

## F.    The plaintiffs have standing.

The Secretary has argued that the plaintiffs lack standing to challenge the Senate districting plan in the Huntsville area. *See* Doc. 229 at 7; Doc. 173 at 3–5. The Court has rejected that argument once already. *See* Doc. 191 at 4–8. But because

the Court "is obligated, as a jurisdictional matter, to confirm the Plaintiffs' standing to bring this case," *Greater Birmingham Ministries v. Sec'y of State*, 992 F.3d 1299, 1316 (11th Cir. 2021), it has re-evaluated the issue after trial and has satisfied again itself that the plaintiffs have standing.

"Article III of the Constitution limits the subject-matter jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) (quoting U.S. Const. art. III, § 2). To satisfy the "case" or "controversy" requirement, an organization may demonstrate standing in two ways: (1) "associational standing based on the injuries of [its] members" or (2) "organizational standing based on [its] own injuries." *Id.* at 1248–49. To assert associational standing, an organization must show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 771 (11th Cir. 2024) (quoting *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 199–200 (2023)).

An organization asserting associational standing must "make specific allegations establishing that at least one identified member ha[s] suffered or [will] suffer harm." *Ga. Republican Party v. Sec. & Exch. Comm'n*, 888 F.3d 1198, 1203

(11th Cir. 2018) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009)).

Further, "in response to a summary judgment motion, the plaintiff can no longer rest

on . . . mere allegations, but must set forth by affidavit or other evidence specific

facts" establishing standing. *Id.* at 1201 (internal quotation marks omitted) (quoting

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

The State Conference has established that it has members affected by the

districting map in Huntsville. The State Conference has identified several members

in the Huntsville area who are Black registered voters. *See* Doc. 248-1. Mr. Simelton,

the president of the State Conference, testified at trial that the State Conference is a

"suborganization" of the national NAACP and that membership dues are shared by

the local, state, and national NAACP. Tr. 156, 158. And he testified at his deposition

that "[e]very member that serves in the State Conference is a member of a branch or

a college chapter within the State Conference" who has been "elected to serve as a

member of the State Conference." Doc. 171-2 at 12. Put simply, the members of the

State Conference are members because they have been elected to that status.

The reality that membership in the State Conference is by election from the

local chapters does not diminish the ability of the State Conference to establish

associational standing. Controlling Eleventh Circuit precedent confirms this

analysis. *See, e.g, Greater Birmingham Ministries*, 992 F.3d at 1316 (holding that

the State Conference "ha[s] members (minority voters in Alabama)" for standing

245

purposes); *see also Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1164 (11th Cir. 2008) (concluding that the Florida State Conference of the NAACP "ha[d] standing to sue on behalf of [its] members"). Because the State Conference has identified at least one member who is registered to vote in Huntsville, Doc. 171-4 at 5, the Court concludes that the State Conference has associational standing.

Because the State Conference has associational standing, the Court need not decide whether Greater Birmingham Ministries has standing to challenge the districting map in that area. *See Florida v. U.S. Dept. of Health & Hum. Servs.*, 648 F.3d 1235, 1243 (11th Cir. 2011), *rev'd on other grounds sub nom. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) ("The law is abundantly clear that so long as one plaintiff has standing to raise each claim[,] … [a federal court] need not address whether the remaining plaintiffs have standing.").

## VI.   REMEDY

"Federal-court review of districting legislation represents a serious intrusion on the most vital of local functions. It is well settled that 'reapportionment is primarily the duty and responsibility of the State." *Miller*, 515 U.S. at 915 (quoting *Chapman v. Meier*, 420 U.S. 1, 27 (1975)).

Even when a federal court finds that a redistricting plan violates federal law, the Supreme Court "has repeatedly held that redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every

effort not to pre-empt." *Wise*, 437 U.S. at 539–40 (opinion of White, J.) (collecting cases). Upon such a finding, "it is therefore, appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan." *Id.* at 540. "The new legislative plan, if forthcoming, will then be the governing law unless it, too, is challenged and found to violate the Constitution." *Id.*

Following a determination that a redistricting plan violates Section Two, "[s]tates retain broad discretion in drawing districts to comply with the mandate of § 2." *Shaw II*, 517 U.S. at 917 n.9. A state may rely on a Section Two plaintiff's remedial plan, but is not required to do so, nor to "draw the precise compact district that a court would impose in a successful § 2 challenge." *Vera*, 517 U.S. at 978 (internal quotation marks omitted). Instead, "the States retain a flexibility that federal courts enforcing § 2 lack, both insofar as they may avoid strict scrutiny altogether by respecting their own traditional districting principles, and insofar as deference is due to their reasonable fears of, and to their reasonable efforts to avoid, § 2 liability." *Id.*

