# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| ALABAMA STATE CONFERENCE OF THE NAACP, *et al.*, | ) ) ) |
| *Plaintiffs*, | ) ) |
| v. | ) ) ) |
| WES ALLEN, *in his official capacity as Alabama Secretary of State*, | ) ) ) ) |
| *Defendant*. | ) |

Case No. 2:21-cv-1531-AMM

## SECRETARY OF STATE'S MOTION TO STAY REMEDIAL PROCEEDINGS & INJUNCTION

As recently demonstrated by Louisiana's plight in *Louisiana v. Callais*, moving forward with remedial proceedings here would put Alabama in an impossible situation with the highest constitutional stakes. In less than seven weeks, the Supreme Court will hear arguments for the second time in a case about Louisiana's 2024 congressional plan, which was enacted to remedy a likely § 2 violation by drawing an additional majority-minority district. The question is: "Whether the State's intentional creation of a second majority-minority … district violates the Fourteenth or Fifteenth Amendments to the U.S. Constitution." *Louisiana v. Callais*, No. 24-109, 2025 WL 2180226 (U.S. Aug. 1, 2025). Whatever the answer, there is little doubt that the Supreme Court's decision will provide critical guidance the State currently lacks for judging Alabama's next Senate map.

1

But a stay is warranted not merely because the Supreme Court may clarify legal issues contested in this case. In addition, redistricting is unique in that the State must have some plan in effect. For example, when Alabama's law restricting panhandling was recently enjoined on First Amendment grounds, no replacement law was necessarily required. But *some* plan must govern the next election.

And redistricting is doubly unique in that trying to enact that replacement subjects the State to "competing hazards of liability."[1] If Alabama enacted a new restriction on panhandling, it could presumably hew more closely to First Amendment precedent and avoid federal-law liability. But in redistricting today, there is no obvious safe harbor. If the Legislature creates an additional majority-minority district (like Louisiana did in 2024), it runs the risk of "violat[ing] the Fourteenth or Fifteenth Amendments." And if the Legislature avoids that risk by enacting a plan that does not intentionally create a new majority-minority district, it runs a separate risk of being found to have discriminated.[2]

Moreover, this moment in redistricting jurisprudence is more unique still. While the Supreme Court has long "assumed that compliance with the VRA may justify the consideration of race in a way that would not otherwise be allowed," *Abbott*, 585 U.S. at 587, that assumption is under review by the Court right now.

---

[1] *Abbott v. Perez*, 585 U.S. 579, 587 (2018).
[2] *See Singleton v. Allen*, No. 2:21-CV-01291-AMM, 2025 WL 1342947 (N.D. Ala. May 8, 2025).

And, finally, Alabama's case is more unique still, because Plaintiffs here have argued in *Milligan v. Allen* that either a gerrymandering violation for using race too much or an intentional dilution violation for using race too little merits preclearance bail-in under § 3 of the VRA. In light of this confluence of factors, a stay of further proceedings and of this Court's injunction is warranted to avoid the heavy costs and risks that would follow from proceeding on contested assumptions.

Three courts have recently reached similar conclusions. The Western District of Texas suspended briefing on § 2 claims due in part to the "consequential development[]" of "the Supreme Court's pending decision[]" in *Callais*.[3] And two courts in Louisiana likewise stayed § 2 litigation. As one court found, even assuming plaintiffs were likely to prevail, "any prejudice they suffer from a stay will be substantially outweighed by" prejudice to the State and public interest of pressing forward before "*Callais* is decided."[4] Even in Louisiana's litigation over its State legislative plans (as opposed to its congressional plans), the district court canceled its "remedial evidentiary hearing … pending resolution by the United States Supreme Court" of *Callais*,[5] despite having found §2 violations in 2024.[6] This Court should follow a similar path.

---

[3] *See LULAC v. Abbott*, No. 3:21-cv-00259 (W.D. Tx. Aug. 11, 2025) (three-judge court), ECF 1126.
[4] *Clark v. Landry*, No. 86-435 (M.D. La. July 17, 2025), ECF 752.
[5] *Nairne v. Ardoin*, 3:22-cv-00178 (M.D. La. Aug. 6, 2025), ECF 345.
[6] *Nairne v. Ardoin*, 715 F. Supp. 3d 808 (M.D. La. 2024).

