IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| ALABAMA STATE CONFERENCE OF THE NAACP, *et al.*, | ) ) ) | |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | Case No. 2:21-cv-1531-AMM |
| WES ALLEN, in his official capacity as Alabama Secretary of State, *et al.*, | ) ) ) ) | |
| *Defendants*. | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO STAY REMEDIAL PROCEEDINGS**

Staying the remedial proceedings in this case pending the outcome of *Louisiana v. Callais*, No. 24-109 (S. Ct.) would be "denying justice by delay." *Marti v. Iberostar Hoteles y Apartamentos S.L.*, 54 F.4th 641, 651 (11th Cir. 2022). There is no dispute that granting the Secretary's motion will deny Plaintiffs and Black Alabamians fair State Senate districts in Montgomery for the 2026 elections given the timeline. Permitting this would be unjust and unnecessary.

"[G]rants of certiorari do not themselves change the law," and "must not be used by courts" as a basis to grant relief that would otherwise be denied *In re Bradford*, 830 F.3d 1273, 1275 (11th Cir. 2016). But that is exactly what the Secretary attempts here. And for what?

The supplemental question presented in *Callais* does not threaten the viability of Section 2 of the Voting Rights Act (VRA) or race-conscious districting remedies. The *Callais* Court is the same one that affirmed the constitutionality of a race-conscious Section 2 two years ago in *Milligan*. The issue raised in *Callais* is state specific, and does not implicate racial blindfolds: whether the Louisiana's "intentional creation of a second majority-minority . . . . district" based on the record in that case violates the Constitution. *Louisiana v. Callais*, (No. 24-109), 2025 WL 2180226, at *1 (U.S. Aug. 1, 2025) (mem.). Unsurprisingly, only one of the cases the Secretary cites as stayed due to *Callais* involves plaintiffs who have already prevailed, and the next scheduled elections there are not until late 2027.

1

Neither this Court's ruling on the merits nor any Supreme Court precedent requires the Alabama Legislature to tread on the issues in *Callais* at all. Section 2 "says nothing about majority-minority districts," *Voinovich v. Quilter*, 507 U.S. 146, 155 (1993) and has never required "strict racial percentages," *Abrams v. Johnson*, 521 U.S. 74, 93 (1997). The Legislature need not (and should not) take the path it took in *Milligan*, when it passed a new map despite its own analysis showing no real electoral opportunity for Black Alabamians, *Milligan v. Allen*, 782 F. Supp. 3d 1092, 1356 (N.D. Ala. 2025), or employ any racial target. The Legislature need only focus in good faith on "the ultimate right of § 2"—"equality of opportunity." *Johnson v. De Grandy*, 512 U.S. 997, 1014 n.11 (1994).

The equities (and merits) strongly favor denial of the stay.

## ARGUMENT

District courts may stay proceedings based on an "exercise of judgment." *Landis v. N. Am. Co.*, 299 U.S. 248, 254-55 (1936). But the moving party "must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to [someone] else." *Id.* at 255. If a stay would be "oppressive in its consequences," *id.* at 256, the Court should deny it.

2

## I. Staying Remedial Proceedings Would Deny Justice and is Unnecessary.

### A. The Practical Effect of a Stay Would Be Denial of Fair Districts for the 2026 Election and Potentially Beyond.

A stay would mean that Plaintiffs and Black Alabamians in Montgomery are forced to "endure[] one [more] election in this census cycle . . . under an unlawful map," simply because the Secretary hopes that forty years of well-settled law *may possibly* change, but there is "no reason to allow that to happen again." *Milligan v. Allen*, 691 F. Supp. 3d 1343, 1357 (N.D. Ala. 2023) (denying a stay where, as here, Alabama pointed to a potential for change in the law). Allowing this racially discriminatory map to remain in place for 2026 would be "oppressive in its consequences." *Landis*, 299 U.S. at 256.

