FILED
2025 Oct-01  PM 03:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **ALABAMA STATE CONFERENCE OF THE NAACP,** *et al.*, | ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Case No.: 2:21-cv-1531-AMM** |
| **WES ALLEN,** *in his official capacity as Alabama Secretary of State*, | ) ) ) ) | |
| **Defendant.** | ) ) | |

## ORDER

This redistricting case is before the Court on the motion of Alabama Secretary of State Wes Allen to stay remedial proceedings in this case pending the outcome of another case in another state that is before the Supreme Court of the United States, Doc. 278, as well as his status report representing that Alabama Governor Kay Ivey will not call the Alabama Legislature into a special session to draw a lawful map for Alabama's 2026 state Senate elections, Doc. 299. As explained below, the Secretary's motion is **DENIED WITHOUT PREJUDICE** to his opportunity to renew it as appropriate. And the Court **APPOINTS** a Special Master and **INSTRUCTS** him and the persons appointed to assist him to begin their work.

## I.  BACKGROUND

The Court enjoined the Secretary and his successors from conducting state Senate elections according to the redistricting plan that the Alabama Legislature enacted in 2021 ("the Enacted Plan") because the plan violates Section Two of the Voting Rights Act of 1965, 52 U.S.C. § 10301 ("Section Two"). Doc. 274 at 4. The Secretary thereafter moved to stay that injunction and remedial proceedings in this case, Doc. 278, and advised the Court that the Governor will not convene the Legislature to draw a remedial map, Doc. 299.

"It is well settled that 'reapportionment is primarily the duty and responsibility of the State,'" *Miller v. Johnson*, 515 U.S. 900, 915 (1995) (quoting *Chapman v. Meier,* 420 U.S. 1, 27 (1975)); that "it is the domain of the States, and not the federal courts, to conduct apportionment in the first place," *Voinovich v. Quilter*, 507 U.S. 146, 156 (1993); that each State has a "sovereign interest in implementing its redistricting plan," *Bush v. Vera*, 517 U.S. 952, 978 (1996); and that because "the Constitution vests redistricting responsibilities foremost in the legislatures of the States and in Congress, a lawful, legislatively enacted plan should be preferable to one drawn by the courts," *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 416 (2006) (citation omitted).

When a federal court finds that a redistricting plan violates federal law, Supreme Court precedent dictates that the state legislature has the first opportunity

to draw a new map. *See, e.g.*, *North Carolina v. Covington*, 585 U.S. 969, 977 (2018); *White v. Weiser*, 412 U.S. 783, 794–95 (1973). Only when "those with legislative responsibilities do not respond, or the imminence of a state election makes it impractical for them to do so, [does] it become[] the unwelcome obligation of the federal court to devise and impose a reapportionment plan pending later legislative action." *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978) (opinion of White, J.) (internal quotation marks and citation omitted); *accord Growe v. Emison*, 507 U.S. 25, 36–37 (1993). Having afforded the Legislature the opportunity to draw a remedial map, the Court must now assume the task of drawing the map.

## II. STAY

The Secretary moved this Court to exercise its discretion to stay proceedings in this case pending the resolution of another case involving Section Two that is currently pending in the Supreme Court: *Louisiana v. Callais*, No. 24-109. *See* Doc. 278 at 1–10.

"A stay is an intrusion into the ordinary processes of administration and judicial review, and accordingly is not a matter of right, even if irreparable injury might otherwise result to the appellant." *Nken v. Holder*, 556 U.S. 418, 427 (2009) (internal quotation marks and citations omitted). The moving party bears the burden of establishing that "circumstances justify an exercise of [the Court's] discretion." *Id.* at 433–34.

Although the Secretary does not seek a stay pending the resolution of his appeal in this case, *see* Doc. 278, the Court looks to the familiar legal standard that would have controlled such a request to guide its exercise of its discretion as to the pending request. Courts consider four factors in in evaluating a motion to stay proceedings pending appeal: (1) "whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken*, 556 U.S. at 425–26 (internal quotation marks omitted).

