FILED
2025 Oct-24  PM 08:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **ALABAMA STATE CONFERENCE OF THE NAACP,** *et al.*, ) ) ) | |
| **Plaintiffs,** ) ) | |
| **v.** ) ) ) | **Case No. 2:21-cv-1531-AMM** **Case No. 2:25-mc-1682-AMM** |
| **WES ALLEN,** *in his official capacity as Alabama Secretary of State*, ) ) ) | |
| **Defendant.** ) ) | |

## REPORT AND RECOMMENDATION
## OF THE SPECIAL MASTER

**BEFORE THE SPECIAL MASTER:**

Pursuant to the Court's August 22, 2025 order and instructions to the Special Master issued on October 1, 2025 and October 16, 2025, the Special Master files three proposed remedial plans for Alabama's state Senate map, attached to this Report and Recommendation as Exhibits 1-3. As the Court instructed, each proposed plan remedies the violation of Section Two of the Voting Rights Act identified in the Court's August 22 order, although there is significant difference among the three regarding the effectiveness of the remedy. Each proposed plan also complies with the U.S. Constitution and the Voting Rights Act; adheres to the one-person, one-vote requirement; and honors traditional redistricting principles, including compactness, contiguity, respect for political subdivisions, and maintenance of communities of interest. As the Court directed in its October 1 order, the Report and Recommendation explains in detail the choices made in preparing each proposed plan, the differences between and among the proposed plans, and why each plan remedies the vote dilution found by the Court.[1]

## I.    INTRODUCTION AND PROCEDURAL BACKGROUND

### A.    Redistricting in Alabama

Pursuant to the Alabama Constitution, the Alabama state Legislature consists of the House of Representatives and the Senate. Ala. Const. art. IV, § 44. The Legislature must redistrict the state's legislative seats following each decennial census. Ala. Const. art. IX, §§ 199-200. After the 2020 census, the Legislative Committee on Reapportionment (the "Committee"), which is tasked with creating, proposing, and evaluating state redistricting plans, *see* Ala. Code § 29-2-52, began the process of reapportionment by adopting redistricting guidelines providing criteria for

---

[1] In preparing the proposed remedial plans and this Report and Recommendation, the Special Master was assisted by the cartographer, David R. Ely of Compass Demographics, Inc., and Michael A. Scodro, Mitchell D. Holzrichter, Rachel J. Lamorte, Clare E. Myers, and their team of attorneys at Mayer Brown LLP. The Special Master wishes to thank Mr. Ely and the Mayer Brown LLP team for their diligent work and analysis.

redistricting. *See* Doc. 274, Appendix A. The Committee retained expert cartographer Randy Hinaman to prepare a new map in accordance with the Redistricting Guidelines, using the 2020 census data. Doc. 274, 16-17. The Committee then proposed a plan to reapportion the state's 35 Senate districts (the "Enacted Plan"). Doc. 274, 13-17. In a Special Legislative Session on redistricting, the Legislature passed the Enacted Plan, and Governor Kay Ivey signed it into law on November 4, 2021. *Id.* at 17; Ala. Code § 29-1-1.2 (2021); Ala. Code § 29-1-2.3 (2021). The Enacted Plan is reproduced below.



### B.    Background of this Litigation

On November 16, 2021, individual plaintiffs and civic organizations[2] filed suit challenging the Enacted Plan under Section Two of the Voting Rights Act and the Fourteenth Amendment of the United States Constitution. Doc. 1. The Court of Appeals for the Eleventh Circuit convened a three-judge panel that same day, Doc. 5, and stayed the proceedings pending the Supreme Court's resolution of *Allen v. Milligan*, No. 21-1086, and *Caster v. Allen*, No. 21-1087, which challenged the Legislature's federal congressional reapportionment plan following the 2020 census.[3] After the Supreme Court issued its ruling in *Allen*, 599 U.S. 1, the stay was lifted and litigation resumed. Doc. 75.

On December 6, 2023, Plaintiffs filed their Fourth Amended Complaint—the now-operative pleading—against Alabama Secretary of State Wes Allen and the co-chairs of the Committee, Representative Chris Pringle and Senator Steve Livingston.[4] The Fourth Amended Complaint alleges that the Enacted Plan violates Section Two but no longer pursues constitutional claims. Doc. 126, ¶¶ 170-76. Accordingly, the panel issued an order dissolving itself and returning the case to the Honorable Anna M. Manasco, U.S. District Judge for the Northern District of Alabama, to whom the case was originally assigned. Doc. 127.

---

[2] The original complaint was brought by registered voters James Thomas, Laquisha Chandler, Khadidah Stone, and Evan Milligan, as well as Greater Birmingham Ministries and the Alabama State Conference of the NAACP. Doc. 1. Over the course of the litigation, the parties stipulated to the dismissal of various individual plaintiffs from the case. Docs. 198, 204. As of the filing of this report, only plaintiffs Evan Milligan, Greater Birmingham Ministries, and the Alabama State Conference of the NAACP remain in the litigation. Doc. 126. As used in this report, "Plaintiffs" refers to the plaintiffs who were in the case at the time of the relevant filing.

[3] At the same time Plaintiffs filed the instant litigation on the state legislative apportionment plan, other plaintiffs sought to enjoin the 2022 congressional elections from proceeding under Alabama's congressional apportionment plan. *Singleton v. Allen*, No. 2:21-cv-1291-AMM; *Milligan v. Allen*, No. 2:21-cv-1530-AMM; *Caster v. Allen*, No. 2:21-cv-1536-AMM. Both a three-judge panel and Judge Manasco sitting alone granted preliminary injunctions, holding that the Plan likely violated Section Two of the Voting Rights Act. *Singleton v. Merrill*, 582 F.Supp.3d 924, 1026 (N.D. Ala. 2022); *Caster v. Merrill*, 2022 WL 264819, at *3 (Jan. 24, 2022). The Supreme Court affirmed. *Allen v. Milligan*, 599 U.S. 1 (2023).

[4] Claims against Senator Livingston have since been dismissed on the ground of legislative immunity. Docs. 130, 143.

