# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

ALABAMA STATE CONFERENCE
OF THE NAACP, *et al.*,

   *Plaintiffs*,

v.

WES ALLEN, in his official capacity
as Alabama Secretary of State,

   *Defendant*.

Case No. 2:21-cv-01531-AMM

**PLAINTIFFS' RESPONSE TO THE SPECIAL MASTER'S
REPORT AND RECOMMENDATION**

Plaintiffs respectfully request that the Court adopt Special Master Plan 2 and reject Plan 3. Although Plan 1 also provides a full remedy to the Voting Rights Act ("VRA") violation, Plan 2 better minimizes population deviations, achieves more compact districts, and is unimpeachable against a racial gerrymandering challenge as both map-drawers who created Plan 2 did so without referencing racial data.[1]

In contrast, and as the Special Master Report recognizes, Plan 3 does not remedy the violation. *See* Doc. 312 (hereinafter "Report") at 20, 28. Plaintiffs object to Plan 3 *both* because only White candidates stand any chance of winning in Senate District (SD) 26 *and* because Black-preferred candidates (regardless of race) win less than 50% of the time.[2] Under Plan 3, Black candidates in SD26 won only three (23%) of the thirteen analyzed elections and *none* of these wins occurred after 2018. Report at 19. Even including those wins, Black candidates lose by an average margin

---

[1] Plaintiffs intend to call Dr. Kassra Oskooii to testify at the November 5 Remedial Hearing absent any objection from the Court. Dr. Oskooii drew the remedial plan that forms the basis of Special Master Plan 2. He intends to testify about his creation of this map and to rebut insinuations from the Secretary that, despite writing under penalty of perjury that he did not review any racial, ethnic, political, or electoral data in creating this map nor reference any other map besides the Enacted Plan, that his map is a "racial gerrymander," was "drawn with a racial target," or used "racial sorting." Defs.' Comments on Proposed Remedial Plans at 2–3, *In re Redistricting 2025*, Case No. 2:25-mc-01682-AMM (N.D. Ala. Oct 15, 2015), Doc. 9.

[2] This performance estimate accounts for the 2024 races analyzed by Dr. Liu. *See* Decl. of Baodong Liu, Ph.D., *In re Redistricting*, Case No. 2:25-mc-01682-AMM (N.D. Ala. Oct 15, 2015), Doc. 11-1.

of over 7%. *Id.*; *see also* Report Ex. 3 at 3, Doc. 312-3.

Section 2's "guarantee of equal opportunity is not met when '[c]andidates favored by blacks can win, but only if the candidates are white.'" *Rural W. Tenn. African-American Affairs Council v. Sundquist* ("*Rural West*"), 209 F.3d 835, 840 (6th Cir. 2000) (quoting *Smith v. Clinton*, 687 F. Supp. 1310, 1318 (E.D. Ark. 1988) (three-judge panel)). The Court should reject Plan 3 and choose Plan 2.

## STANDARD

Any remedial plan must (1) "completely" and "with certitude" remedy the Section 2 violation, *Dillard v. Crenshaw Cnty.*, 831 F.2d 246, 252 (11th Cir. 1987); (2) comply with federal requirements including one-person-one-vote and the ban on racial gerrymandering, *Abrams v. Johnson*, 521 U.S. 74, 90, 98 (1997); and (3) respect traditional districting criteria while minimizing changes to the existing plan except as needed to remedy the violation, *see Singleton v. Allen* ("*Singleton III*"), No. 2:21-CV-1291-AMM, 2023 WL 6567895, at *16 (N.D. Ala. Oct. 5, 2023).

## ARGUMENT

### I.   Plans 1 and 2 Provide a Complete Remedy; Plan 3 Does Not.

In choosing a remedy, "the first and foremost obligation . . . is to correct the Section 2 violation." *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1022 (8th Cir. 2006).

