# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| ALABAMA STATE CONFERENCE OF THE NAACP, *et al.*, | ) ) ) |
| *Plaintiffs*, | ) |
| v. | ) |
| | ) Case No. 2:21-cv-1531-AMM |
| WES ALLEN, in his official capacity as Alabama Secretary of State, *et al.*, | ) ) ) ) |
| *Defendants*. | ) |

**Defendant's Objections to the**
**Special Master's Proposed Remedial Plans**

Defendant, Secretary of State Wes Allen, respectfully objects to the three remedial plans proposed by the Special Master.

**1. Each of the three proposed plans is a racial gerrymander.**

Each of the proposed plans was drawn with a racial target. The Court instructed the Special Master to submit three plans that "include[] either an additional majority-black Senate district in the Montgomery area, or an additional district there in which Black voters each have an opportunity to elect a Senator of their choice." Doc. 307. The Court noted that "[a]s a practical reality, … any remedial plan will need to include an additional district in the Montgomery area in which Black voters either comprise a voting age majority or something quite close to it." *Id.*

These instructions provide a racial target. Any plan without a second district that is 50% black voting age population or close to 50%, would not comply with the Court's order. And any race-neutral considerations in drawing the remedial plans, or the plans they were based upon, "came into play only after the race-based decision had been made." *Bethune-Hill v. Va. State Bd. Of Elections*, 580 U.S. 178, 189 (2017).

That the Special Master reports that he drew the proposed remedial plans without displaying racial data does not cure the racial predominance. No racial data was needed because the Fairfax illustrative plans and other submitted plans provide the roadmap: Split the black population in the City of Montgomery down the middle and then connect half of it with Elmore County and the other half with rural Montgomery County and Crenshaw County. Turning off the racial data does not eliminate the racial considerations already underlying the supplied roadmap.

The racial sorting used in developing the proposed plans is evident from the statistics of districts on which those plans are based. In Fairfax Remedial Plan 1, for instance, the drafter split Montgomery to move 27,000 black people from SD26 to SD25, and then moved 37,000 white people out of SD25. *Compare* Population Summary, *In re Redistricting* doc. 7-1 at 44-45, *with* Enacted Plan Statistics, doc. 7-1 at 139-40. The same for Dr. Oskooii's plans. As compared to the enacted plan, SD25 went from 29.01% BVAP to 53.56% BVAP in Oskooii Remedial B,

accomplished by shifting over 24,000 black voters into SD25 (around 22,000 from SD26 and around 2,500 from SD30).[1]

The drafters accomplished this by splitting the black population in the City of Montgomery across two districts. In most cases, including this one and others in this State, Section 2 plaintiffs argue that black voters are a community of interest that must be kept together. That's true, they say, even if some are in Decatur and some in Huntsville, or if some are in Mobile and others on the Georgia line.

And Plaintiff Evan Milligan has testified to the connectedness of the black population in Montgomery. Indeed, in *Milligan v. Allen*, Milligan testified that black citizens throughout Montgomery County are connected to the downtown Montgomery area that the Remedial Plans here now split. Citing institutions such as churches, Alabama State University, schools, the Acadome, and the river front, he testified that "there's a commitment to really the center of the city, in terms of downtown and the river front area, and the areas that are immediately just adjacent to there." January 4, 2022 Tr. at 138-140. And *these very Plaintiffs* complained in their challenge to Alabama's 2021 congressional plan that, "[a]mong other

---

[1] Additionally, the Secretary notes that each of the Special Master's Maps only manages to raise the BVAP of District 25 *above* 50% by dropping the BVAP of District 26 *below* 50%—a race-based decision that the Legislature would not have been able to make in the first instance, even if it claimed it was trying to comply with Section 2. *See*, *e.g.*, *ALBC v. Alabama*, 231 F. Supp. 3d 1026, 1320 (M.D. Ala. 2017) ( "Because the black voting-age population percentage in District 85 is 47.23 percent, (Doc. 35–2 at 3), Alabama cannot claim that its district is narrowly tailored to achieve compliance with section 2.").

deviations from traditional redistricting principles, the districts in HB1 split[] Montgomery County," when the Legislature's plan included the western portions of the City of Montgomery in Congressional District 7. Compl. ¶8, *Milligan v. Allen*, No. 2:21-cv-1530 (Nov. 16, 2021), ECF 1. Now, though, when dismantling that same community of interest will result in their favored outcome, Plaintiffs claim that the black population must be divided.

