## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **ALABAMA STATE CONFERENCE OF THE NAACP,** *et al.*, | ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Case No.: 2:21-cv-1531-AMM** |
| **WES ALLEN,** *in his official capacity as Alabama Secretary of State*, | ) ) ) ) | |
| **Defendant.** | ) ) | |

## <u>INJUNCTION, ORDER, AND COURT-ORDERED REMEDIAL MAP</u>

This redistricting case is before the Court to direct the Secretary of State ("the Secretary") to conduct Alabama's state Senate elections pursuant to a districting plan that remedies racially discriminatory vote dilution previously found by this Court. *See* Doc. 274. As explained below, the Court orders the use of a remedial map that was prepared race-blind and affords Black voters in the Montgomery area an equal opportunity, but certainly not a guarantee, to elect Senators of their choice.

## I.     BACKGROUND

The Court enjoined the Secretary and his successors from conducting state Senate elections according to the redistricting plan that the Alabama Legislature enacted in 2021 ("the Enacted Plan") because the plan violates Section Two of the

Voting Rights Act of 1965, 52 U.S.C. § 10301 ("Section Two"). Doc. 274 at 4. The Secretary moved to stay that injunction and remedial proceedings, Doc. 278, but the Court denied a stay and appointed a Special Master tasked with recommending remedial maps for use in Alabama's state Senate elections, *see* Docs. 302, 307.

The Secretary previously advised this Court that he needs a remedial map in hand by November 17, 2025, to administer the 2026 elections, Doc. 275 at 4, so the Court proceeded on a timetable that accommodates that deadline. The Court invited the parties to object to the appointment of the Special Master, and none did. Doc. 276 at 2–3. And the Secretary alerted the Court that Alabama Governor Kay Ivey decided not to convene the Alabama Legislature for the purpose of enacting a remedial state Senate map. Doc. 299.

The Court appointed Richard Allen as Special Master, Michael Scodro and the Mayer Brown LLP law firm as counsel to the Special Master, and David Ely as cartographer. Docs. 302, 307. This is the same Special Master and team that were appointed in the Alabama congressional redistricting litigation in 2023, after those cases returned from the Supreme Court of the United States for remedial proceedings. *See generally Milligan* Doc. 273.[1]

Although "[r]edistricting is primarily the duty and responsibility of the State,"

---

[1] Citations to documents in the congressional redistricting litigation in the district court are to the documents in the *Milligan* action, No. 2:21-cv-1530-AMM.

*Abbott v. Perez*, 585 U.S. 579, 603 (2018) (internal quotation marks omitted), this Court "ha[s] its own duty to cure" districts drawn in violation of federal law when state legislatures do not do so, *North Carolina v. Covington*, 585 U.S. 969, 977 (2018). So the Court tasked the Special Master and his team with filing a report and recommendation containing three remedial plans that remedy the vote dilution previously found by the Court. Doc. 302 at 11.

The Court instructed the Special Master to produce plans that "remediate the essential problem found in the Enacted Plan—the unlawful dilution of the Black vote in Alabama's state Senate districting scheme." Doc. 307 at 2. Those plans, therefore, had to "include[] either an additional majority-Black Senate district in the Montgomery area, or an additional district there in which Black voters otherwise have an opportunity to elect a Senator of their choice." *Id.* (quoting Doc. 274 at 5). Under the Voting Rights Act and binding precedent, that is the remedy to which the plaintiffs are entitled. *See*, *e.g.*, *Bartlett v. Strickland*, 556 U.S. 1, 24 (2009) (plurality opinion); *Cooper v. Harris*, 581 U.S. 285, 306 (2017).

For the reasons the Court explains below, the Secretary is **ORDERED** to administer Alabama's upcoming state Senate elections using the plan titled "Remedial Plan 3" in the Special Master's Report, which is appended to this order. This plan satisfies all constitutional and statutory requirements while hewing as closely as possible (indeed, very closely) to the Enacted Plan.

3

The Court appreciates the thorough and expeditious work of the Special Master and his team. The Special Master Team is **INSTRUCTED** to file a Fee Statement within twenty-one days of the date of this order. The Fee Statement must set forth expenses incurred (with supporting documentation), hours worked and work performed, hourly rate, and any additional information necessary for the Court to assess the reasonableness of the expenses and fees claimed, for the Special Master, his counsel, and the cartographer. Any party wishing to respond to the Fee Statement is **ORDERED** to do so within fourteen days of the date it is filed, and the Court will assess the Special Master fees as appropriate by separate order.

