FILED

2026 May-12  PM 09:37
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| ALABAMA STATE CONFERENCE OF THE NAACP, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 2:21-cv-1531-AMM |
| WES ALLEN, *in his official capacity as Alabama Secretary of State,* | ) ) ) ) | |
| Defendant. | ) | |

**SECRETARY OF STATE'S EMERGENCY MOTION TO DISSOLVE INJUNCTIONS OR, IN THE ALTERNATIVE, TO STAY— RULING REQUESTED BY MAY 14**

The Secretary of State respectfully requests an order pursuant to Rules 60(b)(5) and/or 62(d) vacating the injunctions this Court entered prohibiting the Secretary from conducting elections pursuant to the State's 2021 Plan for its Senate districts and requiring the Secretary to use a court-ordered map that created an additional "Black-opportunity" Senate district. Doc. 322 at 21 (remedial map), Doc. 274 (liability injunction). When the Court entered its injunctions, it did not have the benefit of the Supreme Court's decision in *Louisiana v. Callais*, which significantly "update[d] the *Gingles* framework" to "realign it with the text of §2 and constitutional principles." Slip Op. at 29, No. 24-109 (U.S. Apr. 29, 2026) ("*Callais*

1

Op."). Because Plaintiffs have yet to meet their burden under *Callais*, the Court should dissolve its injunctions.

Vacatur is the norm in such situations, as the Supreme Court just demonstrated in vacating and remanding similar challenges brought under Section 2 to Alabama's congressional districts, and this case is no exception. *E.g.*, *Allen v. Milligan*, No. 25-274 (U.S. May 11, 2026) (vacating and remanding injunctions and remedial maps "for further consideration in light of *Louisiana v. Callais*"); *see also Dillard v. City of Greensboro*, 74 F.3d 230, 236 (11th Cir. 1996) ("Because the district court did not have the benefit of *Miller [v. Johnson*, 515 U.S. 900 (1995)] when it adopted the challenged redistricting plan, we [vacate and] remand the case to allow the district court to reevaluate the plan under *Miller*."). Indeed, "[a] court errs when it refuses to modify an injunction … in light of such changes" in the "decisional law." *Agostini v. Felton*, 521 U.S. 203, 215 (1997). And while a district court in this situation would typically need to issue an indicative ruling since the case is on appeal, the Eleventh Circuit in its order yesterday "relinquish[ed] jurisdiction to the district court so that it can address the Secretary's … motion for vacatur and/or for a stay and, if warranted, modify, stay, or dissolve the injunction." CA11 No. 25-13007 Doc. 72-2 at 5.

The Secretary respectfully asks this Court to act quickly in light of the upcoming primary on May 19. After *Callais*, the Alabama Legislature passed and

2

the Governor signed Alabama Act 2026-613, which authorizes a special primary "[i]n the event" that "a federal court, by issuing a judgment or by vacating an injunction, permits the reinstatement of the last legislatively enacted State Senate Districts." The Supreme Court also weighed these equities in the congressional cases and granted the Secretary's motion to expedite, vacate, and remand in light of *Callais*—and issued its judgment "forthwith"—so that Alabama may have the "same opportunity as other States to use a lawfully enacted" map "free of an injunction that cannot be reconciled with Section 2 of the Voting Rights Act" as construed in *Callais*. *See* Secretary's Mot. to Expedite, *Milligan*, *supra* (U.S. April 30, 2026); Order, *Milligan*, *supra* (granting motion). In doing so, the Supreme Court necessarily rejected the plaintiffs' arguments that it was too late to act and that vacating the injunctions would run afoul of the *Purcell* principle. *See* Milligan Respondents' Opp. to Mot. to Expedite, *Milligan*, *supra* (U.S. Apr. 30, 2026). This Court should do the same.

In the alternative, but for similar reasons, this Court should stay its injunctions pending appeal. First, the Secretary is likely to succeed on the merits of the relief he seeks—vacatur—because that is the normal course of action when an intervening change in the law alters the governing standard. And if the Court reaches the underlying merits—as opposed to the simple question whether the injunctions are likely to be vacated and remanded in light of *Callais*—the Secretary is likely to

3

succeed on that score as well because Plaintiffs have not met their burden under *Callais*. Second, the equities favor the Secretary because the injunctions do great harm to the State of Alabama and the public, who are prohibited from voting in accordance with the map enacted by their elected representatives. Third, while time is tight, it is up to the Alabama Legislature to determine a path forward, which it has. *See Democratic Nat'l Comm. v. Wisc. State Leg.*, 141 S. Ct. 28, 28-30 (2020) (Gorsuch, J., concurring). The *Purcell* principle applies to "federal intrusion on state lawmaking processes," *id.* at 28 (Roberts, C.J., concurring), so invoking it *to sustain* that intrusion would turn the doctrine on its head—as the Supreme Court confirmed in vacating the injunctions in the congressional cases. If vacatur is likely in light of *Callais*, the Court should not delay simply because "[o]ne may disagree with [the] State's policy choice," *Wisc. State Leg.*, 141 S. Ct. at 34 (Kavanaugh, J., concurring), to hold elections under the State's preferred districting plan.

