FILED
2026 Oct-30 PM 04:56
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **ALABAMA STATE CONFERENCE OF THE NAACP, ET AL.,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Case No. 2:21-cv-01531-AMM** |
| **WES ALLEN, IN HIS OFFICIAL CAPACITY AS ALABAMA SECRETARY OF STATE ,** | ) | |
| **Defendant.** | ) | |

# SECRETARY OF STATE'S POST-REMAND BRIEF

# TABLE OF CONTENTS

TABLE OF CONTENTS .......... i

INTRODUCTION .......... 1

STATEMENT OF THE CASE .......... 4

A. Alabama enacts the 2021 State Senate Map. .......... 4

B. The Court enjoins use of the 2021 Plan under §2 of the Voting Rights Act. .......... 5

C. The Court requires Alabama to use a court-imposed map. .......... 10

D. The Supreme Court decides *Louisiana v. Callais*, and the Eleventh Circuit vacates this Court's injunctions against the Secretary. .......... 11

ARGUMENT .......... 13

I. Plaintiffs' Section 2 Claim Does Not Survive The First *Gingles* Precondition Because Their Illustrative Plan Does Not Meet All Of the State's Districting Objectives And It Was Drawn Using Race. .......... 13

A. Plaintiffs' illustrative map does not achieve all of the Legislature's districting objectives, including its specified political goals, just as well as the 2021 Plan. .......... 14

1. Incumbency Protection .......... 15

2. Communities of Interest .......... 16

3. Core Retention .......... 17

B. Plaintiffs' cannot retroactively rely on remedial-phase maps as Gingles I illustrative maps .......... 18

C. Callais rejects—not justifies—Plaintiffs' undeniable use of race in their map-drawing process. .......... 20

II. Plaintiffs' Inability To Disentangle Race From Politics Is Dispositive Of Their Section 2 Claim Under The Updated Second And Third *Gingles* Preconditions. ....25

III. The Record Lacks Evidence Of Present-Day Intentional Racial Discrimination Regarding Voting By The State To Allow For An Inference Of Racial Discrimination Under Section 2. ....33

A. Callais requires a strong inference that intentional discrimination occurred when drawing the challenged plan. ....34

B. The record does not support a strong inference that the 2021 Senate Plan was the result of intentional racial discrimination. ....35

CONCLUSION ....43

CERTIFICATE OF SERVICE ....45

## INTRODUCTION

In 2025, this Court enjoined Alabama's 2021 State Senate Plan under §2 of the Voting Rights Act by accepting "tradeoffs" between legitimate districting objectives regardless of the Legislature's specified goals, holding map-drawers to a racial "predominance" standard, eschewing the need to separate race from politics, giving great weight to instances of past discrimination, and setting aside evidence that the current-day political process is equally open to black Alabamians. *See generally Ala. State Conf. of the NAACP v. Allen*, 796 F. Supp. 3d 759 (N.D. Ala. 2025), *vacated and remanded Ala. State Conf. of the NAACP v. Allen*, No. 25-13007, 2026 WL 1649570 (11th Cir. June 8, 2026) (per curiam). Since then, the Supreme Court decided *Louisiana v. Callais*, 608 U.S. 85 (2026), and *Allen v. Milligan*, 608 U.S. 511 (2026) (per curiam), establishing a new standard for evaluating §2 claims. Plaintiffs' claim fails under that standard.

In *Callais*, the Supreme Court addressed issues that Alabama raised in this litigation but had "never [been] decided," 608 U.S. at 99. In so doing, the Court overhauled the law that governs §2 cases—so much so that an injunction against Louisiana's 2022 map and affirmed by the Fifth Circuit in 2023 had become "easily" wrong under "the updated *Gingles* framework." *Id.* at 122. The Court explained that, "*properly construed*," *id.* at 93, "the focus of §2 must be enforcement of the Fifteenth Amendment's prohibition on *intentional* racial discrimination," *id.* at 113. "While

that interpretation does not demand a finding of intentional discrimination," the Court said, §2 "imposes liability only when the circumstances give rise to a *strong inference* that intentional discrimination occurred." *Id.* (emphasis added). The Court also emphasized that the intentional discrimination must relate to the challenged redistricting plan, not something else: "§2 imposes liability only when the evidence supports a strong inference that the State intentionally *drew its districts* to afford minority voters less opportunity because of their race." *Id.* at 116 (emphasis added). Applied here, that means Plaintiffs can prevail only if the "evidence supports a strong inference" that the Legislature drew the 2021 Senate Plan for a discriminatory purpose. They cannot.

In refocusing the §2 test on intentional discrimination, the Supreme Court updated every element of the *Gingles* preconditions as well as the focus of the totality-of-the-circumstances inquiry. *Id.* at 116-18. Under the updated first *Gingles* precondition, a plaintiff's illustrative map must satisfy *all* of the State's legitimate districting objectives and can no longer make trade-offs between the Legislature's specified political goals. *Id.* at 118-19; *see Allen*, 608 U.S. at 514 (courts must "deny relief unless the plaintiffs' alternative map performed 'just as well' with respect to *all* of the State's constitutionally permissible districting criteria"). Not only that, but a plaintiff's map-drawer is prohibited from using race as a districting criterion, even if the criterion did not "predominate." *Callais*, 608 U.S. at 119. Plaintiffs fail both

conditions: their map-drawer failed to meet the State's districting objectives like core retention and protecting incumbents, and he used race as a criterion.

Under the updated second and third *Gingles* preconditions, a plaintiff cannot successfully demonstrate racially polarized voting without controlling for party affiliation and disentangling race from politics. *Id.* at 119-20. As the Supreme Court explained, "the mere fact that voters of different races vote for different parties is not relevant to proving racially polarized voting patterns." *Allen*, 608 U.S. at 514. But here, Plaintiffs were unable to separate racial bloc voting from partisan bloc voting, and this Court affirmatively found that it "cannot separate voters' racial considerations from their party affiliations." *Ala. NAACP*, 796 F. Supp. 3d at 865. That

Finally, under the totality-of-the-circumstances inquiry, a plaintiff can no longer rely on instances of past discrimination in general but must instead present evidence of present-day intentional discrimination concerning voting. *Callais*, 608 U.S. at 120-21. Yet Plaintiffs in this case continue to focus on Alabama's distant history and disparate facts that *Callais* said deserve little weight under this inquiry.

Plaintiffs claim to have anticipated "higher evidentiary burdens than were necessary in the pre-*Callais* framework" considering Alabama's litigation defenses. Doc. 357 at 7. Yet they continue to rely on an obsolete §2 standard, and their evidence cannot survive the correct standard under *Callais*. This Court should thus reject their remaining claim and enter judgment for the Secretary.

## STATEMENT OF THE CASE

### A. Alabama enacts the 2021 State Senate Map.

Following the 2020 Census, the Alabama Permanent Legislative Committee on Reapportionment enacted guidelines for the 2021 redistricting cycle and began drawing new districts for State and federal offices. Doc. 230 ¶¶ 17, 29. The 2021 Redistricting Guidelines set forth several of the Legislature's objectives and political goals in the districting process, including protecting incumbents, respecting "communities of interest," and preserving the cores of existing districts. Doc. 190-21. In September 2021, the Committee held 28 public hearings across the State. Doc. 230 ¶ 31. Governor Kay Ivey called a Special Legislative Session on redistricting to begin that October. *Id.* ¶ 33.

The Reapportionment Committee's expert cartographer was Randy Hinaman. "Mr. Hinaman testified that he began drawing the 2021 Plan by using the 2017 Senate plan that was enacted after the *Alabama Black Legislative Caucus* litigation."[1] *Ala. NAACP*, 796 F. Supp. 3d at 778 (citing Doc. 235-2 at 30). He further "testified that he prioritized preserving the cores of the existing districts, and that he drew the map 'race blind,' only reviewing the racial makeup of the districts after the Plan was

---

[1] Plaintiffs in the *ALBC* litigation "posed no objection to the majority-black districts" in the 2017 remedial plan enacted by the Legislature. *See Ala. Legislative Black Caucus v. Alabama*, 2017 WL 4563868, at *1 (M.D. Ala. Oct. 12, 2017). That is, the parties agreed that the Legislature "cure[d]" any constitutional violation found in *ALBC*. *Id.* Thus, the starting point for the 2021 Senate Plan was a plan that just four years earlier was held to be constitutional. *Id.*

completed." *Id.* at 778-79 (internal record citations omitted). "After he drew the Plan, he reviewed the racial data of the districts—that is, the BVAP of the districts—to 'mak[e] sure that they still looked like they would function as a majority[-B]lack district.'" *Id.* at 818 (internal record citations omitted) (alterations in original). "Mr. Hinaman made no changes to the Plan after reviewing data related to race." *Id.* at 819 (citing doc. 235-2 at 51, 55-56).