If—and only if—the state legislature cannot or will not adopt a remedial map that complies with federal law in time for use in an upcoming election does the job of drawing an interim map fall to the courts. "Legislative bodies should not leave

their reapportionment tasks to the federal courts; but when those with legislative responsibilities do not respond, or the imminence of a state election makes it impractical for them to do so, it becomes the unwelcome obligation of the federal court to devise and impose a reapportionment plan pending later legislative action." *Wise*, 437 U.S. at 540 (opinion of White, J.) (internal quotation marks and citation omitted); *accord Growe*, 507 U.S. at 36–37.

To facilitate timely remedial proceedings, a status conference is **SET** for **AUGUST 28, 2025,** at 10:00 AM in the Third Floor Courtroom, Robert S. Vance Federal Building and United States Courthouse, 1800 5th Avenue North Birmingham, Alabama 35203. The parties are **ORDERED** to file a joint status report with the parties' proposals for moving the case forward at or before noon on **AUGUST 27, 2025.**

## VII.   EVIDENTIARY RULINGS

During the bench trial, the Court accepted into evidence the overwhelming majority of the exhibits that the parties offered; most were stipulated, and the Court ruled on some evidentiary objections and reserved ruling on others. All pending objections are **SUSTAINED**.

## VIII. THE SECRETARY'S MOTION FOR JUDGMENT AS A MATTER OF LAW

After trial, the Secretary moved for judgment as a matter of law as a "'belt and suspenders' approach to preservation" of his legal arguments. *See* Doc. 247 at

248

1. He re-raises his arguments that (1) Section Two does not provide a private right of action and (2) the plaintiffs failed to satisfy the first *Gingles* precondition with their illustrative districts in the Huntsville area. Doc. 247 at 1–2. For the reasons stated above, *see supra* Part V.E, the Secretary's motion for judgment as a matter of law with respect to the enforceability of Section Two as a private right of action is **DENIED**. Because the court concluded that the plaintiffs did not establish numerosity in the Huntsville area, *see supra* Part V.A.–V.B.2, the Secretary's motion for judgment as a matter of law with respect to that argument is **DENIED AS MOOT**.

     **DONE** and **ORDERED** this 22nd day of August, 2025.

_____
**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE

# APPENDIX A – COMMITTEE GUIDELINES

1   **REAPPORTIONMENT COMMITTEE REDISTRICTING GUIDELINES**

2                           May 5, 2021

3   **I. POPULATION**

4   The total Alabama state population, and the population of defined subunits
5   thereof, as reported by the 2020 Census, shall be the permissible data base used
6   for the development, evaluation, and analysis of proposed redistricting plans. It is
7   the intention of this provision to exclude from use any census data, for the purpose
8   of determining compliance with the one person, one vote requirement, other than
9   that provided by the United States Census Bureau.

10  **II. CRITERIA FOR REDISTRICTING**

11  a.     Districts shall comply with the United States Constitution, including the
12  requirement that they equalize total population.

13  b.     Congressional districts shall have minimal population deviation.

14  c.     Legislative and state board of education districts shall be drawn to achieve
15  substantial equality of population among the districts and shall not exceed an
16  overall population deviation range of ±5%.

17  d.     A redistricting plan considered by the Reapportionment Committee shall
18  comply with the one person, one vote principle of the Equal Protection Clause of
19  the 14th Amendment of the United States Constitution.

20  e.     The Reapportionment Committee shall not approve a redistricting plan that
21  does not comply with these population requirements.

22  f.     Districts shall be drawn in compliance with the Voting Rights Act of 1965, as
23  amended. A redistricting plan shall have neither the purpose nor the effect of
24  diluting minority voting strength, and shall comply with Section 2 of the Voting
25  Rights Act and the United States Constitution.

26  g.     No district will be drawn in a manner that subordinates race-neutral
27  districting criteria to considerations of race, color, or membership in a language-
28  minority group, except that race, color, or membership in a language-minority
29  group may predominate over race-neutral districting criteria to comply with
30  Section 2 of the Voting Rights Act, provided there is a strong basis in evidence in
31  support of such a race-based choice. A strong basis in evidence exists when there
32  is good reason to believe that race must be used in order to satisfy the Voting Rights
33  Act.

10213405.2

h.    Districts will be composed of contiguous and reasonably compact geography.

i.    The following requirements of the Alabama Constitution shall be complied with:

(i)    Sovereignty resides in the people of Alabama, and all districts should be drawn to reflect the democratic will of all the people concerning how their governments should be restructured.