3

## ARGUMENT

"The inherent discretionary authority of the district court to stay litigation pending the outcome of [a] related proceeding in another forum is not questioned." *CTI-Container Leasing Corp. v. Uiterwyk Corp.*, 685 F.2d 1284, 1289 (11th Cir. 1982). Indeed, "a district court has 'general discretionary power to stay proceedings before it in the control of its docket and in the interests of justice.'" *Marti v. Iberostar Hoteles y Apartamentos S.L.*, 54 F.4th 641, 649 (11th Cir. 2022) (quoting *Ortega Trujillo v. Conover & Co. Commc'ns, Inc.*, 221 F.3d 1262, 1264 (11th Cir. 2000)). So long as the stay is not "immoderate"—i.e., it is reasonable in terms of scope, duration, and the underlying basis—a district court does not abuse its discretion by staying a case pending the outcome of another case. *Ortega Trujillo*, 221 F.3d at 1264. Here, this Court should exercise this inherent authority and stay further proceedings pending the outcome of *Callais* for several related reasons.

*First*, the outcome in *Callais* will almost certainly affect how the Legislature, or the Court, draws Alabama's remedial plan. It is well-recognized that "federal law imposes complex and delicately balanced requirements regarding the consideration of race in redistricting." Doc. 274 at 11 (internal quotation marks omitted). The Equal Protection Clause and § 2 "pull[] in … opposite direction[s]," with the Fourteenth Amendment "restrict[ing] the consideration of race in the districting process" and § 2 "often insist[ing] that districts be created precisely because of race."

4

*Abbott v. Perez*, 585 U.S. 579, 586 (2018). The Supreme Court has "assumed … that a State's consideration of race in making a districting decision is narrowly tailored and thus satisfies strict scrutiny if the State has good reasons for believing that its decision is necessary in order to comply with the VRA." *Id.* at 587. But even this "notoriously unclear and confusing"[7] approach for States may soon be foreclosed. The Supreme Court in *Callais* is currently positioned to address the tension between what § 2 demands and what the Constitution prohibits in redistricting. The Supreme Court's decision will set the rules by which the lawfulness of any future Senate plan will be judged, and thus will likely have a significant effect on the remedial proceedings in this case. Forging ahead now will force all parties involved to guess on whether any enacted or proposed plan will comply with federal law.

A wrong guess carries severe practical and legal consequences. First and foremost, it may unconstitutionally subject Alabamians to the "odious" practice of racial sorting into districts. *Shaw v. Reno*, 509 U.S. 630, 643 (1993). But a wrong guess could also draw claims of discrimination and subject the State to downstream consequences such as preclearance. For instance, the Plaintiffs here argued recently in *Milligan* that even a single constitutional violation—whether a *Shaw* claim or intentional dilution—should subject the State to bail-in pursuant to Section 3(c) of

---

[7] *See Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring) ("[T]he Court's case law in this area is notoriously unclear and confusing.").

the Voting Rights Act. *See* Milligan Pls.' Resp. in Support of their Request for Section 3(c) Relief, *Milligan v. Allen*, Case No. 2:21-cv-01530-AMM (N.D. Ala. June 25, 2025), ECF 502.

Said otherwise, "it is … appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan." Doc. 274 at 252 (internal quotation marks omitted). But just weeks away from reargument in *Callais*, the Alabama Legislature cannot know what "constitutional requirements" will apply to its work. Even if the Legislature enacted a plan that completely satisfied the Plaintiffs, the State could face new litigation from any number of future plaintiffs in future cases challenging the remedial plan, as happened to Louisiana in *Callais*, and, worse, the outcome of *Callais* could dramatically incentivize just that result.

The State's only escape from this dangerous wager would be to cede its sovereign prerogative to the Court, which represents a "serious intrusion" on one of the Legislature's "most vital of local functions." *See* Doc. 274 at 246-48 (recognizing precedent providing Legislature the first opportunity to redistrict, and that the Legislature has more leeway than the Court). Forcing the State to take that drastic step is unwarranted and inequitable when the parties are likely to soon know how to weigh and navigate the operative legal parameters when *Callais* is decided.

On a practical note, *Callais*'s effect on the State's remedial districts (whether legislatively enacted or judicially imposed) threaten confusion for the 2026 election cycle. The 2026 Primary Election is scheduled for May 19, 2026, and the Primary Runoff for June 16, 2026. If the Supreme Court releases the *Callais* opinion *after* one or both of these elections and the decision results in the remedial districts here being found incompatible with the Constitution, that will present numerous concerns, including complicated practical and legal questions about which set of districts the election could or should proceed under.