The Secretary contends that a remedial map would need to "be in place on or before November 17, 2025" for orderly administration of the 2026 election. Dkt. 275 at 4. He does not deny that by seeking a stay until the Supreme Court issues its opinion in *Callais*, the consequence will be to blow past that November date, likely by many weeks or months. *See* Mot. 7 (acknowledging that the *Callais* opinion may not be released until May or June 2026). *Callais* supplemental briefing will not conclude until October 3, 2025, with argument to follow. *See Callais*, 2025 WL 2180226, at *1. It is quite unlikely there will be a *Callais* decision anywhere near the Secretary's suggested deadline or with enough time to complete the remedial process close to that date. Nor does the Secretary acknowledge his prior statements

3

that proceeding to a trial in Fall 2024 would allow ample time for a remedy for the 2026 elections. *See* Dkt. 73 at 5.

"'Once the election occurs, there can be no do-over and no redress' for voters whose rights were violated." *Milligan*, 691 F. Supp. 3d 1343 at 1355 (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)). For this reason, discriminatory voting rules cause irreparable injury and "are the kind of serious violation . . . for which courts" should "grant[] immediate relief." *See id*. (collecting cases).

If the Court stays the remedial process, Alabamians will vote under a discriminatory map in 2026. And they will do so based on speculation about further guidance from the Supreme Court that need not implicate the Legislature's decisions. Neither special elections—which this Secretary has argued "are an extraordinary remedy" that "Plaintiffs are not likely to show an entitlement to . . . no matter when this case proceeds," Dkt. 73 at 3 n.2—nor waiting until 2030 will cure this harm.

### B. The Cases Cited by the Secretary Do Not Raise the Same Threat of Irreparable Harm to Plaintiffs and VRA Enforcement Continues.

The Secretary cites three cases in which he asserts "district courts facing this same *Callais* conundrum have recently stayed § 2 litigation." Mot. 7. The plaintiffs there did not face the same unjust threat of irreparable harm as the Plaintiffs do here. Only in *Nairne* has the court stayed remedial proceedings after a judgment in the

4

plaintiffs' favor, and there, the next elections will not be held until 2027, leaving time for a post-*Callais* remedy. Meanwhile, other courts have moved forward Section 2 cases since the Supreme Court ordered supplemental briefing in *Callais*.

In *LULAC v. Abbott*, the court merely stayed the post-trial briefing deadline. *See* Order Suspending Deadline, No. 3:21-cv-00259 (W.D. Tx. Aug. 11, 2025), Dkt. 1126. In suspending the deadline before any liability ruling on Section 2 challenges to Texas's congressional map, the court cited the pending *Callais* decision as only one of three reasons, the first being "whether the Texas Legislature enacts redistricting legislation in its current Called Session or a subsequent legislative session." *Id.* The Texas Legislature enacted a new map twelve days later, and the court vacated its August 11 order in part and scheduled a preliminary injunction hearing on Section 2 challenges to the new map. Order, No. 3:21-cv-00259 (W.D. Tx. Aug. 28, 2025), Dkt. 1146.

*Clark v. Landry* was filed in 1986 and terminated in 1991, and the court had not yet even granted the plaintiffs' motion to reopen, Mot. to Reopen, No. 86-cv-435 (M.D. La. Oct. 7, 2024), Dkt. 695, when the court issued the order cited by the Secretary, *see* Order, No. 86-cv-435 (M.D. La. July 17, 2025), Dkt. 752. No trial concerning the alleged Section 2 violation has been held nor had a violation been established, *id.*, and the next election there may not be until December 31, 2028. La. Const. art. V §§ 8, 9, 22; La. Rev. Stat. § 18:621(A) (2024).

In *Nairne v. Ardoin*, elections are not scheduled under the dilutive Louisiana state legislative maps until October 2027, and the Louisiana Secretary of State represented that new maps must be in place by January 1, 2027. *See* Tr. at 6, *Nairne v. Landry*, No. 3:22-cv-00178 (M.D. La. Aug. 28, 2025), Dkt. 348, (attached as Ex. A); *see also* Dkt. 345 (referring to transcript as basis for order). This timing leaves at the very least six months for remedial proceedings following a decision in *Callais*.