The Secretary argues that the forthcoming ruling in *Callais* "will provide critical guidance" for the State and "may clarify legal issues" for the Court. Doc. 278 at 1–2. He asserts that other district courts have stayed redistricting cases pending *Callais*, *id.* at 7–8, and that he has satisfied the test for a stay pending appeal, *id.* at 8–14. The Secretary argues that if this Court conducts remedial proceedings without awaiting *Callais*, it will "force all parties involved to guess on whether any enacted or proposed plan will comply with federal law." *Id.* at 5.

The plaintiffs respond that a stay would effectively deny them relief for the 2026 elections (one of two state Senate elections remaining this census cycle), *see* Doc. 286 at 4–6; that no other court has granted a stay where it would deny a Section Two prevailing party a remedy for the next set of scheduled elections, *id.*

4

at 7; and that the Secretary's arguments assume an outcome in *Callais* that requires this Court to disregard binding precedent, *id.* at 8–10. Separately, the plaintiffs argue that the Secretary has not adequately addressed his likelihood of success on the merits, and that the Secretary is unlikely to succeed on the merits of his defenses because of the Supreme Court's recent decision in the Alabama congressional redistricting litigation: *Allen v. Milligan*, 599 U.S. 1 (2023). *See* Doc. 286 at 11–13, 15–16.

The Secretary has not established that because of *Callais*, he is likely to succeed on the merits of his defenses in this case. The Secretary predicts that *Callais* may overturn or disrupt the legal test that this Court applied in its injunction, *see* Doc. 274, but the Court cannot forestall or deny relief that is due based on such predictions. The legal test this Court applied in that injunction has been the controlling test for forty years, *see Thornburg v. Gingles*, 478 U.S 30 (1986), and the Supreme Court reiterated it as recently as two years ago in an Alabama case involving substantial evidentiary overlap with this case. *See Milligan*, 599 U.S. at 23. This Court did not guess about the law when it enjoined the use of Alabama's state Senate map, and no guess is needed to undertake remedial proceedings. If the Supreme Court changes the law, the Secretary may renew his stay application. Unless and until such a change occurs, the plaintiffs are entitled to relief from the State's unlawful electoral plan.

Likewise, the Court cannot find that the Secretary will be "irreparably injured absent a stay." *Nken*, 556 U.S. at 426. The Secretary contends that "significant threats to [Alabama's] sovereignty" and "potentially unconstitutional racial sorting and disruption to the election process" create "per se irreparable harm." Doc. 278 at 9. But the Secretary is not a sovereign; he administers elections. And the Legislature has had ample opportunity to exercise its authority to enact a remedial map and will not go into a special session to do so. The State cannot both decline to enact a remedial map and complain that the Court tramples its sovereignty by undertaking that task.

Further, the Court rejects as overdrawn and inconsistent with controlling precedent the Secretary's assertion that absent a stay, remedial proceedings will result in impermissible racial sorting of voters. The Secretary's apparent assumption that a court-drawn map will impermissibly consider race is unfounded and premature. This Court will faithfully apply the law and applicable Supreme Court precedent to prepare a remedial map. Additionally, the Court appoints the same Special Master and team that prepared race-blind remedial maps in the Alabama congressional redistricting litigation. *See Milligan* Doc. 295 at 36.[1] Accordingly, any harm to the State's sovereignty is self-inflicted, and any accusation of improper racial sorting is unsupported.

Additionally, the practical realities confirm that a stay pending *Callais*

---

[1] Citations to documents in the current round of congressional redistricting litigation in the district court are to the documents in the *Milligan* action.

would "substantially injure the other parties interested in th[is] proceeding." *Nken*, 556 U.S. at 426. The plaintiffs are Alabamians who prevailed in their challenge to the State's redistricting plan under Section Two. They are entitled to relief for the next scheduled election. The deadline for candidates to qualify with the major political parties for the 2026 Alabama Senate election is January 23, 2026, Ala. Code § 17-13-5(a), and the Secretary has represented that he needs a remedial map in hand by November 17, 2025, to administer that election, Doc. 275 at 4. The Secretary's deadline for a map is approximately seven weeks away, and *Callais* will not be argued until October 15, 2025. Because the Legislature will not enact a remedial map, under the law as it has been for decades the only relief available on the Secretary's timetable is a judicially-drawn remedial map. A stay would thus seriously injure the plaintiffs.