The Fourth Amended Complaint alleges that the Enacted Plan violates Section Two by diluting Black voting power and denying Black voters an equal opportunity to participate in the political process and elect candidates of their choice. Doc. 126, ¶ 2. As relevant here, Plaintiffs contend that the Enacted Plan packs Black voters in the Montgomery area into a single Senate district, District 26. *Id.* ¶¶ 2.[5] The complaint alleges that the three *Gingles* preconditions for a Section Two violation are met because "Black voting-age citizens are sufficiently numerous and geographically compact to form a reasonably configured majority" in an additional district, "the voting patterns of Black voters in the [Montgomery area] are politically cohesive," and "white voters in this region of Alabama vote sufficiently as a bloc typically to defeat the candidates preferred by Black voters." *Id.*; *see Thornburg v. Gingles*, 478 U.S. 30, 50 (1986). "Under the totality of circumstances," Plaintiffs allege, including Alabama's "ongoing history of racial discrimination in voting," the Enacted Plan "prevents Black voters from participating equally in the political process and electing candidates of choice." Doc. 126, ¶ 5. Plaintiffs asked the Court to enjoin the administration of state legislative elections under the Plan and issue an order for "the creation of additional State Senate districts in the Montgomery . . . region[]" to cure the alleged vote dilution. *Id.* ¶ 176.

## C.    Procedural History of This Litigation

This case proceeded to an eight-day bench trial in November 2024, and Plaintiffs and Secretary Allen submitted proposed findings of fact and conclusions of law. Docs. 250, 251. The Secretary also submitted a motion for judgment as a matter of law. Doc. 247. In an August 22,

---

[5] The Fourth Amended Complaint also alleges that the Enacted Plan violates Section Two because it divides Black voters among Districts 2, 7, and 8 in the Huntsville area to preserve three districts where candidates preferred by white voters reliably win. Doc. 126 ¶ 3; *see also id.* ¶ 176 (alleging vote dilution in the Huntsville region). The Court ultimately held that Plaintiffs did not establish a Section Two violation in the Huntsville area because their illustrative plans did not propose a remedial district that was "reasonably configured," as required under *Thornburg v. Gingles*, 478 U.S. 30 (1986). Doc. 274, 161-65. Because the Court did not find a Section Two violation in Huntsville, this Report and Recommendation does not address these claims further.

2025 order, the Court held that Plaintiffs had demonstrated a Section Two violation in the Montgomery area. Doc. 274, iii. Accordingly, it denied the Secretary's motion and enjoined the Legislature from conducting Senate elections under the Plan. *Id.*, iv.

1. The Court's August 22, 2025 Order and Injunction

The Court evaluated each Section Two claim under the factors set forth in *Gingles*, 478 U.S. 30; *see* Doc. 274, 27-31 (describing framework for Court's analysis). To establish a Section Two violation, a plaintiff must show that: (1) the minority group is "sufficiently large" and geographically compact "to constitute a majority in a single-member district"; (2) the minority group is "politically cohesive"; and (3) the "white majority votes sufficiently as a block to enable it . . . to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 50-51. Once these three preconditions are satisfied, a plaintiff then must establish that the political process is not equally open to minority voters under the "totality of the circumstances." *Id.* at 79.

Plaintiffs provided three illustrative plans ("Illustrative Plans 1, 2A, and 3"). Docs. 207-1, 207-4, 207-13, 207-15. In each, Plaintiffs proposed the same remedial district ("Proposed District 25") to remedy the alleged packing of voters in the Montgomery area. Doc. 274, 20. In support of these plans, Plaintiffs offered the testimony of witnesses including expert Anthony Fairfax, who has extensive experience with redistricting issues, including his service as an expert in redistricting lawsuits and developing approximately 1,000 redistricting plans for states and municipalities. *Id.* at 35. Defendant Secretary Allen offered the testimony of witnesses including Dr. Sean Trende, a scholar, lecturer, and elections analyst who has served as both a party expert and a court-appointed expert in redistricting litigation. *Id.* at 97-98. The Court found the testimony of both Mr. Fairfax and Dr. Trende credible. *Id.* at 152.

Of the three plans, the Court rejected Illustrative Plans 1 and 2A because in those plans Plaintiffs failed to show that the Black population was "sufficiently large" to satisfy the first *Gingles* requirement. Doc. 247, 146-51. With respect to Illustrative Plan 3, the Court concluded that the Black population was sufficiently large to accommodate remedial districts and went on to consider whether the proposed remedial districts were "reasonably configured," as *Gingles* requires. *Id.* at 151-70. It held that Proposed District 25 adhered to many of the county lines, "foreclos[ing] a finding that Proposed District 25 is bizarrely shaped." *Id.* at 165. Indeed, Defendant Secretary Allen did not dispute that Proposed District 25 was geographically compact. *Id.* In addition, Proposed District 25 exceeded the Legislature's plan in terms of industry-standard compactness scores, another point the Secretary did not dispute. *Id.* at 165-66.

Rather, the Secretary argued that Plaintiffs could not prove a Section Two violation because Proposed District 25 "subordinates traditional districting principles to racial considerations," *id.* at 165-66 (quoting Doc. 251 ¶¶ 145-57), and that race predominated in Mr. Fairfax's preparation of the proposed district. Doc. 274, 166. The Court disagreed. *Id.* at 166-67. Citing the Supreme Court's decision in *Allen*, the Court explained that Section Two "demands consideration of race," and that to show that race predominated, a challenger "will often need to show that the . . . map conflicts with traditional redistricting criteria." *Id.* (first quoting *Allen*, 599 U.S. at 30-31, then quoting *Alexander v. South Carolina State Conf. of the NAACP*, 602 U.S. 1, 8 (2024)). The Court found, first, that Mr. Fairfax relied on traditional redistricting criteria— including equalizing population, respecting political subdivisions, keeping districts compact and contiguous, and preserving communities of interest—when drawing the plans. *Id.* at 167. Although Mr. Fairfax's process was not race-blind, the Court explained, "his map-making process was race-aware to the degree the law allows." *Id.* at 168-69. The Court held that Proposed District 25's

configuration, which respected the Legislature's priorities of avoiding city and county splits and largely followed county lines, confirmed that race did not predominate. *Id.* at 169-70. And Dr. Trende's testimony did not support the Secretary's argument, the Court found, because Dr. Trende neither opined that race predominated in Mr. Fairfax's process nor addressed the race-neutral reasons for Mr. Fairfax's map-drawing decisions. *Id.* at 170.