To determine if a plan is an acceptable remedy, the court relies on a "performance analysis" to evaluate "whether a purportedly remedial district completely remedies the vote dilution found in the prior plan." *Singleton v. Allen*, 690 F. Supp. 3d 1226, 1294 (N.D. Ala. 2023), *stay denied sub. nom. Allen v. Milligan*, 144 S. Ct. 476 (2023). "A performance analysis predicts how a district will function based on statistical information about, among other things, demographics of the voting-age population in the district, patterns of racially polarized voting and bloc voting, and the interaction of those factors." *Id.* at 1294–95. "The Supreme Court has not dictated a baseline level at which a district must perform to be considered an 'opportunity' district." *Id.* at 1295. But, if a performance analysis "shows that a cohesive majority will 'often, if not always, prevent' minority voters from electing the candidate of their choice in the purportedly remedial district, there is a 'denial of opportunity in the real sense of that term.'" *Id.* (quoting *LULAC v. Perry*, 548 U.S. 399, 427 (2006)).

Plans 1 and 2 both provide effective remedies by ensuring that Black voters in both SD25 and SD26 have realistic opportunities to elect preferred candidates, regardless of that candidates' race. In the elections analyzed by the Special Master, Black-preferred candidates (whether Black or White) would win most—but not all—

3

of the elections in both districts. *See* Doc. 312-1 at 3; Doc. 312-2 at 3.

That is not the case with Plan 3, however, where Black voters could only rarely elect Black candidates and can only sometimes elect their preferred candidates if those candidates are White. *See* Doc. 312-3 at 3. For this reason and others, as the Special Master recognized, Plan 3 does not remedy the Section 2 violation.

This is because Plan 3 creates an opportunity district in SD25 at the expense of the existing opportunity in SD26. Although in Plan 3 Black-preferred candidates win around 89% of the time in SD25, such candidates win less than 50% of the time in SD26.[3] Report at 19–20; *see also* Liu Sup. Decl., Ex. A. This approach conflicts with the requirement that, in remedying a Section 2 violation, a court "may not trade off the rights of some members of a racial group against the rights of other members of that group." *LULAC*, 548 U.S. at 437; *cf. Abrams*, 521 U.S. at 94 (affirming the rejection of a §2 district where "the probability of electing a [Black-preferred] candidate [fell] below 50%"). But Plan 3's biggest problem is not that Black-

---

[3] These figures include the two biracial 2024 elections Dr. Liu analyzed. The Special Master did not use these 2024 elections even though they are "probative because of their recency" because Dr. Liu did not identify the Black-preferred candidate in his analysis. Report at 18. Plaintiffs attach a supplemental declaration from Dr. Liu as **Exhibit A**, which identifies that both of the Black candidates in those races, Kamala Harris and Greg Griffin, were also the Black-preferred candidates, who Black voters in Plan 3's Districts 25 and 26 supported with 95-96% of their vote. White voters provided those candidates less than 20% of their votes.

4

preferred candidates win only around half the time. Indeed, if Black voters could elect preferred candidates of *any race* over 50% of the time in a sufficient pool of recent elections in both SD25 and SD26, such a plan might be an adequate remedy depending on other factors. *Miss. State Conf. of NAACP v. State Bd. of Elect. Comm'rs* ("*Miss. NAACP*"), 782 F. Supp. 3d 349, 356 (S.D. Miss. 2025) (three-judge court)*.* But that is not the situation presented by Plan 3.

Under Plan 3, when Black-preferred candidates are Black, they almost never win in SD26. Doc. 312-3 at 3. In thirteen biracial elections over a decade, Black candidates would have won only 23% of elections in SD 26 under Plan 3, all three of them in 2018. *Id.* They would have lost every modeled election in 2014 and lost in all seven races during the most recent federal elections in 2022 and 2024. *Id.*; *see also* Liu Sup. Decl., Ex. A. The margin of defeat is not close—across the eleven biracial elections the Special Master analyzed, Black candidates lose on average by over 7% even including the three wins. Report at 19. This is significant because "more recent elections better explain the opportunities that will exist in future elections." *Miss. NAACP*, 782 F. Supp. 3d at 356; *see also Wright v. Sumter Cnty. Bd. of Elections and Registration*, 979 F.3d 1282, 1301 (11th Cir. 2020) (courts "may conclude that recent elections are more probative than those which occurred

long before the litigation began") (citation omitted). The six elections that bring the win rate of Black-preferred candidates to 47% (nine of nineteen) when including the 2024 elections involve only White candidates. *See* Doc. 312-3 at 3; Liu Sup. Decl., Ex. A. All occurred at least five years ago, and in two of them the Black-preferred candidate was the "well-known . . . well-funded" Doug Jones. *Singleton v. Allen* ("*Singleton III*"), 782 F. Supp. 3d 1092, 1152 (N.D. Ala. 2025).