What supposed communities of interests are connected by the new districts 25 and 26, no one knows. Mr. Fairfax did not even look to see whether the areas joined by his proposed SD26—West Montgomery and Lake Jordan—had anything in common. Tr. 296:8. Nor is there evidence of why he thought it appropriate to split Prattville and Millbrook, which the Legislature kept together.

Defendant therefore objects to each of the Special Master's proposed remedial plans on grounds that they are racial gerrymanders.

**2. Remedial Plans 1 and 2 make more changes than necessary for a "remedy."**

As the Special Master noted in *Milligan*, for purposes of a court-drawn plan, a court's "modifications of a state plan are limited to those necessary to cure any constitutional or statutory defect." *Milligan* Doc. 295 at 26. What more is necessary than ending the alleged vote dilution?

While the Secretary maintains his racial gerrymandering objection—and further maintains that the Enacted Plan was not dilutive—the Special Master finds

that all three of his proposed plans comply with the U.S. Constitution and the Voting Rights Act. Doc. 312 at 22. Specifically, he finds that all three plans "comply with … the prohibition on vote dilution under the Voting Rights Act." *Id.* That being the case, the Court should choose the plan that leaves the greatest portion of the Legislature's plan in place, and that's Remedial Plan 3.

Plan 3, based on one of "D.D.'s" plans, limits all changes to SD25 and SD26, without altering the Legislature's design for any other district (e.g., District 30). Plans 1 and 2 make additional changes, and they also split Prattville and Wetumpka, which the Legislature kept together in the Enacted Plan. Choosing Plan 1 or 2 over Plan 3 would add city splits and change more of the Legislature's Enacted Plan than necessary according to the Special Master, solely for the purpose of adding black voters to a district.

The Special Master recommends against Remedial Plan 3 because it does not perform as well for a Democratic candidate as Plans 1 and 2. Defendant notes that according to the Special Master, a Democrat would have won over half the elections analyzed (9 of 17), and that the elections that a Democrat would have lost were in 2014 and 2018—federal mid-term elections that historically have a lower turnout, and where the party of a sitting President (a Democrat in both those instances) typically loses ground. Moreover, the notion that Remedial Plan 3 could "only weakly remed[y]" vote dilution based on performance, Doc. 312 at 21, seems to be

5

"a mere euphemism for political defeat at the polls." *Whitcomb v. Chavis,* 403 U.S. 124, 153 (1971). If vote dilution is remedied, then it is remedied — there is no longer any basis for making changes to the Legislature's Enacted Map, except to favor one political party over another.

Defendant therefore objects to Remedial Plans 1 and 2 on grounds that another plan that the Special Master finds to be non-dilutive and constitutional better respects the Legislature's priorities and avoids unnecessary city splits. To be sure, the Secretary does not waive any objections to Remedial Plan 3; it's just the least bad of several bad options.

Respectfully submitted,

    Steve Marshall
      *Attorney General*

    <u>*/s/ James W. Davis*</u>
    James W. Davis (ASB-4063-I58J)
      *Deputy Attorney General*

    Richard D. Mink (ASB-4802-M76R)
    Misty S. Fairbanks Messick (ASB-1813-T71F)
    Brenton M. Smith (ASB-1656-X27Q)
    Benjamin M. Seiss (ASB-2110-O00W)
      *Assistant Attorneys General*

    OFFICE OF THE ATTORNEY GENERAL
    STATE OF ALABAMA
    501 Washington Avenue
    P.O. Box 300152
    Montgomery, Alabama  36130-0152
    Telephone: (334) 242-7300
    Fax: (334) 353-8400
    Jim.Davis@AlabamaAG.gov

Richard.Mink@AlabamaAG.gov
Misty.Messick@AlabamaAG.gov
Brenton.Smith@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov

Michael P. Taunton (ASB-6833-H00S)
Riley Kate Lancaster (ASB-1002-X86W)
BALCH & BINGHAM LLP
1901 Sixth Avenue North, Suite 1500
Birmingham, Alabama 35203
Telephone (205) 251-8100
MTaunton@Balch.com
RLancaster@Balch.com

***Counsel for Secretary of State Allen***