## II.    THE SPECIAL MASTER

The Court provided detailed instructions to the Special Master and his team. The Court directed the Special Master to file three remedial plans and a report and recommendation "that explain[ed] in some detail the choices made in each proposed plan, the differences between the proposed plans, and why each plan remedies the vote dilution found by this Court." Doc. 302 at 11. Those proposed plans were required to "[c]ompletely remedy the Section Two violation identified in this Court's" injunction, "[c]omply with the U.S. Constitution and the Voting Rights Act[,]" and "[c]omply with the one-person, one-vote principle guaranteed by the Equal Protection Clause of the Fourteenth Amendment, based on data from the 2020 Census." *Id.* at 11. The Court required the Special Master's plans to "[r]espect

traditional redistricting principles to the extent reasonably practicable as expressed in the Alabama Legislature's Permanent Legislative Committee on Reapportionment" while acknowledging that "the Alabama Legislature has substantially more discretion than does this Court in drawing a remedial map." *Id.* at 12. Any plan included in the Special Master's report was required to "[h]ew as closely as possibly to the Enacted Plan while providing a lawful remedial district." *Id.* at 13.

The Special Master was permitted to consider the illustrative plans offered by the plaintiffs and all record evidence. *Id.* He was also directed to consider "any proposals, plans, and comments submitted to them by any of the parties." *Id.* As directed by the Court, the Special Master allowed non-parties to propose remedial plans. *Id.*; Doc. 303 at 3. The Special Master was authorized to retain assistants and experts, obtain the software needed to produce plans, and issue appropriate orders as necessary. Doc. 302 at 13. The Court forbade *ex parte* conversations between the Special Master and the parties or their counsel, but allowed *ex parte* communication between the Special Master and the Court. *Id.*

The Special Master was and is required to preserve all of the documents and related materials used in developing his remedial plans until relieved of that obligation by the Court. *Id.* at 13–14. And finally, the Court provided that the Special Master and his team would be compensated by the parties for the reasonable time

and expenses they incurred in developing their plans. *Id.* at 14.

The Court set a deadline of October 24, 2025, for the Special Master's report, and a deadline of October 31, 2025, for objections to that report. *Id.* at 14–15. The Court held a remedial hearing in the Myron H. Thompson Courtroom at the Frank M. Johnson Courthouse in Montgomery, Alabama, on November 5, 2025, to receive comments from the parties and the public.

## A.  Submissions to the Special Master

The Court opened a miscellaneous docket for the Special Master. *See In re Redistricting 2025*, Case No. 2:25-mc-01682-AMM ("*Redistricting*"). On October 2, 2025, the Special Master set deadlines for parties and interested non-parties to submit proposed plans or comments. *Redistricting* Doc. 2. The Special Master received nine proposed plans. *Redistricting* Doc. 13 at 10. The Plaintiffs jointly proposed three plans, and D.D., a minor resident of the State of Alabama, proposed six plans. *See id.* The Special Master received comments from the Plaintiffs, the Secretary, and a non-party. *See Redistricting* Docs. 9–12.

The Special Master observed that the proposals and comments were "necessarily done on an expedited basis but were nonetheless of extremely high quality and were clearly the product of extensive work and thoughtful analysis." Doc. 312 at 11. The Special Master "reviewed[] and carefully considered" each submission. *Id.*

### B.    The Special Master's Report

The Special Master filed his Report and Recommendation on October 24, 2025. *See id.* The Special Master explained that he limited his analysis exactly as the Court directed. *See id.* at 11–12. The Special Master ensured that each of the three remedial plans in his Report (1) complies with the primary criteria set out in the Court's instructions (*i.e.*, it completely remedies the likely Section Two violation, complies with the one-person, one-vote principle, and otherwise complies with the U.S. Constitution and the Voting Rights Act), and (2) respects traditional districting criteria ("compactness, contiguity, respect for political subdivisions, and maintenance of communities of interest"). *Id.* at 11. The Special Master (3) "minimized changes to the Enacted Plan to the extent possible by maintaining most district boundaries and retaining the vast majority of people within the same districts they occupied under the Enacted Plan." *Id.* And (4) the Special Master "emphasize[d] that neither he nor his cartographer, Mr. Ely, used racial population data when drawing district boundaries, nor did they 'target' any particular Black population percentage in any district." *Id.* at 12. In other words, the Special Master prepared each plan race-blind.

For each remedial plan, the Special Master provided core retention metrics, an effectiveness analysis, compactness scores, and information about respect for political subdivisions and communities of interest. The core retention metric

indicates (1) the percentage of the population of each district in the Enacted Plan that was retained in that district in each remedial plan, and (2) that statistic calculated on a statewide basis. *Id.* at 15 tbl. 1. Each remedial plan in the Special Master's report retains between 96.1% and 97.6% of Alabama's population in the same districts they were in under the Enacted Plan. *See id.*

The Special Master provided two compactness scores for each remedial plan, using "the most commonly-used measures": Polsby-Popper and Reock. *Id.* at 24; *see id.* at 25 tbl. 6. The Special Master also used cut edges scores and considered the population polygon metric, which is a "statistical measure that examines the shape of a district and the location of where people live in and around the district." *Id.* at 24–25 (internal quotation marks omitted).