Given these time constraints, the Secretary respectfully requests a ruling by **Thursday, May 14.**

## BACKGROUND

**1.** In 2024, the Court held a trial to determine whether Alabama's 2021 Plan violates §2 for failing to add additional majority-black Senate districts in the Huntsville and Montgomery areas. On August 22, 2025, the Court held that Plaintiffs failed to establish a §2 violation near Huntsville but established a violation near

Montgomery. Doc. 274 at 3-4. The Court thus permanently enjoined the Secretary from conducting future elections under the 2021 Plan and ordered remedial proceedings for a new plan. *Id.* at 4-5. The Court said the remedial map had to "include an additional district in the Montgomery area in which Black voters either comprise a voting-age majority or something quite close to it." *Id.* at 5.

The Secretary asked the Court to stay remedial proceedings because the Supreme Court in *Callais* would soon be providing "critical guidance" for judging Alabama's map. Doc. 278 at 1. The Court denied the motion "without prejudice to his opportunity to renew it as appropriate." Doc. 302 at 1. As the Court explained, "[t]he legal test this Court applied in that injunction has been the controlling test for forty years, *see Thornburg v. Gingles*, 478 U.S. 30 (1986)," and "[i]f the Supreme Court changes the law, the Secretary may renew his stay application." *Id.* at 5. The Court also noted that this case "involve[es] substantial evidentiary overlap" with the congressional redistricting litigation, which proceeded with a remedial map drawn by the same special master the Court planned to appoint here. *Id.* at 5-6

The Court thus went forward with remedial proceedings, and on November 17, 2025, ordered the Secretary "to administer Alabama's 2026 and 2030 state Senate elections, as well as any special and other elections for the state Senate that occur before the Legislature passes a districting plan based on the 2030 census, according to" a remedial map that adjusted the boundaries of Montgomery-area

Senate Districts 25 and 26 to make both districts "Black-opportunity districts." Doc. 322 at 25.  The Secretary appealed the injunctions and asked the Eleventh Circuit to hold the appeals in abeyance until the Supreme Court issued its opinion in *Callais*, which that court did. CA11 No. 25-13007 Doc. 61-1.

**2.** The Supreme Court issued its decision in *Callais* on April 29. The Secretary immediately moved the Court to expedite consideration of his pending appeals and petition in the congressional cases and vacate and remand in light of *Callais*. *See* Secretary's Mot. to Expedite, *Milligan*, *supra*. The plaintiffs in those cases opposed the Secretary's motion, arguing that because "the 2026 primary election day is less than three weeks away, on May 19," the Court should not "expedite consideration and thereby enable a mid-election change of districts." Caster Respondents' Opp. to Mot. to Expedite at 1-2, *Allen v. Caster*, No. 25-243 (U.S. Apr. 30, 2026); Milligan Respondents' Opp., *supra*, at 4-5. They also argued that "the issues in [the congressional] case are not identical to the issues in *Callais*" because "unlike in *Callais*, the remedial districts at issue here were drawn race-blind by a court-appointed special master." Caster Opp., *supra*, at 2 (emphasis omitted).

On May 11, the Supreme Court granted the Secretary's motion, vacated and remanded the congressional cases in light of *Callais*, and ordered the Clerk to issue the judgments "forthwith" under Rule 45.3, causing the injunctions to be immediately lifted. Order, *Milligan*, *supra*. While Justice Sotomayor in dissent

echoed the plaintiffs' concerns that "vacating the District Court's injunction will immediately replace the current map with Alabama's 2023 Redistricting Plan," which she thought was not "appropriate" "because Alabama's congressional primary election is next week," *id.* at 4 (Sotomayor, J., dissenting), the Court rejected those arguments and ordered that its ruling vacating the injunctions take effect immediately.