On November 1, 2021, the Senate passed the State Senate map (the "2021 Plan") along party lines. Doc. 230 ¶ 47. Three days later, Governor Ivey signed the Plan into law. *Id.* ¶ 48; *see* Ala. Act No. 2021-558, codified at Ala. Code §29-1-2.3. The 2021 Plan has eight majority-black Senate districts. Doc. 126 ¶ 172.

### B. The Court enjoins use of the 2021 Plan under §2 of the Voting Rights Act.

In November 2021, Plaintiffs filed suit challenging the 2021 Plan. Under the operative complaint, doc. 126, Plaintiffs alleged that the Plan diluted black voting power in violation of §2 by not including "ten Alabama Senate Districts in which Black voters constitute the majority" and requested additional majority-BVAP Senate Districts in the Montgomery and Huntsville regions. Doc. 126, ¶¶ 2–4, 172.

Following trial, on August 22, 2025, the Court held that the configuration of Districts 25 and 26 in the Montgomery area violated §2, but that Plaintiffs failed to meet their burden under §2 as to the Huntsville area. *Ala. NAACP*, 796 F. Supp. 3d at 769.

**1.** The Court's opinion recounts how the State's Senate map has had eight majority-black districts since the 1990s, *id.* at 796, and how a three-judge court found that the Senate plan enacted after the 2010 census did not violate §2, *id.* at 775 (citing *Ala. Legislative Black Caucus v. Alabama*, 989 F. Supp. 2d 1227, 1280-87 (M.D. 2013)). Relevant here, the *ALBC* district court held that the plaintiffs there could not satisfy the totality of the circumstances portion of the *Gingles* test in 2013 because (1) "black voters in Alabama are highly politically active," (2) "black voters have successfully elected the candidates of their choice in the majority-black districts," (3) "the majority-black districts are roughly proportional to the black voting-age population in Alabama," and (4) "the record contains no evidence of racial appeals in recent political campaigns or of a significant lack of responsiveness to the needs of the black population." 989 F. Supp. 2d at 1286. In sum, the court found, "the overwhelming evidence" showed "that black voters have an equal opportunity to participate in the political process the same as everyone else." *Id.* at 1287. The *ALBC* court ultimately blessed the State's remedial plan in 2017, which formed the core of the districts in the 2021 State Senate Plans, including those in the Montgomery area. *See* ECF 372, *ALBC*, 12-cv-00691-WKW-MHT-WHP (M.D. Ala. Oct. 12, 2017).

In the very next redistricting cycle, this Court held that the State's failure to draw a second majority-black district in the Montgomery area violated §2. *See Ala.*

*NAACP*, 796 F. Supp. 3d at 769. Under *Gingles* I, as interpreted pre-*Callais*, the Court found that "Black voters comprise[ ] a voting-age majority in plaintiffs' Montgomery-area illustrative district" and that the district was "reasonably configured," and the Court rejected the Secretary's argument that race predominated in the drawing of Plaintiffs' illustrative district. *Id.* at 770. Under *Gingles* II and III (again, pre-*Callais*), the Court found that "patterns of racially polarized voting are apparent in Alabama elections" and rejected the Secretary's argument that these voting patterns "are attributable *only* to voters' political party affiliations, divorced from considerations of race." *Id.* The Court then turned to the totality of the circumstances, which it found "supports Section Two relief." *Id.*

**2.** When the Court ruled, it did so without the benefit of *Callais*. So perhaps understandably, the Court discounted evidence that is now dispositive under the new standard. When analyzing *Gingles* I, for example, the Court found no issue in Plaintiffs' map drawer, Anthony Fairfax, using race in developing the illustrative plan so long as "race did not predominate." *Id.* at 853. The Court thus discarded as immaterial evidence of Mr. Fairfax's use of race throughout the process. *See, e.g.*, *id.* (recounting Mr. Fairfax's testimony that he reviewed race "at the beginning of the process … but then 'turned it off'" except to "later check[ ]" it "periodically 'to see if he met the sufficiently large component'" (alterations accepted)). The Court likewise blessed Mr. Fairfax's stated goal of producing an illustrative plan that added

majority-black districts "without eliminating any of the eight existing majority Black Senate Districts." Doc. 206-6 ¶ 55.

For *Gingles* II and III, the Court held that it was not required to "disentangle party and race," *Ala. NAACP*, 796 F. Supp. 3d at 857, and thus found that "the Secretary's argument that patterns of racially polarized voting in Alabama [as being] attributable more to political party affiliations than to race" was irrelevant, *see id.* Nor was the Court concerned that Plaintiffs' expert on racially polarized voting, Dr. Baodong Liu, examined only biracial elections in which the black candidate was running as a Democrat and the white candidate was running as a Republican. Doc. 264 at 92-93, 117; Doc. 259 at 1459:5-13; Doc. 189-1 at 13 ¶ 25. While the Secretary presented evidence that party identity was "the single biggest determinant of vote choice in American politics," *id.* at ¶ 22, Dr. Liu failed to control for political party even as he agreed that racially polarized voting could have multiple causes that have little to do with race or discrimination, Doc. 264 at 97.

Last, on the totality of the circumstances, the Secretary contested Plaintiffs' focus on evidence of historic discrimination and socioeconomic disparities and instead emphasized black Alabamians' *present-day* participation in the political process. That evidence of present-day participation showed that:

- in Montgomery County in 2022, "the Black voter registration rate was 1.3 percentage points higher than the White registration rate," doc. 206-11 at 5;
- the black voter registration rate statewide had grown from 23.5% in 1965 to 95.2% as of 2024, *Ala. NAACP*, 796 F. Supp. 3d at 835; doc. 189-5 at 22;
- there were zero black State legislators in 1965, but 33 today, *Ala. NAACP*, 796 F. Supp. 3d at 835; doc. 189-5 at 23;
- each of Plaintiffs' witnesses had long been able to participate in the political process in Alabama, *e.g.*, Doc. 255 515:11-25; Doc. 264 194:12-23; and
- the socioeconomic disparities identified by Plaintiffs existed in every State with a substantial black population—regardless of geography, political alignment, or any other variable—and, in many cases, Alabama's disparities were smaller than the average, doc. 265 at 809-10; doc. 189-5 at 20.

Not having the guidance provided by *Callais*, the Court gave substantial weight to instances of discrimination that occurred long ago and socioeconomic disparities it said were "traceable to Alabama's lengthy history of official discrimination." *Ala. NAACP*, 796 F. Supp. 3d at 871. The Court "emphatically rejected" the

Secretary's evidence of modern political participation by black Alabamians as irrelevant, *id.* at 869; gave weight to instances of discrimination from decades ago, *id.*; held instances of discrimination by political *subdivisions* against the *State*, *e.g., id.* at 868; and found Plaintiffs' expert testimony on the lingering effects of discrimination and their impact to be both substantial and "near-obvious," *id.* at 870-71.

**3.** The Court permanently enjoined the Secretary from conducting future elections under the 2021 Plan and ordered remedial proceedings for a new Senate plan. *Id.* at 770. According to the Court, any remedial plan had to "include an additional district in the Montgomery area in which Black voters either comprise a voting-age majority or something quite close to it." *Id.*

### C. The Court requires Alabama to use a court-imposed map.

During remedial proceedings, the Court appointed a Special Master. *See* Doc. 302. The Special Master's report and recommendation included two proposed remedial plans drawn by the Special Master's cartographer and one proposed remedial plan submitted by a then-anonymous member of the public, "DD." Doc. 312 at 11-14. The Secretary objected that "[e]ach of the three proposed plans is a racial gerrymander" because each "was drawn with a racial target" considering the instruction to the Special Master to submit three plans that "include[ ] either an additional majority-black Senate district in the Montgomery area, or an additional district there in

which Black voters each have an opportunity to elect a Senator of their choice." Doc. 317 at 1; Doc. 307; *accord* Doc. 322 at 15.