(ii)    Districts shall be drawn on the basis of total population, except that voting age population may be considered, as necessary to comply with Section 2 of the Voting Rights Act or other federal or state law.

(iii)    The number of Alabama Senate districts is set by statute at 35 and, under the Alabama Constitution, may not exceed 35.

(iv)    The number of Alabama Senate districts shall be not less than one-fourth or more than one-third of the number of House districts.

(v)    The number of Alabama House districts is set by statute at 105 and, under the Alabama Constitution, may not exceed 106.

(vi)    The number of Alabama House districts shall not be less than 67.

(vii)    All districts will be single-member districts.

(viii)    Every part of every district shall be contiguous with every other part of the district.

j.    The following redistricting policies are embedded in the political values, traditions, customs, and usages of the State of Alabama and shall be observed to the extent that they do not violate or subordinate the foregoing policies prescribed by the Constitution and laws of the United States and of the State of Alabama:

(i)    Contests between incumbents will be avoided whenever possible.

(ii)    Contiguity by water is allowed, but point-to-point contiguity and long-lasso contiguity is not.

(iii)    Districts shall respect communities of interest, neighborhoods, and political subdivisions to the extent practicable and in compliance with paragraphs a through i. A community of interest is defined as an area with recognized similarities of interests, including but not limited to ethnic, racial, economic, tribal, social, geographic, or historical identities. The term communities of interest may, in certain circumstances, include political subdivisions such as counties, voting

10213405.2

2

251

precincts, municipalities, tribal lands and reservations, or school districts. The discernment, weighing, and balancing of the varied factors that contribute to communities of interest is an intensely political process best carried out by elected representatives of the people.

(iv)    The Legislature shall try to minimize the number of counties in each district.

(v)    The Legislature shall try to preserve the cores of existing districts.

(vi)  In establishing legislative districts, the Reapportionment Committee shall give due consideration to all the criteria herein. However, priority is to be given to the compelling State interests requiring equality of population among districts and compliance with the Voting Rights Act of 1965, as amended, should the requirements of those criteria conflict with any other criteria.

g.    The criteria identified in paragraphs j(i)-(vi) are not listed in order of precedence, and in each instance where they conflict, the Legislature shall at its discretion determine which takes priority.

### III. PLANS PRODUCED BY LEGISLATORS

1.    The confidentiality of any Legislator developing plans or portions thereof will be respected. The Reapportionment Office staff will not release any information on any Legislator's work without written permission of the Legislator developing the plan, subject to paragraph two below.

2.    A proposed redistricting plan will become public information upon its introduction as a bill in the legislative process, or upon presentation for consideration by the Reapportionment Committee.

3.    Access to the Legislative Reapportionment Office Computer System, census population data, and redistricting work maps will be available to all members of the Legislature upon request. Reapportionment Office staff will provide technical assistance to all Legislators who wish to develop proposals.

4.    In accordance with Rule 23 of the Joint Rules of the Alabama Legislature "[a]ll amendments or revisions to redistricting plans, following introduction as a bill, shall be drafted by the Reapportionment Office." Amendments or revisions must be part of a whole plan. Partial plans are not allowed.

5.    In accordance with Rule 24 of the Joint Rules of the Alabama Legislature, "[d]rafts of all redistricting plans which are for introduction at any session of the Legislature, and which are not prepared by the Reapportionment Office, shall be presented to the Reapportionment Office for review of proper form and for entry into the Legislative Data System at least ten (10) days prior to introduction."

10213405.2

3

Case 2:21-cv-01531-AMM    Document 190-21    Filed 09/19/24    Page 5 of 8

## IV. REAPPORTIONMENT COMMITTEE MEETINGS AND PUBLIC HEARINGS

1.    All meetings of the Reapportionment Committee and its sub-committees will be open to the public and all plans presented at committee meetings will be made available to the public.

2.    Minutes of all Reapportionment Committee meetings shall be taken and maintained as part of the public record. Copies of all minutes shall be made available to the public.

3.    Transcripts of any public hearings shall be made and maintained as part of the public record, and shall be available to the public.

4.    All interested persons are encouraged to appear before the Reapportionment Committee and to give their comments and input regarding legislative redistricting. Reasonable opportunity will be given to such persons, consistent with the criteria herein established, to present plans or amendments redistricting plans to the Reapportionment Committee, if desired, unless such plans or amendments fail to meet the minimal criteria herein established.