**Second**, district courts facing this same *Callais* conundrum have recently stayed § 2 litigation in light of troubles like those noted above. *See LULAC v. Abbott*, No. 3:21-cv-00259 (W.D. Tx. Aug. 11, 2025) (three-judge court), ECF 1126; *Clark v. Landry*, No. 86-435 (M.D. La. July 17, 2025), ECF 752; *Nairne v. Ardoin*, 3:22-cv-00178 (M.D. La. Aug. 6, 2025), ECF 345.

The three-judge court in Texas found it was "prudent to suspend" further § 2 proceedings "until the law in this area becomes more settled." *LULAC*, No. 3:21-cv-00259, ECF 1126 at 2. In *Clark*, the district court stayed § 2 litigation because,

> *even if Plaintiffs had shown a likelihood of success on the merits*, any prejudice they suffer from a stay will be *substantially outweighed* by (1) the prejudice suffered by Defendants in having a decision rendered using a standard that has a *significant potential to change* following a decision in *Callais*; and (2) the fact that the public interest would be better served by conserving judicial and party resources in rendering a decision *only once rather than potentially having to relitigate all of these issues again* after *Callais* is decided.

7

*Clark*, No. 86-435 (M.D. La. July 17, 2025), ECF 752 (emphases added). In *Nairne*, after the court found a § 2 violation yet before the parties entered into the remedial proceedings (i.e., the same procedural posture in this case), the court cancelled the remedial hearing "pending resolution by the United States Supreme Court." *Nairne*, 3:22-cv-00178 (M.D. La. Aug. 6, 2025), ECF 345.

Similarly, this Court too *sua sponte* stayed this case (and subsequently rejected attempts to lift that stay) pending the Supreme Court's decision in *Allen v. Milligan*. Doc. 61. Such prudence is again warranted here, where the caselaw is uniquely in flux and the potential costs to the State and voters are uniquely high.

***Third***, even if staying this Court's injunction pending a decision in *Callais* implicates the four-factor test usually reserved for stays pending appeal rather than those of further proceedings under this Court's inherent authority, that test is satisfied here. Four considerations govern: (1) the likelihood of success on the merits (2) irreparable injury to the movant; (3) whether the other parties will be "substantially injured"; and (4) where the public interest lies. *Venus Lines Agency v. CVG Industria Venezolana De Aluminio, C.A.*, 210 F.3d 1309, 1313 (11th Cir. 2000) (cleaned up). "[W]here the government is the party opposing the … injunction, its interest and harm merge with the public interest." *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020). And an applicant can also satisfy the test by making the "lesser showing of a 'substantial case on the merits' when 'the balance of the equities

identified in factors 2, 3, and 4 weigh heavily in favor of granting the stay." *Garcia-Mir. v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986) (quoting *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. 1981) (per curiam)) (alterations adopted).

As explained above, the equities weigh heavily in favor of a stay. The State faces significant threats to its sovereignty (including bail-in threats by Plaintiffs) if this matter proceeds. *See Miller v. Johnson*, 515 U.S. 900, 915 (1995) ("Federal-court review of districting legislation represents a serious intrusion on the most vital of local functions."). And the public faces potentially unconstitutional racial sorting and disruption to the election process. *Id.* at 912 ("Race-based assignments embody stereotypes that treat individuals as the product of their race, evaluating their thoughts and efforts—their very worth as citizens—according to a criterion barred to the Government by history and the Constitution.") (internal quotation marks omitted). The State likewise faces the per se irreparable harm of being forced to conduct elections under districts other than those it duly enacted. *See Abbott*, 585 U.S. at 602 n.17.

On the flip side, Plaintiffs—who never sought preliminary injunctive relief—will not suffer "substantial injury" by waiting for the Legislature to enact a plan that is not guaranteed to be subject to subsequent litigation given the ground rules *Callais* will provide on how to balance the long-simmering conflict between § 2 and the Constitution. *Cf. Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir.)

(holding that plaintiffs' delay "of even only a few months" weighs against their claims of injury for preliminary injunction purposes). Just like the plaintiffs in *Clark*, any prejudice the Plaintiffs here may suffer from a stay will be "substantially outweighed" by (1) the prejudice suffered by the Secretary in having a remedial map passed (or imposed) "using a standard that has a significant potential to change following a decision in *Callais*"; and (2) "the fact that the public interest would be better served by conserving judicial and party resources in rendering a decision only once rather than potentially having to relitigate" this issue again after *Callais*. *Clark*, No. 86-435 (M.D. La. July 17, 2025), ECF 752.