The Secretary does not mention that although the 2027 elections in *Nairne* gave the district court time to pause remedial proceedings, the Fifth Circuit affirmed the district court's liability decision after the Supreme Court issued its supplemental briefing order in *Callais*, *see Nairne v. Landry*, No. 24-30115, --- F.4th ----, 2025 WL 2355524 (5th Cir. Aug. 14, 2025), and denied defendants' motion to stay that decision while *Callais* is pending, Order Denying Stay, *Nairne*, No. 24-30115, Dkt. 328 (5th Cir. Aug. 25, 2025). The Fifth Circuit's affirmance in *Nairne* rejected "the State's challenge to the constitutionality of § 2," 2025 WL 2355524, at *22, reasoning that "[t]here is no legal basis for th[e] proposition [that Congress's enforcement power under the Fifteenth Amendment has somehow lapsed], and the State offers no evidence that conditions in Louisiana have changed in the year since *Milligan* was decided," *id.* at *23.

This case would be the only one where Section 2 prevailing parties are denied a remedy for the next set of scheduled elections due to *Callais*.

6

### C. The Secretary's Assertions of Harm are Speculative, Overdrawn, and Unmoored from the Law.

The Secretary asserts that the equities "weigh heavily in favor of the stay" pending *Callais* because, without it, the State "faces significant threats to its sovereignty," and the public "faces potentially unconstitutional racial sorting and disruption." Mot. 9. Every piece of this argument is wrong.

First, courts have a "duty to cure" districts drawn in violation of federal law through an "orderly process in advance of elections" when the state legislature either won't or can't do so. *Milligan*, 691 F. Supp. 3d at 1355 (citation omitted). "[C]ompliance with federal law is [not] an onerous burden[.])" *Id*.

Second, "a grant of certiorari does not constitute a change in the law or a basis for relief." *Thompson v. United States*, 924 F.3d 1153, 1157 n.4 (11th Cir. 2019). Courts must apply the law based on existing precedent, rather than predict future Supreme Court decisions. *See, e.g.*, *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023); *Agostini v. Felton*, 521 U.S. 203, 237 (1997). As such, "grants of certiorari . . . must not be used by courts as a basis to grant relief that would otherwise be denied." *In re Bradford*, 830 F.3d at 1275.[1]

---

[1] If "[b]inding precedent bars" a lower court "from issuing a stay of execution solely on the basis that the Supreme Court has granted certiorari in another appeal," *Woods v. Warden, Holman Corr. Facility*, 951 F.3d 1296, 1298 (11th Cir. 2020)— the answer cannot be that preserving a State's discriminatory districts rise above human life.

7

Third, the remedy in this case need not even implicate the questions raised in *Callais* or "unconstitutional racial sorting" to remedy the Section 2 violation. Alabama does not need to pursue a racial target or draw a new "majority-Black" or "majority-minority" district in enacting a new map. *See Voinovich*, 507 U.S. at 155 ("Section 2 . . . . says nothing about majority-minority districts. . . ."); *Abrams*, 521 U.S. at 93 (rejecting the notion that VRA-remedies require "strict racial percentages"). Nor does it need to use race as the predominant factor. Instead, by focusing in good faith on "the ultimate right of § 2"—"equality of opportunity, not a guarantee of electoral success," *De Grandy*, 512 U.S. at 1014 n.11, the State can insulate itself from any meritorious challenge, regardless of the outcome in *Callais*. The Legislature retains "broad discretion" to craft a plan that complies with Section 2, and "may avoid strict scrutiny altogether" by drawing their plan in line with traditional districting principles. *Ala. State Conf. of the NAACP v. Allen* ("*Ala. NAACP*"), No. 2:21-cv-1531-AMM, --- F.Supp.3d ----, 2025 WL 2451166, at *95. That the Legislature "should be mindful of the practical reality, based on the ample evidence of intensely racially polarized voting adduced during the trial," of the need for a substantial Black voting-age population in the remedial district, *id.* at *2, reflects the need to consider electoral opportunities for Black voters as a practical matter, not to hit any specific racial target. *See, e.g.*, *Milligan v. Allen*, No. 2:21-CV-1291-AMM, 2023 WL 6567895, at *17 (N.D. Ala. Oct. 5, 2023) (rejecting argument

8

against a remedial plan without "two majority-Black districts, because . . . Section Two ensures only equal opportunity, not a guaranteed result for any group.").