Finally, on the facts as they are now, the public interest leans heavily in the plaintiffs' favor. *Nken*, 556 U.S. at 426. Alabamians have the right to vote under lawful electoral plans, and the Court has enjoined the current map as unlawful. *See* 52 U.S.C. § 10301; Doc. 274.

Ultimately, the Secretary has not established that he is likely to succeed on the merits of his defenses, nor that he faces irreparable harm. He has shown only that he anticipates that another case might disrupt long-settled redistricting jurisprudence. But as a practical matter, staying this case to wait on that one will

deprive the plaintiffs of relief that they are entitled to under long-settled law. Accordingly, his motion to stay these proceedings, Doc. 278, is **DENIED WITHOUT PREJUDICE** to his opportunity to renew it as appropriate.

## III. SPECIAL MASTER

The Court previously ordered the parties to raise any objections to the Court appointing the same Special Master and his team that prepared the remedial plan in the Alabama congressional redistricting litigation in 2023. Doc. 276 at 2–3. No party objected. Doc. 284. Before the Court became aware of the Governor's decision not to call a special legislative session, the Court asked the parties to comment on their positions as to whether that Special Master and his team could proceed on a contingent basis to ensure that the State could conduct an election with a lawful map in 2026. *See* Doc. 289. Further, the Court discussed with the parties how the Special Master and his team would be compensated for their work in the event that their fees were (for any reason) not assessable as part of a prevailing party fee.

Based on those proceedings, pursuant to the Court's inherent authority and Federal Rule of Civil Procedure 53, Mr. Richard Allen is **APPOINTED** Special Master, Mr. David Ely is **APPOINTED** as the Court's expert cartographer, and Mr. Michael Scodro and Mayer Brown LLP are **APPOINTED** to assist Mr. Allen in the performance of his duties and responsibilities as necessary.

8

Mr. Allen is an esteemed public servant with eminent knowledge of Alabama state government. After seven years of active-duty military service, he attended the University of Alabama School of Law, where he earned numerous accolades, including the selection by his classmates as the most outstanding graduate in his final year. After he graduated from law school, he clerked for Alabama Supreme Court Chief Justice Howell Heflin and then commenced his private practice at a well-regarded law firm in Montgomery. After Mr. Heflin was elected to the United States Senate, Mr. Allen served as his Chief Legislative Assistant for a time. He then returned to Montgomery, where he spent fifteen years in private practice before Alabama Attorney General Jeff Sessions tapped him to serve as Chief Deputy Attorney General. Mr. Allen served in that role for ten years: first with Attorney General Sessions, then with Attorney General William H. Pryor Jr., and then with Attorney General Troy King. He then returned to private practice, but not for long before he was tapped again, this time by Governor Bob Riley to serve as Commissioner of the Alabama Department of Corrections. After five years of service in that role, Mr. Allen left to return to his previous work as Chief Deputy Attorney General, serving this time with Attorney General Luther Strange. Mr. Allen then returned to private practice, where he also served for four years as the parliamentary law advisor for then-Lieutenant Governor Kay Ivey.

The foregoing narrative recites only one dimension of Mr. Allen's career of

9

service: after he graduated from law school, Mr. Allen spent twenty years as an officer in the United States Army Reserve and retired from military service with the rank of Brigadier General. And of course, Mr. Allen has recent experience preparing a race-blind remedial districting map for Alabama's use in its 2024 congressional elections. *See Milligan* Doc. 295 at 36.