The Court further found that the second and third *Gingles* preconditions were met because there is "no serious dispute" that patterns of racially polarized voting exist in the Montgomery area. *Id.* at 171. Finally, it concluded that every factor it considered in the "totality of the circumstances" evaluation favored Plaintiffs. *Id.* at 178. Accordingly, the Court held that Plaintiffs established a violation of Section Two in the Montgomery area and enjoined Secretary Allen and his successors from conducting any Senate elections according to the Enacted Plan. *Id.* at iv, 216.

2. Remedial Proceedings Before the Court

One week later, Defendant Secretary Allen moved to stay the Court's injunction and remedial proceedings. Doc. 278. He subsequently advised the Court that Governor Ivey would not call the Alabama Legislature into special session to draw a remedial map for Alabama's 2026 state Senate elections. Doc. 299. Because the Legislature declined the opportunity to draw a lawful map, the Court assumed the obligation of doing so. Doc. 302. In an October 1, 2025 Order, it appointed a Special Master, Richard Allen, and a team comprised of expert cartographer David Ely and Michael Scodro and his law firm, Mayer Brown LLP, to assist the Special Master. *Id.*

**D.    The District Court's Instructions to the Special Master**

In its October 1 Order, the Court provided specific instructions to the Special Master and his team. Doc. 302, 11-14. It directed them to file three proposed remedial plans to remedy the Section Two violation the Court had identified. In an October 16, 2025 Order, it issued a supplemental order providing clarification of its initial instructions. Doc. 307. As supplemented

by the October 16 Order, the Court instructed that each of the Special Master's proposed plans

must:

- Completely remedy the Section Two violation identified in th[e] Court's August 22, 2025 Order. Each plan shall remediate the essential problem found in the Enacted [2021] Plan—the unlawful dilution of the Black vote in Alabama's state Senate districting scheme. To that end, "the appropriate remedy is a redistricting plan that includes either an additional majority-Black Senate district in the Montgomery area, or an additional district there in which Black voters otherwise have an opportunity to elect a Senator of their choice." Doc. 274 at 5. As a practical reality, "based on the ample evidence of intensely racially polarized voting adduced during the trial, . . . any remedial plan will need to include an additional district in the Montgomery [area] in which Black voters either comprise a voting age majority or something quite close to it." *Id.*

- Comply with the U.S. Constitution and the Voting Rights Act.

- Comply with the one-person, one-vote principle guaranteed by the Equal Protection Clause of the Fourteenth amendment, based on data from the 2020 Census.

- Respect traditional redistricting principles to the extent reasonably practicable as expressed in the Alabama Legislature's Permanent Legislative Committee on Reapportionment, a copy of which are attached hereto as Appendix A. Ordinarily, these principles "[i]nclude compactness, contiguity, respect for political subdivisions or communities defined by actual shared interests, incumbency protection, and political affiliation." *Ala. Legislative Black Caucus v. Alabama*, 575 U.S. 254, 272 (2015) (quotation marks and citations omitted). That said, the Alabama Legislature has substantially more discretion than does this Court in drawing a remedial map: state legislatures may consider political circumstances that courts may not. *See, e.g.*, *Upham v. Seamon*, 456 U.S. 37, 42 (1982) (per curiam); *Connor v. Finch*, 431 U.S. 407, 414–15 (1977); *Wyche v. Madison Parish Police Jury*, 635 F.2d 1151, 1160 (5th Cir. 1981). In other words, "in the process of adopting reapportionment plans, the courts are 'forbidden to take into account purely political considerations that might be appropriate for legislative bodies,'" such as incumbency protection and political affiliation. *Larios v. Cox*, 306 F. Supp. 2d 1214, 1218 (N.D. Ga. 2004) (three-judge court) (quoting *Wyche*, 635 F.2d at 1160). Thus, consistent with these limitations, the Special Master and his team shall consider traditional redistricting criteria, such as compactness, contiguity, respect for political subdivisions, and maintenance of communities of interest.

- Hew as closely as possibly to the Enacted Plan while providing a lawful remedial district in the Montgomery area.

*Id.* at 11-13.

8

The Court directed the Special Master to consider as background, among other things, the Montgomery-area illustrative remedial plan submitted by Plaintiffs, all evidence of record, and any proposals, plans, and comments submitted to them by the parties in this case. *Id.* at 13.

### E.    Filings and Proceedings Before the Special Master

The Court created a new docket to receive filings and submissions intended for the Special Master. Doc. 274, 14; *see also* Case No. 2:25-mc-1682, Doc. 1 (directing Clerk of Court to open miscellaneous civil case to facilitate work of the Special Master).[6] To meet the deadline for submission of the proposed remedial maps and the Report and Recommendation, the Special Master issued an Order setting a schedule for parties and non-parties to submit proposed remedial maps and comments for consideration by the Special Master. Case No. 2:25-mc-1682, Doc. 2. The following parties and non-parties submitted proposed remedial plans to the Special Master:

1. Three plans by Plaintiffs, *see* Case No. 2:25-mc-1682, Doc. 7 (collectively "Plaintiffs' Plans"), as follows:

   a. A plan based on an earlier illustrative plan prepared by Plaintiffs' expert Mr. Fairfax during the liability phase of the case (the "Fairfax Plan"); and

   b. Two plans prepared by Plaintiffs' expert Dr. Kassra Oskooii ("Oskooii Plan A" and "Oskooii Plan B"); and

2. Six plans by non-party D.D.,[7] Case No. 2:25-mc-1682, Doc. 8, labeled as plans 3.0, 3.2, 4.0, 4.2, 5.0, and 5.2 (collectively the "D.D. Plans").

The Special Master also received the following comments from Parties and non-parties regarding the submitted proposed remedial plans:

1. Comments from Defendant Secretary Allen (Case No. 2:25-mc-1682, Docs. 9 and 10);

---

[6] References to the filings in this docket are preceded by the case number for the miscellaneous docket. References to the filings in the original case docket, No. 2:21-cv-1531, are designated as "Doc. __."

[7] D.D. is a minor resident of the State of Alabama, so the plans were submitted under D.D.'s initials rather than full name.