In both the liability and remedial context, "evidence drawn from elections involving black candidates is more probative in Section Two cases." *Davis v. Chiles*, 139 F.3d 1414, 1417 n.5 (11th Cir. 1998); *Wright*, 979 F.3d at 1292–93. This is not because Black voters never prefer White candidates or because wins by those candidates have no relevance. But Section 2's "guarantee of equal opportunity is not met when candidates favored by blacks can win, but only if the candidates are white." *Rural West*, 209 F.3d at 840 (citation modified); *see also Rogers v. Lodge*, 458 U.S. 613, 623–24 (1982); *Jeffers v. Clinton*, 730 F. Supp. 196, 209 (E.D. Ark. 1989), *aff'd mem.*, 498 U.S. 1019 (1991).

This Court has already found that the "assertion that White voters are willing to support minority candidates in large numbers" cannot be reconciled "with political reality," and that "the rarity of Black electoral success in Alabama tells the

6

Court that the Secretary may be substantially overstating White voters' willingness to support minority candidates, particularly in Montgomery." Op., Doc. 274 at 192–93. When such "white bloc voting is 'targeted' against black candidates, black voters are denied an opportunity enjoyed by white voters," even if they can elect acceptable white candidates in some elections. *Rural West*, 209 F.3d at 845 (Jones, J., concurring) (citation omitted). "[T]hat black voters also support white candidates acceptable to the majority does not negate instances in which a white voting majority operates to defeat the candidate preferred by black voters when that candidate is a minority." *United States v. City of Eastpointe*, 378 F. Supp. 3d 589, 610 (E.D. Mich. 2019); *see also Ruiz v. City of Santa Maria*, 160 F.3d 543, 554 (9th Cir. 1998). The VRA guarantees the ability of minority voters "to elect [their] candidate of choice on an equal basis with other voters," *Voinovich v. Quilter*, 507 U.S. 146, 153 (1993), whatever the candidate's race. Plan 2 provides that opportunity and Plan 3 does not.

II. **Plan 2 Best Avoids Constitutional Challenges by Improving Population Equality and Avoiding Any Use of Race in its Construction.**

As the Court set out, another key factor in selecting a remedial plan is compliance with the Fourteenth Amendment to the U.S. Constitution, both by avoiding racial gerrymanders and complying with the one-person, one-vote principle. Doc. 302 at 11–12. Plan 2 best meets this standard.

7

First, there is a difference between race "consciousness and predominance," with the former being permissible in map-drawing. *Allen v. Milligan*, 599 U.S. 1, 33 (2023) (plurality op.); *see also North Carolina v. Covington*, 585 U.S. 969, 978 (2018). Plan 1 meets this standard because the Court firmly rejected arguments that "race predominated in the plaintiffs' map-drawing process for their Montgomery-area illustrative district," Op., Doc. 274 at iv, and the Special Master did not use racial data at all in converting this plan into Plan 1, *see* Report at 11.

The Secretary argues, however, that any use of race in districting is impermissible, making Plan 2 an even safer option. *See Singleton III*, 782 F. Supp. 3d at 1358 ("Although federal law does not require a Section Two remedial plan to be prepared race-blind, the ability of the Special Master to do it that way . . . [means that we] have no concern that race will predominate in the preparation of a remedial plan, nor that a remedial plan will segregate Alabama voters on the basis of race."). The Special Master drew Plan 2 starting from one drawn by Dr. Kassra Oskooii. Report at 12. Dr. Oskooii drew his plan without referencing any map other than the Enacted Plan and without viewing any racial or electoral data until after completing the map. Oskooii Report at 4, *In re Redistricting 2025*, Doc. 7-3. The Special Master modified Dr. Oskooii's map by eliminating four VTD splits to create Plan 2 and the

Special Master also did not view racial data. Report at 11, 21. Under no logical reading could anyone consider Plan 2 to be race-based, race-predominant, or race-targeted. *Alexander v. S.C. Conf. of the NAACP*, 602 US 1, 22 (2024) (finding no racial predominance where a map-drawer considered racial data "only *after* he had drawn" the plan and where "he generated that data solely for a lawful purpose" of conforming that the map "complied with [] [VRA] precedent").