The Special Master concluded that all three remedial plans "are all as compact as the Enacted Plan and have none of the 'tentacles, appendages, or fingers [that] may reflect an attempt to "combine two farflung segments of a racial group with disparate interests.'"" *Id.* at 25 (first quoting Doc. 274, 154–55; then quoting *League of United Latin Am. Citizens v. Perry* ("*LULAC*"), 548 U.S. 399, 433 (2006) (plurality opinion in part)).

The Special Master explained that each of the three remedial plans complies with the one-person, one-vote principle based on 2020 Census data and is at or below the population deviation reflected in the Enacted Plan. *Id.* at 22–23. And the Special

Master provided data to establish that his plans respect political subdivisions and communities of interest, including information about county splits, municipality splits, and precinct splits. *Id.* at 26–27.

"After preparing each draft plan, Mr. Ely performed an election analysis . . . to determine how frequently the Black-preferred candidate would have won past election contests in each district." *Id.* at 12. The Special Master explained that "[a]n effectiveness analysis uses recent election results to assess whether a candidate preferred by a particular group would be elected from a proposed 'opportunity district.'" *Id.* at 18. The Special Master reasoned that for a proposed remedial district to perform as an opportunity district, "an effectiveness analysis in this case should demonstrate that the Black-preferred candidate often would win an election in the subject district." *Id.*

The Special Master used two sets of elections for his effectiveness analysis. *Id.* at 19. The first set contained eleven biracial, statewide elections between 2014 and 2022 that "the Parties examined during the liability phase of this case and cited in their Joint Statement of Undisputed Facts." *Id.* The second set included those eleven elections as well as "six uni-racial elections that the parties and the Special Master examined in *Milligan*," for a total of seventeen elections. *Id.*

The Plaintiffs suggested, but the Special Master declined to consider, two additional elections from 2024; the Special Master reasoned that "there is no expert

analysis and identification of the Black-preferred candidates in those contests." *Id.*
at 19–20. The Special Master also declined to consider "other earlier elections"
suggested by the Secretary, "including eleven elections held between 2014 and 2018
that [the Plaintiffs' expert] did not consider" "because the Parties did not consider
and agree on those elections, and . . . there [was] no expert analysis and identification
of the Black-preferred candidates in those contests." *Id.* The Special Master
"concluded that the set of seventeen elections [he used] was sufficiently robust to
conduct" an effectiveness analysis. *Id.* at 20.

In all three remedial plans, Districts 25 and 26 are the Black-opportunity
districts in the Montgomery area. *See id.* at 20–21, tbls. 3 & 4. District 26 was a
majority-Black district in the Enacted Plan. Doc 312-4 at 3.

### 1.    Remedial Plan 1

Remedial Plan 1 is similar to an illustrative plan prepared by the Plaintiffs'
liability expert, Mr. Anthony Fairfax, that modified four districts in the Enacted Plan.
Doc. 312 at 12. Remedial Plan 1 "modifies only three districts in the Enacted Plan."
*Id.* at 28.

Of the three plans included in the Special Master's Report and
Recommendation, Remedial Plan 1 has the lowest statewide core retention
percentage. *See id.* at 15 tbl. 1.

A Black-preferred candidate wins Senate Districts 25 and 26 under Remedial

Plan 1 in approximately 94% of the elections considered by the Special Master. *Id.* at 21 tbl. 4. In Remedial Plan 1, the Black voting-age population is 51.6% of District 25 and 49.7% of District 26. *Id.* at 22 tbl. 5. In Remedial Plan 1, Senate Districts 25, 26, and 30 are more compact than in the Enacted Plan using the Polsby-Popper score, and only District 26 becomes less compact when using the Reock score. *See id.* at 25 tbl. 6. Remedial Plan 1 splits eighty-seven municipalities statewide, slightly more than the eighty-five split under the Enacted Plan. *Id.* at 26. And Remedial Plan 1 splits thirteen precincts statewide, as does the Enacted Plan. *Id.* at 27.

2. Remedial Plan 2

Remedial Plan 2 is similar to a remedial plan prepared by another Plaintiffs' expert, Dr. Kassra Oskooii, *see id.* at 13, and "is more similar to the Enacted Plan than Remedial Plan 1," *id.* at 28. Like Remedial Plan 1, Remedial Plan 2 modifies three districts in the Enacted Plan. *Id.*

The statewide core retention percentage for Remedial Plan 2 is the second highest out of the three remedial plans. *Id.* at 15 tbl. 1.

Under Remedial Plan 2, a Black-preferred candidate wins every election analyzed by the Special Master in Senate District 25 and approximately 94% of the elections analyzed in Senate District 26. *Id.* at 21 tbl. 4. In Remedial Plan 2, the Black voting-age population is 53.6% of District 25 and 48.3% of District 26. *Id.* at 22 tbl. 5.