**3.** Parallel with his efforts before the Supreme Court in the congressional cases, the Secretary also moved the Eleventh Circuit to vacate and remand the injunctions in this case in light of *Callais* or, in the alternative, to stay the injunctions. *See* CA11 No. 25-13007 Doc. 65-1. Plaintiffs argued, as their counsel had done before the Supreme Court in *Milligan*, that it was too late to grant the Secretary relief and that doing so would "violat[e] *Purcell*." *See* CA11 No. 25-13007 Doc. 67 at 14. They also argued that vacatur was inappropriate because they believed they could win "[e]ven under the *Callais* standard." *Id.* at 20.

Less than two hours before the Supreme Court vacated and remanded the congressional cases, a motions panel of the Eleventh Circuit denied the Secretary's requests for relief on procedural grounds. *See* CA11 No. 25-13007 Doc. 72-2 at 3. As to vacatur, the panel explained that, "as a motions panel," it was "not authorized to enter such a merits-based judgment on the pending appeals" because only a merits panel could do that. *Id.* at 3. As for the Secretary's alternative request for a stay, the

7

panel denied the motion without prejudice to allow the Secretary the opportunity to seek relief from this Court. *Id.* The Court noted that "other circuits have held that a district court does not have the power to *dissolve* a permanent injunction while that injunction is on appeal," so, "[i]n an abundance of caution," the panel "relinquish[ed] jurisdiction to the district court so that it can address the Secretary's expected forthcoming motion for vacatur and/or for a stay and, if warranted, modify, stay, or dissolve the injunction." *Id.* at 5. "Once the district court has concluded proceedings and entered an order on the Secretary's expected motion (and any related motions filed by any of the parties," the Court continued, "it shall notify th[e Eleventh Circuit] so that the additional portions of the record can be transmitted." *Id.*

## ARGUMENT

Relief from a "a final judgment, order, or proceeding" is warranted when the judgment "is based on an earlier judgment that has been reversed or vacated[,] or applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). The Supreme Court has "held that it is appropriate to grant a Rule 60(b)(5) motion when the party seeking relief from an injunction … can show 'a significant change either in factual conditions or in law,'" including "decisional law." *Agostini*, 521 U.S. at 215 (quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992)). "A

8

court errs when it refuses to modify an injunction or consent decree in light of such changes." *Id.*

Vacatur is appropriate where, as here, "a subsequent case[] in the Supreme Court" "substantially alter[s] the landscape" after a court enters its order. *Thomas v. Att'y Gen., Fla.*, 795 F.3d 1286, 1291 (11th Cir. 2015). The Eleventh Circuit's decision in *Dillard v. City of Greensboro*, 74 F.3d 230 (11th Cir. 1995), illustrates the point. There, after the Middle District of Alabama entered a remedial plan pursuant to Section 2 of the VRA and the case was on appeal, the Supreme Court issued its decision in *Miller v. Johnson*, 515 U.S. 900 (1995). *See Dillard*, 74 F.3d at 233. Because "[t]he Supreme Court's decision in *Miller* govern[ed]" the Eleventh Circuit's "analysis of this case," *id.*, and "[b]ecause the district court did not have the benefit of *Miller* when it adopted the challenged redistricting plan," *id.* at 231, the Eleventh Circuit "vacate[d] the decision of the district court and remand[ed] th[e] case for a reevaluation of the proposed redistricting plans in light of *Miller*," *id.* at 236. *Cf. ALBC v. Alabama*, 575 U.S. 254, 273-75 (2015) (vacating and remanding where conclusions "might well have been different" but for "contrary view of the law").[1]

---

[1] *See also, e.g., Simpson v. Thurston*, 144 S. Ct. 2602 (2024) (Mem.) (vacate-and-remand in light of *Alexander v. S.C. State Conf. NAACP*); *Chatfield v. League of Women Voters of Mich.*, 589 U.S. 1031 (2019) (Mem.) (vacate-and-remand in light of *Rucho v. Common Cause*); *Chabot v. Ohio A. Philip Randolph Inst.*, 589 U.S. 901 (2019) (Mem.) (same); *Rucho v. Common Cause*,

The Supreme Court just did the same thing in the congressional redistricting cases—where, as this Court knows, witnesses, evidence, and arguments substantially overlapped with this case. Even though the plaintiffs there argued that the cases were distinguishable from *Callais* and that the equities counseled against quick action due to the upcoming election, the Supreme Court rejected those arguments, vacated the injunctions in light of *Callais*, and immediately issued its judgments so that the injunctions would be lifted "forthwith." *See* Order, *Milligan*, *supra*. While the Eleventh Circuit did not have the benefit of these orders when it ruled, this Court does.