The Court ordered the use of DD's map, which adjusted the boundaries of Senate Districts 25 and 26 to make both districts "Black-opportunity districts," and ordered the Secretary "to administer Alabama's 2026 and 2030 state Senate elections, as well as any special and other elections for the state Senate that occur before the Legislature passes a districting plan based on the 2030 census, according to" DD's remedial map. Doc. 322 at 25.

The Secretary appealed and asked the Eleventh Circuit to hold the appeal in abeyance until the Supreme Court issued its opinion in *Callais*. "No matter how the Supreme Court decides that case," the Secretary noted, "it will provide guidance about how Section 2 should apply here." *Ala. State Conf. of NAACP v. Sec'y of State of the State of Ala.*, No. 25-13007 (11th Cir.), CA11 doc. 60 at 10. The Court of Appeals agreed and stayed the case "until a decision is issued in *Louisiana v. Callais*." *Ala. State Conf. of NAACP*, No. 25-13007, CA11 doc. 61-1.

### D. The Supreme Court decides *Louisiana v. Callais*, and the Eleventh Circuit vacates this Court's injunctions against the Secretary.

The Supreme Court issued its decision in *Callais* on April 29, 2026, providing much-needed guidance on §2 and significantly "updat[ing] the [*Gingles*] framework so it aligns with the statutory text and reflects important developments since [the Court] decided *Gingles* 40 years ago." *Callais*, 608 U.S. at 116.

Parallel with the State Defendants' efforts in the congressional cases before the Supreme Court, the Secretary in this litigation moved the Eleventh Circuit to vacate and remand this Court's injunctions in light of *Callais* or, in the alternative, to stay them. *See* CA11.DE65-1. After the Supreme Court vacated the pre-*Callais* injunctions and then stayed the post-*Callais* injunctions in the congressional cases, *see Allen*, 608 U.S. at 513, 515, the Eleventh Circuit stayed the injunction here, *see Ala. State Conf. of NAACP*, No. 25-13007, CA11 Doc. 81. The Court of Appeals held that the Secretary was entitled to relief because (1) he "will succeed in vacating the injunctions," *id.* at 5, (2) the "district court's injunctions irreparably harm the state because they prohibit it from conducting the senate elections under the 2021 map approved by the people through their elected representatives," *id.*, (3) Plaintiffs "have not shown they are likely to succeed on their section two claim after *Callais*," *id.* at 6, and (4) "the public interest lies in electing the public's representatives with the public's chosen map over the new one imposed by the district court," *id.* at 7.

On June 8, 2026, the Eleventh Circuit vacated and remanded the injunctions "for the district court to give these cases further consideration in light of *Callais* and *Milligan*." *Ala. State Conf. of NAACP*, No. 25-13007, CA11 Doc. 86 (citing *Callais*, 146 S. Ct. at 1136, and *Allen*, 608 U.S. 511).

## ARGUMENT

### I. Plaintiffs' Section 2 Claim Does Not Survive The First *Gingles* Precondition Because Their Illustrative Plan Does Not Meet All Of the State's Districting Objectives And It Was Drawn Using Race.

"The first *Gingles* precondition is that a community of minority voters must be sufficiently numerous and compact to constitute a majority in a reasonably configured district." *Callais*, 608 U.S. at 118-19. Before *Callais* significantly updated this precondition, courts could find that a §2 plaintiff met this requirement simply by offering "illustrative maps with their desired number of majority-minority districts." *Id.* at 119. After *Callais*, such maps "are not alone sufficient" because "[t]hey prove only that the State *could* create an additional majority-minority district, not that the State's failure to do so violated §2 of the Voting Rights Act." *Id.* at 119. Thus, the *Callais* Court clarified that to satisfy *Gingles* I, (1) "illustrative maps must meet all the State's legitimate districting objectives, including traditional districting criteria and the State's specific political goals," and (2) "in drawing illustrative maps, plaintiffs cannot use race as a districting criterion" because "an illustrative map in which race was used has no value in proving a §2 plaintiff's case." *Id.* at 119. A map that fails to accomplish both *Gingles* I requirements "fail[s] to demonstrate that the State's chosen map was driven by racial considerations rather than permissible aims" and thus cannot prove a §2 claim. *Id.*

Plaintiffs' illustrative plan failed to satisfy these requirements because it did not "perform[ ] 'just as well' with respect to *all* of the State's constitutionally permissible district criteria," *Allen*, 608 U.S. at 513, and instead made "tradeoffs" while attempting to "balance"—not meet—the State's objectives, *see Ala. NAACP*, 796 F. Supp. 3d. at 853. It also improperly used race in a way the State could not.

### A. Plaintiffs' illustrative map does not achieve all of the Legislature's districting objectives, including its specified political goals, just as well as the 2021 Plan.

In satisfying all of "the State's legitimate districting objectives," Plaintiffs "must achieve these goals *just as well*" as the State's 2021 Plan does. *Callais*, 608 U.S. at 119 (emphasis added).

Plaintiffs' map drawer, Mr. Fairfax, "testified that he followed five traditional redistricting criteria when drawing the plans," but only "*attempted*" to do so for "other criteria found in the Legislature's redistricting guidelines." *Ala. NAACP*, 796 F. Supp. 3d. at 853. "'[T]here are always tradeoffs' when drawing a map," he explained, *id.*, revealing his failure to "achieve" "all the State's legitimate objectives" with his map in which he prioritized drawing a majority-black district at the expense of the State's neutral redistricting goals, *Callais*, 608 U.S. at 118-19. Such tradeoffs do not survive *Gingles* I after *Callais*. *See id.*

**1. Incumbency Protection**

One of the Legislature's express political goals was incumbency protection. *See Ala. NAACP*, 796 F. Supp. 3d. at 776. Every Senator of both parties was given an opportunity to impact the shape of their specific district. State map-drawer Randy Hinaman described his process as beginning by meeting with Senators (before any changes were made), including at times with multiple Senators for "more complicated" changes or when "there was still not agreement on which precincts or which counties" would be affected. Doc. 235-2 at 32:2-21.

Unsurprisingly—particularly when paired with the State's goal of preserving district cores, which would preserve the cores of districts that elected the incumbents—the 2021 Plan protected incumbents by not drawing incumbents into unfavorable (and even less favorable) districts so that voters are "familiar with those people running for office." Doc. 235-1 at 35; *see id.* at 23, 31-32, 34-35; Doc. 235-2 at 33. While Plaintiffs did not consider such protection necessary, under *Callais*, the State is entitled to favor a map that protects its incumbents. It is immaterial that Plaintiffs did not *pair* incumbents in the districts at issue when the 2021 Plan also *protects* incumbents by allowing them to have direct input into the shape of their own districts to draw them favorably for their reelection. *Contra* Doc. 357 at 28-29 (narrowly construing the Legislature's goal to protect incumbents to the avoidance

of *pairing* incumbents only). Indeed, that was dispositive of the Supreme Court's §2 analysis of the *Robinson* plaintiffs:

> The *Robinson* court erroneously concluded that the plaintiffs' illustrative maps protected incumbents because the maps left all six Representatives "in the district where they currently live" and "could avoid incumbent pairing." That observation missed the point: An incumbent is not protected if he or she will lose re-election. And because the plaintiffs' illustrative maps failed to protect all the incumbents that the State sought to shield, the plaintiffs did not meet their burden on this precondition.