5.    Notice of all Reapportionment Committee meetings will be posted on monitors throughout the Alabama State House, the Reapportionment Committee's website, and on the Secretary of State's website. Individual notice of Reapportionment Committee meetings will be sent by email to any citizen or organization who requests individual notice and provides the necessary information to the Reapportionment Committee staff. Persons or organizations who want to receive this information should contact the Reapportionment Office.

## V. PUBLIC ACCESS

1.    The Reapportionment Committee seeks active and informed public participation in all activities of the Committee and the widest range of public information and citizen input into its deliberations. Public access to the Reapportionment Office computer system is available every Friday from 8:30 a.m. to 4:30 p.m. Please contact the Reapportionment Office to schedule an appointment.

2.    A redistricting plan may be presented to the Reapportionment Committee by any individual citizen or organization by written presentation at a public meeting or by submission in writing to the Committee. All plans submitted to the Reapportionment Committee will be made part of the public record and made available in the same manner as other public records of the Committee.

10213405.2

4

1  3.    Any proposed redistricting plan drafted into legislation must be offered by a
2  member of the Legislature for introduction into the legislative process.

3  4.    A redistricting plan developed outside the Legislature or a redistricting plan
4  developed without Reapportionment Office assistance which is to be presented for
5  consideration by the Reapportionment Committee must:

6  a.    Be clearly depicted on maps which follow 2020 Census geographic
7  boundaries;

8  b.    Be accompanied by a statistical sheet listing total population for each district
9  and listing the census geography making up each proposed district;

10  c.    Stand as a complete statewide plan for redistricting.

11  d.    Comply with the guidelines adopted by the Reapportionment Committee.

12  5.    Electronic Submissions

13  a.    Electronic submissions of redistricting plans will be accepted by the
14  Reapportionment Committee.

15  b.    Plans submitted electronically must also be accompanied by the paper
16  materials referenced in this section.

17  c.    See the Appendix for the technical documentation for the electronic
18  submission of redistricting plans.

19  6.    Census Data and Redistricting Materials

20  a.    Census population data and census maps will be made available through the
21  Reapportionment Office at a cost determined by the Permanent Legislative
22  Committee on Reapportionment.

23  b.    Summary population data at the precinct level and a statewide work maps
24  will be made available to the public through the Reapportionment Office at a cost
25  determined by the Permanent Legislative Committee on Reapportionment.

26  c.    All such fees shall be deposited in the state treasury to the credit of the
27  general fund and shall be used to cover the expenses of the Legislature.

28                         **Appendix.**

29        **ELECTRONIC SUBMISSION OF REDISTRICTING PLANS**

30      **REAPPORTIONMENT COMMITTEE - STATE OF ALABAMA**

10213405.2

1

The Legislative Reapportionment Computer System supports the electronic submission of redistricting plans. The electronic submission of these plans must be via email or a flash drive. The software used by the Reapportionment Office is Maptitude.

The electronic file should be in DOJ format (Block, district # or district #, Block). This should be a two column, comma delimited file containing the FIPS code for each block, and the district number. Maptitude has an automated plan import that creates a new plan from the block/district assignment list.

Web services that can be accessed directly with a URL and ArcView Shapefiles can be viewed as overlays. A new plan would have to be built using this overlay as a guide to assign units into a blank Maptitude plan. In order to analyze the plans with our attribute data, edit, and report on, a new plan will have to be built in Maptitude.

In order for plans to be analyzed with our attribute data, to be able to edit, report on, and produce maps in the most efficient, accurate and time saving procedure, electronic submissions are REQUIRED to be in DOJ format.

Example: (DOJ FORMAT BLOCK, DISTRICT #)

SSCCCTTTTTTBBBBDDDD

| | |
|---|---|
| SS | is the 2 digit state FIPS code |
| CCC | is the 3 digit county FIPS code |
| TTTTTT | is the 6 digit census tract code |
| BBBB | is the 4 digit census block code |
| DDDD | is the district number, right adjusted |

**Contact Information:**

Legislative Reapportionment Office

Room 317, State House

11 South Union Street

Montgomery, Alabama 36130

(334) 261-0706

6

10213405.2

255

1  For questions relating to reapportionment and redistricting, please contact:

2  Donna Overton Loftin, Supervisor

3  Legislative Reapportionment Office

4  donna.overton@alsenate.gov

5  Please Note: The above e-mail address is to be used only for the purposes of
6  obtaining information regarding redistricting. Political messages, including those
7  relative to specific legislation or other political matters, cannot be answered or
8  disseminated via this email to members of the Legislature. Members of the
9  Permanent Legislative Committee on Reapportionment may be contacted through
10  information contained on their Member pages of the Official Website of the
11  Alabama Legislature, legislature.state.al.us/aliswww/default.aspx.

Doc. 190-21.