"When the massive disruption to the political process of the [State] is weighed against the harm to plaintiffs of suffering through one more election based on an allegedly invalid districting scheme, equity requires that [this Court] deny relief." *Mac Govern v. Connolly*, 637 F. Supp. 111, 116 (D. Mass. 1986) (three-judge court). Thus, "[t]he Supreme Court has held that an injunction may be inappropriate even when a redistricting plan has actually been found unconstitutional because of the great difficulty of unwinding and reworking a state's entire electoral process." *Favors v. Cuomo*, 881 F. Supp. 2d 356, 371 (E.D.N.Y. 2012) (citing *Reynolds v. Sims*, 377 U.S. 533, 585 (1964); *Roman v. Sincock*, 377 U.S. 695, 709-10 (1964)).

On the merits—while the Secretary acknowledges that this Court has disagreed with the Secretary's arguments—the Secretary believes he is likely to

succeed on appeal, and at a minimum, has made the lesser showing of a substantial case on the merits justifying a stay here given the weight of the equities. *See Garcia-Mir*, 781 F.2d at 1453. As this Court recounted, Alabama's Senate plans have had eight majority-black districts since the 1990s. Doc. 274 at 15. And this case is not the first § 2 challenge demanding an additional majority-black districts. Rather, just last decade, plaintiffs brought a § 2 challenge to the 2012 legislative plan. *Ala. Legis. Black Caucus v. Alabama*, 989 F. Supp. 2d 1227, 1236 (M.D. Ala. 2013) (*ALBC I*), *vacated on other grounds*, 575 U.S. 254.[8] There, a three-judge court "conclude[d] that the totality of the circumstances does not support the conclusion that the" 2012 Plan "would deny black voters an equal opportunity to participate in the political process. *Id.* at 1286. Among other factors, the Middle District of Alabama noted that "black voters in Alabama are highly politically active," "black voters have successfully elected the candidates of their choice in the majority-black districts," and "the majority-black districts are roughly proportional to the black voting-age population in Alabama." *Id.* at 1286.

That reading tracks with the text of § 2, which requires Plaintiffs here to show that black voters in the Montgomery area have less opportunity not only to elect the candidates of their choice but also to participate in the political process. Both

---

[8] The district court's conclusions as to § 2 were later readopted after remand from the Supreme Court. *See Ala. Legis. Black Caucus v. Alabama*, 231 F. Supp. 3d 1026, 1033 (M.D. Ala. 2017) (*ALBC II*).

11

showings are required. Proving only less opportunity to elect "is not sufficient to establish a violation unless … it can also be said that the members of the protected class have less opportunity to participate in the political process." *Chisom v. Roemer*, 501 U.S. 380, 397 (1991). The 1982 amendments to "§ 2 [were] intended to 'codify' the results test employed in *Whitcomb v. Chavis*, 403 U.S. 124 (1971), and *White v. Regester*, 412 U.S. 755 (1973)." *Chisom*, 501 U.S. at 394 n.21 (quoting *Thornburg v. Gingles*, 478 U.S. 30, 83-84 (1986) (O'Connor, J., concurring in the judgment)). The plaintiffs in *Whitcomb* lost because they did not show that they "were not allowed [1] to register or vote, [2] to choose the political party they desired to support, [3] to participate in its affairs or [4] to be equally represented on those occasions when legislative candidates were chosen." *Whitcomb*, 403 U.S. at 149-50. In the words of the Middle District, they were "politically active and registered to vote in high numbers." *ALBC I*, 989 F. Supp. 2d at 1286.

The same is true here in the Montgomery area today. Plaintiffs' expert, Dr. Tracy Burch, found that in 2022, in Montgomery County "the Black voter registration rate was 1.3 percentage points higher than the White registration rate." PX11 at 5. This comports with what the Middle District of Alabama found in 2020: "Voter registration and turnout rates among African-Americans and whites have reached parity." *Ala. St. Conf. of the NAACP v. Alabama*, 612 F. Supp. 3d 1232, 1290 (M.D. Ala. 2020).

Here, the Court focused instead on how "racial disparities in family poverty, internet access, and access to transportation hamper voting participation due to an inability to learn about candidates, absentee vote, locate voting information, and travel to polls." Doc. 274 at 214-15. But even if socioeconomic disparities "hamper voting participation," "the size of the burden imposed by a voting rule is important." *Brnovich v. DNC*, 594 U.S. 647, 669 (2021). The burden courts should focus on is whether voters are able to engage in the fundamental forms of political participation—registration, voting, and participating with the party of their choice.