After providing similar guidance regarding congressional districting, a three-judge panel selected a plan in which the opportunity district had a Black Voting Age Population (BVAP) under fifty percent. *Milligan v. Allen*, No. 2:21-CV-01530-AMM, 2025 WL 2451593, at *4 (N.D. Ala. Aug. 7, 2025). The map-drawer employed "nonracial characteristics and criteria related to communities of interest and political subdivisions," *Milligan*, 782 F. Supp. 3d at 1358, and confirmed that his map remedied the violation by referencing election results, *see Milligan*, 2023 WL 6567895, at *8. Other courts have used a similar process to devise remedial plans that comply with Section 2 with a less-than fifty-percent BVAP district. *See, e.g.*, *Lawyer v. Dep't of Justice*, 521 U.S. 567, 581-82 (1997); *Baltimore Cnty. Branch of NAACP v. Baltimore Cnty.*, No. 21-CV-03232-LKG, 2022 WL 888419, at *6 (D. Md. Mar. 25, 2022).

The law leaves plenty of well-trod avenues for the Legislature without heightened concerns of additional liability, *Callais* or no.

## II. The Remedy Phase May Proceed Based on Equal Opportunity and Need Not Implicate *Callais* or "Race-Based" Districting.

The Secretary casts the remedial process as a "plight" that "put[s] Alabama in an impossible situation with the highest constitutional stakes." Mot. 1. This

9

mischaracterizes the question in *Callais* and the Legislature's conduct in *Milligan* while ignoring the many options open to the Legislature.

### A. *Callais* Concerns Racial Targets as Applied to Louisiana's Map and Does Not Call into Question All Section 2 Remedial Districts.

Just two years ago, the Supreme Court held that the mere consideration of race in evaluating Section 2 districting was proper and unexceptional: "Section 2 itself demands consideration of race," but "there is a difference between being aware of racial considerations and being motivated by them." *Allen v. Milligan*, 599 U.S. 1, 30–31 (2023) (cleaned up); *see also id.* at 44 (Kavanaugh, J., concurring) ("[T]he effects test, as applied by *Gingles* to redistricting, requires in certain circumstances that courts account for the race of voters so as to prevent the cracking or packing…").

The Secretary does not argue that *Callais* calls *Milligan* into question. The supplemental question in *Callais* refers to the "question raised on pages 36—38 of the Brief for Appellees"—whether *Louisiana's* "intentional creation of a second majority-minority . . . . district" violates the Constitution. *Callais*, 2025 WL 2180226, at *1. This is a fact-bound, state-specific inquiry. The pages the Supreme Court refers to concern specific arguments about Louisiana—whether "Section 2 imposes burdens on constitutional redistricting laws that cannot be justified by Black Louisianans' needs," and whether based on the record there, Section 2 had been "abused to set racial quotas." Appellees' Br., *Callais*, 2025 WL 455177, at *37, *38.

10

Even in trying to push its boundaries, the Secretary does not contend that *Callais* questions the propriety of considering race *at all* in VRA remedies. He argues that the assumption "'that compliance with the VRA may justify the consideration of race in a way that would not otherwise be allowed,' *Abbott*, 585 U.S. at 587, . . . is under review by the Court right now." Mot. 2. That question is not whether a State may remedy a VRA violation by making decisions with awareness of the racial implications, but rather whether a state may do so using race as the predominant factor. The State has ample breathing room. *See supra* § I.C.

The Secretary points to Justice Kavanaugh's reference in his *Milligan* concurrence to whether "the authority to conduct race-based redistricting" can "extend indefinitely into the future." 599 U.S. at 45 (Kavanaugh, J., concurring). But the Supreme Court majority, joined by Justice Kavanaugh, already rejected Alabama's attempt "to remake our § 2 jurisprudence anew," *id.* at 23 (majority op.) and was "not persuaded by Alabama's arguments that § 2 as interpreted in *Gingles* exceeds the remedial authority of Congress," *id.* at 41. It would be highly irregular for the same Supreme Court to overrule its precedent from two years prior. Stare decisis is "a foundation stone of the rule of law," *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 798 (2014), especially when it comes to statutory precedent, *see Ramos v. Louisiana*, 590 U.S. 83, 118 (2020) (Kavanaugh, J., concurring in part).

Nor does the Court's decision in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College* ("*SFFA*"), 600 U.S. 181 (2023), change this calculus. The *SFFA* Court noted—citing *Shaw v. Hunt*, 517 U.S. 899 (1996), a case interpreting the intersection between Section 2 of the VRA and the Fourteenth Amendment—that "remediating specific, identified instances of past discrimination that violated the Constitution or a statute" is a "compelling interest[]" under the Fourteenth Amendment. *Id.* at 207. Combine this with the fact that the same Court and same author issued *SFFA* and *Milligan* just weeks apart, and it squashes any notion that *SFFA* and *Callais* signal the VRA's death knell.