Mr. Ely has extensive experience as a map-drawer, consultant, and expert on districting plans. He has drawn maps and provided expert consulting services for cities, counties, and other legislative bodies in Texas, California, Utah, Pennsylvania, Ohio, Massachusetts, and Illinois. He has also previously recommended remedial plans to this Court and served as a special master in a Louisiana redistricting case.

Mr. Scodro and his law firm, Mayer Brown LLP, were appointed by the *Milligan* Court to assist Mr. Allen as Special Master in that case. *Milligan* Doc. 226 at 5. The Court found Mr. Scodro and his law firm qualified, and no party objected to his appointment. *Id.*; *Milligan* Doc. 264. Mr. Scodro graduated from Yale Law School, clerked for United States Supreme Court Justice Sandra Day O'Connor and Circuit Judge Jose A. Cabranes, served as the Illinois Solicitor General for six years, and co-chairs the Supreme Court and Appellate Practice at Mayer Brown.

Mr. Allen, Mr. Ely, and Mr. Scodro are **DIRECTED** to file affidavits

disclosing whether there is any ground for disqualification under 28 U.S.C. § 455 of them or any assistants not later than **MONDAY, OCTOBER 6, 2025**.

The Special Master and his team are appointed with the following authority, responsibility, and instructions:

1.      The Special Master and his team shall file with the Court three (3) proposed remedial plans to remedy the Section Two violation identified in this Court's injunction issued on August 22, 2025. Each plan should include color maps with inset maps sufficient to clearly show the boundaries that divide political subdivisions in Montgomery and the affected surrounding areas, along with demographic data for each proposed map (including population deviations of each district, Black voting-age population of each district, and any other relevant criteria). The Special Master and his team shall file a Report and Recommendation along with these proposed plans that explains in some detail the choices made in each proposed plan, the differences between the proposed plans, and why each plan remedies the vote dilution found by this Court. Specifically, the Report and Recommendation should discuss the facts and legal analysis supporting the proposed districts' compliance with the U.S. Constitution, the Voting Rights Act, traditional redistricting criteria, and the other criteria listed below.

2.      Each of the three proposed plans shall:

   a.   Completely remedy the Section Two violation identified in this Court's order of August 22, 2025. Each plan shall remediate the essential problem found in the Enacted Plan—the unlawful dilution of the Black vote in Alabama's state Senate districting scheme. To that end, "any remedial plan will need to include an additional district in the Montgomery area in which Black voters either comprise a voting-age majority or something quite close to it." Doc. 274 at 5.

   b.   Comply with the U.S. Constitution and the Voting Rights Act.

   c.   Comply with the one-person, one-vote principle guaranteed by the Equal Protection Clause of the Fourteenth Amendment, based on data from the 2020 Census. Any remedy shall ensure that one person's "vote in a congressional election" is as "nearly as is

11

practicable . . . worth as much as another's." *Wesberry v. Sanders*, 376 U.S. 1, 7−8 (1964). When a State designs a districting plan, the Supreme Court has "explained that the 'as nearly as is practicable' standard does not require that congressional districts be drawn with 'precise mathematical equality,' but instead that the State justify population differences between districts that could have been avoided by 'a good faith effort to achieve absolute equality.'" *Tennant v. Jefferson Cnty. Comm'n*, 567 U.S. 758, 759 (2012) (citation omitted). But court-ordered plans must comply even more strictly with the principle of one-person, one-vote "in the absence of significant state policies or other acceptable considerations that require adoption of a plan with so great a variance." *Chapman*, 420 U.S. at 24. To that end, the Special Master and his team must ensure that "there are no *de minimis* population variations, which could practicably be avoided, but which nonetheless meet the standard of Art. I, § 2 without justification." *Karcher v. Daggett*, 462 U.S. 725, 734 (1983). Any "showing required to justify population deviations [shall be] proportional to the size of the deviations." *Larios v. Cox*, 300 F. Supp. 2d 1320, 1356 (N.D. Ga. 2004) (three-judge court), *aff'd*, 542 U.S. 947 (2004).