      2.   Comments from Plaintiffs (Case No. 2:25-mc-1682, Doc. 11); and

      3.   Comments from non-party William Abernathy (Case No. 2:25-mc-1682, Doc. 12).

The Special Master received, reviewed, and carefully considered the proposed remedial plans and comments filed by the Parties and interested non-parties, which were very helpful to the Special Master and his team in crafting his proposed remedial plans. The Special Master commends the Parties and non-parties who filed proposed plans and comments, which were necessarily done on an expedited basis but were nonetheless of extremely high quality and were clearly the product of extensive work and thoughtful analysis.

## II.    SPECIAL MASTER'S REMEDIAL PLANS

As explained above, the Court set out specific criteria for each plan the Special Master recommends. Doc. 302, 11-14; Doc. 307, 1-2. In evaluating plans proposed by the Parties and interested non-parties, as well as the plans ultimately proposed by the Special Master, he assessed whether each plan complied with the first three criteria set out in the Court's order: that the plan (1) completely remedies the likely Section Two violation; (2) complies with one-person, one-vote principles, as evidenced by population equality; and (3) otherwise complies with the U.S. Constitution and the Voting Rights Act. The Special Master also considered other traditional redistricting criteria, in particular compactness, contiguity, respect for political subdivisions, and maintenance of communities of interest. Finally, in keeping with the Court's acknowledgement that "[r]edistricting is primarily the duty and responsibility of the State," Doc. 274, 6 (quoting *Allen*, 599 U.S. at 29), the Special Master minimized changes to the Enacted Plan to the extent possible by maintaining most district boundaries and retaining the vast majority of people within the same districts they occupied under the Enacted Plan.

The Special Master submits three proposed remedial plans, each described in full below and referred to as "Remedial Plan 1," "Remedial Plan 2," and "Remedial Plan 3." Maps of the Special Master's remedial plans and the other plans submitted to the Special Master, as well as the demographic characteristics, election performance results, and other attributes of each plan, are included as Exhibits 1 through 13. A list of counties, voting districts, and blocks within each remedial plan is included in each exhibit, and block equivalency files for the three remedial plans in PDF format are being uploaded to the docket.

As an initial matter, the Special Master emphasizes that neither he nor his cartographer, Mr. Ely, used racial population data when drawing district boundaries, nor did they "target" any particular Black population percentage in any district. Instead, where Mr. Ely needed to deviate from the Enacted Plan boundaries, he prioritized following county, voting district (precinct), and municipal boundaries. Mr. Ely also had median income data from the U.S. Census Bureau's American Community Survey, as relevant to the social and economic factors identified in the Legislature's guidelines and findings. After preparing each draft plan, Mr. Ely performed an election analysis (discussed below) to determine how frequently the Black-preferred candidate would have won past election contests in each district.

## A.    Remedial Plan 1

Remedial Plan 1 is similar to the Fairfax Plan, particularly with respect to the configuration of District 25. But unlike the Fairfax Plan, Remedial Plan 1 limits modifications to only three districts in the Enacted Plan: Districts 25, 26, and 30. By contrast, the Fairfax Plan also modifies District 14. Districts 25 and 26 in Remedial Plan 1 would often elect the Black-preferred candidate.

**B.    Remedial Plan 2**

Remedial Plan 2 is similar to Oskooii Plan B. Remedial Plan 2 requires modifications to only three districts in the Enacted Plan: Districts 25, 26, and 30. In Elmore County, Oskooii Plan B's boundary between proposed Districts 25 and 26 split four additional precincts. Remedial Plan 2 instead follows precinct boundaries to avoid splitting those precincts. Districts 25 and 26 in Remedial Plan 2 would often elect the Black-preferred candidate.

Remedial Plan 2 even more closely aligns with the Enacted Plan than Remedial Plan 1: as explained below in Section III.A, as compared to Remedial Plan 1, a slightly higher percentage of the population within the modified area would remain in the same districts as in the Enacted Plan. Remedial Plan 2 also performs slightly better than Remedial Plan 1 as a Section Two remedy: as explained below in Section III.B, the Black-preferred candidate would win all seventeen elections examined by the Special Master in Districts 25 and 26 under Remedial Plan 2, and the average margin of victory of the Black-preferred candidate in District 25 is approximately two percentage points higher than under Remedial Plan 1. On the other hand, Remedial Plan 2 requires splitting one more precinct than Remedial Plan 1.

**C.    Proposed Remedial Plan 3**

Remedial Plan 3 is identical to D.D. Plan 5.0. Unlike the other proposed remedial plans, Remedial Plan 3 requires modifications to only two districts in the Enacted Plan: Districts 25 and 26. As explained below in Section III.B.2, however, Remedial Plan 3 only weakly remedies the Section Two violation. While District 25 in Remedial Plan 3 would often elect the Black-preferred candidate, District 26 would elect the Black-preferred candidate in only *three* of the eleven biracial elections examined by the Special Master. The Black-preferred candidate would perform better in District 26 in uni-racial elections, winning all six uni-racial elections examined by the Special

Master. In other words, a white Black-preferred candidate would be able to win District 26 much more reliably than a Black Black-preferred candidate.

The Special Master is cognizant of the Court's instruction that each remedial plan must completely remedy the Section Two violation. The Special Master puts forward Remedial Plan 3 because, while it weakly remedies the Section Two violation, the comparison of Remedial Plan 3 to Remedial Plans 1 and 2 demonstrates the impact of modifying a third district (District 30) on the effectiveness of the remedy. Additionally, given the small region in which the remedy is being effected, the Special Master lacked a third remedial plan that would modify only three districts, would more adequately remedy the Section Two violation, and would materially differ from Remedial Plans 1 and 2.

III.    **ANALYSIS**

As explained above, the Court set out specific criteria for each plan the Special Master proposes. Doc. 302, 11-14; Doc. 307, 1-2. In evaluating plans suggested by the parties and interested non-parties, as well as the three plans he now submits to the Court, the Special Master sought to measure compliance with the first three criteria set out in the Court's order: that the plan (1) completely remedies the likely Section Two violation; (2) complies with one-person, one-vote principles, as evidenced by population equality; and (3) otherwise complies with the U.S. Constitution and the Voting Rights Act. *Id.* The Special Master analyzed the overlap of proposed plan districts with the districts in the Enacted Plan to verify that any changes were necessary to comply with the Court's order to provide a complete remedy. The Special Master also considered other traditional redistricting criteria, in particular compactness, contiguity, respect for political subdivisions, and maintenance of communities of interest. Each of those considerations is described in greater detail below.