Second, when a federal court chooses a remedial plan, it has less leeway than the legislature when it comes to population deviation. *See Chapman v. Meier*, 420 U.S. 1, 26, 27 n.19 (1975). Plan 2 provides the best option on this criterion, having the lowest deviation in each of the affected districts and the smallest overall range of deviation between those districts, as shown in the chart below.[4]

| | Percent Deviation from Ideal Population | | | |
|---|---|---|---|---|
| **District** | **Enacted Plan** | **Plan 1** | **Plan 2** | **Plan 3** |
| SD 25 | 2.96% | -4.28% | -2.25% | 3.18% |
| SD 26 | 3.41% | 0.71% | -0.13% | 3.19% |
| SD 30 | -4.98% | 4.94% | 3.77% | -4.98% |
| Range | 8.39% | 9.22% | 6.02% | 8.17% |

Plan 2 therefore best complies with the Court's constitutional obligations.

---

[4] The Chart calculates population deviations by dividing the population of the district by the ideal population of the district. The ideal population of an Alabama State Senate district is 143,551. *See* Oskooii Report at 5 n.1, 14, *In re Redistricting 2025*, Doc. 7-3; *see also* Doc. 321-1 at 3, Doc. 321-2 at 3, Doc. 321-3 at 3 (providing district populations for each plan).

## III.     Plan 2 Comports with Traditional Districting Criteria and State Policies.

A remedial plan should promote—to the extent possible while ensuring that it remedies the VRA violation and complies with the Constitution—the state's traditional districting principles. Here, that is contiguity, compactness, respect for political subdivisions and communities of interest, as well as minimizing changes to the Enacted Plan beyond what is needed to remedy the violation. Doc. 302 at 12–13; *see also Larios v. Cox*, 306 F. Supp. 2d 1214, 1217 (N.D. Ga. 2004); *Colleton Cnty. Council v. McConnell*, 201 F. Supp. 2d 618, 646–47 (D.S.C. 2002).

Plan 2 complies with Alabama's traditional districting principles and minimizes changes to the districts while also remedying the VRA violation and complying with the Constitution.

### A. Plan 2 Beats the Enacted Plan and Other Plans on Compactness.

The Redistricting Guidelines (the "Guidelines") of Alabama's Permanent Legislative Committee on Reapportionment lists the requirement that "[d]istricts will be composed of contiguous and reasonably compact geography" among the first group of "criteria for redistricting" along with VRA compliance, rather than in the lower category of principles to be observed only "to the extent that they do not violate or subordinate" the first group of principles. Doc. 302 at 17–18.

10

On the two primary metrics used to evaluate compactness, Reock and Polsby Popper, Plan 2 beats both the Enacted Plan and the other Plans on both metrics in all three redrawn districts except that it ties the Enacted Plan under Reock for SD 26. *See* Report at 25, Tbl. 6. Plan 2 therefore best accomplishes the State's goal of reasonably compact geography in its districts.

### B. Plan 2 Respects Counties as Well as the Enacted Plan and Other Plans and Makes Only Minor Additional Locality Splits.

The first principle concerning respect for political subdivisions in Alabama comes from the Alabama Constitution, which states that for State Senate seats, "[n]o county shall be divided between two districts." Ala. Const. § 200. Since the 1960s, courts have recognized that the Supremacy Clause requires this principle to give way to comply with one-person, one-vote and federal law. *Sims v. Baggett*, 247 F. Supp. 96, 103 (M.D. Ala. 1965). But because of its place in the Alabama Constitution, it retains prominence as a districting principle. Plan 2 (and all the Special Master plans) contain the same number of county splits as the Enacted Plan, thereby respecting this districting principle. *See* Report at 25.