Statewide, Remedial Plan 2 has the same Polsby-Popper compactness score as the Enacted Plan. *Id.* at 25 tbl. 6. And at the district level, each district is more compact than in the Enacted Plan using the Polsby-Popper score. *Id.* Using the Reock score, Remedial Plan 2 is more compact statewide and at least as compact as the Enacted Plan at the district level. *See id.* Remedial Plan 2 splits eighty-seven municipalities statewide and fourteen precincts—more of both than the Enacted Plan. *Id.* at 26–27.

3.    Remedial Plan 3

Remedial Plan 3 is "identical" to D.D. Plan 5.0, and is "closest to the Enacted Plan, limiting its modifications to the Enacted Plan to only two districts." *Id.* at 28. Remedial Plan 3 has the highest statewide core retention percentage, 97.6%, out of any plan in the Special Master's Report and Recommendation. *See id.* at 15 tbl. 1. At the district level, Remedial Plan 3 has the highest core retention percentage in Senate District 25 and the second-highest core retention percentage in Senate District 26. *See id.*

A Black-preferred candidate wins election in Senate District 25 in approximately 88% of the seventeen elections analyzed by the Special Master. *Id.* at 21 tbl. 4. In Senate District 26, a Black-preferred candidate wins approximately 53% of the seventeen elections analyzed by the Special Master. *Id.* If the two 2024 elections urged by the Plaintiffs are included in the effectiveness analysis, a Black-

preferred candidate wins approximately 47% of the nineteen elections studied. *See* Doc. 316 at 5 n.3.

In Remedial Plan 3, the Black voting-age population is 51.1% of District 25 and 43.9% of District 26. Doc. 312 at 22 tbl. 5. Statewide, Remedial Plan 3 has the same Polsby-Popper score and Reock score as the Enacted Plan. *Id.* at 25 tbl. 6. And at the district level, Districts 25 and 26 are more compact than the Enacted Plan using the Polsby-Popper score. *Id.* Using the Reock score, District 25 is more compact in Remedial Plan 3 than in the Enacted Plan, while District 26 is less compact in Remedial Plan 3 than in the Enacted Plan. *Id.* Remedial Plan 3 splits eighty-four municipalities statewide, three fewer than the Enacted Plan, but fourteen precincts, one more than the Enacted Plan. *Id.* at 26–27.

## C.    The Special Master's Recommendation

Ultimately, "the Special Master recommend[ed] that the Court adopt Remedial Plan 1 or Remedial Plan 2, recognizing that Remedial Plan 3, while instructive, is less effective as a Section Two remedy." *Id.* at 29. The Special Master reasoned that

> Remedial Plan 3 only weakly remedies the Section Two violation: while the Black-preferred candidate often wins District 25, the Black-preferred candidate wins District 26 in only *three* of the eleven biracial elections examined by the Special Master. The Black-preferred candidate performs better in the uni-racial elections, winning all six uni-racial elections examined. In other words, [W]hite candidates (including [W]hite Black-preferred candidates)

are able to win District 26 much more reliably than Black candidates.

*Id.* at 21. Conversely, he reasoned that "Remedial Plan 2 . . . represents the most effective Section Two remedy," *id.* at 28, because Black-preferred candidates win every election he analyzed in Senate District 25 and approximately 94% of the elections he analyzed in Senate District 26, *see id.* at 21 tbl. 4.

### D.    Objections

Both the Plaintiffs and the Secretary objected to the Special Master's Report and Recommendation. *See* Docs. 316, 317. The Plaintiffs object to Remedial Plan 3 because "Section 2's 'guarantee of equal opportunity is not met when [c]andidates favored by [B]lacks can win, but only if the candidates are [W]hite.'" Doc. 316 at 3 (some alteration in original) (quoting *Rural W. Tenn. African-Am. Affairs Council v. Sundquist* ("*Rural West*"), 209 F.3d 835, 840 (6th Cir. 2000)).

The Plaintiffs assert that Remedial Plan 3 does not provide a complete remedy because, in the Special Master's effectiveness analysis, the Plaintiffs say that "Black voters could only rarely elect Black candidates and can only sometimes elect their preferred candidates if those candidates are White." *Id.* at 5 (citing Doc. 312-3 at 3). (In the Special Master's effectiveness analysis for Remedial Plan 3, the Black-preferred candidate won all six uni-racial elections in District 26 and won three out of eleven biracial elections in that District, winning nine out of seventeen elections studied overall. Doc. 312 at 21 tbl. 4).

The Plaintiffs further object to the Special Master's exclusion of two 2024 elections from his effectiveness analysis; the Plaintiffs argue that if those elections are included, the Black-preferred candidate's win-rate in District 26 under Remedial Plan 3 decreases from 53% to approximately 47%. Doc. 316 at 5 n.3.