Alternatively, when analyzing whether to stay or modify an injunction pending appeal under Rule 62(d), the Court should consider "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Swain v. Junior*, 958 F.3d 1081, 1088 (11th Cir. 2020) (quotation omitted).

---

585 U.S. 1012 (2018) (Mem.) (vacate-and-remand in light of *Gill v. Whitford*); *Dickson v. Rucho*, 581 U.S. 1004 (2017) (Mem.) (vacate-and-remand in light of *Cooper v. Harris*); *Cantor v. Personhuballah*, 575 U.S. 931 (2015) (Mem.) (vacate-and-remand in light of *ALBC v. Alabama*); *Texas v. Holder*, 570 U.S. 928 (2013) (Mem.) (vacate-and-remand in light of *Shelby County v. Holder*).

All these considerations point toward vacatur or—at the least—a stay of the injunctions. Even assuming the Court properly applied "the law extant at the time it considered" the case, *Thomas*, 795 F.3d at 1291, the *Callais* Court rejected the interpretations of §2 this Court relied on and updated the *Gingles* framework. The injunctions here thus cannot survive *Callais*, making immediate vacatur proper and nearly guaranteeing the Secretary's likelihood of success on the merits. As for the equities, without immediate action by this Court, Alabama will lack any opportunity to conduct the upcoming elections pursuant to its lawfully enacted map.

## I.    Because *Callais* Updated The Governing Standard, The Court Should Dissolve Its Injunctions.

*Callais* rejected every test the Court applied to impose its injunctions. Whether the *Callais* Court applied "the plain text of §2" and simply "updated [the] *Gingles* framework" (as the majority put it, *Callais* Op. 33) or radically "transform[ed] it" (as the dissenters said, *id.* at 23 (Kagan, J., dissenting)), the upshot is the same: Even if this Court perfectly applied §2 precedent as it existed before *Callais*, that precedent can no longer support the Court's injunctions.

In *Callais*, the Supreme Court held that §2, "properly construed," begins with the text of the Fifteenth Amendment and §2 of the VRA. The Court then held that "the focus of §2 must be enforcement of the Fifteenth Amendment's prohibition on *intentional* racial discrimination." *Callais* Op. 23. "While that interpretation does not demand a finding of intentional discrimination," the Court explained, §2

11

"imposes liability only when the circumstances give rise to a strong inference that intentional discrimination occurred." *Id.* The Court gave an example of when such an inference would be proper: when "application of a State's districting algorithm yields numerous maps with districts in which the members of a minority group constitute a majority" and the "State cannot provide a legitimate reason for rejecting all those maps and eliminating all majority-minority districts." *Id.*

Under *Callais*, plaintiffs challenging a state map thus have the burden of "disentangl[ing] race from politics," which they can do only "by offering an alternative map that achieves all the State's objectives—including partisan advantage and any of the State's other political goals—at least as well as the State's map." *Id.* at 25 (quotation omitted). "Properly understood," the Court concluded, "§2 thus does not intrude on States' prerogative to draw districts based on nonracial factors." *Id.* at 24.

Without the benefit of the *Callais* opinion, this Court relied on prior cases to interpret §2 and therefore applied a different standard than what a proper interpretation of Section 2 requires. To begin, the Court did not analyze racial intent because "[i]ntent is not an element of a Section Two violation," Doc. 274 at 13, and focused instead on "the impact" or "effects" a challenged action had "on minority electoral opportunities," *id.* at 36 (quotation omitted), without considering whether those effects may have been the product of race-neutral redistricting goals. That

12

analysis cannot survive the Supreme Court's holding that §2 simply guarantees minority voters "whatever opportunity results from the application of the State's combination of permissible criteria"—"nothing less and nothing more." *Callais* Op. 22.