*Callais*, 608 U.S. at 123 (citation omitted). So here. Plaintiffs' failure to protect incumbents in their illustrative plan as well as the 2021 Plan is a dispositive and "obvious deficit." *Id.*

#### 2. Communities of Interest

Despite the Legislature's preference for "respecting communities of interest"—which was both included in the State's districting guidelines, *see Ala. NAACP*, 796 F. Supp. 3d. at 776, and verbally expressed to the Senate Chair and the State's map-drawer, *id.* at 819—Plaintiffs' illustrative map also failed to satisfy this goal. Instead, it connected "isolated rural black populations throughout the countryside that have little, if anything, in common with the urban Montgomery population." Doc. 251 ¶¶ 154–56; *see* Doc 235-1 at 34. At the same time, while the Legislature opposed further city splits, *see* doc. 251 ¶ 153, Plaintiffs' map split District 26 across Montgomery and Elmore Counties, and in so doing "created a new city split in Prattville in Senate District 26," *Ala. NAACP*, 796 F. Supp. 3d. at 853. And though

Elmore County was split in the 2021 Map between Districts 26 and 30, the only part of District 30 within Elmore County incorporated the portion of Prattville in that county, thereby avoiding a city split. Under *Callais*, Plaintiffs' disregard for a legitimate objective can no longer be justified as "logical." *See Ala. NAACP*, 796 F. Supp. 3d. at 854.

### 3. Core Retention

The 2021 Plan was a least-change map that prioritized core retention. *Id.* at 777. In particular, the Legislature recognized "preserv[ing] the cores of existing districts" as one of its "embedded" redistricting objectives. *Id*. Under *Callais*, "preserving the core of existing districts" is a "traditional districting factor[ ]" entitled to deference. 608 U.S. at 114.[2] Not only did that goal help protect incumbents—the districts had previously elected the incumbents, and so might reliably do so again—but making the 2021 Plan a "least-change" map was necessary due to six-month-late Census data creating "tight" timelines before the 2022 elections. *Ala. NAACP*, 796 F. Supp. 3d. at 819. And the Secretary later objected to certain remedial plans that did not "leave[ ] the greatest portion of the Legislature's plan in place." Doc. 317 at 5.

[2] Plaintiffs' reliance on *Milligan I* to read core retention out of *Gingles* I altogether, *see* doc. 357 at 23, is misplaced. First, *Callais* expressly endorses core retention. 608 U.S. at 114. Second, although *Callais* did not formally overrule *Milligan I*, it so thoroughly cabined that decision—confining it to Alabama's now-rejected "race-neutral benchmark" evidentiary argument and expressly reserving the questions that control here—that *Milligan I* retains little weight today, particularly on the issues *Callais* decided. *See Callais*, 608 U.S. at 121-22.

Nonetheless, Mr. Fairfax only "attempted to follow" this criterion, *Ala. NAACP*, 796 F. Supp. 3d. at 792, "accord[ing] it lower priority," Doc. 206-6 at 14, and preserving only 45.63% of District 25, 53.88% of District 26, and 62.27% of District 30, Doc. 164-8 at 113-14. Indeed, he was open about the fact that he subordinated the preservation of district cores to his use of race as a districting criteria, suggesting that preservation of district cores and compliance with the Voting Rights Act was an either/or proposition. *See* Doc. 164-13 at 109:2-21. *Callais* says otherwise. 608 U.S. at 114.

**B. Plaintiffs' cannot retroactively rely on remedial-phase maps as Gingles I illustrative maps.**

Given these deficiencies in their *Gingles* I map, Plaintiffs attempt to bolster their case by relying on post-trial *remedial* plans as evidence they met the *Gingles preconditions*. *See* Doc. 357 at 30. That is not allowed. For one, it is unfair to the Secretary. With the exception of Dr. Oskooii, none of the remedial map-drawers were examined or cross-examined on their process—a right the Secretary would not have forgone had the maps been introduced as trial evidence. For another, every one of the submitted remedial plans either did not draw District 25 with a black voting age population above 50%, or did so only by drawing District 26 below 50% black voting age population. Just as the proposed remedial plans were irrelevant in the Court's initial liability analysis, they are irrelevant now for *Gingles* I purposes.

These concerns are also true of the other remedial maps the court considered, including Remedial Plan 3. These maps were not presented as part of Plaintiffs' §2 case, so should play no role in the Court's liability finding. And—contrary to Plaintiffs' assertion (Doc. 357 at 38), the Secretary *never* conceded that Remedial Plan 3, or any of the proposed remedial plans, was drawn race-blind. Neither the then-anonymous drawer, D.D., nor the Special Master was examined on his map-drawing process. That D.D. claimed not to "display" race and the Special Master said that race did not predominate does not preclude the possibility that one or both of them drew an unconstitutional gerrymander, especially given that the Special Master was ordered to submit maps that hit a racial target, doc. 317 at 1. *Accord Callais*, 146 S. Ct. at 1162 (noting that "intentional compliance with the [district] court's demands constituted an 'express acknowledgment that race played a role in the drawing of district lines'"). Plaintiffs cannot retroactively rely on these remedial maps produced in very different ways for a very different context to launder away the issues posed by their illustrative maps.

In any event, even if remedial maps were considered at *Gingles* I, the burden would be on Plaintiffs to demonstrate that they meet the updated *Gingles* I standard—not on the Secretary to prove they don't. But Plaintiffs cannot meet that standard for many of the same reasons their own illustrative map fails: the remedial maps also do not "perform[ ] 'just as well' with respect to *all* of the State's constitutionally

permissible districting criteria" and political goals, *Allen*, 608 U.S. at 514, including incumbency protection, preservation of communities of interest, and core retention.

### C. Callais rejects—not justifies—Plaintiffs' undeniable use of race in their map-drawing process.

Plaintiffs' use of race as a districting criterion cannot be squared with *Callais*. The Supreme Court drew a clear line: a §2 plaintiff's map-drawer may be *aware* of racial demographics—and may even review a completed map's racial composition to confirm compliance with the Voting Rights Act—but he may not use race *as a districting criterion*. 608 U.S. at 119. So he cannot allow the pursuit of a racial outcome to drive his map-drawing decisions. *Id.* In that sense, *Callais* is a blanket bar; it admits no "permissible degree" to which a racial *goal* may guide a map-drawer's pen. *Contra* Doc. 357 at 33-34. *Callais* rejects the predominance standard previously applied by this Court and holds instead that an illustrative map in which race was used as a criterion "has no value in proving a §2 plaintiff's case." 608 U.S. at 119; *see id.* at 92-93 (noting that prior caselaw, abrogated by *Callais*, "posed the question whether race or politics was the State's 'predominant' motivation").

The question, then, is not whether Mr. Fairfax ever looked at race, but whether he used race as a criterion. He all but admitted he did.

*First*, all parties and the Court agree that Mr. Fairfax "reviewed race at the beginning of the process to see 'where the minority community exists.'" *Ala. NAACP*, 796 F. Supp. 3d at 791. While Mr. Fairfax's "awareness of the State's racial

demographics" is "not[ ] nefarious" on its own, Doc. 357 at 36 (quoting *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 37 (2024)), there is a difference between passive awareness of one's own State's demographics—as a State Legislature or local government is aware, *Shaw v. Reno*, 509 U.S. 630, 646 (1993)—and actively looking for black voters in preparation of drawing districts that hit a racial target. Plaintiffs cannot point to *Alexander* to avoid the fact that Mr. Fairfax began his map-drawing process by studying the districts' racial makeup and considered other race-neutral factors "only after" reviewing census data to see where black voters lived. Doc. 357 at 35; *Alexander*, 602 U.S. at 37 (noting the difference between awareness of racial demographics and use of demographics in map-making).

*Second*, race guided Mr. Fairfax's decision-making as he drew illustrative maps. He consulted racial data "periodically," or "every few minutes," *while drawing the map*. *Ala. NAACP*, 796 F. Supp. 3d at 791; Doc. 254 at 63. That is distinctly different from having a rough awareness of demographics *before* drawing and then using demographic data to describe (and determine whether to submit) a finished product *afterwards*. Race guided Mr. Fairfax's decisions from beginning to end. He testified that drawing a map "is a balancing act that you are trying to perform when you are drawing districts. And so you are balancing criteria, *but you are also using race*." Doc. 164-13 at 32:22-33:3 (emphasis added); *see also id.* at 301:4-20. That "use" of race is prohibited by *Callais*.