A finding of Voting Rights Act liability by plaintiffs who enjoy equal access to these fundamental voting rights "would spawn endless litigation." *Whitcomb*, 403 U.S. at 157. But "the authority to conduct race-based redistricting cannot extend indefinitely into the future." *Allen v. Milligan*, 599 U.S. 1, 45 (2023) (Kavanaugh, J., concurring). Accordingly, the Secretary believes the Eleventh Circuit is likely to look closer at whether voters in Montgomery can register and vote, rather than whether socioeconomic disparities otherwise "hinder Black Alabamians' political participation." Doc. 274 at 215.

The Eleventh Circuit will also have to address another conflict between the Middle District's 2017 decision on gerrymandering and this Court's decision on legally significant racially polarized voting. In 2017, the Middle District held that House District 85 was a gerrymander that could not be saved by an appeal to § 2

"[b]ecause the black voting-age population percentage in District 85 is 47.23 percent," which meant that under the 50% VAP rule of *Bartlett v. Strickland*, 556 U.S. 1 (2009), Alabama could not "claim that its district is narrowly tailored to achieve compliance with section 2." *ALBC II*, 231 F. Supp. 3d at 1320. And here (though the precise threshold is disputed) the evidence supports that a new district in the Montgomery area below 50% BVAP would likely elect the candidate preferred by most black voters. Doc. 274 at 181-82. Thus, if Alabama engages in race-based districting to draw a new SD25 that is below 50% BVAP, the State may violate the Equal Protection Clause. But if the State uses race *more* to boost a district up to 50% BVAP or higher, the State might be liable under *Cooper v. Harris*, 581 U.S. 285, 302 (2017), for aiming at a 50% target when a lower BVAP would do. Reading *Gingles* 3 in line with *Pierce v. North Carolina State Board of Elections*, 97 F.4th 194 (4th Cir. 2024), solves this problem.

For all these reasons, as well as those set forth in the Secretary's motions to dismiss and proposed findings of fact and conclusions of law, the Secretary has at a minimum shown a substantial case on the merits. Accordingly, this Court should stay its injunction pending further proceedings.

\*   \*   \*

The State is seeking a stay not merely because the law governing this case may soon change, and not merely because competing hazards of liability make

14

redistricting particularly difficult. The State seeks a stay because, at this moment, in the shadow of *Callais*, the State undeniably faces "a lose-lose situation" that risks violating its citizens' rights and forfeiting the State's right to enact future laws. *Alexander v. S.C. St. Conf. NAACP*, 602 U.S. 1, 65 (2024) (Thomas, J., concurring in part). Entering a stay will prevent serious harms that would ensue if the State is forced to play this lose-lose game just months before the Supreme Court is likely to provide clearer rules. The stay's duration is likely to be modest. And the reasons for stay could hardly be clearer, as Alabama finds itself in the same shoes as Louisiana was in before it enacted the plan that landed it back in the Supreme Court. Accordingly, this Court should stay further proceedings and its injunction preventing the State from using its enacted map pending the Supreme Court's decision in *Callais*.

        Steve Marshall
          *Attorney General*

        Edmund G. LaCour Jr. (ASB-9182-U81L)
          *Solicitor General*

        James W. Davis (ASB-4063-I58J)
          *Deputy Attorney General*

        /s/ Brenton M. Smith
        Misty S. Fairbanks Messick (ASB-1813-T71F)
        Brenton M. Smith (ASB-1656-X27Q)
          *Assistant Attorneys General*

        OFFICE OF THE ATTORNEY GENERAL
        STATE OF ALABAMA

501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Misty.Messick@AlabamaAG.gov
Brenton.Smith@AlabamaAG.gov

Michael P. Taunton (ASB-6833-H00S)
Riley Kate Lancaster (ASB-1002-X86W)
BALCH & BINGHAM LLP
1901 Sixth Avenue North, Suite 1500
Birmingham, Alabama 35203
Telephone (205) 251-8100
MTaunton@Balch.com
RLancaster@Balch.com

*Counsel for Secretary of State Allen*

**CERTIFICATE OF SERVICE**

I certify that on August 29, 2025, I electronically filed the foregoing notice with the Clerk of the Court using the CM/ECF system, which will send notice to all counsel of record.

/s/ Brenton M. Smith
*Counsel for Secretary of State Allen*