*Callais* does not implicate the Court's holding in *Milligan* or "the permanent, nationwide ban on racial discrimination in voting found in § 2." *Shelby Cnty. v. Holder*, 570 U.S. 529, 557 (2013); *see also Nairne*, 2025 WL 2355524, at *23.

### B. The Legislature Can Avoid Legal Jeopardy by a Good-Faith Focus on Equal Opportunity and Reasonably Configured Districts.

The Secretary ignores the Legislature's options that do not implicate *Callais*. The Legislature need only look to the guidance of this Court and the Supreme Court and try in good faith to create equal opportunities for Black Alabamians.

Alabama's problems in *Milligan* arose not because it "refused to intentionally create a second majority-minority district." Jurisdictional Statement at i, *Allen v. Milligan*, (S. Ct. Sept. 4, 2025). Rather, in *Milligan*, the "Legislature intentionally chose not to satisfy the remedial requirements found in [the Court's] order." 782 F.

12

Supp. 3d at 1343. The Secretary contends that the *Milligan* panel's intentional discrimination ruling was a "backwards holding" that "is un-precedented and indefensible." Jurisdictional Statement at 27. Yet the Supreme Court denied Alabama's attempt to stay the panel's ruling preliminarily enjoining the 2023 map, with no noted dissents. *Allen v. Milligan*, 144 S. Ct. 476 (2023) (mem.). The Legislature can avoid a repeat of 2023 by not forcing through a plan in which its own analysis said, "the Black-preferred candidate in [District] 2 would have been elected in 0 out of the 7 contests analyzed," *Singleton v. Allen*, 690 F. Supp. 3d 1226, 1297 (N.D. Ala. 2023).

The State therefore has many options at its disposal that do not implicate racial targets or "racial sorting." For one, the Legislature can look at the map drawn by Plaintiffs' expert Tony Fairfax, which the Court already found that "establishes that Mr. Fairfax did not allow race to predominate when drawing Proposed District 25," and that the map "respected traditional districting principles." *Ala. NAACP*, 2025 WL 2451166, at *64. The Legislature can adjust that map without seeking any racial threshold and according to its own priorities so long as it ensures equal opportunity for Black voters. *Singleton*, 690 F. Supp. 3d at 1294; *see also LULAC v. Perry*, 548 U.S. 399, 440–41 (2006) (rejecting a purported "opportunity" district because the white majority would "often, if not always" prevail in that district). Or it can pursue

13

the same result from a different starting point. The *Milligan* remedial district provides another example. 2023 WL 6567895, at *16.

The Legislature can avoid "racial sorting," Mot. 9, while ensuring an adequate remedy for Black voters. It must only decide if it has the will to do so.

### III. Even Under the Alternative Standard, the Secretary is not Likely to Succeed on the Merits on Appeal or Otherwise Obtain a Stay.

The Secretary does not seek a stay pending appeal, but his arguments under that standard also do not justify a stay, which is "an exceptional response." *Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986). Among the four factors, the "strong likelihood of success" and irreparable harm factors "are the most critical." *Nken v. Holder*, 556 U.S. 418, 434 (2009). Plaintiffs have already explained *supra* why the equities favor them; the same is true for the merits.

The Secretary offers no criticism of the Court's ruling on the *Gingles* preconditions, or its evaluation of several Senate Factors. Rather, he cherry picks a few quotations from the Court's thorough decision and implies that Alabama could not be liable here because it has prevailed on other claims in prior decades. Neither tack establishes a strong showing on likelihood of success.

First, the Eleventh Circuit will need "to decline [the] invitation to 'reweigh the evidence presented to the district court,' as that is not [its] function. The Supreme Court has instructed that [appellate courts] must uphold the district court's

14

'determination whether the § 2 requirements are satisfied . . . unless [it is] clearly erroneous.'" *Pierce v. N.C. Bd. of Elections*, 97 F.4th 194, 214 (4th Cir. 2024).