   d. Respect traditional redistricting principles to the extent reasonably practicable as expressed in the Alabama Legislature's Permanent Legislative Committee on Reapportionment, a copy of which are attached hereto as Appendix A. Ordinarily, these principles "[i]nclude compactness, contiguity, respect for political subdivisions or communities defined by actual shared interests, incumbency protection, and political affiliation." *Ala. Legislative Black Caucus v. Alabama*, 575 U.S. 254, 272 (2015) (quotation marks and citations omitted). That said, the Alabama Legislature has substantially more discretion than does this Court in drawing a remedial map: state legislatures may consider political circumstances that courts may not. *See, e.g.*, *Upham v. Seamon*, 456 U.S. 37, 42 (1982) (per curiam); *Connor v. Finch*, 431 U.S. 407, 414−15 (1977); *Wyche v. Madison Parish Police Jury*, 635 F.2d 1151, 1160 (5th Cir. 1981). In other words, "in the process of adopting reapportionment plans, the courts are 'forbidden to take into account purely political considerations that might be appropriate for legislative bodies,'" such as incumbency protection and political affiliation. *Larios v. Cox*, 306 F. Supp. 2d 1214, 1218

(N.D. Ga. 2004) (three-judge court) (quoting *Wyche*, 635 F.2d at 1160). Thus, consistent with these limitations, the Special Master and his team shall consider traditional redistricting criteria, such as compactness, contiguity, respect for political subdivisions, and maintenance of communities of interest.

e.  Hew as closely as possibly to the Enacted Plan while providing a lawful remedial district in the Montgomery area.

3.    The Special Master and his team may consider, as background, among other things, the Montgomery-area illustrative remedial plan offered by the plaintiffs in connection with their claims under the Voting Rights Act. The Special Master and his team may also consider all evidence of record in this case.

4.    The Special Master and his team are authorized to retain appropriate assistants and experts as may be reasonably necessary for them to accomplish their task within the time constraints imposed by this Order. The expert cartographer is authorized to buy any specialized software reasonably necessary to facilitate his work.

5.    The Special Master and his team are authorized to issue appropriate orders as may be reasonably necessary for them to accomplish their task within the time constraints imposed by this Order.

6.    The Special Master and his team may not engage in *ex parte* communications with the parties or their counsel, but may engage in *ex parte* communications with the Court as the need may arise.

7.    The Special Master and his team shall consider any proposals, plans, and comments submitted to them by any of the parties to this case, and they are directed to invite submissions and comments, take testimony, and hold hearings as may be necessary to reasonably assist them to develop a remedial plan (or to recommend a remedial plan that any of the parties has proposed). The Special Master is directed to set appropriate deadlines for such submissions, comments, and testimony.

8.    The Special Master and his team shall maintain orderly files consisting of all documents submitted to them by the parties and any written orders, findings, and recommendations. All other materials relating to their work shall be preserved until relieved of this obligation by the Court. The Special Master and his team shall preserve all datasets used in the

formulation of redistricting plans, and any drafts considered but not recommended to the Court in their native format.

9.      All reasonable costs and expenses of the Special Master and his team, including reasonable compensation for those persons and any assistants they may retain, shall (subject to the approval of this Court) be paid by the parties as determined by the Court. The Special Master and his team shall take special care to protect against unreasonable expenses.

To facilitate the work of the Special Master and his team:

10.     The Secretary is **ORDERED** to notify the Special Master and his team whether the State has a Maptitude license to make available for Mr. Ely to use for his work on this case, or whether it will be necessary for Mr. Ely to acquire one for that purpose.

11.     The plaintiffs are **ORDERED** to provide Mr. Ely the block equivalency files for the Montgomery-area illustrative remedial plan offered by the plaintiffs in connection with their claims under the Voting Rights Act.

12.     The Secretary is **ORDERED** to provide Mr. Ely (1) the block equivalency files for the Enacted Plan, (2) the shapefiles for Alabama's municipalities and current voting districts (precincts), and (3) any other shapefiles necessary for Mr. Ely to conduct his work.