### A.    Consideration of the Enacted Plan

As the Court explained, "[r]edistricting is primarily the duty and responsibility of the State." Doc. 274, 6 (quoting *Allen*, 599 U.S. at 29). Thus, a court "must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus" while ensuring "compl[iance] with federal constitutional and statutory requirements." *Id.* (first quoting *Abbot v. Perez*, 585 U.S. 579, 603 (2018)); *see also Upham v. Seamon*, 456 U.S. 37, 43 (1982) (court's "modifications of a state plan are limited to those necessary to cure any constitutional or statutory defect").

The three remedial plans submitted by the Special Master preserve boundaries from the Enacted Plan except where modifications are needed to remedy the Section Two violation. The Special Master found it was necessary to modify only three districts, so 32 of the 35 Senate districts are entirely unchanged from the Enacted Plan. For those three districts whose boundaries were changed, Table 1 below summarizes the percentage of the population of each Enacted Plan district that is retained in that same district under each of the Special Master's three remedial plans.

**Table 1**
**Core Retention of Districts in Proposed Remedial Plans**
**Compared to the Enacted Plan by Population**

(All districts that are not identified below are unchanged.)

| District | Remedial Plan 1 | Remedial Plan 2 | Remedial Plan 3 |
|----------|-----------------|-----------------|-----------------|
| District 25 | 45.6% | 57.7% | 59.4% |
| District 26 | 51.0% | 62.2% | 59.6% |
| District 30 | 68.0% | 68.8% | 100.0% |
| **Statewide** | **96.1%** | **96.8%** | **97.6%** |

Remedial Plan 3 hews most closely to the Enacted Plan because it modifies only two districts—but it does so at the expense of the effectiveness of the Section Two remedy as discussed below in Section III.B. Remedial Plan 2 has slightly better retention from the Enacted Plan than Remedial Plan 1.

The Fairfax Plan changed a fourth district (District 14); no other plan did so, and the Special Master therefore concluded that changing a fourth district was unnecessary. The Oskooii Plans, in turn, made changes to the same three districts (25, 26, and 30). Case No. 2:25-mc-1682, Doc. 7.

D.D. Plans 3.0, 4.0, and 5.0 modified only two districts (25 and 26), while D.D. Plans 3.2, 4.2, and 5.2 also modestly changed District 30 for the sole purpose of equalizing population. Case No. 2:25-mc-1682, Doc. 8. The Special Master closely examined the approach taken by D.D. in modifying only Districts 25 and 26—a feature of the D.D. Plans that Defendant Secretary Allen commended, Case No. 2:25-mc-1682, Docs. 9, 10—and the Special Master adopted D.D. Plan 5.0 as the Special Master's Remedial Plan 3. As discussed below in Section III.B.2, however, limiting the remedy to only Districts 25 and 26 significantly reduces the effectiveness of the Section Two remedy.

Table 2 below summarizes the percentage of the population of Enacted Plan districts retained in those same districts on a statewide basis under each of the proposed remedial plans. Table 2 also identifies the number of districts, out of 35 Senate districts, that each plan would modify from the Enacted Plan.

15

**Table 2**
**Statewide Core Retention of Districts in Proposed Remedial Plans**
**Compared to the Enacted Plan by Population**

| Plan | Statewide Core Retention | Districts Modified |
|---|---|---|
| Remedial Plan 1 | 96.1% | 3 |
| Remedial Plan 2 | 96.8% | 3 |
| Remedial Plan 3 | 97.6% | 3 |
| Fairfax Plan | 96.0% | 4 |
| Oskooii Plan A | 97.0% | 3 |
| Oskooii Plan B | 96.8% | 3 |
| D.D. Plan 3.0 | 97.8% | 2 |
| D.D. Plan 3.2 | 97.9% | 3 |
| D.D. Plan 4.0 | 97.8% | 2 |
| D.D. Plan 4.2 | 97.9% | 3 |
| D.D. Plan 5.0 | 97.6% | 2 |
| D.D. Plan 5.2 | 97.5% | 3 |

**B.     Remedy of Section Two Violation**

The Court directed that each proposed plan "[c]ompletely remedy the Section Two violation identified in the Court's order of August 22, 2025." Doc. 307, 1. "Each plan shall remediate the essential problem found in the Enacted Plan—the unlawful dilution of the Black vote in Alabama's state Senate districting scheme." *Id.* at 2. The Court instructed that, "[t]o that end, the appropriate remedy is a redistricting plan that includes either an additional majority-Black Senate district in the Montgomery area, or an additional district there in which Black voters otherwise have an opportunity to elect a Senator of their choice." *Id.* (internal quotation marks omitted); see also Doc. 302, 11. It noted that "[a]s a practical reality, . . . any remedial plan will need to include an additional district in the Montgomery [area] in which Black voters either comprise a voting-age majority or something quite close to it." *Id.*

An effectiveness analysis (also called a performance analysis), which the Court described as "a comparative study of two or more redistricting plans" that "reports the different opportunities for racial minority voters . . . to elect the candidates of their choice," is commonly used to evaluate

Section Two remedial plans. Doc. 274, 66. An effectiveness analysis uses recent election results to assess whether a candidate preferred by a particular group would be elected from a proposed "opportunity district," meaning a district where "the minority group forms an effective majority"; no such opportunity exists if a cohesive majority "will often, if not always, prevent" minority voters from electing the candidate of their choice. *League of United Latin Am. Citizens v. Perry* ("*LULAC*"), 548 U.S. 399, 426-27 (2006). Accordingly, an effectiveness analysis in this case should demonstrate that the Black-preferred candidate often would win an election in the subject district.

### 1. Election Contests Used for the Performance Analyses

The Special Master first looked to the elections used by the Parties' experts for their own analyses of the Enacted Plan during the liability phase of this litigation. Plaintiffs' expert, Dr. Liu, considered eleven biracial statewide elections between 2014 and 2022 during the liability phase. Doc. 206-16, 6.[8] The Secretary's expert, Dr. Trende, examined those same 2018-2022 elections but did not have access to the 2014 election data. Doc. 189-7, 25. The Parties also cited these eleven elections in their Joint Statement of Undisputed Facts. Doc. 230 ¶ 119.