The Guidelines also call for maps to respect other "political subdivisions to the extent practicable and in compliance with" higher-ranked criteria such as compactness and VRA compliance. Doc. 302 at 18. Plan 2 keeps VTDs and

11

municipalities together almost to the same degree as the Enacted Plan, and the few additional splits that do exist promote other districting principles including preservation of county lines and greater population equality.

In terms of VTD splits, Plan 2 only splits one additional VTD compared to the Enacted Plan out of 1,837 VTDs statewide, for a difference of .06%. Doc. 312-2 at 3. For municipalities, Plan 2 splits two more municipalities than the Enacted Plan out of 462 statewide, for a difference of 0.4%. *Id.* For one of these splits, in Prattville, the split avoided breaking a county line, which is a higher-level priority. *See* Op., Doc. 274 at 169 (recognizing that the illustrative map that split Prattville along county lines was an appropriate way of respecting legislative priorities).

The Secretary criticizes the approximately 50%/50% split of the City of Montgomery into SD 25 and 26 in Plan 2, *see* Report at 26, but ignores the underlying evidence in doing so. The Legislature's map-drawer, Randy Hinaman, testified that in the Montgomery area, the Enacted Plan "place[d] all majority-Black precincts except two into the majority-Black District 26. He testified that District 25 in the [Enacted] Plan extends into the center of Montgomery to include two predominantly White precincts and a portion of a third." Op., Doc. 274 at 94. Thus, under the Enacted Plan, the Legislature unnecessarily packed Black voters into a

12

particular district rather than relying on traditional redistricting criteria. It is not surprising then that Plan 2 achieved a different split of the City of Mongomery by relying first and foremost on traditional districting principles.

Plan 2 complies with Alabama's districting principles concerning respect for counties and political subdivisions.

### C. Plan 2 Respects Communities of Interest as Well as or Better than the Enacted Plan.

The Guidelines also identify respect for communities of interest as a criterion. Doc. 302 at 18–19. But Mr. Hinaman testified that no one instructed him, and he did not attempt, to keep any specific communities of interest together. Hinaman Dep., Doc. 235-2 at 75. Senator McClendon—who Co-Chaired the Reapportionment Committee—testified that he did not recall accounting for any specific geographic communities of interest except the Shoals area in Northwest Alabama, and he did not consider other aspects of communities of interest other than county and municipal boundaries. McClendon Dep., Doc. 235-1 at 49–50. He was present at some of the meetings that Mr. Hinaman had with Senators about districting but did not recall any discussions about communities of interest in those meetings. *Id.* at 85.

The trial record reflects discussion of certain communities in Montgomery County including the City of Montgomery and Pike Road. For example, Plaintiff

13

Evan Milligan testified about how the Enacted Plan split communities along racial lines in East Montgomery between SD25 and SD26. Op., Doc. 274 at 88. Several other witnesses testified that the Town of Pike Road was "created because its residents wanted to preserve their rural lifestyle" and to "have its own school system," yet it was split in the Enacted Plan between SD25 and SD26. *Id.* at 137–39.

Plan 2 addresses these aspects of the record. Although neither Dr. Oskooii nor the Special Master drew Plan 2 with any regard to race or racial data, by seeking to improve SD25 and SD26's compliance with traditional districting principles, Plan 2 eliminates the Legislature's race-based division of the City of Montgomery and unites Pike Road in one district. Doc. 312-2 at 2–3. The record does not contain the same evidence about Prattville, which spans two counties, or Wetumpka.

Plan 2 respects communities of interest at least as well as the Enacted Plan.

**D. Plan 2 Adequately Retains Existing Districts and District Cores.**

Plan 2 properly limits its changes to the Enacted Plan to "districts that were challenged and found unlawful, and to those changes to adjacent districts that are necessary to satisfy applicable constitutional and statutory requirements." *Singleton II*, 2023 WL 6567895, at *13. It also preserves well over 50% of the three districts

14

it changes and almost 97% of the Enacted Plan statewide, Doc. 312-2 at 3.