Separately, the Plaintiffs contend that Remedial Plan 2 most effectively avoids the unconstitutional use of race because Dr. Oskooii "drew his plan without referencing any map other than the Enacted Plan and without viewing any racial or electoral data until after completing the map." *Id.* at 9. The Plaintiffs do not take issue with D.D.'s representation that he did not view any racial data while he prepared his plans. *See Redistricting* Doc. 11; Doc. 316.

The Secretary objects that "[e]ach of the proposed plans was drawn with a racial target" because the Court's instructions noted the "practical reality" that because of intensely racially polarized voting in Alabama, to provide an additional opportunity district a remedial plan would likely need to include "an additional district in the Montgomery area in which Black voters either comprise a voting age majority or something quite close to it." Doc. 317 at 1 (quoting Doc. 307 at 2).

The Secretary further contends that Remedial Plans 1 and 2 change the Enacted Plan more than what is necessary to remedy the Section Two violation found. *See id.* at 4–5. The Secretary thus contends the "least bad" option is for the Court to select Remedial Plan 3 because it most closely approximates the Enacted

Plan. *Id.* at 5–6.

### E.    Remedial Hearing

At the remedial hearing, the Plaintiffs called Dr. Oskooii, who provided testimony on both direct and cross-examination about his plans. *See generally* Tr. 3–61. The Court then heard arguments from the parties as to their positions on the remedial plans included in the Special Master's Report and Recommendation.

The Plaintiffs argued that an "opportunity district" is one in which the Section Two "violation is remedied." *Id.* at 63. When asked about the legal basis for considering a candidate's race to determine the effectiveness of a remedy, the Plaintiffs responded that because the "remedy should speak to the legal violation," *id.* at 64, "the guarantee of equal opportunity is not met . . . when candidates favored by [B]lack voters can win but only if those candidates are [W]hite," *id.* at 65. The Plaintiffs also asserted that the Court should assign greater weight to the more recent elections in the Special Master's effectiveness analysis. *Id.* at 67.

The Plaintiffs conceded that Section Two provides only an "opportunity [for Black voters] to elect" a candidate of their choice, not a "guarantee[]" to elect a chosen candidate. *Id.* And the Plaintiffs conceded that a district in which a Black-preferred candidate won 40% of the time would not "categorically" fail to remedy a Section Two violation. *Id.* at 69. The Plaintiffs acknowledged that, regardless whether the Special Master considered 2024 elections in his effectiveness analysis,

District 25 in Remedial Plan 3 would elect a Black-preferred candidate "around 50 percent" of the time in the modeled elections; the Plaintiffs further acknowledged that whether the Black-preferred candidate would win nine of seventeen modeled elections or nine of nineteen modeled elections "cannot be the fulcrum on which [the remedial question in this case] hinges." *Id.* at 73. Nevertheless, although the Plaintiffs concede that Remedial Plan 3 "offer[s] more opportunity" than the Enacted Plan, *id.* at 77, they maintain that it is a "complete failure" in "recent elections," *id.* at 67, and not an adequate remedy.

The Secretary repeated his objection to all three remedial plans as "racial gerrymanders." *Id.* at 78. The Secretary argued that of the three plans, the Court is "required to choose [Remedial] Plan 3 because [Remedial] Plan 3 is the most respectful of the [L]egislature's decisions." *Id.* at 80. He further argued that Remedial Plan 3 provides Black voters an opportunity to elect candidates of their choice, as the Special Master's effectiveness analysis revealed that a Black-preferred candidate wins more than half of the time. *Id.* at 82.

The Secretary acknowledged that in the light of the Court's liability finding that the Enacted Plan unlawfully diluted Black votes by packing Black voters into District 26, any remedy must "unpack" that District. *See id.* at 84–85. The Secretary conceded that his objections to Remedial Plan 3 are coterminous with his objections to the Court's liability findings, and that he maintains no other objections to that

Plan. *See id.* at 88–89 ("I don't believe we would have other objections outside of the gerrymandering objection to [Remedial Plan 3.]").

The Secretary maintained that even though neither the Special Master nor D.D. displayed any racial data while preparing their remedial plans, those plans are not race-blind. *See* Doc. 317 at 2; *Redistricting* Doc. 8-1 at 3. He contended that any keen observer of this litigation would understand how to draw a racial gerrymander in the Montgomery area without needing to see racial demographic data while drawing, such that it is impossible to prepare a map race-blind. *See* Doc. 317 at 2.

## III.   STANDARD OF REVIEW

Controlling Supreme Court precedent dictates rules that the Court must follow in ordering a remedial plan. The Court does not have the authority to simply select the plan that outperforms all other proposed plans on any particular metric and order the Secretary to use that plan. The Court must give the Alabama Legislature as much deference as possible, and the Court may not disturb the policy choices in the Enacted Plan any more than is necessary to remedy the likely Section Two violation this Court found. *See, e.g.*, *Upham v. Seamon*, 456 U.S. 37, 43 (1982) (per curiam); *Whitcomb v. Chavis*, 403 U.S. 124, 160 (1971).