Likewise, where this Court relied on the "controlling test for forty years," *Thornburg v. Gingles*, Doc. 302 at 5, the Supreme Court "update[d]" the *Gingles* framework to align it "with the statutory text and reflect[] important developments since [the Court] decided *Gingles* 40 years ago," *Callais* Op. 26. Here is an overview of some of the "updates" compared to the standard this Court applied:

| *NAACP* Opinion | *Callais* Opinion |
|---|---|
| **Gingles I: Numerosity and Compactness** | |
| ***THERE WILL BE TRADE-OFFS BETWEEN DISTRICTING OBJECTIVES*** | ***ALL LEGITIMATE DISTRICTING OBJECTIVES MUST BE MET*** |
| "To determine whether the plaintiffs satisfy this requirement, the Court compares the [Enacted] Plan with each illustrative plan provided by the plaintiffs. Further comparisons are not required; a Section Two district that is reasonably compact and regular, taking into account traditional districting principles, need not also defeat a rival compact district in a beauty contest." Doc. 274 at 32 (citations and quotation marks omitted) (cleaned up). | "Second, illustrative maps **must meet all the State's legitimate districting objectives**, including traditional districting criteria and the State's specified political goals. If the State's aims in drawing a map include a target partisan distribution of voters, a specific margin of victory for certain incumbents, … the plaintiffs' illustrative maps must achieve these goals just as well. If not, the plaintiffs would fail to demonstrate that the State's chosen map was driven by racial considerations rather than permissible aims. Only by meeting all the State's legitimate objectives can the illustrative maps help to 'disentangle race' from politics and other constitutionally permissible considerations." *Callais* Op. 29-30 (emphasis added). |

13

| *SECTION 2 DEMANDS CONSIDERATION OF RACE* | *RACE CANNOT BE CONSIDERED* |
|---|---|
| The Court allowed Plaintiffs to satisfy *Gingles* with illustrative plans that made "tradeoffs," "balance[d]" districting criteria, and did not use "race as much" as other criteria. Doc. 274 at 173; *see id.* at 176 (finding "trade-offs" "permitted").<br><br>"Because the Voting Rights Act in itself *demands* consideration of race, map drawers in Section Two cases will be aware of racial demographics[.] … While race consciousness is permissible, **race may not be the predominant factor in drawing district lines** unless there is a compelling reason." Doc. 274 at 30-31 (citations and quotation marks omitted) (cleaned up) (emphases added). | "First, in drawing illustrative maps, **plaintiffs cannot use race as a criterion**. If a plaintiff can produce an additional majority-minority district only by using race—a process that would be unconstitutional if a State engaged in such mapmaking—that illustrative map sheds no light on whether the State acted unconstitutionally by *not* adopting such a map. Thus, **an illustrative map in which race was used has no value in proving a §2 plaintiff's case**." *Callais* Op. 29 (citation omitted) (emphases added). |

| *Gingles* II & III – Racially Polarized Voting | |
|---|---|
| *RACE AND POLITICS DO NOT NEED TO BE DISENTANGLED* | *RACE AND POLITICS MUST BE DISENTANGLED* |
| "[T]he second and third *Gingles* preconditions **do not require that the Court disentangle party and race**." Doc. 274 at 183 (emphasis added).<br><br>"[A]cknowledging that race plays a key role in party attachments keeps the controlling legal standard honest and workable.… As the Court understands it, *Gingles* accounts for partisanship based on race in its demand for political cohesion among the minority group, which will be absent in times or places where party affiliations are driven primarily by something other than race." *Id.* at 201. | "To satisfy the second and third preconditions—politically cohesive voting by the minority and racial-bloc voting by the majority—the plaintiffs must provide an analysis that **controls for party affiliation**. In other words, they must show that voters engage in racial bloc voting that cannot be explained by partisan affiliation. This is, once again, **critical for disentangling race and politics**." *Callais* Op. 30 (quotation marks and citation omitted) (cleaned up) (emphases added). |

| Totality of the Circumstances | |
|---|---|
| *PAST AND PRESENT DISCRIMINATION, AND SOCIO-ECONOMIC DISPARITIES, ARE GIVEN SUBSTANTIAL WEIGHT* | *PAST DISCRIMINATION AND SOCIO-ECONOMIC DISPARITIES ARE GIVEN "MUCH LESS WEIGHT"* |
| "[The totality of the circumstances] inquiry… requires … a searching practical evaluation of the past and present reality.… In this step, the court considers the Senate Factors, which | "[T]he 'totality of circumstances' inquiry must focus on evidence that has more than a remote bearing on what the Fifteenth Amendment prohibits: present-day intentional racial |

14

| | |
|---|---|
| include: **the *history* of voting-related discrimination** in the State or political subdivision; [and] … the **extent to which minority group members bear the effects of *past* discrimination**….” Doc. 274 at 32-33 (citations and quotation marks omitted) (emphases added). | discrimination regarding voting. **Discrimination that occurred some time ago, as well as present-day disparities that are characterized as the ongoing effects of societal discrimination, are entitled to much less weight**. Far more germane are current data and current political conditions that shed light on current intentional discrimination. In large part *because of* the Voting Rights Act, our Nation has made great strides in eliminating racial discrimination in voting. And if, as a result of this progress, it is hard to find pertinent evidence relating to intentional present-day voting discrimination, that is cause for celebration. *Callais* Op. 30-31 (cleaned up and emphasis added). |

As can be seen, the Supreme Court updated every aspect of the *Gingles* framework as well as the totality of the circumstances analysis. This update “follow[s] from the plain text of §2” and is consistent with constitutional limitations on statutory authority.