Indeed, Mr. Fairfax's "process … would be unconstitutional if a State engaged in such mapmaking." *Callais*, 608 U.S. at 119; *cf. Bush v. Vera*, 517 U.S. 952, 969-70 (1996) (plurality) (faulting use of race "[t]hroughout the course of the … process"). His tainted illustrative districts thus fail the updated *Gingles* test. Plaintiffs try to elide this distinction, but actively consulting racial demographic data "every few minutes" to determine where to draw lines on a map is using race as a redistricting criterion to sort voters by the color of their skin. That is a far cry from the permissible before- or after-the-fact awareness described by *Alexander*. 602 U.S. at 37. Treating such continuous, outcome-driven use as acceptable would be "the kind of 'exception' that goes pretty far toward swallowing the rule." *Cf. Cooper v. Harris*, 581 U.S. 285, 314 (2017).

*Third*, Mr. Fairfax expressly aimed to draw a new black-majority district without compromising existing race-based districts, thereby injecting *another* racial criterion into his process. *See* Doc. 206-6 at 33 (defending illustrative map because "it includes two additional majority Black Senate Districts that adhere to traditional redistricting criteria without eliminating any of the eight existing majority Black Senate Districts"). That goal is an "express acknowledgment that race played a role in the drawing of district lines." *Alexander*, 602 U.S. at 8; *accord Malliotakis v. Williams*, 146 S. Ct. 809 (2026) (Mem.) (Alito, J., concurring) (explaining that order "to draw a new congressional district for the express purpose of ensuring that

'minority voters' are able to elect the candidate of their choice" was "unadorned, racial discrimination, an inherently odious activity"); *Callais*, 608 U.S. at 122-23. It's also one that, coincidentally, gave rise to gerrymandering liability in *ALBC v. Alabama* when the State sought "to maintain roughly the same black population percentage in existing majority-minority districts" to comply with §5 of the VRA, as the State understood it. 575 U.S. 254, 259-60 (2015). If it's unconstitutional for the State to engage in such mapmaking, it's unlawful for §2 plaintiffs to do so. *Callais*, 608 U.S. at 119.

*Fourth*, Mr. Fairfax confirmed his use of race when he "testified that he 'tends to not consider race *as much as* the other redistricting criteria,'" *Ala. NAACP*, 796 F. Supp. 3d at 791 (alterations accepted) (emphasis added), which concedes that race was a considered criterion. Indeed, the Court's finding that Mr. Fairfax "did not *prioritize race over* other factors" recognizes that he used race as a map-drawing factor to some degree. *Ala. NAACP*, 796 F. Supp. 3d at 853 (emphasis added); Doc. 206-6 at 33. Even before *Callais*, a mapmaker would violate the Constitution for using "race as opposed to other, 'traditional' factors" regardless of whether race "takes ultimate priority." *ALBC*, 575 U.S. at 273; *see SFFA v. Harvard*, 600 U.S. 181, 230-31 (2023). Again, if the government cannot use race as a "tip" or a "plus," *SFFA*, 600 U.S. at 294 (Gorsuch, J., concurring), neither can Mr. Fairfax, *Callais*, 608 U.S. at 119.

*Fifth*, other evidence offers a strong inference that Mr. Fairfax used race to draw his illustrative map—the "baby dragon with an overbite in flight" that he offered as an additional black-majority district near Huntsville:



*Ala. NAACP*, 796 F. Supp. 3d. at 847. What but race explains this map, which the Court rightly rejected under *Gingles* I? *See id.* at 746-47. Yet Plaintiffs ask the Court to believe that someone who used race so obviously to draw a district in one part of the State did not use race when adding another majority-black district in a different part of the State. The suggestion blinks reality.

At bottom, Plaintiffs do not seriously challenge that Mr. Fairfax used race as a factor, but instead ultimately ask the Court to—in essence if not in name—fall back on the rejected "predominance" standard. But Plaintiffs cannot overcome *Callais*'s rejection of the predominance standard by relabeling the same idea as *Alexander*'s "impermissible" versus "permissible" uses of race. *Cf. Ala. NAACP*, 796 F. Supp. 3d at 853 (finding that Mr. Fairfax "was race-aware to the degree the law

allows”). As explained above, the two are not the same, and while “existing case law” once allowed the use of race in non-predominant ways, *Callais*, 608 U.S. at 91, *Callais* corrected course, *id.* at 99-101 (citing, *inter alia*, *SFFA*, 600 U.S. at 206). So should this Court.

## II. Plaintiffs’ Inability To Disentangle Race From Politics Is Dispositive Of Their Section 2 Claim Under The Updated Second And Third *Gingles* Preconditions.

“To satisfy the second and third preconditions—politically cohesive voting by the minority and racial-bloc voting by the majority—the plaintiffs must provide an analysis that controls for party affiliation.” *Callais*, 608 U.S. at 119-20. It is *Plaintiffs’* burden to demonstrate that their rights are “den[ied] or abridge[d] … on account of race or color,” 52 U.S.C. §10301(a), “not just because of partisan affiliation,” *Callais*, 608 U.S. at 120.

Controlling for party is “critical for disentangling race and politics.” *Callais*, 608 U.S. at 120 (cleaned up). Although some pre-*Callais* decisions may have encouraged the Court to ignore this type of evidence, *see Ala. NAACP*, 796 F. Supp. 3d at 857 (reasoning that “the second and third *Gingles* preconditions do not require that the Court disentangle party and race”), *Callais* clarified that a §2 plaintiff’s failure to “disentangle race and politics” means his claim necessarily fails, 608 U.S. at 120 (cleaned up).

As the Supreme Court explained, "[w]hen the vast majority of voters, regardless of race, favors the same political party, a map that is disadvantageous for members of one racial group cannot be explained on the ground that it was drawn to favor a particular political party." *Callais*, 608 U.S. at 117. "But in a State" like Alabama "where both parties have substantial support and where race is often correlated with party preference, a litigant can easily exploit §2 for partisan purposes by 'repackag[ing] a partisan-gerrymandering claim as a racial-gerrymandering claim.'" *Id.* (quoting *Alexander*, 602 U.S. at 21) (alteration by the Court). Thus, "simply pointing to *inter*-party racial polarization proves nothing, because a jurisdiction may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact." *Id.* at 120 (internal quotation marks and citation omitted). So "the mere fact that voters of different races vote for different parties is not relevant to proving racially polarized voting patterns." *Allen*, 608 U.S. at 514.

Plaintiffs' evidence here thus "prove[s] nothing." *Callais*, 608 U.S. at 117. This Court already found that it "*cannot* separate voters' racial considerations from their party affiliations" based on this record. *Ala. NAACP*, 796 F. Supp. 3d. at 865 (emphasis added). The Court was clear about that when it weighed the evidence presented at trial:

> [The Court] acknowledges the well-known reality that party affiliations drive voting patterns, but it understands this evidentiary record as

> indicating that *the Court cannot separate voters' racial considerations from their party affiliations*, and that it must not ignore the role that voters' race plays in their partisan attachments.

*Id.* (emphasis added). Because *Callais* requires Plaintiffs to "disentangle race and politics," *Callais*, 608 U.S. at 120, and this Court found that Plaintiffs cannot do that, that finding is dispositive.

So it was in *Callais*. There, "the [district] court observed that black voters have been aligned with the Democratic party for decades and that issues discussed by that party appealed to black voters." 608 U.S. at 124. But, as the Supreme Court explained, "[t]hose observations should have undercut, not strengthened, any showing of intentional racial discrimination because race and politics are so intertwined." *Id.* And, the Court emphasized, it was not the *defendants'* burden to disprove intertwinement with patterns of "mere party politics," *contra Ala. NAACP*, 796 F. Supp. 3d. at 865, but the *plaintiffs'* burden to fully "control for partisan preferences," *Callais*, 608 U.S. at 124. If the two are "intertwined"—as they were in *Callais*, and as they are here—§2 liability is precluded. *Id.*

Nor can the limited evidence Plaintiffs offered about racially polarized voting that attempted to control for political party counteract the Court's existing finding. In explaining that a §2 plaintiff must control for party, *Callais* requires systematic evidence of intra-party racial-bloc voting, not stray anecdotes. 608 U.S. at 119-20. Yet Plaintiffs' expert, Dr. Liu, analyzed only biracial *general* elections in his

principal report and thus, at most, could demonstrate only that black voters in Alabama generally support Democrats while white voters in Alabama generally support Republicans. Doc. 189-9 at 4-5; *accord Callais*, 608 U.S. at 124; *Allen*, 608 U.S. at 514. But not only does a biracial election featuring a black Democrat against a white Republican fail to control for party (as *Callais* requires), it can also give the false impression that "what appears to be bloc voting on account of race" may, in reality, be "the result of political or personal affiliation of different racial groups with different candidates." *Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1225 (11th Cir. 2000). Under the updated *Gingles* II and III preconditions, Dr. Liu's principal analysis thus "proves nothing." *Callais*, 608 U.S. at 120.