Second, the Secretary is not highly likely to succeed in his argument that the statutory phrase "equal opportunity to participate in the political process" requires Section 2 plaintiffs to prove that Black voters are completely unable "to engage in . . . registration, voting, and participating with the party of their choice." Mot. 13. This is essentially the same argument that the Secretary and the Court rejected in *Milligan*. *See* 599 U.S. at 18, 22. Regardless, the Court detailed the "extensive record" showing "official discrimination on the basis of race has affected Black Alabamians' lives and political participation for a long time, and it continues to affect Black Alabamians' lives and political participation today." *Ala. NAACP*, 2025 WL 2451166, at *75–81. That record distinguishes this case from cases from the prior decade concerning different districts, parties, and records. *See* Mot. 11.

## CONCLUSION

The Secretary's request to stay remedial proceedings would place speculation above justice. The Court should deny the motion.

15

DATED this 8th day of September 2025.   Respectfully submitted,

*/s/ Alison Mollman*
Alison Mollman (ASB-8397-A33C)
Laurel Hattix (ASB-4592-E20I)
American Civil Liberties Union of Alabama
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 265-2754
amollman@aclualabama.org
lhattix@aclualabama.org

*/s/ Deuel Ross*
Deuel Ross*
NAACP Legal Defense &
Educational Fund, Inc.
700 14th Street N.W. Ste. 600
Washington, DC 20005
(202) 682-1300
dross@naacpldf.org

Leah Aden*
Stuart Naifeh*
Kathryn Sadasivan (ASB-517-E48T)
Brittany Carter*
Colin Burke*
NAACP Legal Defense &
Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
 (212) 965-2200
laden@naacpldf.org
snaifeh@naacpldf.org
ksadasivan@naacpldf.org
bcarter@naacpldf.org
cburke@naacpldf.org

Jessica L. Ellsworth*
Shelita M. Stewart*
Amanda N. Allen*

*/s/ Davin M. Rosborough*
Davin M. Rosborough*
Dayton Campbell-Harris*+
Sophia Lin Lakin*
American Civil Liberties Union Foundation
125 Broad St.
New York, NY 10004
 (212) 549-2500
drosborough@aclu.org
dcampbell-harris@aclu.org
slakin@aclu.org

Jacob van Leer*
American Civil Liberties Union Foundation
915 15th St. NW
Washington, DC 20005
jvanleer@aclu.org

/s/ *Sidney Jackson*
Sidney Jackson (ASB-1462-K40W)
Nicki Lawsen (ASB-2602-C00K)
Wiggins, Childs, Pantazis, Fisher, & Goldfarb
301 19th Street
North Birmingham, AL 35203
(205) 314-0500
sjackson@wigginschilds.com
nlawsen@wigginschilds.com

*/s/ Jack Genberg*
Bradley E. Heard*
Jack Genberg*
Southern Poverty Law Center 150 E. Ponce de Leon Avenue, Suite 340
Decatur, GA 30030
(404) 521-6700

16

Hogan Lovells LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600
jessica.ellsworth@hoganlovells.com
shelita.stewart@hoganlovells.com
Amanda.n.allen@hoganlovells.com

David Dunn*
Hogan Lovells LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000
david.dunn@hoganlovells.com

Blayne R. Thompson*
HOGAN LOVELLS US LLP
609 Main St., Suite 4200
Houston, TX 77002
(713) 632-1400
blayne.thompson@hoganlovells.com

Bradley.heard@splcenter.org
jack.genberg@splcenter.org

Avner Shapiro*
Southern Poverty Law Center
1101 17th Street NW, Suite 510
Washington, DC 20036
240-890-1735
avner.shapiro@splcenter.org

Michael Turrill*
James W. Ettinger*
HOGAN LOVELLS US LLP
1999 Avenue of the Stars
 Suite 1400
Los Angeles, CA 90067
(310) 785-4600
michael.turrill@hoganlovells.com
jay.ettinger@hoganlovells.com

*Attorneys for Plaintiffs*

*Admitted *pro hac vice*
+ Admitted only in Washington State

17

## CERTIFICATE OF SERVICE

I hereby certify that on September 8, 2025, a copy of the foregoing has been served on all counsel of record through the Court's CF/ECF system.

*/s/ Davin Rosborough*

Davin Rosborough
*Attorney for Plaintiffs*