The Court is aware of the need to have a remedial plan in place as soon as is reasonably possible. Accordingly, the Court directs that the Special Master and his team file the above-described Report and Recommendation not later than **October 24, 2025**. If the Special Master is able to complete his task before that date, the Court encourages him to file the Report and Recommendation as expeditiously as possible, consistent with the need for thoughtful and deliberate analysis. The Clerk of Court is **DIRECTED** to open a Miscellaneous Civil Case to facilitate the work of the Special Master.

The parties are **DIRECTED** to file with the Court any objections to the

14

Special Master's Report and Recommendation not later than **October 31, 2025**. Any member of the public having objections to the Special Master's Report and Recommendation **HAS LEAVE** to file such objections provided they are filed not later than **October 31, 2025**.

The Court **SETS** a remedial hearing to occur in the Myron H. Thompson Courtroom at the Frank M. Johnson Federal Building and United States Courthouse in Montgomery, Alabama, on **November 5, 2025, at 10:00 AM**.

**DONE** and **ORDERED** this 1st day of October, 2025.

**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE

APPENDIX A

**REAPPORTIONMENT COMMITTEE REDISTRICTING GUIDELINES**

May 5, 2021

**I. POPULATION**

The total Alabama state population, and the population of defined subunits thereof, as reported by the 2020 Census, shall be the permissible data base used for the development, evaluation, and analysis of proposed redistricting plans. It is the intention of this provision to exclude from use any census data, for the purpose of determining compliance with the one person, one vote requirement, other than that provided by the United States Census Bureau.

**II. CRITERIA FOR REDISTRICTING**

a.    Districts shall comply with the United States Constitution, including the requirement that they equalize total population.

b.     Congressional districts shall have minimal population deviation.

c.    Legislative and state board of education districts shall be drawn to achieve substantial equality of population among the districts and shall not exceed an overall population deviation range of ±5%.

d.    A redistricting plan considered by the Reapportionment Committee shall comply with the one person, one vote principle of the Equal Protection Clause of the 14th Amendment of the United States Constitution.

e.    The Reapportionment Committee shall not approve a redistricting plan that does not comply with these population requirements.

f.    Districts shall be drawn in compliance with the Voting Rights Act of 1965, as amended. A redistricting plan shall have neither the purpose nor the effect of diluting minority voting strength, and shall comply with Section 2 of the Voting Rights Act and the United States Constitution.

g.    No district will be drawn in a manner that subordinates race-neutral districting criteria to considerations of race, color, or membership in a language-minority group, except that race, color, or membership in a language-minority group may predominate over race-neutral districting criteria to comply with Section 2 of the Voting Rights Act, provided there is a strong basis in evidence in support of such a race-based choice. A strong basis in evidence exists when there is good reason to believe that race must be used in order to satisfy the Voting Rights Act.

10213405.2

h.     Districts will be composed of contiguous and reasonably compact geography.

i.     The following requirements of the Alabama Constitution shall be complied with:

(i)     Sovereignty resides in the people of Alabama, and all districts should be drawn to reflect the democratic will of all the people concerning how their governments should be restructured.

(ii)     Districts shall be drawn on the basis of total population, except that voting age population may be considered, as necessary to comply with Section 2 of the Voting Rights Act or other federal or state law.

(iii)     The number of Alabama Senate districts is set by statute at 35 and, under the Alabama Constitution, may not exceed 35.

(iv)     The number of Alabama Senate districts shall be not less than one-fourth or more than one-third of the number of House districts.

(v)     The number of Alabama House districts is set by statute at 105 and, under the Alabama Constitution, may not exceed 106.

(vi)     The number of Alabama House districts shall not be less than 67.

(vii)     All districts will be single-member districts.

(viii)     Every part of every district shall be contiguous with every other part of the district.

j.     The following redistricting policies are embedded in the political values, traditions, customs, and usages of the State of Alabama and shall be observed to the extent that they do not violate or subordinate the foregoing policies prescribed by the Constitution and laws of the United States and of the State of Alabama:

(i)     Contests between incumbents will be avoided whenever possible.