In his remedial report, Dr. Liu also considered five uni-racial statewide elections between 2017 and 2020 that the Special Master used in the 2023 *Milligan* proceedings,[9] as well as two more recent 2024 elections.[10]

---

[8] Those elections are: (1) 2014 Secretary of State, (2) 2014 Lt. Governor, (3) 2014 State Auditor, (4) 2018 Lt. Governor, (5) 2018 State Auditor, (6) 2018 Public Service Commission (Place 1), (7) 2022 Governor, (8) 2022 U.S. Senate, (9) 2022 Secretary of State, (10) 2022 Attorney General, and (11) 2022 Alabama Supreme Court Associate Justice (Place 5).

[9] Those elections are: (1) 2017 U.S. Senate, (2) 2018 Attorney General, (3) 2018 Governor, (4) 2020 U.S. President, and (5) 2020 U.S. Senate. The Special Master also had examined the 2018 Secretary of State election contest in *Milligan*, but Dr. Liu did not include that election in his remedial report in this case.

[10] Those elections are: (1) 2024 President and (2) 2024 Alabama Supreme Court Chief Justice.

The Special Master notified the Parties of his intention to conduct an effectiveness analysis using the same election contests used by the Parties' own experts. The Secretary responded by agreeing to the Special Master's use of the elections used by Dr. Liu in his remedial report, but the Secretary also suggested using a number of additional elections, including eleven elections held between 2014 and 2018 that Dr. Liu did not consider. The Parties' experts did not consider those additional eleven elections in earlier proceedings, except that the 2018 Secretary of State election was part of the Special Master's 2023 analysis and report in *Milligan*.

The Special Master decided to use two sets of elections for his effectiveness analysis:

- The first set comprises the eleven biracial statewide elections between 2014 and 2022 that the Parties examined during the liability phase of this case and cited in their Joint Statement of Undisputed Facts. The Court credited use of this election set, Doc. 274, 63-66, 172-77, and the Special Master is able to rely on the Parties' own identification of the Black-preferred candidate in each election.

- The second set comprises those eleven elections, plus the additional six uni-racial elections that the parties and the Special Master examined in *Milligan*. Dr. Liu used five of these elections in his remedial report in this case, and Defendant accepted all six in his response to the Special Master. While these six elections were not examined in the liability phase of this case, they were examined in *Milligan*, and the Special Master therefore may rely on the identification of the Black-preferred candidate from the *Milligan* record.

The Special Master did not use the 2024 elections, despite the fact that Dr. Liu considered these elections in his remedial report and Defendant accepted them in later correspondence. While the 2024 elections would be probative because of their recency, there is no expert analysis and

identification of the Black-preferred candidates in those contests. Similarly, the Special Master did not use the other earlier elections suggested by the Defendant (other than the 2018 Secretary of State election, which was considered in *Milligan*) because the Parties did not consider and agree on those elections, and again there is no expert analysis and identification of the Black-preferred candidates in those contests. The Special Master also concluded that the set of seventeen elections was sufficiently robust to conduct the performance analyses.

2.    Effectiveness of Section Two Remedy

Remedial Plans 1 and 2 each include one additional Senate district in the Montgomery area in which the Black-preferred candidate often wins the election, while Remedial Plan 3 includes an additional Senate district in which the Black-preferred candidate occasionally, but not reliably, wins the election. Table 3 below reports the number of election contests in Districts 25 and 26 that the Black-preferred candidate would have won and the average percentage margin of victory (or defeat) of that candidate using the first set of election contests (eleven biracial statewide elections), while Table 4 below provides the same data using the second set of election contests (seventeen statewide elections).

**Table 3**
**Election Performance of the Black-Preferred Candidate**
**in Districts 25 and 26 and Average Margin of Victory,**
**Using Eleven Biracial Statewide Elections**

| Plan | District 25 | | District 26 | |
|---|---|---|---|---|
| | **Contests Won (out of 11)** | **Average Margin of Victory** | **Contests Won (out of 11)** | **Average Margin of Victory (or Defeat)** |
| Remedial Plan 1 | 10 | +8.7% | 10 | +7.8% |
| Remedial Plan 2 | 11 | +10.7% | 10 | +7.7% |
| Remedial Plan 3 | 9 | +5.4% | 3 | **-7.1%** |

**Table 4**
**Election Performance of the Black-Preferred Candidate**
**in Districts 25 and 26 and Average Margin of Victory,**
**Using Seventeen Statewide Elections**

| Plan | District 25 | | District 26 | |
|------|-------------|---|-------------|---|
| | **Contests Won (out of 17)** | **Average Margin of Victory** | **Contests Won (out of 17)** | **Average Margin of Victory (or Defeat)** |
| Remedial Plan 1 | 16 | +13.2% | 16 | +12.1% |
| Remedial Plan 2 | 17 | +15.0% | 16 | +12.3% |
| Remedial Plan 3 | 15 | +9.9% | 9 | -1.8% |

Both Remedial Plans 1 and 2 adequately remedy the Section Two violation. The only contest lost by the Black-preferred candidate under either plan is the 2014 Auditor contest (and the Black-preferred candidate would have prevailed even in that contest in Remedial Plan 2's District 25). Remedial Plan 2 offers slightly better performance for the Black-preferred candidate, increasing the average margin of victory in District 25.

Remedial Plan 3 only weakly remedies the Section Two violation: while the Black-preferred candidate often wins District 25, the Black-preferred candidate wins District 26 in only *three* of the eleven biracial elections examined by the Special Master. The Black-preferred candidate performs better in the uni-racial elections, winning all six uni-racial elections examined. In other words, white candidates (including white Black-preferred candidates) are able to win District 26 much more reliably than Black candidates. But even taking into account all seventeen elections, the Black-preferred candidate still loses the election in District 26 by 1.8% on average.

The Plaintiffs' Plans all perform comparably to the Special Master's remedial plans. The Black-preferred candidate performs better (by approximately two-to-three percentage points) in District 26 under the Fairfax Plan—but at the expense of modifying a fourth district (District 14).