Although Plan 3 changes only two districts, that plan fails to remedy the violation. Plan 2 is thus reasonable in making changes to a third district. Even though Plan 3 changes one less district, both Plans 2 and 3 change the same counties—Montgomery and Elmore—and no more. *Compare id.* at 1 *with* Doc. 312-3 at 1. This matters because the VRA claim upon which Plaintiffs prevailed focused on Montgomery, Elmore, and Crenshaw Counties. *See, e.g.*, Doc. 274 at 83–84 (describing expert analysis of racial disparities in these counties); *id.* at 169–170 (discussing illustrative map configuration in these counties). By limiting changes to only two counties and not making any changes to counties outside this core area, Plan 2 remedies the violation without making unnecessary changes.

## CONCLUSION

Plan 3 does not provide an adequate remedy for Black voters in Montgomery, limiting their opportunity to elect to mostly White candidates. Of the other two plans, both provide adequate remedies, but Plan 2 is both unquestionably constitutional and best complies with Alabama's districting principles. Plaintiffs respectfully encourage the Court to adopt Special Master Plan 2 and to reject Plan 3.

15

DATED this 31st day of October 2025.

Respectfully submitted,

*/s/ Alison Mollman*
Alison Mollman (ASB-8397-A33C)
Laurel Hattix (ASB-4592-E20I)
American Civil Liberties Union
of Alabama
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 265-2754
amollman@aclualabama.org
lhattix@aclualabama.org

*/s/ Deuel Ross*
Deuel Ross*
NAACP Legal Defense &
Educational Fund, Inc.
700 14th Street N.W. Ste. 600
Washington, DC 20005
(202) 682-1300
dross@naacpldf.org

Leah Aden*
Stuart Naifeh*
Kathryn Sadasivan (ASB-517-E48T)
Brittany Carter*
Colin Burke*
NAACP Legal Defense &
Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
 (212) 965-2200
laden@naacpldf.org
snaifeh@naacpldf.org
ksadasivan@naacpldf.org
bcarter@naacpldf.org

*/s/ Davin M. Rosborough*
Davin M. Rosborough*
Dayton Campbell-Harris*+
Theresa J. Lee*
Sophia Lin Lakin*
American Civil Liberties Union
Foundation
125 Broad St.
New York, NY 10004
 (212) 549-2500
drosborough@aclu.org
dcampbell-harris@aclu.org
tlee@aclu.org
slakin@aclu.org

Jacob van Leer*
American Civil Liberties Union
Foundation
915 15th St. NW
Washington, DC 20005
jvanleer@aclu.org

*/s/ Sidney Jackson*
Sidney Jackson (ASB-1462-K40W)
Nicki Lawsen (ASB-2602-C00K)
Wiggins, Childs, Pantazis, Fisher, &
Goldfarb
301 19th Street
North Birmingham, AL 35203
(205) 314-0500
sjackson@wigginschilds.com
nlawsen@wigginschilds.com

cburke@naacpldf.org

Jessica L. Ellsworth*
Shelita M. Stewart*
Amanda N. Allen*
Hogan Lovells LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600
jessica.ellsworth@hoganlovells.com
shelita.stewart@hoganlovells.com
Amanda.n.allen@hoganlovells.com

David Dunn*
Hogan Lovells LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000
david.dunn@hoganlovells.com

Blayne R. Thompson*
HOGAN LOVELLS US LLP
609 Main St., Suite 4200
Houston, TX 77002
(713) 632-1400
blayne.thompson@hoganlovells.com

*/s/ Jack Genberg*
Bradley E. Heard
Avner Shapiro*
Jack Genberg*
Southern Poverty Law Center
1101 17th Street NW, Suite 550
Washington, DC 20036
240-890-1735
bradley.heard@splcenter.org
avner.shapiro@splcenter.org
jack.genberg@splcenter.org

Michael Turrill*
James W. Ettinger*
HOGAN LOVELLS US LLP
1999 Avenue of the Stars
 Suite 1400
Los Angeles, CA 90067
(310) 785-4600
michael.turrill@hoganlovells.com
jay.ettinger@hoganlovells.com

*Attorneys for Plaintiffs*

*Admitted *pro hac vice*
+ Practice Limited to Federal Court

17

**CERTIFICATE OF SERVICE**

I hereby certify that on October 31, 2025, a copy of the foregoing has been served on all counsel of record through the Court's CF/ECF system.

*/s/ Davin Rosborough*
Davin Rosborough
*Attorney for Plaintiffs*