This is a robust rule. A district court errs "when, in choosing between two possible court-ordered plans, it failed to choose that plan which most closely approximated the state-proposed plan." *Upham*, 456 U.S. at 42. Put differently,

"[t]he **only** limits on judicial deference to state apportionment policy . . . [a]re the substantive constitutional and statutory standards to which such state plans are subject." *Id.* (emphasis added). So the Court must select the plan that "most clearly approximated the reapportionment of the state legislature," while also satisfying federal constitutional and statutory requirements. *White v. Weiser*, 412 U.S. 783, 793 (1973).

This rule is consistent with the judiciary's limited role. "From the beginning, [the Supreme Court] ha[s] recognized that 'reapportionment is primarily a matter for legislative consideration and determination, and that judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so.'" *Id.* at 794–95 (quoting *Reynolds v. Sims*, 377 U.S. 533, 586 (1964)). Indeed, the Supreme Court "has repeatedly held that redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to pre-empt." *Wise v. Lipscomb*, 437 U.S. 535, 539 (1978) (citations omitted).

The Court has repeatedly explained that it understands its limited role. *See generally* Docs. 302, 274, 143. The Court reiterates its understanding that the Court acts within the bounds of its authority only "if [its] modifications of a state plan are limited to those necessary to cure any constitutional or statutory defect." *Upham*,

19

456 U.S. at 43. The Court must not "pre-empt the legislative task nor 'intrude upon state policy any more than necessary.'" *White*, 412 U.S. at 795 (quoting *Whitcomb*, 403 U.S. at 160). At the same time, however, the "Court cannot authorize an element of an election proposal that will not with certitude *completely* remedy the Section 2 violation." *Dillard v. Crenshaw Cnty.*, 831 F.2d 246, 252 (11th Cir. 1987) (Johnson, J.).

And the Court reiterates that it regards this task—"to devise and impose a reapportionment plan" for Alabama to conduct its upcoming state Senate elections without the taint of racially discriminatory vote dilution—as an "unwelcome obligation." *Wise*, 437 U.S. at 540; *see also* Doc. 302 at 2–3.

Although the Legislature had the discretion to consider various political factors when it considered the Enacted Plan (for example, such as whether any redrawn district paired incumbents), the Court may not consider such factors now. *See, e.g.*, *Larios v. Cox*, 306 F. Supp. 2d 1214, 1218 (N.D. Ga. 2004) (three-judge court) (explaining that "in the process of adopting reapportionment plans, the courts are forbidden to take into account the purely political considerations that might be appropriate for legislative bodies," and that "many factors, such as the protection of incumbents, that are appropriate in the legislative development of an apportionment plan have no place in a plan formulated by the courts") (quoting *Wyche v. Madison Parish Police Jury,* 635 F.2d 1151, 1160 (5th Cir. 1981), and *Wyche v. Madison*

*Parish Police Jury,* 769 F.2d 265, 268 (5th Cir. 1985) (per curiam)) (internal quotation marks omitted).

## IV.   ANALYSIS

The Court has carefully reviewed each proposed plan, all comments submitted to the Special Master, the Special Master's Report and Recommendation, each objection raised and comment filed to that Recommendation, and the parties' arguments at the remedial hearing. Like the Special Master and his team, the Court finds that the proposals, comments, and objections are the product of thoughtful analysis by the parties and interested members of the public.

### A.   Remedial Plan 3

The Court begins its analysis with Remedial Plan 3 because that plan alters only two districts in the Enacted Plan: Districts 25 and 26—the Black-opportunity districts in the Montgomery area. The Court must adopt Remedial Plan 3 if it is a lawful remedial plan. If Remedial Plan 3 is such a plan, the Court has no discretion to adopt a remedial plan (such as Remedial Plans 1 or 2) that modifies three districts in the Enacted Plan. Because the Court must leave the Legislature's chosen district boundaries undisturbed as much as possible, the Court must not modify any more districts than are strictly necessary to remedy the vote dilution it found.

The Court is satisfied that Remedial Plan 3 respects the traditional districting principles that the Alabama Legislature has identified, complies with Section Two,

and is constitutional. *First,* Remedial Plan 3 pays significant respect to traditional districting principles. Although federal law does not require that a remedial plan materially meet or beat an enacted plan on various measures of geographic compactness, Remedial Plan 3 does that. *See* Doc. 312 at 25 & tbl. 6. Likewise, although federal law does not require that a remedial plan split fewer municipalities than an enacted plan splits, Remedial Plan 3 does that. *See id.* at 26. And Remedial Plan 3 respects communities of interest. Indeed, although the Secretary initially objected to all remedial plans on the ground that they split a community of Black Alabamians "connected to the downtown Montgomery area," Doc. 317 at 3, he later limited his objection to Remedial Plan 3 to his "gerrymandering objection," Tr. at 89.