### A.    First *Gingles* Precondition

“The first *Gingles* precondition is that a community of minority voters must be sufficiently numerous and compact to constitute a majority in a reasonably configured district.” *Callais* Op. 29. While before *Callais* many §2 plaintiffs purported to meet this requirement by offering “illustrative maps with their desired number of majority-minority districts,” *Callais* held that such maps “prove only that the State *could* create an additional majority-minority district, not that the State’s failure to do so violated §2.” *Id.* at 29. Thus, the Supreme Court clarified that to

satisfy *Gingles* I, (1) "in drawing illustrative maps, plaintiffs cannot use race" such that "an illustrative map in which race was used has no value in proving a §2 plaintiff's case," and (2) "illustrative maps must meet all the State's legitimate districting objectives, including traditional districting criteria and the State's specific political goals." *Id.*

But here, Plaintiffs aimed to draw a new majority-black district "without eliminating any of the [ ] existing" ones, Doc. 251 at 43 (quoting PX6 ¶55), which improperly made "race [ ] a districting criterion," *Callais* Op. 29. And relying on prior interpretations of *Gingles* I, the Court understood this to be permissible so long as "race did not predominate," *id.* at 172—which, it said, occurs "'when race-neutral considerations [come] into play only after the race-based decision had been made,'" *id.* (alteration in original and quotation omitted). Accordingly, the Court was unconcerned when Plaintiffs' expert Anthony Fairfax admitted that he used race when he drew Plaintiffs' illustrative maps:

> Mr. Fairfax testified that he *reviewed race at the beginning of the process* to see "where the minority community exists" but then "turn[ed] it off." *He acknowledged that he later checked the minority BVAP and BCVAP periodically* "to see if [he] me[]t th[e] sufficiently large component."

> Further, Mr. Fairfax testified that he "tend[s] to not consider race *as much* as the other [redistricting] criteria" and "always use[s] the other criteria labels more than race." Mr. Fairfax testified that when he prepared the illustrative plans he was not "toggling race and compactness" only, but "look[ed] at all of the criteria and trading off

16

those," and he *considered race only to see "where the minority community exists."*

*Id.* at 173 (alterations in original, citations omitted, and emphases added).

Despite these admissions, the Court concluded that "nothing in Mr. Fairfax's explanation of his map-drawing process causes the Court concern that he considered race-neutral criteria only after he made race-based decisions." *Id.* at 173-74. "Rather," the Court found, "his testimony about his order of operations supports a finding that his map-making process was *race-aware to the degree the law allows*." *Id.* at 174 (emphasis added). But *Callais* made clear that "the degree the law allows" race to be used when drawing an illustrative map is none at all: "If a plaintiff can produce an additional majority-minority district only by using race—a process that would be unconstitutional if a State engaged in such mapmaking—that illustrative map … has no value in proving a §2 plaintiff's case." *Callais* Op. 29 (citation omitted). The Court's holding to the contrary thus cannot survive *Callais*.

*Second*, the Court was confined to a pre-*Callais* standard when analyzing whether Fairfax considered the State's other districting objectives. While the *Callais* Court emphasized that an illustrative map "must meet all the State's legitimate districting objectives," *Callais* Op. 29, the Court continued to hold Plaintiffs to a race-predominance standard. As it explained, Fairfax "testified that he followed five traditional redistricting criteria when drawing the plans," but merely "attempted" to follow "other criteria found in the Legislature's redistricting guidelines." Doc. 274

17

at 172-73. "'[T]here are always tradeoffs' when drawing a map," he explained, *id.* at 173, to excuse why he could not "achieve" "all the State's legitimate objectives" with his map, *Callais* Op. 29.