Other than ripping isolated comments from a couple of lay witnesses out of context,[3] the only additional evidence that Plaintiffs can point to are the highly limited additional analyses that Dr. Liu conducted in his rebuttal report to oppose Dr. Bonneau's report and testimony. But Dr. Liu's rebuttal evidence is insufficient to satisfy the second and third *Gingles* preconditions because (1) most of the cited evidence "controls for partisanship" in name only, (2) isolated anecdotal evidence

[3] Plaintiffs suggest that Mr. McCollum's testimony that black voters tend to support black candidates proves their argument that voting patterns are governed by race, not issues or politics. Doc. 357 at 44. But perhaps black voters tend to support black candidates because most black voters are Democrats and most black candidates run as Democrats. Again, Plaintiffs make no effort to disentangle politics and race.

cannot carry a plaintiff's systematic burden, and (3) the Secretary's expert provided contrary, systematic evidence.

For instance, the 2019 and 2023 Montgomery mayoral elections relied on by Dr. Liu, *see* Doc. 357 at 43, are not adequate controls for partisanship. As the Secretary's expert Dr. Bonneau testified, nonpartisan elections often feature many of the same characteristics as partisan elections. Doc. 259 at 1469:14-17. In particular, voters were likely aware that Steven Reed (the same black candidate in both mayoral races, and son of long-time State Democratic Party leader Joe Reed), is a Democrat. *See* Doc 259 at 1457:20–1458:2, 1458:15-17.

Similarly, the 2008 Democratic Primary on which Dr. Liu relies, *see* Doc. 357 at 43, is insufficient in both scope and time to establish systematic bloc voting in Alabama State Senate elections today. Dr. Liu did not perform any racial analysis on that election but merely reported exit polling, *see* doc. 198 at 5, and—regardless—the election was from nearly 20 years ago. *Id.*

Nor do the 2024 Republican primary results that Plaintiffs invoke, *see* doc. 357 at 41-42, carry their burden. Plaintiffs cite the 2024 Republican primary election between Justin Castanza and Cedric Coley for Montgomery County Commission District 3 as evidence of racially suspect voting patterns (Doc. 357 at 41), but Mr. Coley himself testified at trial and disputed that characterization. *See* Doc. 258 at 1318:1–1319:17 ("Q. In your opinion, did race play a part in that election? A. No.");

*id.* (citing low voter turnout, campaign financing, name recognition, and the fact that the current officer holder endorsed Mr. Castanza as the "factors [that] mattered" in the outcome of the election). Plaintiffs also rely on the 2024 Republican primary elections for Congressional District 2, doc. 357 at 41-42, but similarly failed to analyze any circumstances around that election—such as the presence of incumbents, campaign financing, name recognition, endorsements, number of campaign events, or even whether the candidates withdrew from the primary prior to the election. And regardless, isolated primary returns simply do not establish the systematic, district-specific intra-party bloc voting that *Callais* requires before a federal court can overcome a sovereign's decisions about how to district. 608 U.S. at 119-20.

The remaining pieces of "evidence" Plaintiffs point to are isolated anecdotes that fall short of demonstrating the presence of systematic bloc voting. *See United States v. Charleston Cnty.*, 365 F.3d 341, 352-53 (4th Cir. 2004) (finding a county's "present[ation] of anecdotal evidence" concerning race and partisanship unpersuasive as a matter of "systematic proof"). If the anecdotal evidence Plaintiffs now offer were sufficient, *any* biracial primary election where the partisan majority failed to vote for the racial minority would be sufficient. Indeed, anecdotal information about even a single racist voter might be sufficient (or at least probative). If that were the case, *Callais* would have turned out differently. But the Supreme Court held that Section 2 demands more. *See Callais*, 608 U.S. at 119-20.

Moreover, though Plaintiffs didn't offer it, the record *does* contain evidence of systematic evidence controlling for partisan affiliation. Dr. Christopher Bonneau, for example, analyzed the 2022 elections to the Alabama House of Representatives and concluded that black Democratic candidates outperformed white Democratic candidates (though all Democrats tended to perform poorly). *See* Doc. 259 at 1417:19–1418:24. He did not see any evidence to suggest that black candidates performed more poorly on account of their race. *Id.* Dr. Bonneau also analyzed the Democratic primary election for House District 74 in 2022, in which a white Democratic candidate won the primary over a black Democrat in a majority black district, *id.* at 1419:8-25, and the Republican Primary Election for House District 73 in 2021, where a black Republican candidate won the primary over a white Republican candidate in a majority white district and then proceeded to win the General Election with nearly 75% of the vote over a white Democrat, *id.* at 1421:12–1422:16. That same black Republican, Kenneth Paschal, then won re-election in 2022 without any opposition. *Id.*[4]

Alabama has also demonstrated a willingness to promote black citizens to positions of leadership. Most prominently, Bill Lewis was appointed to Circuit Court

[4] While the *Milligan* Court initially described Paschall "as a 'unicorn,'" it acknowledged that "[p]reliminary results of the May 19 Republican primary indicate that Mr. Maurice McCaney, who is Black, was elected the Republican nominee in House District 1, which is majority-White; Mr. McCaney will not have Democratic opposition in the general election." *Singleton v. Allen*, 833 F. Supp. 3d 1222, 1262 (N.D. Ala. 2026), *stayed*, *Allen*, 608 U.S. 511.

Judge by a Republican Governor; was subsequently elected without opposition; and was then appointed by a Republican Governor to the Alabama Court of Civil Appeals. *Id.* at 1422:20–1423:14. This Court can take judicial notice that the story didn't stop there. *See* Fed. R. Evid. 201(b). Judge Lewis was then appointed by the Republican Governor to the Supreme Court of Alabama, then by President Trump—with the support of Alabama's Republican Senators—to the U.S. District Court for the Middle District of Alabama. *See Judge Bill Lewis*, United States District Court, Middle District of Alabama, *available at* https://www.almd.uscourts.gov/judges/bill-lewis (last visited Oct. 28, 2026).

Dr. Bonneau also analyzed straight-ticket voting in the State. As he explained, when voters cast a straight-ticket ballot, they are voting for the team, not the individual player. That is important here because straight-ticket voters make a decision based on party affiliation rather than the individual characteristics of any particular candidate, such as race. *See* Doc. 259 at 1424:17–1425:25. Dr. Bonneau found that about two-thirds of all Alabama voters in recent elections had voted by straight-ticket. *Id.* at 1426:1-14. He testified that his analyses of the percentage of Democrats casting ballots by straight-ticket voting—paired with his analysis demonstrating the high correlation between the black population of a county and the number of votes received by Democratic candidates, and the fact that black voters overwhelmingly identify with the Democratic Party—led him to conclude that a

significant percentage of black voters must be casting straight-ticket ballots for Democrats. *Id.* at 1441:7–1442:7; 1448:4-19; 1453:23–1454:12. This type of evidence shows that partisanship, not race, is controlling election outcomes in Alabama. *E.g.*, Doc. 259 at 1420:1–1421:1. Plaintiffs cannot succeed under *Gingles* II and III.

## III. The Record Lacks Evidence Of Present-Day Intentional Racial Discrimination Regarding Voting By The State To Allow For An Inference Of Racial Discrimination Under Section 2.