(ii)     Contiguity by water is allowed, but point-to-point contiguity and long-lasso contiguity is not.

(iii)     Districts shall respect communities of interest, neighborhoods, and political subdivisions to the extent practicable and in compliance with paragraphs a through i. A community of interest is defined as an area with recognized similarities of interests, including but not limited to ethnic, racial, economic, tribal, social, geographic, or historical identities. The term communities of interest may, in certain circumstances, include political subdivisions such as counties, voting

2

10213405.2

precincts, municipalities, tribal lands and reservations, or school districts. The discernment, weighing, and balancing of the varied factors that contribute to communities of interest is an intensely political process best carried out by elected representatives of the people.

(iv)    The Legislature shall try to minimize the number of counties in each district.

(v)    The Legislature shall try to preserve the cores of existing districts.

(vi)    In establishing legislative districts, the Reapportionment Committee shall give due consideration to all the criteria herein. However, priority is to be given to the compelling State interests requiring equality of population among districts and compliance with the Voting Rights Act of 1965, as amended, should the requirements of those criteria conflict with any other criteria.

g.    The criteria identified in paragraphs j(i)-(vi) are not listed in order of precedence, and in each instance where they conflict, the Legislature shall at its discretion determine which takes priority.

**III. PLANS PRODUCED BY LEGISLATORS**

1.    The confidentiality of any Legislator developing plans or portions thereof will be respected. The Reapportionment Office staff will not release any information on any Legislator's work without written permission of the Legislator developing the plan, subject to paragraph two below.

2.    A proposed redistricting plan will become public information upon its introduction as a bill in the legislative process, or upon presentation for consideration by the Reapportionment Committee.

3.    Access to the Legislative Reapportionment Office Computer System, census population data, and redistricting work maps will be available to all members of the Legislature upon request. Reapportionment Office staff will provide technical assistance to all Legislators who wish to develop proposals.

4.    In accordance with Rule 23 of the Joint Rules of the Alabama Legislature "[a]ll amendments or revisions to redistricting plans, following introduction as a bill, shall be drafted by the Reapportionment Office." Amendments or revisions must be part of a whole plan. Partial plans are not allowed.

5.    In accordance with Rule 24 of the Joint Rules of the Alabama Legislature, "[d]rafts of all redistricting plans which are for introduction at any session of the Legislature, and which are not prepared by the Reapportionment Office, shall be presented to the Reapportionment Office for review of proper form and for entry into the Legislative Data System at least ten (10) days prior to introduction."

3

## IV. REAPPORTIONMENT COMMITTEE MEETINGS AND PUBLIC HEARINGS

1.      All meetings of the Reapportionment Committee and its sub-committees will be open to the public and all plans presented at committee meetings will be made available to the public.

2.      Minutes of all Reapportionment Committee meetings shall be taken and maintained as part of the public record. Copies of all minutes shall be made available to the public.

3.      Transcripts of any public hearings shall be made and maintained as part of the public record, and shall be available to the public.

4.      All interested persons are encouraged to appear before the Reapportionment Committee and to give their comments and input regarding legislative redistricting. Reasonable opportunity will be given to such persons, consistent with the criteria herein established, to present plans or amendments redistricting plans to the Reapportionment Committee, if desired, unless such plans or amendments fail to meet the minimal criteria herein established.

5.      Notice of all Reapportionment Committee meetings will be posted on monitors throughout the Alabama State House, the Reapportionment Committee's website, and on the Secretary of State's website. Individual notice of Reapportionment Committee meetings will be sent by email to any citizen or organization who requests individual notice and provides the necessary information to the Reapportionment Committee staff. Persons or organizations who want to receive this information should contact the Reapportionment Office.

## V. PUBLIC ACCESS

1.      The Reapportionment Committee seeks active and informed public participation in all activities of the Committee and the widest range of public information and citizen input into its deliberations. Public access to the Reapportionment Office computer system is available every Friday from 8:30 a.m. to 4:30 p.m. Please contact the Reapportionment Office to schedule an appointment.