None of the D.D. Plans includes an additional district that often elects the Black-preferred candidate. In every D.D. Plan, the Black-preferred candidate fails to win the second opportunity district more than three times out of the eleven biracial elections that the Special Master considered. The D.D. Plans fare better when considering the full set of seventeen elections, as discussed above with respect to Remedial Plan 3.

The Special Master and cartographer emphasize that they did not use any measure of Black population or voting age population as a proxy for performance. Districts were not drawn to attain any particular threshold of Black population. Instead, after they were drawn, districts were tested to determine how often the Black-preferred candidate in those districts would have won past elections. In fact, as shown in Table 5 immediately below, District 26 does not have a majority Black voting age population ("BVAP") in any of the Special Master's proposed remedial plans.

**Table 5**
**BVAP of Districts 25 and 26 in the Proposed Remedial Plans**

| Plan | BVAP of District 25 | BVAP of District 26 |
|------|--------------------|--------------------|
| Remedial Plan 1 | 51.6% | 49.7% |
| Remedial Plan 2 | 53.6% | 48.3% |
| Remedial Plan 3 | 51.1% | 43.9% |

### C.    Population Equality

The Court directed that each proposed plan "[c]omply with the one-person, one-vote principle guaranteed by the Equal Protection Clause of the Fourteenth Amendment, based on data from the 2020 Census." Doc. 302, 11.

The Committee's Redistricting Guidelines directed that the Enacted Plan should have a population deviation of no greater than +/-5% (that is, 10% total). Doc. 274, Appendix A, II(c); Doc. 230, 5. The Enacted Plan has a population deviation between the most-populated and least-populated districts (Districts 2 and 33, respectively) of 14,313, which is 9.97% of the State

population. Every remedial plan considered in this Report is at or below that deviation, with the lowest deviation at 14,115.

### D.    Other Compliance with the U.S. Constitution and Voting Rights Act

The Court directed that each proposed plan "[c]omply with the U.S. Constitution and the Voting Rights Act." Doc. 302, 11. As described above, the Special Master has confirmed that his remedial plans comply with (1) the population equality principles required by Article 1, Section Two of the U.S. Constitution and the Equal Protection Clause of the Fourteenth Amendment (*see supra*, Section C), and (2) the prohibition on vote dilution under the Voting Rights Act also described above (*see supra*, Section B) (recognizing the significant difference in the effectiveness of the Section Two remedy between Remedial Plans 1 and 2, on the one hand, and Remedial Plan 3, on the other). In addition, as described below, the Special Master has confirmed that the remedial plans do not constitute racial gerrymanders prohibited by the Equal Protection Clause or intentional discrimination prohibited by the Equal Protection Clause and Fifteenth Amendment.

The Equal Protection Clause prohibits separating citizens into different voting districts on the basis of race when race has predominated over traditional race-neutral districting principles and the race-based sorting of voters is not narrowly tailored to serve a compelling state interest, such as to comply with the Voting Rights Act. *Alexander*, 602 U.S. at 7; *Cooper v. Harris*, 581 U.S. 285, 291 (2017); *see also Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 187 (2017). The prohibition on racial gerrymandering does not require map drawers to be entirely blind to racial demographics, but racial demographics must not predominate. *Allen*, 599 U.S. at 30-31. As the Supreme Court plurality explained: "When it comes to considering race in the context of districting, we have made clear that there is a difference between being aware of racial considerations and being motivated by them . . . . The former is permissible; the latter is usually

22

not." *Id.* at 30 (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)). In addition, the Equal Protection Clause and Fifteenth Amendment prohibit drawing legislative districts with the intent to discriminate against racial or ethnic minority voters. *Miller*, 515 U.S. 911; *see also Rogers v. Lodge*, 458 U.S. 613, 617 (1982) (explaining that redistricting plans are unconstitutional if "conceived or operated as purposeful devices to further racial discrimination by minimizing, cancelling out or diluting the voting strength of racial elements in the voting population" (quoting *Whitcomb v. Chavis*, 403 U.S. 124, 149 (1971)).

The Special Master's remedial plans are neither prohibited racial gerrymanders nor intentionally discriminatory. As explained above, while the Special Master measured whether Black residents had an opportunity to elect candidates of their choice through an election effectiveness analysis, the boundaries within the submitted remedial plans were not drawn on the basis of race. The Special Master's cartographer, Mr. Ely, did not display racial demographic data while drawing districts or examining others' proposed remedial plans within the mapping software, Maptitude.

### E.    Compactness

The Court recognized that compactness is a traditional redistricting principle. Doc. 302, 12 (citing *Ala. Legislative Black Caucus*, 575 U.S. at 272). There is no single accepted measure of compactness, so the Special Master looked to the most commonly-used measures, including those employed by the parties' own experts. The Plaintiffs' expert, Mr. Fairfax, used the Reock score, the Polsby-Popper score, and the Convex Hull score. The Secretary's expert, Dr. Trende, used the Reock score, the Polsby-Popper score, and the cut edges score. The Special Master used the Reock and Polsby-Popper scores, as all of the Parties' experts used these measures, as well as the cut edges score, which was easily available to the Special Master and was used in his analysis and

report in *Milligan*. The compactness scores of the remedial plans compared to the Enacted Plan are shown immediately below in Table 6.

**Table 6**
**Compactness of the Enacted Plan and Remedial Plans**
**Using Polsby-Popper and Reock Scores**

| Plan | Statewide | District 25 | District 26 | District 30 |
|------|-----------|-------------|-------------|-------------|
| Enacted Plan | 0.26 / 0.41 | 0.14 / 0.24 | 0.18 / 0.50 | 0.23 / 0.44 |
| Remedial Plan 1 | 0.26 / 0.41 | 0.23 / 0.32 | 0.22 / 0.35 | 0.24 / 0.54 |
| Remedial Plan 2 | 0.26 / 0.42 | 0.21 / 0.34 | 0.35 / 0.50 | 0.24 / 0.54 |
| Remedial Plan 3 | 0.26 / 0.41 | 0.20 / 0.34 | 0.28 / 0.48 | -- |

*Polsby-Popper Score is listed first, followed by Reock Score. Green indicates a more compact score than the Enacted Plan, and red indicates a less compact score. District 30 in Remedial Plan 30 is not modified from the Enacted Plan.*

In addition, as in *Milligan*, the Special Master used the population polygon, a statistical measure that "examines the shape of a district and the location of where people live in and around the district." *Bowman v. Chambers*, 586 F. Supp. 3d 926, 935 (E.D. Mo. 2022). The Court acknowledged, however, that a visual assessment is also appropriate and that this should not be a compactness "beauty contest." Doc. 274, 157.