*Second*, Remedial Plan 3 pays significant respect to legislative redistricting decisions. Remedial Plan 3 leaves 97.6% of Alabama voters in the same districts the Enacted Plan provided for them. Doc. 312 at 15 tbl.1. Even the most casual comparison of Remedial Plan 3 and the Enacted Plan reveals how it remedies the vote dilution the Court found by redistricting only 2.4% of Alabama voters: it unpacks District 26 by moving some Black voters from District 26 into the adjacent District 25. *See* Doc. 312-3. Remedial Plan 3 leaves everything else alone.

Accordingly, there can be no legitimate argument that Remedial Plan 3 does significant violence to any traditional districting principle or legislative redistricting

decision, other than the decision that resulted in racially discriminatory vote dilution. Likewise, there can be no legitimate argument that the Legislature could not have enacted Remedial Plan 3 in the first instance: there is (obviously) no legal requirement for the Legislature to pack Black voters into District 26, nor any prohibition on unpacking that district following a finding of unlawful vote dilution.

*Third*, the Court is satisfied that Remedial Plan 3 "completely" and "with certitude" remedies the Section Two violation the Court found. *See Dillard*, 831 F.2d at 252 (emphasis omitted). Under Remedial Plan 3, a Black-preferred candidate wins election in District 25 in approximately 88% of the seventeen elections analyzed by the Special Master. Doc. 312 at 21 tbl. 4. Under Remedial Plan 3, a Black-preferred candidate wins election in District 26 in more than half of the seventeen elections studied by the Special Master. *See id.* In biracial elections in District 26, the Black-preferred candidate wins approximately 27% of the time, while in uni-racial elections the Black-preferred candidate wins every election. *Id.* at 21. If the Court considers the two 2024 elections that the Plaintiffs request, by the Plaintiffs' own admission the results are materially unchanged. *See* Tr. 73.

The Court rejects the Plaintiffs' argument that Remedial Plan 3 is nevertheless not an effective remedy. This is for two reasons. First, the Court discerns no legal basis to hold that a district where a Black-referred candidate wins approximately half of the (seventeen or nineteen) modeled elections is not an effective remedial district.

In the Court's view, requiring a greater chance of success would erroneously convert the requirement of equal opportunity into a requirement of something more.

And second, the Court discerns no legal basis to assign the weight to candidate race that the Plaintiffs suggest. The Plaintiffs cite the *Rural West* case for the proposition that "Section 2's guarantee of equal opportunity is not met when candidates favored by [B]lacks can win, but only if the candidates are [W]hite." Doc. 316 at 3 (quoting *Rural West*, 209 F.3d at 840 (internal quotation marks omitted)). But as just explained, that's not what these data show for District 25 or District 26. The Plaintiffs' suggestion that only White Black-preferred candidates can win election in District 26 is overdrawn from the set of elections studied. Indeed, it rests primarily on just two recent election cycles, but there is no basis to focus on those to the exclusion of the other elections the Special Master analyzed (with no objection from the Plaintiffs).

And in any event, the promise of Section Two is not that a Black voter can often elect a Black candidate: it's that a Black voter has an equal opportunity to elect a candidate of his choice that a White voter has. *See United States v. Dallas Cnty. Comm'n*, 850 F.2d 1433, 1439 n.6 (11th Cir 1998); *accord LULAC*, 548 U.S. at 428 ("[T]he ultimate right of [Section Two] is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race."). That is the rule regardless of the race of the candidate.

24

Ultimately, the record makes clear that Remedial Plan 3 unpacks District 26 by reassigning some Black voters to District 25 such that both districts are Black-opportunity districts. The Court thus finds that Remedial Plan 3 completely remedies the unlawful vote dilution the Court found in the Enacted Plan.

*Fourth*, the Court is satisfied that race did not predominate in the preparation of Remedial Plan 3. The original drafter of Remedial Plan 3, D.D., stated in his filing that he did not display any racial demographic data while he drafted the Plan. *Redistricting* Doc. 8-1 at 3. No party has suggested, let alone established, otherwise. Accordingly, there is no evidentiary basis for a finding that race predominated in the preparation of Remedial Plan 3.

The Court rejects the Secretary's suggestion that Remedial Plan 3 was not prepared race-blind because any keen observer of this litigation would understand how to draw a race-predominant remedial map without displaying racial data while drawing the map. This is for two reasons. First, the Court simply cannot hold that a particular consideration predominated in the preparation of a particular map with zero evidentiary basis. Factfinding does not work that way. Second, standing alone, a cartographer's general knowledge of the areas at issue in a mapmaking process cannot form the basis for a finding that a single consideration predominated over others in that process. Because the general knowledge (assuming *arguendo* that it exists) is fixed, and a predominance finding would be inherently relative, general

knowledge is necessarily insufficient to establish predominance.