To take just one example of Plaintiffs' failure to meet "all the State's legitimate objectives," Plaintiffs' map "created a new city split in Prattville in Senate District 26," Doc. 274 at 174, which the State opposed, Doc. 251 ¶153. For another, what the Court credited as a "logical choice" by Dr. Fairfax, Doc. 274 at 175, the State opposed because he subordinated "communities of interest" by connecting "isolated rural black populations throughout the countryside that have little, if anything, in common with the urban Montgomery population," Doc. 251 ¶¶154-56; *see* Doc. 235 at 1:34. And while the Legislature tried to protect incumbents and their districts, *see* Doc. 274 at 18, so that voters are "familiar with those people running for office," Doc. 235-1 at 35; *see id.* at 23, 31-32, 34-35; Doc. 235-2 at 33, Plaintiffs did not.

Thus, rather than determining whether Plaintiffs' illustrative maps satisfied Alabama's legitimate districting objectives, such as population equality, contiguity, compactness, incumbency protection, respecting communities of interest, and preserving existing districts, Doc. 274 at 13, the Court simply asked whether Plaintiffs' consideration of race trumped any race-neutral objective, *id.* at 167-70. Under *Callais*, that kind of map cannot "demonstrate that the State's chosen map

18

was driven by racial considerations rather than permissible aims." *Callais* Op. 29. Any holding that finds Plaintiffs satisfied *Gingles* I thus cannot be reconciled with *Callais*.

## B.    Second and Third Gingles Preconditions

According to *Callais*, "[t]o satisfy the second and third preconditions— politically cohesive voting by the minority and racial-bloc voting by the majority— the plaintiffs must provide an analysis that controls for party affiliation." *Callais* Op. 30. "In other words, they must show that voters engage in racial bloc voting that cannot be explained by partisan affiliation." *Id.* As the *Callais* Court explained, "simply pointing to *inter*-party racial polarization proves nothing, because 'a jurisdiction may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact." *Id.* (quotation omitted). Section 2 plaintiffs must therefore "disentangle race and politics." *Id.* (cleaned up).

Relying on pre-*Callais* interpretations, this Court applied a different standard, holding that "the second and third *Gingles* preconditions do not require that the Court disentangle party and race." Doc. 274 at 183. That rule cannot be squared with *Callais*, and the impact was significant. The Secretary offered expert testimony "that the voting patterns in Alabama are attributable to political party, not race," *id.* at 73-74—and that "in general elections most black voters prefer Democratic candidates,

19

and most white voters in both the challenged areas prefer Republicans," *id.* at 178 (alterations omitted). But as the Court noted, Plaintiffs' expert on polarized voting, Dr. Liu did not even attempt to disentangle party and race: "he was not concerned with voters' motivations for selecting candidates, only whether the voting patterns were racially polarized." *Id.* at 74. Under *Callais*, such testimony "proves nothing." *Callais* Op. 30.

## C.    Totality of the Circumstances

The *Callais* Court also updated the "totality of the circumstances" inquiry, which focuses on the Senate factors derived from legislative history. This inquiry must now give greater weight to and focus more on "present-day intentional racial discrimination regarding voting." *Callais* Op. 30. "Discrimination that occurred some time ago, as well as present-day disparities that are characterized as the ongoing 'effects of societal discrimination,' are entitled to much less weight." *Id.* at 30-31.

The Court conducted a different analysis. *See* Doc. 274 at 192-216. The Court spent several pages detailing examples of Alabama's distant past, crediting trial testimony from Alabamians "who attended segregated public schools" many years ago, and opining that present-day disparities in income and educational attainment "are inseparable from (and in large part the result of) the state's history of official discrimination." Doc. 274 at 206-16. But that kind of evidence has only a "remote

20

bearing" on the question *Callais* asks: whether there exists "present-day intentional racial discrimination regarding voting." *Callais* Op. 30. And it was similar to the evidence that the *Robinson* plaintiffs brought in *Callais*—which the *Callais* Court held did not create "even a plausible likelihood of intentional discrimination by the State," *Callais* Op. 34; *cf.* Supp. Br. for Robinson Appellants 46-47, *Callais*, No. 24-109 (U.S. Aug. 27, 2025). As the Supreme Court explained, "[d]iscrimination that occurred some time ago, as well as present-day disparities that are characterized as the ongoing effects of societal discrimination, are entitled to much less weight." *Callais* Op. 30 (cleaned up).

\* \* \*

*Callais* clarified how §2 claims are to be assessed and made clear that intentional discrimination must be at the center of that analysis. The Court applied a very different "effects" test, and as a result came to a very different conclusion than the one *Callais* requires. Because that holding must be reconsidered in light of *Callais*, the Court should dissolve its injunctions.