Though the Court need not reach the totality of the circumstances because Plaintiffs cannot advance beyond the *Gingles* preconditions, Plaintiffs fail here too. Notably absent from the record is any evidence demonstrating (1) "present-day intentional racial discrimination" that (2) is "regarding voting" and (3) is "by the State." *Callais*, 608 U.S. at 120, 124. These new requirements are worth emphasizing because, unlike in the past, the updated totality inquiry requires a focus on *present-day* intentional discrimination. *Id.* at 120. "Discrimination that occurred some time ago, as well as present-day disparities that are characterized as the ongoing 'effects of societal discrimination,' are entitled to much less weight." *Id.* "The focus of §2 must therefore be on 'current conditions,' not on 'decades-old data relevant to decades-old problems.'" *Id.* at 124 (quoting *Shelby County v. Holder*, 570 U.S. 529, 553 (2013)).

Consequently, the Court's previously-given credit to decades-old history and socioeconomic data, *Ala. NAACP*, 796 F. Supp. 3d at 857-74, is insufficient to carry

Plaintiffs' burden. These areas have little-to-no "bearing on what the Fifteenth Amendment prohibits: present-day intentional racial discrimination regarding voting." *Callais*, 608 U.S. at 120. Yet Plaintiffs rely on the same evidence today—including testimony from Alabamians attending segregated public schools decades ago and evidence of current disparities attributed to past discrimination—that has only a "remote bearing" on the question §2 asks. *Callais*, 608 U.S. at 120. As a result, their §2 claim fails.

### A. Callais requires a strong inference that intentional discrimination occurred when drawing the challenged plan.

Plaintiffs do not "c[o]me close to showing an objective likelihood that the State's challenged map was the result of intentional racial discrimination." 608 U.S. at 124. Simply cataloguing every possible instance of discrimination (intentional or not) by entities other than the Legislature in any context for the last century is not a strong basis to infer that "intentional discrimination occurred" *when the Legislature enacted the 2021 Plan*. *See id.*

Even Plaintiffs' more recent examples do not move the needle, because none bear on present-day intentional racial discrimination by the State in enacting the 2021 Plan—which is the ultimate question under *Callais*. *See* 608 U.S. at 120, 124. The Supreme Court was clear: the totality of the circumstances inquiry is relevant to demonstrating "an objective likelihood *that the State's challenged map* was the result of intentional racial discrimination." *Id.* at 124 (emphasis added). That is

because "§2 imposes liability only when the evidence supports a strong inference that the State intentionally drew its districts to afford minority voters less opportunity because of their race." *Id.* at 1157. Unrelated allegations of discrimination—or evidence regarding comments, however indefensible, made by a former legislator in unrelated legislation—therefore cannot carry Plaintiffs' burden to offer evidence warranting an inference *about the 2021 Plan*. *See, e.g.*, *City of Hammond, Indiana v. Lake County Board of Elections*, 179 F.4th 1100, 1108 (7th Cir. 2026) ("The Court's new understanding of §2 resolves this case: There is no evidence that Indiana's decision to implement *the Missouri Plan in Lake County* was the product of intentional racial discrimination." (emphasis added)).

The reconfigured totality test works in conjunction with the updated *Gingles* preconditions to smoke out (or not) an objectively reasonable inference of racial discrimination with respect to the specific plan being challenged. A §2 claim is no longer a box-checking exercise. No matter how many incidents of supposed discrimination Plaintiffs can list, if they do not ultimately bear on the question of discrimination in enacting the challenged plan, there can be no §2 liability for that plan.

**B. The record does not support a strong inference that the 2021 Senate Plan was the result of intentional racial discrimination.**

In their opening brief on remand, Plaintiffs never argue that there is a strong inference that the Legislature was guilty of intentional discrimination when it enacted the 2021 Plan. Instead, they stick stubbornly to their pre-*Callais* strategy of

cataloguing old, unrelated accusations of racial discrimination that have nothing to do with the challenged Plan.

The record evidence shows that the 2021 Plan was not driven by racial discrimination. As noted above, cartographer Randy Hinaman's starting point was the 2017 Senate Plan, a remedial plan that was blessed by a three-judge federal court and by the Alabama Legislative Black Caucus. *See* Doc. 235-2 at 30:8-16. Hinaman testified that he adjusted the plan "race-blind" and prioritized core preservation. *Ala. NAACP*, 796 F. Supp. 3d at 778-79 (citing Doc. 235-2 at 46-47). He looked at race only after the plan was drawn and made no changes to the plan after reviewing racial data. *Id.* Plaintiffs point to no evidence in the record showing that the Legislature intended to discriminate on the basis of race when passing the 2021 Senate Plan. That alone should end this case.

Instead, Plaintiffs point to unrelated evidence. That evidence boils down to an admittedly demeaning, but isolated, comment made over a decade ago by a former lawmaker who has not held office since 2014, doc. 357 at 48; Plaintiffs' disagreement with the Legislature's fiscal policy decisions concerning Medicaid, *id.* at 56-57; and similar examples. None of this evidence concerns redistricting or voting or sheds any light on why the Legislature drew the lines as it did for the 2021 Plan. But a §2 vote-dilution claim is meant to capture "circumstances giv[ing] rise to a *strong inference* that *intentional discrimination* occurred" in the challenged plan, *Callais*,

608 U.S. at 113 (emphasis added), not in old, isolated, and unrelated matters. And it certainly isn't meant to capture mere policy disagreements. *See City of Hammond*, 179 F.4th at 1108.

Indeed, even before *Callais*, the Eleventh Circuit taught that comments by former legislators unrelated to a challenged act have little to no probative value in determining whether *that act* was passed with a discriminatory purpose. In a challenge to Alabama's photo ID law, for instance, the plaintiffs pointed to one of the same comments Plaintiffs in this case rely upon. *See Greater Birmingham Ministries v. Secretary of State*, 992 F.3d 1299, 1306 (11th Cir. 2021) (referring to statements of then-Sen. Scott Beason). There, the comment was closer in time to the challenged act and the speaker was still in the Legislature when the photo ID law was passed. Nonetheless, the Eleventh Circuit ruled that the comment was not relevant to determining whether the Legislature enacted the law with a discriminatory purpose: "[W]e are confined to an analysis of discriminatory intent as it relates to [the photo ID law], and the statements Plaintiffs identify were not made about the law at issue in this case and thus do not evidence discriminatory intent behind it." *Id.* at 1323. While the Court's reasoning concerned *Arlington Heights*, the point applies just the same to §2 after *Callais*.

Nor can Plaintiffs point to anything from the challenges to Alabama's congressional districts that will help them here. It is a different plan, of course, but more

importantly, the Supreme Court has now held that Alabama is likely to prevail on the merits of both the §2 and intentional-discrimination claims after *Callais*. *See Allen*, 608 U.S. at 513-14. Nothing in *Milligan* supports a finding of §2 liability here.

The remainder of Plaintiffs' "recent" proof consists of litigation against *other* defendants—counties, municipalities, school boards, and other local bodies—each resolved on its own record, under its own facts, sometimes by consent, and never involving this Legislature. Those local matters are distinguishable and cannot be aggregated into an inference that *the State* "intentionally drew its districts to afford minority voters less opportunity because of their race." *Callais*, 608 U.S. at 116. Cataloguing unrelated conduct by unrelated actors is exactly the approach *Callais* forecloses. Yet that is precisely what Plaintiffs do, relying on the red herring that Alabama has had multiple "political subdivisions bailed into Section 3(c) preclearance." Doc. 357 at 47. But each one of the three cases Plaintiffs cite involved a municipality—not the State—that voluntarily agreed to Section 3(c) preclearance. *See Braxton v. Town of Newbern*, No. 23-CV-00127, 2024 WL 3519193, at *2-3 (S.D. Ala. July 23, 2024) (agreeing to a settlement with the bail-in remedy in a case in which municipality had not held municipal elections since 1965); *Jones v. Jefferson County Bd. of Educ.*, Case No. 2:19-CV-1821-MHH, 2019 WL 7500528, at *1 (noting that the court's order was entered pursuant to "the joint motion of the plaintiffs … and the defendants … to resolve the litigation,"); *Allen v. City of Evergreen*, Case.

No. 13-0107-CG-M, 2014 WL 12607819, at *1 (S.D. Ala. Jan. 13, 2014) (noting that "[p]ursuant to joint motions of the parties" the Court had previously "enjoined … use of the 2012 redistricting plan … unless and until defendants obtained Section 5 preclearance' and that—after *Shelby County v. Holder*—"[t]he parties agree that … limited coverage of voting changes under Section 3 is appropriate").