2.      A redistricting plan may be presented to the Reapportionment Committee by any individual citizen or organization by written presentation at a public meeting or by submission in writing to the Committee. All plans submitted to the Reapportionment Committee will be made part of the public record and made available in the same manner as other public records of the Committee.

4

3.      Any proposed redistricting plan drafted into legislation must be offered by a member of the Legislature for introduction into the legislative process.

4.      A redistricting plan developed outside the Legislature or a redistricting plan developed without Reapportionment Office assistance which is to be presented for consideration by the Reapportionment Committee must:

a.      Be clearly depicted on maps which follow 2020 Census geographic boundaries;

b.      Be accompanied by a statistical sheet listing total population for each district and listing the census geography making up each proposed district;

c.      Stand as a complete statewide plan for redistricting.

d.      Comply with the guidelines adopted by the Reapportionment Committee.

5.      Electronic Submissions

a.      Electronic submissions of redistricting plans will be accepted by the Reapportionment Committee.

b.      Plans submitted electronically must also be accompanied by the paper materials referenced in this section.

c.      See the Appendix for the technical documentation for the electronic submission of redistricting plans.

6.      Census Data and Redistricting Materials

a.      Census population data and census maps will be made available through the Reapportionment Office at a cost determined by the Permanent Legislative Committee on Reapportionment.

b.      Summary population data at the precinct level and a statewide work maps will be made available to the public through the Reapportionment Office at a cost determined by the Permanent Legislative Committee on Reapportionment.

c.      All such fees shall be deposited in the state treasury to the credit of the general fund and shall be used to cover the expenses of the Legislature.

## Appendix.

## ELECTRONIC SUBMISSION OF REDISTRICTING PLANS

## REAPPORTIONMENT COMMITTEE - STATE OF ALABAMA

10213405.2

1

2    The Legislative Reapportionment Computer System supports the electronic
3    submission of redistricting plans. The electronic submission of these plans must
4    be via email or a flash drive. The software used by the Reapportionment Office is
5    Maptitude.

6    The electronic file should be in DOJ format (Block, district # or district #,
7    Block). This should be a two column, comma delimited file containing the FIPS
8    code for each block, and the district number. Maptitude has an automated plan
9    import that creates a new plan from the block/district assignment list.

10    Web services that can be accessed directly with a URL and ArcView
11    Shapefiles can be viewed as overlays. A new plan would have to be built using this
12    overlay as a guide to assign units into a blank Maptitude plan. In order to analyze
13    the plans with our attribute data, edit, and report on, a new plan will have to be
14    built in Maptitude.

15    In order for plans to be analyzed with our attribute data, to be able to edit,
16    report on, and produce maps in the most efficient, accurate and time saving
17    procedure, electronic submissions are REQUIRED to be in DOJ format.

18    Example: (DOJ FORMAT BLOCK, DISTRICT #)

19    SSCCCTTTTTTBBBBDDDD

20    SS          is the 2 digit state FIPS code

21    CCC         is the 3 digit county FIPS code

22    TTTTTT      is the 6 digit census tract code

23    BBBB        is the 4 digit census block code

24    DDDD             is the district number, right adjusted

25    **Contact Information:**

26    Legislative Reapportionment Office

27    Room 317, State House

28    11 South Union Street

29    Montgomery, Alabama 36130

30    (334) 261-0706

10213405.2

1  For questions relating to reapportionment and redistricting, please contact:

2  Donna Overton Loftin, Supervisor

3  Legislative Reapportionment Office

4  donna.overton@alsenate.gov

5  Please Note: The above e-mail address is to be used only for the purposes of
6  obtaining information regarding redistricting. Political messages, including those
7  relative to specific legislation or other political matters, cannot be answered or
8  disseminated via this email to members of the Legislature. Members of the
9  Permanent Legislative Committee on Reapportionment may be contacted through
10  information contained on their Member pages of the Official Website of the
11  Alabama Legislature, legislature.state.al.us/aliswww/default.aspx.

10213405.2