The Special Master's three proposed remedial plans are all as compact as the Enacted Plan and have none of the "tentacles, appendages, or fingers [that] may reflect an attempt to 'combine two farflung segments of a racial group with disparate interests.'" Doc. 274, 154-55 (quoting *LULAC*, 548 U.S. at 433). Districts 25 and 30 are more compact in each of the Special Master's remedial plans than in the Enacted Plan. District 26 is of comparable compactness across all of the Special Master's remedial plans and the Enacted Plan. Accordingly, the Special Master concludes that the three proposed remedial plans are "reasonably compact."

**F.      Contiguity**

The Court also recognized that traditional redistricting principles include contiguity. Doc. 274, 25; *see also Allen*, 599 U.S. at 18 (listing contiguity as part of "traditional districting criteria"). The Reapportionment Committee Redistricting Guidelines, adopted by the Alabama Legislature's Reapportionment Committee on May 5, 2021, require each district to be contiguous. Doc. 274, Appendix A, II(h); *see also id.* at II(i)(viii); II(j)(ii).

All plans considered by the Special Master, including those submitted by parties and non-parties, have only contiguous districts.

**G.      Respect for Political Subdivisions**

The Court directed the Special Master to respect, among other traditional redistricting principles, political subdivisions to the extent reasonably practicable. Doc. 302, 12-13.[11]

1.   Counties

The Enacted Plan splits nineteen counties statewide. Each of the Special Master's remedial plans splits the same nineteen counties as the Enacted Plan—only the district boundaries splitting Montgomery and Elmore Counties are modified.

2.   Municipalities

The Enacted Plan splits 85 municipalities statewide. The Special Master prioritized following county and precinct boundaries over municipal boundaries where a choice was needed. Remedial Plans 1 and 2 split 87 municipalities statewide, while Remedial Plan 3 splits 84 municipalities statewide. In Remedial Plans 1 and 2, Prattville and Wetumpka are split, whereas they are not split in the Enacted Plan.

---

[11] The Reapportionment Committee Redistricting Guidelines state that "[c]ontests between incumbents will be avoided whenever possible." Doc. 274, App. A, ¶ II(j)(i). Protecting incumbents was not a consideration used in drawing the Special Master's three proposed remedial plans.

The Enacted Plan splits the City of Montgomery between District 25 (29% of the city population) and District 26 (71% of the city population). In each of the Special Master's remedial plans, as well as each remedial plan proposed by the Plaintiffs and D.D., the City of Montgomery is split approximately 50%/50% between Districts 25 and 26, which is necessary for the Section Two remedy. The Secretary contends that in "any other context," "Plaintiffs would argue that the area split was a community of interest which should be held together," citing the complaint in *Allen*, Case No. 2:21-cv-1530, Doc. 1, which alleged that splitting Montgomery County constituted a break from traditional redistricting principles, Case No. 2:25-mc-1682, Doc. 9, 2. But the Secretary does not explain why the City of Montgomery is a community of interest in the same way that the County of Montgomery is. And, as explained above, the Special Master prioritized preserving county and precinct boundaries over municipal boundaries. In any case, the City of Montgomery is split between two districts in all plans, including the Enacted Plan.

### 3. Precincts

The Enacted Plan splits thirteen precincts. Remedial Plan 1 also splits thirteen precincts, while Remedial Plans 2 and 3 split fourteen precincts.

Several of the other plans considered by the Special Master proposed additional splits. Oskooii Plan B would split eighteen precincts; D.D. Plans 3.2, 4.2, and 5.2 would split sixteen precincts; and D.D. Plan 4.0 would split fifteen precincts. The Special Master sought to minimize splitting additional precincts to ease the burden of any remedy on election administrators and voters.

## IV.    CONCLUSION

As detailed above, each of the three remedial plans proposed by the Special Master remedies the Section Two violation that the Court identified, although there is significant

26

difference among the three regarding the effectiveness of the remedy. Each proposed plan also complies with the U.S. Constitution, the Voting Rights Act, the one-person, one-vote principle, and traditional redistricting principles.

The three proposed remedial plans are substantially similar but offer differences for the Court's consideration. Remedial Plan 1 is similar to the Fairfax Plan but modifies only three districts in the Enacted Plan. While Remedial Plan 2 also modifies only three districts, it is more similar to the Enacted Plan than Remedial Plan 1. Remedial Plan 2 also represents the most effective Section Two remedy, performing slightly better than Remedial Plan 1 in that respect. Remedial Plan 3 is closest to the Enacted Plan, limiting its modifications to the Enacted Plan to only two districts, but it offers a weak remedy for the Section Two violation.

As described throughout this Report, the Special Master gave serious consideration to each of the plans proposed by parties and non-parties alike, as well as their comments to each other's submissions, all of which greatly aided the preparation of the three proposed remedial plans and this Report. Among those plans, certain features bear repeating in conclusion:

- The Fairfax Plan is similar to Remedial Plan 1, particularly with respect to the configuration of District 25. But the Fairfax Plan modified a fourth district, which the Special Master found to be unnecessary.

- Oskooii Plan B is similar to Remedial Plan 2, except that while Oskooii Plan B split four additional precincts in Elmore County along the boundary between proposed Districts 25 and 26, Remedial Plan 2 follows those precinct boundaries.

- D.D. Plan 5.0 is identical to Remedial Plan 3. Although the Special Master recognizes that each proposed remedial plan must completely remedy the Section Two violation, Remedial Plan 3 shows the impact of modifying a third district—

which Remedial Plans 1 and 2 proposed—rather than modifying only two, as D.D.

Plan 5.0 and Remedial Plan 3 do.

Accordingly, the Special Master recommends that the Court adopt Remedial Plan 1 or

Remedial Plan 2, recognizing that Remedial Plan 3, while instructive, is less effective as a Section

Two remedy.

**SUBMITTED** this 24th day of October, 2025.

**/s/ Richard F. Allen**
**RICHARD F. ALLEN**
**SPECIAL MASTER**