In any event, the facts of this case make it very difficult for the Court to accept the suggestion that Remedial Plan 3 is race-predominant even though it was prepared race-blind. The vote dilution the Court found in the Montgomery area was the practical result of the reality that the Enacted Plan packed Black voters into District 26. The Court cannot reconcile current Section Two jurisprudence with the Secretary's suggestion that the law forbids the Court to unpack that district even though a teenager can draw a map doing just that without displaying any racial data during the process.

### B. Affirmative Injunction Requiring Use of Remedial Plan 3

The Court further finds that all requirements for injunctive relief are satisfied to order the Secretary to conduct Alabama's state Senate elections according to Remedial Plan 3. When, as here, an injunction "goes beyond the status quo and seeks to force one party to act, it becomes a mandatory or affirmative injunction and the burden placed on the moving party is increased." *Mercedes-Benz U.S. Int'l, Inc. v. Cobasys, LLC*, 605 F. Supp. 2d 1189, 1196 (N.D. Ala. 2009) (citing *Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.,* 441 F.2d 560, 561 (5th Cir. 1971)). An affirmative injunction "should not be granted except in rare instances in which the facts and law are clearly in favor of the moving party." *Exhibitors Poster Exch., Inc.*, 441 F.2d at 561 (quoting *Mia. Beach Fed. Sav. & Loan Ass'n. v. Callander,*

256 F.2d 410, 415 (5th Cir. 1958) and collecting cases).

The Court has no doubt that the facts and law clearly favor an affirmative injunction requiring the Secretary to administer Alabama's state Senate elections according to Remedial Plan 3. "An injunction is an exercise of a court's equitable authority, to be ordered only after taking into account all of the circumstances that bear on the need for prospective relief." *Salazar v. Buono*, 559 U.S. 700, 714 (2010) (plurality opinion). "Under traditional equitable principles, a plaintiff seeking a permanent injunction must demonstrate (1) it has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction." *Angel Flight of Ga., Inc. v. Angel Flight of Am., Inc.*, 522 F.3d 1200, 1208 (11th Cir. 2008) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)); *see also KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1268 (11th Cir. 2006).

The Plaintiffs prevailed on the merits of their Section Two claim in the Montgomery area, and the Court is satisfied that the facts and law are quite clearly in their favor. This case has proceeded through years of litigation. It was stayed for a period of time for the Supreme Court to rule in the Alabama congressional redistricting litigation, and that ruling reiterated the applicable legal standard in a

highly relevant factual context—namely, the totality of the circumstances in present-day Alabama. *Allen v. Milligan*, 599 U.S. 1, 22–23 (2023). After that ruling, the Court held an eight-day bench trial and ultimately enjoined the use of the Enacted Plan based on an extensive record well prepared by all counsel. During that trial, the Secretary's expert did not even attempt to contest the reasonable compactness of the Plaintiffs' illustrative remedial district in the Montgomery area. Doc. 274 at 103–04.

The Court is further satisfied that an affirmative injunction is necessary to protect the public interest in lawful elections. When the Court refused to stay its injunction, the Secretary did not seek an appellate stay. Accordingly, and because the Governor did not call the Legislature into Special Session to attempt to enact a remedial plan, the unwelcome task of preparing a remedial plan fell to the Court. Absent a court-ordered remedial plan, Alabama will have no lawful districting plan for its upcoming state Senate elections.

The Court also finds that an affirmative injunction is necessary to prevent further irreparable injury to the Plaintiffs and other Alabama voters. Those persons already suffered an irreparable injury to their voting rights once in this census cycle, when they cast their votes under the Enacted Plan in Alabama's 2022 state Senate election. Today's remedial order prevents such future injuries.

Indeed, it is self-evident that the Plaintiffs face a far greater harm than does the Secretary should this Court refuse to enter a permanent injunction. "Voting is the

beating heart of democracy," and a "fundamental political right, because it is preservative of all rights." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1315 (11th Cir. 2019) (internal quotation marks omitted) (alterations accepted). And "once the election occurs, there can be no do-over and no redress" for voters whose rights were violated and votes were diluted. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014). Without a permanent injunction, the Plaintiffs face the loss of their most fundamental right: the opportunity to participate in self-government on equal footing with their peers. Comparatively, the Secretary's ministerial role in administering elections would be only moderately impacted by administering state Senate elections under a different map that redistricts less than three percent of all Alabama voters and affects only two of thirty-five Senate districts.

## V.    CONCLUSION

Accordingly, the Alabama Secretary of State is **ORDERED** to administer Alabama's 2026 and 2030 state Senate elections, as well as any special and other elections for the state Senate that occur before the Legislature passes a districting plan based on the 2030 census, according to Remedial Plan 3, which is appended to this order as Appendix A.

**DONE** and **ORDERED** this 17th day of November, 2025.

**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE

**APPENDIX A**