## II.    Alternatively, The Court Should Stay Its Injunctions To Prevent Irreparable Harm.

In the alternative, the Court should stay the injunctions because the Secretary has shown that he is likely to succeed on the question before the Eleventh Circuit—

whether to vacate and remand in light of *Callais*—and the equities demand it.[2] No court has found that Plaintiffs have or could meet their burden under *Callais*, and thus no court has found that it is likely that Alabama's 2021 Senate Plan violates §2 under the proper standard. Yet Alabama remains enjoined.

At the Eleventh Circuit, Plaintiffs sought to defend the upside-down by citing the *Purcell* principle—the rule that *courts* should not "enjoin an impending election" at the last minute. CA11 No. 25-13007 Doc. 67 at 4 (quoting *Sw. Voter Registration Educ. Project v. Shelly*, 344 F.3d 914, 918 (9th Cir. 2003)); *see Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring) (collecting cases). But that was before the Supreme Court itself rejected the congressional plaintiffs' exact same argument and vacated and remanded in the congressional cases. And the Supreme Court's ruling there makes sense: *Purcell* is rooted in federalism principles and the recognition that States—though not courts—have the expertise necessary to determine how to conduct elections. As Justice Kavanaugh put it: "It is one thing for

---

[2] The Eleventh Circuit is likely to vacate because it sees itself as "a court of review, not a court of first view." *E.g.*, *Compulife Software v. Newman*, 959 F.3d 1288, 1307 (11th Cir. 2020) (remanding where district court "failed to make required factual findings and legal conclusions 'because of an erroneous view of the law'"). That principle has special force here for two reasons. First, "the parties had no occasion" to address the requirements of *Callais* before this Court. *United States v. Pickett*, 916 F.3d 960, 967 (11th Cir. 2019); *accord Anderson v. United States*, 835 F. App'x 999, 1002 (11th Cir. 2020); *Schumann v. Collier Anesthesia, P.A.*, 803 F.3d 1199, 1213 (11th Cir. 2015). Second, the Eleventh Circuit is especially "wary of diving head-first" into issues the district court has not considered when they "likely turn on fact- and context-intensive questions that the district court is better equipped to decide." *Callahan v. U.S. Dep't of Health & Hum. Servs.*, 939 F.3d 1251, 1265 (11th Cir. 2019).

state legislatures to alter their own election rules in the late innings and to bear the responsibility for any unintended consequences. It is quite another thing for a federal district court to swoop in and alter carefully considered and democratically enacted state election rules when an election is imminent." *Wisc. State Leg.*, 141 S. Ct. at 31 (Kavanaugh, J., concurring); *accord Gardner v. Henderson*, No. 2:26-CV-00084-RJS-JCB, 2026 WL 496448, at *16 (D. Utah Feb. 23, 2026) (3-judge court) (Tymkovich, J., concurring) ("*Purcell*, while commonly justified by anti-disruption principles, is also grounded in a federalism principle—protecting states' constitutional interest under the Elections Clause in governing their own elections."). This case is thus the opposite of *Purcell*: the Secretary asks this Court to vacate or stay an injunction, not to impose one.

## CONCLUSION

For these reasons, the Secretary respectfully asks the Court to (1) dissolve its injunctions (Docs 274 & 322) or (2) stay the injunctions pending appeal.

23

Steve Marshall
  *Attorney General*

s/ A. Barrett Bowdre
A. Barrett Bowdre (ASB-2087-K29V)
  *Solicitor General*

James W. Davis (ASB-4063-I58J)
Brenton M. Smith (ASB-1656-X27Q)
  *Deputy Attorneys General*

Richard D. Mink (ASB-4802-M76R)
Misty S. Fairbanks Messick (ASB-1813-T71F)
Benjamin M. Seiss (ASB-2110-O00W)
  *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Barrett.Bowdre@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Richard.Mink@AlabamaAG.gov
Misty.Messick@AlabamaAG.gov
Brenton.Smith@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov

Michael P. Taunton (ASB-6833-H00S)
Riley Kate Lancaster (ASB-1002-X86W)
BALCH & BINGHAM LLP
1901 Sixth Avenue North, Suite 1500
Birmingham, Alabama 35203
Telephone (205) 251-8100
MTaunton@Balch.com
RLancaster@Balch.com

***Counsel for Secretary of State Allen***

24

**CERTIFICATE OF SERVICE**

I certify that on May 12, 2026, I electronically filed the foregoing notice with the Clerk of the Court using the CM/ECF system, which will send notice to all counsel of record.

s/ A. Barrett Bowdre
*Counsel for Secretary of State Allen*