Plaintiffs also continue to point to socioeconomic gaps and claim that gaps in educational attainment or employment or car ownership or healthcare support a finding of §2 liability. *See* Doc. 357 at 50-57.[5] But this is precisely the type of evidence of "present-day disparities that are characterized as the ongoing 'effects of societal discrimination'" that *Callais* said was entitled to little weight. 608 U.S. at 120. That's because this type of evidence sheds no light on whether the Legislature intentionally discriminated in adopting the 2021 Plan. And while Plaintiffs continue to argue that there is no possible explanation for a socio-economic gap other than racial discrimination, they do not try to explain why those gaps occur in every State—or why Alabama's gaps are typically less severe than those in many blue states. *See* Doc. 189-5 at 1-20; Doc. 258 at 1232:17-24. New York's education

[5] Plaintiffs also mischaracterize much of this evidence, citing decades-old evidence as "recent"—*see* doc. 357 at 51 (citing decades-old cases and evidence concerning education); *id.* at 53-54 (citing decades-old evidence concerning segregation); *id.* at 55 (citing decades-old evidence concerning infrastructure projects)—and fundamentally mischaracterizing other evidence, *see id.* at 55-56 (characterizing evidence about public transportation funding as "*de jure* discrimination" without any record support, and where Ms. Branyon successfully ran for office on a platform to create a public transportation system (*cf.* doc. 265 at 863:24–866:13).

achievement gap is nearly twice the gap in Alabama, while Illinois' unemployment gap is 2.5 times the gap in Alabama, and New Jersey's vehicle ownership gap is twice Alabama's gap. Doc. 189-5 at 7-20.

Critical to the "totality of the circumstances" inquiry, Plaintiffs identify no present-day, State-imposed barrier to black political participation in Alabama, much less a barrier connected to the drawing of the Montgomery-area Senate districts. Plaintiffs' evidence instead resembles the "sordid history" and "disparities" evidence that was presented by the earlier *Robinson* plaintiffs in the Louisiana litigation and then rejected in round two by the Supreme Court in *Callais*. 608 U.S. at 124. The *Callais* Court found that the *Robinson* plaintiffs' evidence, "such as the low number of black Louisianians who have been elected to Congress in recent decades," failed to "disentangle race from politics" and thus failed to "show even a plausible likelihood of intentional discrimination by the State," *id.* (holding that "none of the historical evidence came close to showing an objective likelihood that the State's challenged map was the result of intentional discrimination."); *cf.* Supp. Br. for *Robinson* Appellants 46-47, *Callais*, No. 24-109 (U.S. Aug. 27, 2025).

Plaintiffs may also no longer downplay "the lack of evidence that black voters had faced intentional discrimination in recent years" in Alabama. 608 U.S. at 124. While the Court once "refuse[d]" to credit evidence of equal access on the logic that it would "give punitive effect to the political participation of Black Alabamians,"

*Ala. NAACP*, 796 F. Supp. 3d. at 870, the Supreme Court rejected that reasoning, *Callais*, 608 U.S. at 124. Instead, the Supreme Court said, strides in "eliminating racial discrimination in voting"—including those attributable to the Voting Rights Act itself—shed significant light "on current intentional discrimination." *Id.* at 120. The fact that "as a result of this progress, it is hard to find pertinent evidence relating to intentional present-day discrimination" is "cause for celebration," *id.*—not evidence to be dismissed as "punitive."

On the other side of the ledger, the Secretary presented considerable evidence that black Alabamians are fully able to vote and otherwise participate in the political process. The "circumstances" today are not at all "comparable to those in *White [v. Regester*, 412 U.S. 755 (1973)]," which involved districting schemes that had an invidious purpose and effect to diminish minority participation. *Callais*, 608 U.S. at 125. Even Plaintiffs' expert, Dr. Traci Burch, found that in 2022 in Montgomery County "the Black voter registration rate was 1.3 percentage points *higher* than the White registration rate." Doc. 206-11 at 5 (emphasis added). And the Secretary showed that (1) the statewide black voter registration rate had grown from 23.5% in 1965 to 95.2% as of 2024, Doc. 189-5 at 23; (2) there were zero black State Legislators in 1965, but 33 today, *id.* at 22; (3) the socioeconomic disparities identified by Plaintiffs existed in every State with a substantial black population—regardless of geography, political alignment, or any other variable—and, in many cases,

Alabama's disparities were smaller than the average, *id.* at 20; and (4) each of Plaintiffs' witnesses—including those who had experienced segregated education or other specific instances of discrimination—had long been able to participate in the political process in Alabama, *e.g.*, Doc. 255 at 515:11-25; Doc. 264 at 194:12-23.

This evidence matches much of the evidence the court in *ALBC* found persuasive when it refused to hold the successes of the VRA against Alabama. *See Ala. Legislative Black Caucus v. Alabama*, 989 F. Supp. 2d 1227, 1280-87 (M.D. 2013); *accord Callais*, 608 U.S. at 124 (holding that the *Robinson* court erred by "cast[ing] aside as 'irrelevant' the lack of evidence that black voters had faced intentional discrimination in recent years"). The *ALBC* court—considering §2 and constitutional challenges to Alabama legislative districts, just like this case—considered evidence of black Alabamians' political participation to be especially probative, ultimately holding that it foreclosed those plaintiffs' ability to show the totality of the circumstances. Specifically, it credited that (1) "black voters in Alabama are highly politically active," (2) "black voters have successfully elected the candidates of their choice in the majority-black districts," (3) "the majority-black districts are roughly proportional to the black voting-age population in Alabama," and (4) "the record contains no evidence of racial appeals in recent political campaigns or of a significant lack of responsiveness to the needs of the black population." *Id.* at 1286. In sum, "the overwhelming evidence" showed "that black voters have an equal

opportunity to participate in the political process the same as everyone else." *Id.* at 1287. To the extent the situation today is much different than 2013 (or 2017, when the *ALBC* court readopted its findings), it has only improved.

* * *

"The Fifteenth Amendment, which the Voting Rights Act enforces, 'is not designed to punish for the past' but works 'to ensure a better future.'" *Callais*, 608 U.S. at 124 (quoting *Shelby County*, 570 U.S. at 553). The Supreme Court thus updated the §2 inquiry to focus on "current conditions" and ask whether there is "an objective likelihood of intentional discrimination" in the State's Plan. *Id.* (citation omitted). The evidence here shows that when the Legislature enacted the 2021 Plan, it was business as normal, with minimum changes made to the court-blessed plan to account for changes in population and legislators' political priorities. Because "none of the historical evidence presented by [P]laintiffs [comes] close to showing an objective likelihood that the State's challenged map was the result of intentional racial discrimination," *id.*, Plaintiffs' §2 challenge fails.

## CONCLUSION

For these reasons, Plaintiffs' §2 challenge fails under *Callais*. The Court should vacate its injunctions and enter judgment for the Secretary.

Respectfully submitted,

Steve Marshall
*Alabama Attorney General*

s/ A. Barrett Bowdre
A. Barrett Bowdre
*Solicitor General*

Robert M. Overing
*Principal Deputy Solicitor General*

James W. Davis
Brenton M. Smith
*Deputy Attorneys General*

Misty S. Fairbanks Messick
Benjamin M. Seiss
*Assistant Attorneys General*

STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36104
Telephone: (334) 242-7300
Fax: (334) 353-8400
Barrett.Bowdre@AlabamaAG.gov
Robert.Overing@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Brenton.Smith@AlabamaAG.gov
Misty.Messick@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov

Michael P. Taunton
Riley Kate Lancaster
BALCH & BINGHAM LLP
1901 Sixth Avenue North
Suite 1500
Birmingham, Alabama 35203
Telephone (205) 251-8100
MTaunton@Balch.com

*Counsel for Secretary of State Wes Allen*

OCTOBER 30, 2026

## CERTIFICATE OF SERVICE

I certify that on October 30, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record in this case.

s/ A. Barrett Bowdre
*Counsel for Secretary of State Wes Allen*